# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SALEH, an individual residing in Sweden and Dearborn, Michigan; HAJ ALI SHALLAL ABBAS AL-UWEISSI, an individual residing in Iraq; JILAL MEHDE HADOD, an individual residing in Iraq; UMER ABDUL MUTALIB ABDUL LATIF, an individual residing in Iraq; AHMED SHEHAB AHMED, an individual residing in Iraq; AHMED IBRAHIEM NEISEF JASSEM, an individual residing in Iraq; ISMAEL NEISEF JASSEM AL-NIDAWI, an individual residing in Iraq; KINAN ISMAEL NEISEF AL-NIDAWI an individual residing in Iraq; ESTATE OF IBRAHIEM NEISEF JASSEM, the heirs and estate of Ibrahiem Neisef Jassem; MUSTAFA, an individual residing in Iraq; NATHEER, an individual residing in Iraq; OTHMAN, an individual residing in Iraq; HASSAN an individual residing in Iraq; and CLASSES OF PERSONS SIMILARLY SITUATED, KNOWN HEREINAFTER AS JOHN and JANE DOES NOS. 1 – 1050,<br>        Plaintiffs,<br><br>v.<br><br>TITAN CORPORATION, a Delaware Corporation; ADEL NAKHLA, a former Titan employee residing in Maryland; JOHN B. ISRAEL, a former Titan employee temporarily residing in Iraq; CACI INTERNATIONAL INC., a Delaware Corporation; CACI INCORPORATED – FEDERAL, a Delaware Corporation; CACI PREMIER TECHNOLOGY, INC., a Delaware Corporation; STEVEN A. STEFANOWICZ, a former CACI employee residing in Pennsylvania; TIMOTHY DUGGAN, a former CACI employee residing in Ohio, and DANIEL E. JOHNSON, a former CACI employee residing in the United States.<br>        Defendants. | Case No. 1:05-cv-1165 |

## THIRD AMENDED CLASS ACTION COMPLAINT

1.     This class action alleges that Defendants tortured and otherwise mistreated

Plaintiffs and the class of persons held at Abu Ghraib and other prisons in Iraq.  Defendants,

acting under the color of the United States authority, engaged in a series of wrongful acts – such as rape and assault – that seriously injured Plaintiffs and Class Members. Defendants' misconduct not only violated United States and international law, but also endangered American soldiers. Defendants' acts of torture and other mistreatment were not taken pursuant to any lawful orders or contracts issued by the United States military. This action seeks money damages (both compensatory and punitive) to compensate Plaintiffs and the Class Members who were tortured and treated in a cruel, inhuman and degrading manner by Defendants and their co-conspirators.

## PARTIES

2.    Plaintiff Saleh ("Plaintiff Saleh") is a Swedish citizen residing in both Sweden and Dearborn, Michigan. Plaintiff Saleh opposed Saddam Hussein, who had him imprisoned and tortured in the Abu Ghraib prison in Iraq. After being released from prison, Plaintiff Saleh fled from Iraq to Sweden. After the fall of the Hussein regime, Plaintiff Saleh responded to United States' plea for expatriates to return and help rebuild Iraq. Plaintiff Saleh returned to Iraq with funds to invest and rebuild the country. Upon his arrival on or about September 25, 2003, he was detained, sent to the same Abu Ghraib prison where he had been tortured by Saddam Hussein, and was tortured and otherwise mistreated by the Defendants and their co-conspirators. His prison number was No. 151183.

3.    Plaintiff Haj Ali Shallal Abbas Al-Uweissi ("Plaintiff Haj Ali") is an Iraqi who was arrested on or around October 15, 2003 and taken to Abu Ghraib prison and kept in Camp Vigilant and the cellblocks. His prison number was No. 151716. Plaintiff Haj Ali was tortured and otherwise mistreated by Defendants and their co-conspirators.

4.      Plaintiff Jilal Mehde Hadod ("Plaintiff Hadod") is an Iraqi who was arrested on or around October 1, 2003 and taken to Abu Ghraib prison, and kept in the cellblocks. His prison number was No. 151073. Plaintiff Hadod was tortured and otherwise mistreated by Defendants and their co-conspirators.

5.      Plaintiff Umer Abdul Mutalib Abdul Latif ("Plaintiff Umer") is a young Iraqi and resident of Baghdad who was arrested on or around July 11, 2003 and imprisoned in a series of prison facilities until he was released without charge on or around October 4, 2003. His prison number was No. 117631. Plaintiff Umer was tortured and otherwise mistreated by Defendants and their co-conspirators.

6.      Plaintiff Ahmed Shehab Ahmed ("Plaintiff Shehab") is an Iraqi and resident of Baghdad who was arrested on or around December 29, 2003 and released without charge on or around January 6, 2004. Plaintiff Shehab was tortured and otherwise mistreated by Defendants and their co-conspirators.

7.      Plaintiff Ahmed Ibrahiem Neisef Jassem ("Plaintiff Ahmed") is an Iraqi released without charge after five months of imprisonment in Abu Ghraib Prison, Tent No. 7, Camp No. 3. His prison number was No. 154120. Plaintiff Ahmed was tortured and otherwise mistreated by Defendants and their co-conspirators.

8.      Plaintiff Ismael Neisef Jassem Al-Nidawi ("Plaintiff Ismael") is an Iraqi released without charge on or around June 6, 2004, after months of imprisonment in Abu Ghraib Prison, Tent No. 7, Camp No. 3 and Bucca Prison. His prison number was No. 154115. Plaintiff Ismael was tortured and otherwise mistreated by deendants and their co-conspirators.

9.      Plaintiff Kinan Ismael Neisef Al-Nidawi ("Plaintiff Neisef") is an Iraqi who was detained for seven months in Abu Ghraib Prison and Bucca Prison. His prison number was No.

154110.  Plaintiff Neisef was tortured and otherwise mistreated by Defendants and their co-conspirators.

10.    Plaintiff Estate of Ibrahiem Neisef Jassem ("Ibrahiem Estate Plaintiff") is the estate and heirs of Ibrahiem Neisef Jassem ("Ibrahiem"), a 63-year old man who died in Abu Ghraib Prison as a result of acts and inactions by Defendants and their co-conspirators. Ibrahiem's prison number was No. 154111.

11.    Plaintiffs Mustafa, Natheer, Othman, and Hassan (the "July 2004 Torture Victims") were detained on or around July 12, 2004 and released without charge on or around July 26, 2004.  They were kept in wooden boxes near an airport and were tortured and otherwise mistreated by Defendants and their co-conspirators.

12.    Plaintiffs John and Jane Does Nos. 1-100 are persons other than United States citizens who (a) were robbed or imprisoned in prisons or facilities in or around Iraq under the control of the United States forces; (b) were tortured and otherwise mistreated by Defendants and their co-conspirators in a manner that violates United States and international law; and (c) suffered injuries to their persons and properties as a result. (This class shall hereinafter be known as the "RICO Class.")

13.    Plaintiffs John and Jane Does Nos. 101-1000 are persons other than United States citizens who (a) were imprisoned in prisons or facilities in or around Iraq under the control of the United States forces; (b) were tortured and otherwise mistreated by Defendants and their co-conspirators in a manner that violates United States and international law; and (c) suffered injuries to their persons as a result.  (This class shall hereinafter be known as the "Common Law Class.")

14.    Plaintiffs John and Jane Does Nos. 1001-1050 are the estates and heirs of persons other than United States citizens who (a) were imprisoned in prisons or facilities in or around Iraq under the control of the United States forces; (b) were tortured and otherwise mistreated by Defendants and their co-conspirators in a manner that violates United States and international law; and (c) wrongfully died as a result.  (This class shall hereinafter be known as the "Wrongful Death Class.")

15.    Defendant Titan Corporation (hereinafter "Defendant Titan") is a publicly traded corporation with headquarters located at 3033 Science Park Road, San Diego, California 92121-1199.  Defendant Titan Corporation was formed and incorporated under the laws of Delaware. Defendant Titan Corporation's subsidiaries, corporate agents, employees, and any other person or entity acting on behalf of Titan Corporation are hereinafter subsumed within the term "Defendant Titan."

16.    Defendant Titan Corporation received millions of dollars from the United States in exchange for providing the United States Army and others with translators to translate interrogations and other interactions in the prisons under United States' control.  Defendant Titan Corporation is responsible for the actions taken by its translators in these prisons.

17.    Defendant Titan Corporation is responsible for the actions of Defendant Nakhla, Defendant Israel and the other employees who tortured and otherwise mistreated Plaintiffs and Class Members.  The identities of the employees other than Nakhla and Israel who tortured and otherwise mistreated Plaintiffs and Class Members are known (or should be known) to Defendant Titan Corporation and discoverable.

18.     Defendant John B. Israel is a resident of California who worked for Defendant Titan as a translator.  Upon information and belief, Defendant Israel assaulted Plaintiff Umer and other Class Members.

19.     Defendant Adel Nakhla is a resident of Maryland who worked for Defendant Titan as a translator.  Defendant Adel Nakhla assaulted Plaintiff Hadod and raped a teenage Class Member.

20.     Defendant CACI International Inc. (hereafter "Defendant CACI") is a publicly traded corporation with headquarters located at 1100 North Glebe Road, Arlington, Virginia 22201.  Defendant CACI was formed in 1962 and incorporated under the laws of Delaware. CACI International Inc.'s subsidiaries, corporate agents, employees, and any other person or entity acting on behalf of CACI International Inc. or any of its subsidiaries are hereinafter subsumed within the term "The CACI Corporate Defendants."

21.     Defendant CACI Incorporated – Federal is a subsidiary wholly owned and controlled by Defendant CACI.  Defendant CACI Incorporated – Federal was formed and incorporated under the laws of Delaware.  CACI Incorporated – Federal's subsidiaries, corporate agents, employees, and any other person or entity acting on behalf of CACI Incorporated – Federal or any of its subsidiaries are hereinafter subsumed within the term "The CACI Corporate Defendants."

22.     Defendant CACI Premier Technology, Inc. ("CACI PT") is a subsidiary wholly owned and controlled by Defendant CACI.  CACI PT is a Delaware corporation doing business at 14151 Park Meadow Drive, Chantilly, Virginia, 20151-2218 and 1100 North Glebe Road, Arlington, Virginia 22201.  CACI PT's subsidiaries, corporate agents, employees, and any other

person or entity acting on behalf of CACI PT or any of its subsidiaries are hereinafter subsumed within the term "The CACI Corporate Defendants."

23.    The CACI Corporate Defendants conduct business throughout the United States and the rest of the world.

24.    The CACI Corporate Defendants are responsible for the actions taken by Defendant Stefanowicz, Defendant Duggan, Defendant Johnson, and other employees who tortured and otherwise mistreated Plaintiffs and Class Members.  The identities of the employees other than Stefanowicz, Duggan and Johnson who tortured and otherwise mistreated Plaintiffs and Class Members are known (or should be known) to the CACI Corporate Defendants and are discoverable.

25.    Defendant Steven Stefanowicz is a resident of Pennsylvania who worked for the CACI Corporate Defendants as an interrogator at the Abu Ghraib prison in Iraq from October 2003 to February 2004.  Defendant Stefanowicz directed the torture and mistreatment of Class Members and, upon information and belief, one or more of the Plaintiffs.  Upon information and belief,[1] the Department of Justice is investigating Defendant Stefanowicz.

26.    Defendant Timothy Duggan is a resident of Pataskala, Ohio who worked for the CACI Corporate Defendants as an interrogator at the Abu Ghraib prison in Iraq.  Defendant Duggan directed and engaged in the torture and mistreatment of Class Members and, upon information and belief, one or more of the Plaintiffs.  Upon information and belief, the Department of Justice is investigating Defendant Duggan.

---

[1] The term "information and belief" is used throughout the Third Amended Complaint to connote those instances when Plaintiffs believe the allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

27.     Defendant Daniel E. Johnson is a resident of the United States who worked for the CACI Corporate Defendants as an interrogator at the Abu Ghraib prison in Iraq.  Defendant Johnson directed and engaged in the torture and mistreatment of Class Members and, upon information and belief, one or more of the Plaintiffs.  Upon information and belief, the Department of Justice is investigating Defendant Johnson.

28.     Defendants Titan, CACI Corporate Defendants, and the Individual Defendants Stefanowicz, Duggan, Johnson, Israel, and Nakhla ("Individual Defendants") conspired with each other and other persons (including Spc. Charles Graner, Spc. Roman Krol, Spc. Javal Davis, Spc. Jeremy Sivits, Spc. Armin Cruz, Spc. Megan Ambuhl, Staff Sgt. Ivan "Chip" Frederick, Spc. Sabrina Harman and other military and government officials who acted illegally) to engage in a series of wrongful acts in prisons under the United States' control.  The Corporate and Individual Defendants also conspired and are continuing to conspire to prevent the discovery and investigation of these wrongful acts.

29.     The Defendants intentionally and knowingly agreed to and did work in concert with each other and the co-conspirators.  To the extent that any particular act was perpetrated by a certain Defendant or co-conspirator, the remaining Defendants confirmed and ratified the same.

30.     In the alternative, the Defendant Titan and the CACI Corporate Defendants (collectively referred to as "the Corporate Defendants") acted negligently and wrongfully by failing to prevent their employees from engaging in foreseeable and predictable wrongful acts and by failing to discipline those who engaged in wrongful acts.  The Corporate Defendants' negligence includes, but is not limited to, failing to take due care in hiring, failing to train, failing to supervise, failing to discipline, and failing to investigate reports of wrongdoing.

31.    The Corporate Defendants and the Individual Defendants profited financially by their misconduct.  The United States paid the Corporate Defendants millions of dollars in exchange for their contractual promises to provide services in a lawful manner.  Instead of providing those services in a lawful manner, the Corporate Defendants failed to ensure that their employees abided by the contract terms, such as the express requirement that their employees act in accord with the Third and Fourth Geneva Conventions.

32.    Defendants' action and inaction injured Plaintiffs and harmed the reputation of the United States throughout the world.  Plaintiffs and the Class seek compensatory and punitive damages in an amount for each individual in excess of the jurisdictional amount set forth in 28 U.S.C. § 1332 ($75,000).  Plaintiffs and the Class also seek any and all additional remedies (such as attorneys' fees) available under law and equity.

## JURISDICTION AND VENUE

33.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction); 28 U.S.C. § 1367 (supplemental jurisdiction); 28 U.S.C. § 1350 (Alien Tort Statute); and 18 U.S.C. § 1964 (Racketeer Influenced and Corrupt Organizations Act).

34.    Venue is proper pursuant to 28 U.S.C. § 1331(a)(3) and § 1391(b)(2).

## CLASS ALLEGATIONS

35.    This action should be certified as a class action under Fed. R. Civ. P. 23(b)(3) because common questions of law and fact predominate over any questions affecting only individual members and a class action is superior to other method for the fair and efficient adjudication of the controversy.

36.    Plaintiffs satisfy all of the prerequisites to a class action set forth in Fed. R. Civ.

P. 23(a).  Specifically, the class numbers more than 1000 and joinder of all members is

impracticable; there are questions of law common to the class; there are questions of fact

common to the class; the claims of the named Plaintiffs are typical of the claims of the class; and

the named Plaintiffs will fairly and adequately protect the interests of the class.

37.    Class Counsel is experienced in bringing and defending class actions and will

adequately represent the class interests.

38.    This action should be certified with three subclasses defined as follows:

> *First*, a subclass known as the RICO Class that consists of persons
> other than U.S. citizens who (a) were robbed or imprisoned in
> prisons or facilities in or around Iraq under the control of the
> United States forces; (b) were tortured and otherwise mistreated by
> Defendants and their co-conspirators in a manner that violates
> United States and international law; and (c) suffered injuries to
> their businesses or properties as a result;

> *second*, a subclass known as the Common Law Class that consists
> of persons other than U.S. citizens who (a) were imprisoned in
> prisons or facilities in or around Iraq under the control of the
> United States forces; (b) were tortured and otherwise mistreated by
> Defendants and their co-conspirators in a manner that violates
> United States and international law; and (c) suffered injuries to
> their persons as a result; and

> *third*, a subclass known as the Wrongful Death Class that consists
> of the estates and heirs of persons other than U.S. citizens who (a)
> were imprisoned in prisons or facilities in or around Iraq under the
> control of the United States forces; (b) were tortured and otherwise
> mistreated by Defendants and their co-conspirators in a manner
> that violates United States and international law; and (c)
> wrongfully died as a result.

**FACTS RELATING TO DEFENDANTS
TITAN CORPORATION, NAKHLA AND ISRAEL**

39.    Beginning in or before January 2002, Defendant Titan invested significantly in

building capacity for services needed in prisons and elsewhere in Iraq, such as interrogation,

interpretation, translation, intelligence gathering, and security (hereinafter referred to as "Interrogation Services"). Defendant Titan attributes its significant increase in revenues over the past three years to increased demand by the United States for Interrogation Services, which are provided by Titan's National Security Solutions division.

40.     Defendant Titan's federal revenues went from 90% of its total revenues in 2000 to 96% in 2004. No business other than federal government business matters significantly to the bottom line of Defendant Titan. As a result, Defendant Titan was willing to engage in illegal conduct in order to maintain and grow its revenues from the federal government.

41.     The terms of the documents that Defendant Titan claims are contracts with the United States expressly require that Defendant Titan act in a lawful manner, including abiding by the Geneva Conventions. The terms of the documents that Defendant Titan claims are contracts with the United States expressly require that Defendant Titan bear the cost and responsibility for training employees to act in a lawful manner, including abiding by the Geneva Conventions.

42.     Defendant Titan does not actually have valid contracts with the United States. That is, Defendant Titan entered into services contracts without already having the requisite skilled personnel in their employ to perform these contracts. To be able to perform the contracts, Defendant Titan had to advertise and recruit in the United States, Iraq and elsewhere. Because the United States is not permitted to hire companies merely to serve as recruiters and to therefore obtain personnel who could otherwise be hired directly by the United States, Defendant Titan acted illegally by purporting to enter into contracts with the United States without having the existing capacity to perform the contracts.

43.    Defendant Titan did not adequately screen or train the persons hired to provide Interrogation Services.  Defendant Titan placed persons in positions of control and power over Plaintiffs and Class Members without having any knowledge as to the character (including any past violence) or the skills of these persons.

44.    Defendant Titan provided the United States with persons who lacked sufficient skill to perform the Interrogation Services.

45.    Defendant Titan, not the United States, was responsible for supervising its employees providing Interrogation Services.  Defendant Titan management advised employees "Do not to bring personal or professional issues to the U.S. Government representatives.  We are supporting the U.S. Government, but they do not exercise administrative control over the group."

46.    Defendant Titan failed to supervise employees providing Interrogation Services in Iraq.

47.    According to United States Army Criminal Investigative Division agents, Defendant Titan is not able to produce, or is willfully failing to produce, records relating to the hiring and supervision of employees assigned to provide Interrogation Services in Abu Ghraib and other prisons or facilities in or around Iraq.

48.    Defendant Titan Corporation, Defendant Nakhla, Defendant Israel and other Titan employees providing Interrogation Services knew that Plaintiffs and the other Class Members, whether or not they had been captured during combat, were placed outside combat when they were imprisoned in prisons or other facilities by United States forces.

49.    Defendant Nakhla raped a fourteen year old Class Member and, upon information and belief, tortured and otherwise mistreated Plaintiffs and other Class Members during interrogations.  Upon information and belief, Defendant Nakhla assaulted Plaintiff Hadod.

Among other things, Defendant Nakhla pushed Plaintiff Hadod against a wall and forced him to wear women's underwear on his head.

50.     Defendant Israel, along with co-conspirators known by physical appearance (but not yet known by name), repeatedly beat, kicked and punched defenseless seventeen-year old Plaintiff Umer during interrogations.  Defendant Israel repeatedly threw Plaintiff Omar against the wall of the interrogation room.  Defendant Israel repeatedly threatened Plaintiff Omar.  Upon information and belief, Defendant Israel tortured and otherwise mistreated other Class Members during interrogations.

51.     At least nineteen Defendant Titan employees known by physical appearance but not yet known by name personally initiated assaults on Class Members during interrogations. On at least one occasion, a United States military officer stepped in to stop a Titan employee from torturing a Class Member during an interrogation that was intended to obtain intelligence information for the United States.

52.     Certain other Defendant Titan employees known by physical appearance but not yet known by name conspired with Defendants Stefanowicz, Duggan, Johnson, other CACI employees known by physical appearance but yet known by name, and other co-conspirators known by physical appearance but not yet known by name or institutional affiliation to torture and mistreat Plaintiffs and Class Members during interrogations.  In addition to other wrongful acts such as beating, hitting, and kicking, Titan employees repeatedly conspired to violate the law of war by agreeing to, and translating, CACI and other co-conspirators' threats of death, threats of rape, threats of rape of family members, and threats of death to family members.

53.     Certain employees of the Defendant Titan have admitted to engaging in these overt acts.  For example, on or before May 21, 2004, an unknown employee of Defendant Titan

working in Iraq admitted to stripping, handcuffing, and forcibly restraining putative Class Members as they were placed by the employee and others in sexual positions.

54.    Upon information and belief, a Titan employee stole and never returned a Mercedes automobile owned by a class member.

55.    Defendant Titan knew or should have known that Nakhla, Israel and the other employees were conspiring with CACI employees and other co-conspirators to engage in repeated acts of torture and mistreatment against Plaintiffs and Class Members that were intended to obtain intelligence information for the United States.

56.    Defendant Titan intentionally and knowingly entered into a conspiracy to torture and mistreat prisoners.

57.    Defendant Titan intentionally and knowingly engaged in a conspiracy to prevent the reporting of human rights and humanitarian law violations to the appropriate authorities. Defendant Titan intentionally and knowingly engaged in a conspiracy to undermine and neutralize information coming from the United States government, the Red Cross and the human rights community (e.g. Amnesty International, Human Rights Watch, Human Rights First, etc.) about the torture and mistreatment of prisoners.

58.    Defendant Titan furthered its own goals and the goals of the conspiracy by adopting and implementing corporate policies and procedures (written and unwritten) that permitted and encouraged the repeated criminal acts.

59.    Defendant Titan furthered its own goals and the goals of the conspiracy by repeatedly failing to report crimes by its employees and others to the proper United States military authorities. Defendant Titan furthered the goals of the conspiracy by refusing to spend

the money, time or other resources necessary to ensure that its employees understood that prisoners in United States custody could not be tortured or otherwise mistreated.

60.    Defendant Titan furthered their own goals and the goals of the conspiracy by knowingly and intentionally fostering and encouraging a climate of lawlessness.  Defendant Titan management expressly and implicitly encouraged employees not to report violations of the law of war committed by Titan translators and other employees.  Defendant Titan management told Titan employees that the fact that the United States had issued a declaration immunizing government contractors from the reach of Iraqi law meant that they did not need to fear any legal consequences flowing from their unlawful actions.  Defendant Titan expressly and implicitly encouraged its employees to go along with any actions taken by anyone in the United States military even if those actions were known to be unlawful.

61.    Defendant Titan furthered their own goals and the goals of the conspiracy by intentionally recruiting and retaining individuals known to be full of hatred and violent animus towards Iraqis in the custody of the United States.

62.    One example of Defendant Titan's acts in furtherance of the conspiracy: Defendant Titan learned that Titan employee Hamza Elisherbiny violently assaulted a defenseless person being held in United States custody.  A military officer had to intervene and stop him.  Defendant Titan learned of the assault, but failed to take any effective action. Defendant Titan failed to report the assault to the United States or Iraqi authorities.  Defendant Titan discouraged Titan employees from reporting the incident to the United States authorities. Defendant Titan expressed the view that it hoped the military officer who had intervened "was on the same team" as Titan, which was an express reference to the ongoing conspiracy.

63. Defendant Titan conspired with the CACI Corporate Defendants and the Individual Defendants to create the lawless environment needed for the implementation of the conspiracy to torture and mistreat prisoners. The two companies worked together to dupe the United States into accepting as "cleared" Titan employees who were not fit to provide Interrogation Services.

64. Defendant Titan participated in the conspiracies and tortured and otherwise mistreated Plaintiffs and Class Members under the color of the United States authority. Defendant Titan placed employees in prisons that were under the control, or partial control, of the United States. Defendant Titan wrongfully permitted their employees providing Interrogation Services to wear uniforms, portions of uniforms, and other attire that portrayed them as part of the United States military. Defendant Titan employees intentionally concealed their true identities and held themselves out as empowered to act on behalf of the United States. By repeatedly engaging in wrongful criminal acts that violated United States law and policy under the color of the United States' authority, Defendant Titan harmed Plaintiffs and Class Members.

65. Defendant Titan continues to further their own goals and the goals of the conspiracy by investing money, time and energy into halting the various efforts being made to uncover the full truth relating to its role in the torture and mistreatment of prisoners held under United States' custody in Iraqi prisons. Upon information and belief, Defendant Titan has retained outside consultants to advise on eliminating or reducing sustained attention and investigation of these issues.

66. Defendant Titan knew, or should have foreseen, that the conspiracy would harm Plaintiffs and Class Members.

**FACTS RELATING**
**TO THE CACI CORPORATE DEFENDANTS,**
**STEFANOWICZ, DUGGAN AND JOHNSON**

67.     CACI Corporate Defendants have been involved in government contracting for

many years.  Beginning in 2001, the CACI Corporate Defendants began to grow dramatically –

in terms of both employees (approximately 5,000 employees in 2001 to 6,300 employees in

2003) and revenue. CACI Corporate Defendants' growth resulted from a deliberate strategy to

build capacity to provide services, including interrogation services, to the United States.  To

implement the strategy to build services capacity, CACI Corporate Defendants made a series of

acquisitions and took other steps designed to increase their ability to contract with the United

States military for intelligence services. CACI Corporate Defendants' strategy has been

successful.  Their SEC filings reveal "a significant part of the company's growth over the past

two years was primarily due to the expansion of the managed network services and intelligence

community work."

68.     As reflected in the SEC filings, CACI Corporate Defendants became increasingly

financially dependent on revenues generated from federal intelligence agency contracts and

permitted their other revenue sources (such as commercial, state and local governments) to

dwindle.  As stipulated in their SEC filings, "continued and expanded focus on DoD and federal

civilian agency opportunities has resulted in a reduced emphasis on state and local government

business."

69.     CACI Corporate Defendants maintained close relationships with certain

government officials.  As their SEC filings reveal, "our senior management team is very

important to our business because personal reputations and individual business relationships are

a critical element of obtaining and maintaining client engagements in our industry, *particularly*

*with agencies performing classified operations. The loss of any our senior executives could*

*cause us to lose client relationships or new business opportunities*, which could cause actual

results to differ materially from those anticipated." (Emphasis added.)

70.    The CACI Corporate Defendants do not have valid contracts with the United

States. The CACI Corporate Defendants claim that they were retained by contract to conduct

interrogations in the Iraqi prisons. However, the conduct of such interrogations is an "inherently

governmental function" as that term is defined by law and therefore interrogations cannot be

delegated to anyone other than a public official. In addition, the contracts are not valid because

the CACI Corporate Defendants procured them by misconduct. As set forth in a report issued by

the General Accounting Office, the CACI Corporate Defendants improperly used their

relationships with government officials and otherwise thwarted the legally-required procurement

policies in order to secure government contracts outside the required bidding process.

71.    The CACI Corporate Defendants failed to exercise due diligence in hiring. The

CACI Corporate Defendants hired people based on telephone interviews and deployed them to

Iraq without anyone in CACI management even meeting or interviewing them in person.

72.    The CACI Corporate Defendants failed to provide adequate training on the law of

war and the need to treat prisoners in accord with the Geneva Conventions to the persons

employed to provide Interrogation Services.

73.    The CACI Corporate Defendants failed to supervise employees providing

Interrogation Services. The CACI Corporate Defendants admitted on their web site that

Interrogators and other employees in Iraq work under "minimal supervision." For example, one

job description on the CACI Corporate Defendants' web site stated:

> Assists the US Military interrogation support program team leader
> (under direction and supervision) to *increase the effectiveness of*

*getting intelligence information from Detainees, Persons of Interest, and Prisoners of War (POWs)* that are in the custody of US/Coalition Forces in the CJTF 7 AOR, in terms of screening, interrogation, and debriefing of persons of intelligence value. Under *minimal CACI supervision* [see Additional Job Information below], will assist the government team leader in managing a multifaceted interrogation support cell consisting of database entry/intelligence research clerks, screeners, tactical/strategic interrogators, and intelligence analysts.

74.     The CACI Corporate Defendants placed a subset of these unscreened employees in positions of complete power and control over whether prisoners were released or kept imprisoned. The CACI Corporate Defendants assigned employees to serve on the Detainee Assessment Board at Abu Ghraib. Each CACI employee serving on the Detainee Assessment Boards had the unilateral power to decide that a prisoner should not be released. There was no review or oversight exercised by CACI or the military over CACI employee decisions to continue to imprison people.

75.     CACI employees were stationed at Abu Ghraib prison and at other locations in Iraq.

76.     The CACI Corporate Defendants failed to train and supervise in any way the CACI employees who had complete control over prisoner release. The CACI Corporate Defendants failed to take any steps to ensure that its employees making release decisions were not influenced by the CACI corporate interest in being paid to screen and interrogate prisoners.

77.     Defendant Steven Stefanowicz tortured and otherwise mistreated Plaintiffs and Class Members during interrogations. He repeatedly conducted interrogations in a manner that violated United States law and policy as well as international law. He used his position of authority to direct others, including military soldiers, to torture and mistreat Plaintiffs and Class

Members.  For example, he conspired with Sgt. Michael J. Smith, Sgt. Santos A. Cardona, Cpl. Charles Graner, and Staff Sgt. Ivan L. Frederick to assault Class Members with unmuzzled dogs.

78.    Defendant Timothy Duggan tortured and otherwise mistreated Plaintiffs and Class Members during interrogations.  He repeatedly conducted interrogations in a manner that violated United States law and policy as well as international law.  He used his position of authority to direct others, including military soldiers, to torture and mistreat Plaintiffs and Class Members.  Defendant Duggan threatened death to one or more of those who were unwilling to participate in the conspiracy and instead reported it to the military authorities.

79.    Defendant Daniel E. Johnson tortured and otherwise mistreated Plaintiffs and Class Members during interrogations.  He repeatedly conducted interrogations in a manner that violated United States law and policy as well as international law.  He used his position of authority to direct others, including military soldiers, to torture and mistreat Plaintiffs and Class Members.

80.    The CACI Corporate Defendants knew or should have known that their employees Stefanowicz, Duggan, Johnson and other employees were torturing and mistreating prisoners during interrogations that should have been used to obtain reliable intelligence information for the United States, and were conspiring with others (including Titan translators) to torture and mistreat prisoners.  The CACI Corporate Defendants knew that their employee Duggan had threatened death to a person who was unwilling to participate in the conspiracy and who instead reported it to the military authorities.

81.    The CACI Corporate Defendants knew or should have known that interrogators Stefanowicz, Duggan, Johnson and others were engaged in repeated violent crimes against Plaintiffs and Class Members.  The CACI Corporate Defendants permitted Stefanowicz,

Duggan, Johnson and other employees to act and to continue to act without any supervision or oversight. The CACI Corporate Defendants were fully aware of criminal conduct by their employees, but continued to give them unfettered ability to design and implement interrogation plans that violated United States and international law.

82. The CACI Corporate Defendants intentionally and knowingly joined the conspiracy to torture and mistreat prisoners during interrogations.

83. The CACI Corporate Defendants intentionally and knowingly engaged in a conspiracy to prevent the reporting of human rights violations to the appropriate authorities. The CACI Corporate Defendants intentionally and knowingly engaged in a conspiracy to undermine and neutralize information coming from the United States government, the Red Cross and the human rights community (e.g. Amnesty International, Human Rights Watch, Human Rights First, etc.) about the torture and mistreatment of prisoners.

84. The CACI Corporate Defendants furthered their own goals and the goals of the conspiracy by repeatedly failing to report crimes by its employees and others to the proper military authorities.

85. The CACI Corporate Defendants furthered their own goals and the goals of the conspiracy by refusing to spend the money, time or other resources to ensure that its employees were supervised and adhered to the law controlling the conduct of interrogations.

86. The CACI Corporate Defendants furthered their own goals and the goals of the conspiracy by adopting and implementing corporate policies and procedures (written and unwritten) that permitted and encouraged the repeated criminal acts. The CACI Corporate Defendants adopted corporate policies and procedures designed to prevent the discovery and prosecution of the repeated criminal acts.

87.     One example of the CACI Corporate Defendants' policies and procedures that

furthered the goals of the conspiracy:  The CACI Corporate Defendants amended the CACI

Code of Ethics and Business Conduct Standards to encourage employees to disregard the law

and to discourage employees from reporting violations of the law to the relevant United States

authorities.  The 2002 version of the CACI Code of Ethics and Business Conduct Standards

stated that:

> All employees should be aware that if they are a party to violations
> that affect or involve transactions with the U.S. Department of
> Defense or other U.S. government agencies, a record of any
> involvement and disciplinary action taken *will* be made available
> to the U.S. government.

(Emphasis added.)  The CACI Corporate Defendants deliberately eliminated the mandatory

reporting language on some date between 2002 and 2003.  The new language states:

> All employees should be aware that if they are a party to any
> *demonstrably illegal activity*, the Company *in its discretion may*
> make a record of any involvement and disciplinary action taken
> available to the appropriate law enforcement officials.

(Emphasis added.)

88.     The CACI Corporate Defendants management expressly and implicitly

encouraged employees not to report human rights violations committed by CACI interrogators

and other employees.

89.     The CACI Corporate Defendants conspired with Defendant Titan to create and

permit to flourish the lawless environment needed for the implementation of the conspiracy to

torture and mistreat prisoners.  For example, the CACI Corporate Defendants were retained by

the United States military to "clear" translators proposed for service by Defendant Titan.  If a

proposed translator was not cleared for service, he or she could not be placed in the prisons to

translate interrogations.  Rather than acting with due care, the CACI Corporate Defendants and

their employees knowingly and intentionally or with reckless disregard cleared for service Titan

translators who should not have been cleared and who went on to engage in repeated acts of

criminal violence against the prisoners.

90.     The CACI Corporate Defendants and the co-conspirators tortured and otherwise

mistreated Plaintiffs and Class Members under the color of the United States authority.  The

CACI Corporate Defendant employees (including, but not limited to the CACI Individual

Defendants), concealed their true identities and held themselves out as empowered to act on

behalf of the United States.  The CACI interrogators actually gave orders to those United States

military personnel willing to engage in criminal activity and willing to participate in the

conspiracy.  Thus, the CACI interrogators' actions resulted in United States' uniformed military

personnel torturing and mistreating prisoners.  These actions by uniformed military personnel

gave the impression to the prisoners (and to the world at large) that the United States had

adopted a policy of torturing prisoners.  At no time did the United States as the United States

ever adopt such a policy.  By repeatedly engaging in wrongful criminal acts that violated United

States law and policy under the color of the United States' authority, and by using the façade of

ostensible authority to direct military soldiers to engage in wrongful criminal conduct, the CACI

Corporate Defendants and their employees harmed the Plaintiffs and Class Members.

91.     The CACI Corporate Defendants continue to further their own goals and the goals

of the conspiracy by investing money, time and energy into halting the various efforts being

made to uncover the full truth relating to its role in the torture and mistreatment of prisoners held

under United States' custody in Iraqi prisons.

92.     The CACI Corporate Defendants have knowingly and intentionally embarked

upon a course of action designed to suppress any coverage or investigation of their role in the

conspiracy. The CACI Corporate Defendants have sent several letters to reporters threatening to sue them if they report on the CACI Corporate Defendants' role in the torture and mistreatment.

93.    Upper management of the CACI Corporate Defendants made a series of unqualified and false statements to the effect that independent and complete internal investigations had been conducted and had confirmed that CACI employees had not engaged in any wrongdoing. In fact, to date, the CACI Corporate Defendants have not conducted an independent and complete investigation.

94.    Upon information and belief, the CACI Corporate Defendants have retained outside consultants to advise on eliminating or reducing attention and investigation of these issues.

95.    The CACI Defendants knew, or should have foreseen, that the conspiracy would harm Plaintiffs and Class Members.

## ADDITIONAL FACTS RELATING TO FORMATION AND DURATION OF CONSPIRACY

96.    The conspiracy to torture and mistreat prisoners during interrogations began in or around 2002. Upon information and belief, prisoners continue to be tortured and otherwise mistreated. The conspiracy to suppress the full and complete reporting of human rights abuses began in or around 2002 and continues to present. Hereinafter, the term "Torture Conspiracy" is used to refer to these conspiracies.

97.    Certain government officials and senior management in Defendant Titan and CACI Corporate Defendants had relationships that assisted in the formation and implementation of the Torture Conspiracy. These relationships were formed and fostered by meetings, telephonic discussions, in-person discussions, email discussions and other communications that occurred in, among other places, Arizona, California, Virginia and the District of Columbia.

98.    The corporate Defendants formed and implemented the Torture Conspiracy in order to make money selling Interrogation Services to the United States.  The corporate Defendants also formed and implemented the Torture Conspiracy to ensure that they did not lose money on their past acquisitions of Interrogation Services capacity.

99.    The individual Defendants formed and implemented the Torture Conspiracy in order to obtain personal financial rewards and/or financial rewards for their employers.

100.    The Torture Conspiracy harmed the Plaintiffs and Class Members.  Defendants' failure to act in accord with the law of war, the laws of the United States, international law, and the terms of the documents that Defendants claim constitute binding contracts, caused Plaintiffs and Class Members to be tortured and to suffer from the lasting damage caused by torture. Defendants' failure to act in accord with the law of war, the laws of the United States, and international law, caused Plaintiffs and the RICO Class Members to suffer injuries to their businesses and properties.

101.    During the period 2002 to present, upon information and belief, Defendant Titan earned millions of dollars in revenue from the provision of Interrogation Services.  These fruits of the Torture Conspiracy have been invested in the ongoing operations of Defendant Titan.

102.    Defendant Titan knows that it will have to return millions of dollars to the United States government if the truth about its employees' activities becomes fully known and on the public record.  Upon information and belief, Defendant Titan has admitted that it cannot bill the United States government for services provided by Defendants Nakhla and Israel.

103.    During the period 2002 to present, upon information and belief, CACI Corporate Defendants earned millions of dollars in revenues from their provision of Interrogation Services.

These fruits of the Torture Conspiracy have been invested in the ongoing operations of CACI Corporate Defendants.

104.     Upon information and belief, each individual Defendant, through their participation in the Torture Conspiracy, earned far more money per hour than they could otherwise have earned, and had far more demand for their services than would have existed, absent the Torture Conspiracy.

105.     Upon information and belief, the corporate Defendants also benefited financially by forming the Torture Conspiracy because their co-conspirators used their influence to ensure that the corporate Defendants were awarded contracts or modifications of existing contracts on a no-bid basis.

106.     Numerous predicate acts have been committed by the conspirators (and others acting at their direction) in their implementation of the Torture Conspiracy.  In addition to the predicate acts described above, they include, but are not limited to, murder, assault and battery, unlawful imprisonment, obstruction of justice, and other acts intended to be humiliating and mentally devastating to those who practice the faith of Islam.

## THE UNITED STATES INTENDED THAT THE CONTRACTORS CONDUCT INTERROGATIONS WITHOUT TORTURING AND MISTREATING PRISONERS

107.     Defendants knew, or should have known, that the United States intended that any person acting under the color of United States authority would conduct interrogations in accord with the relevant domestic and international laws.

108.     The United States government in official pronouncements has repeatedly and forthrightly denounced the use of torture and other cruel, inhuman or degrading treatment at all times.  In its Initial Report to the United Nations Committee Against Torture, the United States

Department of State noted that, "[t]orture is prohibited by law throughout the United States.  It is categorically denounced as a matter of policy and as a tool of state authority . . . .  No official of the government, federal, state or local, civilian or military is authorized to commit or to instruct anyone else to commit torture.  Nor may any official condone or tolerate torture in any form."  *U.S. Department of State: Initial Report of the United States of America to the U.N. Committee Against Torture, Introduction (1999).*

109.    In the same report, the United States explicitly stated that no exigent circumstances permit the use of torture:  "No exceptional circumstances may be invoked as a justification for torture.  U.S. law contains no provision permitting otherwise prohibited acts of torture or other cruel inhuman or degrading treatment or punishment to be employed on grounds of exigent circumstances (for example, during a "state of public emergency") or on orders from a superior officer or public authority."  *Id.*

110.    More recently, President Bush, in an address on United Nations International Day in Support of Victims of Torture, reiterated the United States position on the use of torture and other cruel, inhuman or degrading treatment:  "The United States is committed to the worldwide elimination of torture and we are leading the fight by example.  I call on all governments to join with the United States and the community of law-abiding nations in prohibiting, investigating and prosecuting all acts of torture and in undertaking to prevent other cruel and unusual punishment."  *President George W. Bush, United Nations International Day in Support of Victims of Torture, June 26, 2003.*

111.    The United States annually publishes a compilation of practices and techniques used by foreign governments that transgress the laws against torture and other cruel, inhuman or degrading treatment.  This publication, called the U.S. Department of State Select Country

Reports on Human Rights Practices, criticized the following practices and techniques when engaged in by other countries: repeated slapping, exposure to cold, stripping and blindfolding, food and sleep deprivation, threats to detainees or family members, dripping water on the head, squeezing of the testicles, mock executions, and sexual humiliation.

112.    The United States has adopted regulations to govern the military to ensure its adherence to the Geneva Conventions and United States laws generally, including a 1995 Central Command regulation.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO PLAINTIFF SALEH

113.    On or about September 25, 2003, the Torture Conspirators detained Plaintiff Saleh without any cause.  Plaintiff Saleh, an opponent of Saddam Hussein, was returning to Iraq with certain monies and a vehicle to assist with the rebuilding efforts.  The Torture Conspirators tied him up, placed a hood over his head, and placed him in the trunk of a vehicle.  The Torture Conspirators stole his car and cash he had brought with him to invest in rebuilding Iraq.

114.    Thereafter, the Torture Conspirators imprisoned Plaintiff Saleh in El-Najaf for approximately eight days for no reason whatsoever.  They beat him with a stick so fiercely he lost consciousness.

115.    On or about October 4, 2003, the Torture Conspirators took Plaintiff Saleh to Abu Ghraib Prison, the same prison where he had been tortured by Saddam Hussein.  The Torture Conspirators thereafter engaged in a series of actions against Plaintiff Saleh, including, but not limited to, the following:

(a)    Roping Plaintiff Saleh and 12 other naked prisoners together by their genitals and then pushing one of the male detainees to the ground, causing the others to suffer extreme physical, mental and emotional distress;

- 28 -

(b)    Stretching Plaintiff Saleh's penis with a rope and beating it with a stick;

(c)    Stripping Plaintiff Saleh naked for extended periods of time (as long as a day and a half) and leaving him this way with a hood over his head;

(d)    Forcing Plaintiff Saleh to ejaculate in a plastic cup and pouring the semen over his head and body;

(e)    Forcing Plaintiff Saleh to lay naked over another male with his penis touching the buttocks of the male, causing both males to cry profusely and ask for forgiveness from God;

(f)    Pouring cold water over him;

(g)    Repeatedly shocking Plaintiff Saleh with an electric stick and beating him with a cable;

(h)    Depriving Plaintiff Saleh of sleep by blasting music and pouring cold water over him every time he attempted to sleep;

(i)    Subjecting him to dehumanizing name-calling using Arabic phrases such as "minuk" which means "bitch" and "ishtah," meaning worthless scum;

(j)    Tying a belt around his neck and dragging him approximately 70 feet;

(k)    Using a dog to threaten and intimidate him;

(l)    Beating him with a pistol and slamming his head against the wall;

(m)    Pouring chemicals on his body;

(n)    Tying his hands above his head and sodomizing him while slapping his head back and forth;

(o)    Placing him naked on a table, face down with a hood over his head, and grabbing his penis and inserting fingers up his anus;

(p)    Urinating on him;

(q)    Shooting him with plastic bullets to his chest as he was trying to call for prayer;

(r)    Forcing him to carry buckets of feces as the Torture Conspirators bumped the buckets to have the feces cover Plaintiff Saleh;

(s)    Denying his ability to perform his prayers.

116.    Plaintiff Saleh also observed the Torture Conspirators summarily execute other detainees. A Torture Conspirator shot randomly at a crowd of detainees, killing approximately five prisoners, including an individual by the name of "Saed," whom Plaintiff Saleh had befriended. Mr. Saed was shot in the neck and chest and left to bleed on the ground for a couple of hours. Plaintiff Saleh witnessed two men dying slowly without being provided medical treatment.

117.    Plaintiff Saleh also observed the Torture Conspirators strip and rape two young male detainees. The Torture Conspirators tied their hands, and raped them in front of Mr. Saleh and other prisoners. The Torture Conspirators then warned Plaintiff Saleh and other plaintiffs that if they told anyone, they would be next.

118.    Plaintiff Saleh observed the Torture Conspirators strip naked three plaintiffs and hang them by their hands from a hook in the ceiling, while a laughing Torture Conspirator beat their genitals and sodomized them with a stick in front of other detainees.

119.    Plaintiff Saleh observed the Torture Conspirators rounding up and imprisoning local females. For approximately 13 days, Mr. Saleh heard constant screaming and crying at night from many females. Mr. Saleh heard some females screaming "No! No! Shame on you!

This is against God's laws." Although Plaintiff Saleh did not see the acts, he is convinced the Torture Conspirators were raping these women.

120.    To date, Mr. Saleh's money and car have not been returned.

**SPECIFIC EXAMPLES OF WRONGFUL ACTS
RELATING TO PLAINTIFF HAJ ALI**

121.    The Torture Conspirators detained Plaintiff Haj Ali on or around October 15, 2003.

122.    The Torture Conspirators tortured and otherwise mistreated plaintiff Haj Ali. They punched, kicked, and hit him with a stick after he was unable to climb stairs due to his legs being chained. They took away all of his clothes and forced him to stand naked in his cell, hands cuffed together, with the handcuffs attached to a hook above his head while fans blew cold air on him. In November, when the air was very cold, they poured cold water on him while he was naked.

123.    A Torture Conspirator handcuffed Plaintiff Haj Ali with his arms extended through the bars of his cell. The Torture Conspirator then ordered Plaintiff Haj Ali to lie down. The Torture Conspirator then stood on Plaintiff Haj Ali's arms and ground the heels of his boots into Plaintiff Haj Ali's arms, especially his left wrist and hand, which were still in a cast after multiple rounds of reconstructive surgery. Plaintiff Haj Ali passed out from the pain. The Torture Conspirator then handcuffed Plaintiff Haj Ali to the bars of his cell so that his toes were just touching the ground and he was suspended from his wrists overnight. After the congealed blood underneath his cast had dried, the Torture Conspirator forcibly removed the cast, taking portions of Plaintiff Haj Ali's skin with it. When Plaintiff Haj Ali asked a guard if he could receive treatment for his arm, the guard informed him that such decisions were up to his interrogator.

124.    During interrogation, the Torture Conspirators forced Plaintiff Haj Ali to stand on a box, with electrical wires attached to his wrists, and they shocked him with intense pulses of electricity to such an extent that he fell off the box involuntarily.  They laughed when he fell, and kicked and hit him with a stick while ordering him to get back on the box.  They repeated this at least five times.

125.    The Torture Conspirators used threats to torture Plaintiff Haj Ali.  During interrogation, a Torture Conspirator loaded a gun near his ear while he was hooded.  They told him that if he did not do what they wanted, he would not receive medical treatment for his injured hand and as a result his hand would rot away.  They also wrote words on his body with a marker and laughed.

126.    The Torture Conspirators also tortured Plaintiff Haj Ali with loud noise.  They shouted "shut the fuck up" directly into his ear with a megaphone.  They set up several large loudspeakers in front of his cell and played the repeated refrain from a song, consisting of the word "Babylon," continuously for a night and a day, at extremely loud volume.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO PLAINTIFF JILAL MEHDE HADOD

127.    Plaintiff Hadod was detained by the Torture Conspirators on October 1, 2005. Initially detained in Al-Ammeria prison, and American military base, Plaintiff Hadod was transferred to Abu Ghraib prison for about five months.

128.    Throughout his detention and interrogation the Torture Conspirators tortured and otherwise mistreated Plaintiff Hadod by subjecting him to the following acts, among others:

(a)    Subjecting him to extreme heat;

(b)    Denying him sleep due to loud noises intentionally performed by the guards at night;

(c)    Forcing him to wear womens' undergarments;

(d)    Beating him severely and throwing him against a wall while his hands were chained behind his back;

(e)    Dragging him for a lengthy period behind soldiers as they were walking.

129.    A female Torture Conspirator requested that Plaintiff Hadod choose between a young officer and an old officer as to which man he preferred to sodomize him; Plaintiff Hadod was forced to remain in a painful squatting position and denied food until he decided.

130.    Plaintiff Hadod also suffered property losses as a result of actions by the Torture Conspirators.  They took 300,000 dinars and destroyed many of Plaintiff Hadod's household belongings.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO PLAINTIFF UMER ABDUL MUTALIB ABDUL LATIF

131.    On or about July 11, 2003, Plantiff Umer's house was raided by the U.S. military. During this disturbance, property was damaged and money was stolen.  After being arrested he was taken from place to place including an American base south of Baghdad known as Scania. There the Plaintiff Umer and other prisoners were subjected to unhealthy conditions.  Plaintiff Umer was placed in an adult prison for a period of 10 days.

132.    Throughout his detention and interrogation the Torture Conspirators tortured and otherwise mistreated Plaintiff Umer by subjecting him to the following acts, among others:

(a)    Depriving him of sleep, food, and water for three days while standing under the sun in the hot sand;

(b)    Holding him at gunpoint;

(c)    Beating him with a stick;

(d)     Threatening him with dogs and forcing him to act like a dog;

(e)     Dragging him by a rope;

(f)     Denying him the ability to perform prayers;

(g)     Restraining him in awkward and painful positions;

(h)     Threatening to have his family members killed;

(i)     Witnessing the mistreatment of his family members;

(j)     Shocking him with a Taser-like device.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO PLAINTIFF AHMED SHEHAB AHMED

133.     On or around December 29, 2003, Plaintiff Shehab's house was raided.  Plaintiff Ahmed was beaten on the head with a rifle until unconscious.

134.     Plaintiff Shehab was then imprisoned at Baghdad International Airport and Rehidwaniya.  Throughout his detention and interrogation the Torture Conspirators tortured and otherwise mistreated Plaintiff Shehab by subjecting him to the following acts, among others:

(a)     Beating and dragging him until unconscious, then denying him medical treatment for the resulting injuries;

(b)     Confining him to an area of 1m x 1.30m and giving him just enough water to survive;

(c)     Depriving him of sleep and food and bathroom access for three days;

(d)     Hooding him, stripping him of all clothing, then beating him;

(e)     Threatening his family and children with rape.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO PLAINTIFF AHMED IBRAHIEM NEISEF JASSEM

135.    The Torture Conspirators detained Plaintiff Ahmed and his father Ibrahiem (now deceased) without cause in the Abu Ghraib Prison.

136.    The Torture Conspirators tortured and otherwise mistreated Plaintiff Ahmed and his father Ibrahiem by committing the following acts, among others:

(a)    Removing their clothes and spraying them with cold water during the cold winter;

(b)    Stripping them of their clothes entirely and then tying their hands and legs together and allowing fierce and hungry dogs to come two inches away from their faces and bark in their faces;

(c)    Kicking them with their heavy military boots on all parts of their bodies including their heads, backs, private parts, and stomach;

(d)    Hitting them with guns on their bodies, including their heads, backs, stomach, and private parts;

(e)    Removing all their clothes and leaving them outside for days;

(f)    Depriving them of food and keeping them in the cold for such lengths of time as to cause fainting;

(g)    Lifting their hands above their heads and leaving them standing in that position for days, and beating them whenever they moved or twitched;

(h)    Leaving them lying on their stomachs naked on the floor with their hands tied above their heads for long hours.

137.    Plaintiff Ahmed was forced to observe the Torture Conspirators torturing his father and putative Class Plaintiffs by physically and verbally assaulting them, humiliating them, including humiliating them sexually.

138.    Plaintiff Ahmed was forced to observe the Torture Conspirators torturing his father to such a degree that he died.

139.    Plaintiff Ahmed also suffered property losses as a result of actions by the Torture Conspirators.  They took $3,200 in cash, $1,500 worth of gold, jewelry and other property.

### SPECIFIC EXAMPLES OF WRONGFUL ACTS RELATING TO PLAINTIFF ISMAEL

140.    The Torture Conspirators detained Plaintiff Ismael without cause in the Abu Ghraib Prison and the Bucca Prison.

141.    Thereafter the Torture Conspirators continued to detain and otherwise mistreat Plaintiff Ismael and committed the following acts, among others, during his Abu Ghraib Prison detention:

(a)    During interrogation, hitting him with electric cables and kicking him with boots if he did not answer or did not answer in the manner desired by the Torture Conspirators;

(b)    Tying his hands behind his back and terrorizing him by shooting electric guns at him;

(c)    Stripping him, tying his hands behind his back and releasing dogs to attack his private parts;

(d)    Using demeaning and dehumanizing language;

(e)    Depriving him of sleep by use of loud music or loose dogs roaming around the tent;

(f)    Stripping his clothes off and forcing him to stand on one leg for as long as

six hours, during which they would hit him with a rifle if he showed any sign of fatigue or moved in any manner;

(g)    Hitting his private parts repeatedly.

142.    During a particular interrogation, the Torture Conspirators asked Plaintiff Ismael a question that he refused to answer.  As a result, they stripped off his clothes and covered his face with a bag.  Hours later they removed the bag and showed him two photographs of sexual torture committed on detainees known to Plaintiff Ismael.  The first photograph showed a young boy (age 12-15) being sexually molested by a person in a United States uniform.  The Torture Conspirators told Plaintiff Ismael that he would be treated in the same fashion if he did not answer their question.  The Torture Conspirators then showed him another photograph of a different detainee, also known to Plaintiff Ismael, who was being forced to perform oral sex on a person in a United States uniform.  The Torture Conspirators again threatened Plaintiff Ismael with similar treatment if he refused to answer questions.

143.    The Torture Conspirators also tortured and otherwise mistreated Plaintiff Ismael during his detention at the Bucca Prison.  They committed the following acts, among others:

(a)    Turning on very loud music whenever he and other detainees tried to pray or read the Quran and otherwise preventing any type of worship;

(b)    Placing him standing outside in the burning sun for long hours;

(c)    Stripping him and tying him together with other detainees and dragging their naked bodies with a leash across the hot summer sand;

(d)    Kicking him with their heavy boots on their heads;

(e)    Tying him to other detainees by their feet and forcing them to sleep on their stomachs on the hot sand.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO PLAINTIFF KINAN ISMAEL NEISEF AL-NIDAWI

144.    The Torture Conspirators detained Plaintiff Neisef without cause in the Abu Ghraib and Bucca Prisons.

145.    During his detention in the Abu Ghraib Prison, the Torture Conspirators tortured and otherwise mistreated Plaintiff Neisef by committing the following acts, among others:

(a)    Placing brown mesh bags on his head as they questioned him;

(b)    Hitting him on his face and body with heavy military boots if he did not provide the desired answers;

(c)    Placing him and other male detainees in a room with a naked female detainee who had a brown mesh bag on her head and who was screaming;

(d)    Depriving him of sleep for as much as 48 hours by placing him in a room with very loud music close to his ears;

(e)    Spraying cold water on him and placing him outside in the cold for long periods of time.

146.    During his detention in the Bucca Prison, the Torture Conspirators committed the following acts, among others:

(a)    Stripping him, tying his hands and feet together with other detainees, and placing them on dog leashes and dragging their naked bodies on the hot summer sand;

(b)    Hitting him with their heavy boots on his head;

(c)    Forcing him to stand in the hot summer sun outside with his hands tied behind his neck for periods between six hours to 24 hours without movement, and beating him if he showed any sign of movement or fatigue.

147.    The Torture Conspirators again degraded Plaintiff Neisef sexually by forcing him to assume a dog position and by threatening to sodomize him with a stick.

148.    The Torture Conspirators raped Plaintiff Neisef.

149.    The Torture Conspirators prevented Plaintiff Neisef from praying.  Whenever he and other detainees tried to pray the religious prayer of salah, the Torture Conspirators would place their heavy boots on their heads and prevent them from lifting their heads off the ground. When asked, "why do you torture us and prevent us from worshipping God?," the Torture Conspirators answered "you are under our authority, we can do whatever we want with you."

150.    Plaintiff Neisef suffered property losses as a result of actions by the Torture Conspirators.  They damaged his house, took $6,000 in cash, $1,000 worth of gold and jewelry.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO THE IBRAHIEM ESTATE PLAINTIFF

151.    The Torture Conspirators detained, tortured and otherwise mistreated Ibrahiem as described above in the paragraphs relating to Plaintiff Ahmed.

152.    The Torture Conspirators wrongfully killed Ibrahiem by torturing him and thereafter refusing to provide him the needed medical attention to prevent his death.

## SPECIFIC EXAMPLES OF WRONGFUL ACTS
## RELATING TO MUSTAFA, NATHEER, OTHMAN, HASSAN

153.    The Torture Conspirators detained the July 2004 Torture Victims on July 12, 2004.  They were taken from the same house and were detained together.

154.    The Torture Conspirators tortured and otherwise mistreated the July 2004 Torture Victims.  They locked them in wooden boxes for almost 24 hours each day, for a period of two weeks.  The boxes were completely dark, were 1 meter square, 1.8 meters high and empty.  The guards ensured that the July 2004 Torture Victims were blindfolded and shackled at all times

they were in the boxes.  Guards would periodically check on them, and if they found them sitting

down or lying down, they would hit them and make them stand up, even though the boxes were

not tall enough for them to stand up in.  When Mustafa's hands began to bleed because of the

tightness of the shackles on his wrists, a doctor treated his hands but told him that he could not

make the shackles less tight because those decisions belonged to the interrogator.

155.    For the first two days the Torture Conspirators deprived the July 2004 Torture

Victims of food and provided very little water.

156.    During interrogations, the Torture Conspirators threatened the July 2004 Torture

Victims with abuse, and threatened to rape and humiliate their mothers, aunts and female

cousins.

157.    The July 2004 Torture Victims were given two bathroom breaks a day.  During

each bathroom break, they were escorted by guards to a bathroom or a portable toilet, their cuffs

were moved from the back to the front and they were given between 20 and 30 seconds to use

the toilet before they were forcibly taken back to their cells.  Mustafa and Natheer were sexually

molested during bathroom breaks by the guards.

## WRONGFUL ACTS RELATING TO THE CLASS

158.    The Torture Conspirators conducted this illegal activity in several prisons and

facilities in Iraq, including but not limited to, the Umm Qasr camp, Camp Bucca, Abu Ghraib,

Camp Cropper and the building that was formerly known as the Saddam Hussein Islamic School.

159.    The Torture Conspirators (including but not limited to the corporate Defendants

and the named Individual Defendants) tortured and otherwise mistreated Plaintiffs and Class

Members by repeatedly engaging in the following acts:

    (a)    Hooding, used to prevent Plaintiffs and putative Class Plaintiffs from

seeing and to disorient them, and also to prevent them from breathing freely. The conspirators used one or sometimes two bags, sometimes with an elastic blindfold over the eyes which, when it slips down, further impedes proper breathing. The Torture Conspirators use hooding in conjunction with beatings, thus increasing anxiety as to when blows would come. The practice of hooding also allows the Torture Conspirators to remain anonymous and act with impunity. At times, Plaintiffs and putative Class Plaintiffs are hooded up to two to four consecutive days, during which hoods are lifted only for drinking, eating or going to the toilets;

(b)      Handcuffing with flexi-cuffs, which are sometimes made so tight and used for such extended periods that they caused skin lesions and long-term after-effects on the hands (nerve damage);

(c)      Beatings with hard objects (including pistols and rifles), slapping, punching, kicking with knees or feet on various parts of the body (legs, sides, lower back, groin);

(d)      Pressing the face into the ground with boots;

(e)      Threatening further ill-treatment, reprisals against family members, and imminent execution or transfer to Guantánamo;

(f)      Stripping them naked and holding them naked for several days while held in solitary confinement in an empty and pitch black cell;

(g)      Placing them in solitary confinement for extended periods of time;

(h)      Depriving them of food and water and access to showers and open air;

(i)      Holding them incommunicado for prolonged periods;

(j)      Parading them naked outside cells in front of other detainees, and guards, and sometimes hooded with women's underwear over the head;

(k)      Humiliating them by making them stand naked against the wall of their

cells with their arms raised or with women's underwear over the head for prolonged periods -

while being laughed at by guards, including female guards;

    (l)    Urinating on them;

    (m)    Force-feeding them foreign objects, such as baseballs;

    (n)    Photographing them in humiliating positions;

    (o)    Raping them;

    (p)    Restraining them while others raped them;

    (q)    Forcing them to engage in sex acts;

    (r)    Repeatedly attacking and beating them over several days, for several

hours each time, as they are handcuffed to the bars of their cell door in humiliating (*i.e.* naked or

in underwear) and/or uncomfortable positions causing physical pain;

    (s)    Exposing them to loud noise or music, prolonged exposure to the sun over

several hours, including during the hottest time of the day when temperatures could reach 122

degrees Fahrenheit or higher;

    (t)    Forcing them to remain for prolonged periods in stressful positions such as

squatting or standing with or without their arms raised;

    (u)    Depriving them of sleep for days or weeks, by various means, including

but not limited to throwing cold water on them and illuminating their cells with powerful arc

lighting for 24 hours per day;

    (v)    Engaging in other acts for the purpose of ridiculing and attacking their

religious faith of Islam.

## CONTINUING PATTERN AND PRACTICE OF
## ATTEMPTING TO OBSTRUCT JUSTICE

160.    The Torture Conspiracy's activities have been observed by, among others, the International Committee of the Red Cross ("ICRC").  These observations were verbally shared with the United States on several occasions, including April 1, 2003.  These observations were also shared with the United States in memoranda dated May 2003, July 2003, and February 2004.  The ICRC also had additional communications on dates not known to Plaintiffs.

161.    ICRC reports as well as reports by other entities, such as Amnesty International and allied countries, resulted in concerns being raised by some United States government officials about Plaintiffs' and Class Members' treatment.

162.    Defendants took steps to repress the dissemination of information about the torture and mistreatment of prisoners.  Defendants repeatedly failed to report their own observances of torture and mistreatment of prisoners to the appropriate, non-conspiring authorities.

163.    The Corporate Defendants failed to investigate fully the conduct of their employees.

164.    Defendants and their co-conspirators attempted to persuade others that the ICRC reports were not credible and should not be used to guide the United States' actions.  However, the conspirators knew that the ICRC reports were credible and accurately reported on their misconduct.

165.    Defendants and their co-conspirators on more than one occasion moved Plaintiffs and Class Members who showed visible signs of torture and mistreatment in order to prevent non-conspiring parties from discovering the torture and mistreatment.

166.    Defendants and/or co-conspirators issued an "International Death Certificate" for the person they killed that attributed the death directly to "card-respiratory arrest – asphyxia" and claimed the "cause of the condition" was "unknown." The conspirators intentionally made these false statements on official documents to obstruct the on-going investigations into the murder, including an investigation conducted by the United States military, which began on or about October 3, 2003.  Upon information and belief, these documents were sent to the United States.

167.    Defendants and/or co-conspirators attempted to delay the completion of investigations into the torture and mistreatment of prisoners.  Defendants have failed to cooperate fully with the United States' efforts to investigate the torture and mistreatment of prisoners.

168.    Defendants took steps within the United States as well as abroad to prevent the commencement or completion of investigations into the torture and mistreatment of prisoners.

**DAMAGES**

169.    Defendants are liable for the extrajudicial killing of more than 15 persons.

170.    Defendants are liable for more than 50 suicides.

171.    Defendants are liable for numerous serious physical injuries, including irreversible brain damage, broken bones, permanent paralysis, and permanent physical ill health.

172.    Defendants are liable for causing serious mental illnesses.  Plaintiffs and Class Members have developed, among other conditions, concentration difficulties, memory problems, verbal expression difficulties, incoherent speech, acute anxiety reactions, abnormal behavior and suicidal tendencies.

173.    Defendants converted certain Plaintiffs' properties.  In addition, Defendants' conduct caused harm to certain Plaintiffs and Class Members' businesses.

**COUNT ONE**
**CLAIM UNDER THE ALIEN TORT STATUTE –**
**EXTRAJUDICIAL KILLING**

174.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

175.    The deliberate killings, under color of law, of Ibrahiem and putative Wrongful Death Class Members were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

176.    Each victim of extrajudicial killing was killed while detained at Abu Ghraib or other prisons in Iraq.

177.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to execute Ibrahiem and other members of the putative Wrongful Death Class.

178.    Defendants' misconduct caused grave and foreseeable injuries (namely death) to Ibrahiem and Wrongful Death Class Members.

179.    Defendants are liable for their conduct that led to the wrongful deaths

180.    Related Plaintiffs and Class Members were forced to suffer severe physical and psychological abuse and agony as a result of the extrajudicial killings.

## COUNT TWO
## CIVIL CONSPIRACY TO COMMIT
## EXTRAJUDICIAL KILLINGS

181.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

182.    Defendants agreed with each other and others to participate in a series of unlawful acts.

183.    Each victim of extrajudicial killing was killed while detained at Abu Ghraib or other prisons in Iraq.

184.    Each Defendant performed one or more overt acts (set forth above in detail) pursuant to and in furtherance of the common scheme.

185.    Defendants are liable for committing extrajudicial killings because they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to execute Ibrahiem and other members of the putative Wrongful Death Class.

186.    Related Plaintiffs and Class Members suffered severe physical and psychological abuse and agony as a result of the conspiracy to conduct extrajudicial killings.

## COUNT THREE
## AIDING AND ABETTING
## EXTRAJUDICIAL KILLINGS

187.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

188.    Defendants knowingly and substantially assisted others in committing extrajudicial killings.

189.    Each victim of extrajudicial killing was killed while detained at Abu Ghraib or other prisons in Iraq.

190.    Defendants are liable for the extrajudicial killings because they substantially aided and abetted others who committed extrajudicial killings of Ibrahiem and other members of the putative Wrongful Death Class.

191.    Related Plaintiffs and Class Members were forced to suffer severe physical and psychological abuse and agony as a result of Defendants' misconduct.

## COUNT FOUR
## CLAIM UNDER THE ALIEN TORT STATUTE – TORTURE

192.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

193.    Plaintiffs bring this claim on their own behalf and on behalf of the class against all Defendants.

194.    Defendants' acts and omissions were deliberate and intentional.  Defendants acted purposefully to punish, intimidate, and to obtain information from Plaintiffs and Class Members.

195.    The acts (including rape and sexual assault) committed by Defendants constitute torture in violation of the law of nations.  The acts were taken under the color of the United States' authority, although in direct contradiction to the United States' express policy against torture.

196.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to torture Plaintiffs and Class Members.

197.    Defendants' misconduct caused grave and foreseeable injuries to Plaintiffs and Class Members.

198.    Defendants are liable for their misconduct that led to the torture of Plaintiffs and Class Members.

## COUNT FIVE
## CIVIL CONSPIRACY TO TORTURE

199.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

200.    Defendants agreed with each other and others to participate in a series of unlawful acts.

201.    Each Defendant performed one or more overt acts (set forth above in detail) pursuant to and in furtherance of the common scheme.

202.    Defendants are liable for torture because they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to torture Plaintiffs and Class Members.

203.    Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT SIX
## AIDING AND ABETTING TORTURE

204.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

205.    Defendants knowingly and substantially assisted others in torturing Plaintiffs and Class Members.

206.    Defendants are liable for the torture because they substantially aided and abetted others who were torturing Plaintiffs and Class Members.

207.    Defendants' substantial assistance caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT SEVEN
## CLAIM UNDER THE ALIEN TORT STATUTE –
## CRUEL, INHUMAN OR DEGRADING TREATMENT

208.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

209.    Plaintiffs bring this claim on their own behalf and on behalf of the Class Members against all Defendants.

210.    The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs and Class Members, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical or moral resistance.

211.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to subject Plaintiffs and Class Members to cruel, inhuman or degrading treatment.

212.    Defendants are liable for their conduct that led to the cruel, inhuman and degrading treatment of Plaintiffs and Class Members.

213.    Defendants' misconduct caused grave and foreseeable injuries to Plaintiffs and Class Members.

## COUNT EIGHT
## CIVIL CONSPIRACY TO TREAT PLAINTIFFS AND CLASS MEMBERS IN
## A CRUEL, INHUMAN OR DEGRADING MANNER

214.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

215.    Defendants agreed with each other and others to participate in a series of unlawful acts.

216.    Each Defendant performed one or more overt acts (set forth above in detail) pursuant to and in furtherance of the common scheme.

217.    Defendants are liable for the cruel, inhuman and degrading treatment of Plaintiffs and Class Members because they because they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to so treat Plaintiffs and Class Members.

218.    Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Plaintiffs and Class Members.

**COUNT NINE**
**AIDING AND ABETTING**
**CRUEL, INHUMAN AND DEGRADING TREATMENT**

219.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

220.    Defendants knowingly and substantially assisted others in treating Plaintiffs and Class Members in a cruel, inhuman and degrading manner.

221.    Defendants are liable for the injuries caused by the cruel, inhuman and degrading treatment because they substantially aided and abetted others in so treating Plaintiffs and Class Members.

222.    Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT TEN
## CLAIM UNDER THE ALIEN TORT STATUTE – WAR CRIMES

223.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

224.    Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and constitute war crimes.

225.    Defendants' acts took place during a period of armed conflict.

226.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to commit war crimes against Plaintiffs and Class Members.

227.    Defendants are liable for their conduct that constitutes war crimes.

228.    Defendants' misconduct caused grave and foreseeable injuries to Plaintiffs and Class Members.

## COUNT ELEVEN
## CIVIL CONSPIRACY TO COMMIT WAR CRIMES

229.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

230.    Defendants agreed with each other and others to participate in a series of unlawful acts.

231.    Each Defendant performed one or more overt acts (set forth above in detail) pursuant to and in furtherance of the common scheme.

232.    Defendants are liable for war crimes against Plaintiffs and Class Members because they because they set the conditions, directly and/or indirectly facilitated, ordered,

acquiesced, confirmed, ratified and/or conspired with others to commit war crimes against Plaintiffs and Class Members.

233.    Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT TWELVE
## AIDING AND ABETTING
## COMMISSION OF WAR CRIMES

234.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

235.    Defendants knowingly and substantially assisted others in committing war crimes against Plaintiffs and Class Members.

236.    Defendants are liable for the injuries caused by the war crimes because they substantially aided and abetted others in committing war crimes against Plaintiffs and Class Members.

237.    Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT THIRTEEN
## CLAIM UNDER THE ALIEN TORT STATUTE –
## CRIMES AGAINST HUMANITY

238.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

239.    The acts described herein committed against Plaintiffs constitute crimes against humanity, including willful killing, torture, rape, arbitrary arrest and detention, and other inhumane acts committed as part of a widespread or systematic attack on persons believed to be opposed to the occupation.  Leaders, organizers, instigators and accomplices participating in the

formulation of these acts are responsible for all acts performed by any person in execution of such plan.

240.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to commit crimes against Plaintiffs and Class Members.

241.    Defendants are liable for their conduct that constitutes crimes against humanity.

242.    Defendants' misconduct caused grave and foreseeable injuries to Plaintiffs and Class Members.

**COUNT FOURTEEN**
**CIVIL CONSPIRACY TO COMMIT CRIMES AGAINST HUMANITY**

243.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

244.    Defendants agreed with each other and others to participate in a series of unlawful acts.

245.    Each Defendant performed one or more overt acts (set forth above in detail) pursuant to and in furtherance of the common scheme.

246.    Defendants are liable for crimes against humanity because they because they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to commit crimes against Plaintiffs and Class Members.

247.    Defendants' knowing participation in the conspiracy to commit crimes against humanity caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT FIFTEEN
## AIDING AND ABETTING
## COMMISSION OF CRIMES AGAINST HUMANITY

248.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

249.    Defendants knowingly and substantially assisted others in committing crimes against humanity.

250.    Defendants are liable for the injuries caused by the crimes because they substantially aided and abetted others in committing crimes against humanity, including crimes against Plaintiffs and Class Members.

251.    Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT SIXTEEN
## ASSAULT AND BATTERY

252.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

253.    Defendants unlawfully intended to and did inflict immediate injury upon Plaintiffs and Class Members.

254.    Defendants intentionally assaulted, battered, and made other offensive contacts; and aided and abetted the assaulting, battering and offensively contacting, of the Plaintiffs and Class Members.

255.    Plaintiffs and Class Members did not consent to the offensive contacts. Plaintiffs feared for their personal safety and felt threatened by Defendants' actions.

256.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to commit the assaults and batteries.

257.    Defendants' acts caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT SEVENTEEN
## CIVIL CONSPIRACY TO ASSAULT AND BATTER

258.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

259.    Defendants agreed with each other and others to participate in a series of unlawful acts.

260.    Each Defendant performed one or more overt acts (set forth above in detail) pursuant to and in furtherance of the common scheme.

261.    Defendants are liable for the assaults and batteries against Plaintiffs and Class Members because they because they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to commit the assaults and batteries.

262.    Defendants' knowing participation in the conspiracy to assault and batter caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT EIGHTEEN
## AIDING AND ABETTING
## ASSAULTS AND BATTERIES

263.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

264.    Defendants knowingly and substantially assisted others in assaulting and battering Plaintiffs and Class Members.

265.    Defendants are liable for the injuries caused because they substantially aided and abetted others in assaulting and battering Plaintiffs and Class Members.

266.    Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT NINETEEN
## SEXUAL ASSAULT AND BATTERY

267.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

268.    Certain Plaintiffs and certain Class Members were raped and otherwise sexually assaulted and battered by Defendants and their co-conspirators.

269.    Defendants intended to, and did, cause offensive sexual contacts with intimate parts of another, including but not limited to Plaintiffs.  Defendants acted to cause Plaintiffs' imminent apprehension of harmful and offensive contact with their intimate parts.

270.    Plaintiffs and Class Members did not consent to the contacts.  Plaintiffs and Class Members feared for their personal safety and felt threatened by Defendants' actions.

271.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to sexually assault and batter certain Plaintiffs and Class Members.

272.    Defendants' act caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT TWENTY
## CIVIL CONSPIRACY TO SEXUALLY ASSAULT AND BATTER

273.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

274.    Defendants agreed with each other and others to participate in a series of unlawful acts.

275.    Each Defendant performed one or more overt acts (set forth above in detail) pursuant to and in furtherance of the common scheme.

276.    Defendants are liable for the sexual assaults and batteries against certain Plaintiffs and Class Members because they because they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to sexually assault and batter certain Plaintiffs and Class Members.

277.    Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Plaintiffs and Class Members.

**COUNT TWENTY-ONE**
**AIDING AND ABETTING**
**SEXUAL ASSAULTS AND BATTERIES**

278.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

279.    Defendants knowingly and substantially assisted others in sexually assaulting Plaintiffs and Class Members.

280.    Defendants are liable for the injuries caused by the crimes because they substantially aided and abetted others in sexually assaulting and battering Plaintiffs and Class Members.

281.    Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiffs and Class Members.

**COUNT TWENTY-TWO**
**WRONGFUL DEATH**

282.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

283.    Defendants' wrongful acts and omissions caused the death of Ibrahiem and the deaths of the Wrongful Death Class Members.

284.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to act in the manner that led to the wrongful deaths.

285.    The deaths of Ibrahiem and the other persons were the foreseeable result of Defendants' wrongful acts and omissions.

**COUNT TWENTY-THREE**
**CIVIL CONSPIRACY TO CAUSE WRONGFUL DEATH**

286.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

287.    Defendants agreed with each other and others to participate in a series of unlawful acts.

288.    Each Defendant performed one or more overt acts (set forth above in detail) pursuant to and in furtherance of the common scheme.

289.    Defendants are liable for the wrongful death of Ibrahiem and the other Wrongful Death Class Members because they because they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to act in the manner that led to the wrongful deaths.

290.    Defendants' knowing participation in the conspiracy leading to wrongful deaths caused deaths and other grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT TWENTY-FOUR
## AIDING AND ABETTING
## WRONGFUL DEATHS

291.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

292.     Defendants knowingly and substantially assisted others in causing foreseeable wrongful deaths.

293.     Defendants are liable for the wrongful deaths of Ibrahiem and the other Wrongful Death Class Members because they substantially aided and abetted others in the acts leading to the wrongful deaths.

294.     Defendants' knowing and substantial assistance to others caused death and grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT TWENTY-FIVE
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

295.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

296.     Defendants intentionally inflicted severe emotional distress by way of extreme and outrageous conduct on Plaintiffs and Class Members.  Defendants intended or recklessly disregarding the probability of Plaintiffs and Class Members suffering emotional distress when directing offensive conduct toward Plaintiffs and Class Members or carrying out offensive conduct while aware of Plaintiffs' and Class Members' presence.

297.     Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to inflict emotional distress on Plaintiffs and Class Members.

298.    Defendants' acts caused grave and foreseeable injuries to Plaintiffs and Class Members.

## COUNT TWENTY-SIX
## CIVIL CONSPIRACY TO INFLICT EMOTIONAL DISTRESS

299.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

300.    Defendants agreed with each other and others to participate in a series of unlawful acts.

301.    Each Defendant performed one or more overt acts (set forth above in detail) pursuant to and in furtherance of the common scheme.

302.    Defendants are liable for intentional infliction of emotional distress on Plaintiffs and Class Members because they because they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to inflict emotional distress on Plaintiffs and Class Members.

303.    Defendants' knowing participation in the conspiracy to inflict intentionally emotional distress caused grave and foreseeable damages to Plaintiffs and Class Members.

## COUNT TWENTY-SEVEN
## AIDING AND ABETTING
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

304.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

305.    Defendants knowingly and substantially assisted others in intentionally inflicting emotional distress upon Plaintiffs and Class Members.

306.     Defendants are liable for the injuries caused by the intentional infliction of emotional distress because they substantially aided and abetted others in causing the emotional distress to Plaintiffs and Class Members.

307.     Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Plaintiffs and Class Members.

### COUNT TWENTY-EIGHT – AGAINST THE CORPORATE DEFENDANTS NEGLIGENT HIRING AND SUPERVISION

308.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

309.     Defendants Titan and CACI Corporate Defendants acted negligently and directly harmed Plaintiffs and Class Members by:

(a)     failing to take the appropriate steps in hiring proper personnel to perform services;

(b)     failing to properly screen personnel before their hiring;

(c)     failing to train personnel properly to perform interrogation services legally;

(d)     failing to investigate allegations of torture and abuse carried by their employees; and

(e)     negligently setting the conditions that facilitated the abuse.

310.     Defendants Titan and CACI Corporate Defendants' negligence directly and foreseeably harmed Plaintiffs and Class Members.

**COUNT TWENTY-NINE – AGAINST THE CORPORATE DEFENDANTS**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

311.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

312.    Defendants negligently inflicted severe emotional distress on Plaintiffs and Class Members.

313.    Defendants had a duty to Plaintiffs and Class Members, which they breached.

314.    Defendants had a duty to bystanders Plaintiffs and Class Members, who had close relationships to the victims, were present at the scene of the infliction of injury, and were immediately aware of the victim's injury.

315.    Defendants' negligence directly and foreseeably harmed Plaintiffs and Class Members.

**COUNT THIRTY – AGAINST THE CORPORATE DEFENDANTS**
**VIOLATION OF RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT ("RICO")**

316.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

317.    Defendant Titan and the CACI Corporate Defendants violated Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

318.    Defendant Titan and the CACI Corporate Defendants, Defendant Israel, Defendant Nakhla, Defendant Stefanowicz, Defendant Duggan and Defendant Johnson, along with Spc. Charles Graner, Spc. Roman Krol, Spc. Javal Davis, Spc. Jeremy Sivits, Spc. Armin Cruz, Spc. Megan Ambuhl, Staff Sgt. Ivan "Chip" Frederick, Spc. Sabrina Harman, and other persons known and unknown, formed an Enterprise as that term is defined by RICO.  The

Enterprise intended to, and did, earn millions of dollars more than would have been earned in the absence of illegal activity.

319.    The Enterprise's activities affected interstate commerce.  The impacts on interstate commerce include, but are not limited to, the hiring of persons across the United States, the transport of employees across the United States, and otherwise being generally engaged in the production, distribution or acquisition of goods and services in interstate commerce.

320.    Defendant Titan and the CACI Corporate Defendants were associated with the Enterprise, which is an association-in-fact.

321.    Defendant Titan and the CACI Corporate Defendants participated in and conducted, directly or indirectly, the affairs of the Enterprise.

322.    Defendant Titan participated in the affairs of the Enterprise through a pattern of racketeering activity.  Defendant Titan's racketeering activities included, but are not limited to, repeatedly making threats of murder.

323.    The CACI Corporate Defendants participated in the affairs of the Enterprise through a pattern of racketeering activity.  The CACI Corporate Defendants' racketeering activities included, but are not limited to, repeatedly making threats of murder.

324.    The Enterprise began in or around January 2002 and continues as an ongoing concern.

325.    Plaintiffs Saleh, Hadod, Ahmed, Neisef, and the RICO Class Members have standing to bring this action because they suffered substantial business and property damages, as required by 18 U.S.C. § 1964(c), as a result of the Defendants' actions and the Enterprise's actions in robbing and threatening to murder them.

326.    Defendants set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired with others to engage in racketeering activities and bring about Plaintiffs' and Class Members' RICO injuries.

**COUNT THIRTY-ONE**
**CONSPIRACY TO VIOLATE**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**

327.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

328.    Each and every Defendant conspired to violate RICO Section 1962(c). Defendants Israel, Nakhla, Stefanowicz, Duggan and Johnson were aware of, and agreed to, conduct the affairs of the Enterprise through a pattern of racketeering activity.  Defendants Israel, Nakhla, Stefanowicz, Duggan and Johnson were aware of, and agreed to, the predicate acts committed by Defendant Titan, the CACI Corporate Defendants, Spc. Charles Graner, Spc. Roman Krol, Spc. Javal Davis, Spc. Jeremy Sivits, Spc. Armin Cruz, Spc. Megan Ambuhl, Staff Sgt. Ivan "Chip" Frederick, Spc. Sabrina Harman, and the other members (known and unknown) of the Enterprise.

**PRAYER FOR DAMAGES**

329.    Plaintiffs and Class Members are entitled to any and all remedies available to them as a result of the conduct alleged herein, including, but not limited to:

        (a)     compensatory damages for physical, mental and economic injuries;

        (b)     punitive damages in an amount sufficient to punish Defendants and to deter them from engaging in similar misconduct;

        (c)     treble damages to the extent permitted by RICO; and

        (d)     attorneys' fees and costs, including but not limited to such fees and costs

as may be awarded under RICO.

330.    Each and every Plaintiff and Class Member is entitled to millions of dollars in compensatory and punitive damages.

Date:  September 12, 2005                              /s/ Susan L. Burke
                                                Susan L. Burke (D.C. Bar # 414939)
                                                Jonathan H. Pyle (admitted *pro hac vice*)
                                                BURKE PYLE LLC
                                                3527 Lancaster Avenue
                                                Philadelphia, PA 19104
                                                Telephone:    (215) 387-4705
                                                Facsimile:    (215) 387-4713

                                                Jennifer Green
                                                Judith Brown Chomsky
                                                CENTER FOR CONSTITUTIONAL RIGHTS
                                                666 Broadway, 7th Floor
                                                New York, NY 10012
                                                Telephone:    (212) 614-6439
                                                Facsimile:    (212) 614-6499

                                                Shereef Hadi Akeel (admitted *pro hac vice*)
                                                AKEEL & VALENTINE, P.C.
                                                401 South Old Woodward Avenue
                                                Suite 430
                                                Birmingham, MI 48009
                                                Telephone:    (248) 594-9595
                                                Facsimile:    (248) 594-4477

                                                Joseph Margulies
                                                Locke Bowman
                                                MACARTHUR JUSTICE CENTER
                                                UNIVERSITY OF CHICAGO LAW SCHOOL
                                                1111 East 60th Street
                                                Chicago, IL 60637
                                                Telephone:    (773) 702-9560
                                                Facsimile:    (773) 702-0771

                                                Susan Feathers
                                                UNIVERSITY OF PENNSYLVANIA
                                                        LAW SCHOOL
                                                3400 Chestnut Street
                                                Philadelphia, PA 19104-6204

Telephone:    (215) 898-0459
Facsimile:    (215) 573-5808

*Counsel for Plaintiffs and Class Plaintiffs*