**EXHIBIT L**

**GAO**

United States Government Accountability Office

Report to Congressional Committees

April 2005

# INTERAGENCY CONTRACTING

## Problems with DOD's and Interior's Orders to Support Military Operations



GAO
Accountability * Integrity * Reliability

GAO-05-201

(DOD) during military operations in Iraq provides insight into aspects of interagency contracting that need careful attention. By August 2003, DOD was faced with a critical and largely unforeseen need for interrogators and screeners, some of whom were needed at Abu Ghraib prison. DOD had in place only a contingency contracting office in Iraq at the time, whose efforts were focused on obtaining basic necessities such as portable sanitation facilities and water trucks. To obtain interrogation and other services quickly, DOD relied on an Interior contracting office that specializes in awarding and administering contracts for other agencies through fee-for-service arrangements. Over an 8-month period, the Interior contracting office issued 11 task orders, valued at over $66 million, to CACI International, Inc. (CACI) on behalf of DOD. Of the 11 orders, 6 were for interrogation, screening, and other intelligence-related services, and 5 were for logistics support services. Interior placed the task orders on an information technology contract that CACI had in place with the General Services Administration (GSA) under GSA's Schedule program.[3] The Interior Inspector General (IG) and GSA subsequently determined that 10 of the 11 orders were out of scope of the information technology contract. Following the disclosure of the prisoner abuse at Abu Ghraib and the implication of contractor employees in the abuse, questions arose about how DOD used Interior to acquire interrogators and screeners on an information technology contract and, more generally, about the integrity of the federal procurement process.

To learn more about some of the challenges associated with interagency contracting, we assessed (1) breakdowns that occurred in the procurement process when Interior placed orders with CACI for interrogation and other services in Iraq, (2) factors that led to the breakdowns, and (3) the extent to which recent or planned actions by Interior and DOD address these factors. To help ensure that the corrective actions underway will fully address the problems, we are recommending steps Interior and DOD can take to further refine those efforts.

We conducted our work at Interior, DOD, and GSA. In addition, we spoke with Army program officials who were responsible for overseeing the contractor's performance in Iraq and with contractor employees and representatives. Appendix I contains more detail on our scope and methodology. Appendix V contains a summary of the 11 orders for

---

[3]Schedule contracts allow agencies to quickly procure commonly available commercial goods and services at prices associated with volume buying.

increased substantially over the past 3 years, with reported obligations increasing from $609 million in fiscal year 2002 to $1.02 billion in fiscal year 2004.

The fee-for-service procurement process generally involves three parties: the agency requiring a good or service; the agency placing the order or awarding the contract; and contractors providing the goods and services the government needs. The requiring agency officials determine the goods or services needed and, if applicable, prepare a statement of work, sometimes with the assistance of the ordering organization. The contracting officer at the ordering office ensures that the contract or order is properly awarded or issued (including any required competition), and administered under applicable regulations and agency requirements. If contract performance will be ongoing, a contracting officer's representative—generally an official at the requiring agency with relevant technical expertise—is normally designated by the contracting officer to monitor the contractor's performance and serve as the liaison between the contracting officer and the contractor.

At the same time as use of interagency contracting has increased, DOD has also increased its use of contractors in military operations. Particularly since the 1991 Gulf War, contractors have taken over support positions that were traditionally filled by government personnel. For example, a company that CACI later acquired began providing intelligence support to the Army in Germany in 1999.[4] When the Army in Europe deployed intelligence personnel to the Iraq theater in 2003, CACI employees went with them. Following the announcement of the end of major combat in May 2003, the Army, as part of the Coalition Joint Task Force Seven (CJTF-7), was expecting a non-hostile situation and did not plan for an insurgency.[5] It was unprepared for the volume of Iraqi detainees and the

---

[4] In 1999, the Army acquired intelligence analysis support from Premier Technology Group. CACI acquired the assets of Premier Technology Group in May 2003, including the GSA contract.

[5] The CJTF was designed to conduct offensive operations to defeat remaining noncompliant forces and neutralize destabilizing influences in the Iraq theater to create a secure environment in direct support of the Coalition Provisional Authority. Previous reports demonstrate that DOD did not adequately plan for the acquisition support required to perform its mission in Iraq. In fact, in June 2004, we recommended that the Secretary of Defense develop a strategy for assuring that adequate acquisition staff and other resources can be made available in a timely manner to improve the delivery of acquisition support in future operations. GAO, *Rebuilding Iraq: Fiscal Year 2003 Contract Award Procedures and Management Challenges*, GAO-04-605 (Washington, D.C.: June 1, 2004).

| | |
|---|---|
| | orders placed by non-DOD agencies on behalf of DOD.[14] The Interior contracting office, however, placed the orders directly with CACI without notifying other prospective contractors. Interior did not make any written determination that no additional contractors could be identified or that the competition requirement should be waived in this case. |
| Decision to Use Interagency Contracting Was Not Properly Justified | In contracting through Interior, the Army did not follow requirements to justify use of interagency contracts. According to procurement regulations, an Economy Act determination and findings should have been approved by an Army contracting officer or another designated official to justify the use of Interior to acquire the services for the Army.[15] The Economy Act authorizes agencies to enter into mutual agreements to obtain supplies or services by interagency acquisition.[16] The FAR mandates that the requiring activity document that an Economy Act order is in the agency's best interest and that it cannot obtain the goods and services as conveniently or economically by contracting directly with a private source. However, Army personnel did not prepare the determination and findings, as required.[17] |
| Ordering Procedures Meant to Ensure Best Value Were Not Followed | Interior placed the orders with CACI by using a blanket purchase agreement (BPA) established under the GSA Information Technology Schedule contract in 1998.[18] BPAs, a simplified method of filling anticipated repetitive needs for supplies and services, allow agencies to establish "charge accounts" with qualified vendors. The BPA in this case |

---

[14] DFARS § 208.404-70 (effective Oct. 25, 2002).

[15] FAR Subpart 17.5.

[16] 31 U.S.C. § 1535; FAR § 17.502(a).

[17] An Economy Act determination and findings is not required when the agency needing the services uses certain required or optional sources of supply (such as GSA Schedule contracts) or for acquisitions using government wide acquisition contracts (FAR § 17.500). These conditions were not met in this instance because the Army—the agency needing the services—was not ordering directly from the GSA Schedules and because a government wide acquisition contract was not used.

[18] The BPA in question was originally established in 1998 between Premier Technology Group Inc. (the assets of which were acquired by CACI in May 2003) and the Army Directorate of Contracting at Fort Huachuca, Arizona. In 2001, Interior's National Business Center assumed responsibility for the contracting staff at Fort Huachuca, and the BPA was transferred to Interior. Interior subsequently extended the BPA in 2003 to match the time frame of the underlying GSA contract.

# Appendix IV: Comments from CACI International Inc.


EVER VIGILANT

April 07, 2005

Mr. David E. Cooper, Director
Acquisition and Sourcing Management
United States Government Accountability Office
441 G. Street, N.W.
Washington, D.C. 20548

Re: *CACI Comments on Draft GAO Report*

Dear Mr. Cooper:

I.  **Executive Summary**

CACI International Inc and CACI Premier Technology, Inc. (collectively "CACI") submit the following comments on the GAO's draft report, *Interagency Contracting, Problems with DOD's and Interior's Orders to Support Military Operations* (GAO-05-201) ("GAO Report" or "Report"). CACI believes that the GAO Report has identified a number of areas in which the Government can improve its contracting processes. CACI also believes, however, that several aspects of the Report require clarification or revision, as discussed further below.[1] In summary:

1. CACI recommends that the final Report more fully acknowledge the impacts of the urgent, wartime circumstances on the contracting practices used by the Army and Department of the Interior ("DOI") and on the relationships between CACI and the Army and DOI.

2. CACI believes it acted reasonably and in good faith in accepting and performing the delivery orders ("DOs") for intelligence support services in Iraq that were awarded pursuant to a Blanket Purchase Agreement ("BPA") established under CACI Premier Technology, Inc.'s ("CACI-PTI") GSA Federal Supply Schedule Information Technology ("IT") contract, particularly given the exigent wartime circumstances and prior course of dealing among the parties. Likewise, CACI believes that the DOI acted reasonably under the circumstances in awarding those DOs to CACI.

---

[1] These comments focus primarily on matters in the Report relating to CACI and do not address GAO's comments and recommendations relating solely to internal Government processes and controls.

CACI International Inc and Subsidiary Companies
Worldwide Headquarters • 1100 North Glebe Road • Arlington, Virginia 22201 • (703) 841-7800 • Fax (703) 841-7882
CACI Website - www.caci.com

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 2

3. CACI submits that prior Government determinations that the DOs for intelligence support services in Iraq were "outside the scope" of CACI-PTI's GSA schedule contract, did not properly consider:

   - The prior course of dealing between the Army and CACI's predecessor, Premier Technology Group, Inc. ("PTG"), in using the GSA IT contract, and its related BPA, for the acquisition of intelligence support services; and

   - The importance of IT in the performance of intelligence support work, including interrogation.

4. CACI believes that it (i) acted reasonably and with full disclosure to the DOI and the Army in its selection of GSA labor categories and labor rates for interrogation support services provided under the Statements of Work ("SOWs"), and that (ii) contract scope determinations should not be based on unduly narrow and mechanical comparison of SOWs and GSA contract labor categories.

5. The suggestions in the Report that CACI's employees improperly displaced Government employees in the acquisition process or had a "conflict of interest" that undermined the integrity of the competitive procurement process, are both unfair and unwarranted in that they fail to consider all the relevant circumstances surrounding the award and performance of the DOs and the contributions that CACI made to filling an urgent need on the ground in Iraq.

6. CACI has enhanced its contracting policies and procedures as a result of various Government reviews of those DOs, and believes that the Report provides a baseline for improving the interagency acquisition process.

II.   **Importance of the Unique Wartime Environment**

The GAO Report includes some recognition of the fact that the Army's acquisition of the intelligence and other services discussed in the Report occurred in unique, wartime circumstances. As the Report correctly points out:

   - "[At] the end of major combat in May 2003, the Army . . . was expecting a non-hostile situation and did not plan for an insurgency," Report at 5;

   - The situation in Iraq at that time "was extraordinary – a wartime environment and an atmosphere of turmoil and urgency," id. at 3; and,

WASHINGTON D.C. • SAN DIEGO • LONDON