# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SALEH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-CV-1165 (JR) |
| v. | ) | |
| | ) | |
| TITAN CORP., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION OF DEFENDANTS CACI INTERNATIONAL INC, CACI, INC.-FEDERAL, AND CACI PREMIER TECHNOLOGY, INC. TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT

Defendants CACI International Inc, CACI, INC.-FEDERAL, and CACI Premier Technology, Inc., hereby mover to dismiss Plaintiffs' Third Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Dismissal is appropriate because the Third Amended Complaint fails to state a claim for which relief may be granted and the Court lacks subject-matter jurisdiction over Plaintiffs' claims. The basis for the motion to dismiss is set out in greater detail in the accompanying Memorandum.

WHEREFORE, Defendants CACI International Inc, CACI, INC.-FEDERAL, and CACI Premier Technology, Inc. respectfully request that the Court dismiss the Third Amended Complaint with prejudice. A proposed order is attached.

Respectfully submitted,

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:    (202) 429-3000
Facsimile:    (202) 429-3902

**_Counsel for Defendants CACI International Inc,_**
**_CACI, INC.-FEDERAL, and CACI PT, Inc._**

April 7, 2006

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SALEH, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 05-CV-1165 (JR) |
| v. | ) |
| | ) |
| TITAN CORP., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OF DEFENDANTS CACI INTERNATIONAL INC, CACI, INC.-FEDERAL, AND CACI PREMIER TECHNOLOGY, INC. IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

*Counsel for Defendants CACI International Inc,
CACI, INC-FEDERAL, and CACI PT, Inc.*

April 7, 2006

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   ANALYSIS............................................................................................................4

    A.    The Standard For CACI's Motion To Dismiss .......................................................4

    B.    Plaintiffs' Alien Tort Claims Must Be Dismissed ..................................................5

    C.    Plaintiffs' Common Law Tort Claims Are Preempted ...........................................10

        1.    Federal Military Contractors Are Immune From Tort Liability For Any "Combatant Activities" For Which the Government Itself Is Immune ........................................................................................................11

        2.    The Third Amended Complaint Makes Clear On Its Face That All Misconduct Alleged Falls Within the "Combatant Activities" Exception ......................................................................................................13

        3.    Defendants' Contractual Responsibilities: To Provide Military Interrogation Services ......................................................................................15

        4.    Defendants' Employees Reported To, And Were Supervised By, U.S. Military Forces.................................................................................................17

        5.    The Foreign Country Exception To The FTCA Bars Plaintiffs' Common Law Claims ............................................................................................21

    D.    Plaintiffs' Claims Present Non-Justiciable Political Questions ............................22

        1.    Claims for Wartime Reparations Present Classic Political Questions................................................................................................................26

        2.    The Propriety of Reparations for Injuries Incurred in the Prosecution of War Is An Issue Textually Committed to the Political Branches ........................................................................................28

        3.    There Are No Judicially Discoverable and Manageable Standards for Evaluating Plaintiffs' Claims ...............................................................31

    E.    Plaintiffs' RICO Claims Fail As A Matter Of Law ..............................................32

        1.    Plaintiffs Lack Standing To Bring A Civil RICO Claim ..........................34

        2.    Plaintiffs Fail To Plead The Elements Of Any RICO Violation ..............36

a.  Plaintiffs Fail To Show A § 1962 Violation Directly And Proximately Caused Injury To Plaintiffs' Business Or Property..................................................................................36

b.  Plaintiffs Fail To Plead An "Enterprise" .......................................37

3.  Plaintiffs Fail To Plead A Conspiracy Pursuant To 18 U.S.C. § 1962(D)..................................................................................38

F.  Plaintiffs Have Alleged No Facts That Would Create Liability For CACI International Inc Or CACI, Inc.-Federal...............................................40

III.  CONCLUSION........................................................................................43

## TABLE OF AUTHORITIES

### CASES

*In re African-American Slave Descendants Litig.*, 304 F. Supp. 2d 1027 (N.D. Ill. 2004).....26, 28

*Alperin v. Vatican Bank*, 242 F. Supp. 2d 686 (N.D. Cal. 2003)........................................28, 29, 31

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) ........................................................28

*Anderman v. Fed. Republic of Austria*, 256 F. Supp. 2d 1098 (C.D. Cal. 2003)..............27, 28, 31

*Ange v. Bush*, 752 F. Supp. 509 (D.D.C. 1990).........................................................29

*Baker v. Carr*, 369 U.S. 186 (1962)..........................................................24, 25, 28, 31

*Beck v. Prupis*, 529 U.S. 494 (2000)..........................................................35

*Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486 (C.D. Cal. 1993)..........................................31

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) .......................................... *passim*

*Burger-Fischer v. Degussa AG*, 65 F. Supp. 2d 248 (D.N.J. 1999) ................................30

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003) ................................34

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001)....................................................37

*Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996)..........................................................37

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948) ................................31

*Dames & Moore v. Regan*, 453 U.S. 654 (1981)..........................................................28

*Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005)....................................................10

*Doe v. State of Isral*, 400 F. Supp. 2d 86 (D.D.C. 2005)............................................................38

*El-Shifa Pharm. Indus. Co. v. United States*, 55 Fed. Cl. 751 (2003), *aff'd*, 378 F.3d 134 (Fed. Cir. 2004)..........................................................28, 30

*Frumkin v. JA Jones, Inc.*, 129 F. Supp. 2d 370 (D.N.J. 2001) ....................................................30

*Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9 (D.D.C. 2001) ..........................................................5

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) .................................................................6, 10

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ......................................................................12, 16, 24

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)..........................................................................29

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) .......................................39

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192 (D.C. Cir. 1992).....................................................5

*Holmes v. Secs. Investor Protections Corp.*, 503 U.S. 258 (1992)..........................................34, 36

*Hwang Geum Joo v. Japan*, 172 F. Supp. 2d 52 (D.D.C. 2001), *aff'd*, 332 F.3d 679 (D.C. Cir. 2003), *vacated on other grounds*, 542 U.S. 901 (2004) ..............................................27

*Hwang Geum Joo v. Japan,*, 413 F.3d 45 (D.C. Cir.).....................................................................27

*ITT Indus. v. NLRB*, 251 F.3d 995 (D.C. Cir. 2001)........................................................................6

*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005).................................................. *passim*

*Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424 (D.N.J. 1999).....................................................30

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)...............................................................................12

*Johnson v. United States*, 170 F.2d 767 (9th Cir. 1948).........................................................14, 16

*Jones v. Exec. Office of President*, 167 F. Supp. 2d 10 (D.D.C. 2001) ...........................................5

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) .........................................................8, 11, 13

*Kucinich v. Bush*, 236 F. Supp. 2d 1 (D.D.C. 2002)......................................................................29

*Lipsman v. Sec'y of Army*, 257 F. Supp. 2d 3 (D.D.C. 2003) ..........................................................5

*Luftig v. McNamara*, 373 F.2d 664 (D.C. Cir. 1967) ....................................................................29

*Mahorner v. Bush*, 224 F. Supp. 2d 48 (D.D.C. 2002)..................................................................29

*McKay v. Rockwell Int'l Corp.*, 704 F.2d 444 (9th Cir. 1983)......................................................10

*Michael v. United States*, 260 F. Supp. 2d 23 (D.D.C. 2003)........................................................29

*Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002).........................................5

*Norris v. Dep't of Defense,* Civ. Act. No. 95-2392 (PLF), 1996 U.S. Dist. LEXIS 22753
    (D.D.C. Oct. 28, 1996), *aff'd,* No. 96-5326, 1997 U.S. App. LEXIS 16360 ....................32

*Oetjen v. Cent. Leather Co.,* 246 U.S. 297 (1918).........................................................................29

*Paul v. Howard Univ.,* 754 A.2d 297 (D.C. 2000) ........................................................42

*Perrin v. United States,* 4 Ct. Cl. 543 (1868, *aff'd,* 79 U.S. (12 Wall.) 315 (1871) ....................26

*Ex Parte Quirin,* 317 U.S. 1 (1942) .........................................................................12, 16, 24

*Reeves v. Ernst & Young,* 507 U.S. 170 (1993)..........................................................................35

*Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155 (1993) ................................................29

*Salinas v. United States,* 522 U.S. 52 (1997)..........................................................................39

*Sanchez-Espinoza v. Reagan,* 770 F.2d 202 (D.C. Cir. 1985)........................................2, 7, 8, 9, 10

*Sarei v. Rio Tinto PLC,* 221 F. Supp. 2d 1116 (C.D. Cal. 2002)............................................27, 28

*Scheck v. Gen. Elec. Corp.,* Civ. A. No. 91-1594, 1992 WL 13219 (D.D.C. Jan. 7, 1992) ..........34

*Schneider v. Kissinger,* 310 F. Supp. 2d 251 (D.D.C. 2004), *aff'd,* 412 F.3d 190 (D.C.
    Cir. 2005) .........................................................................5

*Schneider v. Kissinger,* 412 F.3d 190 (D.C. Cir. 2005)....................................................22, 29, 30

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985) ................................................34, 36

*Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004).........................................................................6, 21

*United States v. Pink,* 315 U.S. 203 (1942) ........................................................................12, 28

*United States v. Turkette,* 452 U.S. 576 (1981) ........................................................36, 37

*Ware v. Hylton,* 3 U.S. (3 Dall.) 199 (1796).....................................................................26, 27, 30

*Weishapl v. Sowers,* 771 A.2d 1014 (D.C. 2001) ........................................................................42

*Wright v. Towns,* Civ. Act. No. 90-0565 (JHG), 1991 U.S. Dist. LEXIS 12527 (D.D.C.
    May 30, 1991).........................................................................39

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 883 F.2d 132
    (D.C. Cir. 1989) ........................................................................37

*Zivkovich v. Vatican Bank*, 242 F. Supp. 2d 659 (N.D. Cal. 2002) ...........................26, 28, 29, 31

## STATUTES

18 U.S.C. §§ 1961(1), (3), (4) & (5) ..........................................................................................36, 37

18 U.S.C. § 1962 ...............................................................................................................34, 35, 36, 37

18 U.S.C. § 1962(c) ......................................................................................................................35, 38

28 U.S.C. § 2680 ........................................................................................................................ *passim*

28 U.S.C. § 1346(b) ........................................................................................................................1, 9

28 U.S.C. § 1350...............................................................................................................................1, 6

28 U.S.C. § 2680(j).......................................................................................................................3, 11

Fed. R. Civ. P. 41(b) ........................................................................................................................40

U.S. Const. art. I, § 8, cls. 11, 12-14, 16.......................................................................................12

## I.    INTRODUCTION

In their Third Amended Complaint ("Complaint" or "TAC"), Plaintiffs assert that Defendants "tortured and otherwise mistreated Plaintiffs and the class of persons held at Abu Ghraib and other prisons in Iraq." TAC ¶ 1. Plaintiffs' TAC consists of several counts under the Alien Tort Statute, 28 U.S.C. § 1350 (2000) ("ATS"), and for each of these claims, two related counts – one for conspiracy and one for aiding and abetting – to commit the wrong that is allegedly a violation of the Alien Tort Statute. Plaintiffs' claims also include state tort claims for Assault and Battery, Sexual Assault and Battery, Wrongful Death and Intentional Infliction of Emotional Distress, again in each instance with two related counts for conspiracy and aiding and abetting. Plaintiffs also have pled two tort counts against the Corporate Defendants for negligent hiring and supervision and for the negligent infliction of emotional distress. Last, Plaintiffs' TAC includes two claims pursuant to the Racketeer Influenced and Corrupt Organizations ("RICO") Act. Plaintiffs purport to have revised their complaint to take into account the decision of this Court in *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005). As explained more fully below, however, the entirety of Plaintiffs' Third Amended Complaint is subject to dismissal for the reasons this Court recognized in *Ibrahim*.

In *Ibrahim*, this Court dismissed claims by similarly situated plaintiffs for alleged acts of torture at the Abu Ghraib prison in Iraq. The Court dismissed the *Ibrahim* RICO claims, noting that plaintiffs' allegations that U.S. Military forces deprived them of certain money and property did not meet RICO's statutory standing requirements. *Id.* at 19-20. The Court also dismissed plaintiffs' claims under the ATS, determining that the ATS conferred jurisdiction but not a right of action, and that the "'law of nations'" does not afford a right of action for torture by non-state actors. *Id.* at 13-15. The Court declined, however, to rule on Defendants' federal pre-emption claim (under *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), and the Federal Tort

Claims Act, 28 U.S.C. § 1346(b) (2000) ("FTCA")) at the motion to dismiss stage. Instead, the

Court invited Defendants to submit a motion for summary judgment setting forth factual support

for that affirmative defense, noting that if the government contractors "were indeed soldiers in all

but name, the government contractor defense will succeed, but the burden is on the defendants to

show that they are entitled to preemption." 391 F. Supp. 2d at 18. The Court also determined

that the political question doctrine did not preclude plaintiffs' claims. *Id.* at 15-16.

Plaintiffs' Alien Tort claims here must fail for the reasons stated in *Ibrahim*. In *Ibrahim*,

this Court found jurisdiction lacking under the ATS because those "plaintiffs disavow[ed] any

assertion that the defendants were state actors . . . ." *Id.* at 14 n.3. Attempting to plead around

that holding, the *Saleh* plaintiffs have revised their complaint to allege that defendants were

acting "under the color of the United States authority," though in violation of U.S. law, TAC ¶ 1;

*see also* TAC ¶¶ 91, 108-13, 196. That allegation is insufficient, however, for jurisdiction under

the ATS. In *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), the Court of Appeals

held that the ATS requires, "*as a jurisdictional necessity,* official actions of the United States" –

that is, "action *authorized by the sovereign* as opposed to private wrongdoing." *Id.* at 207.

*Sanchez-Espinoza* thus forecloses Plaintiffs' "rogue state actor" theory of jurisdiction under the

ATS. To state a claim under the ATS, plaintiffs must allege *official* government action, which,

as this Court recognized in *Ibrahim*, would lead inexorably to sovereign immunity. *Ibrahim*, 391

F. Supp. 2d at 14 n.3; *accord Sanchez-Espinoza*, 770 F.2d at 207. Plaintiffs cannot have it both

ways, alleging that Defendants are state actors for jurisdictional purposes but private actors for

purposes of sovereign immunity.

The Third Amended Complaint also contains new allegations which are sufficient, unlike

the *Ibrahim* complaint, to show that Plaintiffs' common-law tort claims are preempted. As noted

above, in *Ibrahim*, this Court declined to apply the "government contractor defense" recognized in *Boyle* to pre-empt plaintiffs' claims at the motion to dismiss stage. Instead, it required Defendants to put forth facts supporting their affirmative defense in a motion for summary judgment. The Court phrased the operative question as "whether defendants' employees were essentially acting as soldiers," and placed the burden on Defendants to come forth with facts showing that to be the case. *Ibrahim*, 391 F. Supp. 2d at 19. Here, however, the *Saleh* Plaintiffs have added allegations not present in the *Ibrahim* complaint, which show that the Defendants' employees were indeed carrying out combatant functions, in a theater of war, under military control.

Plaintiffs' own allegations show that Defendants were performing "combatant activities" that are the province of the U.S. military. 28 U.S.C. § 2680(j) (2000). Plaintiffs' averments in the TAC are sufficient to show that Defendants' employees were furnishing, under military supervision, services in the interrogation of prisoners detained by the U.S. military in a theater of war. Such interrogation of military detainees is unquestionably a "combatant activity" uniquely federal and military in nature, sufficient to preempt common law tort liability under the FTCA as applied in *Boyle*. These admissions on the face of Plaintiffs' pleading are sufficient for invocation of the combatant activities exception on the pleadings, without additional evidence by Defendants.

Similarly, this case differs from *Ibrahim* in a notable way that makes the applicability of the political question doctrine more appropriate. Unlike the plaintiffs in *Ibrahim*, Plaintiffs here have alleged that Defendants conspired with any number of U.S. military and government officials in connection with the United States' prosecution of the war in Iraq. Additionally, *Ibrahim* alleged purely private action by civilian contractors. In this case, by contrast, Plaintiffs

allege that defendants operated under the color of United States authority in supporting the war effort. Passing judgment on the adequacy and appropriateness of strategic and tactical decisions of the United States military is a scenario that the political question doctrine and combatant activities exception are intended to prevent.

It is equally inconceivable that the RICO statute should apply to claims arising from prosecution of a war in a foreign country. This Court's dismissal of the RICO claims in *Ibrahim* should apply with equal force here. Plaintiffs here allege that, incident to arrest, the Defendants confiscated cash, gold, jewelry, and an automobile owned by Plaintiffs, and caused damage to three personal residences. TAC ¶¶ 55, 114, 131, 140, 151. As in *Ibrahim*, these acts incident to arrest would have to have been committed by U.S. military forces, not Defendants, and therefore plaintiffs can allege no business or property injury by these Defendants, only personal injury – which is insufficient under 18 U.S.C. § 1964(c) (2000). *See Ibrahim*, 391 F. Supp. 2d at 20. Plaintiffs also fail to allege the requisite economic injury and existence of an enterprise required for a RICO claim.

Plaintiffs continue to seek to inject themselves and this Court into the process of establishing and overseeing the United States' foreign policy and the manner in which the federal government is waging the war in Iraq. Not a single claim in the TAC, however, suffices to permit that. The Court should dismiss this action with prejudice.

## II.    ANALYSIS

### A.    The Standard For CACI's Motion To Dismiss

The CACI Defendants seek dismissal of Plaintiffs' TAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiffs' TAC fails to state a claim for which relief may be granted. Furthermore, because Plaintiffs' claims implicate non-justiciable political questions, the Court lacks subject matter jurisdiction.

Under Rule 12(b)(1), the Plaintiffs bear the burden of proving the existence of subject matter jurisdiction. *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 256 (D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005); *Jones v. Exec. Office of President*, 167 F. Supp. 2d 10, 13 (D.D.C. 2001). "In deciding such a motion, the Court must accept as true all of the factual allegations set forth in the . . . complaint; however, such allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Schneider*, 310 F. Supp. 2d at 256 (quotation marks omitted) (*quoting Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001)). In deciding a motion to dismiss for lack of subject matter jurisdiction, the Court may consider matters outside the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *Lipsman v. Sec'y of Army*, 257 F. Supp. 2d 3, 5 (D.D.C. 2003).

A motion pursuant to Rule 12(b)(6) should be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1134 (D.C. Cir. 2002). In conducting this inquiry, "'the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations.'" *Id.* (*quoting Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## B.    Plaintiffs' Alien Tort Claims Must Be Dismissed

Plaintiffs' claims all arise out of their treatment while detained by the U.S. military, in Abu Ghraib prison or other military facilities, in a war zone in Iraq.[1]    Plaintiffs have not,

---

[1] *See* TAC ¶ 28 (alleging conspiracy with "military and government officials" to engage in wrongdoing "in prisons under the United States' control"); *id.* ¶¶ 12, 13, 14, 38 (alleging Plaintiffs were "imprisoned in prisons or facilities in or around Iraq under the control of the United States forces"); *id.* ¶ 91 (alleging that Defendant interrogators gave orders to U.S.

however, sued the U.S. military or any other U.S. government agency. Instead, they plead claims under the ATS, 28 U.S.C. § 1350, against the Defendants, all private parties. These claims fail as a matter of law because Plaintiffs fail to satisfy the strict standards for establishing a new private tort action under ATS.[2] Indeed, in *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 14 (D.D.C. 2005), this Court rejected similar claims, noting that "[t]he Supreme Court has not answered" the question of whether the law of nations applies to private actors like the defendants here, "but in the D.C. Circuit the answer is no." *Id.* This Court held that these types of claims asserted against private actors are "not actionable under the Alien Tort Statute's grant of jurisdiction, as a violation of the law of nations." *Id.* at 15. That prior construction of the ATS by the D.C. Court and this Court is binding as a matter of stare decisis. *See ITT Indus. v. NLRB*, 251 F.3d 995, 1000 (D.C. Cir. 2001).

In *Ibrahim*, this Court recognized that Plaintiffs face a dilemma: if they sue Defendants as private actors, they have no claim under the law of nations,[3] which prohibits only government-

---

military personnel, resulting in uniformed U.S. military personnel torturing and mistreating prisoners); ¶ 225 ("Defendants' acts took place during a period of armed conflict."); *see also* TAC ¶ 101 (alleging "failure to act in accord with the law of war"); *id.* ¶¶ 225, 227-28, 233, 237 (alleging war crimes); and *id.* ¶¶ 25, 26, 27, 47-48, 75, 76, 128, 132, 136, 141, 145, 159 (alleging detention and/or mistreatment at Abu Ghraib prison, commonly known to have been under U.S. military control at the time, or at other prisons or facilities under U.S. control).

[2] Plaintiffs' ATS claims also fail because they are preempted as inconsistent with exceptions to the Federal Tort Claims Act, 28 U.S.C. § 2680 (2000) (discussed in Section C, *infra*), and because they present a non-justiciable political question (discussed in Section D, *infra*). Additionally, as noted above, for each ATS claim Plaintiffs plead, Plaintiffs have pled related claims for conspiracy and aiding and abetting. These claims fail because their underlying ATS claims fail. *See, e.g., Halberstam v. Welch*, 705 F.2d 472, 479, 487 (D.C. Cir. 1983) (liability for civil conspiracy depends on performance of some underlying tortious act; elements of aiding and abetting require wrongful act that causes an injury).

[3] In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court held that the ATS grants only jurisdiction, not a private right of action, and that a private right of action for torts suffered by individual aliens, if it exists, must be found among those very few actions

sanctioned torture. 391 F. Supp. 2d at 14 (*citing Tel-Oren v. Libyan Arab Repub.*, 726 F.2d 774, 786-87, 791-96 (D.C. Cir. 1984)). If, however, they sue Defendants as agents of the government, Defendants are entitled to sovereign immunity. *Id.* at 14 n.3 (*citing Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985)). Plaintiffs cannot have it both ways: they "cannot allege that conduct is state action for jurisdictional purposes but private action for sovereign immunity purposes." *Id.* (*citing Sanchez-Espinoza*).

Plaintiffs try to thread the needle by asserting that Defendants acted "under the color of the United States authority," but in violation of U.S. law. TAC ¶¶ 1, 65, 91.[4] This creative pleading effort must fail. It is true there is dicta in Judge Edwards' concurring *Tel-Oren* opinion, which was not joined by the other two judges, suggesting torture might be actionable if committed by "individuals acting under color of state law." 726 F.2d at 793;[5] *see Ibrahim*, 391 F. Supp. 2d at 14 n.3. But the possibility raised in Judge Edwards' minority opinion was foreclosed by the D.C. Circuit's later opinion in *Sanchez-Espinoza*, where the panel unanimously held (per then-Judge Scalia, joined by then-Judge Ginsburg) that jurisdiction under the ATS extended only to suits concerning "official actions of the United States." 770 F.2d at 207.

---

specifically recognized by the law of nations as appropriate for enforcement by individuals rather than nations. *See id.* at 714-15, 720, 723-33.

[4] *See also* TAC ¶¶ 108-13, 196; Pls.' Mot. for Leave to Amend at 5.

[5] In Judge Edwards' opinion, the "individuals acting under color of state law" language referred to government and military officials, such as those tried at Nuremberg. *Id.* Regarding actions against purely private individuals, Judge Edwards wrote that tort liability was "not so widely accepted doctrinally or practically as to represent the consensus among nations." *Id.* Judge Edwards did not address the situation of private individuals alleged to have conspired with government officials. In any event, this section of Judge Edwards' opinion was dicta, unnecessary to his holding that torture by actors unconnected to any government was not actionable under the ATS. *See id.* at 776-77, 791-92.

*Sanchez-Espinoza* arose out of the Reagan administration's covert efforts in the 1980s to support the "Contras" fighting for overthrow of Nicaragua's then-Communist government. The plaintiffs in *Sanchez-Espinoza* sued the President and a number of federal officials in both their official and personal capacities, and also sued two private organizations and one private individual. 770 F.2d at 205. As here, the complaint alleged a conspiracy between federal officials and private individuals and entities, who were alleged to have acted in concert with one another to injure the plaintiffs. *Compare Sanchez-Espinoza*, 770 F.2d at 205, *with* TAC ¶¶ 28, 64-65, 90-91, 97-101. As here, the private organizations and individuals were alleged to have acted unlawfully, in concert with U.S. military personnel and with the support of rogue federal officials, to have injured the plaintiffs through actions including "summary execution, murder, abduction, torture, rape, wounding, and the destruction of private property . . . ." *Sanchez-Espinoza*, 770 F.2d at 205. Although the words "under color of law" were not used, it was clear in *Sanchez-Espinoza* that the alleged wrongdoing involved use of the highest offices and organs of the United States government, millions of dollars in U.S. financial assistance, and the actions of U.S. military personnel. *See id.*; *compare* TAC ¶¶ 28, 71, 74-75, 91, 97-98.

The Court of Appeals rejected an action under the ATS against the private defendants, despite the allegation that those individuals had acted in concert with government officials, concluding that the law of nations did "not reach private, non-state conduct of this sort . . . ." *Sanchez-Espinoza*, 770 F.2d at 206-07. The court went on to hold, explicitly, that the jurisdictional reach of the ATS extends only as far as *official government conduct*:

> Assuming, however, that the Alien Tort Statute covers state acts as
> well, then it embraces this suit only insofar as the federal appellees
> are sued in their official, as opposed to their personal, capacities –
> *i.e.*, to the extent that appellants are seeking to hold them to
> account for, or to prevent them from implementing in the future,
> *actions of the United States*. It would make a mockery of the

8

> doctrine of sovereign immunity if federal courts were authorized to
> sanction or enjoin, by judgments nominally against present or
> former Executive officers, actions that are, *concededly and as a
> jurisdictional necessity*, official actions of the United States.

*Id.* at 207 (footnote omitted).

The court went on to hold that, insofar as an action for damages was concerned, the

defendants would be protected by sovereign immunity. *Id.*[6] In a footnote, the court noted that to

the extent that private, non-government officials might be sued under the ATS for actions taken

as agents of the United States, they would also be entitled to the same sovereign immunity that

government officials would enjoy. Thus, the appellate court left no middle ground: to fall within

the ATS' grant of jurisdiction, an action may be brought only to contest official state action by a

government actor or agent. But any action against an official or agent of the U.S. government

which satisfies that jurisdictional condition is *ipso facto* subject to sovereign immunity. *Id.*

The *Sanchez-Espinoza* court went further, and specifically addressed the situation where

"the officer's action is unauthorized because contrary to statutory or constitutional prescription,"

as Plaintiffs allege here. The court noted that although an action might be allowed for

unauthorized or illegal conduct in contexts other than the ATS, such an exception "can have no

application when the basis for jurisdiction requires action authorized by the sovereign as opposed

to private wrongdoing." *Id.* Thus, *Sanchez-Espinoza* leaves no room for a torture action under

the ATS against U.S. government officials, agents, or alleged co-conspirators, whether their

actions are authorized or unauthorized. The statute's jurisdictional grant allows only suits based

---

[6] The Court ruled that the "Alien Tort Statute itself is not a waiver of sovereign immunity," and that there was no other waiver for money damages. *Id.* (citation omitted). To the extent Plaintiffs might seek to bring this case within the sovereign immunity waiver of the Federal Tort Claims Act, 28 U.S.C. § 1346(b), their claims are barred by the exceptions to that Act under 28 U.S.C. § 2680, principally the combatant activities exception (§ 2680(j)), for the reasons discussed in the next section.

on official government action – suits that by definition are subject to U.S. sovereign immunity. *Sanchez-Espinoza* controls this case. Plaintiffs' claims under the ATS must be dismissed.

### C.    Plaintiffs' Common Law Tort Claims Are Preempted

Plaintiffs' suit is for alleged mistreatment suffered while in the custody of the United States military, at prisons or other U.S. military facilities in the war zone of Iraq. *See, e.g.,* TAC ¶ 1. Plaintiffs have not named the United States or any of its officials as defendants because they know that the government and its employees are immune from suit. Instead, Plaintiffs allege "upon information and belief" a conspiracy between government officials, soldiers, and the private entities named as Defendants, in an effort to obtain recovery through the backdoor for injuries suffered while in United States military custody.[7] To bring their action within the Alien Tort Statute, as interpreted by this Court and the D.C. Circuit, the Plaintiffs allege that Defendants were acting "under the color of the United States authority," *e.g.,* TAC ¶¶ 1, 65, 91, 196, but at the same time Plaintiffs minimize their mentions of the United States government, to try to avoid admitting what is undeniable: that they seek redress for actions of the United States government and its civilian contractors and agents, taken pursuant to the United States' war-making powers. Because all of the misconduct alleged in the TAC fell under the United States'

---

[7] *See, e.g., McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 449 (9th Cir. 1983) ("To permit [petitioner] to proceed . . . here would be to judicially admit at the back door that which has been legislatively turned away at the front door. We do not believe that the [Federal Tort Claims] Act permits such a result.") (alterations in original, citation omitted).

Nor may plaintiffs recover for claims for conspiracy and aiding and abetting pled in conjunction with their tort claims. These claims fail because the underlying tort claims fail. *See, e.g., Halberstam*, 705 F.2d at 479, 487 (liability for civil conspiracy depends on performance of some underlying tortious act; elements of aiding and abetting require wrongful act that causes an injury). *See also Doe v. Exxon Mobil Corp.,* 393 F. Supp. 2d 20, 24 (D.D.C. 2005) (aiding and abetting violations of international law not actionable under ATS).

military mission in Iraq, the "combatant activities" exception pre-empts any assertion of common law tort liability.

### 1. Federal Military Contractors Are Immune From Tort Liability For Any "Combatant Activities" For Which the Government Itself Is Immune

As this Court acknowledged in *Ibrahim*, common law tort liability must yield where it conflicts with a "uniquely federal interest" such as the United States' power to conduct war. The Supreme Court first recognized this form of pre-emption in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), where it held that the "discretionary function" exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), could be raised as a defense to tort liability where the Defendant was a contractor performing services to specification for the United States military. *Boyle*, 487 U.S. at 509-12. This form of preemption, termed the "[g]overnment contractor defense," *Boyle*, 487 U.S. at 513; *Ibrahim*, 391 F. Supp. 2d at 16-19, is not limited to the "discretionary function" exemption. In *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), the Ninth Circuit extended *Boyle* pre-emption to bar tort claims against a military contractor where the complained-of conduct arose from the performance of "combatant activities," another exception to the FTCA, 28 U.S.C. § 2680(j). *See Koohi*, 976 F.2d at 1336-37. As Defendants have previously argued, *Koohi* is not merely a persuasive guidepost. Rather, the logic of *Boyle* – that defense contractors performing contracted-for military functions cannot be held liable where the military itself could not be liable, because such liability would ultimately interfere with the military's mission – *compels* the application of the "combatant activities" exception to preempt tort liability for actions taken in a combat zone, as the Ninth Circuit ruled in *Koohi*. *See Boyle*, 487 U.S. at 511-12; *Koohi*, 976 F.2d at 1336-37.

In *Ibrahim*, this Court acknowledged that the "combatant activities" exception recognized in the FTCA and *Koohi*, if made out as a factual matter, would pre-empt Plaintiffs' tort claims.

First, the Court agreed, under step one of *Boyle*'s analysis, "that the treatment of prisoners during wartime implicates 'uniquely federal interests.'" *Ibrahim*, 391 F. Supp. 2d at 18. Interrogation of military detainees during war is a quintessential military function, as even the Plaintiffs allege. *See* TAC ¶ 71 (alleging that "the conduct of such interrogations is an 'inherently governmental function'"); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (noting that capture and detention of combatants, "by 'universal agreement and practice,' are 'important incident[s] of war'") (citation omitted) (alteration in original).[8]

Next, the Court found that the imposition of tort liability on a defense contractor performing wartime duties would create a "significant conflict" with federal policies or interests. The Court echoed *Boyle*'s conclusion that it makes little sense to exempt the military, but not its contractors, from tort liability, "because the government will eventually end up paying for increased liability through higher contracting prices (or through an inability to find contractors willing to take on certain tasks). . . ." *Ibrahim*, 391 F. Supp. 2d at 18. The Court further found that the "combatant activities" exception to the FTCA expresses a "federal interest in unfettered military action," *id.* at 19, and represents a "Congressional acknowledgment that war is an inherently ugly business for which tort claims are simply inappropriate." *Id.* Indeed,

---

[8] Exercise of the United States' war-making power is of course a uniquely federal prerogative. *See* U.S. Const. art. I, § 8, cls. 11, 12-14, 16 (Congress shall have power to "declare War, . . . and make Rules concerning Captures on Land and Water," and to raise, maintain, and regulate armed forces); *id.* art. II, § 2, cls. 1, 2 (President shall be Commander in Chief of the United States' armed forces, and shall have power to conduct foreign affairs); *id.* art. I, § 10, cls. 1, 3 (States shall not engage in foreign affairs, nor keep troops or ships of war in time of peace, nor engage in war unless actually invaded); *accord Johnson v. Eisentrager,* 339 U.S. 763, 788 (1950); *Ex Parte Quirin,* 317 U.S. 1, 25-27 (1942); *United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs . . . is vested in the national government exclusively."); The Federalist No. 74 (Alexander), at 447 (Clinton Rossiter ed. 1961) ("Of all the cares or concerns of government, the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand.").

> "[i]t would be difficult to devise more effective fettering of a field
> commander than to allow the very enemies he is ordered to reduce
> to submission to call him to account in his own civil courts and
> divert his efforts and attention from the military offensive abroad
> to the legal defensive at home."

*Ibrahim*, 391 F. Supp. at 18 (*quoting Johnson v. Eisentrager*, 339 U.S. 763, 778 (1950)).

Accordingly, the Court ruled, consonant with *Boyle* and *Koohi*, that the "combatant activities"

exception bars liability even for intentional torts, because it represents a congressional

determination that combat activity by its "very nature should be free from the hindrance of a

possible damage suit." *Id.* at 19 (*citing Koohi* and *allotting Johnson v. United States*, 170 F.2d

767, 769 (9th Cir. 1948)).

Coming to the question of whether the "combatant activities" exception was supported by

the facts in *Ibrahim*, this Court declined to resolve the question at the dismissal stage, because it

did not have a sufficient factual record before it. The Court noted that the exception was an

affirmative defense, for which Defendants have the burden, and that Defendants' support for the

exception was contained in briefing and argument, but not record evidence. *Ibrahim*, 391

F. Supp. 2d at 19. Accordingly, the Court invited submissions of evidence in the context of a

summary judgment motion. *Id.* CACI's summary judgment motion in *Ibrahim* is pending.

### 2.    The Third Amended Complaint Makes Clear On Its Face That All Misconduct Alleged Falls Within the "Combatant Activities" Exception

In this case, in contrast to *Ibrahim*, the Court may apply the "combatant activities"

defense at the motion to dismiss stage, because Plaintiffs' pleading admits on its face sufficient

facts to justify the exception. As in *Ibrahim*, the Third Amended Complaint here seeks redress

for alleged mistreatment suffered while plaintiffs were detained under U.S. custody in Iraq.

Unlike *Ibrahim*, the TAC in *Saleh* goes on to make additional allegations and admissions,

concerning CACI's mission in Iraq and its control by (or alleged conspiracy with) the U.S.

military. These new averments and admissions in the TAC fill in the factual holes left open in *Ibrahim*, and justify dismissal under the "combatant activities" exception in this case.

The Third Amended Complaint makes clear that all the injuries for which it seeks redress, and all of the misconduct that it alleges, occurred while the Plaintiffs were detained in U.S. military custody in the war zone of Iraq. First, the TAC alleges broadly that it concerns allegations of torture and mistreatment of Plaintiffs "held at Abu Ghraib and other prisons in Iraq." TAC ¶ 1. Abu Ghraib and the other prisons and facilities in Iraq at the times complained of were controlled by United States armed forces. The TAC admits this, averring that all of the alleged injuries were suffered by Plaintiffs "imprisoned in prisons or facilities in or around Iraq *under the control of the United States forces*." TAC ¶¶ 12, 13, 14, 38 (emphasis added); *see also id.* ¶¶ 28, 63, 65, 128, 132 (alleging wrongful acts in prisons under the United States' control). The TAC further avers, and thereby admits, that all of "Defendants' acts took place during a period of armed conflict." TAC ¶ 226. Indeed, the TAC alleges that Defendants' conduct constituted war crimes. TAC ¶¶ 225, 227-28, 233, 237. Thus, it is plain that the actions for which Defendants are being sued were taken in a war zone pursuant to a United States war effort.

In *Ibrahim*, this Court phrased the operative question as "whether defendants' employees were essentially acting as soldiers," or whether "they were indeed soldiers in all but name." 391 F. Supp. 2d at 19. Although Defendants' employees were indeed integrated with the military, serving many of the same functions as soldiers, they need not have been soldiers "in *all* but name" to fall within the "combatant activities" exception. *Id.* (emphasis added).[9] Rather, the

_____

[9] For instance, two hallmarks of a soldier are the wearing of a uniform and the carrying of arms. Were this case to proceed beyond the pleadings, the evidence would show that CACI PT's employees did not wear United States uniforms and did not carry weapons. Nonetheless, the wearing of uniforms or the bearing of arms is not necessary or relevant to decision of this case under the "combatant activities" exception. Defendants need not themselves have been soldiers

question is whether their actions were "combatant activities . . . during time of war," 28 U.S.C.

§ 2680(j), performed pursuant to military contract, *Boyle*, 487 U.S. at 505-06, 511-12. The

allegations of the Third Amended Complaint suffice to establish, as a matter of law, that all of

the alleged misconduct constituted combatant activity sufficient to fall under the "combatant

activities" exception. Beyond that, the TAC in *Saleh* contains specific allegations sufficient to

answer each of the factual questions left unanswered at the dismissal stage in *Ibrahim*, 391 F.

Supp. 2d at 19.[10]

### 3. Defendants' Contractual Responsibilities: To Provide Military Interrogation Services

The Third Amended Complaint alleges that Defendants and their employees were

contracted by the United States military to provide "Interrogation Services" in Iraq. TAC ¶¶ 39,

43-47, 73, 99, 102, 104 (referring to Defendants' contracting for and performance of

"Interrogation Services"); *see also* TAC ¶¶ 16, 25-27, 48-52, 71, 74, 78-82, 90, 97, 108

(allegations concerning prison interrogations). Plaintiffs contest the legality or validity of

Defendants' contracts, but admit the contracts' existence. TAC ¶¶ 1, 31, 41-42, 71; *see also*

TAC ¶¶ 16, 31, 99, 102, 104 (alleging Defendants earned millions of dollars selling Interrogation

Services to the United States—a transaction possible only by government contract). Under the

contracts, Defendants' employees were to interrogate detainees in order to obtain intelligence

information for use by United States forces. TAC ¶¶ 51, 56, 74, 81. Plaintiffs further allege that

---

in combat. It is enough if Defendants' employees were performing "combatant activities," *i.e.*, direct support activities in a combat area during wartime. *See Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948)) (discussed *infra*).

[10] Those questions were: What were Defendants' employees "doing in Iraq[?] What were their contractual responsibilities? To whom did they report? How were they supervised? What were the structures of command and control?" *Ibrahim*, 391 F. Supp. 2d at 19.

under the contracts, Defendants and their employees were responsible for obeying the laws of war, including the Geneva Conventions.  TAC ¶¶ 31, 41, 73, 101.

These allegations alone are sufficient to satisfy the "combatant activities" exception.  The Supreme Court has recently recognized that capture and detention of combatants in a military theater, "by 'universal agreement and practice,' are 'important incident[s] of war.'"  *Hamdi*, 542 U.S. at 518 (alteration in original) (*quoting Ex parte Quirin*, 317 U.S. 1, 28 (1942)). Intelligence-gathering in a combat area, including the questioning of military detainees to gather intelligence, is also a quintessentially military activity.  Indeed, Plaintiffs assert that interrogation is such an "inherently governmental function" that it could not be contracted out.  TAC ¶ 71. They further admit that the purpose of such interrogation was to gain intelligence useful to U.S. armed forces.  TAC ¶¶ 51, 56, 74, 81.

Thus, it is wrong, or at least irrelevant, for Plaintiffs to assert that, once detained, they were "placed outside combat."  TAC ¶ 48.  "Combatant activities," under the FTCA, connotes a broader range of activity than direct participation in hostilities—it includes actions "*pertaining to* actual hostilities."  *Johnson*, 170 F.2d at 770.  The phrase "would therefore include not only physical violence, but activities both necessary to and in direct connection with actual hostilities . . . ."  *Id.*  In *Johnson*, the court noted that the act of supplying ammunition to ships in a combat zone would be a "combatant activity," even if the supply ships were purely logistical, never intended to fire their own guns.  *Id.*  Similarly here, the act of gathering intelligence from military detainees, which could be useful or even life-saving to U.S. soldiers, is a "combatant activity" when performed during wartime, in a prison within the theater of combat.

Plaintiffs themselves assert that in performing Interrogation Services, the Defendants were obligated "to act in accord with the law of war."  TAC ¶ 101; *see also* TAC ¶¶ 41, 73.  That

allegation contains an inherent admission that the actions performed were done pursuant to the United States' war-making authority.    Plaintiffs further allege that "Defendants' acts took place during a period of armed conflict," TAC ¶ 226, and that they constituted war crimes. TAC ¶¶ 225, 227-28, 233, 237.  By averring that Defendants' actions were all wartime actions, subject to the law of war, Plaintiffs necessarily admit that the actions were "combatant activities . . . during time of war." 28 U.S.C. § 2680(j).  The only remaining question is whether the actions were pursuant to military contract, as required by *Boyle*.  The answer again is admitted in the complaint.  Whether the contracts were legal or illegal, valid or invalid, TAC ¶¶ 42, 71, there is no question that the alleged acts were done pursuant to the contractual provision of Interrogation Services.  TAC ¶¶ 16, 31, 39, 41-47, 71, 73, 99, 102, 104.  On the facts pled in the complaint, as a matter of law, the "combatant activities" exception applies.

### 4.    Defendants' Employees Reported To, And Were Supervised By, U.S. Military Forces

In *Ibrahim*, this Court noted the complaint did not show the reporting relationships, supervision, or command and control governing the actions of Defendants' employees in Iraq. 391 F. Supp. 2d at 19.  Because the *Saleh* Third Amended Complaint makes clear on its face that all actions complained of were performed under contract as part of the United States' war-making power, the combatant activities exception applies, and further inquiry is not necessary.  It is not necessary to establish the precise reporting, supervision, or command of Defendants' employees in Iraq; it is enough to establish that they were performing contractual "Interrogation Services" involving U.S. military detainees in a war zone.  Nonetheless, the Third Amended Complaint goes on to answer this Court's earlier questions on the pleading's face, in a manner favorable to the application of the combatant activities exception.  The TAC avers that the Defendants' employees worked together with military officers, subject to military rather than

employer supervision, giving orders to uniformed U.S. soldiers.  These allegations suffice to establish, without further evidence, that Defendants' employees were integrated into U.S. military operations in a way that supports application of the combatant activities exception.

One of Plaintiffs' repeated claims is that Defendants failed to supervise their employees' actions.  TAC ¶¶ 30, 46, 74-75, 77, 82, 309-11.  To support the claim, Plaintiffs allege that "CACI Intl. admitted on its web site that Interrogators and other employees in Iraq work under 'minimal supervision.'"  TAC ¶ 74.  The complaint incorporates a public job description of one of the positions at issue under one of the contracts for Interrogation Services:

> Assists the US Military interrogation support program team leader (under direction and supervision) to *increase the effectiveness of getting intelligence information from Detainees, Persons of Interest, and Prisoners of War (POWs)* that are in the custody of US/Coalition Forces in the CJTF 7 AOR, in terms of screening, interrogation, and debriefing of persons of intelligence value. Under *minimal CACI supervision* [see Additional Job Information below], will assist the government team leader in managing a multifaceted interrogation support cell consisting of database entry/intelligence research clerks, screeners, tactical/strategic interrogators, and intelligence analysts.

TAC ¶ 74.

This incorporated description makes clear on the face of the pleading what was argued in *Ibrahim*: that the CACI employees performing Interrogation Services in Iraq were integrated with "the U.S. Military interrogation support program," reporting to and working with that program's "government team leader."  TAC ¶ 74.  Plaintiffs themselves allege that the employees at issue were subject not to CACI's supervision, but instead to the "direction and supervision" of the "U.S. Military interrogation support program team leader."  *Id.*  Though paragraph 74 is the only paragraph directly explaining the Defendants' employees' supervision and command, it is consistent with the theory advanced throughout the complaint – that the employees were not supervised by the Corporate Defendants, but instead were sent to work

directly with military interrogation units, in integrated fashion, subject to the military's supervision and control.

The fact that Defendants' employees were integrated into military units is further supported by Plaintiffs' allegations that the interrogators and the military units worked in concert. TAC ¶¶ 28-29, 78-81, 91. Plaintiffs go so far as to allege that Defendants' employees gave orders to uniformed U.S. soldiers, orders that were obeyed. TAC ¶¶ 78-80, 91. That Defendants' employees were both receiving supervision from military team leaders (TAC ¶ 74) and allegedly giving orders to soldiers on the ground (TAC ¶ 91) shows they were effectively functioning as integrated parts of military interrogation units, performing the combatant activity of interrogating military detainees to extract military intelligence for the United States (TAC ¶¶ 51, 56, 74, 81). Thus, though not necessary for application of the combatant activities exception, Defendants' interrogators and translators were, within the context of the military interrogation units in Iraq, "essentially acting as soldiers." *Ibrahim*, 391 F. Supp. 2d at 19.

Unlike the complaint in *Ibrahim*, the Third Amended Complaint here is further rife with allegations that the Defendants' employees conspired with soldiers on the ground, as well "other military and government officials," to implement a program of torture and mistreatment in U.S. military prisons in Iraq. TAC ¶¶ 28-29, 97-107; *see also* TAC ¶¶ 65-67, 78-81, 83, 90-91, 96. Plaintiffs do not describe the membership of the conspiracy beyond the named Defendants and a group of soldiers named in the media (TAC ¶¶ 28, 78), aiming their government allegations only at nameless military and government officials.[11] But having alleged a broad conspiracy in bare and conclusory terms, Plaintiffs thereafter refer only to the "Torture Conspiracy" to support all

---

[11] Those officials are described in a recent pleading by Plaintiffs as "a small but powerful cabal of military and government officials who decided to break the law and torture other human beings." Pls.' Reply to CACI's Opp. to Mot. to Amend, Dkt. 31, at 18.

of their specific allegations regarding individual alleged acts of mistreatment. TAC ¶¶ 114-61. In the complaint's specific factual allegations of wrongdoing against the Plaintiffs, the TAC does not state whether the acts were performed by Defendants' employees or military personnel, instead lumping all acts together and attributing them to the "Torture Conspirators." *See id.* Thus, the Plaintiffs seek to attribute every act of alleged mistreatment by any individual, military or civilian, to the civilian Defendants sued here. *E.g.*, TAC ¶ 29.[12]

The merits of Plaintiffs' unfounded conspiracy allegations are addressed elsewhere in this motion. For present purposes, the conspiracy allegations are relevant insofar as they furnish additional answers to the questions this Court found unresolved in *Ibrahim*, 391 F. Supp. 2d at 19. The allegations that Defendants and their employees conspired and worked closely with military and government officials provide further support for the one relevant fact – that they were working as part of a coordinated U.S. military effort within the war zone of Iraq. That Plaintiffs claim the unnamed government and military officials were acting illegally (*e.g.*, TAC ¶¶ 1, 28) is of no moment to the combatant activities exception. The point of the combatant activities exception is to ensure that United States forces fighting a war do so free from the threat of civil litigation at home. *See Ibrahim*, 391 F. Supp. 2d at 18-19 (*quoting Johnson v. Eisentrager*, 339 U.S. 763, 778 (1950)). Here, there is no real dispute that the activities for which Plaintiffs sue were part of the U.S. military's prosecution of the Iraq war. Thus the combatant activities exception applies, and extends to the military's contractors as well as the military itself.

---

[12] *See also* TAC ¶¶ 170-74, 180, 186, 191, 199, 203, 207, 213, 218, 222, 228, 233, 237, 242, 247, 251, 257, 262, 266, 272, 277, 281, 285, 290, 294, 298, 303, 307, 327, 329.

### 5.    The Foreign Country Exception To The FTCA Bars Plaintiffs' Common Law Claims

The foreign country exception to the FTCA, like the combatant activities exception, bars Plaintiffs' common law claims in this case.  The Supreme Court in *Sosa* recently simplified the jurisprudence in this area.  The *Sosa* Court unequivocally held that the United States is immune from suit for injuries arising outside the United States without regard to whether foreign law might *actually* apply under modern choice of law principles.  *Sosa v. Alvarez-Machain,* 542 U.S. 692, 711-12 (2004).

The foreign country exception to the FTCA retains sovereign immunity with respect to "[a]ny claim arising in a foreign country."  28 U.S.C. § 2680(k).  As this Court recognized in *Ibrahim*, Congress's rationale at the time of enactment was to avoid the United States being held liable under the laws of a foreign country.  391 F. Supp. 2d at 18 n.6.  Toward that end, Congress limited the United States' waiver of sovereign immunity to claims arising within the United States:

> *We therefore hold that the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred.*

*Sosa,* 542 U.S. at 712 (emphasis added).

Here, all injuries alleged by the Plaintiffs indisputably occurred *in Iraq*.  Indeed, the Third Amended Complaint is replete with allegations that Plaintiffs' alleged injuries occurred exclusively while forcibly detained under United States custody in Iraq.  *See* TAC ¶ 1, 114, 116-20, 123-27, 132-33, 135, 136-40, 141-44, 145-51, 159-60.  Since Plaintiffs' alleged injuries were indisputably and by their own allegations suffered in a foreign country, the FTCA's foreign country exception bars those claims as against a government contractor operating under the direction, control and supervision of the United States.

### D.    Plaintiffs' Claims Present Non-Justiciable Political Questions

Notwithstanding that the war in Iraq continues to this day, Plaintiffs seek through this action to prosecute war claims against civilian contractors arising from an alleged conspiracy with government officials. As explained below, the Constitution does not vest the authority to resolve this dispute in the courts. Rather, that responsibility resides with the President in connection with the conduct of the foreign relations of the United States and with Congress in connection with the use of military power.

In considering the political question doctrine, the threshold issue is whether this Court's holding in *Ibrahim* controls here. In *Ibrahim*, this Court turned aside the political question doctrine for three reasons. First, the Court observed that *Ibrahim's* action for damages arising from the acts of private contractors would not involve the Court in "'overseeing the conduct of foreign policy or the use and disposition of military power.'" 391 F. Supp. 2d at 15 (*quoting Luftig v. McNamara,* 373 F.2d 664, 666 (D.C. Cir. 1967)). Second, the Court noted that, unlike in many other reparations cases entangled with political questions, there was no state-negotiated reparations agreement competing for legitimacy with this Court's rulings. *Id.* at 16. Finally, the Court found that the facts in *Ibrahim* were distinct from those found to implicate the political question doctrine in *Schneider v. Kissinger,* 412 F.3d 190 (D.C. Cir. 2005). In *Schneider,* a former NSA advisor and the United States were sued for the alleged murder and torture of a Chilean general. The Court of Appeals found that the case challenged foreign policy decisions over which the courts have no authority. In *Ibrahim,* by contrast, this Court held that plaintiffs were suing private parties for actions that allegedly violate United States policy.

The result in *Ibrahim* does not follow here. This case differs from *Ibrahim* in ways that dictate a different result when the political question doctrine is applied.

First, Plaintiffs allege a far-reaching conspiracy between government officials, soldiers and the Defendants. Plaintiffs allege that they, and the innumerable putative class members they purport to represent, were injured during their detentions by what Plaintiffs call the "Torture Conspirators," a group never defined, but clearly intended to encompass the Defendants, their employees, and "other military and government officials" who were allegedly either indifferent to the legality of interrogations in Iraq, or were part of a conspiracy to flout domestic and international laws governing the conduct of interrogations. TAC ¶¶ 28. Plaintiffs also allege that each Defendant is liable for all of the wrongful acts of any other member of this so-called Torture Conspiracy. TAC ¶ 29. Thus, Plaintiffs seek to hold CACI liable for the acts of the United States military (certain of whose officials are supposedly part of this "Torture Conspiracy") in arresting, detaining and interrogating the named Plaintiffs and the thousands of other members of the putative class. Yet it is no accident that Plaintiffs, in recognition of sovereign immunity, have not sued the United States or any United States officials.

Second, Plaintiffs allege that the Defendants' actions were "under the color of the United States authority." TAC ¶¶ 1, 65, 91. In other words, the Defendants operated as agents of the United States, clothed with the authority of law. Indeed, CACI's employees were subject to the "direction and supervision" of the "government team leader." TAC ¶ 74. The Third Amended Complaint makes clear that all the injuries for which it seeks redress, and all of the misconduct that it alleges, occurred while the Plaintiffs were detained in U.S. military custody in the war zone of Iraq and "imprisoned in prisons or facilities in or around Iraq *under the control of the United States forces.*" TAC ¶¶ 12, 13, 14, 38 (emphasis added); *see also id.* ¶¶ 28, 63, 65, 128, 132 (alleging wrongful acts in prisons under the United States' control). The TAC further avers, and thereby admits, that all of "Defendants' acts took place during a period of armed conflict."

TAC ¶ 226.  Indeed, the TAC alleges that Defendants' conduct constituted war crimes.  TAC ¶¶ 225, 227-28, 233, 237.  Thus, it is plain that the actions for which Defendants are being sued were taken in a war zone pursuant to a United States war effort.  To a significantly greater extent than *Ibrahim,* this action seeks to have this Court pass judgment on the way in which the United States, particularly with the support of civilian contractors, has waged war in Iraq.  That the political question doctrine does not permit.

Plaintiffs' claims necessarily ask this Court to sit in judgment of the manner in which the United States has waged the war in Iraq.  Plaintiffs challenge the decisions made by the United States armed forces in deciding which persons found in the combat theater would be detained, as well as the standards established by the United States government in deciding how to interrogate those who were detained.  Decisions regarding the detention of persons found in a combat theater are an inseparable component of the prosecution of war.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004) (arrest and detention activities "by 'universal agreement and practice,' are 'important incident[s] of war'" (*quoting Ex parte Quirin*, 317 U.S. 1, 28 (1942)).  Damages claims based on the conduct of war are classic political questions that are committed exclusively to Congress and the President for resolution.

In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court set forth the controlling standards for determining whether a case raises a non-justiciable political question.  After reviewing the doctrine's history, the Court noted that cases raising political questions generally have one or more of the of the following characteristics:

(1)    a textually demonstrable constitutional commitment of the issue to a coordinate political department;

(2)    a lack of judicially discoverable and manageable standards for resolving it;

(3)    the impossibility of deciding without an initial policy determination of a kind clearly for non judicial discretion;

(4)    the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

(5)    an unusual need for unquestioning adherence to a political decision already made; or

(6)    the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.  If any "one of these formulations is inextricable from the case," the Court must dismiss the case as presenting a non-justiciable political question.  *Id.*

While not every case having a foreign affairs connection presents a political question, the political question doctrine unquestionably has widespread application to "questions touching foreign relations."  *Baker*, 369 U.S. at 211.  Rather than automatically holding that any suit relating in any way to foreign relations presents a non-justiciable political question, the Court instead must undertake a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action."  *Id.* at 211-12.

The present action fits squarely within the class of cases touching on foreign relations to which the political question doctrine applies.  Plaintiffs seek reparations for injuries – real or imagined – that they allegedly suffered as a consequence of the United States' conduct of the war in Iraq.  Determinations as to the propriety of such civil recompense has always been the exclusive province of the political branches of government.  Moreover, Plaintiffs' claims necessarily ask this Court to sit in judgment of virtually every decision the Executive branch has made in prosecuting the war in Iraq, even to the detailed decisions – which often will be based on classified information – as to which persons found in the combat zone would be apprehended, detained and interrogated.

1.    **Claims for Wartime Reparations Present Classic Political Questions**

Reduced to their essentials, Plaintiffs' claims seek reparations for the injuries that they allegedly suffered as a consequence of the actions of the United States in invading and occupying Iraq. Those actions included the provision of interrogation services by CACI PT pursuant to a contract with the United States.

American courts have long recognized that they have no role in assessing the propriety of reparations for wartime injuries. *See Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 230 (1796); *Perrin v. United States*, 4 Ct. Cl. 543 (1868), *aff'd*, 79 U.S. (12 Wall.) 315 (1871). These cases establish that, from the earliest days of the Republic, the federal courts have recognized that they have no role in compensating individuals, whether the defendant is the United States or a private party, for injuries suffered as a result of the manner in which the United States wages war, even if the United States violated the law of nations through its war-fighting tactics. Rather, the advisability of such compensation appropriately is determined through the diplomatic efforts of the political branches of government.

More recent cases have echoed this principle. For example, in *Zivkovich v. Vatican Bank*, 242 F. Supp. 2d 659, 666-67 (N.D. Cal. 2002), the court held that claims against a bank for financial losses suffered by the plaintiff during World War II were reparations claims constitutionally committed to the political branches: "As an issue affecting United States relations with the international community, war reparations fall within the domain of the political branches and are not subject to judicial review." *Id.* at 666 (citation omitted). The *Zivkovich* court also rejected plaintiff's argument that his claim was not for reparations because it was asserted against a private bank. *Id.* at 666-67. There is considerable support for that view. *See In re African-American Slave Descendants Litig.*, 304 F. Supp. 2d 1027, 1055 (N.D. Ill. 2004);

*Anderman v. Fed. Republic of Austria*, 256 F. Supp. 2d 1098, 1117 (C.D. Cal. 2003); *Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116, 1195 (C.D. Cal. 2002).

Indeed, the D.C. Circuit recently rejected on political question grounds a wartime reparations claim asserted by former "'comfort women'" who alleged that they had been abducted and forced into sexual slavery by the Japanese Army before and during World War II. *Hwang Geum Joo v. Japan*, 172 F. Supp. 2d 52, 55 (D.D.C. 2001), *aff'd*, 332 F.3d 679 (D.C. Cir. 2003), *vacated on other grounds*, 542 U.S. 901 (2004), *reaff'd*, 413 F.3d 45 (D.C. Cir. 2005), *cert. denied*, 126 S. Ct. 1418 (2006). In *Hwang Geum Joo*, the court of appeals affirmed the dismissal of plaintiffs' complaint on the grounds that the plaintiffs' claims implicated the United States' foreign policy.

In *Ibrahim*, this Court cited *Hwang Geum Joo*, noting that "[h]ere, unlike in many other reparations cases entangled with political questions, there is no state-negotiated reparations agreement competing for legitimacy with this court's rulings." *Ibrahim*, 391 F. Supp. 2d at 16. A reparations agreement, however, is not the *sine qua non* for dismissal based on the political question doctrine. Not all cases dismissing reparations claims on political question grounds have involved cases where the claimant could file an administrative claim elsewhere. In fact, an agreement *that makes no provision for reparations* just as conclusively bars war claims as an agreement providing for reparations:

> "Hence it follows, that the restitution of, or compensation for, British property confiscated, or extinguished, during the war, by any of the United States, could only be provided for by the treaty of peace; and *if there had been no provision, respecting these subjects, in the treaty,* they could not be agitated after the treaty, by the British government, much less by her subjects in courts of justice."

*Hwang Geum Joo v. Japan,*, 413 F.3d 45, 51 (D.C. Cir.) (*quoting Ware v. Hylton,* 3 U.S. (3 Dal.) 199, 230 (1796)) (emphasis by the Court of Appeals, *cert. denied,* 126 S. Ct. 1418 (2006).

The courts have relied upon the political question doctrine to reject reparations claims even though the claimants had no administrative claims procedure or other means of recovery available to them. *See, e.g., In re African-American Slave Descendants Litig.*, 304 F. Supp. 2d at 1055; *El-Shifa Pharm. Indus. Co. v. United States*, 55 Fed. Cl. 751, 769 (2003), *aff'd,* 378 F.3d 134 (Fed. Cir. 2004); *Sarei*, 221 F. Supp. 2d at 1195; *Alperin*, 242 F. Supp. 2d at 689-90; *Anderman*, 256 F. Supp. 2d at 1117; *Zivkovich*, 242 F. Supp. 2d at 666-67.

These cases present political questions even when the claims involve intentional infliction of injury, and even when the claims involve credible allegations of some of the most heinous conduct imaginable, such as forced labor, slavery, sexual assault, and wartime plunder. These cases nevertheless stand for the proposition that claims for compensation for injuries suffered as a consequence of war – whether asserted against governments or against private companies – present non-justiciable political questions. This is so even in the absence of any alternative procedure for recourse. Federal courts have reached this conclusion because, as discussed below, wartime compensation claims implicate several of the factors set out in *Baker v. Carr* as characteristic of political questions.

### 2. The Propriety of Reparations for Injuries Incurred in the Prosecution of War Is An Issue Textually Committed to the Political Branches

Claims seeking compensation for injuries allegedly suffered as a consequence of the manner in which the United States has conducted the war in Iraq are textually committed to, and historically resolved by, the political branches as part of their war and foreign affairs powers. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003) (*quoting United States v. Pink*, 315 U.S. 203, 225 (1942), and *Dames & Moore v. Regan*, 453 U.S. 654, 679 (1981)). In *Garamendi*, the Court even noted that resolution of wartime claims against private parties is a function historically undertaken by the political branches and not by the courts. *Id.* at 416.

28

The historical commitment to the political branches of wartime reparations claims, even reparations claims against private entities, flows directly from the Constitution's commitment of matters of war and foreign policy to Congress and the President. *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (the President has "unique responsibility" for the conduct of "foreign and military affairs"); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our [g]overnment is committed by the Constitution to the [e]xecutive and [l]egislative . . . ."); *Zivkovich*, 242 F. Supp. 2d at 668 (dismissing reparations claim because "the Constitution relegates issues of foreign policy to the political departments of the government"); *Alperin v. Vatican Bank*, 242 F. Supp. 2d 686, 689-90 (N.D. Cal. 2003) (dismissing reparations claim because issue is committed to the political branches).

The D.C. Circuit and this Court have observed repeatedly that the conduct of the Nation's foreign policy, including the prosecution of war, is constitutionally vested in the political branches and is not an area for judicial intervention. *See Luftig v. McNamara*, 373 F.2d 664, 665-66 (D.C. Cir. 1967); *Michael v. United States*, 260 F. Supp. 2d 23, 27 (D.D.C. 2003) ("The Supreme Court considers the conducting of military operations to be 'so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" (*quoting Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952))); *Kucinich v. Bush*, 236 F. Supp. 2d 1, 15 (D.D.C. 2002); *Mahorner v. Bush*, 224 F. Supp. 2d 48, 52 (D.D.C. 2002); *Ange v. Bush*, 752 F. Supp. 509, 512 (D.D.C. 1990).

For these reasons, the D.C. Circuit recently rejected on political question grounds a suit filed by the family of an assassinated Chilean general alleging that certain government officials supported the general's kidnapping and resulting death. *Schneider*, 412 F.3d at 193-97. In *Ibrahim*, this Court distinguished *Schneider* on the grounds that plaintiffs were suing private

parties for private actions that allegedly violated U.S. policy. Here, by contrast, Plaintiffs are suing private parties who acted "under the color of the United States authority" and in concert with military and government officials. This overarching theme of Plaintiffs' claims – for which the Defendants' liability turns on whether government and military officials committed violations of law – makes them indistinguishable from those dismissed in *Schneider*.

Indeed, because compensation for wartime injuries is indivisible from the power to conduct war and foreign policy, it has been recognized for more than two centuries that such compensation claims belong to governments, not individuals, and are to be resolved on a government-to-government level without the interference of private litigation. *Ware*, 3 U.S. (3 Dal.) at 230; *Perrin*, 4 Ct. Cl. at 544; *see also Frumkin v. JA Jones, Inc.*, 129 F. Supp. 2d 370, 376 (D.N.J. 2001) (dismissing World War II-era forced labor claims against German company because "[c]laims for war reparations arising out of World War II have always been managed on a governmental level"); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 485 (D.N.J. 1999) ("The executive branch has always addressed claims for reparations as claims between governments."); *Burger-Fischer v. Degussa AG*, 65 F. Supp. 2d 248, 273 (D.N.J. 1999) ("Under international law claims for compensation by individuals harmed by war-related activity belong exclusively to the state of which the individual is a citizen."); *El-Shifa Pharm.*, 55 Fed. Cl. at 770 ("Claims for injuries for violations of international law are political questions to be decided between governments.").[13]

For these reasons, the Constitution's commitment to the political branches of the power to conduct war renders and foreign policy precludes judicial involvement in determining the

---

[13] Separate and apart from the political question doctrine, the Court could dismiss Plaintiffs' claims on standing grounds because, for the reasons detailed above, the claims they are asserting belong to their respective governments and may not be asserted by individuals.

propriety of monetary claims asserted by Plaintiffs for injuries they allegedly received as a result of the manner in which the United States prosecuted the war in Iraq.[14]

### 3.    There Are No Judicially Discoverable and Manageable Standards for Evaluating Plaintiffs' Claims

Much of the evidence bearing on Plaintiffs' claims, and establishing Defendants' utter blamelessness with respect to those claims, likely will be impossible for the Court and the parties to discover. The Court acknowledged this possibility in *Ibrahim.* 391 F. Supp. 2d at 14. That obstacle is exponentially greater here because of the vast conspiracy among military and government officials and civilian contractors alleged by Plaintiffs. Because there are no judicially manageable standards for evaluating Plaintiffs' claims, the political question doctrine renders Plaintiffs' claims non-justiciable.

Federal courts regularly have held that they lack judicially manageable standards for evaluating claims for wartime injuries that would require an extensive review of classified materials, or materials that are unlikely to be discoverable because of the "fog of war." *See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *Anderman*, 256 F. Supp. 2d at 1112-13; *Alperin*, 242 F. Supp. 2d at 695; *Zivkovich*, 242 F. Supp. 2d at 668. As one court has observed, "[i]n wartime, it would be inappropriate to have soldiers assembling evidence, collected from the 'battlefield.'" *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1495 (C.D. Cal. 1993). Indeed, for each and every member of the class, the parties would need access to evidence associated with that claimant's arrest and detention – much of which is classified – in order to assess the veracity of the claimant's assertion that his or her detention by

---

[14] Moreover, because the Constitution vests the power to wage war and conduct foreign affairs in the political branches, adjudicating Plaintiffs' reparations claims would demonstrate a lack of respect for the proper constitutional role of coordinate branches of government, which, under *Baker*, supports a finding of non-justiciability. *Zivkovich*, 242 F. Supp. 2d at 668.

the United States was unjustified and their treatment unlawful.  This is precisely the type of wartime claim that defies resolution through the judicial process.

### E.    Plaintiffs' RICO Claims Fail As A Matter Of Law

There is no indication that Congress ever contemplated that RICO would lay the foundation for Iraqi detainees to challenge the conduct of the United States and its civilian contractors in prosecuting the war in Iraq.[15]  In a reckless effort to shoehorn their claims within the narrow confines of the RICO statute, Plaintiffs retreat behind the shroud of "on information and belief" when confronted with myriad obstacles to asserting a RICO claim.  Even then, Plaintiffs' RICO claims remain patently lacking as a matter of law.

Plaintiffs' TAC asserts civil RICO claims on behalf of four named RICO Class Plaintiffs (Plaintiffs Saleh, Hadood, Ahmed, and Neisef) and a putative RICO subclass.  In support of their claims, Plaintiffs allege that that "[t]he CACI Corporate Defendants' racketeering activities included, but are not limited to, repeatedly making threats of murder."  TAC ¶ 323.  The Complaint also alleges that the four named RICO Class Plaintiffs and the Class Members "have standing to bring this action because they suffered substantial business and property damages, as required by 18 U.S.C. § 1964(c) . . . ."  TAC ¶ 325.  With respect to these named plaintiffs, Plaintiffs allege that, incident to arrest, the Defendants confiscated cash, gold, and jewelry belonging to the RICO Class Plaintiffs and in addition caused damage to the personal residences

---

[15] RICO "contains no express waiver sovereign immunity, and every court that has considered the issue has recognized that the United States has not waived its sovereign immunity for claims brought under RICO." *Norris v. Dep't of Defense*, Civ. Act. No. 95-2392 (PLF), 1996 U.S. Dist. LEXIS 22753, at 5 (D.D.C. Oct. 28, 1996), *aff'd*, No. 96-5326, 1997 U.S. App. LEXIS 16360 (D.C. Cir. May 5, 1997).

of three of them.  TAC ¶¶ 113, 130, 139, 150.  *See also* Plaintiffs' RICO Case Statement ¶¶ 4, 15 ("RCS").[16]

As to the CACI Defendants specifically, Plaintiffs have alleged that they, with other "Defendants and co-conspiring government officials, operated an intensive interrogation, debriefing and intelligence gathering program designed to screen and identify detainees who had valuable 'intelligence.'" RCS ¶ 5(f).  According to Plaintiffs, the CACI Defendants helped form multiple interrogations teams, usually consisting of three persons, typically an "Interrogator" and an "Analyst," which in some instances were employed by one of the CACI Defendants, and a Translator, none of whom were employed by any of the CACI Defendants.  *Id.*  These teams "interrogated detainees in interrogation booths," but allegedly "did not conduct the interrogations in a manner that complied with the law."  *Id.*  Plaintiffs reference "murders, kidnappings, robberies, threats of murder, and obscene acts" and characterize them as "part of the series of wrongful acts all designed to intimidate and coerce detainees into providing 'intelligence.'" RCS ¶ 5(g).  Plaintiffs theorize that these tactics were adopted to "inflate artificially" the demand for interrogation services.  RCS ¶¶ 2, 5, 10.  Plaintiffs also allege that the "Enterprise intended to, and did, earn millions of dollars more than would have been earned in the absence of illegal activity."  TAC ¶ 318.

---

[16]  In conjunction with the filing of their original Complaint and First Amended Complaint in the Southern District of California, Plaintiffs filed a RICO Case Statement pursuant to Local Rule 11.1.  Although such a statement is not required by the local rules in this jurisdiction, the statements in Plaintiffs' RCS constitute admissions by plaintiffs as to their RICO claims.

### 1.    Plaintiffs Lack Standing To Bring A Civil RICO Claim

Plaintiffs allege that they "suffered injuries to their businesses and properties as a result of defendants' violation of Section 1962(c) of RICO," (*citing* TAC ¶¶ 38, 100, 113, 120, 130, 139, 150, 173, 325, and 329.  Pls.' Mot. for Leave to Amend at 12).

RICO's statutory standing requirement for a civil plaintiff is unambiguous:  a plaintiff must suffer an injury to his "business or property by reason of a violation of section 1962 of this chapter . . . ." 18 U.S.C. § 1964(c).  "[T]he plaintiff only has standing if, and can only recover to the extent that, he has been *injured in his business or property by the conduct constituting the [§ 1962] violation*." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496-97 (1985) (emphasis added).  Furthermore, the injury must be directly and proximately caused by the defendant's § 1962 violation:  "Proximate cause is thus required." *Holmes v. Secs. Investor Protections Corp.*, 503 U.S. 258, 268 (1992).  Here, Plaintiffs have suffered no injury sufficient for standing to assert their RICO claims.

First, allegations of personal injuries are not sufficient to sustain a RICO claim.  *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 19 (D.D.C. 2005); *see also Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 100-02 (D.D.C. 2003) (Robertson, J.).   Courts have consistently rejected attempts to use civil RICO as a vehicle for personal injury, other tort or contract claims. *See, e.g., Scheck v. Gen. Elec. Corp.*, Civ. A. No. 91-1594, 1992 WL 13219, at *4 (D.D.C. Jan. 7, 1992) (disapproving plaintiff's attempted use of the RICO statute "to litigate a combination of grievances with his supervisors and unsupported allegations of wrongdoing.").

Plaintiffs allege violations of § 1962(c).  *See* TAC Counts 30, 31.  That subsection provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, *to conduct* or participate, directly

34

> or indirectly, in the conduct of *such enterprise's affairs through a pattern of racketeering* or collection of an unlawful debt.

18 U.S.C. § 1962(c) (2000) (emphasis added).  To "conduct" the affairs of a RICO enterprise, the defendant "must have some part in *directing* those affairs."  *Reeves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (approving an "operation or management" test) (emphasis added). Plaintiffs have no standing to assert a violation of § 1962(c) because they show no injury to business or property flowing from the CACI Defendants' supposed conduct of the enterprise ("Enterprise") that Plaintiffs describe.  *See* RCS ¶ 6.

Plaintiffs have alleged an Enterprise that "obtains "'intelligence' from detainees by both lawful and unlawful means."  *Id*. ¶ 6(b).  Plaintiffs have further alleged murder, attempted murder, threats to murder, threats of death, kidnapping, various types of sexual assault, and the recording, transportation, or importation of obscene materials, as predicate acts generally attributable to members of the "Enterprise."  *See* RCS ¶ 5(b).  Not a single one of these alleged predicate acts is alleged to have caused *any* injury to RICO Plaintiffs' *property or business*.  *See* RCS ¶ 4.  The only alleged injury to the RICO Plaintiffs' property or business occurred incident to arrest, *not* in the course of providing interrogation services, the alleged business of the alleged Enterprise.  *See id.*  Thus, Plaintiffs have no standing to assert a claim against any of the CACI Defendants for a violation of § 1962(c).

A plaintiff cannot sue under RICO for injuries from a RICO conspiracy unless he can show an injury to business or property that resulted from an overt act of racketeering.  *Beck v. Prupis*, 529 U.S. 494, 507 (2000).  Because Plaintiffs show no injury to business or property flowing from the alleged violations of § 1962(c), Plaintiffs cannot show any injury to business or property flowing from a RICO conspiracy and, therefore, Plaintiffs lack standing to claim a violation of § 1962(d).

### 2.    Plaintiffs Fail To Plead The Elements Of Any RICO Violation

Even if Plaintiffs had the requisite standing, they still have failed to state a legally cognizable RICO claim. Pleading any violation of § 1962 requires Plaintiffs to allege facts showing (*i*) that Defendants engaged in (*ii*) multiple acts of "racketeering activity," (*iii*) that constitute a "pattern" (*iv*) that directly and proximately caused injury to Plaintiffs' business or property, and (*v*) the existence of a "RICO enterprise" that is distinct from the Defendants and distinct from any criminal conspiracy. *See* 18 U.S.C. §§ 1961(1), (3), (4) & (5) (2000); 18 U.S.C. § 1964(c); *Sedima,* 473 U.S. at 496-97; *Holmes,* 503 U.S. at 268; *United States v. Turkette,* 452 U.S. 576, 583 (1981) ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages."). Here, Plaintiffs fail to establish several of the required elements to state a cognizable RICO claim.

### a.    Plaintiffs Fail To Show A § 1962 Violation Directly And Proximately Caused Injury To Plaintiffs' Business Or Property

A RICO plaintiff must demonstrate some direct relation between the injury asserted and the injurious conduct alleged. *Holmes*, 503 U.S. at 268. Plaintiffs do not demonstrate any causal link between a violation of § 1962 and any injury to the RICO Plaintiffs' property or business. Plaintiffs do not show that they have been directly and proximately injured in their business either (*i*) by the Defendants' investment of racketeering proceeds in an enterprise or the use of racketeering proceeds to acquire an interest in, manage, or operate, an enterprise, or (*ii*) by the Defendants' conduct of the Enterprise through a pattern of racketeering activity. In fact, Plaintiffs do not even demonstrate that any of the alleged predicate acts, *see* RCS ¶ 5(b), caused any injury at all to RICO Plaintiffs' property or business, *see* RCS ¶ 4. By a wide margin, Plaintiffs fail to establish that a violation of § 1962 directly and proximately caused an injury to a

RICO Plaintiffs' business or property. The absence of any element of causation is fatal to Plaintiffs' RICO claims.

### b.    Plaintiffs Fail To Plead An "Enterprise"

To plead a RICO violation, Plaintiffs must allege facts to show the existence of a RICO "enterprise." *See* 18 U.S.C. §§ 1962 & 1961(4). An association-in-fact that serves as the RICO defendant's tool may constitute a RICO enterprise. *See* 18 U.S.C. § 1961(4); *Turkette*, 452 U.S. at 581-82; *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162, 164 (2001). Such a RICO enterprise must (*i*) be comprised of persons associating for a common purpose of engaging in a particular course of conduct, (*ii*) function as a continuing unit rather than on an *ad hoc* basis, and (*iii*) have an ascertainable structure for decision-making and for controlling and directing its affairs. *Turkette*, 452 U.S. at 583; *Chang v. Chen*, 80 F.3d 1293, 1299 (9th Cir. 1996). Further, such an enterprise must be an entity that is "separate and apart from the pattern of [racketeering] activity in which it engages," *Turkette*, 452 U.S. at 583, and separate and distinct from the defendant. *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 140 (D.C. Cir. 1989) (§ 1962 forbids an identity of defendant and enterprise). Plaintiffs' allegations, largely devoid of specific facts, do not satisfy these requirements and therefore Plaintiffs' RICO claims fail.

While alleging that "Defendant Titan and the CACI Corporate Defendants, Defendant Israel, Defendant Nakhla, Defendant Stefanowicz, Defendant Duggan and Defendant Johnson, along with Spc. Charles Graner, Spc. Roman Krol, Spc. Javal Davis, Spc. Jeremy Sivits, Spc. Armin Cruz, Spc. Megan Ambuhl, Staff Sgt. Ivan "Chip" Frederick, Spc. Sabrina Harman, and other persons known and unknown, formed an Enterprise as that term is defined by RICO," TAC ¶ 318, Plaintiffs do not flesh out this skeleton list with facts. Required to describe the purpose and function of the enterprise, Plaintiffs have alleged that the "central purpose of the Enterprise

is to increase the United States' demand for the non-governmental professionals to assist the United States' intelligence gathering efforts." RCS ¶ 6(b); *see also* RCS ¶ 5(g). Directed to describe the structure of the enterprise, Plaintiffs dodge the issue by offering a description of the three-person interrogation teams, *see* RCS ¶ 6(b), and failing to provide any description whatsoever of the structure of the management and operation of the alleged Enterprise entity, the affairs of which Plaintiffs must show are conducted "through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). Plaintiffs' bald assertions notwithstanding, Plaintiffs do not in any way describe -- with facts – the very existence of the alleged Enterprise or its structure, management or operation. This court has held that similar allegations are insufficient. *See Doe v. State of Isral,* 400 F. Supp. 2d 86, 119 (D.D.C. 2005). In *State of Israel,* plaintiffs alleged that defendants formed an association-in-fact, but alleged no facts linking defendants "through allegations of common orders or control," "explain[ing] how the several groups of defendants associated or operated together," or demonstrating "a shared decision-making infrastructure." *Id.* at 119-20. Based upon these allegations, the Court found that Plaintiffs had failed to adequately allege a formal or informal structure sufficient to establish an enterprise under RICO. *Id.* at 120. Alleging an "enterprise" is absolutely necessary to the maintenance of a RICO allegation and Plantiffs' failure to allege facts in support of the structure, management and organization of the underlying alleged enterprise is fatal to the RICO claims.

### 3.    Plaintiffs Fail To Plead A Conspiracy Pursuant To 18 U.S.C. § 1962(D)

It is unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this [§ 1962]." 18 U.S.C. § 1962(d). Plaintiffs' failure to plead the requisite elements of a substantive violation of RICO necessarily means that Plaintiffs cannot successfully

plead a conspiracy to violate RICO. Even if Plaintiffs had sufficiently pled a substantive violation of RICO, however, their conspiracy pleading fails for other reasons.

To state a claim for conspiracy to violate RICO, the complaint must allege some *factual basis* for the finding of a *conscious agreement* among the defendants. *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d Cir. 1990); *see also Wright v. Towns*, Civ. Act. No. 90-0565 (JHG), 1991 U.S. Dist. LEXIS 12527, at **8-9 (D.D.C. May 30, 1991) (*citing Hecht*, 897 F.2d 21). Plaintiffs must plead facts demonstrating that the partners in the criminal plan agreed to pursue the same objective by criminal means, which, if executed, would satisfy all of the elements of a substantive RICO violation. *Salinas v. United States*, 522 U.S. 52, 63, 65 (1997).

Plaintiffs fail completely to allege facts regarding CACI in support of their conspiracy claim. For example, the TAC asserts that "certain government officials and senior management in" Titan and the CACI Defendants "had relationships that assisted in the formation" of the alleged conspiracy. TAC ¶ 18. It then alleges that "these relationships were formed and fostered by meetings, telephonic discussions, in person discussions, email discussions and other communications . . . ." *Id.* Not a single fact is provided in connection with these generic allegations. Similarly, Plaintiffs assert that the conspiracy to torture and mistreat prisoners during interrogation began in or around 2002. This allegation is unadorned with any factual information whatsoever. *See* TAC ¶ 97. Elsewhere, Plaintiffs allege that CACI PT, and upon information and belief, CACI International and CACI, Inc.-Federal, conspired with Titan "to create and permit to flourish the lawless environment needed for the implementation of the conspiracy." TAC ¶ 90. The TAC then asserts that CACI PT intentionally cleared for service Titan's translators who went on to engage in repeated acts of criminal violence against the

prisoners. As elsewhere, specific facts are left to the reader's imagination. These allegations are simply incapable of supporting an inference of a conspiracy attributable to the CACI Defendants.

**F.      Plaintiffs Have Alleged No Facts That Would Create Liability For CACI International Inc Or CACI, Inc.-Federal**

On March 17, 2006, this Court issued an Order denying plaintiffs' motion for leave to file their TAC, without prejudice to plaintiffs' right to file an amended complaint, consistent with Rule 11, "that makes allegations as to the individual CACI corporations now lumped together in the proposed third amended complaint as 'the CACI Corporate defendants.'" Plaintiffs' Third Amended Complaint fails to heed that admonition.[17] Indeed, they seek to circumvent that requirement with an agile use of word processing.

Rather than focus their allegations against CACI PT (the only CACI entity that supplied interrogators in Iraq), or make specific allegations against CACI International Inc or CACI, Inc.-Federal, the TAC continues Plaintiffs' blunderbuss approach. Although Plaintiffs' original complaint was filed in June 2004, their allegations against CACI International Inc and CACI, Inc.-Federal continue to be "upon information and belief." Plaintiffs seek to justify this through the incantation of Rule 11 language, stating that these allegations "connote those instances when Plaintiffs believe the allegations are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." TAC ¶ 24 n.1. In lieu of the term "CACI corporate defendants," the TAC then substitutes, at random intervals, the name of CACI International Inc or CACI, Inc.-Federal. This change is a distinction without a difference.

---

[17] Fed. R. Civ. P. 41(b) authorizes a district court to dismiss a complaint for failure to comply with a court order, treating the non-compliance as a failure to prosecute. This provides an alternative basis for dismissal here given the Court's clear directive to Plaintiffs to correct their pleading against the CACI Defendants.

*None* of the specific examples of wrongful acts relating to the named Plaintiffs specifically reference CACI International Inc or CACI, Inc.-Federal.  Instead, all acts are attributed to the undefined "Torture Conspirators."  *See* TAC ¶¶ 114-58.  This approach is repeated in each of the TAC's 31 counts.  There is not a single specific allegation relating to CACI International Inc or CACI, Inc.-Federal in those counts.  Rather, all conduct alleged by Plaintiffs is attributable to "Defendants."  *See* TAC ¶¶ 175-329.

When a CACI entity is referenced by name, the allegations remain bereft of any factual specificity.  Some examples:

- Plaintiff allege that Defendant Titan conspired with CACI-PT and (upon information and belief), CACI, Inc.-Federal – but not CACI International Inc – to "create the lawless environment needed for the implementation of the conspiracy to torture and mistreat prisoners."  TAC ¶ 64.  No factual allegations are provided.

- Plaintiffs allege (upon information and belief), that CACI International Inc, and CACI, Inc.-Federal "failed to exercise due diligence in hiring CACI-PT management."  TAC ¶ 72.  No factual allegations are provided.

- Notwithstanding the fact that CACI PT was the only company that contracted to provide interrogation services in Iraq, TAC ¶ 71, and the fact that the CACI employees named as defendants were, as plaintiffs acknowledge, employees of CACI PT, plaintiffs allege that all three CACI entities "failed to supervise employees providing Interrogation Services."  TAC ¶ 74.  No factual allegations are provided.

- (on information and belief) plaintiffs lump CACI, Inc.-Federal in with CACI PT, accusing these CACI entities (but not CACI International Inc) of placing their employees in positions of "power and control over whether prisoners were released or kept imprisoned."  TAC ¶ 75.  No factual allegations are provided.

- Plaintiffs allege that CACI PT and (upon information and belief) CACI International Inc, had employees stationed at Abu Ghraib and at other locations in Iraq, TAC ¶ 76, but then go on to allege that CACI PT and (upon information and belief) CACI, Inc.-Federal (but not CACI International Inc) failed to train or supervise employees who had control of prisoner release.  TAC ¶ 77.

Plaintiffs had more than 20 months since the filing of their complaint in June 2004 until the filing of their TAC in March 2006. Despite that time they were unable to add any factual allegations with respect to CACI International Inc, or CACI, Inc.-Federal. All of the facts alleged regarding the CACI defendants continue to relate to the contract between CACI PT and the U.S. military to supply interrogation services and acts or omissions related to the performance of that contract. Yet with regard to CACI International Inc, and CACI, Inc.-Federal, plaintiffs continue their "sue now, find support later" approach by claiming that their allegations are likely to find support somewhere down the road. Plaintiffs offer no clue as to the ostensible basis for their expectation. In any event, reciting the language of Rule 11 is not a substitute for stating a cognizable claim.

Plaintiffs' conspiracy allegations do not salvage the TAC vis-à-vis CACI International Inc and CACI, Inc.-Federal. Plaintiffs conclusory allegations that all of the CACI defendants were involved in a vast conspiracy to abuse prisoners in Iraq are insufficient to state a claim as to CACI International Inc or CACI, Inc.-Federal. First, to state a claim for civil conspiracy, Plaintiffs must allege particular facts to support its assertion that *each Defendant* was a member of the conspiracy. *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000).[18] Those particular facts must, at a minimum, present circumstances from which a common intent to further the conspiracy may be inferred. *Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001). The TAC fails this test. It is singularly devoid of any facts particular to CACI International Inc or CACI, Inc.-Federal which support their inclusion in the so-called "Torture Conspirators." All of the alleged *facts* relating to the CACI Defendants' involvement and furtherance of the supposed conspiracy are attributable to the entity actually supplying the interrogators: CACI PT.

---

[18] This memorandum assumes for argument that D.C. law is applicable.

After a year and a half of litigation, Plaintiffs' TAC alleges no facts or acts attributable to CACI International Inc or CACI, Inc.-Federal. Because the TAC alleges no facts or theory that would support a finding that CACI International Inc or CACI, Inc.-Federal are liable for the claims stated therein, the Court should dismiss the TAC as to them.

## III.    CONCLUSION

For these reasons, and for the reasons set forth in Defendant Titan's motion to dismiss, which CACI incorporates by reference, the Court should dismiss the Third Amended Complaint with prejudice.

Respectfully submitted,

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:    (202) 429-3000
Facsimile:    (202) 429-3902

***Counsel for Defendants CACI International Inc,
CACI, INC.-FEDERAL, and CACI PT, Inc.***

April 7, 2006