## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AL RAWI, *et al.*,

          **Plaintiffs,**

    **v.**

TITAN CORPORATION, *et al.*,

          **Defendants.**

**Civil Action No. 05-1165 (JR)**

**ORAL ARGUMENT REQUESTED**

## DEFENDANT L-3 COMMUNICATIONS TITAN CORPORATION'S
## MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

**COMES NOW** defendant L-3 Communications Titan Corporation ("Titan"), formerly known as The Titan Corporation, by and through undersigned counsel, and respectfully moves the Court to dismiss plaintiffs' Third Amended Complaint ("TAC") pursuant to Federal Rules of Civil Procedure 8, 10, 12(b)(1), and 12(b)(6).

The TAC asserts claims under the Alien Tort Statute, RICO, and common law claims based on their alleged mistreatment by the military and private contractor employees during their detention by the military in Iraq. They also allege that they were deprived of property when they were arrested. Like its predecessors, the TAC fails to state a claim.

Plaintiffs' ATS claims (Counts 1-15), brought under the Alien Tort Statute ("ATS"), fail under the holding of *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985). Additional reasons for dismissing the ATS claims include that plaintiffs have failed to allege facts that establish violations of clearly defined and widely accepted international norms; special factors counsel against allowing such claims based on these facts, and the ATS does not permit suits against corporations.

Plaintiffs' state law claims (Counts 16-29) must be dismissed under the rationale of *Sanchez-Espinoza*. In addition, plaintiffs' allegations of government involvement (through

conspiracy and attempts to impose aiding and abetting liability) establish, as a matter of law, these claims are preempted.

Plaintiffs' RICO claims (Counts 30 and 31) must be dismissed because plaintiffs lack standing to bring a claim under RICO, RICO does not reach the extraterritorial conduct alleged, plaintiffs have not alleged predicate acts chargeable in any State, and plaintiffs' enterprise allegations are inadequate.

The TAC also fails to comply with Rules 8 and 10, which, in accordance with Rule 12(e), independently requires plaintiffs to replead should any counts survive the Court's review.

Accordingly, for the reasons set forth above and in the memorandum of points and authorities filed herewith, this action should be dismissed. Pursuant to Local Civil Rule 7(f), Titan respectfully requests oral argument on this motion.

Respectfully submitted,

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C.  20005
(202) 434-5000
*Attorneys for Defendant L-3 Communications Titan Corporation*

Dated:  April 7, 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AL RAWI, *et al.*,

                    Plaintiffs,

     v.

THE TITAN CORPORATION,
*et al.*,

                    Defendants.

Civil Action No. 05-01165 (JR)

---

### DEFENDANT L-3 COMMUNICATIONS TITAN CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C.  20005
(202) 434-5000

*Attorneys for Defendant L-3 Communications
Titan Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

TABLE OF ABBREVIATIONS ................................................................................ viii

INDEX TO EXHIBITS ............................................................................................... ix

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

    A.    The Parties .................................................................................................... 2

    B.    The Allegations Establish the Centrality of Government and Military
            Personnel Acting in Their Official Capacities to Plaintiffs' Claims ....... 3

    C.    The Claims .................................................................................................... 6

ARGUMENT ................................................................................................................ 7

I.    Legal Standards for Defendants' Motions .................................................. 7

II.    The ATS Claims Must Be Dismissed (Counts 1-15) .................................. 8

    A.    The ATS Claims Are Barred by *Sanchez-Espinoza* ............................... 9

           1.    The Facts of *Sanchez-Espinoza* Are on All Fours with this Case ........... 10

           2.    Alleging Illegality and That the Actions Were Contrary to U.S.
               Policy or *Ultra Vires* Does Not Take this Case Outside of
               *Sanchez-Espinoza* ........................................................................... 14

           3.    The Term "Color of Law" Does Not Change the Analysis ..................... 14

    B.    The ATS Claims Are Barred for Independent Reasons .......................... 16

           1.    Plaintiffs Fail To Allege Facts that State ATS Claims ........................... 16

               a.    Extrajudicial Killing (Counts 1-3) ................................................ 16

               b.    Cruel, Inhuman, and Degrading Treatment (Counts 7-9) ............ 17

               c.    War Crimes (Counts 10-12) ........................................................... 18

               d.    Crimes Against Humanity (Counts 13-15) .................................... 19

            2.    Special Factors .................................................................................... 20

               a.    Alternate Remedies ........................................................................ 20

               b.    National Security, Foreign Policy, and Military
                   Discipline ....................................................................................... 22

           3.    There Is No Corporate Liability for the ATS Claims ............................. 23

III.    Plaintiffs' RICO Claims Must Be Dismissed (Counts 30-31) .................... 25

    A.    The RICO Plaintiffs Lack Standing ........................................................ 27

    B.    RICO Does Not Reach the Extraterritorial Conduct Alleged .................. 29

           1.    Plaintiffs Do Not Allege Substantial Domestic Effects from
               Their Alleged Mistreatment in Iraq ................................................ 30

            2.    The Alleged Domestic Conduct Does Not Support the
               Extraterritorial Application of RICO .............................................. 32

C.    Plaintiffs Have Not Properly Pled Predicate Acts .................................. 33

D.    Plaintiffs' Enterprise Allegations Require Dismissal ............................ 33

1.    There Is No RICO Claim Where the United States Government Is a Necessary Constituent of the Alleged Ad Hoc Enterprise ................ 34

2.    Plaintiffs' Allegations Are Insufficient To Establish the Existence of an Enterprise Between Titan and CACI ............................ 35

IV.    Plaintiffs' State Law Claims Must Be Dismissed (Counts 16-29) ...................... 37

A.    *Sanchez-Espinoza* Requires Dismissal of the State Law Claims (Counts 16-29) ................................................................... 37

B.    The State Law Claims Are Preempted .............................................. 39

C.    Titan Is Not Liable for the Actions of Soldiers (Counts 16-27) ..................... 41

V.    The Complaint Does Not Comply with Federal Rules of Civil Procedure 8 and 10 ......................................................................... 42

CONCLUSION ......................................................................... 44

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abdullahi v. Pfizer Inc.*, 2005 U.S. Dist. LEXIS 16126 (S.D.N.Y. Aug. 9, 2005)........................20

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987) ..........................30

*In re Agent Orange Prod. Liability Litigation*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005)....................25

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005)........8, 17, 30, 33

*Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285 (S.D. Fla. 2003)............8, 30, 33

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...............................................................................24

*Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379 (S.D. Tex. 1994)......................................38

*Allee v. Medrano*, 416 U.S. 802 (1974) ..........................................................................................8

*Anderson v. United States*, 417 U.S. 211 (1974) ..........................................................................38

*Arar v. Ashcroft*, 414 F. Supp. 2d 250 (E.D.N.Y. 2006) .........................................................15, 22

*Arsenaux v. Roberts*, 726 F.2d 1022 (5th Cir. 1982) ....................................................................44

*Bagguley v. Bush*, 953 F.2d 660 (D.C. Cir. 1991) ...........................................................................7

*Bautista v. L.A. County*, 216 F.3d 837 (9th Cir. 2000) ..................................................................43

*Berger v. Pierce*, 933 F.2d 393 (6th Cir. 1991) .............................................................................35

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) ........................................................20

*\* Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988) ...............................................................41, 42

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ..........................................................7, 26, 28

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003) ..............26, 27, 28, 43

*Bush v. Lucas*, 462 U.S. 367 (1983) ...............................................................................................20

*Butte Mining PLC v. Smith*, 76 F.3d 287 (9th Cir. 1996) ............................................26, 29, 30, 33

*Butters v. Vance International, Inc.*, 225 F.3d 462 (4th Cir. 2000)................................................38

*CFTC v. Nahas*, 738 F.2d 487 (D.C. Cir. 1984)............................................................................29

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ....................................................19

*Chappell v. Wallace*, 462 U.S. 296 (1983) ......................................................................13, 20, 23

*City of Worcester v. HCA Management Co., Inc.*, 753 F. Supp. 31 (D. Mass. 1990) ..................38

*Conley v. Gibson*, 355 U.S. 41 (1957) .................................................................7

*Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252 (2d Cir. 1989)...........................30

* *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) .............................................21, 23

*Dammarrel v. Islamic Rep. of Iran*, 2005 U.S. Dist. LEXIS 5343 (D.D.C. Mar. 29, 2005) .........16

*Dees v. Cal. State University*, 33 F. Supp. 2d 1190 (N.D. Cal. 1998)...........................................35

* *Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) .......................................29, 30, 31, 36

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260 (D.C. Cir. 1995)..........25

*El-Shifa Pharm. Industrial Co. v. United States*, 378 F.3d 1346 (Fed. Cir. 2004).......................13

* *Empagran S.A. v. F. Hoffman-LaRoche LTD*, 417 F.3d 1267 (D.C. Cir. 2005).................31, 32

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005)....................................................................16

* *F. Hoffmann-La Roche LTD v. Empagran S.A.*, 542 U.S. 155 (2004) .....................................31

*Finley v. United States*, 490 U.S. 545 (1989) ..............................................................................37

*Foley Brothers, Inc. v. Filardo*, 336 U.S. 281 (1949)..................................................................29

*Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987) .....................................................17

*Grogan v. Platt*, 835 F.2d 844 (11th Cir. 1988) .........................................................................27

*Hagans v. Lavine*, 415 U.S. 528 (1974).......................................................................................24

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ...................................................................................13

*Harley v. United States DOJ*, 1994 U.S. Dist. LEXIS 21621 (D.D.C. Oct. 7, 1994)...................35

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) .......................................27

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992)......................................................26, 28

*Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417 (5th Cir. 2001) ...............................................27

* *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005)................................................. passim

*Jennings v. Emry*, 910 F.2d 1434 (7th Cir. 1990).................................................................33, 34

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)..............................................................................7

* *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) .......................................................40, 42

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994).....................................................7

*Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001)................................................................44

\* *Mangold v. Analytic Services, Inc.*, 77 F.3d 1442 (4th Cir. 1996) ................................12, 38, 41

*McAfee v. 5th Circuit Judges*, 884 F.2d 221 (5th Cir. 1989).........................................................44

*Murphy v. United States*, 653 F.2d 637 (D. C. Cir. 1981) ...........................................................28

*Norris v. United States DOD*, 1996 U.S. Dist. LEXIS 22753 (D.D.C. Oct. 28, 1996) ................35

*North South Finance Corp. v. Al-Turki*, 100 F.3d 1046 (2d Cir. 1996) ..........................26, 29, 30

*Oscar v. University Students Cooperative Association*, 965 F.2d 783 (9th Cir. 1992) ................27

*Pennhurst State Sch. & Hospital v. Halderman*, 465 U.S. 89 (1984)...........................................24

*Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004) .....................................................30

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003) ........................................................................................................................................24

*Qualls v. Rumsfeld*, 228 F.R.D. 8 (D.D.C. 2005) .......................................................................44

*Richmond v. Lewis*, 1992 U.S. App. LEXIS 313 (9th Cir. Jan. 14, 1992)....................................17

*Roberson v. Money Tree*, 954 F. Supp. 1519 (M.D. Ala. 1997).................................................38

*Roe v. Ingraham*, 364 F. Supp. 536 (S.D.N.Y. 1973)..................................................................44

\* *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985)................................. passim

*Sanchez-Espinoza v. Regan*, 568 F. Supp. 596 (D.D.C. 1983)....................................................37

*Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116 (C.D. Cal. 2003)..........................................17, 19

\* *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005)...................................................13, 14, 39

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) ...............................................................................20

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ...................................................................25

*Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345 (S.D. Fla. 2003) ....................................30

\* *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739 (2004)...…………………..……………….. passim

*Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988).....................................................................20

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)......................................................................42

*United States v. LSL Biotechs.*, 379 F.3d 672 (9th Cir. 2004) .....................................................30

*United States v. Morrow,* 2005 WL. 1389256 (D.D.C. June 13, 2005).........................................36

\* *United States v. Perholtz*, 842 F.2d 343 (D.C. Cir. 1988) .....................................................35, 36

\* *United States v. Stanley*, 483 U.S. 669 (1987)....................................................................14, 22, 39

* *United States v. Turkette*, 452 U.S. 576 (1981) ...............................................................35

*United States v. White*, 116 F.3d 903 (D.C. Cir. 1997) ...................................................35

*Wagh v. Metris Direct, Inc.*, 348 F.3d 1102 (9th Cir. 2003) ...........................................25

*Warth v. Seldin*, 422 U.S. 490 (1975) ..............................................................................8

*Western Associates Ltd. Partnership, ex rel. Avenue Associates Ltd. Partnership v. Market Sq. Associates*, 235 F.3d 629 (D.C. Cir. 2001)...............................................25

*Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163 (3d Cir. 1987)..................................8

*Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27 (D.C. Cir. 1987) ...................................32

## FEDERAL STATUTES

10 U.S.C. § 113 ..................................................................................................................6

10 U.S.C. § 134 ..................................................................................................................6

10 U.S.C. § 137 ..................................................................................................................6

10 U.S.C. § 2734 .........................................................................................................20, 21

42 U.S.C. § 1983 ..............................................................................................................23

18 U.S.C. § 1111 ..............................................................................................................17

28 U.S.C. § 1350 ..............................................................................................................16

18 U.S.C. § 1510 ..............................................................................................................26

18 U.S.C. § 1961 .........................................................................................................26, 33

18 U.S.C. § 1962 .........................................................................................................25, 28

18 U.S.C. § 1964 .........................................................................................................26, 27

28 U.S.C. § 2680 ..............................................................................................................21

150 Cong. Rec. H4707 .....................................................................................................21

H.R. Rep No. 102-376(I) ..................................................................................................15

H.R. Rep. No. 734, 101-734 (1990)..................................................................................37

H.R. Rep. No. 1549, 91st Cong., 2d Sess. .......................................................................29

S. Rep. No. 102-249..........................................................................................................15

S. Rep. No. 617, 91st Cong., 1st Sess. (1969) .................................................................29

Torture Victim Protection Act of 1991, 106 Stat. 73............................................................15, 16

## MISCELLANEOUS

1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2002)...........................8

2 James Wm. Moore et al., *Moore's Federal Practice* .........................................................43, 44

Ernst Schneeberger, *The Responsibility of the Individual Under International Law,* 35
    Geo. L.J. 481 (1947) ....................................................................................................24

Restatement (Second) of Torts (1979)...........................................................................38

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ATS | Alien Tort Statute |
| CACI | Collectively, defendants CACI International Inc., CACI Incorporated – Federal, and CACI Premier Technology, Inc. |
| FCA | Foreign Claims Act |
| FTCA | Federal Tort Claims Act |
| MCA | Military Claims Act |
| RCS | Plaintiffs' RICO Case Statement |
| SAC | Plaintiffs' Second Amended Complaint |
| TAC | Plaintiffs' Third Amended Complaint |
| Titan | L-3 Communications Titan Corporation and The Titan Corporation |
| TVPA | Torture Victim Protection Act |

## INDEX TO EXHIBITS

A.              Plaintiffs' RICO Case Statement

## INTRODUCTION

After having had the benefit of two previous unadjudicated motions to dismiss by defendant L-3 Communications Titan Corporation ("Titan") and the other defendants, and this Court's opinion in *Ibrahim v. Titan Corp.*, thirteen plaintiffs present the fourth complaint in this matter in the form of a Third Amended Complaint (the "TAC"). At bottom, the TAC alleges plaintiffs were abused while they were detained by the U.S. military in Iraq during the prosecution of the war and insurgency in a fashion similar (and in the case of Mr. Hadood, identical) to those alleged in *Ibrahim*. In *Ibrahim*, the Court found that even applying the generous Rule 12 standards, there were no set of facts that would state a claim against Titan for these factual allegations, with the exception of certain state common law claims that appeared to be pre-empted (but based on the sparseness of the complaint in that case, had to be adjudicated on summary judgment). Notwithstanding that the TAC is more complex, attempts to plead around this Court's decision, and generally attempts to evade Rule 12 through obfuscation of who did what to whom and a liberal use of the word conspiracy, the TAC cannot fare better than the complaint in *Ibrahim*, and in fact, fares worse.

Use of the word conspiracy and its derivatives (196 times), or the phrases "Torture Conspirators," "Defendants and/or others," and "Color of Law" and other conclusory or concealing allegations cannot make claims of what was not found to state a claim in *Ibrahim*. Asserting that the abuses were in concert and conspiracy with the military and other government officials in an attempt to plead around the rationale of *Ibrahim* and to make Titan liable for acts for that which the military cannot be sued, not only brings the ATS claims within the holding of *Sanchez-Espinoza*, but has also pleaded plaintiffs out of the state law claims. *Sanchez-Espinoza* leaves no middle ground: either the claims are of unofficial action that do not state ATS claims, or they implicate official U.S. action, which bars such claims. But by choosing the latter course (as opposed to the frolic and detour alleged by the *Ibrahim* plaintiffs) these plaintiffs have established both a basis for applying the result in *Sanchez-Espinoza* to the state law claims, and for establishing pre-emption of those claims under *Boyle* without the need for factual discovery.

Nor can plaintiffs create RICO standing where there was none before by being vague on who they allege took their property. The remoteness of the seizures from the Torture Conspiracy means they do not confer standing, any more than the alleged effects on U.S. commerce, divorced from any effect on these plaintiffs, bring this foreign activity within the reach of RICO. None of the other RICO defects are cured any more than the problems with most of the ATS claims.

While the complaint pleads enough to establish that these plaintiffs do not have any claims, to the extent there is any doubt, their failure to comply with the must fundamental requirements of Federal Rules of Civil Procedure 8 and 10 also means that even if anything remains of the TAC, it must be dismissed and repleaded. Use of "Torture Conspirators" and "Defendants and/or Others" and failure to identify which plaintiffs are pursuing which claims against which defendants, means that this complaint flunks even the liberal provisions of Rule 8. The purpose of notice pleading is as much to allow the Court to determine whether the plaintiffs have a basis to start up the machinery of litigation. Given the facts pleaded, it is clear they do not, but to the extent that there is any doubt about some portion, plaintiffs must replead, subject to Rule 11, in conformance with Rule 8 and this Court's prior order with regard to CACI.

## BACKGROUND

### A.    The Parties

Defendant L-3 Communications Titan Corporation, formerly known as The Titan Corporation ("Titan"),[1] supplied linguists to the U.S. military in Iraq under a Department of Defense contract. The other corporate defendants are publicly traded referred to here collectively as "CACI." In Iraq, CACI provided interrogators in support of military operations. In addition, five individuals are named in the complaint, two of whom, Messrs. Johnson and Duggan, have not been served.

---

[1] On July 29, 2005, publicly traded L-3 Communications Corporation completed the acquisition of The Titan Corporation, which renamed its wholly owned subsidiary, L-3 Communications Titan Corporation. "Titan" refers to the corporation under whatever name it was operating.

The thirteen named plaintiffs allege that they or their decedents were detained by the U.S. military during its operations in Iraq. One plaintiff is alleged to be a citizen of Sweden; the others are presumably citizens of Iraq. None are U.S. citizens. Eight plaintiffs provide detainee numbers purportedly assigned by the U.S. military; the others provide no such information. Four plaintiffs are identified by first name only.

**B.    The Allegations Establish the Centrality of Government and Military Personnel Acting in Their Official Capacities to Plaintiffs' Claims**

Plaintiffs collectively allege that they were detained by the U.S. military at facilities in Iraq and under the control of the United States at various times during the period July 11, 2003 through July 26, 2004. (TAC ¶¶ 2-11.) The bulk of plaintiffs' allegations, to the extent they provide specifics, arise at the Abu Ghraib facility during the period between October 4, 2003 and June 6, 2004, although plaintiffs make references to six additional military facilities in Iraq, all alleged to be under U.S. military control. (TAC ¶¶ 115, 128, 132, 135, 141, 145, 159.) Plaintiffs allege numerous physical injuries from mistreatment while in the custody of the U.S. military. Plaintiffs also allege that incident to their capture, property was taken from them or otherwise damaged or destroyed.

Like in *Ibrahim v. Titan Corp.*, No. 04-1248 (JR) (D.D.C.), the TAC seeks to impose liability upon Titan for: (1) Titan's alleged corporate actions and inactions (i.e., negligent hiring and supervision) and (2) the alleged actions of Titan employees. In contrast to the plaintiffs in *Ibrahim*, these plaintiffs allege that these actions were taken as aiders, abettors, and co-conspirators of the military and other government officials at all levels and seek to hold Titan responsible for acts allegedly committed by soldiers and other government officials throughout Iraq. Such actions—attributed to "Torture Conspirators" or "Defendants and/or their co-conspirators" rather than the soldiers or military units that have been identified as responsible—constitute the bulk of the allegations. Finally, the complaint states that defendants are *liable* for (although not alleged to be directly involved with or even present for) the killing of more than 15 persons and for causing more than 50 suicides, among other heinous acts that also are not

grounded in well-pled factual allegations which, if true, would establish the involvement of Titan. (TAC ¶¶ 169-70.)

Despite the numerous heinous allegations, only two alleged Titan employees (as distinct from "Torture Conspirators") are specifically accused of injuring named plaintiffs. Defendant Nakhla, a former employee of Titan, is alleged to have "assaulted Plaintiff Hadood" and "tortured and otherwise mistreated Plaintiffs." (TAC ¶¶ 19, 49.) Defendant John Israel, an employee of a Titan subcontractor, is alleged, upon information and belief, to have "assaulted" and repeatedly beaten, kicked and punched, and threatened Plaintiff Umer during interrogations, including throwing him against the wall of the interrogation room. (TAC ¶¶ 18, 50.)[2] Even if these allegations satisfy Rule 8 (which is unlikely, particularly in the case of Hadood), they do not support most of the claims asserted against the individuals alleged to have committed them, much less against Titan.[3] Moreover, these scant factual allegations (one qualified with "information and belief") stand in stark contrast to the bulk of plaintiffs' allegations, which are attributed to "Torture Conspirators," a term they employ no less than 56 times to obscure the centrality of U.S. military personnel to their allegations, even where publicly-available government investigations have thoroughly identified the participants as soldiers and other government officials.[4] It is upon this thin reed that plaintiffs seek to hold Titan legally responsible for all the alleged abuses to have occurred during the occupation of Iraq by the United States through some hundreds of thousands of U.S. military personnel since 2003.

---

[2] Plaintiffs also conclusorily allege that Defendants Nakhla and Israel "[u]pon information and belief...tortured and otherwise mistreated Plaintiffs and other Class Members during interrogations." (TAC ¶ 49 (Nakhla); ¶ 50 (Israel).)

[3] Specifically, as discussed further below, these allegations clearly do not support counts 1-3, 5-15, 17-24, 26-27, and 30-31; and are likely insufficient for counts 4, 10, 28, 29. Counts 4 (ATS – torture), 16 (assault and battery), 25 (intentional infliction of emotional distress), 28 (negligent hiring and supervision), and 29 (negligent infliction of emotional distress) must be dismissed for other reasons.

[4] In addition, plaintiffs use the phrase "defendants and their co-conspirators" 17 times and the phrase "defendants and/or co-conspirators" 2 times.

The glue that holds this complaint together is plaintiffs' repeated use of terms asserting conspiracy (a total of 196 different times) and obfuscating terms that include one or more of the defendants and/or military and/or other actors: contractors, soldiers, military and government officials are all lumped together as "Torture Conspirators" and "Defendants and/or others." "Torture Conspirators" was defined in the Second Amended Complaint ("SAC") as defendants and "certain government officials." (SAC ¶ 80.) Although plaintiffs have not repeated the definition in the TAC, the factual allegations give the same content to the term, i.e., that military and government officials acting in their official capacities are at the heart of the alleged conspiracy and are inseparable from the allegations against Titan. For example, plaintiffs repeatedly refer to as conspirators nameless and faceless "government officials" and "military officials" (TAC ¶¶ 28, 70, 71, 98), in addition to the eight soldiers held responsible for their actions at Abu Ghraib by the military, (TAC ¶ 28). More information about the identity of the conspirators is provided in plaintiffs' allegations that senior Titan management (unnamed) leveraged relationships with unnamed government officials to secure contracts for Titan on a no-bid basis. (TAC ¶¶ 98, 106.)

Plaintiffs trumpet that the conduct at issue was done in the course of Titan's employees' support of a uniquely (and they contend exclusively) governmental function: the provision of translators (linguists) to aid the military in the collection of military intelligence. (TAC ¶ 16.) Plaintiffs' alleged mistreatment occurred in U.S. military facilities under U.S. military control. (TAC ¶¶ 12-14, 16, 28, 38, 65.) Titan's employees' alleged misdeeds took place within those military-controlled facilities "during interrogations." (TAC ¶¶ 49, 51, 157.) Indeed, plaintiffs contend that the conspiracy at the core of this case involved an alleged agreement to "torture and mistreat prisoners during interrogations..." (TAC ¶ 97.) More specifically, the alleged tortious actions of Titan employees, "were intended to obtain intelligence information for the United

States." (TAC ¶ 56.[5])  Titan's role, according to plaintiffs, was to serve as a recruiter to aid the U.S. military in hiring linguists to support interrogations.[6]  (TAC ¶ 42.)

The RICO Case Statement ("RCS"),[7] a pleading required under the local rules in the U.S. District Court for the Southern District of California, clearly identifies these nameless and faceless "government officials" who play so prominent a role in plaintiffs' factual allegations concerning the functions performed by Titan and those involved in their alleged abuse.  These officials include Secretary of Defense Donald Rumsfeld and two of his senior policy advisors, Under Secretary of Defense Douglas J. Feith and Under Secretary of Defense Stephen A. Cambone.[8]  (RCS at 4.)

### C.    The Claims

The TAC contains 31 counts, including violation of international law under the **Alien Tort Statute** ("ATS") (Counts 1-15: extrajudicial killing; torture; cruel, inhuman, and degrading treatment; war crimes; and crimes against humanity), **common law torts** (Counts 16-29: assault and battery, sexual assault and battery, wrongful death, intentional infliction of emotional distress, negligent hiring and supervision, negligent infliction of emotional distress), and **RICO/conspiracy to violate RICO** (Counts 30-31).  The claims for negligent hiring and supervision, negligent infliction of emotional distress, and RICO are brought only against corporate defendants; all others are brought against all defendants and are alleged in triplicate:

---

[5] Consistent with the TAC, plaintiffs have also disclosed that their claim is that Titan employees worked "hand-in-hand" with the military, in the "operat[ion of] an intensive interrogation, debriefing, and intelligence gathering program designed to screen and identify detainees who had valuable 'intelligence.'" (RCS at 11, 17-18).

[6] *See also* TAC ¶ 44 ("Defendant Titan provided the United States with persons who lacked sufficient skill to perform the Interrogation Services.").

[7] For the Court's convenience, plaintiffs' RICO Case Statement is attached as Exhibit A.

[8] Secretary Rumsfeld is the "principal assistant to the President" charged with running the Department of Defense.  10 U.S.C. § 113(b).  Douglas Feith is the Under Secretary of Defense for Policy who is a senior advisor to the Secretary for the formulation of defense policy.  *See* 10 U.S.C. § 134.  Stephen A. Cambone is the Under Secretary of Defense for Intelligence, the Secretary of Defense's senior advisor on intelligence matters.  *See* 10 U.S.C. § 137.

directly and indirectly through "civil conspiracy" and "aiding and abetting" theories (conspiracy to violate RICO is asserted against all defendants; there is no aiding and abetting RICO count).

## ARGUMENT

### I.    Legal Standards for Defendants' Motions

Titan moves to dismiss the TAC under Federal Rules of Civil Procedure 8, 10, 12(b)(1), and 12(b)(6). A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint while a motion to dismiss under Rule 12(b)(1) tests the jurisdictional basis for the underlying complaint. Some of the bases on which the TAC should be dismissed have been variously treated under Rules 12(b)(1) and 12(b)(6). Since we accept as true the TAC's well-pleaded *factual* allegations for the purposes of this motion, the standard of review here is equivalent. A motion to dismiss for failure to state a claim under Rule 12(b)(6) will be granted if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). While the complaint will be construed in the light most favorable to the plaintiff, and the plaintiff will have "the benefit of all inferences that can be derived from the facts alleged," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), a court may accept "neither 'inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint,' nor 'legal conclusions cast in the form of factual allegations,'" *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (quoting *Kowal*, 16 F.3d at 1275).

The ATS incorporates substantive violations into its jurisdictional pleading requirements and is subject to a more searching review. *See Bagguley v. Bush,* 953 F.2d 660, 663 (D.C. Cir. 1991); *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir. 1995) ("Because the [ATS] requires that plaintiffs plead a 'violation of the law of nations' at the jurisdictional threshold, this statute requires a more searching review of the merits to establish jurisdiction than is required under the more flexible 'arising under' formula of section 1331 [federal question jurisdiction].") (quoting *Filartiga v. Pena-Irala*, 630 F.2d 876, 887-88 (2d Cir. 1980)). "The [ATS] requires that a more searching review of the merits to establish jurisdiction.... The heightened pleading standard

requires that the complaint identify facts showing Defendants violated a specific international law." *Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285, 1292 (S.D. Fla. 2003) (internal citations omitted), *aff'd in part and vacated in part on other grounds*, 416 F. 3d 1242 (11th Cir. 2005).

In evaluating the sufficiency of the plaintiffs' claims, the Court only looks to the factual allegations made by the named plaintiffs, not those of the would-be class members. *See* 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 2.07 (4th ed. 2002) ("If the plaintiff has no standing individually, then no case or controversy arises, and the plaintiff's claims are not typical of the claims of those who might otherwise litigate the action."). The allegations of unidentified class members can not save an inadequate case from dismissal:

> Petitioners must allege and show that they *personally* have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless these petitioners can demonstrate thus the requisite case or controversy between themselves *personally* and respondents, "none may seek relief on behalf of himself or any other member of the class."

*Warth v. Seldin*, 422 U.S. 490, 502 (1975) (emphasis added) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)); *see also Allee v. Medrano*, 416 U.S. 802, 828-29 (1974) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.") (Burger, J., concurring in part and dissenting in part). "It is well settled that to be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim." *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1169 (3d Cir. 1987).

## II.    The ATS Claims Must Be Dismissed (Counts 1-15)

Thirteen of plaintiffs' thirty-one counts are claims under the Alien Tort Statute (the "ATS," sometimes referred to as "ATCA"). These counts (implied causes of action grounded in federal common law), must be dismissed with regard to all plaintiffs because the ATS does not provide jurisdiction over claims involving official U.S. action. In *Ibrahim*, the plaintiffs sought to avoid the holding of *Sanchez-Espinoza* by pleading that the conduct at issue did not involve

state action. This Court understood that this attempt to avoid the holding of that case meant that plaintiffs had failed to plead an essential element of their ATS claims and dismissed them for failure to allege state action. *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 13-15 (D.D.C. 2005). Unlike in *Ibrahim*, plaintiffs here have pled the performance of government functions by defendants, extensive involvement and participation of U.S. government officials, and framed their allegations such that the actions of contractors and soldiers are indistinguishable. While this might avoid the defect that caused this Court to dismiss the *Ibrahim* claims, these allegations place this case on all fours with *Sanchez-Espinoza* and require dismissal for the reasons explained there. Simply put, *Sanchez-Espinoza* makes clear that ATS claims are available only where there is official state action, but that official U.S. actions cannot be the basis of ATS claims. Plaintiffs cannot avoid the consequences of their factual allegations by painting them as *ultra vires* but taken under "color of law." Moreover, plaintiffs' ATS claims against Titan are independently precluded for three additional reasons not reached in *Ibrahim*: (1) plaintiffs have not stated a claim, with respect to three of the ATS counts, for violations of international law norms with sufficiently definite content and acceptance among civilized nations, *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2755 (2004); (2) *special factors* bar these claims; and (3) there is no corporate liability.

## A.    The ATS Claims Are Barred by *Sanchez-Espinoza*

*Ibrahim* was founded on similar (and in the case of one plaintiff, Jilal Mahdy Hadood, identical) allegations of abuse by the contractors' employees. The *Ibrahim* plaintiffs expressly "disavow[ed] any assertion that the defendants were state actors," *Ibrahim*, 391 F. Supp. at 14 n.3, and sought only "damages arising from the acts of private contractors," *id.* at 15. They specifically rejected that the defendants there were acting on behalf of the military.[9] Accordingly, this Court correctly found that the *Ibrahim* allegations were not actionable under the ATS's grant of jurisdiction.

---

[9] *See Ibrahim* Pls.' Opp'n Mot. Dismiss ("The Plaintiffs in the case at bar do not allege atrocities of military combat, which is a purely governmental function, by agents of the government.")

Seeking to avoid the effect of this Court's dismissal of ATS claims in *Ibrahim* and to litigate the military's interrogation policies during the conflict in Iraq, plaintiffs here have taken the opposite approach, alleging pervasive government involvement and participation in the alleged conduct and performance of government functions by defendants. Plaintiffs have also pled their case to make the alleged acts of defendants indistinguishable from the acts of military personnel acting in their official capacity, so much so that they seek to recover from defendants for the actions of the U.S. military. To the extent that these allegations avoid dismissal for the reasons that controlled *Ibrahim*, the alleged participation of and entanglement with government officials and government functions makes these claims indistinguishable from those in *Sanchez-Espinoza* and require dismissal of Counts 1-15 for the reasons stated there.

### 1.    The Facts of *Sanchez-Espinoza* Are on All Fours with this Case

The plaintiffs in *Sanchez-Espinoza*, like the plaintiffs here, sought to use the Courts to adjudicate the U.S. Government's foreign policy, alleged abuses, and illegal conduct that took place with the alleged participation and acquiescence of U.S. military and other government officials. They, like the plaintiffs here, brought claims under the ATS (as well as state law) against the private individuals and private corporations who were working for the government in carrying out those policies. Here, as in *Sanchez-Espinoza*, plaintiffs seek to recover for actions taken with government officials. Just like these plaintiffs, the plaintiffs in *Sanchez-Espinoza* founded their ATS claims on allegations of abhorrent, illegal conduct allegedly carried out to further an allegedly illegitimate foreign policy: murder, summary execution, abduction, torture, rape, wounding, and the destruction of private property and public facilities during the course of armed conflict in Nicaragua between so-called "Contra" forces and government forces. *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 205 (D.C. Cir. 1985). Like here, they alleged that private parties acted "in concert and conspiracy" with other defendants, including U.S. government officials, to mistreat or aid in the mistreatment of the civilian population of a foreign nation in the midst of armed conflict. *Id.* at 205. Although present and former U.S. officials (sued in both individual and official capacities) were defendants in *Sanchez-Espinoza* but not here, plaintiffs

cannot escape *Sanchez-Espinoza*'s holding with regard to the private contractors by moving the official actors from the "defendant" to the "co-conspirator" category. The allegations here, as in *Sanchez-Espinoza*, directly implicate "actions of the United States." *Id.* These state actions are not subject to plaintiffs' civil damages claims because judgment on such claims "would necessarily 'interfere with the public administration,' or 'restrain the government from acting, or…compel it to act.'" *Id.* (citations omitted). Permitting such actions - whether against a government official or private contractor, *id.* at 207 n.4, would "make a mockery of the doctrine of sovereign immunity," *id.* at 207.

Plaintiffs seek to avoid the clear holding of *Sanchez-Espinoza* by attempting to conceal the nature of their allegations (at least for the purposes of establishing the state action that led to dismissal of the claims in *Sanchez-Espinoza*), but they cannot escape the consequences of the facts they have pled, no matter how much they obscure who did what to whom, and the nature of the government's involvement in the actions that form the basis of their claims. Contractors, soldiers, and military and government officials are all lumped together as "Torture Conspirators" and "Defendants and/or others." "Conspirators" is used no less than 75 times in the TAC to describe who is alleged to have harmed plaintiffs. These terms clearly include soldiers all the way up to high government officials. While the TAC only explicitly identifies eight soldiers convicted for their abuses of detainees, it is full of references to "government officials" and "military officials" (TAC ¶¶ 28, 70, 71, 98), who must have been senior enough to secure contracts worth hundreds of millions of dollars on a no-bid basis. (TAC ¶¶ 98, 106.)

Plaintiffs cannot claim frolic and detour, as do the *Ibrahim* plaintiffs, where they specify in their complaint that the conduct at issue was done in the course of Titan's employees' support of a uniquely (and they contend exclusively) governmental function: the provision of translators (linguists) to aid the military in the collection of military intelligence in U.S. military facilities, under U.S. military control, "during interrogations." (TAC ¶¶ 12-14, 16, 28, 38, 49, 51, 65, 157.) The alleged conspiracy at the core of this case involved an alleged agreement to "torture and mistreat prisoners during interrogations…." (TAC ¶ 97.) Significantly, plaintiffs contend

that the military should have hired its linguists directly without involving Titan, *id.*, meaning that the purpose for Titan's presence was, in plaintiffs' view, to support official government action. And even plaintiffs agree that intelligence gathering through military interrogation during armed conflict is quite clearly an official governmental function.  (TAC ¶ 71) (Interrogation Services provided by defendants constitute "an 'inherently governmental function' as that term is defined by law....")  The delegation of allegedly governmental functions to private military contractors does not change their official nature:  "[N]o matter how many times or to what level that function is delegated, it is a small step to protect that function when delegated to private contractors, particularly in light of the government's unquestioned need to delegate governmental functions." *Mangold v. Analytic Servs., Inc.,* 77 F.3d 1442, 1447-48 (4th Cir. 1996).

Plaintiffs' allegations do more than challenge the performance by defendants of allegedly governmental functions.  Plaintiffs assert that the military lacks authority altogether to delegate such functions to military contractors.  (TAC ¶¶ 42, 71.)  This implicates official action even more broadly because it subjects to damage claims high-level military policy decisions to resort to the use of contractors rather than expand the size of the force to cover such functions.  Even litigation between private parties touching upon such issues has the potential to affect military policy concerning the size and composition of the military forces and the manner in which contractors are utilized in support of combatant activities.  Such decisions, which plaintiffs in *Ibrahim* avoided, are undeniably official action and are squarely implicated here.  And plaintiffs' contention that the contracting practices involved here were illegal, if given effect through a judgment, would, without question, "restrain the government" from using contractors to perform such services in future conflicts. *Sanchez-Espinoza,* 770 F.2d at 207 (quotations omitted).

Although not explicitly set forth in this complaint (though it has been detailed in their RCS), plaintiffs' allegations also directly implicate the official military chain of command in their alleged conspiracy.  No other means could control this allegedly vast enterprise to direct the hundreds of low-level soldiers allegedly involved in torturing more than 1000 putative class plaintiffs across all detention facilities in Iraq.  The direction of soldiers through the military

chain of command is, by definition, official action, even if plaintiffs allege it is "contrary" to the policy of the United States government. Official action giving rise to state action for ATS purposes is determined by what individuals were doing and their governmental roles, not by the alleged illegality or *ultra vires* nature of the conduct. *Schneider v. Kissinger*, 412 F. 3d 190, 199 (D.C. Cir. 2005). The Supreme Court has consistently cautioned against civil suits where there is danger of interference with unhesitating compliance to orders issued through the military chain of command. *See Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (no *Bivens* action against superior officer due to potential impact on "the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel").

Plaintiffs' identification of the Secretary of Defense and his highest subordinates as participating in the alleged criminal enterprise, while not necessary to fall within *Sanchez-Espinoza*, makes it certain. It is beyond peradventure that these officials' duties involve the formulation of military policy, including intelligence gathering and evaluation, core official actions of the United States. *See, e.g., El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1365 (Fed. Cir. 2004), *cert. denied*, 125 S. Ct. 2963 (2005). This is particularly the case here, where the policy-making at issue concerns not only intelligence gathering, but also the military detention of prisoners in a combat zone, a well-recognized extension of the war power and an "important incident[] of war." *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004). This Court found that the *Ibrahim* plaintiffs avoided this problem by seeking only "damages arising from the acts of private contractors," *Ibrahim*, 391 F. Supp. 22 at 15, and "disavow[ing] any assertion that the defendants were state actors," *id.* at 14 n.3. But plaintiffs here assert that the actions challenged were taken with the agreement of (and under the direction of) government officials. In framing their action in this way, and in seeking to recover for the actions of U.S. soldiers,[10]

---

[10] *See* TAC ¶ 1 ("This action seeks money damages (both compensatory and punitive) to compensate Plaintiffs and the Class Members who were tortured and treated in a cruel, inhuman and degrading manner by Defendants *and their co-conspirators*.") (emphasis supplied); TAC ¶ 28 (naming 8 soldiers and "other military and government officials who acted illegally" as conspirators); RCS at 4 (naming the Secretary of Defense and other senior policy advisors and military commanders as conspirators).

plaintiffs have entangled this action in the combatant activities of the U.S. military in a way that *Ibrahim* did not.

> ### 2.    Alleging Illegality and That the Actions Were Contrary to U.S. Policy or *Ultra Vires* Does Not Take this Case Outside of *Sanchez-Espinoza*

Plaintiffs attempt to avoid dismissal by alleging that the government officials involved were acting illegally. That effort was unsuccessful in *Sanchez-Espinoza* and, likewise, fails here. It is the factual allegations that control; not plaintiffs' characterization of those facts. It would make a mockery of sovereign immunity if a plaintiff could maintain a suit for damages against the United States that would otherwise be barred simply by alleging that the actions underlying his suit were illegal. Nor does the law permit it. *Schneider v. Kissinger*, 412 F.3d 190, 199 (D.C. Cir. 2005). Thus, the Court has barred damages actions even where military action was abhorrent and patently unlawful. *United States v. Stanley*, 483 U.S. 669, 681 (1987) (disallowing *Bivens* actions by military personnel for human experimentation involving undisclosed administration of LSD because the alleged "injury arises out of activity 'incident to service'"). This is not to say that the challenged actions are lawful. Nor is it necessary in order to defeat the ATS claims that plaintiffs' claims implicate military discipline so as to render them unsustainable as in *Chappel* and *Stanley* (although we believe that is also the case here). Rather, these cases illustrate that the alleged involvement of the military chain of command implicates official action which, under *Sanchez-Espinoza*, requires dismissal of the ATS claims.

> ### 3.    The Term "Color of Law" Does Not Change the Analysis

In an attempt to "thread-the-needle" postulated by this Court in footnote 3 of the *Ibrahim* opinion, plaintiffs characterize Titan's actions as being under "color of law," presumably to implicate state action for ATS purposes but not to fall within the holding of *Sanchez-Espinoza*. This attempt is foredoomed.

First, the private contractors in *Sanchez-Espinoza* could easily also have been alleged to act under "color of law" in support of unlawful and *ultra vires* acts such as murder, torture, and rape. The adequacy of a complaint, however, is not measured by the legal characterization

chosen by the lawyers. Official action is established by the factual allegations here, no matter the use of the term "color of law." But even if one assumes that "color of law" excludes "official action" then the ATS claims must be dismissed for the same reason as those in *Ibrahim*: private actions do not support ATS claims. *Sanchez-Espinoza* made clear that there is no needle to thread because "official actions of the United States" are a *"jurisdictional necessity." Sanchez-Espinoza*, 770 F.2d at 207.

Second, while there might be a distinction in Section 1983 cases and in ATS cases involving foreign governments between "color of law" for state action in the ATS versus the immunity context, that distinction simply does not exist where the "state" in state action is the United States. The immunity of foreign nations as applied in U.S. courts is "quite distinct from the doctrine of domestic sovereign immunity…being based upon considerations of international comity rather than separation of powers." *Sanchez-Espinoza*, 770 F.2d at 207 n.5. In a number of situations codified in the Foreign Sovereign Immunities Act, Congress has permitted suits, including ATS suits against private actors, to go forward in U.S. courts. But it is well-settled that the ATS does not waive sovereign immunity of the United States. *Sanchez-Espinoza*, 770 F.2d at 207 (citing *Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980)). Thus, plaintiffs cannot maintain ATS claims for actions alleged to have been taken under color of U.S. law or authority, as opposed to foreign law, even where they have chosen to sue only private parties and not government officials.

This well-settled principle was confirmed by Congress when it enacted the Torture Victim Protection Act of 1991 ("TVPA"), 106 Stat. 73. The TVPA, codified as a note to the ATS, provides equal access to U.S. citizens who are victims of violations of international law. *See* H.R. Rep No. 102-376(I), at 4 ("While the Alien Tort Claims Act provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad."); *accord* S. Rep. No. 102-249, at 5. The TVPA permits suits by U.S. citizens who are victims of torture and extrajudicial killing under color of law of a *foreign nation*. By its terms, the TVPA is unavailable for actions taken under color of U.S. law. *See Arar v. Ashcroft*,

414 F. Supp. 2d 250, 264 (E.D.N.Y. 2006). This is compelling evidence of Congress's understanding that the ATS is not (and should not be) either.[11]

## B.     The ATS Claims Are Barred for Independent Reasons

### 1.     Plaintiffs Fail To Allege Facts that State ATS Claims

Independent of the foregoing discussion, the ATS claims against Titan must be dismissed because facts have not been pled that implicate Titan for violation of international norms that meet *Sosa*'s demanding standard. Plaintiffs make two allegations of mistreatment that are attributed to Titan's employees. Defendant Nakhla, a former employee of Titan, is alleged to have "assaulted Plaintiff Hadood" and "tortured and otherwise mistreated Plaintiffs." (TAC ¶¶ 19, 49.) Defendant John Israel, an employee of a Titan subcontractor, is alleged, upon information and belief, to have repeatedly beaten, kicked and punched, and threatened Plaintiff Umer during interrogations, including throwing him against the wall of the interrogation room. (TAC ¶¶ 17, 50.) Neither of these, even assuming for the purposes of this motion that Nakhla's and Israel's actions can be attributed to Titan, and that Hadood is permitted to re-litigate his claims, state claims against Titan for violations of several of the international norms involved.

### a.     Extrajudicial Killing (Counts 1-3)

"[E]xtrajudicial killing" is the "deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples." *Dammarrel v. Islamic Rep. of Iran*, No. 01-2224, 2005 U.S. Dist. LEXIS 5343, at *18 n.5 (D.D.C. Mar. 29, 2005) (citing Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note)). Plaintiffs allege "Torture Conspirators wrongfully killed Ibrahiem by torturing him and thereafter refusing to provide him

---

[11] Recently, the U.S. Court of Appeals for the Seventh Circuit held that the TVPA occupies the field with respect to allegations of torture and extrajudicial killing and that such claims are displaced and may not be recognized independently under the ATS. *See Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005), *cert. denied*, 125 S. Ct. 1341 (2006). The majority and dissenting opinions agreed that the TVPA was enacted to provide U.S. citizens with access equivalent to what the ATS provided aliens. Under the majority's view, the TVPA represents Congress's view of the scope of actions available under the ATS and the extension of their availability to U.S. citizens.

the needed medical attention to prevent his death." (TAC ¶ 153.) First, plaintiffs do not allege the involvement of Titan employees in Ibrahiem's alleged torture and death. Second, to the extent plaintiffs allege that the withholding of medical treatment caused Ibrahiem's death, Titan is not responsible. It is alleged (and beyond dispute) that Ibrahiem's death occurred in a U.S. military facility under the control of the U.S. military. (TAC ¶¶ 12-14, 16, 28, 38.) The law of armed conflict places the duty to provide medical treatment under such circumstances squarely upon the United States.[12] Even if the law of armed conflict permitted this duty to be delegated (which is not the case), plaintiffs have not alleged that Titan assumed this duty by contract or otherwise; Titan's contract was to provide linguist services, not medical treatment.[13] (TAC ¶ 16.) Accordingly, the TAC fails to state a claim against Titan for extrajudicial killing.

### b.    Cruel, Inhuman, and Degrading Treatment (Counts 7-9)

Even before *Sosa* limited the availability of ATS actions, the federal courts addressed claims for cruel, inhuman, or degrading treatment and found wanting the proffered bases for permitting such actions. *See Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116 (C.D. Cal. 2003)*; Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987) (allegations of cruel, inhuman and degrading behavior fail to state a cognizable claim under ATS). After *Sosa*, there can be no doubt that these claims do not "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Sosa*, 124 S. Ct. at 2761-62; *see Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) (dismissing claims for cruel, inhuman, and degrading

---

[12] *See, e.g.*, Convention Relative to the Treatment of Prisoners of War (Aug. 12, 1949) (Geneva Convention III) Art. 15 ("The Power detaining prisoners of war shall be bound to provide free of charge for their maintenance and for the medical attention required by their state of health."); *see also* Convention Relative to the Protection of Civilian Persons in Time of War (Aug. 12, 1949) (Geneva Convention IV) Art. 76.

[13] Moreover, plaintiffs' allegations fail to allege that Ibrahiem was *deliberately* killed. While a death resulting from torture might constitute reckless indifference sufficient to constitute murder under state or federal law, *see, e.g.*, 18 U.S.C. § 1111, the international law norm they seek to invoke requires specific intent, which they have failed to plead here. *See, e.g., Richmond v. Lewis*, No. 86-2382, 1992 U.S. App. LEXIS 313, at *48 (9th Cir. Jan. 14, 1992) (describing death resulting from torture as "nonintentional murder[]").

treatment based on *Sosa*'s observation that the International Covenant of Civil and Political Rights did not "'create obligations enforceable in the federal courts'") (quoting *Sosa*, 124 S. Ct. at 2767).

### c.    War Crimes (Counts 10-12)

Although plaintiffs have suggested that *Sanchez-Espinoza*'s holding does not reach their war crimes allegations because they assert war crimes are among the few international law norms that do not require state action, *see* Pls.' Mot. Lv. Amend at 12 n.6 (citing *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)), the issue is identification of the belligerent.  *Kadic* does not alter the application of *Sanchez-Espinoza* to plaintiffs' allegations here, and even under *Kadic*, Titan cannot be liable for war crimes because the United States is the belligerent party.

In *Kadic*, the district court dismissed for lack of subject matter jurisdiction ATS and TVPA claims brought against the leader of insurgent Bosnian-Serb forces (who was also President of the self-proclaimed Republic of Srpska) for genocide, rape, forced prostitution and impregnation, torture and other cruel, inhuman, and degrading treatment, assault and battery, sex and ethnic inequality, summary execution, and wrongful death.  The district court held that Karadzic's military faction was not a recognized state and therefore Karadzic was not a state actor.  This, the court reasoned, meant there was no state action for ATS purposes, whether for torture, war crimes, or crimes against humanity.  The Second Circuit reversed, holding that some of the ATS claims, including genocide, crimes against humanity, and war crimes, reached Karadzic's actions.  While "state action" (and hence a "state") was required for official torture, the analysis under the war crimes claims was different, the Second Circuit explained.[14]  The court explained that the law of war regulates the conduct of all *parties to a conflict* (i.e., belligerent action).  *Id.* at 242-43.[15]  Thus, the question is not whether there was a state, but

---

[14] The Second Circuit also found that plaintiffs' allegations that Karadzic's military faction was in actual control of territory entitled them to prove that his regime satisfied the criteria for a state, thus making the holding on War Crimes at best an alternate holding.

[15] *See also* Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, art. 25(3), U.N. Doc. A/CONF.183/9 (1998) ("Rome Statute") Article 8(1) (jurisdiction

whether Karadzic's faction was a party to a conflict (i.e., a belligerent party in the parlance of the law of war). The court held that Karadzic's military faction, as an "insurgent military group[]," qualified as a party to a conflict, subjecting him to the laws of war in his carrying out belligerent actions, without regard to whether there was a state. *Id* at 243.

Plaintiffs have not, and cannot, allege that Titan is an "insurgent military group" or a party to armed conflict in Iraq. It is the United States that is the party to the armed conflict in Iraq, not Titan. Titan's actions are subject to the laws of war only insofar as they are taken on behalf of (or as the agent of) the United States as a belligerent party. Thus, as with plaintiffs' other ATS claims, U.S. state action is a "jurisdictional necessity" of their war crimes claims. This means that *Sanchez-Espinoza* requires dismissal of the war crimes claims.

### d.    Crimes Against Humanity (Counts 13-15)

Crimes against humanity are defined as widespread persecution "of entire racial, ethnic, national or religious groups." *Sarei v. Rio Tinto Plc*, 221 F. Supp. 2d 1116, 1150 (C.D. Cal. 2002) (internal citations omitted); *see also Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005).[16] Plaintiffs' allegations against Nakhla and Israel fall far short of widespread persecution of entire racial, ethnic, national, or religious groups. Even the entirety of the allegations against the "Torture Conspirators," which for reasons discussed below cannot be attributed to Titan, does not amount to widespread persecution of "entire racial, ethnic, national or religious groups." Counts 13-15 must be dismissed.

---

over war crimes limited to those acts "committed as part of a plan or policy of a large-scale commission of such crimes").

[16] *See also* Rome Statute Article 7 (1) ("'[C]rime against humanity' means any of the following acts when committed as part of a *widespread or systematic attack directed against any civilian population*, with knowledge of the attack . . . ."); Article 7(2)(a) ("'Attack directed against any civilian population' means a course of conduct involving the multiple commission of acts referred to in paragraph 1 against any civilian population, pursuant to or in furtherance of a *State or organizational policy to commit such attack*.") (emphasis added).

### 2.    Special Factors

In *Sosa*, the Supreme Court made clear that suits under the ATS, like *Bivens* suits, are implied common law actions subject to limitations under the federal common law intended to ensure that district courts use "great caution" in recognizing such claims. *Sosa*, 124 S. Ct. at 2763. Accordingly, courts should not recognize such actions where "'special factors counselling hesitation' are present." *Chappell v. Wallace*, 462 U.S. 296, 298 (1983) (quoting *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 396 (1971)); *see Abdullahi v. Pfizer Inc.*, No. 01 CIV 8118, 2005 U.S. Dist. LEXIS 16126, at *26 (S.D.N.Y. Aug. 9, 2005) (explaining that courts should consider presence of special factors in implying ATS claims). The federal common law claims at issue here—under the ATS—are barred by a number of special factors, including the existence of alternative remedies, national security and foreign policy concerns, and potential interference with military discipline.

### a.    Alternate Remedies

One well-established special factor that bars implied actions under federal common law is the availability of an alternative remedial scheme. *See Schweiker v. Chilicky*, 487 U.S. 412 (1988); *Bush v. Lucas*, 462 U.S. 367 (1983); *Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988) (*en banc*). It is not surprising that the Court in *Sosa* suggested that where Congress acts to "occupy the field," *Sosa*, 124 S.Ct. at 2765, an implied action under the ATS would be inappropriate.[17] There are such remedies here and they require dismissal of plaintiffs' claims. Specifically, the Foreign Claims Act ("FCA") exists to remedy injuries arising from noncombatant U.S. military operations overseas. *See* 10 U.S.C. § 2734; *see also* 32 C.F.R. pt. 536.

In *Ibrahim*, the Court adopted the "working assumption" that "it is either this court or nothing for plaintiffs." *Ibrahim*, 391 F. Supp. 2d at 17 n.4. The Court noted that the "very general pledge by the Secretary of Defense to compensate detainees mistreated at Abu Ghraib"

---

[17] This limitation is distinct from (although not inconsistent with) the requirement founded in international law (and codified in the TVPA) that plaintiffs exhaust local remedies prior to suing in U.S. courts. *See Sosa*, 124 S. Ct. at 2766 n.21.

did not overcome this assumption.[18]  Nor did the existence of the FCA and MCA, which the

Court noted are limited to "noncombat activities." *Id.* [19]  Since the *Ibrahim* decision, however,

the U.S. Department of State has specifically and officially pledged in a publicly released policy

statement to compensate victims of the same abuses alleged here:

> The United States is committed to adequately compensating the victims of abuse
> and mistreatment by U.S. military personnel. * * * There are currently 78 Foreign
> Claims Commission personnel in Iraq.  Claims may be submitted to the claims
> personnel, who regularly visit detention facilities, or they may be presented to the
> Iraqi Assistance Center. * * *
>
> In addition, the Secretary of Defense has directed the Secretary of the Army to
> review all claims for compensation based on allegations of abuse in Iraq and to
> act on them in his discretion.  In instances where meritorious claims are not
> payable under the FCA or the MCA, the Secretary of the Army is responsible for
> identifying alternative authorities to provide compensation and either to take such
> action or forward the claims to the Deputy Secretary of Defense with a
> recommendation for action.

Update to Annex One of the Second Periodic Report of the United States of America to the

Committee Against Torture 22 (Oct. 21, 2005) (*available at* http://www.state.gov/g/drl/rls/

55712.htm (visited Dec. 2, 2005)).

The consistent and repeated U.S. government pledges to compensate for injuries such as

those alleged here, alongside the comprehensive statutory scheme, "occupy the field" and

constitute a special factor that must be considered in determining whether to imply a cause of

action under federal common law.  Plaintiffs' ATS claims are barred unless it is "'crystal clear'

that Congress intended [these remedial schemes] to serve as 'parallel' and 'complementary'

sources of liability" to ATS suits against U.S. military contractors.  *Corr. Servs. Corp. v.*

---

[18] *Id.* (referring to the Secretary's pledge that "appropriate compensation" would be provided to
Iraqis who were mistreated at Abu Ghraib reported at 150 Cong. Rec. H4707, 4724 (daily ed.
June 22, 2004) (statement of Sen. Strickland)).

[19] In *Ibrahim*, the Court believed that the FCA's limitation to "noncombat activities" conflicts
with the preemption found in the FTCA for combatant activities.  The terms in the two statutes
are not synonymous.  The FCA exclusion of injuries resulting "directly or indirectly from an act
of the armed forces of the United States in combat," 10 U.S.C. § 2734(b)(3), is far narrower than
the FTCA's exception for "combatant activities during time of war," 28 U.S.C. § 2680(j).
Moreover, it is clear that if the FCA is not available for some reason, the government will pay
claims on other bases.

*Malesko,* 534 U.S. 61, 68 (2001). There is no reason to believe (and there is no crystal clear evidence demonstrating) that Congress intended ATS suits to serve as parallel and complementary sources of liability to the relief available under the FTCA, FCA and MCA for the tortious acts occurring during military operations abroad. Such a Congressional intent is particularly unlikely given that: (i) the FTCA, for which judicial review is provided, expressly exempts from its coverage combatant activities, discretionary functions, and foreign activities, all of which are implicated by plaintiffs' claims here; and (ii) U.S. citizens have no ability to sue for injuries incurred under the same circumstances under the ATS or its analogue, the Torture Victim Protection Act ("TVPA"). And even if the existence of this alternative remedial scheme does not bar plaintiffs' ATS claims, they should be required, at a minimum, to *exhaust* these remedies. *Sosa,* 124 S. Ct. at 2766 n.21.

### b.    National Security, Foreign Policy, and Military Discipline

Where the danger of infringement upon the Executive's prerogative to engage in foreign affairs, *Sanchez-Espinoza,* 770 F.2d at 208-09, or interference with military discipline, *United States v. Stanley,* 483 U.S. 669, 678 (1987), is too great, the federal common law bars tort claims from proceeding. Both concerns are compelling in this case. In *Arar v. Ashcroft,* , 414 F. Supp. 2d 250 (E.D.N.Y. 2006), the court held that national security and foreign policy implications barred plaintiffs' *Bivens* claim based on rendition. Plaintiff, a dual citizen of Canada and Syria, alleged that U.S. officials detained him at an international airport in New York, unconstitutionally mistreated him there, and then rendered him to Syria so that Syrian officials could, in concert with the U.S. officials, torture him. The court dismissed plaintiff's rendition claim, holding that "the task of balancing individual rights against national-security concerns is one that courts should not undertake without the guidance or the authority of the coordinate branches, in whom the Constitution imposes responsibility for our foreign affairs and national security," particularly where claims arise in the "foreign realm." *Id.* at *94-96.

It is also well-settled that damages suits that threaten to invade the special province of military discipline are barred, even where allegations of unconstitutional treatment are

concerned. *See Chappell v. Wallace*, 462 U.S. 296 (1983). This is not because such allegations are taken lightly by the courts, but rather because "the special needs of the armed forces require the courts to leave to Congress the creation of damage remedies." *Sanchez-Espinoza*, 770 F.2d at 208-09.

That plaintiffs here seek to recover for all injuries suffered by every Iraqi detained by the U.S. military during the entire course of the U.S. occupation—without regard to whether the injuries were inflicted by U.S. military personnel, other government personnel, or private contractors—makes it clear that suits such as these should not be allowed to proceed. Plaintiffs also challenge the legality of the military's use of contractors for Interrogation Services. This too would directly affect the manner in which the military executes future conflicts (as well as the balance of the current one). Plaintiffs also seek to require Titan to exercise stricter supervision over its translators. This will necessarily interfere with the military's ability to exercise control over them. Whatever the wisdom of these policies, and whatever the efficacy of civil suits against contractors in changing them, the law is clear that such policy decisions are committed to the political branches rather than the courts. Then-Judge Scalia explained as follows in dismissing *Bivens* claims in *Sanchez-Espinoza*:

> Whether or not the present litigation is motivated by considerations of geopolitics rather than personal harm, we think that as a general matter the danger of foreign citizens' using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.

*Sanchez-Espinoza*, 770 F.2d at 209.

### 3.    There Is No Corporate Liability for the ATS Claims

Under federal common law, it is not assumed that actions may be brought against corporations. In fact, in 2001, the Supreme Court made clear that implied causes of action against corporate entities are disfavored. *See Corr. Serv. Corp. v. Malesko*, 534 U.S. 61 (2001) (holding that constitutional tort actions under federal common law—*Bivens* actions—are unavailable against corporate defendants notwithstanding that corporations may be sued for constitutional torts under *Bivens*'s statutory analogue: 42 U.S.C. § 1983). The circumstances of

this case—arising as it does in the context of a U.S. military occupation embroiled in a violent insurgency—even more strongly mandate no cause of action against corporate defendants than under *Bivens*. That is because *Malesko* (which involved injuries to a U.S. citizen arising in the course of a private contractor's administration of a federal prison in the United States) did not implicate the political branches' authority over war powers and foreign affairs, areas in which the federal common law is independently reluctant to infer private causes of action. While it is true that prior to *Sosa*, courts had permitted ATS suits against corporations to go forward, those cases did so under the then-prevailing view that the ATS constituted an express statutory cause of action. *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 308-20 (S.D.N.Y. 2003) (holding that corporations are subject to liability under ATS and collecting cases that assumed the same). Courts that have done so since *Sosa* have continued to rely on pre-*Sosa* precedent and failed to address whether such actions are available against corporations after *Sosa*'s holding that ATS is not a statutory action. Even without the sea change effected by *Sosa*, it is well-established that questions of jurisdiction cannot be settled unless directly presented and addressed. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119 (1984). Thus, the rationale of *Malesko* precludes implying a cause of action against corporations under the ATS.[20]

International law is consistent with federal common law on this point: international law also does not recognize corporate liability, as distinct from individual liability. *See* Ernst Schneeberger, *The Responsibility of the Individual Under International Law*, 35 Geo. L.J. 481,

---

[20] *Sosa*'s *dicta* in footnote 20 is not to the contrary. There, the Court stated: "A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Sosa*, 124 S. Ct. at 2766 n.20. *Sosa* did not involve corporate defendants and, therefore, did not require the Court to consider the liability of corporations or apply the Court's framework for implying common law claims against corporate defendants. Not surprisingly, the Court did not discuss *Malesko*, and its *dicta* cannot be taken as suggesting a contrary resolution to this important jurisdictional question. *See Pennhurst*, 465 U.S. at 119 (When "'questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.'") (quoting *Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974)); *Alexander v. Sandoval*, 532 U.S. 275, 282 (2001) (the Court is "bound by holdings, not language.").

489 (1947) ("In the last resort responsibility under international law can only be responsibility of an individual...."). International law does not, in the context of international criminal law or elsewhere, impose obligations or liability on juridical actors or artificial persons such as corporations. For example, the drafters of the treaty creating the International Criminal Court (including the United States) expressly rejected corporate liability. *See In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 55 (E.D.N.Y. 2005). Plaintiffs cannot expand either the type of conduct or "the type of perpetrator" reached by international law and the federal common law through reference to state law. Instead, under *Sosa*, plaintiffs must show that a definite and universally accepted norm of international law prohibits corporations working with a government (and in this case the U.S. Government) to violate an international norm.

### III.    Plaintiffs' RICO Claims Must Be Dismissed (Counts 30-31)

Counts 30 and 31 of the TAC plead claims under RICO on behalf of plaintiffs Saleh, Hadood, Ahmed, and Neisef (the "RICO Plaintiffs"). (TAC ¶¶ 317-29.) Count 30 asserts a claim under 18 U.S.C. § 1962(c), while Count 31 asserts a conspiracy to violate RICO under § 1962(d).[21]

To state a claim under RICO a plaintiff must allege the defendant has (1) conducted; (2) an enterprise; (3) through a pattern (i.e., two or more acts that are sufficiently related); (4) of racketeering activity. *See Western Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Sq. Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)). A RICO enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal

---

[21]    Because plaintiffs have failed to state a claim under Section 1962(c), we do not separately address their conspiracy claim under Section 1962(d). *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (dismissing 1962(d) claim after determining that plaintiffs had not sufficiently alleged elements of 1962(c) claim); *see also Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1112 (9th Cir. 2003) ("Since [plaintiff] has not satisfied the pleading requirements for [Sections 1962(a), (b), or (c),] he has also not alleged sufficient facts to state a claim [for conspiracy under Section 1962(d)]."), *cert. denied*, 541 U.S. 1043 (2004).

entity." 18 U.S.C. § 1961(4).[22] "Racketeering activity" includes enumerated offenses that are either "chargeable" or "indictable" under state or federal law.[23] 18 U.S.C. § 1961(1). Standing to assert claims under RICO is limited to those who have suffered business or property losses directly and proximately caused by the underlying predicate acts. *See* 18 U.S.C. § 1964(c); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992); *Browning v. Clinton,* 292 F.3d 235, 249 (D.C. Cir. 2002). In addition, RICO does not apply to foreign conduct with foreign effects. *See Butte Mining PLC v. Smith*, 76 F.3d 287, 291-92 (9th Cir. 1996); *North South Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996).

This Court has already had occasion to examine the conduct at issue here and determined that the attempt to turn the alleged harms suffered by former detainees at Abu Ghraib (harms similar in type to those in the *Ibrahim* case, and in the case of Mr. Hadood identical, to the claims here) into RICO claims fails for lack of standing, among other defects:

> Plaintiffs' claims under RICO could be dismissed for a number of reasons, but it is sufficient to note here that plaintiffs do not have standing. A plaintiff seeking RICO standing must allege damage to "business or property." 18 U.S.C. § 1964(c). Allegations of personal injuries alone are not sufficient. *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 100-02 (D.D.C. 2003). Plaintiffs allege that U.S. Military forces seized $400 and a weapon from plaintiff Hadod, First Am. Compl. at ¶ 40, but plaintiffs' counsel concede that they can allege no acts involving defendants that go beyond personal injury. Pls.' Opp'n to Def. Titan's Mot. Dismiss at 27-28.

*Ibrahim*, 391 F. Supp. 2d at 19-20.

While the RICO Plaintiffs attempt to obscure who actually seized their property behind the veil of the alleged "Torture Conspirators," this retreat to obfuscation in what is now their Fourth complaint does not establish their standing where this Court has already determined there is none. In addition, like the *Ibrahim* plaintiffs, the RICO Plaintiffs' claims suffer from many

---

[22] A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

[23] Enumerated state law offenses are murder, kidnapping, robbery, and dealing in obscene matter. Enumerated federal offenses are 18 U.S.C. § 1510 (obstruction of criminal investigations), § 1951 (interference with commerce), § 1952 (racketeering), § 1958 (use of interstate commerce facilities in the commission of murder for hire), and §§ 2314–15 (interstate transportation of stolen property).

other infirmities, including that (a) RICO does not reach the alleged extraterritorial conduct; (b) the predicate acts are insufficient; and (c) and the enterprise allegations are inadequate.

### A.    The RICO Plaintiffs Lack Standing

As in *Ibrahim*, the bulk of the injuries plaintiffs claim are personal, and the property injuries were sustained incident to arrest and detention by the military—not because of the alleged torture by Titan employees.  As this Court has already held in these same circumstances, personal injuries are not cognizable under RICO.  *See Ibrahim*, 391 F. Supp. 2d at 19; *see also Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 422 (5th Cir. 2001) ("The phrase 'injury to business or property' excludes personal injuries.") (citation omitted); *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) ("[I]t is clear that personal injuries are not compensable under RICO."); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 100-02 (D.D.C. 2003); 18 U.S.C. § 1964(c).  The rule against entertaining personal injuries applies regardless of the severity of the personal injury because RICO was intended to remedy commercial crimes.  *See Grogan v. Platt*, 835 F.2d 844 (11th Cir. 1988).  Thus, a plaintiff must allege that the RICO violation injured his business or property.  *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990).

The RICO Plaintiffs attempt to meet this requirement by alleging the following property losses:  Saleh alleges that his car and an unspecified amount of cash were seized when he was arrested (TAC ¶ 114); Hadood alleges that 300,000 dinars were seized when his household goods were damaged (TAC ¶ 131);[24] Ahmed alleges that $3,200 in cash and $1,500 worth of gold and jewelry were seized (TAC ¶ 140); and Neisef alleges that $6,000 in cash and $1,000 worth of gold and jewelry were seized when his house was damaged (TAC ¶ 151).  Although they allege business damages (TAC ¶ 326), they plead no facts to support this legal conclusion.

---

[24]  The only differences between Hadood's allegations of loss in the instant case and in *Ibrahim* are as follows:  here, Hadood alleges that an amount of money was stolen from him in dinars rather than dollars, and he has abandoned the *Ibrahim* allegation that a weapon was stolen from him.  (*Compare* TAC ¶ 131 *with Ibrahim* First Am. Compl. ¶ 40.)

As in *Ibrahim*, the common thread is that all of these losses were incurred incident to arrest, well before they were detained at Abu Ghraib, or any other facility controlled by the military wherein Titan supposedly participated in improper interrogations.    Plaintiffs have attempted to conceal who did the seizing by alleging in this Complaint that their property was wrongfully confiscated by the "Torture Conspirators."    Take plaintiff Hadood's allegations.    In *Ibrahim* he alleged that "U.S. Military forces" seized his property, and Hadood "allege[d] no acts involving defendants that go beyond personal injury."  *Ibrahim*, 391 F. Supp. 2d at 19.    Hadood cannot now join this lawsuit, allege that it was the "Torture Conspirators" that took the very same money, under the very same circumstances, and confer standing on himself by using a term that includes parties other than the U.S. military that he already judicially admitted took his property.    Nor have the other RICO Plaintiffs pleaded facts that demonstrate that Titan took, or is otherwise responsible for taking, their property, i.e., that they have standing.    At the very least, the Complaint must be dismissed and the plaintiffs required to specify whom they allege took their property.

Moreover, even if plaintiffs were to allege that Titan employees were present at the time of the seizures, these seizures do not give the RICO Plaintiffs standing.    To state a claim under 18 U.S.C. § 1962(c), there must be "'some direct relation between the injury asserted and the injurious conduct alleged'—in other words, proximate causation."  *Browning v. Clinton,* 292 F.3d 235, 249 (D.C. Cir. 2002) (citing *Holmes v. Secs. Investor Prot. Corp.,* 503 U.S. at 268). "Proximate cause is defined as 'a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to be foreseen in light of the circumstances.'"  *Burnett*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003) (citing *Murphy v. United States,* 653 F.2d 637, 648 n. 48 (D. C. Cir. 1981)).    Plaintiffs' allegations plainly fail to establish how an alleged agreement to "torture and mistreat prisoners during interrogations…" (TAC ¶ 97) proximately caused the RICO Plaintiffs' alleged property losses.    Plaintiffs' claims are "that Defendants tortured and otherwise mistreated Plaintiffs and the class of persons held at Abu Ghraib and other prisons in Iraq." (TAC ¶ 1.)    The property was allegedly taken before plaintiffs

were detained, or during the arrest leading to detention, not in the furtherance of the enterprise to extract information by unlawful means.  With regard to Titan, the RICO Plaintiffs do not allege that Titan translators captured, arrested, or physically secured individuals or buildings.  It is difficult if not impossible to see how, but for the alleged pattern of racketeering, plaintiffs' property would not have been seized by the U.S. military, let alone that the racketeering activity was the proximate cause of the loss.  It is equally unlikely that the seizure of property from plaintiffs would be a reasonably foreseeable consequence of those alleged unlawful activities.

Nor do the various allegations that Titan engaged in the Torture Conspiracy to increase its earnings from government contracts give the RICO Plaintiffs standing.  The RICO Plaintiffs have not alleged that these activities directly caused their property losses, and given the lack of logical connection between the economic motive the RICO Plaintiffs attribute to the conspirators—increasing the demand for interrogation services—and the seizure of their property incident to their arrest, it is unlikely that they could credibly do so.  No RICO Plaintiff alleges that his property loss flowed from the allegedly unfair competitive advantage obtained by Titan, which is not surprising given that none is a competitor of Titan.

### B.    RICO Does Not Reach the Extraterritorial Conduct Alleged

An independent basis for dismissing the RICO claims is that RICO does not apply extraterritorially, and the claims here are about conduct in Iraq affecting aliens.  It is presumed that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *CFTC v. Nahas*, 738 F.2d 487, 493 (D.C. Cir. 1984) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)).  RICO is silent on its extraterritorial application,[25] thus there is no subject matter jurisdiction over a RICO claim for foreign conduct with foreign effects.  *See Butte Mining  v. Smith*, 76 F.3d at 291-92; *see also North South Fin. Corp.* 100 F.3d at 1051; *Doe v. State of Israel*, 400 F. Supp. 2d 86, 114-16

---

[25]  The extensive legislative history of RICO also contains no expression of Congressional intent to reach transactions abroad.  *See* H.R. Rep. No. 1549, 91st Cong., 2d Sess., *reprinted* in 1970 U.S.C.C.A.N. 4007, 4010, 4032-4036; S. Rep. No. 617, 91st Cong., 1st Sess. 76-83, 121-128, 157-214 (1969).

(D.D.C. 2005); *Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285, 1306 (S.D. Fla. 2003), *aff'd in part and vacated in part on other grounds*, 416 F.3d 1242 (11th Cir. 2005).

Here, plaintiffs have attempted to allege both domestic conduct and domestic effects to bring their claims of torture in Iraq within RICO's ambit. In evaluating whether such claims give rise to RICO jurisdiction, courts look to securities and antitrust jurisprudence (statutes on which RICO was based) to determine whether RICO reaches foreign injury based on domestic conduct, or foreign conduct causing domestic injury. *See Poulos v. Caesars World, Inc.*, 379 F.3d 654, 663 (9th Cir. 2004) ("Although the RICO and the securities fraud contexts are not precisely analogous, the tests used to assess the extraterritorial application of the securities laws provide useful guidelines for evaluating whether the jurisdictional minimum exists."); *North South Fin. Corp.*, 100 F.3d at 1051-52 (tracing effects test to securities and antitrust law but noting that antitrust approach is "an equally or even more appropriate test, especially since the civil action provision of RICO was patterned after the Clayton Act") (quoting *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150 (1987)); *see also State of Israel*, 400 F. Supp. 2d at 116 (applying antitrust law to determine reasonableness of extraterritorial application of RICO). Subject matter jurisdiction over RICO claims requires, at a minimum, allegations of domestic conduct or *substantial* domestic effects. *See Butte Mining PLC*, 76 F.3d at 291-92.

### 1. Plaintiffs Do Not Allege Substantial Domestic Effects from Their Alleged Mistreatment in Iraq

In cases of foreign conduct, courts look to the "effects" test to establish jurisdiction. *See North South Fin. Corp.*, 100 F.3d at 1051; *State of Israel*, 400 F. Supp. 2d at 114-16. Under the effects test, foreign conduct must cause "substantial" domestic effects that are a "direct and foreseeable result of the conduct outside of the United States." *Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1359 (S.D. Fla. 2003) (quoting *Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261-62 (2d Cir. 1989)). An effect is not direct where it depends on uncertain intervening factors. *See United States v. LSL Biotechs.*, 379 F.3d 672, 681 (9th Cir. 2004). In *Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005), this Court concluded that RICO does

not apply to foreign human rights violations on the West Bank that allegedly harmed the plaintiffs financially in the United States because RICO may not be applied extraterritorially to "solely personal harms suffered overseas that only marginally—and tangentially—impact American commerce." *Id.* at 116. The same is even more true here, where plaintiffs suffered their alleged financial harms in Iraq.

Recently the Supreme Court made clear that allegation of an effect on interstate commerce, without resulting harm to the plaintiffs, is simply not enough. *See F. Hoffmann-La Roche LTD v. Empagran S.A.*, 542 U.S. 155, 169-75 (2004) (holding that foreign plaintiffs cannot establish jurisdiction unless the domestic effect injured the foreign plaintiffs and gives rise to a claim cognizable on their behalf). The D.C. Circuit on remand made clear that the link between the domestic effects and plaintiffs' injury must be quite strong, finding that "'but-for' causation between the domestic effects and the foreign injury claim is simply not sufficient," as plaintiffs must allege "a direct causal relationship, that is, proximate causation," between the domestic effects and foreign injury. *Empagran S.A. v. F. Hoffman-LaRoche LTD*, 417 F.3d 1267, 1270-71 (D.C. Cir. 2005). Even facilitation of plaintiffs' injury is not enough, as that does not amount to proximate causation. *Id.* at 1271. Such facilitation is the most alleged here.

The alleged domestic effects of the RICO enterprise in this case are "the hiring of persons across the United States, the transport of employees across the United States," and generally "the production, distribution or acquisition of goods and services in interstate commerce." (TAC ¶ 320.) Plaintiffs also allege, "upon information and belief," that Titan earned "millions of dollars in revenue" in providing interrogation services to the U.S. military and that "[t]hese fruits of the Torture Conspiracy have been invested in the ongoing operations of Defendant Titan." (TAC ¶ 102.) At most, these constitute only "marginal" and "tangential" effects on "American commerce" that do not warrant extraterritorial application of RICO, as "the primary and significant effects of [Defendants'] actions are felt abroad, not in the United States." *See State of Israel*, 400 F. Supp. 2d at 116.

Moreover, such domestic effects are not alleged to have injured these foreign plaintiffs. Plaintiffs utterly fail to allege any facts to support the conclusion that the *domestic effects* ("millions of dollars in revenue") injured them.  At most, plaintiffs allege that this revenue facilitated the injurious conduct in Iraq, and as stated above, the D.C. Circuit has conclusively established that if the domestic effects merely facilitate the foreign injury, that is insufficient to support extraterritorial application of the statute.  *Empagran S.A.*, 417 F.3d at 1270-71.

### 2. The Alleged Domestic Conduct Does Not Support the Extraterritorial Application of RICO

Perhaps recognizing that they cannot present a RICO claim based solely on foreign activities, plaintiffs allege some domestic meetings and training (or lack thereof) activities. These alleged activities, even if true, do not bring the allegations of mistreatment abroad within the ambit of RICO.  In securities law cases involving domestic conduct causing foreign injury, the D.C. Circuit has adopted a test that permits such suits only when the domestic conduct "directly causes[s]" the harm to plaintiffs.  *See Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 33 (D.C. Cir. 1987).  Under this test, courts have "declined jurisdiction over alleged violations of the securities laws based on conduct in the United States when the conduct here was 'merely preparatory' to the alleged fraud, that is, when the conduct...did not 'directly cause' the losses elsewhere."  *Id.* at 30.  Plaintiffs' allegations of domestic conduct at most fall into this category and do not give rise to jurisdiction.

The RICO Plaintiffs allege that Defendants "formed and fostered" relationships with "[c]ertain government officials...by meetings, telephonic discussions, in-person discussions, email discussions and other communications that occurred in, among other places, Arizona, California, Virginia, and the District of Columbia."  (TAC ¶ 98.)  In addition, plaintiffs allege that Titan "adopt[ed] and implement[ed] corporate policies and procedures (written and unwritten) that permitted and encouraged the repeated criminal acts."  (TAC ¶ 59.)  Such conduct is far removed from the alleged mistreatment in military prisons in Iraq.  The domestic conduct did not "directly cause" the RICO Plaintiffs' alleged property losses, i.e., property

seized during arrest that led to detention that led to the challenged conduct. At most the domestic activities are "[m]ere preparatory activities" and "conduct far removed from the completion of the wrongdoing," which fail to confer subject matter jurisdiction under the conduct test. *Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285, 1306 (S.D. Fla. 2003), *aff'd in part and vacated in part on other grounds*, 416 F.3d 1242 (11th Cir. 2005); *see also Butte Mining PLC*, 76 F.3d at 287. Again plaintiffs have alleged at most "but for" causation that is insufficient to support the extraterritorial application of RICO.

### C.    Plaintiffs Have Not Properly Pled Predicate Acts

Plaintiffs have failed to establish that any of the alleged predicate acts—murder, threats of murder, assault and battery, unlawful imprisonment, and obstruction of justice—would be chargeable or indictable in the United States, as is required to constitute racketeering activity under RICO. *See* 18 U.S.C. § 1961(1); *Jennings v. Emry*, 910 F.2d 1434, 1438 (7th Cir. 1990). All of the alleged predicate acts occurred in Iraq against foreign plaintiffs. With respect to the obstruction of justice allegations, an enumerated offense, plaintiffs fail to state a claim for obstruction of justice. (TAC ¶¶ 161-69.) Even if true, misleading the International Red Cross and the press (or denigrating their reports) does not constitute obstruction of justice, nor does failing to disseminate information regarding the alleged torture at Abu Ghraib. The Death Certificate containing the alleged false statement was issued by the U.S. government—not Titan.

### D.    Plaintiffs' Enterprise Allegations Require Dismissal

The RICO Plaintiffs allege that the corporate defendants, individual defendants, and certain members of the U.S. military and "other persons known and unknown" formed an association-in-fact that constituted an "Enterprise" for the purposes of RICO.[26] (TAC ¶ 319.) They further allege that the enterprise engaged in racketeering activity, including but not limited

---

[26]  The TAC specifically lists Spc. Charles Graner, Spc. Roman Krol, Spc. Javal Davis, Spc. Jeremy Sivits, Spc. Armin Cruz, Spc. Megan Ambuhl, Staff Sgt. Ivan "Chip" Frederick, and Spc. Sabrina Harman—U.S. Army reservists who were convicted of charges related to prisoner abuse at Abu Ghraib—and includes "other persons known and unknown." (TAC ¶ 319.)

to threats of murder (TAC ¶¶ 323-24), and that the acts of the enterprise affected interstate commerce (TAC ¶ 320). This allegation of the enterprise fails for at least two reasons.

### 1.    There Is No RICO Claim Where the United States Government Is a Necessary Constituent of the Alleged Ad Hoc Enterprise

Although plaintiffs have attempted to conceal in the TAC who constitute the ad hoc enterprise by including "other persons known and unknown," their factual allegations and their previous judicial admissions make clear that the U.S. military is an indispensable part of plaintiffs' alleged RICO enterprise. First, even though the named other members of the enterprise are convicted felons, there are no allegations that they were not acting in their official capacities. If anything, as elsewhere discussed at length, the implication of the factual pleadings is that plaintiffs are alleging that all of the military members were acting in their official capacities. Moreover, although they have now attempted to cover up the fact that high-level government officials are part of the alleged enterprise, the factual allegations are clear that they must have been involved. Having been forced to specify their RICO claims earlier in the case, they cannot now escape these judicial admissions after the transfer from the Southern District of California. According to their RCS, at the core of plaintiffs' claims is the assertion that government officials, including the Secretary of Defense and other senior Department of Defense officials—both civilian and military—"adopted and/or implemented policies and practices that led to detainees being kidnapped, tortured, threatened with death and bodily harm, physically and mentally permanently disabled, and, in some cases, murdered." (RCS at 4.) Plaintiffs point to the "Rules of Engagement for Interrogations" promulgated by these government officials as "purporting to permit interrogators to threaten detainees with death." *Id.* In total, plaintiffs identify 126 soldiers, officers, and civilian officials in the Department of Defense as possible participants in the enterprise. *Id.* at 4-5. Without the participation of senior Department of Defense officials, as well as senior and junior military personnel, no "Torture Conspiracy" could exist.

This does not state a claim under RICO. The United States is not subject to suit under RICO. *See Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991) ("[I]t is clear that there can be no RICO claim against the federal government."); *Dees v. Cal. State Univ.*, 33 F. Supp. 2d 1190 (N.D. Cal. 1998); *Harley v. United States DOJ*, No. 94-0807, 1994 U.S. Dist. LEXIS 21621 (D.D.C. Oct. 7, 1994). It is not surprising that in one of the few cases where the issue has come up, the court found that no RICO claim can be brought against the federal government. *See Norris v. United States DOD*, No. 95-2392, 1996 U.S. Dist. LEXIS 22753 (D.D.C. Oct. 28, 1996) (allegations that Secretary of Defense and other senior military officials conspired to reduce the number of active duty physicians to secure pay raises for those remaining not cognizable under RICO), *aff'd*, No. 96-5326, 1997 U.S. LEXIS 16130 (D.C. Cir. May 5, 1997); *see also Berger*, 933 F.2d at 397 (federal government cannot be sued under RICO because it cannot be "prosecuted" for predicate acts). Because the indispensable principal actors in plaintiffs' alleged criminal enterprise are government officials acting in their official capacities, the enterprise fails, and with it, plaintiffs' RICO claims.

**2.      Plaintiffs' Allegations Are Insufficient To Establish the Existence of an Enterprise Between Titan and CACI**

Putting to one side the inclusion of the United States in the alleged enterprise, the allegations are still plainly insufficient. An enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The enterprise is proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* An enterprise is an "entity separate and apart from the pattern of activity in which [the enterprise] engages" and "at all times remains a separate element which must be proved," although "the existence of the enterprise may be inferred from proof of the pattern." *United States v. White*, 116 F.3d 903, 924 (D.C. Cir. 1997) (quotations omitted). The "same group of individuals who repeatedly commit predicate offenses do not necessarily comprise an enterprise. An extra ingredient is required: organization." *United States v. Perholtz*, 842 F.2d 343, 363 (D.C. Cir.

1988).  Thus, the D.C. Circuit has clearly enumerated that an enterprise requires "(1) a common purpose among the participants, (2) organization, and (3) continuity."  *Id.* at 362.

Plaintiffs' allegations fall far short of establishing this *sine qua non* of an enterprise.  They allege the RICO enterprise consists of an association-in-fact among the individual defendants, Titan, CACI, a number of U.S. Army reservists stationed at the prisons, and others named and unnamed (TAC ¶ 319), but they do not allege *facts* that establish such an association-in-fact.  The TAC is completely devoid of facts demonstrating that Titan and CACI and the other named and unnamed individuals have created "a consistent structure, intrinsic hierarchy, and planned method of operation sufficient to constitute a level of 'organization' above and beyond that which was simply required to commit each of the [alleged] racketeering acts."  *See United States v. Morrow*, No. CRIM A. 04-355, 2005 WL 1389256, at *7 (D.D.C. June 13, 2005).  Rather, plaintiffs merely parrot the language of the RICO statute, offering no specific facts in support of their assertions.  Paragraph 90 conclusorily alleges that Titan conspired with CACI to clear unqualified individuals for interrogation service in Iraq.  It does not plead facts showing that the alleged enterprise had any kind of formal or informal structure for the conduct of interrogations in Iraq based on preparatory activity in the United States.

This Court has determined that such allegations are insufficient.  *See Doe v. State of Israel*, 400 F. Supp. 2d 86, 119 (D.D.C. 2005).  In *Doe*, plaintiffs alleged that defendants formed an association-in-fact, but alleged no facts linking defendants "through allegations of common orders or control," "explain[ing] how the several groups of defendants associated or operated together," or demonstrating "a shared decision-making infrastructure."  *Id.* at 119-20.  Based upon these allegations, the Court found that plaintiffs had failed to adequately allege a formal or informal structure sufficient to establish an enterprise under RICO.  *Id.* at 120.  Alleging an "enterprise" is absolutely necessary to the maintenance of a RICO allegation, and plaintiffs' failure to allege facts in support of an "organization" underlying the alleged enterprise dooms their RICO claim.  *See Perholtz,* 842 F.2d at 362; *Morrow,* 2005 WL 1389256 at *5.

IV.    **Plaintiffs' State Law Claims Must Be Dismissed (Counts 16-29)**

While we disagree with the Court's reluctance to dismiss the state law claims in *Ibrahim* based on the complaint, the allegations of official action and government involvement here require that these claims be dismissed without further discovery for at least three reasons: (1) *Sanchez-Espinoza* requires dismissal; (2) state law is preempted; and (3) Titan is not liable for the actions of soldiers.

A.    *Sanchez-Espinoza* **Requires Dismissal of the State Law Claims (Counts 16-29)**

The analysis of plaintiffs' state law claims begins and ends with *Sanchez-Espinoza*. *Sanchez-Espinoza* dealt only with the federal law claims because of the procedural posture of that case when it reached the Court of Appeals. Nonetheless, the rationale of that case applied to this complaint—alleging that the private defendants were acting "in concert and conspiracy with" government officials, *Sanchez-Espinoza*, 770 F.2d at 205—requires that the state law claims be dismissed as well.

The District Court in *Sanchez-Espinoza* dismissed all federal claims under the political question doctrine, and dismissed the state law claims "because the state law claims of the Florida plaintiffs [had] no federal jurisdictional hook." *Sanchez-Espinoza v. Regan*, 568 F. Supp. 596, 602 (D.D.C. 1983). The Court of Appeals, while not disagreeing that the political question doctrine applied, instead dismissed the ATS claims for lack of subject matter jurisdiction. This meant that the Court of Appeals could not address the merits of the state law claims.[27] That does not mean the state claims would have fared differently than the federal claims in *Sanchez-Espinoza*, only that it was up to a court of general jurisdiction to apply that law to those claims. It is clear that the Supremacy Clause requires that since ATS claims cannot be brought against

---

[27] Diversity was lacking in *Sanchez-Espinoza*. The state law claims would have had to be retained under the theory of pendent claims. At the time *Sanchez-Espinoza* was decided, it was Justice Scalia's view, as evidenced by his opinion for the Court three years later in *Finley v. United States*, 490 U.S. 545 (1989), that pendent-party jurisdiction was not a basis upon which a court could reach the merits in the situation he was presented in *Sanchez-Espinoza*. In reaction to *Finley*, Congress amended the statute to expand the scope of pendent party jurisdiction. *See* H.R. Rep. No. 734, 101-734, § 114 (1990). The presence of diversity here makes consideration of whether the Court should elect to exercise jurisdiction over the state law claims irrelevant.

contractors acting on behalf of state actors as a result of the sovereign immunity of the United States, state claims also cannot be maintained. This is consistent with the decisions of other courts faced with state law claims against private parties performing *governmental functions* as government *agents*. Imposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work. As a result, courts have extended derivative immunity to private contractors, "particularly in light of the government's unquestioned need to delegate governmental functions." *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1448 (4th Cir. 1996); *City of Worcester v. HCA Mgmt. Co., Inc.*, 753 F. Supp. 31, 37-38 (D. Mass. 1990) ("[P]ursuant to sovereign immunity, a private company which contracts with the federal government to perform the duties of the government will not be held liable for its actions on behalf of the government."); *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (finding it well-settled "that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity"); *see also Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379, 385 (S.D. Tex. 1994), *aff'd mem.*, 79 F.3d 1145 (5th Cir. 1996) (derivative sovereign immunity required dismissal where defendant "merely repeated" principal's order).

Unlike in *Ibrahim*, where the Court found no state action and required the defendants to rely on the affirmative government contractor defense because plaintiffs did not plead government involvement, the plaintiffs here, as in *Sanchez-Espinoza*, have alleged that the acts at issue were undertaken "in concert with" (TAC ¶ 29), in conspiracy with (TAC ¶ 57), and at the direction of (TAC ¶ 107) government and military officials. This means that the alleged actions of Titan's linguists were undertaken with and on behalf of a host of government and military officials, as their agents. *See, e.g., Anderson v. United States*, 417 U.S. 211, 219 n.6 (1974) (the law deems conspirators "agents of one another"); *Roberson v. Money Tree*, 954 F. Supp. 1519, 1529 (M.D. Ala. 1997); Restatement (Second) of Torts § 876 cmt. a (1979) ("The theory of the early common law of conspiracy was that there was a mutual agency of each to act for the others."). As set forth above, the facts in this case establish that the alleged actions of Titan's

linguists were undertaken with and on behalf of officials acting in their official capacity. By definition, these are acts of the United States. *Schneider v. Kissinger*, 412 F.3d 190, 199 (D.C. Cir. 2005). That is the case even where the policies and directions pursuant to which the government officials and their agents acted turn out to be illegitimate or unlawful. *Sanchez-Espinoza*, 770 F.2d at 207; *see also United States v. Stanley*, 483 U.S. 669, 681 (1987) (government officials). Because "defendants were acting as agents of the state, they [] have sovereign immunity under *Sanchez-Espinoza*." *Ibrahim*, 391 F. Supp. 2d at 14 n.3.

### B.    The State Law Claims Are Preempted

Independent of *Sanchez-Espinoza*'s rationale, the pleadings here establish that the state law claims are pre-empted by uniquely federal interests. State law claims cannot be brought to the extent they create a significant conflict with the federal interests in the treatment of wartime prisoners and unfettered military action. *Ibrahim*, 391 F. Supp. 2d at 16-19. In *Ibrahim*, the Court found that facts beyond those pled in the complaint were required to establish such a conflict:  namely, in the absence of allegations of state action, that Titan linguists and CACI interrogators were under the supervision and control of the military at Abu Ghraib. *Id.* Without regard to proving the extent of military supervision and control,[28] the government involvement and governmental functions alleged here, however, establish a conflict with the treatment of wartime prisoners and unfettered military action that requires preemption.

The same allegations that give rise to the application of *Sanchez-Espinoza* to state claims—the widespread involvement of military officials performing governmental functions with whom Titan linguists acted in concert and conspired with, to accomplish governmental functions, (TAC ¶¶ 29, 57, 107)—also create a conflict that pre-empts state law claims. Plaintiffs' claims based on Titan's conduct in performing "Interrogation Services" would directly

---

[28]  The TAC also alleges facts sufficient to establish that the Titan linguists and CACI interrogators were integrated into the military chain of command and therefore acting as soldiers in all but name. *See, e.g.*, TAC ¶¶ 74, 107. But as set forth in the text, it is not necessary to reach the question of whether the Titan linguists and CACI interrogators acted as "soldiers in all but name" to establish a conflict that creates preemption.

conflict with the federal interests in the treatment of wartime prisoners and unfettered military action.   In contrast to *Ibrahim*, which purports to attempt to regulate the conduct of purely private parties on a "frolic and detour" from their actions on behalf of the government, this action directly seeks to recover for the actions of government officials and soldiers and the actions of private contractors taken with their express involvement and direction.   In other words, *Ibrahim*'s careful excision of government involvement put the burden upon defendants to establish the fact of a conflict (through proof that its employees were soldiers in all but name), while the *Al Rawi* plaintiffs have established the conflict through their intertwining of the government in their claims, thereby pleading themselves out of court.[29]   This is no different than the result in *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), where the Ninth Circuit dismissed state law claims against private contractors on the pleadings because the plaintiffs' claims against the private contractors would necessarily conflict with the unique federal interest in combatant activities.

For example, plaintiffs seek to recover for intentional infliction of emotional distress (Count 25) for "offensive conduct" to which they were exposed during interrogations.   (TAC ¶¶ 49, 51, 157.)   Military interrogators are not subject to state law regulation in the performance of combatant activities, including interrogation of wartime prisoners.   Yet such a military interrogator would nevertheless be effectively constrained by state law if the civilian linguist through whom he conducts an interrogation were subject to state law.   As a result, where contract linguists are employed, military officials would be restrained by state law from employing certain interrogation techniques, even if those techniques comply with the law of armed conflict.

---

[29] That is not to say that the military or its contractors are free to mistreat prisoners, only that the activities that plaintiffs challenge—the treatment of military prisoners with and by the military and the methods of interrogating prisoners to extract military intelligence—are "[g]overnment activities which by their very nature should be free from the hindrance of a possible damage suit." *Ibrahim*, 391 F. Supp. 2d at 19 (quoting *Johnson v. United States*, 170 F.2d at 769; citing *Koohi*, 976 F.2d at 1335) (FTCA combatant activities exception applies even to acts that are "deliberate rather than the result of error").   It is clear from the numerous prosecutions of the soldiers identified in the TAC, and from the other actions taken by the government, that the absence of a civil damages remedy does not condone prisoner mistreatment or eliminate the enforcement of legal norms.

Because it would be impossible to predict where suit might be brought against the linguist, the military would be required to conform its interrogation techniques to the most restrictive state tort law when using contract linguists. State tort law is simply not an appropriate vehicle to regulate wartime military interrogations and is what the preemption doctrine avoids. The *Ibrahim* plaintiffs avoided this, at least temporarily, by disavowing state action in the pleadings.

It makes no difference that plaintiffs have not sued the government and military officials, particularly because in this case they seek to recover for the actions of those officials and soldiers. It is the military *judgment* to undertake to treat detainees in a particular manner or to undertake particular methods of interrogation—whether right or wrong—that is insulated from civil liability. *See Mangold*, 77 F.3d at 1447-48. It matters not whether those military judgments are executed by contractors or military personnel:

> It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.

*Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).

### C.    Titan Is Not Liable for the Actions of Soldiers (Counts 16-27)

In *Ibrahim*, this Court concluded that if Titan linguists "were indeed soldiers in all but name, the government contractor defense will succeed." *Ibrahim*, 391 F. Supp. 2d at 19. Despite this, plaintiffs here seek to hold Titan directly liable for the actions of actual soldiers and other government officials through the doctrines of civil conspiracy and aiding and abetting.[30]

The question left open in *Ibrahim* was whether the application of state law to the alleged purely private conduct would in fact conflict with federal interests. *Ibrahim*, 391 F. Supp. 2d at 18-19. Here, plaintiffs' attempt to hold *Titan* liable for the actions of *soldiers* and other

---

[30] *See* Counts 2-3, 5-6, 8-9, 11-12, 14-15, 17-18, 20-21, 23-24, 26-27, 31; TAC ¶ 1 ("This action seeks money damages (both compensatory and punitive) to compensate Plaintiffs and the Class Members who were tortured and treated in a cruel, inhuman and degrading manner by Defendants *and their co-conspirators*.") (emphasis supplied); TAC ¶ 28 (naming 8 soldiers and "other military and government officials who acted illegally" as conspirators); RCS at 4 (naming the Secretary of Defense and senior policy advisors and military commanders as conspirators).

government officials turns *Boyle* and *Koohi* upside down and directly contravenes this Court's preemption analysis in *Ibrahim*. The open question in *Ibrahim*—whether Titan linguists were subject to military control—is beyond dispute as applied to soldiers: there can be no question that soldiers, by definition, are subject to military control. Accordingly, the application of state law to the alleged actions of soldiers, even if the plaintiffs seek to make a private party liable, is clearly preempted. This is implicit in this Court's pronouncement in *Ibrahim* that claims arising from the actions of defendants' employees are preempted if those employees were performing as "soldiers *in all but name*." And it was a holding of *Koohi*. 976 F.2d at 1336. Moreover, preemption is not avoided by suing only the government's contractors. This is the inescapable implication of *Boyle*, which set forth conditions under which contractors cannot be liable for their own actions, much less for those of the government. *Boyle*, 487 U.S. at 512. Put another way, given that there is no recovery for the actions of *soldiers in all but name*, then surely there can be no recovery for the actions of *soldiers* and certainly no recovery from *Titan* for the actions of *soldiers*.

## V.    The Complaint Does Not Comply with Federal Rules of Civil Procedure 8 and 10

While what can be discerned from the TAC demonstrates that these plaintiffs have pled themselves out of court, it is clear that at the very least the TAC must be dismissed and/or a more definite statement required under Rule 12(e) because of the utter failure to comply with Federal Rules of Civil Procedure 8 and 10. A complaint must "give respondent fair notice of what petitioner's claims are and the grounds upon which they rest." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). Simply put, the TAC must give Titan (and the other defendants) fair notice of who accuses Titan and of what Titan is accused. The TAC does not accomplish this basic task. It contains allegations of heinous acts attributed to unidentified actors, *see* TAC ¶¶ 114-60, alleges harms suffered by unidentified persons, *id.* ¶ 107, and by persons admittedly not parties here, *id.* ¶¶ 53-55. The TAC does not even properly identify all the "named" plaintiffs, or set forth the plaintiff or plaintiffs that bring each count and against which defendant it is brought. As noted above, plaintiffs hide their allegations (and attempt to avoid the

- 42 -

requirements of Rule 11 and the reach of Rule 12) behind their use of "Torture Conspirators" and "Defendants and/or others."

Notice pleading, and basic justice, require that *each* defendant be notified of what *it* stands accused and by whom. As this Court said when faced with a similarly complex complaint alleging, just as here, that a class of persons was injured by the conspiratorial or negligent acts of a large group of actors, heinous allegations require scrutiny of "plaintiffs' allegations as to any particular defendant, to ensure that [each defendant] does indeed have fair notice of what the plaintiffs' claim is and the ground upon which it rests, and that no inferences are accepted that are unsupported by the facts set out in the [complaint]." *Burnett v. Al Baraka Inv. & Dev Corp.*, 274 F. Supp. 2d 86, 104 (D.D.C. 2003). And striking closer to home, in confronting the use of this tactic with regard to the CACI defendants, this Court has most recently required plaintiffs to make specific,

> allegations as to the individual CACI corporations now lumped together in the proposed third amended complaint as "the CACI Corporate defendants" (para. 21) specific enough that such allegations may be tested against the requirement of Rule 11 that they "have evidentiary support, or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

Order Den. Mot. to Am. (Mar. 17, 2006).

When, as here, multiple plaintiffs file claims based on separate transactions and occurrences, proper notice also requires that each claim that arises from a separate transaction be set forth in a separate count. *See Bautista v. L.A. County*, 216 F.3d 837, 840-41 (9th Cir. 2000); *see also* 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 10.03(2)(a) (3d ed. 2005). Because plaintiffs have disregarded these simple pleading standards, it is impossible to determine which of the thirteen plaintiffs in this case are bringing twenty-three of the thirty-one counts in the complaint,[31] or against whom they are brought. This type of "shotgun" pleading, charging all defendants with all counts without making clear the basis for each count, does not

---

[31] Counts 1-3, alleging extrajudicial killing, and 22-24, alleging wrongful death, are presumably brought by Ibrahiem's estate. Counts 30 and 31 set forth that they are brought by Saleh, Hadood, Ahmed, and Neisef.

comply with the requirements of Rules 8 and 10(b).  *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).  Plaintiffs allege that all defendants, as co-conspirators, are liable for all counts in the complaint.  But the complaint sets forth conspiracy-derived liability in separate counts (Counts 5, 8, 11, 14, 17, 20, 23, and 26).  Is Titan to assume that it is also accused of direct liability for extrajudicial killing, sexual assault, and the other heinous crimes detailed in the complaint?  Which plaintiff alleges that his situation rises to the level of a war crime, or of a crime against humanity?  Titan cannot reasonably defend itself, or even conduct effective discovery, without the answers to these basic questions.  Accordingly, the Court should order plaintiffs to replead any counts that survive this Motion, to set forth which plaintiff brings each count, against which defendant each count is brought, and to plead separate counts for the individual transactions and occurrences plaintiffs believe give rise to liability.

The TAC is also deficient in that it provides only a single name for four plaintiffs, Mustafa, Natheer, Othman, and Hassan, and does not provide addresses for any of the plaintiffs. This violation of both Federal Rule of Civil Procedure 10(a) and Local Rule 5.1(e) renders the complaint essentially pseudonymous, as least as to those four plaintiffs.  Plaintiffs have made no attempt to justify this pseudonymous filing.  *See Qualls v. Rumsfeld*, 228 F.R.D. 8, 10-11 (D.D.C. 2005) (setting forth procedures and standards for pseudonymous filings).  This lack creates more than a mere "technical" issue.  Without confidence that it knows the true identities of its accusers, Titan cannot be assured of obtaining the *res judicata* effect of any decision, *see Moore's Federal Practice* ¶ 10.02; *see also Roe v. Ingraham*, 364 F. Supp. 536, 541 n.7 (S.D.N.Y. 1973), or determine the real party in interest as required by Rule 17.

Even under the liberal pleading standards of Rule 8, a plaintiff must do more than conclusorily allege conspiracy.  *See McAfee v. 5th Circuit Judges*, 884 F.2d 221, 222 (5th Cir. 1989); *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982) ("Mere conclusory allegations of conspiracy cannot, absent reference to material facts, survive a motion to dismiss.").

## CONCLUSION

For the reasons set forth above, plaintiffs' TAC should be dismissed.

Respectfully Submitted,

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
E. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C.  20005
(202) 434-5000

Dated:  April 7, 2006

*Attorneys for Defendant L-3 Communications Titan Corporation*