# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ———————————————— | ) |
| SALEH, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | )    Civil Action No. 05-CV-1165 (JR) |
| v. | ) |
| | ) |
| TITAN CORP., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |

## REPLY OF DEFENDANTS CACI INTERNATIONAL INC, CACI, INC. – FEDERAL, AND CACI PREMIER TECHNOLOGY, INC. IN SUPPORT OF THEIR MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

Attorneys for Defendants CACI International Inc,
CACI, INC.–FEDERAL, and CACI Premier
Technology, Inc.

May 26, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 1

I.    Plaintiffs' Alien Tort Claims Must Be Dismissed ............................................... 1

    A.    *Sanchez-Espinoza* Requires Dismissal of the ATS Claims ............................ 1

        1.    *Sanchez-Espinoza* Is Controlling, As Recognized in *Ibrahim* ..................... 1

        2.    Plaintiffs' "Under Color of Law" Allegations Do Not Allow Them to Escape *Sanchez-Espinoza* ............................................................... 2

        3.    *Sanchez-Espinoza* Is Still Good Law ..................................................... 3

        4.    *Sanchez-Espinoza* Is On Point With Plaintiffs' Allegations In the TAC ............................................................................................. 5

    B.    Even Under *Sosa*, Plaintiffs' Claims Under the ATS Must Fail ...................... 5

        1.    The *Sosa* Decision ........................................................................... 6

        2.    Under *Sosa*, Plaintiffs Have No Right of Action Here .............................. 8

    C.    Aiding and Abetting and Conspiracy Claims Are Not Actionable Under the ATS ...................................................................................... 12

II.    Plaintiffs' Common-Law Claims Are Preempted ............................................. 13

    A.    The Combatant Activities Exception Bars Plaintiffs' Claims ........................ 13

        1.    Plaintiffs' TAC Supplies the Necessary Factual Allegations to Demonstrate Preemption of Plaintiffs' Claims .................................... 13

        2.    Plaintiffs' Common-Law Claims Are Susceptible to Preemption ............. 15

        3.    The Court Has Rejected, and Should Reject Again, Plaintiffs' Absurdly Narrow Conception of "Combatant Activities" ..................... 17

    B.    The Foreign Country Exception Bars Plaintiffs' Claims .............................. 18

III.    Plaintiffs' Claims Present Nonjusticiable Political Questions ............................ 19

IV.    Plaintiffs' RICO Claims Must Be Dismissed ................................................. 22

    A.    Plaintiffs' RICO Claims Must Be Dismissed For Lack of Standing ............... 22

    B.    Plaintiffs Have Failed to Plead An "Enterprise" ..................................... 23

    C.    Plaintiffs Have Failed to Plead a § 1962(d) "Conspiracy" ......................... 24

V.    The Court Should Dismiss CACI International Inc and CACI, INC.-FEDERAL ........... 24

## TABLE OF AUTHORITIES

### CASES

*In re Agent Orange Prod. Liab. Litig.*, 580 F. Supp. 1242 (E.D.N.Y. 1984) ........................17, 18

*In re "Agent Orange" Product Liab. Litig.*, 373 F.Supp.2d 7 (E.D.N.Y. 2005) ...........................16

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ...................................................................................8

*\*Bancoult v. McNamara*, __ F.3d __, 2006 WL 1042356 (D.C. Cir. 2006) ..........................19, 20

*Caudill v. Blue Cross & Blue Shield*, 999 F.2d 74 (4th Cir. 1993) ................................................15

*Dammarell v. Iran*, 2005 WL 756090 ............................................................................................12

*\*Doe v. Exxon Mobil Corp.*, 393 F.Supp.2d 20 (D.D.C. 2005) ..............................................3, 9, 12

*Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) ......................................................22, 23

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ................................................................................17, 18

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) ..........................................................................19

*Hecht v. Commerce Clearinghouse*, 897 F.2d 21 (2d. Cir. 1990) ...........................................22, 24

*Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992) ...................................................................23

*\*Ibrahim v. Titan Corp.*, 391 F.Supp.2d 10 (D.D.C. 2005) ......................................1, 2, 3, 13, 14,
                                                                                           15, 16, 17, 18, 19,
                                                                                           22

*\*Johnson v. United States*, 170 F.2d 767 (9th Cir. 1948) ...............................................15, 17, 18

*\*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) ...............................................1, 14, 15, 16

*McMahon v. Presidential Airwaves, Inc.*, 410 F. Supp. 2d 1189 (M.D. Fla. 2006) .....................19

*Meng v. Schwartz*, 116 F. Supp. 2d 92 (D.D.C. 2000) ...................................................................23

*Pennhurst State Sch. & Hosp. v. Haldeman*, 465 U.S. 89 (1984) ...............................................4, 5

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) ........................................................................2

*Prosecutor v. Furndzija*, Case No. IT-95-17/1-T ............................................................................8

*Prosecutor v. Kunarec*, IT-96-23&23/1-T ...................................................................8

*Prosecutor v. Kupreskic*, IT-95-16-T .......................................................................8

*Reves v. Ernst & Young*, 507 U.S. 170 (1993).......................................................23

*\*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985)......................1, 2, 3, 4, 5,
6, 16

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005)..........................................20

*Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) ..............................................23

*Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1 (2000) ..........................4

*Skeels v. United States*, 72 F. Supp. 372 (W.D. La. 1947) .....................................17

*\*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)........................................2, 3, 4, 5, 6,
7, 8, 10, 11, 12,
13, 16, 18, 19

*In re South Af. Apartheid Litig.*, 346 F.Supp.2d 538 (S.D.N.Y. 2004)......................12

*Tel-Oren v. Libyan Arab Repub.*, 726 F.2d 774 (D.C. Cir. 1984) ...............................10

*The Prize Cases*, 67 U.S. (2 Black) 635, 17 L. Ed. 459 (1863)............................20, 21

*United States v. Turkette*, 452 U.S. 576 (1981) .....................................................23

*Vogelaar v. United States*, 665 F. Supp. 1295 (E.D. Mich. 1987) ........................17, 18

*Webster v. Fall*, 266 U.S. 507 (1925) ..................................................................4, 5

*Wright v. Towns*, No. 90-0565, 1991 WL 100388 (D.D.C. May 30, 1991) ................24

## STATUTES

18 U.S.C. § 1962(c)-(d) ...................................................................................22

28 U.S.C. § 1962...................................................................................22, 23

28 U.S.C. § 2680(j)...............................................................................14

Torture Victim Protection Act of 1991, Pub. L. 102-256, 106 Stat. 73
(Mar. 12, 1992), *codified at* 28 U.S.C. §1350 note (2000)...............................10

U.S. Const. art. I, § 8, cl. 10.................................................................10

## INTRODUCTION

The unspoken but ubiquitous theme permeating Plaintiffs' Opposition ("Opp.") is that because they allege atrocities, they must prevail. On each disputed point, Plaintiffs revert to their substantive allegations, while ignoring the threshold questions of whether the law gives them a forum and a right of action to assert their claims. Amazingly, the complaint remains bereft of a single allegation of misconduct by any CACI employee that is connected to a named plaintiff or to any other named detainee. Indeed, the principal difference between Plaintiffs' Third Amended Complaint ("TAC") and the complaint at issue in *Ibrahim v. Titan Corp.*, 391 F.Supp.2d 10 (D.D.C. 2005), is that these Plaintiffs allege that their injuries were caused by a vast conspiracy between Defendants, high-ranking government officials, and Army personnel to abuse detainees in Iraq. As discussed below, these allegations of government involvement in causing Plaintiffs' injuries strengthens Defendants' preemption and political question arguments, supporting dismissal of Plaintiffs' claims on those bases. In addition, these conspiracy allegations do nothing to change the result the Court reached in dismissing the *Ibrahim* plaintiffs' Alien Tort Statute ("ATS") and RICO claims. The Court should dismiss the TAC in its entirety.

## ARGUMENT

### I. Plaintiffs' Alien Tort Claims Must Be Dismissed

#### A. *Sanchez-Espinoza* Requires Dismissal of the ATS Claims

##### 1. *Sanchez-Espinoza* Is Controlling, As Recognized in *Ibrahim*

The D.C. Circuit's decision in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), requires dismissal. Under *Sanchez-Espinoza*, *official action of the United States* is required, *as a jurisdictional necessity*, to state a claim for torture or related actions under the law of nations and the ATS. *Id.* at 207; Mot. at 6-10. To the extent a defendant is a government actor for ATS purposes, however, he is also entitled to sovereign immunity. *Sanchez-Espinoza*, 770 F.2d at 207 & n.4. There is no middle ground. *See* Mot. at 5-6 & n.1.

This Court recognized *Sanchez-Espinoza* as controlling in *Ibrahim*, 391 F.Supp.2d at 14. The question there, as here, was "whether the law of nations applies to *private actors* like the defendants in the present case." *Id.* Acknowledging *Sosa*, this Court stated, "[t]he Supreme Court has not answered that question, but in the D.C. Circuit the answer is no." *Id.* Accordingly, this Court ruled the conduct in *Ibrahim*, nearly identical to that alleged here, was "not actionable under the [ATS]'s grant of jurisdiction, as a violation of the law of nations." *Id.* at 15. Plaintiffs cite no compelling circumstances warranting departure from *Ibrahim*. Instead, they openly ask this Court to reconsider that decision. Opp. at 13 n.9. The Court should decline to do so.[1]

### 2.    Plaintiffs' "Under Color of Law" Allegations Do Not Allow Them to Escape *Sanchez-Espinoza*

Emphasizing their "under color of law" allegations, Plaintiffs aim for a perceived opening in footnote 3 of the *Ibrahim* opinion. But this Court did not hold that alleging "color of law" was an open route to escape *Sanchez-Espinoza*. Rather, it recognized that route is closed:

> [I]f defendants were acting as agents of the state, they would have sovereign immunity under *Sanchez-Espinoza*. As then-Judge Scalia noted in dicta, plaintiffs cannot allege that conduct is state action for jurisdictional purposes but private action for sovereign immunity purposes.

391 F.Supp.2d at 14 n.3. The issue left for another day was whether "under color of law" allegations might create "any tension between the state actor inquiry under the ATS *and a similar inquiry under preemption involving an affirmative government contractor defense* but not immunity." *Id.* (emphasis added). Thus, any remaining inquiry raised by "color of law" allegations has to do with their effect on government contractor preemption, not ATS jurisdiction.

_____

[1] Defendants argue *Ibrahim* is not stare decisis until that case reaches final judgment. Opp. at 12 n.9. But prior decisions may be precedential even though not yet preclusive. Broadly, stare decisis means like cases should be decided in like manner. It is fundamental to the rule of law. *See Planned Parenthood v. Casey*, 505 U.S. 833, 854 (1992). In *Ibrahim*, this Court considered nearly identical allegations of torture and abuse, and ruled that *Sanchez-Espinoza* precluded ATS jurisdiction for claims against private defendants. 391 F.Supp.2d at 14-15. The Court was aware of *Sosa*, and nonetheless found *Sanchez-Espinoza* controlling. *Id.*

Indeed, this Court has already rejected similar "color of law" allegations under the ATS. In *Doe v. Exxon Mobil Corp.*, 393 F.Supp.2d 20 (D.D.C. 2005), Indonesian citizens sued Exxon Mobil under the ATS, alleging torture, crimes against humanity, extrajudicial killing, and sexual violence, had been committed by military units hired by Exxon Mobil. *Id.* at 22, 24. This Court declined to adjudicate the crimes against humanity claims because they would require the court to intrude in Indonesia's internal affairs by judging the conduct of its military.[2] The Court then rejected claims of torture and extrajudicial killing under ATS, because "[t]raditionally only states (and not persons) could be liable under the [ATS] for torture . . . or extrajudicial killing." *Id.* at 25-26 (citing *Sanchez-Espinoza*). The Court rejected the "color of law" cases Plaintiffs cite here, because "[g]rafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states." *Id.* (citing *Sanchez-Espinoza*). Because "[r]ecognizing acts under color of law would dramatically expand the extraterritorial reach of the statute," beyond Congress's mandate, the Court ruled that "basing liability for [ATS] violations on color of law jurisprudence is a[n] . . . overreach." *Id.*

Plaintiffs' "color of law" allegations are thus irrelevant. Even if true, under *Sanchez-Espinoza* and *Exxon Mobil*, they do not make the alleged conduct actionable under the ATS.

### 3.    *Sanchez-Espinoza* Is Still Good Law

Plaintiffs' fallback argument, that *Sanchez-Espinoza* did not survive *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), is unfounded. In *Ibrahim*, this Court found *Sanchez-Espinoza* controlling, notwithstanding *Sosa*. The same was true in *Exxon Mobil*. Those cases show that

---

[2] Similarly here, accepting Plaintiffs' war crimes and crimes against humanity claims would require the Court to insert itself into adjudication of the United States' conduct of a war, in violation of the separation of powers and the combatant activities exception to the Federal Tort Claims Act. *See* Section III (political question doctrine) and Section II.A (combatant activities exception), *infra*.

*Sanchez-Espinoza* is still good law.

Plaintiffs' argument that *Sosa* overruled *Sanchez-Espinoza* is farfetched. Conceding *Sosa* does not even mention *Sanchez-Espinoza*, Plaintiffs try to cobble a *sub silentio* overruling based on multiple inferences. Opp. at 18-19. Of course, finding *sub silentio* overrulings is disfavored.[3] And for good reason: "*sub silentio*" often means "nonexistent."[4] Not only are "*sub silentio*" jurisdictional rulings not "automatically precedential," Opp. at 18, they are not precedential at all.[5]

Plaintiffs rest their "*sub silentio* overruling" argument on a series of dubious premises: that Sosa was an agent of the United States; that immunity is a jurisdictional issue to be raised *sua sponte*; and that the Supreme Court would have ruled on immunity grounds if it could. Because the Court did not find Sosa immune, Plaintiffs conclude the Court rejected *Sanchez-Espinoza*. Opp. at 18-19 & n.14. The argument fails because Plaintiffs' premises are flawed.

First, Plaintiffs argue the "Supreme Court knew that Sosa was such an agent, having worked closely with the DEA officials to kidnap Alvarez-Machain." Opp. at 19. But the fact that Sosa "worked closely with the DEA officials" was hardly sufficient to make him a federal agent, clothe him with federal sovereign immunity, or show he was acting under color of law. To the contrary, Alvarez's claim against Sosa was that Sosa acted lawlessly. *Sosa*, 542 U.S. at 734-36.

Second, there was no reason for the Court to consider sovereign immunity for Sosa. The Supreme Court's opinion does not indicate Sosa was sued as a government actor, much less that

---

[3] *See Shalala v. Illinois Council on Long Term Care*, 529 U.S. 1, 17 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

[4] *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

[5] *See Pennhurst State Sch. & Hosp. v. Haldeman*, 465 U.S. 89, 119 (1984) ("[W]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.").

he claimed sovereign immunity. *See id.* at 698, 712. Where the issue was not raised or mentioned, the case sets no precedent. *See Pennhurst*, 465 U.S. at 199; *Webster*, 266 U.S. at 511. *Sosa* did not overrule *Sanchez-Espinoza*, silently or otherwise.

### 4.    *Sanchez-Espinoza* Is On Point With Plaintiffs' Allegations In the TAC

Finally, Plaintiffs contend *Sanchez-Espinoza* concerned only official United States policy, approved by President Reagan, which was not "contrary to statutory or constitutional prescription." Opp. at 20-21. Plaintiffs' description contrasts sharply with the facts. Just as here, the *Sanchez-Espinoza* complaint included allegations of "summary execution, murder, abduction, torture, rape, wounding, and destruction of private property." 770 F.2d at 205. In both cases, plaintiffs alleged that private entities conspired with high-ranking officials to use military resources in an unauthorized way that led to atrocities. In both cases, the actions were allegedly taken under the guise of official action, but in violation of U.S. law. *Id.* at 206-07; Opp. at 9.[6] Because *Sanchez-Espinoza* held official government action was a necessary condition for ATS jurisdiction, Plaintiffs may not sue CACI under the ATS for actions which Plaintiffs argue are contrary to official U.S. policy. *Sanchez-Espinoza* thus requires dismissal of the ATS claims.

### B.    Even Under *Sosa*, Plaintiffs' Claims Under the ATS Must Fail

Even if not for *Sanchez-Espinoza*, Plaintiffs' claims would fail under the Supreme Court's analysis in *Sosa*. Though purporting to rely on *Sosa*, Plaintiffs' opposition omits any discussion of the Court's majority opinion, which *rejected* an expansive interpretation of the "law of nations" under the ATS. *Sosa* holds that "law of nations" must be interpreted narrowly under ATS, to avoid infringing the political branches' conduct of foreign policy, or Congress's right to decide when and how federal claims based on violation of international norms should be

---

[6] The *Sanchez-Espinoza* plaintiffs argued those defendants' actions violated the War Powers Resolution, the Hughes-Ryan Amendment, the National Security Act, the Neutrality Act, the Boland Amendment, and the U.S. Constitution's War Powers Clause. *Sanchez-Espinoza*, 770 F.2d at 209-10.

cognizable. *Sosa*'s actual holding cuts against, not for, recognizing Plaintiffs' ATS claims here.

### 1.    The *Sosa* Decision

In *Sosa*, the plaintiff, Alvarez, had been indicted in the U.S. for the torture and murder of a DEA agent in Mexico. After extradition efforts failed, the DEA allegedly hired Mexican nationals to kidnap Alvarez and bring him to the U.S. for trial. Alvarez was acquitted, and then sued the United States, various DEA officials, and the Mexican kidnappers, including Sosa. *Id.* at 697-99. His claim against Sosa was brought under the ATS, alleging arbitrary detention, in violation of the law of nations. *Id.* at 698-99, 734-37. The Supreme Court rejected Alvarez's ATS claim, finding he had not shown a "law of nations" violation under the ATS. *Id.* at 734-38. Before reaching that result, the Court cautioned that federal courts must proceed very carefully, and interpret the law narrowly, before recognizing new international torts under the statute.

The first holding of *Sosa*, nowhere mentioned in Plaintiffs' brief, is that *the ATS confers jurisdiction only, not a private right of action.* Every Justice concurred on this point.[7] Second, the Court recognized that, since the time of Blackstone, the "law of nations" has been concerned principally with relations *among nations*, and has very rarely recognized a judicial remedy to vindicate *individual* rights. *Id.* at 714-15, 720. Before a plaintiff may sue under the ATS, the plaintiff must identify, among the law of nations, not only the law defining the substantive violation, *but also the law giving the individual plaintiff a right of action against the individual defendant he seeks to hold liable. See id.* at 713, 718-24.

While such a cause of action may be found in that subset of the law of nations which is so universally accepted as to be part of the common law, that body of law is exceedingly narrow. *See id.* at 719-21. The violation must be both universally recognized, and be one for which the law of nations recognizes a judicial remedy *between individuals*, rather than between states. *See*

---

[7] *See* 542 U.S. at 713-14, 724, 729 (Court majority); *accord id.* at 743 (Scalia, Rehnquist, and Thomas, JJ.); *id.* at 751 (Ginsburg and Breyer, JJ.); *id.* at 760 (Breyer, J.).

*id.* at 720-21. At the time of the ATS's enactment, only three violations were so recognized: violation of safe conduct, infringement of the rights of ambassadors, and piracy. *Id.* at 715, 720, 724. "It was this narrow set of violations of the law of nations, *admitting of a judicial remedy* and at the same time threatening serious consequences in international affairs," that the Court found to fall within the ATS. *Id.* at 726 (emphasis added).

Though the Court acknowledged that federal courts might yet recognize new "law of nations" claims as part of federal common law, it cautioned, "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind." *Id.* at 725. The Court listed five reasons for such judicial caution.

First and second were two changes between Founding-era and 21st-century legal analysis. Whereas Founding-era judges believed the common law was discovered, not made, modern judges recognize that allowing new causes of action amounts to making new law, which should be done with restraint. *Id.* at 725-26. Moreover, since *Erie*, federal courts have looked "for legislative guidance before exercising innovative authority over substantive law." *Id.* at 726.

Third, the Supreme Court has "repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Id.* at 727. Even where Congress has enacted clear rules governing conduct, the Court has been "reluctant to infer intent to provide a private cause of action where the statute does not supply one expressly." *Id.* Fourth, the potential for new causes of action to affect foreign relations "should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* Finally, the Court recognized that the judiciary has "no congressional mandate to seek out and define new and debatable violations of the law of nations." *Id.* at 728.

In light of these high bars and narrow authority, the Court cautioned that

> federal courts should not recognize private claims under federal common law
> for violations of any international law norm with less definite content and ac-

7

ceptance among civilized nations than the historical paradigms familiar when
§1350 was enacted.

*Id.* at 732. Applying this caution, the Court rejected Alvarez's ATS action, finding that his claim

of arbitrary detention was not so universally recognized or specifically defined to be cognizable

under the law of nations, and that Alvarez had failed to show the law of nations recognized an

*individual remedy* for violation of such a right. *See id.* at 734-38.

### 2.    Under *Sosa*, Plaintiffs Have No Right of Action Here

Plaintiffs ignore the *Sosa* majority opinion completely, acknowledging neither its holding

nor its emphasis on judicial caution before recognizing new causes of action. Instead, Plaintiffs

focus on one Justice's lone concurrence, and on a few mentions in *Sosa* of other circuits' case

law, to try to argue that *Sosa* recognized new international tort claims under the ATS. *Sosa* did

no such thing. It *rejected* the ATS claim at issue, and counseled caution before recognizing other

new ATS claims. It is *Sosa*'s holding, not the isolated language cited by Plaintiffs, that governs

this Court's analysis. *See Alexander v. Sandoval*, 532 U.S. 275, 282 (2001).

### a.    The Law of Nations Does Not Allow An Individual Remedy

Plaintiffs focus extensively and exclusively on the *substantive* principles of the "law of

nations" violations they allege. Opp. at 10-12. They do not even try, however, to show that the

law of nations recognizes *a judicial remedy by individual plaintiffs for tort liability against indi-

vidual defendants*. Plaintiffs rely principally on decisions of the Nuremburg Military Tribunals

and the International Criminal Tribunal for the former Yugoslavia ("ICTY"). But these criminal

prosecutions by internationally sanctioned war crimes tribunals are irrelevant to the threshold

issue: whether individual civil remedies against individual, non-State defendants are universally

recognized under then law of nations.

For instance, the ICTY decisions quoted by Plaintiffs involved conduct by state officials.[8]

---

[8] *See Prosecutor v. Kunarec*, IT-96-23&23/1-T, ICTY Trial Chamber, Judgment, 22 February 2001 ¶ 3 (commanding officer in Serbian Army); *Prosecutor v. Kupreskic*, IT-95-16-T,

That individual state actors have been held criminally liable for war crimes says nothing as to whether the law of nations authorizes civil actions, in any nation's courts, for private, non-state conduct. While Plaintiffs cite a few Nuremberg cases in which private actors were convicted of collaborating with Nazi abuses, Opp. at 16, those cases again do not establish universal recognition of a civil tort remedy between individuals rather than states.[9] Both Nuremberg and the ICTY were situations where the world came together to constitute a tribunal, vest it with authority, and specifically define the prosecutable offenses. Those actions taken by nations do not decide the threshold issue here: whether the law of nations recognizes the ability of individual plaintiffs to sue individual non-state defendants for violations of international norms.

Further, Plaintiffs' citations largely consist of cherry-picked quotations removed from context. While Plaintiffs cite *Prosecutor v. Furndizja* as showing that international law recognizes aiding and abetting liability, Opp. at 10, *Furndizja* did not recognize such liability in a tort context, or as a matter of international common law. The *Furndizja* tribunal was interpreting a criminal statute, adopted by the U.N. in establishing the ICTY, which specifically provided criminal liability for aiding and abetting war crimes. *See Furndizja*, Judgment ¶ 42. Similarly, Plaintiffs cite *Prosecutor v. Tadic*, for the proposition that "war crimes need not be acts tied to the practices of a conflict." Opp. at 11. But the context was the *Tadic* tribunal's determination whether its jurisdictional statute, requiring a "nexus between the armed conflict and the conduct at issue," had been satisfied. *See Tadic*, Judgment ¶¶ 572-73. Plaintiffs cannot twist that statutory jurisdictional requirement into a generally accepted principle of international law.

---

ICTY Trial Chamber, Judgment, 14 January 2000 ¶¶ 365, 421, 466, 500-502 (Croatian military and police officers); *Prosecutor v. Furndzija*, Case No. IT-95-17/1-T, ICTY Trial Chamber, Judgment, 10 December 1998 ¶¶ 39-41 (Croatian military police officer); *Prosecutor v. Tadic*, IT-94-1-T, ICTY Trial Chamber, Judgment, 7 May 1997 (political leader of Bosnian town following takeover by Serbian nationalist forces).

[9] Moreover, the Nuremberg convictions for aiding and abetting Nazi war crimes do not support extending civil liability under that theory. This Court has rejected aiding and abetting liability under the ATS. *See Exxon Mobil*, 393 F.Supp.2d at 24 (discussed in Section 3, *infra*).

Plaintiffs rely on a number of treaties without regard to whether the United States has recognized individual remedies under those treaties. For instance, Plaintiffs cite a treatise titled *Elements of War Crimes Under the Rome Statute of the International Criminal Court*, Opp. at 10 n.6, without acknowledging that the United States has refused to join the treaty creating that court.[10] Similarly, Defendants cite the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Opp. at 14 n.10, but neglect the U.S. Senate's reservation to that treaty, which made clear that the treaty is not self-executing.[11] The TAC also invokes the Geneva Conventions, TAC ¶¶ 31, 41, 73, 113, but again, the Geneva Conventions are not self-executing. *Tel-Oren v. Libyan Arab Repub.*, 726 F.2d 774, 808-09 (D.C. Cir. 1984) (Bork, J., concurring). Where the United States has not recognized treaties as self-executing, those treaties do not "create obligations enforceable in the federal courts." *Sosa*, 542 U.S. at 735; *see also Tel-Oren*, 726 F.2d at 816-19 (Bork, J., concurring).

### b.  Congress Has Not Authorized An Individual Remedy

*Sosa* emphasized that the conduct of foreign relations is for the political branches, and that enforcement of rights under international law is a matter on which courts should look to Congress for guidance. 542 U.S. at 727-28, 731.[12] Along those lines, the Court acknowledged the "clear mandate appear[ing] in the Torture Victim Protection Act of 1991, 106 Stat. 73,"[13]

---

[10] *See* Letter from John R. Bolton, Under Secretary of State for Arms Control and International Security, to Kofi Annan, Secretary General of the United Nations (May 6, 2002) (*reproduced at* http://www.state.gov/r/pa/prs/ps/2002/9968.htm); *see also* Multilateral Treaties Deposited with the Secretary-General, Ch. XVIII, No. 10, Rome Statute of the International Court, list of Participants, n.6,
http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterXVIII/treaty11.asp.

[11] *See* Multilateral Treaties Deposited with the Secretary-General, Ch. IV, No. 9, Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Declarations and Reservations, United States of America, Reservation III.(1), *available at* http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterIV/treaty14.asp.

[12] Indeed, under the Constitution, the power "[t]o define and punish ... Offences against the Law of Nations" is reserved to Congress, not the Judiciary. U.S. Const. art. I, § 8, cl. 10.

[13] Pub. L. 102-256 (Mar. 12, 1992), *codified at* 28 U.S.C. §1350 note (2000) (the "TVPA").

which "'establish[ed] an unambiguous and modern basis for' federal claims of torture and extra-judicial killing." *Sosa*, 542 U.S. at 728. But *Sosa* cautioned that courts should respect the specific limits of the "affirmative authority" Congress set out in the Act. *Id.* Despite its applicability to torture claims, Plaintiffs have barely mentioned the TVPA, for an unsurprising reason: that Act specifically limits federal claims for torture or extrajudicial killing to actions under the color of law "of foreign nations." TVPA §2(a), 106 Stat. 73. The TVPA thus specifically excludes from tort liability actions taken under color of *U.S.* law.

The TVPA shows that even for torture—the offense that comes closest to the 18th century condemnation of piracy, *Sosa*, 542 U.S. at 732—Congress has specifically declined to create a tort remedy against individuals acting under color of U.S. law. This is not mere favoritism—it falls under Congress' prerogative to determine the extent to which U.S. government actors may be sued in U.S. courts. It also falls within the political branches' prerogative to determine the extent to which the United States will assent to the liability of its citizens for alleged international offenses.[14] Indeed, upon signing the TVPA, the first President Bush explicitly declared the Act does not authorize tort actions in the context of U.S. military operations:

> I am signing the bill based on my understanding that the Act does not permit suits for alleged human rights violations in the context of United States military operations abroad or law enforcement actions. Because the Act permits suits based only on actions 'under actual or apparent authority, or color of law, of any foreign nation,' I do not believe it is Congress' intent that [the TVPA] should apply to United States Armed Forces or law enforcement operations, which are always carried out under the authority of United States law.[15]

Where Congress has enacted specific legislation regarding the alleged conduct at issue, and has excluded an individual right of action, this Court should not infer such an action under the more general statute governing claims under the "law of nations."

---

[14] *See* USUN Press Release #98-02, "Ambassador Negroponte: Remarks at UN Headquarters following Adoption of Security Council Resolution 1422 on the International Criminal Court, July 12, 2002," *available at* http://www.un.int/usa/02_098.htm.

[15] Statement By President Bush Upon Signing H.R. 2092, 1992 U.S.C.C.A.N. 91, 92.

This Court has relied on the limited scope of the TVPA to reject individual liability under the Foreign Sovereign Immunities Act.  That Act contains "pass-through" provisions that allow plaintiffs to assert against foreign governments causes of action they could assert against a private individual in like circumstances.  *Dammarell v. Iran*, 2005 WL 756090, at *8-14, *17, *recon. granted in part on other grounds*, 370 F.Supp.2d 218 (D.D.C. 2005).  In *Dammarell*, plaintiffs sought to assert such a "pass-through" action against the government of Iran, based on the TVPA.  This Court, however, found that the specific limitations enacted in the TVPA—there, the limitation of TVPA liability to individuals, not governments—precluded an FSIA action that would exceed those limitations.  *Id.* at *29, *31.  Here, the TVPA shows clear congressional intent to authorize tort actions only for actions taken under foreign law.  This Court should not exceed that legislative limitation by inferring a right of action under the ATS that the TVPA denies.

### C.    Aiding and Abetting and Conspiracy Claims Are Not Actionable Under the ATS

Finally, for each claim pled under the ATS, Plaintiffs have pled companion claims for aiding and abetting and civil conspiracy.  These claims must also be dismissed.

In *Exxon Mobil*, this Court adopted the analysis of *In re South Af. Apartheid Litig.*, 346 F.Supp.2d 538, 549-51 (S.D.N.Y. 2004), to hold "that liability for 'aiding and abetting' violations of international law [is] not itself actionable under the [ATS]." 393 F.Supp.2d at 26.  The court was "heedful of the admonition in *Sosa* that Congress should be deferred to with respect to innovative interpretations of the [ATS]," and also "mindful of the collateral consequences and possible foreign relations repercussions that would result from allowing courts in this country to hear civil suits for the aiding and abetting of violations of international norms." *Id.*

Under the same analysis, Plaintiffs' civil conspiracy claims must fail.  Like aiding and abetting, civil conspiracy is another way of extending a principal's tort liability to other defendants vicariously.  In the international context, its use poses the same threat of infringing on U.S.

foreign policy interests, and on Congress's ability to prescribe the extent to which U.S. law will

provide a cause of action to police international norms. Under the reasoning of *Exxon Mobil* and

*S. Af. Apartheid Litigation*, Plaintiffs' civil conspiracy allegations must also be rejected.[16]

## II.    Plaintiffs' Common-Law Claims Are Preempted

### A.    The Combatant Activities Exception Bars Plaintiffs' Claims

#### 1.    Plaintiffs' TAC Supplies the Necessary Factual Allegations to Demonstrate Preemption of Plaintiffs' Claims

In *Ibrahim*, 391 F.Supp.2d at 18-19, the Court held that the combatant activities excep-

tion to the FTCA can, on appropriate facts, preempt common-law claims by persons detained by

U.S. forces in Iraq. Under the Court's formulation, preemption is appropriate if "defendants'

employees were essentially acting as soldiers." *Id.* at 19. Plaintiffs mischaracterize CACI's mo-

tion to dismiss as "tak[ing] another run at automatic immunity." Opp. at 23. Rather than merely

repeating its arguments from *Ibrahim*, however, CACI has shown how the additional factual al-

legations in this action, beyond those in *Ibrahim*, compel a finding of preemption. Mot. at 13-20.

Plaintiffs' opposition ignores these arguments for reasons that are abundantly clear, as the TAC

supplies more than enough factual allegations to preempt Plaintiffs' claims as a matter of law.

While the present action and *Ibrahim* involve similar causes of action and similar alleged

injuries, the two actions are fundamentally different as it relates to the alleged involvement of

government officials in causing the alleged injuries. In *Ibrahim*, the plaintiffs disclaim any con-

spiracy between the defendants and United States civilian and military personnel, seeking to hold

CACI PT and Titan liable only for whatever conduct the was committed by those defendants'

employees. By contrast, Plaintiffs here allege a grand "Torture Conspiracy" between Defendants

---

[16] Where a statute, such as the ATS, incorporates federal common law analysis, *see Sosa*, 542 U.S. at 732, and that analysis prohibits a claim under the statute, the same analysis should preclude the court from entertaining the claim as a matter of "freestanding" common law apart from the statute.

and the highest levels of the U.S. government and U.S. Army. TAC ¶¶ 28-29, 97-107. Indeed, Plaintiffs' RICO Case Statement ("RCS"), cited in their opposition as correctly identifying the members of the so-called "torture conspiracy" (Opp. at 36, 37 & n.23), asserts that Defendants' co-conspirators included Secretary of Defense Rumsfeld, Undersecretaries of Defense Cambone and Feith, sixteen U.S. Army officers (including five general-grade officers) and fourteen enlisted soldiers. RCS at 4-5 (Exhibit A to Titan's motion to dismiss).[17]

The TAC also differs from the *Ibrahim* complaint in that Plaintiffs allege co-conspirator liability, thereby seeking to hold Defendants liable for the acts of the Secretary of Defense, two Undersecretaries of Defense, and at least thirty uniformed soldiers. TAC ¶ 28. Thus, Plaintiffs' allegation of a conspiracy reaching the highest levels of the Defense Department and U.S. Army completely enmeshes their claims with the United States' prosecution of the war in Iraq.

To support their grand conspiracy theory, Plaintiffs allege that the CACI and Titan employees were fully integrated within the military hierarchy and answered to military authority. *See* TAC ¶¶ 74, 91; Mot. at 17-19. Indeed, Plaintiffs allege that CACI's interrogation services were such "inherently governmental function[s]" that the United States was somehow prohibited from contracting for such services. *Id.* ¶ 71. Thus, the TAC includes factual allegations to answer the questions left open in *Ibrahim* – specifically alleging that CACI and Titan personnel were fully integrated within the military hierarchy, answering to and directing the activities of soldiers in the handling of combat-zone detainees, and allegedly participating in a conspiracy headed by the sitting Secretary of Defense. Mot. at 13-20; RCS at 5.

Thus, Plaintiffs' allegations *in this case* show that Plaintiffs seek relief for conduct qualifying as "combatant activities." *See* 28 U.S.C. § 2680(j); *Koohi v. United States*, 976 F.2d 1328,

---

[17] Plaintiffs' RCS also lists seven Army officers and eighty-three enlisted soldiers (often solely by rank and last name) as possible additional members of the supposed "Torture Conspiracy." RCS at 5.

1336-37 (9th Cir. 1992). They also show that the CACI PT personnel were fully integrated within the military hierarchy at U.S. detention facilities in Iraq, and thus were acting essentially as soldiers. *Ibrahim*, 391 F.Supp.2d at 19. Plaintiffs neither acknowledge these differences in their factual allegations nor attempt to apply the combatant activities exception to the actual allegations in the TAC. Rather, Plaintiffs urge the Court to ignore the facts alleged and instead adopt a litany of *per se* rules that would preclude preemption regardless of the nexus between the conduct alleged and the United States' prosecution of the Iraq war. The *per se* "rules" urged by Plaintiffs are incorrect as a matter of law, and, for the most part, have been explicitly or implicitly rejected by the Court in *Ibrahim*.

2.    <strong>Plaintiffs' Common-Law Claims Are Susceptible to Preemption</strong>

Plaintiffs urge the Court to adopt a *per se* rule that "human rights claims," a term they do not define, can never be preempted by federal law. Opp. at 24. In support of this "rule," Plaintiffs state that "the only court known . . . to have considered whether human rights claims may be defeated by the government contractor defense held that such claims necessarily survive the defense." Opp. at 24. This assertion is doubly wrong, as this Court ruled in *Ibrahim* that claims of the type asserted here by Plaintiffs *may* be preempted by federal law, and the case relied on by Plaintiffs actually *dismissed* all domestic common-law claims on preemption grounds.

In *Ibrahim*, the Court recognized that the purposes behind the combatant activities support preemption, on appropriate facts, of intentional torts:

> State law regulation of combat activity would present a "significant conflict" with this federal interest in unfettered military action. *This is true even with regard to intentional torts*, because exceptions to FTCA represent "Governmental activities which by their very nature should be free from the hindrance of a possible damage suit." *Johnson v. United States*, [170 F.2d 767, 769 (9th Cir. 1948)]; *see also Koohi*, 976 F.2d at 1335 (FTCA combatant activities exception applies even to acts that are "deliberate rather than the result of error.").

*Ibrahim*, 391 F.Supp.2d at 19 (emphasis added); *see also Caudill v. Blue Cross & Blue Shield*,

15

999 F.2d 74, 79 (4th Cir. 1993) (*Boyle* preemption can apply to intentional torts). The common-law tort claims asserted here are virtually identical to those in *Ibrahim*.[18] This Court's ruling that the plaintiffs' common-law claims may be preempted depending on the extent to which the contractor personnel were integrated with the military necessarily rejects Plaintiffs' proposed *per se* rule that tort claims of this type can never be preempted.[19]

Moreover, the single case invoked by Plaintiffs actually stands for the opposite proposition. In *In re "Agent Orange" Product Liab. Litig.*, 373 F.Supp.2d 7, 44-45 (E.D.N.Y. 2005), the court *dismissed*, pursuant to the government contractor defense, all common-law claims arising under federal law, state law, or Vietnamese law. The claims dismissed included intentional torts such as assault and battery, intentional infliction of emotional distress, and wrongful death. *Id.* While the court stated that it would not apply the government contractor defense to claims alleging violations of international law, that intimation is inapplicable here for several reasons.

First, Judge Weinstein's statement is pure *dicta*, as the court dismissed all the international law claims. *Id.* at 130. Second, even if Judge Weinstein's conclusion as to the relationship between preemption and international law were correct, the *most* such a pronouncement would do, as Judge Weinstein recognized, is shift the analysis from preemption to the scope of jurisdiction conferred by the ATS. *Id.* at 130-31. This Court held in *Ibrahim* that the D.C. Circuit's decision in *Sanchez-Espinoza*, 770 F.2d at 207, bars claims such as these under the ATS. *See* Section I.A, *supra*. Third, Judge Weinstein's *dicta* is directly contrary to *Koohi*, 976 F.2d at 1335, where the court dismissed international law claims as incompatible with the combatant ac-

_____

[18] *Compare Ibrahim*, 391 F.Supp.2d at 13 (noting common-law claims for "assault and battery, wrongful death, false imprisonment, intentional infliction of emotional distress, conversion, and negligence") *with* TAC, counts XVI-XXIX (assault and battery, sexual assault and battery, wrongful death, intentional and negligent infliction of emotional distress, negligent hiring and supervision, and conspiracy and aiding and abetting claims).

[19] The Court's ruling in *Ibrahim* that combatant activities preemption may preclude claims arising out of CACI PT's provision of interrogators in Iraq also necessarily rejects Plaintiffs' claim that combatant activities preemption is limited to procurement contracts and product liability claims. Opp. at 31.

tivities exception.   Given *Sosa*'s holding that claims cognizable under the ATS are "federal common law cause[s] of action"[20] derived from an international law norm, it defies logic that the combatant activities exception cannot preclude a claim that is grounded in federal common law.

### 3.    The Court Has Rejected, and Should Reject Again, Plaintiffs' Absurdly Narrow Conception of "Combatant Activities"

Plaintiffs also make the novel argument that the combatant activities exception does not reach the military detention and interrogation of persons in a combat-zone detention facility. According to Plaintiffs, "[i]mprisoning plaintiffs and class members kept them *out* of combat" and therefore is not a combatant activity.  Opp. at 32.  In *Ibrahim*, 391 F.Supp.2d at 19, the Court necessarily rejected Plaintiffs' argument in holding that those plaintiffs' claims potentially were preempted by the combatant activities exception.  Indeed, the Supreme Court observed in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), that the capture and detention of combatants "by 'universal agreement and practice,' are 'important incident[s] of war.'"  *Id.* at 518 (citation omitted).[21]  The combatant activities exception is not limited to Plaintiffs' cramped notion of "combat," but encompasses "activities both necessary to and in direct connection with actual hostilities."  *Johnson*, 170 F.2d at 770.  In *Johnson*, for example, the court held that "[t]he act of supplying ammunition to fighting vessels in a combat area during war is undoubtedly a 'combatant activity.'"  *Id.*; *see also Vogelaar v. United States*, 665 F. Supp. 1295, 1302 (E.D. Mich. 1987) ("accounting for and identifying [the remains of] soldiers under the exigencies of a combat zone" were combatant activities).  It defies logic and common sense to suggest that forcibly detaining personnel from the battlefield, while interrogating them to obtain battlefield intelligence, is anything other than a quintessential combatant activity.

---

[20] *Sosa*, 542 U.S. 692, 732 (2004); *Ibrahim*, 391 F.Supp.2d at 13.

[21] The TAC makes this very point, specifically alleging that "interrogation services" at issue were designed to obtain intelligence useful to U.S. forces fighting in Iraq.  TAC ¶¶ 51, 56, 74, 81.

Plaintiffs' reliance on *Skeels v. United States*, 72 F. Supp. 372 (W.D. La. 1947), is misplaced. *Skeels* merely held that injuries incurred in a flight training exercise *over the Gulf of Mexico* in July 1945 did not become an FTCA "combatant activity" simply because the United States remained at war with Japan at the time of the exercise. *Id.* at 374. Equally unavailing is Defendants' reliance on *In re Agent Orange Prod. Liab. Litig.*, 580 F. Supp. 1242 (E.D.N.Y. 1984). That decision was admittedly a preliminary one, subject to reexamination as the case proceeded. *Id.* at 1255. In its abbreviated discussion of the scope of the term "combatant activities," the court relied principally on a law review article, and did not address the Ninth Circuit's leading discussion of the issue in *Johnson*, 170 F.2d at 770. Moreover, any construction of the term "combatant activities" that limits its application solely to the act of inflicting force upon an enemy soldier on the open battlefield, and none of the activities directly connected with the infliction of such force, is inconsistent with *Johnson*, *Vogelaar*, *Ibrahim*, and the Supreme Court's observation in *Hamdi* concerning the indispensability of detention operations to waging war.

Plaintiffs variously contend that combatant activities preemption is *per se* unavailable for intentional torts, "human rights claims," detention operations, and non-procurement contracts. But these unsupportable legal theories cannot stave off a meaningful examination of the TAC to determine whether its factual allegations, taken as true, require preemption of its claims under the combatant activities exception. Plaintiffs' theory of the case – that they were injured by a conspiracy between Defendants, the Secretary of Defense, and the military chain of command responsible for fighting the war in Iraq – compels preemption of their common-law claims.

**B.      The Foreign Country Exception Bars Plaintiffs' Claims**

In arguing that Congress enacted the foreign country exception only to spare the United States from the application of foreign tort law, Opp. at 33, Plaintiffs ignore the Supreme Court's holding in *Sosa* that the United States is immune from any claim based on injuries in a foreign

country, without regard to whether foreign law might actually apply:

> The point would be well taken, of course, if Congress had written the exception to apply when foreign law would be applied. But that is not what Congress said.
>
> . . . .
>
> We therefore hold that the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortuous act or omission occurred.

*Sosa*, 542 U.S. at 707.

Plaintiffs next argue that the rationale behind the foreign country exception does not apply to suits against civilian contractors. Opp. at 33-34.[22] But this argument fails to come to grips with the fact that the services provided by CACI were rendered pursuant to a contract with the United States. The imposition of liability on a government contractor who enters into a contract to support the U.S. military in a foreign war directly implicates the significant federal interest in the performance of the government's work. Accordingly, the foreign country exception preempts Plaintiffs' tort claims against CACI.

## III. Plaintiffs' Claims Present Nonjusticiable Political Questions

Plaintiffs do not challenge that the conduct of military operations is "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) "[T]he fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matters are plainly the exclusive province of Congress and the Executive." *Bancoult v. McNamara*, __ F.3d __,

---

[22] Plaintiffs cite *McMahon v. Presidential Airwaves, Inc.*, 410 F. Supp. 2d 1189 (M.D. Fla. 2006), as support for this proposition. But in *McMahon*, the issue was whether the defendants had presented colorable federal defenses in connection with the removal of an action to federal court. Failing even to cite *Sosa*, the court held that the defendants, who had asserted but not argued the foreign country exception, had failed to demonstrate that they presented a colorable defense.

2006 WL 1042356, at *4 (D.C. Cir. 2006).

The differences between the claims here and in *Ibrahim* dictate a different result on the political question doctrine. Plaintiffs argue here that because they allege that CACI's conduct contravened U.S. policy, the political question doctrine is inapplicable. Opp. at 34. This argument is circular. The political question doctrine exists in large part out of recognition that the political branches are entrusted to determine what is and is not U.S. policy in certain matters entrusted to them. If allegations that the conduct of military operations violated U.S. policy were sufficient to neuter the political question doctrine, courts repeatedly would be required to adjudicate disputes over foreign policy decisions. However, courts lack jurisdiction over matters by their nature committed to the political branches, such as foreign relations, the conduct of war, and wartime reparations. *See, e.g., id.* at *4-6.

Plaintiffs' core argument – that they are not challenging the conduct of war in Iraq but merely whether CACI's role in that conduct violated U.S. policy – was rejected in *Bancoult*. In that action, the plaintiffs conceded the nonjusticiability of the decision to establish a military base in Diego Garcia. Instead, they sought to challenge "egregious and illegal conduct during the depopulation process." *Id.* at *23. The plaintiffs argued that the manner in which the policy decision was implemented was distinct from the policy itself and thus reviewable. The D.C. Circuit disagreed in language that bears quoting at length:

> We are unconvinced that the claims presented here merely "touch[]" on foreign policymaking. The specific tactical measures allegedly taken to depopulate the Chagos Archipelago and construct the Diego Garcia base are as inextricably intertwined with the underlying strategy of establishing a regional military presence as the alleged "neutralization" of General Schneider was with the policy of undermining Allende's government. *See Schneider* [*v. Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005)]. We are unconvinced by Appellants' efforts to distinguish this case from *Schneider*, the same logic that compelled our application of the political question doctrine in that case applies just as forcefully here.

20

> In each case, the policy and its implementation constitute a sort of Mobius strip that we cannot sever without impermissibly impugning past policy and promising future remedies that will remain beyond our ken. Thus, just as we cannot review the decision to establish a base in the Indian Ocean (as Appellants concede), the same reasoning we applied in *Schneider* dictates that we cannot review the manner in which that decision was carried out. The political branches must "determine whether drastic measures should be taken in matters of foreign policy and national security," *id.*, and the President "must determine what degree of force [a] crisis demands," *The Prize Cases*, 67 U.S. (2 Black) 635, 670, 17 L. Ed. 459 (1863). We cannot second-guess the degree to which the executive was willing to burden itself by protecting the Chagossians' well-being while pursuing the foreign policy goals of the United States; we may not dictate to the executive what its priorities should have been. In this respect, the specific steps taken to establish the base did not merely touch on foreign policy, but rather constituted foreign policy decisions themselves. If we were to hold that the executive owed a duty of care toward the Chagossians, or that the executive's actions in depopulating the islands and constructing the base had to comport with some minimum level of protections, we would be meddling in foreign affairs beyond our institutional competence. The courts may not bind the executive's hands on matters such as these, whether directly-by restricting what may be done – or indirectly – by restricting how the executive may do it. Finally, while the presence of constitutionally-protected liberties could require us to address limits on the foreign policy and national security powers assigned to the political branches, no such constitutional claims are at issue in this case.

*Id.* at *7.

The TAC necessarily requires the Court to pass judgment on the legality of the means used by the United States (acting through alleged "Torture Conspirators" such as Secretary Rumsfeld and the Army chain of command) to detain and interrogate detainees in support of U.S. military operations in Iraq. RCS ¶ 5(f). Moreover, Plaintiffs seek to defeat preemption by arguing that CACI PT's government contract was invalid on the grounds that the conduct of interrogations is an "inherently governmental function," an argument that asks this Court to decide the legality of the means chosen by the Executive to prosecute a war. *See* TAC ¶ 71. Thus, Plaintiffs' allegations inevitably would require this Court to judge interrogation policies and practices in connection with the conduct of military operations in Iraq.[23] The conduct of war,

---

[23] Plaintiffs' claim that Defendants were acting under color of U.S. law, which they trumpet in opposing dismissal of their ATS claims, most vividly shows the direct nexus between Plaintiffs' allegations and the political branches' policy determinations with respect to the prose-

including the interrogation of detainees, is committed by the constitution to the executive and legislative branches of government. The propriety of what is done in the exercise of power over foreign relations and national security is not subject to judicial inquiry or decision.

**IV.    Plaintiffs' RICO Claims Must Be Dismissed**

Plaintiffs' opposition shows the TAC is devoid of any alleged facts that would support a RICO claim. The "injuries" claimed by three named Plaintiffs are entirely unrelated to the alleged misconduct, such that Plaintiffs lack RICO standing. Worse yet, the TAC fails to allege the most basic elements of any RICO claim under 18 U.S.C. § 1962(c)-(d). Though Plaintiffs disclaim a heightened pleading standard, Opp. at 36, they must "allege some factual basis" in support of a valid RICO claim. *Hecht v. Commerce Clearinghouse*, 897 F.2d 21, 26 n.4 (2d. Cir. 1990). Plaintiffs rest their RICO claims on far-flung conspiracy allegations that lack factual support. This Court should reject Plaintiffs' attempt to manufacture RICO claims out of injuries suffered during the Iraq war. *Ibrahim*, 391 F.Supp.2d at 19. Congress never contemplated that RICO would lay the foundation for claims of individuals injured overseas in a persistent armed conflict. *Doe v. State of Israel*, 400 F. Supp. 2d 86, 116 (D.D.C. 2005).

**A.    Plaintiffs' RICO Claims Must Be Dismissed For Lack of Standing**

Plaintiffs' opposition concedes that only three paragraphs in the TAC contain allegations of injury to business or property. Opp. at 36. These paragraphs allege that three Plaintiffs were robbed of property when they were arrested by unnamed U.S. soldiers.[24] *Id.*; *see also* RCS at 5-6. However, Plaintiffs have alleged that the racketeering "activities of the enterprise" consisted of obtaining intelligence through unlawful interrogations. *See id.* at 15. The alleged predicate

---

cution of the war in Iraq.

[24] Plaintiffs do not and cannot allege that any CACI employee (or any Defendant) was involved in the arrest of individuals by the U.S. military in Iraq. The TAC only alleges that CACI employees engaged in misconduct within Abu Ghraib and other prisons in Iraq. *See* TAC ¶¶ 68-96.

acts included murder, attempted murder, sexual abuse, and other physical abuse. *Id.* at 8-10.[25] And the financial benefit to the enterprise was alleged increased government demand for intelligence services. *See* TAC ¶¶ 2, 5, 10; RCS at 15. On the face of these allegations, the "injuries to property" are entirely disconnected from the conduct or profit of the supposed enterprise.

Plaintiffs argue it is "immaterial" who committed these robberies, or when they were committed. Opp. at 37. But a RICO plaintiff has standing only if the alleged injury to his business or property was caused by a pattern of racketeering. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 276 (1992); *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 486-97 (1985); *see also Meng v. Schwartz*, 116 F. Supp. 2d 92, 96-97 (D.D.C. 2000) (dismissing RICO claims where injuries did not result from alleged activities of enterprise). Here, none of the alleged acts of racketeering attributed to members of the enterprise caused injury to business or property.

Additionally, under 28 U.S.C. § 1962(c), the injury to business or property must flow from the conduct of an enterprise "directed" by Defendants. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Plaintiffs confuse the issue by arguing that *Reves* allows a finding that "lower rung participants" could have a role in "directing" a § 1962(c) enterprise. But Plaintiffs allege no facts to suggest CACI directed an enterprise that resulted in the robberies alleged in the TAC. Indeed, the only predicate act specifically attributed to CACI (with no support) is "making threats of murder." TAC ¶ 324. The claims should be dismissed for lack of RICO standing.[26]

**B.    Plaintiffs Have Failed to Plead An "Enterprise"**

Plaintiffs merely allege that Defendants and other unnamed conspirators had "meetings,

---

[25] Predictably, Plaintiffs cannot identify a single CACI employee involved in the predicate acts listed in the RCS. Every single alleged act is attributable to unidentified individuals. RCS at 8-10.

[26] Similarly, Plaintiffs' RICO claims must be dismissed because the TAC alleges that any injury to the Plaintiffs' business or property occurred incident to their arrest by United States military personnel and not as a result of CACI's supposed mistreatment of the Plaintiffs while detained in Iraq.

telephonic discussions, in-person discussions, email discussions, and other communications" at undisclosed times in any number of locations. *See* TAC ¶ 98. This allegation does not describe an enterprise with "an ascertainable structure for decision-making and controlling and directing its affairs," which is required under RICO. *United States v. Turkette*, 452 U.S. 576, 583 (1981). As this Court concluded in *Doe*, 400 F.Supp.2d at 119, "[i]t is not enough for a group of individuals to commit acts enumerated by §1961(1); plaintiff must assert that those individuals were organized together in some way, and that there was a structure to the association." Plaintiffs do not allege facts sufficient to demonstrate a RICO enterprise.

### C.     Plaintiffs Have Failed to Plead a § 1962(d) "Conspiracy"

In *Wright v. Towns*, No. 90-0565, 1991 WL 100388 (D.D.C. May 30, 1991), this Court dismissed a RICO conspiracy claim where the complaint merely asserted that "defendants, 'evinced by [their] words or actions and objectively manifested an agreement to participate, directly or indirectly in the affairs of the Enterprise.'" *Id.* at *4; *see also Hecht*, 897 F.2d at 26 n.4. *Wright* and *Hecht* clearly establish that a RICO conspiracy plaintiff must plead facts to support the existence of an agreement among the defendants. The TAC merely states that "[e]ach and every defendant conspired to violate 1962(c)," and then lists a number of low-level U.S. military personnel who supposedly participated in the same agreement. TAC ¶¶ 328-29. The TAC is no different from the complaint alleged in *Wright*, and the conspiracy claim must be dismissed.

### V.     The Court Should Dismiss CACI International Inc and CACI, INC.-FEDERAL

Plaintiffs' opposition makes clear they are aware of no facts to support liability for CACI International Inc or CACI, INC.-FEDERAL. Plaintiffs do not dispute that they responded to the Court's March 17, 2006 Order by merely engaging in a word processing "find and replace" exercise. Presumably, the Court's order contemplated a good-faith recitation of facts relating to CACI International Inc and CACI, INC.-FEDERAL, and not the rote listing of individual CACI

entities where Plaintiffs previously listed them collectively as "the CACI Corporate Defendants."

Plaintiffs' opposition tacitly admits that CACI International and CACI, Inc-FEDERAL's alleged liability is entirely dependent on the actions of CACI PT. Plaintiffs claim that CACI International Inc is a proper defendant by virtue of its "complete ownership" of CACI PT and/or knowledge of the alleged misconduct attributable to CACI PT. Opp. at 42. Plaintiffs argue that CACI, INC.-FEDERAL is a proper defendant because it owned or controlled CACI PT, and/or failed to take steps to stop the actions of CACI PT employees. *Id.* But the very nature of a parent-subsidiary relationship is that the parent corporation owns and controls the subsidiary, and this does not, without more, create liability for the corporate parent. Accordingly, all claims against CACI International Inc and CACI, INC.-FEDERAL should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all of Plaintiffs' claims.

Respectfully submitted,

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000

*Attorneys for Defendants CACI International
Inc., CACI, Inc. – Federal, and CACI PT Inc*

May 26, 2006

25