# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AL RAWI, *et al.*,

                    **Plaintiffs,**

        **v.**

**THE TITAN CORPORATION,**
*et al.*,

                    **Defendants.**

**Civil Action No. 05-01165 (JR)**

## DEFENDANT L-3 COMMUNICATIONS TITAN CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Attorneys for Defendant L-3 Communications
Titan Corporation*

Dated: May 26, 2006

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

TABLE OF ABBREVIATIONS ............................................................................ v

INDEX TO EXHIBITS......................................................................................... vi

ARGUMENT ......................................................................................................... 1

I.     The ATS Claims (Counts 1-15) Must Be Dismissed......................................... 1

       A.     *Sanchez-Espinoza* Requires Dismissal of All of the ATS Claims
              (Counts 1-15) .......................................................................................... 1

              1.     *Sanchez-Espinoza* Remains Controlling Authority in this
                     Circuit ........................................................................................... 2

                     a.     *Sanchez-Espinoza* Cannot Be Disregarded Based on
                            *Sosa*'s Alleged Implications ............................................ 2

                     b.     *Sosa* Is Not Inconsistent with *Sanchez-Espinoza*............ 3

                     c.     There Is No "Color of U.S. Law" that Creates an ATS
                            Claim That Escapes the Effects of U.S. Sovereign
                            Immunity............................................................................ 4

                     d.     *Sosa* Differs in Key Respects from *Sanchez-Espinoza*... 6

              2.     Alleging Illegality and That the Actions Were Contrary to U.S.
                     Policy or *Ultra Vires* Does Not Take This Case Outside of
                     *Sanchez-Espinoza* ........................................................................ 7

              3.     *Sanchez-Espinoza* Is Rooted in Separation of Powers Rather
                     Than Common Law Immunities ..................................................... 8

       B.     The ATS Claims Are Barred for Independent Reasons.......................... 9

II.    Titan Is Not Liable for Soldiers' Actions ....................................................... 13

III.   Plaintiffs' RICO Claims Must Be Dismissed .................................................. 13

       A.     Plaintiffs Lack Standing....................................................................... 13

       B.     RICO Does Not Reach the Alleged Extraterritorial Conduct............... 14

              1.     There Are No Substantial Domestic Effects from Plaintiffs'
                     Alleged Mistreatment in Iraq ..................................................... 15

              2.     The Alleged Domestic Conduct Is Insufficient .......................... 16

       C.     Plaintiffs Have Not Properly Pled Predicate Acts ............................... 18

       D.     Plaintiffs' Enterprise Allegations Do Not State a Claim ..................... 19

IV.    The Government Contractor Defense Bars Plaintiffs' State Law Claims ........ 21

V.     The TAC Fails To Meet Pleading Requirements.............................................. 23

CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396 (7th Cir. 1989) .......................2

*Abdullahi v. Pfizer Inc.*, No. 01 Civ 8118, 2005 U.S. Dist. LEXIS 16126 (S.D.N.Y. Aug. 9, 2005) ..........................................................................................................................................11

*Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000) .......................................................................2

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987) ..........................15

*In re Agent Orange Prod. Liability Litigation*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005).....................22

*Agostini v. Felton*, 521 U.S. 203 (1997) ..........................................................................................2

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005)..................10, 17

*Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285 (S.D. Fla. 2003)................17, 18

*Alvarez-Machain v. United States*, 331 F.3d 604 (9th Cir. 2003) ....................................................6

*Alvarez-Machain v. United States,* No. CV 93-4072, 1994 U.S. Dist. LEXIS 21702 (C.D. Cal. Aug. 30, 1994)...............................................................................................................7

*Alvarez-Machain v. United States,* No. CV 93-4072, 1999 U.S. Dist. LEXIS 23304 (C.D. Cal. Mar. 18, 1999)...............................................................................................................6

*Arar v. Ashcroft*, 414 F. Supp. 2d 250 (E.D.N.Y. 2006) ..................................................................5

*Averbach v. Rival Manufacturing Co.*, 809 F.2d 1016 (3d Cir. 1987) ...........................................20

*Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229 (N.D. Cal. 2004)............................16, 17

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ....................................................................14

* *Burnett v. Al Baraka Investment & Development Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003) ...............................................................................................................................................24

* *Chappell v. Wallace*, 462 U.S. 296 (1983) ................................................................................11

*Davis v.  Hudgins*, 896 F. Supp. 561 (E.D. Va. 1995)....................................................................20

*Dennis v. Sparks*, 449 U.S. 24 (1980).............................................................................................8

* *Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) ......................................................15, 20

* *Empagran S.A. v. F. Hoffmann-LaRoche Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005).......................15

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005).......................................................................5

*Euro Trade & Forfaiting, Inc. v. Vowell*, No. 00 CIV. 8431 (LAP), 2002 WL 500672 (S.D.N.Y. Mar. 29, 2002) .............................................................................................................18

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998)......................................................................................................................18

\* *F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) .........................................15

*Federal Information Systems, Corp. v. Boyd*, 753 F. Supp. 971 (D.D.C. 1990) ...........................14

*First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004)...............20

*Gantt v. Sec. USA, Inc.*, 356 F.3d 547 (4th Cir. 2004)...................................................................12

*Genty v. Resolution Trust Corp.*, 937 F.2d 899 (3d Cir. 1991) .....................................................20

*Grunenthal GmbH v. Hotz*, 712 F.2d 421 (9th Cir. 1983) ..............................................................17

\* *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005)..................................................21, 23

*Jama v. INS*, 334 F. Supp. 2d 662 (D.N.J. 2004)...........................................................................23

\* *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)..........................................................................10

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).........................................................................5

*McDonald v. Schencker*, 18 F.3d 491 (7th Cir. 1994) ...................................................................14

*NCAA v. Tarkanian*, 488 U.S. 179 (1988) ......................................................................................5

*North South Finance Corp. v. Al-Turki*, 100 F.3d 1046 (2d Cir. 1996) .......................................15

*Pennhurst State Sch. & Hospital v. Halderman*, 465 U.S. 89 (1984).............................................3

*Peters v. Welsh Development Agency*, No. 86 C 2646, 1991 WL 172950 (N.D. Ill. Aug. 29, 1991) .....................................................................................................................................19

*Rasul v. Bush*, 542 U.S. 466 (2004).................................................................................................7

*Robinson v. TCI/US W. Comm'ns Inc.*, 117 F.3d 900 (5th Cir. 1997)............................................17

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989)............................2

*Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857 (7th Cir. 1999) ...........................................24

\* *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985)............................................ passim

*Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998) .............................................................................9

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) .....................................................................18

*Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345 (S.D. Fla. 2003) .......................................15

\* *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)................................................................ passim

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) ................................................5

*Toms v. Pizzo*, 172 F.3d 38 (2d Cir. 1998) ...................................................................14

*Toussie v. Powell*, 323 F.3d 178 (2d Cir. 2003) ..............................................................9

*United States v. Bagaric*, 706 F.2d 42 (2d Cir. 1983) ...................................................18

*United States v. Carrillo*, 229 F.3d 177 (2d Cir. 2000) ..................................................19

*United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991)..................................................18

*United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004) ............................15

*United States v. Miller*, 116 F.3d 641 (2d Cir. 1997) .....................................................18

*United States v. Morrow,* No. CRIM.A. 04-355 (CKK), 2005 WL 1389256 (D.D.C. June 13, 2005) ........................................................................................................................20

*United States v. Paone*, 782 F.2d 386 (2d Cir. 1986) .....................................................18

*United States v. Perholtz*, 842 F.2d 343 (D.C. Cir. 1988) ..............................................20

*United States v. Torres*, 115 F.3d 1033 (D.C. Cir. 1997) ................................................2

*United States v. Watchmaker*, 761 F.2d 1459 (11th Cir. 1985).....................................18

*Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 (S.D.N.Y. 2002) ..............16, 19

*Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27 (D.C. Cir. 1987) .................................16

## FEDERAL LEGISLATION AND REGULATIONS

32 C.F.R. § 536.3..............................................................................................................11

15 U.S.C. § 6a...................................................................................................................15

18 U.S.C. § 1961...............................................................................................................18

H.R. Rep. No. 97-686 (1982)............................................................................................15

## STATE CASES

*Mitchell v. United States*, 569 A.2d 177 (D.C. 1990)......................................................19

*People v. McLaughlin*, 80 N.Y.2d 466 (1992).................................................................19

## STATE STATUTE

D.C. Code § 22-2801 ……………………………………………………………………14

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ATS | Alien Tort Statute |
| CACI | Collectively, defendants CACI International Inc., CACI Incorporated – Federal, and CACI Premier Technology, Inc. |
| FCA | Foreign Claims Act |
| FTCA | Federal Tort Claims Act |
| Mem. | Titan's Memorandum in Support of Motion to Dismiss the Third Amended Complaint |
| Opp. | Plaintiffs' Opposition to Titan's Motion to Dismiss the Third Amended Complaint |
| RCS | Plaintiffs' RICO Case Statement |
| TAC | Plaintiffs' Third Amended Complaint |
| Titan | L-3 Communications Titan Corporation and The Titan Corporation |
| TVPA | Torture Victim Protection Act |

## INDEX TO EXHIBITS

A.     Excerpt: Reply Brief for Appellants in *Sanchez-Espinoza v. Reagan* (D.C. Cir.)

## ARGUMENT

After litigating for nearly a year to transfer their case to this Court based on common issues with *Ibrahim*, plaintiffs pretend as if this Court's adjudication of the motions to dismiss in that case did not occur. They do not attempt to demonstrate why the result in this case should be different with regard to their RICO or ATS claims beyond suggesting they have better "legal" arguments that on examination do not stand up. With regard to the state law claims, they do not attempt to articulate why their allegations of involvement of the entire chain of command does not plead themselves out of court. This is their consistent approach to any contrary authority: over and again, plaintiffs respond to contrary points and authorities by ignoring them.[1] Indeed, plaintiffs seem to argue that because they allege reprehensible conduct, and because they have cloaked their allegations in the fog of conspiracy, they get a free pass on their complaint to proceed with discovery. Needless to say, that is not the law, and the TAC—assessed against the law as it exists, and not what plaintiffs wish it be—must be dismissed.

## I.    The ATS Claims (Counts 1-15) Must Be Dismissed

### A.    *Sanchez-Espinoza* Requires Dismissal of All of the ATS Claims (Counts 1-15)

*Sanchez-Espinoza* plainly held, relying on *Tel-Oren*, that action by the United States necessary to satisfy ATS jurisdiction also implicates U.S. sovereign immunity to bar claims against private parties of the sort alleged here (e.g., execution, murder, torture, and rape during the course of an armed conflict in Nicaragua). *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 205 (D.C. Cir. 1985). As set forth in our opening brief, plaintiffs' allegations are on all fours with *Sanchez-Espinoza*. In opposition, plaintiffs do not really address the facts, holding, or rationale of *Sanchez-Espinoza*:    they neither disavow their factual allegations nor dispute our interpretation of *Sanchez-Espinoza*. Instead, they argue that *Sanchez-Espinoza* was impliedly

---

[1] One prime example is their improper reliance on allegations of class members to support the sufficiency of claims by the named plaintiffs. (Mem. 8.) They do not contest the law on this point, but continue to rely upon such allegations in an attempt to salvage the TAC. Other concessions through silence are identified in the relevant sections below.

overruled by *Sosa* and did not address plaintiffs' "color of law" argument that has allegedly been developed by later cases from other jurisdictions. Plaintiffs' arguments are without merit: *Sanchez-Espinoza* is uncontradicted by *Sosa* and remains the law of this Circuit, while the distinction they draw around the phrase "color of law" simply does not exist.

### 1. *Sanchez-Espinoza* Remains Controlling Authority in this Circuit

Plaintiffs, using a "creative" reading of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), urge this Court to infer that *Sosa* reversed by implication *Sanchez-Espinoza*, i.e. *sub silentio*. They do so using arguments not made, questions not presented, and their characterization of *Sosa*'s use of citations as "approval" of plaintiffs' interpretation of other Circuits' cases. Plaintiffs' argument reduces to the assertion that what the Supreme Court did *not* say in *Sosa* requires this Court to ignore what the D.C. Circuit did say in *Sanchez-Espinoza*. (Opp. 7-8.) Controlling precedent cannot be disregarded based on such wishful "tea leaf" reading. Moreover, plaintiffs' strained interpretation of *Sosa* is simply wrong.

### a. *Sanchez-Espinoza* Cannot Be Disregarded Based on *Sosa*'s Alleged Implications

Plaintiffs' speculation about what the Supreme Court might do if it were to consider the issue decided in *Sanchez-Espinoza* is immaterial. "'If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" *Agostini v. Felton,* 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989)). The same is true for Circuit precedent:

> [J]ust as we "leave to [the Supreme Court] the prerogative of overruling its ... decisions," *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989), district judges, like panels of this court, are obligated to follow controlling circuit precedent until either we, sitting en banc, or the Supreme Court, overrule it.

*United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997); *see also Adams v. Clinton*, 90 F. Supp. 2d 35, 65 (D.D.C. 2000), *aff'd* 531 U.S. 941 (2000); *A.A. Poultry Farms, Inc. v. Rose Acre*

*Farms, Inc.*, 881 F.2d 1396, 1405 (7th Cir. 1989) (Easterbrook, J.) ("Inferior federal courts, in order to provide equal justice under law, must apply the holdings of cases still on the books. When the case stands unquestioned, however, a belief that the Court would not reach the same decision today if the question were open anew is not a basis for disregarding the law on the books.").

**b.     *Sosa* Is Not Inconsistent with *Sanchez-Espinoza***

Putting to one-side plaintiffs' illegitimate methodology, the premise, i.e., that *Sosa* is inconsistent with *Sanchez-Espinoza*, is just wrong.  That *Sosa* did not address the effect of the United States' sovereign immunity in the course of *finding* no jurisdiction under the ATS over respondent's claims for other reasons is simply irrelevant.  Anything the Court would have said on the subject of immunity would have been *dicta* given its determination that there was no violation of international norms by Sosa's detention of Alvarez.  That the Court did not address the question at all says less than nothing about the vitality of *Sanchez-Espinoza*.  An obvious explanation for why none of the *Sosa* opinions cited *Sanchez-Espinoza* is because it did not bear on the jurisdictional issue the Court addressed: whether the ATS creates or permits a cause of action and, if so, its scope.  Although plaintiffs imply that the Court considered the immunity issue presented by *Sanchez-Espinoza* because the government cited the case in a footnote to one brief (Opp. 8), the citation is out of context.[2]  More importantly, a review of all the briefs and the transcript of the oral argument reveals that the issue of the United States' sovereign immunity was not raised by the parties nor by the Court.[3]

---

[2] The citation—one of 15 cases discussed (6 in text and 9 in footnotes)—was in support of the proposition that "[i]n numerous cases, the assertion of claims under Section 1350 in the aftermath of *Filartiga* has directly embroiled United States courts in difficult and politically sensitive disputes that, in many instances, are confined to foreign nations." (U.S. Br. Supporting Pet. at 40 (Exhibit A to Opp).)  In fact, the Government did not have occasion to argue that the ATS claims should be dismissed under *Sanchez-Espinoza*.  Contrary to plaintiffs' assertions (Opp. 7), no government officials remained in the case and the only claims addressed by the Court were FTCA claims against the United States and ATS claims against Sosa.

[3] Plaintiffs' observations that the Supreme Court can re-examine subject matter jurisdiction *sua sponte* (Opp. 8), and "typically seeks to rule on the narrowest grounds presented," *id*. at n.5, does nothing to improve their argument.  *Sosa*'s finding that the norm asserted did not rise to the level required meant there was no subject matter jurisdiction over the ATS claims (Mem. 7-8), and the

**c.      There Is No "Color of U.S. Law" that Creates an ATS Claim That Escapes the Effects of U.S. Sovereign Immunity**

Recognizing that their claims cannot survive *Sanchez-Espinoza*'s framework, plaintiffs argue that this Court should not follow it, because "color of law jurisprudence," which *Sosa* allegedly "endorsed," "rejects" its reasoning. (Opp. 13-15.) Plaintiffs contend that "color of law" is a category of action that lies between "official action" and "private action" that meets the "state action" requirements of the ATS, but does not trench upon U.S. sovereign immunity. This argument is invented out of whole cloth: no court has ever held that "color of law" permits ATS claims to be maintained against private parties alleged to have conspired with and acted on behalf of the U.S. military; *Sanchez-Espinoza* is directly to the contrary.

Plaintiffs suggest that *Sanchez-Espinoza* did not consider "color of law" because it developed subsequently. (Opp. 8-9, 12-15.) Plaintiffs are mistaken: *Sanchez-Espinoza* expressly considered the progenitor cases relied on by plaintiffs that used this terminology in the context of foreign sovereigns, recognized the outcomes in those cases were different, and found no conflict between their analyses and its holding. Plaintiffs in *Sanchez-Espinoza* also actually used the phrase "color of authority" in their briefs. *See* Exhibit A (Reply Br. for Appellants 34). Nonetheless, the D.C. Circuit held that sovereign immunity required the dismissal of ATS claims against private contractors engaged in U.S. state action even if similar allegations might be actionable where taken on behalf of a foreign sovereign. The separation of powers concerns implicated by actions against U.S. government officials and private parties acting on their behalf are fundamentally different from the immunity of foreign sovereigns and its effect on claims against others. *Sanchez-Espinoza*, 770 F.2d at 207 n.5. Nor does adherence to *Sanchez-Espinoza* render the ATS "an empty vessel" or "stillborn" (Opp. 14), other than with regard to

---

Court had no reason to articulate more than one reason for its lack of subject matter jurisdiction. And there is no reason to believe that *Sanchez-Espinoza*'s rationale for lack of subject matter jurisdiction is "narrower" than *Sosa*'s. Even if *Sanchez-Espinoza* was distinguishable from *Sosa* as "jurisdictional," plaintiffs mislead by stating that "a *sub silentio* ruling on a question of subject matter jurisdiction is not *necessarily* precedential." (Opp. 7) (emphasis added). Such a ruling is *not* precedential. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119 (1984).

plaintiffs' claims. The holding in *Sanchez-Espinoza* would not affect the outcome of any of the cases plaintiffs cite in support of their "color of law" theory, and the ATS remains vital in all the areas that Congress intended.[4]

The entire premise of plaintiffs' argument is unsound, i.e., that the cases involving foreign state action upon which they rely articulated a distinction between the state action required for ATS claims and "color of law." Those cases analyze whether the actions alleged are fairly attributable to a foreign nation such that they are regulated by norms of international law. But neither *Filartiga*, nor any other ATS case, uses "color of law" as a substitute for the state action requirement, or as a way of distinguishing the rationale of *Sanchez-Espinoza*. Indeed, Judge Edwards's opinion in *Tel-Oren v. Libyan Arab Republic*, 726 F. 2d 774 (D.C. Cir. 1984), consistent with *Filartiga* and other ATS cases decided since, clearly equated "color of law" with "official" or "state-initiated" action and not something different:

> The two fact patterns [underlying in *Filartiga* and *Tel-Oren*] diverge, however, on the issue of official torture. The Palestine Liberation Organization is not a recognized state, and it does not act under color of any recognized state's law. In contrast, the Paraguayan official in Filartiga acted under *color of state law*, although in violation of it. The Second Circuit surveyed the law of nations and concluded that official torture constituted a violation. Plaintiffs in the case before us do not allege facts to show that *official or state-initiated torture* is implicated in this action. Nor do I think they could, so long as the PLO is not a recognized member of the community of nations.

*See id.* at 791 (emphasis added) (Edwards, J., concurring).[5]

---

[4] Plaintiffs cannot deny that their argument is completely inconsistent with the limitation of the TVPA to action taken under color of "foreign law" (Mem. 15-16), but attempt to rationalize the inconsistency by arguing that the TVPA "supplemented the ATS and extended *Filartiga*." (Opp. 14.) This misses the point. We never argued that the TVPA repeals the ATS or legislatively overrules *Filartiga*. The point, to which plaintiffs do not respond, is that in supplementing the ATS and extending *Filartiga* by providing an equivalent remedy to U.S. citizens, Congress excluded actions taken under color of U.S. law. *See Arar v. Ashcroft*, 414 F. Supp. 2d 250, 264-65 (E.D.N.Y. 2006). This is compelling evidence of Congress's understanding of what the ATS is not (and should not be) either, a point of agreement between the majority and dissenting opinions in *Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005). The pre-*Sosa* cases that plaintiffs cite for a different point and their quotation of the *Enahoro* dissent (Opp. 14 n.8), are simply non-responsive.

[5] That the U.S. courts draw upon § 1983 cases, from which the phrase color of law derives, does not diminish (1) the requirement that plaintiffs plead conduct that is actionable under international law, including that state action is implicated, and (2) that U.S. courts must respect

### d.    *Sosa* Differs in Key Respects from *Sanchez-Espinoza*

Plaintiffs' argument concerning the implied reversal by *Sosa* is premised on their assertion that, "[t]he facts of *Sosa* are similar to the instant facts, differing only as to the egregiousness of the underlying conduct." (Opp. 6-7.) Again, the record does not support plaintiffs' brief: in contra-distinction to the allegations here, it was not clear whether Sosa acted under color of U.S. or Mexican law for the claims at issue in the Supreme Court, and Sosa was far removed from the U.S. actors in that case. The abduction in Mexico was undertaken by Sosa along with other current and former Mexican law enforcement officials after the Mexican government had rejected diplomatic requests from the United States to extradite Alvarez-Machain.[6] *Alvarez-Machain v. United States*, 331 F.3d 604, 609 (9th Cir. 2003), *vacated and remanded*, 374 F.3d 1384 (9th Cir. 2004). There was no evidence that the U.S. DEA agents had any control over Sosa and the other Mexican law enforcement officials hired by intermediaries to abduct Alvarez-Machain. *Alvarez-Machain v. United States*, No. CV 93-4072, 1999 U.S. Dist. LEXIS 23304, at *12 (C.D. Cal. Mar. 18, 1999). The U.S. officials did not know when the abduction was to take place and were uninvolved in its planning, preparation, and execution. *Id.* The U.S. officials did not learn Sosa's identity until after the abduction was complete and Sosa entered the United States. *Id.* at *14-15. On this record, the district court noted that it could not

---

that official action of the United States implicates U.S. sovereign immunity. Nonetheless, plaintiffs' reading of "color of law" as a new category or substitute for the state action requirement is inconsistent with § 1983 law as well. "Color of law" does not supplant the state action requirement in the § 1983 context, *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935-37 (1982), although courts need not undertake a separate analysis of the two concepts in that context, *see, e.g.*, *NCAA v. Tarkanian*, 488 U.S. 179, 182 n.4 (1988). In addition, U.S. sovereign immunity concerns are absent from the § 1983 cases relied upon by plaintiffs because (1) they involve actions of state, not federal, actors and action; (2) § 1983 is an express Congressional enactment permitting such suits; and (3) the enforcement of Constitutional provisions is wholly different from that of international norms not subject to the democratic process.

[6] The Supreme Court only considered Sosa's actions in Mexico. *Sosa*, 542 U.S. at 100-01 ("Alvarez's arrest, however, was said to be 'false,' and thus tortious, only because, and only to the extent that, it took place and endured in Mexico."); *id.* at 735-36 (explaining that Sosa's position before the Court rested solely on the argument that no applicable law authorized his arrest in Mexico).

determine whether the abduction in Mexico was under color of Mexican law or U.S. law.[7] *Alvarez-Machain v. United States*, No. CV 93-4072, 1994 U.S. Dist. LEXIS 21702, at *42-43 (C.D. Cal. Aug. 30, 1994).

**2.    Alleging Illegality and That the Actions Were Contrary to U.S. Policy or *Ultra Vires* Does Not Take This Case Outside of *Sanchez-Espinoza***

Plaintiffs argue that the illegality of the actions alleged here distinguish this case from *Sanchez-Espinoza*.[8] Put another way, plaintiffs argue that illegal actions can never be official actions and therefore their allegations do not implicate sovereign immunity. Of course, the allegations of murder, torture, and rape in *Sanchez-Espinoza* were no less illegal and reprehensible allegations than those made here, so this argument was settled there. Plaintiffs badly mischaracterize the opinion's language as the Court having "held that the official conduct of the Reagan Administration's foreign policy in Nicaragua was not 'contrary to statutory or constitutional prescription,'" and assert that this is another basis for distinguishing *Sanchez-Espinoza*. (Opp. 13.) In fact, the Court did no such thing with respect to the allegations of execution, murder, torture, and rape underlying the ATS claims.[9] Nor did the plaintiffs in *Sanchez-Espinoza* concede (or the Court find) that the alleged acts of execution, murder, torture, and rape were authorized by President Reagan and consistent with statutory and constitutional prescription, as plaintiffs suggest.[10] *See* Exhibit A ("Torture…is clearly beyond the scope of any

---

[7] Nor did the Supreme Court presume Sosa acted under color of U.S. law: "And all of this assumes that Alvarez could establish that Sosa was acting on behalf of a government when he made the arrest, for otherwise he would need a rule broader still." *Sosa*, 542 U.S. at 737.

[8] *See* Opp. 13 ("The Court of Appeals also held that the official conduct of the Reagan Administration's foreign policy was not 'contrary to statutory or constitutional prescription.'"); Opp. 5 (arguing that *Sanchez-Espinoza* addressed "only conduct that had been claimed as 'official action' by President Ronald Reagan.").

[9] The case involved a number of other claims including a challenge by certain members of Congress to the lawfulness of the Administration's policy of assisting the Contras. The Court dismissed those claims for lack of standing, a holding unrelated to the merits of the claims or to the Court's disposition of the ATS claims.

[10] Plaintiffs also argue that *Rasul v. Bush*, 542 U.S. 466 (2004), contradicts Titan's supposed assertion that military actions can never be heard. (Opp. 11.) In addition to misconstruing our argument to knock down a straw man (Titan demonstrated that official actions are not stripped of

reasonable view of executive authority.  The acts here are beyond even the outer perimeter of the President's authority.").

### 3.  *Sanchez-Espinoza* Is Rooted in Separation of Powers Rather Than Common Law Immunities

Plaintiffs cite five cases involving the denial of specific common law immunities to private parties that conspired with immune state or local officials who were engaged in corruption, most of which trace their origins to *Dennis v. Sparks*, 449 U.S. 24 (1980).  (Opp. 15.) Those cases, involving the corruption of government officials, have nothing to say about whether plaintiffs have ATS claims against private actors for their actions *on behalf* of government officials prosecuting the war in Iraq.  *See, e.g.*, *Dennis*, 449 U.S. at 30 ("Here, there could be no claim that petitioner or any of the other private parties was actually performing a judicial act or was in any sense an official aide of the judge.").

*Dennis* and its progeny are irrelevant to, and do not undermine *Sanchez-Espinoza*. *Dennis* had been on the books for five years when *Sanchez-Espinoza* was decided in 1985. *Sanchez-Espinoza* turned on the effect of *sovereign immunity* of the *United States* in connection with international law claims based on official action, whether against government officials or private parties, *see Sanchez-Espinoza*, 770 F.2d at 207 n.5, not personal common law immunities in the context of governmental corruption.  The *Sanchez-Espinoza* Court expressly held that the line of authority permitting suits against *federal officials* for violation of statutory or constitutional prescription "can have no application" to ATS claims for which "the basis for jurisdiction requires action authorized by the sovereign as opposed to private wrongdoing."

---

their status by allegations of illegality (Mem. 14), not that such actions "can never be heard."), plaintiffs' reliance on *Rasul* is misplaced.  *Rasul* decided only that habeas jurisdiction lay in the federal courts; petitioners withdrew their ATS claims prior to the Court's decision.  *Id*. at 504 n.6 (Scalia, J., dissenting).  Prior to that, the D.C. Circuit ruled that *Eisentrager* had withdrawn the privilege of litigation from enemy combatants altogether, including for ATS claims.  That the Court's *dicta* suggested that this aspect of the Court of Appeals' ruling was erroneous, does nothing.  Titan has not argued that plaintiffs do not have privilege of litigation because of their status.

*Sanchez-Espinoza*, 770 F.2d at 207. That *Dennis* involved a *state* judge rather than *federal* officials renders it even less pertinent.[11]

### B.    The ATS Claims Are Barred for Independent Reasons

We set forth in our opening brief that plaintiffs' ATS claims must be dismissed for additional independent reasons: (1) plaintiffs have not pled facts to state claims for certain international norms; (2) special factors bar the ATS claims; and (3) the federal common law disfavors claims against corporations. Plaintiffs' opposition either does not respond to our points or does so erroneously. We address the main issues below.

*Extrajudicial Killings:*  Plaintiffs do not dispute that: (1) extrajudicial killing requires specific intent and that they have failed to allege it here; and (2) no Titan employee is alleged to have been involved in the death of Ibraheim. (Mem. 16-17.) Instead they assert that because they have invoked the term "conspirator," it is of no consequence that Titan employees were not involved. (Opp. 17.) But Titan is not liable for the actions of soldiers. (Mem. 41-42; § II, *infra*.) Moreover, plaintiffs have no response for the settled law of war principle that it is the protecting power, here the United States, that was responsible for providing the medical care they allege was wrongfully withheld and caused Ibraheim's death. (Mem. 17.) They do not allege that Titan assumed this responsibility by contract or otherwise. In short, plaintiffs allege no facts under which Titan could be held to have a duty to provide medical care to U.S. military prisoners, or be responsible for the U.S. military's alleged failure to do so. Characterizing this as a factual dispute is simply incorrect. (Opp. 17.)

---

[11]  The other authorities involve discussion or applications of *Dennis* in the context of conspiracies involving state officials, and in fact, two of the cases do not even stand for the proposition that plaintiffs assert. In *Toussie* **none** of the defendants were immune from suit, *Toussie v. Powell*, 323 F.3d 178, 182-84 (2d Cir. 2003), and the *Toussie* Court made clear that it was *not* "speak[ing] to the question of whether private defendants who are acting pursuant to a government contract or a court order can be shielded by qualified immunity." *Id.* at 184. *Scotto* is even further astray; there was no conspiracy at all. *See Scotto v. Almenas*, 143 F.3d 105, 114-15 (2d Cir. 1998) (affirming summary judgment in favor of private party defendants for failure to present sufficient facts to support an inference of conspiracy and noting that mere allegation of meetings among alleged conspirators is not "sufficient to create a material issue of fact as to whether something improper took place during them").

*Cruel, inhuman, and degrading treatment:* Aldana v. Del Monte Fresh Produce, N.A., *Inc.*, 416 F.3d 1242, 1246-47 (11th Cir. 2005), holds that cruel, inhuman, and degrading treatment is not actionable under *Sosa*'s guidance and is the most persuasive authority on this issue; yet, plaintiffs do not address it. Other than a single district court case, plaintiffs rely solely on pre-*Sosa* decisions (Opp. 17-18), that "reflect[] a more assertive view of federal judicial discretion over claims based on customary international law than the position" taken by the Supreme Court. *Sosa*, 542 U.S. at 748 (quotation marks omitted).

*War Crimes:* Plaintiffs argue that "[p]rivate actors not designated 'belligerents' have been held accountable for war crimes...." (Opp. 19.) This does not respond to our argument: even if state action is not required for war crimes,[12] the requirement that the defendant must be either a belligerent or acting on its behalf means plaintiffs fail to state a claim where the United States is the belligerent. Plaintiffs do not dispute that the only mechanism by which the underlying law of war could regulate Titan's conduct is through its association with and support of the U.S. military's combatant activities. Since the United States is no less jurisdictionally required for such claims as for official torture (albeit as a belligerent not a state), *Sanchez-Espinoza* requires dismissal of war crime claims no less than other ATS claims that implicate the United States' sovereign immunity.[13]

*Crimes against Humanity:* Plaintiffs do not dispute that crimes against humanity involve persecution of "entire racial, ethnic, national or religious groups." (Mem. 19.) Instead, they assert with no support that the "Torture Conspirators tortured a substantial portion of the populations in Iraqi prisons under U.S. control." (Opp. 20.) But even if Titan could be liable for

---

[12] We do not concede that this is the law in this jurisdiction. (Opp. 19.)

[13] Plaintiffs' reliance on *Kadic*, *Presbyterian Church*, and *Agent Orange* is misplaced. Karadzic directed a belligerent party to a conflict regulated by the law of war, *Kadic v. Karadzic*, 70 F.3d 232, 242-43 (2d Cir. 1995), and the corporation at issue in *Presbyterian Church* was alleged to have supported the Sudanese government in its civil wars. Neither turned on association with U.S. military action. As explained, *infra*, the *Agent Orange* Court dismissed all ATS claims.

the actions of unnamed U.S. soldiers, a "substantial portion" of the detainees of the U.S. military are not an "entire racial, ethnic, national or religious group."

    ***Special Factors:***  Plaintiffs accept that special factors counsel caution in implying a cause of action under the ATS, but they argue that such factors are not applied on a case-specific basis where well-established norms are invoked.  Not so.  Courts are required to examine such factors on a basis that is "case-specific." *Sosa*, 542 U.S. at 733 n.21.[14]

    • ***Alternative Remedies:***  Despite that at least one of their number has filed such a claim himself and the State Department has officially pledged to compensate victims of abuse (Mem. 21), plaintiffs argue the FCA is unavailable to them because (1) it covers only injuries caused by soldiers and federal employees; (2) there are "significant challenges" to bringing FCA claims for such abuses and; (3) Titan would be immune from liability under Iraqi law under CPA 17.  (Opp. 21-22.)  First, plaintiffs do not dispute that the FCA's "noncombat activities" limitation is not synonymous with FTCA's exception for "combatant activities" (Mem. 21 n.19), so coverage is available for abuse during detention.  Second, plaintiffs' own authority shows that the FCA is not limited to soldiers and federal employees as plaintiffs argue.[15]  Third, that significant challenges to recovery exist is both immaterial (it is the existence of the statutory scheme and Congress's intent to occupy the field that matters, (Mem. 21-22)) and unsupported (being based solely on plaintiffs' counsel's self-serving letter and no representation by the Army).  Finally, CPA 17 bears on Titan's amenability to Iraqi law and has nothing to do with the FCA as an alternate remedy and special factor barring these ATS claims.  That a remedy may be recoverable from the government alone hardly matters if compensation for the injury is available.

---

[14] Moreover, in the related federal common law context of *Bivens* actions, *see, e.g., Abdullahi v. Pfizer Inc.*, No. 01 Civ 8118, 2005 U.S. Dist. LEXIS 16126, at *26 (S.D.N.Y. Aug. 9, 2005), it is clear that special factors apply with full force even where the underlying constitutional violation is well-established. *See Chappell v. Wallace*, 462 U.S. 296, 298 (1983).

[15] *See* Opp. 22 n.14 (defining civilian employee as "a person whose activities the Government *has the right to direct and control*, not only as to the result to be accomplished but also as to the means used; this includes, *but is not limited to*, full-time Federal civilian officers and employees") (quoting 32 C.F. R. § 536.3(b)) (emphasis added).

- **National Security:** Plaintiffs assert, without any authority, that the claims should be permitted notwithstanding that they implicate national security, foreign policy, and military discipline because torture allegedly places U.S. soldiers at risk.[16] (Opp. 22-23.) Yet plaintiffs do not dispute that their claims would (indeed, are intended to) influence the manner in which the U.S. military administers detention facilities in a theater of combat. (Mem. 23.) Nor do they contradict the authority we cite, including *Sanchez-Espinoza*, that this special factor is intended to avoid judicial inquiry altogether and not (as their argument erroneously presumes) that the special factor invites courts to intercede if they believe the influence to be beneficial.

   **Corporate Liability:** Plaintiffs assert that corporations are subject to liability for ATS claims, but they fail to address effectively our principal argument that *Malesko* bars corporate liability as a matter of federal common law.[17] (Mem. 23-25.) Plaintiffs' response is to argue, as Titan acknowledged in its opening brief, that courts, both before and after *Sosa*, have permitted ATS suits against corporations. (Mem. 24.) But they fail to address that (1) none have addressed the application of *Malesko* after *Sosa* held that ATS claims, like *Bivens* actions, are implied under the federal common law, and (2) none could have settled this issue *sub silentio* because it concerns subject matter jurisdiction. (Mem. 24.) Plaintiffs argue that the *Malesko* Court's holding "relied, in part, on the conclusion that there was a tort action against the corporation." (Opp. 25.) In fact, *Malesko* established a categorical rule against corporate liability for implied common law actions and did not turn on the application of a case-specific special factor. *See, e.g.*, *Gantt v. Sec. USA, Inc.*, 356 F.3d 547 (4th Cir. 2004). Plaintiffs also argue, without support, that potential for corporate criminal liability implies civil claims, but fail to acknowledge that the drafters of the ICC Charter rejected corporate liability. (Mem. 25.)

---

[16] Plaintiffs attach affidavits of former interrogators that purport to describe proper training, supervision and techniques. Even if such affidavits were appropriate in opposition to a motion to dismiss, these do not address safety of U.S. soldiers as plaintiffs suggest.

[17] We also noted that the *Agent Orange* Court found substantial support for this proposition as a matter of international law (Mem. 25), notwithstanding that it ultimately concluded to the contrary. But *Agent Orange*, like the other cases that have permitted ATS claims against corporations, erred in not considering the application of *Malesko*'s federal common law rule.

## II.     Titan Is Not Liable for Soldiers' Actions

Titan explained in its opening brief, (Mem. 41-42), that pre-emption principles precluded Titan's liability for the actions of soldiers and military officials. Plaintiffs' response amounts to no response at all. Other than attempting to re-litigate in the most general terms what this Court already held in *Ibrahim* (Opp. 40-42), i.e., that pre-emption principles are implicated by the allegations here, plaintiffs fail to explain why liability for *soldiers' actions* is not pre-empted *as a matter of law*. They cite no contrary authority. They do not identify any faults in the logic of this argument. And they fail to identify any case in which private contractors have been held liable for the alleged actions of soldiers and military officials. Without the ability to attribute the actions of military officials to Titan, most of the factual allegations of the TAC evaporate.

## III.     Plaintiffs' RICO Claims Must Be Dismissed

### A.     Plaintiffs Lack Standing

In our opening brief, we showed that the property losses alleged in the TAC are of the same type as, and in the case of Mr. Hadood identical to, those found wanting in the *Ibrahim* case. In response to this dispositive point, plaintiffs say nothing: the Court will search the opposition in vain for an explanation for why alleged injuries already determined not to give former detainees RICO standing do so here. As to business damages, plaintiffs similarly say nothing about the absence of factual allegations or the inadequacy of their conclusory allegation.

Instead of addressing this, the RICO plaintiffs resort to obfuscation and misdirection. First, plaintiffs point to paragraphs of the TAC (Opp. 27) (citing TAC ¶¶ 12, 38, 114, 131-32, 140, 151, 326), implying that allegations of "robbery" answer the defects. But these paragraphs either set forth irrelevant class allegations or describe conduct that was already considered in *Ibrahim*. And while plaintiffs criticize Titan for pointing out that personal injuries cannot confer RICO standing (Opp. 26), they use such injuries to support their claims. (Opp. 27 n.23.)

Plaintiffs' assertion that "only at the time of release from prison did seizure of money and goods become robbery; the initial *taking* does not establish who *stole* it" (Opp. 27), is both wrong and a non-sequitur. It is wrong because these facts at most describe the tort of

conversion, and conversion is not a RICO predicate act. *See McDonald v. Schencker*, 18 F.3d 491, 496 (7th Cir. 1994); *see also Toms v. Pizzo*, 172 F.3d 38 (2d Cir. 1998) (table), *available at* 1998 WL 964199, at *2.[18]  It is a non-sequitur because it does not address the lack of proximate cause between the predicate acts and the alleged RICO injuries, or the fact that the takings were completed by the military.[19]  Plaintiffs describe the enterprise as an association-in-fact for the purpose of "intimidat[ing] prisoners into providing 'intelligence' in order to artificially inflate the demand for interrogations and related services." (Opp. 34.)  Plaintiffs cannot establish a "direct relation between the injury asserted" (the property losses) "and the injurious conduct alleged" (torture and mistreatment of prisoners during interrogations). *See Browning v. Clinton*, 292 F.3d 235, 249 (D.C. Cir. 2002) (quotation omitted).  Nor does *Federal Information Systems, Corp. v. Boyd*, 753 F. Supp. 971 (D.D.C. 1990), help.  There, unlike here, the predicate acts implemented the RICO scheme that injured plaintiffs. *Id.* at 977.

Plaintiffs' attempt to resuscitate their moribund claims by hiding behind their conspiracy allegations (Opp. 27), simply misses the point.  First, the paragraphs of the complaint on which they rely (TAC ¶¶ 12, 38), are class allegations that cannot support these plaintiffs' claims. Second, the question is whether these plaintiffs have standing to bring this RICO action against these defendants based on these alleged acts. *Salinas*'s holding on conspirator liability does not address the questions of Titan's liability for military thefts or of proximate cause.

### B.    RICO Does Not Reach the Alleged Extraterritorial Conduct

The parties agree that RICO only applies if significant, furthering conduct occurred in the United States or if foreign conduct caused substantial effects in the United States. (Opp. 29-30.) Plaintiffs fail to show how their allegations of torture in Iraq meet either test.

---

[18] Robbery is defined as the taking "from the person or immediate actual possession of another anything of value" "by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear." D.C. Code § 22-2801.

[19] Even if the robberies were "completed" upon plaintiffs' release, the "robberies" either took place when plaintiffs were captured by the military or released by them—not Titan.

### 1. There Are No Substantial Domestic Effects from Plaintiffs' Alleged Mistreatment in Iraq

Plaintiffs do not really dispute that *F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 169-75 (2004) and the decision on remand by the D.C. Circuit, *Empagran S.A. v. F. Hoffmann-LaRoche Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005) are fatal to their position; instead, they assert that the decisions are technical irrelevancies that should be ignored because *F. Hoffmann La-Roche* applied the Foreign Trade Antitrust Improvements Act ("FTAIA"). They are not. The FTAIA clarified the reach of the Sherman Act,[20] *see* H.R. Rep. No. 97-686, at 2 (1982) (noting that the FTAIA's effects test "will serve as a simple and straightforward clarification of existing American law"), and represents Congress's view on how to apply the effects test.[21] RICO was modeled on antitrust laws, *see Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150 (1987), and courts have uniformly held that both securities and antitrust law can be used to inform the RICO "effects" standard. The antitrust approach is "an equally or even more appropriate test." *North South Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051-52 (2d Cir. 1996); *see also* Opp. 28 ("[C]ourts look to securities *and antitrust* jurisprudence to determine whether RICO has extraterritorial reach.") (emphasis added). The Supreme Court has now made clear that the test is whether the domestic effect injured the foreign plaintiffs and gives rise to a claim on their behalf. *See F. Hoffmann La-Roche Ltd.*, 542 U.S. at 169-75; *Empagran S.A. v. F. Hoffmann-LaRoche Ltd.*, 417 F.3d 1267, 1270-71 (D.C. Cir. 2005).[22]

---

[20] 15 U.S.C. § 6a, provides that the Sherman Act "shall not apply to conduct" involving trade or commerce with foreign nations unless "such conduct has a direct, substantial, and reasonably foreseeable effect" on trade or commerce in the United States.

[21] *United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004), supports Titan's position, not plaintiffs'. In deciding that certain conduct did not satisfy the FTAIA's effects test, the Ninth Circuit explained that prior to the enactment of the FTAIA, there was some confusion and "uncertainty" as to how to apply the effects test, and the FTAIA "'more clearly establish[ed] when antitrust liability attaches to international business activities.'" *Id.* at 677-79 (citing H.R. Rep. No. 97-686 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487, 2492).

[22] Plaintiffs claim that *Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) did not "reference any allegations of conduct having an effect in the United States." (Opp. 29.) Plaintiffs are mistaken. *See Doe*, 400 F. Supp. 2d at 97, 106 (allegations of significant financial injury to the plaintiffs in the United States). Notwithstanding these allegations—allegations lacking here—the Court explained that RICO does not apply to "solely personal harms suffered

Plaintiffs' reliance on *Wiwa v. Royal Dutch Petroleum*, No. 96 Civ 8386 (KMW), 2002 U.S. Dist. LEXIS 3293 (S.D.N.Y. Feb. 28, 2002) and *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229 (N.D. Cal. 2004) is misplaced for at least three reasons. First, *Wiwa* and *Bowoto* were decided before *F. Hoffmann-LaRoche* established the requirement of a direct nexus between the alleged domestic effects and the foreign plaintiffs' injuries. The decision in *Wiwa* was clear that it found jurisdiction based on U.S. effect, divorced from plaintiffs' injuries, while the basis for *Bowoto*'s decision is not publicly available. This is insufficient after *F. Hoffmann-LaRoche*. Plaintiffs here do not compete with defendants in the translation or interrogation services business. Second, in *Wiwa* and *Bowoto* the nexus between the object of the enterprise and the U.S. effects is far tighter than is alleged here. As in *Doe*, there needs to be more of a nexus between the U.S. effects and the conduct than has been pleaded here. Finally, the decisions are just not persuasive, since they have a view of easily invoked extraterritorial application of RICO that is inconsistent with the precedent in this Circuit.[23]

## 2.    The Alleged Domestic Conduct Is Insufficient

With respect to the conduct test, plaintiffs cite cases from outside this circuit and ask the Court to reject the law of the D.C. Circuit. *Compare* Opp. 30 *with Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 33 (D.C. Cir. 1987) (permitting securities law suits involving domestic conduct causing foreign industry only when the domestic conduct "directly cause[s]" the harm to plaintiffs).[24] Notably, one case incorrectly cited by plaintiffs for the proposition that "'the

---

overseas that only marginally—and tangentially—impact American commerce." *Id.* at 116; *see also Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1359 (S.D. Fla. 2003).

[23] Plaintiffs also argue that to the extent the Court finds plaintiffs' allegations insufficient, they should be allowed to take jurisdictional discovery "concerning the financial arrangements and rewards which flowed to defendants in the United States and the competitive advantages they obtained over U.S.-based competitors as a result of the predicate acts." (Opp. 29 n.26.) Since such discovery is irrelevant to the application of RICO to the TAC, it should be denied.

[24] Plaintiffs simply ignore this law when they insist that there is no support for requiring more than "but for" causation. (Opp. 31.) *Zoelsch* clearly mandates "direct"—not "but for"—causation. *See* 824 F.2d at 33.

domestic conduct need be only significant to the fraud rather than a direct cause of it'" (Opp. 30), actually adopts the D.C. and Second Circuits' "more restrictive" direct causation test, finding that that test is "the better reasoned of the competing positions." *Robinson v. TCI/US W. Comm'ns Inc.*, 117 F.3d 900, 905-07 (5th Cir. 1997). Even under plaintiffs' more liberal "significant, furthering cause" test, however, plaintiffs' allegations fail, because the alleged domestic conduct was "merely preparatory" to the alleged predicate acts. Plaintiffs' misreliance on *Grunenthal GmbH v. Hotz*, 712 F.2d 421 (9th Cir. 1983) (Opp. 30), proves the point. Although *Grunenthal* involved one domestic meeting, the required misrepresentations were made at that single meeting whereupon "immediately thereafter defendants signed and plaintiff was induced to execute the agreement." *Grunenthal*, 712 F.2d at 425. The conduct in the United States constituted the alleged violation. *Id.* Here, the alleged conduct in the United States (meetings, emails, etc.) was not the violation (i.e., the abuse of plaintiffs) but was "preparatory," which even plaintiffs admit is insufficient, (Opp. 30).[25] *See Grunenthal*, 712 F.2d at 424; *Aldana v. Fresh Del Monte Produce, Inc.*, 305 F. Supp. 2d 1285, 1306 (S.D. Fla. 2003), *aff'd in part and vacated in part on other grounds*, 416 F.3d 1242 (11th Cir. 2005).[26]

Plaintiffs' argument that it is enough that the defendants are domestic corporations, because "punishing unlawful conduct by United States citizens is a proper basis for extraterritorial jurisdiction under the effects test" (Opp. at 32), is also without support. Plaintiffs

---

[25] Plaintiffs' recitation of the allegations they believe support application of RICO under the conduct test only serves to underscore their "preparatory" nature: acquisition of U.S. firms, contracting with the government, recruiting employees, and forming relationships with government representatives. (Opp. 31.)

[26] Plaintiffs argue that *Aldana* is inapposite, because there "plaintiffs did not allege meetings or other activities occurring in the United States." (Opp. 31 n.27.) Again plaintiffs ignore the facts: *Aldana* specifically considered domestic conduct of the same magnitude as that alleged here, stating that "even if the scheme was hatched in the United States, as plaintiffs allege, the connection to Defendants' profits is tenuous at best." 305 F. Supp. 2d at 1306. "Schemes" cannot be hatched without meetings. The court found that these activities, which are equivalent to those alleged by plaintiffs in the instant case, "essentially concern preparatory activities for foreign conduct that do not have a substantial effect within the United States." *Id.* And contrary to plaintiffs' assertion (Opp. 31), *Bowoto*, 312 F. Supp. 2d 1229, did not even consider the conduct test in its analysis. *Id.* at 1249.

seize on dicta of two securities cases holding that the conduct and effects tests were not met, *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 130 (2d Cir. 1998); *Euro Trade & Forfaiting, Inc. v. Vowell*, No. 00 CIV. 8431 (LAP), 2002 WL 500672, at *10 (S.D.N.Y. Mar. 29, 2002), to argue that those outcomes were a result of "no U.S. party to protect or punish." Those cases did not hold, or even suggest, that the domestic situs of a defendant would justify extraterritorial application of the securities laws or RICO. We have not found a single case where the domestic situs of the defendant provided RICO jurisdiction in the absence of domestic conduct or effect. The precedent is in fact to the contrary. *See, e.g., Aldana*, 305 F. Supp. 2d at 1306 (no extraterritorial RICO application in case involving U.S. corporations).

## C.    Plaintiffs Have Not Properly Pled Predicate Acts

To state a RICO claim, plaintiffs bear the burden of pleading each element of the statute, including that defendants committed predicate acts that are "chargeable" or "indictable" under state or federal law. *See* 18 U.S.C. § 1961(1); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 488 (1985). Here, all of the alleged predicate acts occurred in Iraq against foreign plaintiffs. Even plaintiffs are not certain that the alleged predicate acts are chargeable or indictable in the United States. *See* Opp. 33 ("The TAC clearly alleges conduct in this jurisdiction, which *may* even be indictable here.") (emphasis added). That is not enough.

Instead, plaintiffs rely on a series of Second and Eleventh Circuit cases to argue that the plain language of the statute and the Supreme Court precedent should be disregarded because the "chargeable" or "indictable" language of the RICO statute is "generic," thereby making a violation of some state's law unimportant. (Opp. 32-33.) That is not what these cases hold. Almost all of them involve crimes that were not "provable" under state law, but were almost certainly indictable. None of them considered whether alleged predicate acts not chargeable or indictable anywhere in the United States could constitute racketeering activity.[27] And the

---

[27] *United States v. Bagaric*, 706 F.2d 42 (2d Cir. 1983), held that a jury charge is not required to charge the elements of the penal codes of various states where the alleged acts of racketeering

Second Circuit has since clarified that *Bagaric* and its progeny "extended only to the principle that where the jury has found that all elements of an offense have been proved, a conviction cannot later be overturned on the formalistic grounds that the jury charge had omitted to state all elements." *United States v. Carrillo*, 229 F.3d 177, 184 n.1 (2d Cir. 2000). The Second Circuit went on to note that the RICO statute "seem[s] to require of a predicate act based on state law that the act include the essential elements of the *state* crime." *Id.* at 186 (emphasis added).[28]

### D.    Plaintiffs' Enterprise Allegations Do Not State a Claim

In an attempt to avoid a fatal flaw in their enterprise, plaintiffs recharacterize Titan's argument as one that calls for "absolute immunity…[to] insulate[] corporations from liability merely because they conspire with government officials who act outside the law" (Opp. 35), and then spend considerable time knocking down their straw man of "qualified immunity" for "private actors who conspire with [government employees]." (Opp. 35.) Plaintiffs do not address the real issue:  the impossibility of a RICO enterprise comprised of U.S. government

occurred; *United States v. Coonan*, 938 F.2d 1553 (2d Cir. 1991), held that an alleged state law crime could constitute a RICO predicate act even though the defendant was acquitted of the crime in state court; *United States v. Paone*, 782 F.2d 386 (2d Cir. 1986), held that the alleged predicate acts could constitute racketeering activity even though the government failed to offer corroboration of accomplice testimony, as was required by state law to prove the predicate acts; *United States v. Miller*, 116 F.3d 641 (2d Cir. 1997), held that criminal facilitation was a valid predicate act under RICO even though the state statute criminalizing such conduct did not require intent to commit the underlying crime of murder; and *United States v. Watchmaker*, 761 F.2d 1459 (11th Cir. 1985), held that the defining of a predicate act by reference to a state statute in an indictment did not constitute an unconstitutional amendment of the indictment.

[28] While *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 (S.D.N.Y. 2002) allowed RICO claims to proceed, asserting that the location of the predicate acts (in that case Nigeria) was a mere procedural element of the underlying state statute that did not remove the conduct from the definition of "racketeering activity" under RICO, as set forth above, the outcome is not supported by the precedent and better reasoned cases have reached the opposite conclusion. *See e.g.*, *Peters v. Welsh Dev. Agency*, No. 86 C 2646, 1991 WL 172950, at *7 (N.D. Ill. Aug. 29, 1991) (finding that acts occurring outside the United States could not constitute RICO predicate acts because this "would give RICO a nearly boundless extraterritorial scope and turn RICO into a vehicle for adventurous civil and criminal litigators with an itch to see the world"). *Peters* accords with the established principle that location is a fundamental prerequisite to finding that a defendant's acts violate a state statute. *See People v. McLaughlin*, 80 N.Y.2d 466, 471 (1992) ("[T]here can be no criminal offense unless [the state] has territorial jurisdiction."); *Mitchell v. United States*, 569 A.2d 177, 181 (D.C. 1990) (finding that territorial jurisdiction must be proved beyond a reasonable doubt rather than by a preponderance of the evidence).

employees acting in their official capacity. *Compare* Mot. 33-35 *with* Opp. 35-36. Plaintiffs cite a number of cases involving municipal or state government officials.[29]  Those cases are inapposite to a case implicating the United States government, indeed Secretary of Defense Donald Rumsfeld himself, *see* RCS at 4, as a necessary part of the RICO enterprise.

Putting aside the inclusion of the U.S. government in the alleged enterprise, the allegations are still plainly insufficient. As we pointed out (Mot. 35-36), plaintiffs must allege the decision-making structure and organization of the alleged enterprise. In opposition, plaintiffs once again have no response and instead point to a laundry list of allegations that concern alleged contacts among, and actions taken by, the alleged members of the enterprise. (Opp. 34.) Unable to respond substantively, plaintiffs assert that Titan only cites post-conviction and post-trial cases, which plaintiffs argue have no bearing on requirements at the pleadings stage. *United States v. Perholtz*, 842 F.2d 343 (D.C. Cir. 1988) and *United States v. Morrow*, No. CRIM.A. 04-355 (CKK), 2005 WL 1389256 (D.D.C. June 13, 2005), however, are important, much-cited cases that provide the law against which the TAC must be assessed to see if it states a claim. Plaintiffs ignore that this court in *Doe* relied on *Perholtz* to find a similar complaint wanting. Because the plaintiffs there failed to allege facts linking defendants "through allegations of common orders or control," "explain[ing] how the several groups of defendants associated or operated together," or demonstrating "a shared decision-making infrastructure," the court found plaintiffs' enterprise allegations insufficient. *Doe*, 400 F. Supp. 2d at 119-20; *see also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 175 (2d Cir. 2004) ("Plaintiffs' conclusory naming of a string of entities does not adequately allege an enterprise."); *Davis v.*

---

[29] In the single case cited by plaintiffs involving the federal government, the court dismissed the RICO claim for other reasons. *See Averbach v. Rival Mfg. Co.*, 809 F.2d 1016, 1018 (3d Cir. 1987). All of the other cases cited by plaintiffs involve municipal or state officials or agencies, and, contrary to plaintiffs' representations, one case even holds that municipalities are immune from civil punitive damage actions under RICO. *See Genty v. Resolution Trust Corp.*, 937 F.2d 899, 914 (3d Cir. 1991).

*Hudgins*, 896 F. Supp. 561, 568 (E.D. Va. 1995) (conclusory allegations that parties associated in fact insufficient).

## IV.    The Government Contractor Defense Bars Plaintiffs' State Law Claims

In its opening brief, Titan demonstrated that, independent of *Sanchez-Espinoza*, plaintiffs' state law claims are pre-empted as a matter of law. (Mem. 39-41.) Plaintiffs do not address these arguments directly. In fact, plaintiffs fail to cite (much less discuss or distinguish) *Koohi*, the principal appellate authority upon which the Court's holding in *Ibrahim* relies; instead, they restrict their attention to cases involving the discretionary function exception. (Opp. 38-41.) This authority does nothing to undermine the conclusion that plaintiffs' state law claims are pre-empted by the uniquely federal interests expressed in the *combatant activities* function and the allegations of extensive government involvement, including the military chain of command up to the Secretary of Defense, in the conduct that gives rise to the torture claims. (Mem. 40.) Plaintiffs simply have no response to the proposition that their factual allegations (as distinguished from their characterizations and legal conclusions), unlike those in *Ibrahim*, establish the involvement of government and military officials acting in their official capacities to the degree that they require pre-emption and dismissal of the claims in the complaint.

Rather than confront the uniquely federal interests raised by the factual allegations of the TAC, plaintiffs repeat a variation of their argument in opposition to the application of *Sanchez-Espinoza*, i.e., that because they are alleging human rights violations (e.g., rape, torture), such conduct can never not be subject to suit against private parties. *Compare* Opp. 37-42 *with* Mem. 5, 11-13. But it is only in the context of such allegations of wrongful conduct that pre-emption becomes an issue, and this Court has already determined that such claims are pre-empted if Titan's employees were acting at the direction of and in conjunction with the military. *Ibrahim v. Titan Corp.*, 391 F.Supp. 2d 10, 19 (D.D.C. 2005). Plaintiffs have no answer for how the alleged conduct could have involved the military chain of command up to the Secretary of Defense in the prosecution of the Iraq war, and ***not*** establish the requisite conflict between state tort liability and uniquely federal interests. Plaintiffs assert that the illegal conduct was not

- 21 -

"contractually required or requested." (Opp. 41.) But this is not the relevant inquiry.[30] What determines the outcome here is with whom and on whose behalf they acted, i.e., whether plaintiffs' factual allegations of the direct involvement of the military in the alleged conduct as part of the prosecution of the war, takes this from private frolic and detour (no pre-emption) to uniquely federal interests that pre-empts, no matter the underlying conduct.

Plaintiffs assert "the only court to have considered whether human rights claims may be defeated by the government contractor defense held that such claims necessarily survive the defense." (Opp. 38) (citing *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005)). This is simply false. The *Agent Orange* plaintiffs (Vietnamese nationals and an organization) had asserted claims under both domestic tort law and under international law against military contractors that manufactured the herbicides used during the Vietnam War and that allegedly harmed them and their land.[31] 373 F. Supp. 2d 7. *Agent Orange held*, consistent with every court to have considered such claims in the context of U.S. combatant activities, that the asserted state law claims are pre-empted by the government contractor defense. *Id.* at 17 ("For domestic conflicts of law purposes the government contractor defense is a federal substantive rule. Neither the rule of *Erie*...nor comity in recognizing the internal substantive law of another nation can trump this federal substantive rule of law...").[32]

---

[30] While unnecessary to resolution of this motion, plaintiffs have wrongly framed the inquiry under the contract. The question is not whether the contract asked for the illegal conduct, but whether the contract established that the Titan employees were "loaned" to the military such they were soldiers in all but name. They were, especially given the factual allegations here, but the Court need not find that at this stage to rule in Titan's favor.

[31] The tort claims asserted under state law and dismissed under the government contractor defense overlap considerably with those asserted here and, notably, include a number of *intentional* torts. They include, *inter alia*, assault and battery, negligence, intentional infliction of emotional distress, and civil conspiracy. *Agent Orange*, 373 F. Supp. 2d at 36-40.

[32] The Court also *held* plaintiffs did not state a claim under the ATS. Understandably, plaintiffs do not cite this case in opposition to the application of *Sanchez-Espinoza* to their ATS claims. As fully briefed in the context of Mr. Hadod's claims in *Ibrahim*, *Agent Orange*'s *dicta* regarding the interaction between the federal common law and international law under the ATS is both wrong and immaterial in light of *Sanchez-Espinoza*.

Unlike *Agent Orange*, *Jama v. INS*, 334 F. Supp. 2d 662 (D.N.J. 2004) ("*Jama II*") actually ruled against application of the government contractor defense (characterizing it as immunity rather than pre-emption), at least "at this stage," because it found that the contractor had a general duty of "running the facility safely" and that it would defy logic to suggest that INS approved practices that breached that duty. *Id.* at 689. That ruling, though, does not undermine the applicability of the defense here. The Court did not address whether the role of the INS raised the type of pre-emption issues of "uniquely federal interests" that were presented in *Boyle* and even more so in the context of combatant activities. *Jama II* concerned a domestic INS detention facility that was being completely run by a private company. Plaintiffs allege precisely the contrary here: that the military facilities in a war zone at which they were confined were under control of the U.S. military. (TAC ¶¶ 115, 128, 132, 135, 141, 145, 159.) Instead they argue that the private parties' actions in conspiracy with the government were improper. The specific concern articulated by the Court and cited by plaintiffs (Opp. 42)—that the INS did not approve the policies by which Esmor ran the facility and breached its duty to do so safely— demonstrates how far removed that case is from this one. The Court's reticence in giving effect to the defense was grounded in the concern that it was Esmor's, not the government's, discretion at issue. This consideration does not arise in the context of the combatant activities exception and one that does not arise where the private parties are alleged to be working with the chain of command all the way to the Secretary of Defense. *See Ibrahim*, 391 F. Supp. 2d at 12 (explaining that *Boyle*'s three-part test "ensure[s] that the design was a product of government discretionary decision-making….").

## V.    The TAC Fails To Meet Pleading Requirements

In our opening brief, we showed that plaintiffs' allegations failed rules 8, 10, and 12(e) in three ways (Mem. 42-45): by lumping defendants into the category "Torture Conspirators," by lumping plaintiffs' and nonparties' allegations together, and by failing to separate claims based on separate transactions or occurrences. *Id.* Plaintiffs do not dispute any of this. Nor do they think that there is anything wrong with obfuscating who stands accused of what by which

- 23 -

plaintiff.  (Opp. 42-44.)  Plaintiffs also do not dispute or even address our interpretation of the pertinent law or this Court's prior order.

Instead their sole response is that they are not required to plead every element of their claims.  *Id.* 42-43.  We did not suggest otherwise.  Although the 66-page, 331-paragraph complaint contains more than enough *quantity*, we explained that it is clearly lacking in the required *specificity* that would allow disaggregating defendants, plaintiffs, and transactions. (Mem. 42-43.)  Plaintiffs' recitation of allegations in their brief (many of which are legal conclusions) (Opp. 43-44), neither responds nor resolves this problem because the allegations cited do not distinguish among defendants or between defendants and government officials; among plaintiffs or between plaintiffs and others; or among the various occurrences that they allege support the various claims.  (Opp. 43.)  Plaintiffs' reliance on *Burnett* (Opp. 44), is telling given that the court invited a Rule 12(e) motion like that Titan makes here.  *See Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 111 (D.D.C. 2003).

The assertion that Titan "has notice of the claims against it" because they have pleaded vicarious and direct liability, even if true, do not make up for the identified deficiencies, and their page-long repetition of the TAC's allegations merely proves Titan's point.  Plaintiffs' argument that they should escape having to replead because Titan can test the merit of their case after discovery on summary judgment (Opp. 42), has never been held to be the law.  Rules 8 and 10 might not require much, but they require more than plaintiffs have provided here.  In addition to sufficient notice of which plaintiffs are bringing which claims against which defendants (hardly onerous requirements), the pleading rules are designed to give the district court enough information to decide if it is appropriate to engage the limited resources of the court in litigating what may be an untenable claim.  *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999) (explaining rules intended "to allow the court to determine at the outset of the litigation... whether the plaintiff has any tenable theory or basis of suit").  This is certainly the case here, where there are issues of sovereign immunity, subject matter jurisdiction, federal pre-

emption, and other thorny matters that turn in large part on the "who" that plaintiffs have intentionally obscured.

As to the other identified deficiencies in identifying themselves, plaintiffs do not deny their complaint is deficient, but blame Titan for their failure to comply with the most fundamental rule of initiating litigation in federal court, i.e., identifying the plaintiff or securing permission to proceed anonymously. In short, plaintiffs' brief makes it clear that they have no legitimate response to their failure to comply with the most basic pleading requirements and, to the extent they have not pled themselves out of court as a matter of law, they must be required to replead to disaggregate defendants, plaintiffs, and claims.

## CONCLUSION

For the reasons set forth above, plaintiffs' TAC should be dismissed.

Respectfully Submitted,

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C.  20005
(202) 434-5000

Dated:  May 26, 2006                    *Attorneys for Defendant L-3 Communications*
                                        *Titan Corporation*