## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SALEH *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 05-1165 (JR) |
| v. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| TITAN CORPORATION *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST TITAN ON THE GOVERNMENT CONTRACTOR DEFENSE

Plaintiffs hereby move this Court to find that defendant Titan Corporation ("Titan") cannot assert the affirmative government contractor defense at trial in this matter. As set forth in the attached Statement of Material Facts and discussed in the attached Memorandum of Points and Authorities, it is clear Titan employees were not soldiers in all but name. Therefore, under the reasoning set forth by this Court in *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 19 (D.D.C. 2005), Titan is not entitled to assert the defense.

Plaintiffs respectfully request oral argument.


Dated: June 12, 2006                 /s/ Susan L. Burke
                                     Susan L. Burke (D.C. Bar # 414939)
                                     BURKE PYLE LLC
                                     4112 Station Street
                                     Philadelphia, PA 19127
                                     Telephone:    (215) 487-6590
                                     Facsimile:    (215) 482-0874

                                     Jennifer Green
                                     CENTER FOR CONSTITUTIONAL RIGHTS
                                     666 Broadway, 7th Floor
                                     New York, NY 10012

Telephone:    (212) 614-6439
Facsimile:    (212) 614-6499


Shereef Hadi Akeel (admitted *pro hac vice*)
AKEEL & VALENTINE, P.C.
401 South Old Woodward Avenue
Suite 430
Birmingham, MI 48009
Telephone:    (248) 594-9595
Facsimile:    (248) 594-4477

*Counsel for Plaintiffs and Class Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SALEH *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 05-1165 (JR) |
| v. | ) |
| | ) **ORAL ARGUMENT REQUESTED** |
| TITAN CORPORATION *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST TITAN**
**ON THE GOVERNMENT CONTRACTOR DEFENSE**

In the related *Ibrahim* matter, this Court set forth four factors to consider in determining whether Titan employees are essentially soldiers in all but name: (1) contractual responsibilities; (2) reporting structure; (3) supervision; and (4) structures of command and control. *Ibrahim v. Titan Corp*., 391 F. Supp. 2d 10, 19 (D.D.C. 2005). Although discovery has not yet commenced in the *Saleh* action, there is a substantial amount of uncontested information available in the public domain relating to these four factors.[1]

**CONTRACTUAL RESPONSIBILITIES**

1.    In 1999, the United States and Titan (via its corporate predecessor) entered into a contract pursuant to which Titan provides translators needed to support military operations (hereinafter "Titan Contract"). *Declaration of Kevin S. Hopkins (appended to Defendant L-3 Communications Titan Corporation's Motion To Dismiss And For Summary Judgment, Ibrahim v. Titan Corp., filed Dec. 16, 2005) ("Hopkins Decl.")* ¶¶ *10-11*; attached as Appendix 1. The

---

[1] Plaintiffs also have obtained similar information relating to the CACI Defendants and will be filing a motion for summary judgment against the CACI defendants in the next few weeks.

general terms of this contract were set forth in a Statement of Work, while specific requirements such as the number and type of linguists needed were set forth in delivery orders for projects under the Titan Contract. *Id.* ¶*10.*[2]

2.     After September 11, 2001, the United States turned to the 1999 Titan Contract to request translation services for United States military engagements in Afghanistan and Iraq. *Hopkins Decl. ¶ 11 (Appendix 1).*

3.     The United States required that Titan agree to certain material conditions that govern all contractors who contract with the United States military.  These material conditions are set forth in the regulations and manuals (described below) and restrict the range of contractual activities able to be engaged in by Titan employees.

4.     Titan employees are barred from taking any actions that might elevate them to the status of a soldier.  *Army Regulation 715-9, Contractors Accompanying the Force (Oct. 29, 1999) ("AR 715-9") § 3-3(d) (emphasis added)*; attached as Appendix 3 ("[Contracted support service personnel] may not be used in or undertake any role that could jeopardize their status as civilians accompanying the force.").

5.     Titan employees are not permitted to engage in any combat activity.  They are permitted only to engage in support services for soldiers.  *Id. (Appendix 3).*

6.     Titan employees may *not* be armed:  "Contractor personnel are not authorized to carry or possess personal weapons to include, but not limited to, firearms and knives with a blade length in excess of three inches."  *SOW § C-1.8.5 (Appendix 2).*

---

[2] The Statement of Work For Linguistic Support Services To United States Central Command Persian Gulf Area Of Operations (hereinafter "SOW") provided by Titan as an attachment to the Hopkins Declaration is attached as Appendix 2.

7.      Titan employees are not permitted to wear military uniforms.  *AR 715-9 § 3-3(e) (Appendix 3)*.

8.      Titan employees are free to quit their positions without giving notice to the military.  It is Titan's obligation to provide linguists to meet the military's requirements under the contract.  *SOW §§ C-1.3.1; C-1.3.4 (Appendix 2)* ("Support unit commanders will provide the Contractor with a schedule of required linguist services.  The Contractor will ensure that a linguist is assigned to cover this requirement . . . . In the event that a replacement or an additional translator is required immediately, the Contractor shall provide from among those translators currently employed and in theater, in coordination with the COR, until such time that a permanent replacement or new translator is provided.").  In contrast, soldiers who quit their positions face court-martial, jail time, or dishonorable discharge.  *Manual for Courts-Martial (2005) ¶ 10.e*; excerpt attached as Appendix 4.  Indeed, even with notice, soldiers cannot voluntarily withdraw from the military; they must seek a voluntary discharge based on set criteria.  *Army Field Manual 27-14, Legal Guide for Soldiers (Apr. 16, 1991) Ch. 2*; excerpt attached as Appendix 5.

9.      Titan employees are required to provide only "interpretation and translation services."  *SOW § C-1.3.1 (Appendix 2)*.

10.     Titan employees are not required to obey a lawful order issued by a military official if that lawful order requires Titan employees to engage in acts that are beyond the terms of the Titan Contract, namely, beyond "interpretation and translation."  For example, a Titan employee ordered to mop a floor by a military official is permitted to refuse to do so without any consequence.  *Army Field Manual 3-100.21, Contractors on the Battlefield (Jan. 2003) § 1-39 ("FM 3-100.21")* ("Contractors are required to perform all tasks identified within the [Statement

- 3 -

of Work] and all provisions **defined in the contract.**  Contractors must be prepared to perform **all tasks stipulated in the contract** by the government to address potential requirements.")  (emphasis added); attached as Appendix 6.  In contrast, soldiers are required "to follow all lawful orders and perform all assigned duties."  *Enlistment/Reenlistment Document for the Armed Forces § 9.a.1*; attached as Appendix 7.

11.    As admitted by Titan Vice President Ralph Williams, "Titan has no contracts that involve the physical handling of prisoners.  The only service we provide is linguistic services."  Joel Brinkley & James Glanz, *The Struggle for Iraq: Civilian Employees*, N.Y. Times, May 4, 2004, at A6; attached as Appendix 8.

12.    The United States does not require Titan employees to engage in any acts beyond interpretation and translation services as set forth in the SOW.  According to a report prepared by Major General George R. Fay and Lieutenant General Anthony R. Jones, Titan employees are expected to provide translation services and nothing further:

> The contract called for Titan initially to develop a plan to provide and manage linguists throughout the world, and later, implement the plan as required . . . . It is noted that the contract calls for translation services only, and makes no mention of contractor employees actually conducting interrogations.  ***Since the statement of work is limited to translation services, the linguists apparently were not required to review and sign the IROE [Interrogation Rules of Engagement] at Abu Ghraib***.  A recent review of the contract indicated that the current contract ceiling is approximately $650 Million.  Other agencies can order linguist services under this contract.  For the most part, the ordering activity also provides the funds for these delivery orders*.*

*LTG Anthony R. Jones & MG George R. Fay, AR 15-6 Investigation of the Abu Ghraib Prison and 205th Military Intelligence Brigade* ("*Fay/Jones Report*") *at 48*; attached as Appendix 9.

13.     Titan employees are barred from engaging in acts that violate United States or international law such as the Geneva Conventions.  *FM 3-100.21 § 1-39 (Appendix 6)* ("Contractors will comply with all applicable US and/or international laws.").

14.     Titan employees are barred from torturing prisoners during interrogations.  The Army prohibits such interrogation techniques, which contravene the Geneva Conventions and generate unreliable intelligence:

> The GWS [Geneva Convention for the Amelioration of the Wounded and Sick in Armed Forces in the Field of August 12, 1949], GPW [Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949], GC [Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949], and US Policy expressly prohibit acts of violence or intimidation, including physical or mental torture, threats, insults, or exposure to inhumane treatment as a means of or aid to interrogation.
>
> ***Such illegal acts are not authorized and will not be condoned by US Army.  Acts in violation of these prohibitions are criminal acts punishable under the UCMJ [Uniform Code of Military Justice]*** . . . .
>
> Experience indicates that the use of prohibited techniques is not necessary to gain the cooperation of interrogation sources.  ***Use of torture and other illegal methods is a poor technique that yields unreliable results, may damage subsequent collection efforts, and can induce the source to say whatever he thinks the interrogator wants to hear.***
>
> ***Revelation of use of torture by US personnel will bring discredit upon the US and its armed forces while undermining domestic and international support for the war effort.***

*Army Field Manual 34-52, Intelligence Interrogation (Sept. 28, 1992) at 1-8 ("FM 34-52")*; attached as Appendix 10.  This Army Field Manual identifies as examples of physical torture the "infliction of pain through chemicals or bondage," "electric shock," "forcing an individual to stand, sit, or kneel in abnormal positions for prolonged periods of time," "food deprivation," and

"any form of beating."  *Id*.  It identifies "abnormal sleep deprivation" as a form of "mental torture."  *Id*.[3]

## REPORTING STRUCTURE

15.    Titan management directed employees to report concerns and issues to Titan management, not to military personnel.  *Declaration of Thomas B. Crowley ("Crowley Decl.") ¶ 5*; attached as Appendix 12.  Thomas B. Crowley is a former Titan Site Manager who worked for Titan in Iraq between October 2003 and May 2004.

16.    Titan translators were required to report to Titan site management, not the military, with questions about scheduling and work hours.  *Id. ¶ 6*.

17.    Titan translators were not permitted to bring either personal or professional issues to military personnel.  Instead, they were required to bring those issues to Titan management. For example, a "Job Description/Policy Memorandum" for Titan linguist staff in Iraq states: "While supporting [Operation Enduring Freedom], any professional issues that arise need to be brought to your site manager's attention.  Do not bring any personal or professional issues to the U.S. Government representatives.  We are supporting the U.S. Government, but they do not

_____

[3] Army regulations also prohibit the mistreatment of prisoners in a combat zone:

> Prisoners may be interrogated in the combat zone.  The use of physical or mental torture or any coercion to compel prisoners to provide information *is prohibited*. Prisoners may voluntarily cooperate with PSYOP personnel in the development, evaluation, or dissemination of PSYOP messages or products.  *Prisoners may not be threatened, insulted, or exposed to unpleasant or disparate treatment of any kind because of their refusal to answer questions*.  Interrogations will normally be performed by intelligence or counterintelligence personnel.

*Army Regulation 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees (Oct. 1, 1997) § 2-1(d) ("AR 190-8")* (emphasis added); attached as Appendix 11.

exercise administrative control over the group." *Titan Corporation Job Description/Policy Memorandum*; attached as Appendix 13.

## SUPERVISION

18.     Titan, not the military, is obligated to supervise all of its civilian translators accompanying military personnel by the terms of the Titan Contract:  "The Contractor shall provide a sufficient number of on-site managers to adequately supervise contractor personnel during the period of this contract."  *SOW § C-1.4.1 (Appendix 2)*.

19.     [*This paragraph and one document cited therein have been redacted and filed separately under seal*.]

20.     The United States clearly places the duty to supervise employees on Titan, not the military:

> The commercial firm(s) providing the battlefield support services will perform the necessary supervisory and management functions of their employees.  ***Contractor employees are not under the direct supervision of military personnel in the chain of command***.

*AR 715-9 § 3.2(f) (emphasis added)(Appendix 3)*.

21.     Titan, not the military, is also responsible for providing resources sufficient to supervise the employees:  "The Contractor shall provide all personnel, equipment, tools, materials, ***supervision,*** and other items and services (except as specified in Section C-3) ***necessary to provide foreign language interpretation and translation services*** in support of United States (U.S.) Forces and Agencies that are supporting United States Central Command operations in the Persian Gulf Area of Operations (AO)."  *SOW § C-1.1 (Appendix 2)*.

22.     Titan employees are not on loan to the military.  Instead, the Titan Contract expressly states that Titan employees remain the employees of Titan, and cannot be considered

as employees of the United States:  "Personnel performing work under this contract shall remain employees of the Contractor and will not be considered employees of the Government.  *Id. § C-1.4.1 (Appendix 2)*.

23.    Titan admitted in Declarations submitted in the *Ibrahim* litigation that Titan failed to fulfill its contractual obligations to provide a full-time site manager at Abu Ghraib.  The Statement of Work provides:

> A contractor **on-site** representative shall be available to the Administrative Contracting Officer (ACO) or Contracting Officer's Representative (COR) during the hours of 8:00 am to 5:00 PM daily (including weekends) and shall be on call during all other times.

*Id. § C-1.3.2 (Appendix 2)*.  Yet Titan's Site Manager for Abu Ghraib between October 2003 and January 2004, David Winkler, admitted that he lived in the "Green Zone" in the center of Baghdad during this period and drove out to the Abu Ghraib prison only two or three times per week.  *Declaration of David Winkler (appended to Defendant L-3 Communications Titan Corporation's Motion To Dismiss And For Summary Judgment, Ibrahim v. Titan Corp., filed Dec. 16, 2005) ¶ 3 ("Winkler Decl.")*; attached as Appendix 14.

24.    Titan admitted in Declarations submitted in the *Ibrahim* litigation that Titan failed to provide enough personnel to supervise its interpreters.  The Statement of Work provides:

> The Contractor shall provide a sufficient number of on-site managers to adequately supervise contractor personnel during the period of this contract.  The Contractor shall coordinate the work locations of its on-site managers with the Contracting Officer Representative (COR) to ensure access to Government-furnished resources and coordination with Government representatives.

*SOW § C-1.4.1.1 (Appendix 2)*.  Yet Kevin Hopkins, Director of Operations for Titan's Technical and Support Group between June 2003 and April 2005, admitted that Titan supplied an inadequate number of Site Managers:

Titan Site Managers were Titans' first line of management in Iraq. They acted as the interface between the linguists and Titan. The Site Managers were not necessarily located where the linguists were assigned, but rather traveled from location to location, often seeing linguists no more than once a week, and some times less frequently. *The reality was that site managers often found it difficult to see all of their linguists more than once per week, if that. In December 2003, there were 28 Titan Site Managers for 3052 linguists, a ratio of less than 1 to 100.*

*Hopkins Decl. ¶ 14 (Appendix 1).*

## COMMAND AND CONTROL STRUCTURES

25.    The military has established a command and control structure over Titan and

other contractor employees that is wholly separate and apart from the military's own chain of

command. The military makes clear that Titan and other contractors are ***not*** within the chain of

command and control that governs soldiers:

> *The contract administration oversight exerted over contractors is very different from the command and control exerted over military and civilian employees*. Therefore, reliance on private contractors poses risks to maintaining adequate civilian oversight over intelligence operations.

*Memorandum from Patrick T. Henry, Assistant Secretary of the Army, to Assistant Deputy Chief*

*of Staff for Intelligence (Dec. 26, 2000) at 2 (emphasis added)*; attached as Appendix 15.

26.    Under this distinct structure for private contractors, Titan employees are ***not***

integrated into the military's existing command and control structure to be directly supervised by

the military:

> Similar to the military chain-of-command, command and control of commercial support service personnel will be defined by the terms and conditions of the contract . . . . *The cognizant contracting officer is the only government official with the authority to increase, decrease or materially alter a contract's scope of work.*
> *        *        *
> *Contracted support service personnel shall not be supervised or directed by military or Department of the Army (DA) civilian*

> ***personnel.*** Instead, as prescribed by the applicable federal
> acquisition regulations, or as required by force protection to insure
> the health and welfare, the Contracting Officer's Representative
> shall communicate the Army's requirements and prioritize the
> contractor's activities within the terms and conditions of the
> contract.

*AR 715-9 §§ 3.2(e), 3-3(b) (emphasis added) (Appendix 3).*

27.    Titan management knew that Titan translators were not within the formal command and control structure of the military. *Crowley Decl. ¶ 9 (Appendix 12).*

28.    Because the command and control structure for Titan was distinct from the military chain of command, the military personnel at Abu Ghraib and other prisons working with Titan employees had limited ability to impact the manner in which Titan employees performed services. *See Fay/Jones Report at 50 (Appendix 9).*

29.    Military personnel were not able to direct comments or concerns to Titan translators. Instead, they had to register their complaints with the appointed Contracting Officer. The Contracting Officer had the power to order Titan to remove the employee at issue from the contract, but only if the complaint established that the Titan employee at issue was engaged in misconduct, created a security risk, or was under the influence of drugs or alcohol. *SOW § C-1.5 (Appendix 2).* Under those circumstances, Titan was required provide – without delay – a replacement translator "in the same category and with the same level of qualifications." *Id.*

30.    Titan management understood that they, not the military, had the power to supervise and discipline Titan employees. *Crowley Decl. ¶¶ 7-8 (Appendix 12).*

31.    After the disclosure of the torture at Abu Ghraib, the military reviewed whether using contractors rather than government employees had contributed to the events. Major General Fay expressly recommended in his report that, going forward, only government employees, not contractor employees, be permitted to participate in interrogations. He found that

the military would benefit from using only government employees for several reasons: (1) government employees are clearly subject to the chain of command as well as the military's administrative and criminal sanctions; (2) government employees are able to be supervised directly without the need to contact a Contracting Officer; and (3) government employees are able to be subjected to consistent training that results in reliable measures of qualifications. *Fay/Jones Report at 49 (Appendix 9)*.

32.    The United States military found Titan's contractual failures were one of the causes of the abuse at Abu Ghraib. MG Fay stated that "the abuses at Abu Ghraib occurred" in part because of the "[f]ailure to effectively screen [and] certify . . . contractor . . . linguists." *Fay/Jones Report at 6 (Appendix 9)*. MG Fay found Titan's lack of supervision contributed to the abuse: "Proper oversight did not occur at Abu Ghraib due to a lack of training and inadequate contract management and monitoring." *Id. at 52*.

33.    Major General Fay also noted:

> The general policy of not contracting for intelligence functions and services was designed in part to avoid many of the problems that eventually developed at Abu Ghraib, i.e., lack of oversight to insure that intelligence operations continued to fall within the law and the authorized chain of command, as well as the government's ability to oversee contract operations.

*Id. at 49*.

34.    MG Fay was concerned that the "Army's basic interests" were not being well-served by Titan and the other contractors. *Id. at 50*.

35.    In his investigation of some of the events at Abu Ghraib, Major General Antonio M. Taguba similarly found that Titan employees were not adequately supervised: "U.S. civilian contract personnel (Titan Corporation, CACI, etc.) third country nationals, and local contractors do not appear to be properly supervised within the detention facility at Abu Ghraib. During our

on-site inspection, they wandered about with too much unsupervised free access in the detainee

area." *The Article 15-6 Investigation of the 800th Military Police Brigade* ("*Taguba Report*") *at

26*, attached as Appendix 16.

36.    The conclusions of MG Fay and MG Taguba were echoed in the Final Report by

the Independent Panel To Review DOD Detention Operations.  That Panel found, "Contractors

were a particular problem at Abu Ghraib.  The Army Inspector General found that 35 percent of

the contractors employed did not receive formal training in military techniques, policy, or

doctrine . . . Oversight of contractor personnel and activities was not sufficient to ensure

intelligence operations fell within the law and the authorized chain of command." *Final Report

by the Independent Panel To Review DOD Detention Operations at 69*; attached as Appendix 17.

37.    Documents produced by the United States military in response to Freedom of

Information Act litigation by the American Civil Liberties Union reveals the military was

frustrated by its inability to exercise effective control over Titan interpreters.  For example, when

the military informed Titan that it had hired a former Enemy Prisoner of War, Titan – after

admitting it failed to conduct any background check – failed to fire the individual:

> I asked [redacted] to call Titan and find out what his file said,
> because then we could get rid of him for lying on his application.
> They said they had no file on him and that he was hired on
> somebody's recommendation down at Bucca.  And we couldn't get
> rid of him.

*FOIA Document AG0000220*; attached as Appendix 18.

38.    First-hand accounts told to the media by those present at Abu Ghraib also reveal

similar frustrations.  Brigadier General Janis Karpinski, who was in charge of the Abu Ghraib

prison in late 2003 through early 2004, described the military's inability to exercise control over

Titan interpreters as follows:

*Signal: So in the field, when contractors were assigned to the MP [Military Police] brigade, would the MP person in charge ever give direct orders to civilians?*

Karpinski: No.

*Signal: How did it work?*

Karpinski: Well, if there was a problem with the interpreter – or, like, for us, because we didn't have interrogators – but for interpreters, they would call my point of contact in the brigade and he would try to get it resolved. And the job manager, or the site manager, was down in the CPA building. They were never out at the site. Never. But the battalion commander or the company commander would voice those concerns to my lieutenant commander, who would work on getting it resolved. But even documentation to poor performance or poor English language skills or whatever, it was just a document. Nobody was ever fired.

Leon Worden, *Interview of Brig. Gen. Janis Karpinski*, The Signal, July 4, 2004; attached as Appendix 19.

39.     According to former Titan Site Manager Thomas Crowley, when the military did send a complaint about Titan personnel to Titan management, Titan management would generally move the person to another post within Iraq rather than remove them from the contract. This allowed Titan to continue to make money from this translator under its contract, which paid Titan based on the number of translators in the field. *Crowley Decl. ¶ 11 (Appendix 12).*

40.     Titan management conveyed to Titan employees that they were outside the reach of the law. Titan Site Manager Crowley attended a Titan staff meeting in which his supervisor told him and other assembled staff members, "You can do pretty much of everything over here except kill somebody." *Id. ¶ 10 (Appendix 12).*

Dated: June 12, 2006                        _____/s/ Susan L. Burke_____
                                            Susan L. Burke (D.C. Bar # 414939)
                                            BURKE PYLE LLC
                                            4112 Station Street
                                            Philadelphia, PA 19127
                                            Telephone:    (215) 487-6590
                                            Facsimile:    (215) 482-0874

                                            Jennifer Green
                                            CENTER FOR CONSTITUTIONAL RIGHTS
                                            666 Broadway, 7th Floor
                                            New York, NY 10012
                                            Telephone:    (212) 614-6439
                                            Facsimile:    (212) 614-6499

                                            Shereef Hadi Akeel (admitted *pro hac vice*)
                                            AKEEL & VALENTINE, P.C.
                                            401 South Old Woodward Avenue
                                            Suite 430
                                            Birmingham, MI 48009
                                            Telephone:    (248) 594-9595
                                            Facsimile:    (248) 594-4477

                                            *Counsel for Plaintiffs and Class Plaintiffs*

### INDEX TO APPENDIX TO STATEMENT OF MATERIAL FACTS

1    Declaration of Kevin S. Hopkins (appended to Defendant L-3 Communications Titan Corporation's Motion To Dismiss And For Summary Judgment, *Ibrahim v. Titan Corp.*, filed Dec. 16, 2005)

2.    Statement of Work for Linguistic Support Services to United States Central Command Persian Gulf Area of Operations

3.    Army Regulation 715-9, *Contractors Accompanying the Force* (Oct. 29, 1999)

4.    Manual for Courts-Martial (2005) (Excerpt)

5.    Army Field Manual 27-14, *Legal Guide for Soldiers* (Apr. 16, 1991) (Excerpt)

6.    Army Field Manual 3-100.21, *Contractors on the Battlefield* (Jan. 2003)

7.    Enlistment/Reenlistment Document for the Armed Forces

8.    Joel Brinkley & James Glanz, *The Struggle for Iraq: Civilian Employees*, N.Y. Times, May 4, 2004, at A6

9.    MG George R. Fay & Anthony R. Jones, The Investigation of Intelligence Activities at Abu Ghraib Report

10.    Army Field Manual 34-52, *Intelligence Interrogation* (Sept. 28, 1992)

11.    Army Regulation 190-8, *Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees* (Oct. 1, 1997)

12.    Declaration of Thomas B. Crowley

13.    Titan Corporation Job Description/Policy Memorandum

14.    Declaration of David Winkler (appended to Defendant L-3 Communications Titan Corporation's Motion To Dismiss and for Summary Judgment in *Ibrahim v. Titan Corp.* filed Dec. 16, 2005)

15.    Memorandum by Assistant Secretary of the Army Patrick T. Henry to the Secretary of the Army re: Intelligence Exemption (Dec. 26, 2000)

16.    Major General Antonio M. Taguba, The Article 15-6 Investigation of the 800th Military Police Brigade

17.    Final Report by the Independent Panel To Review DOD Detention Operations

18.    ACLU FOIA Document AG0000220

19.    Leon Worden, *Interview of Brig. Gen. Janis Karpinski*, The Signal, July 4, 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SALEH *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 05-1165 (JR) |
| v. | ) |
| | ) **ORAL ARGUMENT REQUESTED** |
| TITAN CORPORATION *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST TITAN
ON THE GOVERNMENT CONTRACTOR DEFENSE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................iii

INTRODUCTION ............................................................................................................1

ARGUMENT ...................................................................................................................4

    I.  A Motion For Summary Judgment Is The Appropriate Vehicle
       To Adjudicate The Affirmative Government Contractor Defense ..................................4

    II.  The Motion For Summary Judgment Should Be Granted Because
       Titan Employees Were Not Combatants Acting As Soldiers In All But Name .............5

        A.  Contractual Relationship.................................................................................6

        B.  Reporting Structures......................................................................................8

        C.  Supervision....................................................................................................9

        D.  Command and Control Structures..................................................................10

CONCLUSION................................................................................................................11

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Al-Site Corp. v. VSI International, Inc.*, 902 F. Supp. 1551 (S.D. Fla. 1995) .................................4

*Amalgamet Inc. v. Underwriters at Lloyd's*, 724 F. Supp. 1132 (S.D.N.Y. 1989)..........................4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................................................4

*Bloomgarden v. Coyer*, 479 F.2d 201 (D.C. Cir. 1973).....................................................................4

\* *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) .......................................................1, 8

*Celotex Corp. v Catrett*, 477 U.S. 317 (1986) ...................................................................................5

*Fisher v. Halliburton*, 390 F. Supp. 2d 610 (S.D. Tex. 2005) ........................................................8

\* *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005).................................................. passim

*In re Agent Orange Prod. Liab. Litig.*, 580 F. Supp. 1242 (E.D.N.Y. 1984) ................................6

\* *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1993)........................................................ passim

*Kopelowitz v. Home Ins. Co.*, 977 F. Supp. 2d 1179 (S.D. Fla. 1997) ...........................................4

*McKay v. Rockwell Int'l Corp.*, 704 F.2d 444 (9th Cir. 1983) ....................................................4, 5

*Morgan v. Federal Home Loan Mortgage Corp.*, 328 F.3d 647 (D.C. Cir. 2003)..........................4

*Skeels v. United States*, 72 F. Supp. 372 (W.D. La. 1947) ..............................................................6

*United States v. Kinder*, 14 C.M.R. 742 (A.F.C.M.R. 1954).........................................................9

## FEDERAL STATUTES

Federal Tort Claims Act, 28 U.S.C. § 2680(j)..............................................................................2, 7

**INTRODUCTION**

Although discovery has not yet begun in this action, the indisputable evidence establishes

that plaintiffs are entitled to a judgment in their favor on the so-called "government contractor

defense." That defense was judicially created in *Boyle v. United Technologies Corp.*, 487 U.S.

500 (1988), to insulate weapons manufacturers from product liability claims based on design

defects in weapons actually designed by the United States, rather than the manufacturer. In the

related action *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 18 n.6 (D.D.C. 2005), this Court held

that Titan cannot assert the *Boyle* formulation of the government contractor defense, in which the

Supreme Court reasoned that a contractor should not be liable for implementing a government

decision made in its discretionary function.

However, the Court in *Ibrahim* also held that Titan (and CACI) may be able to invoke an

extension of the *Boyle* defense judicially created by the Court of Appeals for the Ninth Circuit in

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1993).[1] *Ibrahim* at 17-19. In *Koohi*, a private

manufacturer of an air defense system was at risk of being held liable under California law

because the military had mistakenly used that system to shoot down a passenger plane during

combat. As in *Boyle*, the contractor had done nothing other than manufacture a weapon in

accord with government specifications. *Koohi* at 1336-37. The Court of Appeals for the Ninth

---

[1] In their Opposition to Defendant Titan Corporation's Motion to Dismiss the Third Amended Complaint, plaintiffs explained why, as a matter of law, Titan should not be permitted to invoke the government contractor defense because it should be available only in those instances when a contractor can state "the government made me do it." Titan has not – and cannot – make that argument for conduct that was prohibited by the contract and did not benefit the United States. Instead in its motion to dismiss the Third Amended Complaint, Titan simply asserts that the defense should be available because Titan had a contract with the United States. The United States has not filed any papers or given any other indication that it views Titan as having acted in its interests. Indeed, the United States has claimed the opposite. Titan simply did not act to further the interests of the sovereign.

Circuit, reasoning that the military needed to be free to make mistakes during combat without being concerned with the tort implications for its contractors, extended the government contractor defense to encompass an exception to Federal Tort Claims Act ("FTCA") tort liability relating to combatant activities. *Id.* (citing 28 U.S.C. § 2680(j), which protects the government from tort liability for "any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war.").

Based on this decision, this Court held in *Ibrahim* that contractors Titan and CACI may be able to invoke the *Koohi* defense, but only if they could prove that the United States required Titan and CACI employees to be "essentially soldiers in all but name" and thus fell within the FTCA "combatant activities" found applicable by the *Koohi* court to government contractors. *Id* at 18. This Court suggested that Titan and CACI establish their employees were soldiers in all but name by introducing, via a motion for summary judgment, competent evidence relating to four factors: (1) contractual responsibilities, (2) reporting structure, (3) supervision, and (4) structures of command and control. *Id.* at 19. Defendants have filed such motions for summary judgment in the *Ibrahim* matter. *Motion For Summary Judgment Of Defendant CACI Premier Technology, Inc. and Defendant L-3 Communications Titan Corporation's Motion To Dismiss And For Summary Judgment, both filed in Ibrahim v. Titan Corp., 04-cv-1248 (Dec. 16, 2005).* The *Ibrahim* plaintiffs have sought the right to discovery before opposing the motions for summary judgment. *Plaintiffs' Supplemental Response To Notice And Order of January 27, 2006 And Supplemental Response To Defendants' Motions For Summary Judgment, filed in Ibrahim v. Titan Corp., 04-cv-1248 (Feb. 16, 2006).*

The motion filed by Titan and the evidence submitted fall far short of the mark. Thus plaintiffs in the instant action hereby seek summary judgment on the very same issue presently

being litigated in *Ibrahim*.[2]  Plaintiffs set forth uncontested evidence in the Statement of Material Facts establishing beyond dispute that Titan employees were ***not*** combatants acting as soldiers in all but name.  Indeed, Titan's contract with the United States required Titan to ensure that its employees did not act as combatants in any way, but rather preserved their legal status as "civilians accompanying the force."  *Statement of Material Facts* ¶¶ *4-5*.  Titan employees reported to Titan management, not to military.  *Statement of Material Facts* ¶¶ *15-17*.  Titan employees were supervised by Titan management, not the military.  *Statement of Material Facts* ¶¶ *18, 20-24*.  Titan employees were outside the military structure of command and control.  *Statement of Material Facts* ¶¶ *25-40*.

In sum, it is clear that Titan is not entitled to invoke the "combatant activities" government contractor defense.  Because there are no genuine issues of material fact, plaintiffs respectfully request that this Court enter an order finding that the undisputed facts establish that Titan cannot invoke the affirmative government contractor defense at the trial in this matter.  In the alternative, if the Court is not persuaded by the existing evidence compiled without the benefit of discovery, plaintiffs respectfully request leave to conduct 120 days of discovery to build a formal record establishing Titan employees are not soldiers in all but name.

---

[2] Plaintiffs continue to believe that consolidating the actions would save judicial resources because the issues being litigated are very similar.  Nonetheless, given that both defendants (who would seem to have the most to gain from consolidation) and plaintiffs' counsel in *Ibrahim* oppose consolidation, undersigned counsel is not seeking to consolidate the proceedings at this juncture.

# ARGUMENT

## I.    A MOTION FOR SUMMARY JUDGMENT IS THE APPROPRIATE VEHICLE TO ADJUDICATE THE AFFIRMATIVE GOVERNMENT CONTRACTOR DEFENSE.

As this Court noted in the *Ibrahim* action, "a motion for summary judgment is the right vehicle to address the issue of preemption." *Ibrahim*, 391 F. Supp. 2d at 19.  That plaintiffs, rather than defendants, are moving for such a ruling does not alter the appropriateness of resolving the inapplicability of the affirmative government contractor defense.  *See*, *e.g.*, *Kopelowitz v. Home Ins. Co*., 977 F. Supp. 2d 1179 (S.D. Fla. 1997) (granting summary judgment to plaintiff where defendant insurer had failed to make out facts supporting its affirmative defenses); *Al-Site Corp. v. VSI Int'l, Inc*., 902 F. Supp. 1551 (S.D. Fla. 1995) (granting plaintiff's motion for partial summary judgment on two affirmative defenses raised by defendant); *Amalgamet Inc. v. Underwriters at Lloyd's*, 724 F. Supp. 1132 (S.D.N.Y. 1989) (granting plaintiffs' motion for partial summary judgment dismissing affirmative defenses in part).

Defendant Titan, not plaintiffs, bears the ultimate burden of proof on the issue presented by this motion for summary judgment.  *McKay v. Rockwell Int'l Corp*., 704 F.2d 444, 453 (9th Cir. 1983); *Ibrahim*, 391 F. Supp. 2d at 17-18 ("[P]reemption under the government contractor defense is an affirmative defense, with the burden of proof on the defendants.").  Thus, although the evidence must be viewed in Titan's favor for purposes of plaintiffs' motion for summary judgment, *Bloomgarden v. Coyer*, 479 F.2d 201 (D.C. Cir. 1973), Titan cannot defeat the motion merely by asserting without evidence that Titan employees were soldiers in all but name. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Morgan v. Federal Home Loan*

*Mortgage Corp.*, 328 F.3d 647, 650 (D.C. Cir. 2003), *citing Celotex Corp. v Catrett*, 477 U.S

317, 322 (1986).[3]

## II.     THE MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE TITAN EMPLOYEES WERE NOT COMBATANTS ACTING AS SOLIDERS IN ALL BUT NAME.

The government contractor defense is founded on the premise that government

contractors should not be forced to incur tort liability for conduct and mistakes that are not of

their own making, but rather result from or are required by their contract with the United States.

The *Boyle* and *Koohi* decisions both considered facts in which the plaintiffs were seeking to

recover for a contractor's *design* defect in a weapon manufactured pursuant to government

specification.  Indeed, the Court of Appeals for the Ninth Circuit has noted that in those instances

when a contractor created a flawed product due to a manufacturing defect – its own mistake and

an act not called for under the contract – it cannot seek protection under the government

contractor defense.  *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 448 n.6 (9th Cir. 1983)

(distinguishing manufacturing and design defects).  There has never been a case in which a

government contractor was permitted to use the government contractor defense to insulate itself

from tort liability for damages caused by its own volitional conduct – as distinct from conduct

mandated by the United States.

In *Ibrahim*, this Court held that the answer to whether Titan's conduct was mandated by

the United States turns on the facts.  Did the United States have such unfettered control over

Titan employees that they were the equivalent of soldiers?  Did the United States seek such

ability to control the actions of Titan employees by the terms of the contract with Titan?  Did the

---

[3] Titan, knowing the reality that its employees are not soldiers in all but name, used their Motion To Dismiss in this action to try to persuade the Court to revisit the analytical framework set forth in *Ibrahim*.

United States directly supervise Titan employees?  Did Titan employees report to the United

States rather than to Titan?  Did the United States integrate Titan employees into the existing

military command and control structure?[4]  *Ibrahim*, 391 F. Supp. 2d at 19.  The answer to all of

these questions is no.

Titan employees are not the equivalent of soldiers.  They are non-combatants who are not

even permitted to be armed.  The contract between Titan and the United States and the

regulations incorporated by reference into that contract make it clear that Titan, not the United

States, is liable for the misconduct of its employees.  Titan employees are (or should be)

supervised by Titan management, not the United States.  Titan employees report to Titan

management, not the United States.  Titan employees are not integrated into the military's

command and control structure, but rather are beyond the reach of the military officials who are

frustrated by their inability to influence the conduct of Titan employees' conduct.

### A.    Contractual Relationship

Titan is contractually bound to take steps to ensure that its employees are ***not*** acting as

soldiers in all but name.  Titan is required by Army Regulations to maintain its employees in the

status known as "civilians accompanying the force."  *Statement of Material Facts ¶ 4*.  This is a

non-combatant status.  The judicial precedent interpreting the "combatant activities" FTCA

exception is meager, *see Ibrahim*, 391 F. Supp. 2d at 18, but those courts that have done so have

interpreted "combatant activities" as referring to actually engaging in the exercise of physical

force with enemies, *see Skeels v. United States*, 72 F. Supp. 372, 374 (W.D. La. 1947), or actual

hostilities and physical violence during wartime, *see In re Agent Orange Prod. Liab. Litig.*, 580

---

[4]Plaintiffs argued in their oppositions to defendants' motions to dismiss that the Court should
answer these questions as a matter of law rather than fact because the United States cannot
contract for illegal conduct such as torture.

F. Supp. 1242, 1255 (E.D.N.Y. 1984).

Titan contractors are not permitted to engage in combat, only in translating services. Titan employees are responsible for translating Arabic and other languages into English and vice versa – nothing else. *Statement of Material Facts ¶¶ 9-12*. Titan employees are not permitted to bear arms. *Statement of Material Facts ¶ 6*. Titan employees are free to quit their posts without notice to the United States. *Statement of Material Facts ¶ 8*. Titan employees are not required by contract to engage in any physical contact with prisoners. *Statement of Material Facts ¶ 11*. Further, the Titan Contract prohibits Titan employees from engaging in torture. *Statement of Material Facts ¶¶ 3, 13, 14*.

Thus, holding Titan accountable for the heinous acts of Titan employees does not implicate any of the concerns set forth in *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1993). In *Koohi*, the Ninth Circuit Court of Appeals held that the government contractor defense protected manufacturers of an air defense weapons system from California state tort law liability for the military's misuse of that system to shoot down a civilian passenger plane in a combat zone. *Id.* at 1337. The court found that there would be a conflict between imposing a duty of care on weapons manufacturers under state negligence law and congressional intent expressed in the FTCA combatant activities exception *not* to create a duty of reasonable care towards persons "against whom force is directed as a result of authorized military action." *Id.* at 1337, *citing* 28 U.S.C. § 2680(j). The *Koohi* court aimed to ensure that the United States was not indirectly subject to tort claims arising on the battlefield where the military is authorized to use physical force and owes no duty of care to combatants. Those concerns are not present in this case. The tort claims against Titan arise from the unauthorized and illegal treatment of prisoners in a non-combat institutional setting. Holding Titan liable for torturing prisoners would not impact or

hamper the ability of any military commanders to conduct operations in wartime or give them pause before giving direction on the battlefield.[5]  Titan employees are not out on the battlefield taking direction from commanders.  Titan employees are unarmed civilians who are limited to one task, and only one task – translating.  *Statement of Material Facts ¶¶ 9-12*.

The facts of *Koohi* and *Boyle* also differ from those here in that the contractors in those cases had merely followed government instructions in manufacturing military equipment that became the subject of a tort action based on the original design by the military or the use of that equipment by the military.  Here, however, Titan was not following United States policy and military regulations when it tortured prisoners; its translators took independent tortious actions.  Furthermore, because Titan translators did not follow United States policy and military regulations, they did not serve the U.S. Army's "basic interests," *see Statement of Material Facts ¶ 34*, and likely put American soldiers serving in Iraq in greater danger.

## B.    Reporting Structures

Titan employees reported to Titan management, not to the military.  *Statement of Material Facts ¶¶ 15-17*.  This contractual mandate was carried out in practice, as has been attested to by a former Titan Manager.  *Id.*

---

[5] Plaintiffs note that at least one court has found *Koohi* inapplicable beyond the context of products liability.  In *Fisher v. Halliburton*, 390 F. Supp. 2d 610 (S.D. Tex. 2005), a military contractor was sued for wrongful death and other torts after several of its employees were killed while driving a fuel convoy to the Baghdad airport.  Halliburton argued that the claims were barred by the combatant activities exception under the government contractor defense.  The court found the defense inapplicable:  "Defendants herein have cited no case in which the § 2680(j) 'combatant activities' exception or any other exception to the FTCA's waiver of sovereign immunity has been held to bar . . . claims against a defense contractor other than in situations in which the contractor has provided allegedly defective products, and this Court's research has found none . . . . The Court concludes that extension of the government contractor defense beyond its current boundaries is unwarranted and the FTCA does not bar Plaintiffs' claims."  *Id.* at 615-16; *see also Fisher v. Halliburton*, No. Civ. A. H-05-1731, 2005 WL 2001351 (S.D. Tex. Aug. 18, 2005) (denying defendants' motion for reconsideration).

Thus, even if a military soldier or official asked or ordered a Titan employee to assist in torture, there is absolutely no reason why a Titan employee would have to accede to that request. Titan employees are free to walk away from such misconduct.[6]

### C.    Supervision

Titan cannot dispute that Titan, not the military, is required to supervise its employees. *Statement of Material Facts ¶¶ 18, 20-24*. That Titan did not fulfill that contractual obligation does not insulate Titan from liability, but rather helps prove the veracity of plaintiffs' allegations. That is, Titan admits in the Declarations submitted in the *Ibrahim* litigation that it failed to fulfill its contractual obligation to provide sufficient resources to supervise its employees. *Statement of Material Facts ¶¶ 23-24*. Titan then argues that therefore it should be assumed that the military is actually supervising the Titan employees. But Titan, not the military, should have spent the money on the resources needed to supervise its employees. Titan, not the military, should have made sure that Titan employees were not torturing and mistreating prisoners. The fact that Titan's admitted malfeasance to abide by its contractual duty to supervise its employees does not result in a conclusion that the military must have stepped in and supervised Titan employees.

Rather, according to the military, Titan's failure to supervise its employees was one of the causes of the torture at Abu Ghraib. *Statement of Material Facts ¶ 32*. As MG Fay explained, "Proper oversight did not occur at Abu Ghraib due to a lack of training and inadequate contract management and monitoring." *Id*. MG Taguba also cited Titan's failures as

---

[6] Indeed, even soldiers need not follow unlawful orders. *United States v. Kinder*, 14 C.M.R. 742, 776 (A.F.C.M.R. 1954) ("It is the heart of the principle of law contained in the provision of the Manual for Courts-Martial and the other military and civil authorities cited to the same effect . . . that a soldier or airman is not an automaton but a 'reasoning agent' who is under a duty to exercise judgment in obeying the orders of a superior officer to the extent, that where such orders are so palpably illegal on their face that a man of ordinary sense and understanding would know them to be illegal, then the fact of obedience to the order of a superior officer will not protect a soldier for acts committed pursuant to such illegal orders.") (internal citation omitted.)

part of the problem: "U.S. civilian contract personnel (Titan Corporation, CACI, etc.) third

country nationals, and local contractors do not appear to be properly supervised within the

detention facility at Abu Ghraib."  *Statement of Material Facts ¶ 35.*

In short, Titan's claim that the military must have been supervising Titan employees

because Titan was not doing so is simply false.  No one was supervising Titan employees, who

were thus free to engage in repeated acts of egregious misconduct that harmed the named

plaintiffs and class members.

### D.    Command and Control Structures

Titan employees were outside the military's command and control structure.  *Statement*

*of Material Facts ¶¶ 25-40.*  As a result, senior military officials have advised the military to

stop using contractor employees for interrogations.  *Statement of Material Facts ¶ 31.*  The

military did not have the power to order Titan employees to engage in tasks necessary to the war

effort.  Instead, military officials were permitted only to use Titan employees to translate.  They

did not even have the power to remove a Titan employee who was a bad translator.  If a military

official was concerned about the quality of translation, his or her only recourse was to contact the

Contracting Officer and complain.  Even the Contracting Officer did not have unfettered power

to remove a Titan employee.  Instead, the Contracting Officer was permitted to ask Titan to

remove an employee from the contract only in instances of misconduct or intoxication.

*Statement of Material Facts ¶¶ 28-29.*  In practice, Titan often ignored the United States'

requests to remove an employee from the contract, but instead simply moved the employee to

another location.  *Statement of Material Facts ¶ 39.*  The military officials were frustrated and

concerned about their complete inability to manage Titan employees.  *Statement of Material*

*Facts ¶ 37.*

## CONCLUSION

Titan cannot dispute the material facts set forth in documents created by the United States. Titan simply cannot prove that its employees stood in the shoes of soldiers. Titan employees reported to Titan management, who should have been supervising them. That Titan failed to invest the funds to ensure adequate supervision does not somehow transform Titan employees into soldiers within the military chain of command. Plaintiffs respectfully request that the Court enter an order finding that Titan is not entitled to invoke the affirmative government contractor defense at the trial in this matter.


Dated: June 12, 2006                        _____/s/ Susan L. Burke_____
                                            Susan L. Burke (D.C. Bar # 414939)
                                            BURKE PYLE LLC
                                            4112 Station Street
                                            Philadelphia, PA 19127
                                            Telephone:    (215) 487-6590
                                            Facsimile:    (215) 482-0874

                                            Jennifer Green
                                            CENTER FOR CONSTITUTIONAL RIGHTS
                                            666 Broadway, 7th Floor
                                            New York, NY 10012
                                            Telephone:    (212) 614-6439
                                            Facsimile:    (212) 614-6499

                                            Shereef Hadi Akeel (admitted *pro hac vice*)
                                            AKEEL & VALENTINE, P.C.
                                            401 South Old Woodward Avenue
                                            Suite 430
                                            Birmingham, MI 48009
                                            Telephone:    (248) 594-9595
                                            Facsimile:    (248) 594-4477

                                            *Counsel for Plaintiffs and Class Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jonathan H. Pyle, do hereby certify that on the 12th day of June 2006, I caused true and

correct copies of Plaintiffs' Motion For Summary Judgment Against Titan On The Government

Contractor Defense to be served via electronic mail, upon the following individuals at the

addressed indicated:

F. Whitten Peters
Thomas M. Craig
Williams and Connolly
725 12th Street, NW
Washington, DC 20005
wpeters@wc.com
*Counsel for Defendant Titan Corp.*

J. William Koegel Jr.
John F. O'Connor
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
wkoegel@steptoe.com
*Counsel for Defendants CACI
International, CACI Inc. – Federal, and
CACI-PT*

Adam L. Rosman
Ellen D. Marcus
Zuckerman Spaeder LLP
1800 M Street, NW
Washington, DC 20036
arosman@zuckerman.com
*Counsel for Defendant Adel Nakhla*

Henry E. Hockeimer Jr.
Jessica Natali
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market St, 51st Floor
Philadelphia, PA 19103
hockeimerh@ballardspahr.com
*Counsel for Defendant Steven Stefanowicz*

Alison L. Doyle
Shari L. Klevens
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006-1108
adoyle@mckennalong.com
*Counsel for Defendant John B. Israel*

Jonathan H. Pyle