# FM 34-52
# INTELLIGENCE INTERROGATION

HEADQUARTERS, DEPARTMENT OF THE ARMY

DISTRIBUTION RESTRICTION: Approved for public release; distribution is unlimited.

FIELD MANUAL 34-52

*FM 34-52
Headquarters
Department of the Army
Washington, DC, 28 September 1992

# INTELLIGENCE INTERROGATION

## Table of Contents

Page

PREFACE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

CHAPTER 1 - MILITARY INTELLIGENCE MISSIONS AND . . . . . . . . . . . . . . . . . . . . . . . 1-1
            INTELLIGENCE PREPARATION OF THE BATTLEFIELD
   Warfighting Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
   The Intelligence Cycle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
   Intelligence Disciplines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2
   Intelligence and Electronic Warfare Operations . . . . . . . . . . . . . . . . . . 1-3
   Mission, Enemy, Troops, Terrain, and Time Available Factors . . . . . . . . . . . 1-5
   Definition of Interrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-6
   Definition of Prisoner of War and Enemy Prisoner of War . . . . . . . . . . . . . 1-9
   Pertinent Articles of Geneva Conventions . . . . . . . . . . . . . . . . . . . . . 1-10
   Types of Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-10
   Personal Qualities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-12
   Special Areas of Knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-14
   Interrogator Capabilities and Limitations . . . . . . . . . . . . . . . . . . . . 1-15
   Conflicts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-16
   Interrogation Missions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-17
   Drug and Law Enforcement Agency Operations . . . . . . . . . . . . . . . . . . . . 1-17

CHAPTER 2 - COMPOSITION AND STRUCTURE . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
   Tactical Operations Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
   Interrogation Below Division . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-2
   Division Interrogation Assets . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3
   Corps Interrogation Assets and Organization . . . . . . . . . . . . . . . . . . . 2-6
   Echelons Above Corps Interrogation Assets and Organization . . . . . . . . . . . . 2-7
   Enemy Prisoner of War and Interrogation Facilities . . . . . . . . . . . . . . . . 2-9

DISTRIBUTION RESTRICTION: Approved for public release; distribution is unlimited.

*This publication supersedes FM 34-52, 8 May 1987.

|  | Page |
|---|---|
| Corps Facilities | 2-10 |
| Echelons Above Corps Facilities | 2-12 |
| Medical Company Interrogations | 2-12 |
| Interrogation at Brigade and Below | 2-12 |
| Special Forces | 2-14 |
| Amphibious Operations | 2-14 |
| Airborne Operations | 2-15 |
| Interrogator Supported Operations | 2-18 |
| Theater Interrogation Facility | 2-22 |
| Support Relationships | 2-24 |

CHAPTER 3 - THE INTERROGATION PROCESS ........................... 3-1
    Collection Priority ........................................... 3-1
    Screening .................................................... 3-2
    Planning and Preparation ..................................... 3-7
    Approach Phase ............................................... 3-10
    Questioning Phase ............................................ 3-20
    Termination Phase ............................................ 3-26
    Reporting Information ........................................ 3-28
    Interrogation with an Interpreter ............................ 3-29
    Strategic Interrogations and Debriefings ..................... 3-31

CHAPTER 4 - PROCESSING AND EXPLOITING CAPTURED ENEMY DOCUMENTS ... 4-1
    Document Categories .......................................... 4-2
    Document Handling ............................................ 4-4
    Document Exploitation ........................................ 4-7
    Translating .................................................. 4-9
    Evacuation Procedures ........................................ 4-12

APPENDIX A - UNIFORM CODE OF MILITARY JUSTICE EXTRACT ............ A-1

APPENDIX B - QUESTIONING GUIDES .................................. B-1

APPENDIX C - S2 TACTICAL QUESTIONING GUIDE AND BATTLEFIELD EXPLOITATION ... C-1
    OF CAPTURED ENEMY DOCUMENTS AND EQUIPMENT

APPENDIX D - PROTECTED PERSONS RIGHTS VERSUS SECURITY NEEDS ...... D-1

APPENDIX E - REPORTS ............................................. E-1

APPENDIX F - COMMAND LANGUAGE PROGRAM ............................ F-1

APPENDIX G - INDIVIDUAL AND COLLECTIVE TRAINING .................. G-1

|  | Page |
|---|---|
| GLOSSARY | Glossary-1 |
| REFERENCES | References-1 |
| INDEX | Index -1 |

# PREFACE

This manual provides doctrinal guidance, techniques, and procedures governing employment of interrogators as human intelligence (HUMINT) collection assets in support of the commander's intelligence needs. It outlines the interrogator's role within the intelligence collection effort and the supported unit's day-to-day operations. Details are presented on how interrogation assets accomplish their assigned collection mission.

Material in this manual applies to operations in low-, mid-, and high-intensity conflicts. Principles outlined are valid under conditions involving use of electronic warfare (EW) or nuclear, biological, or chemical (NBC) weapons.

This manual is intended for use by interrogators as well as commanders, staff officers, and military intelligence (MI) personnel charged with the responsibility of the interrogation collection effort. Unless otherwise stated, descriptions pertaining to duties, functions, and responsibilities of the G1, G2, G3, G4, and G5 apply to equivalent positions at other organizational echelons.

Interrogation is the HUMINT subdiscipline responsible for MI exploitation of enemy personnel and documents to answer the supported specific information requirements (SIR). These SIR responses, along with those of other MI disciplines, are correlated to satisfy the force commander's priority intelligence requirements (PIR) and intelligence requirements (IR).

During previous armed conflicts, interrogators contributed significantly to the overall intelligence collection effort. They revalidated and established keystone interrogation doctrine (for example, theater interrogation facility [TIF] operations) and documented valuable lessons learned. This knowledge became the genesis for evolving interrogation doctrine.

During Southwest Asia operations, interrogators organized and operated a massive document exploitation (DOCEX) effort. Interrogation units screened, interrogated, or debriefed 49,350 enemy prisoners of war (EPWs), and gathered enough captured enemy documents (CEDs) for DOCEX to fill 18 trailer trucks.

MI interrogation units are a proven and valued collection asset. This manual incorporates the operational experiences and lessons learned. It builds upon existing doctrine and moves interrogation into the 21st century.

These principles and techniques of interrogation are to be used within the constraints established by the following:

- The Uniform Code of Military Justice (UCMJ).

- Geneva Convention for the Amelioration of the Wounded and Sick in Armed Forces in the Field of August 12, 1949, hereinafter referred to as GWS.

- Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949, hereinafter referred to as GPW.

- Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949, hereinafter referred to as GC.

Doctrine in this publication conforms with and supports principles contained in FM 34-1.

This publication implements the following Standardization Agreements (STANAGs):

- STANAG 2033, Interrogation of Prisoners of War, Edition 6.

- STANAG 2044, Procedures for Dealing with Prisoners of War, Edition 5.

- STANAG 2084, Handling and Reporting of Captured Enemy Equipment and Documents, Edition 5.

This publication also complies with STANAG 1059 and Quadripartite Standardization Agreements (QSTAGs) 170, 523, and 528.

The use of the terms EPW, detainee, and source are interchangeable during interrogation process.

Unless this publication states otherwise, masculine nouns or pronouns do not refer exclusively to men.

The proponent of this publication is the US Army Intelligence Center. Send comments and recommendations on DA Form 2028 (Recommended Changes to Publications and Blank Forms) to Headquarters, US Army Intelligence Center, ATTN: ATSI-TDL-D, Fort Huachuca, AZ 85613-6000.

# CHAPTER 1
# MILITARY INTELLIGENCE MISSIONS AND INTELLIGENCE PREPARATION OF THE BATTLEFIELD

This manual is about interrogation operations. The purpose of this chapter is to define the interrogation mission and its critical elements; describe battlefield operations, IEW operations, and the intelligence processes, disciplines, and the mission, enemy, troops, terrain, and time available (METT-T) factors that shape and drive the interrogation process.

It also addresses the personal qualities and special areas of knowledge of the interrogator and the capabilities and limitations of interrogation. It includes information on the various levels of conflict, interrogation missions, intelligence preparation of the battlefield (IPB) and the intelligence cycle. The level of detail is structured to assist you in understanding the interrogation tactics, techniques, and procedures described in the remainder of the manual.

## WARFIGHTING DOCTRINE

Battlefield operations demand seizing and maintaining the initiative. When operations are properly designed and executed, initiative accrues significant benefits from the outset of an operation to final victory. It permits attacking where, when, and what; while forcing the enemy to react and try to adapt to our operations.

To gain the initiative, the commander must—

- See the enemy early and determine the capabilities and intentions of the enemy.
- Find and track enemy follow-on echelons.
- Identify enemy high-value targets (HVTs), which, if successfully attacked, will contribute to the degradation of important enemy battlefield functions.
- Identify, locate, and develop the required targeting data for the attack of high-payoff targets (HPTs), which, if successfully attacked, will contribute to the success of friendly plans.
- Detect enemy weaknesses and develop the necessary data to support the exploitation of these weaknesses.
- Effectively use electronic warfare (EW) assets to support battlefield operations while protecting friendly use of the electromagnetic spectrum.
- Determine the enemy's capability and guard against that capability.
- Protect friendly forces and operations from enemy intelligence collection operations.
- Ensure the enemy is defeated.
- Use the weather and terrain to friendly advantage.

The commander uses defensive and offensive operations to destroy enemy first-echelon forces and deep-attack to simultaneously delay, disrupt, and manipulate enemy follow-on forces. The commander anticipates, creates, and exploits windows of opportunity, using flexible battle planning, to gain the initiative through offensive operations.

By effectively employing maneuver and fire support assets, manipulating the enemy, and expertly using the weather and the terrain, the friendly commander can successfully defeat a superior enemy force. OPERATION DESERT STORM is an example of the successful application of this doctrine.

IEW support is vital to the successful planning and execution of battlefield operations at all echelons. Intelligence support at brigade and battalion levels focuses primarily on close operations, while at division it focuses on close and deep operations. Corps is the focal point for intelligence operations that support rear and deep operations.

## THE INTELLIGENCE CYCLE

Intelligence operations follow a four-phase process known as the intelligence cycle, which is shown at Figure 1-1. The intelligence cycle is oriented to the commander's mission. Supervising and planning are inherent in all phases of the cycle.

FM 34-52



Figure 1-1. The Intelligence cycle.

The intelligence cycle is continuous. Although the four phases are conducted in sequence, all are conducted concurrently. While available information is processed and additional information is collected, the intelligence staff is planning and directing the collection effort to meet new demands. Previously collected and processed information (intelligence) is disseminated as soon as it is available or needed.

## INTELLIGENCE DISCIPLINES

The IEW system includes three MI disciplines: signals intelligence (SIGINT), imagery intelligence (IMINT), and HUMINT. Intelligence interrogation falls within the realm of HUMINT.

### SIGINT

SIGINT is derived from the intercept, analysis, and exploitation of threat communications and noncommunications radio-electronic emissions.

### IMINT

IMINT is obtained from the analysis of radar, photographic, infrared, and electro-optical imagery.

### HUMINT

HUMINT is obtained from information collected from human sources and consists of the following intelligence collection operations:

- Interrogation of EPWs, civilian detainees, insurgents, defectors, refugees, displaced persons, and agents or suspected agents.
- Long-range surveillance (LRS) patrols.
- Strategic debriefing.
- Controlled collection operations.
- Open-source exploitation, to include publications and broadcasts.
- Reports of contact from forward units.
- Observation and listening posts.
- Low-level source operations (LLSO).
- HUMINT liaison contacts.

After World War II, the US General Board on Intelligence surveyed 54 division G2s, 18 corps G2s, and 7

Army G2s. It concluded that 43 percent of all intelligence produced in the European theater of operations was from HUMINT, and 84 percent of the HUMINT was from interrogation. The majority of those surveyed agreed that interrogation was the most valuable of all collection operations.

HUMINT is vital in all combat operations, regardless of echelon or intensity of conflict. By nature, HUMINT lends itself to the collection of information about the enemy's thought processes and intentions. HUMINT can provide information on almost any topic of intelligence interest, including order of battle (OB) factors, as well as scientific and technical (S&T) intelligence subjects. During OPERATION DESERT STORM, interrogators collected information which helped to—

- Develop a plan to breach Iraqi defensive belts.
- Confirm Iraqi supply-line interdiction by coalition air strikes.
- Identify diminishing Iraqi troop morale.
- Identify a US PW captured during the battle of Kafji.

## INTELLIGENCE AND ELECTRONIC WARFARE OPERATIONS

The intelligence cycle supports six tasks which are common to all echelons and which must be worked, at least in part, concurrently to satisfy the needs of the commander. The commander may have to prioritize these functions when resource and time constraints dictate.

### INDICATIONS AND WARNING (I&W)

I&W identifies major shifts in enemy tactics, operations, and strategy which will set or change the terms of battle. They protect the commander from surprise and identify areas or times of risk by detecting enemy actions that are counter to planning assumptions.

- At the operational level, they identify potential enemy action and determine the need for a military response and the probability of hostilities.
- At the tactical level, they focus on the timing of hostilities rather than on their probability.

I&W prevent surprise and minimize risk through the early identification of enemy activities and capabilities.

### INTELLIGENCE PREPARATION OF THE BATTLEFIELD

IPB integrates the environment with the enemy's fighting doctrine and actions. It reveals his capabilities and vulnerabilities and allows the commander to systematically predict his actions. It also allows him to understand the battlefield and how to synchronize all of his battlefield operating systems for maximum effect.

The results of IPB and staff wargaming are used to coordinate and synchronize the intelligence system regardless of the echelon at which it is performed or the intensity of conflict. IPB is more than preparation of the field of battle during hostilities. IPB considers the entire environment of conflict, supporting contingency as well as planning operations.

- At the strategic level, IPB focuses on all factors that contribute to military potential and includes political, economic, sociological, and S&T aspects of the enemy's ability and intent to conduct military operations.
- At the operational level, IPB identifies the enemy's political, economic or military center of gravity, the lines of operation, and the points in time and geography where the decisive engagements of a campaign will occur. It also predicts the courses of action (COAs) the enemy is likely to follow. This is done by incorporating political, economic, social, and geographical factors, as well as military factors (such as his military potential and ability to apply air, ground, and naval power).
- At the tactical level, IPB focuses on the details of the terrain, weather, and enemy. It predicts and prioritizes the enemy's COAs and synchronizes the application of combat power on identified decisive points.

In mid-intensity conflict (MIC) to high-intensity conflict (HIC), IPB focuses on the traditional aspects of terrain, weather, and enemy. Many of the factors evaluated in IPB at the strategic level are used during IPB for low-intensity conflict (LIC) at the operational and tactical levels.

Social, economic, and political factors that affect the environment of conflict are considered in IPB. The population must be examined in as much detail as the enemy and the terrain to understand what an enemy can or cannot do. Figure 1-2 shows the intelligence cycle using IPB.

FM 34-52



Figure 1-2. Intelligence cycle using IPB.

## SITUATION DEVELOPMENT

Situation development confirms or denies the enemy COAs predicted in IPB. It confirms predicted centers of gravity and decisive points and identifies enemy strengths and vulnerabilities. This enables the commander to make timely decisions and effectively apply his combat power.

## TARGET DEVELOPMENT AND TARGET ACQUISITION

Target development and target acquisition provide targets and targeting data for attacks by fire, maneuver, and electronic means. They identify and locate those targets that will have the greatest impact on the campaign's decisive engagements. These include deep operational reserves, strategic and operational level command, control, and communications ($C^3$) nodes, key lines of communication, and air and naval staging facilities throughout the enemy's depth that contribute to his combat potential.

At the tactical level, they address those HVTs that directly contribute to the application of combat power at decisive points on the battlefield.

## BATTLE DAMAGE ASSESSMENT (BDA)

BDA provides the commander with the effect of friendly operations on the enemy. It focuses on the enemy's remaining military capabilities and potential. At the operational level, it also considers the campaign's effects on the enemy's economy and operational infrastructure as well as his military force structure.

BDA is focused on providing effects of particular strikes and attacks, or a series of them. BDA is performed by the same collection assets used to satisfy the commander's intelligence and targeting priorities; therefore, BDA cannot be performed continuously without degradation of other capabilities, such as situation development and targeting. The commander must prioritize the BDA effort, identifying what he must know and when he must know it, just as he does for his PIR and targeting priorities.

## FORCE PROTECTION

Force protection identifies friendly vulnerabilities and the enemy's efforts to exploit them. At the operational level, it includes the early identification of significant improvements in weapon lethality, the introduction of weapons of mass destruction into the conflict, or the commitment of terrorist or other unconventional forces into friendly rear areas.

Force protection goes beyond countering enemy intelligence and includes the protection of all forces that contribute to our combat power. At the tactical level, it emphasizes measures to counter the enemy's intelligence collection capabilities and to protect the force from enemy action.

## MISSION, ENEMY, TROOPS, TERRAIN, AND TIME AVAILABLE FACTORS

The METT-T factors are important to the commander when planning interrogation operations. METT-T determines how the commander will use interrogation assets. The effect of METT-T on interrogation missions is discussed below.

### MISSION SUPPORT

The supported force's mission bears directly on how the interrogation element will be employed. In cordon and search operations, commanders may determine interrogators are best suited to screen the populace in order to identify insurgents and their supporters. In counter-drug operations, commanders may use interrogators to exploit documents and to train US and foreign agents in interrogation techniques. In all conflicts, the focus will be on EPW interrogation and CED exploitation.

The mission influences interrogation operations in other ways. For example, if the force's mission is offensive, interrogation elements must be highly mobile, with secure communications to the supported G2 or S2. They must be constantly prepared to move forward with the element they are supporting. This limits time available for exploitation and dissemination.

On the other hand, if the mission is defensive, interrogation elements have more time to exploit individual sources. They may also have more flexibility to exploit EPWs or detainees and CEDs, to fulfill the commander's intent to construct operational graphics.

Collection requirements vary according to echelon. Strategic echelon requirements reflect the wide scope of interest of the theater and national command authority (NCA); whereas, tactical PIR and IR--and resultant SIR--reflect the immediate, more narrowly focused intelligence interest of the maneuver commander.

### ENEMY

The enemy, and our knowledge of the enemy, can influence interrogator assignments and the complexity of the exploitation process. One factor which affects interrogation operations is the type of opposing enemy force. The techniques and procedures used to collect from insurgents in a LIC may differ from those used to collect from regular enemy forces in a MIC to HIC.

For example, an EPW from a regular forces unit may have undergone political indoctrination, but his commitment to his unit may not be as strong as that of the insurgent who is passionately committed to an ideal. Thus, interrogators may have more difficulty persuading the insurgent to talk.

Another factor affecting interrogation operations is our current intelligence holdings on the enemy force and the interrogator's understanding of the threat. Our intelligence holdings on the composition of a newly formed insurgent organization usually will not be as complete as holdings on the composition of a regular enemy force. Thus, the focus of interrogation efforts in the early stages of a LIC may be on enemy force composition; whereas, the focus in a MIC or HIC may be on enemy force missions or intentions.

Cultural aspects also affect interrogation missions. The employment of some basic interrogation techniques will differ based on the ethnic and cultural background of the enemy, and our failure to understand and adapt to this could hamper the collection effort.

### TROOPS

The number, experience level, and language proficiency of interrogators affect the tactical employment of interrogation elements. Due to the limited number of interrogators at any echelon, interrogation element commanders have to pick from available interrogators. They must manage personnel to ensure the most experienced are used to the best advantage (for example, to exploit complex enemy documents) and select EPWs most likely to answer SIR.

Interrogation element commanders often have to contend with a mismatch between language-qualified personnel assigned to the unit and languages needed to perform the mission. They overcome the mismatch by acquiring local national (LN) interpreter support through the Assistant Chief of Staff, G1 (Personnel). They can also augment their interrogators by requesting other available linguists within the supported command to serve as interpreters.

Another troop-related factor which affects interrogation operations is the training of all soldiers on EPW handling and evacuation. EPW treatment during the early stages of capture is critical to the success of subsequent interrogations. The availability of military police (MP) support at brigade and above can enhance interrogation activities. Interrogation operations are more effective in a controlled environment where EPWs are adequately guarded.

### TERRAIN

Terrain and weather are relevant to interrogator operations and affect site deployments, communications, and mobility. MP must ensure proper shelter and security for the EPW facility if it is collocated or immediately adjacent to the EPW collecting point or internment facility.

### TIME AVAILABLE

Information collected through interrogation operations is valuable only if it is reported in a timely manner. Exploitation procedures may need to be adjusted to make the most use of time available. At the tactical level, interrogations will be brief, PIR driven, and reported in concise formats such as size, activity, location, unit, time, equipment (SALUTE).

At the operational and strategic levels, time will generally allow for a more expanded interrogation effort and flexible reporting format, such as the intelligence information report (IIR).

The challenge is for interrogators to be proficient linguists and skilled members of a highly organized collection activity. This ensures the acquisition of the maximum amount of pertinent information regardless of time available.

Like other intelligence assets, interrogators must serve the commander. Interrogation operations are of no value unless they contribute to the accomplishment of the supported commander's mission. To understand the interrogator's role in mission accomplishment, one must understand the interrogation process.

### DEFINITION OF INTERROGATION

Interrogation is the process of questioning a source to obtain the maximum amount of usable information. The goal of any interrogation is to obtain reliable information in a lawful manner, in a minimum amount of

time, and to satisfy intelligence requirements of any echelon of command. Sources may be—

- Civilian internees.
- Insurgents.
- EPWs.
- Defectors.
- Refugees.
- Displaced persons.
- Agents or suspected agents.
- Other non-US personnel.

A good interrogation produces needed information which is timely, complete, clear, and accurate. An interrogation involves the interaction of two personalities—the source and interrogator. Each contact between these two may differ because of individual characteristics and capabilities of the participants. Furthermore, the circumstances of each contact and physical environment vary.

Other forms of intelligence interrogations include interviews, debriefings, and elicitations. There are certain principles which generally apply to all types of interrogations; namely, the objective, the prohibition against use of force, and security.

## OBJECTIVE

Each interrogation must be conducted for a definite purpose. The interrogator must keep this purpose firmly in mind as he proceeds to obtain usable information to satisfy the assigned requirement, and thus contribute to the success of the unit's mission.

The objective may be specific—Establish the exact location of an ammunition storage facility. Or it may be general—Seek to obtain OB information about a specific echelon of the enemy forces.

In either case, the interrogator must use the objective as a basis for planning and conducting the interrogation. He should attempt to prevent the source from becoming aware of the true objective of the interrogation. The interrogator should not concentrate on the objective to the extent he overlooks or fails to recognize and exploit other valuable information extracted from the source.

For example, during an interrogation, the interrogator learns of the presence of a heretofore unknown, highly destructive weapon. Although this information may not be in line with his specific objective, the interrogator must develop this important lead to obtain all possible information concerning this weapon. It becomes obvious an interrogation objective can be changed as necessary or desired.

## PROHIBITION AGAINST USE OF FORCE

The Intelligence Staff Officer (J2, G2, or S2) has responsibility for all command intelligence functions. He assists the commander by—

- Supervising the collection, evaluation, and interpretation of all intelligence information.
- Disseminating intelligence to appropriate higher, lower, and adjacent units.
- Assuming primary responsibility to ensure that all command intelligence functions are conducted in accordance with international, US, and other applicable law and policy. Specifically, the J2, G2, or S2 is responsible to ensure the GWS, GPW, and GC are not violated by intelligence personnel.

One of the significant means used by the intelligence staff is the interrogation of the following:

- EPWs.
- Captured insurgents.
- Civilian internees.
- Other captured, detained, or retained persons.
- Foreign deserters or other persons of intelligence interest.

These persons are protected by the Geneva Conventions for the Protection of War Victims of August 12, 1949, as they relate to captured wounded and sick enemy personnel (GWS), retained enemy medical personnel and chaplains (GWS), enemy prisoners of war (GPW), and civilian internees (GC). Captured insurgents and other detained personnel whose status is not clear, such as suspected terrorists, are entitled to PW protection until their precise status has been determined by competent authority.

In conducting intelligence interrogations, the J2, G2, or S2 has primary staff responsibility to ensure these activities are performed in accordance with the GWS, GPW, and GC, as well as US policies, regarding the treatment and handling of the above-mentioned persons.

The GWS, GPW, GC, and US policy expressly prohibit acts of violence or intimidation, including physical or mental torture, threats, insults, or exposure to inhumane treatment as a means of or aid to interrogation.

Such illegal acts are not authorized and will not be condoned by the US Army. Acts in violation of these prohibitions are criminal acts punishable under the UCMJ. If there is doubt as to the legality of a proposed form of interrogation not specifically authorized in this manual, the advice of the command judge advocate should be sought before using the method in question.

Experience indicates that the use of prohibited techniques is not necessary to gain the cooperation of interrogation sources. Use of torture and other illegal methods is a poor technique that yields unreliable results, may damage subsequent collection efforts, and can induce the source to say what he thinks the interrogator wants to hear.

Revelation of use of torture by US personnel will bring discredit upon the US and its armed forces while undermining domestic and international support for the war effort. It also may place US and allied personnel in enemy hands at a greater risk of abuse by their captors. Conversely, knowing the enemy has abused US and allied PWs does not justify using methods of interrogation specifically prohibited by the GWS, GPW, or GC, and US policy.

Limitations on the use of methods identified herein as expressly prohibited should not be confused with psychological ploys, verbal trickery, or other nonviolent or noncoercive ruses used by the interrogator in the successful interrogation of hesitant or uncooperative sources.

The psychological techniques and principles in this manual should neither be confused with, nor construed to be synonymous with, unauthorized techniques such as brainwashing, physical or mental torture, or any other form of mental coercion to include drugs that may induce lasting and permanent mental alteration and damage.

Physical or mental torture and coercion revolve around eliminating the source's free will, and are expressly prohibited by GWS, Article 13; GPW, Articles 13 and 17; and GC, Articles 31 and 32. Torture is defined as the infliction of intense pain to body or mind to extract a confession or information, or for sadistic pleasure.

Examples of physical torture include—

- Electric shock.
- Infliction of pain through chemicals or bondage (other than legitimate use of restraints to prevent escape).
- Forcing an individual to stand, sit, or kneel in abnormal positions for prolonged periods of time.
- Food deprivation.
- Any form of beating.

Examples of mental torture include—

- Mock executions.
- Abnormal sleep deprivation.
- Chemically induced psychosis.

Coercion is defined as actions designed to unlawfully induce another to compel an act against one's will. Examples of coercion include—

- Threatening or implying physical or mental torture to the subject, his family, or others to whom he owes loyalty.
- Intentionally denying medical assistance or care in exchange for the information sought or other cooperation.
- Threatening or implying that other rights guaranteed by the GWS, GPW, or GC will not be provided unless cooperation is forthcoming.

Specific acts committed by US Army personnel may subject them to prosecution under one or more of the following punitive articles of the UCMJ:

- Article 78 - Accessory after the fact.
- Article 80 - Attempts (to commit one of the following offenses).
- Article 81 - Conspiracy (to commit one of the following offenses).
- Article 93 - Cruelty and maltreatment.
- Article 118 - Murder.
- Article 119 - Manslaughter.
- Article 124 - Maiming.

- Article 127 - Extortion.
- Article 128 - Assault (consummated by battery; with a dangerous weapon; or intentionally inflicting grievous bodily harm).
- Article 134 - Homicide, negligent:

    -- Misprision of a serious offense (taking some positive act to conceal a serious crime committed by another).

    -- Soliciting another to commit an offense.

    -- Threat, communicating.

See Appendix A for the text of these offenses.

While using legitimate interrogation techniques, certain applications of approaches and techniques may approach the line between lawful actions and unlawful actions. It may often be difficult to determine where lawful actions end and unlawful actions begin. In attempting to determine if a contemplated approach or technique would be considered unlawful, consider these two tests:

- Given all the surrounding facts and circumstances, would a reasonable person in the place of the person being interrogated believe that his rights, as guaranteed under both international and US law, are being violated or withheld, or will be violated or withheld if he fails to cooperate.
- If your contemplated actions were perpetrated by the enemy against US PWs, you would believe such actions violate international or US law.

If you answer yes to either of these tests, do not engage in the contemplated action. If a doubt still remains as to the legality of a proposed action, seek a legal opinion from your servicing judge advocate.

The approaches, psychological techniques, and other principles presented in this manual must be read in light of the requirements of international and US law as discussed above.

Authority for conducting interrogations of personnel detained by military forces rests primarily upon the traditional concept that the commander may use all available resources and lawful means to accomplish his mission and to protect and secure his unit.

It is the stated policy of the US Army that military operations will be conducted in accordance with the law of war obligations of the US. The GWS, GPW, and GC establish specific standards for humane care and treatment of enemy personnel captured, retained, or detained by US military forces and its allies. Suspected or alleged violations of these standards will be reported, investigated and, if appropriate, referred to competent authority for trial or other disposition. Violations of the GWS, GPW, or GC committed by US personnel normally constitute violations of the UCMJ.

The commander is responsible for ensuring that the forces under his command comply with the GWS, GPW, and GC. Should violations occur in the conduct of warfare, the commander bears primary responsibility for investigating and prosecuting violations.

### SECURITY

The interrogator, by virtue of his position, possesses a great deal of classified information. He is aware his job is to obtain information, not impart it to the source. He safeguards military information as well as the source of that information.

This becomes very clear when one considers that among those persons with whom the interrogator has contact, there are those attempting to collect information for the enemy. The interrogator is alert to detect any attempt made by the source to elicit information.

### DEFINITION OF PRISONER OF WAR AND ENEMY PRISONER OF WAR

A PW is a US or allied person detained by an enemy power. An EPW is a person detained by US or allied powers. The first issue interrogators must deal with is who must be afforded PW treatment. Figure 1-3 paraphrases Article 4 of the GPW. In addition, the following personnel shall be treated as PWs: Persons belonging, or having belonged, to the armed forces of the occupied country, if—

- The occupying power considers it necessary by reason of such allegiance to intern them; in particular, if—
- Such persons have made an unsuccessful attempt to rejoin the armed forces to which they belong and which are engaged in combat; or

> PWs are persons who have fallen into the power of the enemy and who are—
>
> - Members of the armed forces of a party to the conflict, militias, or volunteer corps forming part of such armed forces.
>
> - Members of other militias and volunteer corps, including those of organized resistance movements, belonging to a part of the conflict, and operating in or outside their territory, even if this territory is occupied, provided such militias or volunteer corps, including such organized resistance movements, fulfill the following conditions by—
>
>     --Being commanded by a person responsible for their subordinates.
>
>     --Having a fixed distinctive sign recognizable at a distance.
>
>     --Carrying arms openly.
>
>     --Conducting their operations by the laws and customs of war.
>
> - Members of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power.
>
> - Persons who accompany the armed forces without being members of it, such as civilian members of military aircraft crews, war correspondents, supply contractors, members of labor units or services responsible for the welfare of the armed forces, if they have received authorization from the armed forces they accompany, who shall provide them for that purpose with an identity card as described in the Geneva Conventions.
>
> - Members of the crews of merchant marine, and crews of civil aircraft of the parties to the conflict, who do not benefit by more favorable treatment under any other provisions of international law.
>
> - Inhabitants of an unoccupied territory, who on the approach of the enemy, spontaneously take up arms to resist the invading forces, without having had time to form themselves into regular armed units provided they carry arms openly and respect the laws and customs of war.

Figure 1-3. Definition of prisoner of war (GPW).

- Where they fail to comply with a summons made to them with a view to internment.

Obviously, there are many personnel who qualify for and require treatment as PWs. If there is any question whether a person should be treated as a PW, treat the individual as such. The determination whether an individual qualifies as a PW is a Staff Judge Advocate (SJA) function, but has a direct impact on the interrogation effort due to GPW requirements. It is especially important in LICs to distinguish between PWs and criminals.

## PERTINENT ARTICLES OF GENEVA CONVENTIONS

Several articles of the GPW apply to interrogators and interrogation operations. The articles most commonly used by interrogators are shown in Figure 1-4.

## TYPES OF SOURCES

The interrogator encounters many sources who vary greatly in personality, social class, civilian occupation, military specialty, and political and religious beliefs. Their physical conditions may range from near death to perfect health; intelligence levels may range from well below average to well above average; and security consciousness may range from the lowest to the highest.