FM 34-52

population; and on the works and activities arising from treaties, agreements, international law, and US policy.

- Provide civil support for tactical and CSS operations and prevent civilian interference with these operations.
- Coordinate military support of populace and resource control programs.
- Provide technical advice and assistance in reorientation of sources and enemy defectors.
- Coordinate MI aspects of CMO activities with the G2 or S2.

## ADDITIONAL SUPPORT

Besides the major staff elements, an interrogation element requires support from several other elements in order to conduct operations. These elements are discussed below.

### Communications

Secure, reliable communication must be available at or near the interrogation element's deployment site. Priority access to these communications must be arranged to support contact with collection management.

### Staff Judge Advocate

This element can provide legal support and advice on the interpretation and application of international regulations and agreements about handling sources. It is also a channel for reporting known or suspected war crimes.

### Health Service Support

This element must clear all sick and wounded sources before they can be interrogated. Seriously sick or wounded sources are evacuated through medical channels. If adequate facilities are not available in EPW hospitals, EPWs are admitted to military or civilian medical facilities where treatment can be obtained.

Each EPW is medically examined and weighed at least once a month. Provisions are made for the isolation of communicable cases, disinfection, and inoculations. Retained medical personnel and EPWs with medical training are used to care for their own sick and wounded.

### NBC Protection

All EPWs will be provided NBC protection. If EPWs do not have their own NBC protection equipment, or their equipment is not usable, the detaining forces must provide them with proper NBC gear.

### Chaplain Support

The unit ministry team, consisting of the chaplain and chaplain assistant, provides religious support. The team coordinates with the G5 and S5 to provide religious support for refugees, displaced persons, and indigenous civilians. It provides services for EPWs or assists detained clergy of enemy forces and other detained clergy. The team provides burial rites according to the religious rites of combatants. Religious preference of EPWs will be obtained from DA Form 4237-R (Detainee Personnel Record) (see Chapter 3).

### Inspector General

This element is a channel for reporting known or suspected war crimes.

### Public Affairs officer

The public affairs officer advises and informs the commander of public affairs impact inherent in planned or implemented EPW operations.

### Engineer Officer

The engineer officer assists in planning the construction of EPW enclosures. He also assists the G2 and S2 in developing obstacle intelligence (OBSTINTEL) during the IPB. OBSTINTEL requirements are reflected in the PIR and IR. Much of the IR is technical in nature and warrants direct coordination with the interrogator to ensure the right questions are asked. Through the J2, G2, and S2, he will also analyze the information collected and its impact on the maneuver and engineer plan.

### Military Band Unit

At division and corps, the band may augment the MP by providing security at central collecting points and corps holding areas.

## CHAPTER 3
# THE INTERROGATION PROCESS

Criteria for selecting personnel to be interrogated vary with the—

- Commander's collection requirements.
- Time limitations.
- Number and types of potential sources available.
- Exact circumstances surrounding the employment of US Forces.

In this regard, source selection is important in conducting interrogation at tactical echelons of command because of the proximity to enemy ele-ments, number and conditions of detainees, and time restrictions.

The interrogation process involves screening of sources for interrogation and the use of interrogation techniques and procedures. Screening and interrogation involve complex interpersonal skills, and many aspects of their performance are subjective. Each screening and interrogation is unique because of the interaction between the interrogator and the source.

The five interrogation phases—planning and preparation, approach, questioning, termination, and reporting—are discussed later in this chapter.

## COLLECTION PRIORITY

Interrogators are trained to exploit sources and CEDs. This allows the all-source collection manager three exploitation options for interrogation assets: They may exploit sources alone, exploit CEDs, or exploit both simultaneously.

In the past, it was assumed interrogators could accomplish the dual collection mission no matter what type of combat operations were being supported. This may no longer be true. Unit staffing, coupled with the amount of CEDs and sources, may prevent exploitation of sources and CEDs simultaneously.

The density of interrogation assets and command emphasis on the collection effort determine mission requirements. The feasibility of a dual collection mission may also be the result of initial IPB by the commander's intelligence staff. If an echelon cannot conduct a dual collection effort, interrogating sources receives the priority for two reasons:

- The greater intelligence potential of a source.
- The rate at which people forget detailed information.

An individual's value system is easier to bypass immediately after undergoing a significant traumatic experience. The circumstances of capture are traumatic for most sources. Many former PWs indicated extreme disorientation immediately after capture. Capture thrusts them into a foreign environment over which they have no control. Their mores were of no use to them during this period. Most of them survived this phase by clinging to very basic values (love of family and loyalty to friends or comrades).

Since humans are adaptable, this initial vulnerability passes quickly. An individual's established values begin to assert themselves again within a day or two. When this happens, much of an individual's susceptibility to interrogation is gone.

Memory stores information in two areas: short-term and long-term memory. The five senses constantly transmit information to the brain's short-term memory temporarily and then shifts to the brain's long-term memory. The time at which this transfer takes place varies, but research shows a great amount of detail is lost during that transfer. The percentage of information lost beyond recall varies from study to study, but 70 percent is a conservative estimate.

Much of the information of value to the interrogator is information the source is not aware he has. Although no research data is available in this area, it is likely this type of information will be lost quickly.

CEDs, while not affected by memory loss, are often time-sensitive and thus are screened quickly for possible exploitation (see Chapter 4).

The supported echelon's intelligence officer determines the guidelines for priority of exploitation. The commander's intelligence needs and the J2's, G2's, or S2's estimate of the enemy's intentions dictate the extent to which these guidelines can be applied. Exploitation priorities are reviewed and changed when needed.

FM 34-52

# SCREENING

Screening is the selection of sources for interrogation. It must be conducted at every echelon to—

- Determine source cooperativeness and knowledgeability.

- Determine which sources can best satisfy the commander's PIR and IR in a timely manner.

## PREPARE TO CONDUCT SCREENINGS

Screeners should obtain a copy of the element's overall objective statement from the PIR, IR, and SIR and become familiar with the intelligence indicators listed there. Screeners must use their experience and imagination to devise ways to identify EPWs and detainees who might possess information pertinent to these indicators.

For example, one group of indicators may concern new enemy units moving along a specific avenue of approach. In this case, a screener may want to concentrate first on screening EPWs and detainees captured near that location. When he questions those EPWs or detainees, the screener might try to determine what units are due to arrive in that area in the near future. The ability to recognize branch of service and rank insignia can be of great assistance to screeners.

Screeners coordinate with MP holding area guards on their role in the screening process. The guards are told where the screening will take place, how EPWs and detainees are to be brought there from the holding area, and what types of behavior on their part will facilitate the screenings.

## DOCUMENT SCREENING

If time permits, screeners should go to the holding area and examine all available documents pertaining to the EPWs and detainees. They should look for signs that certain EPWs and detainees are willing, or can be induced, to cooperate with the interrogator. Previous screening and interrogation reports and EPW personnel records are important.

Interrogation reports identify EPWs and detainees who have been cooperative in the past. Prior screening reports indicate EPWs and detainees who appear cooperative. During EPW inprocessing, MPs prepare a DA Form 4237-R, which is prescribed by AR 190-8. A sample is shown at Figure 3-1. DA Form 4237-R contains additional information not required by the GWS, GPW, and GC, but which the EPWs and detainees may have volunteered during inprocessing. The volunteer-

ing of information is one indicator of EPW's or detainee's cooperation.

When examining documents, screeners should identify topics on which EPWs and detainees have pertinent information. Screeners should make a note of any documents captured with specific EPWs and detainees that may contain indications of pertinent knowledge and potential cooperation.

## PERSONNEL SCREENING

If time permits, screeners should question holding area personnel about the EPWs and detainees. Since these personnel are in almost constant contact with the EPWs and detainees, their descriptions of specific ones can help identify sources who might answer the supported commander's PIR and IR.

Screeners should identify and note those EPWs and detainees whose appearance and behavior indicate they are willing to cooperate immediately or are unlikely to cooperate ever. Unless time is critically short, screeners should—

- Personally observe the EPWs and detainees.

- Pay attention to rank and branch of service insignias, and condition of uniform and equipment.

- Carefully observe the behavior demonstrated by other EPWs and detainees.

- Look for things like attempts to talk to the guards, intentional placement in the wrong segregation group, or any overt signs of nervousness, anxiety, or fright.

- Note any EPW or detainee whose appearance or behavior indicates willingness to talk.

## CI SCREENING

Before initiating the screening process, the interrogator establishes liaison with supporting CI agents. The CI element, through the CM&D, provides PIR of CI interest. During the screening process, interrogators identify sources of CI interest. After these sources have been interrogated for any information of immediate tactical value (as needed), they are turned over to CI. CI is interested in sources who—

- Have no identification documents.

- Have excessive or modified identification documents.

3-2

FM 34-52

## DETAINEE PERSONNEL RECORD
For use of this form, see AR 190-8, the proponent agency is ODCSPER.

**PART I — TO BE COMPLETED AT TIME OF PROCESSING**

| CARD I | 1. INTERNMENT SERIAL NO. (1-13) US-1501-23176 | 2. NAME (last, first, middle) (14-34) CH'OE, HYON-SIK | 3. RANK (35-37) SRSGT |
|---|---|---|---|

| 4. ENEMY SVC NO. (38-46) 5611642 | 5. TYPE (47) REG | 6. DATE OF CAPTURE (48-53) 8 OCT 99 | 7. DATE OF BIRTH (54-59) 24 FEB 77 |
|---|---|---|---|

| 8. NATIONALITY (60-61) KOREAN (DPRK) | 9. EDUCATION (62) 10 year compulsory | 10. RELIGION (63-64) None | 11. MARSTA (65) Single | 12. PW CAMP UIC (66-71) US-AA3CU | 13. PW PROCESS DATE (72-77) 8 Oct 99 |
|---|---|---|---|---|---|

| CARD II (Keypuncher will pick up Item 1 above) | 14. SEX (14) M | 15. LANGUAGE I (15-16) KOREAN | 16. LANGUAGE II (17-18) KOREAN |
|---|---|---|---|

| 17. PHYSICAL CONDITION (19) Good | 18. PW CAMP LOCATION (20-22) AB654321 | 19. ENEMY UNIT (23-34) 3BN, 34REGT, 17INF DIV. |
|---|---|---|

| 20. ARM OF SVC (35) Army | 21. MOSC (36-39) IIA(INF) | 22. CIVILIAN OCCUPATION (40-45) FARMER | 23. UIC-CAPTURE UNIT (46-51) US-ARA7DD |
|---|---|---|---|

| 24. CORPS AREA OF CAPTURE (52) IV | 25. PLACE OF CAPTURE AB123456 | 26. POWER SERVED DPRK | 27. PLACE OF BIRTH KAESONG |
|---|---|---|---|

| 28. ADDRESS TO WHICH MAIL FOR PW MAY BE SENT 3 DONG 5 BAN KAESONG, DPRK | 29. FATHER/STEPFATHER CH'OE, KANG-T'AE |
|---|---|
| | 30. MOTHER'S MAIDEN NAME YI, NYONG-CHA |

| 31. PERMANENT HOME ADDRESS OF PW See Item 28. | 32. NAME, ADDRESS, AND RELATIONSHIP OF PERSON TO BE INFORMED OF CAPTURE See Items 29 and 30. |
|---|---|

| 33. OTHER PARTICULARS FROM ID CARD. HT - 1.70 meters    HAIR - Black WT - 65 Kilos      EYES - Brown | 34. DISTINGUISHING MARKS Scar on left knee. |
|---|---|

35. IMPOUNDED PERSONAL EFFECTS AND MONEY

26 WON

THE ABOVE LIST OF IMPOUNDED ITEMS IS CORRECT     _Choe Hyon-Sik_
(Signature of Detainee)

| 36. REMARKS None. | 37. PHOTO |
|---|---|
| | PHOTO (Front View)    PHOTO (Right Profile) |

| 38. PREPARED BY (Individual and unit) SFC D.C. SMITH, 17th MP Co. | 39. SIGNATURE SFC D.C. Smith |
|---|---|

| 40. DATE PREPARED 8 Oct 99 | 41. PLACE 29th INF DIV REAR INTERNMENT FACILITY |
|---|---|

DA FORM 4237-R, Aug 85     EDITION OF MAY 82 IS OBSOLETE

**Figure 3-1. DA Form 4237-R (Detainee Personnel Record) (front).**

FM 34-52



| PART II – TO BE MAINTAINED BY UNIT HAVING CUSTODY | | |
|---|---|---|

**42a. LAST NAME**
CH'OE

**b. FIRST NAMES**
HYON-SIK

**43. INTERNMENT SERIAL NUMBER**
US-1501-23176

**44. MEDICAL RECORD**

**a. IMMUNIZATION (Vaccinations and Innoculations with Dates)**

Smallpox – 15 APR 98

**b. MAJOR ILLNESSES AND PHYSICAL DEFECTS (With Dates)**
NONE.

**c. BLOOD GROUP**
B POS

**45. INTERNMENT EMPLOYMENT QUALIFICATIONS**

FARMER

**46. SERIOUS OFFENSES, PUNISHMENTS, AND ESCAPES (With Dates)**
NONE.

**47. TRANSFERS**

| FROM (Location) | TO (Location) | DATE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**48. REMARKS**

**49. FINANCIAL STATUS AT TIME OF FIRST INTERNATIONAL TRANSFER**

| a. CERTIFICATE OF CREDIT BALANCE ISSUED TO EPW (Amount in words) | b. AMT IN FIGURES |
|---|---|
| c. LOCATION | d. DATE |

**50. FINANCIAL STATUS AT TIME OF SECOND INTERNATIONAL TRANSFER**

| a. CERTIFICATE OF CREDIT BALANCE ISSUED TO EPW (Amount in words) | b. AMT IN FIGURES |
|---|---|
| c. LOCATION | d. DATE |

**51. REPATRIATION**

| a. REASON | |
|---|---|
| b. MODE | c. DATE |

**52. FINANCIAL STATUS AT TIME OF REPATRIATION**

| a. CERTIFICATE OF CREDIT BALANCE ISSUED TO EPW (Amount in words) | b. AMT IN FIGURES |
|---|---|
| c. LOCATION | d. DATE |

REVERSE OF DA FORM 4237-R, AUG 85

Figure 3-1. DA Form 4237-R (Detainee Personnel Record) (reverse).

3-4

- Possess unusually large amounts of cash or valuables.

- Possess knowledge of critical interest (for example, nuclear power or chemical plant operations, weapons test and development).

- Are illegal border crossers.

- Attempt to avoid checkpoints.

- Are on the black, gray, or white list (FM 34-60A(S)).

- Request to see CI or US Army Intelligence personnel.

- Have family in the denied area.

Screeners should always try to screen cooperative knowledgeable EPWs and detainees first. These include EPWs and detainees identified during the screener's review of documents, questioning of holding area personnel, and their own personal observations. Based on screener notes and recommendations, they establish the order which EPWs and detainees will be questioned. The holding area guards are then told to bring these EPWs and detainees, in order, to the screening site one at a time.

A screener must use a screening report to record information as it is obtained from the source. Figure 3-2 is a format for a screening report. All information shown is rarely obtained from any one source. The blocks save the screener as much additional writing as possible. If PIR, IR, and SIR information is obtained, it is spot reported in SALUTE format. When this type of information is obtained during screening, it must be exploited fully and reported as soon as possible.

Source screening ends when the screener is sure he can make an accurate assessment of the source's potential cooperation and pertinent knowledge. At this time, the source is returned to the control of the guards, and the screener records his assessment on the screening report.

The assessment is recorded using a screening code. The screening code is an alphanumeric designation which reflects the level of cooperation expected from the source and the level of knowledgeability the source may possess. Table 3-1 shows the codes for assessing sources.

Those sources who have been assigned to the same category may be interrogated in any order deemed appropriate by the senior interrogator. Category 1A sources normally should be the first to be interrogated; Category 1B, next; followed by those assigned to categories 2A, 1C, 2B, 3A, 2C, and 3B. Category 3C sources are normally interrogated last.

This order ensures the highest probability of obtaining the greatest amount of pertinent information within available time. Screening codes may change with the echelon. The higher the echelon, the more time is available to conduct an approach.

Figure 3-3 shows the order in which sources will be interrogated. The term "screening category" should not be confused with the categories that are assigned to EPWs and detainees based on their intelligence value.

There are five interrogation phases which take place after the screening process.

- Planning and preparation.

Table 3-1. Instructions for assessing sources.

| CODE | COOPERATION LEVEL |
|------|-------------------|
| 1 | Responds to direct questions. |
| 2 | Responds hesitantly to questioning. |
| 3 | Does not respond to questioning. |
|  | KNOWLEDGEABILITY LEVEL |
| A | Very likely to possess PIR information. |
| B | Might have IR information. |
| C | Does not appear to have pertinent information. |

FM 34-52

| MP | NUMBER: | | EVACUATION  DATE: | |
|---|---|---|---|---|

**PERSONAL**

LNAME (P): _KHRAIS_
LNAME (M): _____
FNAME: _HAITHAM_
MNAME: _ABDULLAH_
SVC/ID NO: _1234567_
DOB: _24 OCT 80_
LANGUAGES: _ARABIC_
MARITAL STATUS:  M  (S)  W  D

*** STATUS: (M) = Military    C = Civilian
P = Paramilitary    ? = Other

**MILITARY**

BRANCH:  AF (AR) CG MC NV _____
RANK: _PVT_
FULL UNIT DSG: _1SQD/2PLT/3Co_

DUTY PSN: _DUTY SOLDIER_
JOB: _RIFLEMAN_
STATION: _____
SKILLS: _SHARPSHOOTER_
EXPERIENCE: _IN SVC 9 MOS._

**CIVILIAN**

JOB: _STUDENT_
ORG: _____
DUTIES: _____

SKILLS: _NONE._

**CAPTURE DATA**

DATE: _7 Aug 99_
TIME: _1417_
PLACE: _ZA 123456_
CAP UNIT: _1Co/2/3/4 REGT_
CIRCUMSTANCES: _AFTER_
_FIRE FIGHT_
DOCUMENTS: _NONE_

WPNS/EQUIP: _AK-47_

**ASSESSMENT DATA**

PHYSICAL CONDITION:    SEX: (M)  F
WOUNDED:  Y  (N)
REMARKS: _____

MENTAL CONDITION:
EDUCATION = _8_ YRS
INTELLIGENCE:  AVG +   AVG  (AVG -)
MENTAL STATE: _NERVOUS_

SCREENER: _SFC ROYCE_
DATE: _____    TIME: _____
COOPERATION: (1)(High)   2   3 (low)
KNOWLEDGE:   A (High)  (B)  C (low)
BGW LIST:  Y (N)   BGW CODE: _____
SOURCE CATEGORY:  A   B  (C)  D
APPROACH: _DIRECT; INCENTIVE_

SPECIAL HANDLING REQUIREMENT CODES: _____

**PIR & IR**

**REMARKS**

Figure 3-2. Screening report format.

FM 34-52



Figure 3-3. Interrogation priorities by screening category.

- Approach.
- Questioning.
- Termination.
- Reporting.

## PLANNING AND PREPARATION

Once the senior interrogator has assigned specific sources to his subordinates, the interrogators develop a plan for their interrogations. These plans reflect the supported commander's PIR, IR, and SIR and current tactical situation. If they do not, subsequent interrogations will not help the element to satisfy its assigned collection mission, and information needed by the supported unit will be missed.

Each interrogator, where feasible, begins his preparation by examining the SITMAP, OB data base, and pertinent information contained in the interrogation element's files.

Screening reports (Figure 3-2) and DA Form 5976 (Enemy Prisoner of War Capture Tag) are excellent sources of information the interrogator needs. Figure 3-4 shows a sample of DA Form 5976. There should be at least one of these documents available on each EPW and detainee. Additional sources of information may be—

- Documents captured with the EPW or detainee.
- Reports from interrogation elements at previous echelons.

- DA Form 4237-R (Figure 3-1).

The planning and preparation phase and the approach phase (discussed later) are interrelated. In the planning and preparation phase, the interrogator gathers—

- Information on the source's circumstances of capture.
- Comments from others who have been with the source.
- Information on the source's observed behavior and personal traits.
- Peculiarities from the screening sheet.

This information helps the interrogator develop a picture of the source and enables him to select approaches most likely to work.

There are four primary factors that must be considered when selecting tentative approaches:

- The source's mental and physical state. Is the source injured, angry, crying, arrogant, cocky, or frightened? If so, how can this state be best exploited during interrogation.

FM 34-52



Figure 3-4. DA Form 5976 (Enemy Prisoner of War Capture Tag).

3-8

- The source's background. What is the source's age and level of military or civilian experience.

- The objective of the interrogation. How much time is available for the interrogation? Is the commander interested only in specific areas (PIR, IR, SIR)? Is this source knowledgeable enough to require a full OB interrogation?

- The interrogator himself. What abilities does he have that can be brought into play? What weaknesses does he have that may interfere with the interrogation? Can his personality adapt to the personality of the source?

The interrogation may require the interrogator conduct research to obtain detailed data on a specific geographic area, political group, weapons system, or technical field. In the technical field, TECHINT personnel assist the interrogator.

There are various weapons identification guides to assist the interrogator in identifying any weapons mentioned by the source. However, the source should not be shown this guide until he has thoroughly described the items, or has drawn a picture of the weapons.

The interrogator may require maps, documents, recording and photographic equipment, screening reports, and other aids to facilitate the interrogation. From these aids, he must select those best suited to accomplish the objective, determine their availability, and arrange for their procurement well in advance of the interrogation. Some aids the interrogator may use are—

- DA Form 5976.

- Previous interrogation reports.

- Documents found on an EPW or detainee or on the battlefield.

- Maps.

- Imagery or aerial photographs.

- OB data.

- Guards.

- CA and PSYOP personnel.

- Informants.

- Physical aids (such as lights, tables, drafting tools).

- Interrogation guides.

The interrogator must consider in advance obstacles and limitations which may affect the interrogation. These obstacles and limitations may include—

- EPW or detainee legal status.

- Time and facilities available for interrogation.

- The military situation.

- Knowledgeability.

- Language restrictions.

- Physical condition.

- Psychological aspects.

- Other issues which may appear during the course of the interrogation.

Logistical requirements include—

- Billets.

- Office space.

- Heat.

- Light.

- Messing and detention facilities.

- Transportation which may be required in support of the interrogation.

The various staff sections of the supported command may be called upon to furnish the necessary logistical items mentioned above. All support requests will be coordinated with the appropriate staff officer by the EPW or detainee camp or collecting point commander.

Interrogators should question guards about the sources, time permitting, as part of preparation. Since the guards are in constant contact with the sources, they may be able to provide information on—

- Their physical condition.

- Demonstrated attitude and behavior.

- Contact made with other guards or sources.

- How the source has been handled since capture.

- Hearsay (H/S) information from others who have handled the source.

- Confirmation of capture data, especially the circumstances under which the source was captured.

**FM 34-52**

Time permitting, each interrogator should unobtrusively observe the source to personally confirm his identity and to check his personal appearance and behavior.

After the interrogator has collected all information available about his assigned source, he analyzes it. He looks for indicators of psychological or physical weakness that might make the source susceptible to one or more approaches, which facilitates his approach strategy. He also uses the information he collected to identify the type and level of knowledge possessed by the source pertinent to the element's collection mission.

The interrogator uses his estimate of the type and extent of knowledge possessed by the source to modify the basic topical sequence of questioning. He selects only those topics in which he believes the source has pertinent knowledge. In this way, the interrogator refines his element's overall objective into a set of specific interrogation subjects.

The major topics that can be covered in an interrogation are shown below in their normal sequence. However, the interrogator is free to modify this sequence as necessary.

- Missions.
- Composition.
- Weapons, equipment, strength.
- Dispositions.
- Tactics.
- Training.

- Combat effectiveness.
- Logistics.
- Electronic technical data.
- Miscellaneous.

As a result of the planning and preparation phase, the interrogator develops a plan for conducting his assigned interrogation. He must review this plan with the senior interrogator, when possible. Whether written or oral, the interrogation plan must contain at least the following items:

- Interrogation objective.
- EPW's or detainee's identity, to include visual observation of the EPW or detainee by the interrogator.
- Interrogation time and place.
- Primary and alternate approaches.
- Questioning techniques to be used or why the interrogator selected only specific topics from the basic questioning sequence.
- Means of recording and reporting information obtained.

The senior interrogator reviews each plan and makes any changes he feels necessary based on the commander's PIR and IR. After the plan is approved, the holding compound is notified when to bring the source to the interrogation site. The interrogator collects all available interrogation aids needed (maps, charts, writing tools, and reference materials) and proceeds to the interrogation site.

## APPROACH PHASE

The approach phase begins with initial contact between the EPW or detainee and interrogator. Extreme care is required since the success of the interrogation hinges, to a large degree, on the early development of the EPW's or detainee's willingness to communicate. The interrogator's objective during this phase is to establish EPW or detainee rapport, and to gain his willing cooperation so he will correctly answer pertinent questions to follow. The interrogator—

- Adopts an appropriate attitude based on EPW or detainee appraisal.
- Prepares for an attitude change, if necessary.

- Begins to use an approach technique.

The amount of time spent on this phase will mostly depend on the probable quantity and value of information the EPW or detainee possesses, the availability of other EPW or detainee with knowledge on the same topics, and available time. At the initial contact, a businesslike relationship should be maintained. As the EPW or detainee assumes a cooperative attitude, a more relaxed atmosphere may be advantageous. The interrogator must carefully determine which of the various approach techniques to employ.

Regardless of the type of EPW or detainee and his outward personality, he does possess weaknesses which,

if recognized by the interrogator, can be exploited. These weaknesses are manifested in personality traits such as speech, mannerisms, facial expressions, physical movements, excessive perspiration, and other overt indications that vary from EPW or detainee.

From a psychological standpoint, the interrogator must be cognizant of the following behaviors. People tend to—

- Talk, especially after harrowing experiences.

- Show deference when confronted by superior authority.

- Rationalize acts about which they feel guilty.

- Fail to apply or remember lessons they may have been taught regarding security if confronted with a disorganized or strange situation.

- Cooperate with those who have control over them.

- Attach less importance to a topic about which the interrogator demonstrates identical or related experience or knowledge.

- Appreciate flattery and exoneration from guilt.

- Resent having someone or something they respect belittled, especially by someone they dislike.

- Respond to kindness and understanding during trying circumstances.

- Cooperate readily when given material rewards such as extra food or luxury items for their personal comfort.

Interrogators do not "run" an approach by following a set pattern or routine. Each interrogation is different, but all interrogation approaches have the following in common. They—

- Establish and maintain control over the source and interrogation.

- Establish and maintain rapport between the interrogator and source.

- Manipulate the source's emotions and weaknesses to gain his willing cooperation.

The successful application of approach techniques eventually induces the source to willingly provide accurate intelligence information to the interrogator. The term "willingly" refers to the source's answering the

interrogator's questions, not necessarily his cooperation.

The source may or may not be aware he is providing the interrogator with information about enemy forces. Some approaches may be complete when the source begins to answer questions. Others may have to be constantly maintained or reinforced throughout the interrogation.

The techniques used in an approach can best be defined as a series of events, not just verbal conversation between the interrogator and the source. The exploitation of the source's emotion can be harsh or gentle in application. Some useful techniques used by interrogators are—

- Hand and body movements.

- Actual physical contact such as a hand on the shoulder for reassurance.

- Silence.

## RAPPORT POSTURES

There are two types of rapport postures determined during planning and preparation: stern and sympathetic.

In the stern posture, the interrogator keeps the EPW or detainee at attention. The aim is to make the EPW or detainee keenly aware of his helpless and inferior status. Interrogators use this posture with officers, NCOs, and security-conscious enlisted men.

In the sympathetic posture, the interrogator addresses the EPW or detainee in a friendly fashion, striving to put him at ease. This posture is commonly used in interrogating older or younger EPWs. EPWs may be frightened and confused. One variation of this posture is when the interrogator asks about the EPW's family. Few EPWs will hesitate to discuss their family.

Frightened persons, regardless of rank, will invariably talk in order to relieve tension once they hear a sympathetic voice in their own tongue. To put the EPW at ease, the interrogator may allow the EPW to sit down, offer a cigarette, ask whether or not he needs medical care, and otherwise show interest in his case.

There are many variations of these basic postures. Regardless of the one used, the interrogator must present a military appearance and show character and energy. The interrogator must control his temper at all times, except when a display is planned. The inter-

FM 34-52

rogator must not waste time in pointless discussions or make promises he cannot keep; for example, the interrogator's granting political asylum.

When making promises in an effort to establish rapport, great care must be taken to prevent implying that rights guaranteed the EPW under international and US law will be withheld if the EPW refuses to cooperate.

Under no circumstances will the interrogator betray surprise at anything the EPW might say. Many EPWs will talk freely if they feel the information they are discussing is already known to the interrogator. If the interrogator acts surprised, the EPW may stop talking immediately.

The interrogator encourages any behavior that deepens rapport and increases the flow of communication. At the same time, the interrogator must discourage any behavior that has the opposite effect.

The interrogator must always be in control of the interrogation. If the EPW or detainee challenges this control, the interrogator must act quickly and firmly. Everything the interrogator says and does must be within the limits of the GPW, Article 17.

## DEVELOPING RAPPORT

Rapport must be maintained throughout the interrogation, not only in the approach phase. If the interrogator has established good rapport initially and then abandons the effort, the source would rightfully assume the interrogator cares less and less about him as the information is being obtained. If this occurs, rapport is lost and the source may cease answering questions. Rapport may be developed by—

- Asking about the circumstances of capture. By doing this, the interrogator can gain insight into the prisoner's actual state of mind and, more importantly, he can ascertain his possible breaking points.

- Asking background questions. After asking about the source's circumstances of capture, apparent interest can be built by asking about the source's family, civilian life, friends, likes, and dislikes. This is to develop rapport, but nonpertinent questions may open new avenues for the approach and help determine whether tentative approaches chosen in the planning and preparation phase will be effective. If these questions show that the tentative approaches chosen will not be effective, a flexible

interrogator can shift the approach direction without the source being aware of the change.

Depending on the situation, and requests the source may have made, the interrogator also can use the following to develop rapport.

- Offer realistic incentives, such as—

  —Immediate comfort items (coffee, cigarettes).

  —Short-term (a meal, shower, send a letter home).

  —Long-term (repatriation, political asylum).

- Feign experience similar to those of the source.

- Show concern for the source through the use of voice vitality and body language.

- Help the source to rationalize his guilt.

- Show kindness and understanding toward the source's predicament.

- Exonerate the source from guilt.

- Flatter the source.

After having established control and rapport, the interrogator continually assesses the source to see if the approaches—and later the questioning techniques—chosen in the planning and preparation phase will indeed work.

Approaches chosen in planning and preparation are tentative and based on the sometimes scanty information available from documents, guards, and personal observation. This may lead the interrogator to select approaches which may be totally incorrect for obtaining this source's willing cooperation. Thus, careful assessment of the source is critical to avoid wasting valuable time in the approach phase.

The questions can be mixed or separate. If, for example, the interrogator has tentatively chosen a "love of comrades" approach, he should ask the source questions like "How did you get along with your fellow squad members?" If the source answers they were all very close and worked well as a team, the interrogator can use this approach and be reasonably sure of its success.

However, if the source answers, "They all hated my guts and I couldn't stand any of them," the interrogator should abandon that approach and ask some quick, nonpertinent questions to give himself time to work out a new approach.

## Smooth Transitions

The interrogator must guide the conversation smoothly and logically, especially if he needs to move from one approach technique to another. "Poking and hoping" in the approach may alert the prisoner to ploys and will make the job more difficult.

Tie-ins to another approach can be made logically and smoothly by using transitional phrases. Logical tie-ins can be made by including simple sentences which connect the previously used approach with the basis for the next one.

Transitions can also be smoothly covered by leaving the unsuccessful approach and going back to nonpertinent questions. By using nonpertinent conversation, the interrogator can move the conversation in the desired direction and, as previously stated, sometimes can obtain leads and hints about the source's stresses or weaknesses or other approach strategies that may be more successful.

## Sincere and Convincing

If an interrogator is using argument and reason to get the source to cooperate, he must be convincing and appear sincere. All inferences of promises, situations, and arguments, or other invented material must be believable. What a source may or may not believe depends on the interrogator's knowledge, experience, and training. A good source assessment is the basis for the approach and vital to the success of the interrogation effort.

## Recognize the Breaking Point

Every source has a breaking point, but an interrogator never knows what it is until it has been reached. There are, however, some good indicators the source is near his breaking point or has already reached it. For example, if during the approach, the source leans forward with his facial expression indicating an interest in the proposal or is more hesitant in his argument, he is probably nearing the breaking point. The interrogator must be alert to recognize these signs.

Once the interrogator determines the source is breaking, he should interject a question pertinent to the objective of the interrogation. If the source answers it, the interrogator can move into the questioning phase. If the source does not answer or balks at answering it, the interrogator must realize the source was not as close to the breaking point as thought. In this case, the interrogator must continue with his approach, or switch to an alternate approach or questioning technique and

continue to work until he feels the source is near breaking.

The interrogator can tell if the source has broken only by interjecting pertinent questions. This process must be followed until the EPW or detainee begins to answer pertinent questions. It is possible the EPW or detainee may cooperate for a while and then balk at answering further questions. If this occurs, the interrogator can reinforce the approaches that initially gained the source's cooperation or move into a different approach before returning to the questioning phase.

At this point, it is important to note the amount of time spent with a particular source depends on several factors:

- The battlefield situation.
- Expediency which the supported commander's PIR and IR requirements need to be answered.
- Source's willingness to talk.

The number of approaches used is limited only by the interrogator's skill. Almost any ruse or deception is usable as long as the provisions of the GPW, as outlined in Figure 1-4, are not violated.

An interrogator must not pass himself off as a medic, chaplain, or as a member of the Red Cross (Red Crescent or Red Lion). To every approach technique, there are literally hundreds of possible variations, each of which can be developed for a specific situation or source. The variations are limited only by the interrogator's personality, experience, ingenuity, and imagination.

## APPROACH COMBINATIONS

With the exception of the direct approach, no other approach is effective by itself. Interrogators use different approach techniques or combine them into a cohesive, logical technique. Smooth transitions, sincerity, logic, and conviction almost always make a strategy work. The lack of will undoubtedly dooms it to failure. Some examples of combinations are—

- Direct—futility—incentive.
- Direct—futility—love of comrades.
- Direct—fear-up (mild)—incentive.

The number of combinations are unlimited. Interrogators must carefully choose the approach strategy in the planning and preparation phase and listen carefully

FM 34-52

to what the source is saying (verbally or nonverbally) for leads the strategy chosen will not work. When this occurs, the interrogator must adapt to approaches he believes will work in gaining the source's cooperation.

The approach techniques are not new nor are all the possible or acceptable techniques discussed below. Everything the interrogator says and does must be in concert with the GWS, GPW, GC, and UCMJ. The approaches which have proven effective are—

- Direct.
- Incentive.
- Emotional.
- Increased fear-up.
- Pride and ego.

### Direct Approach

The interrogator asks questions directly related to information sought, making no effort to conceal the interrogation's purpose. The direct approach, always the first to be attempted, is used on EPWs or detainees who the interrogator believes will cooperate.

This may occur when interrogating an EPW or detainee who has proven cooperative during initial screening or first interrogation. It may also be used on those with little or no security training. The direct approach works best on lower enlisted personnel, as they have little or no resistance training and have had minimal security training.

The direct approach is simple to use, and it is possible to obtain the maximum amount of information in the minimum amount of time. It is frequently employed at lower echelons when the tactical situation precludes selecting other techniques, and where the EPW's or detainee's mental state is one of confusion or extreme shock. Figure C-3 contains sample questions used in direct questioning.

The direct approach is the most effective. Statistics show in World War II, it was 90 percent effective. In Vietnam and OPERATIONS URGENT FURY, JUST CAUSE, and DESERT STORM, it was 95 percent effective.

### Incentive Approach

The incentive approach is based on the application of inferred discomfort upon an EPW or detainee who lacks willpower. The EPW or detainee may display fondness for certain luxury items such as candy, fruit, or cigarettes. This fondness provides the interrogator with a positive means of rewarding the EPW or detainee for cooperation and truthfulness, as he may give or withhold such comfort items at his discretion. Caution must be used when employing this technique because—

- Any pressure applied in this manner must not amount to a denial of basic human needs under any circumstances. [NOTE: Interrogators may not withhold a source's rights under the GPW, but they can withhold a source's privileges.] Granting incentives must not infringe on these rights, but they can be things to which the source is already entitled. This can be effective only if the source is unaware of his rights or privileges.

- The EPW or detainee might be tempted to provide false or inaccurate information to gain the desired luxury item or to stop the interrogation.

The GPW, Article 41, requires the posting of the convention contents in the EPW's own language. This is an MP responsibility.

Incentives must seem to be logical and possible. An interrogator must not promise anything that cannot be delivered. Interrogators do not make promises, but usually infer them while sidestepping guarantees.

For example, if an interrogator made a promise he could not keep and he or another interrogator had to talk with the source again, the source would not have any trust and would probably not cooperate. Instead of clearly promising a certain thing, such as political asylum, an interrogator will offer to do what he can to help achieve the source's desired goal; as long as the source cooperates.

As with developing rapport, the incentive approach can be broken down into two incentives. The determination rests on when the source expects to receive the incentive offered.

- Short term—received immediately; for example, letter home, seeing wounded buddies.

- Long term—received within a period of time; for example, political asylum.

### Emotional Approach

Through EPW or detainee observation, the interrogator can often identify dominant emotions which motivate. The motivating emotion may be greed, love, hate, revenge, or others. The interrogator employs ver-

bal and emotional ruses in applying pressure to the EPW's or detainee's dominant emotions.

One major advantage of this technique is it is versatile and allows the interrogator to use the same basic situation positively and negatively.

For example, this technique can be used on the EPW who has a great love for his unit and fellow soldiers. The interrogator may take advantage of this by telling the EPW that by providing pertinent information, he may shorten the war or battle in progress and save many of his comrades' lives, but his refusal to talk may cause their deaths. This places the burden on the EPW or detainee and may motivate him to seek relief through cooperation.

Conversely, this technique can also be used on the EPW or detainee who hates his unit because it withdrew and left him to be captured, or who feels he was unfairly treated in his unit. In such cases, the interrogator can point out that if the EPW cooperates and specifies the unit's location, the unit can be destroyed, thus giving the EPW an opportunity for revenge. The interrogator proceeds with this method in a very formal manner.

This approach is likely to be effective with the immature and timid EPW.

Emotional Love Approach. For the emotional love approach to be successful, the interrogator must focus on the anxiety felt by the source about the circumstances in which he finds himself. The interrogator must direct the love the source feels toward the appropriate object: family, homeland, or comrades. If the interrogator can show the source what the source himself can do to alter or improve his situation, the approach has a chance of success.

This approach usually involves some incentive such as communication with the source's family or a quicker end to the war to save his comrades' lives. A good interrogator will usually orchestrate some futility with an emotional love approach to hasten the source's reaching the breaking point.

Sincerity and conviction are critical in a successful attempt at an emotional love approach as the interrogator must show genuine concern for the source, and for the object at which the interrogator is directing the source's emotion.

If the interrogator ascertains the source has great love for his unit and fellow soldiers, the interrogator can ef-

fectively exploit the situation. This places a burden on the source and may motivate him to seek relief through cooperation with the interrogator.

Emotional Hate Approach. The emotional hate approach focuses on any genuine hate, or possibly a desire for revenge, the source may feel. The interrogator must ascertain exactly what it is the source may hate so the emotion can be exploited to override the source's rational side. The source may have negative feelings about his country's regime, immediate superiors, officers in general, or fellow soldiers.

This approach is usually most effective on members of racial or religious minorities who have suffered discrimination in military and civilian life. If a source feels he has been treated unfairly in his unit, the interrogator can point out that, if the source cooperates and divulges the location of that unit, the unit can be destroyed, thus affording the source revenge.

By using a conspiratorial tone of voice, the interrogator can enhance the value of this technique. Phrases, such as "You owe them no loyalty for the way they treated you," when used appropriately, can expedite the success of this technique.

Do not immediately begin to berate a certain facet of the source's background or life until your assessment indicates the source feels a negative emotion toward it.

The emotional hate approach can be used more effectively by drawing out the source's negative emotions with questions that elicit a thought-provoking response. For example, "Why do you think they allowed you to be captured?" or "Why do you think they left you to die?" Do not berate the source's forces or homeland unless certain negative emotions surface.

Many sources may have great love for their country, but may hate the regime in control. The emotional hate approach is most effective with the immature or timid source who may have no opportunity up to this point for revenge, or never had the courage to voice his feelings.

### Fear-Up Approach

The fear-up approach is the exploitation of a source's preexisting fear during the period of capture and interrogation. The approach works best with young, inexperienced sources, or sources who exhibit a greater than normal amount of fear or nervousness. A source's fear may be justified or unjustified. For example, a source who has committed a war crime may justifiably fear