FM 34-52

prosecution and punishment. By contrast, a source who has been indoctrinated by enemy propaganda may unjustifiably fear that he will suffer torture or death in our hands if captured.

This approach has the greatest potential to violate the law of war. Great care must be taken to avoid threatening or coercing a source which is in violation of the GPW, Article 17.

It is critical the interrogator distinguish what the source fears in order to exploit that fear. The way in which the interrogator exploits the source's fear depends on whether the source's fear is justified or unjustified.

Fear-Up (Harsh). In this approach, the interrogator behaves in an overpowering manner with a loud and threatening voice. The interrogator may even feel the need to throw objects across the room to heighten the source's implanted feelings of fear. Great care must be taken when doing this so any actions would not violate the prohibition on coercion and threats contained in the GPW, Article 17.

This technique is to convince the source he does indeed have something to fear; that he has no option but to cooperate. A good interrogator will implant in the source's mind that the interrogator himself is not the object to be feared, but is a possible way out of the trap.

Use the confirmation of fear only on sources whose fear is justified. During this approach, confirm to the source that he does indeed have a legitimate fear. Then convince the source that you are the source's best or only hope in avoiding or mitigating the object of his fear, such as punishment for his crimes.

You must take great care to avoid promising actions that are not in your power to grant. For example, if the source has committed a war crime, inform the source that the crime has been reported to the appropriate authorities and that action is pending. Next inform the source that, if he cooperates and tells the truth, you will report that he cooperated and told the truth to the appropriate authorities. You may add that you will also report his lack of cooperation. You may not promise that the charges against him will be dismissed because you have no authority to dismiss the charges.

Fear-Up (Mild). This approach is better suited to the strong, confident type of interrogator; there is generally no need to raise the voice or resort to heavy-handed, table-banging.

For example, capture may be a result of coincidence—the soldier was caught on the wrong side of the border before hostilities actually commenced (he was armed, he could be a terrorist)—or as a result of his actions (he surrendered contrary to his military oath and is now a traitor to his country, and his forces will take care of the disciplinary action).

The fear-up (mild) approach must be credible. It usually involves some logical incentive.

In most cases, a loud voice is not necessary. The actual fear is increased by helping the source realize the unpleasant consequences the facts may cause and by presenting an alternative, which, of course, can be brought about by answering some simple questions.

The fear-up (harsh) approach is usually a dead end, and a wise interrogator may want to keep it in reserve as a trump card. After working to increase the source's fear, it would be difficult to convince him everything will be all right if the approach is not successful.

### Fear-Down Approach

This technique is nothing more than calming the source and convincing him he will be properly and humanely treated, or telling him the war for him is mercifully over and he need not go into combat again. When used with a soothing, calm tone of voice, this often creates rapport and usually nothing else is needed to get the source to cooperate.

While calming the source, it is a good idea to stay initially with nonpertinent conversation and to avoid the subject which has caused the source's fear. This works quickly in developing rapport and communication, as the source will readily respond to kindness.

When using this approach, it is important the interrogator relate to the source at his perspective level and not expect the source to come up to the interrogator's level.

If the EPW or detainee is so frightened he has withdrawn into a shell or regressed to a less threatening state of mind, the interrogator must break through to him. The interrogator can do this by putting himself on the same physical level as the source; this may require some physical contact. As the source relaxes and begins to respond to kindness, the interrogator can begin asking pertinent questions.

This approach technique may backfire if allowed to go too far. After convincing the source he has nothing

to fear, he may cease to be afraid and may feel secure enough to resist the interrogator's pertinent question. If this occurs, reverting to a harsher approach technique usually will bring the desired result quickly.

The fear-down approach works best if the source's fear is unjustified. During this approach, take specific actions to reduce the source's unjustified fear. For example, if the source believes that he will be abused while in your custody, make extra efforts to ensure that the source is well cared for, fed, and appropriately treated.

Once the source is convinced that he has no legitimate reason to fear you, he will be more inclined to cooperate. The interrogator is under no duty to reduce a source's unjustified fear. The only prohibition is that the interrogator may not say or do anything that directly or indirectly communicates to the source that he will be harmed unless he provides the requested information.

These applications of the fear approach may be combined to achieve the desired effect. For example, if a source has justified and unjustified fears, you may initially reduce the source's unfounded fears, then confirm his legitimate fears. Again, the source should be convinced the interrogator is his best or only hope in avoiding or mitigating the object of his fear.

### Pride and Ego Approach

The strategy of this approach is to trick the source into revealing desired information by goading or flattering him. It is effective with sources who have displayed weakness or feelings of inferiority. A real or imaginary deficiency voiced about the source, loyalty to his organization, or any other feature can provide a basis for this technique.

The interrogator accuses the source of weakness or implies he is unable to do a certain thing. This type of source is also prone to excuses and reasons why he did or did not do a certain thing, often shifting the blame to others. An example is opening the interrogation with the question, "Why did you surrender so easily when you could have escaped by crossing the nearby ford in the river?"

The source is likely to provide a basis for further questions or to reveal significant intelligence information if he attempts to explain his surrender in order to vindicate himself. He may give an answer such as, "No one could cross the ford because it is mined."

This technique can also be employed in another manner--by flattering the source into admitting certain information in order to gain credit. For example, while interrogating a suspected saboteur, the interrogator states: "This was a smooth operation. I have seen many previous attempts fail. I bet you planned this. Who else but a clever person like you would have planned it? When did you first decide to do the job?"

This technique is especially effective with the source who has been looked down upon by his superiors. The source has the opportunity to show someone he is intelligent.

A problem with the pride and ego approach is it relies on trickery. The source will eventually realize he has been tricked and may refuse to cooperate further. If this occurs, the interrogator can easily move into a fear-up approach and convince the source the questions he has already answered have committed him, and it would be useless to resist further.

The interrogator can mention it will be reported to the source's forces that he has cooperated fully with the enemy, will be considered a traitor, and has much to fear if he is returned to his forces.

This may even offer the interrogator the option to go into a love-of-family approach where the source must protect his family by preventing his forces from learning of his duplicity or collaboration. Telling the source you will not report that he talked or that he was a severe discipline problem is an incentive that may enhance the effectiveness of the approach.

<u>Pride and Ego-Up Approach</u>. This approach is most effective on sources with little or no intelligence, or on those who have been looked down upon for a long time. It is very effective on low-ranking enlisted personnel and junior grade officers, as it allows the source to finally show someone he does indeed have some "brains."

The source is constantly flattered into providing certain information in order to gain credit. The interrogator must take care to use a flattering somewhat-in-awe tone of voice, and speak highly of the source throughout this approach. This quickly produces positive feelings on the source's part, as he has probably been looking for this type of recognition all of his life.

The interrogator may blow things out of proportion using items from the source's background and making them seem noteworthy or important. As everyone is eager to hear praise, the source will eventually reveal

pertinent information to solicit more laudatory comments from the interrogator.

Effective targets for a successful pride and ego-up approach are usually the socially accepted reasons for flattery, such as appearance and good military bearing. The interrogator should closely watch the source's demeanor for indications the approach is working. Some indications to look for are—

- Raising of the head.
- A look of pride in the eyes.
- Swelling of the chest.
- Stiffening of the back.

Pride and Ego-Down Approach. This approach is based on attacking the source's sense of personal worth. Any source who shows any real or imagined inferiority or weakness about himself, loyalty to his organization, or captured under embarrassing circumstances, can be easily broken with this approach technique.

The objective is for the interrogator to pounce on the source's sense of pride by attacking his loyalty, intelligence, abilities, leadership qualities, slovenly appearance, or any other perceived weakness. This will usually goad the source into becoming defensive, and he will try to convince the interrogator he is wrong. In his attempt to redeem his pride, the source will usually involuntarily provide pertinent information in attempting to vindicate himself.

A source susceptible to this approach is also prone to make excuses and give reasons why he did or did not do a certain thing, often shifting the blame to others. If the interrogator uses a sarcastic, caustic tone of voice with appropriate expressions of distaste or disgust, the source will readily believe him. Possible targets for the pride and ego-down approach are the source's—

- Loyalty.
- Technical competence.
- Leadership abilities.
- Soldierly qualities.
- Appearance.

The pride and ego-down approach is also a dead end in that, if unsuccessful, it is difficult for the interrogator to recover and move to another approach and reestablish a different type of rapport without losing all credibility.

### Futility

In this approach, the interrogator convinces the source that resistance to questioning is futile. When employing this technique, the interrogator must have factual information. These facts are presented by the interrogator in a persuasive, logical manner. He should be aware of and able to exploit the source's psychological and moral weaknesses, as well as weaknesses inherent in his society.

The futility approach is effective when the interrogator can play on doubts that already exist in the source's mind. There are different variations of the futility approach. For example:

- Futility of the personal situation—"You are not finished here until you answer the questions."
- Futility in that "everyone talks sooner or later."
- Futility of the battlefield situation.
- Futility in the sense if the source does not mind talking about history, why should he mind talking about his missions, they are also history.

If the source's unit had run out of supplies (ammunition, food, or fuel), it would be somewhat easy to convince him all of his forces are having the same logistical problems. A soldier who has been ambushed may have doubts as to how he was attacked so suddenly. The interrogator should be able to talk him into believing that the interrogator's forces knew of the EPW's unit location, as well as many more units.

The interrogator might describe the source's frightening recollections of seeing death on the battlefield as an everyday occurrence for his forces. Factual or seemingly factual information must be presented in a persuasive, logical manner, and in a matter-of-fact tone of voice.

Making the situation appear hopeless allows the source to rationalize his actions, especially if that action is cooperating with the interrogator. When employing this technique, the interrogator must not only have factual information but also be aware of and exploit the source's psychological, moral, and sociological weaknesses.

Another way of using the futility approach is to blow things out of proportion. If the source's unit was low on, or had exhausted, all food supplies, he can be easily

led to believe all of his forces had run out of food. If the source is hinging on cooperating, it may aid the interrogation effort if he is told all the other source's have cooperated.

The futility approach must be orchestrated with other approach techniques (for example, love of comrades). A source who may want to help save his comrades' lives may be convinced the battlefield situation is hopeless and they will die without his assistance.

The futility approach is used to paint a bleak picture for the prisoner, but it is not effective in and of itself in gaining the source's cooperation.

### We Know All

This approach may be employed in conjunction with the "file and dossier" technique (discussed below) or by itself. If used alone, the interrogator must first become thoroughly familiar with available data concerning the source. To begin the interrogation, the interrogator asks questions based on this known data. When the source hesitates, refuses to answer, or provides an incorrect or incomplete reply, the interrogator provides the detailed answer.

When the source begins to give accurate and complete information, the interrogator interjects questions designed to gain the needed information. Questions to which answers are already known are also asked to test the source's truthfulness and to maintain the deception that the information is already known. By repeating this procedure, the interrogator convinces the source that resistance is useless as everything is already known.

After gaining the source's cooperation, the interrogator still tests the extent of cooperation by periodically using questions to which he has the answers; this is very necessary. If the interrogator does not challenge the source when he is lying, the source will know everything is not known, and he has been tricked. He may then provide incorrect answers to the interrogator's questions.

There are some inherent problems with the use of the "we know all" approach. The interrogator is required to prepare everything in detail, which is time consuming. He must commit much of the information to memory, as working from notes may show the limits of the information actually known.

### File and Dossier

The file and dossier approach is used when the interrogator prepares a dossier containing all available information obtained from documents concerning the source or his organization. Careful arrangement of the material within the file may give the illusion it contains more data than actually there. The file may be padded with extra paper, if necessary. Index tabs with titles such as education, employment, criminal record, military service, and others are particularly effective.

The interrogator confronts the source with the dossiers at the beginning of the interrogation and explains intelligence has provided a complete record of every significant happening in the source's life; therefore, it would be useless to resist. The interrogator may read a few selected bits of known data to further impress the source.

If the technique is successful, the source will be intimidated by the size of the file, conclude everything is known, and resign himself to complete cooperation. The success of this technique is largely dependent on the naivete of the source, volume of data on the subject, and skill of the interrogator in convincing the source.

### Establish Your Identity

This approach is especially adaptable to interrogation. The interrogator insists the source has been correctly identified as an infamous individual wanted by higher authorities on serious charges, and he is not the person he purports to be. In an effort to clear himself of this allegation, the source makes a genuine and detailed effort to establish or substantiate his true identity. In so doing, he may provide the interrogator with information and leads for further development.

The "establish your identity" approach was effective in Viet Nam with the Viet Cong and in OPERATIONS JUST CAUSE and DESERT STORM.

This approach can be used at tactical echelons. The interrogator must be aware if it is used in conjunction with the file and dossier approach, as it may exceed the tactical interrogator's preparation resources.

The interrogator should initially refuse to believe the source and insist he is the criminal wanted by the ambiguous higher authorities. This will force the source to give even more detailed information about his unit in order to convince the interrogator he is who he says he is. This approach works well when combined with the "futility" or "we know all" approach.

### Repetition

This approach is used to induce cooperation from a hostile source. In one variation of this approach, the interrogator listens carefully to a source's answer to a question, and then repeats the question and answer several times. He does this with each succeeding question until the source becomes so thoroughly bored with the procedure he answers questions fully and candidly to satisfy the interrogator and gain relief from the monotony of this method.

The repetition technique must be judiciously used, as it will generally be ineffective when employed against introverted sources or those having great self-control. In fact, it may provide an opportunity for a source to regain his composure and delay the interrogation. In this approach, the use of more than one interrogator or a tape recorder has proven effective.

### Rapid Fire

This approach involves a psychological ploy based upon the principles that—

- Everyone likes to be heard when he speaks.
- It is confusing to be interrupted in mid-sentence with an unrelated question.

This approach may be used by one or simultaneously by two or more interrogators in questioning the same source. In employing this technique, the interrogator asks a series of questions in such a manner that the source does not have time to answer a question completely before the next one is asked.

This confuses the source and he will tend to contradict himself, as he has little time to formulate his answers. The interrogator then confronts the source with the inconsistencies causing further contradictions.

In many instances, the source will begin to talk freely in an attempt to explain himself and deny the interrogator's claims of inconsistencies. In this attempt, the source is likely to reveal more than he intends, thus creating additional leads for further exploitation. This approach may be orchestrated with the pride and ego-down or fear-up approaches.

Besides extensive preparation, this approach requires an experienced and competent interrogator, with comprehensive case knowledge and fluency in the source's language.

### Silent

This approach may be successful when used against the nervous or confident source. When employing this technique, the interrogator says nothing to the source, but looks him squarely in the eye, preferably with a slight smile on his face. It is important not to look away from the source but force him to break eye contact first.

The source may become nervous, begin to shift in his chair, cross and recross his legs, and look away. He may ask questions, but the interrogator should not answer until he is ready to break the silence. The source may blurt out questions such as, "Come on now, what do you want with me?"

When the interrogator is ready to break silence, he may do so with some nonchalant questions such as, "You planned this operation for a long time, didn't you? Was it your idea?" The interrogator must be patient when using this technique. It may appear the technique is not succeeding, but usually will when given a reasonable chance.

### Change of Scene

The idea in using this approach is to get the source away from the atmosphere of an interrogation room or setting. If the interrogator confronts a source who is apprehensive or frightened because of the interrogation environment, this technique may prove effective.

In some circumstances, the interrogator may be able to invite the source to a different setting for coffee and pleasant conversation. During the conversation in this more relaxed environment, the interrogator steers the conversation to the topic of interest. Through this somewhat indirect method, he attempts to elicit the desired information. The source may never realize he is being interrogated.

Another example in this approach is an interrogator poses as a compound guard and engages the source in conversation, thus eliciting the desired information.

## QUESTIONING PHASE

The interrogation effort has two primary goals: To obtain information and to report it. Developing and using good questioning techniques enable the interrogator to obtain accurate and pertinent information by following a logical sequence.

The questioning phase starts when the source begins to answer questions pertinent to interrogation objectives.

## QUESTIONING TECHNIQUES

Good questioning techniques must be used throughout the interrogation. The interrogator must know when to use different types of questions. Good questioning techniques enable the interrogator to extract the maximum amount of information in the minimum amount of time. The interrogator must be able to use the following types of questions:

- Direct.
- Follow-up.
- Nonpertinent.
- Repeated.
- Control.
- Prepared.

### Direct Questions

Questions should be presented in a logical sequence to avoid neglecting significant topics. A series of questions following a chronological sequence of events is frequently employed, but this is not the only logical method of asking questions. Adherence to a sequence should not deter the interrogator from exploiting informational leads as they are obtained.

The interrogator must consider the probable response of the source to a particular question or line of questioning and should not, if at all possible, ask direct questions likely to evoke a refusal to answer or to antagonize the source.

Experience has shown that in most tactical interrogations, the source is cooperative. In such instances, the interrogator should proceed with direct questions. Good, direct questions—

---

(CLASSIFICATION)

SPOT REPORT

TO: G2, X Corps                                         DATE: 171105FEB99

FROM: Team 2, IPW Section, 213th MI Bn                  REPORT NO: 02-314
      25th Div (Armd), X Corps

1. SIZE/WHO: Squad.

2. ACTIVITY/WHAT: Reconnaissance.

3. LOCATION/WHERE: NB 576472 (Hwy intersection).

4. UNIT/WHO: 1 MRS/3 MRC/2 MRB/44 MRR/56 MRD.

5. TIME/WHEN: No later than 171800FEB99.

6. EQUIPMENT/HOW: Using assigned weapons and equipment, recon forward areas to determine avenues of approach for elements of 2 MRB.

7. REMARKS:

    a. SOURCE: EPW, Interrogation serial number US-AR-23.035-73.

    b. MAP DATA: GERMANY, EISENACH-HUNFELD, 1:50,000, USACGSC 50-242, Edition 5.

    c. H/S, CPT ANRUF, CO, 3 MRC/2 MRB/44 MRR/56 MRD, DOI: 170100FEB99.

(CLASSIFICATION)

Figure 3-5. Sample spot report (SALUTE).

- Begin with a basic interrogative: Who, What, When, Where, Why, and How.
- Require a narrative answer. One which cannot be answered by a simple Yes or No. This type of question requires the source to think about his answer in order to respond correctly.
- Provide a maximum amount of information in the least amount of time, and the greatest number of leads to other information.
- Are brief, precise, and simply worded to avoid confusion.

(NOTE: The source may not be on the same intellectual level as the interrogator and some may be illiterate. Some words or phases in English do not translate into a foreign language.)

### Follow-Up Questions

Follow-up questions are used to obtain complete information on a topic that pertains to the interrogation objective. They are used to exploit leads obtained from the source on information not directly related to the primary interrogation objective. Exploitation of these leads is discussed later. There are two types of leads:

- Hot—information that could affect the immediate tactical situation in your AO. This type of lead should be exploited immediately, and a spot report submitted as soon as possible. Figure 3-5 is a sample of a spot report in a SALUTE format.
- Cold—information of intelligence value that will not affect the immediate tactical situation. This type of lead is recorded and exploited after the interrogation objective has been satisfied or at the appropriate time during the interrogation sequence.

### Nonpertinent Questions

Nonpertinent questions are used to conceal the interrogation's objectives or to strengthen rapport with the source. They may also be used to break the source's concentration, particularly, if the interrogator suspects the source is lying. It is hard for a source to be a convincing liar if his concentration is frequently interrupted.

### Repeated Questions

Repeated questions ask the source for the same information obtained in response to earlier questions. They may be exact repetitions of the previous question, or the previous question may be rephrased or otherwise disguised. The use of repeated questions may develop a topic the source had refused to talk about earlier. Repeated questions may also be used to—

- Check source reliability.
- Ensure accuracy of important details such as place names, dates, and component parts of technical equipment.
- Return to a topical area for further questioning.

### Control Questions

Control questions are developed from recently confirmed information that is not likely to have changed. They are used to check the truthfulness of the source's responses and should be mixed in with other questions throughout the interrogation.

### Prepared Questions

Prepared questions are used primarily when dealing with information of a technical nature, or specific topic, which requires the interrogator to formulate questions beforehand; the interrogator prepares them in writing to be used during the interrogation. The interrogator may have to research technical material or contact TECHINT personnel to assist him in preparing questions. Interrogators must not allow the use of prepared questions to restrict the scope and flexibility of their interrogations.

The interrogator must use the different type of questions effectively. Active listening and maximum eye-to-eye contact with the source will provide excellent indicators for when to use follow-up, repeated, control, and nonpertinent questions.

The interrogator must use direct and follow-up questions to fully exploit subjects pertinent to his interrogation objectives. He should periodically include control, repeated, and nonpertinent questions in order to check the sincerity and consistency of the source's responses and to strengthen rapport.

A response which is inconsistent with earlier responses or the interrogator's available data is not necessarily a lie. When such a response is obtained, the interrogator should reveal the inconsistency to the source and ask for an explanation. The source's truthfulness should then be evaluated based on the plausibility of his explanation.

## QUESTIONS TO AVOID

Interrogators should avoid the following types of questions.

### Leading Questions

Leading questions require the source to answer Yes or No. They do not elicit narrative answers. They also prompt the source to answer the question in a way he thinks the interrogator wants to hear it; for example, "Did you go to the command post last night?" Although normally avoided during the interrogation, leading questions may be used to—

- Verify facts.
- Pinpoint map locations.
- Confirm information obtained during map tracking. Leading questions are used sparingly during map tracking.

### Negative Questions

Negative questions should never be used during an interrogation. They imply the source should reply in the negative, and this sometimes confuses or leads the source to provide false information; for example, "You're not in the 1st Company, are you?" Negative questions usually require additional questions to clarify the source's responses.

### Compound Questions

Compound questions are never used during an interrogation. They are two questions asked at the same time; for example, "Before you were captured today, were you traveling north or south?" They are easily misunderstood and may confuse the source or force him to give an ambiguous answer. Compound questions allow the source to evade a part of the question or to give an incomplete answer. They may confuse the source or cause the interrogator to misunderstand the response.

### Vague Questions

Vague questions do not have enough information for the source to understand exactly what is being asked by the interrogator. They may be incomplete, general, or otherwise nonspecific and create doubt in the source's mind. Vague questions confuse the source, waste time, are easily evaded, and result in answers that may confuse or mislead the interrogator.

## INTERROGATORS GUIDE

An Interrogators Guide is a pamphlet or notebook designed to guide the interrogator through the interrogation. The IPW senior interrogator should ensure team members prepare an interrogators guide, which could be included in the unit's SOP. The guides are made based on the AO and supported command intelligence requirements. They should be jointly prepared by the interrogator and available intelligence analysts. The guides contain information such as—

- PIR and IR.
- Topical sequence question format.
- Actual prepared questions to be used during the interrogation.
- Guidelines for employing the various approach techniques.
- Formats or samples of completed interrogation reports used by interrogators.

## SPOT REPORTABLE INFORMATION

Spot reportable information is critical to the successful accomplishment of friendly COAs. Information may be spot reportable even when an interrogator cannot determine its immediate intelligence value. Spot reportable information is always time sensitive in that its value depends on the speed with which it is reported and processed.

If an interrogator obtains information he thinks is spot reportable, he must compare the information with his element's overall objective statement. Items of information relating to any of the intelligence indicators listed in the objective statement are spot reportable. Information relating to indicators not listed may still be spot reportable.

The key to identifying spot reportable information is recognizing its potential value. If the information indicates a significant change in the enemy's capabilities or intentions, it is spot reportable. Information inconsistent with current OB holdings should be spot reported if the inconsistency concerns an important item and the source has given a plausible explanation for it.

If an interrogator cannot decide if a piece of information is spot reportable, he should act as though it is. This means he should exploit it fully and record all pertinent information. The interrogator should then consult the senior interrogator for a final determination of

the information's value. Spot reportable information is transmitted by the interrogator either written or orally in the SALUTE format (Figure 3-5).

## LEADS

Leads are signs which tell the interrogator the source has additional pertinent information that can be obtained through further questioning. Hot and cold leads are provided by a source in response to interrogator questions.

A hot lead, when exploited, may obtain spot reportable information. A cold lead, when exploited, may obtain information not spot reportable, but still of intelligence value.

The use of follow-up questions to fully exploit hot and cold leads may require an interrogator to cover topics he did not list in his interrogation plan. An interrogator must exploit hot leads as soon as he identifies them.

Once the interrogator is sure he has obtained and recorded all the details known to the source, he issues a spot report. The interrogator then resumes his questioning of the source at the same point where the hot lead was obtained. An interrogator should note cold leads as they are obtained, and exploit them fully during his questioning on the topics to which the cold lead apply.

Cold leads may expand the scope of the interrogation because they may indicate the source possesses pertinent information in areas not previously selected for questioning. If the interrogator does not fully exploit all cold leads he obtains, he must include information on all leads he did not exploit in his interrogation report.

## HEARSAY INFORMATION

H/S information must include the most precise data possible of its source. This will include—

- Name, rank, and duty position.
- Full unit designation of the person who provided the information.
- Date-time group (DTG) when the source obtained the information.

## QUESTIONING SEQUENCE

The interrogator begins the questioning phase with the first topic in the sequence he tentatively established as part of his interrogation plan. He obtains all the source's pertinent knowledge in this topical area before moving on to the next topic in his sequence. He maintains his established questioning sequence to ensure no topics are missed. The only exception is exploiting a hot lead.

### Map Tracking

During the questioning phase, the interrogator will attempt to pinpoint locations of any enemy dispositions known to the source. He will attempt to determine the whereabouts of the source, and will compare the source's description of terrain features with maps, aerial photographs, and pictomaps. Some map tracking advantages are—

- The source is led through his memory in a logical manner.
- A valid reliability scale can be determined by comparing the source's information with a map or aerial photographs.
- Discrepancies in the source's statements are easier to detect.

The interrogator asks the source if he can read the map being used. If so, he should be asked to show the location of routes and dispositions. If the source cannot read the interrogator's map, he must be asked if he knows compass directions. If not, the interrogator must explain them to him. This can be done by having the source picture himself facing the rising or setting sun and then establishing compass points.

The interrogator may find the source is most confident when expressing himself in terms other than compass directions. When this happens, the interrogator should allow the source to use his own frames of reference. However, the interrogator must ensure he understands the source.

The first location the interrogator should try to establish as the initial common point of reference (ICPR) is the source's POC. The POC cannot be used, however, unless the source can describe it well enough for the interrogator to be certain of its location. If the POC cannot be used, the interrogator must review locations previously mentioned by the source and ask him to describe each of them in turn.

Once the source describes a location well enough for the interrogator to be certain of its position on the map, an ICPR has been established. The interrogator then marks that position.

The interrogator reviews the source's past missions to identify those points he actually visited. The interrogator determines how long ago the source was at each point, and approximately how far each point is from the ICPR.

The interrogator wants to select as the destination common point of reference (DCPR) that point visited by the source which provides the longest route of travel to the ICPR, and is still within the supported command's AI. The DCPR selected must be a location the source can describe well enough for it to be plotted on the map, even if it is nothing more than a general vicinity.

### Establish a Route

The interrogator establishes the route the source traveled between the DCPR and ICPR. When the DCPR is a specific point, the interrogator can establish the route from it to the ICPR, tracing the route in the same direction which the source actually traveled.

When the DCPR is an undefined point, the interrogator establishes the route from ICPR to the DCPR. This means the interrogator must trace the route in the opposite direction from that traveled by the source. The interrogator should establish the route traveled by using the following procedures in the sequence shown:

- Obtain the direction in which the source would travel when leaving the ICPR.
- Obtain a description of the surface on which the source would be traveling.
- Obtain the distance the source would travel in this direction.
- Obtain a description of the prominent terrain features the source would remember while traveling in this direction.
- Repeat the questions and plot responses until the entire route between the ICPR and DCPR has been plotted.

The interrogator can follow the same sequence when establishing the route actually traveled by the source by beginning with the DCPR.

### Exploit the DCPR

The interrogator must obtain the exact location and description of each enemy disposition the source knew about at the DCPR. The interrogator does this by having the source—

- Identify and describe all items of military significance belonging to his forces which are located at the DCPR.
- Provide the full unit designation of enemy units to which these items belong.
- Identify and describe all collocated enemy units.
- Describe security measures employed at each identified disposition.
- Identify the source of his information.
- Provide the date and time he obtained his information.
- Provide name, rank, duty position, and full unit designation of each person who provided H/S information to the source.

The interrogator must repeat these questions, and plot or record the information as it is provided by the source, until he obtains all dispositions known by the source to be in the vicinity of the DCPR.

### Segment and Exploit the Route

The interrogator begins exploiting the source's route with the segment closest to the ICPR or DCPR. The interrogator will segment closest to the DCPR, but either can be used.

The interrogator will exploit each segment of the route by asking the question: "From (description of common point of reference [(CPR)] to (description of next CPR) back along your route of travel, what of military significance belonging to your forces do you know of, have seen, or heard?" The interrogator will continue from segment to segment, fully exploiting each, until he has exploited the entire route traveled.

### Exploit Dispositions Not On Route

If the interrogator obtains a disposition which is not located on the established route, he must establish the route the source would have taken to that disposition. The interrogator then treats this new route the same way he does any other route segment, exploiting it fully before moving on to the next segment of the original route.

The sequence above organizes map tracking so information obtained from the source can be plotted and recorded accurately. The description of each disposition must be recorded preferably near the site of the disposition on the map.

### Recording Information

There are several reasons for recording information obtained during interrogations. The most important is to ensure information can be reported completely and accurately. Recorded information may also be used to—

- Refresh the interrogator's memory on a topic covered earlier, such as when returning to a topic after exploiting a hot lead.
- Check responses to repeated questions.
- Point out inconsistencies to the source.
- Gain the cooperation of other sources.
- Compare with information received from other sources.

### Taking Notes

There are several methods of recording information used during interrogations. Two are listed below, along with their advantages and disadvantages. These methods may be used separately, or in combination with each other.

Using His Own Notes. The interrogator's own notes are the primary method of recording information. When the interrogator takes his own notes, he has a ready reference to verify responses to repeated questions or to refresh his memory. They also provide him with the means to record cold leads for later exploitation.

Using his own notes expedites the interrogator's accurate transferral of information into a report format. When taking his own notes, however, he cannot observe the source continuously. This may cause him to miss leads or fail to detect losses in rapport or control that are detectable only through clues provided by the source's behavior.

It is possible to lose control, and the source's willing cooperation, by concentrating too much on note taking. The interrogator must avoid distracting the source while taking notes. They should be taken in such a way that maintains maximum eye-to-eye contact with the source.

The interrogator will not have enough time to record each word the source says. Thus, he must—

- Be able to summarize information into a few words.
- Use past experiences to decide which items of information should be recorded.
- Organize his materials to avoid having to flip back and forth between references.

The only information that should be recorded during the approach phase is that required by Part I of DA Form 4237-R (Figure 3-1). All other information should not be recorded until after the source's cooperation has been obtained.

All notes must be complete, accurate, and legible. Notes should be organized by topical areas. A separate piece of paper should be used to record cold leads. The interrogator should use authorized military abbreviations and brevity codes (see AR 310-50). Notes should be in a recognizable format and complete for other interrogators to use. Situations may arise that require one interrogator to finish another's interrogation.

Using a Sound or Video Recorder. This method allows the interrogator to continually observe the source. When compared with note taking, this method allows more information to be obtained in less time. However, more time is required for report writing because the entire tape must be replayed to transfer information to the report.

Record names, numbers, and other pertinent, detailed information that may be unclear on the tape. Sound recorders cannot provide a quick reference that can be used to compare answers to a repeated question, and the equipment may malfunction.

Another method which has proven successful during exercises is to have linguist qualified intelligence analysts view interrogations or debriefings by using video cameras and monitors. This method allows the intelligence analyst to immediately pass additional questions to the interrogator to follow up on possible source knowledge.

## TERMINATION PHASE

When it is necessary or prudent, the interrogator will terminate the interrogation. There are many ways to conduct a termination, but the following points must be conveyed to the source:

- The approaches used to "break" the source must be reinforced. Any promised incentives should be rendered. The reinforcement must be sincere and



Figure 3-6. DA Form 2662-R (United States Army EPW Identification Card).

convincing, as the source may be interrogated again.

- The source must be told the information he gave will be checked for truthfulness and accuracy. His reaction to this statement should be closely monitored.

- The source must be told he will be spoken to again by the same or another interrogator.

- Any identification or other documents, personal property, or other material must be returned to the source or be given to the evacuation guard, as appropriate.

### REASONS FOR TERMINATION

Some reasons for termination are—

- The source remains uncooperative during the approach phase.

- The source could be wounded, sick, or elderly, and his condition might force the interrogator to terminate until a later time.

- The interrogation objective requires several questioning periods to obtain all the information.

- The source may change his attitude during the interrogation, and may become more alert, belligerent, bored, or too talkative, thus indicating termination until later.

- The interrogator fails to maintain rapport and loses control of the interrogation.

- Interrogation objectives have been satisfied.

- The interrogator becomes physically or mentally unable to continue.

- Information possessed by the source is of such value his immediate evacuation to the next echelon is required.

- The interrogator's presence is required elsewhere.

### TERMINATION PROCEDURES

Whatever the reason for terminating, the interrogator must remember there is a possibility someone may want to question the source at a later date. For that reason, he should terminate without any loss of rapport when possible. He offers the opportunity for the source to change or add to any information he has given.

During termination, the interrogator must properly dispose of any documents captured with the source. A source's military identity document must be returned to him.

If a source does not hold an identity card issued by his government, the MP will issue a DA Form 2662-R (United States Army EPW Identification Card). This form, shown at Figure 3-6, will accompany the source at all times. AR 190-8 is the prescribing directive of this form.

Some captured documents will contain information that must be exploited at higher echelons. These documents may be impounded by the interrogator and evacuated through intelligence channels. The interrogator must issue a receipt to the source for any personal documents he decides to impound. He must comply with the accounting procedures established for captured documents by the MP in accordance with AR 190-8.

These procedures are time-consuming but necessary. The interrogator can save time by preparing receipts and document tags during the planning and preparation phase.

The interrogator completes the termination phase by instructing the escort guard to return the source to the holding compound and to keep him away from sources who have not been interrogated.

### REPORTING INFORMATION

The last portion of the interrogation process is reporting information obtained. The most brilliantly executed interrogation becomes a wasted effort if not reported properly. To aid military operations, information obtained must be transmitted as quickly as the situation permits in a usable form to an agency capable of taking action.

Although the interrogator normally takes notes during the interrogation, he will have to rely on his memory, to some degree, while reporting information received from the source. The more distractions that occur between the interrogation and the reporting, the greater the chance the interrogator will lose some of the information obtained. The reporting normally is done in the format appropriate for the information being reported.

Appendix E contains formats of reports. Initial reports are submitted electronically when possible to ensure the information reaches the intelligence analysts in the least amount of time.

Written reports are prepared to document electronic reports. They are used as initial means of reporting only when electronic reporting is impossible. Any information of intelligence value that will diminish with the passage of time must be SALUTE reported.

Electronic SALUTE reports are formatted and submitted according to the procedures established during the senior interrogator's initial coordination. Information not SALUTE reportable is electronically reported with a lower priority.

The aim of any interrogation is to obtain information which will help satisfy a commander's intelligence requirements. Since these requirements will differ in scope at each level, when conducting PIR or IR interrogations, nonapplicable paragraphs may be deleted. Part I must always be included and distribution made according to STANAG 2033.

Regardless of the report format used, information must be reported accurately according to the following criteria:

- Each item of information reported which has a different date of information from the overall report must be accompanied by its correct date.
- Each item of information not obtained as a direct result of the source's personal experiences must be accompanied by a description of how he obtained that information.
- All dispositions, towns, and other specific geographic locations must be accompanied by a correct, complete set of at least 6-digit universal transverse mercator (UTM) coordinates, to include the correct 100,000-meter grid zone identifier. The UTM coordinates are in STP 34-97E24-SM-TG.
- The information is reported exactly as it was obtained from the source. No information is deleted or added without explanatory comments.
- The report contains no errors in spelling, punctuation, or grammar that affect the meaning of the information reported.

Each report must include the interrogator's assessment of the source's value. This assessment addresses the source's intelligence, experience, cooperation, and reliability. Any areas of special knowledge possessed by the source should be identified.

The assessment codes are established by STANAG 2033. The codes assigned, and a written statement supporting these assignments, must be included on each report.

## INTERROGATION WITH AN INTERPRETER

Interrogating through an interpreter is time consuming because the interpreter must repeat everything said by the interrogator and source. The interrogator must brief the interpreter before the interrogation can begin. An interrogation with an interpreter will go through all five phases of the interrogation process. After the interrogation is over, the interrogator will evaluate the interpreter.

### INTERPRETATION METHODS

During the planning and preparation phase, the interrogator selects a method of interpretation. There are two methods: Simultaneous and alternate. The interrogator obtains information about his interpreter from the senior interrogator. He analyzes this information and talks to the interpreter before deciding which method to use.

With the alternate method, the interpreter listens to an entire phrase, sentence, or paragraph. He then translates during natural pauses in the interrogation.

The simultaneous method should be selected only if all the following criteria are met:

- The sentence structure of the target language is parallel to English.
- The interpreter can understand and speak English as well as the target language with ease.
- The interpreter has special vocabulary skills for the topics to be covered.
- The interpreter can easily imitate the interrogator's tone of voice and attitude for the approaches selected.

- Neither interrogator nor interpreter tends to get confused when using the simultaneous method of interpretation.

With the simultaneous method, the interpreter listens and translates at the same time as the person for whom he is interpreting, usually just a phrase or a few words behind.

If any of the criteria in the simultaneous method cannot be met, the interrogator must use the alternate method. The alternate method should also be used when a high degree of precision is required.

## INTERPRETER BRIEFING

Once the interrogator has chosen a method of interpretation, he must brief his interpreter. This briefing must cover—

- Current tactical situation.
- Background information obtained on the source.
- Specific interrogation objectives.
- Method of interpretation to be used.
- The conduct of the interrogation: For example—

    —Statements made by the interpreter and source should be interpreted in the first person, using the same content, tone of voice, inflection, and intent. The interpreter must not inject his own personality, ideas, or questions into the interrogation.

    —The interpreter should inform the interrogator if there are any inconsistencies in the language used by the source. The interrogator will use this information in his assessment of the source. One example is a source who claims to be an officer, but uses excessive slang and profanity.

- Selected approach techniques and how they are to be applied.
- Physical arrangements of the interrogation site. Ideally, the interrogator and the source should face each other with the interpreter behind the source. This enhances interrogator control by allowing him to simultaneously observe the source and interpreter.
- Need for the interpreter to assist with preparing reports.

Throughout the briefing, the interrogator fully and clearly answers questions the interpreter may have. This helps ensure the interpreter completely understands his role in the interrogation.

## CONDUCT THE INTERROGATION

During the interrogation, the interrogator corrects the interpreter if he violates any standards on which he was briefed. For example, if the interpreter injects his own ideas into the interrogation, he must be corrected.

Corrections should be made in a low-key manner. At no time should the interrogator rebuke his interpreter sternly or loudly while they are with the source. The interrogator should never argue with the interpreter in the presence of the source. If a major correction must be made, the interrogator and interpreter should leave the interrogation site temporarily, and only when necessary.

When initial source contact is made, the interpreter must instruct him to maintain eye contact with the interrogator. Since rapport and control must be established, the interpreter should be able to closely imitate the attitude, behavior, and tone of voice used by the interrogator and source. The questioning phase is conducted in the same way it would be if no interpreter were used.

During the termination phase, too, the interpreter's ability to closely imitate the interrogator and source is important. The approaches used are reinforced, and necessary sincerity and conviction must be conveyed to the source.

The interpreter assists the interrogator in preparing reports. He may be able to fill in gaps and unclear areas in the interrogator's notes. He may also assist in transliterating, translating, and explaining foreign terms.

After submitting all reports, the interrogator evaluates the performance of his interpreter. The evaluation must cover the same points of information the interrogator received from the senior interrogator.

The interrogator submits the results of his evaluation to the senior interrogator, who uses this evaluation to update information about the interpreter. This evaluation may also be used to develop training programs for interpreters.

# STRATEGIC INTERROGATIONS AND DEBRIEFINGS

Strategic debriefing is questioning of individuals who are sources of information in a strategic or operational environment. This is done to obtain usable information in response to command and national level intelligence needs. Strategic intelligence—

- Provides support to national level planners and operational commanders across the operational continuum, and is useful for long-range planning.
- Is collected in peacetime as well as wartime; it often fills intelligence gaps on extremely sensitive topics or areas.

The objective of the strategic debriefing process is to obtain information of the highest degree of credibility to satisfy outstanding information objectives (IO). This avoids surprises of a strategic nature and consequences.

The types of sources encountered in strategic debriefing are emigres, refugees, resettlers, defectors, and selected US personnel. While there are other types, these represent the majority. Strategic debriefing guidance is provided in DIAM 58-13 and FM 34-5(S), Chapter 4.

## DUTIES AND RESPONSIBILITIES OF DEBRIEFERS

Specific duties and responsibilities peculiar to a particular operation will be detailed in unit SOPs. This is due to the diverse nature of the various operations using debriefers outside continental United States (OCONUS) and within the continental United States (CONUS). However, debriefers have the following common duties and responsibilities regardless of assignment.

### Notification

Proper response to notification of the availability of a source will depend upon unit operations. The debriefer may have to respond spontaneously as in the case of walk-in sources. He may have the luxury of advance notice as in the case of an invitational interview.

### Planning the Debriefing

The process for planning a strategic debriefing is similar to conducting a tactical interrogation, with the following considerations peculiar to the strategic environment. The debriefer should—

- Determine source's area of knowledgeability, personality traits, and potential intelligence value.
- Review IOs.
- Assemble and organize necessary maps, technical reference manuals, city plans, photographs, and handbooks in anticipated debriefing sequence.
- Select an appropriate debriefing site with consideration to host country legal agreements or particular unit SOP directives.

### Initial Contact

The debriefer will usually use a friendly rapport posture with sources, who have a status far different from EPWs or detainees.

### Questioning

Good questioning techniques, rapport, and effective lead follow-up ensure answering specific IO.

### Reporting Information Obtained

Comprehensive and logical note taking is translated into objective reporting within the parameters of intelligence report procedures in DIAM 58-13.

### Concluding the Debriefing

An interview is concluded in a manner which enables any debriefer to contact a source at a later date and resume the debriefing process. The debriefer ensures the source receives all promised incentives. It is often necessary to provide source transportation and lodging. Such considerations demand the debriefer be familiar with procedures for using Intelligence Contingency Funds (ICFs).

### Operational Security

There is an obvious need for OPSEC before, during, and after any debriefing. Source confidentiality and handling of classified materials demand constant and special attention.

### Language Ability

Maintaining a language proficiency is a basic requirement; improvement of dialects, slang, technical terminology, and military vocabulary is a must.

### Liaison

A debriefer may have the added responsibility of maintaining local liaison with host-government agencies while OCONUS. Unit SOPs usually dictate necessary and proper procedures.