23. What malfunctions are occurring with enemy communications?

    a. What malfunctions are occurring with enemy vehicle- mounted communications equipment in each brigade sector?

    b. What malfunctions are occurring with enemy manpacked communications equipment in each brigade sector?

    c. What is the nomenclature or operating frequency of enemy communications equipment which is malfunctioning?

24. What are major enemy supply routes?

    a. What are the known movement routes used by enemy supply convoys in each brigade sector?

    b. What movement routes are rumored to be used by enemy supply convoys in each of the brigade sectors?

    c. What is the known direction of travel for enemy supply convoys passing NAIs in each brigade sector?

    d. What direction of travel is rumored for enemy supply convoys passing NAIs in each brigade factor?

25. What choke points have the enemy identified along their own LOCs?

    a. What choke points along enemy LOCs in each brigade sector are known to exist?

    b. What choke points are rumored to exist along enemy LOCs in each brigade sector?

IV. FORCE PROTECTION.

1. Where will NBC weapons be used?

    a. Have specific areas within any brigade sector been identified as targets for NBC weapons?

    b. Have orders been received by any enemy units in any brigade sector which indicate that NBC weapons might be used in support?

    c. Where has enemy air activity suddenly increased within any of the brigade sectors?

    d. Where is unusual enemy air activity taking place within any of the brigade sectors?

    e. Where has very heavy artillery been moved to within supporting distance of front-line enemy troops within any brigade sector?

    f. Where has random firing of very heavy artillery occurred within any of the brigade sectors?

2. What is the main objective of enemy attack?

    a. What objectives have been assigned to specific enemy units in each brigade sector for their offensive operations?

Figure B-2. Sample overall objective statement (IEW tasks) (continued).

   b. How many enemy units within each brigade sector have been assigned the same objectives?

   c. What measures are the enemy using to conceal the offensive's objectives in each brigade sector?

3. What units have been assigned to conduct the attack?

   a. What enemy units are rumored to be preparing for offensive operations within any of the brigade sectors?

   b. What special operations elements are attached to enemy units preparing for offensive operations in each brigade sector?

   c. What is the nomenclature or operating frequency of any electronic emitters belonging to enemy units preparing to conduct offensive operations in each brigade sector?

4. What enemy units have been assigned to defensive belts?

   a. What specific enemy units are preparing extensive field fortifications in each brigade sector?

   b. What special operations elements have been attached to enemy units establishing lines of defense in each brigade sector?

   c. What is the nomenclature or operating frequency of electronic emitters belonging to enemy units establishing lines of defense within each brigade sector?

   d. What measures are employed to conceal defensive preparations in each brigade sector?

5. What units comprise the reaction force to counter friendly armor or heliborne assaults?

   a. What enemy units are rumored to be the reaction force for defensive positions in each brigade sector?

   b. What enemy units are located behind, but in proximity to, the defensive positions in each brigade sector?

   c. What special operations elements have been attached to the units in enemy reaction force in each brigade sector?

   d. What is the nomenclature or operating frequency of electronic emitters belonging to the units which are part of the enemy's reaction force within each brigade sector?

6. What enemy units will take part in a retreat?

   a. What enemy units in each brigade sector are rumored to be participating in a retreat?

   b. What special operations elements are attached to retreating enemy units in each brigade sector?

   c. What enemy units in each brigade sector have been designated as stay-behind elements?

Figure B-2. Sample overall objective statement (IEW tasks) (continued).

d. What efforts have been made to recruit stay-behind agents from the local populace in each brigade sector?

e. What is the nomenclature or operating frequency of electronic emitters belonging to retreating enemy units in each brigade sector?

7. What deception efforts will be made to conceal the retreat?

a. What deception efforts have been ordered in conjunction with the retreat in each brigade sector?

b. What specific enemy units are conducting deception efforts in conjunction with the retreat in each brigade sector?

c. What special operations elements are involved in the deception efforts being conducted in each brigade sector?

d. What deception efforts are being cited in rumors about the retreat in each brigade sector?

e. What enemy units are rumored to be conducting deception efforts in conjunction with the retreat in each brigade sector?

8. What units comprise the enemy's second echelon?

a. What specific units are rumored to be part of the enemy's second echelon in each brigade sector?

b. How many units comprise the enemy's second echelon in each brigade sector?

c. What type of units comprise the enemy's second echelon in each brigade sector?

d. What special operations elements are attached to units in the enemy's second echelon?

e. What is the nomenclature and operating frequency of electronic emitters belonging to units in the enemy's second echelon in each brigade sector?

V. BATTLE DAMAGE ASSESSMENT.

1. What production loss has the enemy sustained?

a. How long will it take to recuperate?

b. What was the extent of battle damage?

c. What was the attack's total effect?

d. How much warfighting stock was lost?

e. How many personnel were lost?

f. What type, and how many pieces, of warfighting equipment were destroyed or damaged?

Figure B-2. Sample overall objective statement (IEW tasks) (continued).

FM 34-52

    g. How many craters are visible?

    h. Where was the detonation point?

    i. What contingency plans have been put into effect?

VI. INDICATIONS AND WARNING.

  1. How stable is the current government?

    a. What anti-allied demonstrations are planned?

    b. Who, or what organization, is responsible for the unrest?

    c. How well financed is the opposition?

    d. What outside help is the opposition receiving?

    e. What is the current economic situation?

    f. What kind of treatment can foreign citizens expect?

Figure B-2. Sample overall objective statement (IEW tasks) (continued).

# APPENDIX C

# S2 TACTICAL QUESTIONING GUIDE AND BATTLEFIELD EXPLOITATION OF CAPTURED ENEMY DOCUMENTS AND EQUIPMENT

History shows that EPWs, CEDs, and CEE are critical sources of combat intelligence. It has also shown the usefulness of information is directly proportionate to how fast a commander can get it.

OPERATIONS URGENT FURY, JUST CAUSE, and DESERT STORM proved that without workable procedures to handle captured persons or items, our combat effectiveness suffers because the evacuation chain jams the forward resupply effort. We also suffer because we have not exploited combat information sources at a low enough echelon to do that commander any good.

This guide is for battalion and brigade S2s. It explains standard procedures on what to do when the S2—

- Receives an enemy soldier.
- Detains a civilian.
- Finds an enemy document.
- Discovers an unusual enemy weapon during tactical operations.

## PERSONNEL HANDLING

There are two types of persons captured on the battlefield: combatants and noncombatants. FM 27-10 defines the two types. The capturing unit treats all combatants and noncombatants as EPWs until the division forward collecting point segregates them by category. This is whether they are soldiers, clergy, or medics (see Chapter 3).

Noncombatants are handled, questioned, detained, evacuated, and released in accordance with theater policy.

At the EPW's capture point, the capturing element performs the following steps, with the senior soldier responsible for ensuring they are done. The steps are referred to as the "five S's."

### STEP 1. SEARCH

The POC unit's first job is to disarm, then search all EPW or detainees, and tie their hands behind their back. They gather all loose enemy documents and equipment in the area. They evacuate them with the EPW. Documents and personal and protective military equipment stay with the prisoner unless otherwise directed by the battalion S2.

### STEP 2. SILENT

The capturing unit instructs or signals EPWs to be silent. If that does not work, the EPW is gagged. Guards give orders to EPWs, but do not talk nor give them comfort items.

### STEP 3. SAFEGUARD

The POC unit immediately moves the EPWs out of the fire zone. They protect EPWs from reprisals and give them medical care as necessary. The POC unit tries to preserve the shock of capture until brigade interrogators have a chance to question the EPWs.

### STEP 4. SEGREGATE

The POC unit orders the EPWs to sit on the ground. It separates officers from enlisted, senior from junior, male from female, and civilian from soldier. It prepares a captive tag and puts one on each EPW (Figure 3-4). Tagging procedures are discussed under equipment handling procedures below.

### STEP 5. SPEED TO THE REAR

Lastly, the POC unit moves EPWs to the unit supply point for evacuation. All captured documents, personal effects, and portable enemy equipment go with the EPW. Also, one escort guard should know the EPW's circumstances of capture.

## CAPTURED ENEMY DOCUMENTS FOUND ON ENEMY PRISONER OF WAR

The battalion S2, and subordinate unit commander, ensures CEDs found on EPWs are handled as follows. The POC unit will—

- Search each EPW.
- Return identification documents to EPW.
- Write the following on the top and bottom half of the EPW captive tag: Number of documents taken; date and time, location and circumstances of capture; capturing unit's designation.
- Put CED in a waterproof bag, one per EPW.
- Affix Part C of the captive tag to the bag (see Figure 3-4).
- Give CEDs to senior escort.
- Direct senior escort to evacuate CEDs with the EPW.

## CAPTURED ENEMY DOCUMENTS FOUND ON THE BATTLEFIELD

An example of CEDs found on the battlefield is paperwork discovered in an overrun CP, but not on an EPW's person. The POC unit will—

- Put CEDs in a waterproof bag.
- Follow the same procedures described above, and tag the bag.
- Evacuate to battalion S2.
- Battalion S2 evacuates all CEDs along EPW evacuation channels.

## EQUIPMENT HANDLING PROCEDURES

CEE includes all types of foreign materiel found on an EPW or on the battlefield that may have military application. The POC unit—

- Evacuates equipment with the EPW.
- Confiscates, tags, and evacuates weapons and other equipment found on an EPW the same as CEDs.

### ITEMS OF TECHINT VALUE

The capturing unit may recognize certain CEE as having possible TECHINT value. Such items include—

- New weapons.
- Radios.
- Track vehicles.
- Associated manuals.
- All CEE known or believed to be of TECHINT interest.

The capturing unit's primary job when capturing a TECHINT item is to secure and report the capture to its S2 for disposition instructions. Figure C-1 provides a scenario for TECHINT items.

### FIRST ECHELON BATTLEFIELD TECHINT EXPLOITATION

It is conceivable, although not likely, that the capturing unit leader or S2 may need to do field exploitation of a piece of CEE. If this happens—

- It will usually be at the request of the battlefield TECHINT team attached to corps headquarters.
- The small-unit leader or S2 follows the same procedures used to exploit a CED.

### TAGGING PROCEDURES

There are two capture tags: A CEE tag and an EPW tag with a smaller tear-off document tag. The POC unit tags all captured personnel, CEDs, and CEE at the POC.

The battalion S2 or company commander is responsible for having sufficient CEE and EPW document tags as well as and waterproof bags prior to an operation.

When no standard tag forms are available, the following procedures will be used for expediency:

- Use meals, ready-to-eat (MRE) cardboard or other type of paper.

---

### FROM THE FOXHOLE TO THE CMEC

The soldier either captures or observes an item of possible TECHINT interest. The soldier quickly reports the encounter through his or her command to the Battalion S2. The soldier then either safeguards the item or continues the mission as directed.

Upon learning that a forward platoon or company has captured or encountered an item of possible TECHINT interest, the Battalion S2 promptly—

- Coordinates security or continued observation of the item with the S3 and ensures the item is not tampered with in any way. Components, control knobs, and switches on C-E equipment should not be touched until the equipment is photographed or positions recorded.

- Examines and screens the item against PIR and IR and determines whether the item is known or believed to be of TECHINT interest; or, whether, in the soldier's opinion, the item deserves initiative reporting.

- Spot reports the capture or encounter in the SALUTE format through higher headquarters to the first Battlefield TECHINT element in the chain of command.

- Coordinates continued security or observation of the item until receipt of further instructions.

- Identifies items requiring immediate screening for combat information by other supporting MI elements. This could include C-E system items like code books, radios, or technical documents such as operator manuals.

Intermediate echelons of command continue forwarding the spot reported encounter or capture to their supporting Battlefield TECHINT element.

The supporting Battlefield TECHINT element receives the spot report and compares the information to requirements and the existing data base to see if collection is necessary. The element then decides further action and notifies the capturing unit accordingly. The CMEC or Battlefield TECHINT team's options at this point include, but are not limited to—

- Requesting the capturing unit to provide further information, such as detailed descriptions, sketches, photographs, or documents captured with the item.

- On-site screening or exploiting.

- Destroying the item.

- Abandoning the item unharmed.

- TECHINT team-supervised or routine evacuating.

- Priority evacuating to EAC.

- Recommending turning over initial exploitation to other MI elements, such as target exploitation or interrogators, for immediate tactical information screening.

---

Figure C-1. Disposition of TECHINT items scenario.

- Write the capturing unit's designation.
- Write date and time of capture.
- Write POC coordinates.
- Write circumstances of capture.
- Identify EPW, CED, or CEE captured.
- Put tag, without damaging the CED, in a waterproof bag.
- Attach EPW and CEE tags so they will not come off.

## TACTICAL QUESTIONING

This section provides "how to" instructions to enable the S2 to do tactical questioning (TQ) on EPWs. Following these will—

- Achieve usable results.
- Preserve the source for subsequent formal interrogation.
- Keep the S2 from breaking the law.

> **WARNING**
> Improper, unlawful, or inept attempt at field exploitation can harm or destroy possible critical intelligence sources, and send US soldiers to prison. Any decision to attempt these procedures is a command responsibility, and only done by the S2.

Figure C-2 is an example of the front and reverse sides of a CEE tag. It should be included as a tab to the TECHINT appendix in the intelligence annex of an OPLAN plan or operations order (OPORD).

The purpose of TQ is to obtain combat information of immediate use to the battalion or subordinate unit by the S2. Sources of information can be an EPW and local or friendly civilians encountered in the operational area. (S2s use established procedures when questioning local or friendly civilians.)

### LANGUAGE REQUIREMENT

TQ can be done only under one of following circumstances:

- The S2 speaks the EPW's language well enough to ask direct questions and understand the answers.
- A language qualified interpreter is available to assist the S2.

### WHERE TQ IS DONE

TQ is done as soon as possible after removing the EPW from fire zones. However, battalion or brigade commanders forced to deal with heavy EPW input may set up an organized TQ effort at the unit's EPW collecting point.

### WHO ASKS THE QUESTIONS

Only the S2 is authorized to conduct TQ. The S2 asks every question himself, even when using another soldier or local national as an interpreter. If augmented by interrogators, the interrogation team supervises the TQ effort.

### TIME CONSIDERATIONS

TQ is designed to be a quick procedure, lasting from 5 to 20 minutes. A command decision is required if source questioning interferes with mission accomplishment or delays a priority evacuation.

### ITEMS NEEDED FOR TQ

TQ is authorized for collection of combat information critical to successful mission accomplishment. The questioner needs to know what information headquarters requires. Other items required for TQ are—

- Maps.
- Vehicle and aircraft identification guides.
- Target language dictionary.
- Report forms, stationery, capture tags, waterproof bags.
- Interpreter or translator.

## THE EXPLOITATION PROCESS

The exploitation process, discussed in Chapter 3, is the basis for all personnel examinations, to include TQ. It consists of three parts: screening, questioning, and reporting.

FM 34-52

**Front of tag:**

TO BE AFFIXED TO CAPTURED ENEMY EQUIPMENT

**DO NOT DISTURB**

NOMENCLATURE: MT-140-A
SERIAL NO: 1234567
DATE/PLACE CAPTURED: 2 FEB 99 CA 123456
CAPTURING UNIT: 1 INF Co/2/3 REGT
QUANTITY: ONE EACH

BELOW FOR USE BY TECH INTEL UNITS ONLY

PROPERTY U.S. GOVERNMENT

**NOTICE**

THIS EQUIPMENT IS BEING HELD FOR:

ANALYSIS
UTILIZATION
DESTRUCTION

BY AUTHORITY OF THE JOINT U.S. FORCES COMMANDER.

SIGNATURE _____ PRINTED NAME _____
UNIT _____ DATE _____

**DO NOT DISTURB**

**Reverse of tag:**

TECH INTEL USE ONLY

TIME OF RECEIPT: _____
DATE OF RECEIPT: _____
INSPECTED BY: _____
    NAME        RANK
DISPOSITION: _____

**DO NOT DISTURB THIS EQUIPMENT**

PROPERTY U.S. GOVERNMENT

PERSONNEL TAMPERING WITH THIS EQUIPMENT WILL BE SUBJECT TO PROSECUTION UNDER ARTICLE 103, UCMJ

Figure C-2. Front and reverse sides of CEE tag.

## SCREENING

If there is more than one EPW, the quickest method to pick who to question first is to—

- Check the captive tag to see if your unit recently captured the EPW with unusual equipment; for example, a sniper rifle or booby trap in an area of operational interest.
- Observe for high rank, key enemy unit patches, and unusual behavior.
- Use established guidelines and rank the most likely EPWs first for questioning.

## QUESTIONING

The key to questioning is brevity. Tactical questioners work fast until they find an EPW who will give useful combat information. To do this, the tactical questioner—

- Ensures the EPW is under guard.
- Briefs interpreter as necessary.
- Has the EPW searched and obtains identity document.
- Looks over EPW's identity document and CEDs.
- Makes a mental questioning plan.
- Presents military bearing. Preserves the shock of capture.
- Asks military questions, intermixing biographical questions so as not to arouse the EPW's security training.
- Compares answers given on the identity card and other items found on the EPW to check for truthfulness.
- Ends questioning if the EPW stops or refuses to answer military questions.
- Ends questioning if the EPW intentionally or unintentionally provides so much irrelevant military information instead of information pertinent to the tactical questioner's combat mission.
- Never promises anything that cannot be delivered.

## REPORTING

Tactical questioners report acquired information in SALUTE format (Figure 3-5). To do this, they—

- Obtain combat information using the direct questioning technique (see Chapter 3).
- Record combat information of interest to headquarters. This is recorded in SALUTE format as relevant answers are obtained.
- Attempt to fill in all SALUTE report blanks before moving to another collection requirement or before ending the questioning.
- End questioning by telling the EPW they will talk again, and return required items, such as the EPW's ID.

## THE TACTICAL QUESTIONING PLAN

The questioning plan used during TQ is short, simple, and standard. The questioner can use it to uncover spot reportable information on any subject. An easy way to remember it is through the phrase "BIG 4 and JUMP."

- BIG 4 is a nickname for the Geneva Convention's "name, rank, service number, and date of birth."
- JUMP is an acronym for job, unit, mission, PIR, IR, and SIR, which is the sequence of the TQ plan.

More specifically, the TQ plan covers the following topics in sequence. Figure C-3 shows examples of the BIG 4 and JUMP questions.

- EPW biographical data.
- EPW duty position or job.
- EPW unit or employer.
- EPW present and future mission at time of capture.
- Commander's collection requirements in order of priority.

## BATTLEFIELD DOCUMENT EXPLOITATION

Battlefield DOCEX is a capturing unit procedure done by the S2 before interrogator exploitation. A combat unit without language-qualified personnel can perform limited battlefield DOCEX, mainly on maps and overlays. Units with linguists have the advantage of being able to do more.

> What is your last name? First name? Middle name?
> What is your rank? Service number? Date of Birth?
>
> * * * *
>
> What is your position (or job) in your unit (or firm)?
> What unit are you in (or who do you work for)?
> What was your mission (or what type of work were you doing) when you were captured?
> What would your future mission have been (or what jobs or projects would you have had) had you not been captured? What other missions would you have had if you had not been captured?
>
> * * * *
>
> Follow up on all given information items; in particular, ensure you have the source's full unit designation and thoroughly follow up on the source's missions. A good rule of thumb is to ask Who, What, When, Where, How, and Why to fully develop whatever information you obtain.
>
> NOTE: Continue to ask questions based on collection requirements, phrasing them as direct questions. For example, "Where is the GATO cell's arm caches?" or "When will your unit attack SAN PABLO?"

Figure C-3. BIG 4 and JUMP question examples.

After capturing an EPW or enemy CP, the capturing unit needs to look for maps, encrypted items, OPORDs, overlays, and other documents. The capturing unit then notifies headquarters to request disposition instructions.

The small-unit leader safeguards the items pending disposition instructions. At the same time he—

- Looks over the document.
- Does not mark or harm it in any way.
- Uses whatever resources are available to decipher it; for example, dictionaries and enemy map symbol guides. An example of Soviet and non-NATO symbols is at Figure C-5.
- Looks for information that has a direct bearing on his current mission.

After finding information of possible value to the mission, the S2 extracts the combat information and uses the SALUTE format as a template to organize the information (see Figure 3-5).

FM 34-52



Figure C-4. Soviet and non-NATO map symbols.

FM 34-52



Figure C-4. Soviet and non-NATO map symbols (continued).

# APPENDIX D

# PROTECTED PERSONS RIGHTS VERSUS SECURITY NEEDS

The articles in this Appendix are extracted from the Geneva Convention Relative to the Protection of Civilian Persons in Time of War of August 12, 1949.

The GC attempts to balance the necessity of the proper treatment of protected persons with the needs of security by the Detaining or Occupying Power. The GC applies to the whole of the populations of the countries in conflict, without any adverse distinction based, in particular, on race, nationality, religion, or political opinion. It is the design of the Convention to alleviate the sufferings caused by war (Article 13).

At the outbreak of a conflict, many protected persons become displaced persons. They move within their own country to areas where hostilities are not a threat or a power is able to protect them. They may become refugees, fleeing into neighboring countries seeking a safe haven. The GC provides that protected persons who desire to leave at the outset of, or during a conflict, should be allowed to do so, unless their departure is contrary to the national interest of the State (Article 35). However, in light of possible threats to the security of the State receiving the refugees or a Detaining Power, the Geneva Convention does recognize a State's right to take appropriate action to insure security.

The most typical security measure taken in such cases is the establishment of some manner of screening camps where the people may be identified and screened. During the process, useful intelligence may be obtained from legitimate displaced persons or refugees, and from potential threats, such as covert agents, who may be identified and interrogated.

In most cases, interrogators or linguists will conduct the screening operations while working closely with CI personnel to identify those protected persons of CI interest. Other military intelligence personnel may be required to participate in this screening process because of the large numbers of refugees and/or the lack of other qualified personnel.

Internment of a protected person occurs when the Detaining Power determines that confinement or assignment of residences to certain protected persons is absolutely necessary to the security of the Detaining Power (Articles 41 and 42). A civilian internee is defined by the Department of Defense (DOD) as a civilian who is interned during an armed conflict or occupation for security reasons or for protection or because he has committed an offense against the Detaining Power.

## GENEVA CONVENTION PROVISIONS CONCERNING PROTECTED PERSONS

It is critical that the GC provisions concerning protected persons be strictly adhered to in the quest to identify legitimate threats and gain needed intelligence. Specifically:

(a) Article 5 provides that if a Party to the conflict is satisfied that an individual protected person is suspected of or engaged in activities hostile to the security of the State, such individual shall not be entitled to claim rights or privileges under the convention, if the exercise of that right would be prejudicial to that State. However, such individuals must be humanely treated during internment and the pendency of any investigation and/or prosecution. A limitation of rights or privileges may include the withholding of the right to communicate with members of their family or representatives of their government. Such restrictions would be appropriate in a case involving spying.

(b) Article 29 places the responsibility for the treatment accorded protected persons upon the Party in whose hands they are found. This is in addition to any personal responsibility incurred by an agent of that Party. This is an affirmative duty upon commanders to insure their subordinates are not mistreating protected persons or their property. The command and the government will ultimately be held responsible for any mistreatment.

(c) Article 31 prohibits physical or moral coercion against protected persons to obtain information from them or from third parties. Prohibited coercion may be obvious, such as physically abusing the subject of the screening or interrogation. It may also be more subtle, such as threats to turn the individual over to hostile forces; subjecting the individual to humiliating or degrading treatment; implying harm to the individual or his

D-1

property, or implying a deprivation of rights guaranteed by international law because of a failure to cooperate; threatening to separate parents from their children; or forcing a protected person to perform guide services.

(d) Article 32 prohibits corporal punishment, torture or taking any measure of such character as to cause the physical suffering or extermination of protected persons in your control. This prohibition not only applies to actions taken by the Detaining Party against the protected persons, but also any adverse action that others may take.

(e) Article 33 prohibits collective punishments, penalties, reprisals, or pillaging of protected persons and their property. The principle behind this provision is that protected persons should only be held liable for offenses they personally commit. This prohibition includes all measures of intimidation or terrorism.

(f) Article 41 allows the Power, in whose hands the protected persons are found, to intern or force assigned residence to protected persons, if the other measures of control permitted by the convention are inadequate. Some persons may demand internment (for example, protected persons who may be threatened by others). Internment must be provided when the situation renders this step necessary (Article 42).

(g) If interned or forced into assigned residences, protected persons have the right to have any such determination reconsidered and reviewed on a periodic basis (Article 43).

(h) In connection with the above, Article 44 prohibits the Detaining Power from automatically interning or forcing an assigned residence against refugees who are nationals of an Enemy State, exclusively on the basis of their nationality, who do not, in fact, enjoy the protection of any government. The purpose of this article is to insure that refugees, who may only technically remain enemy aliens, are not, on that basis alone, automatically subject to control measures, notwithstanding the fact that they are not protected by their government. An example of this would be interning Iraqi refugees based solely on their status as Iraqis. This prohibition, however, does not in any way deny the right of a State to intern such persons or subject them to legitimate controls when there is an additional basis for taking such action in the interest of security of the State.

(i) Article 45 prohibits the transfer of protected persons into the custody of a Power not a signatory to the convention. The transferring Power must insure that protected persons transferred from their custody will be treated in accordance with the conventions. In the event that the transferring Power discovers that the protected persons are not being treated in accordance with the convention, they shall request that the protected persons be returned to their custody.

# APPENDIX E

# REPORTS

In addition to reports previously covered, there are other reports prepared or used by interrogators in tactical and strategic units. DIAM 58-13 is the authority for format and preparation of intelligence information reports (IIRs), biographic reports, and knowledgeability briefs (KBs). Local SOPs guide the interrogator in preparing other reports.

Message Text Format (MTF) Editor is software used by the military services, National Security Agency (NSA), and Defense Intelligence Agency (DIA).

MTF Editor—

- Creates, formats, edits, stores, prints, and transmits United States Message Text Formatting (USMTF) messages.
- Is designed to run on Z-150, AN/UYK-83, Z-248, IBM PC compatibles, and other standard and non-standard systems.
- Requires minimum 320K random access memory (RAM), microsoft (MS) or personal computer (PC) disk operating system (DOS) version 2.1 or higher, and 5.25-inch disk drive.
- Is "user friendly," as it employs many of the same commands available in commercial word processors.

The SALUTE report format contains relevant information necessary to alert higher commands of an incident or relevant information obtained. It answers all basic interrogatives: Who, What, When, Where, How, and Why.

Figures of sample reports, formats, and tags used by interrogators are listed below:

- Figure E-1, Spot report voice message template.
- Figure E-2, Battlefield TECHINT spot report.
- Figure E-3, Tactical interrogation report.
- Figure E-4, Captive tag (STANAG 2044).
- Figure E-5, IIR.
- Figure E-6, Biographic report.
- Figure E-7, Knowledgeability brief.
- Figure E-8, Interrogation report.

## TACTICAL INTERROGATION REPORT

The TIR (Figure E-3) serves as written summary of initial or subsequent interrogations. The term "tactical interrogation report" was adopted under NATO STANAG 2033. The TIR—

- Eliminates information duplication of effort in later EPW interrogations.
- Disseminates information to the intelligence officers of the immediate command, those of other appropriate commands, and interrogators who will conduct further interrogations.
- Serves as an intelligence value assessment of EPWs, documents, and equipment carried by him at time of capture.
- Consists of Part I, Intelligence Potential of EPW, and Part II, information obtained.

In the heading, the EPW will be classified according to one of four categories explained in Chapter 4 under document exploitation.

The first section of the report contains the source's name and category, interrogation serial number, date, report number, interrogator's name and unit, maps and language used, and interpreter's name (if one is used).

The second section, Part I, contains the EPW's personal particulars, career, assessment of intelligence value, capture data from the captive tag, and documents and equipment found on the EPW.

The third section, Part II, lists information obtained from the EPW during the interrogation regarding missions, composition, strength, dispositions, tactics, training, logistics, combat effectiveness, electronic technical data, and miscellaneous data.