**Army Regulation 190–8**
**OPNAVINST 3461.6**
**AFJI 31-304**
**MCO 3461.1**

Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

Headquarters
Departments of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

# UNCLASSIFIED

# SUMMARY of CHANGE

AR 190–8/OPNAVINST 3461.6/AFJI 31–304/MCO 3461.1
Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other
Detainees

This revision--

o Establishes a multi-service regulation for all services (para 1-4a).

o Ensures compliance with DOD Directive 2310.1 dated August 1994 (para 1-4g).

o Establishes HQDA, Deputy Chief of Staff for Operations as the primary Army
  Staff responsibility for the Enemy Prisoner of War, Civilian Internee and
  Retained Persons Program (para 1-4c).

o Establishes a DD FORM 2745, Enemy Prisoner of War(EPW) Capture Tag (para 2-
  1b).

o Highlights Combatant Commanders, Task Force Commanders and Joint Task Force
  Commanders responsibilities (para 1-4g).

o Establishes procedures for conducting tribunals (para 1-6).

o Establishes Public Affairs policy (para 1-9).

o Establishes policy for EPW held aboard ship (para 2-1b).

o Updates OCONUS evacuation policy (para 2-3).

o Establishes the use of Health and Comfort Packs as a temporary substitution
  for Advance of Pay for short term operations (para 3-4h).

o Updates procedures for contracting EPW (para 4-22).

o Combines AR 190-8 and AR 190-57 (para 6-1).

Headquarters
Departments of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

*Army Regulation 190–8
*OPNAVINST 3461.6
*AFJI 31–304
*MCO 3461.1

Effective 1 November 1997

Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

By Order of the Secretary of the Navy:

*[signature]*
TOGO D. WEST,JR.
Secretary of the Army

J.L. JOHNSON
Admiral, United States Navy
Chief of Naval Operations
Acting

*[signature]*
J.S. Mobley
Rear Admiral, United States Navy
Director, Navy Staff

By Order of the Secretary of the Air Force:

RICHARD A. COLEMAN
Colonel, USAF
Chief of Security Police

By Order of the Secretary of the Navy:

*[signature]*
LT GENERAL J.L. JONES. USMC
Marine Corps Deputy Chief of Staff
for Plans, Policies and Operations

**History.** This printing publishes a revision of this publication. Because the publication has been extensively revised the changed portions have not been highlighted.

**Summary.** This regulation implements Department Of Defense Directive 2310.1 and establishes policies and planning guidance for the treatment, care, accountability, legal status, and administrative procedures for Enemy Prisoners of War, Civilian Internees, Retained Persons, and Other Detainees. This regulation is a consolidation of Army Regulation 190-8 and Army Regulation 190-57 and incorporates SECNAV Instruction 3461. 3 and Air Force Joint Instruction 31-304. Policy and procedures established herein apply to the services and their capabilities to the extent that they are resourced and organized for enemy prisoner of war operations.

**Applicability.** This is a multi-service regulation. It applies to the Army, Navy, Air Force and Marine Corps and to their Reserve components when lawfully ordered to active duty under the provisions of Title 10 United States Code.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff for Operations and Plans. The proponent has the authority to approve exceptions to this regulation that are consistent with controlling law and regulation. Proponents may delegate the approval authority, in writing, to a division chief within the proponent agency in the grade of colonel or the civilian equivalent.

**Army management control process.** The Regulation contains management control provisions in accordance with AR 11-2, but does not contain checklists for conducting management control. Reviews are used to accomplish assessment of management controls.

**Supplementation.** Army supplementation of this regulation and establishment of command or local forms is prohibited without prior approval from HQDA (DAMO-ODL), WASH DC 20310. Navy, Marine Corps and Air Force supplementation of this regulation is authorized, but is not required. If supplements are issued, major or second echelon commands will furnish one copy of each supplement to their headquarters, as follows: Navy, to the Chief of Naval Operations (N511), 2000 Navy Pentagon, Washington DC 20350-2000, Marine Corps, to the Commandant of the Marine Corps, HQ USMC (POS-10) 2 Navy Annex, Washington DC, 20380-1775 11), and Air Force, to HQ USAF/SPO, 1340 Air Force Pentagon, Washington, DC 20330-1340.

**Suggested Improvements.** Users are invited to send comments and suggested improvements through channels as follows: HQDA (DAMO-ODL), WASH DC 20310-0440.

**Distribution.** *Army:* Distribution of this regulation is made in accordance with initial distribution number (IDN) 092120, intended for command levels A, B, C, D, and E for Active Army, Army National Guard, U. S. Army Reserve.
*Navy:* SNDL A (Navy Department); B5 (Coast Guard); (COMDTCOGARD, only) 21A (Fleet Commanders in Chief); 22A (Fleet Commanders); 23 (Force Commanders); 24 (Type Commanders); 26A (Amphibious Groups); 28 (Squadron, Division, and Group Commanders—Ships); 41A (COM-SC); SECNAV/OPNAV Directives Control Office,Washington Navy Yard Bldg 200, 901 M Street SE, Washington DC 20374-5074
*Air Force:* F
*Marine Corps:* PCN 10203324000

---

*This regulation supersedes AR 190-8, 1 June 1982, and rescinds AR 190-57, 4 March 1987. This regulation also rescinds DA Form 5451-R, August 1985; DA Form 5452-R, August 1985; and DA Form 5976, January 1991.

# UNCLASSIFIED

# Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
General protection policy • 1–5, *page 2*
Tribunals • 1–6, *page 2*
The National Prisoner of War Information Center (NPWIC) • 1–7, *page 3*
The Branch PWIC • 1–8, *page 3*
Public Affairs • 1–9, *page 4*

**Chapter 2**
**Beginning of Captivity EPW/RP,** *page 4*
Initial actions upon capture • 2–1, *page 4*
Evacuation and care of EPW and RP • 2–2, *page 5*
Evacuation Policy • 2–3, *page 5*

**Chapter 3**
**Administration and Operation of EPW Internment Facilities,** *page 5*
Establishment • 3–1, *page 5*
EPW internment facilities • 3–2, *page 5*
EPW Facility Management • 3–3, *page 5*
Operation of prisoner of war internment facilities • 3–4, *page 6*
Procedures for prisoner of war correspondence • 3–5, *page 7*
Discipline and security • 3–6, *page 9*
Punitive Jurisdiction • 3–7, *page 10*
Judicial proceedings • 3–8, *page 10*
Loss or damage to property • 3–9, *page 11*
Death and burial • 3–10, *page 11*
Transfer of prisoners of war • 3–11, *page 12*
Repatriation of sick and wounded EPW/RP • 3–12, *page 13*
Repatriation of other EPW/RP • 3–13, *page 14*
Repatriation transfer procedures • 3–14, *page 14*
Retained personnel • 3–15, *page 14*
Complaints and requests to camp commanders • 3–16, *page 15*
EPW/RP safety program • 3–17, *page 15*

**Chapter 4**
**Employment and Compensation for EPWs,** *page 15*

*Section I*
*General Policy and Guidelines, page 15*
General principles • 4–1, *page 15*
Restricted employment • 4–2, *page 15*
Liability to perform labor • 4–3, *page 15*
Authorized work • 4–4, *page 16*
Unauthorized work • 4–5, *page 16*
Decisions on work conditions and safeguards • 4–6, *page 16*
Referrals to HQDA, ODCSOPS • 4–7, *page 16*
Length of workday • 4–8, *page 16*
Rest periods • 4–9, *page 17*
Responsibility for work supervision • 4–10, *page 17*
Work detail leaders and interpreters • 4–11, *page 17*
Task system • 4–12, *page 17*
Employing EPW • 4–13, *page 17*
Paid work • 4–14, *page 17*
Restriction on paid work • 4–15, *page 17*
Rates for paid work • 4–16, *page 17*
Days of paid work per month • 4–17, *page 18*
Unpaid work • 4–18, *page 18*
Sale of articles and repair services • 4–19, *page 18*
Disability compensation • 4–20, *page 18*

Operation of government vehicles • 4–21, *page 18*

*Section II*
*Contract Employment, page 18*
Rules and procedures • 4–22, *page 18*

**Chapter 5**
**Beginning of Internment (CI),** *page 18*
General protection policy—civilian internee • 5–1, *page 18*
Civilian Internee Safety Program • 5–2, *page 19*
Republic of Korea/United States Agreement on processing civilian internees in Korea • 5–3, *page 19*

**Chapter 6**
**Administration and Operation of CI Internment Facilities,** *page 19*
Internment Facility • 6–1, *page 19*
Administrative processing • 6–2, *page 20*
Personal effects • 6–3, *page 20*
Internee Committee • 6–4, *page 21*
Supplies • 6–5, *page 21*
Medical Care and Sanitation • 6–6, *page 22*
Social, Intellectual, and Religious activities • 6–7, *page 22*
Procedures for communications • 6–8, *page 23*
Complaints and requests to camp commanders and protecting power • 6–9, *page 24*
Discipline and security • 6–10, *page 24*
Provisions common to disciplinary and judicial punishments • 6–11, *page 25*
Disciplinary proceedings and punishments • 6–12, *page 25*
Judicial proceedings • 6–13, *page 26*
Death and burial • 6–14, *page 27*
Transfers • 6–15, *page 27*
Release • 6–16, *page 28*

**Chapter 7**
**Employment and Compensation—Civilian Internees,** *page 28*
General • 7–1, *page 28*
Ability to perform labor • 7–2, *page 28*
Authorized work • 7–3, *page 28*
Unauthorized work • 7–4, *page 28*
Working conditions • 7–5, *page 28*
Length of workday • 7–6, *page 28*
Day of rest • 7–7, *page 28*
Paid work • 7–8, *page 28*
Unpaid work • 7–9, *page 28*
Compensation for paid work • 7–10, *page 29*
Disability compensation • 7–11, *page 29*

**Appendixes**

**A.** References, *page 30*

**B.** Internment Serial Number, *page 31*

**Glossary**

**Index**

# Chapter 1
## Introduction

### 1–1. Purpose

*a.* This regulation provides policy, procedures, and responsibilities for the administration, treatment, employment, and compensation of enemy prisoners of war (EPW), retained personnel (RP), civilian internees (CI) and other detainees (OD) in the custody of U.S. Armed Forces. This regulation also establishes procedures for transfer of custody from the United States to another detaining power.

*b.* This regulation implements international law, both customary and codified, relating to EPW, RP, CI, and ODs which includes those persons held during military operations other than war. The principal treaties relevant to this regulation are:

(1) The 1949 Geneva Convention Relative to the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field (GWS).

(2) The 1949 Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea (GWS SEA).

(3) The 1949 Geneva Convention Relative to the Treatment of Prisoners of War (GPW).

(4) The 1949 Geneva Convention Relative to the Protection of Civilian Persons in Time of War (GC), and In the event of conflicts or discrepancies between this regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence.

### 1–2. References

Required and related publications and prescribed and referenced forms are listed in appendix A.

### 1–3. Explanation of abbreviations and terms

Abbreviations and special terms used in this regulation are explained in the glossary.

### 1–4. Responsibilities

*a. The Secretaries of the Military Departments.* The Secretaries will—

(1) Develop internal policies and procedures consistent with this regulation in support of the Department of Defense (DOD), EPW/CI and other detainee programs.

(2) Ensure that appropriate training, as required, pursuant to DOD Directive 5100.77 is provided so that the principles of the Geneva Conventions, and the rights and obligations thereunder, are known by members of their service.

(3) Ensure that suspected or alleged violations of the international law of war are promptly reported and investigated per DOD Directive 5100.77.

(4) Conduct a periodic review of the EPW, CI and RP Program and training to ensure compliance with the law of war.

*b. The Secretary of the Army (SA).* The Secretary of the Army is the DOD Executive Agent (EA) for administering the DOD EPW, CI and RP Program. The SA, in coordination with the Assistant Secretary of Defense, International Security Affairs (ASD-ISA), will plan and develop the policy and coordinate the operation of the programs.

*c. The Army Deputy Chief of Staff for Operations and Plans (DCSOPS).* DCSOPS has primary Headquarters, Department of the Army (HQDA) staff responsibility for the EPW, CI and RP programs. The DCSOPS will-

(1) Develop and disseminate policy guidance for the treatment, care, accountability, legal status, and processing of EPW, CI, RP, and ODs.

(2) Report suspected or alleged violations of law committed by or against military personnel or civilians.

(3) Provide HQDA staff supervision for National Prisoner of War Information Center (NPWIC).

(4) Develop plans for the initial assignment and replacement of block internment serial numbers (ISNs) from the NPWIC to the

Branch PWIC and for the assignment of the theater code section of the ISN.

(5) Provide necessary reports, coordination, technical advice, and staff assistance to:

(a) The Office of the Secretary of Defense (OSD).

(b) The Joint Chiefs of Staff (JCS).

(c) The military departments.

(d) Unified commands.

(e) Department of State and other Federal agencies.

(f) The International Committee of the Red Cross (ICRC).

(g) Protecting powers.

*d. The Army Judge Advocate General (TJAG).* The TJAG will provide HQDA guidance and advice to commanders on the legal aspects of the EPW, CI and RP program. TJAG will—

(1) Conduct liaison in coordination with the ASA-ISA, the Department of State, the Department of Justice, and other Federal agencies; the JCS; the Defense Intelligence Agency (DIA); the military departments; the ICRC; the Protecting Powers; and other detaining powers, as required.

(2) Provide advice and assistance to commanders on legal aspects of reported violations by EPW, CI, RP, and ODs.

(3) Provide theater guidelines for any EPW, CI and RP claims against the U.S. Government.

(4) Provide guidance regarding GPW Article 5 Tribunals.

*e. Deputy Chief of Staff for Logistics (DCSLOG).* The DCSLOG will ensure logistical resources are available to support EPW operations.

*f. The Assistant Secretary of the Army Financial Management (ASA-FM&C).* The ASA-FM&C will establish the policies and procedures governing entitlement, control, and accounting for pay, allowances, and personal funds for EPW, CI, RP, and ODs per the provisions of the GPW and GC.

*g. Combatant Commanders, Task Force Commanders and Joint Task Force Commanders.* Combatant Commanders, Task Force Commanders and Joint Task Force Commanders have the overall responsibility for the EPW, CI and RP program, operations, and contingency plans in the theater of operation involved to ensure compliance with international law of war. DOD Directive 2310.1 provides that persons captured or detained by the U.S. Military Services shall normally be handed over for safeguarding to U.S. Army Military Police, or to detainee collecting points or other holding facilities and installations operated by U.S. Army Military Police as soon as practical. U.S. Army Military Police have units specifically organized to perform the long-term functions associated with EPW/CI internment. Commanders must ensure the proper force structure is included in any joint operational plans. Commanders at all levels will ensure that all EPW, CI, RP, and ODs are accounted for and humanely treated, and that collection, evacuation, internment, transfers, release, and repatriation operations are conducted per this regulation. Combatant Commanders, Task Force Commanders and Joint Task Force Commanders will—

(1) Provide for an EPW, CI and RP camp liaison and assistance program to ensure the protection of U.S. interests per the Geneva Conventions upon the capture and transfer of EPW, CI, RP, and ODs to a host or other nation.

(2) Plan and procure logistical support to include: transportation, subsistence, personal, organizational and Nuclear, Biological & Chemical (NBC) clothing and equipment items, mail collection and distribution, laundry, and bath for EPW, CI and RP.

(3) Collect and dispose of captured enemy supplies and equipment through theater logistics and Explosive Ordnance Disposal (EOD) channels.

(4) Coordinate for acquisition of real estate, and as required, for planning, design, contracting, and construction of facilities for EPW, CI and RP with the Theater or JTF Engineer.

(5) Establish guidance for the use, transport, and evacuation of EPW, CI, RP, and ODs in logistical support operations.

(6) Identify requirements and allocations for Army Medical units in support of the EPW, CI and RP Program, and ensure that the

medical annex of OPLANs, OPORDs and contingency plans includes procedures for treatment of EPW, CI, RP, and ODs. Medical support will specifically include:

*(a)* First aid and all sanitary aspects of food service including provisions for potable water, pest management, and entomological support.

*(b)* Preventive medicine.

*(c)* Professional medical services and medical supply.

*(d)* Reviewing, recommending, and coordinating the use and assignment of medically trained EPW, CI, RP and OD personnel and medical material.

*(e)* Establishing policy for medical repatriation of EPW, CI and RP and monitoring the actions of the Mixed Medical Commission.

*h. U. S. Army Criminal Investigation Command (USACIDC).* USACIDC will provide criminal investigative support to EPW, CI and RP Camp Commanders per AR 195-2.

## 1–5. General protection policy

*a.* U.S. policy, relative to the treatment of EPW, CI and RP in the custody of the U.S. Armed Forces, is as follows:

(1) All persons captured, detained, interned, or otherwise held in U.S. Armed Forces custody during the course of conflict will be given humanitarian care and treatment from the moment they fall into the hands of U.S. forces until final release or repatriation.

(2) All persons taken into custody by U.S. forces will be provided with the protections of the GPW until some other legal status is determined by competent authority.

(3) The punishment of EPW, CI and RP known to have, or suspected of having, committed serious offenses will be administered IAW due process of law and under legally constituted authority per the GPW, GC, the Uniform Code of Military Justice and the Manual for Courts Martial.

(4) The inhumane treatment of EPW, CI, RP is prohibited and is not justified by the stress of combat or with deep provocation. Inhumane treatment is a serious and punishable violation under international law and the Uniform Code of Military Justice (UCMJ).

*b.* All prisoners will receive humane treatment without regard to race, nationality, religion, political opinion, sex, or other criteria. The following acts are prohibited: murder, torture, corporal punishment, mutilation, the taking of hostages, sensory deprivation, collective punishments, execution without trial by proper authority, and all cruel and degrading treatment.

*c.* All persons will be respected as human beings. They will be protected against all acts of violence to include rape, forced prostitution, assault and theft, insults, public curiosity, bodily injury, and reprisals of any kind. They will not be subjected to medical or scientific experiments. This list is not exclusive. EPW/RP are to be protected from all threats or acts of violence.

*d.* Photographing, filming, and video taping of individual EPW, CI and RP for other than internal Internment Facility administration or intelligence/counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of EPW, CI and RP or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command.

*e.* A neutral state or an international humanitarian organization, such as the ICRC, may be designated by the U.S. Government as a Protecting Power (PP) to monitor whether protected persons are receiving humane treatment as required by the Geneva Conventions. The text of the Geneva Convention, its annexes, and any special agreements, will be posted in each camp in the language of the EPW, CI and RP.

*f.* Medical Personnel. Retained medical personnel shall receive as a minimum the benefits and protection given to EPW and shall also be granted all facilities necessary to provide for the medical care of EPW. They shall continue to exercise their medical functions for the benefit of EPW, preferably those belonging to the armed forces upon which they depend, within the scope of the military laws and regulations of the United States Armed Forces. They shall be provided with necessary transport and allowed to periodically visit EPW situated in working detachments or in hospitals outside the EPW camp. Although subject to the internal discipline of the camp in which they are retained such personnel may not be compelled to carry out any work other than that concerned with their medical duties. The senior medical officer shall be responsible to the camp military authorities for everything connected with the activities of retained medical personnel.

*g.* Religion.

(1) EPW, and RP will enjoy latitude in the exercise of their religious practices, including attendance at the service of their faith, on condition that they comply with the disciplinary routine prescribed by the military authorities. Adequate space will be provided where religious services may be held.

(2) Military chaplains who fall into the hands of the U.S. and who remain or are retained to assist EPW, and RP, will be allowed to minister to EPW, RP, of the same religion. Chaplains will be allocated among various camps and labor detachments containing EPW, RP, belonging to the same forces, speaking the same language, or practicing the same religion. They will enjoy the necessary facilities, including the means of transport provided in the Geneva Convention, for visiting the EPW, RP, outside their camp. They will be free to correspond, subject to censorship, on matters concerning their religious duties with the ecclesiastical authorities in the country of detention and with international religious organizations. Chaplains shall not be compelled to carry out any work other than their religious duties.

(3) Enemy Prisoners of War, who are ministers of religion, without having officiated as chaplains to their own forces, will be at liberty, whatever their denomination, to minister freely to the members of their faith in U.S. custody. For this purpose, they will receive the same treatment as the chaplains retained by the United States. They are not to be obligated to do any additional work.

(4) If EPW, RP, do not have the assistance of a chaplain or a minister of their faith. A minister belonging to the prisoner's denomination, or in a minister's absence, a qualified layman, will be appointed, at the request of the prisoners, to fill this office. This appointment, subject to approval of the camp commander, will take place with agreement from the religious community of prisoners concerned and, wherever necessary, with approval of the local religious authorities of the same faith. The appointed person will comply with all regulations established by the United States.

## 1–6. Tribunals

*a.* In accordance with Article 5, GPW, if any doubt arises as to whether a person, having committed a belligerent act and been taken into custody by the US Armed Forces, belongs to any of the categories enumerated in Article 4, GPW, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

*b.* A competent tribunal shall determine the status of any person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists.

*c.* A competent tribunal shall be composed of three commissioned officers, one of whom must be of a field grade. The senior officer shall serve as President of the Tribunal. Another non-voting officer, preferably an officer in the Judge Advocate General Corps, shall serve as the recorder.

*d.* The convening authority shall be a commander exercising general courts-martial convening authority.

*e.* Procedures.

(1) Members of the Tribunal and the recorder shall be sworn. The recorder shall be sworn first by the President of the Tribunal. The recorder will then administer the oath to all voting members of the Tribunal to include the President.

(2) A written record shall be made of proceedings.

(3) Proceedings shall be open except for deliberation and voting by the members and testimony or other matters which would compromise security if held in the open.

(4) Persons whose status is to be determined shall be advised of their rights at the beginning of their hearings.

(5) Persons whose status is to be determined shall be allowed to attend all open sessions and will be provided with an interpreter if necessary.

(6) Persons whose status is to be determined shall be allowed to call witnesses if reasonably available, and to question those witnesses called by the Tribunal. Witnesses shall not be considered reasonably available if, as determined by their commanders, their presence at a hearing would affect combat or support operations. In these cases, written statements, preferably sworn, may be submitted and considered as evidence.

(7) Persons whose status is to be determined have a right to testify or otherwise address the Tribunal.

(8) Persons whose status is to be determined may not be compelled to testify before the Tribunal.

(9) Following the hearing of testimony and the review of documents and other evidence, the Tribunal shall determine the status of the subject of the proceeding in closed session by majority vote. Preponderance of evidence shall be the standard used in reaching this determination.

(10) A written report of the tribunal decision is completed in each case. Possible Board determinations are:

*(a)* EPW.

*(b)* Recommended RP, entitled to EPW protections, who should be considered for certification as a medical, religious, or volunteer aid society RP.

*(c)* Innocent civilian who should be immediately returned to his home or released.

*(d)* Civilian Internee who for reasons of operational security, or probable cause incident to criminal investigation, should be detained.

*f.* The recorder shall prepare the record of the Tribunal within three work days of the announcement of the tribunal's decision. The record will then be forwarded to the first Staff Judge Advocate in the internment facility's chain of command.

*g.* Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed. The record of every Tribunal proceeding resulting in a determination denying EPW status shall be reviewed for legal sufficiency when the record is received at the office of the Staff Judge Advocate for the convening authority.

## 1–7. The National Prisoner of War Information Center (NPWIC)

The NPWIC will—

*a.* Forward blocks of ISNs to designated Branch PWIC in Theater and CONUS, as required.

*b.* Obtain and store information concerning EPW, CI and RP, and their confiscated personal property. Information will be collected and stored on each EPW, CI, and RP captured and detained by U.S. Armed Forces. This includes those EPW, RP, who were captured by the United States but are in custody of other powers and those who have been released or repatriated. EPW, CI and RP cannot be forced to reveal any information however they are required to provide their name, rank, serial number and date of birth. The Geneva Convention requires the NPWIC to collect and store the following information for EPW, RP:

(1) Complete name.

(2) ISN.

(3) Rank.

(4) Serial number.

(5) Date of birth.

(6) City of birth.

(7) Country of birth.

(8) Name and address of next of kin.

(9) Date of capture.

(10) Place of capture.

(11) Capturing unit.

(12) Circumstances of capture.

(13) Location of confiscated personal property.

(14) Nationality.

(15) General statement of health.

(16) Nation in whose armed services the individual is serving.

(17) Name and address of a person to be notified of the individual's capture.

(18) Address to which correspondence may be sent.

(19) Certificates of death or duly authenticated lists of the dead.

(20) Information showing the exact location of war graves together with particulars of the dead.

(21) Notification of capture.

(22) List of personal articles of value not restored upon repatriation.

*c.* Obtain and store information concerning CI and ODs who are kept in the custody of U.S. Armed Forces who are subjected to assigned residence, or who were interned and then released. The following information will be collected:

(1) Any particulars that may assist in the individual's identification. This information shall include at least the person's surname, first names, place and date of birth, nationality, last residence and distinguishing characteristics, the first name of the father and the maiden name of the mother, the date, place and nature of the action taken with regard to the individual, the address at which correspondence may be sent and the name and address of the person to be informed.

(2) The individual's personal data for notification of his or her internment, state of health, and changes to this data.

(3) Certificates of death or authenticated lists of the dead and information showing the location of graves.

(4) Authenticated lists of personal valuables left by these protected persons.

(5) Information pertaining to children living in territories occupied by the United States. This will include all data necessary for identifying children whose identity is in doubt.

*d.* Process all inquiries concerning EPW and RP captured by U.S. Armed Forces.

*e.* Make reports to the ICRC, the State Department, and other Federal agencies as required.

*f.* Provide to the adverse party via the ICRC's Central Tracing Agency (CTA) all pertinent information pertaining to EPW, CI, and RP, in custody of the U.S. Armed Forces.

*g.* Transmit via the CTA/ICRC/PP, all official documents and information on judicial proceedings concerning EPW and RP captured, interned, retained or detained by U.S. Armed Forces.

*h.* Information and Property Transfers.

(1) In response to an inquiry, the NPWIC will forward all information and documents to the CTA or PP.

(2) Valuables and personal property which can be returned to a released or repatriated person will be forwarded through the CTA or PP.

(3) Valuables and personal property of deceased EPW/RP, which can be released, will be forwarded to the next of kin through the CTA or PP.

*i.* The ICRC/PP transmits information, documents, and personal effects to the State it represents as follows:

(1) If civilians are concerned, to their countries of origin and/or residence.

(2) If combatants or EPW, CI, and RP are concerned, to their country of origin or to the Power on which they depend.

## 1–8. The Branch PWIC

*a.* The Branch PWIC functions as the field operations agency for the NPWIC. It is the central agency responsible to maintain information on all EPW, CI and RP and their personal property within an assigned theater of operations or in CONUS.

*b.* The Branch PWIC serves as the theater repository for information pertaining to:

(1) Accountability of EPW, CI, and RP and implementation of DOD policy.

(2) Providing initial and replacement block ISN assignments to theater EPW, CI and RP processing organizations, and requests replacement ISNs from the NPWIC.

(3) Obtaining and storing information concerning all EPW, CI and RP, in the custody of U.S. Armed Forces, those captured by U.S. Armed Forces and transferred to other powers for internment (either temporarily or permanently), those EPW and RP transferred to CONUS for internment, and EPW, CI and RP released or repatriated. Obtaining and storing information about CI kept in the custody of U.S. Armed Forces within its assigned theater of operations who are subjected to assigned residence, interned, or released. Information required includes:

*(a)* That which may assist in an individual's identification.

*(b)* Certificates of death or authenticated lists of the dead.

*(c)* Information showing the location of war graves, together with particulars of the dead.

*(d)* Individual personal data, notification of capture, state of health, and changes.

*(e)* Certificates of death or authenticated lists of the dead and information showing the location of graves.

*(f)* Authenticated lists of personal valuables left by CI.

*(g)* Information pertaining to children living in territories occupied by the United States. This will include all data necessary for identifying children whose identity is in doubt.

(4) Processing, storing and maintaining all personal property of escaped or dead EPW/CI/RP or articles of value which were not restored upon repatriation, until final disposition instructions are received from the NPWIC or next higher headquarters.

(5) Processing and replying to all inquiries received from the NPWIC, the chain of command, or other agencies as directed by the NPWIC concerning EPW/CI/RP and other protected persons in the theater of operations that the U.S. is responsible for under the Geneva Convention.

(6) Making regular reports to the NPWIC, the chain of command, and supported internment facilities as required. This will include all pertinent information, official documents and information on judicial proceedings pertaining to EPW/CI/RP in the theater of operations for which the U.S. is responsible under the Geneva Convention.

(7) Valuables and personal property which can be returned to a released or repatriated person are forwarded to the ICRC CTA or Protecting Power, as directed by the NPWIC.

(8) Valuables and personal property of deceased EPW, CI, and RP which can be released, will be forwarded to the next of kin through the NPWIC to the ICRC Central Tracing Agency or Protecting Power.

(9) Confiscated property which cannot be released or returned will be stored until final disposition is determined.

*(a)* Unclaimed property will be safeguarded by the Branch PWIC until all EPW/CI have been repatriated. If property ownership cannot be determined, said property shall be released through the MP BDE G-4 and SUPCOM to the Defense Reutilization and Marketing Office (DRMO).

*(b)* Unclaimed money and negotiable instruments will be maintained by the PWIC pending inquiry. Upon completion of all repatriation actions and inquiries, unclaimed money and negotiable instruments will be transferred to the FAO as abandoned property.

(10) Accountability data concerning personal and confiscated property of EPW, CI, and RP transferred to CONUS will be forwarded directly to the PWIC designated to support CONUS operations.

(11) The Branch PWIC is responsible for establishing and enforcing the information requirements that the United States forces will collect on EPW,CI and RP taken or held in the Branch PWIC's area of responsibility. The Branch PWIC will receive its information requirements from the NPWIC.

## 1–9. Public Affairs
In the interest of national security, and the protection of the prisoners from public curiosity, and in adherence to the GPW and GC,

EPW, CI, RP and other detainees will not be photographed as per paragraph 1-5d. Interviews of EPW, CI, RP and other detainees by news media will not be permitted. Requests for media access to EPW, CI, or other detainee internment facilities will be coordinated through the Public Affairs Office, and the Staff Judge Advocate, and approved by the first commander who exercises General Court Martial Convening Authority over the internment facility. Requests for exception to policy will be forwarded through command channels to HQDA (SAPA-PP), Washington, D.C. 20310-4420

## Chapter 2
## Beginning of Captivity EPW/RP

### 2–1. Initial actions upon capture
*a.* The commanding officer of the capturing unit will ensure that:

(1) All EPW/RP are protected, safeguarded, and accounted for this regulation. This regulation applies from the time of capture until evacuation to designated internment facilities.

*(a)* Each EPW/RP will be searched immediately after capture. Use males to search males and females to search female prisoners, when possible. Weapons, ammunition, and equipment or documents with intelligence value will be confiscated and turned over to the nearest intelligence unit. Propaganda and other Psychological Operations (PSYOP) materials will be confiscated, identified by the EPW/RP name and ISN and turned over to the supporting EPW/CI PSYOP unit through intelligence channels. Currency will only be confiscated on the order of a commissioned officer and will be receipted for using DA Form 4137 (Evidence/Property Custody Document). EPW and RP are allowed to retain personal effects such as jewelry, helmets, canteens, protective mask and chemical protective garments, clothing, identification cards and tags, badges of rank and nationality, and Red Cross brassards, articles having personal or sentimental or religious value, and items used for eating except knives and forks.

*(b)* All prisoners of war and retained persons will, at the time of capture, be tagged using DD Form 2745. They will be searched for concealed weapons and items of intelligence. All equipment, documents, and personal property confiscated during the search must be tagged and administratively accounted for by the capturing unit. Capturing units must provide the: date of capture, location of capture (grid coordinates), capturing unit, and any special circumstances of the capture (how the EPW was captured). The remaining information will be included on the tag as it becomes available.

*(c)* The DD Form 2745 is perforated in three parts. The form is individually numbered and is constructed of durable, waterproof, tear-resistant material, and has reinforced eye-holes at the top of parts A and C. Part A is attached to the detainee with wire, string, or other type of durable material. Part B is retained by the capturing unit and maintained in the unit's records. Part C is attached to the property confiscated from the detainee, so that it may later be matched to that detainee.

*(d)* Prisoners may be interrogated in the combat zone. The use of physical or mental torture or any coercion to compel prisoners to provide information is prohibited. Prisoners may voluntarily cooperate with PSYOP personnel in the development, evaluation, or dissemination of PSYOP messages or products. Prisoners may not be threatened, insulted, or exposed to unpleasant or disparate treatment of any kind because of their refusal to answer questions. Interrogations will normally be performed by intelligence or counterintelligence personnel.

*(e)* Prisoners will be humanely evacuated from the combat zone and into appropriate channels as quickly as possible. Instructions given to prisoners during evacuation from the combat zone will be, if possible, in their own language and as brief as possible. When military necessity requires delay in evacuation beyond a reasonable period of time, health and comfort items will be issued, such as food, potable water, appropriate clothing, shelter, and medical attention. Prisoners will not be unnecessarily exposed to danger while awaiting evacuation. The capturing unit may keep prisoners in the

combat zone in cases where, due to wounds or sickness, prompt evacuation would be more dangerous to their survival than retention in the combat zone. Individuals presumed to have intelligence value should be separated immediately from other EPW.

*(f)* Accountability will be maintained for all evacuated prisoners, regardless of the evacuation channel used. Units designated to receive the prisoners at the collecting points or camps will prepare a receipt DD Form 629 (Receipt for Prisoner or Detained Person) with a list of each prisoner's name attached and provide a copy of the receipt to the escort.

*(2)* Prisoners will not be located next to obvious targets such as ammunition sites, fuel facilities, or communications equipment. First aid and medical treatment will be provided to the same extent that the United States provides to its own forces. Sick and wounded prisoners will be evacuated separately, but in the same manner as U.S. and allied forces. Accountability and security of prisoners and their possessions in medical facilities is the responsibility of the respective echelon commander.

*b.* Special policy pertaining to the temporary detention of EPW, CI, RP and other detained persons aboard United States Naval Vessels:

(1) Detention of EPW/RP on board naval vessels will be limited.

(2) EPW recovered at sea may be temporarily held on board as operational needs dictate, pending a reasonable opportunity to transfer them to a shore facility, or to another vessel for transfer to a shore facility.

(3) EPW/RP may be temporarily held aboard naval vessels while being transported between land facilities. They may also be treated and temporarily quartered aboard naval vessels incidental to their treatment, to receive necessary and appropriate medical attention if such detention would appreciably improve their health or safety prospects.

(4) Holding of EPW/RP on vessels must be temporary, limited to the minimum period necessary to evacuate them from the combat zone or to avoid significant harm that would be faced if detained on land.

(5) Use of immobilized vessels for temporary holding of EPW/RP is not authorized without SECDEF approval.

## 2–2. Evacuation and care of EPW and RP

Those units designated to hold and evacuate EPW and RP will:

*a.* Collect prisoners from capturing units, and evacuate them from the combat zone as soon as possible.

*b.* Ensure sick and wounded EPW and RP in their custody are classified, by qualified medical personnel, as either walking wounded or litter, or as non-walking wounded. Walking wounded or litter EPW will be evacuated through established evacuation channels. Non-walking wounded or sick EPW will be delivered to the nearest medical aid station and evacuated through medical channels. All detained personnel will remain physically segregated from U.S. and allied patients.

(1) Appropriate intelligence sources will be notified when EPW and RP are found in possession of large sums of U.S. or foreign currency. A receipt DA Form 4137 will be prepared to account for all property that is taken from the EPW. Copies of DD Form 629 (Receipt for Prisoner or Detained Person) and DA Form 4137 will be maintained to establish positive accountability of the EPW and their property and can be used to substantiate proper care and treatment at a later time. DA Form 4137 will be used to account for property released before final disposition is ordered. Records of disposition of property will be evacuated with prisoners for inclusion in their personnel records.

(2) EPW will be segregated into categories of officer, noncommissioned officer, enlisted, male, female, nationality, recognized ethnic groups, deserters or any other category that the senior officer or NCO having custody of the prisoners designate to ensure the security, health and welfare of the prisoners. Segregation should prevent prisoners from communicating by voice or visual means. Guards will communicate with the prisoners only to give commands and instructions.

(3) The requirements for safeguarding prisoners are the same as those for capturing units.

*c.* In cases of mass capture or surrender of entire units, combatants should be disarmed and those with the greatest intelligence value identified for debriefing.

*d.* Repatriation or parole of the remainder should be considered, with final determination directed by HQDA. Prisoners will not be forced to be repatriated against their will. Prisoners who refuse repatriation will be treated as prisoners of war until their legal status and further disposition can be determined by competent authority.

## 2–3. Evacuation Policy

*a.* Evacuation of EPW or RP outside the theater of operations requires SECDEF approval.

*b.* Wounded EPW generally will not be evacuated to CONUS until released from medical channels. They will be processed through U.S. military police assets. If EPW are to be medically evacuated, they will be processed and accounted for per this regulation.

# Chapter 3
# Administration and Operation of EPW Internment Facilities

## 3–1. Establishment

Internment facilities will be established in the communications zone of each theater of operations for the purpose of receiving, accounting for, administering, securing, and logistically supporting EPW/RP.

## 3–2. EPW internment facilities

*a.* The operation of all EPW internment facilities is governed by the provisions of the Geneva Conventions.

*b.* The theater commander remains responsible for the location of EPW facilities. EPW/RP may be interned only in premises located on land and affording proper health and hygiene standards. Except in extreme circumstances, in the best interests of the individual, EPW/RP will not be interned in correctional facilities housing military or civilian prisoners. Prisoners will not normally be interned in unhealthy areas, or where the climate proves to be injurious to them, and will be removed as soon as possible to a more favorable climate. Transit camps or collecting points will operate under conditions similar to those prescribed for permanent prisoner of war camps, and the prisoners will receive the same treatment as in permanent EPW camps.

*c.* The internment facility will be marked with the letters "PW" (Prisoner of War Camps) and will be placed so they will be clearly visible from the air during the daytime. Other markings may be used when agreed to by the combatant commanders and approved by HQDA.

## 3–3. EPW Facility Management

*a.* The United States may subject EPW/RP to internment and may have contingency plans to confine and enclose EPW in camps located both in and outside CONUS. Medical personnel and chaplains classified as RP, while retained by the Detaining Power with a view to assisting prisoners of war, shall not be considered prisoners of war. The EPW facility commander will provide command, control, accountability, administrative, and logistical support for the operation of all EPW/CI facilities. The EPW/CI facility commander will:

(1) Intern prisoners captured by or transferred to the custody of U.S. forces.

(2) Process interned prisoners to include tagging, assignment of ISN, fingerprinting, photographing, and weighing, as needed.

*(a)* EPW and RP may be required to show their identity card issued by his or her government; however in no case may the card be taken from the individual.

*(b)* If an EPW does not hold an identity card issued by his or her

government, the EPW will be issued a completed DA Form 2662-R (EPW Identity Card). The identity card will be in the possession of the EPW at all times. A notation indicating preparation of DA Form 2662-R will be made under item 36 of DA Form 4237-R (Detainee Personnel Record). DA Form 2662-R will be reproduced locally on 5-by 3-inch card head to foot. A copy for reproduction purposes is located at the back of this regulation. DA Form 4237-R will be reproduced locally on 8 1/2 by 11-inch paper. A copy for reproduction purposes is located at the back of this regulation. These forms are for the use of Army only.

*(c)* DA Form 2663-R (Fingerprint Card) will be prepared in duplicate for each EPW/RP. One copy will be retained at the camp in which the EPW/RP is confined and will accompany the EPW/RP upon transfer. The other is forwarded to the Branch PWIC.

(3) Provide prisoners with humane treatment, health and welfare items, quarters, food, clothing, and medical care. Health Services Command (HSC) provides medical and dental care for EPW in federal or civilian health care facilities per HSC plans.

(4) Provide for morale, religious, intellectual, educational, social, physical and recreational activities for the prisoners.

(5) Establish liaison with the supporting Branch PWIC, collect necessary information regarding the location, the physical well-being, legal status, and any change thereto, of all prisoners interned by the command.

(6) Allow prisoners to correspond with their families and receive relief shipments.

(7) Provide prisoners copies of the 1949 Geneva Conventions (in their own language, if possible).

(8) Employ and compensate assigned prisoners based on verified needs/requirements and monitor all aspects of EPW and RP employment per this regulation. If sundry packets are provided, no advance pay is required.

(9) Provide command and control, and operate, administer, and secure the camp.

(10) Prepare necessary documents for administrative actions, court-martial charges or any disciplinary proceedings for prisoners.

(11) Post personnel files and maintain unit level records of proceedings.

(12) Supervise qualified EPW/RP in providing medical care and field sanitation/preventive medicine for prisoners.

(13) Provide the initial medical examination and monthly screening of prisoners.

(14) Maintain EPW labor and finance records on each prisoner per AR 37-1.

(15) Ensure preparation of monthly pay credit statements of prisoner's personal accounts and ensure pay for prisoners.

(16) Direct activities relating to the assignment and supervision of work projects for prisoners.

(17) Advise employers of provisions for handling EPW.

(18) Establish and maintain records of prisoner labor projects.

(19) Provide initial reports of and perform initial investigation and inquiries into prisoner labor injuries or incidents.

(20) Report allegations of criminal acts or war crimes committed by or against EPW/RP to the supporting element of the U.S. Army Criminal Investigation Command (USACIDC). Deaths resulting from other than natural causes will be investigated by USACIDC.

(21) Provide assistance to the medical facility commander to assess the threat posed by hospitalized EPW.

(22) Establish and maintain complete and accurate accountability information regarding the location, physical and legal status, training, and employment of all individuals in the custody of, or assigned to, the EPW facility. Information will be posted to the individual's personal, medical, and financial records, and will be provided to the supporting PWIC and next higher headquarters, as required.

(23) Provide an area for intelligence collection efforts.

*b.* USACIDC will ensure criminal investigative support for EPW and RP is planned and resources are allocated for this purpose.

## 3–4. Operation of prisoner of war internment facilities

EPW camps will be organized and operated, where possible, as other military commands. Each internment facility will be commanded by a commissioned officer of the U.S. Military. The following provisions will be observed:

*a.* The Geneva Conventions will be posted within the camp in the language(s) of the EPW/RP nation(s). A copy of the text will be supplied, on request, to any person who does not have access to posted copies. The supporting EPW/CI PSYOP unit can assist in preparing and disseminating native language copies of the text as well as other translation, printing, and audio-visual information dissemination support.

*b.* EPW will be interned in camps according to their nationality and language. They will not be separated from other prisoners belonging to the Armed Forces with which they were serving at the time of their capture, except with their consent. Officers will be separated from enlisted personnel and females will be separated from males.

*c.* EPW representatives will be authorized for EPW Camps.

(1) At each enlisted EPW or branch camp, EPW will select a prisoner representative. These representatives will be elected by secret ballot every 6 months and are eligible for reelection. EPW will be permitted to consult freely with their representatives. In turn, their representatives will represent them before:

*(a)* The military authorities.

*(b)* The Protecting Power.

*(c)* The ICRC.

*(d)* Other relief or aid organizations.

(2) In officer EPW camps or in camps with both officers and enlisted EPW, the senior EPW officer, unless incapacitated or incompetent, will be recognized as the prisoner representative. In officer EPW camps, one or more advisers chosen by the EPW officers will assist the prisoner representative. The supporting EPW/CI PSYOP unit can assist in identifying officers, key communicators, and English speaking EPW who may be hiding within the camp population.

(3) In mixed camps (officers and enlisted), one or more enlisted advisors will be elected to assist the EPW officer representative.

(4) The camp commander will be designated as the final approval authority for each elected prisoner representative. When the camp commander denies, approves, or dismisses an elected representative, a notice to that effect will be sent through channels to HQDA, (DAMO-ODL) NPWIC for forwarding to the ICRC or the PP. Reasons for the refusal will be included. EPW will then be permitted to elect another representative.

(5) RP (medical personnel and chaplains) are not considered prisoners of war and therefore may not elect prisoner representatives. The senior medical officer in each camp will be responsible for matters connected with the activities of retained medical personnel. Individual chaplains, like the responsible medical officer, will have direct access to camp authorities.

(6) Prisoner representatives may appoint EPW assistants. These assistants are in addition to the advisers provided for in (2) above. The camp commander will also approve the selection of such assistants and their continuance in those positions.

(7) Prisoner representatives must be of the same nationality, observe the same customs, and speak the same language as the EPW they represent. EPW interned in separate compounds due to differing nationality, language, or customs will be permitted to have their own prisoner representative according to (1) through (4) above. The internment facility commander will establish the local policy for an escort to accompany the representative.

(8) Duties, responsibilities, and available resources.

*(a)* Representatives will be responsible for furthering the physical, spiritual, and intellectual well-being of the persons they represent. They will not exercise any disciplinary powers. They will not perform any other work if the work interferes with their duties as representatives. They will be allowed a reasonable time to acquaint their successors with their duties and related current affairs.

*(b)* Representatives may be given the freedom of movement

needed to accomplish their duties, such as inspection of labor detachments and receipt of supplies. Ordinarily, representatives will be permitted to visit places where EPW, whose interests they represent are detained.

*(c)* Postal and telegraph facilities will be made available to prisoner representatives for communicating with the U.S. Army authorities; Protecting Powers, if any; the ICRC and its delegates; the Mixed Medical Commission, and other organizations authorized to assist EPW. Prisoner representatives at branch camps will be granted the same facilities for communication with the prisoner representative of the parent camp.

*d.* EPW/RP social privileges. Social privileges will be subject to security considerations and camp discipline. EPW/RP will be encouraged to take part in intellectual, educational, and recreational activities. The introduction of political overtones into or the furtherance of anti-U.S. propaganda objectives through these activities is prohibited. The supporting EPW/CI PSYOP unit can assist in identifying agitators, malcontents, and political officers who may create resistance within the camp. These units are also trained to develop and implement programs to reduce hostile political activity and to persuade EPW/CI populations to accept U.S. authority and regulations.

*e.* EPW/RP will be quartered under conditions as favorable as those for the force of the detaining power billeted in the same area. The conditions shall make allowance for the habits and customs of the prisoners and shall in no case be prejudicial to their health. The forgoing shall apply in particular to the dormitories of EPW/RP as it regards both total surface and minimum cubic space and the general installation of bedding and blankets. Quarters furnished to EPW/RP must be protected from dampness, must be adequately lit and heated (particularly between dusk and lights-out), and must have adequate precautions taken against the dangers of fire. In camps accommodating both sexes, EPW/RP will be provided with separate facilities for women. When possible consult the preventive medicine authority in theater for provisions of minimum living space and sanitary facilities.

*f.* The daily food rations will be sufficient in quantity, quality, and variety to keep EPW/RP in good health and prevent loss of weight or development of nutritional deficiencies.

(1) Account will be taken of the habitual diet of the prisoners.

(2) EPW/RP who work may be given additional rations when required.

(3) Sufficient drinking water will be supplied to EPW/RP.

(4) The use of tobacco will be permitted in designated smoking areas.

(5) EPW will, as far as possible, be associated with the preparation of their meals and may be employed for that purpose in the kitchens. Furthermore, they will be given means of preparing additional food in their possession. Food service handlers must have training in sanitary methods of food service.

(6) Adequate premises will be provided for messing.

(7) Collective disciplinary measures affecting food are prohibited.

*g.* Clothing, underwear, and footwear will be supplied to EPW/RP in sufficient quantities, and allowances will be made for the climate of the region where the prisoners are detained. Captured uniforms of enemy armed forces will, if suitable for the climate, be made available to clothe EPW/RP. The camp commander will ensure the regular replacement and repair of the above articles. EPW/RP who work will receive clothing appropriate to the nature or location of the work demands.

*h.* Canteens. EPW/RP will be provided sundry/health and comfort packs, which may be supplemented with items tailored to their cultural needs, as a temporary substitute for establishing canteen operations. When directed by the Theater Area Provost Marshal or senior Military Police officer in the internment facilities' chain of command, canteens will be installed in all camps, where EPW/RP may procure foodstuffs, soap, tobacco and ordinary articles in daily use. The tariff will never exceed local market prices. When authorized, canteens will be operated IAW the provisions of the GPW. Procedures regarding EPW/RP payment for canteen purchases are contained in AR 37-1. Profits made by camp canteens will be used for the benefit of the prisoners; a special fund will be created for this purpose. The prisoners' representative may make suggestions regarding the management of the canteen and of this fund. When an interment facility is closed, the credit balance of the special fund will be transferred to another U.S. interment facility operating in theater. When all facilities are closed, funds will be turned over to an international welfare organization. The fund will be employed for the benefit of EPW/RP of the same nationalities as those who have contributed to the fund. In case of a general repatriation, profits will be kept by the United States.

*i.* Hygiene and medical care:

(1) The United States is bound to take all sanitary measures necessary to ensure clean and healthy camps to prevent epidemics. EPW/RP will have access, day and night, to latrines that conform to the rules of hygiene and are maintained in a constant state of cleanliness. In any camps in which women EPW/RP are accommodated, separate latrines will be provided for them. EPW/RP will have sufficient water and soap for their personal needs and laundry. The necessary facilities and time will be made available for those purposes. The supporting EPW/CI PSYOP unit can assist in maintaining and improving health and sanitary conditions by producing and disseminating informational products concerning proper hygiene, sanitation, and food preparation, where required.

(2) Every camp will have an infirmary. EPW/RP with a contagious disease, mental condition, or other illness, as determined by the medical officer, will be isolated from other patients. A list of endemic diseases of military importance can be obtained from the theater surgeon or preventive medicine officer. EPW/RP will be immunized and reimmunized against other diseases as recommended by the Theater Surgeon. EPW/RP suffering from serious disease, or whose condition necessitates special treatment, surgery, or hospital care, must be admitted to any military or civilian medical unit where such treatment can be given. Special facilities will be available for the care and rehabilitation of the disabled, particularly the blind. EPW/RP will be accorded the attention of medical personnel of the power on which they depend and, if possible, of their nationality. EPW/RP will not be denied medical care. The detaining authorities shall, upon request, issue to every EPW/RP who has undergone treatment, an official certificate indicating the nature of the illness or injury, and the duration and kind of treatment received. A duplicate of this certificate will be forwarded to the ICRC. The detaining authority will also ensure medical personnel properly complete the SF 88 (Report of Medical Examination), SF 600 (Chronological Record of Medical Care and DA Form 3444 (Treatment Record). The cost of treatment will be borne by the United States.

(3) Medical inspections of EPW/RP will be held at least once a month, where each detainee will be weighed and the weight recorded on DA Form 2664-R (Weight Register). DA Form 2664-R will be reproduced locally on 8- by 5-inch card. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only. The purpose of these inspections will be to monitor the general state of health, nutrition, and cleanliness of prisoners and to detect contagious diseases, especially tuberculosis, venereal disease, lice, louse-borne diseases and HIV.

(4) EPW who, though not attached to the medical service of the Armed Forces, are physicians, surgeons, dentists, nurses, or medical orderlies may be required to exercise their medical functions in the interests of prisoners of war dependent on the same power after being certified per Paragraph 3-15. They will continue to be classified as EPW, but will receive the same treatment as corresponding RP (medical personnel). They will be exempted from any other work.

(5) Experimental research will not be conducted on EPW/RP.

## 3–5. Procedures for prisoner of war correspondence

*a.* EPW/RP will be allowed to send and receive letters and cards. There is no restriction on the number or length of letters or cards EPW/RP may receive. EPW/RP will be permitted to send not less than two letters and four cards monthly, in addition to the capture

cards provided in Article 70, GPW. In the event EPW/RP are prevented from writing their monthly quota of letters and cards because of a lack of stationery forms, they will be allowed to make up their quotas when forms are available.

b. All persons may address complaints, in writing to U.S. military authorities and the Protecting Power. These communications will not be limited in length or number, nor will they be charged against the person's correspondence quota. They will be transmitted without delay.

c. Letters and cards addressed to persons other than representatives of a Protecting Power or to U.S. military authorities will not:

(1) Contain complaints or criticism of any governmental agency or official.

(2) Refer to events of capture.

(3) Compare camps.

(4) Contain quotations from books or other writings.

(5) Contain numbers, ciphers, codes, music symbols, shorthand, marks, or signs other than those used for normal punctuation.

(6) Contain military information on numbers of EPW/RP. (Exceptions: Letters to a Protecting Power or prisoner representative or to a relief or aid organization.)

(7) Should any such correspondence be discovered, it will be turned over to the supporting counterintelligence element.

d. Correspondence forms.

(1) EPW will use DA Form 2667-R (Prisoner of War Mail (Letter)) and DA Form 2668-R (Prisoner of War (Post Card)) for correspondence, except as authorized elsewhere in this regulation. DA Form 2667-R will be reproduced on 8 1/2-by 11-inch paper, head to head. DA Form 2668-R will be reproduced locally on 6-by 4-inch cards, head to foot. Copies for reproduction purposes are located at the back of this regulation. These forms are for the use of Army only. Legal documents may be written on blank paper instead of DA forms. Prisoner representatives may use ordinary paper in writing to:

(a) The Protecting Power.

(b) ICRC.

(c) Other approved relief or aid organizations.

(d) U.S. military authorities.

(2) Except for official correspondence by prisoner representatives or unless required by HQDA, communication in two or more copies is prohibited.

(3) Camp commanders will distribute DA letter and card forms to EPW/RP.

(4) Upon Completion of DA Form 4237-R, but not later than 1 week after arrival at a camp for processing, each EPW or RP will be permitted to send a DA Form 2666-R to a relative or next of kin.

(5) Within a period of not more than 1 week after arrival at the first EPW camp or when an EPW/RP's address is changed by transfer to a hospital or to another camp, a DA Form 2665-R (Capture Card for Prisoner of War) will be filled out and forwarded to the Branch PWIC. DA Form 2665-R will be reproduced locally on 6-by 4-inch card, head to foot, a copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only.

e. Subject to (1) and (2) below, outgoing letters and cards will be sent unsealed directly from the camp to the theater commander's designated censorship element. All incoming letters and cards that arrive at a camp without having been censored will be sent to the designated censorship element before delivery to addressees.

(1) Communication to the Protecting Power or the ICRC. Letters and cards not intended for other addresses and not containing enclosure for other addresses will be forwarded directly from the camp to the proper Branch PWIC

(2) Other correspondence. Outgoing letters and cards from a branch camp's EPW will be forwarded as soon as possible.

f. Date and packaging of correspondence. Letters and cards will be forwarded without undue delay in pouches or in government envelopes.

(1) EPW/RP may not write letters for others who are able to write. If an EPW/RP is unable to write, the camp commander may permit another person to write the message. The person doing the writing will countersign the message.

(2) EPW/RP legal documents may be enclosed with outgoing correspondence. When it becomes necessary for a detainee to send a legal document, the document and forwarding letter or card may be enclosed in a plain envelope.

(3) EPW/RP will not send maps, sketches, or drawings in outgoing correspondence.

g. Individuals will not be permitted to mail or receive registered, certified, insured, or COD.

h. Letters and cards to or from EPW/RP sent by ordinary mail are postage free.

i. Outgoing letters and cards will be secured by using locked boxes or similar means. Only authorized U.S. personnel will handle outgoing mail. Incoming mail may be sorted by detainees when supervised by U.S. personnel.

j. Censorship of EPW/RP mail may be instituted by the theater commander as follows:

(1) Outgoing letters and cards may be examined and read by the camp commander or his designated representative. No censorship action of any kind will be taken at the camp. The camp commander will return to the sender for rewriting any outgoing correspondence containing obvious deviations from regulations with a copy provided to the supporting counterintelligence element.

(2) Camp commanders will designate U.S. military personnel to supervise the opening of all mail pouches containing incoming letters and cards for detainees. These items will be carefully examined by the named personnel before delivery to detainees.

(3) EPW/CI wishing to make complaints concerning mail delivery must direct those complaints to:

(a) The camp authorities

(b) The responsible major commander.

(c) The Protecting Power/ICRC.

k. Parcels.

(1) Persons may receive individual parcels and collective shipments containing:

(a) Foodstuffs.

(b) Clothing.

(c) Medical supplies.

(d) Articles of a religious, educational, or recreational nature.

(2) EPW/RP will not be permitted to mail parcels (Article 16, 1974 Universal Postal Convention).

(3) Parcels received for transferred persons will be forwarded immediately.

(4) Nonperishable articles received for persons who have died or escaped, or who have been repatriated, will be forwarded to the Branch PWIC. Perishable items received for deceased or escaped persons will be released to the prisoner representative who will deliver them to the camp infirmary or hospital for the benefit of EPW/RP.

(5) The contents of all incoming parcels will be examined at the camp by a U.S. officer in the presence of the addressee or the named representative. When considered necessary, the camp commander may request that the parcel be examined by the censors. The articles in each parcel will be removed. The string, the inner wrappings, the outer container, and any extraneous items found in the parcel will not be turned over to the EPW/RP or the designated representative. Examination will be close enough to reveal concealed articles and messages; however, undue destruction of contents of parcels will be avoided.

l. EPW/RP may send and receive telegrams as determined by the camp commander. They may not make or receive telephone calls.

(1) At a minimum:

(a) A detainee who has not received mail from next of kin for 3 months may send a telegram. One month from the date a previous telegram was sent, a detainee who has not received a written answer or other communication from the addressee may send another telegram.

(b) Detainees unable to receive mail from their next of kin or send mail to them by ordinary postal routes, or who are a great

distance from their home, will be permitted to send one telegram a month.

*(c)* A person who is seriously ill, or who has received news of serious illness or death in the family, may be permitted to send a telegram. The camp commander may authorize the sending of additional telegrams.

(2) The sending of telegrams as provided for in (1) above will be governed by the following:

*(a)* The message proper will consist of not more than 15 words.

*(b)* The cost of sending the telegram will be debited to the person's account.

*(c)* Arrangements for messages going to or through enemy-occupied countries will be made with the ICRC Field Director.

*(d)* Telegrams, as a general rule, shall be written in their native language.

*(e)* No telegram will be sent to a Government official or to a Protecting Power.

*(f)* Telegrams are subject to the same procedures for censorship listed in paragraph 3-5j(2).

*m.* EPW/RP may receive books. Books that arrive at camps uncensored will be censored. Publications containing maps may be made available to the EPW/RP upon approval of the camp commander, provided they do not contain maps of the territory surrounding the camps. Books, included in parcels of clothing and foodstuffs, may be confiscated on order of the camp commander.

*n.* The following may be made available to EPW/RP:

(1) Current newspapers and magazines published in the English language and selected by the camp commander.

(2) Unmarked, unused magazines in the English language, published in the United States, and distributed by approved relief or aid organizations at the discretion of the camp commanders after censorship.

(3) Foreign language newspapers and magazines published in the United States, upon approval of the camp commander and after censorship of individual issues.

(4) Newspapers and magazines published outside the United States, regardless of language, must be approved by the theater commander.

## 3–6. Discipline and security

Measures needed to maintain discipline and security will be established in each camp and rigidly enforced. The camp commander will maintain records of disciplinary punishments. These records will be open to inspection by the Protecting Power.

*a.* The following acts will not be permitted:

(1) Fraternization between EPW, RP and U.S. military or civilian personnel. Fraternization is defined as improper or intimate communications or actions between U.S. Armed Forces personnel and EPW/RP.

(2) Donating or receiving gifts or engaging in any commercial activity between persons in U.S. custody and U.S. personnel.

(3) Setting up of courts by detainees. Disciplinary powers will not be delegated to or exercised by EPW/RP. Punishment will not be administered by EPW/RP.

*b.* The GPW, regulations, orders, the contents of any special agreements and notices on the conduct and activities of detainees will be published in a language the detainee understands. They will be posted in places within each camp where the detainees may read them and will be made available to persons who do not have access to posted copies. Additional copies will be given to the prisoner representatives. Every order and command will be addressed to detainees personally. The supporting EPW/CI PSYOP unit may assist in providing necessary printed, loudspeaker, or other audiovisual support in communicating directly to EPW/RP. To protect persons from acts of violence, bodily injury, and threats of reprisals at the hands of fellow detainees, a copy of the following notice in the detainees' language will be posted in every compound:

**NOTICE**

EPW/RP who fear that their lives are in danger or that they may

suffer physical injury at the hands of other EPW/RP will immediately report the fact personally to any U.S. Armed Forces Personnel of this camp without consulting the EPW/CI representative. From that time on, the camp commander will assure adequate protection to such EPW/RP by segregation, transfer, or other means. EPW/RP who mistreat fellow detainees will be punished.

Signed (Commanding Officer)

*c.* The following military courtesies are required of EPW:

(1) When the U.S. national anthem is played or "To the Colors" or "Retreat" is sounded, EPW not in buildings will stand at attention and face toward the music or colors.

(2) Besides the courtesies required in their own armies toward their officers, enlisted EPW will salute all commissioned officers of the U.S. Armed Forces. Officer EPW will be required to salute only officers of a higher rank and the camp commander regardless of grade.

(3) EPW may salute in the way prescribed by regulations in force in their own armies.

(4) Other military courtesies will be rendered per AR 600-25 (Salutes, Honors, and Visits of Courtesy) and FM-22-5 (Drill and Ceremonies).

*d.* U.S. military personnel will extend the following courtesies toward EPW:

(1) U.S. military personnel will not be required to salute EPW or assume the position of attention when addressing them; however, U.S. officers will return the salutes of EPW.

(2) When addressing senior officer EPW on official business, U.S. military personnel will be courteous and extend the respect due them by grade and age.

*e.* Flags upon which an enemy political emblem or device appears will be seized. EPW/RP will not have any political emblem, insignia, flag, or picture of political leaders. Badges of grade and nationality, and decoration worn as part of the uniform are permitted. EPW/RP may have pictures of political leaders that appear in magazines, books, and newspapers if the pictures are not removed.

*f.* Security guidelines outlined below concern the custody and use of EPW/RP.

(1) *Guard work details.* EPW on work details will be guarded as required to provide security against escape. Selected EPW/RP may be employed without guards in areas where military personnel are on duty if:

*(a)* EPW/RP are under a U.S. work supervisor.

*(b)* Frequent counts of detainees and work inspections are made at irregular intervals.

(2) *Preventing escape.* The camp commander will ensure that each EPW/RP understands the meaning of the English word "halt". If EPW/RP attempt to escape, the guard will shout "halt" three times, thereafter the guard will use the least amount of force necessary to halt the EPW/RP. If there is no other effective means of preventing escape, deadly force may be used.

*(a)* In an attempted escape from a fenced enclosure, a prisoner will not be fired at unless he/she has cleared the outside fence and is making further effort to escape.

*(b)* EPW/RP attempting to escape outside a fenced enclosure will be fired on if they do not halt after the third command to halt.

*(c)* An EPW/RP will have succeeded in escaping when he or she has:

*1.* Joined the armed forces of the power on which he or she depends or those of an ally of that power.

*2.* Left the territory under U.S. control or control of U.S. allied powers.

*3.* Joined a ship flying the flag of the power on which he or she depends, or of an ally of that power, in U.S. territorial waters, and the ship is not under U.S. control.

*(d)* An EPW who has successfully escaped shall not be punished for the escape if subsequently recaptured.

## 3–7. Punitive Jurisdiction

*a.* EPW/RP are subject to punishment under the Uniform Code of Military Justice and other U.S. Laws, regulations and orders in force during the time of their detention.

*b.* Judicial proceedings against EPW and RP will be by courts-martial or by civil courts. When EPW are tried by courts-martial, pretrial, trial, and post-trial procedures will be according to the UCMJ and the U.S. Manual for Courts-Martial. An EPW will not be tried by a civil court for committing an offense unless a member of the U.S. Armed Forces would be so tried.

*c.* When possible, disciplinary rather than judicial measures will be taken for an offense. The disciplinary measures below are authorized:

(1) Suspend or eliminate privileges granted over and above the minimum privileges provided for in the GPW and GC.

(2) Confinement.

(3) A fine not to exceed one-half of the advance of pay (article 60 GPW) and working pay (article 62 GPW) that the detainee would otherwise receive during a period of not more than 30 days.

(4) Fatigue duties not exceeding 2 hours daily. This punishment will not be applied to officers.

*d.* EPW and RP rights. Before any disciplinary punishment is pronounced, EPW/RP will be given precise information regarding the offenses for which they are accused. They will be given a chance to explain their conduct and to defend themselves. They will be permitted to call witnesses and to have use of a qualified interpreter, if necessary and reasonably available. The board's decision will be announced to the person and to the person's representative.

*e.* The following are limitations on punishment:

(1) Collective punishment for individual acts, corporal punishment, imprisonment in premises without sunlight, and any form of torture or cruelty is forbidden.

(2) EPW may not be deprived of their grade or prevented from wearing insignia of grade and nationality.

(3) No EPW or RP will be handcuffed or tied, except to ensure safe custody or when prescribed by a responsible medical officer as needed to control a medical case requiring restraint.

(4) No EPW or RP may be punished more than once for the same act or sentenced to any penalties except those authorized herein.

(5) In no case will disciplinary punishments be inhumane, brutal, or dangerous to the person's health. The length of a single disciplinary punishment will not exceed 30 days. Confinement served while awaiting the hearing of a disciplinary offense or the award of disciplinary punishment will be deducted from punishment awarded. No more than 30 days punishment may be prescribed even if a person is answerable for several acts at the same time. This is true whether such acts are related or not. The period between pronouncing an award of disciplinary punishment and commencing punishment will not exceed 30 days.

(6) When EPW or RP are awarded a further disciplinary punishment, a period of at least 3 days will elapse between punishments if the length of one of the punishments is 10 days or more.

(7) EPW or RP being disciplined or judicially punished will not be subjected to more severe treatment than that authorized for the same offense by members of the U.S. Armed Forces of equal grade.

(8) EPW or RP sentenced by a courts-martial or awarded disciplinary punishment will not be treated differently from other detainees after their punishment.

*f.* Offenses and warranted punishments. EPW or RP who attempt to escape or escape the confines of the camp, but who do not succeed in their escape, will be liable only to disciplinary punishments for those escape acts. They will not be liable to judicial proceedings, even if they are repeat offenders. Escapes or attempts to escape, even if they are repeat offenses, will not be considered aggravating circumstances if detainees are tried by judicial proceedings for offenses committed during their escapes or attempts to

escape. Offenses, such as those against public property, theft without intention of self-enrichment, drawing up or use of false papers, or wearing of civilian clothing, that are committed by detainees with the sole intent of making their escape easier and that do not entail any violence against life or limb will warrant disciplinary punishment only. Because of attempts to escape, EPW and RP may be subjected to close watch. The watch must not affect the state of their health. The EPW and RP watched must be in camp. The watch must not deprive them of the safeguards granted by the Geneva Conventions. Persons who aid or abet an escape or an attempt to escape will be liable on this count for disciplinary punishment.

*g.* Offenses against discipline. EPW and RP accused of an offense against disciplinary measures will not be confined pending a hearing, unless members of the U.S. Armed Forces would be confined if they were accused of a similar offense or unless camp order and discipline would be jeopardized. A period spent in confinement awaiting disposal of an offense against disciplinary measures will be reduced to an absolute minimum. It will not exceed 14 days.

*h.* Confinement. A pretrial investigation of an offense alleged to have been committed by a detainee will be conducted as soon as circumstances permit so that trial, if warranted, will take place as soon as possible. A detainee will not be confined while awaiting trial unless a member of the U.S. Armed Forces would be so confined if accused of a similar offense, or unless national security would be served. In no case will this confinement exceed 3 months. A period spent in confinement while awaiting trial will be deducted from a sentence of imprisonment. The period will be taken into account in fixing a penalty.

*i.* Retention of Geneva Convention benefits. Persons prosecuted for an act committed before capture will retain, even if convicted, the protection of the Geneva Conventions. EPW, RP undergoing confinement will:

(1) Continue to enjoy the benefits of the Geneva Convention except when such benefits do not apply because detainees are confined.

(2) Be permitted to exercise their right to complain and to confer with visiting representatives of the Protecting Power.

(3) Not be deprived of the prerogatives attached to their grade.

(4) Be allowed to exercise and to stay in the open air at least 2 hours daily.

(5) Be given medical attention as prescribed in this regulation.

(6) Be permitted to read and write and to send and receive letters and cards. Parcels, however, may be withheld from them until the punishment is completed. Such parcels will be released to the safekeeping of the detainee representative. If perishable goods are contained in the parcels, the detainee representative will give them to the camp infirmary or hospital to distribute them fairly among the other detainees.

## 3–8. Judicial proceedings

*a.* No EPW or RP will be tried or sentenced for an act that was not forbidden by U.S. law or by international law in force at the time the act was committed.

*b.* No moral or physical coercion will be exerted to induce EPW or RP to admit guilt for any act.

*c.* No EPW or RP will be convicted without having had the chance to present a defense and without having the assistance of a qualified advocate or counsel.

*d.* Accused persons will be notified promptly of the charges in writing. Charges will be in a language understood by the accused. These persons will be tried as soon as possible. A notification (in duplicate) of proceedings against a detainee will be submitted through channels to the NPWIC. The NPWIC will send such notification to the Protecting Power in cases of charges involving the death penalty or imprisonment for 2 years or more. Upon request, the Protecting Power will be furnished data on the status of such proceedings. Furthermore, the Protecting Power will be entitled, upon request, to be furnished with all data or any other proceedings started against a detainee. The information will be sent without delay. Trial will not commence until 3 weeks after the Protecting

Power has been notified. Unless evidence is submitted at the opening of the trial that this regulation has been fully complied with, the trial will not proceed. The following information will be provided:

(1) Surname and first name, grade, if proper, ISN, date of birth, and profession, trade, or prior civil capacity of the detainee.

(2) Place of internment or confinement.

(3) Specification of the charges with penal provisions under which they are brought.

(4) Designation of the court that will hear the case.

*e.* The EPW representatives will be informed of all judicial proceedings against EPW and RP and the results of the proceedings. Records of trials will be kept by the first Staff Judge Advocates General office in the internment facility's chain of command. These records will be open to inspection by representatives of the Protecting Power.

*f.* In each trial by court-martial, accused persons will be entitled to assistance by one of his prisoner comrades, a qualified advocate or counsel of their own choice, to the calling of witnesses, and services of a competent interpreter, if needed. The commander concerned will appoint a Judge Advocate to serve as defense counsel in additional to any other counsel of the accused person's choice. The commander concerned will notify the accused person of these rights in ample time before the trial.

(1) If the accused does not exercise the right to choose an advocate or counsel, notice to that effect will be sent through the NPWIC to the Protecting Power to permit the Protecting Power to choose counsel. If the accused and the Protecting Power fail to choose an advocate or counsel, the commander concerned shall appoint a counsel, which in normal circumstances will be the judge advocate previously appointed. The accused person must consent to the service of the appointed advocate or counsel..

(2) If requested by the accused person, the commander concerned will appoint an interpreter to assist the accused person during the preliminary hearing and the hearing in court. The interpreter must not be a trial counsel, a defense counsel, an assistant to either, a witness, or have any bias or interest in the case. Accused persons have the right to object to the interpreter appointed, and to ask for a replacement.

(3) A judge advocate will serve as defense counsel in any general or special court-martial of an EPW/RP.

*g.* Representatives of the Protecting Power may attend the trial. It may be decided that in the interest of security, the trial will be conducted with the public excluded. If so, a notice will be given to NPWIC at least 3 weeks before the trial opens to permit notice to the Protecting Power.

*h.* Two copies of the findings and the sentence, if applicable, will be forwarded immediately to NPWIC. A summary will be sent to the Protecting Power, and the detainee representative. Notice of the EPW, RP decision to use or waive the right of appeal to the Court of Appeals for the Armed Forces, when review by that court is not mandatory, will also be forwarded (in duplicate) to HQDA (DAMO-ODL), NPWIC, WASH, DC 20310-0400. NPWIC will send a copy of the decision to the Protecting Power. An EPW, RP waiver of the right to appeal will in no way affect, or change the requirement for, review by a supervisory authority, a board of review, or the U.S. Court of Military Appeals when such review is required under the UCMJ. If the sentence adjudged is death, one copy of the court-martial record of trial will be forwarded to ODCSOPS, NPWIC. NPWIC will send a copy of the record of trial to the Protecting Power. The following information will be included:

(1) A precise wording of the approved finding and sentence.

(2) A summary report of the evidence, including any preliminary investigation, elements of offenses, and any defense raised thereto.

(3) If applicable, the place where the detainee will serve confinement.

*i.* A sentence to confinement imposed on EPW, or RP will be served in the same type of place and under the same conditions as in the case of a member of the U.S. Armed Forces. EPW and RP sentenced to U.S. Disciplinary Barracks (USDB) or Federal penitentiaries will remain EPW/RP. Accountability requirements will be

coordinated prior to any transfer by the losing commander and Commandant, USDB through HQDA (DAMO-ODL) NPWIC. Accused persons and the Protecting Power will be informed as soon as possible of all offenses that are punishable by the death sentence under U.S. laws. Lists of these offenses will be posted in all camps. Duplicate lists will be given to detainee representatives. Other offenses will not thereafter be made punishable by the death penalty without the concurrence of the power on which the detainee depends.

(1) An EPW or RP can be sentenced to death only if the court has taken into consideration, to the maximum extent possible, the fact that the accused is not a US citizen and is not bound to it by any duty or allegiance and is in US custody as a result of circumstances beyond their own will or control.

(2) If the death sentence is pronounced, it will not be carried out until 6 months have passed from the date the Protecting Power received the U.S. notice of the judgment and sentence.

(3) ODCSOPS will monitor and acknowledge when the ICRC/ Protecting Power has received the notice permitting the execution of the sentence.

## 3–9. Loss or damage to property

*a.* Persons will be held responsible for the loss of, or damage to, any Government property through negligence or wrongful acts. A complaint may be made to the installation commander that property of a private person has been destroyed, lost, or damaged by a person interned at the installation, including any branch camp. If the EPW, RP does not accept responsibility for the damage, the commander will appoint a board of one to three officers to investigate the complaint.

*b.* Reports of survey or statements of charges will be processed according to AR 735-5. For this purpose, the commanding officer of an internment facility will be considered an installation commander. Amounts collected will be disposed of according to AR 735-5.

*c.* Supporting EPW/CI PSYOP units can assist the commanding officer in improving relations with local populations following loss or damage to private property.

## 3–10. Death and burial

*a.* For general procedures and authorized expenses for the care and disposition of remains, see AR 638-30 and AR 600-8-1.

*b.* When EPW and RP have chosen to make a will, the original will and two certified copies will be forwarded to the supporting PWIC upon death or at their request.

*c.* When an EPW or RP in U.S. custody dies, the attending medical officer will immediately furnish the camp (or hospital) commander or other officer charged with their custody before death, the following information:

(1) Full name of deceased.

(2) ISN of deceased.

(3) Date, place, and cause of death.

(4) Statement that death was, or was not, the result of the deceased's own misconduct.

(5) When the cause of death is undetermined, the attending medical officer will make a statement to that effect. When the cause of death is finally determined, a supplemental report will be made.

*d.* The camp or hospital commander, or other officer charged with custody of the person before death, will notify the proper Branch PWIC immediately, by telegram or the most expeditious means, of the death. The data listed in subparagraph *c* above will be included. If the required data has not been determined, a supplemental report will be made as soon as possible.

*e.* The attending medical officer and the appropriate camp commander will complete a DA Form 2669-R (Certificate of Death). DA Form 2669-R will be reproduced locally on 8 1/2 by 11-inch paper. The form is located at the back of this regulation. This form is for the use of Army only. Enough copies of form will be made out to provide distribution as follows:

(1) Original—information center.

(2) Copy—information center (branch), if necessary.

(3) Copy—The Surgeon General.

(4) Copy—EPW or RP personal file.

(5) The proper civil authorities responsible for recording deaths in the particular state if the EPW dies in the United States.

*f.* Investigating officer's report:

(1) The camp commander will appoint an officer to investigate and report:

*(a)* Each death or serious injury caused by guards or suspected to have been caused by guards or sentries, another detainee, or any other person.

*(b)* Each suicide or death resulting from unnatural or unknown causes.

(2) One copy of the investigating officer's report will be forwarded to the NPWIC.

(3) USACIDC special agents will investigate deaths from other than natural causes per AR 195-2. A copy of the USACIDC report of investigation, if any, will be attached to the camp commander's report.

*g.* Burial, record of internment, and cremation. Deceased detainees will be buried honorably in a cemetery established for them according to AR 638-30. Deceased detainees will be buried, if possible, according to the rites of their religion and customs of their military forces. Unless unavoidable circumstances require the use of collective (group or mass) graves, detainees will be buried individually. Graves Registration Services will record any later movement of the remains. The United States will also care for the ashes of cremated persons. Ashes will be kept by Graves Registration Service persons until proper disposal can be decided according to the wishes of the power on which that person depended. A body may be cremated only due to imperative hygiene reasons, the detainee's religion, or the detainee's request for cremation. When a body is cremated, this fact together with the reasons will be set forth in the death certificate.

*h.* Burial at sea and after land transfer. If a detainee dies at sea, the body will not be buried there unless absolutely necessary. If the body has to be buried at sea, the procedures prescribed for U.S. troops will be followed as far as possible; however, a U.S. flag will not be used. When death occurs during a land transfer, the responsible officer will follow the same procedures for burial prescribed for U.S. military personnel.

*i.* The personnel file of a deceased person with all pertinent records will be forwarded to the Branch PWIC.

## 3–11. Transfer of prisoners of war

*a.* General. Permanent transfer of EPW in the custody of the U.S. forces to the host nation or other allied forces requires approval of the Secretary of Defense (SECDEF). The permanent transfer of EPW to foreign national control will be governed by bilateral national agreement and in accordance with subparagraph *b* below following SECDEF approval. Temporary transfer of EPW/RP to accommodate surges in prisoner population beyond the immediate capability of U.S. forces to manage is authorized. Theater commanders will develop measures to ensure accountability and humane treatment of prisoners so transferred.

*b.* EPW/RP may only be transferred from the custody of the United States to a power which is a party to the GPW, and only after a representative of the United States has visited the Power's internment facilities and is satisfied that the Power in question is willing and able to apply the GPW. EPW/RP transfers should not increase the difficulty of repatriation. Prisoners of war during transfer will have sufficient food and drinking water to keep them in good health, and will be provided adequate clothing, shelter, and medical attention. Precautions will be taken, especially in case of transport by sea or by air, to ensure their safety during transfer. A complete list of all transferred prisoners will be made before their departure and maintained by the Branch PWIC.

*c.* The supporting Branch PWIC and NPWIC will be notified immediately by the EPW camp commander of any EPW or RP transferred.

*d.* Transfer within the territory of the detaining power will always be carried out humanely and in conditions no less favorable than those enjoyed by the troops of the detaining power during their movements. If EPW/RP are transferred on foot, only those who are fit to walk may be so transferred. The EPW/RP will not be exposed to excessive fatigue during transfer by foot.

*e.* The sick, wounded, or infirm EPW and RP as well as maternity cases will be evacuated through U.S. military medical channels and will remain in medical channels until they are certified "fit for normal internment" by competent medical authorities.

*f.* Necessary clothing, adequate shelter, and medical attention will be made available.

*g.* Suitable precautions will be taken to prevent EPW and RP, from escaping and to ensure their safety. Wounded and sick EPW and RP will not be transferred as long as their recovery may be endangered by the journey, unless their safety demands it.

*h.* The EPW and RP will be permitted to take with them their personal effects and property. The weight of their baggage may be limited if the conditions of transfer so require, but in no case will it be limited to less than 55 pounds per EPW/RP. The personal property that the EPW and RP are unable to carry will be forwarded separately.

*i.* The mail and parcels addressed to EPW and RP who have been transferred will be forwarded to them without delay.

*j.* Property, such as that used for religious services, or items donated by welfare agencies, will be forwarded as community property. These items are not to be considered a part of the 55 pounds of personal effects and property that each EPW is authorized to take.

*k.* When EPW and RP are to be transferred, they will be notified of their new postal addresses before departure. Notice will be given in time to pack and tag their luggage. They will also be given time to inform their next of kin and the Branch PWIC of their transfer and new address.

*l.* EPW and RP will not be confined in a jail or other correctional institution during transfer except in an emergency. They will be confined only in such fashion while the circumstances that necessitate the measures continue to exist. Transfer will be effected under conditions not less favorable than those under which U.S. Armed Forces are transferred.

*m.* Receipt of transferred EPW/RP.

(1) EPW and RP will not be accepted for detainment or transfer to U.S. Military control from outside nations without prior approval from SECDEF. EPW and RP received by transfer from an allied nation will be properly receipted for by the officer designated to accept them. The receipt will indicate the place and date the United States assumed custody and the name, grade, ISN, and nationality of each transferred EPW and RP. Three or more copies of the receipt will be prepared. The original, plus one copy, will be delivered to the commander of the camp to which the EPW and RP are assigned. Upon receiving the copies, the camp commander will forward immediately one copy directly to the Branch PWIC, or to the NPWIC if the Branch PWIC is not operational. A DA Form 4237-R or an allied equivalent form for individuals listed on the receipt should be delivered to the accepting officer at the time the transfer is effected.

(2) EPW and RP transferred between EPW facilities and hospitals will be receipted for as above when there is little chance that the EPW/RP will be returned to the original camp. When EPW and RP are transferred to hospitals outside the jurisdiction of the EPW/CI camp, the hospital commander is required to submit their strength accountability reports to the supporting branch PWIC.

(3) The use of a manifest identifying the name, rank/status, ISN, power served/nationality, and physical condition of each EPW and RP transferred and received is required. The manifest will be attached to the original receipt of transfer and forwarded to the Branch PWIC.

*n.* EPW and RP captured or detained by the U.S. Marine Corps, Navy, Air Force, or Coast Guard are turned over to the U.S. Army at receiving points designated by the Theater Commander.

(1) All inter-service transfers should be effected as soon as possible after initial classification and administrative processing has been accomplished.

(2) CI will only be transferred within theater, unless directed by DOD.

(3) A manifest is required to identify as a minimum: name, rank/status, ISN (if assigned), power served/nationality, and physical condition of each EPW and RP transferred and received. The manifest will be attached to the receipt of transfer and will become a permanent record to assure accountability of each prisoner.

*o.* When EPW are moved to a port of debarkation from an interior point, the theater commander will provide for:

(1) Transportation of the EPW up to and including their departure from the port.

(2) Care and security of the EPW, their baggage, monies, other valuables, and records until their custody is assumed by the CONUS EPW command.

*p. Transfers between Army commands.* The EPW's command, with the advice of military medical authority, is authorized to transfer injured, sick, and wounded EPW to other commands.

*q. Transfer of personal effects.*

*(1)* Each EPW and retained person will be permitted to hand carry personal effects and property not to exceed 55 pounds.

*(2)* EPW/RP who have been serving as chaplains or clergymen during their internment will be permitted to transfer, at Government expense, an additional 110 pounds to take other religious materials with them.

*r.* The transfer of physically disabled, insane, mentally incompetent, or wounded EPW/RP in a theater of operations will be according to procedures set up by the Theater Commander.

*s.* When a railroad car other than an U.S. Military-owned or operated hospital car is used to transfer EPW or RP patients, Red Cross signs will be placed on the inside of the middle window of each side of the car and on the inside of each door window of the car. These signs will be made of white paper or cardboard with a large red cross in the center of the sign. The word "hospital" will be placed above, and the word "car" below the red cross, in black letters. When EPW/RP patients are transferred in a compartment, drawing room, bedroom, or roomette, a sign as described above, with the exception of the word "car," in proportionate dimensions will be placed on the outside of the door of the compartment, drawing room, bedroom, or roomette.

*t.* Theater commanders are subject to the general restrictions on transfers contained in this regulation. They may transfer injured, sick, or wounded EPW who are within their commands to or from hospitals designated by the theater surgeon or Commander, HSC with guidance from the Joint Medical Regulation Office (JMRO) or the Theater Patient Movement Requirements Center (TPMRC) if:

(1) The EPW requires prolonged hospitalization or specialized treatment, including surgery, that is not available locally.

(2) The transfer is recommended by a medical officer after an examination of the EPW.

*u.* When EPW no longer require hospital care, they may be returned to the command from which transferred or to an EPW camp within the receiving command.

## 3–12. Repatriation of sick and wounded EPW/RP

*a.* Sick and wounded prisoners will be processed and their eligibility determined for repatriation or accommodation in a neutral country during hostilities. Both will be according to the procedures set forth below.

(1) Sick and wounded prisoners will not be repatriated against their will during hostilities.

(2) Procedures for a Mixed Medical Commission will be established by HQDA, according to this regulation and Annex II of the GPW. The purpose of the Commission will be to determine cases eligible for repatriation. The Mixed Medical Commission will be composed of three members. Two of the members, appointed by the ICRC and approved by the parties to the conflict, will be from a neutral country. As far as possible, one of the neutral members will be a surgeon and the other a physician. The third member will be a medical officer of the U.S. Army selected by HQDA. One of the members from the neutral country will act as chairman.

*b.* If for any reason the use of neutral doctors cannot be arranged for by the ICRC, the United States, acting in agreement with the Protecting Power concerned, will set up a Medical Commission. This Commission will perform the duties of a Mixed Medical Commission.

*c.* The Mixed Medical Commission will:

(1) Examine EPW, and RP who have applied for repatriation.

(2) Inspect clinical records pertaining to these EPW.

(3) Determine those cases eligible for repatriation or hospitalization in a neutral country.

*d.* Decisions made by the Mixed Medical Commission will be a majority vote and cannot be changed to the detriment of the EPW and RP examined, except upon concurrence of the Commission.

*e.* The decisions made by the Mixed Medical Commission on all cases will be communicated to HQDA (DAMO-ODL), NPWIC, the Protecting Power, and the ICRC, during the month following the Commission's visit. Each EPW and RP examined will be informed by the Mixed Medical Commission of the decision made on the case.

*f.* The United States will carry out the decisions of the Mixed Medical Commission as soon as possible and within 3 months of the time after it receives due notice of the decisions.

*g.* The U.S. member will arrange all administrative details to expedite the work of the Commission. Commanders concerned will assist, facilitate, and expedite the operations of the Commission to the fullest extent.

*h.* The EPW and RP noted below will be examined by the Mixed Medical Commission.

(1) EPW and RP designated by a camp or hospital surgeon or a retained physician or surgeon who is exercising the functions of the surgeon in a camp.

(2) EPW and RP whose applications are submitted by a prisoner representative.

(3) EPW and RP recommended for examination by the power on which the EPW and RP depend or by an organization duly recognized by that power and that gives assistance to them.

(4) EPW, RP who submit written requests. These EPW will not be examined until the EPW listed in (1), (2), and (3) above have been examined.

*i.* An EPW or RP found ineligible by the Mixed Medical Commission may apply for reexamination 3 months after the last examination.

*j.* Each commander will be notified before arrival of the Commission. Before arrival of the Commission at a camp, hospital, or other designated place, the commander will prepare DA Form 2670-R (Mixed Medical Commission Certificate for EPW) and update and make available the records. For each EPW and RP to be examined, DA Form 2670-R will be completed in four copies. DA Form 2670-R will be locally reproduced on 8 1/2 by 11-inch paper. This form is located at the back of this regulation. This form is for the use of Army only.

*k.* The commanding officers of designated hospitals will complete DA Form 2671-R (Certificate of Direct Repatriation for EPW) and forward to the Branch PWIC. DA Form 2671-R will be locally reproduced on 8 1/2 by 11-inch paper. The form is located at the back of this publication. This form is for the use of Army only. The certificate will be in four copies to:

(1) Make the repatriation of sick and wounded EPW, RP easier.

(2) Relieve the Mixed Medical Commission of the need to visit EPW and RP patients who are eligible for direct repatriation.

*l.* The following EPW and RP are eligible for direct repatriation:

(1) EPW and RP suffering from disabilities as a result of injury, loss of limb, paralysis, or other disabilities, when these disabilities are at least the loss of a hand or foot, or the equivalent.

(2) Sick or wounded EPW and RP whose conditions have become chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1 year from inception of disease or date of injury.

*m.* The original and one copy of DA Form 2671-R will be forwarded to ODCSOPS, NPWIC. The other two copies will be attached to the clinical record. In all instances, these records will accompany the records of the EPW or RP when transferred.

### 3–13. Repatriation of other EPW/RP

Prisoners who are not sick or wounded will be repatriated or released at the cessation of hostilities as directed by OSD.

### 3–14. Repatriation transfer procedures

a. Control and accountability of EPW and RP will be maintained until the EPW or RP is receipted for by the serving power or designated protecting power.

b. The use of a manifest identifying at the minimum; name, rank/status, ISN, power served/nationality, and physical condition of each EPW and RP transferred is required. The manifest will be used as an official receipt of transfer and will become a permanent record to assure accountability of each EPW and RP until final release.

c. Copies of appropriate personnel, finance, and medical records will accompany the released and/or repatriated EPW/RP. These records will be transferred to the custody of the designated official receipting for the EPW/RP.

d. All confiscated personal property that can be released, will accompany the released or repatriated EPW/RP. An inventory will be conducted and any discrepancies identified. The individual will sign a property receipt for his personal items.

e. Upon completion of the transfer, the U.S. escort guard will forward the official receipt of transfer to the Branch PWIC.

f. Upon notification from the PWIC that the transfer is complete, the losing EPW or RP internment facility will forward all official records and confiscated property that cannot be released to the Branch PWIC for final disposition.

g. The PWIC will:

(1) Notify the NPWIC of final status of released/ repatriated EPW and RP.

(2) Forward all EPW and RP records and reports per AR 25-400-2, The Modern Army Recordkeeping System (MARKS).

(3) Dispose of confiscated property in their possession per instructions received from the NPWIC and applicable Army Regulations.

### 3–15. Retained personnel

a. Enemy personnel entitled to a retained status should have on their person at the time of capture a special identity card attesting to their status. The minimum data shown on the card will be the name, date of birth, grade, and service number of the bearer. The card will state in what capacity the bearer is entitled to the protection of GPW. The card will also bear the photograph of the owner and either the signature or fingerprints or both. It will be embossed with the stamp of the military authority with which the person was serving at time of capture.

b. Enemy personnel who fall within any of the following categories, are eligible to be certified as RP:

(1) Medical personnel who are members of the medical service of their armed forces.

(2) Medical personnel who are exclusively engaged in:

(a) The search for or the collection, transport, or treatment of the wounded or sick.

(b) The prevention of disease.

(c) Staffs exclusively engaged in administering medical units and establishments.

(3) Chaplains.

(4) The staff of the National Red Cross, Red Crescent, and other voluntary aid organizations. These organizations must be duly recognized and authorized by their governments. The staff of these organizations may be employed on the same duties as persons in (2) above, if such organizations are subject to military laws and regulations.

c. RP whose status is certified will not be considered as EPW; however, they will receive the benefits and protection of an EPW.

d. EPW who are certified to be proficient medically or religiously continue to be considered and identified as EPW, as appropriate, but will be administered and treated in the same way prescribed for RP. Enemy personnel who are classified in these categories and are determined qualified by competent Army authority are eligible to be certified as proficient to perform medical or religious duties:

(1) EPW who are ministers of religion; however, they have not officiated as chaplains to their own forces.

(2) Specially trained EPW, employed at the time of their capture as hospital orderlies, nurses, or auxiliary stretcher-bearers, in search for, or in collecting, transporting, or treating of the wounded and sick. These EPW are not eligible for RP status but may be employed only on medical duties they are qualified to perform.

e. Certification of the retained status of personnel will be effected upon the decision that the special identity card held by each such person is valid and authentic. This certification will be decided, if possible, at the time of processing by the camp commander.

f. The Theater Commander, or CINCUSACOM will confirm the certification of the technical proficiency of the persons described in paragraph 3-15d. Qualified U.S. Military medical and religious personnel must first confirm the medical or religious proficiency of each EPW.

g. Classification forms will be completed as follows:

(1) DA Form 2672-R (Classification Questionnaire for Officer Retained Personnel) will be completed in three copies by captured officers and civilians of equal grade who have or:

(a) Claim RP status.

(b) Are applicants for a certificate of medical proficiency. DA Form 2672-R will be locally reproduced on 8 1/2 by 11-inch paper. The form is located at the back of this publication. This form is for the use of Army only.

(2) DA Form 2673-R (Classification Questionnaire for Enlisted Retained Personnel) will be completed in three copies by all captured enlisted persons and civilians of equal grade who have or are applicants for a certificate of medical proficiency. DA Form 2673-R will be loally reproduced on 8 1/2 by 11-inch paper. This form is located at the back of this publication. This form is for the use of Army only.

h. The camp commander will retain one copy of each of the forms noted in subparagraph g above. The second will be forwarded to the next higher commander. The third copy will be forwarded to the Branch PWIC.

i. Verifications of retained status and religious or medical proficiency will be recorded on the DA Form 4237-R of the person concerned. Denials of claims to retained status or certification of proficiency will also be recorded together with a brief statement of the reason.

j. RP are subject to the internal discipline of the camp in which they are retained; however, they may not be compelled to do any work except that relating to their medical or religious duties.

k. RP, who are members of the enemy's Armed Forces, will be assigned to EPW camps. If available, they will be assigned in the ratio of two physicians, two nurses, one chaplain, and seven enlisted medical personnel per 1,000 EPW. Economy of medical staffing may be achieved at higher levels per guidance from Commanding General, HSC. As much as possible, these RP will be assigned to camps containing EPW from the same Armed Forces upon which the RP depend.

l. CINCs, Task Force Commanders, Joint Task Force Commanders are authorized to transfer RP and EPW who are qualified to perform medical or religious duties between EPW camps within their jurisdiction in order to distribute them equitably.

m. Subject to security requirements the theater commander will ensure:

(1) Full use of enemy medical personnel for the treatment of sick and wounded EPW/RP.

(2) Release of U.S. medical personnel, when possible, from caring for sick and wounded EPW except for supervision and training of enemy medical personnel.

n. The senior medical officer in each camp will provide close and continuing supervision of the professional activities of the retained medical persons and report all improper activities.

o. RP will not be allowed access to or custody of narcotic drugs or other controlled substances as delineated in Title 21, United

States Code, except under close supervision of U.S. medical personnel.

*p.* EPW camp surgeons or hospital commanders in which retained persons are used will verify:

(1) Accuracy of the final diagnosis.

(2) Adequacy of treatment.

(3) Final disposition of patients treated by RP.

*q.* While caring for the sick and wounded, RP will receive the same daily rate of pay as is received by EPW.

*r.* Monthly allowances for RP will be the same as those prescribed for EPW of the same rank.

*s.* RP may be detained in EPW camps. When practical, they will be assigned quarters separate from EPW.

*t.* RP will wear on their left sleeve a water resistant arm band bearing the distinctive emblem (Red Cross, Red Crescent) issued and stamped by the military authority of the power with which they have served. Authorized persons who do not have such armbands in their possession will be provided with Geneva Convention brassards (AR 670-1).

*u.* RP will enjoy the same correspondence privileges as EPW. Chaplains will be free to correspond, subject to censorship, on matters about their religious duties. Correspondence may be with ecclesiastical authorities both in the country where they are retained and in the country on which they depend, and with international religious organizations. RP will be authorized the following additional privileges:

(1) They will be granted facilities necessary to provide EPW with medical care, spiritual assistance, and welfare services.

(2) They will be authorized to visit EPW periodically in branch camps and in hospitals outside the EPW camps in order to carry out their medical, spiritual, or welfare duties.

(3) They will be given the necessary means of transportation for making such visits.

(4) The senior retained medical officer, as well as chaplains, will have the right to correspond and consult with the camp commander or his or her authorized representatives on all questions about their duties.

*v.* RP are subject to the same disciplinary measures as are EPW.

*w.* RP will be retained only insofar as the state of health, the spiritual needs, and the number of EPW require. Persons whose retention is not required will be repatriated as soon as military requirements permit. Nothing precludes reasonable measures to prevent such persons from carrying information of strategic or tactical value. Should they come into possession of such information, their return to their own armed force may be delayed until the information is of no significant value.

### 3–16. Complaints and requests to camp commanders

*a.* EPW and RP have the right to make complaints and requests to camp commanders and the ICRC/protecting powers regarding the conditions of their internment. EPW and RP may not be punished for making complaints, even if those complaints later prove unfounded. Complaints will be received in confidence, as they might endanger the safety of other detainees. Appropriate action, including segregation, will be taken to protect detainees when necessary. This policy also applies to persons who are confined pending trial or as a result of a trial.

*b.* EPW and RP may take complaints or requests to the camp commander.

*c.* Persons exercising the right to complain to the ICRC or protecting power about their treatment and camp may do so:

(1) By mail.

(2) In person to the visiting representatives of the ICRC or protecting power.

(3) Through their detainee representative.

*d.* Written complaints to the protecting power will be forwarded promptly through HQDA, ODCSOPS (DAMO-ODL) NPWIC. A separate letter with the camp commander's comments will be included. Military endorsements will not be placed on a detainee's communication.

*e.* If an ICRC/protecting power communicates directly with an EPW/CI camp commander about any matter requiring an answer, the communication and commander's reply will be forwarded to HQDA, ODCSOPS (DAMO-ODL) NPWIC, for proper action.

*f.* Any act or allegation of inhumane treatment will be investigated and, if substantiated, reported to HQDA as a Serious Incident Report (SIR) per AR 190-40. Once completed, a copy of the SIR accompanies the prisoner to the EPW/CI camp, and a copy is furnished to the monitoring Branch PWIC. All available pertinent information that the EPW or RP is willing to give, will be entered on the form.

### 3–17. EPW/RP safety program

A safety program for EPW and RP will be set up and administered in each EPW camp. Army regulations, circulars, and pamphlets in the 385-series may be used as guides for establishing an EPW and RP safety program. Accident injury forms used in the EPW and RP safety programs will be prepared, administered, and maintained separately from those prepared for other persons included under the Army Safety Program.

## Chapter 4
## Employment and Compensation for EPWs

### Section I
### General Policy and Guidelines

### 4–1. General principles

*a.* To the extent possible, EPW will be employed in work needed to construct, administer, manage, and maintain EPW camps. EPW will be employed in other essential work permitted by this regulation only when qualified civilian labor is not available. Essential work is work that must be done, despite the availability of EPW.

*b.* EPW labor, external to DOD, is regulated by contract. When authorized by theater directives, EPW, RP may be given advance pay. Procedures for administering this advance pay are set forth in AR 37-1.

### 4–2. Restricted employment

*a.* EPW will not be employed in positions that require or permit them:

(1) Access to classified defense information or records of other personnel.

(2) Access to telephone or other communication systems.

(3) Authority to command or instruct U.S. personnel.

*b.* EPW may be employed in the following types of labor:

(1) EPW camp administration, installation, or maintenance.

(2) Agriculture.

(3) Public works, public utilities, and building operations which have no military character or purpose.

(4) Transportation and handling of stores which are not military in nature or purpose.

(5) Domestic service.

### 4–3. Liability to perform labor

*a.* Subject to the limitations stated in paragraph 4-5 and 4-6, EPW will be required to perform any and all work consistent with their grade and status as follows:

(1) Officer EPW. Officer EPW will not be required to work. Officer EPW, however, may make a written request for work. The camp commander will provide such work, if feasible. Officer EPW may, at any time, revoke a voluntary request for work. Officer EPW are required to maintain their personal areas, equipment and other items/areas in a manner that promotes good health and personal hygiene.

(2) Noncommissioned officer (NCO) EPW. NCO EPW will be required to do supervisory work only. NCO EPW, however, may make a written request for work other than supervisory work. NCO

EPW may, at any time, revoke a voluntary request for work other than supervisory work.

(3) Enlisted EPW. Enlisted EPW will be required to do any and all work consistent with this regulation.

b. Fitness of EPW for labor will be verified at least once a month by medical examination. An attending medical officer will classify the level of physical fitness EPW can perform for work as follows: heavy work, light work, and no work. Lists of these individual labor levels of EPW will be posted in each EPW camp. If physical conditions permit, each EPW will perform labor as directed by the camp commander.

## 4–4. Authorized work

a. Categories. Levels of work for which each EPW are authorized and may be compelled to perform are categorized as follows:

(1) Restricted work. EPW may be compelled to perform the following types which may not be of a military nature or purpose:

(a) Public works and building operations. The primary factor in deciding whether EPW may be employed is the nature of the construction being undertaken. If the construction is purely military in nature, each EPW may not be compelled to engage in such work. If the construction is not purely military in nature, the purpose for which the structure is to be used is the deciding factor. If the completed construction is intended to be used primarily by units engaged in, or in direct support of, military operations against the enemy, EPW may not be compelled to work on the project.

(b) Transporting and handling stores. The first consideration is the nature of the property being handled. If the stores are military in nature, EPW may not be compelled to transport or handle them. If the items are not military in nature, then their purpose is the deciding factor. EPW may not be required to transport or handle stores specifically consigned to units engaged in military operations. EPW and RP may, however, be required to handle stores when handling is incidental to the performance of authorized types of work. For example, work in a military mess may be classified as domestic service. Handling of rations by EPW in connection with domestic service may be required.

(c) Public utility services. Construction, repair, or maintenance of water, sewage, drainage, gas, or electrical facilities are not of an inherent military nature. The purpose of these services is the deciding factor as to whether or not EPW may be compelled to engage in such activities. Such services may be intended primarily or exclusively for the benefit of units engaged in, or directly supporting, operations against the enemy. If so, EPW may not be required to perform these services. On the other hand, services intended primarily or exclusively for other purposes represent work that EPW may be compelled to perform.

(2) Nonrestricted work. EPW may be compelled to perform types of work listed below having no direct military purpose:

(a) Construction, administration, management, and maintenance of EPW camps.

(b) Agriculture.

(c) Manufacturing industries, with the exception of metallurgical, machinery, and chemical industries.

(d) Commercial business and arts and crafts.

(e) Domestic service, including a clothing repair shop, laundry, bakery, or a mess hall.

## 4–5. Unauthorized work

a. Unhealthy or dangerous work. EPW and RP may not be employed in any job considered injurious to health or dangerous because of the inherent nature of the work, the conditions under which it is performed, or the person's physical unfitness or lack of technical skill. A specific task should be considered, not the industry as a whole. The specific conditions for each job are the deciding factors. For example, an otherwise dangerous task may be rendered safe by the use of safety equipment. Likewise, an otherwise safe job may be dangerous because of the circumstances under which the work is required to be done. Similarly, dangerous work may be safe for

those whose training and experience have made them adept at it. EPW will not be employed in tasks requiring:

(1) Exertion beyond physical capacity.

(2) Use of inherently dangerous mechanisms or materials such as:

(a) explosives or mine removal.

(b) Mechanisms that are dangerous because the person is unskilled in their use.

(3) Climbing to dangerous heights or exposure to risk of injury from falling objects under motion and not under full control.

b. Humiliating work. No person will be assigned labor that is humiliating or degrading for a member of the U.S. Armed Forces. This prohibition does not prevent EPW from doing ordinary and frequently unpleasant tasks such as maintaining sanitation facilities, ditch digging and manual labor in agriculture.

c. Other specifically prohibited work. Certain vocations or types of work are prohibited for safety, security, or other reasons. EPW and RP will not be:

(1) Permitted to work in an area where they may be exposed to combat zone fire.

(2) Employed as personal servants to members of the U.S. Armed Forces.

(3) Employed to tend bars or serve alcoholic beverages in officers' messes or similar establishments.

(4) Permitted to work inside correctional facility walls or near inmates.

d. Questionable work. In case of doubt as to whether certain work is authorized, the next higher HQ Staff Judge Advocate (SJA) will review the proposed tasks. The purpose of the review will be to ensure consistency with this regulation and the law of war. The SJA will provide recommendations in writing to the camp commander. A copy will be forwarded to HQDA (DAJA-IA), WASH DC 20310-2214.

## 4–6. Decisions on work conditions and safeguards

Commanders will make on-the-job decisions as to whether work is safe. They will take into account the guidance set forth in this regulation. Commanders will make decisions by ordinary standards of sound judgment, assisted by the informed advice of persons familiar with the occupations and other available data. Data will include the opinions of the SJA. Preliminary job training will be given when necessary and; protective clothing and accessories will be provided as required (e.g., hard-toed shoes, goggles, and gloves). Such safety devices will be equal to safeguards provided for civilian labor. Commanders will make periodic inspections to ensure satisfactory conditions and safeguards are maintained at all times.

## 4–7. Referrals to HQDA, ODCSOPS

a. When substantial doubt exists as to whether or not a type of work is permissible according to this regulation, a request to ODCSOPS for specific instructions will be made through channels by the most expeditious means.

b. Each question forwarded will be accompanied by a statement as to:

(1) Type and place of work.

(2) Tasks to be performed.

(3) Number of EPW to be employed.

(4) Other facts having a direct bearing on the employment.

## 4–8. Length of workday

a. The length of the workday for EPW, including the time for travel will not exceed that permitted for civilians in the locale who are employed in the same general type of work. The working period may be extended but will not be considered excessive because EPW are laboring under a task system. EPW contracts will contain specific terms on the hours of employment.

b. Except as provided in subparagraph c below, the EPW will not be required to work more than 10 hours (in one day) exclusive of a one hour lunch and rest period. They will not be kept out of camp for more than 12 consecutive hours, including travel time. Rest

cycles consistent with the wet bulb, black globe temperature will be monitored and followed.

*c.* EPW may be required to work any number of hours for the efficient operation of the EPW compound messes. EPW are responsible for preparing food within these messes.

## 4–9. Rest periods

*a.* Day of rest. Each EPW will be allowed a rest period of 24 consecutive hours every week. These hours will preferably be on Sunday or on the day of rest in the prisoner's country of origin or as established by his or her religious affiliation.

*b.* Annual. Each EPW who has worked for one full year will be given a rest of eight consecutive days during which the U.S. will give working pay to the EPW.

## 4–10. Responsibility for work supervision

The EPW camp commander will:

(1) Decide, as far as practical, how adequate the technical supervision is which is provided by the using agency.

(2) Report the facts on inadequately supervised details to the using agency.

(3) Refuse to continue details on contract work unless adequate work supervision is provided.

## 4–11. Work detail leaders and interpreters

EPW camp commanders are authorized to use selected EPW as work detail leaders and interpreters. The time of work detail leaders and interpreters will be included in labor reports under the same project work classification as their details. The supporting EPW/CI PSYOP unit can assist the camp commander in identifying key communicators, informal leaders, and linguists among the camp population for use as work detail leaders and interpreters.

## 4–12. Task system

The task system will be used when it is possible to predetermine the amount of finished work that an EPW, or group of EPW, can reasonably be expected to complete in a specific period of time.

*a.* Elements of the task system. The task system consists of:

(1) Assigning each EPW, or each group of EPW, a definite and reasonable amount of work to be completed within each workday or other predetermined time period.

(2) Payment for completed work according to this regulation.

(3) Incentive adjustments of the required work according to this regulation.

(4) Penalty measures needed to enforce the task system.

*b.* Decision on daily tasks. The camp commander will decide the reasonable amount of completed work to be required of each EPW or group of EPW during a day.

*c.* Notice to EPW. EPW will be informed of the adoption of the task system before it is put into effect. Each EPW or group of EPW, depending upon whether separate or group tasks are assigned, will be informed of the amount of completed work required each day.

*d.* Incentives. As an incentive, EPW who have completed the required amount of work in less than normal time may be returned to quarters.

*e.* Enforcing the task systems. The camp commander may take disciplinary action against physically qualified EPW who habitually fail to complete the assigned tasks.

## 4–13. Employing EPW

*a.* The greatest benefit from EPW labor on work projects will be obtained. EPW will be employed, as far as practical, on work for which they are qualified. The Dictionary of Occupational Titles, U.S. Government Printing Office, WASH, DC, will be used as a guide in deciding the qualifications of each EPW.

*b.* In assigning EPW to details requiring special training and skills, the following qualification will be considered:

(1) Technical skills.

(2) Aptitudes.

(3) Past work records.

(4) On-the-job training.

*c.* EPW capable of performing skilled and semi-skilled work should be employed on essential work. Persons on work details that require special training or skill will remain as constant as practical. When it is necessary to substitute an EPW in such a detail, the using agency will be notified.

## 4–14. Paid work

EPW will be compensated for performing work for which pay is authorized. The rate of such pay shall be not less than as prescribed in Article 62, GPW. Compensation for all such work will be made as authorized from U.S. Army appropriated funds, canteen funds, or camp EPW funds. Types of paid work for which compensation is authorized are:

*a.* Labor performed for a contract employer or for a federal agency.

*b.* Services as orderlies and cooks (for officer EPW).

*c.* Services to construct, administer, manage, and maintain EPW camps, branch camps, and hospitals when such services are performed by EPW permanently assigned to certain duties or occupations.

*d.* Labor of RP for their duties.

*e.* Spiritual or medical duties required to be performed by EPW for fellow EPW.

*f.* Service as prisoner representative or assistant. Such persons will be paid from the camp EPW fund. If no such fund exists, they will be paid the prescribed rate of pay from U.S. Army appropriated funds.

*g.* Work as detail leaders or interpreters.

## 4–15. Restriction on paid work

*a.* Mess personnel. The number of EPW cooks and assistant cooks who will be paid for work in camp messes will in no case exceed the total number authorized for Army enlisted messes of the same or similar size.

*b.* Fatigue details. Kitchen police, latrine orderlies, and other fatigue details will normally be provided by rotating enlisted EPW. Each EPW assigned to these details will not be paid from Government canteen or camp EPW funds. Assignment of persons to such details by rotation on a duty roster may interfere with the work program. If so, the Camp Commander may assign those duties to EPW who volunteer and whose skills or training are not essential for other work details. In such cases, EPW assigned may be paid the authorized daily rate from canteen credits contributed by all EPW. Payment will be under supervision of the Camp Commander.

*c. Gardening work.*

(1) To the extent practical, EPW will be required to raise their own vegetables. This work will be classified as paid work.

(2) The produce from gardens operated with EPW labor will be U.S. property. It will be used for the benefit of EPW and U.S. Armed Forces personnel. It should not be sold or traded in civilian markets.

## 4–16. Rates for paid work

EPW employed for paid work will be compensated at a rate to be specified, on either piecework or by the workday, as provided below:

*a. Piecework rates.* Piecework rates will be used in compensating EPW when the work performed is for a contract employer or a Federal agency other than DOD.

*b. Working rates.* Working rates will be used for compensating all other paid work (other than contract work) as follows:

(1) EPW of all grades, whether acting in a supervisory capacity or otherwise, will be compensated at the authorized daily rate per full workday.

(2) EPW laboring less than the full workday will be compensated in proportion to the number of hours worked, except when working under a task system and having completed the required task, EPW working under a task system will be paid only for the completed parts of the task despite the number of hours worked.

(3) The U.S. work supervisor may decide that an EPW who is not under a task system is producing less than should be produced

in a full workday. If so, the EPW will be compensated at a rate proportionately lower than the authorized daily rate. Such a decision must be approved by the Camp Commander.

## 4–17. Days of paid work per month
The maximum number of days of paid work for an EPW will be limited to the number of workdays in a calendar month. The total workdays include the total number of days minus Sunday and any holiday specifically authorized by HQDA, ODCSOPS, (DAMO-ODL) NPWIC.

## 4–18. Unpaid work
EPW/RP will not be paid for those services connected with administering and maintaining EPW camps, branch camps, and hospitals when such services are performed on a daily rotation or other temporary basis. Unpaid work, in all cases, will include:

   *a.* Kitchen police.

   *b.* Latrine orderlies.

   *c.* Ground police.

   *d.* Other routine fatigue details of the types normally assigned and performed equitably and temporarily by persons in U.S. Army units.

## 4–19. Sale of articles and repair services
The canteen officer may sell articles made to order for, or repair services performed for, U.S. personnel by EPW. This sale is subject to the following provisions:

   *a.* Articles will be manufactured or repair services will be performed only during the spare time of EPW.

   *b.* No expense to the U.S. will be incurred for equipment, materials, or labor.

   *c.* Repair work or the making of articles to order for U.S. personnel will be prohibited unless an order for the work is placed through the EPW canteen.

   *d.* The canteen officer will fix the price of each article or repair service. The price will reasonably conform to prices for similar articles or services in the civilian market, less the cost of any material supplied by the customer.

   *e.* The canteen officer and the Camp Commander will enter into a blanket contract. Under this contract, the canteen officer will pay to the Camp Commander amounts derived from the sale of articles made to order for, and repair service performed for, U.S. personnel, less a handling charge by the canteen of not more than 10 percent. The canteen officer will submit a voucher monthly to the camp commander. The voucher will list:

   (1) The individual sales and services performed during the month.

   (2) The price charged for each.

   (3) The deductions made for handling charges.

   *f.* The Camp Commander will deposit the amount derived from the sale of articles made to order for, or repair services performed for, U.S. personnel with the U.S. Treasurer. Procedures for these transactions are prescribed in AR 37-1. The EPW will be paid an hourly rate. The rate will not exceed the authorized daily rate for paid work for the services performed. However, in no case will the amount paid to the EPW exceed the price of the article or repair service fixed under subparagraph d above. Amounts will be subject to deductions provided for in this regulation. Any residual money will be disbursed by the EPW camp counsel for use by camp EPW. This disbursement must be approved by the Camp Commander.

## 4–20. Disability compensation
   *a.* An EPW may be injured or suffer a disability while working under circumstances that may be attributed to work. If so, DA Form 2675-R (Certificate of Work Incurred Injury or Disability) will be completed in four copies. The original will be given to the EPW; the second copy will be forwarded to the PWIC to be sent to the National Prisoner of War Information Center; and the third and fourth will be placed in the EPW's personnel file.

   *b.* A claim by the EPW for compensation for work-incurred injury or disability will be forwarded to the PWIC. The PWIC will send the claim to the Power on which the EPW depends for settlement. A copy of the completed DA Form 2675-R taken from the personnel files of the EPW will be attached to the claim. DA Form 2675-R will be reproduced locally on 8 1/2 by 11 inch paper. This form is for the use of Army only.

## 4–21. Operation of government vehicles
EPW may be licensed to operate Government motor vehicles according to AR 600-55.

## Section II
## Contract Employment

## 4–22. Rules and procedures
Rules and procedures governing the military and contract employment of EPW will be according to the most current contract laws, procedures and guidelines and comply with the provisions of the Geneva Convention. All requests for the contracting of EPW will be forwarded promptly through channels to HQDA, ODCSOPS (DAMO-ODL) and be coordinated with HQDA, DAJA.

# Chapter 5
# Beginning of Internment (CI)

## 5–1. General protection policy—civilian internee
   *a.* Treatment.

   (1) No form of physical torture or moral coercion will be exercised against the CI. This provision does not constitute a prohibition against the use of minimum force necessary to effect compliance with measures authorized or directed by these regulations.

   (2) In all circumstances, the CI will be treated with respect for their person, their honor, their family rights, their religious convictions and practices, and their manners and customs. At all times the CI will be humanely treated and protected against all acts of violence or threats and insults and public curiosity. In all official cases they will be entitled to a fair and regular trial as prescribed by this regulation.

   (3) The CI will be especially protected against all acts of violence, insults, public curiosity, bodily injury, reprisals of any kind, sexual attack such as rape, forced prostitution, or any form of indecent assault.

   (4) The CI will be treated with the same consideration and without adverse distinction based on race, religion, political opinion, sex, or age.

   (5) The CI will be entitled to apply for assistance to the protecting powers, the International Committee of the Red Cross, approved religious organizations, relief societies, and any other organizations that can assist the CI. The commander will grant these organizations the necessary facilities to enable them to assist the CI within the limits of military and security considerations.

   (6) The following acts are specifically prohibited:

   (a) Any measures of such character as to cause the physical suffering or extermination of the CI. This prohibition applies not only to murder, torture, corporal punishment, mutilation, and medical or scientific experiments, but also to any other measure of brutality.

   (b) Punishment of the CI for an offense they did not personally commit.

   (c) Collective penalties and all measures of intimidation and terrorism against the CI.

   (d) Reprisals against the CI and their property.

   (e) The taking and holding of the CI as hostages.

   (f) Deportations from occupied territory to the territory of the occupying power or to that of any other country, occupied or not, are prohibited.

   *b.* Authorization to intern. Internment of protected civilian persons in a CI camp is authorized and directed provided that such

persons satisfy the requirements for being accorded the status of CI. One of the following two conditions must apply:

(1) Internment has been determined by competent U.S. Military authority to be necessary for imperative reasons of security to the United States Armed Forces in the occupied territory.

(2) Internment has been directed by a properly constituted U.S. military court sitting in the occupied territory as the sentence for conviction of an offense in violation of penal provisions issued by the occupying U.S. Armed Forces.

*c.* Order for internment.

(1) A protected civilian person in occupied territory will be accepted for evacuation to, and/or for internment in, a CI camp only on receipt of one of the following:

*(a)* An internment order for imperative security reasons authenticated by a responsible commissioned officer of the United States Military specifically delegated such authority by the theater commander.

*(b)* An order of an authorized commander approving and ordering into execution a sentence to internment pronounced by a properly constituted U.S. military court sitting in the occupied territory.

(2) The internment order will contain, as a minimum, the following information:

*(a)* The internee's personal data to include full name, home address, and identification document number, if any.

*(b)* A brief statement of the reason for internment.

*(c)* Authentication to include the signature of the authenticating officer over his or her typed name, grade, service number, and organization.

*d.* Compassionate internment. Notwithstanding the provisions of b and c above, requests by the CI for the compassionate internment of their dependent children who are at liberty without parental care in the occupied territory will normally be granted when both parents or the only surviving parent is interned.

*e.* Spies and saboteurs.

(1) As individually determined by the theater commander, protected civilian persons who are detained as alleged spies or saboteurs or as persons under definite suspicion of activities hostile to the security of the United States as an occupying power, will be regarded as having forfeited rights of communication with the outside world under the Geneva Convention (GC) for reasons of military security. Such forfeiture will be viewed as an exceptional and temporary measure. Due to the seriousness of the charges, such persons will not be processed as ordinary CI.

(2) Suspected spies and saboteurs will be afforded the same human rights treatment as the CI, and in case of trial, will be accorded the rights of fair and regular trial prescribed by the GC and by this regulation.

(3) When by the direction of the theater commander, suspected spies and saboteurs rights of communication with the outside world have been restored, their internment in a CI camp may be ordered in accordance with the provisions stated in paragraphs b and c above. When so interned, they will be accorded full CI status and rights and privileges as provided for by these regulations.

(4) At the earliest date consistent with the security of the United States, they will be released and granted full rights and privileges as protected persons under the GC.

*f.* Custodial security. The degree of security and control exercised over the CI will reflect the conditions under which their internment is authorized and directed and will recognize the escape hazards and difficulties of apprehension attendant on the internment of the CI in the occupied territory.

*g.* Appeals and periodic review of security internment cases.

(1) *Appeals.* The CI who are interned for imperative security reasons will be accorded the right to appeal the order directing their internment. Such appeals will be decided with the least possible delay by a board of officers. Appeals will be decided only on the grounds of the existence or nonexistence of imperative security reasons requiring the internment of the protected person.

(2) *Periodic review.* In the case where an appeal has been rejected, the board will review the case at least every 6 months, if

possible, to determine whether continued internment is essential to the security of the U.S. Armed Forces.

(3) *Reclassification to assigned residence.* In each CI case reviewed by the board in which continued control is necessary, the CI will be considered for an assignment to a residence in an area where there is adequate control.

*h.* Support of dependents. The United States will financially support the CI's dependents who are at liberty in the occupied territory and are without adequate means of support or are unable to earn a living.

## 5–2. Civilian Internee Safety Program

*a.* Establishment. A safety program for the CI will be established and administered in accordance with the policies prescribed in AR 385-10 and other pertinent safety directives.

*b.* Reports and records. DA forms and procedures outlined in AR 385-40 will be used in the implementation of the CI safety program. When so used, the letters "CI" will be clearly stamped at the top and bottom of each form. All such forms will be prepared, administered, and maintained separately from those prepared for personnel included under the Army Safety Program.

## 5–3. Republic of Korea/United States Agreement on processing civilian internees in Korea

*a.* On 12 February 1982, the United States and Korea signed The Memorandum of Agreement for the Transfer of the CI. The agreement applies to both the Republic of Korea (ROK) Armed Forces and the United States Armed Forces in Korea (USFK) who handle the CI.

*b.* As a result of this agreement, USFK Regulation 190-6 reflects minor modifications to procedures and forms concerning the processing of CI applicable only to the Korean theater of operations.

# Chapter 6
# Administration and Operation of CI Internment Facilities

## 6–1. Internment Facility

*a.* Location. The theater commander will be responsible for the location of the CI internment facilities within his or her command. The CI retained temporarily in an unhealthy area or where the climate is harmful to their health will be removed to a more suitable place of internment as soon as possible.

*b.* Quarters. Adequate shelters to ensure protection against air bombardments and other hazards of war will be provided and precautions against fire will be taken at each CI camp and branch camp.

(1) All necessary and possible measures will be taken to ensure that CI shall, from the outset of their internment, be accommodated in buildings or quarters which afford every possible safeguard as regards hygiene and health, and provide efficient protection against the rigors of the climate and the effects of war. in no case shall permanent places of internment be placed in unhealthy areas, or in districts the climate of which is injurious to CI.

(2) The premises shall be fully protected from dampness, adequately heated and lighted, in particular between dusk and lights out. The sleeping quarters shall be sufficiently spacious and well ventilated, and the internees shall have suitable bedding and sufficient blankets, account being taken of the climate, and the age, sex and state of health of the internees.

(3) Internees shall have for their use, day and night, sanitary conveniences which conform to the rules of hygiene and are constantly maintained in a state of cleanliness. They shall be provided with sufficient water and soap for their daily personal hygiene and for washing their personal laundry; installations and facilities necessary for this purpose shall be provided. Showers or baths shall also be available. The necessary time shall be set aside for washing and for cleaning.

(4) CI shall be administered and housed separately from EPW/

RP. Except in the case of families, female CI shall be housed in separate quarters and shall be under the direct supervision of women.

*c. Marking.* Whenever military considerations permit, internment facilities will be marked with the letters "CI" placed so as to be clearly visible in the daytime from the air. Only internment facilities for the CI will be so marked.

*d. Organizations and operation.*

(1) The CI internment facilities will be organized and operated, so far as possible, as other military commands.

(2) A U.S. Military commissioned officer will command each CI internment facility.

(3) When possible, the CI will be interned in CI camps according to their nationality, language, and customs. All CI who are nationals of the same country will not be separated merely because they speak different languages.

(4) Complete segregation of female and male CI will be maintained except—

*(a)* When possible, members of the same family, particularly parents and children, will be lodged together and will have facilities for leading a normal family life.

*(b)* A parent with children, if single or interned without spouse, will be provided quarters separate from those for single persons.

*(c)* CI may be searched for security purposes. Female CI may be searched only by female personnel.

## 6–2. Administrative processing

*a.* Military police processing.

(1) Military police (MP) prisoner of war units officially establish CI status and processes the CI.

(2) Only civilian persons entitled to protected status and that meet the requirements set forth in the GC will be classified as a CI.

(3) Dependent children, who are interned for compassionate reasons with their parents, will not be classified as CI or otherwise processed except as required on DA Form 2674-R (Enemy Prisoner of War/Civilian Internee Strength Report) (RCS CSGP-1583) and DA Form 2663-R. DA Form 2674-R will be reproduced locally on 8 1/2 by 11 inch paper, head to head. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only. Children under the age of twelve are to be identified by the wearing of some form of identity badge or wristband or some other means of identification.

(4) All efforts will be made to take the necessary measures to ensure that children under fifteen, who are orphaned or are separated from their families as a result of the war, are not left to their own resources.

*b.* DA Form 2674-R

(1) General. DA Form 2674-R will be prepared for each CI camp and hospital to which CI are assigned. Preparation will be in accordance with applicable procedures set forth for EPWs. DA Form 2674-R will be reproduced locally on 8 1/2 by 11-inch paper, head to head. A copy for reproduction purposes is located at the back of this regulation. This form is for the use of Army only.

(2) Personnel to be accounted for. All civilians processed and classified as CI and for whom a DA Form 4237-R has been prepared in accordance with paragraph 6-2. of this regulation and dependent children for whom compassionate internment with their CI parents has been approved in accordance with procedures prescribed by the theater commander.

(3) Basic personnel data. References to entries in section B, Remarks, requiring basic personnel data, will be interpreted as follows:

*(a)* Name. Enter last names and first names, in that order, alphabetically according to section (assigned gains, losses, and so forth) of CI and dependent children.

*(b)* Internment serial number. Enter complete serial number. of this regulation (dependent children are not assigned internment serial numbers (ISNs)).

*(c)* Grade. Civilian capacity or title, CI only.

*(d)* Sex. CI and dependent children.

*(e)* Nationality. CI and dependent children. Enter name of country of which parents claim citizenship.

*(f)* Occupational skill. Applies only to CI.

(4) Remarks column. On initial entry, enter in the "remarks" column the notation "approved by" (insert appropriate headquarters) on (insert date approved) CI and dependent children.

*c.* Civilian internee personnel record.

(1) DA Form 4237-R will be prepared for each protected civilian processed in an occupied territory as a CI or dependent child.

(2) All pertinent information available or which the CI is willing to give will be entered on the form. If a CI refuses or is unable to give any items of information, a notation will be made in item 36 on DA Form 4237-R. The codes to be used are contained in the Prisoner of War Information System (PWIS) Operator's Manual. Stamp the letters "CI" at the top and bottom of all pages of the form.

(3) All items on DA Form 4237-R are self explanatory except the following entries:

*(a)* Item 3. Civilian capacity or title (for example, mayor or police chief) if appropriate.

*(b)* Item 4. Serial number of identification document, if any.

*(c)* Item 5. Entry of "civilian internee."

*(d)* Items 19 through 21. Not applicable.

*(e)* Items 23 through 25. Name of apprehending unit and location, if known.

*(f)* Item 35. List impounded items from DA Form 1132 (Prisoner's Personal Property List-Personal Deposit Fund) and have the CI sign in the appropriate space verifying the impounded items.

(4) Entries will be typed if possible; otherwise, the form will be printed by hand in BLOCK LETTERS.

(5) Once completed, a copy of the form will accompany the CI to the CI camp. A copy will be furnished to the Branch PWIC monitoring CI activity for the theater commander.

*d. Internment serial number (ISN).* ISNs for each CI will be assigned according to the procedure set forth for EPW. The letters ACI@ will be substituted for AEPW@ e.g. US9AB-0001CI.

*e. DA Form 2677-R (Civilian Internee Identity Card).* Each CI will be issued a completed DA Form 2677-R. Notation thereof will be made under item 36 of DA Form 4237-R. DA Form 2677-R will be reproduced locally on 3- by 5- inch card head to foot. (Copy for local reproduction is located at the back of this regulation.) This form is for the use of Army only. All cards will be weatherproof. The CI will retain their identity cards at all times.

*f. Internment card.* On completion of a DA Form 4237-R, but not later than one week after arrival at a CI camp, each CI must complete two copies of DA Form 2678-R (Civilian Internee Notification of Address). One copy will be addressed to the EPW/CI information organization and the other copy to a relative or next-of-kin. DA Form 2678-R will be reproduced locally on 4- by 6-inch card, printed head to foot. (Copy for local reproduction is located at the back of this regulation.)

*g. DA Form 2663-R.* DA Form 2663-R will be completed in duplicate for each CI and for each interned dependent child. One copy will be retained in the camp at which the CI or dependent child is interned and will accompany internee on transfers; the other copy will be forwarded to the Branch PWIC.

## 6–3. Personal effects

*a.* All personal effects, including money and other valuables, of the CI will be safeguarded. Personal effects are classified according to their disposition.

*b.* The personal effects that detainees are allowed to retain, but are taken from them temporarily for intelligence purposes, will be receipted for and returned as soon as practical. Any national identification card or DA Form 2677-R will not be taken from the CI at any time.

(1) The camp commander may receive personal effects that the CI are permitted to retain, but which they wish stored. Individual receipts will be given to the CI for all items stored in this manner.

(2) Any claim by a CI for compensation for personal effects, money, or valuables stored or impounded by the United States and not returned upon repatriation or any loss alleged to be the fault of

the United States or its agents will be referred to the country to which the CI owes allegiance. In all cases, camp commanders will provide the CI with a statement, signed by a responsible officer, describing the property not returned and the reason. A copy of this statement will be forwarded to the Branch PWIC.

*c.* An inventory of personal effects that have been impounded will be entered on DA Form 4237-R, item 35. Also, DA Form 1132 will be completed by the CI and signed by the officer in charge or his or her authorized representative and a copy given to the CI.

*d.* The commanding officer of the camp where the CI is interned will be responsible for storing and safekeeping impounded personal effects. Such property will be marked or otherwise identified and securely bound or packaged. Upon transfer, the CI's impounded property will be delivered to the commanding officer of the receiving facility.

*e.* Money found in the possession of the CI will be handled according to AR 37-1.

*f.* Confiscated items of economic value will be receipted to the proper agency. Items of intelligence interest will be brought to the attention of military intelligence personnel immediately and receipted to them.

*g.* Personal property and documents of importance to the next-of-kin left by a CI who has been released, has died, or has been in an escaped status in excess of 30 days, will be forwarded to the Branch PWIC in sealed parcels. The parcels will be accompanied by statements identifying the CI and listing the contents. All parcels will be receipted for by the authorized losing or gaining facility representative.

*h.* The theater commander will be responsible for retaining and storing other personal effects, pending final disposition instructions from HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

### 6–4. Internee Committee

*a. Election.* At each camp and branch camp, CI will be elected by secret written ballot to the Internee Committee. This committee is empowered to represent the camp to the protecting powers, International Committee of the Red Cross, or other authorized relief or aid organizations and U.S. military authorities.

*b. Composition.* The Internee Committee will consist of not less than two and not more than three elected members. Elections will be held every 6 months or upon the existence of a vacancy. Committee members are eligible for re-election.

*c. Approval.* Each member of the Internee Committee will be approved by the camp commander prior to assumption of duty. If the camp commander refuses to approve or dismisses an elected member, a notice to that effect with the reasons for refusal or dismissal will be forwarded through channels to the Branch PWIC for transmittal to the protecting power with a copy furnished to NPWIC.

*d. Assistants.* Each member of the Internee Committee may have an assistant to act as an interpreter. The interpreter must be approved by the camp commander.

*e. Duties.*

(1) The Internee Committee will be responsible for furthering the physical, spiritual, and intellectual well being of the CI. Members will not be required to perform any other work if it interferes with their duties.

(2) Any mutual assistance organization set up by the CI will be under the jurisdiction of the Internee Committee.

(3) Internee Committee members will be provided with the necessary materials, facilities, and transportation and will be given the freedom required to accomplish their duties. Additional special duties performed by members of an Internee Committee include the following:

(a) Visits to outside labor details.

(b) Checking the management of the canteen and the canteen fund.

(c) The presentation and transmittal of petitions and complaints to the appropriate authorities.

(d) The distribution and disposition of collective relief shipments.

(e) Keeping informed of ongoing and final judicial proceedings instituted against a CI whom they represent.

(f) The delivery of perishable goods to the infirmary when addressed to a CI undergoing disciplinary punishment.

(g) Representing the interest of the CI by ensuring the transport of their community property and luggage that they are unable to take with them on transfers because of baggage weight limitations.

(4) Members of Internee Committees who are transferred will be allowed a reasonable time to acquaint their successors with their duties and related current CI affairs.

*f. Communications facilities.* Members of the Internee Committee will be accorded postal and telegraphic facilities for communicating with the protecting powers, International Committee of the Red Cross and its delegates, or other relief and aid organizations authorized to assist the CI and U.S. military authorities. Committee members of branch internment camps will be accorded similar facilities for communicating with the Internee Committee of the parent CI camp. These communications will be unlimited and will not be considered as forming a part of the correspondence quota outlined in paragraph 6-8.

### 6–5. Supplies

*a. General.*

(1) The CI must provide their own clothing and footwear. Approved items of clothing and equipment, general supplies, subsistence, and fuel will be supplied upon requisition.

(2) Except for work clothing or as circumstance warrant, or climatic conditions required, no replacement clothing will be issued.

(3) Except for hats and other accessories any item of clothing that may be worn as outer garments will be marked as prescribed below:

(a) All shirts, undershirts, blouses, jackets, coats including overcoats and raincoats, and similar articles will be marked with the letters "CI" across the back and on the front of each sleeve between the elbow and shoulder. The letters will be black and 4 inches high. If the clothing or uniforms are of such color that black letters do not contrast well, white will be used.

(b) Trousers, walking shorts, and like items of clothing will be similarly marked with the same letters across the back just below the belt and on the front of both legs just above the knees.

(c) At the discretion of the camp commander, the ISN or other identification marks may be written or stamped on the inside of all CI clothing.

*b. Food.*

(1) Subsistence for the CI will be issued on the basis of a master CI menu prepared by the theater commander. Preparation of the menu will include the following:

(a) The daily individual food ration will be sufficient in quantity, quality, and variety to maintain the CI in good health and to prevent nutritional deficiencies.

(b) The customary diet of the CI will be considered.

(c) The CI performing physical labor will receive additional food in proportion to the kind of labor performed.

(d) Expectant and nursing mothers and children under 15 years of age will receive additional food in proportion to their physiological needs.

(2) Facilities will be available to the CI for preparing additional food received or procured by them from authorized sources.

*c.* Miscellaneous.

(1) The issuance of expendable supplies is authorized according to allowances prescribed in Army publications.

(2) Equipment required to support vocational training projects such as gardening, carpentry, tinsmithing, blacksmithing, masonry, repairing shoes and clothing, tailoring, barbering, potting, and farming may be requisitioned through normal supply channels. Subject to restrictions imposed on authorized expenditures from the camp Civilian Internee Fund, camp commanders may purchase locally items of equipment, materials, and supplies needed in the vocational training program that are not available through supply channels.

## 6–6. Medical Care and Sanitation

*a.* General.

(1) Dental, surgical, and medical treatment will be furnished free to the CI.

(2) A medical officer will examine each CI upon arrival at a camp and monthly thereafter. The CI will not be admitted into the general population until medical fitness is determined. These examinations will detect vermin infestation and communicable diseases especially tuberculosis, malaria, and venereal disease. They will also determine the state of health, nutrition, and cleanliness of each CI. During these examinations, each CI will be weighed, and the weight will be recorded on DA Form 2664-R.

(3) Each CI will be immunized or reimmunized as prescribed by theater policy.

*b.* CI medical personnel.

(1) Qualified CI medical personnel will be used as much as possible in medical and hygiene work necessary for the well-being of all CI.

(2) Required Army medical personnel will be provided within the capability of the theater commander.

*c.* Medical facilities. Each CI camp will provide personnel, material, and facilities for adequate routine and emergency dispensary treatment. Patients requiring hospital treatment will be moved, if feasible, to a civilian hospital. The treatment must be as good as that provided for the general population. When civilian hospital facilities are not available or their use is not feasible due to security considerations, U.S. military hospital facilities will be used. Guards for hospitalized CI will be provided, as necessary.

*d.* Medical care.

(1) Medical and dental care, including dentures, spectacles, and other required artificial appliances, will be provided the CI in accordance with AR 40-3.

(2) Each CI will be given an initial radioscopic chest examination. If active disease is found, pulmonary disease consultation is indicated. If no active disease is found, the individual will be followed through routine periodic examinations.

(3) For children up to 14 years of age, a tuberculin skin test (TST) will be administered. No chest x-ray is necessary if the TST is negative. The local medical officer will establish guidance for subsequent tests based on the tuberculosis experience of the population. Routine annual tuberculin testing of children is not warranted unless there is clear-cut evidence of high risk. (See AR 40-26, para 8 f.)

(4) Experimental research will not be conducted on the CI even if the CI agrees to it.

(5) Sick call for the CI desiring medical attention will be held each day. Emergency treatment will be provided at all times.

*e.* Blood donations. At each CI camp and hospital, a list will be maintained according to blood types of CI who have volunteered to furnish blood.

*f.* Records and reports

(1) General. The medical records and forms used for the hospitalization and treatment of U.S. Army personnel and for EPWs will be used for CI. The letters "CI" will be stamped at the top of the form. Medical and dental records will accompany the CI when they are transferred.

(2) Certificate of Work Incurred Injury or Disability. If a CI is injured while working or incurs a disability that may be attributed to work, a DA Form 2675-R will be completed.

(3) Certificate of medical treatment. Each CI who has undergone medical treatment will be given on request an official certificate indicating the nature of his or her illness or injury, and the duration and kind of treatment given. A duplicate of this certificate will be forwarded to the Branch PWIC.

(4) Seriously ill report. When a CI is seriously ill because of injury or disease, the camp or hospital commander will notify the Branch PWIC without delay and provide a brief diagnosis of the case. Follow-up reports, including notification of removal from the seriously ill list, will be submitted each week thereafter during the period the CI remains critical.

*g.* Sanitation.

(1) Hygiene and sanitation measures will conform to those prescribed in AR 40-5 and related regulations. Camp commanders will conduct periodic and detailed sanitary inspections.

(2) A detailed sanitary order meeting the specific needs of each CI camp or branch camp will be published by the CI camp commander. Copies will be reproduced in a language that the CI understands and will be posted in each compound.

(3) Each CI will be provided with sanitary supplies, service, and facilities necessary for their personal cleanliness and sanitation. Separate sanitary facilities will be provided for each sex.

(4) All CI will have at their disposal, day and night, latrine facilities conforming to sanitary rules of the Army.

## 6–7. Social, Intellectual, and Religious activities

*a.* General.

(1) Subject to security considerations and camp discipline, the CI will be encouraged, but not required, to participate in social, intellectual, religious, and recreational activities. Introducing political overtones into or furthering enemy propaganda objectives through these activities will not be tolerated.

(2) Premises and facilities for conducting the activities in (1) above will be made available in each camp, if possible. Required materials and supplies will be requisitioned through normal supply channels.

(3) Carefully selected and qualified civilian nationals and CI may be used for the conducting of activities in (1) above where practical as long as they are closely supervised by U.S. Military personnel.

*b.* Visits.

(1) Official. Duly accredited representatives of the protecting powers and of the International Committee of the Red Cross and other will be permitted to visit and inspect CI camps and other places of internment in the discharge of their official duties. The inspections will be at times previously authorized by the theater commander. Such visits will not be prohibited, nor will their duration and frequency be restricted, except for reasons of imperative military necessity, and then only as a temporary measure. These representatives will be permitted to—

*(a)* Interview the CI without witnesses, if requested.

*(b)* Distribute relief supplies and approved materials intended for educational, recreational, or religious purposes, or for assisting the CI in organizing their leisure time within the places of internment. Visiting representatives may not accept from the CI any letters, papers, documents, or articles for delivery.

(2) Social. Near relatives and other persons authorized by the theater commander will be permitted to visit the CI as frequently as possible in accordance with theater regulations. They should be advised that the taking of photographs on or about the facility is prohibited.

(3) Emergency visits by civilian internees. Subject to theater policy, the CI may visit their homes in urgent cases, particularly in cases of death or serious illness of close relatives.

*c.* Education.

(1) The CI education program, as developed for each CI camp, will reflect consideration of the following:

*(a)* The several educational levels represented in the CI population of the camp.

*(b)* The establishment of basic courses of instruction to include elementary level reading, writing, geography, mathematics, language, music, art, history, and literature.

*(c)* The uninterrupted education of dependents residing with their CI parents. This education will reflect to the extent determined feasible by the theater commander, the educational curriculums of the particular country.

*(d)* The development of vocational training projects with an immediate view of developing skills that may be useful during internment and a longer range view of enabling the CI to learn a useful trade in which they may engage when returned to normal civilian life. Such projects may include, at the discretion of the theater commander, carpentry, tinsmithing, masonry, repairing shoes and clothing, tailoring, barbering, potting, and farming.

(2) Equipment required to support the education program will be requisitioned through normal supply channels. At the discretion of the camp commander, items not in supply may be purchased locally and paid for from the camp Civilian Internee Fund provided the items will benefit most CI. The CI personnel employed in the education program will be paid the established rate of pay from the camp Civilian Internee Fund.

*d.* Religion.

(1) CI will enjoy freedom of religion, including attendance at services of their respective faiths held within the internment camps. Wines used for religious purposes will be permitted.

(2) CI who are clergy may minister freely to CI who voluntarily request their ministration. Equitable allocation of CI clergy will be effected among the various camps.

(3) If there is a shortage of CI clergy and the circumstances warrant, the camp commander will provide the CI clergy with the necessary means of transport for visiting the CI in branch camps and hospitals.

(4) The CI clergy will be permitted to correspond on religious matters with the religious authorities in the country of detention and, as far as possible, with the international religious organizations of their faiths. This correspondence will not be considered as forming a part of the quota that may be established in accordance with paragraph 6-8, but will be subject to censorship.

(5) Ordained clergy or a theological student who are not CI may be authorized to enter a camp and conduct religious services. Visits by such personnel will be in accordance with procedures prescribed by the theater commander.

*e.* Recreation.

(1) Recreational activities and facilities, in addition to sports and outdoor games, may include concerts and plays put on by the CI, recorded music, selected motion pictures, and other activities provided by the theater commander.

(2) Special playgrounds will be reserved for dependent children of the CI.

(3) Expenditures from the camp Civilian Internee Fund for the purchase or rental of recreational equipment are authorized.

(4) Appointed delegates of the International Committee of Red Cross are authorized to assist in developing recreational and welfare activities.

## 6–8. Procedures for communications

*a.* Restrictions on numbers and addresses. Procedures for CI correspondence will be in accordance paragraph 3-5. a-f. except that DA Forms 2668-R and 2680-R (Civilian Internee PostCard) will be substituted for DA Forms 2667-R and 2679-R (Civilian Internee Letter) respectively. No restriction will be placed on persons with whom the CI may correspond. DA Form 2679-R will be reproduced on 8 1/2-by 11-inch paper, head to head. DA Form 2680-R will be reproduced on 4-by 6-inch card, head to foot. Copies for local reproduction are located at the back of this regulation. These forms are for the use of Army only.

*b.* Outgoing mail. The following procedures apply to outgoing mail:

(1) Letters and cards will be typed or written legibly in ink. Block printing may be used.

(2) Correspondence will be addressed as follows:

*(a)* Names and addresses will be complete; they will be placed in the spaces designated on the correspondence forms.

*(b)* The return address will be in block print to include the full name, grade, ISN, place and date of birth of the sender, and the name of the camp to which assigned. Instructions for including the APO number or the country in which the camp is located should be issued by local directives.

*(c)* A person at a branch camp will give the parent camp as the return address. The person will be retained on the rosters and postal records of the parent camp.

*(d)* The surnames in the address and return address of letters and cards will be underlined.

(3) Each person will be required to date his or her letters and

cards. The name of the month will be written, not shown by a number.

(4) To expedite the handling of mail, CIs will designate the language of their communication.

(5) The date will not be crossed off, written over, or otherwise modified.

(6) Letters and cards will not be numbered consecutively.

(7) The entire letter or card will be written by the same person. If necessary, the address may be written by someone else.

(8) The CI may not write letters for others who are able to do so themselves. A person may be unable to write because of lack of education, accident, or sickness. If so, the camp commander may permit another person to write the message. In these cases, the person doing the writing will countersign the message.

(9) Letters and cards with parts excised, deleted, or otherwise mutilated before being dispatched from the camp will be returned to the person for rewriting.

*c.* Correspondence sent to civilian internees. Instructions on letters and cards that are sent to CI should be communicated by CI to their correspondents.

(1) The name and return address of the sender will be typewritten or hand printed. For letters, the sender's name and address will always appear on the backs of the envelope. The addresser's surname will be underlined.

(2) The name, grade, ISN of the detainee, the name or number of the base camp, and the geographical designation or APO number will be placed in the center lower half of the envelope card. These items are specified by local directives or the camp commander. The entire name of the detainee will be in block print. The address will be placed as near the lower edge of the envelope as possible; the postmark at the top will not be obscured or obliterated.

(3) The term "Civilian Internee Mail" will be placed in the upper left corner on the address side. In the upper right corner the words "Postage Free" must be shown.

*d.* Legal documents. Legal documents, such as wills and deeds, may be enclosed with outgoing correspondence. When it is necessary for a CI to send a legal document, the document and forwarding letter or card may be enclosed in a plain envelope.

*e.* Maps, sketches, or drawings. The CI will not send maps, sketches, or drawings in outgoing correspondence.

*f.* Registered certified, insured, COD, or airmail items. Individuals will not be permitted to mail registered, certified, insured, COD, or airmail items. If registered, certified, insured, or COD mail of either domestic or foreign origin addressed to a detainee is received, it will be refused. The local post office will return them to the sender.

*g.* Postage. Letters and cards to and from the CI will be sent by ordinary mail and postage free.

*h.* Security. Outgoing letters and cards will be secured by using locked boxes or similar means. Only authorized U.S. personnel will handle outgoing mail. Incoming mail may be sorted by the CI when supervised by U.S. personnel.

*i.* Censorship. Censorship of the CI mail will be according to policies established by the theater commander:

(1) Outgoing letters and cards may be examined and read by the camp commander. The camp commander will return outgoing correspondence containing obvious deviations from regulations for rewriting.

(2) Camp commanders will name U.S. military personnel to supervise the opening of all mail pouches containing incoming letters and cards for CI. These items will be carefully examined by the named personnel before delivery to detainees. Those items that arrive without having been censored by appropriate censorship elements will be returned for censorship to the designated censorship elements.

(3) The CI complaints concerning mail delivery will not be directed to censorship elements. These will be directed to—

*(a)* The camp authorities.

*(b)* The responsible major Army commander.

*(c)* HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

*(d)* The protecting power.

*j.* Procedures for parcels.

(1) A person may receive individual parcels and collective shipments containing—

*(a)* Foodstuffs.

*(b)* Clothing.

*(c)* Medical supplies.

*(d)* Articles of religious, educational, or recreational nature.

(2) Books, included in parcels of clothing and foodstuffs, may be confiscated as the camp commander decides.

(3) The CI may send parcels subject to such restrictions as may be deemed necessary by the theater commander with respect to quotas, contents, size, and weight. The CI may send parcels free of charge up to a weight of 5 kilograms per package, or 10 kilograms in the case of articles that cannot be separated (Art 39, Universal Postal Convention).

(4) Parcels received for transferred persons will be forwarded immediately to them.

(5) Nonperishable articles received for persons who have died, escaped, or been released will be forwarded to the Branch PWIC. Perishable items received for deceased or escaped persons will be released to the Internee Committee who will deliver them to the camp infirmary or hospital for the benefit of the sick.

(6) The contents of all incoming parcels will be examined at the camp by a U.S. officer in the presence of the addressee or the named representative. When considered necessary, the camp commander may request that the parcel be examined by the censorship element. The articles in each parcel will be removed. The string, the inner wrappings, the outer container, and any extraneous items found in the parcel will not be turned over to the CI or the named representatives. Examination will be close enough to reveal concealed articles and messages; however, undue destruction of contents of parcels will be avoided.

*k.* Telegrams and telephone calls. The CI may read and receive telegrams. They may not make or receive telephone calls.

(1) Dispatching telegrams will be as follows:

*(a)* A CI who has not received mail from next-of-kin for 3 months may send a telegram not earlier than one month from the date a previous telegram was sent.

*(b)* CI who are unable to receive mail from their next-of-kin or send mail to them by ordinary postal routes or who are a great distance from their home will be permitted to send one telegram a month.

*(c)* The CI who is seriously ill or who has received news of serious illness or death in the family will be permitted to send a telegram. The camp commander will authorize the sending of additional telegrams.

(2) The sending of telegrams as provided for in (1) above will be governed by the following:

*(a)* The message proper will consist of not more than 15 words.

*(b)* The cost of sending the telegram will be charged to the personal account of the CI.

*(c)* Arrangements for messages going to or through enemy-occupied countries will be made with the local International Committee of the Red Cross field director and will be sent through the International Committee of Red Cross, Geneva, Switzerland.

*(d)* Telegrams will be in the English.

*(e)* No telegram, except by members of the Internee Committee, will be sent to a Government official or to a protecting power.

*(f)* Telegrams will be censored according to instructions issued by the chief censor.

*l.* Books. The CI may receive books. Persons or organizations may donate new or unmarked used books, singly or in collections, to camp libraries. Books that arrive at camps uncensored will be censored by a representative of the censorship element. Publications (books, magazines, newspapers, and so forth) containing maps may be made available to the CI upon approval by the camp commander, provided they do not contain maps of the territory surrounding the camps.

*m.* Newspapers and magazines. The following may be made available to the CI:

(1) Current newspapers and magazines published in English in the United States and selected by the camp commanders.

(2) Unmarked, unused magazines in English published in the United States and distributed by approved relief or aid organizations received at the discretion of the camp commanders for camp libraries after censorship by the censorship element.

(3) Foreign language newspapers and magazines published in the United States, upon approval of the camp commander and after censorship of individual issues by the censorship element.

(4) Newspapers and magazines published outside the United States, regardless of language, must be approved by the theater commander or HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

## 6–9. Complaints and requests to camp commanders and protecting power

*a.* Persons may make complaints or requests to the camp commander, who will try to resolve the complaints and answer the requests. If the CI are not satisfied with the way the commander handles a complaint or request, they may submit it in writing, through channels, to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400.

*b.* Persons exercising the right to complain to the protecting power about their treatment and camp may do so—

(1) By mail.

(2) In person to the visiting representatives of the protecting power.

(3) Through their Internee Committee.

*c.* Written complaints to the protecting power will be forwarded promptly through HQDA (DAMO-ODL)NPWIC, WASH DC 20310-0400. A separate letter with the comments of the camp commander will be included. Military endorsements will not be placed on any CI communications.

*d.* If a protecting power communicates with a CI camp commander about any matter requiring an answer, the communication and commander=s reply will be forwarded to HQDA (DAMO-ODL) NPWIC, WASH DC 20310-0400, for proper action.

*e.* Any act or allegation of inhumane treatment or other violations of this regulation will be reported to HQDA (DAMO-ODL), WASH DC 20310-0400 as a Serious Incident Report. Reporting instructions in AR 190-40 will be used.

## 6–10. Discipline and security

Measures needed to maintain discipline and security will be set up in each camp and rigidly enforced. Offensive acts against discipline will be dealt with promptly. The camp commander will record disciplinary punishments. The record will be open to inspection by the protecting power.

*a.* Prohibited acts.

(1) Associations on close terms between the CI and U.S. military or civilian personnel.

(2) Exchange of gifts between the CI and U.S. military or civilian personnel.

(3) Setting up of courts by the CI. The CI will not have any disciplinary power or administer any punishment.

*b.* Regulations, orders, and notices. Regulations, orders, and notices on the conduct and activities of the CI will be written in a language the CI can understand. They will be posted in a place within each camp where the CI may read them. They will also be made available to persons who do not have access to posted copies. Additional copies will be given to the Internee Committee. This requirement will also apply to the text of the GC and texts of special agreements concluded under it. Every order and command addressed personally to the CI must be given in a language he or she understands. To protect persons from acts of violence, bodily injury, and threats of reprisals at the hand of fellow internees, a copy of a notice in the internee's language will be posted in every compound.

**NOTICE**

The CI regardless of faith or political belief, who fear that their lives are in danger or that they may suffer physical injury at the hands of other detainees will immediately report the fact personally to any U.S. Army officer of this camp without consulting the Internee Committee. From that time on, the camp command will assure adequate protection to such civilian internees by segregation, transfer, or other means. Civilian internees who mistreat fellow internees will be punished.

Signed (Commanding Officer)

*c. Courtesies.* The normal civilian courtesies will be required of the CI in their relationships with military personnel. U.S. military personnel will be courteous and will extend to the CI the regard due them.

*d. Flags and political emblems.* Flags on which a political enemy emblem or device appears will be seized. The CI will not have any political emblem, insignia, flag, or picture of political leaders. The CI may have pictures of political leaders that appear in magazines, books, and newspapers if the pictures are not removed.

*e. Security.* All security matters connected with the custody and utilization of the CI are the responsibilities of the theater commanders in overseas areas.

## 6–11. Provisions common to disciplinary and judicial punishments

*a. General.*

(1) If general laws, regulations, or orders declare acts committed by the CI to be punishable, whereas the same acts are not punishable when committed by persons who are not interned, these acts will only entail disciplinary punishment.

(2) When possible disciplinary punishment rather than judicial punishment will be used.

(3) The courts or authorities in passing sentence or awarding disciplinary punishment will consider the fact that the defendant is not a national of the United States. They will be free to reduce the penalty prescribed for the offense with which the CI is charged and will not be obliged to apply the prescribed minimum sentence but may impose a lesser one.

(4) Punishment will not be inhumane, brutal, or dangerous to the health of the CI The age, sex, and state of health of the CI will be considered.

(5) Imprisonment in premises without daylight is prohibited.

(6) The length of time a CI is confined while awaiting a disciplinary hearing or a trial will be deducted from any disciplinary or judicial punishment involving confinement to which he or she may be sentenced and will be taken into account in finding any penalty.

(7) No CI may be punished more than once for the same offense.

(8) The CI who has served disciplinary punishment on judicial sentences will not be treated differently from other CI.

*b. Confinement benefits.* The CI undergoing confinement, whether before or after trial and whether in connection with disciplinary or judicial proceedings, will—

(1) Be allowed to exercise and stay in the open air at least two hours daily.

(2) Be allowed to attend daily sick call, receive medical attention as needed, and if necessary be transferred to a hospital.

(3) Be given enough food to maintain them in as good health as that provided other CI.

(4) Be permitted to confer with visiting representatives of the protecting power or the ICRC.

(5) Be permitted to receive spiritual assistance.

(6) If a minor, be treated with proper regard.

(7) Be provided with hygienic living conditions.

(8) Be provided adequate bedding and supplies and facilities necessary for personal cleanliness.

(9) If a female, be confined in separate quarters from male CI and will be under the immediate supervision of women.

## 6–12. Disciplinary proceedings and punishments

*a. Authority to order disciplinary punishment.* Without prejudice to the competence of courts and higher authorities, disciplinary punishment may be ordered only by the camp commander.

*b. Rights of accused prior to imposition of disciplinary punishment.* Prior to imposition of disciplinary punishment, the CI will be—

(1) Provided precise information regarding the offense of which they are accused.

(2) Given an opportunity to defend the allegation.

(3) Permitted to call witnesses and to have, if necessary, the service of a qualified interpreter.

*c. Authorized disciplinary punishment.* The following disciplinary punishments are authorized:

(1) Discontinuance of privileges granted over and above the treatment provided for by this regulation.

(2) Confinement.

(3) A fine not to exceed one-half of the wages that the CI may receive during a period of not more than 30 days.

(4) Extra fatigue duties, not exceeding 2 hours daily, in connection with maintaining the internment camp.

*d. Duration of disciplinary punishment.*

(1) The duration of any single disciplinary punishment will not exceed 30 consecutive days. The maximum of 30 days will not be exceeded even if the CI is answerable for several breaches of discipline, whether related or not, at the time when punishment is imposed.

(2) The period elapsing between the pronouncing of the disciplinary punishment and the completion of its execution will not exceed 30 days.

(3) After imposition of disciplinary punishment on the CI, further discipline will not be imposed on the same CI until at least 3 days have elapsed between the execution of any two of the punishments if the duration on one of the two punishments is 10 days or more.

*e. Escape and connected offenses.*

(1) The CI who are recaptured after having escaped or when attempting to escape will be liable to disciplinary punishment with respect to this act only, even if it is a repeated offense.

(2) The CI punished as a result of escape or attempt to escape may be subjected to special surveillance that does not affect the state of their health, when the punishment is exercised in a CI camp and if it does not violate any of the provisions of this regulation.

(3) The CI who aid and abet an escape or an attempt to escape, if no injury is done to a person, will be liable to disciplinary punishment only.

(4) Escape, or attempt to escape, even if it is a repeated offense, will not be deemed an aggravating circumstance in cases where the CI is prosecuted for offenses committed incidental to or during his or her escape or attempt to escape.

(5) The CI is liable to prosecution for an escape or attempted escape that results in a death or serious bodily injury to another person.

*f. Confinement pending hearing.*

(1) The CI accused of an offense for which disciplinary punishment is contemplated will not be confined pending a disciplinary hearing unless it is essential to the interest of camp order and discipline. Its duration will in any case be deducted from any sentence of confinement.

(2) Any period spent by the CI in confinement awaiting a hearing will be reduced to an absolute minimum. For offenses entailing disciplinary punishment only, it will not exceed 14 days.

*g. Confinement facilities.* CI confined as disciplinary punishment will undergo their punishment in a CI camp stockade.

*h. Confinement benefits.* In addition to the benefits provided by paragraph 6-11 b of this regulation, the CI placed in confinement in connection with disciplinary proceedings will be allowed to send and receive letters, cards, and telegrams in accordance with the

provisions of this chapter. Parcels and remittances of money, however, may be withheld from the CI until the completion of the punishment. Parcels will be released to the safekeeping of the Internee Committee. If perishable goods are contained in the parcels, the Internee Committee will give them to the infirmary or hospital.

## 6–13. Judicial proceedings

*a.* General principles.

(1) The penal laws of the occupied territory will remain in force, with the exception that they may be repealed or suspended by the United States in cases where they constitute a threat to its security or an obstacle to the application of the GC.

(2) The United States may subject the population of the occupied territory to provisions that are essential to enable it to fulfill its obligation under the GC, to maintain orderly government of the territory, and to ensure the security of the U.S. Armed Forces.

(3) The penal provisions enacted by the United States will not come into force before they have been published and brought to the knowledge of the inhabitants in their own language. The effect of penal provisions will not be retroactive.

(4) The CI may be tried by general court-martial that must sit within the occupied territory. The CI will not be tried before summary or special court-martial.

(5) No CI will be tried or sentenced for an act that was not forbidden by U.S. law or by international law in force at the time the act was committed.

(6) No protected person may be punished for an offense he or she has not personally committed.

(7) No moral or physical coercion will be exerted to induce the CI to admit guilt for any act.

(8) No CI will be convicted without having had the chance to present a defense with the assistance of a qualified advocate or counsel.

*b.* Notification of judicial procedures.

(1) The accused will be promptly notified, in writing in a language they understand, of the charges against them and will be tried as rapidly as possible.

(2) A notice (in duplicate) of proceedings against the CI will be submitted through channels to HQDA (DAMO-ODL) NPWIC, WASH DC 20310-0400 for transmittal to the protecting power, in cases of charges involving the death penalty or imprisonment for 2 years or more. Upon request, the protecting power will be furnished with information regarding the status of such proceedings. Furthermore, the protecting power will be entitled, on request, to be furnished with all particulars of any other proceedings instituted against the CI.

(3) The above notice will be sent without delay. The trial will not commence until 3 weeks after the protecting power has been notified.

(4) The notice will include the following:

*(a)* Surname and first names; internment serial number; date of birth; and profession, trade, or prior civil capacity of the CI.

*(b)* Place of internment.

*(c)* Specification of the charges with penal provisions under which they are brought.

*(d)* Designation of the court that will hear the case.

*(e)* Place and date of the first hearing.

(5) The Internee Committee will be informed of all judicial proceedings against the CI that it represents and of the results of the proceedings.

(6) The records of trials will be kept by the courts and will be open to inspection by the representatives of the protecting power.

*c.* Rights and means of defense.

(1) In each trial by court-martial, the accused will be entitled to assistance by a qualified advocate or counsel of his or her own choice, the calling of witnesses, and if necessary the services of a competent interpreter. The CI will be advised of these rights by the commander concerned in due time before the trial.

(2) When the accused does not exercise the right to choose an advocate or counsel, notice to that effect will be sent through

HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, to the protecting power. The protecting power may provide a counsel.

(3) When the protecting power is not functioning and the accused is faced with a serious charge, the convening authority will provide, subject to consent of the accused, an advocate or counsel.

(4) Unless the CI freely waives such assistance, an accused will be provided with the assistance of an interpreter both during preliminary investigation and during the hearing in court. The CI will have the right to object to the interpreter provided and to ask for a replacement.

(5) The defense counsel will be given at least 2 weeks before the opening of the trial and will be granted the necessary facilities to prepare the defense of the accused. The defense counsel will be permitted to visit the accused freely and to interview the accused in private. The defense counsel will also be permitted to confer with any witnesses for the defense including other CI. These privileges will continue until the term of appeal or petition has expired.

(6) Copies of the charge sheet will be given to the accused and the defense counsel in the language that they understand at least 2 weeks before the trial begins.

(7) The interpreter, appointed for and sworn by the court, will provide the official translation of all trial proceedings. The interpreter must not be a trial counsel, defense counsel, assistant to either, or witness; nor should he or she have any bias or interest in the case. The interpreter will translate testimony given in the language of the accused into English for the benefit of the court.

*d.* Participation of protecting power in criminal proceedings. Representatives of the protecting power will be permitted to attend the trial of any CI unless the hearing has to be held secretly as an exceptional measure in the interest of the security of the United States. If a trial is to be held in secret, a notice as to the reasons, the date, and place of the secret trial will be sent to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400. They will be notified at least three weeks before the opening of the trial to permit timely notification to the protecting power.

*e.* Notification of judgment and sentence.

(1) In all cases requiring notification to the protecting power, two copies of the findings, and if applicable the sentence will be forwarded immediately to HQDA, ODCSOPS(DAMO-ODL), NPWIC WASH DC 20310-0400, in the form of a summary communication for transmittal to the protecting power. When NPWIC transmits this information to the protecting power, it will include a brief statement of the appellate rights of the accused. Notification as to the decision of the CI to use or waive his or her right to appeal will also be forwarded (in duplicate) to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power. If the sentence adjudged is death, the information set forth in *g* below, together with one copy of the court-martial record of trial will be forwarded to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power.

(2) After final approval of a sentence involving the death penalty or imprisonment for 2 years or more, the following information will be forwarded (in duplicate) to HQDA, ODCSOPS(DAMO-ODL) NPWIC, WASH DC 20310-0400, for transmittal to the protecting power:

*(a)* A precise wording of the approved finding and sentence.

*(b)* A summarized report of the evidence.

*(c)* If applicable, the name of the place where confinement will be served.

*f.* Appeals in criminal proceedings.

(1) The convicted CI sentenced to confinement or to punishment other than death will have the right of appeal provided for by the laws applied by the court. In all instances, the CI condemned to death will be permitted to petition for pardon or reprieve. The CI will be fully informed of the right to appeal or petition and of the time within which it must be done.

(2) When the laws applied by the court make no provision for appeals, the convicted CI will have the right to petition against the finding and sentence to the competent authority of the United States.

(3) Any period allowed for appeal in the case of sentences involving the death penalty or imprisonment of 2 years or more will not begin to run until notification of the judgment has been received by the protecting power.

(4) Courts of Appeal, if at all possible, will sit in the occupied territory.

*g.* Death penalty.

(1) The CI will be informed as soon as possible of all offenses that are punishable by the death sentence under applicable laws. Lists of these offenses will be posted in all camps. Duplicate lists will be given to the Internee Committee.

(2) The death sentence may not be pronounced against the CI who was under 18 years of age at the time of the offense unless the attention of the court has been particularly called to the fact that since the accused is not a national of the United States, he or she is not bound to it by any duty or allegiance.

(3) If the death sentence is pronounced, it will not be executed for at least 6 months from the date when the protecting power received the detailed communication furnished by the United States in regard to trial (e. above) except as provided in (4) below.

(4) The 6-month period after suspension of the death sentence ((3) above) may be reduced in an individual case in circumstances of grave emergency involving an organized threat to the security of the United States. However, the protecting power must always be notified by HQDA (DAMO-ODL) as to the exception to the 6-month waiting period.

*h.* Civil proceedings. In every case where the CI is a party to any civil litigation, the camp commander will if the CI so requests inform the court of his or her detention. The camp commander will, within legal limits, take all necessary steps to prevent the CI from being in any way prejudiced by reason of his or her internment regarding the preparation and conduct of the case or execution of any judgment of the court.

*i.* Confinement pending trial. A pretrial investigation of an offense alleged to have been committed by the CI will be conducted rapidly so that the trial will take place as soon as possible. The CI will not be confined while awaiting trial unless a civilian national of the occupied territory would be so confined if accused of a similar offense. The CI may be confined if it is essential to do so in the interest of camp or national security. However, this confinement will never exceed 3 months.

*j.* Confinement facilities. CI confined as judicial punishment will serve their sentences in an internment facility, assigned by the theater commander, in the occupied territory as long as U.S. authorities can guarantee their security.

*k.* Confinement benefits. In addition to the benefits stated in paragraph 6-11*b*, the CI placed in confinement in connection with judicial proceedings will be permitted to receive one relief parcel each month.

## 6–14. Death and burial

*a.* Reference. For general procedures and authorized expenses for the care and disposition of remains, see AR 638-30 and AR 638-40.

*b.* Disposition of wills. When a person has chosen to make a will, the original and two certified copies will be forwarded to the Branch PWIC upon death or at the CI's request.

*c.* Information furnished to camp or hospital commander upon death. When the CI in U.S. custody dies, the attending medical officer will promptly furnish the following to the camp (or hospital) commander, the local provost marshal, or other officers who were charged with the custody of the CI prior to his or her death.

(1) Full name.

(2) ISN.

(3) Date, place, and cause of death.

(4) Statement that in his or her opinion death was, or was not, the result of the CI's own misconduct.

(5) When the cause of death is undetermined, the medical officer will make a statement to that effect.

(6) When the cause of death is finally determined, a supplemental report will be made.

*d.* Notifying the Branch PWIC of a death. The camp or hospital commander or other officer charged with custody of the CI prior to his or her death will notify the local Branch PWIC immediately by telegram of the death. Notification will include all data required in *c* above. The use of supplemental reports is authorized until requirements have been met.

*e.* Certificate of Death. A copy of DA Form 2669-R is contained in this regulation. For each death, the attending medical officer and the responsible camp commander will complete a DA Form 2669-R. The form will be made out in enough copies to provide the distribution below.

(1) Original—NPWIC.

(2) Copy—Branch PWIC.

(3) Copy—The Surgeon General.

(4) Copy—CI's Personnel File.

(5) If the CI dies in the United States, a copy will be sent to the proper civil authorities responsible for recording deaths in that State.

*f.* Investigating officer's report.

(1) The camp or hospital commander will appoint an officer to investigate and report the following:

*(a)* Each death or serious injury caused, or suspected to have been caused, by guards or sentries, another CI, or any other person.

*(b)* Each suicide or death resulting from unnatural or unknown causes.

(2) The precepts outlined in GC 1949, part IV, section 3, will be used as a guide. (See DA Pam 27-1.)

(3) Military police investigators may be used at the discretion of the camp commander.

*g.* Burial, record of internment, and cremation.

(1) The deceased CI will be buried honorably in a cemetery set up for them according to AR 638-30 and if possible, according to the rites of their religion. Unless unavoidable circumstances require the use of collective (group or mass) graves, the CI will be buried in a separate grave.

(2) Graves Registration Services will record information on burials and graves. A copy of DD Form 551 (Record of Interment) will be forwarded to the Branch PWIC. The United States will care for graves and record of any subsequent moves of the remains.

(3) A body may be cremated only because of imperative hygiene reasons, the CI's religion, or the CI's request for cremation. The reason for cremation of a body will be cited on the death certificate. Ashes will be kept by Graves Registration until proper disposal can be decided according to the instructions of the protecting power.

*h.* Forwarding deceased person's file. The personnel files of a deceased person with all pertinent records will be forwarded to the Branch PWIC.

## 6–15. Transfers

*a.* Authority to transfer. Theater commanders may direct the transfer of the CI, subject to the following conditions:

(1) The CI may not be transferred beyond the borders of the occupied country in which interned except when for material reasons it is impossible to avoid such displacement. The CI thus evacuated will be transferred back to the area from which they were evacuated as soon as hostilities in that area have ceased.

(2) The sick, wounded, or infirmed CI, as well as maternity cases, will not be transferred if the journey would be seriously detrimental to the health of the CI.

(3) If the combat zone draws close to an internment camp, CI may not be transferred unless they can be moved under adequate conditions of safety. However, CI may be moved if they would be exposed to greater risks by remaining than by being transferred.

*b.* Notification of transfer.

(1) The CI to be transferred will be officially advised of their departure and their new postal address in time for them to pack their luggage and notify their next-of-kin. The Internee Committee members to be transferred will be notified in time to acquaint their successors with their duties and related current affairs.

(2) The Branch PWIC and NPWIC will be notified immediately of any CI transferred.

*c.* Treatment during transfer.

(1) Generally, the CI will be transferred under conditions equal to those used for the transfer of personnel of the U.S. Military in the occupied territory. If, as an exceptional measure, the CI must be transferred on foot, only those who are in a fit state of health may be so transferred. The CI will not be exposed to excessive fatigue during transfer by foot.

(2) The sick, wounded, or infirmed CI as well as maternity cases will be evacuated through U.S. military medical channels and will remain in medical channels until they are certified "fit for normal internment" by competent medical authorities.

(3) Potable water and food sufficient in quantity, quality, and variety to maintain them in good health will be provided to the CI during transfer.

(4) Necessary clothing, adequate shelter, and medical attention will be made available.

(5) Suitable precautions will be taken to prevent CI from escaping and to ensure their safety.

*d.* Transfer of personal effects and property.

(1) The CI will be permitted to take with them their personal effects and property. The weight of their baggage may be limited if the conditions of transfer so require, but in no case will it be limited to less than 55 pounds per CI. The personal property that the CI are unable to carry will be forwarded separately.

(2) The mail and parcels addressed to CI who have been transferred will be forwarded to them.

(3) Property, such as that used for religious services, or items donated by welfare agencies will be forwarded as community property. These items are not to be considered a part of the 55 pounds of personal effects and property that each CI is authorized to take.

## 6–16. Release

*a.* General.

(1) Control and accountability of CI will be maintained until the CI is receipted for by a representative of his or her country of residence or a designated protecting power.

(2) After hostilities cease and subject to the provisions of (3) below, CI will be released as soon as the reasons for their internment are determined by the theater commander to no longer exist.

(3) The CI who are eligible for release but have judicial proceedings pending for offenses not exclusively subject to disciplinary punishment will be detained until the close of the proceedings. At the discretion of the theater commander, the CI may be detained until completion of their penalty. The CI previously sentenced to confinement as judicial punishment may be similarly detained. Lists of the CI held under this guidance will be forwarded to the Branch PWIC and NPWIC for transmittal to the protecting power.

*b.* Return of impounded personal effects. Upon release, the CI will be given all articles, moneys, or other valuables impounded during internment and will receive in currency the balance of any credit to their accounts. If the theater commander directs that any impounded currency or articles be withheld, the CI will be given a receipt.

*c.* Cost of transport. The United States will pay the cost of returning the released CI to the places where they were living when interned.

*d.* Medical fitness. The CI will not be admitted into the general population until their medical fitness is determined.

## Chapter 7
## Employment and Compensation—Civilian Internees

## 7–1. General

*a.* Theater commanders may issue, within their respective commands, implementing instructions governing the employment and compensation of the CI consistent with these regulations. Copies of such instructions will be forwarded promptly to ODCSOPS.

*b.* The CI will be employed, so far as possible, in work necessary for the construction, administration, management, and maintenance of the CI camps.

*c.* The CI compensation procedures will be accomplished in accordance with AR 37-1.

## 7–2. Ability to perform labor

*a.* The CI will be required to perform any work consistent with their age and physical condition and in accordance with this regulation.

*b.* The fitness of CI for labor will be determined using the same procedures as those outlined in paragraph 3-4 b.

*c.* The CI under 18 years of age will not be compelled to work.

## 7–3. Authorized work

*a.* Compulsory. The CI may be compelled to perform only the following type of work:

(1) Administrative, maintenance, and domestic work in an internment camp.

(2) Duties connected with the protection of the CI against aerial bombardment or other war risks.

(3) Medical duties if they are professionally and technically qualified.

*b.* Voluntary. Subject to the provisions of paragraph 4-4. and to other restrictions as may be imposed by the theater commander, the CI may volunteer for, but may not be compelled to perform, work of any type without regard to the military character, purpose, or classification of the work. They will be free to terminate such work at any time subject to having labored for 6 weeks and having given an 8-day notice.

## 7–4. Unauthorized work

The criteria for unauthorized work for CI is the same as those found for EPW/RP in paragraph 4-5.

## 7–5. Working conditions

The working conditions for the CI, to include protective clothing, equipment, and safety devices, will be at least as favorable as those prescribed for the civilian population of the occupied territory by the national laws and regulations and as provided for in existing practice. In no case will the working conditions for the CI be inferior to those for the civilian population employed in work of the same nature and in the same district.

## 7–6. Length of workday

*a.* The length of the working day of the CI will not exceed that permitted for civilians in the locality who are employed in the same general type of work. A rest period of not less than 1 hour will be allowed during the workday.

*b.* The length of the workday for CI will be in accordance with paragraph 4-8.

## 7–7. Day of rest

Each CI will be allowed a rest of 24 consecutive hours every week, preferably on Sunday or on the day of rest in his or her country.

## 7–8. Paid work

The following are types of work for which the CI will be compensated:

*a.* Services, including domestic tasks, in connection with administering and maintaining CI camps, branch camps, and hospitals when the CI performs these services permanently.

*b.* Spiritual and medical duties performed by the CI on behalf of their fellow CI.

*c.* Services as members and as assistants to the members of the Internee Committee. These persons will be paid from the camp Civilian Internee Account. If there is no such account, they will be paid the prescribed rate from U.S. Army appropriated funds.

*d.* All types of work that the CI does not have to do but does voluntarily.

**7–9. Unpaid work**

The criteria for unpaid work for CI is the same as for EPW/RP found in paragraph 4-18.

**7–10. Compensation for paid work**

The daily compensation that the CI will receive for paid work will be announced by the Department of the Army at an appropriate time subsequent to an outbreak of hostilities. The CI compensation procedures will be in accordance with AR 37-1.

**7–11. Disability compensation**

Procedures for CI disability compensation will be the same as those found in paragraph 4-20.

# Appendix A
# References

## Section I
## Required Publications

**AR 37–1**
Army Accounting and Fund Control. (Cited in para 3-3n.)

**AR 40–3**
Medical, Dental, and Veterinary Care. (Cited in para 6-6d.)

**AR 40–5**
Preventive Medicine. (Cited in para 6-6g.)

**AR 190–40**
Serious Incident Report. (Cited in para 3-16f.)

**AR 195–2**
Criminal Investigation Activities. (Cited in para 1-4h.)

**AR 600–8–1**
Army Casualty Operation/Assistance/Insurance. (Cited in para 3-10a.)

**AR 600–25**
Salutes, Honors, and Visits of Courtesy. (Cited in para 3-6c.(4))

**AR 600–55**
The Army Driver and Operator Standardization Program (Selection, Training,Testing, and Licensing). (Cited in para 4-21)

**AR 638–30**
Graves Registration Organization and Functions in Support Major Military Operations. (Cited in para 3-10a.)

**AR 670–1**
Wear and Appearance of Army Uniforms and Insignia. (Cited in para 3-15e.)

**AR 735–5**
Policies and Procedures for Property Accountability. (Cited in para 3-9b.)

**FM 22–5**
Drill and Ceremonies. (Cited in para 3-6c.(4))

**Dictionary of Occupational Titles**
(Cited in para 4-13a.)

**Manual for Courts–Martial**
Manual for Courts-Martial, U.S., 1984. (Cited in para 3-7b.)

**Uniform Code of Military Justice**
(Cited in para 3-7b.)

**DODD 2310.1**
DOD Program for Enemy Prisoners of War (EPOW) and Other Detainees. (Cited in para 1-4g.)

**DODD 5100.77**
DOD Law of War Program. (Cited in para 1-4a.(2))

## Section II
## Related Publications
A related publication is merely a source of additional information. The user does not have to read it to understand this regulation.

**AR 40–66**
Medical Record Administration.

**AR 40–400**
Patient Administration.

**AR 55–355**
Defense Traffic Management Regulation. (NAVSUPINST 4600.70, AFR 75-2, MCO P4600.14B, DLAR 4500.3

**AR 190–14**
Carrying of Firearms and Use of Force for Law Enforcement and Security Duties.

**AR 190–47**
The Army Corrections System

**AR 355–15**
Management Information Control System.

**AR 380–5**
Department of the Army Information Security Program.

**AR 985 series**
Army Safety Program.

**DA PAM 27–1**
Treaties Governing Land Warfare.

**FM 33–1**
Psychological Operations

**AF Handbook (AFH) 31–302**
Air Base Defense and Contingency Operations Guidance and Procedures.

**SECNAVINST 3461.3**
Program for Prisoners of War and Other Detainees.

## Section III
## Prescribed Forms

**DA Form 2662–R**
EPW Identity Card. (Prescribed in para 3-3a(2)(b))

**DA Form 2663–R**
Fingerprint Card. (Prescribed in para 3-3a(2)(c))

**DA Form 2664–R**
Weight Register. (Prescribed in para 3-4i(3))

**DA Form 2665–R**
Capture Card for Prisoner of War. (Prescribed in para 3-5d(5))

**DA Form 2666–R**
Prisoner of War - Notification of Address. (Prescribed in para 3-5d(4))

**DA Form 2667–R**
Prisoner of War Mail - Letter. (Prescribed in para 3-5d(1))

**DA Form 2668–R**
Prisoner of War Mail - Post Card. (Prescribed in para 3-5d(1))

**DA Form 2669–R**
Certificate of Death. (Prescribed in para 3-10e)

**DA Form 2670–R**
Mixed Medical Commission Certificate for EPW. (Prescribed in para 3-12j)

**DA Form 2671–R**
Certificate of Direct Repatriation for EPW. (Prescribed in para 3-12k)

**DA Form 2672–R**
Classification Questionnaire for Officer Retained Personnel.

**DA Form 2673–R**
Classification Questionnaire for Enlisted Retained Personnel.

**DA Form 2674–R**
Enemy Prisoner of War/Civilian Internee Strength Report.

**DA Form 2675–R**
Certificate of Work Incurred Injury or Disability. (Prescribed in para 6-6f(2))

**DA Form 2677–R**
Civilian Internee Identity Card. (Prescribed in para 6-2e)

**DA Form 2678–R**
Civilian Internee Notification of Address. Prescribed in para 6-2f)

**DA Form 2679–R**
Civilian Internee Mail. (Prescribed in para 6-8a)

**DA Form 2680–R**
Civilian Internee Post Card. (Prescribed in para 6-8a)

**DA Form 4237–R**
Detainee Personnel Record. (Prescribed in para 3-3a(2)(b))

**DD Form 2745**
Enemy Prisoner of War (EPW) Capture Tag. (Prescribed in para 2-1b.)

**Section IV**
**Referenced Forms**

**DA Form 1132**
Prisoners Personal Property List - Personal Deposit Fund

**DD Form 551**
Record of Internment

**DD Form 629**
Receipt for Prisoner or Detained Person

**Standard Form 88**
Report of Medical Examination

**Standard Form 600**
Chronological Record of Medical Care

**DA Form 1132**
Prisoners Personal Property List-Personal Deposit Fund

**DA Form 3444**
Treatment Record

**DA Form 4137**
Receipt for Evidence/Property Custody Document

# Appendix B
## Internment Serial Number
The internment serial number (ISN) is a unique identification number assigned to each EPW, RP and CI taken into the custody of the U.S. Armed Forces. Throughout internment/detention, EPW/CI are identified. PWIS accountability for EPW, RP and CI by the U.S. is established when the ISN is assigned. The ISN will consist of three components, with the first two separated by a dash as follows:

*a. First Component.* The first component will contain five characters. The first two will be the alpha-characters 'US'. The third character will be either the alpha or numeric designation for the command/theater under which the EPW, RP and CI came into the custody of the U.S. The fourth and fifth positions are alpha-characters designating the EPW, RP and CI serving power.

*b. Second Component.* The second component is a six character numeric identifier. These numbers will be assigned consecutively to all EPW, RP and CI processed through ISN assigning organizations. The Branch PWIC will assign blocks of numbers to ISN assigning organization/elements in the supported theater.

*c. Third Component.* The third component will consist of an acronym identifying the classification of the individual: either EPW, RP, or CI, to represent Enemy Prisoner of War, Retained Person, or Civilian Internee, respectively. Should an individual that was initially classified as an EPW later determined to be a medically or religiously qualified retained person, the classification may be changed to "RP"with the approval of the EPW command/brigade.

*d. Example.* The first EPW processed by an ISN assigning organization in a theater designated as "9"and whose country was designated as "AB"will be assigned the following ISN: US9AB- 00000l-EPW. The tenth such EPW processed by the same command will be assigned the ISN of: US9AB-0000l0-EPW. If eleventh individual processed by the same command was an RP and the fifteenth a CI, their ISNs would be: US9AB-0000ll-RP and US9AB-0000l5-CI, respectively.

*e.* EPW transferred to CONUS without having been assigned an ISN and those captured within the Continental U.S., will be processed and assigned an ISN as above, by the CONUS EPW organizations.

# Glossary

## Section II
Abbreviations

### Section 1
Abbreviations

**ADP**
Automated Data Processing

**APO**
Army Post Office

**Cdr**
Commander

**CI**
Civilian Internee(s)

**COD**
Cash on Delivery

**CONUS**
Continental U.S.

**CTA**
Central Tracing Agency

**DA**
Department of the Army

**DAR**
Defense Acquisition Regulation

**DCSINT**
Deputy Chief of Staff for Intelligence

**DCSLOG**
Deputy Chief of Staff for Logistics

**DCSOPS**
Deputy Chief of Staff for Operations and Plans

**DCSPER**
Deputy Chief of Staff for Personnel

**DOD**
Department of Defense

**DRMO**
Defense Reutilization and Marketing Office

**EDCSA**
Effective Date of Change of Strength Accountability

**EPW**
Enemy Prisoner(s) of War

**FAO**
Finance and accounting officer

**FBI**
Federal Bureau of Investigation

**FORSCOM**
Forces Command

**GC**
Geneva Convention Relative to the Protection of Civilian Persons in time of War

**GPW**
Geneva Convention Relative to the Treatment of Prisoners of War

**GWS**
Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the field

**GWS SEA**
Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Ship-wrecked Members of Armed Forces at Sea

**HQDA**
Headquarters, Department of the Army

**HSC**
U.S. Army Health Services Command

**ICRC**
International Committee of the Red Cross

**ISN**
Internment Serial Number

**JCS**
Joint Chiefs of Staff

**MPMIS**
Military Police Management Information Systems

**NCO**
noncommissioned Officer

**OD**
Other Detainees

**OSD**
Office of the Secretary of Defense

**NPWIC**
National Prisoner of War Information Center

**PP**
Protected Person

**PSYOP**
Psychological Operations

**PWIC**
Prisoner of War Information Center

**RP**
Retained Personnel

**ROK**
Republic of Korea

**SJA**
Staff Judge Advocate

**TJAG**
The Judge Advocate General

**TRADOC**
U.S. Army Training and Doctrine Command

**TSG**
The Surgeon General

**TST**
Tuberculin Skin Test

**UCMJ**
Uniform Code of Military Justice

**USAFAC**
U.S. Army Finance and Accounting Center

**USFK**
U.S. Armed Forces, Korea

## Section II
Terms

**Canteen**
A facility set up for the sale of authorized services and items of merchandise.

**Central Tracing Agency**
Centralizes tracing requests concerning all persons reported missing during the conflict. Requests are either forwarded by centralized information bureaus or submitted by families via their respective National Red Cross or Red Crescent Societies. The Central Tracing Agency (CTA) then passes them on for processing to the appropriate authorities and forwards replies to the requesters.

**Civilian Internee(s)**
A civilian who is interned during armed conflict or occupation for security reasons or for protection or because he has committed an offense against the detaining power.

**Civilian Internee Account**
Accounts established and records maintained under control of the disbursing officer. Deposit Fund Account 21X6015.

**Civilian Internee Branch Camp**
A subsidiary camp under the supervision and administration of a civilian internee camp.

**Civilian Internee Camp**
An installation established for the internment and administration of civilian internees.

**Civilian Internee Compound**
A subdivision of a CI enclosure.

**Civilian Internee Enclosure**
A subdivision of a CI camp.

**Contract Employer**
Any person, corporation, association, State or municipal government agency, and other employer (except DOD) that contracts for work to be done.

**Dependent Child Internee**
A child who on request of the interned parents, for compassionate reasons, is accommodated in a CI internment camp with the interned parents.

**Detainee**
A term used to refer to any person captured or otherwise detained by an armed force.

**Domestic Service**
Such normal household duties as preparing and serving food and the care and repair of clothing.

**Enemy Prisoner of War**
A detained person as defined in Articles 4 and 5 of the Geneva Convention Relative to the Treatment of Prisoners of War of August 12, 1949. In particular, one who, while engaged in combat under orders of his or her government, is captured by the armed forces of the enemy. As such, he or she is entitled to the combatant's privilege of immunity from the municipal law of the capturing state for warlike acts which do not amount to breaches of the law of armed conflict. For example, a prisoner of war may be, but is not limited to, any person belonging to one of the following categories who has fallen into the power of the enemy: a member of the armed forces, organized militia or volunteer corps; a person who accompanies the armed forces without actually being a member thereof; a member of a merchant marine or civilian aircraft crew not qualifying for more favorable treatment; or individuals who, on the approach of the enemy, spontaneously take up arms to resist invading forces.

**Enlisted EPW**
Enlisted EPW and civilian EPW entitled to be treated as enlisted EPW.

**EPW Branch Camp**
A subsidiary camp under supervision and administration of the main EPW camp.

**EPW Camp**
A camp set up by the U.S. Army for the separate internment and complete administration of EPW.

**EPW Compound**
A subdivision of an EPW enclosure.

**EPW Enclosure**
A subdivision of an EPW camp. Internment Serial Number Unique, controlled identification number assigned an EPW upon capture and entry into the Prisoner of War Information System.

**Military Nature**
Term that applies to those items or those types of construction that are used exclusively by members of the Armed Forces for operational purposes (e.g., arms, helmets). The purposes are in contrast to items or structures that may be used either by civilian or military personnel (e.g., food, soap, buildings, public roads, or railroads).

**Military Purpose**
Activities intended primarily or exclusively for military operations as contrasted with activities intended primarily or exclusively for other purposes.

**Noncommissioned Officer EPW**
Enlisted EPW and civilian EPW entitled to be treated as a Noncommissioned Officer EPW.

**Other Detainee (OD)**
Persons in the custody of the U.S. Armed Forces who have not been classified as an EPW (article 4, GPW), RP (article 33, GPW), or CI (article 78, GC), shall be treated as EPWs until a legal status is ascertained by competent authority.

**Personal Effects**
Personal effects the EPW may retain include the following:
  *a.* Clothing.
  *b.* Mess equipment (knives and forks excluded).
  *c.* Badges of rank and nationality.
  *d.* Decorations.
  *e.* Identification cards or tags.
  *f.* Religious literature.
  *g.* Articles that are of a personal use or have a sentimental value to the person.
  *h.* Protective mask.

**Prisoner of War Information System**
A computer information system designed to assist military police in the field, the Branch PWIC and the National PWIC to manage enemy prisoners of war by providing automated support for the policies and procedures established by regulation.

**Prisoner of War Information Center (PWIC)**
A TOE organization established to collect information pertaining to EPW, RP and CI and to transmit such information to the National Prisoner of War Information Center.

**Protected Person**
Persons protected by the Geneva Convention who find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals.

**Retained Personnel**
Enemy personnel who come within any of the categories below are eligible to be certified as retained personnel (RP).
  *a.* Medical personnel who are members of the medical service of their armed forces.
  *b.* Medical personnel exclusively engaged in the—
  (1) Search for, collection, transport, or treatment of, the wounded or sick.
  (2) Prevention of disease.
  (3) Staff administration of medical units and establishments exclusively.
  *c.* Chaplains attached to enemy armed forces.
  *d.* Staff of National Red Cross societies and other voluntary aid societies duly recognized and authorized by their governments. The staffs of such societies must be subject to military laws and regulations.

**Section III**
**Special Abbreviations and Terms**
This section contains no entries.

# Index

This index is organized alphabetically by topic and subtopic. Topics and subtopics are identified by paragraph number.

**Canteen, 3-4h**
**Capture, 2-1**
**Civilian Internee**
    Authorization to Intern, 5-1b
    Definition (Glossary Section II
    Personal effects, 6-3
    Treatment, 5-1a(1)
**Complaints**
    CI, 6-9
    EPW and RP, 3-16,
**Correspondence**
    Enemy Prisoner of War and Retained Personnel, 3-5
    Civilian Internee, 6-8

**Discipline and Security**
    CI, 6-10, 6-11
    EPW and RP, 3-6
**Death and Burial, 3-10**
    Civilian Internee, 6-14
    Burial at sea, 3-10h
**Death Penalty**
    Civilian Internee, 6-13g
    EPW/RP, 3-8i(1)
**DOD Directive 2310.1, 1-4g**

**Enemy Prisoner of War**
    Definition (Glossary-Section II,
    Sick and Wounded, 2-2
    Transfers, 3-11
    Questioning of Prisoners, 2-1a(1)(d)
    Evacuation of Prisoners, 2-2, 2-3,
**Escape**
    Preventing Escape, 3-6f(2)
**Evacuation Policy, 2-3**
**Executive Agent, 1-4b**

**Flags, 3-6e**
**Finance**
    Supplemental Pay, 4-14, 4-16

**Health and Comfort Packets, 3-4h**

**International Committee of the Red Cross**
**Internee Committee, 6-4**
**Internment Serial Numbers (Appendix B)**

**Judicial proceedings**
    Civilian Internees, 6-13
    EPW/RP, 3-8,

**Labor (Civilian Internee,**
    Authorized work, 7-3
    Unauthorized work, 7-4
    Working conditions, 7-5
    Day of rest, 7-7
**Labor (EPW/RP)**
    Authorized work, 4-4
    Length of work day, 4-8
    Rest Periods, 4-9
    Task system, 4-12
    Unauthorized work, 4-5

**Mail**
    Civilian Internee, 6-8b
    EPW/RP, 3-5
**Medical**
    Civilian Internee Dental Care, 6-6d(1)
    Civilian Internee Medical Care and Sanitation, 6-6

    Medical Personnel, 1-5f
    Mixed Medical Commission, 3-12
**Military Police, 1-4g, 6-2**

**National Prisoner of War Information Center (NPWIC,, 1-7**
**Naval Vessels, 2-1b**

**Prisoner of War Information Center, 1-8**
**Property, 3-9**

**Other Detainee (Glossary Section II)**

**Parcels, 3-5k**
**Photographing, 1-5d**
**Prisoner of War Information Center**
    National Prisoner of War Information Center, 1-6
    Branch Prisoner of War Information Center, 1-7
**Protection Policy, 1-5**
**Public Affairs, 1-9**

**Release**
    Civilian Internee, 6-16
**Religion, 1-5g**
    Civilian Internee, 6-7
    Chaplains, 3-15b(3)
    Enemy Prisoner of War, 1-5g(2)
    Ministers, 3-15d(1)
**Repatriation, 3-14)**
    Sick and wounded, 3-12
**Retained Personnel, 3-15)**
    Definition (Glossary Section II)
    Chaplains, 3-15b(3)
    Medical Personnel, 1-5f

**Safety**
    Civilian Internee, 5-2
    EPW/RP, 3-17
**Saluting, 3-6d**
**Social, Intellectual and Religious activities, 3-4d**
    Civilian Internee, 6-7
    EPW/RP, 3-4d
**Spies and Saboteurs, 5-1e**

**Telegrams**
    Civilian Internee, 6-8k
    EPW/RP, 3-5l
**Tobacco, 3-4h**
**Transfers**
    CI, 6-15
    EPW and RP, 3-11
**Tribunals, 1-6**
    Article 5 GPW, 1-6a



**EPW IDENTITY CARD**

For use of this form, see AR 190-8;
the proponent agency is DCSPER.

DATE ISSUED

(Photograph)

LAST NAME

FIRST NAME

GRADE

SERVICE NUMBER

POWER SERVED

PLACE OF BIRTH

DATE OF BIRTH

SIGNATURE OF BEARER

DA FORM 2662-R, May 82

EDITION OF 1 JUL 63 IS OBSOLETE.

*(Front)*

OTHER MARKS OF IDENTIFICATION

LEFT INDEX

RIGHT INDEX

FINGERPRINTS

WEIGHT

COLOR OF EYES

HEIGHT

COLOR OF HAIR

BLOOD TYPE

RELIGION

**NOTICE**

This card is issued to prisoners of war in the custody of the United States Army. This card must be carried at all times by the EPW to whom it is issued.

Reverse of DA Form 2662-R, May 82

*(Reverse)*

## FINGERPRINT CARD
For use of this form, see AR 190-8; the proponent agency is DCSPER.

| INTERNMENT SERIAL NUMBER |
|---|

| LAST NAME | FIRST NAME | | GRADE |
|---|---|---|---|

| POWER SERVED | NATIONALITY | SEX | AGE | HEIGHT | WEIGHT |
|---|---|---|---|---|---|

| OTHER MARKS OF IDENTIFICATION | COLOR OF EYES | COLOR OF HAIR |
|---|---|---|

*LEAVE THIS SPACE BLANK*

| SIGNATURE OF OFFICIAL TAKING FINGERPRINTS | CLASSIFICATION |
|---|---|

| SIGNATURE OF EPW/CIVILIAN INTERNEE | REFERENCE |
|---|---|

| 1. RIGHT THUMB | 2. RIGHT INDEX | 3. RIGHT MIDDLE | 4. RIGHT RING | 5. RIGHT LITTLE |
|---|---|---|---|---|

| 6. LEFT THUMB | 7. LEFT INDEX | 8. LEFT MIDDLE | 9. LEFT RING | 10. LEFT LITTLE |
|---|---|---|---|---|

| LEFT FOUR FINGERS TAKEN SIMULTANEOUSLY | LEFT THUMB | RIGHT THUMB | RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY |
|---|---|---|---|

**DA FORM 2663-R, May 82**            EDITION OF 1 JUL 63 IS OBSOLETE

**WEIGHT REGISTER**

For use of this form, see AR 190-8; the proponent agency is DCSPER.

NAME (Last, first, MI)

INTERNMENT SERIAL NUMBER

| WEIGHT | DATE | WEIGHT | DATE | WEIGHT | DATE |
|--------|------|--------|------|--------|------|
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |
|        |      |        |      |        |      |

DA FORM 2664-R, May 82                    EDITION OF 1 JUL 63 IS OBSOLETE.

**PRISONER OF WAR MAIL**

| IMPORTANT | TO: |
|---|---|
| This card must be completed by each prisoner immediately after being taken prisoner and each time his/her address is changed (*by reason of transfer to a hospital or to another camp*).<br><br>This card is distinct from the special card which each prisoner is allowed to send to his/her relatives. | CENTRAL PRISONERS OF WAR AGENCY |

DA FORM 2665-R, May 82                     EDITION OF 1 JUL 63 IS OBSOLETE.

*(Front)*

## CAPTURE CARD FOR PRISONER OF WAR
For use of this form, see AR 190-8; the proponent agency is DCSPER.

*WRITE LEGIBLY IN BLOCK LETTERS. DO NOT ADD ANY REMARKS*

| NAME (Last, First, MI) | | GRADE |
|---|---|---|
| SERVICE NUMBER | POWER SERVED | PLACE OF BIRTH |
| DATE OF BIRTH | FIRST NAME OF FATHER | MAIDEN NAME OF MOTHER |
| NAME, ADDRESS, AND RELATIONSHIP OF NEXT OF KIN | | DATE OF CAPTURE OR TRANSFER |

### PHYSICAL CONDITION *(Check applicable box)*

| GOOD HEALTH | RECOVERED | SICK | SERIOUSLY WOUNDED |
|---|---|---|---|
| NOT WOUNDED | CONVALESCENT | | SLIGHTLY WOUNDED |

| FORMER ADDRESS | INTERNMENT SERIAL NO. |
|---|---|

PRESENT ADDRESS *(Name of Camp, or Hospital, and Location)*

| DATE | SIGNATURE OF PRISONER |
|---|---|

*Reverse of DA Form 2665-R, May 82*

*(Reverse)*

**PRISONER OF WAR MAIL**

DO NOT WRITE HERE

TO:

STREET

CITY

COUNTRY

PROVINCE OR DEPARTMENT

DA FORM 2666-R, May 82

EDITION OF 1 JUL 63 IS OBSOLETE.

(Front)

## PRISONER OF WAR NOTIFICATION OF ADDRESS
For use of this form, see AR 190-8; the proponent agency is DCSPER.

| LANGUAGE | POWER SERVED |
|---|---|

*PRINT CLEARLY THE INFORMATION CALLED FOR. DO NOT ADD ANY REMARKS.*

| NAME (Last, First, MI) | GRADE |
|---|---|

| INTERNMENT SERIAL NUMBER | DATE OF CAPTURE OR TRANSFER |
|---|---|

| DATE OF BIRTH | PLACE OF BIRTH |
|---|---|

**PHYSICAL CONDITION** *(Check applicable box)*

| | GOOD HEALTH | | RECOVERED | | SICK | | SERIOUSLY WOUNDED |
|---|---|---|---|---|---|---|---|
| | NOT WOUNDED | | CONVALESCENT | | | | SLIGHTLY WOUNDED |

FORMER ADDRESS

PRESENT ADDRESS *(Name of Camp or Hospital, and Location)*

| DATE | SIGNATURE OF PRISONER |
|---|---|

*Reverse of DA Form 2666-R, May 82*

(Reverse)

County where posted
_____

Name of Camp
_____

Date and Place of Birth
_____

Interment Serial Number
_____

Name (Last, first MI)
_____

SENDER:

- - - - - - - - - - - - - - - - - *(Fold on this line)* - - - - - - - - - - - - - - - - -

**PRISONER OF WAR MAIL**            **LETTER**

Language _____

To _____

    Street _____

    City _____

    Country _____

    Province or Department _____

*(Fold on this line)*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DO NOT WRITE HERE**

*(Fold on this line)*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**DA FORM 2667-R, May 82**          EDITION OF 1 JUL 63 IS OBSOLETE.          For use of this form, see AR 190-8,
the proponent agency is DCSPER.

**DO NOT WRITE BEYOND HEAVY LINES**

**PRISONER OF WAR MAIL**

| SENDER | TO: |
|---|---|
| NAME *(Last, first, MI)* | |
| INTERNMENT SERIAL NUMBER | STREET |
| DATE AND PLACE OF BIRTH | CITY |
| NAME OF CAMP | COUNTRY |
| | PROVINCE OR DEPARTMENT |
| COUNTRY WHERE POSTED | |

DA FORM 2668-R, May 82                    EDITION OF 1 JUL 63 IS OBSOLETE.

*(Front)*

**POST CARD**

For use of this form, see AR 190-8, the proponent agency is DCSPER.

| | DATE |
|---|---|
| LANGUAGE | POWER SERVED |

*WRITE BETWEEN LINES AND AS LEGIBLY AS POSSIBLE*

*Reverse of DA Form 2668-R, May 82*

*(Reverse)*

## CERTIFICATE OF DEATH
For use of this form, see AR 190-8; the proponent agency is DCSPER.

| | INTERNMENT SERIAL NUMBER |
|---|---|

**FROM:**

**TO:**

| NAME (Last, first, MI) | | GRADE | SERVICE NUMBER |
|---|---|---|---|

| NATIONALITY | POWER SERVED | PLACE OF CAPTURE/INTERNMENT AND DATE |
|---|---|---|

| PLACE OF BIRTH | DATE OF BIRTH |
|---|---|

| NAME, ADDRESS, AND RELATIONSHIP OF NEXT OF KIN | FIRST NAME OF FATHER |
|---|---|

| PLACE OF DEATH | DATE OF DEATH | CAUSE OF DEATH |
|---|---|---|

| PLACE OF BURIAL | DATE OF BURIAL |
|---|---|

IDENTIFICATION OF GRAVE

**PERSONAL EFFECTS** *(To be filled in by Office of Deputy Chief of Staff for Personnel)*

____ RETAINED BY DETAINING POWER    ____ FORWARDED WITH DEATH CERTIFICATE TO *(Specify)*    ____FORWARDED SEPARATELY TO *(Specify)*

BRIEF DETAILS OF DEATH/BURIAL BY PERSON WHO CARED FOR THE DECEASED DURING ILLNESS OR DURING LAST MOMENTS *(Doctor, Nurse, Minister of Religion, Fellow Internee).* IF CREMATED, GIVE REASON. *(If more space is required, continue on reverse side).*

| *DO NOT WRITE IN THIS SPACE*<br>CERTIFIED A TRUE COPY | DATE | SIGNATURE OF MEDICAL OFFICER |
|---|---|---|
| | SIGNATURE OF COMMANDING OFFICER | |
| | WITNESSES | |
| | SIGNATURE | ADDRESS |
| | SIGNATURE | ADDRESS |

**DA FORM 2669-R, May 82**          EDITION OF 1 JUL 63 IS OBSOLETE.

## MIXED MEDICAL COMMISSION CERTIFICATE FOR EPW
For use of this form, see AR 190-8; the proponent agency is DCSPER.

**FROM:**

**TO:**

The undersigned make up the Mixed Medical Commission. They are dully appointed under the GPW of 1949 to examine _____ *(state nationality)* EPW in custody of the US Armed Forces. The EPW claim eligibility for repatriation or for hospitalization in a neutral country under the provisions of that convention. The EPW named below has been presented to the Commission and has been examined at the location, and on the date shown.

| NAME *(Last, first, MI)* | | GRADE |
|---|---|---|
| SERVICE NUMBER | INTERNMENT SERIAL NUMBER | DATE OF BIRTH |

### STATUS

| | | |
|---|---|---|
| ___ MEDICAL: | ___ LITTER | ___ AMBULANT |
| ___ SURGICAL: | ___ LOCKED WARD | ___ OPEN     ___ ISOLATION |
| ___ NEUROPSYCHIATRIC: | | |

| THE MIXED MEDICAL COMMISSION FINDS THAT THE ABOVE NAMED EPW IS *(Check applicable box)* | a. INELIGIBLE FOR REPATRIATION OR HOSPITALIZATION IN A NEUTRAL COUNTRY. |
|---|---|
| | b. ELIGIBLE FOR DIRECT REPATRIATION. |
| | c. ELIGIBLE FOR HOSPITALIZATION IN A NEUTRAL COUNTRY. |
| | d. ELIGIBLE FOR RE-EXAMINATION BY NEXT COMMISSION. |

FINAL DIAGNOSIS *(Continue on reverse side if more space is required).*

| PLACE OF EXAMINATION | | DATE |
|---|---|---|
| TYPED NAME OF CHAIRMAN, MIXED MEDICAL COMMISSION | SIGNATURE | |
| TYPED NAME OF MEMBER | SIGNATURE | |
| TYPED NAME OF US MEDICAL REPRESENTATIVE | SIGNATURE | |

**DA FORM 2670-R, May 82**                    EDITION OF 1 JUL 63 IS OBSOLETE.

## CERTIFICATE FOR DIRECT REPATRIATION FOR EPW
For use of this form, see AR 190-8; the proponent agency is DCSPER.

**FROM:**

**TO:**

The undersigned make up the medical command of a US general hospital. They have examined the EPW named herein and have agreed that he/she is eligible for repatriation according to the medical agreement in the GPW of 1949.

| NAME (Last, first, MI) | | GRADE |
|---|---|---|
| SERVICE NUMBER | INTERNMENT SERIAL NUMBER | DATE OF BIRTH |

### STATUS

____ MEDICAL:          ____ LITTER          ____ AMBULANT

____ SURGICAL:         ____ LOCKED WARD     ____ OPEN          ____ ISOLATION

____ NEUROPSYCHIATRIC

FINAL DIAGNOSIS

| PLACE OF EXAMINATION | | DATE |
|---|---|---|
| TYPED NAME OF COMMANDING OFFICER | SIGNATURE | |
| TYPED NAME OF EXECUTIVE OFFICER | SIGNATURE | |
| TYPED NAME OF CHIEF OF SERVICE | SIGNATURE | |

**DA FORM 2671-R, May 82**          EDITION OF 1 JUL 63 IS OBSOLETE.

## CLASSIFICATION QUESTIONNAIRE FOR OFFICER RETAINED PERSONNEL

For use of this form, see AR 190-8; the proponent agency is DCSPER.

| NAME *(Last, first, MI)* | | GRADE | SERVICE NUMBER |
|---|---|---|---|

| DATE OF BIRTH | NATIONALITY | POWER SERVED | DATE OF CAPTURE |
|---|---|---|---|

| LENGTH OF MILITARY SERVICE | RELIGION | INTERNMENT SERIAL NUMBER |
|---|---|---|

**GENERAL EDUCATION** *(Check highest school attended)*

_____ PRIMARY SCHOOL        _____ HIGH SCHOOL

_____ UNIVERSITY OR COLLEGE

| LANGUAGES | EXCELLENT | GOOD | FAIR |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

### PROFESSIONAL EDUCATION

| NAME OF PROFESSIONAL SCHOOL | LOCATION | YEARS ATTENDED | YEAR GRADUATED | DEGREE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### INTERNSHIP *(Do not include Residences)*

| NAME OF HOSPITAL | LOCATION | SERVICE | YEAR COMPLETED | TIME *(Months)* |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

### RESIDENCES AND FELLOWSHIPS

| HOSPITAL OR INSTITUTION | LOCATION | SERVICE OR SUBJECT | YEAR COMPLETED | TIME *(Months)* |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| VERIFIED BY STATE BOARD OF | LOCATION | DATE | SPECIALTY | |

**DA FORM 2672-R, May 82**        EDITION OF 1 JUL 63 IS OBSOLETE.

## CLASSIFICATION QUESTIONNAIRE FOR ENLISTED RETAINED PERSONNEL
For use of this form, see AR 190-8; the proponent agency is DCSPER

| NAME (Last, first, MI) | | GRADE | SERVICE NUMBER |
|---|---|---|---|
| DATE OF BIRTH | NATIONALITY | POWER SERVED | DATE OF CAPTURE |
| LENGTH OF MILITARY SERVICE | RELIGION | INTERNMENT SERIAL NUMBER | |

| EDUCATION (Check highest school attended) | LANGUAGES | EXCELLENT | GOOD | FAIR |
|---|---|---|---|---|
| ____ PRIMARY SCHOOL      ____ HIGH SCHOOL | | | | |
| ____ UNIVERSITY OR COLLEGE | | | | |

### PRINCIPAL ASSIGNMENTS IN MILITARY SERVICE

| STATION | LOCATION | SPECIFIC MEDICAL DUTIES | TIME (Months) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

### VERIFICATION

| DOCUMENTARY EVIDENCE | DATE VERIFIED | VERIFIED: |
|---|---|---|
| ____ IDENTITY CARD | | ____ EPW PROCESSING CO            ____ CAMP COMMANDER |
| ____ NONE | | ____ AREA COMMANDER |

### MEDICAL ASSIGNMENTS SINCE CAPTURE

| STATION | LOCATION | SPECIFIC ASSIGNMENTS |
|---|---|---|
| | | |
| | | |
| | | |

| PRESENT MEDICAL ASSIGNMENT | MEDICAL CLASSIFICATION |
|---|---|

REMARKS

| DATE | NAME (Typed or Printed) | SIGNATURE |
|---|---|---|

**DA FORM 2673-R, May 82**          EDITION OF 1 JUL 63 IS OBSOLETE.

# ENEMY PRISONER OF WAR/CIVILIAN INTERNEE STRENGTH REPORT
For use of this form, see AR 190-8; the proponent agency is DCSPER.

**REQUIREMENT CONTROL SYMBOL**
*CSGPA-1583*

**PERIOD ENDING 2400 HOURS** *(Year, month, day)*

PAGE NO.

NO. OF PAGES

TO:

FROM: *(Organization and location)*

## SECTION A — STRENGTH

| LINE | CATEGORY | TYPE PERSONNEL | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | ENEMY PRISONERS OF WAR | MILITARY DETAINEES | RETAINED PERSONS | CIVILIAN DETAINEES | INNOCENT CIVILIANS | OTHER | TOTAL |
| | *a* | *b* | *c* | *d* | *e* | *f* | *g* | *h* |
| 1 | PREVIOUS STRENGTH | | | | | | | |
| 2 | INITIAL | | | | | | | |
| 3 | RETURN FROM ESCAPE | | | | | | | |
| 4 | ASSIGNED FROM ANOTHER POWER EPW CAMP | | | | | | | |
| 5 | TRANSFERRED FROM ANOTHER US EPW CAMP | | | | | | | |
| 6 | OTHER | | | | | | | |
| 7 | TRANSFERRED TO ANOTHER POWER EPW CAMP | | | | | | | |
| 8 | ESCAPE | | | | | | | |
| 9 | REPATRIATION | | | | | | | |
| 10 | INTERNATIONAL TRANSFER | | | | | | | |
| 11 | RELEASE IN PLACE | | | | | | | |
| 12 | TRANSFERRED TO ANOTHER US EPW CAMP | | | | | | | |
| 13 | DEATH | | | | | | | |
| 14 | OTHER | | | | | | | |
| 15 | TRANSFER TO HOSPITAL | | | | | | | |
| 16 | IN TRANSIT | | | | | | | |
| 17 | UNPROCESSED | | | | | | | |
| 18 | OTHER | | | | | | | |
| 19 | TOTAL | | | | | | | |

(Lines 3–6 labeled **GAINS**; lines 7–14 labeled **LOSSES**; lines 15–18 labeled **ACCOUNTABLE NOT PRESENT**)

**DA FORM 2674-R, May 82**    EDITION OF 1 JUL 63 IS OBSOLETE.

**SECTION B – GAINS/LOSSES/CHANGES**

| NAME OF DETAINEE | INTERNMENT SERIAL NUMBER | DISPOSITION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**SECTION C – AUTHENTICATION**

| NAME AND TITLE | RANK | SIGNATURE | PAGE NO. | NO. OF PAGES |
|---|---|---|---|---|
| | | | | |

*Reverse of DA FORM 2674-R, May 82*

## CERTIFICATE OF WORK INCURRED INJURY OR DISABILITY
For use of this form, see AR 190-8; the proponent agency is DCSPER.

| FROM: | DATE |
|---|---|

TO:

### SECTION I — TO BE COMPLETED BY INVESTIGATING OFFICER

| NAME *(Last, first, MI)* | | GRADE |
|---|---|---|

| INTERNMENT SERIAL NUMBER | SERVICE NUMBER | NATIONALITY | POWER SERVED |
|---|---|---|---|

| ____ INJURY        ____ DISEASE | LABOR PERFORMED AT TIME OF INJURY OR WORK DISABILITY |
|---|---|

| PLACE WHERE INJURED | TIME | DATE *(Day, Month, Year)* |
|---|---|---|

WITNESSES

CIRCUMSTANCES UNDER WHICH INJURY OR DISABILITY WAS INCURRED

| In my opinion the injury to, or physical disability of, the EPW/Civ Internee named above ____is ____is not attributable to his/her work assignment. | TYPED OR PRINTED NAME, GRADE AND ORIGINATION OF INVESTIGATING OFFICER | |
|---|---|---|
| | SIGNATURE | DATE |

### SECTION II — TO BE COMPLETED BY MEDICAL OFFICER

STATEMENT OF MEDICAL TREATMENT AND HOSPITALIZATION

FINDINGS OF MEDICAL OFFICER

| In my opinion the injury, or physical disability of the EPW/Civ Internee named above in Section I ____ was ____was not attributable to his/her work assignment. | TYPED OR PRINTED NAME AND GRADE OF MEDICAL OFFICER | |
|---|---|---|
| | SIGNATURE | DATE |

DA FORM 2675-R, May 82                          EDITION OF 1 JUL IS OBSOLETE.

| CIVILIAN INTERNEE IDENTITY CARD<br>For use of this form, see AR 190–57; the<br>proponent agency is ODCSPER. | | DATE ISSUED |
|---|---|---|
| (Photograph) | LAST NAME | |
| | FIRST NAME | SEX |
| | SERVICE NUMBER | POWER SERVED |
| PLACE OF BIRTH | | DATE OF BIRTH |
| SIGNATURE OF BEARER | | |

**DA FORM 2677–R, NOV 86**   EDITION OF AUG 63 IS OBSOLETE.

*(FRONT)*

| OTHER MARKS OF IDENTIFICATION | | LEFT INDEX | FINGERPRINTS | WEIGHT | COLOR OF EYES |
|---|---|---|---|---|---|
| | | | | HEIGHT | COLOR OF HAIR |
| | | RIGHT INDEX | | BLOOD TYPE | RELIGION |
| | | | | NOTICE | |
| | | | | | |

*REVERSE OF DA FORM 2677–R, NOV 86*

*(REVERSE)*

# CIVILIAN INTERNEE NOTIFICATION OF ADDRESS
For use of this form, see AR 190-57; the proponent agency is ODCSPER.

| DO NOT WRITE HERE | TO: |
| | STREET |
| | CITY |
| | COUNTRY |
| | PROVINCE OR DEPARTMENT |

**DA FORM 2678-R, NOV 86**      EDITION OF AUG 63 IS OBSOLETE.

*(Front)*

| LANGUAGE | POWER SERVED |
|---|---|

PRINT CLEARLY THE INFORMATION CALLED FOR DO NOT ADD ANY REMARKS

| NAME *(Last, First, MI)* | GRADE |
|---|---|

| INTERNMENT SERIAL NUMBER | DATE OF CAPTURE OR TRANSFER |
|---|---|

| DATE OF BIRTH | PLACE OF BIRTH |
|---|---|

## PHYSICAL CONDITION *(Check applicable box)*

| GOOD HEALTH | RECOVERED | SICK | SERIOUSLY WOUNDED |
|---|---|---|---|
| NOT WOUNDED | CONVALESCENT | | SLIGHTLY WOUNDED |

FORMER ADDRESS

PRESENT ADDRESS *(Name of Camp or Hospital and Location)*

| DATE | SIGNATURE OF PRISONER |
|---|---|

*REVERSE OF DA FORM 2678-R, NOV 86*

*(Fold on this line)*

SENDER:

Name *(Last, first, MI)*

Internment Serial Number

Date and Place of Birth

Name of Camp

    Country where posted

---

## CIVILIAN INTERNEE LETTER

For use of this form, see AR 190–57; the proponent agency is ODCSPER

Language _____

To _____

Street _____

City _____

Country _____

Province or Department _____

*(Fold on this line)*

**DO NOT WRITE HERE**

*(Fold on this line)*

DO NOT WRITE BEYOND HEAVY LINES

# CIVILIAN INTERNEE POST CARD

For use of this form, see AR 190-57; the proponent agency is ODCSPER

| SENDER | TO: |
|---|---|
| NAME *(Last, First, MI)* | |
| INTERNMENT SERIAL NUMBER | STREET |
| DATE AND PLACE OF BIRTH | CITY |
| NAME OF CAMP | COUNTRY |
| | PROVINCE OR DEPARTMENT |
| COUNTRY WHERE POSTED | |

DA FORM 2680-R, NOV 86          EDITION OF AUG 63 IS OBSOLETE

*(Front)*

| LANGUAGE | POWER SERVED | DATE |
|---|---|---|

WRITE BETWEEN LINES AND AS LEGIBLY AS POSSIBLE

*REVERSE OF DA FORM 2680-R, NOV 86*

*(Reverse)*

## DETAINEE PERSONNEL RECORD
For use of this form, see AR 190-8; the proponent agency is ODCSPER.

**PART I — TO BE COMPLETED AT TIME OF PROCESSING**

| CARD I | 1. INTERNMENT SERIAL NO. (1-13) | 2. NAME (Last, first, middle) (14-34) | | 3. RANK (35-37) |
|---|---|---|---|---|

| 4. ENEMY SVC NO. (38-46) | 5. TYPE (47) | 6. DATE OF CAPTURE (48-53) | 7. DATE OF BIRTH (54-59) |
|---|---|---|---|

| 8. NATIONALITY (60-61) | 9. EDUCATION (62) | 10. RELIGION (63-64) | 11. MARSTA (65) | 12. PW CAMP UIC (66-71) | 13. PW PROCESS DATE (72-77) |
|---|---|---|---|---|---|

| CARD II (Keypuncher will pick up Item 1 above) | 14. SEX (14) | 15. LANGUAGE I (15-16) | 16. LANGUAGE II (17-18) |
|---|---|---|---|

| 17. PHYSICAL CONDITION (19) | 18. PW CAMP LOCATION (20-22) | 19. ENEMY UNIT (23-34) |
|---|---|---|

| 20. ARM OF SVC (35) | 21. MOSC (36-39) | 22. CIVILIAN OCCUPATION (40-45) | 23. UIC-CAPTURE UNIT (46-51) |
|---|---|---|---|

| 24. CORPS AREA OF CAPTURE (52) | 25. PLACE OF CAPTURE | 26. POWER SERVED | 27. PLACE OF BIRTH |
|---|---|---|---|

| 28. ADDRESS TO WHICH MAIL FOR PW MAY BE SENT | 29. FATHER/STEPFATHER |
|---|---|
| | 30. MOTHER'S MAIDEN NAME |

| 31. PERMANENT HOME ADDRESS OF PW | 32. NAME, ADDRESS, AND RELATIONSHIP OF PERSON TO BE INFORMED OF CAPTURE |
|---|---|

| 33. OTHER PARTICULARS FROM ID CARD | 34. DISTINGUISHING MARKS |
|---|---|

35. IMPOUNDED PERSONAL EFFECTS AND MONEY (IAW AR 37-36)

THE ABOVE LIST OF IMPOUNDED ITEMS IS CORRECT

_____
(Signature of Detainee)

| 36. REMARKS | 37. PHOTO |
|---|---|
| | PHOTO (Front View)    PHOTO (Right Profile) |

| 38. PREPARED BY (Individual and unit) | 39. SIGNATURE |
|---|---|

| 40. DATE PREPARED | 41. PLACE |
|---|---|

DA FORM 4237-R, Aug 85          EDITION OF MAY 82 IS OBSOLETE

**PART II — TO BE MAINTAINED BY UNIT HAVING CUSTODY**

| 42a. LAST NAME | b. FIRST NAMES |
|---|---|

43. INTERNMENT SERIAL NUMBER

| 44. | MEDICAL RECORD | |
|---|---|---|

a. IMMUNIZATION *(Vaccinations and Innoculations with Dates)*

| b. MAJOR ILLNESSES AND PHYSICAL DEFECTS *(With Dates)* | c. BLOOD GROUP |
|---|---|

45. INTERNMENT EMPLOYMENT QUALIFICATIONS

46. SERIOUS OFFENSES, PUNISHMENTS, AND ESCAPES *(With Dates)*

| 47. | TRANSFERS | |
|---|---|---|
| FROM *(Location)* | TO *(Location)* | DATE |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

48. REMARKS

| 49. | FINANCIAL STATUS AT TIME OF FIRST INTERNATIONAL TRANSFER | |
|---|---|---|
| a. CERTIFICATE OF CREDIT BALANCE ISSUED TO EPW *(Amount in words)* | b. AMT IN FIGURES |
| c. LOCATION | d. DATE |

| 50. | FINANCIAL STATUS AT TIME OF SECOND INTERNATIONAL TRANSFER | |
|---|---|---|
| a. CERTIFICATE OF CREDIT BALANCE ISSUED TO EPW *(Amount in words)* | b. AMT IN FIGURES |
| c. LOCATION | d. DATE |

| 51. | REPATRIATION | |
|---|---|---|
| a. REASON | |
| b. MODE | c. DATE |

| 52. | FINANCIAL STATUS AT TIME OF REPATRIATION | |
|---|---|---|
| a. CERTIFICATE OF CREDIT BALANCE ISSUED TO EPW *(Amount in words)* | b. AMT IN FIGURES |
| c. LOCATION | d. DATE |

**UNCLASSIFIED**

# USAPA

ELECTRONIC  PUBLISHING  SYSTEM
TEXT  FORMATTER  ...  Version  2.45

PIN:           050730–000
DATE:          05-11-98
TIME:          10:41:04
PAGES  SET:    84

DATA  FILE:    ar190-8.fil
DOCUMENT:      AR  190–8
DOC  STATUS:   REVISION