# ARTICLE 15-6 INVESTIGATION OF THE 800th MILITARY POLICE BRIGADE

**SECRET/NO FOREIGN DISSEMINATION**

# TABLE OF CONTENTS

References ……………………………………………………………..  3

Background …………………………………………………………..  6

Assessment of DoD Counter-Terrorism
Interrogation and Detention Operations
In Iraq (MG Miller's Assessment)………………………………………..  8

IO Comments on MG Miller's Assessment..…………………………  8

Report on Detention and Corrections
In Iraq (MG Ryder's Report)……………………………….…………………  9

IO Comments on MG Ryder's Report…...………………….………………..  12

Preliminary Investigative Actions …………………………..……………..  12

## Findings and Recommendations

Part One (Detainee Abuse). ……………………………………………….  15

    Findings …………………………………………………………  15

    Recommendations ……………………………………………  20

Part Two (Escapes and Accountability) ………………………………...  22

    Findings …………………………………………………………  22

    Recommendations. ……………………………………………..  31

Part Three (Command Climate, Etc…). …………………………………...  34

    Findings …………………………………………………………  36

    Recommendations ……………………………………………  44

Other Findings/Observations …………………………………………...  49

Conclusion ………………………………………………………………  50

Annexes ……………………………………………………………………  51

## References

1. Geneva Convention Relative to the Treatment of Prisoners of War, 12 August 1949

2. Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in the Armed Forces in the Field, 12 August 1949

3. Geneva Convention for the Amelioration of the Condition of the Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, 12 August 1949

4. Geneva Convention Protocol Relative to the Status of Refugees, 1967

5. Geneva Convention Relative to the Status of Refugees, 1951

6. Geneva Convention for the Protection of War Victims, 12 August 1949

7. Geneva Convention Relative to the Protection of Civilian Persons in Time of War, 12 August 1949

8. DOD Directive 5100.69, "DOD Program for Prisoners of War and other Detainees," 27 December 1972

9. DOD Directive 5100.77 "DOD Law of War Program," 10 July 1979

10. STANAG No. 2044, Procedures for Dealing with Prisoners of War (PW) (Edition 5), 28 June 1994

11. STANAG No. 2033, Interrogation of Prisoners of War (PW) (Edition 6), 6 December 1994

12. AR 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees, 1 October 1997

13. AR 190-47, The Army Corrections System, 15 August 1996

14. AR 190-14, Carrying of Firearms and Use of Force for Law Enforcement and Security Duties, 12 March 1993

15. AR 195-5, Evidence Procedures, 28 August 1992

16. AR 190-11, Physical Security of Arms, Ammunition and Explosives, 12 February 1998

17. AR 190-12, Military Police Working Dogs, 30 September 1993

18. AR 190-13, The Army Physical Security Program, 30 September 1993

19. AR 380-67, Personnel Security Program, 9 September 1988

20. AR 380-5, Department of the Army Information Security, 31 September 2000

21. AR 670-1, Wear and Appearance of Army Uniforms and Insignia, 5 September 2003

22. AR 190-40, Serious Incident Report, 30 November 1993

23. AR 15-6, Procedures for Investigating Officers and Boards of Officers, 11 May 1988

24. AR 27-10, Military Justice, 6 September 2002

25. AR 635-200, Enlisted Personnel, 1 November 2000

26. AR 600-8-24, Officer Transfers and Discharges, 29 June 2002

27. AR 500-5, Army Mobilization, 6 July 1996

28. AR 600-20, Army Command Policy, 13 May 2002

29. AR 623-105, Officer Evaluation Reports, 1 April 1998

30. AR 175-9, Contractors Accompanying the Force, 29 October 1999

31. FM 3-19.40, Military Police Internment/Resettlement Operations, 1 August 2001

32. FM 3-19.1, Military Police Operations, 22 March 2001

33. FM 3-19.4, Military Police Leaders' Handbook, 4 March 2002

34. FM 3-05.30, Psychological Operations, 19 June 2000

35. FM 33-1-1, Psychological Operations Techniques and Procedures, 5 May 1994

36. FM 34-52, Intelligence Interrogation, 28 September 1992

37. FM 19-15, Civil Disturbances, 25 November 1985

38. FM 3-0, Operations, 14 June 2001

39. FM 101-5, Staff Organizations and Functions, 23 May 1984

40. FM 3-19.30, Physical Security, 8 January 2001

41. FM 3-21.5, Drill and Ceremonies, 7 July 2003

42. ARTEP 19-546-30 MTP, Mission Training Plan for Military Police Battalion (IR)

43. ARTEP 19-667-30 MTP, Mission Training Plan for Military Police Guard Company

44. ARTEP 19-647-30 MTP, Mission Training Plan for Military Police Escort Guard Company

45. STP 19-95B1-SM, Soldier's Manual, MOS 95B, Military Police, Skill Level 1, 6 August 2002

46. STP 19-95C14-SM-TG, Soldier's Manual and Trainer's Guide for MOS 95C Internment/Resettlement Specialist, Skill Levels 1/2/3/4, 26 March 1999

47. STP 19-95C1-SM MOS 95C, Corrections Specialist, Skill Level 1, Soldier's Manual, 30 September 2003

48. STP 19-95C24-SM-TG MOS 95C, Corrections Specialist, Skill Levels 2/3/4, Soldier's Manual and Trainer's Guide, 30 September 2003

49. Assessment of DOD Counter-Terrorism Interrogation and Detention Operations in Iraq, (MG Geoffrey D. Miller, Commander JTF-GTMO, Guantanamo Bay, Cuba), 9 September 2003

50. Assessment of Detention and Corrections Operations in Iraq, (MG Donald J. Ryder, Provost Marshal General), 6 November 2003

51. CJTF-7 FRAGO #1108, Subject: *includes*- para 3.C.8 & 3.C.8.A.1, Assignment of 205 MI BDE CDR Responsibilities for the Baghdad Central Confinement Facility (BCCF), 19 November 2003

52. CJTF-7 FRAGO #749, Subject: Intelligence and Evidence-Led Detention Operations Relating to Detainees, 24 August 2003

53. 800th MP BDE FRAGO # 89, Subject: Rules of Engagement, 26 December 2003

54. CG CJTF-7 Memo: CJTF-7 Interrogation and Counter-Resistance Policy, 12 October 2003

55. CG CJTF-7 Memo: Dignity and Respect While Conducting Operations, 13 December 2003

56. Uniform Code of Military Justice and Manual for Courts Martial, 2002 Edition

# ARTICLE 15-6 INVESTIGATION OF THE
# 800th MILITARY POLICE BRIGADE

## BACKGROUND

1. (U) On 19 January 2004, Lieutenant General (LTG) Ricardo S. Sanchez, Commander, Combined Joint Task Force Seven (CJTF-7) requested that the Commander, US Central Command, appoint an Investigating Officer (IO) in the grade of Major General (MG) or above to investigate the conduct of operations within the 800th Military Police (MP) Brigade. LTG Sanchez requested an investigation of detention and internment operations by the Brigade from 1 November 2003 to present. LTG Sanchez cited recent reports of detainee abuse, escapes from confinement facilities, and accountability lapses, which indicated systemic problems within the brigade and suggested a lack of clear standards, proficiency, and leadership. LTG Sanchez requested a comprehensive and all-encompassing inquiry to make findings and recommendations concerning the fitness and performance of the 800th MP Brigade. **(ANNEX 2)**

2. (U) On 24 January 2003, the Chief of Staff of US Central Command (CENTCOM), MG R. Steven Whitcomb, on behalf of the CENTCOM Commander, directed that the Commander, Coalition Forces Land Component Command (CFLCC), LTG David D. McKiernan, conduct an investigation into the 800th MP Brigade's detention and internment operations from 1 November 2003 to present. CENTCOM directed that the investigation should inquire into all facts and circumstances surrounding recent reports of suspected detainee abuse in Iraq. It also directed that the investigation inquire into detainee escapes and accountability lapses as reported by CJTF-7, and to gain a more comprehensive and all-encompassing inquiry into the fitness and performance of the 800th MP Brigade. **(ANNEX 3)**

3. (U) On 31 January 2004, the Commander, CFLCC, appointed MG Antonio M. Taguba, Deputy Commanding General Support, CFLCC, to conduct this investigation. MG Taguba was directed to conduct an informal investigation under AR 15-6 into the 800th MP Brigade's detention and internment operations. Specifically, MG Taguba was tasked to:

   a. (U) Inquire into all the facts and circumstances surrounding recent allegations of detainee abuse, specifically allegations of maltreatment at the Abu Ghraib Prison (Baghdad Central Confinement Facility (BCCF));

   b. (U) Inquire into detainee escapes and accountability lapses as reported by CJTF-7, specifically allegations concerning these events at the Abu Ghraib Prison;

    c.  (U) Investigate the training, standards, employment, command policies, internal procedures, and command climate in the 800th MP Brigade, as appropriate;

    d.  (U) Make specific findings of fact concerning all aspects of the investigation, and make any recommendations for corrective action, as appropriate.  **(ANNEX 4)**

4.  (U) LTG Sanchez's request to investigate the 800th MP Brigade followed the initiation of a criminal investigation by the US Army Criminal Investigation Command (USACIDC) into specific allegations of detainee abuse committed by members of the 372nd MP Company, 320th MP Battalion in Iraq.  These units are part of the 800th MP Brigade.  The Brigade is an Iraq Theater asset, TACON to CJTF-7, but OPCON to CFLCC at the time this investigation was initiated.  In addition, CJTF-7 had several reports of detainee escapes from US/Coalition Confinement Facilities in Iraq over the past several months.  These include Camp Bucca, Camp Ashraf, Abu Ghraib, and the High Value Detainee (HVD) Complex/Camp Cropper.  The 800th MP Brigade operated these facilities.  In addition, four Soldiers from the 320th MP Battalion had been formally charged under the Uniform Code of Military Justice (UCMJ) with detainee abuse in May 2003 at the Theater Internment Facility (TIF) at Camp Bucca, Iraq. **(ANNEXES 5-18, 34 and 35)**

5.  (U) I began assembling my investigation team prior to the actual appointment by the CFLCC Commander.  I assembled subject matter experts from the CFLCC Provost Marshal (PM) and the CFLCC Staff Judge Advocate (SJA).  I selected COL Kinard J. La Fate, CFLCC Provost Marshal to be my Deputy for this investigation.  I also contacted the Provost Marshal General of the Army, MG Donald J. Ryder, to enlist the support of MP subject matter experts in the areas of detention and internment operations.  **(ANNEXES 4 and 19)**

6.  (U) The Investigating Team also reviewed the Assessment of DoD Counter-Terrorism Interrogation and Detention Operations in Iraq conducted by MG Geoffrey D. Miller, Commander, Joint Task Force Guantanamo (JTF-GTMO).  From 31 August to 9 September 2003, MG Miller led a team of personnel experienced in strategic interrogation to HQ, CJTF-7 and the Iraqi Survey Group (ISG) to review current Iraqi Theater ability to rapidly exploit internees for actionable intelligence.  MG Miller's team focused on three areas:  intelligence integration, synchronization, and fusion; interrogation operations; and detention operations.  MG Miller's team used JTF-GTMO procedures and interrogation authorities as baselines. **(ANNEX 20)**

7.  (U) The Investigating Team began its inquiry with an in-depth analysis of the Report on Detention and Corrections in Iraq, dated 5 November 2003, conducted by MG Ryder and a team of military police, legal, medical, and automation experts.  The CJTF-7 Commander, LTG Sanchez, had previously requested a team of subject matter experts to assess, and make specific recommendations concerning detention and corrections operations.  From 13 October to 6 November 2003, MG Ryder personally led this assessment/assistance team in Iraq.  **(ANNEX 19)**

**ASSESSMENT OF DoD COUNTER-TERRORISM INTERROGATION AND
DETENTION OPERATIONS IN IRAQ (MG MILLER'S ASSESSMENT)**

1. (S/NF) The principal focus of MG Miller's team was on the strategic interrogation of detainees/internees in Iraq.  Among its conclusions in its Executive Summary were that CJTF-7 did not have authorities and procedures in place to affect a unified strategy to detain, interrogate, and report information from detainees/internees in Iraq. The Executive Summary also stated that detention operations must act as an enabler for interrogation.  **(ANNEX 20)**

2. (S/NF) With respect to interrogation, MG Miller's Team recommended that CJTF-7 dedicate and train a detention guard force subordinate to the Joint Interrogation Debriefing Center (JIDC) Commander that "sets the conditions for the successful interrogation and exploitation of internees/detainees."  Regarding Detention Operations, MG Miller's team stated that the function of Detention Operations is to provide a safe, secure, and humane environment that supports the expeditious collection of intelligence.  However, it also stated "it is essential that the guard force be actively engaged in setting the conditions for successful exploitation of the internees."  **(ANNEX 20)**

3. (S/NF) MG Miller's team also concluded that Joint Strategic Interrogation Operations (within CJTF-7) are hampered by lack of active control of the internees within the detention environment.  The Miller Team also stated that establishment of the Theater Joint Interrogation and Detention Center (JIDC) at Abu Ghraib (BCCF) will consolidate both detention and strategic interrogation operations and result in synergy between MP and MI resources and an integrated, synchronized, and focused strategic interrogation effort.  **(ANNEX 20)**

4. (S/NF) MG Miller's team also observed that the application of emerging strategic interrogation strategies and techniques contain new approaches and operational art. The Miller Team also concluded that a legal review and recommendations on internee interrogation operations by a dedicated Command Judge Advocate is required to maximize interrogation effectiveness. **(ANNEX 20)**

**IO COMMENTS ON MG MILLER'S ASSESSMENT**

1. (S/NF) MG Miller's team recognized that they were using JTF-GTMO operational procedures and interrogation authorities as baselines for its observations and recommendations.  There is a strong argument that the intelligence value of detainees held at JTF-Guantanamo (GTMO) is different than that of the detainees/internees held at Abu Ghraib (BCCF) and other detention facilities in Iraq. Currently, there are a large number of Iraqi criminals held at Abu Ghraib (BCCF).  These are not believed to be international terrorists or members of Al Qaida, Anser Al Islam, Taliban, and other international terrorist organizations.  **(ANNEX 20)**

2. (S/NF) The recommendations of MG Miller's team that the "guard force" be actively engaged in setting the conditions for successful exploitation of the internees would appear to be in conflict with the recommendations of MG Ryder's Team and AR 190-8 that military police "do not participate in military intelligence supervised interrogation sessions." The Ryder Report concluded that the OEF template whereby military police actively set the favorable conditions for subsequent interviews runs counter to the smooth operation of a detention facility. **(ANNEX 20)**

## REPORT ON DETENTION AND CORRECTIONS
## IN IRAQ (MG RYDER'S REPORT)

1. (U) MG Ryder and his assessment team conducted a comprehensive review of the entire detainee and corrections system in Iraq and provided recommendations addressing each of the following areas as requested by the Commander CJTF-7:

   a. (U) Detainee and corrections system management
   b. (U) Detainee management, including detainee movement, segregation, and accountability
   c. (U) Means of command and control of the detention and corrections system
   d. (U) Integration of military detention and corrections with the Coalition Provisional Authority (CPA) and adequacy of plans for transition to an Iraqi-run corrections system
   e. (U) Detainee medical care and health management
   f. (U) Detention facilities that meet required health, hygiene, and sanitation standards
   g. (U) Court integration and docket management for criminal detainees
   h. (U) Detainee legal processing
   i. (U) Detainee databases and records, including integration with law enforcement and court databases **(ANNEX 19)**

2. (U) Many of the findings and recommendations of MG Ryder's team are beyond the scope of this investigation. However, several important findings are clearly relevant to this inquiry and are summarized below (emphasis is added in certain areas):

   A. (U) **Detainee Management (including movement, segregation, and accountability)**

   1. (U) There is a wide variance in standards and approaches at the various detention facilities. Several Division/Brigade collection points and US monitored Iraqi prisons had flawed or insufficiently detailed use of force and other standing operating procedures or policies (e.g. weapons in the facility, improper restraint techniques, detainee management, etc.) Though, there were no military police units purposely applying inappropriate confinement practices. **(ANNEX 19)**

2. (U) Currently, due to lack of adequate Iraqi facilities, Iraqi criminals (generally Iraqi-on-Iraqi crimes) are detained with security internees (generally Iraqi-on-Coalition offenses) and EPWs in the same facilities, though segregated in different cells/compounds. **(ANNEX 19)**

3. (U) The management of multiple disparate groups of detained people in a single location by members of the same unit invites confusion about handling, processing, and treatment, and typically facilitates the transfer of information between different categories of detainees. **(ANNEX 19)**

4. (U) The 800th MP (I/R) units did not receive Internment/Resettlement (I/R) and corrections specific training during their mobilization period. Corrections training is only on the METL of two MP (I/R) Confinement Battalions throughout the Army, one currently serving in Afghanistan, and elements of the other are at Camp Arifjan, Kuwait. MP units supporting JTF-GTMO received ten days of training in detention facility operations, to include two days of unarmed self-defense, training in interpersonal communication skills, forced cell moves, and correctional officer safety. **(ANNEX 19)**

B. (U) **Means of Command and Control of the Detention and Corrections System**

1. (U) The 800th MP Brigade was originally task organized with eight MP(I/R) Battalions consisting of both MP Guard and Combat Support companies. Due to force rotation plans, the 800th redeployed two Battalion HHCs in December 2003, the 115th MP Battalion and the 324th MP Battalion. In December 2003, the 400th MP Battalion was relieved of its mission and redeployed in January 2004. The 724th MP Battalion redeployed on 11 February 2004 and the remainder is scheduled to redeploy in March and April 2004. They are the 310th MP Battalion, 320th MP Battalion, 530th MP Battalion, and 744th MP Battalion. The units that remain are generally understrength, as Reserve Component units do not have an individual personnel replacement system to mitigate medical losses or the departure of individual Soldiers that have reached 24 months of Federal active duty in a five-year period. **(ANNEX 19)**

2. (U) The 800th MP Brigade (I/R) is currently a CFLCC asset, TACON to CJTF-7 to conduct Internment/Resettlement (I/R) operations in Iraq. All detention operations are conducted in the CJTF-7 AO; Camps Ganci, Vigilant, Bucca, TSP Whitford, and a separate High Value Detention (HVD) site. **(ANNEX 19)**

3. (U) The 800th MP Brigade has experienced challenges adapting its task organizational structure, training, and equipment resources from a unit designed to conduct standard EPW operations in the COMMZ (Kuwait). Further, the doctrinally trained MP Soldier-to-detainee population ratio and facility layout templates are predicated on a compliant, self-disciplining EPW population, and not criminals or high-risk security internees. **(ANNEX 19)**

4. (U) EPWs and Civilian Internees should receive the full protections of the Geneva Conventions, unless the denial of these protections is due to specifically articulated military necessity (e.g., no visitation to preclude the direction of insurgency operations). **(ANNEXES 19 and 24)**

5. (U) AR 190-8, *Enemy Prisoners of War, Retained Personnel, Civilian Internees, and other Detainees*, FM 3-19.40, *Military Police Internment and Resettlement Operations,* and FM 34-52, *Intelligence Interrogations*, require military police to provide an area for intelligence collection efforts within EPW facilities. Military Police, though adept at passive collection of intelligence within a facility, do not participate in Military Intelligence supervised interrogation sessions. Recent intelligence collection in support of Operation Enduring Freedom posited a template whereby military police actively set favorable conditions for subsequent interviews. Such actions generally run counter to the smooth operation of a detention facility, attempting to maintain its population in a compliant and docile state. **The 800th MP Brigade has not been directed to change its facility procedures to set the conditions for MI interrogations, nor participate in those interrogations.** **(ANNEXES 19 and 21-23)**

6. MG Ryder's Report also made the following, inter alia, near-term and mid-term recommendations regarding the command and control of detainees:

   a. (U) Align the release process for security internees with DoD Policy. The process of screening security internees should include intelligence findings, interrogation results, and current threat assessment.

   b. (U) Determine the scope of intelligence collection that will occur at Camp Vigilant. Refurbish the Northeast Compound to separate the screening operation from the Iraqi run Baghdad Central Correctional Facility. **Establish procedures that define the role of military police Soldiers securing the compound, clearly separating the actions of the guards from those of the military intelligence personnel.**

   c**.** (U) **Consolidate all Security Internee Operations, except the MEK security mission, under a single Military Police Brigade Headquarters for OIF 2.**

   d. (U) **Insist that all units identified to rotate into the Iraqi Theater of Operations (ITO) to conduct internment and confinement operations in support of OIF 2 be organic to CJTF-7.** **(ANNEX 19)**

## IO COMMENTS REGARDING MG RYDER'S REPORT

1. (U) The objective of MG Ryder's Team was to observe detention and prison operations, identify potential systemic and human rights issues, and provide near-term, mid-term, and long-term recommendations to improve CJTF-7 operations and transition of the Iraqi prison system from US military control/oversight to the Coalition Provisional Authority and eventually to the Iraqi Government. The Findings and Recommendations of MG Ryder's Team are thorough and precise and should be implemented immediately. **(ANNEX 19)**

2. (U) **Unfortunately, many of the systemic problems that surfaced during MG Ryder's Team's assessment are the very same issues that are the subject of this investigation. In fact, many of the abuses suffered by detainees occurred during, or near to, the time of that assessment.** As will be pointed out in detail in subsequent portions of this report, I disagree with the conclusion of MG Ryder's Team in one critical aspect, that being its conclusion that the 800th MP Brigade had not been asked to change its facility procedures to set the conditions for MI interviews. **While clearly the 800th MP Brigade and its commanders were not tasked to set conditions for detainees for subsequent MI interrogations, it is obvious from a review of comprehensive CID interviews of suspects and witnesses that this was done at lower levels. (ANNEX 19)**

3. (U) I concur fully with MG Ryder's conclusion regarding the effect of AR 190-8. Military Police, though adept at passive collection of intelligence within a facility, should not participate in Military Intelligence supervised interrogation sessions. Moreover, Military Police should not be involved with setting **"favorable conditions"** for subsequent interviews. These actions, as will be outlined in this investigation, clearly run counter to the smooth operation of a detention facility. **(ANNEX 19)**

## <u>PRELIMINARY INVESTIGATIVE ACTIONS</u>

1. (U) Following our review of MG Ryder's Report and MG Miller's Report, my investigation team immediately began an in-depth review of all available documents regarding the 800th MP Brigade. We reviewed in detail the voluminous CID investigation regarding alleged detainee abuses at detention facilities in Iraq, particularly the Abu Ghraib (BCCF) Detention Facility. We analyzed approximately fifty witness statements from military police and military intelligence personnel, potential suspects, and detainees. We reviewed numerous photos and videos of actual detainee abuse taken by detention facility personnel, which are now in the custody and control of the US Army Criminal Investigation Command and the CJTF-7 prosecution team. The photos and videos are not contained in this investigation. We obtained copies of the 800th MP Brigade roster, rating chain, and assorted internal

investigations and disciplinary actions involving that command for the past several months.  **(All ANNEXES Reviewed by Investigation Team)**

2. (U) In addition to military police and legal officers from the CFLCC PMO and SJA Offices we also obtained the services of two individuals who are experts in military police detention practices and training.  These were LTC Timothy Weathersbee, Commander, 705th MP Battalion, United States Disciplinary Barracks, Fort Leavenworth, and SFC Edward Baldwin, Senior Corrections Advisor, US Army Military Police School, Fort Leonard Wood.  I also requested and received the services of Col (Dr) Henry Nelson, a trained US Air Force psychiatrist assigned to assist my investigation team. **(ANNEX 4)**

3. (U) In addition to MG Ryder's and MG Miller's Reports, the team reviewed numerous reference materials including the 12 October 2003 CJTF-7 Interrogation and Counter-Resistance Policy, the AR 15-6 Investigation on Riot and Shootings at Abu Ghraib on 24 November 2003, the 205th MI Brigade's Interrogation Rules of Engagement (IROE), facility staff logs/journals and numerous records of AR 15-6 investigations and Serious Incident Reports (SIRs) on detainee escapes/shootings and disciplinary matters from the 800th MP Brigade.  **(ANNEXES 5-20, 37, 93, and 94)**

4. (U) On 2 February 2004, I took my team to Baghdad for a one-day inspection of the Abu Ghraib Prison (BCCF) and the High Value Detainee (HVD) Complex in order to become familiar with those facilities.  We also met with COL Jerry Mocello, Commander, 3rd MP Criminal Investigation Group (CID), COL Dave Quantock, Commander, 16th MP Brigade, COL Dave Phillips, Commander, 89th MP Brigade, and COL Ed Sannwaldt, CJTF-7 Provost Marshal.  On 7 February 2004, the team visited the Camp Bucca Detention Facility to familiarize itself with the facility and operating structure.  In addition, on 6 and 7 February 2004, at Camp Doha, Kuwait, we conducted extensive training sessions on approved detention practices.  We continued our preparation by reviewing the ongoing CID investigation and were briefed by the Special Agent in Charge, CW2 Paul Arthur.  We refreshed ourselves on the applicable reference materials within each team member's area of expertise, and practiced investigative techniques.  I met with the team on numerous occasions to finalize appropriate witness lists, review existing witness statements, arrange logistics, and collect potential evidence.  We also coordinated with CJTF-7 to arrange witness attendance, force protection measures, and general logistics for the team's move to Baghdad on 8 February 2004.  **(ANNEXES 4 and 25)**

5. (U) At the same time, due to the Transfer of Authority on 1 February 2004 between III Corps and V Corps, and the upcoming demobilization of the 800th MP Brigade Command, I directed that several critical witnesses who were preparing to leave the theater remain at Camp Arifjan, Kuwait until they could be interviewed **(ANNEX 29).**  My team deployed to Baghdad on 8 February 2004 and conducted a series of interviews with a variety of witnesses **(ANNEX 30).**  We returned to Camp Doha, Kuwait on 13 February 2004.  On 14 and 15 February we interviewed a number of witnesses from the 800th MP Brigade.  On 17 February we returned to Camp Bucca,

Iraq to complete interviews of witnesses at that location.  From 18 February thru 28 February we collected documents, compiled references, did follow-up interviews, and completed a detailed analysis of the volumes of materials accumulated throughout our investigation.  On 29 February we finalized our executive summary and out-briefing slides.  On 9 March we submitted the AR 15-6 written report with findings and recommendations to the CFLCC Deputy SJA, LTC Mark Johnson, for a legal sufficiency review.  The out-brief to the appointing authority, LTG McKiernan, took place on 3 March 2004.  **(ANNEXES 26 and 45-91)**

# FINDINGS AND RECOMMENDATIONS

## (PART ONE)

## (U) The investigation should inquire into all of the facts and circumstances surrounding recent allegations of detainee abuse, specifically, allegations of maltreatment at the Abu Ghraib Prison (Baghdad Central Confinement Facility).

1. (U) The US Army Criminal Investigation Command (CID), led by COL Jerry Mocello, and a team of highly trained professional agents have done a superb job of investigating several complex and extremely disturbing incidents of detainee abuse at the Abu Ghraib Prison.  They conducted over 50 interviews of witnesses, potential criminal suspects, and detainees.  They also uncovered numerous photos and videos portraying in graphic detail detainee abuse by Military Police personnel on numerous occasions from October to December 2003.  Several potential suspects rendered full and complete confessions regarding their personal involvement and the involvement of fellow Soldiers in this abuse.   Several potential suspects invoked their rights under Article 31 of the Uniform Code of Military Justice (UCMJ) and the 5th Amendment of the U.S. Constitution.  **(ANNEX 25)**

2. (U) In addition to a comprehensive and exhaustive review of all of these statements and documentary evidence, we also interviewed numerous officers, NCOs, and junior enlisted Soldiers in the 800th MP Brigade, as well as members of the 205th Military Intelligence Brigade working at the prison.  We did not believe it was necessary to re-interview all the numerous witnesses who had previously provided comprehensive statements to CID, and I have adopted those statements for the purposes of this investigation.  **(ANNEXES 26, 34, 35, and 45-91)**

### REGARDING PART ONE OF THE INVESTIGATION, I MAKE THE FOLLOWING SPECIFIC FINDINGS OF FACT:

1. (U) That Forward Operating Base (FOB) Abu Ghraib (BCCF) provides security of both criminal and security detainees at the Baghdad Central Correctional Facility, facilitates the conducting of interrogations for CJTF-7, supports other CPA operations at the prison, and enhances the force protection/quality of life of Soldiers assigned in order to ensure the success of ongoing operations to secure a free Iraq.  **(ANNEX 31)**

2. (U) That the Commander, 205th Military Intelligence Brigade, was designated by CJTF-7 as the Commander of FOB Abu Ghraib (BCCF) effective 19 November 2003.  That the 205th MI Brigade conducts operational and strategic interrogations for CJTF-7.   That from 19 November 2003 until Transfer of Authority (TOA) on 6

February 2004, COL Thomas M. Pappas was the Commander of the 205th MI Brigade and the Commander of FOB Abu Ghraib (BCCF).  **(ANNEX 31)**

3.  (U) That the 320th Military Police Battalion of the 800th MP Brigade is responsible for the Guard Force at Camp Ganci, Camp Vigilant, & Cellblock 1 of FOB Abu Ghraib (BCCF).  That from February 2003 to until he was suspended from his duties on 17 January 2004, LTC Jerry Phillabaum served as the Battalion Commander of the 320th MP Battalion.  That from December 2002 until he was suspended from his duties, on 17 January 2004, CPT Donald Reese served as the Company Commander of the 372nd MP Company, which was in charge of guarding detainees at FOB Abu Ghraib.  I further find that both the 320th MP Battalion and the 372nd MP Company were located within the confines of FOB Abu Ghraib.   **(ANNEXES 32 and 45)**

4.  (U) That from July of 2003 to the present, BG Janis L. Karpinski was the Commander of the 800th MP Brigade.  **(ANNEX 45)**

5.  (S) That between October and December 2003, at the Abu Ghraib Confinement Facility (BCCF), numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees.  This systemic and illegal abuse of detainees was intentionally perpetrated by several members of the military police guard force (372nd Military Police Company, 320th Military Police Battalion, 800th MP Brigade), in Tier (section) 1-A of the Abu Ghraib Prison (BCCF).  The allegations of abuse were substantiated by detailed witness statements **(ANNEX 26)** and the discovery of extremely graphic photographic evidence.  Due to the extremely sensitive nature of these photographs and videos, the ongoing CID investigation, and the potential for the criminal prosecution of several suspects, the photographic evidence is not included in the body of my investigation.  The pictures and videos are available from the Criminal Investigative Command and the CTJF-7 prosecution team.  In addition to the aforementioned crimes, there were also abuses committed by members of the 325th MI Battalion, 205th MI Brigade, and Joint Interrogation and Debriefing Center (JIDC).  Specifically, on 24 November 2003, SPC Luciana Spencer, 205th MI Brigade, sought to degrade a detainee by having him strip and returned to cell naked.  **(ANNEXES 26 and 53)**

6.  (S) I find that the intentional abuse of detainees by military police personnel included the following acts:

    a.  (S) Punching, slapping, and kicking detainees; jumping on their naked feet;
    b.  (S) Videotaping and photographing naked male and female detainees;
    c.  (S) Forcibly arranging detainees in various sexually explicit positions for photographing;
    d.  (S) Forcing detainees to remove their clothing and keeping them naked for several days at a time;
    e.  (S) Forcing naked male detainees to wear women's underwear;
    f.  (S) Forcing groups of male detainees to masturbate themselves while being photographed and videotaped;

    g.  (S) Arranging naked male detainees in a pile and then jumping on them;

    h.  (S) Positioning a naked detainee on a MRE Box, with a sandbag on his head, and attaching wires to his fingers, toes, and penis to simulate electric torture;

    i.  (S) Writing "I am a Rapest" (sic) on the leg of a detainee alleged to have forcibly raped a 15-year old fellow detainee, and then photographing him naked;

    j.  (S) Placing a dog chain or strap around a naked detainee's neck and having a female Soldier pose for a picture;

    k.  (S) A male MP guard having sex with a female detainee;

    l.  (S) Using military working dogs (without muzzles) to intimidate and frighten detainees, and in at least one case biting and severely injuring a detainee;

    m.  (S) Taking photographs of dead Iraqi detainees.

    **(ANNEXES 25 and 26)**

7.  (U) These findings are amply supported by written confessions provided by several of the suspects, written statements provided by detainees, and witness statements. In reaching my findings, I have carefully considered the pre-existing statements of the following witnesses and suspects **(ANNEX 26)**:

    a.  (U) SPC Jeremy Sivits, 372nd MP Company - **Suspect**

    b.  (U) SPC Sabrina Harman, 372nd MP Company – **Suspect**

    c.  (U) SGT Javal S. Davis, 372nd MP Company - **Suspect**

    c.  (U) PFC Lynndie R. England, 372nd MP Company - **Suspect**

    d.  (U) Adel Nakhla, Civilian Translator, Titan Corp., Assigned to the 205th MI Brigade- **Suspect**

    e.  (U) SPC Joseph M. Darby, 372nd MP Company

    f.  (U) SGT Neil A. Wallin, 109th Area Support Medical Battalion

    g  (U) SGT Samuel Jefferson Provance, 302nd MI Battalion

    h  (U) Torin S. Nelson, Contractor, Titan Corp., Assigned to the 205th MI Brigade

    j.  (U) CPL Matthew Scott Bolanger, 372nd MP Company

    k.  (U) SPC Mathew C. Wisdom, 372nd MP Company

    l.  (U) SSG Reuben R. Layton, Medic, 109th Medical Detachment

    m.  (U) SPC John V. Polak, 229th MP Company

8.  (U) In addition, several detainees also described the following acts of abuse, which under the circumstances, I find credible based on the clarity of their statements and supporting evidence provided by other witnesses **(ANNEX 26)**:

    a.  (U) Breaking chemical lights and pouring the phosphoric liquid on detainees;

    b.  (U) Threatening detainees with a charged 9mm pistol;

    c.  (U) Pouring cold water on naked detainees;

    d.  (U) Beating detainees with a broom handle and a chair;

    e.  (U) Threatening male detainees with rape;

    f.  (U) Allowing a military police guard to stitch the wound of a detainee who was injured after being slammed against the wall in his cell;

    g.  (U) Sodomizing a detainee with a chemical light and perhaps a broom stick.

h. (U) Using military working dogs to frighten and intimidate detainees with threats of attack, and in one instance actually biting a detainee.

9. (U) I have carefully considered the statements provided by the following detainees, which under the circumstances I find credible based on the clarity of their statements and supporting evidence provided by other witnesses:

   a. (U) Amjed Isail Waleed, Detainee # 151365
   b. (U) Hiadar Saber Abed Miktub-Aboodi, Detainee # 13077
   c. (U) Huessin Mohssein Al-Zayiadi, Detainee # 19446
   d. (U) Kasim Mehaddi Hilas, Detainee # 151108
   e. (U) Mohanded Juma Juma (sic), Detainee # 152307
   f. (U) Mustafa Jassim Mustafa, Detainee # 150542
   g. (U) Shalan Said Alsharoni, Detainee, # 150422
   h. (U) Abd Alwhab Youss, Detainee # 150425
   i. (U) Asad Hamza Hanfosh, Detainee # 152529
   j. (U) Nori Samir Gunbar Al-Yasseri, Detainee # 7787
   k. (U) Thaar Salman Dawod, Detainee # 150427
   l. (U) Ameen Sa'eed Al-Sheikh, Detainee # 151362
   m. (U) Abdou Hussain Saad Faleh, Detainee # 18470  **(ANNEX 26)**

10. (U) I find that contrary to the provision of AR 190-8, and the findings found in MG Ryder's Report, Military Intelligence (MI) interrogators and Other US Government Agency's (OGA) interrogators actively requested that MP guards set physical and mental conditions for favorable interrogation of witnesses. Contrary to the findings of MG Ryder's Report, I find that personnel assigned to the 372nd MP Company, 800th MP Brigade were directed to change facility procedures to "set the conditions" for MI interrogations. I find no direct evidence that MP personnel actually participated in those MI interrogations. **(ANNEXES 19, 21, 25, and 26)**.

11. (U) I reach this finding based on the actual proven abuse that I find was inflicted on detainees and by the following witness statements. **(ANNEXES 25 and 26)**:

   a. (U) **SPC Sabrina Harman, 372nd MP Company,** stated in her sworn statement regarding the incident where a detainee was placed on a box with wires attached to his fingers, toes, and penis, "that her job was to keep detainees awake." She stated that MI was talking to CPL Grainer. She stated: **"MI wanted to get them to talk. It is Grainer and Frederick's job to do things for MI and OGA to get these people to talk."**

   b. (U) **SGT Javal S. Davis, 372nd MP Company,** stated in his sworn statement as follows: **"I witnessed prisoners in the MI hold section, wing 1A being made to do various things that I would question morally. In Wing 1A we were told that they had different rules and different SOP for treatment. I never saw a set of rules or SOP for that section just word of mouth. The Soldier in charge of 1A was Corporal Granier. He stated that the Agents and MI Soldiers would ask**

**him to do things, but nothing was ever in writing he would complain (sic).**"
When asked why the rules in 1A/1B were different than the rest of the wings, SGT
Davis stated: **"The rest of the wings are regular prisoners and 1A/B are
Military Intelligence (MI) holds."** When asked why he did not inform his chain
of command about this abuse, SGT Davis stated: **" Because I assumed that if they
were doing things out of the ordinary or outside the guidelines, someone would
have said something. Also the wing belongs to MI and it appeared MI
personnel approved of the abuse."** SGT Davis also stated that he had heard MI
insinuate to the guards to abuse the inmates. When asked what MI said he stated:
**"Loosen this guy up for us." "Make sure he has a bad night." "Make sure he
gets the treatment."** He claimed these comments were made to CPL Granier and
SSG Frederick. Finally, SGT Davis stated that (sic): "**the MI staffs to my
understanding have been giving Granier compliments on the way he has been
handling the MI holds. Example being statements like, "Good job, they're
breaking down real fast. They answer every question. They're giving out good
information, Finally, and Keep up the good work . Stuff like that."**

c. (U) <u>**SPC Jason Kennel,**</u> **372nd MP Company,** was asked if he were present when
any detainees were abused. He stated: **"I saw them nude, but MI would tell us to
take away their mattresses, sheets, and clothes."** He could not recall who in MI
had instructed him to do this, but commented that, "if they wanted me to do that
they needed to give me paperwork." He was later informed that "we could not do
anything to embarrass the prisoners."

d. (U) <u>**Mr. Adel L. Nakhla**</u>, a US civilian contract translator was questioned about
several detainees accused of rape. He observed (sic): **"They (detainees) were all
naked, a bunch of people from MI, the MP were there that night and the
inmates were ordered by SGT Granier and SGT Frederick ordered the guys
while questioning them to admit what they did. They made them do strange
exercises by sliding on their stomach, jump up and down, throw water on them
and made them some wet, called them all kinds of names such as "gays" do
they like to make love to guys, then they handcuffed their hands together and
their legs with shackles and started to stack them on top of each other by
insuring that the bottom guys penis will touch the guy on tops butt."**

e. (U) <u>**SPC Neil A Wallin,**</u> **109th Area Support Medical Battalion**, a medic
testified that: **"Cell 1A was used to house high priority detainees and cell 1B
was used to house the high risk or trouble making detainees. During my tour
at the prison I observed that when the male detainees were first brought to the
facility, some of them were made to wear female underwear, which I think was
to somehow break them down."**

12. (U) **I find that prior to its deployment to Iraq for Operation Iraqi Freedom, the
320th MP Battalion and the 372nd MP Company had received no training in
detention/internee operations.** I also find that very little instruction or training was
provided to MP personnel on the applicable rules of the Geneva Convention Relative

to the Treatment of Prisoners of War, FM 27-10, AR 190-8, or FM 3-19.40. Moreover, I find that few, if any, copies of the Geneva Conventions were ever made available to MP personnel or detainees. (**ANNEXES 21-24, 33, and multiple witness statements**)

13. (U) Another obvious example of the Brigade Leadership not communicating with its Soldiers or ensuring their tactical proficiency concerns the incident of detainee abuse that occurred at Camp Bucca, Iraq, on May 12, 2003. Soldiers from the 223rd MP Company reported to the 800th MP Brigade Command at Camp Bucca, that four Military Police Soldiers from the 320th MP Battalion had abused a number of detainees during inprocessing at Camp Bucca. An extensive CID investigation determined that four soldiers from the 320th MP Battalion had kicked and beaten these detainees following a transport mission from Talil Air Base. (**ANNEXES 34 and 35**)

14. (U) Formal charges under the UCMJ were preferred against these Soldiers and an Article-32 Investigation conducted by LTC Gentry. He recommended a general court martial for the four accused, which BG Karpinski supported. Despite this documented abuse, there is no evidence that BG Karpinski ever attempted to remind 800th MP Soldiers of the requirements of the Geneva Conventions regarding detainee treatment or took any steps to ensure that such abuse was not repeated. Nor is there any evidence that LTC(P) Phillabaum, the commander of the Soldiers involved in the Camp Bucca abuse incident, took any initiative to ensure his Soldiers were properly trained regarding detainee treatment. (**ANNEXES 35 and 62**)

## RECOMMENDATIONS AS TO PART ONE OF THE INVESTIGATION:

1. (U) Immediately deploy to the Iraq Theater an integrated multi-discipline Mobile Training Team (MTT) comprised of subject matter experts in internment/resettlement operations, international and operational law, information technology, facility management, interrogation and intelligence gathering techniques, chaplains, Arab cultural awareness, and medical practices as it pertains to I/R activities. This team needs to oversee and conduct comprehensive training in all aspects of detainee and confinement operations.

2. (U) That all military police and military intelligence personnel involved in any aspect of detainee operations or interrogation operations in CJTF-7, and subordinate units, be immediately provided with training by an international/operational law attorney on the specific provisions of The Law of Land Warfare FM 27-10, specifically the Geneva Convention Relative to the Treatment of Prisoners of War, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees, and AR 190-8.

3. (U) **That a single commander in CJTF-7 be responsible for overall detainee operations throughout the Iraq Theater of Operations**.  I also recommend that the Provost Marshal General of the Army assign a minimum of two (2) subject matter experts, one officer and one NCO, to assist CJTF-7 in coordinating detainee operations.

4. (U) That detention facility commanders and interrogation facility commanders ensure that appropriate copies of the Geneva Convention Relative to the Treatment of Prisoners of War and notice of protections be made available in both English and the detainees' language and be prominently displayed in all detention facilities. Detainees with questions regarding their treatment should be given the full opportunity to read the Convention.

5. (U) That each detention facility commander and interrogation facility commander publish a complete and comprehensive set of Standing Operating Procedures (SOPs) regarding treatment of detainees, and that all personnel be required to read the SOPs and sign a document indicating that they have read and understand the SOPs.

6. (U) That in accordance with the recommendations of MG Ryder's Assessment Report, and my findings and recommendations in this investigation, all units in the Iraq Theater of Operations conducting internment/confinement/detainment operations in support of Operation Iraqi Freedom be OPCON for all purposes, to include action under the UCMJ, to CJTF-7.

7. (U) Appoint the C3, CJTF as the staff proponent for detainee operations in the Iraq Joint Operations Area (JOA).  (MG Tom Miller, C3, CJTF-7, has been appointed by COMCJTF-7).

8. (U) That an inquiry UP AR 381-10, Procedure 15 be conducted to determine the extent of culpability of Military Intelligence personnel, assigned to the 205th MI Brigade and the Joint Interrogation and Debriefing Center (JIDC) regarding abuse of detainees at Abu Ghraib (BCCF).

9. (U) That it is critical that the proponent for detainee operations is assigned a dedicated Senior Judge Advocate, with specialized training and knowledge of international and operational law, to assist and advise on matters of detainee operations.

# <u>FINDINGS AND RECOMMENDATIONS</u>

# (PART TWO)

(U) **The Investigation inquire into detainee escapes and accountability lapses as reported by CJTF-7, specifically allegations concerning these events at the Abu Ghraib Prison:**

### REGARDING PART TWO OF THE INVESTIGATION, I MAKE THE FOLLOWING SPECIFIC FINDINGS OF FACT:

1.  The 800th MP Brigade was responsible for theater-wide Internment and Resettlement (I/R) operations.  (**ANNEXES 45 and 95**)

2.  (U) The 320th MP Battalion, 800th MP Brigade was tasked with detainee operations at the Abu Ghraib Prison Complex during the time period covered in this investigation.  (**ANNEXES 41, 45, and 59**)

3.  (U) The 310th MP Battalion, 800th MP Brigade was tasked with detainee operations and Forward Operating Base (FOB) Operations at the Camp Bucca Detention Facility until TOA on 26 February 2004. (**ANNEXES 41 and 52**)

4.  (U) The 744th MP Battalion, 800th MP Brigade was tasked with detainee operations and FOB Operations at the HVD Detention Facility until TOA on 4 March 2004. (**ANNEXES 41 and 55**)

5.  (U) The 530th MP Battalion, 800th MP Brigade was tasked with detainee operations and FOB Operations at the MEK holding facility until TOA on 15 March 2004. (**ANNEXES 41 and 97**)

6.  (U) Detainee operations include accountability, care, and well being of Enemy Prisoners of War, Retained Person, Civilian Detainees, and Other Detainees, as well as Iraqi criminal prisoners.  (**ANNEX 22**)

7.  (U) The accountability for detainees is doctrinally an MP task IAW FM 3-19.40. (**ANNEX 22**)

8.  (U) There is a general lack of knowledge, implementation, and emphasis of basic legal, regulatory, doctrinal, and command requirements within the 800th MP Brigade and its subordinate units. (**Multiple witness statements in ANNEXES 45-91**).

9.  (U) The handling of detainees and criminal prisoners after in-processing was inconsistent from detention facility to detention facility, compound to compound, encampment to encampment, and even shift to shift throughout the 800th MP Brigade AOR. (**ANNEX 37**)

10. (U) Camp Bucca, operated by the 310th MP Battalion, had a "Criminal Detainee In-Processing SOP" and a "Training Outline" for transferring and releasing detainees, which appears to have been followed. (**ANNEXES 38 and 52**)

11. (U) Incoming and outgoing detainees are being documented in the National Detainee Reporting System (NDRS) and Biometric Automated Toolset System (BATS) as required by regulation at all detention facilities. However, it is underutilized and often does not give a "real time" accurate picture of the detainee population due to untimely updating. (**ANNEX 56**)

12. (U) There was a severe lapse in the accountability of detainees at the Abu Ghraib Prison Complex. The 320th MP Battalion used a self-created "change sheet" to document the transfer of a detainee from one location to another. For proper accountability, it is imperative that these change sheets be processed and the detainee manifest be updated within 24 hours of movement. At Abu Ghraib, this process would often take as long as 4 days to complete. This lag-time resulted in inaccurate detainee Internment Serial Number (ISN) counts, gross differences in the detainee manifest and the actual occupants of an individual compound, and significant confusion of the MP Soldiers. The 320th MP Battalion S-1, CPT Theresa Delbalso, and the S-3, MAJ David DiNenna, explained that this breakdown was due to the lack of manpower to process change sheets in a timely manner. (**ANNEXES 39 and 98**)

13. (U) The 320th Battalion TACSOP requires detainee accountability at least 4 times daily at Abu Ghraib. However, a detailed review of their operational journals revealed that these accounts were often not done or not documented by the unit. Additionally, there is no indication that accounting errors or the loss of a detainee in the accounting process triggered any immediate corrective action by the Battalion TOC. (**ANNEX 44**)

14. (U) There is a lack of standardization in the way the 320th MP Battalion conducted physical counts of their detainees. Each compound within a given encampment did their headcounts differently. Some compounds had detainees line up in lines of 10, some had them sit in rows, and some moved all the detainees to one end of the compound and counted them as they passed to the other end of the compound. (**ANNEX 98**)

15. (U) FM 3-19.40 outlines the need for 2 roll calls (100% ISN band checks) per day. The 320th MP Battalion did this check only 2 times per week. Due to the lack of real-time updates to the system, these checks were regularly inaccurate. (**ANNEXES 22 and 98**)

16. (U) The 800th MP Brigade and subordinate units adopted non-doctrinal terms such as "band checks," "roll-ups," and "call-ups," which contributed to the lapses in accountability and confusion at the soldier level. **(ANNEXES 63, 88, and 98)**

17. (U) Operational journals at the various compounds and the 320th Battalion TOC contained numerous unprofessional entries and flippant comments, which highlighted the lack of discipline within the unit. There was no indication that the journals were ever reviewed by anyone in their chain of command. **(ANNEX 37)**

18. (U) Accountability SOPs were not fully developed and standing TACSOPs were widely ignored. Any SOPs that did exist were not trained on, and were never distributed to the lowest level. Most procedures were shelved at the unit TOC, rather than at the subordinate units and guards mount sites. **(ANNEXES 44, 67, 71, and 85)**

19. (U) Accountability and facility operations SOPs lacked specificity, implementation measures, and a system of checks and balances to ensure compliance. **(ANNEXES 76 and 82)**

20. (U) Basic Army Doctrine was not widely referenced or utilized to develop the accountability practices throughout the 800th MP Brigade's subordinate units. Daily processing, accountability, and detainee care appears to have been made up as the operations developed with reliance on, and guidance from, junior members of the unit who had civilian corrections experience. **(ANNEX 21)**

21. (U) Soldiers were poorly prepared and untrained to conduct I/R operations prior to deployment, at the mobilization site, upon arrival in theater, and throughout their mission. **(ANNEXES 62, 63, and 69)**

22. (U) The documentation provided to this investigation identified 27 escapes or attempted escapes from the detention facilities throughout the 800th MP Brigade's AOR. Based on my assessment and detailed analysis of the substandard accountability process maintained by the 800th MP Brigade, it is highly likely that there were several more unreported cases of escape that were probably "written off" as administrative errors or otherwise undocumented. 1LT Lewis Raeder, Platoon Leader, 372nd MP Company, reported knowing about at least two additional escapes (one from a work detail and one from a window) from Abu Ghraib (BCCF) that were not documented. LTC Dennis McGlone, Commander, 744th MP Battalion, detailed the escape of one detainee at the High Value Detainee Facility who went to the latrine and then outran the guards and escaped. Lastly, BG Janis Karpinski, Commander, 800th MP Brigade, stated that there were more than 32 escapes from her holding facilities, which does not match the number derived from the investigation materials. **(ANNEXES 5-10, 45, 55, and 71)**

23. (U) The Abu Ghraib and Camp Bucca detention facilities are significantly over their intended maximum capacity while the guard force is undermanned and under resourced. This imbalance has contributed to the poor living conditions, escapes, and accountability lapses at the various facilities. The overcrowding of the facilities also limits the ability to identify and segregate leaders in the detainee population who may be organizing escapes and riots within the facility. (**ANNEXES 6, 22, and 92**)

24. (U) The screening, processing, and release of detainees who should not be in custody takes too long and contributes to the overcrowding and unrest in the detention facilities. There are currently three separate release mechanisms in the theater-wide internment operations. First, the apprehending unit can release a detainee if there is a determination that their continued detention is not warranted. Secondly, a criminal detainee can be released after it has been determined that the detainee has no intelligence value, and that their release would not be detrimental to society. BG Karpinski had signature authority to release detainees in this second category. Lastly, detainees accused of committing "Crimes Against the Coalition," who are held throughout the separate facilities in the CJTF-7 AOR, can be released upon a determination that they are of no intelligence value and no longer pose a significant threat to Coalition Forces. The release process for this category of detainee is a screening by the local US Forces Magistrate Cell and a review by a Detainee Release Board consisting of BG Karpinski, COL Marc Warren, SJA, CJTF-7, and MG Barbara Fast, C-2, CJTF-7. MG Fast is the "Detainee Release Authority" for detainees being held for committing crimes against the coalition. According to BG Karpinski, this category of detainee makes up more than 60% of the total detainee population, and is the fastest growing category. However, MG Fast, according to BG Karpinski, routinely denied the board's recommendations to release detainees in this category who were no longer deemed a threat and clearly met the requirements for release. According to BG Karpinski, the extremely slow and ineffective release process has significantly contributed to the overcrowding of the facilities. (**ANNEXES 40, 45, and 46**)

25. (U) After Action Reviews (AARs) are not routinely being conducted after an escape or other serious incident. No lessons learned seem to have been disseminated to subordinate units to enable corrective action at the lowest level. The Investigation Team requested copies of AARs, and none were provided. (**Multiple Witness Statements**)

26. (U) Lessons learned (i.e. Findings and Recommendations from various 15-6 Investigations concerning escapes and accountability lapses) were rubber stamped as approved and ordered implemented by BG Karpinski. There is no evidence that the majority of her orders directing the implementation of substantive changes were ever acted upon. Additionally, there was no follow-up by the command to verify the corrective actions were taken. Had the findings and recommendations contained within their own investigations been analyzed and actually implemented by BG

Karpinski, many of the subsequent escapes, accountability lapses, and cases of abuse may have been prevented. **(ANNEXES 5-10)**

27. (U) The perimeter lighting around Abu Ghraib and the detention facility at Camp Bucca is inadequate and needs to be improved to illuminate dark areas that have routinely become avenues of escape.  **(ANNEX 6)**

28. (U) Neither the camp rules nor the provisions of the Geneva Conventions are posted in English or in the language of the detainees at any of the detention facilities in the 800th MP Brigade's AOR, even after several investigations had annotated the lack of this critical requirement.  **(Multiple Witness Statements and the Personal Observations of the Investigation Team)**

29. (U) The Iraqi guards at Abu Ghraib BCCF) demonstrate questionable work ethics and loyalties, and are a potentially dangerous contingent within the Hard-Site.  These guards have furnished the Iraqi criminal inmates with contraband, weapons, and information.  Additionally, they have facilitated the escape of at least one detainee.  **(ANNEX 8 and 26-SPC Polak's Statement)**

30. (U) In general, US civilian contract personnel (Titan Corporation, CACI, etc…), third country nationals, and local contractors do not appear to be properly supervised within the detention facility at Abu Ghraib.  During our on-site inspection, they wandered about with too much unsupervised free access in the detainee area.  Having civilians in various outfits (civilian and DCUs) in and about the detainee area causes confusion and may have contributed to the difficulties in the accountability process and with detecting escapes.  **(ANNEX 51, Multiple Witness Statements, and the Personal Observations of the Investigation Team)**

31. (U) SGM Marc Emerson, Operations SGM, 320th MP Battalion, contended that the Detainee Rules of Engagement (DROE) and the general principles of the Geneva Convention were briefed at every guard mount and shift change on Abu Ghraib.  However, none of our witnesses, nor our personal observations, support his contention.  I find that SGM Emerson was not a credible witness.  **(ANNEXES 45, 80, and the Personal Observations of the Investigation Team)**

32. (U) Several interviewees insisted that the MP and MI Soldiers at Abu Ghraib (BCCF) received regular training on the basics of detainee operations; however, they have been unable to produce any verifying documentation, sign-in rosters, or soldiers who can recall the content of this training.  **(ANNEXES 59, 80, and the Absence of any Training Records)**

33. (S/NF)  The various detention facilities operated by the 800th MP Brigade have routinely held persons brought to them by Other Government Agencies (OGAs) without accounting for them, knowing their identities, or even the reason for their detention.  The Joint Interrogation and Debriefing Center (JIDC) at Abu Ghraib called these detainees "ghost detainees."  On at least one occasion, the 320th MP

Battalion at Abu Ghraib held a handful of "ghost detainees" (6-8) for OGAs that they moved around within the facility to hide them from a visiting International Committee of the Red Cross (ICRC) survey team.  This maneuver was deceptive, contrary to Army Doctrine, and in violation of international law.  **(ANNEX 53)**

34. (U) The following riots, escapes, and shootings have been documented and reported to this Investigation Team.  Although there is no data from other missions of similar size and duration to compare the number of escapes with, the most significant factors derived from these reports are twofold.  First, investigations and SIRs lacked critical data needed to evaluate the details of each incident.  Second, each investigation seems to have pointed to the same types of deficiencies; however, little to nothing was done to correct the problems and to implement the recommendations as was ordered by BG Karpinski, nor was there any command emphasis to ensure these deficiencies were corrected:

   a. (U) **4 June 03- This escape was mentioned in the 15-6 Investigation covering the 13 June 03 escape, recapture, and shootings of detainees at Camp Vigilant (320th MP Battalion).**  However, no investigation or additional information was provided as requested by this investigation team. **(ANNEX 7)**

   b. (U) **9 June 03- Riot and shootings of five detainees at Camp Cropper. (115th MP Battalion)**  Several detainees allegedly rioted after a detainee was subdued by MPs of the 115th MP Battalion after striking a guard in compound B of Camp Cropper.   A 15-6 investigation by 1LT Magowan (115th MP Battalion, Platoon Leader) concluded that a detainee had acted up and hit an MP.  After being subdued, one of the MPs took off his DCU top and flexed his muscles to the detainees, which further escalated the riot.  The MPs were overwhelmed and the guards fired lethal rounds to protect the life of the compound MPs, whereby 5 detainees were wounded.  Contributing factors were poor communications, no clear chain of command, facility-obstructed views of posted guards, the QRF did not have non-lethal equipment, and the SOP was inadequate and outdated.  **(ANNEX 5)**

   c. (U) **12 June 03- Escape and recapture of detainee #8399, escape and shooting of detainee # 7166, and attempted escape of an unidentified detainee from Camp Cropper Holding Area (115th MP Battalion).**  Several detainees allegedly made their escape in the nighttime hours prior to 0300.   A 15-6 investigation by CPT Wendlandt (115th MP Battalion, S-2) concluded that the detainees allegedly escaped by crawling under the wire at a location with inadequate lighting.  One detainee was stopped prior to escape.  An MP of the 115th MP Battalion search team recaptured detainee # 8399, and detainee # 7166 was shot and killed by a Soldier during the recapture process.  Contributing factors were overcrowding, poor lighting, and the nature of the hardened criminal detainees at that location.  It is of particular note that the command was informed at least 24 hours in advance of the

upcoming escape attempt and started doing amplified announcements in
Arabic stating the camp rules.  The investigation pointed out that rules and
guidelines were not posted in the camps in the detainees' native languages.
(**ANNEX 6**)

**d.**  (U) **13 June 03- Escape and recapture of detainee # 8968 and the shooting
of eight detainees at Abu Ghraib (BCCF) (320th MP Battalion).**  Several
detainees allegedly attempted to escape at about 1400 hours from the Camp
Vigilant Compound, Abu Ghraib (BCCF).  A 15-6 investigation by CPT
Wyks (400th MP Battalion, S-1) concluded that the detainee allegedly
escaped by sliding under the wire while the tower guard was turned in the
other direction.  This detainee was subsequently apprehended by the QRF.  At
about 1600 the same day, 30-40 detainees rioted and pelted three interior MP
guards with rocks.  One guard was injured and the tower guards fired lethal
rounds at the rioters injuring 7 and killing 1 detainee. (**ANNEX 7**)

**e.**  (U) **05 November 03- Escape of detainees # 9877 and # 10739 from Abu
Ghraib (320th MP Battalion).**  Several detainees allegedly escaped at 0345
from the Hard-Site, Abu Ghraib (BCCF).  An SIR was initiated by SPC
Warner (320th MP Battalion, S-3 RTO).  The SIR indicated that 2 criminal
prisoners escaped through their cell window in tier 3A of the Hard-Site.  No
information on findings, contributing factors, or corrective action has been
provided to this investigation team. (**ANNEX 11**)

**f.**  (U) **07 November 03- Escape of detainee # 14239 from Abu Ghraib (320th
MP Battalion).**  A detainee allegedly escaped at 1330 from Compound 2 of
the Ganci Encampment, Abu Ghraib (BCCF).  An SIR was initiated by SSG
Hydro (320th MP Battalion, S-3 Asst. NCOIC).  The SIR indicated that a
detainee escaped from the North end of the compound and was discovered
missing during distribution of the noon meal, but there is no method of escape
listed in the SIR.  No information on findings, contributing factors, or
corrective action has been provided to this investigation team.  (**ANNEX 12**)

**g.**  (U) **08 November 03- Escape of detainees # 115089, # 151623, # 151624, #
116734, # 116735, and # 116738 from Abu Ghraib (320th MP Battalion).**
Several detainees allegedly escaped at 2022 from Compound 8 of the Ganci
encampment, Abu Ghraib.  An SIR was initiated by MAJ DiNenna (320th MP
Battalion, S-3).  The SIR indicated that 5-6 prisoners escaped from the North
end of the compound, but there is no method of escape listed in the SIR.  No
information on findings, contributing factors, or corrective action has been
provided to this investigation team.  (**ANNEX 13**)

**h.**  (U) **24 November 03- Riot and shooting of 12 detainees # 150216, #150894,
#153096, 153165, #153169, #116361, #153399, #20257, #150348, #152616,
#116146, and #152156 at Abu Ghraib (320th MP Battalion).**  Several
detainees allegedly began to riot at about 1300 in all of the compounds at the

Ganci encampment.  This resulted in the shooting deaths of 3 detainees, 9 wounded detainees, and 9 injured US Soldiers.   A 15-6 investigation by COL Bruce Falcone (220th MP Brigade, Deputy Commander) concluded that the detainees rioted in protest of their living conditions, that the riot turned violent, the use of non-lethal force was ineffective, and, after the 320th MP Battalion CDR executed "Golden Spike," the emergency containment plan, the use of deadly force was authorized.  Contributing factors were lack of comprehensive training of guards, poor or non-existent SOPs, no formal guard-mount conducted prior to shift, no rehearsals or ongoing training, the mix of less than lethal rounds with lethal rounds in weapons, no AARs being conducted after incidents, ROE not posted and not understood, overcrowding, uniforms not standardized, and poor communication between the command and Soldiers.  (**ANNEX 8**)

i.   (U) **24 November 03- Shooting of detainee at Abu Ghraib (320th MP Battalion).**   A detainee allegedly had a pistol in his cell and around 1830 an extraction team shot him with less than lethal and lethal rounds in the process of recovering the weapon.  A 15-6 investigation by COL Bruce Falcone (220th Brigade, Deputy Commander) concluded that one of the detainees in tier 1A of the Hard Site had gotten a pistol and a couple of knives from an Iraqi Guard working in the encampment.  Immediately upon receipt of this information, an ad-hoc extraction team consisting of MP and MI personnel conducted what they called a routine cell search, which resulted in the shooting of an MP and the detainee.  Contributing factors were a corrupt Iraqi Guard, inadequate SOPs, the Detention ROE in place at the time was ineffective due to the numerous levels of authorization needed for use of lethal force, poorly trained MPs, unclear lanes of responsibility, and ambiguous relationship between the MI and MP assets.  (**ANNEX 8**)

j.   (U) **13 December 03- Shooting by non-lethal means into crowd at Abu Ghraib (320th MP Battalion).**   Several detainees allegedly got into a detainee-on-detainee fight around 1030 in Compound 8 of the Ganci encampment, Abu Ghraib.  An SIR was initiated by SSG Matash (320th MP Battalion, S-3 Section).  The SIR indicated that there was a fight in the compound and the MPs used a non-lethal crowd-dispersing round to break up the fight, which was successful.  No information on findings, contributing factors, or corrective action has been provided to this investigation team.  (**ANNEX 14**)

k.   (U) **13 December 03- Shooting by non-lethal means into crowd at Abu Ghraib (320th MP Battalion).**   Several detainees allegedly got into a detainee-on-detainee fight around 1120 in Compound 2 of the Ganci encampment, Abu Ghraib.  An SIR was initiated by SSG Matash (320th MP Battalion, S-3 Section).  The SIR indicated that there was a fight in the compound and the MPs used two non-lethal shots to disperse the crowd,

which was successful. No information on findings, contributing factors, or corrective action has been provided to this investigation team. (**ANNEX 15)**

l. (U) **13 December 03- Shooting by non-lethal means into crowd at Abu Ghraib (320th MP Battalion).** Approximately 30-40 detainees allegedly got into a detainee-on-detainee fight around 1642 in Compound 3 of the Ganci encampment, Abu Ghraib (BCCF). An SIR was initiated by SSG Matash (320th MP Battalion, S-3 Section). The SIR indicates that there was a fight in the compound and the MPs used a non-lethal crowd-dispersing round to break up the fight, which was successful. No information on findings, contributing factors, or corrective action has been provided to this investigation team. (**ANNEX 16)**

m. (U) **17 December 03- Shooting by non-lethal means of detainee from Abu Ghraib (320th MP Battalion).** Several detainees allegedly assaulted an MP at 1459 inside the Ganci Encampment, Abu Ghraib (BCCF). An SIR was initiated by SSG Matash (320th MP BRIGADE, S-3 Section). The SIR indicated that three detainees assaulted an MP, which resulted in the use of a non-lethal shot that calmed the situation. No information on findings, contributing factors, or corrective action has been provided to this investigation team. (**ANNEX 17)**

n. (U) **07 January 04- Escape of detainee #115032 from Camp Bucca (310th MP Battalion).** A detainee allegedly escaped between the hours of 0445 and 0640 from Compound 12, of Camp Bucca. Investigation by CPT Kaires (310th MP Battalion S-3) and CPT Holsombeck (724th MP Battalion S-3) concluded that the detainee escaped through an undetected weakness in the wire. Contributing factors were inexperienced guards, lapses in accountability, complacency, lack of leadership presence, poor visibility, and lack of clear and concise communication between the guards and the leadership. (**ANNEX 9)**

o. (U) **12 January 04- Escape of Detainees #115314 and #109950 as well as the escape and recapture of 5 unknown detainees at the Camp Bucca Detention Facility (310th MP Battalion).** Several detainees allegedly escaped around 0300 from Compound 12, of Camp Bucca. An AR 15-6 Investigation by LTC Leigh Coulter (800th MP Brigade, OIC Camp Arifjan Detachment) concluded that three of the detainees escaped through the front holding cell during conditions of limited visibility due to fog. One of the detainees was noticed, shot with a non-lethal round, and returned to his holding compound. That same night, 4 detainees exited through the wire on the South side of the camp and were seen and apprehended by the QRF. Contributing factors were the lack of a coordinated effort for emplacement of MPs during implementation of the fog plan, overcrowding, and poor communications. (**ANNEX 10)**

**p.** (U) **14 January 04- Escape of detainee #12436 and missing Iraqi guard from Hard-Site, Abu Ghraib (320th MP Battalion).**   A detainee allegedly escaped at 1335 from the Hard Site at Abu Ghraib (BCCF).  An SIR was initiated by SSG Hydro (320th MP Battalion, S-3 Asst. NCOIC).  The SIR indicates that an Iraqi guard assisted a detainee to escape by signing him out on a work detail and disappearing with him.  At the time of the second SIR, neither missing person had been located.  No information on findings, contributing factors, or corrective action has been provided to this investigation team.  (**ANNEX 99**)

**q.** (U) **26 January 04- Escape of detainees #s 115236, 116272, and 151933 from Camp Bucca (310th MP Battalion).**   Several Detainees allegedly escaped between the hours of 0440 and 0700 during a period of intense fog.  Investigation by CPT Kaires (310th MP Battalion S-3) concluded that the detainees crawled under a fence when visibility was only 10-15 meters due to fog.  Contributing factors were the limited visibility (darkness under foggy conditions), lack of proper accountability reporting, inadequate number of guards, commencement of detainee feeding during low visibility operations, and poorly rested MPs.  (**ANNEX 18**)

36. (U) As I have previously indicated, this investigation determined that there was virtually a complete lack of detailed SOPs at any of the detention facilities.  Moreover, despite the fact that there were numerous reported escapes at detention facilities throughout Iraq (in excess of 35), AR 15-6 Investigations following these escapes were simply forgotten or ignored by the Brigade Commander with no dissemination to other facilities.  After-Action Reports and Lessons Learned, if done at all, remained at individual facilities and were not shared among other commanders or soldiers throughout the Brigade. The Command never issued standard TTPs for handling escape incidents.  (**ANNEXES 5-10, Multiple Witness Statements, and the Personal Observations of the Investigation Team**)

**RECOMMENDATIONS REGARDING PART TWO OF THE INVESTIGATION**:

1. (U) **ANNEX 100** of this investigation contains a detailed and referenced series of recommendations for improving the detainee accountability practices throughout the OIF area of operations.

2. (U) Accountability practices throughout any particular detention facility must be standardized and in accordance with applicable regulations and international law.

3. (U) The NDRS and BATS accounting systems must be expanded and used to their fullest extent to facilitate real time updating when detainees are moved and or transferred from one location to another.

4.  (U) "Change sheets," or their doctrinal equivalent must be immediately processed and updated into the system to ensure accurate accountability. The detainee roll call or ISN counts must match the manifest provided to the compound guards to ensure proper accountability of detainees.

5.  (U) Develop, staff, and implement comprehensive and detailed SOPs utilizing the lessons learned from this investigation as well as any previous findings, recommendations, and reports.

6.  (U) SOPs must be written, disseminated, trained on, and understood at the lowest level.

7.  (U) Iraqi criminal prisoners must be held in separate facilities from any other category of detainee.

8.  (U) All of the compounds should be wired into the master manifest whereby MP Soldiers can account for their detainees in real time and without waiting for their change sheets to be processed. This would also have the change sheet serve as a way to check up on the accuracy of the manifest as updated by each compound. The BATS and NDRS system can be utilized for this function.

9.  (U) Accountability lapses, escapes, and disturbances within the detainment facilities must be immediately reported through both the operational and administrative Chain of Command via a Serious Incident Report (SIR). The SIRs must then be tracked and followed by daily SITREPs until the situation is resolved.

10. (U) Detention Rules of Engagement (DROE), Interrogation Rules of Engagement (IROE), and the principles of the Geneva Conventions need to be briefed at every shift change and guard mount.

11. (U) AARs must be conducted after serious incidents at any given facility. The observations and corrective actions that develop from the AARs must be analyzed by the respective MP Battalion S-3 section, developed into a plan of action, shared with the other facilities, and implemented as a matter of policy.

12. (U) There must be significant structural improvements at each of the detention facilities. The needed changes include significant enhancement of perimeter lighting, additional chain link fencing, staking down of all concertina wire, hard site development, and expansion of Abu Ghraib (BCCF) .

13. (U) The Geneva Conventions and the facility rules must be prominently displayed in English and the language of the detainees at each compound and encampment at every detention facility IAW AR 190-8.

14. (U) Further restrict US civilians and other contractors' access throughout the facility.  Contractors and civilians must be in an authorized and easily identifiable uniform to be more easily distinguished from the masses of detainees in civilian clothes.

15. (U) Facilities must have a stop movement/transfer period of at least 1 hour prior to every 100% detainee roll call and ISN counts to ensure accurate accountability.

16. (U) The method for doing head counts of detainees within a given compound must be standardized.

17. (U) Those military units conducting I/R operations must know of, train on, and constantly reference the applicable Army Doctrine and CJTF command policies. The references provided in this report cover nearly every deficiency I have enumerated.  Although they do not, and cannot, make up for leadership shortfalls, all soldiers, at all levels, can use them to maintain standardized operating procedures and efficient accountability practices.

# FINDINGS AND RECOMMENDATIONS
# (PART THREE)

## (U) Investigate the training, standards, employment, command policies, internal procedures, and command climate in the 800th MP Brigade, as appropriate:

Pursuant to Part Three of the Investigation, select members of the Investigation team (Primarily COL La Fate and I) personally interviewed the following witnesses:

1. (U) BG Janis Karpinski, Commander, 800th MP Brigade

2. (U) COL Thomas Pappas, Commander, 205th MI Brigade

3. (U) COL Ralph Sabatino, CFLCC Judge Advocate, CPA Ministry of Justice (Interviewed by COL Richard Gordon, CFLCC SJA)

4. (U) LTC Gary W. Maddocks, S-5 and Executive Officer, 800th MP Brigade

5. (U) LTC James O'Hare, Command Judge Advocate, 800th MP Brigade

6. (U) LTC Robert P. Walters Jr., Commander, 165th MI Battalion (Tactical Exploitation)

7. (U) LTC James D. Edwards, Commander, 202nd MI Battalion

8. (U) LTC Vincent Montera, Commander, 310th MP Battalion

9. (U) LTC Steve Jordan, former Director, Joint Interrogation and Debriefing Center/LNO to the 205th MI Brigade

10. (U) LTC Leigh A. Coulter, Commander, 724th MP Battalion and OIC Arifjan Detachment, 800th MP Brigade

11. (U) LTC Dennis McGlone, Commander, 744th MP Battalion

12. (U) MAJ David Hinzman, S-1, 800th MP Brigade

13. (U) MAJ William D. Proietto, Deputy CJA, 800th MP Brigade

14. (U) MAJ Stacy L. Garrity, S-1 (FWD), 800th MP Brigade

15. (U) MAJ David W. DiNenna, S-3, 320th MP Battalion

16. (U) MAJ Michael Sheridan, XO, 320th MP Battalion

17. (U) MAJ Anthony Cavallaro, S-3, 800th MP Brigade

18. (U) CPT Marc C. Hale, Commander, 670th MP Company

19. (U) CPT Donald Reese, Commander, 372nd MP Company

20. (U) CPT Darren Hampton, Assistant S-3, 320th MP Battalion

21. (U) CPT John Kaires, S-3, 310th MP Battalion

22. (U) CPT Ed Diamantis, S-2, 800th MP Brigade

23. (U) CPT Marc C. Hale, Commander, 670th MP Company

24. (U) CPT Donald Reese, Commander, 372nd MP Company

25. (U) CPT James G. Jones, Commander, 229th MP Company

26. (U) CPT Michael Anthony Mastrangelo, Jr., Commander, 310th MP Company

27. (U) CPT Lawrence Bush, IG, 800th MP Brigade

28. (U) 1LT Lewis C. Raeder, Platoon Leader, 372nd MP Company

29. (U) 1LT Elvis Mabry, Aide-de-camp to Brigade Commander, 800th MP Brigade

30. (U) 1LT Warren E. Ford, II, Commander, HHC 320th MP Battalion

31. (U) 2LT David O. Sutton, Platoon Leader, 229th MP Company

32. (U) CW2 Edward J. Rivas, 205th MI Brigade

33. (U) CSM Joseph P. Arrington, Command Sergeant Major, 320th MP Battalion

34. (U) SGM Pascual Cartagena, Acting Command Sergeant Major, 800th MP Brigade

35. (U) CSM Timothy L. Woodcock, Command Sergeant Major, 310th MP Battalion

36. (U) 1SG Dawn J. Rippelmeyer, First Sergeant, 977th MP Company

37. (U) SGM Mark Emerson, Operations SGM, 320th MP Battalion

38. (U) MSG Brian G. Lipinski, First Sergeant, 372nd MP Company

39. (U) MSG Andrew J. Lombardo, Operations Sergeant, 310th MP Battalion

40. (U) SFC Daryl J. Plude, Platoon Sergeant, 229th MP Company

41. (U) SFC Shannon K. Snider, Platoon SGT, 372nd MP Company

42. (U) SFC Keith A. Comer, 372nd MP Company

43. (U) SSG Robert Elliot, Squad Leader, 372nd MP Company

44. (U) SSG Santos A. Cardona, Army Dog Handler, 42nd MP Detachment, 16th MP Brigade

45. (U) SGT Michael Smith, Army Dog Handler, 523rd MP Detachment, 937th Engineer Group

46. (U) MA1 William J. Kimbro, USN Dog Handler, NAS Signal and Canine Unit

47. (U) Mr. Steve Stephanowicz, US civilian Contract Interrogator, CACI, 205th MI Brigade

48. (U) Mr. John Israel, US civilian Contract Interpreter, Titan Corporation, 205th MI Brigade
    **(ANNEXES 45-91)**


**REGARDING PART THREE OF THE INVESTIGATION, I MAKE THE FOLLOWING SPECIFIC FINDINGS OF FACT:**

1. (U) I find that BG Janis Karpinski took command of the 800th MP Brigade on 30 June 2003 from BG Paul Hill. BG Karpinski has remained in command since that date. The 800th MP Brigade is comprised of eight MP battalions in the Iraqi TOR: 115th MP Battalion, 310th MP Battalion, 320th MP Battalion, 324th MP Battalion, 400th MP Battalion, 530th MP Battalion, 724th MP Battalion, and 744th MP Battalion. **(ANNEXES 41 and 45)**

2. (U) Prior to BG Karpinski taking command, members of the 800th MP Brigade believed they would be allowed to go home when all the detainees were released from the Camp Bucca Theater Internment Facility following the cessation of major ground combat on 1 May 2003. At one point, approximately 7,000 to 8,000 detainees were held at Camp Bucca. Through Article-5 Tribunals and a screening process, several thousand detainees were released. Many in the command believed they would go home when the detainees were released. In late May-early June 2003 the 800th MP Brigade was given a new mission to manage the Iraqi penal system and several detention centers. This new mission meant Soldiers would not redeploy to CONUS

when anticipated. Morale suffered, and over the next few months there did not appear to have been any attempt by the Command to mitigate this morale problem. **(ANNEXES 45 and 96)**

3. (U) There is abundant evidence in the statements of numerous witnesses that soldiers throughout the 800th MP Brigade were not proficient in their basic MOS skills, particularly regarding internment/resettlement operations. Moreover, there is no evidence that the command, although aware of these deficiencies, attempted to correct them in any systemic manner other than ad hoc training by individuals with civilian corrections experience**. (Multiple Witness Statements and the Personal Observations of the Investigation Team)**

4. (U) I find that the 800th MP Brigade was not adequately trained for a mission that included operating a prison or penal institution at Abu Ghraib Prison Complex. As the Ryder Assessment found, I also concur that units of the 800th MP Brigade did not receive corrections-specific training during their mobilization period. MP units did not receive pinpoint assignments prior to mobilization and during the post mobilization training, and thus could not train for specific missions. The training that was accomplished at the mobilization sites were developed and implemented at the company level with little or no direction or supervision at the Battalion and Brigade levels, and consisted primarily of common tasks and law enforcement training. However, I found no evidence that the Command, although aware of this deficiency, ever requested specific corrections training from the Commandant of the Military Police School, the US Army Confinement Facility at Mannheim, Germany, the Provost Marshal General of the Army, or the US Army Disciplinary Barracks at Fort Leavenworth, Kansas. **(ANNEXES 19 and 76)**

5. (U) I find that without adequate training for a civilian internee detention mission, Brigade personnel relied heavily on individuals within the Brigade who had civilian corrections experience, including many who worked as prison guards or corrections officials in their civilian jobs. Almost every witness we interviewed had no familiarity with the provisions of AR 190-8 or FM 3-19.40. It does not appear that a Mission Essential Task List (METL) based on in-theater missions was ever developed nor was a training plan implemented throughout the Brigade. **(ANNEXES 21, 22, 67, and 81)**

6. (U) I also find, as did MG Ryder's Team, that the 800th MP Brigade as a whole, was understrength for the mission for which it was tasked. Army Doctrine dictates that an I/R Brigade can be organized with between 7 and 21 battalions, and that the average battalion size element should be able to handle approximately 4000 detainees at a time. This investigation indicates that BG Karpinski and her staff did a poor job allocating resources throughout the Iraq JOA. Abu Ghraib (BCCF) normally housed between 6000 and 7000 detainees, yet it was operated by only one battalion. In contrast, the HVD Facility maintains only about 100 detainees, and is also run by an entire battalion. **(ANNEXES 19, 22, and 96)**

7. (U) Reserve Component units do not have an individual replacement system to mitigate medical or other losses. Over time, the 800th MP Brigade clearly suffered from personnel shortages through release from active duty (REFRAD) actions, medical evacuation, and demobilization. In addition to being severely undermanned, the quality of life for Soldiers assigned to Abu Ghraib (BCCF) was extremely poor. There was no DFAC, PX, barbershop, or MWR facilities. There were numerous mortar attacks, random rifle and RPG attacks, and a serious threat to Soldiers and detainees in the facility. The prison complex was also severely overcrowded and the Brigade lacked adequate resources and personnel to resolve serious logistical problems. Finally, because of past associations and familiarity of Soldiers within the Brigade, it appears that friendship often took precedence over appropriate leader and subordinate relationships. **(ANNEX 101, Multiple Witness Statements, and the Personal Observations of the Investigation Team)**

8. (U) With respect to the 800th MP Brigade mission at Abu Ghraib (BCCF), I find that there was clear friction and lack of effective communication between the Commander, 205th MI Brigade, who controlled FOB Abu Ghraib (BCCF) after 19 November 2003, and the Commander, 800th MP Brigade, who controlled detainee operations inside the FOB. There was no clear delineation of responsibility between commands, little coordination at the command level, and no integration of the two functions. Coordination occurred at the lowest possible levels with little oversight by commanders. **(ANNEXES 31, 45, and 46)**

9. (U) I find that this ambiguous command relationship was exacerbated by a CJTF-7 Fragmentary Order (FRAGO) 1108 issued on 19 November 2003. Paragraph 3.C.8, Assignment of 205th MI Brigade Commander's Responsibilities for the Baghdad Central Confinement Facility, states as follows:

**3.C.8. A. (U) 205 MI BRIGADE.**

**3.C.8. A. 1. (U) EFFECTIVE IMMEDIATELY COMMANDER 205 MI BRIGADE ASSUMES RESPONSIBILITY FOR THE BAGHDAD CONFINEMENT FACILITY (BCCF) AND IS APPOINTED THE FOB COMMANDER. UNITS CURRENTLY AT ABU GHRAIB (BCCF) ARE TACON TO 205 MI BRIGADE FOR <u>"SECURITY OF DETAINEES AND FOB PROTECTION."</u>**

Although not supported by BG Karpinski, FRAGO 1108 made all of the MP units at Abu Ghraib TACON to the Commander, 205th MI Brigade. This effectively made an MI Officer, rather than an MP Officer, responsible for the MP units conducting detainee operations at that facility. This is not doctrinally sound due to the different missions and agendas assigned to each of these respective specialties. **(ANNEX 31)**

10  (U) Joint Publication 0-2, Unified Action Armed Forces (UNAAF), 10 July 2001 defines Tactical Control (TACON) as the detailed direction and control of movements or maneuvers within the operational area necessary to accomplish assigned missions or tasks.  **(ANNEX 42)**

> **"TACON is the command authority over assigned or attached forces or commands or military capability made available for tasking that is limited to the detailed direction and control of movements or maneuvers within the operational area necessary to accomplish assigned missions or tasks. TACON is inherent in OPCON and may be delegated to and exercised by commanders at any echelon at or below the level of combatant commander."**

11.  (U) Based on all the facts and circumstances in this investigation, I find that there was little, if any, recognition of this TACON Order by the 800th MP Brigade or the 205th MI Brigade.  Further, there was no evidence if the Commander, 205th MI Brigade clearly informed the Commander, 800th MP Brigade, and specifically the Commander, 320th MP Battalion assigned at Abu Ghraib (BCCF), on the specific requirements of this TACON relationship.  **(ANNEXES 45 and 46)**

12.  (U) It is clear from a comprehensive review of witness statements and personal interviews that the 320th MP Battalion and 800th MP Brigade continued to function as if they were responsible for the security, health and welfare, and overall security of detainees within Abu Ghraib (BCCF) prison. Both BG Karpinski and COL Pappas clearly behaved as if this were still the case.  **(ANNEXES 45 and 46)**

13.  (U) With respect to the 320th MP Battalion, I find that the Battalion Commander, LTC (P) Jerry Phillabaum, was an extremely ineffective commander and leader. Numerous witnesses confirm that the Battalion S-3, MAJ David W. DiNenna, basically ran the battalion on a day-to-day basis.  At one point, BG Karpinski sent LTC (P) Phillabaum to Camp Arifjan, Kuwait for approximately two weeks, apparently to give him some relief from the pressure he was experiencing as the 320th Battalion Commander.  This movement to Camp Arifjan immediately followed a briefing provided by LTC (P) Phillabaum to the CJTF-7 Commander, LTG Sanchez, near the end of October 2003.  BG Karpinski placed LTC Ronald Chew, Commander of the 115th MP Battalion, in charge of the 320th MP Battalion for a period of approximately two weeks.  LTC Chew was also in command of the 115th MP Battalion assigned to Camp Cropper, BIAP, Iraq.  I could find no orders, either suspending or relieving LTC (P) Phillabaum from command, nor any orders placing LTC Chew in command of the 320th.  In addition, there was no indication this removal and search for a replacement was communicated to the Commander CJTF-7, the Commander 377th TSC, or to Soldiers in the 320th MP Battalion.  Temporarily removing one commander and replacing him with another serving Battalion Commander without an order and without notifying superior or subordinate commands is without precedent in my military career.  LTC (P) Phillabaum was also reprimanded for lapses in accountability that resulted in several escapes.  The 320th MP Battalion was stigmatized as a unit due to previous detainee abuse which

occurred in May 2003 at the Bucca Theater Internment Facility (TIF), while under the command of LTC (P) Phillabaum. Despite his proven deficiencies as both a commander and leader, BG Karpinski allowed LTC (P) Phillabaum to remain in command of her most troubled battalion guarding, by far, the largest number of detainees in the 800th MP Brigade. LTC (P) Phillabaum was suspended from his duties by LTG Sanchez, CJTF-7 Commander on 17 January 2004. (**ANNEXES 43, 45, and 61**)

14. (U) During the course of this investigation I conducted a lengthy interview with BG Karpinski that lasted over four hours, and is included verbatim in the investigation Annexes. BG Karpinski was extremely emotional during much of her testimony. What I found particularly disturbing in her testimony was her complete unwillingness to either understand or accept that many of the problems inherent in the 800th MP Brigade were caused or exacerbated by poor leadership and the refusal of her command to both establish and enforce basic standards and principles among its soldiers. (**ANNEX 45 and the Personal Observations of the Interview Team**)

15. (U) BG Karpinski alleged that she received no help from the Civil Affairs Command, specifically, no assistance from either BG John Kern or COL Tim Regan. She blames much of the abuse that occurred in Abu Ghraib (BCCF) on MI personnel and stated that MI personnel had given the MPs "ideas" that led to detainee abuse. In addition, she blamed the 372nd Company Platoon Sergeant, SFC Snider, the Company Commander, CPT Reese, and the First Sergeant, MSG Lipinski, for the abuse. She argued that problems in Abu Ghraib were the fault of COL Pappas and LTC Jordan because COL Pappas was in charge of FOB Abu Ghraib. (**ANNEX 45**)

16. (U) BG Karpinski also implied during her testimony that the criminal abuses that occurred at Abu Ghraib (BCCF) might have been caused by the ultimate disposition of the detainee abuse cases that originally occurred at Camp Bucca in May 2003. She stated that "**about the same time those incidents were taking place out of Baghdad Central, the decisions were made to give the guilty people at Bucca plea bargains. So, the system communicated to the soldiers, the worst that's gonna happen is, you're gonna go home.**" I think it important to point out that almost every witness testified that the serious criminal abuse of detainees at Abu Ghraib (BCCF) occurred in late October and early November 2003. The photographs and statements clearly support that the abuses occurred during this time period. The Bucca cases were set for trial in January 2004 and were not finally disposed of until 29 December 2003. There is entirely no evidence that the decision of numerous MP personnel to intentionally abuse detainees at Abu Ghrabid (BCCF) was influenced in any respect by the Camp Bucca cases. (**ANNEXES 25, 26, and 45**)

17. (U) Numerous witnesses stated that the 800th MP Brigade S-1, MAJ Hinzman and S-4, MAJ Green, were essentially dysfunctional, but that despite numerous complaints, these officers were not replaced. This had a detrimental effect on the Brigade Staff's effectiveness and morale. Moreover, the Brigade Command Judge Advocate, LTC James O'Hare, appears to lack initiative and was unwilling to accept responsibility

for any of his actions.   LTC Gary Maddocks, the Brigade XO did not properly supervise the Brigade staff by failing to lay out staff priorities, take overt corrective action when needed, and supervise their daily functions.  **(ANNEXES 45, 47, 48, 62, and 67)**

18.  (U) In addition to poor morale and staff inefficiencies, I find that the 800th MP Brigade did not articulate or enforce clear and basic Soldier and Army standards.  I specifically found these examples of unenforced standards:

    a.  There was no clear uniform standard for any MP Soldiers assigned detention duties.  Despite the fact that hundreds of former Iraqi soldiers and officers were detainees, MP personnel were allowed to wear civilian clothes in the FOB after duty hours while carrying weapons.  **(ANNEXES 51 and 74)**

    b.  Some Soldiers wrote poems and other sayings on their helmets and soft caps.  **(ANNEXES 51 and 74)**

    c.  In addition, numerous officers and senior NCOs have been reprimanded/disciplined for misconduct during this period.  Those disciplined include;  **(ANNEXES 43 and 102)**

        1).  (U) BG Janis Karpinski, Commander, 800th MP Brigade
- Memorandum of Admonishment by LTG Sanchez, Commander, CJTF-7, on 17 January 2004.

        2).  (U) LTC (P) Jerry Phillabaum, Commander, 320th MP Battalion
- GOMOR from BG Karpinski, Commander 800th MP Brigade, on 10 November 2003, for lack of leadership and for failing to take corrective security measures as ordered by the Brigade Commander; filed locally
- Suspended by BG Karpinski, Commander 800th MP Brigade, 17 January 2004; Pending Relief for Cause, for dereliction of duty

        3).  (U) LTC Dale Burtyk, Commander, 400th MP Battalion
- GOMOR from BG Karpinski, Commander 800th MP Brigade, on 20 August 2003, for failure to properly train his Soldiers. (Soldier had negligent discharge of M-16 while exiting his vehicle, round went into fuel tank); filed locally.

        4).  (U) MAJ David DiNenna, S-3, 320th MP Battalion
- GOMOR from LTG McKiernan, Commander CFLCC, on 25 May 2003, for dereliction of duty for failing to report a violation of CENTCOM General Order #1 by a subordinate Field Grade Officer and Senior Noncommissioned Officer, which he personally observed; returned to soldier unfiled.

- GOMOR from BG Karpinski, Commander 800th MP Brigade, on 10 November 03, for failing to take corrective security measures as ordered by the Brigade Commander; filed locally.

5).  (U) MAJ Stacy Garrity, Finance Officer, 800th MP Brigade
- GOMOR from LTG McKiernan, Commander CFLCC, on 25 May 2003, for violation of CENTCOM General Order #1, consuming alcohol with an NCO; filed locally.

6).  (U) CPT Leo Merck, Commander, 870th MP Company
- Court-Martial Charges Preferred, for Conduct Unbecoming an Officer and Unauthorized Use of Government Computer in that he was alleged to have taken nude pictures of his female Soldiers without their knowledge; Trial date to be announced.

7).  (U) CPT Damaris Morales, Commander, 770th MP Company
- GOMOR from BG Karpinski, Commander 800th MP Brigade, on 20 August 2003, for failing to properly train his Soldiers (Soldier had negligent discharge of M-16 while exiting his vehicle, round went into fuel tank); filed locally.

8).  (U) CSM Roy Clement, Command Sergeant Major, 800th MP Brigade
- GOMOR and Relief for Cause from BG Janis Karpinski, Commander 800th MP Brigade, for fraternization and dereliction of duty for fraternizing with junior enlisted soldiers within his unit; GOMOR officially filed and he was removed from the CSM list.

9).  (U) CSM Edward Stotts, Command Sergeant Major, 400th MP Battalion
- GOMOR from BG Karpinski, Commander 800th MP Brigade, on 20 August 2003, for failing to properly train his Soldiers (Soldier had negligent discharge of M-16 while exiting his vehicle, round went into fuel tank); filed locally

10).  (U) 1SG Carlos Villanueva, First Sergeant, 770th MP Company
- GOMOR from BG Karpinski, Commander 800th MP Brigade, on 20 August 2003, for failing to properly train his Soldiers (Soldier had negligent discharge of M-16 while exiting his vehicle, round went into fuel tank); filed locally.

11).  (U) MSG David Maffett, NBC NCO, 800th MP Brigade,
- GOMOR from LTG McKiernan, Commander CFLCC, on 25 May 2003, for violation of CENTCOM General Order #1, consuming alcohol; filed locally.

12) (U) SGM Marc Emerson, Operations SGM, 320th MP Battalion,
- Two GO Letters of Concern and a verbal reprimand from BG Karpinski, Commander 800th MP Brigade, for failing to adhere to the guidance/directives given to him by BG Karpinski; filed locally.

d. (U) Saluting of officers was sporadic and not enforced. LTC Robert P. Walters, Jr., Commander of the 165th Military Intelligence Battalion (Tactical Exploitation), testified that the saluting policy was enforced by COL Pappas for all MI personnel, and that BG Karpinski approached COL Pappas to reverse the saluting policy back to a no-saluting policy as previously existed. **(ANNEX 53)**

19. (U) I find that individual Soldiers within the 800th MP Brigade and the 320th Battalion stationed throughout Iraq had very little contact during their tour of duty with either LTC (P) Phillabaum or BG Karpinski. BG Karpinski claimed, during her testimony, that she paid regular visits to the various detention facilities where her Soldiers were stationed. However, the detailed calendar provided by her Aide-de-Camp, 1LT Mabry, does not support her contention. Moreover, numerous witnesses stated that they rarely saw BG Karpinski or LTC (P) Phillabaum. **(Multiple Witness Statements)**

20. (U) In addition I find that psychological factors, such as the difference in culture, the Soldiers' quality of life, the real presence of mortal danger over an extended time period, and the failure of commanders to recognize these pressures contributed to the perversive atmosphere that existed at Abu Ghraib (BCCF) Detention Facility and throughout the 800th MP Brigade. **(ANNEX 1)**.

21. As I have documented in other parts of this investigation, I find that there was no clear emphasis by BG Karpinski to ensure that the 800th MP Brigade Staff, Commanders, and Soldiers were trained to standard in detainee operations and proficiency or that serious accountability lapses that occurred over a significant period of time, particularly at Abu Ghraib (BCCF), were corrected. AR 15-6 Investigations regarding detainee escapes were not acted upon, followed up with corrective action, or disseminated to subordinate commanders or Soldiers. Brigade and unit SOPs for dealing with detainees if they existed at all, were not read or understood by MP Soldiers assigned the difficult mission of detainee operations. Following the abuse of several detainees at Camp Bucca in May 2003, I could find no evidence that BG Karpinski ever directed corrective training for her soldiers or ensured that MP Soldiers throughout Iraq clearly understood the requirements of the Geneva Conventions relating to the treatment of detainees. **(Multiple Witness Statements and the Personal Observations of the Investigation Team )**

22. On 17 January 2004 BG Karpinski was formally admonished in writing by LTG Sanchez regarding the serious deficiencies in her Brigade. LTG Sanchez found that the performance of the 800th MP Brigade had not met the standards set by the Army or by CJTF-7. He found that incidents in the preceding six months had occurred that reflected a lack of clear standards, proficiency and leadership within the Brigade. LTG Sanchez also cited the recent detainee abuse at Abu Ghraib (BCCF) as the most recent example of a poor leadership climate that "permeates the Brigade." I totally concur with LTG Sanchez' opinion regarding the performance of BG Karpinski and the 800th MP Brigade. (**ANNEX 102 and the Personal Observations of the Investigating Officer**)

**RECOMMENDATIONS AS TO PART THREE OF THE INVESTIGATION:**

1. (U) That **BG Janis L. Karpinski, Commander, 800th MP Brigade** be Relieved from Command and given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:

   - Failing to ensure that MP Soldiers at theater-level detention facilities throughout Iraq had appropriate SOPs for dealing with detainees and that Commanders and Soldiers had read, understood, and would adhere to these SOPs.
   - Failing to ensure that MP Soldiers in the 800th MP Brigade knew, understood, and adhered to the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
   - Making material misrepresentations to the Investigation Team as to the frequency of her visits to her subordinate commands.
   - Failing to obey an order from the CFLCC Commander, LTG McKiernan, regarding the withholding of disciplinary authority for Officer and Senior Noncommissioned Officer misconduct.
   - Failing to take appropriate action regarding the ineffectiveness of a subordinate Commander, LTC (P) Jerry Phillabaum.
   - Failing to take appropriate action regarding the ineffectiveness of numerous members of her Brigade Staff including her XO, S-1, S-3, and S-4.
   - Failing to properly ensure the results and recommendations of the AARs and numerous 15-6 Investigation reports on escapes and shootings (over a period of several months) were properly disseminated to, and understood by, subordinate commanders.
   - Failing to ensure and enforce basic Soldier standards throughout her command.
   - Failing to establish a Brigade METL.
   - Failing to establish basic proficiency in assigned tasks for Soldiers throughout the 800th MP Brigade.

- Failing to ensure that numerous and reported accountability lapses at detention facilities throughout Iraq were corrected.

2. (U) That **COL Thomas M. Pappas, Commander, 205th MI Brigade**, be given a General Officer Memorandum of Reprimand and Investigated UP Procedure 15, AR 381-10, US Army Intelligence Activities for the following acts which have been previously referred to in the aforementioned findings:

- Failing to ensure that Soldiers under his direct command were properly trained in and followed the IROE.
- Failing to ensure that Soldiers under his direct command knew, understood, and followed the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
- Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).

3. (U) That **LTC (P) Jerry L. Phillabaum, Commander, 320th MP Battalion,** be Relieved from Command, be given a General Officer Memorandum of Reprimand, and be removed from the Colonel/O-6 Promotion List for the following acts which have been previously referred to in the aforementioned findings:

- Failing to properly ensure the results, recommendations, and AARs from numerous reports on escapes and shootings over a period of several months were properly disseminated to, and understood by, subordinates.
- Failing to implement the appropriate recommendations from various 15-6 Investigations as specifically directed by BG Karpinski.
- Failing to ensure that Soldiers under his direct command were properly trained in Internment and Resettlement Operations.
- Failing to ensure that Soldiers under his direct command knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
- Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
- Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
- Failure to conduct an appropriate Mission Analysis and to task organize to accomplish his mission.

4. (U) That **LTC Steven L. Jordan, Former Director, Joint Interrogation and Debriefing Center and Liaison Officer to 205th Military Intelligence Brigade,** be relieved from duty and be given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:

- Making material misrepresentations to the Investigating Team, including his leadership roll at Abu Ghraib (BCCF).
- Failing to ensure that Soldiers under his direct control were properly trained in and followed the IROE.

- Failing to ensure that Soldiers under his direct control knew, understood, and followed the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
- Failing to properly supervise soldiers under his direct authority working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).

5. (U) That **MAJ David W. DiNenna, Sr., S-3, 320th MP Battalion,** be Relieved from his position as the Battalion S-3 and be given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:

- Received a GOMOR from LTG McKiernan, Commander CFLCC, on 25 May 2003, for dereliction of duty for failing to report a violation of CENTCOM General Order #1 by a subordinate Field Grade Officer and Senior Noncommissioned Officer, which he personally observed; GOMOR was returned to Soldier and not filed.
- Failing to take corrective action and implement recommendations from various 15-6 investigations even after receiving a GOMOR from BG Karpinski, Commander 800th MP Brigade, on 10 November 03, for failing to take corrective security measures as ordered; GOMOR was filed locally.
- Failing to take appropriate action and report an incident of detainee abuse, whereby he personally witnessed a Soldier throw a detainee from the back of a truck.

6. (U) That **CPT Donald J. Reese, Commander, 372nd MP Company,** be Relieved from Command and be given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:

- Failing to ensure that Soldiers under his direct command knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
- Failing to properly supervise his Soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
- Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
- Failing to ensure that Soldiers under his direct command were properly trained in Internment and Resettlement Operations.

7. (U) That **1LT Lewis C. Raeder, Platoon Leader, 372nd MP Company,** be Relieved from his duties as Platoon Leader and be given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:

- Failing to ensure that Soldiers under his direct command knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
- Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
- Failing to properly establish and enforce basic Soldier standards, proficiency, and accountability.

- Failing to ensure that Soldiers under his direct command were properly trained in Internment and Resettlement Operations.

8. (U) That **SGM Marc Emerson, Operations SGM, 320th MP Battalion,** be Relieved from his duties and given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:
   - Making a material misrepresentation to the Investigation Team stating that he had "never" been admonished or reprimanded by BG Karpinski, when in fact he had been admonished for failing to obey an order from BG Karpinski to "stay out of the towers" at the holding facility.
   - Making a material misrepresentation to the Investigation Team stating that he had attended every shift change/guard-mount conducted at the 320th MP Battalion, and that he personally briefed his Soldiers on the proper treatment of detainees, when in fact numerous statements contradict this assertion.
   - Failing to ensure that Soldiers in the 320th MP Battalion knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
   - Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
   - Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
   - Failing to ensure that his Soldiers were properly trained in Internment and Resettlement Operations.

9. (U) That **1SG Brian G. Lipinski, First Sergeant, 372nd MP Company,** be Relieved from his duties as First Sergeant of the 372nd MP Company and given a General Officer Memorandum of Reprimand for the following acts which have been previously referred to in the aforementioned findings:
   - Failing to ensure that Soldiers in the 372nd MP Company knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.
   - Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
   - Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
   - Failing to ensure that his Soldiers were properly trained in Internment and Resettlement Operations.

10. (U) That **SFC Shannon K. Snider, Platoon Sergeant**, **372nd MP Company**, be Relieved from his duties, receive a General Officer Memorandum of Reprimand, and receive action under the Uniform Code of Military Justice for the following acts which have been previously referred to in the aforementioned findings:
   - Failing to ensure that Soldiers in his platoon knew and understood the protections afforded to detainees in the Geneva Convention Relative to the Treatment of Prisoners of War.

- Failing to properly supervise his soldiers working and "visiting" Tier 1 of the Hard-Site at Abu Ghraib (BCCF).
- Failing to properly establish and enforce basic soldier standards, proficiency, and accountability.
- Failing to ensure that his Soldiers were properly trained in Internment and Resettlement Operations.
- Failing to report a Soldier, who under his direct control, abused detainees by stomping on their bare hands and feet in his presence.

11. (U) That **Mr. Steven Stephanowicz, Contract US Civilian Interrogator, CACI, 205th Military Intelligence Brigade**, be given an Official Reprimand to be placed in his employment file, termination of employment, and generation of a derogatory report to revoke his security clearance for the following acts which have been previously referred to in the aforementioned findings:
- Made a false statement to the investigation team regarding the locations of his interrogations, the activities during his interrogations, and his knowledge of abuses.
- Allowed and/or instructed MPs, who were not trained in interrogation techniques, to facilitate interrogations by "setting conditions" which were neither authorized and in accordance with applicable regulations/policy. He clearly knew his instructions equated to physical abuse.

12. (U) **That Mr. John Israel, Contract US Civilian Interpreter, CACI, 205th Military Intelligence Brigade,** be given an Official Reprimand to be placed in his employment file and have his security clearance reviewed by competent authority for the following acts or concerns which have been previously referred to in the aforementioned findings:
- Denied ever having seen interrogation processes in violation of the IROE, which is contrary to several witness statements.
- Did not have a security clearance.

13. (U) I find that there is sufficient credible information to warrant an Inquiry UP Procedure 15, AR 381-10, US Army Intelligence Activities, be conducted to determine the extent of culpability of MI personnel, assigned to the 205th MI Brigade and the Joint Interrogation and Debriefing Center (JIDC) at Abu Ghraib (BCCF). Specifically, I suspect that **COL Thomas M. Pappas, LTC Steve L. Jordan, Mr. Steven Stephanowicz,** and **Mr. John Israel** were either directly or indirectly responsible for the abuses at Abu Ghraib (BCCF) and strongly recommend immediate disciplinary action as described in the preceding paragraphs as well as the initiation of a Procedure 15 Inquiry to determine the full extent of their culpability. **(ANNEX 36)**

# OTHER FINDINGS/OBSERVATIONS

1. (U) Due to the nature and scope of this investigation, I acquired the assistance of Col (Dr.) Henry Nelson, a USAF Psychiatrist, to analyze the investigation materials from a psychological perspective. He determined that there was evidence that the horrific

abuses suffered by the detainees at Abu Ghraib (BCCF) were wanton acts of select soldiers in an unsupervised and dangerous setting. There was a complex interplay of many psychological factors and command insufficiencies. A more detailed analysis is contained in **ANNEX 1** of this investigation.

2. (U) During the course of this investigation I conducted a lengthy interview with BG Karpinski that lasted over four hours, and is included verbatim in the investigation Annexes. BG Karpinski was extremely emotional during much of her testimony. What I found particularly disturbing in her testimony was her complete unwillingness to either understand or accept that many of the problems inherent in the 800th MP Brigade were caused or exacerbated by poor leadership and the refusal of her command to both establish and enforce basic standards and principles among its Soldiers. **(ANNEX 45)**

3. (U) Throughout the investigation, we observed many individual Soldiers and some subordinate units under the 800th MP Brigade that overcame significant obstacles, persevered in extremely poor conditions, and upheld the Army Values. We discovered numerous examples of Soldiers and Sailors taking the initiative in the absence of leadership and accomplishing their assigned tasks.

   a. (U) The 744th MP Battalion, commanded by LTC Dennis McGlone, efficiently operated the HVD Detention Facility at Camp Cropper and met mission requirements with little to no guidance from the 800th MP Brigade. The unit was disciplined, proficient, and appeared to understand their basic tasks.

   b. (U) The 530th MP Battalion, commanded by LTC Stephen J. Novotny, effectively maintained the MEK Detention Facility at Camp Ashraf. His Soldiers were proficient in their individual tasks and adapted well to this highly unique and non-doctrinal operation.

   c. (U) The 165th MI Battalion excelled in providing perimeter security and force protection at Abu Ghraib (BCCF). LTC Robert P. Walters, Jr., demanded standards be enforced and worked endlessly to improve discipline throughout the FOB.

4.  (U) The individual Soldiers and Sailors that we observed and believe should be favorably noted include:

    a.  (U) Master-at-Arms First Class William J. Kimbro, US Navy Dog Handler, knew his duties and refused to participate in improper interrogations despite significant pressure from the MI personnel at Abu Ghraib.

    b.  (U) SPC Joseph M. Darby, 372nd MP Company discovered evidence of abuse and turned it over to military law enforcement.

    c.  (U) 1LT David O. Sutton, 229th MP Company, took immediate action and stopped an abuse, then reported the incident to the chain of command.

# CONCLUSION

1.  (U) Several US Army Soldiers have committed egregious acts and grave breaches of international law at Abu Ghraib/BCCF and Camp Bucca, Iraq.  Furthermore, key senior leaders in both the 800th MP Brigade and the 205th MI Brigade failed to comply with established regulations, policies, and command directives in preventing detainee abuses at Abu Ghraib (BCCF) and at Camp Bucca during the period August 2003 to February 2004.

2.  (U) Approval and implementation of the recommendations of this AR 15-6 Investigation and those highlighted in previous assessments are essential to establish the conditions with the resources and personnel required to prevent future occurrences of detainee abuse.

## Annexes

1. Psychological Assessment
2. Request for investigation from CJTF-7 to CENTCOM
3. Directive to CFLCC from CENTCOM directing investigation
4. Appointment Memo from CFLCC CDR to MG Taguba
5. 15-6 Investigation 9 June 2003
6. 15-6 Investigation 12 June 2003
7. 15-6 Investigation 13 June 2003
8. 15-6 Investigation 24 November 2003
9. 15-6 Investigation 7 January 2004
10. 15-6 Investigation 12 January 2004
11. SIR 5 November 2003
12. SIR 7 November 2003
13. SIR 8 November 2003
14. SIR 13 December 2003
15. SIR 13 December 2003
16. SIR 13 December 2003
17. SIR 17 December 2003
18. Commander's Inquiry 26 January 2004
19. MG Ryder's Report, 6 November 2003
20. MG Miller's Report, 9 September 2003
21. AR 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees, 1 October 1997
22. FM 3-19.40, Military Police Internment/Resettlement Operations, 1 August 2001
23. FM 34-52, Intelligence Interrogation, 28 September 1992
24. Fourth Geneva Convention, 12 August 1949
25. CID Report on criminal abuses at Abu Ghraib, 28 January 2004
26. CID Interviews, 10-25 January 2004
27. 800th MP Brigade Roster, 29 January 2004
28. 205th MI Brigade's IROE, Undated
29. TOA Order (800th MP Brigade) and letter holding witnesses
30. Investigation Team's witness list
31. FRAGO #1108
32. Letters suspending several key leaders in the 800th MP Brigade and Rating Chain with suspensions annotated
33. FM 27-10, Military Justice, 6 September 2002
34. CID Report on abuse of detainees at Camp Bucca, 8 June 2003
35. Article 32 Findings on abuse of detainees at Camp Bucca, 26 August 2003
36. AR 381-10, 1 July 1984
37. Excerpts from log books, 320th MP Battalion
38. 310th MP Battalion's Inprocessing SOP
39. 320th MP Battalion's "Change Sheet"
40. Joint Interrogation and Debriefing Center's (JIDC) Slides, Undated
41. Order of Battle Slides, 12 January 2004
42. Joint Publication 0-2, Unified Actions Armed Forces, 10 July 2001

43. General Officer Memorandums of Reprimand
44. 800th MP Battalion's TACSOP
45. BG Janis Karpinski, Commander, 800th MP Brigade
46. COL Thomas Pappas, Commander, 205th MI Brigade
47. COL Ralph Sabatino, CFLCC Judge Advocate, CPA Ministry of Justice
48. LTC Gary W. Maddocks, S-5 and Executive Officer, 800th MP Brigade
49. LTC James O'Hare, Command Judge Advocate, 800th MP Brigade
50. LTC Robert P. Walters Jr., Commander, 165th MI Battalion (Tactical exploitation)
51. LTC James D. Edwards, Commander, 202nd MI Battalion
52. LTC Vincent Montera, Commander 310th MP Battalion
53. LTC Steve Jordan, former Director, Joint Interrogation and Debriefing Center/LNO to the 205th MI Brigade
54. LTC Leigh A. Coulter, Commander 724th MP Battalion and OIC Arifjan Detachment, 800th MP Brigade
55. LTC Dennis McGlone, Commander, 744th MP Battalion
56. MAJ David Hinzman, S-1, 800th MP Brigade
57. MAJ William D. Proietto, Deputy CJA, 800th MP Brigade
58. MAJ Stacy L. Garrity, S-1 (FWD), 800th MP Brigade
59. MAJ David W. DiNenna, S-3, 320th MP Battalion
60. MAJ Michael Sheridan, XO, 320th MP Battalion
61. MAJ Anthony Cavallaro, S-3, 800th MP Brigade
62. CPT Marc C. Hale, Commander, 670th MP Company
63. CPT Donald Reese, Commander, 372nd MP Company
64. CPT Darren Hampton, Assistant S-3, 320th MP Battalion
65. CPT John Kaires, S-3, 310th MP Battalion
66. CPT Ed Diamantis, S-2, 800th MP Brigade
67. LTC Jerry L. Phillabaum, Commander, 320th MP Battalion
68. CPT James G. Jones, Commander, 229th MP Company
69. CPT Michael A. Mastrangelo, Jr., Commander, 310th MP Company
70. CPT Lawrence Bush, IG, 800th MP Brigade
71. 1LT Lewis C. Raeder, Platoon Leader, 372nd MP Company
72. 1LT Elvis Mabry, Aide-de-Camp to Brigade Commander, 800th MP Brigade
73. 1LT Warren E. Ford, II, Commander, HHC 320th MP Battalion
74. 2LT David O. Sutton, Platoon Leader, 229th MP Company
75. CW2 Edward J. Rivas, 205th MI Brigade
76. CSM Joseph P. Arrison, Command Sergeant Major, 320th MP Battalion
77. SGM Pascual Cartagena, Command Sergeant Major, 800th MP Brigade
78. CSM Timothy L. Woodcock, Command Sergeant Major, 310th MP Battalion
79. 1SG Dawn J. Rippelmeyer, First Sergeant, 977th MP Company
80. SGM Mark Emerson, Operations SGM, 320th MP Battalion
81. MSG Brian G. Lipinski, First Sergeant, 372nd MP Company
82. MSG Andrew J. Lombardo, Operations Sergeant, 310th MP Battalion
83. SFC Daryl J. Plude, Platoon Sergeant, 229th MP Company
84. SFC Shannon K. Snider, Platoon SGT, 372nd MP Company
85. SFC Keith A. Comer, 372nd MP Company

86. SSG Robert Elliot, Squad Leader, 372nd MP Company
87. SSG Santos A. Cardona, Army Dog Handler
88. SGT Michael Smith, Army Dog Handler
89. MA1 William J. Kimbro, USN Dog Handler
90. Mr. Steve Stephanowicz, US civilian contract Interrogator, CACI, 205th MI Brigade
91. Mr. John Israel, US civilian contract Interpreter, Titan Corporation, 205th MI Brigade
92. FM 3-19.1, Military Police Operations, 22 March 2001
93. CJTF-7 IROE and DROE, Undated
94. CJTF-7 Interrogation and Counter Resistance Policy, 12 October 2003
95. 800th MP Brigade Mobilization Orders
96. Sample Detainee Status Report, 13 March 2004
97. 530th MP Battalion Mission Brief, 11 February 2004
98. Memorandum for Record, CPT Ed Ray, Chief of Military Justice, CFLCC, 9 March 2004
99. SIR 14 January 2004
100. Accountability Plan Recommendations, 9 March 2004
101. 2LT Michael R. Osterhout, S-2, 320th MP Battalion
102. Memorandum of Admonishment from LTG Sanchez to BG Karpinski, 17 January 2004
103. Various SIRs from the 800th MP Brigade/320th MP Battalion
104. 205th MI Brigade SITREP to MG Miller, 12 December 2003
105. SGT William A. Cathcart, 372nd MP Company
106. 1LT Michael A. Drayton, Commander, 870th MP Company