FindLaw
WWW.FINDLAW.COM

# Final Report
# of the
# Independent Panel To Review
# DoD Detention Operations



# August 2004

# Independent Panel to Review
# DoD Detention Operations

## Chairman

The Honorable James R. Schlesinger

## Panel Members

The Honorable Harold Brown

The Honorable Tillie K. Fowler

General Charles A. Horner (USAF-RET)

## Executive Director

Dr. James A. Blackwell, Jr.



**INDEPENDENT PANEL TO REVIEW DOD DETENTION OPERATIONS**

**CHAIRMAN**
THE HONORABLE JAMES R. SCHLESINGER

**PANEL MEMBERS**
THE HONORABLE HAROLD BROWN
THE HONORABLE TILLIE K. FOWLER
GENERAL CHARLES A. HORNER (USAF-RET.)

**EXECUTIVE DIRECTOR**
DR. JAMES A. BLACKWELL, JR.

August 24, 2004

To U.S. Secretary of Defense Donald Rumsfeld

We, the appointed members of the Independent Panel to Review DoD Detention Operations, pursuant to our charter do hereby submit the results of our findings and offer our best recommendations.

Sincerely,

The Honorable James R. Schlesinger
Chairman

The Honorable Harold Brown
Panel Member

The Honorable Tillie K. Fowler
Panel Member

General Charles A. Horner
(USAF –Ret.)
Panel Member

223 23rd Street , Crystal Plaza 5, Suite 884, Arlington, VA 22202-3712
Office Main Phone: (703) 602-3200    Unsecured Fax: (703) 602-2712

# The Independent Panel to Review Department of Defense Detention Operations

**August 2004**

# Table of Contents

Executive Summary ............................................................................................. 5

Introduction – Charter and Methodology....................................................... 21

The Changing Threat....................................................................................... 27

The Policy Promulgation Process  ................................................................. 33

Public Release of Abuse Photos .................................................................... 39

Command Responsibilities ............................................................................. 43

Military Police and Detention Operations ..................................................... 53

Interrogation Operations  ............................................................................... 63

The Role of Military Police and Military Intelligence in Detention Operations  .......... 71

Laws of War/Geneva Conventions  ............................................................... 79

The Role of the International Committee of the Red Cross .......................... 85

Recommendations ........................................................................................... 89

Appendices ...................................................................................................... 93

# Table of Appendices

Glossary..........................................................................................................Appendix A

Secretary of Defense Memorandum appointing the Independent Panel.........Appendix B

President of the United States Memorandum, February 7, 2002 ....................Appendix C

Interrogation Policies .....................................................................................Appendix D

Evolution of Interrogation Techniques ..........................................................Appendix E

Timeline, Major Detention Events ................................................................. Appendix F

Psychological Stresses....................................................................................Appendix G

Ethical Issues..................................................................................................Appendix H

# Executive Summary

## OVERVIEW

The events of October through December 2003 on the night shift of Tier 1 at Abu Ghraib prison were acts of brutality and purposeless sadism. We now know these abuses occurred at the hands of both military police and military intelligence personnel. The pictured abuses, unacceptable even in wartime, were not part of authorized interrogations nor were they even directed at intelligence targets. They represent deviant behavior and a failure of military leadership and discipline. However, we do know that some of the egregious abuses at Abu Ghraib which were not photographed did occur during interrogation sessions and that abuses during interrogation sessions occurred elsewhere.

In light of what happened at Abu Ghraib, a series of comprehensive investigations has been conducted by various components of the Department of Defense. Since the beginning of hostilities in Afghanistan and Iraq, U.S. military and security operations have apprehended about 50,000 individuals. From this number, about 300 allegations of abuse in Afghanistan, Iraq or Guantanamo have arisen. As of mid-August 2004, 155 investigations into the allegations have been completed, resulting in 66 substantiated cases. Approximately one-third of these cases occurred at the point of capture or tactical collection point, frequently under uncertain, dangerous and violent circumstances.

Abuses of varying severity occurred at differing locations under differing circumstances and context. They were widespread and, though inflicted on only a small percentage of those detained, they were serious both in number and in effect. No approved procedures called for or allowed the kinds of abuse that in fact occurred. There is no evidence of a policy of abuse promulgated by senior officials or military authorities. Still, the abuses were not just the failure of some individuals to follow known standards, and they are more than the failure of a few leaders to enforce proper discipline. There is both institutional and personal responsibility at higher levels.

5

Secretary of Defense Donald Rumsfeld appointed the members of the Independent Panel to provide independent professional advice on detainee abuses, what caused them and what actions should be taken to preclude their repetition. The Panel reviewed various criminal investigations and a number of command and other major investigations. The Panel also conducted interviews of relevant persons, including the Secretary and Deputy Secretary of Defense, other senior Department of Defense officials, the military chain-of-command and their staffs and other officials directly and indirectly involved with Abu Ghraib and other detention operations. However, the Panel did not have full access to information involving the role of the Central Intelligence Agency in detention operations; this is an area the Panel believes needs further investigation and review. It should be noted that information provided to the Panel was that available as of mid-August 2004. If additional information becomes available, the Panel's judgments might be revised.

## POLICY

With the events of September 11, 2001, the President, the Congress and the American people recognized we were at war with a different kind of enemy. The terrorists who flew airliners into the World Trade Center and the Pentagon were unlike enemy combatants the U.S. has fought in previous conflicts. Their objectives, in fact, are to kill large numbers of civilians and to strike at the heart of America's political cohesion and its economic and military might. In the days and weeks after the attack, the President and his closest advisers developed policies and strategies in response. On September 18, 2001, by a virtually unanimous vote, Congress passed an Authorization for Use of Military Force. Shortly thereafter, the U.S. initiated hostilities in Afghanistan and the first detainees were held at Mazar-e-Sharrif in November 2001.

On February 7, 2002, the President issued a memorandum stating that he determined the Geneva Conventions did not apply to the conflict with al Qaeda, and although they did apply in the conflict with Afghanistan, the Taliban were unlawful combatants and

6

therefore did not qualify for prisoner of war status (see Appendix C). Nonetheless, the Secretary of State, Secretary of Defense, and the Chairman of the Joint Chiefs of Staff were all in agreement that treatment of detainees should be consistent with the Geneva Conventions. The President ordered accordingly that detainees were to be treated ". . . humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva." Earlier, the Department of State had argued the Geneva Conventions in their traditional application provided a sufficiently robust legal construct under which the Global War on Terror could effectively be waged. The Legal Advisor to the Chairman, Joint Chiefs of Staff, and many of the military service attorneys agreed with this position.

In the summer of 2002, the Counsel to the President queried the Department of Justice Office of Legal Counsel (OLC) for an opinion on the standards of conduct for interrogation operations conducted by U.S. personnel outside of the U.S. and the applicability of the Convention Against Torture. The OLC responded in an August 1, 2002 opinion in which it held that in order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain and suffering that is difficult to endure.

Army Field Manual 34-52 (FM 34-52), with its list of 17 authorized interrogation methods, has long been the standard source for interrogation doctrine within the Department of Defense (see Appendix D). In October 2002, authorities at Guantanamo requested approval of stronger interrogation techniques to counter tenacious resistance by some detainees. The Secretary of Defense responded with a December 2, 2002 decision authorizing the use of 16 additional techniques at Guantanamo (see Appendix E). As a result of concerns raised by the Navy General Counsel on January 15, 2003, Secretary Rumsfeld rescinded the majority of the approved measures in the December 2, 2002 authorization. Moreover, he directed the remaining more aggressive techniques could be used only with his approval (see Appendix D).

At the same time, he directed the Department of Defense (DoD) General Counsel to establish a working group to study interrogation techniques. The Working Group was headed by Air Force General Counsel Mary Walker and included wide membership from across the military legal and intelligence communities. The Working Group also relied heavily on the OLC. The Working Group reviewed 35 techniques and after a very extensive debate ultimately recommended 24 to the Secretary of Defense. The study led to the Secretary of Defense's promulgation on April 16, 2003 of a list of approved techniques strictly limited for use at Guantanamo. This policy remains in force at Guantanamo (see Appendix E).

In the initial development of these Secretary of Defense policies, the legal resources of the Services' Judge Advocates General and General Counsels were not utilized to their full potential. Had the Secretary of Defense had a wider range of legal opinions and a more robust debate regarding detainee policies and operations, his policy of April 16, 2003 might well have been developed and issued in early December 2002. This would have avoided the policy changes which characterized the Dec 02, 2002 to April 16, 2003 period.

It is clear that pressures for additional intelligence and the more aggressive methods sanctioned by the Secretary of Defense memorandum, resulted in stronger interrogation techniques that were believed to be needed and appropriate in the treatment of detainees defined as "unlawful combatants." At Guantanamo, the interrogators used those additional techniques with only two detainees, gaining important and time-urgent information in the process.

In Afghanistan, from the war's inception through the end of 2002, all forces used FM 34-52 as a baseline for interrogation techniques. Nonetheless, more aggressive interrogation of detainees appears to have been on-going. On January 24, 2003, in response to a data call from the Joint Staff to facilitate the Working Group efforts, the Commander Joint Task Force-180 forwarded a list of techniques being used in

8

Afghanistan, including some not explicitly set out in FM 34-52. These techniques were included in a Special Operation Forces (SOF) Standard Operating Procedures document published in February 2003. The 519th Military Intelligence Battalion, a company of which was later sent to Iraq, assisted in interrogations in support of SOF and was fully aware of their interrogation techniques.

Interrogators and lists of techniques circulated from Guantanamo and Afghanistan to Iraq. During July and August 2003, the 519th Military Intelligence Company was sent to the Abu Ghraib detention facility to conduct interrogation operations. Absent any explicit policy or guidance, other than FM 34-52, the officer in charge prepared draft interrogation guidelines that were a near copy of the Standard Operating Procedure created by SOF. It is important to note that techniques effective under carefully controlled conditions at Guantanamo became far more problematic when they migrated and were not adequately safeguarded.

Following a CJTF-7 request, Joint Staff tasked SOUTHCOM to send an assistance team to provide advice on facilities and operations, specifically related to screening, interrogations, HUMINT collection, and inter-agency integration in the short and long term. In August 2003, MG Geoffrey Miller arrived to conduct an assessment of DoD counter-terrorism interrogation and detention operations in Iraq. He was to discuss current theater ability to exploit internees rapidly for actionable intelligence. He brought the Secretary of Defense's April 16, 2003 policy guidelines for Guantanamo with him and gave this policy to CJTF-7 as a possible model for the command-wide policy that he recommended be established. MG Miller noted that it applied to unlawful combatants at Guantanamo and was not directly applicable to Iraq where the Geneva Conventions applied. In part as a result of MG Miller's call for strong, command-wide interrogation policies and in part as a result of a request for guidance coming up from the 519th at Abu Ghraib, on September 14, 2003 LTG Sanchez signed a memorandum authorizing a dozen interrogation techniques beyond Field Manual 34-52—five beyond those approved for Guantanamo (see Appendix D).

MG Miller had indicated his model was approved only for Guantanamo. However, CJTF-7, using reasoning from the President's Memorandum of February 7, 2002 which addressed "unlawful combatants," believed additional, tougher measures were warranted because there were "unlawful combatants" mixed in with Enemy Prisoners of War and civilian and criminal detainees. The CJTF-7 Commander, on the advice of his Staff Judge Advocate, believed he had the inherent authority of the Commander in a Theater of War to promulgate such a policy and make determinations as to the categorization of detainees under the Geneva Conventions. CENTCOM viewed the CJTF-7 policy as unacceptably aggressive and on October 12, 2003 Commander CJTF-7 rescinded his September directive and disseminated methods only slightly stronger than those in Field Manual 34-52 (see Appendix D). The policy memos promulgated at the CJTF-7 level allowed for interpretation in several areas and did not adequately set forth the limits of interrogation techniques. The existence of confusing and inconsistent interrogation technique policies contributed to the belief that additional interrogation techniques were condoned.

## DETENTION AND INTERROGATION OPERATIONS

From his experience in Guantanamo, MG Miller called for the military police and military intelligence soldiers to work cooperatively, with the military police "setting the conditions" for interrogations. This MP role included passive collection on detainees as well as supporting incentives recommended by the military interrogators. These collaborative procedures worked effectively in Guantanamo, particularly in light of the high ratio of approximately 1 to 1 of military police to mostly compliant detainees. However, in Iraq and particularly in Abu Ghraib the ratio of military police to repeatedly unruly detainees was significantly smaller, at one point 1 to about 75 at Abu Ghraib, making it difficult even to keep track of prisoners. Moreover, because Abu Ghraib was located in a combat zone, the military police were engaged in force protection of the complex as well as escorting convoys of supplies to and from the prison. Compounding

these problems was the inadequacy of leadership, oversight and support needed in the face of such difficulties.

At various times, the U.S. conducted detention operations at approximately 17 sites in Iraq and 25 sites in Afghanistan, in addition to the strategic operation at Guantanamo. A cumulative total of 50,000 detainees have been in the custody of U.S. forces since November 2001, with a peak population of 11,000 in the month of March 2004.

In Iraq, there was not only a failure to plan for a major insurgency, but also to quickly and adequately adapt to the insurgency that followed after major combat operations. The October 2002 CENTCOM War Plan presupposed that relatively benign stability and security operations would precede a handover to Iraq's authorities. The contingencies contemplated in that plan included sabotage of oil production facilities and large numbers of refugees generated by communal strife.

Major combat operations were accomplished more swiftly than anticipated. Then began a period of occupation and an active and growing insurgency. Although the removal of Saddam Hussein was initially welcomed by the bulk of the population, the occupation became increasingly resented. Detention facilities soon held Iraqi and foreign terrorists as well as a mix of Enemy Prisoners of War, other security detainees, criminals and undoubtedly some accused as a result of factional rivalries. Of the 17 detention facilities in Iraq, the largest, Abu Ghraib, housed up to 7,000 detainees in October 2003, with a guard force of only about 90 personnel from the 800th Military Police Brigade. Abu Ghraib was seriously overcrowded, under-resourced, and under continual attack. Five U.S. soldiers died as a result of mortar attacks on Abu Ghraib. In July 2003, Abu Ghraib was mortared 25 times; on August 16, 2003, five detainees were killed and 67 wounded in a mortar attack. A mortar attack on April 20, 2004 killed 22 detainees.

Problems at Abu Ghraib are traceable in part to the nature and recent history of the military police and military intelligence units at Abu Ghraib. The 800th Military Police

Brigade had one year of notice to plan for detention operations in Iraq. Original projections called for approximately 12 detention facilities in non-hostile, rear areas with a projection of 30,000 to 100,000 Enemy Prisoners of War. Though the 800th had planned a detention operations exercise for the summer of 2002, it was cancelled because of the disruption in soldier and unit availability resulting from the mobilization of Military Police Reserves following 9/11. Although its readiness was certified by U.S. Army Forces Command, actual deployment of the 800th Brigade to Iraq was chaotic. The "Time Phased Force Deployment List," which was the planned flow of forces to the theater of operations, was scrapped in favor of piecemeal unit deployment orders based on actual unit readiness and personnel strength. Equipment and troops regularly arrived out of planned sequence and rarely together. Improvisation was the order of the day. While some units overcame these difficulties, the 800th was among the lowest in priority and did not have the capability to overcome the shortfalls it confronted.

The 205th MI Brigade, deployed to support Combined Joint Task Force-7 (CJTF-7), normally provides the intelligence capability for a Corps Headquarters. However, it was insufficient to provide the kind of support needed by CJTF-7, especially with regard to interrogators and interpreters. Some additional units were mobilized to fill in the gaps, but while these MI units were more prepared than their military police counterparts, there were insufficient numbers of units available. Moreover, unit cohesion was lacking because elements of as many as six different units were assigned to the interrogation mission at Abu Ghraib. These problems were heightened by friction between military intelligence and military police personnel, including the brigade commanders themselves.

## ABUSES

As of the date of this report, there were about 300 incidents of alleged detainee abuse across the Joint Operations Areas. Of the 155 completed investigations, 66 have resulted in a determination that detainees under the control of U.S. forces were abused. Dozens of

non-judicial punishments have already been awarded. Others are in various stages of the military justice process.

Of the 66 already substantiated cases of abuse, eight occurred at Guantanamo, three in Afghanistan and 55 in Iraq. Only about one-third were related to interrogation, and two-thirds to other causes. There were five cases of detainee deaths as a result of abuse by U.S. personnel during interrogations. Many more died from natural causes and enemy mortar attacks. There are 23 cases of detainee deaths still under investigation; three in Afghanistan and 20 in Iraq. Twenty-eight of the abuse cases are alleged to include Special Operations Forces (SOF) and, of the 15 SOF cases that have been closed, ten were determined to be unsubstantiated and five resulted in disciplinary action. The Jacoby review of SOF detention operations found a range of abuses and causes similar in scope and magnitude to those found among conventional forces.

The aberrant behavior on the night shift in Cell Block 1 at Abu Ghraib would have been avoided with proper training, leadership and oversight. Though acts of abuse occurred at a number of locations, those in Cell Block 1 have a unique nature fostered by the predilections of the noncommissioned officers in charge. Had these noncommissioned officers behaved more like those on the day shift, these acts, which one participant described as "just for the fun of it," would not have taken place.

Concerning the abuses at Abu Ghraib, the impact was magnified by the fact the shocking photographs were aired throughout the world in April 2004. Although CENTCOM had publicly addressed the abuses in a press release in January 2004, the photographs remained within the official criminal investigative process. Consequently, the highest levels of command and leadership in the Department of Defense were not adequately informed nor prepared to respond to the Congress and the American public when copies were released by the press.

## POLICY AND COMMAND RESPONSIBILITIES

Interrogation policies with respect to Iraq, where the majority of the abuses occurred, were inadequate or deficient in some respects at three levels: Department of Defense, CENTCOM/CJTF-7, and Abu Ghraib Prison. Policies to guide the demands for actionable intelligence lagged behind battlefield needs. As already noted, the changes in DoD interrogation policies between December 2, 2002 and April 16, 2003 were an element contributing to uncertainties in the field as to which techniques were authorized. Although specifically limited by the Secretary of Defense to Guantanamo, and requiring his personal approval (given in only two cases), the augmented techniques for Guantanamo migrated to Afghanistan and Iraq where they were neither limited nor safeguarded.

At the operational level, in the absence of specific guidance from CENTCOM, interrogators in Iraq relied on Field Manual 34-52 and on unauthorized techniques that had migrated from Afghanistan. On September 14, 2003 CJTF-7 signed the theater's first policy on interrogation, which contained elements of the approved Guantanamo policy and elements of the SOF policy (see Appendix D). Policies approved for use on al Qaeda and Taliban detainees, who were not afforded the protection of the Geneva Conventions, now applied to detainees who did fall under the Geneva Convention protections.

CENTCOM disapproved the September 14, 2003 policy, resulting in another policy signed on October 12, 2003 which essentially mirrored the outdated 1987 version of the FM 34-52 (see Appendix D). The 1987 version, however, authorized interrogators to control all aspects of the interrogation, "to include lighting and heating, as well as food, clothing, and shelter given to detainees." This was specifically left out of the current 1992 version. This clearly led to confusion on what practices were acceptable. We cannot be sure how much the number and severity of abuses would have been curtailed

14

had there been early and consistent guidance from higher levels. Nonetheless, such guidance was needed and likely would have had a limiting effect.

At the tactical level we concur with the Jones/Fay investigation's conclusion that military intelligence personnel share responsibility for the abuses at Abu Ghraib with the military police soldiers cited in the Taguba investigation. The Jones/Fay Investigation found 44 alleged instances of abuse, some which were also considered by the Taguba report. A number of these cases involved MI personnel directing the actions of MP personnel. Yet it should be noted that of the 66 closed cases of detainee abuse in Guantanamo, Afghanistan and Iraq cited by the Naval Inspector General, only one-third were interrogation related.

The Panel concurs with the findings of the Taguba and Jones investigations that serious leadership problems in the 800th MP Brigade and 205th MI Brigade, to include the 320th MP Battalion Commander and the Director of the Joint Debriefing and Interrogation Center (JDIC), allowed the abuses at Abu Ghraib. The Panel endorses the disciplinary actions taken as a result of the Taguba Investigation. The Panel anticipates that the Chain of Command will take additional disciplinary action as a result of the referrals of the Jones/Fay investigation.

We believe LTG Sanchez should have taken stronger action in November when he realized the extent of the leadership problems at Abu Ghraib. His attempt to mentor BG Karpinski, though well-intended, was insufficient in a combat zone in the midst of a serious and growing insurgency. Although LTG Sanchez had more urgent tasks than dealing personally with command and resource deficiencies at Abu Ghraib, MG Wojdakowski and the staff should have seen that urgent demands were placed to higher headquarters for additional assets. We concur with the Jones findings that LTG Sanchez and MG Wojdakowski failed to ensure proper staff oversight of detention and interrogation operations.

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

We note, however, in terms of its responsibilities, CJTF-7 was never fully resourced to meet the size and complexity of its mission. The Joint Staff, CJTF-7 and CENTCOM took too long to finalize the Joint Manning Document (JMD). It was not finally approved until December 2003, six months into the insurgency. At one point, CJTF-7 had only 495 of the 1,400 personnel authorized. The command was burdened with additional complexities associated with its mission to support the Coalition Provisional Authority.

Once it became clear in the summer of 2003 that there was a major insurgency growing in Iraq, with the potential for capturing a large number of enemy combatants, senior leaders should have moved to meet the need for additional military police forces. Certainly by October and November when the fighting reached a new peak, commanders and staff from CJTF-7 all the way to CENTCOM to the Joint Chiefs of Staff should have known about and reacted to the serious limitations of the battalion of the 800th Military Police Brigade at Abu Ghraib. CENTCOM and the JCS should have at least considered adding forces to the detention/interrogation operation mission. It is the judgment of this panel that in the future, considering the sensitivity of this kind of mission, the OSD should assure itself that serious limitations in detention/interrogation missions do not occur.

Several options were available to Commander CENTCOM and above, including reallocation of U.S. Army assets already in the theater, Operational Control (OPCON) of other Service Military Police units in theater, and mobilization and deployment of additional forces from the continental United States. There is no evidence that any of the responsible senior officers considered any of these options. What could and should have been done more promptly is evidenced by the fact that the detention/interrogation operation in Iraq is now directed by a Major General reporting directly to the Commander, Multi-National Forces Iraq (MNFI). Increased units of Military Police, fully manned and more appropriately equipped, are performing the mission once assigned to a single under-strength, poorly trained, inadequately equipped and weakly-led brigade.

16

In addition to the already cited leadership problems in the 800th MP Brigade, there were a series of tangled command relationships. These ranged from an unclear military intelligence chain of command, to the Tactical Control (TACON) relationship of the 800th with CJTF-7 which the Brigade Commander apparently did not adequately understand, and the confusing and unusual assignment of MI and MP responsibilities at Abu Ghraib. The failure to react appropriately to the October 2003 ICRC report, following its two visits to Abu Ghraib, is indicative of the weakness of the leadership at Abu Ghraib. These unsatisfactory relationships were present neither at Guantanamo nor in Afghanistan.

## RECOMMENDATIONS

Department of Defense reform efforts are underway and the Panel commends these efforts. They are discussed in more detail in the body of this report. The Office of the Secretary of Defense, the Joint Chiefs of Staff and the Military Services are conducting comprehensive reviews on how military operations have changed since the end of the Cold War. The Military Services now recognize the problems and are studying force compositions, training, doctrine, responsibilities and active duty/reserve and guard/contractor mixes which must be adjusted to ensure we are better prepared to succeed in the war on terrorism. As an example, the Army is currently planning and developing 27 additional MP companies.

The specific recommendations of the Independent Panel are contained in the Recommendations section, beginning on page 87.

# **CONCLUSION**

The vast majority of detainees in Guantanamo, Afghanistan and Iraq were treated appropriately, and the great bulk of detention operations were conducted in compliance with U.S. policy and directives. They yielded significant amounts of actionable intelligence for dealing with the insurgency in Iraq and strategic intelligence of value in the Global War on Terror. For example, much of the information in the recently released 9/11 Commission's report, on the planning and execution of the attacks on the World Trade Center and Pentagon, came from interrogation of detainees at Guantanamo and elsewhere.

Justice Sandra Day O'Connor, writing for the majority of the Supreme Court of the United States in *Hamdi v. Rumsfeld* on June 28, 2004, pointed out that "The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again." But detention operations also serve the key purpose of intelligence gathering. These are not competing interests but appropriate objectives which the United States may lawfully pursue.

We should emphasize that tens of thousands of men and women in uniform strive every day under austere and dangerous conditions to secure our freedom and the freedom of others. By historical standards, they rate as some of the best trained, disciplined and professional service men and women in our nation's history.

While any abuse is too much, we see signs that the Department of Defense is now on the path to dealing with the personal and professional failures and remedying the underlying causes of these abuses. We expect any potential future incidents of abuse will similarly be discovered and reported out of the same sense of personal honor and duty that characterized many of those who went out of their way to do so in most of these cases. The damage these incidents have done to U.S. policy, to the image of the U.S. among

populations whose support we need in the Global War on Terror and to the morale of our armed forces, must not be repeated.

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

# INTRODUCTION–CHARTER AND METHODOLOGY

The Secretary of Defense chartered the Independent Panel on May 12, 2004, to review Department of Defense (DoD) Detention Operations (see Appendix A). In his memorandum, the Secretary tasked the Independent Panel to review Department of Defense investigations on detention operations whether completed or ongoing, as well as other materials and information the Panel deemed relevant to its review. The Secretary asked for the Panel's independent advice in highlighting the issues considered most important for his attention. He asked for the Panel's views on the causes and contributing factors to problems in detainee operations and what corrective measures would be required.

Completed investigations reviewed by the Panel include the following:

- Joint Staff External Review of Intelligence Operations at Guantanamo Bay, Cuba, September 28, 2002  (Custer Report)

- Joint Task Force Guantanamo assistance visit to Iraq to assess intelligence operations, September 5, 2003 (Miller Report)

- Army Provost Marshal General assessment of detention and corrections operations in Iraq, November 6, 2003  (Ryder Report)

- Administrative investigation under Army Regulation 15-6 (AR 15-6) regarding Abu Ghraib, June 8, 2004 (Taguba Report)

- Army Inspector General assessment of doctrine and training for detention operations, July 23, 2004 (Mikolashek Report)

21

- The Fay investigation of activities of military personnel at Abu Ghraib and related LTG Jones investigation under the direction of GEN Kern, August 16, 2004

- Naval Inspector General's review of detention procedures at Guantanamo Bay, Cuba and the Naval Consolidated Brig, Charleston, South Carolina  (A briefing was presented to the Secretary of Defense on May 8, 2004.)

- Naval Inspector General's review of DoD worldwide interrogation operations, due for release on September 9, 2004

- Special Inspection of Detainee Operations and Facilities in the Combined Forces Command-Afghanistan AOR (CFC-A), June 26, 2004 (Jacoby Report).

- Administrative Investigation of Alleged Detainee Abuse by the Combined Joint Special Operations Task Force – Arabian Peninsula (Formica Report)  Due for release in August, 2004.  Assessment not yet completed and not reviewed by the Independent Panel

- Army Reserve Command Inspector General Assessment of Military Intelligence and Military Police Training (due for release in December 2004)

Panel interviews of selected individuals either in person or via video-teleconference:

June 14, 2004:
- MG Keith Dayton, Director, Iraq Survey Group (ISG), Baghdad, Iraq
- MG Geoffrey Miller, Director, Detainee Operations, CJTF-7, Baghdad, Iraq
- Hon Donald Rumsfeld, Secretary of Defense
- Hon Steve Cambone, Under Secretary of Defense for Intelligence
- MG Walter Wojdakowski, Deputy Commanding General, V Corps, USAREUR and 7th Army

- MG Donald Ryder, Provost Marshal, U.S. Army/Commanding General, U.S. Army Criminal Investigation Command, Washington, D.C.
- COL Thomas Pappas, Commander, 205th Military Intelligence Brigade, V Corps, USAREUR and 7th Army

June 24,2004:

- LTG David McKiernan, Commanding General, Third U.S. Army, U.S. Army Forces Central Command, Coalition Forces Land Component Command
- MG Barbara Fast, CJTF-7 C-2, Director for Intelligence, Baghdad, Iraq
- MG Geoffrey Miller, Director, Detainee Operations, CJTF-7, Baghdad, Iraq
- LTG Ricardo Sanchez, Commanding General, CJTF-7, Commanding General, V Corps, USAREUR and 7th Army in Iraq
- Mr. Daniel Dell'Orto, Principal Deputy General Counsel, DoD
- LTG Keith Alexander, G-2, U.S. Army, Washington, D.C.
- LTG William Boykin, Deputy Undersecretary of Defense for Intelligence, Intelligence and Warfighting Support, Office of the Under Secretary of Defense for Intelligence
- Hon Douglas Feith, Under Secretary of Defense for Policy

July 8, 2004:

- COL Marc Warren, Senior Legal Advisor to LTG Sanchez, Iraq
- BG Janis Karpinski, Commander (TPU), 800th Military Police Brigade, Uniondale, NY
- Hon Paul Wolfowitz, Deputy Secretary of Defense
- Hon William Haynes, General Counsel DoD
- Mr. John Rizzo, CIA Senior Deputy General Counsel
- GEN John Abizaid, Commander, U.S. Central Command
- MG George Fay, Deputy to the Army G2, Washington, D.C.
- VADM Albert Church III, Naval Inspector General

July 22, 2004:

- Hon Donald Rumsfeld, Secretary of Defense

The Panel did not conduct a case-by-case review of individual abuse cases. This task has been accomplished by those professionals conducting criminal and commander-directed investigations. Many of these investigations are still on-going. The Panel did review the various completed and on-going reports covering the causes for the abuse. Each of these inquiries or inspections defined abuse, categorized the abuses, and analyzed the abuses in conformity with the appointing authorities' guidance, but the methodologies do not parallel each other in all respects. The Panel concludes, based on our review of other reports to date and our own efforts that causes for abuse have been adequately examined.

The Panel met on July 22nd and again on August 16th to discuss progress of the report. Panel members also reviewed sections and versions of the report through July and mid-August.

An effective, timely response to our requests for other documents and support was invariably forthcoming, due largely to the efforts of the DoD Detainee Task Force. We conducted reviews of multiple classified and unclassified documents generated by DoD and other sources.

Our staff has met and communicated with representatives of the International Committee of the Red Cross and with the Human Rights Executive Directors' Coordinating Group.

It should be noted that information provided to the Panel was that available as of mid-August 2004. If additional information becomes available, the Panel's judgments might be revised.

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

# THE CHANGING THREAT

The date September 11, 2001, marked an historic juncture in America's collective sense of security. On that day our presumption of invulnerability was irretrievably shattered. Over the last decade, the military has been called upon to establish and maintain the peace in Bosnia and Kosovo, eject the Taliban from Afghanistan, defeat the Iraqi Army, and fight ongoing insurgencies in Iraq and Afghanistan. Elsewhere it has been called upon to confront geographically dispersed terrorists who would threaten America's right to political sovereignty and our right to live free of fear.

In waging the Global War on Terror, the military confronts a far wider range of threats. In Iraq and Afghanistan, U.S. forces are fighting diverse enemies with varying ideologies, goals and capabilities. American soldiers and their coalition partners have defeated the armored divisions of the Republican Guard, but are still under attack by forces using automatic rifles, rocket-propelled grenades, roadside bombs and surface-to-air missiles. We are not simply fighting the remnants of dying regimes or opponents of the local governments and coalition forces assisting those governments, but multiple enemies including indigenous and international terrorists. This complex operational environment requires soldiers capable of conducting traditional stability operations associated with peacekeeping tasks one moment and fighting force-on-force engagements normally associated with war-fighting the next moment.

Warfare under the conditions described inevitably generates detainees—enemy combatants, opportunists, trouble-makers, saboteurs, common criminals, former regime officials and some innocents as well. These people must be carefully but humanely processed to sort out those who remain dangerous or possess militarily-valuable intelligence. Such processing presents extraordinarily formidable logistical, administrative, security and legal problems completely apart from the technical obstacles posed by communicating with prisoners in another language and extracting actionable intelligence from them in timely fashion. These activities, called detention operations,

27

are a vital part of an expeditionary army's responsibility, but they depend upon training, skills, and attributes not normally associated with soldiers in combat units.

Military interrogators and military police, assisted by front-line tactical units, found themselves engaged in detention operations with detention procedures still steeped in the methods of World War II and the Cold War, when those we expected to capture on the battlefield were generally a homogenous group of enemy soldiers. Yet this is a new form of war, not at all like Desert Storm nor even analogous to Vietnam or Korea.

General Abizaid himself best articulated the current nature of combat in testimony before the U.S. Senate Armed Services Committee on May 19, 2004:

> Our enemies are in a unique position, and they are a unique brand of ideological extremists whose vision of the world is best summed up by how the Taliban ran Afghanistan. If they can outlast us in Afghanistan and undermine the legitimate government there, they'll once again fill up the seats at the soccer stadium and force people to watch executions. If, in Iraq, the culture of intimidation practiced by our enemies is allowed to win, the mass graves will fill again. Our enemies kill without remorse, they challenge our will through the careful manipulation of propaganda and information, they seek safe havens in order to develop weapons of mass destruction that they will use against us when they are ready. Their targets are not Kabul and Baghdad, but places like Madrid and London and New York. While we can't be defeated militarily, we're not going to win this thing militarily alone.... As we fight this most unconventional war of this new century, we must be patient and courageous.

In Iraq the U.S. commanders were slow to recognize and adapt to the insurgency that erupted in the summer and fall of 2003. Military police and interrogators who had previous experience in the Balkans, Guantanamo and Afghanistan found themselves, along with increasing numbers of less-experienced troops, in the midst of detention operations in Iraq the likes of which the Department of Defense had not foreseen. As Combined Joint Task Force-7 (CJTF-7) began detaining thousands of Iraqis suspected of

28

involvement in or having knowledge of the insurgency, the problem quickly surpassed the capacity of the staff to deal with and the wherewithal to contain it.

Line units conducting raids found themselves seizing specifically targeted persons, so designated by military intelligence; but, lacking interrogators and interpreters to make precise distinctions in an alien culture and hostile neighborhoods, they reverted to rounding up any and all suspicious-looking persons—all too often including women and children. The flood of incoming detainees contrasted sharply with the trickle of released individuals. Processing was overwhelmed. Some detainees at Abu Ghraib had been held 90 days before being interrogated for the first time.

Many interrogators, already in short supply from major reductions during the post-Cold War drawdown, by this time, were on their second or third combat tour. Unit cohesion and morale were largely absent as under-strength companies and battalions from across the United States and Germany were deployed piecemeal and stitched together in a losing race to keep up with the rapid influx of vast numbers of detainees.

As the insurgency reached an initial peak in the fall of 2003, many military policemen from the Reserves who had been activated shortly after September 11, 2001 had reached the mandatory two-year limit on their mobilization time. Consequently, the ranks of soldiers having custody of detainees in Iraq fell to about half strength as MPs were ordered home by higher headquarters.

Some individuals seized the opportunity provided by this environment to give vent to latent sadistic urges. Moreover, many well-intentioned professionals, attempting to resolve the inherent moral conflict between using harsh techniques to gain information to save lives and treating detainees humanely, found themselves in uncharted ethical ground, with frequently changing guidance from above. Some stepped over the line of humane treatment accidentally; some did so knowingly. Some of the abusers believed other governmental agencies were conducting interrogations using harsher techniques

than allowed by the Army Field Manual 34-52, a perception leading to the belief that such methods were condoned. In nearly 10 percent of the cases of alleged abuse, the chain of command ignored reports of those allegations. More than once a commander was complicit.

The requirements for successful detainee operations following major combat operations were known by U.S. forces in Iraq. After Operations Enduring Freedom and earlier phases of Iraqi Freedom, several lessons learned were captured in official reviews and were available on-line to any authorized military user. These lessons included the need for doctrine tailored to enable police and interrogators to work together effectively; the need for keeping MP and MI units manned at levels sufficient to the task; and the need for MP and MI units to belong to the same tactical command. However, there is no evidence that those responsible for planning and executing detainee operations, in the phase of the Iraq campaign following the major combat operations, availed themselves of these "lessons learned" in a timely fashion.

Judged in a broader context, U.S. detention operations were both traditional and new. They were traditional in that detainee operations were a part of all past conflicts. They were new in that the Global War on Terror and the insurgency we are facing in Iraq present a much more complicated detainee population.

Many of America's enemies, including those in Iraq and Afghanistan, have the ability to conduct this new kind of warfare, often referred to as "asymmetric" warfare. Asymmetric warfare can be viewed as attempts to circumvent or undermine a superior, conventional strength, while exploiting its weaknesses using methods the superior force neither can defeat nor resort to itself. Small unconventional forces can violate a state's security without any state support or affiliation whatsoever. For this reason, many terms in the orthodox lexicon of war—e.g., state sovereignty, national borders, uniformed combatants, declarations of war, and even war itself, are not terms terrorists acknowledge.

30

Today, the power to wage war can rest in the hands of a few dozen highly motivated people with cell phones and access to the Internet. Going beyond simply terrorizing individual civilians, certain insurgent and terrorist organizations represent a higher level of threat, characterized by an ability and willingness to violate the political sovereignty and territorial integrity of sovereign nations.

Essential to defeating terrorist and insurgent threats is the ability to locate cells, kill or detain key leaders, and interdict operational and financial networks. However, the smallness and wide dispersal of these enemy assets make it problematic to focus on signal and imagery intelligence as we did in the Cold War, Desert Storm, and the first phase of Operation Iraqi Freedom. The ability of terrorists and insurgents to blend into the civilian population further decreases their vulnerability to signal and imagery intelligence. Thus, information gained from human sources, whether by spying or interrogation, is essential in narrowing the field upon which other intelligence gathering resources may be applied. In sum, human intelligence is absolutely necessary, not just to fill these gaps in information derived from other sources, but also to provide clues and leads for the other sources to exploit.

Military police functions must also adapt to this new kind of warfare. In addition to organizing more units capable of handling theater-level detention operations, we must also organize those units, so they are able to deal with the heightened threat environment. In this new form of warfare, the distinction between front and rear becomes more fluid. All forces must continuously prepare for combat operations.

INDEPENDENT PANEL TO REVIEW DOD DETENTION OPERATIONS

# THE POLICY PROMULGATION PROCESS

Although there were a number of contributing causes for detainee abuses, policy processes were inadequate or deficient in certain respects at various levels: Department of Defense (DoD), CENTCOM, Coalition Forces Land Component Command (CFLCC), CJTF-7, and the individual holding facility or prison. In pursuing the question of the extent to which policy processes at the DoD or national level contributed to abuses, it is important to begin with policy development as individuals in Afghanistan were first being detained in November 2001. The first detainees arrived at Guantanamo in January 2002.

In early 2002, a debate was ongoing in Washington on the application of treaties and laws to al Qaeda and Taliban. The Department of Justice, Office of Legal Counsel (OLC) advised DoD General Counsel and the Counsel to the President that, among other things:

- Neither the Federal War Crimes Act nor the Geneva Conventions would apply to the detention conditions of al Qaeda prisoners,
- The President had the authority to suspend the United States treaty obligations applying to Afghanistan for the duration of the conflict should he determine Afghanistan to be a failed state,
- The President could find that the Taliban did not qualify for Enemy Prisoner of War (EPW) status under Geneva Convention III.

The Attorney General and the Counsel to the President, in part relying on the opinions of OLC, advised the President to determine the Geneva Conventions did not apply to the conflict with al Qaeda and the Taliban. The Panel understands DoD General Counsel's position was consistent with the Attorney General's and the Counsel to the President's position. Earlier, the Department of State had argued that the Geneva Conventions in their traditional application provided a sufficiently robust legal construct under which the Global War on Terror could effectively be waged.

The Legal Advisor to the Chairman, Joint Chiefs of Staff and many service lawyers agreed with the State Department's initial position. They were concerned that to conclude otherwise would be inconsistent with past practice and policy, jeopardize the United States armed forces personnel, and undermine the United States military culture which is based on a strict adherence to the law of war. At the February 4, 2002 National Security Council meeting to decide this issue, the Department of State, the Department of Defense, and the Chairman of the Joint Chiefs of Staff were in agreement that all detainees would get the treatment they are (or would be) entitled to under the Geneva Conventions.

On February 7, 2002, the President issued his decision memorandum (see Appendix B). The memorandum stated the Geneva Conventions did not apply to al Qaeda and therefore they were not entitled to prisoner of war status. It also stated the Geneva Conventions did apply to the Taliban but the Taliban combatants were not entitled to prisoner of war status as a result of their failure to conduct themselves in accordance with the provisions of the Geneva Conventions. The President's memorandum also stated: "As a matter of policy, United States Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva."

Regarding the applicability of the Convention Against Torture and Other Cruel Inhumane or Degrading Treatment, the OLC opined on August 1, 2002 that interrogation methods that comply with the relevant domestic law do not violate the Convention. It held that only the most extreme acts, that were specifically intended to inflict severe pain and torture, would be in violation; lesser acts might be "cruel, inhumane, or degrading" but would not violate the Convention Against Torture or domestic statutes. The OLC memorandum went on to say, as Commander in Chief exercising his wartime powers, the President could even authorize torture, if he so decided.

Reacting to tenacious resistance by some detainees to existing interrogation methods, which were essentially limited to those in Army Field Manual 34-52 (see Appendix E), Guantanamo authorities in October 2002 requested approval of strengthened counter-interrogation techniques to increase the intelligence yield from interrogations. This request was accompanied by a recommended tiered list of techniques, with the proviso that the harsher Category III methods (see Appendix E) could be used only on "exceptionally resistant detainees" and with approval by higher headquarters.

This Guantanamo initiative resulted in a December 2, 2002 decision by the Secretary of Defense authorizing, "as a matter of policy," the use of Categories I and II and only one technique in Category III: mild, non-injurious physical contact (see Appendix E). As a result of concern by the Navy General Counsel, the Secretary of Defense rescinded his December approval of all Category II techniques plus the one from Category III on January 15, 2003. This essentially returned interrogation techniques to FM 34-52 guidance. He also stated if any of the methods from Categories II and III were deemed warranted, permission for their use should be requested from him (see Appendix E).

The Secretary of Defense directed the DoD General Counsel to establish a working group to study interrogation techniques. The working group was headed by Air Force General Counsel Mary Walker and included wide membership from across the military, legal and intelligence communities. The working group also relied heavily on the OLC. The working group reviewed 35 techniques, and after a very expansive debate, ultimately recommended 24 to the Secretary of Defense. The study led to the Secretary's promulgation on April 16, 2003 of the list of approved techniques. His memorandum emphasized appropriate safeguards should be in place and, further, "*Use of these techniques is limited to interrogations of unlawful combatants held at Guantanamo Bay, Cuba.*" He also stipulated that four of the techniques should be used only in case of military necessity and that he should be so notified in advance. If additional techniques were deemed essential, they should be requested in writing, with "recommended safeguards and rationale for applying with an identified detainee."

35

In the initial development of these Secretary of Defense policies, the legal resources of the Services' Judge Advocates and General Counsels were not utilized to their fullest potential. Had the Secretary of Defense had the benefit of a wider range of legal opinions and a more robust debate regarding detainee policies and operations, his policy of April 16, 2003 might well have been developed and issued in early December 2002. This could have avoided the policy changes which characterized the December 2, 2002 to April 16, 2003 period.

It is clear that pressure for additional intelligence and the more aggressive methods sanctioned by the Secretary of Defense memorandum resulted in stronger interrogation techniques. They did contribute to a belief that stronger interrogation methods were needed and appropriate in their treatment of detainees. At Guantanamo, the interrogators used those additional techniques with only two detainees, gaining important and time-urgent information in the process.

In Afghanistan, from the war's inception through the end of 2002, all forces used FM 34-52 as a baseline for interrogation techniques. Nonetheless, more aggressive interrogation of detainees appears to have been ongoing. On January 24, 2003, in response to a data call from the Joint Staff to facilitate the Secretary of Defense-directed Working Group efforts, the Commander Joint Task Force-180 forwarded a list of techniques being used in Afghanistan, including some not explicitly set out in FM 34-52. These techniques were included in a Special Operations Forces (SOF) Standard Operating Procedures document published in February 2003. The 519th Military Intelligence Battalion, a Company of which was later sent to Iraq, assisted in interrogations in support of SOF and was fully aware of their interrogation techniques.

In Iraq, the operational order from CENTCOM provided the standard FM 34-52 interrogation procedures would be used. Given the greatly different situations in Afghanistan and Iraq, it is not surprising there were differing CENTCOM policies for the

two countries. In light of ongoing hostilities that monopolized commanders' attention in Iraq, it is also not unexpected the detainee issues were not given a higher priority.

Interrogators and lists of techniques circulated from Guantanamo and Afghanistan to Iraq. During July and August 2003, a Company of the 519th MI Battalion was sent to the Abu Ghraib detention facility to conduct interrogation operations. Absent guidance other than FM 34-52, the officer in charge prepared draft interrogation guidelines that were a near copy of the Standard Operating Procedure created by SOF. It is important to note that techniques effective under carefully controlled conditions at Guantanamo became far more problematic when they migrated and were not adequately safeguarded.

In August 2003, MG Geoffrey Miller arrived to conduct an assessment of DoD counterterrorism interrogation and detention operations in Iraq. He was to discuss current theater ability to exploit internees rapidly for actionable intelligence. He brought to Iraq the Secretary of Defense's April 16, 2003 policy guidelines for Guantanamo— which he reportedly gave to CJTF-7 as a potential model—recommending a command-wide policy be established. He noted, however, the Geneva Conventions did apply to Iraq. In addition to these various printed sources, there was also a store of common lore and practice within the interrogator community circulating through Guantanamo, Afghanistan and elsewhere.

At the operational level, in the absence of more specific guidance from CENTCOM, interrogators in Iraq relied on FM 34-52 and on unauthorized techniques that had migrated from Afghanistan. On September 14, 2003, Commander CJTF-7 signed the theater's first policy on interrogation which contained elements of the approved Guantanamo policy and elements of the SOF policy. Policies approved for use on al Qaeda and Taliban detainees who were not afforded the protection of EPW status under the Geneva Conventions now applied to detainees who did fall under the Geneva Convention protections. CENTCOM disapproved the September 14, 2003 policy resulting in another policy signed on October 12, 2003 which essentially mirrored the