INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

outdated 1987 version of the FM 34-52. The 1987 version, however, authorized interrogators to control all aspects of the interrogation, "to include lighting and heating, as well as food, clothing, and shelter given to detainees." This was specifically left out of the 1992 version, which is currently in use. This clearly led to confusion on what practices were acceptable. We cannot be sure how much the number and severity of abuses would have been curtailed had there been early and consistent guidance from higher levels. Nonetheless, such guidance was needed and likely would have had a limiting effect.

At Abu Ghraib, the Jones/Fay investigation concluded that MI professionals at the prison level shared a "major part of the culpability" for the abuses. Some of the abuses occurred during interrogation. As these interrogation techniques exceeded parameters of FM 34-52, no training had been developed. Absent training, the interrogators used their own initiative to implement the new techniques. To what extent the same situation existed at other prisons is unclear, but the widespread nature of abuses warrants an assumption that at least the understanding of interrogations policies was inadequate. A host of other possible contributing factors, such as training, leadership, and the generally chaotic situation in the prisons, are addressed elsewhere in this report.

# PUBLIC RELEASE OF ABUSE PHOTOS

In any large bureaucracy, good news travels up the chain of command quickly; bad news generally does not. In the case of the abuse photos from Abu Ghraib, concerns about command influence on an ongoing investigation may have impeded notification to senior officials.

## Chronology of Events

On January 13, 2004, SPC Darby gave Army criminal investigators a copy of a CD containing abuse photos he had taken from SPC Graner's computer. CJTF-7, CENTCOM, the Chairman of the Joint Chiefs of Staff and the Secretary of Defense were all informed of the issue. LTG Sanchez promptly asked for an outside investigation, and MG Taguba was appointed as the investigating officer. The officials who saw the photos on January 14, 2004, not realizing their likely significance, did not recommend the photos be shown to more senior officials. A CENTCOM press release in Baghdad on January 16, 2004 announced there was an ongoing investigation into reported incidents of detainee abuse at a Coalition Forces detention facility.

An interim report of the investigation was provided to CJTF-7 and CENTCOM commanders in mid-March 2004. It is unclear whether they saw the Abu Ghraib photos, but their impact was not appreciated by either of these officers or their staff officers who may have seen the photographs, as indicated by the failure to transmit them in a timely fashion to more senior officials. When LTG Sanchez received the Taguba report, he immediately requested an investigation into the possible involvement of military intelligence personnel. He told the panel that he did not request the photos be disseminated beyond the criminal investigative process because commanders are prohibited from interfering with, or influencing, active investigations. In mid-April, LTG McKiernan, the appointing official, reported the investigative results through his chain of

command to the Department of the Army, the Army Judge Advocate General, and the U.S. Army Reserve Command. LTG McKiernan advised the panel that he did not send a copy of the report to the Secretary of Defense, but forwarded it through his chain of command. Again the reluctance to move bad news farther up the chain of command probably was a factor impeding notification of the Secretary of Defense.

Given this situation, GEN Richard Myers, the Chairman of the Joint Chiefs of Staff, was unprepared in April 2004 when he learned the photos of detainee abuse were to be aired in a CBS broadcast. The planned release coincided with particularly intense fighting by Coalition forces in Fallujah and Najaf. After a discussion with GEN Abizaid, GEN Myers asked CBS to delay the broadcast out of concern the lives of the Coalition soldiers and the hostages in Iraq would be further endangered. The story of the abuse itself was already public. Nonetheless, both GEN Abizaid and GEN Myers understood the pictures would have an especially explosive impact around the world.

## Informing Senior Officials

Given the magnitude of this problem, the Secretary of Defense and other senior DoD officials need a more effective information pipeline to inform them of high-profile incidents which may have a significant adverse impact on DoD operations. Had such a pipeline existed, it could have provided an accessible and efficient tool for field commanders to apprise higher headquarters, the Joint Chiefs of Staff, and the Office of the Secretary of Defense, of actual or developing situations which might hinder, impede, or undermine U.S. operations and initiatives. Such a system could have equipped senior spokesmen with the known facts of the situation from all DoD elements involved. Finally, it would have allowed for senior official preparation and Congressional notification.

Such a procedure would make it possible for a field-level command or staff agency to alert others of the situation and forward the information to senior officials. This would not have been an unprecedented occurrence. For example, in December 2002, concerned Naval Criminal Investigative Service agents drew attention to the potential for abuse at Guantanamo. Those individuals had direct access to the highest levels of leadership and were able to get that information to senior levels without encumbrance. While a corresponding flow of information might not have prevented the abuses from occurring, the Office of the Secretary of Defense would have been alerted to a festering issue, allowing for an early and appropriate response.

Another example is the Air Force Executive Issues Team. This office has fulfilled the special information pipeline function for the Air Force since February 1998. The team chief and team members are highly trained and experienced field grade officers drawn from a variety of duty assignments. The team members have access to information flow across all levels of command and staff and are continually engaging and building contacts to facilitate the information flow. The information flow to the team runs parallel and complementary to standard reporting channels in order to avoid bypassing the chain of command but yet ensures a rapid and direct flow of relevant information to Air Force Headquarters.

A proper, transparent posture in getting the facts and fixing the problem would have better enabled the DoD to deal with the damage to the mission of the U.S. in the region and to the reputation of the U.S. military.

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

# COMMAND RESPONSIBILITIES

Although the most egregious instances of detainee abuse were caused by the aberrant behavior of a limited number of soldiers and the predilections of the non-commissioned officers on the night shift of Tier 1 at Abu Ghraib, the Independent Panel finds that commanding officers and their staffs at various levels failed in their duties and that such failures contributed directly or indirectly to detainee abuse. Commanders are responsible for all their units do or fail to do, and should be held accountable for their action or inaction. Command failures were compounded by poor advice provided by staff officers with responsibility for overseeing battlefield functions related to detention and interrogation operations. Military and civilian leaders at the Department of Defense share this burden of responsibility.

## Commanders

The Panel finds that the weak and ineffectual leadership of the Commanding General of the 800th MP Brigade and the Commanding Officer of the 205th MI Brigade allowed the abuses at Abu Ghraib. There were serious lapses of leadership in both units from junior non-commissioned officers to battalion and brigade levels. The commanders of both brigades either knew, or should have known, abuses were taking place and taken measures to prevent them. The Panel finds no evidence that organizations above the 800th MP Brigade- or the 205th MI Brigade-level were directly involved in the incidents at Abu Ghraib. Accordingly, the Panel concurs in the judgment and recommendations of MG Taguba, MG Fay, LTG Jones, LTG Sanchez, LTG McKiernan, General Abizaid and General Kern regarding the commanders of these two units. The Panel expects disciplinary action may be forthcoming.

The Independent Panel concurs with the findings of MG Taguba regarding the Director of the Joint Interrogation and Debriefing Center (JIDC) at Abu Ghraib. Specifically, the Panel notes that MG Taguba concluded that the Director, JIDC made material misrepresentations to MG Taguba's investigating team. The panel finds that he failed to properly train and control his soldiers and failed to ensure prisoners were afforded the protections under the relevant Geneva Conventions. The Panel concurs with MG Taguba's recommendation that he be relieved for cause and given a letter of reprimand and notes that disciplinary action may be pending against this officer.

The Independent Panel concurs with the findings of MG Taguba regarding the Commander of the 320th MP Battalion at Abu Ghraib. Specifically, the Panel finds that he failed to ensure that his subordinates were properly trained and supervised and that he failed to establish and enforce basic soldier standards, proficiency and accountability. He was not able to organize tasks to accomplish his mission in an appropriate manner. By not communicating standards, policies and plans to soldiers, he conveyed a sense of tacit approval of abusive behavior towards prisoners and a lax and dysfunctional command climate took hold. The Panel concurs with MG Taguba's recommendation that he be relieved from command, be given a General Officer Memorandum of reprimand, and be removed from the Colonel/O-6 promotion list.

The Independent Panel finds that BG Karpinski's leadership failures helped set the conditions at the prison which led to the abuses, including her failure to establish appropriate standard operating procedures (SOPs) and to ensure the relevant Geneva Conventions protections were afforded prisoners, as well as her failure to take appropriate actions regarding ineffective commanders and staff officers. The Panel notes the conclusion of MG Taguba that she made material misrepresentations to his investigating team regarding the frequency of her visits to Abu Ghraib. The Panel concurs with MG Taguba's recommendation that BG Karpinski be relieved of command and given a General Officer Letter of Reprimand.

44

Although LTG Sanchez had tasks more urgent than dealing personally with command and resource deficiencies and allegations of abuse at Abu Ghraib, he should have ensured his staff dealt with the command and resource problems. He should have assured that urgent demands were placed for appropriate support and resources through Coalition Forces Land Component Command (CFLCC) and CENTCOM to the Joint Chiefs of Staff. He was responsible for establishing the confused command relationship at the Abu Ghraib prison. There was no clear delineation of command responsibilities between the 320th MP Battalion and the 205th MI Brigade. The situation was exacerbated by CJTF-7 Fragmentary Order (FRAGO) 1108 issued on November 19, 2003 that appointed the commander of the 205th MI Brigade as the base commander for Abu Ghraib, including responsibility for the support of all MPs assigned to the prison. In addition to being contrary to existing doctrine, there is no evidence the details of this command relationship were effectively coordinated or implemented by the leaders at Abu Ghraib. The unclear chain of command established by CJTF-7, combined with the poor leadership and lack of supervision, contributed to the atmosphere at Abu Ghraib that allowed the abuses to take place.

The unclear command structure at Abu Ghraib was further exacerbated by the confused command relationship up the chain. The 800th MP Brigade was initially assigned to the Central Command's Combined Forces Land Component Commander (CFLCC) during the major combat phase of Operation Iraqi Freedom. When CFLCC left the theater and returned to Fort McPherson Georgia, CENTCOM established Combined Joint Task Force-Seven (CJTF-7). While the 800th MP Brigade remained assigned to CFLCC, it essentially worked for CJTF-7. LTG Sanchez delegated responsibility for detention operations to his Deputy, MG Wojdakowski. At the same time, intelligence personnel at Abu Ghraib reported through the CJTF-7 C-2, Director for Intelligence. These arrangements had the damaging result that no single individual was responsible for overseeing operations at the prison.

45

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

The Panel endorses the disciplinary actions already taken, although we believe
LTG Sanchez should have taken more forceful action in November when he fully
comprehended the depth of the leadership problems at Abu Ghraib. His apparent attempt
to mentor BG Karpinski, though well-intended, was insufficient in a combat zone in the
midst of a serious and growing insurgency.

The creation of the Joint Interrogation and Debriefing Center (JIDC) at Abu Ghraib was
not an unusual organizational approach. The problem is, as the Army Inspector General
assessment revealed, joint doctrine for the conduct of interrogation operations contains
inconsistent guidance, particularly with regard to addressing the issue of the appropriate
command relationships governing the operation of such organizations as a JIDC. Based
on the findings of the Fay, Jones and Church investigations, SOUTHCOM and
CENTCOM were able to develop effective command relationships for such centers at
Guantanamo and in Afghanistan, but CENTCOM and CJTF-7 failed to do so for the
JIDC at Abu Ghraib.


## Staff Officers


While staff officers have no command responsibilities, they are responsible for providing
oversight, advice and counsel to their commanders. Staff oversight of detention and
interrogation operations for CJTF-7 was dispersed among the principal and special staff.
The lack of one person on the staff to oversee detention operations and facilities
complicated effective and efficient coordination among the staff.

The Panel finds the following:

- The CJTF-7 Deputy Commander failed to initiate action to request additional military police for detention operations after it became clear that there were insufficient assets in Iraq.
- The CJTF-7 C-2, Director for Intelligence failed to advise the commander properly on directives and policies needed for the operation of the JIDC, for interrogation techniques and for appropriately monitoring the activities of Other Government Agencies (OGAs) within the Joint Area of Operations.
- The CJTF-7 Staff Judge Advocate failed to initiate an appropriate response to the November 2003 ICRC report on the conditions at Abu Ghraib.

## Failure of the Combatant Command to Adjust the Plan

Once it became clear in July 2003 there was a major insurgency growing in Iraq and the relatively benign environment projected for Iraq was not materializing, senior leaders should have adjusted the plan from what had been assumed to be a stability operation and a benign handoff of detention operations to the Iraqis. If commanders and staffs at the operational level had been more adaptive in the face of changing conditions, a different approach to detention operations could have been developed by October 2003, as difficulties with the basic plan were readily apparent by that time. Responsible leaders who could have set in motion the development of a more effective alternative course of action extend up the command chain (and staff), to include the Director for Operations, Combined Joint Task Force 7 (CJTF-7); Deputy Commanding General, CJTF-7; Commander CJTF-7; Deputy Commander for Support, CFLCC; Commander, CFLCC; Director for Operations, Central Command (CENTCOM); Commander, CENTCOM; Director for Operations, Joint Staff; the Chairman of the Joint Chiefs of Staff; and the Office of the Secretary of Defense. In most cases these were errors of omission, but they were errors that should not go unnoted.

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

There was ample evidence in both Joint and Army lessons learned that planning for detention operations for Iraq required alternatives to standard doctrinal approaches. Reports from experiences in Operation Enduring Freedom and at Guantanamo had already recognized the inadequacy of current doctrine for the detention mission and the need for augmentation of both MP and MI units with experienced confinement officers and interrogators. Previous experience also supported the likelihood that detainee population numbers would grow beyond planning estimates. The relationship between MP and MI personnel in the conduct of interrogations also demanded close, continuous coordination rather than remaining compartmentalized. "Lessons learned" also reported the value of establishing a clear chain of command subordinating MP and MI to a Joint Task Force or Brigade Commander. This commander would be in charge of all aspects of both detention and interrogations just as tactical combat forces are subordinated to a single commander. The planners had only to search the lessons learned databases (available on-line in military networks) to find these planning insights. Nevertheless, CENTCOM's October 2002 planning annex for detention operations reflected a traditional doctrinal methodology.

The change in the character of the struggle signaled by the sudden spike in U.S. casualties in June, July and August 2003 should have prompted consideration of the need for additional MP assets. GEN Abizaid himself signaled a change in operations when he publicly declared in July that CENTCOM was now dealing with a growing "insurgency," a term government officials had previously avoided in characterizing the war. Certainly by October and November when the fighting reached a new peak, commanders and staffs from CJTF-7 all the way to CENTCOM and the Joint Chiefs of Staff knew by then the serious deficiencies of the 800th MP Brigade and should have at least considered reinforcing the troops for detention operations. Reservists, some of whom had been first mobilized shortly after September 11, 2001, began reaching a two-year mobilization commitment, which, by law, mandated their redeployment and deactivation.

48

There was not much the 800th MP Brigade (an Army Reserve unit), could do to delay the loss of those soldiers, and there was no individual replacement system or a unit replacement plan. The MP Brigade was totally dependent on higher headquarters to initiate action to alleviate the personnel crisis. The brigade was duly reporting readiness shortfalls through appropriate channels. However, its commanding general was emphasizing these shortfalls in personal communications with CJTF-7 commanders and staff as opposed to CFLCC. Since the brigade was assigned to CFLCC, but under the Tactical Control (TACON) of CJTF-7, her communications should been with CFLCC. The response from CJTF-7's Commander and Deputy Commander was that the 800th MP Brigade had sufficient personnel to accomplish its mission and that it needed to reallocate its available soldiers among the dozen or more detention facilities it was operating in Iraq. However, the Panel found the further deterioration in the readiness condition of the brigade should have been recognized by CFLCC and CENTCOM by late summer 2003. This led the Panel to conclude that CJTF-7, CFLCC and CENTCOM failure to request additional forces was an avoidable error.

The Joint Staff recognized intelligence collection from detainees in Iraq needed improvement. This was their rationale for sending MG Miller from Guantanamo to assist CJTF-7 with interrogation operations. However, the Joint Staff was not paying sufficient attention to evidence of broader readiness issues associated with both MP and MI resources.

We note that CJTF-7 Headquarters was never fully resourced to meet the size and complexity of its mission. The Joint Staff, CJTF-7 and CENTCOM took too long to finalize the Joint Manning Document (JMD) which was not finally approved until December 2003—six months into the insurgency. At one point, CJTF-7 Headquarters had only 495 of the 1,400 personnel authorized. The command was burdened with additional complexities associated with its mission to support the Coalition Provisional Authority.

Finally, the Joint Staff failed to recognize the implications of the deteriorating manning levels in the 800th MP Brigade; the absence of combat equipment among detention elements of MP units operating in a combat zone; and the indications of deteriorating mission performance among military intelligence interrogators owing to the stress of repeated combat deployments.

When CJTF-7 did realize the magnitude of the detention problem, it requested an assistance visit by the Provost Marshal General of the Army, MG Ryder. There seemed to be some misunderstanding of the CJTF-7 intent, however, since MG Ryder viewed his visit primarily as an assessment of how to transfer the detention program to the Iraqi prison system.

In retrospect, several options for addressing the detention operations challenge were available. CJTF-7 could have requested a change in command relationships to place the 800th MP Brigade under Operational Control of CJTF-7 rather than Tactical Control. This would have permitted the Commander of CJTF-7 to reallocate tactical assets under his control to the detention mission. While other Military Police units in Iraq were already fully committed to higher-priority combat and combat support missions, such as convoy escort, there were non-MP units that could have been reassigned to help in the conduct of detention operations. For example, an artillery brigade was tasked to operate the CJTF-7 Joint Visitors Center in Baghdad. A similar tasking could have provided additional troop strength to assist the 800th MP Brigade at Abu Ghraib. Such a shift would have supplied valuable experienced sergeants, captains and lieutenant colonels sorely lacking in both the MI and MP units at Abu Ghraib. A similar effect could have been achieved by CENTCOM assigning USMC, Navy and Air Force MP and security units to operational control of CJTF-7 for the detention operations mission.

Mobilization and deployment of additional forces from CONUS was also a feasible option. A system is in place for commands such as CJTF-7, CFLCC, and CENTCOM to submit a formal Request for Forces (RFF). Earlier, CJTF-7 had submitted a RFF for an

50

additional Judge Advocate organization, but CENTCOM would not forward it to the
Joint Chiefs of Staff. Perhaps this experience made CJTF-7 reluctant to submit a RFF for
MP units, but there is no evidence that any of the responsible officers considered any
option other than the response given to BG Karpinski to "wear her stars" and reallocate
personnel among her already over-stretched units.

While it is the responsibility of the JCS and services to provide adequate numbers of
appropriately trained personnel for missions such as the detention operations in Iraq, it is
the responsibility of the combatant commander to organize those forces in a manner to
achieve mission success. The U.S. experience in the conduct of post-conflict stability
operations has been limited, but the impact of our failure to conduct proper detainee
operations in this case has been significant. Combatant commanders and their
subordinates must organize in a manner that affords unity of command, ensuring
commanders work for commanders and not staff.

The fact that the detention operation mission for all of Iraq is now commanded by a 2-star
general who reports directly to the operational commander, and that 1,900 MPs, more
appropriately equipped for combat, now perform the mission once assigned to a single
under-strength, poorly trained, inadequately equipped, and weakly-led brigade, indicate
more robust options should have been considered sooner.

Finally, the panel notes the failure to report the abuses up the chain of command in a
timely manner with adequate urgency. The abuses at Abu Ghraib were known and under
investigation as early as January 2004. However, the gravity of the abuses was not
conveyed up the chain of command to the Secretary of Defense. The Taguba report,
including the photographs, was completed in March 2004. This report was transmitted to
LTG Sanchez and GEN Abizaid; however, it is unclear whether they ever saw the Abu
Ghraib photos. GEN Myers has stated he knew of the existence of the photos as early as
January 2004. Although the knowledge of the investigation into Abu Ghraib was widely
known, as we noted in the previous section, the impact of the photos was not appreciated

51

by any of these officers as indicated by the failure to transmit them in a timely fashion to officials at the Department of Defense. (See Appendix A for the names of persons associated with the positions cited in this section.)

# MILITARY POLICE AND DETENTION OPERATIONS

In Operation Enduring Freedom in Afghanistan and Operation Iraqi Freedom, commanders should have paid greater attention to the relationship between detainees and military operations. The current doctrine and procedures for detaining personnel are inadequate to meet the requirements of these conflicts. Due to the vastly different circumstances in these conflicts, it should not be surprising there were deficiencies in the projected needs for military police forces. All the investigations the Panel reviewed highlight the urgency to augment the prior way of conducting detention operations. In particular, the military police were not trained, organized, or equipped to meet the new challenges.

The Army IG found morale was high and command climate was good throughout forces deployed in Iraq and Afghanistan with one noticeable exception. Soldiers conducting detainee operations in remote or dangerous locations complained of very poor morale and command climate due to the lack of higher command involvement and support and the perception that their leaders did not care. At Abu Ghraib, in particular, there were many serious problems, which could have been avoided, if proper guidance, oversight and leadership had been provided.

## Mobilization and Training

Mobilization and training inadequacies for the MP units occurred during the various phases of employment, beginning with peacetime training, activation, arrival at the mobilization site, deployment, arrival in theater and follow-on operations.

## Mobilization and Deployment

Problems generally began for the MP units upon arrival at the mobilization sites. As one commander stated, "Anything that could go wrong went wrong." Preparation was not consistently applied to all deploying units, wasting time and duplicating efforts already accomplished. Troops were separated from their equipment for excessive periods of time. The flow of equipment and personnel was not coordinated. The Commanding General of the 800th MP Brigade indicated the biggest problem was getting MPs and their equipment deployed together. The unit could neither train at its stateside mobilization site without its equipment nor upon arrival overseas, as two or three weeks could go by before joining with its equipment. This resulted in assigning equipment and troops in an ad hoc manner with no regard to original unit. It also resulted in assigning certain companies that had not trained together in peacetime to battalion headquarters. The flow of forces into theater was originally planned and assigned on the basis of the Time Phased Force Deployment List (TPFDL). The TPFDL was soon scrapped, however, in favor of individual unit deployment orders assigned by U.S. Army Forces Command based on unit readiness and personnel strength. MP Brigade commanders did not know who would be deployed next. This method resulted in a condition wherein a recently arrived battalion headquarters would be assigned the next arriving MP companies, regardless of their capabilities or any other prior command and training relationships.

Original projections called for approximately 12 detention facilities with a projection of 30,000 to 100,000 enemy prisoners of war. These large projections did not materialize. In fact, the initial commanding general of the 800th MP brigade, BG Hill, stated he had more than enough MPs designated for the Internment/Resettlement (I/R—hereafter called detention) mission at the end of the combat phase in Iraq. This assessment radically changed following the major combat phase, when the 800th moved to Baghdad beginning in the summer of 2003 to assume the detention mission. The brigade was given additional tasks assisting the Coalition Provisional Authority (CPA) in reconstructing the Iraqi corrections system, a mission they had neither planned for nor anticipated.

### Inadequate Training for the Military Police Mission

Though some elements performed better than others, generally training was inadequate.
The MP detention units did not receive detention-specific training during their
mobilization period, which was a critical deficiency. Detention training was conducted
for only two MP detention battalions, one in Afghanistan and elements of the other at
Camp Arifjan, Kuwait. The 800th MP Brigade, prior to deployment, had planned for a
major detention exercise during the summer of 2002; however, this was cancelled due to
the activation of many individuals and units for Operation Noble Eagle following the
September 11, 2001 attack. The Deputy Commander of one MP brigade stated "training
at the mobilization site was wholly inadequate." In addition, there was no theater-
specific training.

The Army Inspector General's investigators also found that training at the mobilization
sites failed to prepare units for conducting detention operations. Leaders of inspected
reserve units stated in interviews that they did not receive a clear mission statement prior
to mobilization and were not notified of their mission until after deploying. Personnel
interviewed described being placed immediately in stressful situations in a detention
facility with thousands of non-compliant detainees and not being trained to handle them.
Units arriving in theater were given just a few days to conduct a handover from the
outgoing units. Once deployed, these newly arrived units had difficulty gaining access to
the necessary documentation on tactics, techniques, and procedures to train their
personnel on the MP essential tasks of their new mission. A prime example is that
relevant Army manuals and publications were available only on-line, but personnel did
not have access to computers or the Internet.

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

## Force Structure Organization

The current military police organizational structure does not address the detention mission on the nonlinear battlefield characteristic of the Global War on Terror.

### Current Military Police Structure

The present U.S. Army Reserve and Army National Guard system worked well for the 1991 Gulf War for which large numbers of reserve forces were mobilized, were deployed, fought, and were quickly returned to the United States. These forces, however, were not designed to maintain large numbers of troops at a high operational tempo for a long period of deployment as has been the case in Afghanistan and Iraq.

Comments from commanders and the various inspection reports indicated the current force structure for the MPs is neither flexible enough to support the developing mission, nor can it provide for the sustained detainee operations envisioned for the future. The primary reason is that the present structure lacks sufficient numbers of detention specialists. Currently, the Army active component detention specialists are assigned in support of the Disciplinary Barracks and Regional Correctional Facilities in the United States, all of which are non-deployable.

### New Force Structure Initiatives

Significant efforts are currently being made to shift more of the MP detention requirements into the active force structure. The Army's force design for the future will standardize detention forces between active and reserve components and provide the capability for the active component to immediately deploy detention companies.

The Panel notes that the Mikolashek inspection found significant shortfalls in training and force structure for field sanitation, preventive medicine and medical treatment requirements for detainees.

## Doctrine and Planning

Initial planning envisaged a conflict mirroring operation Desert Storm; approximately 100,000 enemy prisoners of war were forecast for the first five days of the conflict. This expectation did not materialize in the first phase of Operation Iraqi Freedom. As a result, there were too many MP detention companies. The reverse occurred in the second phase of Iraqi Freedom, where the plan envisaged a reduced number of detention MPs on the assumption the initial large numbers of enemy prisoners of war would already have been processed out of the detention facilities. The result was that combat MPs were ultimately reassigned to an unplanned detention mission.

The doctrine of yesterday's battlefield does not satisfy the requirements of today's conflicts. Current doctrine assumes a linear battlefield and is very clear for the handling of detainees from the point of capture to the holding areas and eventually to the detention facilities in the rear. However, Operations Enduring Freedom and Iraqi Freedom, both occurring where there is no distinction between front and rear areas, forced organizations to adapt tactics and procedures to address the resulting voids. Organizations initially used standard operating procedures for collection points and detention facilities. These procedures do not fit the new environment, generally because there are no safe areas behind "friendly lines" – there *are* no friendly lines. The inapplicability of current doctrine had a negative effect on accountability, security, safeguarding of detainees, and intelligence exploitation. Instead of capturing and rapidly moving detainees to secure collection points as prescribed by doctrine, units tended to retain the detainees and attempted to exploit their tactical intelligence value without the required training or infrastructure.

Current doctrine specifies that line combat units hold detainees no longer than 12 – 24 hours to extract immediately useful intelligence. Nonetheless, the Army IG inspection found detainees were routinely held up to 72 hours. For corps collection points, doctrine specifies detainees be held no longer than three days; the Army IG found detainees were held from 30 to 45 days.

## Equipment Shortfalls

The current force structure for MP detention organizations does not provide sufficient assets to meet the inherent force protection requirement on battlefields likely to be characteristic of the future. Detention facilities in the theater may have to be located in a hostile combat zone, instead of the benign secure environment current doctrine presumes.

MP detention units will need to be equipped for combat. Lack of crew-served weapons, e.g., machine guns and mortars, to counter external attacks resulted in casualties to the detainee population as well as to the friendly forces. Moreover, Army-issued radios were frequently inoperable and too few in number. In frustration, individual soldiers purchased commercial radios from civilian sources. This improvisation created an unsecured communications environment that could be monitored by any hostile force outside the detention facility.

## Detention Operations and Accountability

Traditionally, military police support the Joint Task Force (JTF) by undertaking administrative processing of detention operations, thereby relieving the war-fighters of concern over prisoners and civilian detainees. The handling of detainees is a tactical and operational consideration the JTF addresses during planning to prevent combat forces from being diverted to handle large numbers of detainees. Military police are structured,

58

therefore, to facilitate the tempo of combat operations by providing for the quick
movement of prisoners from the battle area to temporary holding areas and thence to
detention facilities.

However, the lack of relevant doctrine meant the design and operation of division,
battalion, and company collection points were improvised on an ad hoc basis, depending
on such immediate local factors as mission, troops available, weather, time, etc. At these
collection points, the SOPs the units had prior to deployment were outdated or ill-suited
for the operating environment of Afghanistan and Iraq. Tactical units found themselves
taking on roles in detainee operations never anticipated in their prior training. Such lack
of proper skills had a negative effect on the intelligence exploitation, security, and
safeguarding of detainees.

The initial point of capture may be at any time or place in a military operation. This is
the place where soldiers have the least control of the environment and where most contact
with the detainees occurs. It is also the place where, in or immediately after battle, abuse
may be most likely. And it is the place where the detainee, shocked by capture, may be
most likely to give information. As noted earlier, instead of capturing and rapidly
transporting detainees to collection points, battalions and companies were holding
detainees for excessive periods, even though they lacked the training, materiel, or
infrastructure for productive interrogation. The Naval IG found that approximately one-
third of the alleged incidents of abuse occurred at the point of capture.

### Detention

The decision to use Abu Ghraib as the primary operational level detention facility
happened by default. Abu Ghraib was selected by Ambassador Bremer who envisioned it
as a temporary facility to be used for criminal detainees until the new Iraqi government
could be established and an Iraqi prison established at another site. However, CJTF-7
saw an opportunity to use it as an interim site for the detainees it expected to round up as

part of Operation Victory Bounty in July 2003. CJTF-7 had considered Camp Bucca but rejected it, as it was 150 miles away from Baghdad where the operation was to take place.

Abu Ghraib was also a questionable facility from a standpoint of conducting interrogations. Its location, next to an urban area, and its large size in relation to the small MP unit tasked to provide a law enforcement presence, made it impossible to achieve the necessary degree of security. The detainee population of approximately 7,000 out-manned the 92 MPs by approximately a 75:1 ratio. The choice of Abu Ghraib as the facility for detention operations placed a strictly detention mission-driven unit— one designed to operate in a rear area—smack in the middle of a combat environment.

## Detainee Accountability and Classification

Adequate procedures for accountability were lacking during the movement of detainees from the collection points to the detainee facilities. During the movement, it was not unusual for detainees to exchange their identification tags with those of other detainees. The diversity of the detainee population also made identification and classification difficult. Classification determined the detainee assignment to particular cells/blocks, but individuals brought to the facility were often a mix of criminals and security detainees. The security detainees were either held for their intelligence value or presented a continuing threat to Coalition Forces. Some innocents were also included in the detainee population. The issue of unregistered or "ghost" detainees presented a limited, though significant, problem of accountability at Abu Ghraib.

## Detainee Reporting

Detainee reporting lacked accountability, reliability and standardization. There was no central agency to collect and manage detainee information. The combatant commanders

60

and the JTF commanders have overall responsibility for the detainee programs to ensure compliance with the international law of armed conflict, domestic law and applicable national policy and directives. The reporting system is supposed to process all inquiries concerning detainees and provide accountability information to the International Committee of the Red Cross. The poor reporting system did not meet this obligation.

## Release Procedures

Multiple reviews were required to make release recommendations prior to approval by the release authority. Nonconcurrence by area commanders, intelligence organizations, or law enforcement agencies resulted in retention of ever larger numbers of detainees. The Army Inspector General estimated that up to 80 percent of detainees being held for security and intelligence reasons might be eligible for release upon proper review of their cases with the other 20 percent either requiring continued detention on security grounds or uncompleted intelligence requirements. Interviews indicated area commanders were reluctant to concur with release decisions out of concern that potential combatants would be reintroduced into their areas of operation or that the detainees had continuing intelligence value.

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

# INTERROGATION OPERATIONS

Any discussion of interrogation techniques must begin with the simple reality that their purpose is to gain intelligence that will help protect the United States, its forces and interests abroad. The severity of the post-September 11, 2001 terrorist threat and the escalating insurgency in Iraq make information gleaned from interrogations especially important. When lives are at stake, all legal and moral means of eliciting information must be considered. Nonetheless, interrogations are inherently unpleasant, and many people find them objectionable by their very nature.

The relationship between interrogators and detainees is frequently adversarial. The interrogator's goal of extracting useful information likely is in direct opposition to the detainee's goal of resisting or dissembling. Although interrogators are trained to stay within the bounds of acceptable conduct, the imperative of eliciting timely and useful information can sometimes conflict with proscriptions against inhumane or degrading treatment. For interrogators in Iraq and Afghanistan, this tension is magnified by the highly stressful combat environment. The conditions of war and the dynamics of detainee operations carry inherent risks for human mistreatment and must be approached with caution and careful planning and training.

A number of interrelated factors both limited the intelligence derived from interrogations and contributed to detainee abuse in Operations Enduring Freedom and Iraqi Freedom. A shortfall of properly trained human intelligence personnel to do tactical interrogation of detainees existed at all levels. At the larger detention centers, qualified and experienced interrogators and interpreters were in short supply. No doctrine existed to cover segregation of detainees whose status differed or was unclear, nor was there guidance on timely release of detainees no longer deemed of intelligence interest. The failure to adapt rapidly to the new intelligence requirements of the Global War on Terror resulted in inadequate resourcing, inexperienced and untrained personnel, and a backlog of detainees

destined for interrogation. These conditions created a climate not conducive to sound intelligence-gathering efforts.

## The Threat Environment

The Global War on Terror requires a fundamental reexamination of how we approach collecting intelligence. Terrorists present new challenges because of the way they organize, communicate, and operate. Many of the terrorists and insurgents are geographically dispersed non-state actors who move across national boundaries and operate in small cells that are difficult to surveil and penetrate.

## Human Intelligence from Interrogations

The need for human intelligence has dramatically increased in the new threat environment of asymmetric warfare. Massed forces and equipment characteristic of the Cold War era, Desert Storm and even Phase I of Operation Iraqi Freedom relied largely on signals and imagery intelligence. The intelligence problem then was primarily one of monitoring known military sites, troop locations and equipment concentrations. The problem today, however, is discovering new information on widely dispersed terrorist and insurgent networks. Human intelligence often provides the clues to understand these networks, enabling the collection of intelligence from other sources. Information derived from interrogations is an important component of this human intelligence, especially in the Global War on Terror.

The interrogation of al Qaeda members held at Guantanamo has yielded valuable information used to disrupt and preempt terrorist planning and activities. Much of the 9/11 Commission's report on the planning and execution of the attacks on the World Trade Center and Pentagon came from interrogation of detainees. In the case of

64

al Qaeda, interrogations provided insights on organization, key personnel, target selection, planning cycles, cooperation among various groups, and logistical support. This information expanded our knowledge of the selection, motivation, and training of these groups. According to Congressional testimony by the Under Secretary of Defense for Intelligence, we have gleaned information on a wide range of al Qaeda activities, including efforts to obtain weapons of mass destruction, sources of finance, training in use of explosives and suicide bombings, and potential travel routes to the United States.

Interrogations provide commanders with information about enemy networks, leadership, and tactics. Such information is critical in planning operations. Tactically, detainee interrogation is a fundamental tool for gaining insight into enemy positions, strength, weapons, and intentions. Thus, it is fundamental to the protection of our forces in combat. Notably, Saddam Hussein's capture was facilitated by interrogation-derived information. Interrogations often provide fragmentary pieces of the broader intelligence picture. These pieces become useful when combined with other human intelligence or intelligence from other sources.

## Pressure on Interrogators to Produce Actionable Intelligence

With the active insurgency in Iraq, pressure was placed on the interrogators to produce "actionable" intelligence. In the months before Saddam Hussein's capture, inability to determine his whereabouts created widespread frustration within the intelligence community. With lives at stake, senior leaders expressed, forcibly at times, their needs for better intelligence. A number of visits by high-level officials to Abu Ghraib undoubtedly contributed to this perceived pressure. Both the CJTF-7 commander and his intelligence officer, CJTF-7 C2, visited the prison on several occasions. MG Miller's visit in August/September, 2003 stressed the need to move from simply collecting tactical information to collecting information of operational and strategic value. In November

65

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

2003, a senior member of the National Security Council Staff visited Abu Ghraib, leading some personnel at the facility to conclude, perhaps incorrectly, that even the White House was interested in the intelligence gleaned from their interrogation reports. Despite the number of visits and the intensity of interest in actionable intelligence, however, the Panel found no undue pressure exerted by senior officials. Nevertheless, their eagerness for intelligence may have been perceived by interrogators as pressure.

## Interrogation Operations Issues

A number of factors contributed to the problems experienced in interrogation operations. They ranged from resource and leadership shortfalls to doctrinal deficiencies and poor training.

### Inadequate Resources

As part of the peace dividend following the Cold War much of the human intelligence capability, particularly in the Army, was reduced. As hostilities began in Afghanistan and Iraq, Army human intelligence personnel, particularly interrogators and interpreters, were ill-equipped to deal with requirements at both the tactical level and at the larger detention centers. At the tactical level, questioning of detainees has been used in all major conflicts. Knowledge of the enemy's positions, strength, equipment and tactics is critical in order to achieve operational success while minimizing casualties. Such tactical questioning to gain immediate battlefield intelligence is generally done at or near the point of capture. In Iraq, although their numbers were insufficient, some of the more seasoned MIs from the MI units supporting Abu Ghraib were assigned to support the Army Tactical HUMINT teams in the field.

In both Afghanistan and Iraq, tactical commanders kept detainees longer than specified by doctrine in order to exploit their unique local knowledge such as religious and tribal affiliation and regional politics. Remaining with the tactical units, the detainees could be

66

available for follow-up questioning and clarification of details. The field commanders were concerned that information from interrogations, obtained in the more permanent facilities, would not be returned to the capturing unit. Tactical units, however, were not properly resourced to implement this altered operating arrangement. The potential for abuse also increases when interrogations are conducted in an emotionally charged field environment by personnel unfamiliar with approved techniques.

At the fixed detention centers such as Abu Ghraib, lack of resources and shortage of more experienced senior interrogators impeded the production of actionable intelligence. Inexperienced and untrained personnel often yielded poor intelligence. Interpreters, particularly, were in short supply, contributing to the backlog of detainees to be interrogated. As noted previously, at Abu Ghraib for instance, there were detainees who had been in custody for as long as 90 days before being interrogated for the first time.

## Leadership and Organization Shortfalls at Abu Ghraib

Neither the leadership nor the organization of Military Intelligence at Abu Ghraib was up to the mission. The 205th MI Brigade had no organic interrogation elements; they had been eliminated by the downsizing in the 1990s. Soldiers from Army Reserve units filled the ranks, with the consequence that the Brigade Commander had to rely on disparate elements of units and individuals, including civilians, which had never trained together. The creation of the Joint Interrogation and Debriefing Center (JIDC) introduced another layer of complexity into an already stressed interrogations environment. The JIDC was an ad hoc organization made up of six different units lacking the normal command and control structure, particularly at the senior noncommissioned officer level. Leadership was also lacking, from the Commander of the 800th MP Brigade in charge of Abu Ghraib, who failed to ensure that soldiers had appropriate SOPs for dealing with detainees, to the Commander of the 205th MI Brigade, who failed to ensure that soldiers under his command were properly trained and followed the interrogation rules of engagement. Moreover, the Director of the JIDC was a weak leader who did not have experience in

interrogation operations and who ceded the core of his responsibilities to subordinates. He failed to provide appropriate training and supervision of personnel assigned to the Center. None of these leaders established the basic standards and accountability that might have served to prevent the abusive behaviors that occurred.

## Interrogation Techniques

Interrogation techniques intended only for Guantanamo came to be used in Afghanistan and Iraq. Techniques employed at Guantanamo included the use of stress positions, isolation for up to 30 days and removal of clothing. In Afghanistan techniques included removal of clothing, isolating people for long periods of time, use of stress positions, exploiting fear of dogs, and sleep and light deprivation. Interrogators in Iraq, already familiar with some of these ideas, implemented them even prior to any policy guidance from CJTF-7. Moreover, interrogators at Abu Ghraib were relying on a 1987 version of FM 34-52, which authorized interrogators to control all aspects of the interrogation to include light, heating, food, clothing and shelter given to detainees.

A range of opinion among interrogators, staff judge advocates and commanders existed regarding what techniques were permissible. Some incidents of abuse were clearly cases of individual criminal misconduct. Other incidents resulted from misinterpretations of law or policy or confusion about what interrogation techniques were permitted by law or local SOPs. The incidents stemming from misinterpretation or confusion occurred for several reasons: the proliferation of guidance and information from other theaters of operation; the interrogators' experiences in other theaters; and the failure to distinguish between permitted interrogation techniques in other theater environments and Iraq. Some soldiers or contractors who committed abuse may honestly have believed the techniques were condoned.

## Use of Contractors as Interrogators

As a consequence of the shortage of interrogators and interpreters, contractors were used to augment the workforce. Contractors were a particular problem at Abu Ghraib. The Army Inspector General found that 35 percent of the contractors employed did not receive formal training in military interrogation techniques, policy, or doctrine. The Naval Inspector General, however, found some of the older contractors had backgrounds as former military interrogators and were generally considered more effective than some of the junior enlisted military personnel. Oversight of contractor personnel and activities was not sufficient to ensure intelligence operations fell within the law and the authorized chain of command. Continued use of contractors will be required, but contracts must clearly specify the technical requirements and personnel qualifications, experience, and training needed. They should also be developed and administered in such as way as to provide the necessary oversight and management.

## Doctrinal Deficiencies

At the tactical level, detaining individuals primarily for intelligence collection or because they constitute a potential security threat, though necessary, presents units with situations not addressed by current doctrine. Many units adapted their operating procedures for conducting detainee operations to fit an environment not contemplated in the existing doctrinal manuals. The capturing units had no relevant procedures for information and evidence collection, which were critical for the proper disposition of detainees.

Additionally, there is inconsistent doctrine on interrogation facility operations for the fixed detention locations. Commanders had to improvise the organization and command relationships within these elements to meet the particular requirements of their operating environments in Afghanistan and Iraq. Doctrine is lacking to address the screening and interrogation of large numbers of detainees whose status (combatants, criminals, or innocents) is not easily ascertainable. Nor does policy specifically address administrative

69

INDEPENDENT PANEL TO REVIEW DOD DETENTION OPERATIONS

responsibilities related to the timely release of detainees captured and detained primarily for intelligence exploitation or for the security threat they may pose.

## Role of CIA

CIA personnel conducted interrogations in DoD detention facilities. In some facilities these interrogations were conducted in conjunction with military personnel, but at Abu Ghraib the CIA was allowed to conduct its interrogations separately. No memorandum of understanding existed on interrogations operations between the CIA and CJTF-7, and the CIA was allowed to operate under different rules. According to the Fay investigation, the CIA's detention and interrogation practices contributed to a loss of accountability at Abu Ghraib. We are aware of the issue of unregistered detainees, but the Panel did not have sufficient access to CIA information to make any determinations in this regard.

# THE ROLE OF MILITARY POLICE AND MILITARY INTELLIGENCE IN DETENTION OPERATIONS

Existing doctrine does not clearly address the relationship between the Military Police (MP) operating detention facilities and Military Intelligence (MI) personnel conducting intelligence exploitation at those facilities. The Army Inspector General report states neither MP nor MI doctrine specifically defines the distinct, but interdependent, roles and responsibilities of the two elements in detainee operations.

In the Global War on Terror, we are dealing with new conditions and new threats. Doctrine must be adjusted accordingly. MP doctrine currently states intelligence personnel may collaborate with MPs at detention sites to conduct interrogations, with coordination between the two groups to establish operating procedures. MP doctrine does not; however, address the subject of approved and prohibited MI procedures in an MP-operated facility. Conversely, MI doctrine does not clearly explain MP detention procedures or the role of MI personnel within a detention setting.

## GUANTANAMO

The first detainees arrived at Guantanamo in January 2002. The SOUTHCOM Commander established two joint task forces at Guantanamo to execute the detention operations (JTF-160) and the interrogation operations (JTF-170). In August of that year, based on difficulties with the command relationships, the two JTFs were organized into a single command designated as Joint Task Force Guantanamo. This reorganization was conceived to enhance unity of command and direct all activities in support of interrogation and detention operations.

71

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

On November 4, 2002, MG Miller was appointed Commander of Joint Task Force
Guantanamo. As the joint commander, he called upon the MP and MI soldiers to work
together cooperatively. Military police were to collect passive intelligence on detainees.
They became key players, serving as the eyes and ears of the cellblocks for military
intelligence personnel. This collaboration helped set conditions for successful
interrogation by providing the interrogator more information about the detainee—his
mood, his communications with other detainees, his receptivity to particular incentives,
etc. Under the single command, the relationship between MPs and MIs became an
effective operating model.

## AFGHANISTAN

The MP and MI commands at the Bagram Detention Facility maintained separate chains
of command and remained focused on their independent missions. The Combined Joint
Task Force-76 Provost Marshal was responsible for detainee operations. He designated a
principal assistant to run the Bagram facility. In parallel fashion, the CJTF-76
Intelligence Officer was responsible for MI operations in the facility, working through an
Officer-in-Charge to oversee interrogation operations. The two deputies worked together
to coordinate execution of their respective missions. A dedicated judge advocate was
assigned full time to the facility, while the CJTF-76 Inspector General provided
independent oversight. Based on information from the Naval Inspector General
investigation, this arrangement in Afghanistan worked reasonably well.

## ABU GHRAIB, IRAQ

The Central Confinement Facility is located near the population center of Baghdad.
Abu Ghraib was selected by Ambassador Bremer who envisioned it as a temporary
facility to be used for criminal detainees until the new Iraqi government could be

72

established and an Iraqi prison established at another site. Following operations during the summer of 2003, Abu Ghraib also was designated by CJTF-7 as the detention center for security detainees. It was selected because it was difficult to transport prisoners, due to improvised explosives devices (IEDs) and other insurgent tactics, to the more remote and secure Camp Bucca, some 150 miles away.

## Request for Assistance

Commander CJTF-7 recognized serious deficiencies at the prison and requested assistance. In response to this request, MG Miller and a team from Guantanamo were sent to Iraq to provide advice on facilities and operations specific to screening, interrogations, HUMINT collection and interagency integration in the short- and long- term. The team arrived in Baghdad on August 31, 2003. MG Miller brought a number of recommendations derived from his experience at Guantanamo to include his model for MP and MI personnel to work together. These collaborative procedures had worked well at Guantanamo, in part because of the high ratio of approximately one-to-one of military police to mostly compliant detainees. However, the guard-to-detainee ratio at Abu Ghraib was approximately 1 to 75, and the Military Intelligence and the Military Police had separate chains of command.

MG Ryder, the Army Provost Marshal, also made an assistance visit in mid-October 2003. He conducted a review of detainee operations in Iraq. He found flawed operating procedures, a lack of training, an inadequate prisoner classification system, under-strength units and a ratio of guard to prisoners designed for "compliant" prisoners of war and not for criminals or high-risk security detainees. However, he failed to detect the warning signs of potential and actual abuse that was ongoing during his visit. The assessment team members did not identify any MP units purposely applying inappropriate confinement practices. The Ryder report continues that "Military Police, though adept at passive collection of intelligence within a facility, do not participate in

73

Military Intelligence-supervised interrogation sessions. The 800th MP Brigade has not been asked to change its facility procedures to set the conditions for MI interviews, nor participate in those interviews."

### Prevailing Conditions

Conditions at Abu Ghraib reflected an exception to those prevailing at other theater detainee facilities. U.S. forces were operating Tiers 1A and 1B, while Tiers 2 through 7 were under the complete control of Iraqi prison guards. Iraqis who had committed crimes against other Iraqis were intended to be housed in the tiers under Iraqi control. The facility was under frequent hostile fire from mortars and rocket-propelled grenades. Detainee escape attempts were numerous and there were several riots. Both MI and MP units were seriously under-resourced and lacked unit cohesion and mid-level leadership. The reserve MP units had lost senior noncommissioned officers and other personnel through rotations back to the U.S. as well as reassignments to other missions in the theater.

When Abu Ghraib opened, the first MP unit was the 72nd MP Company, based in Henderson, Nevada. Known as "the Nevada Company," it has been described by many involved in investigations concerning Abu Ghraib as a very strong unit that kept tight rein on operational procedures at the facility. This company called into question the interrogation practices of the MI brigade regarding nakedness of detainees. The 72nd MP Company voiced and then filed written objections to these practices.

The problems at Abu Ghraib intensified after October 15, 2003, when the 372nd Military Police Company took over the facility. The 372nd MP Company had been given the most sensitive mission: control of Tier 1A and Tier 1B, where civilian and military intelligence specialists held detainees identified for interrogations as well as "high-risk" detainees. An "MI hold" was anyone of intelligence interest and included foreign and

Iraqi terrorists, as well as individuals possessing information regarding foreign fighters, infiltration methods, or pending attacks on Coalition forces. The "high-risk" troublemakers were held in Tier 1B. The prison cells of Tiers 1A and 1B were collectively known as "the hard site." The 372nd soldiers were not trained for prison guard duty and were thinly stretched in dealing with the large number of detainees. With little experience to fall back on, the company commander deferred to noncommissioned officers who had civilian correctional backgrounds to work the night shift. This deference was a significant error in judgment.

### Leadership Shortfalls

At the leadership level, there was friction and a lack of communication between the 800th MP Brigade and the 205th MI Brigade through the summer and fall of 2003. There was no clear delineation of responsibility between commands and little coordination at the command level. Both the Director of the Joint Interrogation and Debriefing Center (JIDC) and the Commander of the 320th MP Battalion were weak and ineffective leaders. Both failed to ensure their subordinates were properly trained and supervised. They failed to establish and enforce basic soldier standards, proficiency, and accountability. Neither was able to organize tasks to accomplish their missions in an appropriate manner. By not communicating standards, policies, and plans to soldiers, these leaders conveyed a sense of tacit approval of abusive behaviors toward prisoners. This was particularly evident with respect to prisoner-handling procedures and techniques, including unfamiliarity with the Geneva Conventions. There was a lack of discipline and standards of behavior were not established nor enforced. A lax and dysfunctional command climate took hold.

In November 2003, the 205th MI Brigade Commander was assigned as the Forward Operation Base Commander, thus receiving responsibility for Abu Ghraib. This assignment was made as a result of CJTF-7 Commander's concern over force protection at the prison. The Fay investigation found this did not change the relationship of MP and

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

MI units in day-to-day operations at the facility, although the Commander of the 800th MP Brigade says she was denied access to areas of Abu Ghraib for which she was doctrinally responsible. Key leaders did not seem to recognize or appreciate psychological stressors associated with the detention mission. MG Taguba concluded these factors included "differences in culture, soldiers' quality of life, and the real presence of mortal danger over an extended time period. The failure of commanders to recognize these pressures contributed to the pervasive atmosphere existing at Abu Ghraib Detention Facility."

## Military Working Dogs at Abu Ghraib

The Military Police directives give guidance for the use of military working dogs. They are used to provide an effective psychological and physical deterrent in the detention facility, offering an alternative to using firearms. Dogs are also used for perimeter security, inspections and patrols. MG Miller had recommended dogs as beneficial for detainee custody and control during his visit in August/September 2003. However, he never recommended, nor were dogs used for interrogations at Guantanamo. The working dog teams were requested by the Commander 205th MI Brigade who never understood the intent as described by MG Miller. It is likely the confusion about using dogs partially stems from the initial request for dog teams by military intelligence and not military police.

The working dogs arrived at Abu Ghraib in mid-November 2003. The two Army teams were assigned primarily to security of the compound while the three Navy teams worked inside at the entry control point. The senior Army and Navy dog handlers indicated they had not previously worked in a prison environment and received only a one-day training session on scout and search for escaped Enemy Prisoners of War. The Navy handler stated that upon arrival at Abu Ghraib he had not received an orientation on what was expected from his canine unit nor what was authorized or not authorized. He further

stated he had never received instruction on the use of force in the compound, but he acknowledged he knew a dog could not be used on a detainee if the detainee posed no threat.

Guidance provided by the CJTF-7 directive of September 14, 2003 allowed working dogs to be used as an interrogation technique with the CJTF-7 Commander's approval. This authorization was updated by the October 12, 2003 memorandum, which allowed the presence of dogs during interrogation as long as they were muzzled and under control of the handler at all times but still required approval. The Taguba and Jones/Fay investigations identified a number of abuses related to using muzzled and unmuzzled dogs during interrogations. They also identified some abuses involving dog-use unrelated to interrogations, apparently for the sadistic pleasure of the MPs involved in these incidents.

## MP/MI Relationship

It is clear, with these serious shortfalls and lack of supervision, the model MG Miller presented for the effective working relationship between MI and MP was neither understood nor could it have been successfully implemented. Based on the Taguba and Jones/Fay investigations, "setting favorable conditions" had some basis in fact at Abu Ghraib, but it was also used as an excuse for abusive behavior toward detainees.

The events that took place at Abu Ghraib are an aberration when compared to the situations at other detention operations. Poor leadership and a lack of oversight set the stage for abuses to occur.