INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

# LAWS OF WAR/GENEVA CONVENTIONS

American military culture, training, and operations are steeped in a long-held commitment to the tenets of military and international law as traditionally codified by the world community. Department of Defense Directive 5100.77, DoD Law of War Program, describes the law of war as:

> That part of international law that regulates the conduct of armed hostilities. It is often called the law of armed conflict. The law of war encompasses all international law for the conduct of hostilities binding on the United States or its individual citizens, including treaties and international agreements to which the United States is a party, and applicable customary international law.

The law of war includes, among other agreements, the Geneva Conventions of 1949. The Geneva Conventions set forth the rights and obligations which govern the treatment of civilians and combatants during periods of armed conflict. Specifically, Geneva Convention III addresses the treatment of prisoners of war; and Geneva Convention IV addresses the treatment of civilians.

Chairman of the Joint Chiefs of Staff Instruction 5810.01B, Implementation of the DoD Law of War Program, reiterates U.S. policy concerning the law of war: "The Armed Forces of the United States will comply with the law of war during all armed conflicts, however such conflicts are characterized...."

The United States became engaged in two distinct conflicts, Operation Enduring Freedom (OEF) in Afghanistan and Operation Iraqi Freedom (OIF) in Iraq. As a result of a Presidential determination, the Geneva Conventions did not apply to al Quaeda and Taliban combatants. Nevertheless, these traditional standards were put into effect for OIF and remain in effect at this writing. Some would argue this is a departure from the

79

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

traditional view of the law of war as espoused by the ICRC and others in the international community.

## Operation Enduring Freedom

On October 17, 2001, pursuant to the commencement of combat operations in OEF, the Commander, CENTCOM, issued an order instructing the Geneva Conventions were to be applied to all captured individuals in accordance with their traditional interpretation. Belligerents would be screened to determine whether or not they were entitled to prisoner of war status. If an individual was entitled to prisoner of war status, the protections of Geneva Convention III would apply. If armed forces personnel were in doubt as to a detained individual's status, Geneva Convention III rights would be accorded to the detainee until a Geneva Convention III Article 5 tribunal made a definitive status determination. If the individual was found not to be entitled to Geneva Convention III protections, he or she might be detained and processed under U.S. criminal code, a procedure consistent with Geneva Convention IV.

A policy debate concerning the application of treaties and laws to al Qaeda and Taliban detainees then began taking shape. The Department of Justice Office of Legal Counsel (OLC) provided opinions to Counsel to the President and Department of Defense General Counsel concluding the Geneva Conventions did not protect members of the al Qaeda organization, and the President could decide that Geneva Conventions did not protect Taliban militia. Counsel to the President and the Attorney General so advised the President.

On February 7, 2002 the President issued a memorandum stating, in part,

> ...the war against terrorism ushers in a new paradigm.... Our nation recognizes that this new paradigm – ushered in not by us, but by terrorists – requires new thinking in the law of war, but thinking that should nevertheless be consistent with the principles of Geneva.

Upon this premise, the President determined the Geneva Conventions did not apply to the U.S. conflict with al Qaeda, and that Taliban detainees did not qualify for prisoner of war status. Removed from the protections of the Geneva Conventions, al Qaeda and Taliban detainees have been classified variously as "unlawful combatants," "enemy combatants," and "unprivileged belligerents."

The enemy in the Global War on Terror is one neither the United States nor the community of nations has ever before engaged on such an extensive scale. These far-reaching, well-resourced, organized, and trained terrorists are attempting to achieve their own ends. Such terrorists are not of a nation state such as those who are party to the agreements which comprise the law of war. Neither do they conform their actions to the letter or spirit of the law of war.

The Panel accepts the proposition that these terrorists are not combatants entitled to the protections of Geneva Convention III. Furthermore, the Panel accepts the conclusion the Geneva Convention IV and the provisions of domestic criminal law are not sufficiently robust and adequate to provide for the appropriate detention of captured terrorists.

The Panel notes the President qualified his determination, directing that United States policy would be "consistent with the principles of Geneva." Among other things, the Geneva Conventions adhere to a standard calling for a delineation of rights for all persons, and humane treatment for all persons. They suggest that no person is "outlaw," that is, outside the laws of some legal entity.

The Panel finds the details of the current policy vague and lacking. Justice Sandra Day O'Connnor, writing for the majority in *Hamdi v Rumsfeld*, June 28, 2004 points out "the Government has never provided any court with the full criteria that it uses in classifying individuals as [enemy combatants]." Justice O'Connor cites several authorities to support the proposition that detention "is a clearly established principle of the law of

war," but also states there is no precept of law, domestic or international, which would permit the indefinite detention of any combatant.

As a matter of logic, there should be a category of persons who do not comply with the specified conditions and thus fall outside the category of persons entitled to EPW status. Although there is not a particular label for this category in law of war conventions, the concept of "unlawful combatant" or "unprivileged belligerent" is a part of the law of war.

### Operation Iraqi Freedom

Operation Iraqi Freedom is wholly different from Operation Enduring Freedom. It is an operation that clearly falls within the boundaries of the Geneva Conventions and the traditional law of war. From the very beginning of the campaign, none of the senior leadership or command considered any possibility other than that the Geneva Conventions applied.

The message in the field, or the assumptions made in the field, at times lost sight of this underpinning. Personnel familiar with the law of war determinations for OEF in Afghanistan tended to factor those determinations into their decision-making for military actions in Iraq. Law of war policy and decisions germane to OEF migrated, often quite innocently, into decision matrices for OIF. We noted earlier the migration of interrogation techniques from Afghanistan to Iraq. Those interrogation techniques were authorized only for OEF. More important, their authorization in Afghanistan and Guantanamo was possible only because the President had determined that individuals subjected to these interrogation techniques fell outside the strict protections of the Geneva Conventions.

One of the more telling examples of this migration centers around CJTF-7's determination that some of the detainees held in Iraq were to be categorized as unlawful

combatants. "Unlawful combatants" was a category set out in the President's February 7, 2002 memorandum. Despite lacking specific authorization to operate beyond the confines of the Geneva Conventions, CJTF-7 nonetheless determined it was within their command discretion to classify, as unlawful combatants, individuals captured during OIF. CJTF-7 concluded it had individuals in custody who met the criteria for unlawful combatants set out by the President and extended it in Iraq to those who were not protected as combatants under the Geneva Conventions, based on the OLC opinions. While CJTF-7's reasoning is understandable in respect to unlawful combatants, nonetheless, they understood there was no authorization to suspend application of the Geneva Conventions, in letter and spirit, to all military actions of Operation Iraqi Freedom. In addition, CJTF-7 had no means of discriminating detainees among the various categories of those protected under the Geneva Conventions and those unlawful combatants who were not.

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

# THE ROLE OF THE INTERNATIONAL
# COMMITTEE OF THE RED CROSS

Since December 2001, the International Committee of the Red Cross (ICRC) has visited
U.S. detention operations in Guantanamo, Iraq, and Afghanistan numerous times.
Various ICRC inspection teams have delivered working papers and reports of findings to
U.S. military leaders at different levels. While the ICRC has acknowledged U.S.
attempts to improve the conditions of detainees, major differences over detainee status as
well as application of specific provisions of Geneva Conventions III and IV remain. If
we were to follow the ICRC's interpretations, interrogation operations would not be
allowed. This would deprive the U.S. of an indispensable source of intelligence in the
war on terrorism.

The ICRC is an independent agency whose activities include observing and reporting on
conditions in wartime detention camps and facilities. During visits, it attempts to register
all prisoners, inspect facilities, and conduct private interviews with detainees to discuss
any problems concerning detainee treatment or conditions; it also provides a means for
detainees to contact their families. While the ICRC has no enforcing authority and its
reports are supposedly confidential, any public revelation regarding standards of detainee
treatment can have a substantial effect on international opinion.

The ICRC seeks to handle problems at the lowest level possible. When a team conducts
an inspection, it provides a briefing, and sometimes a report, to the local commander.
Discrepancies and issues are presented to the detaining authorities, and follow-up visits
are made to monitor compliance with recommendations. The commander may or may
not implement the recommendations based on either resource constraint or his
interpretation of applicable law. These constraints can make complete implementation of
ICRC recommendations either difficult or inappropriate. If recommendations are not
implemented, the ICRC may address the issue with higher authorities. The ICRC does

85

not expect to receive, nor does the DoD have a policy of providing, a written response to ICRC reports. However, DoD elements do attempt to implement as many of the recommendations as practicable, given security and resource constraints.

One important difference in approach between the U.S. and the ICRC is the interpretation of the legal status of terrorists. According to a Panel interview with CJTF-7 legal counsel, the ICRC sent a report to the State Department and the Coalition Provisional Authority in February 2003 citing lack of compliance with Protocol 1. But the U.S. has specifically rejected Protocol 1 stating that certain elements in the protocol, that provide legal protection for terrorists, make it plainly unacceptable. Still the U.S. has worked to preserve the positive elements of Protocol 1. In 1985, the Secretary of Defense noted that "certain provisions of Protocol 1 reflect customary international law, and others appear to be positive new developments. We therefore intend to work with our allies and others to develop a common understanding or declaration of principles incorporating these positive aspects, with the intention they shall, in time, win recognition as customary international law." In 1986 the ICRC acknowledged that it and the U.S. government had "agreed to disagree" on the applicability of Protocol 1. Nevertheless, the ICRC continues to presume the United States should adhere to this standard under the guise of customary international law.

This would grant legal protections to terrorists equivalent to the protections accorded to prisoners of war as required by the Geneva Conventions of 1949 despite the fact terrorists do not wear uniforms and are otherwise indistinguishable from noncombatants. To do so would undermine the prohibition on terrorists blending in with the civilian population, a situation which makes it impossible to attack terrorists without placing noncombatants at risk. For this and other reasons, the U.S. has specifically rejected this additional protocol.

The ICRC also considers the U.S. policy of categorizing some detainees as "unlawful combatants" to be a violation of their interpretation of international humanitarian law. It contends that Geneva Conventions III and IV, which the U.S. has ratified, allow for only

two categories of detainees: (1) civilian detainees who must be charged with a crime and tried and (2) enemy combatants who must be released at the cessation of hostilities. In the ICRC's view, the category of "unlawful combatant" deprives the detainees of certain human rights. It argues that lack of information regarding the reasons for detention and the conditions for release are major sources of stress for detainees.

However, the 1949 Geneva Conventions specify conditions to qualify for protected status. By logic, then, if detainees do not meet the specific requirements of privileged status, there clearly must be a category for those lacking in such privileges. The ICRC does not acknowledge such a category of "unprivileged belligerents," and argues that it is not consistent with its interpretation of the Geneva Conventions.

Regarding the application of current international humanitarian law, including Geneva Conventions III and IV, the ICRC has three concerns: (1) gaining access to and ascertaining the status of all detainees in U.S. custody; (2) its belief that linking detention with interrogations should not be allowed which follows from its refusal to recognize the category of unprivileged combatants and (3) they also worry about losing their effectiveness.

Although the ICRC found U.S. forces generally cooperative, it has cited occasions when the forces did not grant adequate access to detainees, both in Iraq and Afghanistan. Of particular concern to the ICRC, however, has been the existence of "ghost detainees," detainees who were kept from ICRC inspectors. While the Panel has not been able to ascertain the number of ghost detainees in the overall detainee population, several investigations cite their existence. Both the Taguba and Jones/Fay reports cite instances of ghost detainees at Abu Ghraib. Secretary Rumsfeld publicly declared he directed one detainee be held secretly at the request of the Director of Central Intelligence.

On balance, the Panel concludes there is value in the relationship the Department of Defense historically has had with the ICRC. The ICRC should serve as an early warning

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

indicator of possible abuse. Commanders should be alert to ICRC observations in their reports and take corrective actions as appropriate. The Panel also believes the ICRC, no less than the Defense Department, needs to adapt itself to the new realities of conflict, which are far different from the Western European environment from which the ICRC's interpretation of Geneva Conventions was drawn. The Department of Defense has established an office of detainee affairs and should continue to reshape its operational relationship with the ICRC.

# RECOMMENDATIONS

Department of Defense reform efforts are underway and the Panel commends these efforts. The Office of the Secretary of Defense, the Joint Chiefs of Staff and the Military Services are conducting comprehensive reviews on how military operations have changed since the end of the Cold War. The military services now recognize the problems and are studying how to adjust force compositions, training, doctrine and responsibilities for active/reserve/guard and contractor mixes to ensure we are better prepared to succeed in the war on terrorism.

The Panel reviewed various inspections, investigations and assessments that produced over 300 recommendations for corrective actions to address the problems identified with DoD detention operations. For the most part the Panel endorses their recommendations. In some areas the recommendations do not go far enough and we augment them. We provide additional recommendations to address relevant areas not covered by previous analyses.

The Independent Panel provides the following additional recommendations:

1. The United States should further define its policy, applicable to both the Department of Defense and other government agencies, on the categorization and status of all detainees as it applies to various operations and theaters. It should define their status and treatment in a way consistent with U.S. jurisprudence and military doctrine and with U.S. interpretation of the Geneva Conventions. We recommend that additional operational, support and staff judge advocate personnel be assigned to appropriate commands for the purpose of expediting the detainee release review process.

2. The Department of Defense needs to address and develop joint doctrine to define the appropriate collaboration between military intelligence and military police in a detention facility. The meaning of guidance, such as MPs "setting the conditions" for

89

interrogation, needs to be defined with precision. MG Taguba argued that all detainee operations be consolidated under the responsibility of a single commander reporting directly to Commander CJTF-7. This change has now been accomplished and seems to be working effectively. Other than lack of leadership, training deficiencies in both MP and MI units have been cited most often as the needed measures to prevent detainee abuse. We support the recommendations on training articulated by the reports published by the various other reviews.

3. The nation needs more specialists for detention/interrogation operations, including linguists, interrogators, human intelligence, counter-intelligence, corrections police and behavioral scientists. Accompanying professional development and career field management systems must be put in place concurrently. The Panel agrees that some use of contractors in detention operations must continue into the foreseeable future. This is especially the case with the need for qualified interpreters and interrogators and will require rigorous oversight.

4. Joint Forces Command should chair a Joint Service Integrated Process Team to develop a new Operational Concept for Detention Operations in the new era of warfare, covering the Global War on Terror. The team should place special and early emphasis on detention operations during Counter-Insurgency campaigns and Stability Operations in which familiar concepts of front and rear areas may not apply. Attention should also be given to preparing for conditions in which normal law enforcement has broken down in an occupied or failed state. The Panel recommends that the idea of a deployable detention facility should be studied and implemented as appropriate.

5. Clearly, force structure in both MP and MI is inadequate to support the armed forces in this new form of warfare. Every investigation we reviewed refers to force structure deficiencies in some measure. There should be an active and reserve component mix of units for both military intelligence and military police. Other forces besides the Army are also in need of force structure improvements. Those forces have not been addressed

adequately in the reports reviewed by the Panel, and we recommend that the Secretaries of the Navy and Air Force undertake force structure reviews of their own to improve the performance of their Services in detention operations.

6. Well-documented policy and procedures on approved interrogation techniques are imperative to counteract the current chilling effect the reaction to the abuses have had on the collection of valuable intelligence through interrogations. Given the critical role of intelligence in the Global War on Terror, the aggressiveness of interrogation techniques employed must be measured against the value of intelligence sought, to include its importance, urgency and relevance. A policy for interrogation operations should be promulgated early on and acceptable interrogation techniques for each operation must be clearly understood by all interrogation personnel.

7. All personnel who may be engaged in detention operations, from point of capture to final disposition, should participate in a professional ethics program that would equip them with a sharp moral compass for guidance in situations often riven with conflicting moral obligations. The development of such a values-oriented ethics program should be the responsibility of the individual services with assistance provided by the Joint Chiefs of Staff.

8. Clearer guidelines for the interaction of CIA with the Department of Defense in detention and interrogation operations must be defined.

9. The United States needs to redefine its approach to customary and treaty international humanitarian law, which must be adapted to the realities of the nature of conflict in the 21st Century. In doing so, the United States should emphasize the standard of reciprocity, in spite of the low probability that such will be extended to United States Forces by some adversaries, and the preservation of United States societal values and international image that flows from an adherence to recognized humanitarian standards.

10. The Department of Defense should continue to foster its operational relationship with the International Committee of the Red Cross. The Panel believes the International Committee of the Red Cross, no less than the Defense Department, needs to adapt itself to the new realities of conflict which are far different from the Western European environment from which the ICRC's interpretation of Geneva Conventions was drawn.

11. The assignment of a focal point within the office of the Under Secretary for Policy would be a useful organizational step. The new focal point for Detainee Affairs should be charged with all aspects of detention policy and also be responsible for oversight of DoD relations with the International Committee of the Red Cross.

12. The Secretary of Defense should ensure the effective functioning of rapid reporting channels for communicating bad news to senior Department of Defense leadership without prejudice to any criminal or disciplinary actions already underway. The Panel recommends consideration of a joint adaptation of procedures such as the Air Force special notification process.

13. The Panel notes that the Fay investigation cited some medical personnel for failure to report detainee abuse. As noted in that investigation, training should include the obligation to report any detainee abuse. The Panel also notes that the Army IG found significant shortfalls in training and force structure for field sanitation, preventive medicine and medical treatment requirements for detainees. As the DoD improves detention operations force structure and training, it should pay attention to the need for medical personnel to screen and monitor the health of detention personnel and detainees.

14. The integration of the recommendations in this report and all the other efforts underway on detention operations will require further study. Analysis of the dynamics of program and resource implications, with a view to assessing the trade-offs and opportunity costs involved, must be addressed.

# Appendices

GLOSSARY

| | | |
|---|---|---|
| **Army Regulation 15-6** | AR 15-6 | Army regulation which specifies procedures for command investigations. The common name for both formal and informal command investigations. |
| **Active Component** | AC | Active military component of the Army, Navy, Air Force or Marines. |
| **Abuse Cases** | | An incident or allegation of abuse, including, but not limited to death, assault, sexual assault, and theft, that triggers a CID investigation, which may involve multiple individuals. |
| **Behavioral Science Coordination Team** | BSCT | Team comprised of medical and other specialized personnel that provides support to special operations forces. |
| **Civilian Internees** | CI | Designation of civilians encountered and detained in the theater of war. |
| **Criminal Investigation Command** | CID | Investigative agency of the U. S. Army responsible for conducting criminal investigations to which the Army is or may be a party. |
| **Collection Points** | CP | Forward locations where prisoners are collected, processed and prepared for movement to the detention center. |
| **Coalition Provisional Authority** | CPA | Interim government of Iraq, in place from May 2003 through June 2004. |
| **Convention Against Torture and Other Cruel Inhumane or Degrading Treatment** | | An international treaty brought into force in 1987 which seeks to define torture and other cruel, inhuman or degrading treatment or punishment and provides a mechanism for punishing those who would inflict such treatment on others. |
| **Enemy Prisoner of War** | EPW | International Committee of the Red Cross term for prisoners of war; this status bestows certain rights to the individual in the Geneva Conventions. |
| **Force Design Update** | FDU | The Army process to review and restructure forces. |

# GLOSSARY

| | | |
|---|---|---|
| **Fragmentary Order** | FRAGO | An abbreviated form of an operation order (verbal, written or digital) usually issued on a day-to-day basis that eliminates the need for restating information contained in a basic operation order. |
| **Army Field Manual 34-52 "Intelligence Interrogation"** | FM 34-52 | Current manual for operations and training in interrogation techniques.  The edition dated 1987 was updated in 1992. |
| **Geneva Conventions** | GC | The international treaties brought into force in August 1949.  These conventions extend protections to, among others, prisoners of war and civilians in time of war. |
| **Global War on Terror** | GWOT | Worldwide operation to eradicate individuals and groups that participate in and sponsor terrorism. |
| **Internment/Resettlement** | I/R | Internment/resettlement mission assigned to specific US Army Military Police units who are responsible for the detention of Enemy Prisoners of War during armed conflict. |
| **International Committee of the Red Cross** | ICRC | Nongovernmental organization that seeks to help victims of war and internal violence. |
| **In Lieu Of** | ILO | When used in reference to manning, indicates that forces were used in a manner other than originally specified. |
| **Initial Point of Capture** | IPOC | Location where an enemy prisoner or internee is captured. |
| **Iraq Survey Group** | ISG | Organization located in Iraq with the mission to find weapons of mass destruction. |
| **Joint Manning Document** | JMD | Master document covering personnel requirements for the joint theater. |
| **Navy Criminal Investigative Service** | NCIS | Investigative service for the US Navy and Marine Corps. |

GLOSSARY

| | | |
|---|---|---|
| **National Detainee Reporting Center** | NDRC | Agency charged with accounting for and reporting all EPW, retained personnel, civilian internees and other detainees during armed conflict. |
| **Operation Enduring Freedom** | OEF | Military operation in Afghanistan |
| **Other Government Agencies** | OGA | Refers to non-Department of Defense agencies operating in theaters of war. |
| **Operation Iraqi Freedom** | OIF | Military operation in Iraq. |
| **Office of Legal Counsel** | OLC | Refers to the Department of Justice Office of Legal Counsel. |
| **Operation Noble Eagle** | ONE | Operation to activate and deploy forces for homeland defense and civil support in response to the attacks of September 11, 2001. |
| **Operation Victory Bounty** | OVB | CJTF-7 operation to sweep Baghdad area for remaining elements of the Saddam Fedayeen in 2003. |
| **Operational Control** | OPCON | Command authority over all aspects of military operations. |
| **Republican Guard** | RG | Elite Iraqi military forces under the regime of Saddam Hussein. |
| **Reserve Component** | RC | Army, Navy, Air Force and Marine Reserves and Army and Air National Guard |
| **Request for Forces** | RFF | Commanders request for additional forces to support the mission. |
| **Standing Operating Procedure** | SOP | A set of instructions covering those features of operations which lend themselves to a definite or standardized procedures without loss of effectiveness. The procedure is applicable unless ordered otherwise. |
| **Tactical Control** | TACON | Command authority to control and task forces for maneuvers within an area of operations. |

# GLOSSARY

| | | |
|---|---|---|
| **Tactical Human Intelligence Team** | THT | Forward deployed intelligence element providing human intelligence support to maneuver units. |
| **Time Phased Force Deployment List** | TPFDL | Identifies the units needed to support an operational plan and specifies their order and method of deployment. |
| **Army Regulation 15-6** | AR 15-6 | Army regulation which specifies procedures for command investigations. The common name for both formal and informal command investigations. |
| **Active Component** | AC | Active military component of the Army, Navy, Air Force or Marines. |
| **Abuse Cases** | | An incident or allegation of abuse, including, but not limited to death, assault, sexual assault, and theft, that triggers a CID investigation, which may involve multiple individuals. |
| **Behavioral Science Coordination Team** | BSCT | Team comprised of medical and other specialized personnel that provides support to special operations forces. |
| **Civilian Internees** | CI | Designation of civilians encountered and detained in the theater of war. |
| **Criminal Investigation Command** | CID | Investigative agency of the U. S. Army responsible for conducting criminal investigations to which the Army is or may be a party. |
| **Collection Points** | CP | Forward locations where prisoners are collected, processed and prepared for movement to the detention center. |
| **Coalition Provisional Authority** | CPA | Interim government of Iraq, in place from May 2003 through June 2004. |
| **Convention Against Torture and Other Cruel Inhumane or Degrading Treatment** | | An international treaty brought into force in 1987 which seeks to define torture and other cruel, inhuman or degrading treatment or punishment and provides a mechanism for punishing those who would inflict such treatment on others. |

97

# GLOSSARY

| | | |
|---|---|---|
| **Enemy Prisoner of War** | EPW | International Committee of the Red Cross term for prisoners of war; this status bestows certain rights to the individual in the Geneva Conventions. |
| **Force Design Update** | FDU | The Army process to review and restructure forces. |
| **Fragmentary Order** | FRAGO | An abbreviated form of an operation order (verbal, written ordigital) usually issued on a day-to-day basis that eliminates the need for restarting information contained in a basic operation order. |
| **Army Field Manual 34-52 "Intelligence Interrogation"** | FM 34-52 | Current manual for operations and training in interrogation techniques. The edition dated 1987 was updated in 1992. |
| **Geneva Conventions** | GC | The international treaties brought into force in August 1949. These conventions extend protections to, among others, prisoners of war and civilians in time of war. |
| **Global War on Terror** | GWOT | Worldwide operation to eradicate individuals and groups that participate in and sponsor terrorism. |
| **Internment/Resettlement** | I/R | Internment/resettlement mission assigned to specific US Army Military Police units who are responsible for the detention of Enemy Prisoners of War during armed conflict. |
| **International Committee of the Red Cross** | ICRC | Nongovernmental organization that seeks to help victims of war and internal violence. |
| **In Lieu Of** | ILO | When used in reference to manning, indicates that forces were used in a manner other than originally specified. |
| **Initial Point of Capture** | IPOC | Location where an enemy prisoner or internee is captured. |
| **Iraq Survey Group** | ISG | Organization located in Iraq with the mission to find weapons of mass destruction. |
| **Joint Manning Document** | JMD | Master document covering personnel requirements for the joint theater. |

# GLOSSARY

| | | |
|---|---|---|
| **Navy Criminal Investigative Service** | NCIS | Investigative service for the US Navy and Marine Corps. |
| **National Detainee Reporting Center** | NDRC | Agency charged with accounting for and reporting all EPW, retained personnel, civilian internees and other detainees during armed conflict. |
| **Operation Enduring Freedom** | OEF | Military operation in Afghanistan |
| **Other Government Agencies** | OGA | Refers to non-Department of Defense agencies operating in theaters of war. |
| **Operation Iraqi Freedom** | OIF | Military operation in Iraq. |
| **Office of Legal Counsel** | OLC | Refers to the Department of Justice Office of Legal Counsel. |
| **Operation Noble Eagle** | ONE | Operation to activate and deploy forces for homeland defense and civil support in response to the attacks of September 11, 2001. |
| **Operation Victory Bounty** | OVB | CJTF-7 operation to sweep Baghdad area for remaining elements of the Saddam Fedayeen in 2003. |
| **Operational Control** | OPCON | Command authority over all aspects of military operations. |
| **Republican Guard** | RG | Elite Iraqi military forces under the regime of Saddam Hussein. |
| **Reserve Component** | RC | Army, Navy, Air Force and Marine Reserves and Army and Air National Guard |
| **Request for Forces** | RFF | Commanders request for additional forces to support the mission. |
| **Standing Operating Procedure** | SOP | A set of instructions covering those features of operations which lend themselves to a definite or standardized procedures without loss of effectiveness. The procedure is applicable unless ordered otherwise. |
| **Tactical Control** | TACON | Command authority to control and task forces for maneuvers within an area of operations. |

GLOSSARY

| | | |
|---|---|---|
| **Tactical Human Intelligence Team** | THT | Forward deployed intelligence element providing human intelligence support to maneuver units. |
| **Time Phased Force Deployment List** | TPFDL | Identifies the units needed to support an operational plan and specifies their order and method of deployment. |

100