# GLOSSARY

## Guantanamo

| | | | Commander |
|---|---|---|---|
| United States Southern Command | USSOUTHCOM | One of nine Unified Combatant Commands with operational control of U.S. military forces. Area of responsibility includes Guantanamo Bay, Cuba. | GEN James Hill |
| Joint Task Force 160 | JTF-160 | Initially responsible for detention operations at Guantanamo, merged in JTF-G 11/4/02. | |
| Joint Task Force 170 | JTF-170 | Initially responsible for interrogation operations at Guantanamo, merged in JTF-G 11/4/02. | |
| Joint Task Force Guantanamo | JTF-G | Joint task force for all operations at Guantanamo, formed 11/4/02. | |

## Afghanistan

| | | | |
|---|---|---|---|
| United States Central Command | USCENTCOM | One of nine Unified Commands with operational control of U.S. military forces. Area of responsibility includes Afghanistan and Iraq. | GEN John Abizaid |
| Coalition Forces Land Component Command | CFLCC | Senior headquarters element for multi-national land forces in both Iraq and Afghanistan. | LTG David McKiernan |
| Combined Joint Task Force 180 | CJTF-180 | Forward deployed headquarters for Afghanistan. | |

## Iraq

| | | | |
|---|---|---|---|
| United States Central Command | USCENTCOM | One of nine Unified Commands with operational control of U.S. military forces. Area of responsibility includes Afghanistan and Iraq. | GEN John Abizaid |
| Coalition Forces Land Component Command | CFLCC | Senior headquarters element for multi-national land forces in both Iraq and Afghanistan. | LTG David McKiernan |
| Combined Joint Task Force 7 | CJTF-7 | Forward deployed headquarters for Operation Iraqi Freedom. Replaced in May 04 by Multi National Force - Iraq and Multi National Corps - Iraq | LTG Ricardo Sanchez |
| Combined Joint Task Force 7 Intelligence Staff | CJTF-7 C2 | Intelligence staff support to CJTF-7 | MG Barbara Fast |
| 800th Military Police Brigade | 800th MP BDE | U.S. Army Reserve Military Police Brigade, responsible for all internment facilities in Iraq, and assistance to CPA Minister of Justice. | BG Janis Karpinski |
| Joint Interrogation and Detention Center | JDIC | Element of CJTF-7 for introgation mission at Abu Ghuraib. | LTC Steven Jordan |

101

## GLOSSARY

| | | | |
|---|---|---|---|
| 320th Military Police Battalion | 320th MP BN | Element of 800th Bde; assigned to Abu Ghuraib. | LTC Jerry Phillabaum |
| 372nd Military Police Company | 372nd MP CO | Element of 320th Bn; assigned to Abu Ghuraib in October 2003. | CPT Donald Reese |
| 72nd Military Police Company | 72nd MP CO | Nevada National Guard MP Company, assigned to Abu Ghuraib prior to 372nd MP Co. | |
| 205th Military Intelligence Brigade | 205th MI BDE | Military Intelligence Brigade responsible for multiple Army intelligence missions throughout Iraq. | COL Thomas Pappas |
| 519th Military Intelligence Battalion | 519th MI BN | Tactical exploitation element of 525 MI Bde; Company A was located at Abu Ghuraib. | MAJ Michnewicz |

## Other

| | | |
|---|---|---|
| United States Army Forces Command | FORSCOM | U.S. Army major command responsible for training, readiness and deployment. |



**SECRETARY OF DEFENSE**
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

MAY 12 2004

MEMORANDUM FOR THE HONORABLE JAMES R. SCHLESINGER,
                    CHAIRMAN
                    THE HONORABLE HAROLD BROWN
                    THE HONORABLE TILLIE K. FOWLER
                    GENERAL CHARLES A. HORNER, USAF (RET.)

SUBJECT:  Independent Panel to Review DoD Detention Operations

        Various organizations of the Department of Defense have investigated, or will investigate, various aspects of allegations of abuse at DoD Detention Facilities and other matters related to detention operations.  Thus far these inquiries include the following:

        --Criminal investigations into individual allegations
        --Army Provost Marshal General assessment of detention and corrections
          operations in Iraq
        --Joint Task Force Guantanamo assistance visit to Iraq to assess intelligence
          operations
        --Administrative Investigation under AR 15-6 regarding Abu Ghraib
          operations
        --Army Inspector General assessment of doctrine and training for detention
          operations
        --Commander, Joint Task Force-7 review of activities of military
          intelligence personnel at Abu Ghraib
        --Army Reserve Command Inspector General assessment of training of
          Reserve units regarding military intelligence and military police
        --Naval Inspector General review of detention procedures at Guantanamo
          Bay, Cuba, and the Naval Consolidated Brig, Charleston, South Carolina

        I have been or will be briefed on the results of these inquiries and the corrective actions taken by responsible officials within the Department.

        It would be helpful to me to have your independent, professional advice on the issues that you consider most pertinent related to the various allegations, based on your review of completed and pending investigative reports and other materials and information.  I am especially interested in your views on the cause of the problems and what should be done to fix them.  Issues such as force structure, training of regular and reserve personnel, use of contractors, organization, detention policy and procedures, interrogation policy and procedures, the relationship between detention and interrogation, compliance with the Geneva Conventions, relationship with the International Committee



OSD 06804-04

of the Red Cross, command relationships, and operational practices may be contributing factors you might wish to review. Issues of personal accountability will be resolved through established military justice and administrative procedures, although any information you may develop will be welcome.

I would like your independent advice orally and in writing, preferably within 45 days after you begin your review. DoD personnel will collect information for your review and assist you as you deem appropriate. You are to have access to all relevant DoD investigations and other DoD information unless prohibited by law. Reviewing all written materials relevant to these issues may be sufficient to allow you to provide your advice. Should you believe it necessary to travel or conduct interviews, the Director of Administration and Management will make appropriate arrangements.

I intend to provide your report to the Committees on Armed Services, the Secretaries of the Military Departments, the Chairman of the Joint Chiefs of Staff, the Commanders of the Combatant Commands, the Directors of the Defense Agencies, and others as appropriate. If your report contains classified information, please also provide an unclassified version suitable for public release.

By copy of this memorandum, I request the Director of Administration and Management to secure the necessary technical, administrative and legal support for your review from the Department of Defense Components. I appoint you as full-time employees of this Department without pay under 10 U.S.C. §1583. I request all Department of Defense personnel to cooperate fully with your review and to make available all relevant documents and information at your request.

cc:  SECRETARIES OF THE MILITARY DEPARTMENTS
     CHAIRMAN OF THE JOINT CHIEFS OF STAFF
     UNDER SECRETARIES OF DEFENSE
     DIRECTOR, DEFENSE RESEARCH AND ENGINEERING
     ASSISTANT SECRETARIES OF DEFENSE
     GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE
     INSPECTOR GENERAL OF THE DEPARTMENT OF DEFENSE
     DIRECTOR, OPERATIONAL TEST AND EVALUATION
     ASSISTANTS TO THE SECRETARY OF DEFENSE

2

DIRECTOR, ADMINISTRATION AND MANAGEMENT
DIRECTOR, FORCE TRANSFORMATION
DIRECTOR, NET ASSESSMENT
DIRECTOR, PROGRAM ANALYSIS AND EVALUATION
DIRECTORS OF THE DEFENSE AGENCIES
DIRECTORS OF THE DOD FIELD ACTIVITIES

**THE WHITE HOUSE**

WASHINGTON

February 7, 2002

MEMORANDUM FOR THE VICE PRESIDENT
             THE SECRETARY OF STATE
             THE SECRETARY OF DEFENSE
             THE ATTORNEY GENERAL
             CHIEF OF STAFF TO THE PRESIDENT
             DIRECTOR OF CENTRAL INTELLIGENCE
             ASSISTANT TO THE PRESIDENT FOR NATIONAL
                SECURITY AFFAIRS
             CHAIRMAN OF THE JOINT CHIEFS OF STAFF

SUBJECT:        Humane Treatment of al Qaeda and Taliban Detainees

1.    Our recent extensive discussions regarding the status
of al Qaeda and Taliban detainees confirm that the appli-
cation of the Geneva Convention Relative to the Treatment
of Prisoners of War of August 12, 1949 (Geneva) to the
conflict with al Qaeda and the Taliban involves complex
legal questions. By its terms, Geneva applies to conflicts
involving "High Contracting Parties," which can only be
states. Moreover, it assumes the existence of "regular"
armed forces fighting on behalf of states. However, the
war against terrorism ushers in a new paradigm, one in
which groups with broad, international reach commit horrific
acts against innocent civilians, sometimes with the direct
support of states. Our Nation recognizes that this new
paradigm -- ushered in not by us, but by terrorists --
requires new thinking in the law of war, but thinking that
should nevertheless be consistent with the principles of
Geneva.

2.    Pursuant to my authority as Commander in Chief and Chief
Executive of the United States; and relying on the opinion
of the Department of Justice dated January 22, 2002, and on
the legal opinion rendered by the Attorney General in his
letter of February 1, 2002, I hereby determine as follows:

    a.    I accept the legal conclusion of the Department of
Justice and determine that none of the provisions
of Geneva apply to our conflict with al Qaeda in
Afghanistan or elsewhere throughout the world because,
among other reasons, al Qaeda is not a High Contracting
Party to Geneva.

    b.    I accept the legal conclusion of the Attorney General
and the Department of Justice that I have the authority
under the Constitution to suspend Geneva as between
the United States and Afghanistan, but I decline to



Appendix C

2

exercise that authority at this time. Accordingly, I determine that the provisions of Geneva will apply to our present conflict with the Taliban. I reserve the right to exercise this authority in this or future conflicts.

c.  I also accept the legal conclusion of the Department of Justice and determine that common Article 3 of Geneva does not apply to either al Qaeda or Taliban detainees, because, among other reasons, the relevant conflicts are international in scope and common Article 3 applies only to "armed conflict not of an international character."

d.  Based on the facts supplied by the Department of Defense and the recommendation of the Department of Justice, I determine that the Taliban detainees are unlawful combatants and, therefore, do not qualify as prisoners of war under Article 4 of Geneva. I note that, because Geneva does not apply to our conflict with al Qaeda, al Qaeda detainees also do not qualify as prisoners of war.

3.  Of course, our values as a Nation, values that we share with many nations in the world, call for us to treat detainees humanely, including those who are not legally entitled to such treatment. Our Nation has been and will continue to be a strong supporter of Geneva and its principles. As a matter of policy, the United States Armed Forces shall continue to treat detainees humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva.

4.  The United States will hold states, organizations, and individuals who gain control of United States personnel responsible for treating such personnel humanely and consistent with applicable law.

5.  I hereby reaffirm the order previously issued by the Secretary of Defense to the United States Armed Forces requiring that the detainees be treated humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of Geneva.

6.  I hereby direct the Secretary of State to communicate my determinations in an appropriate manner to our allies, and other countries and international organizations cooperating in the war against terrorism of global reach.



# Interrogation Policies in Guantanamo, Afghanistan and Iraq

| | Number of Authorized Techniques | Policy | Date | Notes |
|---|---|---|---|---|
| **GTMO** | 17 | FM 34-52 (1992) | Jan 02 - 01 Dec 02 | |
| | 33 | Secretary of Defense Approved Tiered System | 02 Dec 02 - 15 Jan 03 | 1 |
| | 20 | FM 34-52 (1992) with 3 Cat I Techniques | 16 Jan 03 - 15 Apr 03 | |
| | 24 | Secretary of Defense Memo | 16 Apr 03 - Present | 1,2 |
| **Afghanistan[5]** | 17 | FM 34-52 (1992) | 27 Oct 01 - 24 Jan 03 | |
| | 33 | CJTF 180 Response to Director, Joint Staff | 24-Jan-03 | 1, 3, 6 |
| | 32 | CJTF 180 Detainee SOP | 27-Mar-04 | 1 |
| | 19 | CJTF-A Rev 2 Guidance | Jun-04 | 4 |
| **Iraq[5]** | 17 | FM 34-52 (1992) | | |
| | 29 | CJTF-7 Signed Policy | 14-Sep-03 | 1 |
| | 19 | CJTF-7 Signed Policy | 12-Oct-03 | 4 |
| | 19 | CJTF-7 Signed Policy | 13-May-04 | 4 |

1 Some techniques specifically delineated in this memo are inherent to techniques contained in FM 34-52, e.g. Yelling as a component of Fear Up

2 Five Approved Techniques require SOUTHCOM approval and SECDEF notification.

3 Figure includes techniques that were not in current use but requested for future use.

4 Figure includes one technique which requires CG approval.

5 Memorandum cited for Afghanistan and Iraq are classified.

6 Figure includes the 17 techniques of FM-34-52, although they are not specified in the Memo.

Appendix D

Source: Naval IG Investigation

# Evolution of Interrogation Techniques - GTMO

| Interrogation Techniques | FM 34-52 (1992) Jan 02 - 01 Dec 02 | Secretary of Defense Approved Tiered System 02 Dec 02 - 15 Jan 03 | FM 34-52 (1992) with some Cat I 16 Jan 03 - 15 Apr 03 | Secretary of Defense Memo 16 Apr 03 - Present |
|---|---|---|---|---|
| Direct questioning | X | X | X | X |
| Incentive/removal of incentive | X | X | X | X |
| Emotional love | X | X | X | X |
| Emotional hate | X | X | X | X |
| Fear up harsh | X | X | X | X |
| Fear up mild | X | X | X | X |
| Reduced fear | X | X | X | X |
| Pride and ego up | X | X | X | X |
| Pride and ego down | X | X | X | X |
| Futility | X | X | X | X |
| We know all | X | X | X | X |
| Establish your identity | X | X | X | X |
| Repetition approach | X | X | X | X |
| File and dossier | X | X | X | X |
| Mutt and Jeff | | | | X* |
| Rapid Fire | X | X | X | X |
| Silence | X | X | X | X |
| Change of Scene | X | X | X | X |
| Yelling | | X (Cat I) | | |
| Deception | | X (Cat I) | | |
| Multiple interrogators | | X (Cat I) | X | |
| Interrogator identity | | X (Cat I) | X | |
| Stress positions, like standing | | X (Cat II) | | |
| False documents/reports | | X (Cat II) | | |
| Isolation for up to 30 days | | X (Cat II) | | X* |
| Deprivation of light/auditory stimuli | | X (Cat II) | | |
| Hooding (transportation & questioning) | | X (Cat II) | | |
| 20-interrogations | | X (Cat II) | | |
| Removal of ALL comfort items, including religious items | | X (Cat II) | | |
| MRE-only diet | | X (Cat II) | | X* |
| Removal of clothing | | X (Cat II) | | |
| Forced grooming | | X (Cat II) | | |
| Exploiting individual phobias, e.g. dogs | | X (Cat II) | | |
| Mild, non-injurious physical contact, e.g. grabbing, poking or light pushing | | X (Cat III) | | |
| Environmental manipulation | | | | X |
| Sleep adjustment | | | | X |
| False flag | | | | X |

*Techniques require SOUTHCOM approval and SECDEF notification.

Source: Naval IG Investigation
Appendix E

# Major Detention Events



Appendix F

# PSYCHOLOGICAL STRESSES

The potential for abusive treatment of detainees during the Global War on Terrorism was entirely predictable based on a fundamental understanding of the principle of social psychology principles coupled with an awareness of numerous known environmental risk factors. Most leaders were unacquainted with these known risk factors, and therefore failed to take steps to mitigate the likelihood that abuses of some type would occur during detainee operations. While certain conditions heightened the possibility of abusive treatment, such conditions neither excuse nor absolve the individuals who engaged in deliberate immoral or illegal behaviors.

The abuse the detainees endured at various places and times raises a number of questions about the likely psychological aspects of inflicting such abuses. Findings from the field of social psychology suggest that the conditions of war and the dynamics of detainee operations carry inherent risks for human mistreatment, and therefore must be approached with great caution and careful planning and training.

## The Stanford Prison Experiment

In 1973, Haney, Banks and Zimbardo (1) published their landmark Stanford study, "Interpersonal Dynamics in a Simulated Prison." Their study provides a cautionary tale for all military detention operations. The Stanford Experiment used a set of tested, psychologically sound college students in a benign environment. In contrast, in military detention operations, soldiers work under stressful combat conditions that are far from benign.

The Stanford Prison Experiment (SPE) attempted to "create a prison-like situation" and then observe the behavior of those involved. The researchers randomly assigned 24 young men to either the "prisoner" or "guard" group. Psychological testing was used to eliminate participants with overt psychopathology, and extensive efforts were made to

Appendix G

simulate actual prison conditions. The experiment, scheduled to last two weeks, was cancelled after only six days due to the ethical concerns raised by the behaviors of the participants. The study notes that while guards and prisoners were free to engage in any form of interpersonal interactions, the "characteristic nature of their encounters tended to be negative, hostile, affrontive and dehumanizing."

The researchers found that both prisoners and guards exhibited "pathological reactions" during the course of the experiment. Guards fell into three categories: (1) those who were "tough but fair," (2) those who were passive and reluctant to use coercive control and, of special interests, (3) those who "went far beyond their roles to engage in creative cruelty and harassment." With each passing day, guards "were observed to generally escalate their harassment of the prisoners." The researchers reported: "We witnessed a sample of normal, healthy American college students fractionate into a group of prison guards who seemed to derive pleasure from insulting, threatening, humiliating, and dehumanizing their peers."

Because of the random assignment of subjects, the study concluded the observed behaviors were the result of situational rather than personality factors:

> The negative, anti-social reactions observed were not the product of an environment created by combining a collection of deviant personalities, but rather, the result of an intrinsically pathological situation which could distort and rechannel the behaviour of essentially normal individuals. The abnormality here resided in the psychological nature of the situation and not in those who passed through it.

The authors discussed how prisoner-guard interactions shaped the evolution of power use by the guards:

> The use of power was self-aggrandizing and self-perpetuating. The guard power, derived initially from an arbitrary label, was intensified whenever there was any perceived threat by the prisoners and this new level subsequently became the baseline from which further hostility and harassment would begin. The most hostile guards on each shift moved spontaneously into the leadership roles of

giving orders and deciding on punishments. They became role models whose behaviour was emulated by other members of the shift. Despite minimal contact between the three separate guard shifts and nearly 16 hours a day spent away from the prison, the absolute level of aggression as well as the more subtle and "creative" forms of aggression manifested, increased in a spiraling function. Not to be tough and arrogant was to be seen as a sign of weakness by the guards and even those "good" guards who did not get as drawn into the power syndrome as the others respected the implicit norm of never contradicting or even interfering with an action of a more hostile guard on their shift.

In an article published 25 years after the Stanford Prison Experiment, Haney and Zimbardo noted their initial study "underscored the degree to which institutional settings can develop a life of their own, independent of the wishes, intentions, and purposes of those who run them." They highlighted the need for those outside the culture to offer external perspectives on process and procedures. (2)

## Social Psychology: Causes of Aggression and Inhumane Treatment

The field of social psychology examines the nature of human interactions. Researchers in the field have long been searching to understand why humans sometimes mistreat fellow humans. The discussions below examine the factors behind human aggression and inhumane treatment, striving to impart a better understanding of why detainee abuses occur.

### Human Aggression

Research has identified a number of factors that can assist in predicting human aggression. These factors include:

3

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

- **Personality traits**. Certain traits among the totality of an individual's behavioral and emotional make-up predispose to be more aggressive than other individuals.

- **Beliefs**. Research reveals those who believe they can carry out aggressive acts, and that such acts will result in a desired outcome, are more likely to be aggressive than those who do not hold these beliefs.

- **Attitudes**. Those who hold more positive attitudes towards violence are more likely to commit violent acts.

- **Values.** The values individuals hold vary regarding the appropriateness of using violence to resolve interpersonal conduct.

- **Situational Factors**. Aggressive cues (the presence of weapons), provocation (threats, insults, aggressive behaviors), frustration, pain and discomfort (hot temperatures, loud noises, unpleasant odors), and incentives can all call forth aggressive behaviors.

- **Emotional factors**. Anger, fear, and emotional arousal can heighten the tendency to act out aggressively.

The personality traits, belief systems, attitudes, and values of those who perpetrated detainee abuses can only be speculated upon. However, it is reasonable to assume, in any given population, these characteristics will be distributed along a bell curve, which will predispose some more than others within a group to manifest aggressive behaviors. These existing traits can be affected by environmental conditions, which are discussed later.

<u>Abusive Treatment</u>

Psychologists have attempted to understand how and why individuals and groups who usually act humanely can sometimes act otherwise in certain circumstances. A number of psychological concepts explain why abusive behavior occurs. These concepts include:

4

INDEPENDENT PANEL TO REVIEW DoD DETENTION OPERATIONS

**Deindividuation.** Deindividuation is a process whereby the anonymity, suggestibility, and contagion provided in a crowd allows individuals to participate in behavior marked by the temporary suspension of customary rules and inhibitions. Individuals within a group may experience reduced self-awareness which can also result in disinhibited behavior.

**Groupthink.** Individuals often make very uncharacteristics decisions when part of a group. Symptoms of groupthink include: (1) Illusion of invulnerability—group members believe the group is special and morally superior; therefore its decisions are sound; (2) Illusion of unanimity in which members assume all are in concurrence, and (3) Pressure is brought to bear on those who might dissent.

**Dehumanization.** Dehumanization is the process whereby individuals or groups are viewed as somehow less than fully human. Existing cultural and moral standards are often not applied to those who have been dehumanized.

**Enemy Image.** Enemy image describes the phenomenon wherein both sides participating in a conflict tend to view themselves as good and peace-loving peoples, while the enemy is seen as evil and aggressive.

**Moral Exclusion.** Moral exclusion is a process whereby one group views another as fundamentally different, and therefore prevailing moral rules and practices apply to one group but not the other.

### Abuse and Inhumane Treatment in War

**Socialization to Evil and Doubling.** Dr. Robert Jay Lifton has extensively examined the nature of inhumane treatment during war. Dr. Lifton suggested that ordinary people can experience "socialization to evil," especially in a war environment. Such people often experience a "doubling." They are socialized to evil in one environment and act accordingly within that environment, but they think and behave otherwise when removed from that environment. For example, doctors committed unspeakable acts while working in Auschwitz, but would go home on weekends and behave as "normal" husbands and fathers.

5

**Moral Disengagement.** Moral disengagement occurs when normal self-regulatory mechanisms are altered in a way that allows for abusive treatment and similar immoral behaviors. Certain conditions, identified by Bandura and his colleagues (3), can lead to moral disengagement, such as:

- **Moral Justification.** Misconduct can be justified if it is believed to serve a social good.
- **Euphemistic Language.** Language affects attitudes and beliefs, and the use of euphemistic language such as "softening up" (and even "humane treatment") can lead to moral disengagement.
- **Advantageous Comparison.** "Injurious conduct can be rendered benign" when compared to more violent behaviors. This factor is likely to occur during war. Essentially, abusive behaviors may appear less significant and somehow justifiable when compared to death and destruction.
- **Displacement of Responsibility.** "People view their actions as springing from the social pressures or dictates of others rather than as something for which they are socially responsible." This is consistent with statements from those under investigation for abuses.
- **Diffusion of Responsibility.** Group decisions and behaviors can obscure responsibility: "When everyone is responsible, no one really feels responsible."
- **Disregarding or Distorting the Consequences of Actions.** Harmful acts can be minimized or ignored when the harm is inflicted for personal gain or because of social inducements.
- **Attribution of Blame.** "Victims get blamed for bringing suffering on themselves."

Detainee and interrogation operations consist of a special subset of human interactions, characterized by one group which has significant power and control over another group which must be managed, often against the will of its members. Without proper oversight

6

and monitoring, such interactions carry a higher risk of moral disengagement on the part of those in power and, in turn, are likely to lead to abusive behaviors.

Environmental Factors

The risk of abusive behaviors is best understood by examining both psychological and environmental risk factors. A cursory examination of situational variables present at Abu Ghraib indicates the risk for abusive treatment was considerable. Many of the problematic conditions at Abu Ghraib are discussed elsewhere in this report, to include such factors as poor training, under nearly daily attack, insufficient staffing, inadequate oversight, confused lines of authority, evolving and unclear policy, and a generally poor quality of life. The stresses of these conditions were certainly exacerbated by delayed troop rotations and by basic issues of safety and security. Personnel needed to contend with both internal threats from volatile and potentially dangerous prisoners and external threats from frequent mortar fire and attacks on the prison facilities.

The widespread practice of stripping detainees, another environmental factor, deserves special mention. The removal of clothing interrogation technique evolved into something much broader, resulting in the practice of groups of detainees being kept naked for extended periods at Abu Ghraib. Interviews with personnel at Abu Ghraib indicated that naked detainees were a common sight within the prison, and this was understood to be a general part of interrogation operations.

While the removal of clothing may have been intended to make detainees feel more vulnerable and therefore more compliant with interrogations, this practice is likely to have had a psychological impact on guards and interrogators as well. The wearing of clothes is an inherently social practice, and therefore the stripping away of clothing may have had the unintended consequence of dehumanizing detainees in the eyes of those who interacted with them. As discussed earlier, the process of dehumanization lowers the moral and cultural barriers that usually preclude the abusive treatment of others.

7

(1) Haney, C., Banks, C., and Zimbardo, P., Interpersonal Dynamics in a Simulated Prison, *International Journal of Criminology and Penology,* 1973, 1, 69-97.

(2) Haney, C. and Zimbardo, P., The Past and Future of U.S. Prison Policy, Twenty-Five Years after the Stanford Prison Experiment, *American Psychologist,* July 1998, 709-27.

(3) Bandura, A., Barbaranelli, C., Caprara, G., and Pastorelli, C., Mechanisms of Moral Disengagement in the Exercise of Moral Agency, *Journal of Personality and Social Psychology,* Vol. 71(2), August 1996, 364-74.

# ETHICAL ISSUES

## Introduction

For the United States and other nations with similar value systems, detention and interrogation are themselves ethically challenging activities. Effective interrogators must deceive, seduce, incite, and coerce in ways not normally acceptable for members of the general public. As a result, the U. S. places restrictions on who may be detained and the methods interrogators may employ. Exigencies in the Global War on Terror have stressed the normal American boundaries associated with detention and interrogation. In the ensuing moral uncertainty, arguments of military necessity make the ethical foundation of our soldiers especially important.

## Ethical Foundations of Detention and Interrogation

Within our values system, consent is a central moral criterion on evaluating our behavior toward others. Consent is the manifestation of the freedom and dignity of the person and, as such, plays a critical role in moral reasoning. Consent *restrains*, as well as *enables,* humans in their treatment of others. Criminals, by not respecting the rights of others, may be said to have consented – in principle – to arrest and possible imprisonment. In this construct – and due to the threat they represent – insurgents and terrorists "consent" to the possibility of being captured, detained, interrogated, or possibly killed.

## Permissions and Limits on Detentions

This guideline of implied consent for the U.S. first limits who may be detained. Individuals suspected of insurgent or terrorist activity may be detained to prevent them from conducting further attacks and to gather intelligence to prevent other insurgents and terrorists from conducting attacks. This suggests two categories of persons who may be

Appendix H

detained and interrogated: (1) persons who have engaged in or assisted those who engage in terrorist or insurgent activities; and (2) persons who have come by information regarding insurgent and terrorist activity.

By engaging in such activities, persons in the first category may be detained as criminals or enemy combatants, depending on the context. Persons in the second category may be detained and questioned for specific information, but if they do not represent a continuing threat, they may be detained only long enough to obtain the information.

### Permissions and Limits on Interrogation Techniques

For the U.S., most cases for permitting harsh treatment of detainees on moral grounds begin with variants of the "ticking time bomb" scenario. The ingredients of such scenarios usually include an impending loss of life, a suspect who knows how to prevent it—and in most versions is responsible for it—and a third party who has no humane alternative to obtain the information in order to save lives. Such cases raise a perplexing moral problem: Is it permissible to employ inhumane treatment when it is believed to be the only way to prevent loss of lives?   In periods of emergency, and especially in combat, there will always be a temptation to override legal and moral norms for morally good ends.   Many in Operations Enduring Freedom and Iraqi Freedom were not well prepared by their experience, education, and training to resolve such ethical problems.

A morally consistent approach to the problem would be to recognize there are occasions when violating norms is understandable but not necessarily correct —that is, we can recognize that a good person might, in good faith, violate standards. In principle, someone who, facing such a dilemma, committed abuse should be required to offer his actions up for review and judgment by a competent authority. An excellent example is the case of a 4th Infantry Division battalion commander who permitted his men to beat a detainee whom he had good reason to believe had information about future attacks against his unit. When the beating failed to produce the desired results, the commander

2

fired his weapon near the detainee's head. The technique was successful and the lives of U.S. servicemen were likely saved. However, his actions clearly violated the Geneva Conventions and he reported his actions knowing he would be prosecuted by the Army. He was punished in moderation and allowed to retire.

In such circumstances interrogators must apply a "minimum harm" rule by not inflicting more pressure than is necessary to get the desired information. Further, any treatment that causes permanent harm would not be permitted, as this surely constitutes torture. Moreover, any pain inflicted to teach a lesson or after the interrogator has determined he cannot extract information is morally wrong.

National security is an obligation of the state, and therefore the work of interrogators carries a moral justification. But the methods employed should reflect this nation's commitment to our own values. Of course the tension between military necessity and our values will remain. Because of this, military professionals must accept the reality that during crises they may find themselves in circumstances where lives will be at stake and the morally appropriate methods to preserve those lives may not be obvious. This should not preclude action, but these professionals must be prepared to accept the consequences.

### Ethics Education

The instances of detainee abuse in Iraq and Afghanistan do indicate a review of military ethics education programs is needed. This is not to suggest that more adequate ethics education will necessarily prevent abuses. Major service programs such as the Army's "core values," however, fail to adequately prepare soldiers working in detention operations.

While there are numerous ethics education programs throughout the services, almost all refer to certain "core values" as their foundation. Core-values programs are grounded in

3

organizational efficacy rather than the moral good. They do not address humane treatment of the enemy and noncombatants, leaving military leaders and educators an incomplete tool box with which to deal with "real-world" ethical problems. A professional ethics program addressing these situations would help equip them with a sharper moral compass for guidance in situations often riven with conflicting moral obligations.

# Independent Panel to Review DoD Detention Operations

## Deputy Executive Director
Colonel Gregory A. Schumacher, USAR

## Executive Officer
LCDR Sheila Noles, USN

## Executive Assistant
El 'Rita Cook-Harmeling

## Director of Analysis
Margaret Munson

### Research Staff

Kari D. Baker
Research Assistant

William C. Bartels
Force Strucure Issues

Lt Col Deborah Doheny, USMC-R
Military Police Issues

Rebecca R. Donegan
Intelligence Issues

Lt Col James Favret, USAF
Behavioral Science

Dr. Amos A. Jordan
Policy Issues

Jackie Mather
Research Assistant

Jacob Neufeld, USAF,
Historian

Lt Col Perry Peloquin, USAF
Law

LTC Tony PfAff, Joint Staff
Ethics

George Watson, USAF
Historian

Meghan Wood
Research Assistant

### Support Staff

Tom Alexander
Director of Communications

LCDR Todd Bahlau, USN
Deputy Executive Officer

SSGT Erik D. Battaglia, USMC
Resource Manager

Wanda Brisco
IT Support

MSG Floydell Jackson, USAF
Executive Assistant to Panelists

Thomas Johns
IT Support Supervisor

SFC Kevin Johnson, USA
Security Manager

SSGT Terrence McKenna, USMC
Administrative Assistant

SSGT Andre Powers, USMC
Administrative Assistant

Thomas Prudhomme
WHS Security Manager

Colleen Sheehan
IT Support

Debra Sventek
Editor

*Cover design by Kari Baker*