**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SALEH, *et al.*,

　　　　　　　　Plaintiffs,

　　　v.

THE TITAN CORPORATION, *et al.*,

　　　　　　　　Defendants.

Civil Action No. 05-1165 (JR)

ORAL ARGUMENT REQUESTED

### DEFENDANT L-3 COMMUNICATIONS TITAN CORPORATION'S MOTION FOR SUMMARY JUDGMENT

　　　Defendant L-3 Communications Titan Corporation ("Titan"), by and through undersigned counsel, respectfully moves for summary judgment pursuant to this Court's Memorandum Opinion of June 29, 2006, the stipulation entered between the parties on July 31, 2006, and Federal Rule of Civil Procedure 56. Titan relies upon the memorandum of points and authorities and supporting materials previously submitted in the *Ibrahim v. Titan* case and the materials submitted by CACI corporation in support of its motion for summary judgment. Titan reserves the right to supplement the evidentiary support for this motion with materials developed in the course of discovery permitted by the stipulations of the parties or future orders of the Court.

　　　The U.S. Army contracted with Titan to provide linguists in support of U.S. military operations. Linguists provided under this contract were placed under the operational control of U.S. military units in Iraq; CACI provided interrogators. The thirteen named plaintiffs in this case allege that they or their decedents were detained by the U.S. military in Iraq.[1] Plaintiffs allege they were mistreated, some of them horribly so, while in the custody of the U.S. military. The bulk of plaintiffs' allegations, and the only ones that specifically identify the alleged Titan

---

[1] One plaintiff is alleged to be a citizen of Sweden; the others are presumably citizens of Iraq. None are U.S. citizens. Eight detainee numbers purportedly assigned by the U.S. military are set forth in the Third Amended Complaint (TAC) and three additional detainee numbers were set forth in a sealed filing by plaintiffs; the others provide no such information. Plaintiffs collectively allege that they were detained at U.S. military facilities in Iraq at various times during the period July 11, 2003 through July 26, 2004. (TAC ¶¶ 2-11.)

employees,[2] take place at Abu Ghraib.[3] The named plaintiffs seek to recover from Titan for: (1) Titan's alleged corporate actions and inactions (i.e., negligent hiring and supervision); (2) two instances of mistreatment allegedly inflicted by Titan employees; and (3) the alleged actions of soldiers throughout all of Iraq through allegations against unspecified "Torture Conspirators" or "Defendants and/or their co-conspirators."

The parties have briefed the preemption of these claims (or related ones) on numerous occasions, in both *Saleh* and *Ibrahim*, in this Court as well as in the Southern District of California and Eastern District of Virginia. This Court has since held that the prerequisites to the military contractor defense are present,[4] but declined to adjudicate the defense on a motion to dismiss. Instead, the Court dismissed plaintiffs' federal law claims,[5] and noted that "except for the allegations of conspiracy made in this case, the factual allegations of the two cases are virtually indistinguishable from one another. Both cases involve the same corporate defendants, allegedly doing (or negligently allowing to be done, or failing to prevent) that same kinds of acts, in the same place, at the same time." 6/29/06 Order 2. As a result, the Court found "no reason to treat any of the claims and defenses asserted in this case differently from the way they were treated in *Ibrahim*." The Court also stated:

---

[2] Adel Nakhla, a former employee of Titan, is alleged to have "assaulted Plaintiff Hadood" and "tortured and otherwise mistreated Plaintiffs." (TAC ¶¶ 19, 49.) This conduct has been previously identified as consisting of putting women's underwear on plaintiff Hadood's head and pushing him against a wall. (05-1165 [18], [proposed] TAC ¶ 49.) John Israel, an employee of a Titan subcontractor, is alleged, upon information and belief, to have "assaulted" and repeatedly beaten, kicked and punched, and threatened Plaintiff Umer during interrogations, including throwing him against the wall of the interrogation room. (TAC ¶¶ 18, 50.)

[3] Plaintiffs make references to six additional locations in Iraq (TAC ¶¶ 115, 128, 132, 135, 141, 145, 159), but, other than their use of the term "Torture Conspirators," fail to allege that any Titan employee was involved in any alleged mistreatment at these locations.

[4] *See Ibrahim v. Titan*, 391 F. Supp. 2d 10, 18 (D.D.C. 2005) (finding "the treatment of prisoners during wartime implicates 'uniquely federal interests'"); *id.* at 18-19 ("State law regulation of combat activity would present a 'significant conflict' with th[e] federal interest in unfettered military action."); 6/29/06 *Al Rawi* Op. at 3 (incorporating by reference 8/12/05 *Ibrahim* Opinion).

[5] The Court also dismissed the individual defendants who had been served and denied plaintiffs' motion for partial summary judgment. *See* 6/29/06 *Al Rawi* Op. at 9-10.

> The disposition of the present motions renders this case, and its procedural posture, virtually indistinguishable from *Ibrahim*. Here, as in *Ibrahim*, the next step must be to determine whether the defendants' employees "were essentially acting as soldiers," *see* No. 04-1248 [39] at 16-18. In *Ibrahim*, the defendants moved for summary judgment on that question, after which the parties embarked on an agreed discovery program, No. 04-1248 [63]. It will be in the interest of justice, and of the efficient use of litigation resources, for these two cases to be consolidated, for discovery purposes only.

*Id.* at 9-10.

In recognition of the close relationship between the allegations in the two cases and to conserve judicial resources, Titan relies upon the papers it submitted in *Ibrahim*,[6] which are attached. Titan also relies upon specified parts of its memoranda in support of its motion to dismiss the Third Amended Complaint.[7] These papers, including the three attached declarations, make clear that Titan is entitled to summary judgment on plaintiffs' remaining claims.

    1.    The only claims to survive defendants' motions to dismiss are plaintiffs' state law claims against the corporate defendants (Counts 16-29).[8] But there can be no claim under state law where its application would create a significant conflict with uniquely federal interests. This Court held that uniquely federal interests in the treatment of wartime prisoners and in unfettered military action are implicated here and facts establishing that Titan linguists were under the control of the military will result in dismissal of the state law claims. *Ibrahim*, 391 F. Supp. 2d at 16-19. The declarations submitted in conjunction with this motion establish just that: Titan's linguists were, as a matter of contract and a matter of reality, under the operational control of the U.S. military. Titan management was responsible for administering linguist pay and attending to other administrative issues but had no role in supervising or directing the linguists' performance of their duties.

---

[6] *See* No. 04-1248 [56]: Statement of Material Facts; Mem. at 1-3, 6-26; Hopkins Decl.; Rumminger Decl.; Winkler Decl.

[7] *See* No. 05-1165 [40] at Mem. 1-7, 37-42; No. 05-1165 [53] Mem. at 13, 21-23. Titan also adopts the arguments made by CACI in its motion for summary judgment in this case.

[8] These claims allege assault and battery, sexual assault and battery, wrongful death, intentional infliction of emotional distress, negligent hiring and supervision, and negligent infliction of emotional distress.

2.    This arrangement was necessitated by the unique challenges faced by the military in Iraq.  This has been confirmed by the Congressional testimony of senior military leaders.  Secretary Rumsfeld, for example, testified that the civilian contractors at Abu Ghraib, including civilian linguists, were "responsible to MI [Military Intelligence] personnel who hire them and have the responsibility for supervising them."[9]  The Secretary of the Army elaborated, explaining that:

> These people have no supervisory responsibilities at all.  They work under the supervision of officers or noncommissioned officers (NCOs) in charge of whatever team or unit they are on.

*Id*.  In a later hearing, Senator Akaka queried the Army Inspector General about the integration of contractors into the military chain of command at Abu Ghraib; the Inspector General explained, "[o]f course there is a contracting officer that then ensures that the contract was being followed.  But in terms of what they did and how they performed, their oversight on a day-to-day basis was that military supervisor, that MI person in that organization to whom they reported."[10]  During the same hearing, Senator Akaka expressed his concern that Army doctrine would not permit the military to exercise the operational control demanded in these circumstances.  The Secretary of the Army testified in response that the military did, as a matter of policy, exercise operational control in this circumstance:

> [C]learly any contract employee like that, especially a contract interrogator, is supposed to **work under the direct supervision of an officer or non-commissioned officer who would be the supervisor of that person**.  So these procedures are in place and if they were not followed then somebody was not following the law, the procedures.  The contract person of course can be terminated in terms of the contract.  They can be fired.  If the commander or the supervisor is unhappy with their actions, they can request that that person be terminated.  If it is a criminal act they are subject to U.S. law and can be prosecuted under U.S. law.[11]

---

[9] 04-1248 [55] (Ex. 7), *Allegations of Mistreatment of Iraqi Prisoners: Hearing Before the U.S. Senate Committee on the Armed Services*, 108th Congress 44 (May 7, 2004).

[10] 04-1248 [55] (Ex. 8), *The Department of the Army Inspector General Report on Detention Operation Doctrine and Training: Hearing Before the U.S. Senate Committee on the Armed Services*, 108th Congress 675, 1022 (July 22, 2004) (Statement of Secretary of the Army Brownlee).

[11] *Id*. at 1023 (emphasis added).

3.     Titan is not liable for actions of employees under the operational control of the U.S. military. That is the case whether those actions are cast as having been performed pursuant to contract (and thus the military's direction) or as detours or frolics by an employee and therefore outside the scope of employment with Titan (*see* 04-1248 [56], Mem. at 22-23; 05-1165 [40], at 39-40).

4.     It is even more clear that Titan is not liable for the actions of soldiers, who are the only identified actors in the vast majority of the allegations made in this case. In short, because Titan cannot be held liable for the actions of its own employees when *acting as soldiers in all but name*, Titan certainly is not liable for the *actions of soldiers themselves* (*see* 05-1165 [40], at 41-42). Moreover, by lumping defendants, senior military officials, and soldiers together into the category "Torture Conspirators," by lumping plaintiffs' and nonparties' allegations together, and by failing to separate claims based on separate transactions or occurrences (05-1165 [53], at 23-24), plaintiffs have inextricably intertwined their claims with actions of soldiers and government officials in a manner that requires dismissal of all claims.

5.     Finally, because Titan is alleged to and did in fact act as the government's agent in the recruiting and hiring of linguists, the claims against Titan cannot be maintained because they trench on the sovereign immunity of the United States. (*See* 04-1248 [56], Mem. at 23-26; 05-1165 [40], at 37-39).

Accordingly, for the reasons stated above and further set forth in the memorandum of points and authorities filed herewith, the Court should grant judgment in favor of Titan on plaintiffs' remaining claims.

Pursuant to Local Civil Rule 7(f), Titan respectfully requests oral argument on this motion. A proposed order is attached to this motion.

Respectfully submitted,

_____
F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C.  20005
(202) 434-5000

*Attorneys for Defendant The Titan Corporation*

Dated:  August 4, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ILHAM NASSIR IBRAHIM, *et al.*,<br><br>       **Plaintiffs,**<br><br>    v.<br><br>THE TITAN CORPORATION, *et al.*,<br><br>       **Defendants.** | Civil Action No. 04-01248 (JR)<br><br>ORAL ARGUMENT REQUESTED |

## DEFENDANT L-3 COMMUNICATIONS TITAN CORPORATION'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rules 7(h) and 56.1, defendant L-3 Communications Titan Corporation ("Titan") respectfully submits the following statement of material facts as to which there is no genuine issue to accompany its Motion to Dismiss and for Summary Judgment, dated December 16, 2005.

    1.    The contract under which Titan supplied linguists to the U.S. Army was initially concluded between the U.S. Army and BTG Inc. in 1999. (Hopkins Decl. ¶ 10.)

    2.    The Titan Corporation acquired BTG Inc. in 2001. (Hopkins Decl. ¶ 10.)

    3.    In 2005, L-3 Communications Corporation acquired The Titan Corporation which was renamed L-3 Communication Titan Corporation, a wholly owned subsidiary of L-3 Communications Corporation.[1] (Hopkins Decl. ¶ 10.)

    4.    The statement of work ("SOW") under which Titan supplied linguists to military units at Abu Ghraib is Exhibit A to the Hopkins Declaration. (Hopkins Decl. ¶ 11.)

    5.    Titan was responsible for recruiting and hiring proficient linguists who were medically qualified to deploy to Iraq. (Hopkins Decl. ¶¶ 19, 23; SOW §§ C-1.4.1.2, C-1.7.1, C-1.7.2, C-4.2.)

---

[1] For ease of reference, the term "Titan" is used to refer to both The Titan Corporation and its successor, L-3 Communications Titan Corporation.

6.     Upon arrival in Iraq, Titan linguists were assigned to military units in support of the requirements of the military unit commander.  These requirements were approved and prioritized by the CJTF-7 Linguist Manager, a Major in the U.S. Army Reserves.  (Winkler Decl. ¶ 51.)

7.     Titan site managers transported linguists from Baghdad to their military units, turning them over to the unit Officer in Charge (OIC) or Noncommissioned Officer in Charge (NCOIC).  (Winkler Decl. ¶ 51.)

8.     During the period June 2003 until June 2004, Abu Ghraib (AG) fell under CJTF-7 and its subordinate commands.  (Hopkins Decl. ¶ 21; Winkler Decl. ¶ 39; Rumminger Decl. ¶¶ 17-20.)

9.     Beginning in the summer of 2003, Chief Warrant Officer 3 (CW3) Douglas Rumminger, U.S. Army Reserve, served at Abu Ghraib as the principal Military Intelligence point of contact with Titan.  (Winkler Decl. ¶ 52; Rumminger Decl. ¶ 2.)

10.     The Titan site manager delivered linguists assigned to AG to CW3 Rumminger, who received the linguists on behalf of the military and conducted interrogation indoctrination training.  (Winkler Decl. ¶¶ 31-32; Rumminger Decl. ¶ 2.)  The orientation conducted by CW3 Rumminger included training linguists on the interrogation rules of engagement and concluding a Memorandum of Understanding with individual linguists concerning his responsibilities while assigned to AG.  (Rumminger Decl. ¶¶ 38-40; Rumminger Ex. A.)

11.     Titan linguists were subject to tasking by military supervisors 24 hours per day, 7 days per week.  (Hopkins Decl. ¶ 22a; Winkler Decl. ¶¶ 33, 40, 53; Rumminger Decl. ¶ 52; SOW §§ C-1.3.1, C-1.8.3, C-2.2.2.)

12.     Military supervisors exercised authority over how, where, or when Titan linguists could be assigned to translate or interpret in support of military operations.  (Hopkins Decl. ¶¶ 15-19, 22a, 22b; Winkler ¶ 40; Rumminger Decl. ¶¶ 21; 31; 32; 35; 43.)

13.     Military supervisors directly tasked Titan linguists with work assignments. (Hopkins Decl. ¶¶ 15-19, 22a, 22b; Winkler ¶ 40; Rumminger Decl. ¶¶ 21; 31; 32; 35; 43.)

14.    Titan's in-theater management played no role in the tasking of linguists. (Hopkins Decl. ¶¶ 15-19, 22a, 22b; Winkler ¶ 40; Rumminger Decl. ¶¶ 21; 31; 32; 35; 43.)

15.    The military did not permit Titan managers to observe linguists while interpreting. (Hopkins Decl. ¶ 22b; Winkler Decl. ¶ 28.)

16.    Linguists were not permitted to discuss details of their work with their Titan managers. (Hopkins Decl. ¶ 22b; Winkler Decl. ¶¶ 28, 29.)

17.    Titan linguists reported to military supervisors within their assigned units. (Hopkins Decl. ¶ 19; Winkler Decl. ¶ 32; Rumminger Decl. ¶¶ 21; 31; 32; 35; 43; *see also* Hopkins Ex. B at 3 (slide entitled "Military Chain of Command").)

18.    The military commander retained authority to remove Titan linguists from his unit. (Hopkins Decl. ¶ 22c; Winkler Decl. ¶¶ 37, 43; Rumminger Decl. ¶ 52.)

19.    Titan linguists were required to comply with all directives or orders issued by military commanders. (Hopkins Decl. ¶¶ 22d, 22f; Winkler Decl. ¶ 43; SOW § C-1.8.4.)

20.    Noncompliance with directives or orders issued by military commanders was likely to result in removal from the theater and from the contract. (Hopkins Decl. ¶ 22c; Rumminger Decl. ¶ 52; SOW §§ C-1.5, C-1.8.4.)

21.    The military bore the responsibility for training the linguists on all theater-specific topics. (Hopkins Decl. ¶ 22e; Winkler Decl. ¶¶ 10-24; *see also* SOW § C-3.3.5.)

22.    The military bore the responsibility for training the linguists on all unit-specific topics. (Hopkins Decl. ¶ 22f; Winkler Decl. ¶ 32; *see also* Rumminger Decl. ¶¶ 38-40; SOW § C-3.3.5.)

23.    The military units were required to afford linguists food, berthing, and comfort items equivalent to those enjoyed by military members of the unit. (Hopkins Decl. ¶¶ 18, 22h; SOW §§ C-3.3.2, C-3.3.3, C-3.3.6, C-3.3.9.)

24.    The military provided medical support to the linguists. This support began at the CRC, and continued throughout the deployment to Iraq. (Hopkins Decl. ¶ 22h; SOW § C-3.3.4.)

- 3 -

25.     Contract linguists that were killed in Iraq were processed through the military's mortuary system and repatriated at Dover AFB, just as military members are.  (Hopkins Decl. ¶ 22h.)

26.     The following were responsibilities of the U.S. military under the contract as implemented:

a.      Identification and prioritization of unit requirements to be met by assignment of linguists to a specific military unit.  (Hopkins Decl. ¶ 22f; Winkler Decl. ¶¶ 39, 51; Rumminger Decl. ¶¶ 31-34, 37.)

b.      Theater-specific training at the CRC on how to behave and survive in Iraq. (Hopkins Decl. ¶ 22e; Winkler Decl. ¶¶ 10-24.)

c.      Unit-level training.  (Hopkins Decl. ¶ 22f; Winkler Decl. ¶ 32; *see also* Rumminger Decl. ¶ 38-40.)

d.      Training on the law of land warfare and the Geneva Conventions. (Winkler Decl. ¶ 19.)

e.      Security screening of linguists and granting of security clearances. (Hopkins Decl. ¶ 19; SOW §§ 1-6.1.1, C-1.6.1.2.)

f.      Force protection screening of linguists.  (Hopkins Decl. ¶ 19; SOW §§ 1-6.1.1, C-1.6.1.2.)

g.      Day-to-day work assignments of linguists.  (Hopkins Decl. ¶¶ 15-19, 22a, 22b; Winkler ¶ 40; Rumminger Decl. ¶¶ 21; 31; 32; 35; 43.)

h.      Release of linguists from daily duties for liberty.  (Winkler Decl. ¶¶ 40-42, 52; Rumminger Decl. ¶¶ 52-54.)

i.      Approval of linguists' leave requests.  (Winkler Decl. ¶ 41, 52; Rumminger Decl. ¶¶ 52-54.)

27.     The linguists were fully integrated into their military units.  (Hopkins Decl. ¶¶ 18, 22b; Rumminger Decl. ¶ 30; *see also* Hopkins Decl. Ex. B.)

28.     Military supervisors such as the unit or team OIC or NCOIC supervised the performance of interrogations, including the performance of Titan linguists.  (Hopkins Decl. ¶ 22b; Winkler Decl. ¶ 43; Rumminger Decl. ¶¶ 12, 32, 33, 35.)

29.     Titan's management had no role in supervising the conduct of Titan linguists during interrogations.  (Hopkins Decl. ¶ 22b; Winkler Decl. ¶ 43; Rumminger Decl. ¶¶ 12, 21, 23, 32, 35.)

30.     Once the linguist deployed to Iraq and was assigned to a military unit, Titan managers did not supervise linguists' work but rather handled matters such as:

   a.     Ensuring that the linguists were paid and received their other employment benefits.  (Hopkins Decl. ¶ 24; Winkler Decl. ¶ 34.)

   b.     Handling administrative matters, such as tracking their vacation days, and making sure their life insurance was up to date and properly executed.  (Hopkins Decl. ¶ 24.)

   c.     Obtaining signatures on time cards.  (Winkler Decl. ¶ 33.)

   d.     Transporting Titan linguists to Baghdad so that they could shop in the Post Exchange or fly out of the country or to Kuwait for vacation days (but all trips away from an assigned military unit required the approval of the linguists' military units).  (Hopkins Decl. ¶ 24; Winkler Decl. ¶ 54.)

   e.     Writing performance reviews on each Titan linguist with reliance on input from the linguists' military supervisors.  (Hopkins Decl. ¶ 25; Winkler Decl. ¶ 36.)

   f.     Delivering mail.  (Winkler Decl. ¶ 34.)

   g.     Checking on linguists' general well being.  (Winkler Decl. ¶ 34.)

Respectfully submitted,

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Attorneys for Defendant The Titan Corporation*

Dated: December 16, 2005

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ILHAM NASSIR IBRAHIM, *et al.*,

        Plaintiffs,

    v.

THE TITAN CORPORATION, *et al.*,

        Defendants.

Civil Action No. 04-01248 (JR)

**ORAL ARGUMENT REQUESTED**

**DEFENDANT L-3 COMMUNICATIONS TITAN CORPORATION'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Attorneys for Defendant L-3 Communications
Titan Corporation*

Dated: December 16, 2005

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ............................................................................ iv

INDEX TO EXHIBITS....................................................................................... v

INTRODUCTION .............................................................................................. 1

PROCEDURAL HISTORY................................................................................. 3

    A.    The Parties ....................................................................................... 3

    B.    The Claims ....................................................................................... 4

    C.    The Court's August 12, 2005 Opinion............................................. 4

    D.    The Second Amended Complaint ..................................................... 5

FACTUAL BACKGROUND ............................................................................... 6

    A.    The Titan Contract .......................................................................... 6

    B.    The Hiring of Linguists.................................................................... 7

    C.    U.S. Army Indoctrination at the CONUS Replacement Center........... 7

    D.    Deployment into Theater ................................................................. 8

        1.    Assignment to Abu Ghraib ................................................. 9

        2.    Military Command and Control of Titan Linguists at AG ...... 11

        3.    Linguist Duties................................................................. 11

        4.    Uniforms and Identification Cards...................................... 12

        5.    Leave and Liberty ............................................................. 13

        6.    Titan Site Manager Role .................................................... 13

ARGUMENT .................................................................................................... 14

I.    Titan Is Entitled to Summary Judgment on the Military Contractor Defense ................. 14

    A.    The Legal Standard for Summary Judgment ..................................... 14

    B.    The Military Contractor Defense Bars Plaintiffs' Claims .................... 16

        1.    The Answers to the Court's Questions Demonstrate that Vis-à-vis the Linguists Assigned to the Military, Titan Had Limited Responsibilities in the Face of the Military's Complete Control ............ 17

            a.    Titan Was Responsible for Providing Linguists to the Military for It To Direct ................................................. 17

            b.    The Military Directed and Controlled the Linguists.................... 18

                1)    Titan's Linguists Reported to the Military Personnel that Supervised Them.......................... 18

                2)    Titan Linguists Were Subject to Military Command and Control.......................................... 19

        2.    The Statement of Work Provision on Uniforms Is Not Relevant to the Military Contractor Defense .......................................... 20

    C.    Application of the Government Contractor Defense to These Circumstances Is Consistent with its Purpose and Underpinnings ...................... 21

II.    Titan Is Entitled to Immunity......................................................................... 23

CONCLUSION.............................................................................................................. 26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Agent Orange Prod. Liability Litigation*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005)..........16

*Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379 (S.D. Tex. 1994), *aff'd*, 79 F.3d 1145 (5th Cir. 1996) ....................................................................................................25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................15

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) ......................................1, 21, 23

*Butters v. Vance*, 225 F.3d 462 (4th Cir. 2000) ............................................................24, 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................................15

*Macharia v. United States*, 334 F.3d 61 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 1149 (2004)..........................................................................................................................25

*City of Worcester v. HCA Management Co., Inc.*, 753 F. Supp. 31 (D. Mass. 1990) .......................................................................................................................................24

*Cooper v. First Government Mortgage and Investors Corp.*, 238 F. Supp. 2d 50 (D.D.C. 2002) ........................................................................................................................15

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) .................................................................5, 23

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) .............................................1, 5, 22

*Krombein v. Gali Serv. Industrial, Inc.*, 317 F. Supp. 2d 14 (D.D.C. 2004) .....................15

*Logue v. United States*, 412 U.S. 521 (1973)........................................................................25

*Mangold v. Analytic Services, Inc.*, 77 F.3d 1442 (4th Cir.1996) ......................................24

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ............................................................................24

*Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96 (D.D.C. 2003) ........................................15

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985)......................................1, 24

*United States v. Orleans*, 425 U.S. 807 (1976)....................................................................25

## STATE CASE

*Safeway Stores, Inc. v. Kelly*, 448 A.2d 856 (D.C. 1982)....................................................26

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| AG | Abu Ghraib |
| CACI | Collectively, defendants CACI Premier Technology, Inc. and CACI N.V. |
| CJTF-7 | Coalition Joint Task Force 7 |
| CONUS | Continental United States |
| CRC | CONUS Replacement Center |
| CW3 | Chief Warrant Officer 3 |
| DCUs | Desert Camouflage Uniform |
| JIDC | Joint Interrogation and Debriefing Center |
| FTCA | Federal Tort Claims Act |
| MOU | Memorandum of Agreement |
| MREs | Meals Ready to Eat |
| MI | Military Intelligence |
| SAC | Plaintiffs' Second Amended Complaint |
| SOW | Statement of Work |
| SMF | Statement of Material Facts |
| Titan | L-3 Communications Titan Corporation and The Titan Corporation |

## INDEX TO EXHIBITS

**<u>Description</u>**

Declaration of Kevin S. Hopkins

Ex. A:  Statement of Work

Ex. B:  Linguists Military Orientation Briefing

Declaration of David Winkler

Declaration of Chief Warrant Officer 3 Douglas Rumminger, U.S. Army Reserve

Ex. A:  Memorandum of Understanding

**INTRODUCTION**

In its August 12, 2005 Opinion (the "Opinion"), the Court found the existence of the prerequisites to the military contractor defense in this case,[1] but declined to adjudicate the defense on a motion to dismiss. Instead, the Court dismissed all of plaintiffs' federal claims and some of their state claims on other grounds and invited Titan to move for summary judgment. A summary judgment motion would test whether there was a material dispute of fact concerning the relationship between Titan's employees and the military that would prevent application of the defense here and justify proceeding to full discovery. (Opinion 17.) With this motion, L-3 Communications Titan Corporation ("Titan") submits three declarations and supporting documentary evidence of the applicability of the government contractor defense to plaintiffs' claims. Titan also asks the Court to reconsider whether in the unique circumstances of the Titan contract—where Titan linguists were under the day-to-day control of the United States military—Titan should get the benefit of governmental immunity as established in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985).

As the Court recognized, the determinative question requires examination of the circumstances under which Titan's linguists provided services to the military. Were the linguists directed by the military or by Titan? What was the nature of the military's control? What was the nature of Titan's interaction with its linguists while they were performing their functions for the military? The attached declarations,[2] taken individually and together, along with the Statement of Work under Titan's contract, answer these questions definitively. They set forth the total operational control that the military exerted over the linguists assigned to the military in

---

[1] In the Opinion, the Court found that plaintiffs' remaining common law claims would be preempted by federal law under the rationales of *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) and *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), as applied to the unique circumstances of this case, if Titan's linguists were directed by and placed under the supervision of the military chain of command.

[2] Titan submits declarations from Kevin Hopkins, a senior Titan manager, who served in Iraq during relevant time periods; David Winkler, a former Titan employee who served as site manager at Abu Ghraib; and Chief Warrant Officer 3 Douglas Rumminger, U.S. Army Reserve, who oversaw the linguists—military and civilian—at Abu Ghraib.

Iraq including at Abu Ghraib. Both as a matter of contract and as a matter of reality, once linguists were assigned to military units, the military exercised complete control over every aspect of the linguists' operations, while Titan management had little contact with and no control over the linguists. Titan management was responsible for administering their pay and visiting with them on a weekly basis (if threat conditions permitted a visit). Not even the first line of Titan management was stationed with linguists assigned to Abu Ghraib and for each Titan site manager there were tens to hundreds of line linguists assigned to diverse military units spread throughout hundreds of square miles of treacherous Iraqi territory. The military did not allow Titan managers to observe or direct linguists in the performance of their duties or, in most cases, even to discuss their work with them. The linguists were instructed to take their direction from the military units to which they were assigned and were to raise on-the-job issues with their military supervisors. If the military unit commander insisted that a linguist be replaced, Titan followed that direction.

In contrast, the U.S. military directly tasked Titan linguists through the military chain of command; trained them; subjected them to military directives, regulations, and orders; supervised their work; was able to, and did, call on them 24 hours per day, 7 days per week; housed and fed them in military facilities; and controlled their movements when off duty, including their leave, liberty, and even excursions beyond the confines of military compounds such as Abu Ghraib. There can be no dispute that the Titan linguists assigned to Abu Ghraib were under the exclusive direction and control of the U.S. military chain of command there. In short, Titan completely ceded control over the linguists to the military units to which they were assigned from the point of assignment until they were returned to Titan.

Although not typical of a services contract, this unique arrangement—where the linguists were in effect loaned to the operational military to directly task and supervise—was both the contractual and, more importantly, operational reality. This relationship was the result of multiple factors: the uniquely military nature of the underlying function—the interrogation of prisoners captured in a combat zone; the sensitivity and classified nature of the work; and the

combat environment at remote and isolated facilities scattered throughout Iraq where the linguists worked. Under these circumstances, federal law—whether through the government military defense or the doctrine of derivative immunity—preempts and bars the claims brought in this action.

## PROCEDURAL HISTORY

### A.    The Parties

Defendant L-3 Communications Titan Corporation, formerly known as The Titan Corporation, is headquartered in San Diego, California.[3] (Second Amended Complaint ("SAC") ¶ 9.) In Iraq, Titan supplied linguists to the military under a Department of Defense contract. *See* Statement of Material Facts as to Which There Is No Genuine Issue ("SMF") ¶¶ 1, 4; Statement of Work ("SOW") (Hopkins Decl. Ex. A). CACI, the other defendant, is a publicly traded corporation headquartered in Arlington, Virginia. (SAC ¶ 10.[4]) In Iraq, CACI provided interrogators in support of military operations. *Id.* ¶ 13.

Plaintiffs are six Iraqi individuals who allege that they or their decedents were detained by the U.S. military during its operations in Iraq after March 20, 2003.[5] *Id.* ¶¶ 30-61. All plaintiffs are alleged to be citizens of Iraq. *See id.* The plaintiffs allege that they were detained by the U.S. military at the Abu Ghraib detention facility in Iraq for periods ranging from several days to approximately seven months. *See id.*

---

[3] When the suit was filed, The Titan Corporation was publicly traded. On July 29, 2005, another publicly traded corporation, L-3 Communications Corporation, completed the acquisition of The Titan Corporation, which was renamed L-3 Communications Titan Corporation, and which is now a wholly owned subsidiary of L-3 Communications Corporation. For ease of reference, "Titan" refers to the corporation under whatever name it was operating.

[4] Plaintiffs originally sued [The] Titan Corporation, CACI International Inc., CACI Incorporated – Federal, and CACI, N.V. On December 2, 2005, the parties stipulated to the substitution of CACI Premier Technology, Inc. for CACI International Inc. and CACI Incorporated – Federal.

[5] The SAC contains allegations of seven individuals; however, on November 22, 2005, the Court dismissed (without prejudice) the seventh plaintiff, Jilal Mehde Hadod.

## B.     The Claims

Plaintiffs allege that they were held by the military at Abu Ghraib and mistreated at various times during the period October 2003 through May 2004. *Id.* ¶¶ 30-61. Plaintiffs allege only one specific act by an alleged identified Titan employee:  that Steve Stephanowicz was involved in the torture of Plaintiff Aboud. *Id.* ¶ 37. Plaintiffs also claim that Adel Nakhla, an alleged employee of CACI, was involved in the torture of plaintiff Aboud.[6] *Id.* ¶ 37. Plaintiffs allege that Nakhla and Stephanowicz were "involved" in the incidents without further detail. All other allegations are made against "Defendants and/or others." *See, e.g., id.* ¶ 45.

## C.     The Court's August 12, 2005 Opinion

On August 12, 2005, this Court dismissed plaintiffs' federal claims under the Alien Tort Statute, RICO, various international instruments and agreements, and U.S. contracting laws.  In addition, the Court dismissed plaintiffs' common law claims for false imprisonment and conversion, leaving four common law claims: assault and battery (Count III), wrongful death and survival (Count IV), intentional infliction of emotional distress (Count VI), and negligence (Count VIII).  Having dismissed plaintiffs' claims arising under federal law, the Court noted that subject matter jurisdiction over the remaining common law claims required complete diversity, but that plaintiffs had failed to plead the requisite amount in controversy and had brought claims against a non-diverse defendant, CACI N.V.   The Court dismissed CACI N.V. and invited plaintiffs to file, within 30 days, an amended complaint alleging the requisite amount in controversy.

As to the remaining claims (Counts III, IV, VI, and VIII), the Court recognized that the FTCA's combatant activities exception "seems to represent Congressional acknowledgment that war is an inherently ugly business for which tort claims are simply inappropriate." (Opinion 15.) The Court acknowledged the Supreme Court's historic admonition that "[i]t would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered

---

[6] Although not material to this motion in any way, Nakhla was an employee of Titan, while Stephanowicz was employed by CACI.

to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." (Opinion 15-16 quoting *Johnson v. Eisentrager*, 339 U.S. 763, 778 (1950)). After careful consideration of the statutory framework and decisional precedent, the Court held that "the treatment of prisoners during wartime implicates 'uniquely federal interests'" (Opinion 14), and that "[s]tate law regulation of combat activity would present a 'significant conflict' with th[e] federal interest in unfettered military action," which it found to be the case "even with regard to intentional torts, because exceptions to the FTCA represent 'Governmental activities which by their very nature should be free from the hindrance of a possible damage suit.'" *Id.* at 16 (quoting *Johnson v. United States*, 170 F.2d 767, 769 (9th Cir. 1948)) (citing *Koohi v. United States*, 976 F.2d 1328, 1335 (9th Cir. 1992)). The Court recognized the potential applicability of the government contractor defense so defined to plaintiffs' claims against Titan notwithstanding that, "plaintiffs sued private parties for actions of a type that both violate clear United States policy, *see* First Am. Compl. at ¶¶ 24-28, and have led to recent high profile court martial proceedings against United States soldiers." (Opinion 10.)

Having found that the government contractor defense's prerequisites—uniquely federal interests and a significant conflict with state law—are implicated by claims arising from the U.S. military's treatment of its prisoners during wartime, the Court invited defendants to present, through motions for summary judgment, further explanation of the relationship between the Titan linguists and the military:

> More information is needed on what exactly defendants' employees were doing in Iraq. What were their contractual responsibilities? To whom did they report? How were they supervised? What were the structures of command and control?

(Opinion 17.)

### D.    The Second Amended Complaint

On September 7, 2005, plaintiffs filed the SAC in response to the Court's August 12, 2005 opinion. The SAC added one sentence alleging that the amount in controversy "as to each Plaintiff is in excess of the $75,000 minimum jurisdictional limit under 28 U.S.C. § 1332."

(SAC ¶ 15.) Plaintiffs re-alleged each of the claims that the Court dismissed in its August 12 Order, including realleging claims against the nondiverse Defendant CACI N.V. *Id.* ¶ 12. On December 2, 2005, the parties stipulated to the substitution of CACI Premier Technology, Inc. for CACI International Inc. and CACI Incorporated – Federal.

## FACTUAL BACKGROUND

Pursuant to a contract with the U.S. Army to provide linguists to support military operations, Titan provided linguists who were trained, equipped, and directed by the military in support of combat operations in Iraq. This was accomplished in three phases: (1) the recruiting and screening of linguists by Titan; (2) the training and equipping of the linguists by the Army at Fort Benning, Georgia; and (3) the direction, supervision, and control of the linguists by the military chain of command in Iraq. Upon delivering them to Fort Benning, Georgia, Titan ceded control over its linguists to the U.S. Army to train and equip. When they were assigned to a military unit in Iraq, the military's control over linguists became complete.

### A.    The Titan Contract

In 1999, the Army awarded a contract to BTG Inc. (subsequently acquired by Titan) for the provision of civilian linguists in support of military operations. The contract did not specify the number of linguists, but rather was a delivery-order contract where the general terms were set forth in the Statement of Work. (Hopkins Decl. ¶ 10.) Before September 11, 2001, Titan delivered small numbers of linguists under the contract, primarily to assist in U.S.-based training of Army units prior to their deployment to the Balkans. *Id.* After the attacks of September 11, 2001, military operations required the urgent deployment of far more linguists than the military could supply for combat operations overseas, and the U.S. Army turned to Titan to supply linguists to be attached directly to units deployed to Afghanistan and Iraq to perform translation (primarily during interrogations) in exactly the same fashion that military linguists would have done had there been sufficient numbers of them. *Id.* ¶ 11.

**B.    The Hiring of Linguists**

The terms of Titan's contract to supply linguists to Iraq are set forth in the Statement of Work. (Hopkins Decl., Ex. A.) Under this contract, Titan functioned as a human resources provider to the U.S. Army. *Id.* ¶ 19. Titan was responsible for recruiting sufficient numbers of proficient, medically qualified linguists to meet Army requirements (SMF ¶ 5), but the Army retained authority to disapprove the hiring of linguists based on the Army's security and force protection screening. (SMF ¶¶ 26e, 26f.) Upon hiring, Titan provided a brief orientation into Army customs, practices, and culture (Hopkins Decl. ¶ 19), and instructed the linguists that upon attachment to the Army, "you will fall within this chain of command" and to raise any problems first with military supervisors and "work your way up the chain of command" to "[b]uild a good working relationship with your military counterparts by trusting and utilizing the chain of command…" (Hopkins Decl., Ex. B.)

**C.    U.S. Army Indoctrination at the CONUS Replacement Center**

Titan linguists were turned over to the Army at the CONUS Replacement Center ("CRC") at Fort Benning, Georgia for pre-deployment training and gear issue. (Hopkins Decl. ¶ 19; SOW § C-1.3.3.) CRCs are established and run by the Army to ensure that all personnel deploying as individuals to an overseas theater are properly trained, equipped, and medically ready to deploy. (Winkler Decl. ¶ 11.) All Titan employees deployed through the U.S. Army's CRC. (Hopkins Decl. ¶ 22e; Winkler Decl. ¶ 10.) In addition to being issued Desert Camouflage Uniforms (DCUs) like military members, Titan linguists were issued a Government identification card with an equivalent military rank and Geneva Convention category. (Winkler Decl. ¶ 21.) Titan linguists ate with military members in a common mess hall, slept alongside them in converted WWII-style barracks, and were issued the same equipment as military members. (Winkler Decl. ¶ 15.) The U.S. Army trained Titan employees and military members on the same topics, including the Geneva Conventions and law of armed conflict; hazards in the theater, such as improvised explosive devices; and nuclear, biological and chemical protection. (Winkler Decl. ¶ 16; Hopkins Decl. ¶ 22e.) The CRC training lasted about one week (Winkler

Decl. ¶ 17), and served many of the same purposes as the initial days of basic training (or boot camp). (Winkler Decl. ¶ 12-14.) Linguists typically departed for Iraq directly from the CRC. (Winkler ¶ 23.) Upon return to the United States, Titan linguists were required to pass through the CRC before they were free to return home. (Winkler Decl. ¶ 24.)

### D.    Deployment into Theater

Titan linguists, assigned to and maneuvering with the expeditionary forces to which they were assigned, were among the first U.S. persons to enter Iraq from Kuwait following initiation of hostilities in March 2003. (Hopkins Decl. ¶ 16.) Thereafter, Titan employees normally departed for Iraq directly from the CRC (Hopkins Decl. ¶ 22e; Winkler Decl. ¶ 10), and were flown by commercial charter or military airlift to Rhein Mein Air Force Base in Germany and then to Qatar or Kuwait, from which they were brought to Iraq by military airlift or military convoy into Baghdad. (Winkler Decl. ¶ 23.) Once in Iraq, Titan linguists were involved in interpreting and/or translating the most sensitive intelligence derived from Iraqi documents, military defectors, military prisoners, insurgents, and citizens. (Hopkins Decl. ¶ 17.) Titan linguists were required to accompany their assigned military units—including Special Forces units—on military missions, oftentimes combat missions; work in dangerous combat environments; and eat, sleep, and work alongside the military members of their unit. (Hopkins Decl. ¶ 17.) No matter the unit or the nature of the assignment, the linguists were fully integrated into the military units. (Hopkins Decl. ¶ 18.) The government exercised complete and exclusive control over Titan linguist work assignments and supervision of their work performance; the military did not permit Titan management any involvement in linguist work assignments or supervision of the performance of linguists' work. (SMF ¶ 11-22.) Among the many units to which Titan linguists were attached were those that operated primarily from Abu Ghraib (AG), a former Iraqi prison complex that was taken over by the U.S. military to house military prisoners in Iraq. It is allegedly the location where the plaintiffs were confined by the military, and where they were allegedly mistreated.

### 1.    Assignment to Abu Ghraib

During the summer and fall of 2003, Titan linguists were assigned to various units, including those at AG, by the CJTF-7 Linguist Manager—Major John Scott Harris, U.S. Army Reserve.[7] (Winkler Decl. ¶ 39; Rumminger Decl. ¶ 34.) Upon assignment to AG, Titan's site manager, David Winkler, generally transported linguists assigned there from Baghdad.[8] (Winkler Decl. ¶ 31.) Upon arrival at AG, Mr. Winkler turned the linguists over to Chief Warrant Officer 3 (CW3) Douglas Rumminger, U.S. Army Reserve. (SMF ¶ 10.) CW3 Rumminger was the Army's principal Military Intelligence point of contact with Titan at AG. (Rumminger Decl. ¶ 2.) Once assigned to AG, the military unit commander assumed control over Titan linguists. (SMF ¶¶ 12-20.) Titan linguists at AG, like the linguists throughout Iraq, were subject to tasking by their military commanders 24 hours per day, 7 days per week. (SMF ¶ 11.) In fall 2003 and early 2004, there were approximately 30-40 U.S. citizen Titan linguists at AG and thousands of detainees. (Winkler Decl. ¶ 46.) The linguists at AG were divided among a number of units including Army Criminal Investigation Division (CID); Military Intelligence (MI) (the bulk of the 30-40 linguists); and Military Police (MP). (Winkler Decl. ¶ 46.)

CW3 Rumminger conducted interrogation indoctrination training with all linguists upon their arrival at AG. (SMF ¶ 10.) Titan managers played no part in this training, which was designed to orient the Titan linguists to the then-prevailing interrogation policies. (Rumminger Decl. ¶ 38-40.) CW3 Rumminger briefed each incoming Titan linguist on what was authorized by the rules of engagement and what was prohibited. (SMF ¶ 10; Rumminger Decl. ¶ 38.) Each linguist was required to sign two documents. First, the interrogation rules of engagement (which was a classified document) and, second, a memorandum of understanding (MOU) with the unit. (Rumminger Decl. ¶ 39.) The MOU was concluded directly between the Titan linguist and the

---

[7] CJTF-7 was the highest level of command situated in Iraq.

[8] Site Managers were Titan's first level of management in Iraq and administratively supported the Titan linguists who were assigned to the military units within their geographic areas. Site Managers reported to Regional Managers, who were also located in Iraq. (Winkler Decl. ¶ 2.)

military unit and in it the linguist agreed to follow military rules and directives while attached to the unit. (Rumminger Ex. A.) Titan had no input into the MOU. (Rumminger Decl. ¶ 40.)

The Army provided assigned linguists food, housing, and comfort items equivalent to those provided to military members of the unit. (Winkler Decl. ¶¶ 47-49.) At Abu Ghraib, the food initially consisted of standard Army Meals Ready to Eat (MREs). (Winkler Decl. ¶ 47.) Titan linguists dined in the military mess facilities alongside the military members of the units. (Winkler Decl. ¶ 47.) Living conditions for the linguists and the military were very primitive. (Winkler Decl. ¶ 47; Rumminger Decl. ¶¶ 24-30.) Initially, there was essentially no running water and portable toilets were used for sanitation, but these were often full and overflowing, and military and Titan personnel slept in tents. (Winkler Decl. ¶ 47.) After two soldiers were killed in a mortar attack, the JIDC's[9] operations were moved inside and military and Titan personnel were moved to a new living area in which they lived adjacent to military personnel in cells with locks removed. (Winkler Decl. ¶ 47; Rumminger Decl. ¶¶ 24-27.) Abu Ghraib was "under continual attack" throughout 2003 and 2004. *See* Final Report of the Independent Panel To Review DoD Detention Operations 11 (Aug. 2004) ("Schlesinger Report").[10] At all times, Titan linguists ate in military mess facilities on site, slept in cell blocks alongside those occupied by the military members with whom they served, used the same (however scarce) recreational facilities on site, wore the same uniforms (DCUs) as military members, and carried identification cards with military equivalent rank. (Winkler Decl. ¶ 49.) The military also provided all medical support to the linguists.[11] (SMF ¶ 24.)

---

[9] The Joint Interrogation and Debriefing Center. This was the operational unit run by the Army's military intelligence function at AG.

[10] These attacks ultimately claimed the lives of 5 U.S. soldiers and dozens of detainees. *See* Schlesinger Report 11 (discussing as representative examples 25 mortar attacks on Abu Ghraib in month of July 2003; death of 5 and wounding of 67 detainees on August 16, 2003; and death of 22 detainees on April 20, 2004).

[11] Contract linguists that were killed in Iraq were processed through the military's mortuary system and repatriated at Dover AFB, just as military members are. (SMF ¶ 35.)

### 2.    Military Command and Control of Titan Linguists at AG

Beginning in the summer of 2003, work assignments for Titan linguists at AG were made by CW3 Rumminger.  (Rumminger Decl. ¶ 31.)  Later, the responsibility to directly control linguists, including authority to make daily work assignments for the linguists and to approve (or deny) leave and liberty requests, was delegated by CW3 Rumminger to noncommissioned officers (NCO's) in charge of interrogation teams or cells.  (Rumminger Decl. ¶¶ 32-35.)  Common to each of these organizational structures was that the military chain of command supervised, directed, and controlled Titan linguists 24 hours per day, 7 days per week; Titan management had no role in doing so.  (Hopkins Decl. ¶ 22a; Rumminger Decl. ¶ 43; SMF ¶ 11.)  When units had linguist shortfalls within AG, they negotiated among themselves to permit one team to borrow the Titan linguist assigned to another team without consultation of Titan.  (Rumminger Decl. ¶ 37.)  The military did not permit Titan managers to observe linguists while interpreting during interrogation, and the military expressly directed Titan linguists not to discuss their assignments with the Titan management.  (SMF ¶ 15; Winkler Decl. ¶ 29.)  The military commander retained authority to remove Titan linguists from his unit (and demand a replacement).  (SMF ¶ 18.)  This authority, along with the military's power to veto assignment and/or hiring, is reflective of the direct control exercised by military commanders—out of military necessity—under the unique circumstances presented by this particular contract.  (Hopkins Decl. ¶ 22c.)

In short, military commanders exercised complete authority in how, where, and when Titan linguists were assigned to translate or interpret on a 24/7 basis and whether they would continue with the military units.  (SMF ¶ 12.)

### 3.    Linguist Duties

Army doctrine is clear that linguists, without regard to whether they are soldiers or provided under the Titan contract, are to reflect, as precisely as possible, the words and manner of the interrogator, who is in charge of each interrogation.  (Rumminger Decl. ¶ 41.)  A good translator is like a machine that merely repeats words and serves as a conduit for the interrogator.

*Id.* He is prohibited from injecting his own ideas into the interrogation aside from reporting to the interrogator any insights from his cultural and linguistic expertise. *Id.* The Titan linguists were to perform in precisely the same manner as Army linguists—to repeat precisely the words and to reflect the manner of the interrogator. *Id.* at ¶ 42. Titan linguists had no authority to ask their own questions, direct the use of any particular interrogation method, or inject their own ideas into the process. *Id.* at ¶ 41. Titan linguists were required to comply with directives issued by military commanders. (SMF ¶ 19.) Noncompliance was likely to result in removal from the theater and from the contract. (SMF ¶ 20.)

4.    **Uniforms and Identification Cards**

At AG, Titan linguists wore the same uniform—DCUs—as did military personnel. (Rumminger Decl. ¶ 44.) Although Titan linguists were not issued rank insignia, a nametag and designator such as "CONTRACTOR" was sewn onto the DCU blouse. *Id.* Outside the cell blocks at AG, flak jackets were worn that would have covered any personal identifying information on uniforms. *Id.* at ¶ 45. When flak jackets were not worn, uniform blouses were often removed because of the intense heat. *Id.* Inside interrogations, participants often removed their uniform blouse or turned it inside out to ensure that no personal identifying information was apparent. *Id.* at ¶ 46. Active duty interrogators often had Velcro rank insignia and name tags that could be removed during the interrogations. *Id.* This is consistent with Army doctrine and made good common sense with an active insurgency underway. *Id.*

Titan linguists were issued identification cards with a military equivalent rank and Geneva Convention status reflected on the face of the ID card. *Id.* at ¶ 47. Many Titan linguists' ID cards reflected the equivalent rank Lieutenant Colonial (LTC) or Major (MAJ). *Id.* at ¶ 47. Operationally, the linguists' positions were completely different than their equivalence ranks. *Id.* at ¶ 48. Rather than being field grade or senior officers entitled to issue military orders, Titan linguists were at the bottom of the chain of command within their units and specifically when translating for interrogations. *Id.* at ¶ 44.

### 5.    Leave and Liberty

Titan linguists were required to abide by restrictions the unit commander placed on his troops, including any restrictions on travel, liberty and communications. (Winkler Decl. ¶¶ 40-42; Hopkins Decl. ¶ 22d.) Any trip off the compound by a Titan linguist was always subject to the military mission and the schedules established within the interrogation cells. (Rumminger Decl. ¶ 51.) Trips off the compound required military permission and, for Category II and Category III linguists (U.S. citizens with security clearances), a military escort. *Id.* at ¶ 52. The prohibition of off-base travel without a military escort was the general rule for Titan linguists throughout Iraq and it was strictly enforced at AG. *Id.* at ¶ 44. Titan linguists were required to submit leave requests to their military unit commanders, just as military unit members were required to do. *Id.* at ¶ 53. In considering such requests, military commanders considered the military mission first. *Id.* at ¶ 53. The permission of the linguists' military supervisor was required even for a trip to the Post Exchange with the Titan site manager or CW3 Rumminger. *Id.* ¶ 54. On at least one occasion, a linguist was summarily removed by his military commander for being absent without leave. *Id.* ¶ 52.

### 6.    Titan Site Manager Role

Once a linguist was assigned to AG or another military unit, Titan managers' responsibility and authority over them was limited to administrative matters. (SMF ¶ 26.) Titan managers ensured that the linguists were paid; received their other employment benefits; and handled other administrative requirements, such as tracking their vacation days and making sure their life insurance was up to date and properly executed. (SMF ¶ 30.) Titan managers would sometimes transport Titan linguists to Baghdad to shop or to fly to Kuwait for vacation days, but all trips away from an assigned military unit required military approval. (SMF ¶ 30d; Winkler Decl. ¶¶ 40-42.) Titan managers wrote performance reviews on each Titan linguist, but relied on input from the military supervisors to do so. (SMF ¶ 30e.) Discipline and corrective action also originated with reports of deficiencies made by military supervisors. (Winkler Decl. ¶ 37.)

No Titan supervisory personnel were stationed within the confines of the military facilities at AG. (Winkler Decl. ¶¶ 26-27.) The site manager for AG visited approximately 2-3 times each week. *Id.* at ¶ 46. During these site visits, the site manager met briefly with the Titan linguists assigned there, occasionally conversing as well with the linguists' military supervisors in the units to which they were assigned. *Id.* at ¶ 34. The site manager strove to see each linguist at AG once per week to obtain signatures on timecards.[12] *Id.* at ¶ 33. Because the contract provided that Titan linguists were to be available to their military units 24 hours a day, 7 days a week, signatures were excused when linguists were unavailable to see the site manager because of the linguists' military duties. *Id.* The site manager also delivered mail to the linguists and checked on their general well being. (SMF ¶ 30.) The site manager had no control over the linguists' living or working conditions, and could only make requests of the military who did exercise that control. (Winkler ¶ 34.) The Titan site managers played no role in supervising the linguists' job performance. Because the linguists' military chain of command exclusively controlled and supervised the linguists' assignments and work performance, the military directed linguists not to discuss operational details with their site managers—regardless of whether the site manager might hold the appropriate security clearance. (SMF ¶¶ 15-16.)

## ARGUMENT

### I.  Titan Is Entitled to Summary Judgment on the Military Contractor Defense[13]

#### A.  The Legal Standard for Summary Judgment

The Court should grant judgment to Titan, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[12] This was purely an administrative requirement; timecards were not used to compute amounts due under the contract or linguist pay. (Winkler Decl. ¶ 33.)

[13] Because plaintiffs have realleged all the claims set forth in the First Amended Complaint, (including those dismissed by the Court on August 12, 2005), defendant Titan moves to dismiss those claims for all the same reasons set forth in support of its Motion to Dismiss the First Amended Complaint and the Opinion. This memorandum will only address the issue of summary judgment on the remaining state law claims.

matter of law." Fed. R. Civ. P. 56(c). While Titan, as the moving party, bears the initial responsibility of informing the Court of the basis for its motion and the materials that it believes demonstrates the absence of a genuine issue of any material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), the non-moving party, i.e., plaintiffs, must come forward with evidence of such a dispute. Plaintiffs "must establish more than the mere existence of a scintilla of evidence in support of its position." *Cooper v. First Gov't Mortgage and Investors Corp.*, 238 F. Supp. 2d 50, 53 (D.D.C. 2002); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original); *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003) ("[T]he mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.").

"A 'genuine issue' is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action." *See Krombein v. Gali Serv. Indus., Inc.*, 317 F. Supp. 2d 14, 18 (D.D.C. 2004) (citing *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248). "[T]he nonmoving party may not rely solely on allegations or conclusory statements." *Cooper*, 238 F. Supp. 2d at 53-54 (emphasis added; internal citations omitted); *see also Pro-Football, Inc.*, 284 F. Supp. 2d at 112-13 ("Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment."). Rather, the nonmoving party must "set forth specific facts crystallizing a genuine issue for trial." *Krombein*, 317 F. Supp. 2d at 19 (internal citations omitted). Indeed, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may [nevertheless] be granted." *Cooper*, 238 F. Supp. 2d at 54. Thus, Titan is entitled to judgment if it demonstrates "there is no genuine issue of material fact on the elements of its affirmative defense." *Krombein*, 317 F. Supp. 2d at 19 (internal citations omitted).

**B.    The Military Contractor Defense Bars Plaintiffs' Claims**

Plaintiffs' remaining state law claims seek common law remedies from Titan for the alleged actions of Titan employees on loan to the military pursuant to a contract between the U.S. Army and Titan.  The alleged actions were taken while these linguists were translating for—and under the direction, control, and supervision of—the U.S. military in the Iraq theater of combat.  As the Court set out in its August 12, 2005 opinion, such claims are pre-empted and barred if Titan can establish the elements of the military contractor defense.  (Opinion 17; *see also In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005) (state law claims and those based on the domestic law of a foreign nation, arising out of armed conflict against a military contractor are preempted and precluded by the government contractor defense).)

The Court articulated two requirements:  (1) that plaintiffs' claims implicate uniquely federal interests and (2) that there be conflict between state law regulation and the federal interests.  (Opinion 14, 16.)  The first was clearly present here:  "the treatment of prisoners during wartime implicates 'uniquely federal interests.'"  *Id.* at 14.  The second was also established:  "[s]tate law regulation of combat activity would present a 'significant conflict' with th[e] federal interest in unfettered military action…"  *Id.* (internal citations omitted).  Nonetheless, the Court was unwilling to grant the motion to dismiss because the military contractor defense is an affirmative defense on which Titan bears the burden of proof.  *Id.* at 17.  In particular, the Court wanted "limited additional facts" to support that Titan linguists were "essentially acting as soldiers," *id.* at 16, and were under the control of the military while performing their duties.  *Id.* at 17.  The Court elaborated that whether Titan's linguists were "essentially acting as soldiers" required identification of who supervised and controlled the linguists during their duties.  In particular, the Court presented four questions:

1.    What were [Titan's] contractual responsibilities?

2.    To whom did [Titan's linguists] report?

3.    How were they supervised?

4.    What were the structures of command and control?

*Id.* at 17. If the answers were consistent with the representations made at oral argument on the motion to dismiss, i.e., that the military controlled and supervised the linguists in performance of their functions, then Titan's linguists would be "soldiers in all but name, [and] the government contractor defense will succeed…" *Id.*

1.    **The Answers to the Court's Questions Demonstrate that Vis-à-vis the Linguists Assigned to the Military, Titan Had Limited Responsibilities in the Face of the Military's Complete Control**

a.    **Titan Was Responsible for Providing Linguists to the Military for It To Direct**

As set forth in the factual background section above, and in the Statement of Material Facts, it is clear that Titan's principal contractual responsibility was recruiting sufficient numbers of proficient linguists who were medically qualified and security eligible to deploy overseas with the Army to meet the Army's delivery orders. (SMF ¶¶ 4, 5.) Once hired and delivered to the military, Titan's primary responsibility vis-à-vis the linguists was administrative support, including: ensuring that they were paid and received other employment benefits; tracking their vacation days (although permission of the unit commander was required for a linguist to take vacation); ensuring their life insurance was up to date and properly executed; transporting them to Baghdad, with permission of the military unit commander, so that they could shop in the Post Exchange or fly out of the country or to Kuwait for vacation days; writing performance reviews on each Titan linguist with reliance on input from the linguists' military supervisors; delivering mail; and checking on linguists' general well being. (SMF ¶ 30.) These administrative functions were performed by Titan managers visiting the various military units on a weekly basis. Titan management was not present at AG; only the military chain of command to which the Titan linguists reported supervised them in their day-to-day duties. (Hopkins ¶¶ 14-17.) The limited nature of Titan's interaction with assigned linguists is reflected in the ratio of site managers to linguists during the relevant period: in December 2003, there were 28 site managers for 3052 linguists spread throughout the Iraq Theater, i.e., a ratio of less than 1 to 100. (Hopkins Decl. ¶ 14.)

### b.    The Military Directed and Controlled the Linguists

In contrast to Titan's role, the military's role was total operational control.  These linguists literally filled the slots that would have otherwise been filled by soldiers had the demand for these combatant activities not so far and so quickly outstripped the available supply of soldiers qualified to perform these activities.  (Hopkins Decl. ¶ 11.)  Consistent with their future role as "loaned servants," i.e., soldiers in all but name, Titan instructed prospective linguists in the basic military customs and culture they would need to understand, and told them that once assigned to a military unit, they would be subject to the military chain of command. (Hopkins Decl. ¶ 19; Hopkins Ex. B.)  As set forth below, this is exactly what happened.

### 1)    Titan's Linguists Reported to the Military Personnel that Supervised Them

Military supervision of Titan linguists began at the CRC, where Titan linguists were first turned over to military trainers.  From there, Titan linguists deployed to Iraq and were turned over to the Officer in Charge (OIC) or Noncommissioned Officer in Charge (NCOIC) of the military unit.  (SMF ¶ 7.)  Specifically, linguists assigned to AG were turned over to CW3 Rumminger for further assignment.  (SMF ¶ 10.)  CW3 Rumminger either directly tasked the linguists, as he would with military linguists assigned to him, or turned them over to interrogation teams or cells at AG to be directly supervised and controlled by the team leaders and the military chain of command that included the JIDC and, ultimately, Lieutenant General Ricardo Sanchez, Commander, CJTF-7.  (SMF ¶ 8; Rumminger Decl. ¶¶ 31-33, 35.)

The Army supervised Titan linguists in a number of ways.  First, the Army assumed the responsibility of providing all theater-level pre-deployment training as well as unit-specific training upon arrival to the unit.  For example, at AG, CW3 Rumminger ensured that each linguist assigned to AG received training on the Interrogation Rules of Engagement in effect at AG.  Second, the military at AG reinforced its control of Titan linguists by concluding a Memorandum of Understanding directly with each linguist.  The MOU, to which Titan management was not a party, required each linguist personally to agree to the military's direct supervision over him.  Through the MOU, the military unit (not Titan) directly entered an

agreement with the linguist by which the linguist personally committed to contribute to the military unit's "crucial mission" upon which "many lives are dependent" and which "cannot be accomplished without linguistic support," (Rumminger Decl. Ex. A ¶ 1); to agree to check out each day with the unit Noncommissioned Officer in Charge (NCOIC), *id.* ¶ 2; to be subject to after-hours tasking as required by the military mission, *id.* ¶ 2; to support, if requested, forward screening teams attached to maneuver units conducting raids or other physically demanding (not to mention dangerous) combat operations, *id.* ¶ 5; to report disagreements about operational issues through the military chain of command (rather than to Titan management), *id.* ¶ 6; not to discuss operational issues with people not deemed to have a need to know, *id.* ¶ 7; and to abide by the military's rules for operational security and relations with the local Iraqi populace, *id.* ¶ 7.

The exclusive military supervision was not merely an accident of logistics; rather it was a policy enforced by the military units, which affirmatively prohibited Titan management from observing interrogations and prohibited Titan linguists from discussing operational details with their site managers. (SMF ¶¶ 15-16.) Titan's in-theater management was not permitted to play any role in the tasking or supervision of linguists; the military commander exclusively exercised that authority. (SMF ¶¶ 11-17.) Even Titan managers' weekly contact with Titan linguists was subject to the military mission and the military commanders' priorities. (Winkler Decl. ¶ 33.) If a visit by the Titan site manager would interfere with the military mission, it was delayed until such time that the visit could be accomplished without such interference. *Id.*

### 2)    Titan Linguists Were Subject to Military Command and Control

Titan linguists were fully integrated into the military chain of command for operational (as opposed to administrative) purposes. Day-to-day work assignments of linguists—military and civilian alike—were issued by common military supervisors within the units. Titan linguists were required to comply with all directives and orders issued by military commanders. The military commander retained authority to remove Titan linguists from his unit, and noncompliance with directives or orders issued by military commanders was likely to result in

removal from the theater and from the contract. The military also exercised command and control by retaining the authority to conduct security and force protection screening of linguists and granting of security clearances. Finally, the military controlled the physical movements of the linguists, even when not on duty. Titan linguists were required to seek approval from their military unit in order to obtain release from daily duties for liberty, and to send leave requests through the military commander.

### 2. The Statement of Work Provision on Uniforms Is Not Relevant to the Military Contractor Defense

In its Opinion, the Court correctly identified that the Statement of Work was consistent with the military contractor defense, but suggested that one provision concerning contractors' uniforms might be inconsistent with the application of the government contractor defense. The provision is not inconsistent, but in any case, it does not accurately reflect the practice at AG and is, for both reasons, not relevant here.

The Statement of Work provides: "Contractor personnel shall not wear any identification badge or tags that identifies them as an employee of the United States Government." (SOW ¶ C-1.9.1.) In theory, this provision, to the extent enforced by the military chain of command at AG, would permit one to visually distinguish between a Titan linguist wearing DCUs and a military linguist wearing DCUs. The issue here is not whether there were minor differences between the uniforms of the Titan linguists and those of the military, and there were some obvious differences such as the absence of military rank markings on the linguists' DCUs. The correct question, as articulated by the Court and as drawn from the case law, is the extent to which the linguists were controlled by the military, and not subject to Titan's direction. The undisputable evidence is that whatever their uniform pockets said, Titan linguists were controlled by the military chain of command. Thus, this SOW provision does not defeat the defense.

In any event, the reality on the ground was that one could not visually distinguish between Titan's employees and the soldiers at whose direction they worked. Operational and security concerns at AG and elsewhere prompted military commanders to override the

contractual provisions regarding uniforms. (Hopkins Decl. ¶ 22g.) When the contractual provisions regarding wearing uniforms conflicted with military commanders' directives, Titan linguists were obligated to follow the commanders' directives, and Titan management ensured they did. *Id.* At AG, operational and security concerns dictated that Titan linguists' uniforms were often indistinguishable from military personnel uniforms at AG. (*Id.*; Winkler Decl. ¶ 50; Rumminger Decl. ¶¶ 44-46.) Moreover, the linguists often worked in flak jackets, which are worn on top of DCUs and obscure name and organization tags above the breast pockets of the DCU blouse, or they wore no DCU blouse at all, but only a standard issue T-shirt on which there is no name or unit identification. (Rumminger Decl. ¶¶ 44-46; Winkler Decl. ¶ 50.)

### C.    Application of the Government Contractor Defense to These Circumstances Is Consistent with its Purpose and Underpinnings

The inquiry framed by the Court amounts to an investigation of the extent to which and the manner by which the military, as opposed to Titan management, directed and controlled Titan linguists. In other words, whether Titan linguists (civilians) and military linguists (soldiers) were subject to the same structures of command and control in the execution of their duties determines whether permitting state tort claims to proceed against Titan under these circumstances "'would produce the same effect sought to be avoided by the FTCA exemption'" for combatant activities.[14] (Opinion 14 (quoting *Boyle*, 487 U.S. at 511)).

The documentary evidence and declarations of Kevin Hopkins, David Winkler and CW3 Rumminger establish that it clearly would. Allowing state law claims brought by detainees of the U.S. military in Iraq to proceed against Titan under such conditions creates a significant conflict with the military commander's combatant activities because, on one hand, it would restrain Titan from fully ceding operational control as is demanded by this unique situation. *See, e.g.*, Hopkins ¶¶ 16-17, 22b, 22f. Such interference in the military commander's exclusive

---

[14] In addition, for the reasons set forth in CACI's brief in support of its motion filed contemporaneously, Titan joins in CACI's argument that the foreign country exception to the FTCA provides an independent basis for granting summary judgment to defendants on plaintiffs' claims.

direction and control of assigned linguists by Titan managers, whether prompted by potential common law liability or otherwise, would plainly thwart the military commander's control and impede him from utilizing Titan linguists in the same manner—free from the threat of common law liability—as his soldier-linguists.

In *Koohi v. United States*, 976 F.2d 1328, 1335 (9th Cir. 1992), the Ninth Circuit applied the government contractor defense to claims arising from combatant activities. In *Koohi*, the claims were based on how the equipment provided by the contractor performed and how the military used it. Here, as in *Koohi*, plaintiffs' claims arise from combatant activities and are similarly based on how employees loaned to the military performed and how the military used them. The military's critical need for civilian linguists arose in the context of two major campaigns by the U.S. military for which it simply could not meet its crucial requirements from within its own ranks. (Hopkins Decl. ¶ 11.) The linguists it contracted for at AG were undeniably engaged, not only in the government's work, but, like the equipment in *Koohi*, in combatant activities. Titan loaned its employees directly to the military to work under the direct supervision and control of the military chain of command *in the midst of actual combat*. (Hopkins Decl. ¶ 17.) Titan linguists worked, ate, slept, and lived alongside their counterparts in the military units to which they were attached. (Rumminger Decl. ¶¶ 24-30.) They performed, were supervised, and were controlled in exactly the same manner as soldier linguists alongside whom they worked. (Rumminger Decl. ¶¶ 31-37.) Moreover, the very nature of the service the Army contracted Titan to provide—translation services—demanded its loaned employees to function as "machines" in repeating words and phrases precisely as directed. (Rumminger Decl. ¶¶ 41-42.) The words and phrases that these loaned employees were ordered to repeat are a product of what is quintessentially government work—gathering of intelligence by the military—that, because it took place during a time of war in direct support of the war effort, constituted a combatant activity.

To subject Titan to civil liability for claims arising from its provision of translators under these circumstances is not consistent with the common law governing "loaned employees."

Moreover, to the extent that the goal of the doctrine of vicarious liability is to get employers to take responsible control over the actions of their employees, that goal would here conflict directly with the concept of the military chain of command and the "federal interest in unfettered military action." (Opinion 16.)  Whether the cause of plaintiffs' injuries could be traced to civilian contractors or military members is immaterial; Congress recognized that "war is an inherently ugly business for which tort claims are simply inappropriate," (Opinion 15), and that it should be conducted free from the threat of civil liability.  In addition, all the concerns expressed in *Boyle* apply with equal weight here.  The military's cost of obtaining linguists through contracts—critical to the war effort in Iraq[15]—would necessarily increase to cover the potential cost of such common law suits.  *See Boyle*, 487 U.S. at 512.  This would result in the military either paying more for the same number of linguists or, alternatively, contracting for fewer linguists with the limited funds available.

The threat of state common law liability under these unique circumstances would fetter the military commander in a manner disapproved in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), no less than if such claims were allowed to be brought against the government for the actions of soldier linguists, because the Titan linguists were in all relevant respects replacements for soldiers.  If the military contractor defense does not apply to Titan under these circumstances, it is hard to imagine any combatant activity outsourced by the military that would not expose the contractor to claims for this "inherently ugly business" for which tort claims are inappropriate.

## II.    Titan Is Entitled to Immunity

In the Opinion, the Court declined to dismiss the case at the Rule 12 stage on the basis of derivative immunity, the issue reserved by the *Boyle* Court.  (Opinion 13-14.)  The factual record established here, however, clearly demonstrates that Titan was an agent of the government for the recruiting of linguists to be turned over to the military's direct control and is, therefore,

---

[15]  *See* Hopkins Decl. ¶ 11; Rumminger Decl. ¶ 36 ("The Titan linguists were absolutely indispensable to the accomplishment of our military intelligence mission at AG..."); Rumminger Decl. Ex. A ¶ 1 (stating mission "cannot be accomplished without linguistic support").

entitled to dismissal on the basis of immunity, separate and apart from the government contractor defense.

Immunity from suit involves the right to avoid the expense and inconvenience of trial altogether. *See Mitchell v. Forsyth*, 472 U.S. 511, 523-27 (1985). Although the Supreme Court in *Boyle* reserved the issue of immunity for *independent contractors* performing the government's work (the situation to which the government contractor defense applies), courts of appeal have held that government contractors, when acting as *agents* of the government, as Titan was here, enjoy absolute immunity from suit:

> Imposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work. As a result, courts have extended derivative immunity to private contractors, "particularly in light of the government's unquestioned need to delegate governmental functions."

*Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (quoting *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1448 (4th Cir.1996)); *see also Sanchez-Espinoza*, 770 F.2d at 207 n.4 (finding immunity for government contractors under the ATS); *City of Worcester v. HCA Mgmt. Co., Inc.*, 753 F. Supp. 31, 37-38 (D. Mass. 1990) ("[P]ursuant to sovereign immunity, a private company which contracts with the federal government to perform the duties of the government will not be held liable for its actions on behalf of the government."). Thus, "[i]f absolute immunity protects a particular governmental function, no matter how many times or to what level that function is delegated, it is a small step to protect that function when delegated to private contractors, particularly in light of the government's unquestioned need to delegate governmental functions." *Mangold*, 77 F.3d at 1447-48. This Court as well has recognized that "if defendants were acting as agents of the state, they would have sovereign immunity under *Sanchez-Espinoza*." (Opinion at 7 n.3.)

Given that plaintiffs' state law claims arise out of injuries allegedly inflicted upon plaintiffs while detained in military facilities in Iraq (SAC ¶¶ 20, 30-39, 44-61), there can be no question that the U.S. military is immune from suit under these circumstances, and plaintiffs have not disputed this point. As a result, the only remaining question is whether Titan was

serving as the military's agent in recruiting and providing linguists to the military. If so, then, Titan, as the military's agent, is also immune from suit. *See Butters*, 225 F.3d at 466 (finding it well settled "that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity"); *see also Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379 (S.D. Tex. 1994), *aff'd*, 79 F.3d 1145 (5th Cir. 1996) (derivative sovereign immunity required dismissal where defendant "merely repeated" principal's order).

In this regard, courts have found it indicative of an agency relationship if the Government enjoys the power "'to control the detailed physical performance of the contractor,'" *United States v. Orleans*, 425 U.S. 807, 814 (1976) (quoting *Logue v. United States*, 412 U.S. 521, 528 (1973)), or if the Government in fact supervises the "day-to-day operations." *Orleans*, 425 U.S. at 815; *see also Logue*, 412 U.S. at 528. *Cf. Macharia v. United States*, 334 F.3d 61, 69 (D.C. Cir. 2003) (while contractual provisions establishing specifications were insufficient to create an agency relationship, assignment of a supervisory government official "may well constitute the sort of day-to-day supervision" required to create an agency relationship), *cert. denied*, 540 U.S. 1149 (2004).

Titan served as a human resource provider to the U.S. military. Titan was responsible for recruiting proficient and medically qualified linguists for the U.S. Army. The Army, in turn, was responsible for security screening, force protection screening, theater training (including on Geneva Convention compliance), unit-specific training, feeding and housing, supervising, and directing the linguists that Titan turned over to them. Indeed, Titan's in-theater management was prohibited from being present or even discussing operational details with Titan linguists. Thus, the Army clearly and undisputedly retained the power "'to control the detailed physical performance of the contractor,'" *Orleans*, 425 U.S. at 814, and supervised the "day-to-day operations" involving Titan linguists, *id.* at 815; *Macharia*, 334 F.3d at 69.

Under these unique circumstances, in which military necessity dictated the Government's direct control of Titan linguists, Titan, the corporate entity, is easily an agent of the

government.[16]   Under far less compelling circumstances, Courts have readily found agency relationships between the employee of an independent employer and the entity hiring the independent employer where there was far less control and the employees exercised far more discretion than did Titan's linguists. *See, e.g., Safeway Stores, Inc. v. Kelly*, 448 A.2d 856 (D.C. 1982) (deeming guard who used excessive force agent of grocery store to which he was assigned by contractor).   In sum, plaintiffs cannot escape the bar of *Sanchez-Espinoza* for claims based on the alleged acts of Titan's employees hired out to the U.S. military to translate for military interrogations of aliens detained in U.S. military prisons in a combat zone overseas.

## CONCLUSION

For the reasons set forth above, and based on the evidence submitted herewith, Titan respectfully requests that the Court grant it summary judgment on any of plaintiffs' claims that are not subject to dismissal.

Respectfully submitted,

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C.  20005
(202) 434-5000

*Attorneys for Defendant L-3 Communications Titan Corporation*

Dated:  December 16, 2005

---

[16] Titan has been sued as a corporate entity; no Titan employees are defendants in this case.