## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IBRAHIM, *et al.*,

              **Plaintiffs,**

    v.

TITAN CORPORATION, *et al.*,

              **Defendants.**

**Civil Action No. 1:04-cv-01248 (JR)**

**Judge James Robertson**

### DECLARATION OF KEVIN S. HOPKINS

I, Kevin S. Hopkins, hereby state as follows:

#### Personal Background

1.    I received a Bachelor of Science degree in Islamic and Middle Eastern Studies and a Master of Science degree in U.S. Foreign Policy and Conflict Resolution from the Georgetown School of Foreign Service.

2.    From 1996 until 1998, I was a Foreign Affairs Analyst for the Department of Defense's Office of the Secretary of Defense (OSD).

3.    In addition to my linguist management experience with L-3 Communications Titan Corporation, formerly known as The Titan Corporation ("Titan"), I worked for TRW, Inc. as a Linguist Manager, twice. On the first occasion, in 1996, I worked in Hungary and Croatia. The second was in Bosnia, Albania, and Macedonia from 1998 to 1999.

4.    I have worked for Titan since May 2002. In November 2002, I deployed through the Army's CONUS Replacement Center ("CRC") at Fort Benning, Georgia to prepare me for my assignment as Titan's lead manager on its linguist contract supporting US military operations in Kuwait.

Declaration of Kevin S. Hopkins

5.    As time evolved, my assignment in Kuwait expanded to include supporting units that would eventually conduct combat operations in Iraq. These operations were later collectively referred to as Operation Iraqi Freedom.

6.    I served as Titan's senior manager in Kuwait until March 2003. Given urgent military requirements and my proficiency in Arabic, I joined combat units of the 3rd Infantry Division in their Tactical Assembly Area in northern Kuwait in mid-March 2003 prior to the commencement of the invasion. I then deployed with 3rd Infantry Division maneuver units into Iraq in the first hours of the war and continued to serve with them as an Arabic linguist during combat operations. I remained in Iraq with these 3rd Infantry Division maneuver units until mid-April 2003.

7.    In late-June I was asked to return to the Northern Virginia headquarters and promoted to Director of Operations for Titan's Technical & Operational Support Group. I served in that position from June 2003 until April 2005. Currently, I work on special projects for the Group.

8.    In my position as Director of Operations, I was responsible for overseeing Titan's linguist operations within the region that corresponds to the geographic Area of Responsibility (AOR) of the Commander, U.S. Central Command (CENTCOM). That area includes Iraq and Kuwait. While the Titan Program Manager (to whom I reported) was responsible for communicating directly and frequently—usually on a daily basis—with the U.S. Army's contracting officer's representative ("COR"), I was responsible for speaking with the COR on operational matters in the Program Manager's absence. In addition, I often spoke to the COR to clarify or resolve minor operational issues.

Declaration of Kevin S. Hopkins

9.      As Director of Operations, I traveled to Iraq approximately six times.  I visited Abu Ghraib on two of those visits.

## Titan's Contract to Provide Linguist Services

10.      In 1999, the Army awarded a contract to BTG Inc. (which was acquired by Titan in 2001) for the provision of civilian linguists in support of military operations.  The contract did not specify the number of linguists, but rather was a delivery-order type contract whereby the general terms were set forth in the Statement of Work, with specific requirements (in terms of the number and type of linguists needed, contract amounts, etc.) set forth in delivery orders.  Before September 11, 2001, Titan delivered small numbers of linguists for deployment under the contract, primarily to assist in U.S.-based training of Army units prior to deploying to the Balkans.  The Contract was extended in 2004 after all options were exercised.  In 2005, The Titan Corporation merged with L-3 Communications and is now known as L-3 Communications Titan Corporation, a wholly owned subsidiary of L-3 Communications Corporation.

11.      After the attacks of September 11, 2001, military operations in support of the Global War on Terror required the urgent deployment of large numbers of linguists.  The military simply could not provide the numbers of linguists that were critical to the collection of human intelligence (HUMINT) and signals intelligence (SIGINT), as well as to the conduct of ground combat operations.  Using the 1999 contract, the U.S. Army turned to Titan for help in recruiting sufficient numbers of linguists to be directly attached to units deployed to Afghanistan and Iraq in support of U.S. military combat operations.  The Statement of Work ("SOW"), which provides the substantive terms of the contract between Titan and the U.S. Army for provision of linguists in Iraq, is attached to this declaration as Exhibit A.  The SOW has several aspects that are relatively unique for a government services contract.

Declaration of Kevin S. Hopkins

12.    Generally, the Contracting Officer's Representative (COR) is the government official primarily responsible to the government Contracting Officer for the implementation of government contracts and the supervision of government contractors. The COR is the primary and often exclusive point of contact between the military and the contractor on typical government contracts.

13.    The US Army INSCOM linguist Contract was not typical in this regard. While the US Army INSCOM Contract COR, who was located at Fort Belvoir, Virginia, worked closely with the Titan Program Manager in interpreting and implementing the Contract, the COR and PM were not the only two principals with whom Titan managers interacted on implementation of the Contract. First, at the time of the incidents identified in the Complaint, there was an Alternate Contracting Officer's Representative (ACOR) who was based in Kuwait. Second, and in parallel with the contracting officials who oversaw Titan's administration of the contract, there was a Theater Linguist Manager (TLM), who in 2003 was Major John Scott Harris, U.S. Army Reserve. The TLM coordinated the in-theater linguist requirements for the Major Subordinate Commands (MSCs). He reported through the C-2 to the Department of the Army G-2 staff responsible for meeting US Army linguist requirements, including those in Iraq. Among his responsibilities for coordinating linguist requirements for US military units in Iraq, the TLM provided direction to Titan on the priority of fill for each linguist awaiting assignment. This means that the TLM told Titan where to fill requirements, in which MSC, and when. In this manner, linguists were directly assigned to military units without direct involvement of the Contracting Officer or her representatives.

14.    Titan Site Managers were Titan's first line of management in Iraq. They acted as the interface between the linguists and Titan. The Site Managers were not necessarily

Declaration of Kevin S. Hopkins

located where the linguists were assigned, but rather traveled from location to location, often seeing linguists no more than once a week, and some times less frequently. The reality was that site managers often found it difficult to see all of their linguists more than once per week, if that. In December 2003, there were 28 Titan Site Managers for 3052 linguists, a ratio of less than 1 to 100. Moreover, operational considerations (adequacy and frequency of transportation; ongoing combat operations; unit priorities) and security realities (insurgent activities; road closures; elevated threat) on the ground dictated that site managers were not always able to see their linguists as often as they would like. The Site Managers reported to Regional Managers, who reported to the Theater Manager, who reported to the PM through the Director of Operations.

15.     Once assigned to an individual military unit, Titan linguists were under the day-to-day, operational control of that unit. A number of examples of this unique relationship are set out below. The total operational control of the military commanders over assigned Titan linguists was well understood by Titan managers and by military personnel at all levels. At its most basic level, operational control means that the military units directly tasked Titan linguists with their daily work assignments. Titan managers had no role in work assignments or supervision of such work.

16.     This unique command and control relationship was driven by military necessity in Iraq both during major combat operations—when Titan linguists accompanying expeditionary forces were among the first U.S. persons in Iraq—and in the continuing military operations following the conclusion of major combat. The military necessity to exercise operational military command and control over Titan linguists arose from (1) the significance of the linguists' tasks to the military mission; (2) the sensitivity and classification of the information

- 5 -

Declaration of Kevin S. Hopkins

derived from the linguists' interpretation and translation; and (3) the combat environment in which these activities were carried out.

17.    Titan linguists were involved in interpreting and/or translating the most sensitive intelligence derived from Iraqi documents, military defectors, military prisoners, insurgents, and citizens.  In doing so, Titan linguists were required to accompany their assigned military units—including Special Forces units—on military missions, oftentimes combat missions; work in dangerous combat environments; and eat, sleep, and work alongside the military members of their unit.  Under such conditions, the military commander had an overriding military necessity to exercise complete operational command and control over Titan linguists.  In reality, there is no possible operational method to have a Titan manager accompany each linguist during his/her assigned duties or to exercise mission-related management authority over the linguists while they perform their duties on assignment.  Moreover, Titan managers are not qualified to provide operational guidance or exercise operational control over linguists supporting real-time, military missions.   In addition, although they may possess security clearances, Titan site managers have no operational "need to know" any of the classified information with which many of our linguists routinely work.  The "need to know" test is one of several standards that must be met to gain access to classified information.  As a result, these operational imperatives of command and control of linguists on duty have always fallen to those members of the US military to whom the linguists were assigned.

18.    This relationship was most apparent at the individual unit level.  My visits to individual units throughout Iraq, including Abu Ghraib, demonstrated that the linguists were completely reliant on the military unit to provide physical security, food, shelter, order and structure to their lives.  In other words, the linguists were fully integrated into the military units,

Declaration of Kevin S. Hopkins

which meant that they ate, slept, and worked alongside their military counterparts. Even in those exceptional cases where the linguists' sleeping or living arrangements were provided by higher echelon elements, because such elements provided all life support to all military units within a given operational area, all of the linguist's operational taskings, responsibilities, duty locations, and duty hours remained dictated by the unit to which they were assigned.

19.    In effect, the contract required Titan to serve as a human resources provider to the military. Titan recruited and screened linguists for language proficiency and ensured that they met deployment standards. The military, however, was required to conduct security, counterintelligence, and force protection screening of each linguist candidate prior to deployment from the US and to decide whether the linguist candidate was eligible to deploy on this contract to support US forces in theater. Before sending newly hired linguists to the CRC for military training, Titan indoctrinated them in U.S. Army customs, practices, and culture. Titan's briefing was formalized in late-2003 in briefing slides entitled "Linguists' Military Orientation." A copy of this brief, as used in 2003, is attached to this declaration as Exhibit B. As that brief details, once deployed by Titan to the CRC, and continuing throughout their assignment to individual units in theater, the linguists became subject to the military chain of command – the linguists were "loaned" to the military commander for tasking with linguistic duties and only returned to Titan's operational control once their assignments to the units ended.

## The Military's Role in Implementing the Contract

20.    Titan linguists in Iraq were initially assigned to support individual military units under the overall command of Combined Joint Task Force SEVEN (CJTF-7), led by LTG Ricardo Sanchez. From May 15, 2004, the overall command of all US and coalition forces in Iraq was referred to as Multinational Forces Iraq, led by General George Casey (US Army).

Declaration of Kevin S. Hopkins

21.    The units to which Titan linguists were assigned were located at forward operating bases and former Iraqi government facilities, such as Abu Ghraib, under the exclusive control of CJTF-7 and its subordinate commands.

22.    The military units' total operational control over Titan linguists manifested itself in a number of ways:

a.    Linguists were subject to tasking by the military commander of the unit to which they were assigned, 24 hours per day, 7 days per week. Military commanders exercised complete authority over how, where, or when linguists could be assigned to translate or interpret in support of military operations.

b.    As discussed above, military supervisors within the military units (such as Officers in Charge or Noncommissioned Officers in Charge) directly tasked linguists assigned to them and supervised those linguists in the performance of their assigned tasks. Titan's managers were not permitted to play any role in the operational tasking of linguists, and the military did not permit Titan managers to supervise the linguists' performance when they were assigned to military units. I often briefed deploying Titan site managers during their pre-deployment training and specifically and emphatically instructed them not to become involved in military operations in any way. The military did not permit Titan managers to observe linguists while interpreting during interrogation and linguists were not permitted to discuss operational details of any kind, whether interrogations, HUMINT collection operations, or direct action missions with their Titan managers. The operational tasking and supervision of Titan linguists was the exclusive right and responsibility of the military units. This deviates from the typical government services contract in which all tasking is required to flow through the COR to a single contractor point of contact. In effect, the linguists were embedded in the military units and were

Declaration of Kevin S. Hopkins

directly commanded by the military units. While linguist performance evaluations were written by Titan managers, they were necessarily based upon input from the linguists' military supervisors on how they performed their duties, since Titan managers were not involved in their operations.

        c.      The military commander could remove any Titan linguist from his unit and demand a replacement from Titan for any reason. In instances in which there was a behavioral problem (e.g., failure to comply with military directives or orders), the unit had lost confidence in the linguist, or in cases in which the linguist had to be removed against his wishes, there was a formal, albeit routine, process to effect the change. This included documenting in writing the reasons for the dissatisfaction or request for a change to ensure that Titan had the written documentation to support its personnel actions to remove a linguist. Whether Titan took personnel actions against this individual would depend on the behavior or circumstances that precipitated the unit's request for removal. In any event, the unit's absolute authority to remove a contractor is one hallmark of the total operational control exercised by the military units—out of military necessity—in the context of this contract. If the desire to move a linguist was mutual on the part of both the linguist and the unit and it was in the best interests of the US Government, there was often no need to formally document the request to move a linguist out and move a new one into the vacated position. The Site Manager coordinated such moves with his superiors within Titan who, in turn, ensured that this was okay with the TLM and/or the ACOR, and such transfers were made relatively expeditiously.

        d.      Titan linguists were required to comply with all directives issued by the military. Noncompliance or misconduct was likely to result in removal from the theater and from the Contract.

Declaration of Kevin S. Hopkins

e.    The military assumed the responsibility for training the linguists on all theater-specific (military) and unit-specific topics. Titan linguists were and are required to deploy directly through the U.S. Army's CONUS Replacement Center (CRC) alongside military members deploying to Iraq. From 2002 to the present, Titan employees have been given the same briefs in the same classrooms as military members traveling to Iraq. Titan employees and military members are issued the same uniforms (Desert Camouflage Utilities, known as DCUs), and expected to wear the DCUs even at the CRC. Contractors are also issued U.S. Government identification cards which are virtually identical to the military member's identification, including providing some of the linguists a military rank in lieu of a GS-equivalent grade and a Geneva Convention identifier. I managed linguists deploying through the CRC in November 2002 and personally deployed through the CRC on three separate occasions: 1996 bound for the Balkans; 1998 bound for the Balkans; and 2002 bound for the Middle East. The military was in complete control of Titan personnel going through the CRC.

f.    Upon arrival in theater, a linguist was assigned to a specific military unit and transported to that unit. Assignment of linguists to military units was based upon the military's identification and prioritization of unit requirements and was effected through the TLM's coordination as outlined in paragraph 13. Once the linguist arrived at his/her designated unit assignment, the military unit assumed responsibility for training its assigned Titan linguists on the unit's specific mission and manner of operations. In addition, the units trained the linguists in how to support its missions, including how to interpret for interrogations. Titan was not then and has never been responsible for training linguists in military operations nor military support to specific units or unit missions. This is because (a) Titan does not know the unit to which the linguist will be assigned until the linguist arrives in theater; (b) Titan is not necessarily

Declaration of Kevin S. Hopkins

permitted to know the mission of the units to which linguists are assigned, and (c) Titan does not have the expertise to train each individual linguist in each of the many diverse tasks to which they may be assigned. The military command in Iraq without any doubt understood that the requirement to conduct such training was an intrinsic responsibility of each individual unit. In fact, I would go as far to say that they viewed it as their operational prerogative and right to do so. Without their ability to exercise this prerogative, they believe that they will endanger unit lives, resources, or missions. This was well understood by senior military and USG officials, including the TLM, the ACORs, the COR, and the theater command. The linguists were required to conduct the assigned missions in the manner dictated by the military commander. They were also required to abide by any restrictions the unit commander placed on his own troops, including any restrictions on travel, liberty, and communications.

g.    The SOW requires Titan linguists to wear DCUs with "US CONTRACTOR" prominently displayed over one pocket. In practice, however, Titan linguists' uniforms were often indistinguishable from military personnel uniforms because (a) an individual's name and unit identifier are obscured by flack jackets when (as is often the case) these must be worn in Iraq; (b) military units and linguists often worked in T-shirts and DCU pants, neither of which were marked; and (c) in many military intelligence units neither the military personnel nor the contractors wore markings that could be used to distinguish them from one another. This practice in military intelligence units derived from Army doctrine for conducting interrogation operations and was deemed to override the contractual provision regarding distinctive markings. An important element in this practice is that someone within the military chain of command directs a linguist what he/she can or cannot wear, whether this is the linguist's own name tag, the "US Contractor" tag, or the uniform at all. There are sound

- 11 -

Declaration of Kevin S. Hopkins

military, operational security, and force protection reasons why a military officer or NCO might instruct a linguist to contravene the SOW provisions with regard to the tags or the uniform itself. The site manager's role in this is to ensure that the military's directives are carried out whether to wear or not wear the uniform or a part of it. How, when, and to what extent the linguist wore his/her uniform was entirely at the discretion of his/her military point of contact and the point of contact's chain of command.

   h. The military units were required to afford linguists food, berthing, and comfort items equivalent to those enjoyed by military members of the unit. This was necessary due to the isolation of the military units throughout Iraq and the extreme danger involved in traveling without military escort—particularly for those, like linguists, who were not permitted to carry weapons while supporting U.S. military operations. The military also provided all medical support to the linguists. This support—for food, berthing, and medical needs—began at the CRC, and continued throughout the deployment to Iraq. Contract linguists that were killed in Iraq were processed through the military's in-theater mortuary system and repatriated for final disposition to Dover AFB, just as military members are.

### Titan's Role in Implementing the Contract

   23. In contrast to the military's operational control over the assigned linguists, Titan was limited to administrative tasks. Titan was responsible for recruiting and hiring individuals that met the military's linguistic requirements and for conducting initial language competence and medical screening. Qualified linguists were hired subject to military counterintelligence screening. Titan then deployed him/her to the CRC for full medical screening, uniform/equipment issue, indoctrination into his/her responsibilities as a US

Declaration of Kevin S. Hopkins

contractor while deployed in support of US military operations in Iraq, and ultimately transportation to the Iraq war zone.

24.    Once assigned to military units in Iraq, Titan managers' roles were limited.    Titan managers ensured that the linguists were paid and received their other employment benefits.    They were also responsible for the linguists' administrative needs, such as tracking their vacation days, making sure their life insurance was up to date and properly executed, among other administrative responsibilities.    Titan managers would sometimes transport Titan linguists to Baghdad so that they could fly to the US or to Kuwait for vacation days.    In any event, all trips away from an assigned military unit required the approval of the linguists' military units.

25.    Titan managers wrote performance reviews on each Titan linguist, but by necessity relied on input from the linguists' military points of contact to do so.    Discipline and corrective action with regard to their operational duties usually originated with military supervisors.    If a Titan linguist was not performing his duties/tasks to a military supervisor's satisfaction, the military supervisor would generally correct the linguist himself.    If that did not solve the problem, the military supervisor would raise the issue to his unit's linguist manager, typically a commissioned officer or senior non-commissioned officer.    If the military supervisor or unit linguist manager could not correct the problem, they would seek assistance from the Titan Site Manager.    The Site Manager would speak to the linguist and the unit points of contact in an attempt to resolve the issue on site, which was always the preferred option.    However, if the problem appeared to be inherent to the situation (i.e., irreconcilable personality conflict, inability of the linguist to perform the specific tasks, or total loss of confidence in the linguist on the part of the military points of contact), the Site Manager began efforts to reassign the linguist to

Declaration of Kevin S. Hopkins

another unit or job that was a better fit for the linguist's abilities. If that did not correct the problem or if the dissatisfaction of the unit derived from misconduct on the part of the linguist, the linguist would be returned to CONUS and released from the contract. The military units could not be made to accept linguists with whom the units' officers were dissatisfied.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on December 12, 2005.

_____
Kevin S. Hopkins

DASC01-99-D-0001
0054
Page 8 of 27

ATTACHMENT 1

STATEMENT OF WORK

FOR

LINGUIST SUPPORT SERVICES TO UNITED STATES CENTRAL COMMAND PERSIAN GULF AREA OF OPERATIONS

## TABLE OF CONTENTS

SECTION C-1 GENERAL INFORMATION ...................................................Error! Bookmark not defined.
  C-1.1 SCOPE OF WORK. ..............................................................Error! Bookmark not defined.
  C-1.2 AREA OF RESPONSIBILITY. ...............................................Error! Bookmark not defined.
  C-1.3 HOURS OF OPERATION AND DELIVERY SCHEDULE .....................Error! Bookmark not defined.
  C-1.4 PERSONNEL. .....................................................................Error! Bookmark not defined.
    C-1.4.1 Contractor Personnel. ..................................................Error! Bookmark not defined.
    C-1.4.2 Government Personnel. ................................................Error! Bookmark not defined.
  C-1.5 CONDUCT OF PERSONNEL. ..............................................Error! Bookmark not defined.
  C-1.6 SECURITY REQUIREMENTS. .............................................Error! Bookmark not defined.
    C-1.6.1 Personnel Security Clearances. ......................................Error! Bookmark not defined.
    C-1.6.2 Facility Clearances. .....................................................Error! Bookmark not defined.
  C-1.7 MEDICAL REQUIREMENTS. ..............................................Error! Bookmark not defined.
  C-1.8 WORK CONDITIONS AND REQUIREMENTS ............................Error! Bookmark not defined.
  C-1.9 UNIFORMS/WORKING ATTIRE. .........................................Error! Bookmark not defined.
  C-1.10 PERSONNEL APPEARANCE. .............................................Error! Bookmark not defined.
  C-1.11 TRANSPORTATION. .........................................................Error! Bookmark not defined.
  C-1.12 QUALITY CONTROL. ........................................................Error! Bookmark not defined.
  C-1.13 QUALITY ASSURANCE. .....................................................Error! Bookmark not defined.
  C-1.14 PHYSICAL SECURITY. ......................................................Error! Bookmark not defined.
  C-1.15 DISCLOSURE OF INFORMATION. .....................................Error! Bookmark not defined.
SECTION C-2 .................................................................................Error! Bookmark not defined.
  C-2.1 STANDARD DEFINITIONS. .................................................Error! Bookmark not defined.
  C-2.2 TECHNICAL DEFINITIONS. ................................................Error! Bookmark not defined.
SECTION C-3 GOVERNMENT FURNISHED PROPERTY AND SERVICES......Error! Bookmark not defined.
  C-3.1 GENERAL. ........................................................................Error! Bookmark not defined.
  C-3.2 GOVERNMENT FURNISHED PROPERTY ................................Error! Bookmark not defined.
  C-3.3 GOVERNMENT FURNISHED SERVICES. ..............................Error! Bookmark not defined.
    C-3.3.1 Transportation. ..........................................................Error! Bookmark not defined.
    C-3.3.2 Billeting. ...................................................................Error! Bookmark not defined.
    C-3.3.3 Meals. ......................................................................Error! Bookmark not defined.
    C-3.3.4 Medical Services. ........................................................Error! Bookmark not defined.
  C-3.4 EQUIPMENT/UNIFORM/PROTECTIVE DEVICES INVENTORY .......Error! Bookmark not defined.
SECTION C-4 CONTRACTOR FURNISHED ITEMS ..................................Error! Bookmark not defined.
  C-4.1 GENERAL PROVISION. ......................................................Error! Bookmark not defined.
  C-4.2 MEDICAL/HEALTH EXAMINATION/TESTS. ............................Error! Bookmark not defined.
  C-4.3 TRANSPORTATION. ..........................................................Error! Bookmark not defined.
  C-4.4 RECORD-KEEPING OF GOVERNMENT FURNISHED PROPERTY ........Error! Bookmark not defined.
  C-4.5 PAYMENT OF TRAVEL AND PER DIEM FOR TEMPORARY DUTY (TDY) ASSIGNMENTS. Error!
  Bookmark not defined.
SECTION C-5 SPECIFIC TASKS......................................................Error! Bookmark not defined.
  C-5.1 GENERAL. ........................................................................Error! Bookmark not defined.
  C-5.2 INTERPETER SERVICES/TARGET LANGUAGES. ......................Error! Bookmark not defined.
  C-5.3 DELIVERABLES. ...............................................................Error! Bookmark not defined.

DASC01-99-D-0001
0054
Page 9 of 27

SECTION C-6 APPLICABLE DOCUMENTS ........................................................**Error! Bookmark not defined.**

DASC01-99-D-0001
0054
Page 10 of 27

# SECTION C

## SECTION C-1 GENERAL INFORMATION

**C-1.1 SCOPE OF WORK**.

The Contractor shall provide all personnel, equipment, tools, materials, supervision, and other items and services (except as specified in Section C-3) necessary to provide foreign language interpretation and translation services in support of United States (U.S) Forces and Agencies that are supporting United States Central Command operations in the Persian Gulf Area of Operations (AO). The Requiring Activity (RA) for this contract is Headquarters, United States Army Intelligence and Security Command, Ft. Belvoir, VA. The RA will maintain technical and operational oversight of this contract effort, and will ensure at all times that support to the mission and operational commanders, within the confines of applicable laws and regulations, takes precedence over all other considerations.

**C-1.2 AREA OF RESPONSIBILITY**.

United States Central Command (USCENTCOM) supports military operations throughout the Persian Gulf AO. These operations do not have predefined or predictable work locations. Contract linguists (henceforth referred to as linguists, translators, or interpreters) may be required to perform translator/interpreter services anywhere US Forces/Agencies are deployed or employed to support USCENTCOM Persian Gulf operations, which may include locations outside of the Persian Gulf AO. The RA shall determine work locations on a case-by-case basis in coordination with the Contracting Officer, and shall inform the Contractor of locations as requirements are added to this effort. The RA may change work locations over the progress of the operations. In the event that units or agencies with valid requirements are competing for a limited supply of linguists, the RA shall determine which requirement has priority for fill.

**C-1.3 HOURS OF OPERATION AND DELIVERY SCHEDULE**.

C-1.3.1 The Contractor shall provide interpretation and translation services as required by the supported forces up to 24 hours per day, seven (7) days per week. Linguists shall be at the specified site for a minimum 8 hours per day and may be extended to 12-hours and on-call for the remaining 12-hours, depending on mission requirements. Supported unit commanders will provide the Contractor with a schedule of required linguist services. The Contractor will ensure that a linguist is assigned to cover the requirement. If a linguist is not needed for the scheduled amount of time, the unit will contact the Contractor's supervisory personnel to notify them that the linguist is being released from the unit for the day. Linguists released early for the day from their primary duties will report to the Contractor's supervisory personnel to receive further instructions. Units cannot give contract linguists unscheduled time off.

C-1.3.2 A contractor on-site representative shall be available to the Administrative Contracting Officer (ACO) or Contracting Officer's Representative (COR) during the hours of 8:00 am to 5:00 PM daily (including weekends) and shall be on call during all other times. The Contractor shall provide the ACO and the COR a listing, and any changes thereto, of the names and addresses (where the on-site Representatives are) and the telephone numbers where they can be reached 24 hours per day. This listing shall be kept current at all times.

DASC01-99-D-0001
0054
Page 11 of 27

C-1.3.3 The contractor shall adhere to the following delivery schedule when filling new requirements or replacing incumbent linguists. Categories of linguists are described in section C-1.4.1.2. Requiring Activity may extend this delivery schedule in the event of requests for new languages or under special circumstances that are not the fault of the Contractor.

Category I- Contractor will deliver linguists, ready to begin performance of interpreter/translator duties within seven (7) days of notification by: a) the Contracting Officer for requirements that exceed the maximum number of linguists authorized on this contract; b) the Requiring Activity for requirements that do not exceed the maximum number of linguists authorized under this contract. (See Technical Exhibit) CAT I delivery will be extended to fourteen (14) days for CAT I linguists required to perform translation services in target languages not indigenous to the AO.

Category II/III- Contractor will have available the names and social security numbers of applicant-linguists within seven (7) days of notification by the same parties as described for Category I linguists. If linguists require security screening, contractor will supply names and social security numbers to the United States Army Intelligence and Security Command to begin appropriate investigations. Contractor will ensure personnel are processed in accordance with section C-1.6. For personnel that do not require security screening (already possess the required clearance), the Contractor will deliver those individuals to the Point of Embarkation (currently Ft. Benning, GA) for deployment processing within twenty-one (21) days of notification. For personnel that do require security screening, the Contractor will deliver those individuals to the Point Of Embarkation within fourteen (14) days from notification that interim security clearance has been granted.

C-1.3.4 In the event that a replacement or an additional translator is required immediately, the Contractor shall provide from among those translators currently employed and in theater, in coordination with the COR, until such time that a permanent replacement or a new translator is provided.

## C-1.4 PERSONNEL.

### C-1.4.1 Contractor Personnel.

The Contractor shall provide a work force possessing the skills, knowledge, and training to satisfactorily perform the services required by this contract. Personnel performing work under this contract shall remain employees of the Contractor and will not be considered employees of the Government.

C-1.4.1.1 On-Site Management Team. The Contractor shall provide a sufficient number of on-site managers to adequately supervise contractor personnel during the period of this contract. The Contractor shall coordinate the work locations of its on-site managers with the Contracting Officer Representative (COR) to ensure access to Government-furnished resources and coordination with Government representatives.

C-1.4.1.1.2 On-site managers must be able to read, write, speak, and understand English fluently.

C-1.4.1.1.3 On-site management staff must have the knowledge, maturity and experience to work in a high-pressure, deployed environment with senior military officials.

C-1.4.1.1.4 The Contractor shall ensure that field sites have as part of their on-site management teams at least one staff member with a security clearance level equal to or higher than the linguists working in their region of responsibility.

C-1.4.1.1.5 The list of on-site managers and their addresses, and telephone numbers within the assigned area of operations shall be provided to the COR as soon as available and whenever changes occur. The Contractor shall provide immediate replacement of on-site managers found not qualified by the Government or who do not meet the security clearance requirements.

DASC01-99-D-0001
0054
Page 12 of 27

C-1.4.1.1.6 On-site managers will make available to the COR/RA upon request, a current listing of linguist personnel assigned to their areas of responsibilities, and to which units those linguists are assigned.

C-1.4.1.2 Linguists. The Contractor shall furnish linguist services in accordance with the categories described below, and the qualifications and requirements of those categories. The Contractor shall not employ persons for work on this contract if such employee is identified to the Contractor by the Contracting Officer as a potential threat to the health, safety, security, general well-being or operational mission of U.S. Forces in the identified areas. The Contractor shall ensure that they take into consideration cultural differences and Host Nation sensitivities to certain nationalities. In general, linguists assigned to this contract shall possess the following qualifications:

> (a) Ability to write and speak in clear and concise grammar and pronunciation of the required native language;
>
> (b) Capable of providing idiomatic translations of non-technical material using correct syntax and expression from English to the native language or vice versa;
>
> (c) Ability to conduct consecutive, accurate translations/interpretation of on-going conversations/activities;
>
> (d) Familiarity with and ability to conduct oneself in accordance with the local culture and customs;
>
> (e) Ability to deal unobtrusively with local populace;
>
> (f) Familiarity with and adherence to standards of conduct as prescribed by U.S. Army instructions, this contract, and laws of host nation in performing work assignments;
>
> (g) Willing and capable to live and work in a harsh environment.

The Contractor shall provide a staff member fluent in the target language and English for testing applicants. The screener will ensure that the linguist-applicant has the proficiency level required by paragraphs C-1.4.1.2.1, C-1.4.1.2.2 and C-1.4.1.2.3, as applicable. Other technical skills, such as word processing to be used in conjunction with written translation are preferred, but as they can be part of on-the-job training, they need not be part of the prerequisites for linguists to be assigned to this contract. The Contractor's language screening will ensure applicants possess the following skills:

1. Consecutive interpretation, into and from English/Target Language;
2. Written translation of general and technical material into and from English/Target Language;
3. Interpreting aptitude, maintenance of integrity and meaning of material;
4. Transcription of aural target language material into written form.

C-1.4.1.2.2 Category I (CAT I).

C-1.4.1.2.2.1 CAT I linguists must have native proficiency in the target language (level 4 to 5 as defined by the Interagency Language Roundtable (ILRT), and an advanced working proficiency (ILRT level 2+) in English.

C-1.4.1.2.2.2 CAT I linguists may be locally hired or from a region outside of the AO (esp. for target languages not indigenous to the AO) and will not require a security clearance. However, all CAT I linguists will be screened by the Army Counterintelligence (CI) Support Team. The Army CI Team will review each linguist's background and determine if the linguist shall be allowed to work in that capacity.

C-1.4.1.2.3 Category II (CAT II)

DASC01-99-D-0001
0054
Page 13 of 27

C-1.4.1.2.3.1 CAT II linguists must have native proficiency in the target language (ILRT level 4 to 5) and an advanced working proficiency in English (ILRT level 2+).

C-1.4.1.2.3.2 CAT II linguists shall be U.S. citizens who have been screened by U.S. Army Counterintelligence personnel assigned by the U.S. Army Intelligence and Security Command. CAT II linguists will be granted access to SECRET by the U.S. Army Central Personnel Security Clearance Facility or other designated U.S. Government Personnel Security authority for the specific purpose of providing support to the Operations NOBLE EAGLE/ENDURING FREEDOM.

C-1.4.1.2.4 Category III (CAT III).

C-1.4.1.2.4.1 Native proficiency in the target language is preferred, but not required. CAT III linguists should meet at a minimum the criteria of ILRT level 3. CAT III linguists must be able to understand the essentials of all speech in a standard dialect and have broad enough vocabulary that he/she rarely has to ask for paraphrasing or explanation. CAT III linguists must be able to follow accurately the essentials of conversations between educated native speakers, reasonably make and answer telephone calls, understand radio broadcasts, news stories similar to wire service reports, oral reports, some oral technical reports and public addresses on non-technical subjects. CAT III linguists shall be fluent in English.

C-1.4.1.2.4.2 CAT III linguists shall be U.S. citizens who either possess a TOP SECRET Security Clearance with access to Sensitive Compartmented Information (TS/SCI), or who, after prescribed counterintelligence screening, have been granted, at a minimum, an interim TS/SCI clearance by the U.S. Government.

C-1.4.1.3 The Contractor shall ensure all U.S. employees selected to perform on this contract have current and valid passports and obtain appropriate country visas.

C-1.4.1.4 Military reservists and National Guard members may be subject to recall to active duty. The abrupt absence of these personnel could adversely affect the contractor's ability to perform. However, their absence at any time shall not constitute an excuse for nonperformance under this contract.

**C-1.4.2 Government Personnel.**

C-1.4.2. Contracting Officer (KO).  The KO will serve as a focal point for inquiries and keep the contracting officer and other interested activities advised concerning all pertinent matters related to administration of the contract. The KO will coordinate with functional specialists to assure contract requirements are satisfied and fulfilled in accordance with the contract.

C-1.4.2.3 Program Manager. The Program Manager will represent the Requiring Activity on the contract and serve as the Subject Matter Expert and Action Officer in all matters concerning contract linguist support to the operations. The Program Manager will be the primary interface between the Government and the Contractor's program management personnel. No new requirements will be added to this contract unless routed through the Program Manager and validated by the Requiring Activity. The Contractor's home office will direct all inquiries concerning requirements, deployments, or other mission-related issues to the Program Manager. All contracting-specific issues such as proposals, legal questions, and modifications will be directed to the Contracting Officer (KO).

C-1.4.2.4 Contracting Officer Representative (COR). The KO will appoint on orders one or more COR(s), as necessary. A copy of the COR appointment orders will be provided to the Contractor's Program Manager each time a new COR is appointed. The COR

DASC01-99-D-0001
0054
Page 14 of 27

will act as the primary interface between the deployed units and the Contractor's on-site personnel. The Contractor's on-site personnel will limit direct coordination with customers and instead direct inquiries and requests through the COR. The Contractor is authorized to contact customers as part of a quality assurance program and for daily scheduling coordination. All other contact between unit and Contractor, to include discussion about requirements, personnel actions (moving, firing, or switching linguists), or other directions to the Contractor will be coordinated through the COR.

C-1.4.2.5 Contract Monitor. Individual appointed on orders by the Contract Support Element, Ft. Meade, Maryland that is responsible for all security clearance matters on the contract. On this contract the Program Manager at the Requiring Activity will be appointed as Contract Monitor.

## C-1.5 CONDUCT OF PERSONNEL.

The Contracting Officer may require the Contractor to remove from this contract any employee for reasons of misconduct, security, or found to be or suspected to be under the influence of alcohol, drugs, or other incapacitating agent. The Contractor shall remove the employees from performing under this contract upon notification by the Contracting Officer. The removal of personnel from this contract does not relieve the Contractor of its responsibility to provide the specified number of translators required under this contract. The Contractor shall provide replacements for the removed linguist, in the same category and with the same level of qualifications, without delay.

## C-1.6 SECURITY REQUIREMENTS.

All contract security actions will be coordinated through the Contract Monitor.

### C-1.6.1 Personnel Security Clearances.

For CAT II and CAT III linguists, the Contractor shall hire only those who pass the security clearance procedures prescribed in this section. Security procedures for granting and maintaining SECRET and/or TOP SECRET clearances for contract linguist personnel supporting U.S. Army contingency operations will be governed by the Department of the Army Policy on Counterintelligence and Security Support to Contract Linguist Acquisition and Deployment, dated 26 APR 98, or subsequent versions of this policy. The Contractor will screen applicants for the following. A written record of the applicant's responses to these items will be verified and signed by the applicant.

>    (a) Pending criminal or civil charges (including divorce/child custody proceedings)
>    (b) Felony arrest record
>    (c) Alcohol related arrest within the last five years
>    (d) Any involvement in hate crimes
>    (f) Involvement in any group or organization that espouses extra-legal violence as a legitimate means to achieve an end
>    (g) Dual or multiple citizenship
>    (h) Illegal use, possession, or distribution of narcotics or other controlled substances.

C-1.6.1.1 General. Each prospective linguist candidate shall undergo a security and force protection screening session. This session will be conducted by the US Army Intelligence and Security Command (INSCOM) staff or other U.S. Government personnel security investigative authority as designated by the Office of the Deputy Chief of Staff, Intelligence. The results of the

DASC01-99-D-0001
0054
Page 15 of 27

screening session will be adjudicated by the US Army Central Personnel Security Clearance Facility (CCF) or other designated adjudication authority for approval or denial of interim clearance eligibility. This screening session may be performed at the contractor's facility in the United States, or other site as agreed upon by INSCOM, CCF and the Contractor. This facility shall be located in the Greater Baltimore-Washington-Northern Virginia area to provide ready access by the security screening staff in that area. The Contractor shall also maintain in his home office staff at least two managers who possess TOP SECRET Security clearance with access to Sensitive Compartmented Information (TS/SCI). The Contractor shall make these managers available at the request of the Government for purposes of coordination with Government-designated military intelligence personnel on any issues related to contract linguist duties that may require discussions at the TS/SCI level. Appropriate screening sessions for prospective U.S. citizen contract linguist candidates at either the SECRET or TOP SECRET level shall be coordinated by the Contractor with the Government in order to keep an adequate list of cleared candidates to meet operational requirements on a timely basis.

C-1.6.1.2 Investigations. CAT II and CAT III linguists selected for deployment will be subject to appropriate investigations for their security clearance levels. As part of the investigation, the linguists may be required to pass a polygraph examination. Linguists may be disqualified to work under this contract on the basis of findings derived from the investigations and/or polygraph. Since the Department of the Army security policy governing this contract is an exception to the standard security procedures of the US Government, CCF may suspend its award of interim access at anytime. The decision of CCF adjudicators in this matter is final, and there is no recourse to appeal this decision. In the event a decision was made based upon erroneous information, the Contractor may submit corrected information to CCF via the Contractor's Security Officer. Linguists denied access to classified information will not be allowed to perform duties as CAT II or III linguists.

C-1.6.1.3 Agency Check. The INSCOM staff or other designated U.S. Government authority shall conduct the appropriate name checks for U.S. citizen linguists and Contractor personnel in accordance with Army policy governing Counterintelligence and Security Support to Contract Linguist Acquisition dated April 1998, as established by the Director of Counterintelligence and Human Intelligence, Office of the Deputy Chief of Staff, Intelligence, HQDA, and any additions or addendums to this policy.

C-1.6.1.4 Security Clearance Policy and Procedures. The Contractor and Government shall be responsible for actions as outlined below under this contract in order to ensure the timely screening and deployment of CAT II and CAT III translator/interpreter personnel.

(a) The INSCOM staff, in coordination with CCF, the Contractor and the Requiring Activity, shall schedule six security screening sessions per year, one every other month, and provide the dates of the sessions to the Contractor and Requiring Activity at least six months in advance. These sessions shall be referred to as routine screening sessions. The Requiring Activity may request the INSCOM staff to schedule additional sessions in order to meet new or urgent requirements. These sessions shall be referred to as special screening sessions. Requests for special screening sessions will be made at least fifteen days in advance.

(b) The Contractor shall provide a list of names, social security numbers and languages for each candidate to be screened. List will be provided at least thirty days in advance of a routine screening session and fifteen days in advance of a special screening session. No candidate will be screened that does not appear on this list, and no names shall be added to the list once the deadline has passed without an exception from INSCOM staff. Names of candidates who have previously held a security clearance with the US Government may be submitted through the Requiring Activity to CCF for immediate adjudication.

(c) All candidates will be pre-screened by the Contractor for the items listed in C-1.6.1(a)-(f) prior to submitting their names to INSCOM. Contractor will make a written record of the pre-screening interview and have the candidate verify the record, sign and date it. Two copies of the interview record will be supplied to INSCOM on the day of the screening.

DASC01-99-D-0001
0054
Page 16 of 27

(d) Each candidate will complete SF Form 86, *Questionnaire for National Security Positions*. The Contractor will ensure that the SF 86 is correctly filled out, complete and accurate. The Contractor will supply the original SF 86 and one legible copy to INSCOM personnel on the day of the screening.

(e) INSCOM personnel will conduct a Counterintelligence/Force Protection interview with each candidate. INSCOM will base the interview on information gleaned from the name check, Contractor pre-screening interview record, SF 86 and security screening questionnaire.

(f) All information to include name check results, Contractor pre-screening interview record, SF-86 and counterintelligence agent notes/screening questionnaire will be provided to CCF for adjudication of eligibility for interim security clearance. Candidates granted interim security clearance by CCF and selected for the program will be submitted to the Defense Security Service (DSS) for initiation of the appropriate investigation of the applicant. DSS Operations Center, Columbus, Ohio will make determinations for final Secret/Top Secret clearances. CCF will make final determinations for final SCI access eligibility.

(g) Individuals identified by the Contractor as CAT III candidates will be scheduled for a counterintelligence polygraph (CIPG) to be conducted by INSCOM Polygraph Program personnel. Results of the polygraph will be submitted to CCF for determination of eligibility for interim access to SCI material. In some cases, it may be necessary for CAT II candidates to submit to a CIPG in order for CCF to successfully adjudicate their eligibility.

(h) The Director of Counterintelligence and Human Intelligence, Office of the Deputy Chief of Staff, Intelligence, shall monitor this program and make changes as necessary. Changes will be published and all involved parties shall be notified.

C-1.6.1.5 CAT III linguists who are granted interim and/or final clearances under this contract shall be subject to a periodic, random, follow-up polygraph examinations. Routine random polygraph testing is a standard method of operational security utilized throughout the Department of Defense. It is not meant to accuse or infer any guilt upon the test subject. Linguists who are randomly selected for a follow-up polygraph, and refuse to participate or fail to successfully complete the examination may have their access to classified information suspended.

**C-1.6.2 Facility Clearances.**

The Contractor shall maintain an accredited secure facility within the contractor's home office that will allow for any necessary discussions to take place at the TS/SCI level with Department of the Army military intelligence and security personnel. The secure facility must be equipped with a STU III secure telephone with updated, valid cipher key. This area will also provide an appropriate location within the contractor's home office for special TS/SCI security screening sessions and pre-deployment briefings of TS/SCI contract personnel. The Contractor will also provide a preparation and processing site in the Greater Baltimore-Washington-Northern Virginia area for the purpose of hosting candidate employee security screening sessions with Department of the Army security personnel and Central Clearance Facility adjudicators.

## C-1.7 MEDICAL REQUIREMENTS.

C-1.7.1 Pre-deployment and Post-deployment Medical Treatment. All linguists assigned to work under this contract in any category shall be subject to a pre-deployment and post-deployment medical and dental examination. These examinations are the responsibility of the Contractor (see Section C-4).

C-1.7.2 Immunization Requirement. The Contractor shall be responsible and shall ensure that all on-site personnel under this contract have the required vaccinations or immunizations as at their assigned work area(s). Personnel processing through the CONUS Replacement Center (CRC) at Ft. Benning, GA will be provided with the necessary vaccinations. It is the Contractor's responsibility to obtain and maintain a current list of vaccinations required for local national employees and other employees not

DASC01-99-D-0001
0054
Page 17 of 27

deploying through the CRC for each Area of Operations. This list can normally be obtained from the military medical facility in the AO.

C-1.7.3 The Contractor shall provide medical insurance to cover the medical needs of personnel assigned to this contract with the following exceptions. Coverage is not required to include (1) self inflicted injury, treatment for alcoholism, drug addiction, nervous and mental disorders, venereal diseases; (2) Rest cures, sanitarium or custodial care or periods of quarantine or isolations; (3) Cosmetic or plastic surgery unless necessitated by an accidental bodily injury occurring while insured; (4) Dental examination X-rays, extractions, fillings and general dental care except as a result of accidental injury, supplying or fitting eye glasses or hearing aids except as a result of accidental injury; (5) Examinations for check up purposes not incidental to or necessary to diagnose illness or accidental bodily injury, general health examinations; (6) Pregnancy, childbirth, miscarriage or any disorder of the reproductive system; and (7) Treatment, diagnosis or counseling directly or indirectly arising out of or contributed to by Acquired Immune Deficiency Syndrome (A.I.D.S.) or A.I.D.S. Related Complex (A.R.C.) The Contractor hereby relieves the Government of all liabilities for medical expenses and payments incurred during and after termination of the contract.

C-1.7.4 The Contractor shall be responsible to ensure that contractor personnel who are taking medications for chronic conditions have sufficient quantities of their medicine to last for the duration of their stay in the peacekeeping areas of operation.

C-1.7.5 In the event a deployed linguist is unable to perform his duties due to illness or other reasons, the Contractor is responsible for providing a suitable replacement within the time frames as defined in section C-1.3.3 and C-1.3.4.

## C-1.8 WORK CONDITIONS AND REQUIREMENTS

C-1.8.1 Contractor personnel must be willing to live and work in harsh and hostile environments.

C-1.8.2 Contractor personnel must be willing to remain in the operations area for at least 180 days, with possible voluntary extensions up to six (6) months.

C-1.8.3 Contractor personnel must be willing to work extended hours, i.e., past their normal working schedule, if necessary.

C-1.8.4 Contractor personnel must adhere to the standards of conduct established by the operational or unit commander.

C-1.8.5 Contractor personnel are not authorized to carry or possess personal weapons to include, but not limited to, firearms and knives with a blade length in excess of three inches.

## C-1.9 UNIFORMS/WORKING ATTIRE.

C-1.9.1 Except as otherwise prescribed by the Government, on-site contractor personnel shall wear Government-furnished complete uniforms and accessory items furnished by the Government (see Section C.3). Contractor personnel shall not wear civilian clothing or accessory items with Government-furnished uniforms, but shall have appropriate civilian clothing on-hand, as required by specific missions. The ACO or COR shall also prescribe protective items furnished by the Government to be worn, based on force protection requirements and local command policy. The Contractor shall ensure that all uniforms issued identify the contractor personnel to whom it is issued with the following identification tags: a cloth tape with the person's last name in block letters sewn over the right breast pocket of the uniform and a cloth tape with "U.S. CONTRACTOR" in block letters, sewn over the

DASC01-99-D-0001
0054
Page 18 of 27

left breast pocket of the uniform. All cloth identification tags shall be of the same color and size. Contractor personnel shall not wear any identification badge or tags that identifies them as an employee of the United States Government.

C.1.9.2 The COR may, based on decisions by local commanders, prescribe that contractor personnel at designated work locations wear civilian clothing instead of the military uniforms.

## C-1.10 PERSONNEL APPEARANCE.

Contractor personnel working under this contract shall present a professional appearance commensurate with standards delineated for government civilian/military employees acting in similar capacities. Clothing or uniforms shall kept as clean and neat (i.e. no debris, dirt, mud, stains, rips, tears, or holes) as practicable considering work conditions.

## C-1.11 TRANSPORTATION.

C-1.11.1 The Contractor shall be primarily responsible to ensure that the linguists are at their work sites when required.

C-1.11.2 The Government shall provide the following transportation requirements under this contract. For all air travel, first priority shall be given to military airlifts. In cases that the Government is unable to provide the required transportation, the Contractor shall obtain the transportation. The costs incurred by the Contractor for these transportation requirements will be reimbursed by the Government.

- CAT II and III linguists/contractor managers/site supervisors initial travel from Point of Embarkation (normally Ft. Benning, GA) in the US to deployed area, and return at expiration or termination of the contract, or termination of the individual's service with the Contractor.
- Travel for the purpose of reassignment to provide translator services in another region, area or country, to include board and lodging, as necessary.
- CAT II and III linguists/contractor managers/site supervisors travel from the AO to a point where commericial air travel is available for the purposes of leave.
- Contract manager/site supervisor transportation in the AO.
- Supported units will provide mission-required transportation for linguists.

C-1.11.3 Reserved.

C-1.11.4 The Contractor shall be responsible for all other transportation requirements under this contract. Only those transportation costs incurred by the Contractor for the recruitment and/or screening of linguist or management applicants, and linguists actually assigned and working under this contract for purposes of providing translator services shall be paid or reimbursed. Such transportation costs incurred shall be reimbursed at actual costs.-Transportation and all costs of trips to/from or within the United States or other countries by contractor personnel for personal reasons or purposes other than for the provision of translator services required under this contract shall not be reimbursed. Travel and transportation by contractor personnel in charge of the administration and supervision of this contract may be directly or indirectly reimbursable: indirectly, if proposed as part of the contractor's G&A or overhead costs, or directly as part of otherwise Government provided items. In the latter case, the costs shall not be subject to nor included in computing the fixed fee. The Contractor's price proposal shall clearly state how these transportation costs will be reimbursed under his proposal.

DASC01-99-D-0001
0054
Page 19 of 27

## C-1.12 <u>QUALITY CONTROL</u>.

C-1.12.1 The Contractor shall implement a complete quality control program that identifies potential and actual problem areas in providing requirements of the contract as specified, and the results of corrective actions taken throughout the life of the contract. The Contractor shall provide a Quality Control Plan (QCP) that contains, as a minimum, the items listed in C-1.12.2. The basic tenet of the plan is that the Contractor is responsible for quality. All methods, procedures, and forms shall support this concept.

C-1.12.2 The QCP shall include:

C-1.12.2.1 A description of the inspection system to cover all services in Section C-5 hereof. Description shall specify areas to be inspected on both a scheduled or unscheduled basis and the titles/positions of the individuals (based on the proposed contract operational organizational plan) that will be responsible for the inspection.

C-1.12.2.2 A description of the methods to be used for identifying deficiencies in the quality of services performed under this contract and methods to be used to implement corrective actions.

C-1.12.2.3 A description of the records to be kept to document inspections and corrective or preventive actions taken. The records of inspections shall be made available to the Contracting Officer or designated representative.

C-1.12.2.4 A description of methods of direct and indirect communications with the Government or "feedback" regarding contract performance and actions taken to any deficiencies discovered. The communications shall include regular and formal meetings with the Government as well as informal communications.

C-1.12.3 The finalized QCP shall be submitted to the Contracting Officer for review within fifteen (15) days of issuance of this Statement of Work. The Contracting Officer will notify the Contractor of acceptance or required modifications to the plan. The Contractor shall coordinate suggested modifications and obtain acceptance of the plan by the Contracting Officer. Any modifications to the program during the period of the contract shall be provided to the Contracting Officer for review no later than 10 working days prior to effective date of the change. The quality program shall be subject to government review. The Government may find the QCP "unacceptable" whenever the contractor's procedures do not accomplish their objective(s). The Contractor shall revise the QCP within 15 days from receipt of notice that QCP is found "unacceptable".

## C-1.13 <u>QUALITY ASSURANCE</u>.

C-1.13.1 The U.S. Government will evaluate the contractor's performance under this contract based on reports provided by its field inspectors or quality assurance personnel assigned to this contract. All surveillance observations will be kept by the COR and reported to the Contract Administrator. The Government will inform the Contractor of its findings, especially negative ones, for the Contractor to respond or to take necessary corrective actions.

C-1.13.2 Program Review (Quarterly). Meetings shall be whenever deemed necessary by the Contracting Officer to review contractor performance or resolve reported deficiencies in performance, to be attended by the COR, quality assurance people or other government personnel. The contract manager shall attend these meetings as required by the Contracting Officer. The Contractor may also request the Contracting Officer for a meeting when he or she believes such a meeting is necessary in resolving contract problems or issues occurring during the course of the contract. The Contractor shall prepare the written minutes

DASC01-99-D-0001
0054
Page 20 of 27

of those meetings he attended and signed by those in attendance. Non-concurrence to any portion of the minutes by any attendee shall be provided in writing to the Contracting Officer within 10 calendar days from date the minutes are signed.

## C-1.14 PHYSICAL SECURITY.

The Contractor shall be responsible for proper utilization and safeguarding of all government property provided for contractor use. At the end of each work period, all government facilities, equipment, and materials shall be secured. Contractor employees must immediately report damage to government facilities and equipment upon discovery of such damage. Equipment found to be defective must also be reported in a timely manner to allow for repair or replacement. These reports will be submitted to the designated government custodian, representative or office.

## C-1.15 DISCLOSURE OF INFORMATION.

Performance under this contract may require the Contractor to access data and information proprietary to a government agency, another government contractor, or of such nature that its dissemination or use other than as specified in this work statement would be adverse to the interests of the Government or others. Neither the Contractor nor contractor personnel shall divulge or release data or information developed or obtained in the course of contract performance, except to authorized government personnel or upon written approval of the Contracting Officer. The Contractor shall not use, disclose, or reproduce proprietary data that bear restrictive legend, other than as specified in this work statement. Any question on the release of information or doubt of a person's authority requesting the data shall be addressed to or reported to the Contracting Officer or the COR.

C-1.15.1 Neither the Contractor nor the contractor's employees shall disclose or cause to be disseminated, any information concerning the operations of the activity which could result in, or increase the likelihood of, the possibility of a breach of the activities' security or interrupt the continuity of its operation. Unauthorized disclosure of and/or failure to safeguard classified and/or proprietary data or information by the Contractor (or any persons under the contractor's control) may subject the Contractor, his agent(s) or employees to criminal liability under Title 18, Sections 793 and 798 of the United States Code.

C-1.15.2 The Contractor shall direct to the Contracting Officer all inquiries, comments, or complaints arising from matters observed, experienced, or learned as a result of, or in connection with the performance of this contract, the resolution of which may require dissemination of official information.

C-1.15.3 Inquiries received by the Contractor for work performed under this contract shall be referred to the Government for evaluation under the Freedom of Information Act of 1975, Public Law 93-502, 5 U.S.C., Section 552. The determination of whether records will be released shall remain with the Government. The Contractor shall be responsible for search and submission of records upon request by the Government.

C-1.15.4 The Contractor shall not release any information (including photographs, files, public announcements, statements, denials or confirmations) on any part of the subject matter of this contract or any phase of any program hereunder without the prior written approval of the Contracting Officer. The Contractor shall not release information regarding individuals without the prior written approval of the Contracting Officer. All documentation showing individual's names or other personal information will be controlled and protected. The provisions of the Privacy Act of 1974, Public Law 93-579, 5 U.S. C., Section 552a, shall apply.

DASC01-99-D-0001
0054
Page 21 of 27

# SECTION C-2

## DEFINITIONS

### C-2.1 STANDARD DEFINITIONS.

C-2.1.1 Contract Administrator - The official Government representative delegated authority by the Contracting Officer to administer a contract after its award.

C-2.1.2 Contracting Officer - A person duly appointed with the authority to enter into and administer contracts on behalf of the Government. Typical acronyms including PCO - Procuring Contracting Officer, ACO - Administrative Contracting Officer, or PA-Property Administrator.

C-2.1.3 Contracting Officer's Representative - An individual designated in writing by the Contracting Officer to act as an authorized representative of the Contracting Officer to perform specific contract administrative functions within the scope and limitations as defined by the Contracting Officer. COR is attached to, and directly supervised by the Requiring Activity.

C-2.1.4 Government Furnished Property - property in the possession of or directly acquired by the government and subsequently made available to the contractor shall be managed in accordance with FAR 45.101.

C-2.1.5 Quality Assurance - Those actions taken by the Government to assure that the quality of purchased goods and services received are acceptable in accordance with established standards and requirements of the contract.

C-2.1.6 Quality Control - Those actions taken by the Contractor to control the production of goods or services so that they meet the requirements of the contract.

C-2.1.7 Requiring Activity- The organization that funds the contract and verifies all requirements under the contract. For this contract the Requiring Activity is the Commander, U.S. Army Intelligence and Security Command, ATTN: IAOP-OR-TTL, 8825 Beulah Street, Fort Belvoir, VA 22060-5246.

### C-2.2 TECHNICAL DEFINITIONS.

C-2.2.1 AO - Area of Operations

C-2.2.2 Work Day - Monday through Sunday, depending on unit's mission and commander's needs.

C-2.2.3 Deployment - For the linguist to be at his/her work site, as assigned to this contract.

# SECTION C-3 GOVERNMENT FURNISHED PROPERTY AND SERVICES

### C-3.1 GENERAL.

DASC01-99-D-0001
0054
Page 22 of 27

Except for those specified as contractor-furnished in C-4, the Government will provide all the necessary facilities, equipment, materials, and logistics required in the performance of services under this contract in the Area of Operations or work sites. These shall include, among others, the items listed below. Contractor personnel stationed in Germany are not authorized logistical support of any kind (see section H.1).

## C-3.2 GOVERNMENT FURNISHED PROPERTY.

C-3.2.1 All administrative and office equipment and supplies (i.e. desks, tables, chairs, file cabinets, pencils, paper, computer software, etc.) for forward-deployed staffs and offices and based upon availability at each location. Special requirements must be brought to the attention of the ACO or COR and will be made available to the Contractor when and if feasible.

C-3.2.2 All communications equipment/capabilities including classified and unclassified telephone service, to include facsimile if available. This equipment and service will be for official calls related to work on this contract only. Communications equipment and service includes but is not limited to desk phones, facsimile equipment, MSE equipment, e-mail accounts, and Internet access. Telephone service will be provided by the G-6 within 10 days of request.

C-3.2.3 Military uniforms, headgear, belts, jackets, foul weather gear, and other items appropriate to climatic conditions in the area of operation. This shall not include any civilian clothing or items unless deemed mission essential by the supported unit and authorized for purchase by the ACO.

C-3.2.4 Office space shall be provided by the US Army. The COR and/or ACO shall coordinate space requirements with the deployed Commander's designated representative.

C-3.2.5 CONTRACTOR ACQUISITION OF GOVERNMENT-PROVIDED ARTICLES. In cases where the Government cannot provide government-furnished articles as specified in Section C-3 and failure to provide such articles will jeopardize the delivery of the required services at the time required, the Contractor shall acquire and furnish these articles, *provided* the cost does not exceed $2500 per incident. Purchases in excess of $2,500 shall be approved by the ACO. If the Contractor can obtain items from Government supply system, the Contractor shall give priority to government supply sources in acquiring required materials or services. Cost of acquiring such articles shall be at actual costs incurred. The cost shall be reimbursed against the specified cost reimbursement line item in the schedule of this contract for these requirements. Non-consumable items obtained under this provision shall be identified, recorded and accounted for as Government property. This provision shall not be used to obtain any supplies, services or equipment to bypass standard government acquisition or supply procedures. The first source for all purchases shall be government supply sources. NOTE: The contractor may load the seller price with handling, G&A or indirect costs, provided, this is a standard accounting practice as approved by the Government. These costs, however, shall not be included or considered in the computation of the fixed fee.

C-3.2.6 CONTRACTOR ACQUISITION SUPPORT TO COR. The Contracting Officer may require the Contractor to acquire articles for the COR utilizing the procedures and restrictions of C-3.2.5 when the Government is unable to provide these articles in a manner consistent with the COR's mission requirements. Articles supplied to the COR may include, but are not limited to, a leased vehicle, cell phone, and computer/electronic office equipment. All purchases to support the COR, to include purchases less than $2500, will be validated by the *Requiring Activity* and authorized by the ACO prior to obligating any funds (this restriction does not apply to expendable items). Contractor will upgrade articles provided to the COR on the same schedule as upgrades performed for similar articles acquired under C-3.2.5 for the Contractor staff. Contractor will consult with the COR prior to any upgrade or

DASC01-99-D-0001
0054
Page 23 of 27

change to COR's equipment to ensure the change does not adversely affect the COR's mission. If the COR declines an upgrade, this decision will not affect the Contractor's ability to upgrade its own equipment acquired under C-3.2.5

## C-3.3 GOVERNMENT FURNISHED SERVICES.

C-3.3.1 Transportation.

The Government shall to provide transportation to the linguists and other contractor personnel for purposes and in accordance with para C.1.11. It is, however, primarily the contractor's responsibility to ensure that the linguists are at their work sites. The Contractor shall coordinate with the COR for the transportation requirements under this contract to determine if the Government is able to provide the required transportation or not.

C-3.3.2 Billeting.

Billeting for all on-site contractor personnel in areas of operation.

C-3.3.3 Meals.

Meals for on-site contractor personnel when performing services for U.S. military forces or when billeted in government facilities.

C-3.3.4 Medical Services.

C-3.3.4.1 CAT II AND III linguists and contractor on-site management staff who are U.S. citizens may utilize the military medical facilities at the place of deployment.

C.3.3.4.2 Emergency medical treatment shall be available to all categories of contractor on-site personnel. Emergency medical treatment is defined as treatment of patients with life-threatening or potentially disabling conditions resulting from accident or illness of sudden onset; these conditions necessitate immediate care to prevent undue suffering or loss of life or limb. Emergency treatment shall be performed in an U.S. Government facility by authorized personnel. In each case, authorized U.S. Government medical/dental personnel shall make a final determination as to the nature of the illness or injury, urgency, and scope of treatment.

C-3.3.5 Training or briefings as required by the Government prior to entry into geographic areas covered under this contract.

C-3.3.6 DD Form 1173, Identification Card for deployed U.S. citizens (linguists and contract management personnel) indicating military exchange privileges if and when they are available at the place of assignment for the duration of assignment under the contract. All items bought in US military Exchanges shall be for personal use or consumption only and shall not be sold or used for commercial purposes. The Government reserves the right to withhold the privileges from any contract personnel in case of abuse.

C-3.3.7 United States citizen contractor staff and translators (CAT II/III) are authorized full access to the military postal system without restrictions, including mail privileges for personal correspondence.

C-3.3.8 American Red Cross services, such as emergency family communications and guidance for bereavement airfare, are also available to United States citizen contractor personnel in the area of operations.

C-3.3.9 On-site U.S. citizen personnel, and local national linguists that are required to reside on a U.S. base camp shall be given access to Morale, Welfare, and Recreation (MWR) facilities inside the area of operations, except if specifically denied by the base

camp commander for reasons of security. These privileges do not extend to MWR facilities, trips, or activities outside the area of operations.

## C-3.4 EQUIPMENT/UNIFORM/PROTECTIVE DEVICES INVENTORY.

The Contractor shall sign a receipt for all equipment provided by the government. Items of equipment missing or not in working order shall be recorded and the Contracting Officer notified in writing. The Contractor and the government representative shall jointly determine the working order and condition of all equipment and document their findings on the inventory. In the event of disagreement between the Contractor and the government representative on the working order and condition of equipment, the disagreement shall be treated as a dispute under the contract clause entitled "Disputes."

## SECTION C-4 CONTRACTOR FURNISHED ITEMS

### C-4.1 GENERAL PROVISION.

The Contractor shall provide the following for the required services under this contract, as follow:

- all the personnel, management and supervision, including recruitment, employment, medical/health examinations, health/medical/life insurance,
- training (except for the required training for U.S. citizens conducted by the Government prior to deployment),
- quality control,
- accounting, bookkeeping and reporting of cost incurred for this contract
- record-keeping and accounting for government-furnished properties, and
- acquisition or purchase of items which the Government is unable to provide (as coordinated with the COR and approved by the ACO).

### C-4.2 MEDICAL/HEALTH EXAMINATION/TESTS.

The Contractor shall be responsible for pre-deployment and post-deployment medical examination to include a physical condition test for each candidate linguist. The pre-deployment examination shall include as a minimum: medical history, height; weight; blood pressure check; a 14-point blood chemistry check; a complete blood count; blood type and Rh factor determination; an HIV antibody test; a drug test; a chest X-ray, and dental screening in accordance with US Army requirements. The contractor shall keep on record the results of the medical examination and provide them upon the request of the KO or COR. Upon return from deployment, the linguists and contractor's on-site personnel shall receive an exit physical consisting of the same series of tests as in the pre-deployment examination, except for blood type and Rh factor determination, HIV antibody test, drug testing, and dental screening.

### C-4.3 TRANSPORTATION.

It is the contractor's responsibility to ensure that the linguists are at the work sites when needed. The Contractor shall coordinate transportation requirements with the COR to determine if and when the Government can provide the transportation. If the Government is unable to provide the transportation for the performance of services under this contract, the contractor shall acquire them. The Contractor shall only be reimbursed the actual costs of the transportation required by linguist for performing work under this contract.

DASC01-99-D-0001
0054
Page 25 of 27

## C-4.4 RECORD-KEEPING OF GOVERNMENT FURNISHED PROPERTY.

In accordance with FAR part 45, the Contractor shall be responsible to keep records of government-issued properties under this contract (to track quantities, to whom issued and location) which will be kept updated and will be utilize in the inventory of government-furnished property. Such records shall be subject to government-inspection at any time. The Contractor shall provide copies of the records when requested by the Contracting Officer, COR, or Property Administrator.

## C-4.5 PAYMENT OF TRAVEL AND PER DIEM FOR TEMPORARY DUTY (TDY) ASSIGNMENTS.

The Contractor is authorized to reimburse any linguist who incurs travel and per diem costs while officially in a TDY status. TDY will be defined as accompanying a unit away from the permanent duty location for more than 12 hours. Payments will be made IAW the JTR rates. In order for a linguist to be considered officially in a TDY status, the supported unit must furnish the COR with a written request for TDY in advance of the travel. The request must include at a minimum the location(s) of the TDY, the dates of the assignment, the purpose of the TDY, and the signature of the OIC or commander of the organization making the request. Once received, the COR will review the request and either sign the request indicating approval and provide the original to the Contractor, or decline to sign the document and return it to the unit with the reason the request was disapproved. The Contractor shall maintain on file, all COR-approved TDY requests for a minimum of one year following the end of the fiscal year in which the travel occurred.

# SECTION C-5 SPECIFIC TASKS

## C-5.1 GENERAL.

The Contractor shall provide comprehensive interpreter services in the designated target languages in support of Operations NOBLE EAGLE/ENDURING FREEDOM for United States (U.S.) Forces and Agencies. These services shall be provided in accordance with this work statement and any mandatory directives as may be listed in Section C-6 or elsewhere throughout this document. The actual number of linguistic services and types of linguists necessary to meet operational requirements will fluctuate on a continuing basis to meet the needs of dynamic mission changes. Numbers of linguists provided in the Technical Exhibit reflect the maximum number of linguists by language authorized on this contract, and are subject to change via contract modification. Actual required numbers will be determined by the Requiring Activity.

## C-5.2 INTERPETER SERVICES/TARGET LANGUAGES.

C-5.2.1 The linguists' primary function will be to furnish extensive interpreter services for U.S. Forces in the Southwest Asia, Central/South Asia, and possibly other regions such as North Africa and the Horn of Africa. The following are lists of the target languages required for translation, as well as other languages that may be required for other support requirements, or represent a potential need. This list is not all inclusive nor final:

C-5.2.1.1            Target Languages:            Arabic (all dialects)

Baluchi

Dari (Persian-Afghan)

DASC01-99-D-0001
0054
Page 26 of 27

Pashtu (aka, Pushtu, Pakhto)

Punjabi

Russian

Tadjik (Tadzhik, Tajiki)

Turkoman (Turkmen)

Urdu

Uzbek

C-5.2.1.2    Others:    Amharic

French

Other African Languages to
be specified

Somali

Turkish

C-5.2.2 The Contractor may be required to provide U.S. citizens with SECRET clearance who can verify language capabilities in target and other languages if so designated by the Government.

C-5.2.3 The Contractor shall provide translation services for documents from the target language into English or from English into the target language, as well as produce written documents such as transcripts, reports, posters, and/or signs.

## C-5.3 DELIVERABLES.

C-5.3.1 The Contractor shall submit a Monthly Status Report by the 15th of each month. The report shall provide a summary of linguists deployed during the quarter to include number, categories, languages and deployment region; status of security clearance processing; a summary of costs by CLIN under the contract to include an estimated cost-to-complete. The monthly report shall also provide highlights or areas of concerns or problems in the contract, if any. The report shall be submitted to the Requiring Activity, Contracting Officer, the Contract Administrator (if other than the Contracting Officer) and the COR.

C-5.3.2 Others deliverables.

C-5.3.2.1 Medical Examination Results per C-1.7, which will be made available at the request of the COR or ACO.

C-5.3.2.2 The Contractor shall have available at the request of the COR or Requiring Activity a list of all linguists providing services under this contract. The listing shall be current and accurate at all times and include at a minimum: name, social security number (if U.S. citizen), start date of service, anticipated end date of service, language(s), region of assignment, current unit of assignment, category, date and status (interim or final) of security clearance (if applicable), and any other information the Contractor deems pertinent and important.

C-5.3.2.3 Government provided property inventory as required by FAR Part 45.508. The records shall be made available whenever requested by the COR or Property Administrator.

DASC01-99-D-0001
0054
Page 27 of 27

C-5-3.2.4 Reserved.

C-5.3.2.5 Reserved.

# LINGUISTS
# MILITARY ORIENTATION



# CRC INTRODUCTION

- During your preparation for deployment at the CONUS Replacement Center (CRC), filling out paperwork will be a daily occurrence.

- On any paperwork requiring your name, you should print your last name, first name, and middle initial in legible block letters. For example, "DOE, JOHN L."

- REMEMBER YOUR SOCIAL SECURITY NUMBER (SSN). On most occasions, company cadre (representatives) will call out the last four numbers of your SSN instead of your name.

- When filling in dates, use the year, month day format. For example, "20031203."

Hopkins Exhibit B - Page 2
Case # 1:04-cv-01248-JR

# MILITARY CHAIN OF COMMAND

- The Army has an established command channel to send orders from the highest to the lowest levels in the least possible time and with the least chance of misinterpretation.

- Being attached to the CRC and subsequently to a military unit elsewhere, you will fall within this chain of command.

- While you are preparing for deployment at the CRC, you have three site managers who are fully capable of getting your issues resolved prior to your departure.

- After your deployment, if you should need experience a problem, always start with your immediate supervisor first, and if you get no satisfaction, work your way up the chain of command. Build a good working relationship with your military counterparts by trusting and utilizing the chain of command to get and give pertinent information.

Hopkins Exhibit B - Page 3
Case # 1:04-cv-01248-JR

# I.D CARD USE AND PROTECTION.

- You will be issued a government I.D card on Tuesday during your readiness processing.

- You will be designated a GS grade on the I.D card by the Civilian Personnel Office representative. This GS grade gives you no authority and is only used for Geneva Convention/POW purposes only.

- You during must safeguard your I.D card while at the CRC and especially your entire deployment. If lost or stolen, you must report it immediately to your military supervisor.

- You are required to turn-in your I.D card to one of the Site Managers immediately upon redeploying to the CRC.

# RANK INSIGNIA

As linguist working with the U.S. Armed Services, you should be able to recognize the ranks of Army personnel immediately.

- **OFFICERS**: The highest officer rank is the five-star general and the lowest rank is the second lieutenant.



GENERAL OF THE ARMY

GENERAL

LIEUTENANT GENERAL

MAJOR GENERAL

BRIGADIER GENERAL

COLONEL

LIEUTENANT COLONEL

MAJOR

CAPTAIN

1st LIEUTENANT

2nd LIEUTENANT

# RANK INSIGNIA

- **WARRANT OFFICER**: Address warrant officers as "Mr. (last name)" or "Ms. (last name)". The five warrant officer ranks are listed below.



WO1    CW2    CW3    CW4    CW5

**Warrant Officers**

(Silver and Black or

Green and Black

# RANK INSIGNIA

- **ENLISTED**: Enlisted ranks range from private to sergeant major (grades E1 to E9). Address E1 thru E3 as "Private (last name)." Address specialists as "Specialist (last name)." Address sergeants, staff sergeants, sergeant's first class, and master sergeants as "Sergeant (last name)." Address higher rank sergeants by their full ranks in conjunction with their names.





# MILITARY TIME

All U.S. military services tell time by using the numbers "1" to "24" for the 24 hours in a day. A day begins at one minute after midnight and ends at midnight the same day.

| Civilian Time | Military Time | Civilian Time | Military Time |
|---|---|---|---|
| 12:01 AM | | | |
| 1:00 AM | 0100 | 1:00 PM | 1300 |
| 2:00 AM | 0200 | 2:00 PM | 1400 |
| 3:00 AM | 0300 | 3:00 PM | 1500 |
| 4:00 AM | 0400 | 4:00 PM | 1600 |
| 5:00 AM | 0500 | 5:00 PM | 1700 |
| 6:00 AM | 0600 | 6:00 PM | 1800 |
| 7:00 AM | 0700 | 7:00 PM | 1900 |
| 8:00 AM | 0800 | 8:00 PM | 2000 |
| 9:00 AM | 0900 | 9:00 PM | 2100 |
| 10:00 AM | 1000 | 10:00 PM | 2200 |
| 11:00 AM | 1100 | 11:00 PM | 2300 |
| 12:00 NOON | 1200 | 12:00 PM MIDNIGHT | 2400 |

# ARMY ORGANIZATION

- The **squad** is the smallest unit, consisting of eight to ten soldiers. The squad leader is a noncommissioned officer (NCO).

- The **platoon** includes the platoon leader (lieutenant) and two or more squads.

- The **company** includes the company commander (usually a captain, but sometimes a lieutenant), a headquarters, and two or more platoons.

- The **battalion** includes the battalion commander (a lieutenant colonel), his staff and headquarters, and several companies.

- The **brigade** includes the brigade commander (a full colonel), a headquarters, and several battalions.