IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IBRAHIM, *et al.*,<br><br>              **Plaintiffs,**<br><br>      v.<br><br>**TITAN CORPORATION**, *et al.*,<br><br>              **Defendants.** | **Civil Action No. 1:04-cv-01248 (JR)**<br><br>**Judge James Robertson** |

## DECLARATION OF CHIEF WARRANT OFFICER 3 DOUGLAS RUMMINGER

I, CW3 Douglas Rumminger, U.S. Army Reserve, hereby state as follows:

### Introduction

1.    I am a Chief Warrant Officer 3 in the U.S. Army Reserve.

2.    In April 2003, I entered Iraq. I served as the Army's principal Military Intelligence ("MI") point of contact with The Titan Corporation ("Titan") at Abu Ghraib ("AG") from July 2003 until February 2004. In this role I oversaw the linguist program at AG. Although the various interrogation teams at AG exercised direct command and control over their assigned linguists, I was responsible for the indoctrination of new Titan linguists to AG; delivery of the linguist to one of the various teams operating at AG and, after assignment to a team, helping oversee the well being of the Titan linguists.

### Background

3.    I currently live and work in Greeneville, South Carolina.

4.    In 1985, I received a Bachelor's degree in German from Bob Jones University.

5.    I entered active duty in the United States Army in August 1986. I served in the Army as a German linguist. I was honorably discharged from active duty in August 1990.

Declaration of CW3 Douglas Rumminger

6.    I began drilling with an Army Reserve unit in 1993.  In January 2001, the Army sent me to

the Defense Language Institute to study Arabic.  Upon graduation from the 16-month program, I

was designated as an Arabic linguist in the Army Reserve.  During this time, I was assigned as a

linguist to the 356th MI Company based out of Charlotte, North Carolina.  Upon return from Iraq,

the 356th MI Company was absorbed into the 345th MI Battalion Charlie Company.  I continue

to serve with that unit today.

### Deployment to Iraq

7.    In March 2003, I deployed with the 356th MI Company to Kuwait in support of Operation

Iraqi Freedom.  I served in Iraq for approximately 10 months—from April 2003 until February

2004.

8.    In January 2003, the 356th MI Company was placed on alert and subsequently we were

deployed to Iraq in support of Operation Iraqi Freedom (OIF).  I and approximately 29 other

members of my unit flew to Kuwait in mid-March 2003 on the first night of the Second Gulf

War.  Approximately twenty-four of the unit members were Arabic or Farsi linguists (including

me).

9.    The 356th MI Company received pre-deployment training at Fort Stewart, Georgia.

Because we deployed as a unit rather than individuals, we did not pass through the CONUS

Replacement Center ("CRC") at Fort Benning, Georgia.

10.    I spent about five weeks in Kuwait and entered Iraq in late April 2003.  I remained at Camp

Cropper (on the grounds of the Baghdad International Airport ("BIAP")) until late July 2003

when I was stationed at AG.

11.    Upon arrival in Iraq, individuals from the 356th MI Company, including myself, were

individually assigned to other units within the 205th MI Brigade.  Our Commanding Officer

Declaration of CW3 Douglas Rumminger

attempted to keep track of his unit members and retained administrative responsibility for the unit members, but each unit member fell under the operational control (or chain of command) of his new unit commander in Iraq. I was initially placed under the operational control of 519th MI Battalion and later the 325th MI Battalion.

### Assignment to Abu Ghraib

12.   I was requested to be assigned to AG by an NCO of the 519th MI Battalion who, before I arrived in July 2003, was in charge of military and civilian linguists at AG. It was generally the case that all linguists fell under common supervisory structures; the same military personnel within the unit, team, or cell made work assignments, supervised work performance, and authorized liberty and leave for military and Titan linguists.

13.   When I reported to AG in July 2003, the interrogation mission was just getting started. I remained at AG from July 2003 until February 12, 2004. At AG, I was reassigned for operational purposes to the 519th MI Battalion which was attached to the 205th MI Brigade. The 519th MI Battalion normally part of 18th Airborne Corps, was working under the 205th MI Brigade in support of OIF while in Iraq.

14.   In July 2003 there were approximately ten interrogators and analysts at AG and nine Titan linguists.

15.   In late August or early September 2003, the 325th MI Battalion joined the 519th MI Battalion at AG. Eventually, the 519th rotated back home.

16.   The 165th MI Battalion arrived at AG later in the fall of 2003.

17.   Interrogations at AG were conducted under the direction of the Joint Interrogation and Debriefing Center ("JIDC"). The JIDC comprised personnel from several different Army units:

Declaration of CW3 Douglas Rumminger

the 519th MI Battalion; the 141st MI Battalion; 165th MI Battalion; and a few people (including me) from the 356th MI Company.

18.    Normally, when military units captured persons suspected of possessing information of intelligence value, they ultimately arrived at the JIDC for more detailed interrogations and classification.

19.    The JIDC provided the joint-level theater collection and reporting of strategic, operational, and limited tactical intelligence information obtained through the interrogation and debriefing of human sources.  The JIDC was responsible for interrogation of enemy prisoners of war, civilian detainees, refugees, and other nonprisoner sources.  JIDC activities were overseen by the Director of Intelligence (J-2) for the Commander of Combined Joint Task Force SEVEN (CJTF-7).  CJTF-7 commanded all Coalition Forces in Iraq and reported to Commander, U.S. Central Command who reports to the Secretary of Defense.

20.    Lieutenant General Ricardo Sanchez commanded CJTF-7 beginning approximately July 2003.

21.    When I arrived at AG, I attended daily planning meetings that included the AG interrogation teams, and I used information from those meetings to assign linguists to specific interrogations.  In July 2003, there were three to four interrogation teams each with two linguists assigned.  The interrogation teams were free to assign their linguists as they saw fit without seeking permission from Titan or other military authorities.  No Titan managers or employees participated in these planning meetings or the assignment of linguists to interrogations.

22.    During July 2003 and August 2003, the MP units at AG did not, to my knowledge, have linguists assigned to them.  I believe that they did, however, have authority to hire local nationals

- 4 -

Declaration of CW3 Douglas Rumminger

directly and that they had hired a few to work as linguists. On occasion the MPs would ask me

for the use of a Titan linguist and I would lend a Titan linguist to them.

23.   The Titan site manager visited AG about one time per week. I was the point of contact for

the Titan site manager in terms of taking care of the linguists' living conditions and their other

administrative needs when the site manager could not make it to AG.

## Living Conditions at AG

24.   AG is roughly a square with four walled areas inside. Initially, the interrogation operations

took place in one of these four areas. Later during my tenure, the Military Police ("MPs") used

this area for berthing. The interrogators worked on a large concrete area that contained five

tents. Two of the tents were enclosed in concertina wire and were used as a command and

operations center for the interrogation mission. The remaining three tents were used for

conducting interrogations. The detainees were kept outside in barbed wire enclosures with MPs

guarding them.

25.   The living areas at AG were referred to as LSAs. When I arrived at AG the military and

Titan personnel berthed in the same general area. That area consisted of cots in a large open bay

of a partially destroyed building that was in a yard of the AG compound; this building had been a

prison factory, possibly a shoe factory. The primary work area for the interrogators was located

near this berthing area. At some point, the MI units swapped LSAs with the MPs and the 82nd

Airborne.

26.   After two soldiers were killed in a mortar attack that hit this work area, LTC Jordan, the

Director of the JIDC and one of the senior military personnel at AG, moved the JIDC's

operations inside a building.

Declaration of CW3 Douglas Rumminger

27.   As the operation grew, Titan and the military members moved to a new LSA in which they shared the same cell blocks. The cell blocks were two-storied buildings, built around a central core. Off the central core were hallways with cells off to each side. The Titan linguists typically lived 2 or 3 to a cell or in groups up to 10 or 12 in larger meeting rooms that were interspersed between the cell areas.

28.   In the summer and early fall of 2003, there were no public phones and no Internet for personal use at AG. Public phone and Internet service came to AG toward the end of 2003.

29.   The meals at AG consisted of pre-packaged Meals-Ready-to-Eat ("MREs") and one meal from a mobile kitchen trailer ("MKT") per day.

30.   The senior enlisted members of the military units successfully used their leadership skills to integrate the linguists into the units as  team members fully vested in mission accomplishment.

## Military Tasking and Command and Control of Titan Linguists

31.   Initially in July 2003 I personally gave Titan linguists their work assignments. On a daily basis, I gave linguists their assignments and loaned them to the MPs on an as-requested basis.

32.   In October or November 2003, I decided to create a roster of all linguists assigned to AG and began assigning the linguists to the individual teams at AG to let them make daily work assignments. I did this because linguist assignments had been very unpredictable and I believed the units themselves could more effectively use the linguists. Once I assigned a linguist to a unit, the receiving team directed and supervised the linguist.

33.   In the fall of 2003, we created interrogation cells and assigned linguists directly to these interrogation cells. The head of the cell was typically a non-commissioned officer ("NCO"). Each interrogation cell contained two or three tiger teams that reported to Captain Wood or CW2 Rivas. A tiger team consisted of two interrogators, one analyst, and one linguist. Because

Declaration of CW3 Douglas Rumminger

linguists were in short supply, individual linguists were sometimes required to service more than one tiger team.

34.  In the fall of 2003, the CJTF-7 Linguist Manager assigned Titan linguists directly to the MPs.

35.  Once a linguist was assigned to an interrogation cell, his or her assignments were controlled by the cell NCOs, who supervised linguists assigned to their cells.

36.  There were a few military linguists (including myself) at AG who occasionally performed duties as a linguist, but most of the linguist duties were performed by the Titan linguists. The Titan linguists were absolutely indispensable to the accomplishment of our military intelligence mission at AG and were treated as members of the team.

37.  When units had linguist shortfalls within AG, they negotiated among themselves to permit one team to borrow the Titan linguist assigned to another team. This was accomplished without consultation of anyone from Titan.

## Linguist Indoctrination

38.  I conducted interrogation indoctrination training with all linguists upon their arrival at AG. This training was designed to orient the Titan linguists to the then-prevailing interrogation policies. I spent about thirty minutes with each incoming linguist to explain what was authorized by the interrogation policies and what was prohibited.

39.  Each linguist was required at this indoctrination session to sign two documents. First, the interrogation "rules of engagement" (which was a classified document) and, second, a memorandum of understanding (MOU) with the unit (a sample of which is attached as Exhibit A). The MOU was concluded directly between the Titan linguist and the military unit commander. The MOU laid out the responsibilities of the Titan linguists to follow military rules

Declaration of CW3 Douglas Rumminger

and directives. The MOU was drafted by CPT Wood when she was stationed at Bagram AFB,

Afghanistan, and was modified with my assistance for use at AG.

40.   Although the Titan site manager was aware of the MOU, Titan had no input into the MOU.

### Linguist Duties

41.   Army doctrine is clear as to the responsibilities of linguists during interrogations. Put

simply, linguists are to reflect, as precisely as possible, the words and manner of the interrogator,

who is in charge of each interrogation. A good translator is like a machine; he repeats words and

serves simply as a conduit for the interrogator. He is prohibited from injecting his own ideas into

the interrogation aside from reporting back to the interrogation any insights that came from his

cultural and linguistic expertise.

42.   The MI units at the JIDC were specifically trained in Army doctrine for interrogations,

including doctrine on the role of linguists, and on the occasions when I functioned as the linguist,

I was told to perform as doctrine requires. The Titan linguists were to perform in precisely the

same manner as Army linguists—to repeat precisely the words and to reflect the manner of the

interrogator. Titan linguists had no authority to ask their own questions, direct the use of any

particular interrogation method, or inject their own ideas into the process.

43.   The interrogation cell NCO's assigned linguists to particular interrogations. Linguists were

available to these NCO's 24 hours a day, 7 days a week for assignment as necessary.

### Uniforms

44.   Titan linguists were issued Desert Camouflage Uniforms ("DCUs") by the Army upon

deployment to Iraq, and they were expected to wear these uniforms at AG. Although Titan

linguists were not issued rank insignia, a nametag and designator such as "CONTRATOR" was

sewn onto the DCU blouse.

Declaration of CW3 Douglas Rumminger

45.  Outside the cell blocks, flack jackets were worn that would have covered any personal identifying information on uniforms.  When flack jackets were not worn, uniform blouses were often removed because of the intense heat.

46.  Inside interrogations, participants often removed their uniform blouse or turned it inside out to ensure that no personal identifying information was apparent.  This is consistent with Army interrogation doctrine and made good common sense in this environment with an active insurgency underway.  Active duty interrogators often had Velcro rank insignia and name tags that could be removed during the interrogations.

## ID Cards

47.  Titan linguists were issued identification cards with a military equivalent rank and Geneva Convention status reflected on the face of the ID card.  Many Titan linguists' ID cards reflected the equivalent rank Lieutenant Colonel or LTC, but this did not empower Titan linguists to direct soldiers or mean that they were military officers.

48.  Even though some linguists had assigned equivalence ranks not authorized to others, their positions were completely different than their equivalence ranks.  Rather than being like senior officers entitled to issue military orders, the Titan linguists were directed by military personnel-- irrespective of rank equivalence structure--responsible for the operation of the interrogation teams.

49.  The concept that a member is authorized to exercise (or not authorized to exercise) operational authority as a matter independent from his rank is not unusual in the military.  For example, I outranked most of the interrogators at AG; however, while performing duties as a linguist for an interrogation, I was required, as are all linguists according to Army doctrine, to repeat precisely the interrogator's questions and reflect his manner, even if I believed there might

Declaration of CW3 Douglas Rumminger

be a more effective line of questioning or manner in which to obtain information. In this way, I was subject to the orders of the interrogator to whom I was assigned even though I outranked him.

## Leave and Liberty

50.    The military was in control of the linguists' physical movements.

51.    Any trip off the compound by a Titan linguist was always subject to the military mission and the schedules established within the interrogation cells.

52.    The Titan linguists were on call 24 hours a day, 7 days a week. Trips off the compound required military permission and for Category II and Category III linguists, a military escort. The prohibition of off-base travel without a military escort was the general rule throughout Iraq and it was strictly enforced at AG. I recall a particular incident in which four linguists were removed on the spot by a senior military commander for being absent without leave when they were caught returning to the AG compound. Titan was not consulted in advance and had no input on this removal.

53.    Military unit commanders were required to approve linguists' requests for leave, as they did for any of their unit members. In doing so, unit members were required to consider the military mission first and make arrangements in the linguists' absence.

54.    I tried to work it out so that each Titan linguist had a chance to go the Post Exchange ("PX") at BIAP in order to purchase toiletries and recreational items and, in order to do so, I kept track of when the linguists had the opportunity to go. Even though I was the primary military point of contact for Titan management, to send a linguist to the PX, the permission of the linguist's unit commander or interrogation cell was required.

- 10 -

Declaration of CW3 Douglas Rumminger

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December <u>6</u>, 2005.

Douglas Rumminger

**DEPARTMENT OF THE ARMY**
**JOINT INTERROGATION AND DEBRIEFING CENTER (JIDC)**
**ABU GHRAIB PRISON, BAGHDAD**

7 OCTOBER 2003

MEMORANDUM OF UNDERSTANDING

SUBJECT: Linguist Duties, Responsibilities, and Expectations

1. MISSION. The mission of the JIDC is to provide accurate and timely information to the CJTF 7 Command. This is accomplished by interrogating detainees for information, document exploitation and open source translation. The work we do here is actionable, meaning the information we provide is acted on by fellow US soldiers. We perform a crucial mission and many lives are dependent on what we do. We strive to provide the most comprehensive and correct information possible. This mission cannot be accomplished without linguistic support.

2. DAILY SCOPE OF DUTIES. The overall duty of the linguist is to translate, either orally in an interview, or in a written translation of a document. Each linguist is expected to be at work on time and check out with the NCOIC before leaving each day. Frequently schedules change creating the necessity for a linguist in the hours following close of business. We attempt to minimize these on call requirements, but mission is always first.

3. TRANSLATION. All translations will be conducted as close to WORD for WORD as possible. This means if the source talks for two minutes straight, the translator will provide an answer which is two minutes long as well. Every bit of information from the source is crucial information is which is lost in paraphrasing. The interrogator chooses his/her words carefully to convey a particular meaning or set a certain atmosphere with a source.

   a. Questioning techniques. Often, the interrogator will ask the same question in many different ways, or repeat the same question. This is a questioning technique. Although it may seem odd, it is not appropriate for the translator to answer the question for the source or say to the interrogator "you already asked that question".

   b. Dialects. If the translator cannot understand the particular source due to cultural or dialect differences, it is the translator's responsibility to inform the interrogator that he/she cannot properly and correctly translate for the source. Incorrect translations are detrimental to the mission and can cause sources to be detained longer than necessary or extreme cases, be sent to a long term facility, and most importantly can cause harm and loss of life to US forces.

   c. Sidebar conversations. At no time should the translator and source hold a sidebar, or private conversation. The interrogator maintains control of the interrogation at all times! If the source poses a question, it is NOT the translator's duty to answer it. The question must be translated and the interrogator will provide the answer to the source.

**Rumminger Decl. Ex. A**

    d. Long-winded sources. Sources tend to talk and talk and talk. It is the translator's duty to pause the source, translate what the source has said to maintain the direct translation, and then ask the source to continue with his thought.

    e. Inference. Cultural differences are best explained by translators. If a source makes an inference, the translator should translate the phrase or thought directly and then make the cultural inference clear to the interrogator.

4. TYPES OF APPROACHES/INTERROGATIONS. It is the interrogator's duty to brief the interpreter prior to conducting each interrogation to ensure the translator is prepared mentally and emotionally and has the correct vocabulary in mind. The atmosphere created by the interrogator must be seamlessly mirrored by the translator in the motions, voice inflection and choice of words. Whatever approach is utilized, it is not the translator's place to second guess the interrogator and refuse to translate words or phrases. All interrogations are conducted strictly within the limits of the Geneva Conventions, therefore the source is never in danger.

    a. Fear up – The interrogator intends to create a hostile environment by raising his/her voice, cursing, insulting, or belittling the source. Many times this approach is coupled with directing the source to perform certain tasks or physical activity. This is a method of ultimate control. The translator must put his/her personal feelings aside to mirror the interrogator.

    b. Fear down – The interrogator intends to create a calmer environment by offering the source a drink or cigarette, talking calmly, and boosting the source's ego.

    c. Repetition – The interrogator will purposely and repeatedly ask the same or same type of questions. Or several interrogators will ask the source questions repeatedly at the same time. This will be coordinated and rehearsed so the translator knows which interrogator's questions he will translate.

5. FORWARD SCREENING. On occasion, you may be requested to provide linguistic support to a forward screening team consisting of one to three interrogators. This team will support a maneuver unit conducting raid or other type of operation. For these missions you will wear DCUs, body armor, Kevlar helmet, rucksack, and other required equipment for your protection. These physically demanding missions may be several days in duration.

6. DISAGREEMENTS. In the event of a disagreement, at no time will the interrogator and translator argue in front of the source—this causes a loss of credibility in front of the source. The interrogation will immediately stop and the source will be escorted out, and both the interrogator and translator will report immediately to the NCOIC and OIC.

7. OPERATION SECURITY. Operation Security is of highest concern. For your protection, it is best to not discuss where you work, or what you do. The mission performed here is of a secret security level and may not be discussed with family members or people not of the need to know. Photographing detainees and the facility itself is strictly prohibited. Many local citizens will be curious as to whom you work for and how you live in the United States. If you are questioned to the point that you feel uncomfortable, it is your duty to report the incident to the OIC/NCOIC. Additionally, if you witness locals taking photographs of buildings on post, it is

**Rumminger Decl. Ex. A**

also your responsibility to report all associated information to the OIC/NCOIC.

Linguists are not to go into the cell block where the Iraqi police work unless they have authorization. Also, asking anyone but an approved vendor to obtain items from the economy for you is not authorized. Remember that we are in a hostile environment, and not everyone is as friendly as he seems. While we want to present a friendly, human face to the Iraqi people, we do not want to form close associations that could be used to harm soldiers. The person who wants to kill you may be the friendliest person you know—if he is smart, he won't give you any warning that he is trying to harm you until the moment he strikes.

8. COMPUTER USAGE. Translators are welcome to use the unclassified computers in the MWR rooms. The computers are open for morale and all are expected to be courteous and abide by the designated time limit when others are waiting. At no time will any translator use any classified computer.

9. TRASH. For operational security, all trash of a personal nature is burned. The classified trash includes bills, addressed letter envelopes, and anything operational. The regular trash is for nondescript trash.

10. UNIFORMS. The preferred uniform is DCUs if you have them. Otherwise casual civilian clothes are acceptable. Acceptable civilian attire will include jeans, casual pants, tee shirts and/or button down shirts. We request that DCUs not be mixed with civilian attire.

11. I understand this memorandum of understanding and do not have any reservations in conducting this kind of work and supporting this mission.


**Redacted**
_____
Signature

**Redacted**
_____
Printed name

**Redacted**
_____
Date


**Rumminger Decl. Ex. A**