### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SALEH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-CV-1165 (JR) |
| v. | ) | |
| | ) | |
| TITAN CORP., et al., | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
## CACI INTERNATIONAL INC
## AND CACI PREMIER TECHNOLOGY, INC.

Defendants CACI International Inc and CACI Premier Technology, Inc (collectively, the "CACI Defendants") hereby move for summary judgment on all remaining counts asserted in Plaintiffs' Third Amended Complaint pursuant to Federal Rule of Civil Procedure 56. Summary judgment is appropriate because Plaintiffs' common-law tort claims against the CACI Defendants are preempted.[1] The bases for the CACI Defendants' motion is set forth in greater detail in the accompanying Memorandum.[2]

Wherefore, the CACI Defendants respectfully request that the Court enter summary judgment in CACI Defendants' favor on all counts in the Second Amended Complaint. Pursuant to LCvR 7(f), the CACI Defendants respectfully request oral argument on their motion.

---

[1] On June 29, 2006, the Court dismissed Counts One through Fifteen and Counts Thirty and Thirty-One of Plaintiffs' Third Amended Complaint. The remaining claims (Counts Sixteen through Twenty-Nine) consist of the common-law tort claims and related conspiracy and aiding and abetting claims.

[2] The CACI Defendants also join in the motion for summary judgment filed by Defendant L-3 Titan Corporation.

Respectfully submitted,

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:      (202) 429-3000
Facsimile:      (202) 429-3902

**Attorneys for Defendants CACI International
Inc and CACI Premier Technology, Inc.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SALEH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:05-CV-1165 (JR) |
| v. | ) | |
| | ) | |
| TITAN CORP., et al., | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| Defendants. | ) | |
| | ) | |

## STATEMENT OF MATERIAL UNDISPUTED FACTS
## IN SUPPORT OF THE MOTION FOR SUMMARY
## JUDGMENT OF DEFENDANTS CACI INTERNATIONAL INC
## AND CACI PREMIER TECHNOLOGY, INC.

Defendants CACI International Inc and CACI Premier Technology, Inc. ("CACI Defendants") hereby submit a statement of the undisputed facts that support entry of summary judgment in the CACI Defendants' favor. Because all of the relevant facts to this motion relate to the interrogation work performed by CACI Premier Technology ("CACI PT"), the statement focuses on facts relating to CACI PT:

　　　1.　　With respect to the time frame alleged in Plaintiffs' Second Amended Complaint, CACI PT provided civilian interrogators[1] in support of the United States' mission in Iraq under two delivery orders, Delivery Order 35 ("DO 35") and Delivery Order 71 ("DO 71). Declaration of Mark Billings, ¶ 13.[2]

---

[1] CACI International Inc did not contract with the United States to provide interrogation services in Iraq. *See* ¶ 24, *infra.*

[2] All Declarations referenced in this brief are attached as exhibits to the Declaration of John F. O'Connor, filed on December 16, 2005 in *Ibrahim v. Titan Corp.*, No. 04-1248 (D.D.C.)

2.     DO 35, including its initial Statement of Work, is attached as Exhibit A to the Billings Declaration. The Contracting Officer's Representative ("COR") revised the Statement of Work for DO 35 in February 2004, and that revised Statement of Work is attached as Exhibit B to the Billings Declaration.

3.     The Statement of Work for DO 35 made it clear that the civilian interrogators provided by CACI PT in Iraq would, at all times, be under the direction, supervision and control of the military chain of command with respect to their performance of the interrogation mission. For example, the Statement of Work for DO 35 provided that CACI PT would:

> provide the ACofS, C2, CJTF-7 with the best value Interrogation Support Cell management and support; functioning as resident experts for the implementation of an Interrogation Support Cell IAW regulations and standard operating procedures within the C2, CJTF-7. The contractor will provide Interrogation Support Cells, *as directed by military authority*, throughout the CJTF-7 AOR to assist, supervise, coordinate, and monitor all aspects of interrogation activities, in order to provide timely and actionable intelligence to the commander.

Billings Decl., Ex. A at ¶ 3 (emphasis added).

4.     The Statement of Work for DO 35 made clear that CACI PT personnel would be fully integrated with military personnel in performing intelligence analysis, screening and interrogation tasks, that priorities and tasks would be established by the Coalition Joint Task Force-7 ("CJTF-7"), and that those tasks were required to be performed in accordance with Government regulations:

> *Identified personnel supporting this effort will be integrated into MIL/CIV analyst, screening, and interrogation teams (both static/permanent facilities and mobile locations), in order to*

---

except for the Elefante Declaration referenced in ¶ 24, which was submitted in connection with the November 10, 2004 Motion of the CACI Defendants to Transfer Venue. The O'Connor Declaration from the *Ibrahim* case is attached hereto as Exhibit 1.

*accomplish CDR CJTF-7 priorities and tasking IAW Department of Defense, U.S. Civil Code and International Regulations.*

Billings Decl., Ex. A at ¶ 4 (emphasis added).

    5.    The Statement of Work for DO 35 also contains numerous other entries that made clear that CACI PT interrogators performed their duties at all times under the supervision, control and direction of U.S. military personnel in the Iraqi theater of operations. For example:

- Section 4 of the Statement of Work made clear that interrogators would deal only with "detainees, persons of interest, and Enemy Prisoners of War (EPWs) that are in the custody of U.S./Coalition Forces in the CJTF-7 AOR."

- Section 5 of the Statement of Work provided that CACI PT personnel "will be required to travel (ground/air), as task/directed throughout the CJTF AOR in order to accomplish directed mission."

- Section 6 of the Statement of Work provided that CACI PT interrogators would conduct interrogations "IAW local SOP and higher authority regulations," would review data collected and cross-reference intelligence collection priorities and plans "IAW interrogation SOPs and plan," "will conduct other intelligence supporting activities related to interrogation operations as directed," and "will report findings of interrogation IAW with local reference documents, SOPs, and higher authority regulations *as required/directed.*" (emphasis added)

- Section 7 of the Statement of Work specified qualification criteria for interrogators, specifying that they "should be the civilian equivalent to one of the following: "97E, 351E, Strategic Debriefer or an individual with a similar skill set."

- Section 14 of the Statement of Work specified the place of performance: "The Government intends the contractor personnel to perform from the offices of the CJTF-7 Iraq and its designated interrogation facilities."

- Section 15 of the Statement of Work required that CACI interrogators had to have "DoD Security Clearances."

- Section 20 of the Statement of Work provided that the government would provide CACI PT with:

- ■ The appropriate documentation commensurate with that given to DoD civilians in the Theater of operations: deploying Contractors will be issued a Uniform Services Identification Card, DD Form 1173, and a Geneva Conventions Identity Card, DD Form 489. CJTF-7 will provide the Contractor with a Letter of Authorization (LOA) that allows Army Units to issue necessary equipment, tests, shots, and training to the Contractor employee.

- ■ Appropriate individual readiness training (IRT), area orientations and training/briefings on rules of engagement and general orders applicable to U.S. Armed Forces, DOD Civilians, and U.S. Contractors as issued by the Theater Commander or his/her representative.

- ■ Force Protection Measures.

- ■ On-site transportation to fulfill contract/mission requirements.

- ■ Work space and facilities as required to fulfill contract/mission requirements.

*See generally* Billings Decl., Ex. A.

6.      Section 5 of the DO 35 Statement of Work also recognized that it was CACI PT's responsibility to provide supervision for all of its personnel. CACI PT did so by assigning personnel to serve as country manager and site leads. Those CACI PT administrative personnel in Iraq had supervisory responsibility for all CACI PT personnel with respect to personnel, finance, and related matters. Billings Decl. ¶ 19.

7.      The Statement of Work for DO 71 contains similar provisions demonstrating that the CACI PT interrogators would be integrated within the United States military's interrogation command and would be under the direct supervision and control of the United States military chain of command. *See* Billings Decl., Ex. C at ¶¶ 3, 4, 10-17. Of particular note, the Statement

of Work for DO 71 explicitly provided that CACI PT's intelligence support personnel, including interrogators, operated under the control and direction of the military command:

> As the operational element, HSTs (HUMINT Support Teams) support the overall divisional/separate Brigade HUMINT mission, and *perform under the direction and control of the unit's MI chain of command or Brigade S2, as determined by the supported command.*

Billings Decl., Ex. C at ¶ 3. Similarly, the Statement of Work for DO 71 provided that for CACI PT interrogators: "All actions [of the interrogators provided under DO 71] will be managed by the Senior CI [Counter-Intelligence] Agent," a member of the United States military. Billings Decl., Ex. C at ¶ 4.d.

8.     As required by the applicable Statements of Work, CACI PT interrogators were integrated within the military interrogation process of the military units that they were assigned to support. That is, the CACI PT interrogators received the same operational interrogation taskings and direction from the military as their military interrogator counterparts. All of the interrogators in the Iraq theater of operations – military and civilian – were treated as part of one team and as having the same interrogation responsibilities, reporting obligations, and mission direction. Declaration of Daniel J. Porvaznik ¶ 9; Declaration of Charles Mudd ¶ 8; Declaration of COL William H. Brady ¶¶ 2, 3; Declaration of LTC William Daniels ¶ 2.

9.     The United States military approved CACI PT interrogators for deployment to Iraq before they were so deployed. Once a CACI PT interrogator arrived in Iraq, the United States military chain of command assigned the interrogator his or her interrogation tasks, determined the command structure into which the interrogator would be placed, and determined the interrogator's work schedule. The United States military, through its Contracting Officer's Representative ("COR") also determined whether CACI PT should remove an employee from the contract. Porvaznik Decl. ¶ 10; Mudd Decl. ¶ 9; Northrop Decl. ¶ 6.

10.    For example, at Abu Ghraib prison, all of the military interrogators and CACI PT interrogators were under the control and supervision of the Officer in Charge ("OIC") of the Interrogation Control Element ("ICE").  During the relevant time frame, the OIC of the ICE was Captain Carolyn Wood, U.S. Army.  Military and CACI PT interrogators also reported to the Noncommissioned Officer in Charge ("NCOIC") at the ICE.  The NCOIC, also a member of the United States Army, reported directly to the OIC of the ICE.  Porvaznik Decl. ¶ 12; Northrop Decl. ¶ 8.

11.    The United States military had exclusive responsibility for setting all Interrogation Rules of Engagement ("IROEs").  Only the OIC or the NCOIC or higher military authority could approve any deviation from the IROEs.  Porvaznik Decl. ¶ 13; Billings Decl. ¶ 21; Northrop Decl. ¶ 9.

12.    Below the ICE OIC and NCOIC in the chain of command were Section Leaders.  All Section Leaders were members of the United States Army.  Each Section Leader was responsible for supervision and control of between four and eight interrogation teams.  At times, CACI personnel advised the military Section Leaders.  Each interrogation team consisted of an interrogator, an intelligence analyst and an interpreter.  The United States Army personnel supervising the interrogation effort selected the interrogation teams from among the military and civilian interrogators, analysts, and interpreters.  Thus, the CACI PT interrogators were under the direct supervision and control of three layers of United States military personnel at Abu Ghraib prison, the ICE OIC, the ICE NCOIC, and the Section Leader for the section to which the CACI PT interrogator was assigned.  Porvaznik Decl. ¶ 14.  CACI PT personnel did not perform supervisory functions with respect to the conduct of the interrogation mission.  Daniels Decl. ¶ 2.

13.    CACI PT's interrogators performed their mission in a manner that was indistinguishable from the performance of the mission by U.S. military interrogators. Each interrogator, whether military or civilian, would review detainee packages and develop an interrogation plan. The interrogator would then present the proposed interrogation plan to the Section Leader, a member of the military, who would review the interrogation plan. The interrogation plan would subsequently be presented to the ICE OIC or the NCOIC, also military personnel, for review and approval. As a result, each interrogation plan was authorized at both the Section Leader level and the ICE NCOIC/OIC, or by higher military authority. Porvaznik Decl. ¶ 15; Northrop Decl. ¶ 10.

14.    After concluding an interrogation, the interrogator would prepare a draft Intelligence Information Report ("IIR") based on his or her Interrogation Notes ("INS"). The IIR would be entered into the military's computer server. Porvaznik Decl. ¶ 16.

15.    All databases and computer systems used by CACI PT employees were the property of the United States. All information entered into those databases by CACI PT employees was the property of the United States. The databases used by CACI PT personnel and into which CACI PT personnel entered information were the same servers used by military interrogators and into which military personnel entered information concerning the interrogations they had performed. Porvaznik Decl. ¶ 17; Northrop Decl. ¶ 11.

16.    From a functional standpoint, the only apparent differences between the CACI PT interrogators and military interrogators were that the CACI PT interrogators wore civilian clothes while their military counterparts wore uniforms, and – at least at Abu Ghraib prison – the CACI PT interrogators were billeted in a separate facility from the military interrogators. Brady Decl. ¶ 2; Daniels Decl. ¶ 2.

17.    In addition to direct supervision of the CACI PT interrogators' performance of interrogation tasks, CACI PT also reported to the COR, who was responsible for monitoring CACI's compliance with its contract and for contract administration.  For example, leave for CACI employees had to be approved in the first instance by the major subordinate command to which they were assigned, and leave policy had to be approved by the COR, and CACI's invoices had to be approved by the COR.  From October 2003 until February 2004, CACI PT reported to Lt. Colonel (now Colonel) William H. Brady, U.S. Army, for contract-related matters.  In February 2004, Major Eugene Daniels, U.S. Army assumed the duties of COR for the CACI PT contract.  Porvaznik Decl. ¶ 18; Northrop Decl. ¶ 12.

18.    The only supervisory positions held by CACI PT employees were purely internal CACI PT-related positions, such as country manager and site lead, that existed solely for providing administrative support to CACI personnel and for making liaison with U.S. Army personnel for contract-related issues.  These internal administrative managers did not exercise any operational control over CACI or military interrogators.  Porvaznik Decl. ¶ 19; Mudd Decl. ¶ 10; Brady Decl. ¶ 3.

19.    All CACI PT employees deployed to Iraq were issued Common Access Cards, Letters of Introduction, Uniform Services Identification Cards and Geneva Convention Cards by the Army.  These documents constituted formal authorization by the Army for CACI PT personnel to accompany the armed forces in the CJTF-7 theater of operations.  Billings Decl. ¶ 20.  CACI interrogators were all required to hold security clearances, which is a determination made exclusively by the United States.  Porvaznik Decl. ¶ 11; Northrop Decl. ¶ 7.

20.    As detailed above, the CACI PT contract specifically called for the CACI PT interrogators to perform under the direct supervision of United States military personnel, and

both CACI PT personnel and the Army personnel responsible for overseeing the CACI PT contract have provided sworn testimony that this military supervision in fact occurred. Porvaznik Decl. ¶ 9; Mudd Decl. ¶ 8; Brady Decl. ¶¶ 2, 3; Daniels Decl. ¶ 2.  The highest officials in the Department of Defense similarly have provided sworn testimony before Congress reinforcing that the civilian interrogators deployed to Iraq were at all times supervised by the military personnel in the units to which the civilian interrogators were assigned.

21.    On May 7, 2004, Secretary of Defense Rumsfeld Secretary of the Army Brownlee, and United States Central Command Deputy Commander Lieutenant General Lance Smith testified before the United States Senate Committee on Armed Forces.  In response to questioning by Senator McCain, Lieutenant General Smith testified as follows:

> Q:    Now were [the civilian interrogators at Abu Ghraib prison]
>        in charge of the interrogations?
>
> A:    Yes, sir.  There were 37 interrogators that were –
>
> Q:    I'm asking who was in charge of the interrogations.
>
> A:    ***They were not in charge.  They were interrogators.***
>
> Q:    My question is, who was in charge of the interrogations?
>
> A:    ***The brigade commander for the MI [military intelligence]
>        brigade.***

O'Connor Decl., Ex. 7 at 22 (emphasis added).

22.    In response to questioning by Senator Akaka as to the role of the civilian interrogators and linguists at detention facilities in Iraq and Afghanistan, Secretary Rumsfeld testified as follows:

> The answer is that the civilian contractors, as I indicated,
> numbered something like 37 in this particular facility [Abu Ghraib
> prison].   They tend to be interrogators and linguists.  ***They're
> responsible to MI personnel who hire them and have the
> responsibility for supervising them.***

O'Connor Decl., Ex. 7 at 44 (emphasis added).  Secretary Brownlee immediately amplified on

Secretary Rumsfeld's testimony by stating:

> In the theater, we have employed civilian contract interrogators and linguists.  CENTCOM has done this.  *These people have no supervisory responsibilities at all.  They work under the supervision of officers or noncommissioned officers (NCOs) in charge of whatever team or unit they are on.  They, most of them, are retired military, and they are usually of the skill that they retired in, and that's what they're employed for.  They assist in these processes, but they are not in a supervisory role.  In fact, they would be forbidden from doing that, because it would be inherently governmental.*

O'Connor Decl., Ex. 7 at 44 (emphasis added).

    23.    On July 22, 2004, Inspector General of the Army General Paul Mikolashek

testified before the Senate Committee on Armed Services.  General Mikolashek testified as

follows in response to questioning by Senator Akaka:

> Q:    Who did the contractors report to in the military chain of command?
>
> A:    *There is a military intelligence supervisor or detachment commander that they reported to for their day-to-day work, as stated in the contract.*
>
> Q:    Who in the military was responsible for overseeing or keeping track of the activities of the contractors?
>
> A:    *The immediate supervisor is responsible for how they perform their mission, their security, and what they did.  Of course there is a contracting officer that then ensures that the contract was being followed.  But in terms of what they did and how they performed, their oversight on a day-to-day basis was that military supervisor, that MI person in that organization to whom they reported.*

O'Connor Decl., Ex. 8 at 1022 (emphasis added).

    24.    CACI International Inc did not contract with any agency of the United States

government to provide interrogation services in support of the United States military's mission in

Iraq. No employee of CACI International Inc performed interrogation work in support of the United States' military's mission in Iraq. Declaration of Jeffrey Elefante in support of November 10, 2004 Motion of the CACI Defendants to Transfer Venue, ¶ 7.

Respectfully submitted,

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:    (202) 429-3000
Facsimile:    (202) 429-3902

**Attorneys for Defendants CACI International Inc and CACI Premier Technology, Inc.**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SALEH, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:05-CV-1165 (JR) |
| v. | ) |
| | ) |
| TITAN CORP. et al., | ) ORAL ARGUMENT REQUESTED |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF DEFENDANTS CACI INTERNATIONAL INC
AND CACI PREMIER TECHNOLOGY, INC.
<u>IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:    (202) 429-3000
Facsimile:    (202) 429-3902

**Attorneys for Defendants CACI International
Inc and CACI Premier Technology, Inc.**

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   ANALYSIS...........................................................................................................3

      A.    Standard for Summary Judgment Motions ..............................................3

      B.    The CACI Defendants Are Entitled To Summary Judgment On The Issue
            Of Preemption Because The Undisputed Evidence Shows That CACI PT
            Interrogators Performed The Same Functions As Military Interrogators In
            Iraq And Were Under The Direct Supervision Of Military Personnel ..................3

            1.    The Combatant Activities Exception to the Federal Tort Claims
                  Act........................................................................................................4

            2.    Plaintiffs' Have Alleged That CACI PT Interrogators Were
                  Integrated With and Under the Control of the U.S. Military in Iraq ..........8

            3.    The Undisputed Evidence Confirms that CACI PT Interrogators
                  Were Integrated With and Under the Control of the U.S. Military
                  in Iraq ...............................................................................................10

                  a.    The Statement Of Work Under Which CACI PT Provided
                        Interrogators in Iraq Clearly Provide For Total Military
                        Supervision And Control Over The Conduct Of
                        Interrogations By CACI PT Interrogators .......................................11

                  b.    Consistent With The Applicable Statements Of Work, the
                        CACI PT Interrogators Were Virtually Indistinguishable
                        From Military Interrogators As It Relates To Performance
                        Of Interrogation Duties .......................................................14

                  c.    The Highest Levels Of The United States Military
                        Hierarchy Have Testified That The Civilian Interrogators
                        Employed In Iraq Were At All Times Under The Direct
                        Supervision Of The United States Military .........................19

      C.    The Foreign Country Exception to the FTCA Bars Plaintiffs' Common
            Law Claims.............................................................................................22

      D.    The Intentional Tort Exception to the FTCA Bars Plaintiffs' Common
            Law Claims.............................................................................................25

III.  CONCLUSION..................................................................................................27

# TABLE OF AUTHORITIES

## CASES

*Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981)...........................................................25

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ..............................................................3

*Bancoult v. McNamara*, 370 F. Supp. 2d 1 (D.D.C. 2004)...............................................23

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) ..................................... passim

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................................3

*Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61 (D.D.C. 2005)......................................26

*Hamdi v. Rumsfeld*, 124 S. Ct. 2633 (2004) .......................................................................5

*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (2005) ................................................ passim

*Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 402 F.3d 1249 (D.C. Cir. 2005) .........26

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ....................................................................6

*Johnson v. United States*, 170 F.2d 767 (9th Cir. 1948)................................................5, 6

*Koch v. United States*, 209 F. Supp. 2d 89 (D.D.C. 2002) ..............................................26

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) .................................................5, 6

*Kugel v. United States*, 947 F.2d 1504 (D.C. Cir. 1991) .................................................26

*Majano v. Kim*, 2005 U.S. Dist. LEXIS 6562 (D.D.C. April 11, 2005)..........................26

*McKay v. Rockwell Int'l Corp.*, 704 F.2d 444 (9th Cir. 1983)...........................................6

*Ex parte Quirin*, 317 U.S. 1 (1942) ...................................................................................5

*Saleh v. Titan Corp.*, 05-1165, 2006 WL 1805611 (D.D.C. June 29, 2006) ......... passim

*Sosa v. Alvarez-Machain*, 124 S. Ct. 2739 (2004).....................................................22, 23

*United States v. Shearer*, 473 U.S. 52 (1985)..................................................................27

**STATUTES**

28 U.S.C. §§ 1346(b), 2671-80 .......................................................................................5

28 U.S.C. § 2680(j) ............................................................................................... passim

Fed. R. Civ. P. 56(c) ......................................................................................................3

**MISCELLANEOUS**

*Coalition Provisional Authority Order Number 17* .....................................................24

*Charlotte M. Liegl-Paul, Civilian Prisoners of War: A Proposed Citizen Code of
   Conduct,* 182 Mil. L. Rev. 106, 115 (2004)...........................................................18

*Joseph R. Perlak, The Military Extraterritorial Jurisdiction Act of 2000: Implications for
   Contractor Personnel,* 169 Mil. L. Rev. 92, 111 (2001) .......................................18

## I.    INTRODUCTION

Plaintiffs' action is for alleged mistreatment suffered while in the custody of the United States military, at prisons or other military facilities in the war zone of Iraq.  They bring this action only against civilian contractors that provided civilian interrogators and linguists to augment the United States military's interrogation mission in these combat theater detention facilities.  They seek no direct recourse against the United States, undoubtedly in recognition that the Government is immune from suit for the same allegations of misconduct.  Plaintiffs seek relief not only for the alleged acts or omissions of these civilian contractors, but also for their participation in a purported conspiracy with any number of U.S. military and government officials involving the prosecution of the Iraq war.  Under the shroud of this so-called "Torture Conspiracy," Plaintiffs seek to attribute each and every act of mistreatment by any individual in Iraq, military or civilian, to the contractors sued here.

On June 29, 2006, the Court dismissed many of the counts asserted by Plaintiffs on the grounds that Plaintiffs' claims failed as a matter of law.  In doing so, the Court relied on and incorporated by reference its prior decision in *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (2005) ("*Ibrahim*").  As in *Ibrahim*, the only counts remaining in this case are some of Plaintiffs' common law tort counts, including conspiracy and aiding abetting claims based on those same torts.  With respect to those claims, the Court incorporated by reference its reasoning in *Ibrahim* that it lacked an adequate factual basis for determining whether Plaintiffs' claims are preempted, and invited the Defendants to file summary judgment motions addressing the preemption argument.  *Saleh v. Titan Corp.*, 05-1165, 2006 WL 1805611 at *4 (D.D.C. June 29, 2006) ("the next step must be to determine whether the defendants' employees 'were essentially acting as soldiers'").

Summary judgment is clearly appropriate.  The undisputed evidence demonstrates that the civilian interrogators that CACI Premier Technology, Inc. ("CACI PT") [1] provided in support of the United States military's mission in Iraq were in all material ways indistinguishable from their military counterparts.  The CACI PT interrogators and their military counterparts answered to the same military chain of command, were subject to the same rules for interrogations, and had the same interrogation reporting obligations.  This treatment of CACI PT interrogators as indistinguishable from military interrogators, and fully answerable to the military intelligence chain of command, is entirely consistent with the provisions of the relevant contracts, which recognized that any interrogators provided by CACI PT would take their marching orders from military personnel.  In all material respects, the day-to-day performance and operations of CACI PT interrogators were under the direction, control and supervision of the U.S. Army.  These circumstances were fully confirmed by the Congressional testimony of military and civilian authorities.

Under these circumstances, allowing battlefield tort claims would clearly conflict with Congress's determination, as embodied in the combatant activities exception to the Federal Tort Claims Act, that no tort claims should arise out of combatant activities.  Similarly, Plaintiffs' claims are barred by the foreign country exception to the FTCA because their alleged injuries occurred in Iraq, as well by the intentional tort exception.  Therefore, the Court should enter

---

[1] CACI International Inc did not supply any contract interrogators in support of the United States military's mission in Iraq.  *See* Statement of Undisputed Material Facts ¶ 24.  As this Court recognized in the June 29, 2006 Order, Plaintiffs' have declined to plead additional facts demonstrating independent bases for holding that Defendant liable.  *Saleh*, 2006 WL 1805611 at *3 Plaintiffs' claims against CACI International Inc sound in negligence based on the actions of CACI PT employees, and are insufficient to "pierce the corporate veil" of CACI International Inc.  *Id.*  To the extent Plaintiffs are preempted from asserting tort claims based on the actions of CACI PT employees in Iraq, they are equally preempted from asserting the same (or derivative claims) against CACI PT's ultimate corporate parent.

summary judgment in favor of the CACI Defendants because Plaintiffs' remaining common law

tort claims are preempted by federal law.

## II.    ANALYSIS

### A.    Standard for Summary Judgment Motions

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-34

(1986). While the Court must view the evidence and draw inferences in the light most favorable

to the nonmoving party, the Court can deny a motion for summary judgment only if sufficient

evidence exists favoring the non-moving party which would allow a reasonable jury to return a

verdict for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). Entry of summary

judgment is required "against a party who fails to make a sufficient showing to establish the

existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B.    The CACI Defendants Are Entitled To Summary Judgment On The Issue Of Preemption Because The Undisputed Evidence Shows That CACI PT Interrogators Performed The Same Functions As Military Interrogators In Iraq And Were Under The Direct Supervision Of Military Personnel

In *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), the Supreme Court held that

federal law preempted state law tort claims against the supplier of a military helicopter. In so

holding, the Court ruled that state tort law may be preempted when "'uniquely federal interests'

are . . . committed by the Constitution and laws of the United States to federal control." *Id.* at

504 (citations omitted). When "uniquely federal interests" are implicated by a tort suit,

preemption is required when "a 'significant conflict' exists between an identifiable federal policy

or interest and the [operation] of state law, or the application of state law would frustrate specific objectives of federal legislation." *Id.* at 507 (internal quotations and citations omitted).

This Court has already held in *Ibrahim*, and incorporated by reference in the *Saleh* decision, that "the treatment of prisoners during wartime implicates 'uniquely federal interests.'"[2] 391 F. Supp. 2d at 18; *see also Boyle*, 487 U.S. at 505-06 (holding that "the civil liabilities arising out of the performance of federal procurement contracts" implicates a "uniquely federal" interest for purposes of a preemption analysis). That holding applies with even greater force here, where Plaintiffs have asserted that the Defendants are liable for their participation in a vast "Torture Conspiracy" involving the Secretary of Defense, two Undersecretaries of Defense, and at least thirty members of the United States military. This allegation of a vast, overarching conspiracy underscores how the "uniquely federal interest" is even greater than in *Ibrahim*. Plaintiffs' common law claims against the CACI Defendants are preempted if allowing Plaintiffs to assert claims against a civilian contractor for injuries they allege that they incurred in a United States combat theater detention facility as a result of a conspiracy involving United States government and military officials would conflict with the unique federal interest involved.

## 1.    The Combatant Activities Exception to the Federal Tort Claims Act

The starting point for this analysis is the fact that Congress has determined, through the "combatant activities" exception to the Federal Tort Claims Act, that the United States should not be liable for tort claims based on injuries arising out of combatant activities. *See* 28 U.S.C. §

---

[2] Indeed, Plaintiffs' Third Amended Complaint asserts that interrogation is such an "inherently governmental function" that it cannot be contracted out. TAC ¶ 71.

2680(j).[3]  Based on this exception, the United States is immune from suit for claims such as

those asserted by Plaintiffs, as the detention and interrogation of prisoners at a United States

detention facility in a combat zone is a quintessential "combatant activity."  *See Hamdi v.*

*Rumsfeld*, 124 S. Ct. 2633, 2640 (2004) (noting that arrest and detention activities "by 'universal

agreement and practice,' are 'important incident[s] of war'" (citing *Ex parte Quirin*, 317 U.S. 1

(1942))); *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948) (noting that the term

"combatant activities" includes "not only physical violence, but activities both necessary to and

in direct connection with actual hostilities").[4]

As this Court observed in *Ibrahim*, the combatant activities exception to the FTCA

"seems to represent Congressional acknowledgement that war is an inherently ugly business for

which tort claims are simply inappropriate."  391 F. Supp. 2d at 18.  The Ninth Circuit reached

the same conclusion in *Koohi v. United States*, 976 F.2d 1328, 1337 (9th Cir. 1992), holding that

allowing claims against military contractors when the combatant activities exception bars a claim

---

[3] The FTCA provides a limited waiver of the United States' sovereign immunity for civil actions against the federal government.  *See* 28 U.S.C. §§ 1346(b), 2671-80.  The waiver permits civil actions against the United States for injuries to persons or property caused by the negligent or wrongful acts or omissions of government employees acting within the scope of their employment where the United States, if it had been a private person, would have been liable to the claimant.  *Id.*  Excepted from this waiver of immunity are claims arising "out of the combatant activities of the military or naval forces, or the coast guard, during time of war."  28 U.S.C. § 2680(j).

[4] In opposing the CACI Defendants' Motion to Dismiss, Plaintiffs made the novel argument that the combatant activities exception does not reach the detention and interrogation of persons in a combat-zone activity, because "imprisoning plaintiffs and class members kept them *out* of combat."  This Court's decisions in *Ibrahim* and *Saleh* necessarily rejected Plaintiffs' absurd construction of "combatant activities" in holding that those plaintiffs' claims potentially were preempted by the combatant activities exception.  391 F. Supp. 2d at 19; 2006 WL 1805611 at *4.  Such an argument is directly contrary Supreme Court's observation in *Hamdi*, 547 U.S. at 507, and well-established case law.  Moreover, it defies logic and common sense to suggest that forcibly detaining personnel from the battlefield, while interrogating them to obtain battlefield intelligence, is anything other than a combat activity.

as against the United States "would create a duty of care where the combatant activities exception is intended to ensure that none exists." Given that the combatant activities exception is grounded in the determination that no duty should exist on the battlefield, allowing detainees of the United States to skirt the exception by suing private contractors instead of the United States completely undermines Congress's intent in excepting injuries arising out of combatant activities from the United States' waiver of sovereign immunity. *See McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 449 (9th Cir. 1983) (holding that allowing claims to go forward against a defense contractor performing under a federal contract while the FTCA prohibits the same claim against the United States "would be to judicially admit at the back door that which has been legislatively turned away at the front door") (quoting *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673 (1977)).

There are at least two reasons why allowing tort suits to proceed against civilian contractors for injuries occurring as a result of combatant activities seriously conflicts with the federal interest embodied in the combatant activities exception. *First*, allowing such suits creates a tort duty where one otherwise would not exist, and thereby impairs the military commander's ability to conduct military operations where a civilian contractor has any arguable connection to such operations. *See Johnson v. Eisentrager*, 339 U.S. 763, 778 (1950); *Koohi*, 976 F.2d at 1335; *Johnson v. United States*, 170 F.2d 767, 769 (9th Cir. 1948). Placed into the context of this suit, the commander would know that detainees claiming injuries arising out of their interrogation by military personnel would have no claim against the United States, but that the similar use of any civilian interrogator would open the mission to the specter of tort litigation. The result would be two completely different legal regimes applicable to precisely the same activity conducted under the auspices of precisely the same military unit and commander,

depending on whether the interrogator at issue is a soldier or a civilian. This problem is even more attenuated in this case, where Plaintiffs are attempting to impose tort liability for injuries sustained at the hands of *any* interrogator, whether military or civilian, so long as the offending individual was a member of the purported "Torture Conspiracy." In enacting the combatant activities exception to the FTCA, Congress sought to avoid fettering military commanders with the prospect of tort claims arising out of the prosecution of war, an interest that would be defeated by allowing such claims to proceed against civilian contractors who then would have to conform their conduct in order to avoid the risk of tort suits arising under whatever jurisdiction's tort law might apply.

*Second*, allowing claims against civilian contractors where the United States remains immune from suit indirectly passes onto the government costs that it sought to relieve itself of through exceptions to its waiver of sovereign immunity. *See Boyle*, 487 U.S. at 512. As this Court has observed, the allowance of tort claims against civilian contractors, particularly where the United States is itself immune from suit, invariably will cause civilian contractors to increase contract prices to account for the possibility of tort suits. *Ibrahim*, 391 F. Supp. 2d at 18. Indeed, because of the United States' immunity from claims arising out of combatant activities, a civilian contractor could expect an increased risk of suits that in reality are based on conduct solely of the United States but are recast in an effort to implicate a civilian contractor because of the United States' immunity from suit. Of course, this is precisely what is happening here, where Plaintiffs are attempting to hold CACI Defendants liable for the acts of members of the U.S. military who have been implicated in the media in misconduct at Abu Ghraib prison simply by alleging that those individuals are also members of the "Torture Conspiracy." *See* TAC ¶¶ 28, 78. Of even greater concern, the risk of tort liability might cause contractors to be reluctant

bid for certain projects, such as battlefield support tasks, that are of great importance to the national interest. *Id.*

In assessing the Defendants' preemption arguments at the motion to dismiss stage, the Court incorporated its prior ruling in *Ibrahim*, that "the defendants had not provided enough factual support for their government contractor preemption defense." *Saleh*, 2006 WL 1805611 at *1. In *Ibrahim*, the Court indicated that the defense would depend on the nature of the Defendants' activities in Iraq and the extent to which those activities were indistinguishable from the activities of military personnel. 391 F. Supp. 2d at 19. Specifically, the Court identified as relevant issues the civilian interrogators' contractual responsibilities, the reporting chain for civilian interrogators, the manner by which civilian interrogators were supervised, and the structure of command and control over civilian interrogators. *Id.* The allegations of the Third Amended Complaint ("TAC"), and more importantly, the undisputed facts show that all of these issues support the entry of summary judgment in favor of the CACI Defendants, as the responsibilities, supervision, and reporting requirements of CACI PT interrogators were *identical* to those of their military interrogator counterparts.

### 2. Plaintiffs' Have Alleged That CACI PT Interrogators Were Integrated With and Under the Control of the U.S. Military in Iraq

Plaintiffs' own averments provide the starting point for assessing CACI PT's interrogators. The TAC avers that CACI PT employees worked together with military officers, were subject to military rather than CACI supervision, and gave orders to uniformed U.S. soldiers. These allegations are acknowledgments by Plaintiffs that CACI PT employees were integrated into U.S. military operations in a way that supports application of the combatant activities exception. For example, the TAC incorporates a public job description of one of the positions at issue under one of the CACI PT contracts for Interrogation Services:

> Assists the U.S. Military interrogation support program leader (under direction and supervision) to increase the effectiveness of getting intelligence information from Detainees, Persons of Interest and Prisoners of War (POWs) that are in the custody of US/Coalition Forces in the CJTF 7 AOR, in terms of screening, interrogation, and debriefing of persons of intelligence value. Under minimal CACI supervision [see Additional Job Information below], will assist the government team leader in managing a multifaceted interrogation support cell consisting of database entry/intelligence clerks, screeners, tactical/strategic interrogators, and intelligence analysts.

TAC ¶ 74. This incorporated description makes clear that the CACI employees were integrated with "the U.S. Military interrogation support program." *Id.* Plaintiffs themselves allege that the employees at issue were not subject to CACI's supervision, but instead to the "direction and supervision" of the U.S. Military interrogation support program team leader. *Id.* This allegation is consistent with the theory advanced throughout the TAC – that CACI PT employees were not supervised by the CACI Defendants, but instead were sent to work directly with military interrogation units, subject to the military's supervision and control. Consistent with this, Plaintiffs also aver that the civilian interrogators and the military units worked in concert in Iraq, *see* TAC ¶¶ 28-29, 78-81, 91, and that civilian interrogators gave orders to uniformed soldiers that were obeyed. TAC ¶ 78-80. Thus, though not necessary for the application of the combatant activities exception, CACI PT interrogators were, within the context of the military interrogation units in Iraq, "essentially acting as soldiers." *Ibrahim*, 391 F. Supp. 2d at 19.

Additionally, Plaintiffs' lawsuit is predicated on allegations that CACI PT interrogators conspired with soldiers on the ground, as well as other "military and U.S. government officials," to implement a program of torture and mistreatment in U.S. military prisons in Iraq. *See* TAC ¶¶ 28-29, 97-107; *see also* TAC ¶¶ 65-67, 78-81, 83, 90-91, 96. Thereafter, Plaintiffs do not state whether the alleged acts of wrongdoing were committed by military personnel or

civilian contractors, instead lumping all acts together and attributing them to the "Torture Conspirators." TAC ¶¶ 114-61. Thus Plaintiffs seek to attribute every act of alleged mistreatment by any individual, military or civilian, to the civilian Defendants in this case. These allegations that civilian interrogators conspired and worked closely with military and government officials are further admissions of one relevant fact – that the civilian contractors were working as a part of a coordinated military effort within the war zone of Iraq. That Plaintiffs' claim that the unnamed government and military officials were acting illegally (*e.g.*, TAC ¶¶ 1, 28) is of no moment to the combatant activities exception. The point of the combatant activities exception is to ensure that United States forces fighting a war do so free from the threat of civil litigation at home. *Ibrahim*, 391 F. Supp. 2d at 18-19 *quoting Johnson v. Eisenstrager*, 339 U.S. 763, 778 (1950). Thus, Plaintiffs' allegations of a vast "Torture Conspiracy" provide further evidence that application of the combatant activities exception is appropriate.

> **3.     The Undisputed Evidence Confirms that CACI PT Interrogators Were Integrated With and Under the Control of the U.S. Military in Iraq**

The TAC's allegations are confirmed by the undisputed evidence, which demonstrates that the United States military's supervision and control of CACI PT interrogators' performance of their interrogation duties was complete and omnipresent. First, the contractual documents pursuant to which CACI PT provided interrogation services in Iraq expressly provided for U.S. Military supervision and control of CACI PT interrogators. Second, the testimony of CACI and U.S. Military personnel who were involved in the day to day work under the CACI PT contracts demonstrates that the CACI interrogators were fully integrated with the U.S. Military in Iraq.

Third, and finally, high-ranking military and civilian officials have testified under oath that CACI PT interrogators were under the control of the U.S. Military in Iraq.

<blockquote>
**a.** **The Statements Of Work Under Which CACI PT Provided Interrogators In Iraq Clearly Provide For Total Military Supervision And Control Over The Conduct Of Interrogations By CACI PT Interrogators**
</blockquote>

The CACI PT contract documents established the parameters for military control of interrogation operations. CACI PT provided civilian interrogators in support of the United States' mission in Iraq under two delivery orders, Delivery Order 35 ("DO 35") and Delivery Order 71 ("DO 71) issued by the Government pursuant to CACI PT's GSA schedule contract. Declaration of Mark Billings, ¶ 13.[5]  The Statement of Work for DO 35 made it clear that the civilian interrogators provided by CACI PT in Iraq would, at all times, be under the direction, supervision and control of the military chain of command with respect to their performance of the interrogation mission. For example, the Statement of Work for DO 35 provided that CACI PT would "provide Interrogation Support Cells, *as directed by military authority*, throughout the CJTF-7 AOR to assist, supervise, coordinate, and monitor all aspects of interrogation activities, in order to provide timely and actionable intelligence to the commander." Billings Decl., Ex. A at ¶ 3 (emphasis added).

Similarly, the Statement of Work for DO 35 made clear that CACI PT personnel would be fully integrated with military personnel in performing intelligence analysis, screening and interrogation tasks, that priorities and tasks would be established by the Coalition Joint Task Force-7 ("CJTF-7"), and that those tasks were required to be performed in accordance with Government regulations:

---

[5] All Declarations referenced in this brief are attached as exhibits to the Declaration of John F. O'Connor, filed on December 16, 2005. (Exhibit 1).

> *Identified personnel supporting this effort will be integrated into MIL/CIV analyst, screening, and interrogation teams (both static/permanent facilities and mobile locations), in order to accomplish CDR CJTF-7 priorities and tasking IAW Department of Defense, U.S. Civil Code and International Regulations.*

Billings Decl., Ex. A at ¶ 4 (emphasis added).  Indeed, the Statement of Work for DO 35 contains numerous other entries that made clear that CACI PT interrogators performed their duties at all times under the supervision, control and direction of U.S. military personnel:

- Section 4 of the Statement of Work made clear that interrogators would deal only with "detainees, persons of interest, and Enemy Prisoners of War (EPWs) that are in the custody of U.S./Coalition Forces in the CJTF-7 AOR."

- Section 5 of the Statement of Work provided that CACI PT personnel "will be required to travel (ground/air), as task/directed throughout the CJTF AOR in order to accomplish directed mission."

- Section 6 of the Statement of Work provided that CACI PT interrogators would conduct interrogations "IAW local SOP and higher authority regulations," would review data collected and cross-reference intelligence collection priorities and plans "IAW interrogation SOPs and plan," "will conduct other intelligence supporting activities related to interrogation operations *as directed*," and "will report findings of interrogation IAW with local reference documents, SOPs, and higher authority regulations *as required/directed.*" (emphasis added)

- Section 7 of the Statement of Work specified qualification criteria for interrogators, specifying that they "should be the civilian equivalent to one of the following:  "97E, 351E, Strategic Debriefer or an individual with a similar skill set."

- Section 14 of the Statement of Work specified the place of performance: "The Government intends the contractor personnel to perform from the offices of the CJTF-7 Iraq and its designated interrogation facilities."

- Section 15 of the Statement of Work required that CACI interrogators had to have "DoD Security Clearances."

- Section 20 of the Statement of Work provided that the government would provide CACI PT with:

■ The appropriate documentation commensurate with that given to DoD civilians in the Theater of operations: deploying Contractors will be issued a Uniform Services Identification Card, DD Form 1173, and a Geneva Conventions Identity Card, DD Form 489. CJTF-7 will provide the Contractor with a Letter of Authorization (LOA) that allows Army Units to issue necessary equipment, tests, shots, and training to the Contractor employee.

■ Appropriate individual readiness training (IRT), area orientations and training/briefings on rules of engagement and general orders applicable to U.S. Armed Forces, DOD Civilians, and U.S. Contractors as issued by the Theater Commander or his/her representative.

■ Force Protection Measures.

■ On-site transportation to fulfill contract/mission requirements.

■ Work space and facilities as required to fulfill contract/mission requirements.

*See generally* Billings Decl., Ex. A.

The Statement of Work for DO 71 contains similar provisions demonstrating that the CACI PT interrogators would be integrated within the United States military's interrogation command and would be under the direct supervision and control of the United States military chain of command. *See* Billings Decl., Ex. C at ¶¶ 3, 4, 10-17. Of particular note, the Statement of Work for DO 71 explicitly provided that CACI PT's intelligence support personnel, including interrogators, operated under the control and direction of the military command:

> As the operational element, HSTs (HUMINT Support Teams) support the overall divisional/separate Brigade HUMINT mission, and **perform under the direction and control of the unit's MI chain of command or Brigade S2, as determined by the supported command.**

Billings Decl., Ex. C at ¶ 3.  Similarly, the Statement of Work for DO 71 provided that for CACI PT interrogators: "All actions [of the interrogators provided under DO 71] will be managed by the Senior CI [Counter-Intelligence] Agent," a member of the United States military.  Billings Decl., Ex. C at ¶ 4.d.

In contrast, the Statements of Work for DO 35 and DO 71 made clear that CACI PT's supervision was administrative in nature.  For example, Section 5 of the DO 35 Statement of Work recognized that it was CACI PT's responsibility to provide supervision for all of its personnel.  CACI PT did so by assigning personnel to serve as country manager and site leads. Those CACI PT administrative personnel in Iraq had supervisory responsibility for all CACI PT personnel with respect to personnel, finance, and related matters.  Billings Decl. ¶ 19.  DO 71 contained provisions substantially similar to the provisions of Section 5 of the Statement of Work DO 35.  Thus, by the express terms of the contracts, CACI PT's interrogators operated under the direction and control of the U.S. Military, while receiving administrative support from CACI PT.

**b.    Consistent With The Applicable Statements Of Work, The CACI PT Interrogators Were Virtually Indistinguishable From Military Interrogators As It Relates To Performance Of Interrogation Duties**

The experience of CACI PT interrogators on the ground in Iraq reflected, in every material way, supervision an control by the military.  As required by the applicable Statements of Work, CACI PT interrogators were integrated within the military interrogation process of the military units that they were assigned to support.  That is, the CACI PT interrogators received the same operational interrogation taskings and direction from the military as their military interrogator counterparts.  All of the interrogators in the Iraq theater of operations – military and civilian – were treated as part of one team and as having the same interrogation responsibilities,

reporting obligations, and mission direction. Declaration of Daniel J. Porvaznik ¶ 9; Declaration of Charles Mudd ¶ 8; Declaration of COL William H. Brady ¶¶ 2, 3; Declaration of LTC William Daniels ¶ 2.

As a preliminary matter, the United States military had total control over whether any CACI PT interrogator could work in Iraq. CACI PT interrogators were pre-approved by the U.S. military for deployment to Iraq before they were deployed. As part of that approval, CACI PT interrogators were all required to hold security clearances, which was determined exclusively by the United States. Porvaznik Decl. ¶ 11; Northrop Decl. ¶ 7. The United States military, through its Contracting Officer's Representative ("COR") similarly determined whether CACI PT should remove an employee from the contract. Porvaznik Decl. ¶ 10; Mudd Decl. ¶ 9; Northrop Decl. ¶ 6.

Once in Iraq, the CACI PT interrogators were integrated in the command chain of the U.S. Military. For example, at Abu Ghraib prison, all of the military interrogators and CACI PT interrogators were under the control and supervision of the Officer in Charge ("OIC") of the Interrogation Control Element ("ICE"). During the relevant time frame, the OIC of the ICE was Captain Carolyn Wood, U.S. Army. Military and CACI PT interrogators also reported to the Noncommissioned Officer in Charge ("NCOIC") at the ICE. The NCOIC, also a member of the United States Army, reported directly to the OIC of the ICE. Porvaznik Decl. ¶ 12; Northrop Decl. ¶ 8. Below the ICE OIC and NCOIC in the chain of command were Section Leaders, who were also all members of the United States Army. Each Section Leader was responsible for supervision and control of between four and eight interrogation teams, which included CACI PT interrogators. Thus, the CACI PT interrogators were under the direct supervision and control of three layers of United States military personnel at Abu Ghraib prison, the ICE OIC, the ICE

NCOIC, and the Section Leader for the section to which the CACI PT interrogator was assigned. Porvaznik Decl. ¶ 14.

To conduct interrogations, the United States Army supervisory personnel described above selected interrogation teams from among the military and civilian interrogators, analysts, and interpreters. CACI PT personnel did not perform supervisory functions with respect to the conduct of the interrogation mission. Daniels Decl. ¶ 2. Each interrogation team consisted of an interrogator, an intelligence analyst and an interpreter. Within these teams, CACI PT's interrogators performed their mission in a manner that was indistinguishable from the performance of the mission by U.S. military interrogators. Each interrogator, whether military or civilian, would review detainee packages and develop an interrogation plan. The interrogator would then present the proposed interrogation plan to the Section Leader, a member of the military, who would review the interrogation plan. The interrogation plan would subsequently be presented to the ICE OIC or the NCOIC, also military personnel, for review and approval. .Porvaznik Decl. ¶ 13; Billings Decl. ¶ 21; Northrop Decl. ¶ 9. In reviewing these interrogation plans, the United States military had exclusive responsibility for setting all Interrogation Rules of Engagement ("IROEs"). Only the OIC or the NCOIC or higher military authority could approve any deviation from the IROEs. As a result, each interrogation plan was authorized at both the Section Leader level and the ICE NCOIC/OIC, or by higher military authority. Porvaznik Decl. ¶ 15; Northrop Decl. ¶ 10.

After concluding an interrogation, the interrogator would prepare a draft Intelligence Information Report ("IIR") based on his or her Interrogation Notes ("INS"). The IIR would be entered into the military's computer server. Porvaznik Decl. ¶ 16. Both military and CACI PT interrogators were responsible for submitting IIRs into the same military databases. Indeed, all

databases and computer systems used by CACI PT employees were the property of the United States, and all of the information entered into those databases by CACI PT employees was the property of the United States. Porvaznik Decl. ¶ 17; Northrop Decl. ¶ 11.

In addition to direct supervision of the CACI PT interrogators' performance of interrogation tasks, CACI PT also reported to the COR, who was responsible for monitoring CACI's compliance with its contract and for contract administration. For example, leave for CACI employees had to be approved in the first instance by the major subordinate command to which they were assigned, and leave policy had to be approved by the COR, and CACI's invoices had to be approved by the COR. From October 2003 until February 2004, CACI PT reported to Lt. Colonel (now Colonel) William H. Brady, U.S. Army, for contract-related matters. In February 2004, Major Eugene Daniels, U.S. Army assumed the duties of COR for the CACI PT contract. Porvaznik Decl. ¶ 18; Northrop Decl. ¶ 12. .

Yet another indicia of the parity of military and civilian interrogators is the identical legal protection to which both were entitled. Specifically, CACI PT personnel in Iraq were entitled to the same legal protections as military combatants. If captured, a combatant who has complied with international law is entitled to be treated as a prisoner of war. Geneva Convention Relative to the Treatment of Prisoners of War, August 12, 1949, Articles 5, 13, 99, 6 U.S. Stat. 3316 (entered into force October 21, 1950). Non-combatants, as a general rule, are not entitled to this treatment. Unlike the vast majority of non-combatants, however, CACI PT personnel in Iraq were entitled to the legal protection afforded to military prisoners of war. All CACI PT employees that deployed to Iraq were issued Common Access Cards, Letters of Introduction, Uniform Services Identification Cards, and Geneva Convention Cards by the Army. Billings Decl. ¶ 20. This constituted authorization to accompany the armed forces in the CJTF-7 Theater

of Operations. *Id.* As a result, as with surrendering combatants and *hors de combat* (i.e., prisoners of war, wounded and sick, medical personnel, chaplains, and civilians accompanying the armed forces), CACI PT personnel, if captured, were entitled to treatment as a prisoner of war.[6] 1907 Hague Convention No. IV, Respecting the Laws and Customs of War on Land, Oct. 18, 1907, Art. 13, regulations, 36 Stat. 2277; Geneva Convention Relative to the Treatment of Prisoners of War, August 12, 1949, Art. 4A(4), 6 U.S. Stat. 3316 (entered into force October 21, 1950) (providing prisoner of war status to "[p]ersons who accompany the armed forces without actually being members thereof, such as . . . supply contractors [and] members of labour units . . provided they have received authorization, from the armed forces which they accompany, who shall provide them for that purpose with an identity card").[7]

At bottom, the only functional differences between the CACI PT interrogators and military interrogators were that the CACI PT interrogators wore civilian clothes while their military counterparts wore uniforms, and – at least at Abu Ghraib prison – the CACI PT interrogators were billeted in a separate facility from the military interrogators. Brady Decl. ¶ 2;

---

[6] Similarly, Plaintiffs have averred that CACI PT interrogators were reciprocally bound by the laws of war and the Geneva Conventions with respect to the treatment of detainees in Iraq. *See* TAC ¶¶ 31, 41, 73, 101.

[7] *See* Charlotte M. Liegl-Paul, *Civilian Prisoners of War: A Proposed Citizen Code of Conduct*, 182 Mil. L. Rev. 106, 115 (2004) ("Civilian employees and contractors are generally entitled to prisoner of war status if they have 'fallen into the power of the enemy' during an international armed conflict and are 'persons who accompany the armed forces without actually being members thereof.' The civilian accompanying the force must also possess authorization from the armed forces, generally by way of an armed forces-issued identification card."); Joseph R. Perlak, *The Military Extraterritorial Jurisdiction Act of 2000: Implications for Contractor Personnel*, 169 Mil. L. Rev. 92, 111 (2001) (noting that contractor personnel with authorization to accompany an armed force in a combat theater "clearly are covered" by the prisoner of war provisions of the third Geneva Convention); Rebecca R. Vernon, *The Future of Competitive Sourcing*, 33 Pub. Cont. L.J. 369, 408 (2004) ("Army policy states that as long as contractor employees carry Geneva Convention Cards, they are entitled to prisoner-of-war status.").

Daniels Decl. ¶ 2.  The only supervisory positions held by CACI PT employees were purely internal CACI PT-related positions, such as country manager and site lead, that existed solely for providing administrative support to CACI personnel and communicating with U.S. Army personnel for contract-related issues.  These internal administrative managers did not exercise any operational control over CACI or military interrogators.  Porvaznik Decl. ¶ 19; Mudd Decl. ¶ 10; Brady Decl. ¶ 3.  Thus, in every relevant way, the CACI PT interrogators were  otherwise indistinguishable from their military counterparts.

> **c.**    **The Highest Levels Of The United States Military Hierarchy Have Testified That The Civilian Interrogators Employed In Iraq Were At All Times Under The Direct Supervision Of The United States Military**

As detailed above, the CACI PT contract specifically called for the CACI PT interrogators to perform under the direct supervision of United States military personnel, and both CACI PT personnel and the Army personnel responsible for overseeing the CACI PT contract have provided sworn testimony that this military supervision in fact occurred.  Porvaznik Decl. ¶ 9; Mudd Decl. ¶ 8; Brady Decl. ¶¶ 2, 3; Daniels Decl. ¶ 2.  The highest officials in the Department of Defense similarly have provided sworn testimony before Congress reinforcing that the civilian interrogators deployed to Iraq were at all times supervised by the military personnel in the units to which the civilian interrogators were assigned.

For example, on May 7, 2004, Secretary of Defense Rumsfeld, Secretary of the Army Brownlee, and United States Central Command Deputy Commander Lieutenant General Lance Smith testified before the United States Senate Committee on Armed Forces.  In response to questioning by Senator McCain, Lieutenant General Smith testified as follows:

> Q:    Now were [the civilian interrogators at Abu Ghraib prison]
>        in charge of the interrogations?

A:    Yes, sir.  There were 37 interrogators that were –

Q:    I'm asking who was in charge of the interrogations.

A:    ***They were not in charge.  They were interrogators.***

Q:    My question is, who was in charge of the interrogations?

A:    ***The brigade commander for the MI [military intelligence] brigade.***

O'Connor Decl., Ex. 7 at 22 (emphasis added).  Similarly, in response to questioning by Senator

Akaka as to the role of the civilian interrogators and linguists at detention facilities in Iraq and

Afghanistan, Secretary Rumsfeld stated:

> The answer is that the civilian contractors, as I indicated, numbered something like 37 in this particular facility [Abu Ghraib prison].  They tend to be interrogators and linguists.  ***They're responsible to MI personnel who hire them and have the responsibility for supervising them.***

O'Connor Decl., Ex. 7 at 44 (emphasis added).  Secretary Brownlee immediately amplified on

Secretary Rumsfeld's testimony by stating:

> In the theater, we have employed civilian contract interrogators and linguists.  CENTCOM has done this.  ***These people have no supervisory responsibilities at all.  They work under the supervision of officers or noncommissioned officers (NCOs) in charge of whatever team or unit they are on.  They, most of them, are retired military, and they are usually of the skill that they retired in, and that's what they're employed for.  They assist in these processes, but they are not in a supervisory role.  In fact, they would be forbidden from doing that, because it would be inherently governmental.***

O'Connor Decl., Ex. 7 at 44 (emphasis added).

Finally, on July 22, 2004, Inspector General of the Army General Paul Mikolashek

testified before the Senate Committee on Armed Services.  General Mikolashek testified as

follows in response to questioning by Senator Akaka:

Q:    Who did the contractors report to in the military chain of command?

A:    ***There is a military intelligence supervisor or detachment commander that they reported to for their day-to-day work, as stated in the contract.***

Q:    Who in the military was responsible for overseeing or keeping track of the activities of the contractors?

A:    ***The immediate supervisor is responsible for how they perform their mission, their security, and what they did. Of course there is a contracting officer that then ensures that the contract was being followed. But in terms of what they did and how they performed, their oversight on a day-to-day basis was that military supervisor, that MI person in that organization to whom they reported.***

O'Connor Decl., Ex. 8 at 1022 (emphasis added). This testimony from the highest levels of the United States Military confirms what is set forth in the contractual Statements of Work, and the evidence from CACI PT and U.S. military personnel who performed work under those contracts. Because the CACI PT interrogators were indistinguishable from their military counterparts in every relevant way in the performance of their interrogation duties, allowing tort suits to proceed against the CACI Defendants when the United States is itself immune from suit for the same claims would create a significant conflict with the United States' interest in prosecuting a war without the specter of tort suits arising out of the United States' conduct of that war. Therefore, based on the undisputed evidence on the CACI PT interrogators' *total* integration into the military chain of command and overall interrogation mission, the Court should enter summary judgment in the CACI Defendants' favor on all of the counts that have not been dismissed to date.[8]

---

[8] Plaintiffs have also previously argued that the combatant activities exception is not applicable because "human rights claims" *per se* cannot be preempted by federal law. This unsupportable argument has been rejected by the Court in its prior rulings in *Ibrahim* and this

C.    **The Foreign Country Exception to the FTCA Bars Plaintiffs' Common Law Claims**

In *Ibrahim,* this Court recognized that the foreign country exception to the FTCA, like the combatant activities exception, might bar Plaintiffs' common law claims in that case. The Court, however, declined to rule on the issue because the parties had not substantially discussed the foreign country exception and it appeared to present a number of very complex issues. 391 F. Supp. 2d at 19 n.6. The Court similarly declined to address the foreign country exception in ruling on the Defendants' motions to dismiss in this case, leaving it for summary judgment.

The foreign country exception to the FTCA retains sovereign immunity with respect to "any claim arising in a foreign country." 28 U.S.C. § 2680(k). The Supreme Court has held that the United States is immune from suit for injuries arising outside the United States without regard to whether foreign law might *actually* apply under modern choice of law principles. *Sosa v. Alvarez-Machain,* 124 S. Ct. 2739, 2754 (2004). Congress limited the United States' waiver of sovereign immunity to claims arising within the United States. *Sosa,* 124 S. Ct. at 2752. As this Court recognized, Congress's rationale at the time of enactment was to avoid the United States being held liable under the laws of a foreign country. *Ibrahim*, 391 F. Supp. 2d at 19 n. 6.

In *Sosa,* the Supreme Court made clear that the foreign country exception is *not* limited to those actions were foreign law is implicated by modern choice of law provisions, *i.e.,* where a state's choice of law approach would apply the foreign law of place of injury. *See Sosa,* 124 S. Ct. at 2754. In considering the argument that the purpose of the foreign country exception is not served where foreign law is not implicated, the Court observed:

---

case. Plaintiffs' theory of the case – that they were injured be a conspiracy between Defendants, the Secretary of Defense, and  the military chain of command responsible for fighting the war in Iraq – compels preemption of their common law claims.

The point would be well taken, of course, if Congress had written the exception to apply when foreign law would be applied.  But that is not what Congress said.  Its provision of an exception when a claim arises in a foreign country was written at a time when the phrase "arising in" was used in state statutes to express the position that a claim arises where the harm occurs; and the odds are that Congress meant simply this when it used the "arising in" language.

\* \* \*

*We therefore hold that the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred.*

*Id.* (emphasis added).[9]

Here, all injuries alleged by the Plaintiffs indisputably occurred *in Iraq*.  Indeed, the Third Amended Complaint is replete with allegations that Plaintiffs' alleged injuries occurred exclusively while forcibly detained under United States custody in Iraq.  *See* TAC ¶¶ 114-160.  The only issue here is whether government contractor immunity should derive from government immunity with respect to claims arising from the prosecution of the war in Iraq.  At least in this action, it should.  To paraphrase the rationale of *Boyle,* it makes little sense to insulate the Government against financial liability for claims arising in a foreign country when the Government performs the work itself, but not when it contracts for that work.  The imposition of liability on CACI for claims arising in Iraq would create a significant conflict with the federal interest associated with federal procurement contracts because the liability costs arising out of the contract will be passed on to the Government.  The prospect of such liability would spawn claims against government contractors for injuries suffered by foreign nationals in a foreign country with respect to work performed there under a contract with the United States.

_____

[9] *See, e.g., Bancoult v. McNamara,* 370 F. Supp. 2d 1, 11 n. 8 (D.D.C. 2004) (plaintiffs' claims under FTCA barred "because their injuries occurred on foreign soil.")

Application of the FTCA's foreign country exemption is particularly appropriate in this case because the Coalition Provisional Authority ("CPA") already determined that CACI PT employees have immunity from Plaintiffs' tort claims in Iraq. On June 28, 2003, the CPA (then the internationally recognized governing body in Iraq) enacted CPA Order 17. That Order was the law of Iraq during all times relevant to this action. Section 3(2) of Order 17 provides:

> Coalition contractors and their subcontractors as well as their employees not normally present in Iraq, shall be immune from Iraqi Legal Process with respect to acts performed by them within their official capacities pursuant to the terms and conditions of a contract between a contractor and Coalition Forces or the CPA and any subcontract thereto.[10]

Coalition Provisional Authority Order Number 17 at 2. (Exhibit 2).

In Iraq, CACI PT was a Coalition contractor for purposes of Order 17, as a "non Iraqi business entity…supplying…services to or on behalf of the Coalition Forces or the CPA under contractual arrangements." *Id.* at 1. Similarly, Plaintiffs' claims would be barred in Iraq as "Iraqi Legal Process," which is defined as "any arrest, detention, or legal proceedings in the Iraqi courts or other Iraqi bodies, whether civil, criminal, or administrative in nature." *Id.* It would be perverse indeed to allow Iraqi nationals to pursue state common law claims in this country against a government contractor for injuries suffered in Iraq – in the Iraq war – when those same claims are barred in Iraq and foreclosed altogether as against the United States. The extraterritorial application of state common law is no more permissible against a government contractor than it is against the United States itself.

---

[10] In addition, Section 5(1) of Order 17 provides: "The immunity from Legal Process of…Coalition contractors and their sub-contractors, as well as their employees not normally resident in Iraq is not for the benefit of the individuals concerned and may be waived by the Parent State." *Id.* at 3. The United States has not waived this immunity with respect to CACI PT.

Indeed, application of the law of any state of the United States to the extraterritorial conduct that occurred in Iraq would be unconstitutional because no state had sufficient contacts with this action so that application of its substantive law would be neither arbitrary nor fundamentally unfair under the Due Process Clause. *See Allstate Ins. Co. v. Hague,* 449 U.S. 302 (1981). There, the Supreme Court held that "for a state's substantive law to be selected in a constitutionally permissible manner, that state must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." 449 U.S. at 312-13. Neither California nor Virginia nor D.C. has sufficient contact with this action to support application of state common law to claims arising in Iraq. This constitutional infirmity reinforces the propriety of construing the foreign country exception to bar Plaintiffs' common law claims here.

In enacting Order 17, the CPA determined that contractors supporting U.S. Military forces should receive immunity comparable to that afforded the United States. Under Order 17, CACI PT is immune from suit in Iraq for the acts of its employees pursuant to the Company's contract with the United States. Given this immunity afforded to CACI PT in Iraq, application of the foreign country exception should bar Plaintiffs' common law tort claims.

**D.    The Intentional Tort Exception to the FTCA Bars Plaintiffs' Common Law Claims**

In *Ibrahim*, the Court also suggested that the intentional tort exception to the FTCA might prohibit Plaintiffs' common law claims. 391 F. Supp. 2d at 19. n. 6. The Court's premonition was correct. The intentional tort exception to the FTCA bars "any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). The statute also excludes "any claim arising out of" any of the enumerated torts. *Id.* In

determining whether a claim is barred by the intentional tort exemption, "the court's task is limited to identifying 'circumstances which are within the words and reason of the exception – no less and no more.'" *Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 402 F.3d 1249, 1255 (D.C. Cir. 2005) (citations omitted).

Six common law claims survived the motion to dismiss, with corresponding conspiracy and aiding and abetting counts for four of the torts. All arise from the very same nucleus of operative facts and all are barred by the intentional tort exception. Count Sixteen and Nineteen, for assault and battery and sexual assault and battery, respectively, are expressly barred by the statute. Count Twenty-Two, for wrongful death, is equally barred because it arises out of the actions that are alleged as the basis for the assault and battery claims. Count Twenty-Five, alleging intentional infliction of emotional distress, also arises out of the actions that constitute the basis for the assault and battery claims, and is therefore excluded. *See Majano v. Kim*, 2005 U.S. Dist. LEXIS 6562, No. 04-201 (D.D.C. April 11, 2005) (intentional tort exception bars claim for intentional infliction of emotional distress arising out of assault and battery claims); *Koch v. United States*, 209 F. Supp. 2d 89, 94-95 (D.D.C. 2002) (same). Counts Seventeen, Eighteen, Twenty, Twenty-One, Twenty-Three, Twenty-Four, Twenty-Six, and Twenty-Seven are all conspiracy or aiding abetting counts that must be dismissed because they are based on underlying torts which fall within the intentional tort exception. *See Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 77-78 (D.D.C. 2005) (intentional tort exception bars claim for conspiracy based on underlying intentional fraud). Finally, Counts Thirty and Thirty-One, while denominated as claims for negligence, are also barred because they arise out of the same actions that form the underpinning for the remaining torts.

In *Kugel v. United States,* 947 F.2d 1504 (D.C. Cir. 1991), the court noted that a litigant may not substitute the name of a cause of action not included in § 2680(h) for one that is included where the alleged breach of duties in the two claims is identical. *Id.* at 1507 (citation omitted). In assessing the nature of a claim, the court will scrutinize the alleged cause of the injury. *Id.* Here, Plaintiffs do not allege that they suffered their injuries as a result of the Defendants' negligent execution of their duties or mere participation in the "Torture Conspiracy," but rather allege that they suffered injuries as a result of the willful torts asserted in the TAC. As a result, all of the Counts are barred. *See United States v. Shearer,* 473 U.S. 52, 55 (1985) ("Section 2680(h) does not merely bar claims for assault or battery; in sweeping language it excludes any claim *arising out of* assault and battery. We read this provision to cover claims like respondents that sound in negligence but stem from a battery committed by a government employee.")

## III.    CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in the CACI Defendants' favor.

Respectfully submitted,

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:    (202) 429-3000
Facsimile:    (202) 429-3902

**Attorneys for Defendants CACI International Inc and CACI Premier Technology, Inc.**