# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ILHAM NASSIR IBRAHIM, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 1:04-CV-01248-JR |
| v. ) | |
| ) | |
| TITAN CORPORATION, et al., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF JOHN F. O'CONNOR

I, John F. O'Connor, hereby declare as follows:

1.      I am a partner in the law firm of Steptoe & Johnson LLP, and one of the counsel of record for Defendant CACI Premier Technology, Inc. ("CACI PT").

2.      Attached hereto are true copies of the following exhibits, which are submitted in support of CACI PT's motion for summary judgment:

Exhibit 1:    Declaration of Mark Billings

Exhibit 2:    Declaration of Daniel J. Porvaznik

Exhibit 3:    Declaration of Charles Mudd

Exhibit 4:    Declaration of COL William H. Brady, U.S. Army

Exhibit 5:    Declaration of MAJ Eugene Daniels, U.S. Army

Exhibit 6:    Declaration of Scott Northrop

Exhibit 7:    Excerpts from May 7, 2004 Hearing of United States
              Senate Committee on Armed Services

Exhibit 8:     Excerpts from July 22, 2004 Hearing of United States
               Senate Committee on Armed Services

3.     I swear under penalty of perjury that the foregoing is true and correct to the best

of my knowledge and belief.  Executed at Washington, D.C. this 15th day of December, 2005.

John F. O'Connor

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ILHAM NASSIR IBRAHIM, et al., ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 1:04-CV-01248-JR |
| ) | |
| v. ) | |
| ) | |
| TITAN CORPORATION, et al., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF MARK BILLINGS

I, Mark Billings, hereby declare as follows:

1.    I submit this declaration in support of the motion of CACI Premier Technology, Inc. ("CACI PT") for summary judgment.

2.    I am employed by CACI PT as a Senior Director/Division Deputy. I have been employed in that capacity since approximately May 2003, when substantially all of the assets of Premier Technology Group, Inc. ("PTG") were acquired by CACI PT. In my capacity as Senior Director/Division Deputy, I am responsible for the day-to-day management of operations for personnel, finance, recruiting and quality assurance. More specifically, I had management responsibility for the administration of CACI PT's contract to supply intelligence support services, including interrogators, in Iraq.

3.    Prior to my employment by CACI PT, from 1998-2003 I was employed by PTG as Director/Division Deputy for the Division of Analysis & Information Services. In that

capacity I was responsible for the day-to-day management of operations for personnel, finance, recruiting and quality assurance.

4.    PTG obtained its first order for intelligence-related services under its General Services Administration schedule contract on May 27, 1999.  That order was issued by GSA's FTS Office of Information Security, Washington, DC, pursuant to a competitive solicitation. (GSA RFQ No. TIB-99133-JF1, May 13, 1999.)  The RFQ for the work contemplated an award under a GSA schedule contract.

5.    The subject GSA RFQ was issued to support U.S. Army Europe ("USAREUR") Office of Deputy Chief of Staff, Intelligence ("DCSINT").  The Statement of Work ("SOW") provided that its "objective" was "to provide the full scope of intelligence analysis required for battle staff planning concerning intelligence preparation of the battlefield (IPB) support[ing] contingency operations in the European Theater of Operations."   Functional requirements included, among others, signals analysis (all sources) and HUMNIT/Counterintelligence.   The RFQ defined the "skill set" required for HUMNIT/Counterintelligence positions, for example, to include personnel:

> Capable of providing the full range of CI/HUMINT expertise including collection, management, analysis and tasking.  Focused on support to contingency operations and the force protection aspects of those operations.  Experienced with counterterrorism, subversion, sabotage and espionage threats posed by various entities within the area of operations. Familiar with threat analysis, operations, related systems: MDITDS, IRR production, VCHPAS and DIAMS.

RFQ SOW § 2, Functional Requirements.

6.    That original GSA DO required PTG to provide 25 Senior Intelligence Analysts and five Intelligence Analysts who could meet the functional requirements of the SOW, and specifically incorporated the SOW into the order.

- 2 -

7.    GSA issued this initial DO for a period of 90 days and subsequently extended it for an additional nine months, through May 31, 2000. Subsequently, an Army contracting office issued a DO under PTG's GSA schedule contract for the continued provision of intelligence analysts to support USAREUR. Shortly after the award of the initial GSA DO, PTG received a DO to provide additional intelligence support services to the USAREUR's DCSINT that was issued by the Army's contracting office at Ft. Huachuca pursuant to a Blanket Purchase Agreement entered into under PTG's GSA schedule contract. PTG continued to provide intelligence support services to the Army (and to other DOD components) under the PTG GSA schedule contract through, and subsequent to, the time that the contracts of PTG were acquired by CACI.

8.    The Blanket Purchase Agreement ("BPA") was originally awarded by the Army to PTG and was later assumed and extended by DOI when it took over responsibility from the Army for the contracting office at Ft. Huachuca.

9.    CACI PT acquired substantially all of the assets of PTG, including its GSA contract and the BPA, in mid-May 2003.

10.    CACI PT employees who were involved in providing intelligence support services to V Corps G2, a part of USAREUR, under a DO issued by an Army contracting officer under PTG's GSA schedule contract, deployed to Iraq with the Army.

11.    For CACI PT's work in Iraq, eleven DOs for intelligence and logistics support were issued to CACI between August 2003 and March 2004, by DOI's National Business Center ("NBC") at Ft. Huachuca pursuant to the BPA that had been established under PTG's GSA IT Schedule contract. I had administrative responsibility within CACI PT for the eleven DOs.

12.    CACI supplied personnel and equipment in Iraq to support the military intelligence mission, which generated significant numbers of detainees and a need for intelligence.  CACI personnel performed as interrogators, screeners, intelligence analysts, counterintelligence personnel, data-entry and intelligence research clerks.

13.    Two of the eleven delivery orders issued by the DOI contracting office at Ft. Huachuca, DO 35 and DO 71, involved intelligence support services, including interrogation operations support.  DO 35, including its initial Statement of Work, is attached as Exhibit A. The Statement of Work for DO 35 was revised by the COR in February, 2004.  That revised Statement of Work, titled "Performance Work Statement," is attached as Exhibit B.  DO 71, including its Statement of Work, is attached as Exhibit C.

14.    Section 3 of the Statement of Work for DO 35 provided in pertinent part, that CACI PT would:

> provide the ACofS, C2, CJTF-7 with the best value Interrogation Support Cell management and support; functioning as resident experts for the implementation of an Interrogation Support Cell IAW regulations and standard operating procedures within the C2, CJTF-7.  The contractor will provide Interrogation Support Cells, *as directed by military authority*, throughout the CJTF-7 AOR to assist, supervise, coordinate, and monitor all aspects of interrogation activities, in order to provide timely and actionable intelligence to the commander.  (emphasis added).

15.    The Statement of Work for DO 35 made clear that CACI PT personnel would be fully integrated with military personnel in performing intelligence analysis, screening and interrogation tasks, that priorities and tasks would be established by the coalition joint task force-7 ("CJTF-7"), and that those tasks had to be performed in accordance with Government regulations:

> *Personnel supporting this effort will be integrated into MIL/CIV analyst, screening, and interrogation teams (both static/permanent facilities and mobile locations), in order to*

- 4 -

*accomplish CDR CJTF-7 priorities and tasking IAW Department of Defense, U.S. Civil Code and International Regulations.* (emphasis added).

16.    The Statement of Work for DO 71 made clear that CACI's intelligence support personnel, including interrogators, operated under the control and direction of the military command:

> As the operational element, HSTs (HUMINT Support Teams) support the overall divisional/separate Brigade HUMINT mission, and *perform under the direction and control of the unit's MI chain of command or Brigade S2, as determined by the supported command.* (emphasis added).

17.    The Statement of Work for DO 71 further provided that for CACI PT interrogators: "All actions will be managed by the Senior CI [Counter-Intelligence] Agent."

18.    The Statement of Work for DO 35 also contains numerous entries that made clear that CACI interrogators performed their duties at all times under the supervision, control and direction of U.S. military personnel in the Iraqi theater of operations.  For example:

- Section 4 of the SOW made clear that interrogators would deal only with "detainees, persons of interest, and Enemy Prisoners of War (EPWs) that are in the custody of U.S./Coalition Forces in the CJTF-7 AOR."

- Section 5 of the SOW provided that CACI PT personnel "will be required to travel (ground/air), as task/directed throughout the CJTF AOR in order to accomplish directed mission."

- Section 6 of the SOW provided that CACI PT interrogators would conduct interrogations "IAW local SOP and higher authority regulations," would review data collected and cross-reference intelligence collection priorities and plans "IAW interrogation SOPs and plan," "will conduct other intelligence supporting activities related to interrogation operations as directed," and "will report findings of interrogation IAW with local reference documents, SOPs, and higher authority regulations *as required/directed.*" (emphasis added)

- Section 7 of the SOW specified qualification criteria for interrogators, specifying that they "should be the civilian

- 5 -

equivalent to one of the following: "97E, 351E, Strategic Debriefer or an individual with a similar skill set."

- Section 14 of the SOW specified the place of performance: "The Government intends the contractor personnel to perform from the offices of the CJTF-7 Iraq and its designated interrogation facilities."

- Section 15 of the SOW required that CACI interrogators had to have "DOD Security Clearances."

- Section 20 of the SOW provided that the government would provide CACI PT with:

  - The appropriate documentation commensurate with that given to DoD civilians in the Theater of operations: deploying Contractors will be issued a Uniform Services Identification Card, DD Form 1173, and a Geneva Conventions Identity Card, DD Form 489. CJTF-7 will provide the Contractor with a Letter of Authorization (LOA) that allows Army Units to issue necessary equipment, tests, shots, and training to the Contractor employee.

  - Appropriate individual readiness training (IRT), area orientations and training/briefings on rules of engagement and general orders applicable to U.S. Armed Forces, DOD Civilians, and U.S. Contractors as issued by the Theater Commander or his/her representative.

  - Force Protection Measures.

  - On-site transportation to fulfill contract/mission requirements.

  - Work space and facilities as required to fulfill contract/mission requirements.

19.    Section 5 of the DO 35 Statement of Work also recognized that it was CACI PT's responsibility to provide supervision for all of its personnel. CACI PT did so by assigning personnel to serve as country manager and site leads. Those CACI PT administrative personnel

in Iraq had supervisory responsibility for all CACI PT personnel with respect to personnel, finance, and related matters.

20.    All CACI PT employees deployed to Iraq were issued Common Access Cards, Letters of Introduction, Uniform Services Identification Cards and Geneva Convention Cards by the Army.    These documents constituted formal authorization by the Army for CACI PT personnel to accompany the armed forces in the CJTF-7 theater of operations.

21.    In connection with the intelligence support work performed by CACI PT in Iraq, including interrogation, the U.S. Army had exclusive responsibility for establishing all rules of engagement, standard operating procedures, regulations, priorities, tasks, local reference documents.    CACI PT personnel were required to follow and comply with those authorities.

22.    I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.    Executed this 15th day of December, 2005.

_Mark W. Billings_
Mark Billings

# EXHIBIT A
# to Billings Declaration

## ORDER FOR SUPPLIES OR SERVICES

**IMPORTANT: Mark all packages and papers with contract and/or order numbers.**

| | | | | 1 | 4 |
|---|---|---|---|---|---|

| 1. DATE OF ORDER | 2. CONTRACT NO. *(If any)* | 6. SHIP TO: Susan Goshea |
|---|---|---|
| 08/14/2003 | NBCHA010005 | **a. NAME OF CONSIGNEE** |
| 3. ORDER NO. | 4. REQUISITION/REFERENCE NO. | ACofS C2 CJTF7 |
| J035 | See Lines | **b. STREET ADDRESS** |
| | | VICTORY CAMP |

| 5. ISSUING OFFICE *(Address correspondence to)* |
|---|
| DOI - NBC, Ft. Huachuca AZ |
| P.O. Box 12924 |
| ATTN: Julie Blankenship,520-533-8945 |
| Fort Huachuca    AZ            85670-2924 |

| c. CITY | d. STATE | e. ZIP CODE |
|---|---|---|
| APO | AE | 09302 |

| 7. TO: | f. SHIP VIA |
|---|---|
| **a. NAME OF CONTRACTOR** | |

| b. COMPANY NAME | 8. TYPE OF ORDER |
|---|---|
| CACI/PTI | |
| c. STREET ADDRESS | ☐ a. PURCHASE |
| 14151 Park Meadow Drive | REFERENCE YOUR: |
| | *Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated.* |

| | | | ☒ b. DELIVERY - Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract. |
|---|---|---|---|

| d. CITY | e. STATE | f. ZIP CODE |
|---|---|---|
| Chantilly | VA | 20151-2218 |

| 9. ACCOUNTING AND APPROPRIATION DATA |
|---|
| 2003 - - WH - 8300 - - 255A - .WHOTH-- - CJTF01 - - - - - - - - - - |

| 10. REQUISITIONING OFFICE |
|---|
| ACofS C2 CJTF7 |

| 11. BUSINESS CLASSIFICATION   *(Check appropriate box(es))* |
|---|
| ☒ a. SMALL  ☐ b. OTHER THAN SMALL  ☒ c. DISADVANTAGED  ☐ d. WOMEN-OWNED |

| 12. F.O.B. POINT | 14. GOVERNMENT B/L NO. | 15. DELIVER TO F.O.B. POINT ON OR BEFORE *(Date)* | 16. DISCOUNT TERMS | |
|---|---|---|---|---|
| Destination | | | 10 days | % |
| 13. PLACE OF | | | 20 days | % |
| a. INSPECTION   b. ACCEPTANCE | | | 30 days | % |
| | | | days | % |

### 17. SCHEDULE *(See reverse for Rejections)*

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|
| | **SEE LINE ITEM DETAIL** | | | | | |

| 18. SHIPPING POINT | 19. GROSS SHIPPING WEIGHT | 20. INVOICE NO. | | 17(h) TOT. *(Cont. pages)* |
|---|---|---|---|---|

*SEE BILLING INSTRUCTIONS ON REVERSE*

| 21. MAIL INVOICE TO: |
|---|
| **a. NAME**  See Line Item Detail |
| **b. STREET ADDRESS** *(or P.O. Box)* |

| c. CITY | d. STATE | e. ZIP CODE | | 17(i) GRAND TOTAL |
|---|---|---|---|---|
| | | | $13,765,733.00 | |

| 22. UNITED STATES OF AMERICA BY *(Signature)* | 23. NAME *(Typed)* |
|---|---|
| *Margaret E. Sebastian* | Margaret E. Sebastian |
| | TITLE: CONTRACTING/ORDERING OFFICER |

NSN 7540-01-152-8083
Previous edition not usable

OPTIONAL FORM 347 (REV. 6/95)
Prescribed by GSA/FAR 48 CFR 53.213(e)

HL

| Line Item Summary | Document Number 000035 | Title Premier Technology Group | Page 2 of 4 |
|---|---|---|---|

**Total Funding:** $13,765,733.00

| | Ys | Fund WH | Budget Org 6300 | Sub | Object Class 255A | Sub | Program WHOTH | Cost Org | Sub | Proj/Job No. CJTF01 | Sub | Reporting Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Division | | | Closed FYs | | Cancelled Fund | | | | | | | |

| Line Item Number | Description | (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|
| | SEE ATTACHMENT A | | | | | |
| 0001 | Technical Support Services | (08/14/2003 to 08/13/2004) | 1.00 | lot | $10,328,306.000 | $ 10,328,306.00 |
| | The Contractor shall perform in accordance with the Statement of Work entitled "Statement of Work CJTF-7 C2". | | | | | |
| 0002 | ODC'S, CR/NTE | (08/14/2003 to 08/13/2004) | 1.00 | lot | $327,442.000 | $ 327,442.00 |
| | ODC'S shall be obtained in accordance with the requirement of the GSA Schedule to include HOLA/COLA and equipment. | | | | | |
| 0003 | Travel, CR/NTE | (08/14/2003 to 08/13/2004) | 1.00 | lot | $3,109,985.000 | $ 3,109,985.00 |
| | Travel shall be in accordance with the Joint Travel Regulation (JTR). | | | | | |

**Total Cost:** $13,765,733.00

**Contract ~~~~~**
**Funding Summary** | 000035 | Premier Technology Group

- WH · 6300 · - 255A · · WHOTH · · - CJTF01 · - · · · · ·

$ . . . 65,733.00

Reference Requisition:    NBCHZ030402

Total Funding:  $13,765,733.00

| Address Detail | Premier Techn...gy Group | 000035 | 4 of 4 |
|---|---|---|---|

## Shipping Addresses

| | Detail |
|---|---|
| | **Org:**  ACofS C2 CJTF7<br>**Addr:**  VICTORY CAMP<br><br>APO  AE  09302<br>**Attn:**  Susan Goshea<br>**Phone:** (318) 822-1430 ext.<br>**Fax:**  ( )  -  ext. |

## Invoice Addresses

| Code | Detail | Code | Detail |
|---|---|---|---|
| 0001 | **Org:**  Dept of the Interior - National Business Center<br>**Addr:**  Accounting Operations Branch<br>7301 West Mansfield Avenue<br><br>Denver CO  80235-2230<br>**Attn:**  Deborah Dennis, D-2730, Supervisor<br>**Phone:** (303) 969-5870 ext.<br>**Fax:**  (303) 969-5892 ext. | 0002 | **Org:**  Dept of the Interior - National Business Center<br>**Addr:**  Financial Systems Division,<br>7110 W. Jefferson Avenue<br><br>Denver CO  80235-2230<br>**Attn:**  Deborah Dennis, D-2730, Supervisor<br>**Phone:** (303) 969-5870 ext.<br>**Fax:**  ( )  -  ext. |

## Requisitioning Office Addresses

| Code | Detail |
|---|---|
| 01 | **Org:**  ACofS C2 CJTF7<br>**Addr:**  VICTORY CAMP<br><br>APO  AE  09302<br>**Attn:**  Susan Goshea<br>**Phone:** (318) 822-1430 ext.<br>**Fax:**  ( )  -  ext. |

ATTACHMENT A
08/14/2003

IBCHA010005 DO#000035

This order is being issued for the contractor to provide support in accordance with the Performance Work Statement entitled "Performance Work Statement for CJTF-7 C2 with Interrogation Operations Support". The Performance Work Statement is hereby incorporated into the order.

The period of performance for this order is 14 August 2003 through 13 August 2004. The Contracting Officer issued verbal authorization to begin performance on this effort on 13 August 2004.

Funding in the amount of $13,765,733 is hereby applied to the order. The order is fully funded.

A DD-254 is hereby incorporated into the order and attached.

The following clauses are incorporated:

52.232-7 Payment Under Time-and-Material and Labor Hour Contracts (2/02)
          *the Contracting Officer will not impose the 5% withhold allowed by this clause.

52.243-3 Changes Time-and-Material and Labor Hours (9/00)

52.204-2 Security Requirements (8/96)

**Statement of Work**
**CJTF-7 C2**

1. **Introduction:** This statement of work focuses on providing the Assistant Chief of Staff (ACofS), C2, CJTF-7 with interrogation operations support.

2. **Identification:**
   Organization: Combined Joint Task Force-Seven (CJTF-7)
   Location: Baghdad, Iraq (CJTF-7 AOR)
   Organizational POC: C2, CJTF-7
   Phone number: (DSN) 318-822-1316
   E-mail:

3. **Background:** To provide the ACofS, C2, CJTF-7 with the best value Interrogation Support Cell management and support; functioning as resident experts for the implementation of an Interrogation Support Cell IAW regulations and standard operating procedures within the C2, CJTF-7. The contractor will provide Interrogation Support Cells, as directed by military authority, throughout the CJTF-7 AOR to assist, supervise, coordinate, and monitor all aspects of interrogation activities, in order to provide timely and actionable intelligence to the commander.

4. **General:** An interrogation support program is designed, with mutually-supported efforts, to increase the effectiveness of dealing with detainees, persons of interest, and Enemy Prisoners of War (EPWs) that are in the custody of US/Coalition Forces in the CJTF-7 AOR, in terms of screening, interrogation, and debriefing of persons of intelligence value. It is a multi-faceted interrogation support cell consisting of, but not limited to, C2X Coordinator/Special Advisor, Database Entry/Intelligence Research Clerks, Screeners, and Tactical/Strategic Interrogators. Identified personnel supporting this effort will be integrated into MIL/CIV analyst, screening, and interrogation teams (both static/permanent facilities and mobile locations), in order to accomplish CDR CJTF-7 priorities and tasking IAW Department of Defense, US Civil Code, and International Regulations.

5. **Technical Considerations – C2X Screening and Interrogation Operations Coordinator/Special Advisor:** The Contractor shall contract support to the C2, CJTF-7. This position requires the following skills and experience: proven CI/HUMINT experience at the tactical and operational levels, familiarity with Coalition operations and staff procedures, experience in a Stability and Support Operations (SASO) environment, experience and familiarity with Theater and Division level interrogation and exploitation operations, proven abilities in the planning and conduct of screening and interrogation operations, familiarity with High Value Target (HVT) targeting process, and experience as a Strategic

Debriefer (N7). Candidate will be responsible for all Locally Employed Persons (LEP) screening and Interrogation Support to the CJTF. Candidate must be a US citizen and possess a Top Secret/SCI security clearance. Candidate will be required to work twelve hours per day, seven-days per week. Additionally, candidate will be required to travel (ground/air), as tasked/directed, throughout the CJTF AOR, in order to accomplish directed mission. Position requires the usage (24-hour availability) of a Non-Tactical Vehicle (NTV) and reliable means of communications (i.e., hand-held phone/radio). The Contractor is responsible for providing supervision for all contractor personnel.

a. **C2X Screening and Interrogation Operations Coordinator/Special Advisor.**

    i. Act as coordinator/special advisor to the C2, CJTF-7 on matters concerning Counterintelligence and HUMINT activities, in support of screening and interrogation operations within the AOR.

    ii. Provide oversight and other directed intelligence support to CJTF screening and interrogation operations, with special emphasis on High-Value Detainees (HVD's).

    iii. Provide intelligence support, as necessary, to fully exploit HVDs and derive actionable intelligence ISO Commander's PIRs.

    iv. Act as classified courier, as directed by C2, in support of screening and interrogation operations.

    v. Provide written and oral reports and briefings as directed.

b. **ADP Equipment requirements:** The following is a list of the Office Equipment requirements required for the aforementioned position. This office support equipment will be purchased by the Contractor for operations ISO the contract customer:

    i. One (1) Dell Desktop computer with a Pentium processor, 80 gb hard drive, 256MB of RAM, a CD/RW drive, UPS power supply (capable of both US/UK standards – i.e., 110v/220v), and a 19" flat screen monitor.

    ii. One (1) Printer; HP Laser Jet 4100 series with a power supply capable of both, US/UK standards – i.e., 110v/220v.

    iii. One (1) Dell Laptop with Pentium processor, 40 gb hard drive, a CD/RW drive, 256MB of RAM with a power supply capable

of both, US/UK standards – i.e., 110v/220v.  NOTE: This laptop will be primarily used for mobile support (e.g., fly-away capability) missions as directed by the C2.  Additionally, one (1) digital camera (at minimum three mega-pixel quality), tripod, and case for secure transport of both, laptop and camera (e.g., pelican hardcase with internal/external locking mechanism).

    iv.  All ADP equipment must be network capable.

**6. Technical Considerations – Interrogation Support Operations Teams:** The Interrogation Support Cell is broken down into the following support positions:

    **a.  Screener.**

        i.  The screener will conduct screening with use of organizational reference documents, IAW local SOP and higher-authority regulations.

        ii.  The screener will coordinate and work in conjunction with MP and interrogation unit assigned to support operations of the Theater/Division Interrogation Facility.

        iii.  The screener will review the data collected and cross-reference intelligence collection priorities and plans, in order to ensure proper identification, categorization, and disposition of detained persons IAW with screening SOPs and plan.

        iv.  The screener will take photographs of detainees for screening report.

        v.  The screener will conduct other intelligence supporting activities related to interrogation operations as directed.

    **b.  Data-Entry and Intelligence Research Clerk.**

        i.  Database/Intelligence Clerk (D/IRC) will enter screening data as provided by the screening team.

        ii.  The D/IRC will conduct intelligence research as directed by interrogation team and support interrogation efforts as required (i.e., intelligence analyst support during interrogations).

        iii.  D/IRC will conduct other intelligence supporting activities

related to interrogation operations as directed.

c. **Tactical/Strategic Interrogator.**

   i. The interrogator will conduct tactical, operational and strategic interrogations with use of organizational reference documents, IAW local SOP and higher-authority regulations.

   ii. The interrogator will coordinate and work in conjunction with MP unit and MI interrogation units assigned to support operations of the Theater/Division Interrogation Facility.

   iii. The interrogator will review the data collected and cross-reference intelligence collection priorities and plans, in order to ensure proper identification, categorization, disposition, and interrogation of persons IAW with interrogation SOPs and plan.

   iv. The interrogator will conduct, with usage of a supporting linguist and interrogation plan, interrogations of identified persons of interest, detainees, and POWs IAW with local and higher-authority regulations.

   v. The interrogator will conduct other intelligence supporting activities related to interrogation operations as directed.

   vi. Interrogators will report findings of interrogation IAW with local reference documents, SOPs, and higher-authority regulations as required/directed.

7. **Theater Interrogation Support Cell - Manning requirements:** The Theater Cell is weighted toward Interrogators and Research in order to facilitate exploitation of high value detainees. A basic screening capability is included to facilitate rapid processing and categorization. All positions will require work to be performed twelve-hours per day, six-days/week. The work schedule will be staggered, in order to provide one-day of rest for employee, while still maintaining support seven-days per week).

a. *Database Entry/Intelligence Research Clerk (D/IRC).* **Six (6)** D/IRCs are required at minimum, to support the interrogation operations of the Theater Interrogation Facility. Identified D/IRCs should be the civilian equivalent to one of the following: 96BE, 350B/E or an individual with a similar skill set, and US Citizens; three with a Secret clearance and three with Top Secret clearance.

b. *Screeners.* Six **(6)** screeners are required at minimum, to support the interrogation operations of the Theater Interrogation Facility. Identified screeners should be the civilian equivalent to one of the following: 97B/E, 351B/E, 95BV5, Strategic Debriefer or an individual with a similar skill set), and US Citizens with a Secret clearance.

c. *Interrogators.* Ten **(10)** interrogators are required at minimum, to support the interrogation operations of the Theater Interrogation Facility. Identified interrogators should be the civilian equivalent to one of the following: 97E, 351E, Strategic Debriefer or an individual with a similar skill set, and US Citizens. Five positions, at minimum, require a Top Secret clearance; the other five positions can be either at the Secret or Top Secret clearance levels. Arabic speakers are highly desired. ASI 9N and N7 desired.

8. **Theater Interrogation Support Cell – ADP Equipment requirements:** The following is a list of the Office Equipment requirements required for effective Interrogation support operations. This office support equipment will be purchased by the Contractor for operations ISO the contract customer:

a. 11 Dell Optiplex GX400 computers each with a minimum of a 1.5 GHZ processor, 40 gb hard drive, 256MB of RAM, a CD/RW drive, 40 gb media tape drive, UPS power supply (capable of both US/UK standards – i.e., 110v/220v), and a 17" monitor.

b. 1 x Computer with a minimum of 2 GHZ processor, 100 gb hard drive, 512MB of RAM, a CD/RW, 40 gb media tape drive, a UPS power supply (capable of both US/UK standards – i.e., 110v/220v), and a 19" monitor. (This computer will be utilized as the main database storage unit and will require the upgraded specifications, due to the increased activity on this system).

c. 2 x Dell Laptops with Pentium processors, 40 gb hard drive, a CD/RW drive, 256MB of RAM with a power supply capable of both, US/UK standards – i.e., 110v/220v. NOTE: These identified laptops will be primarily used for mobile interrogation operations, equipped with a digital camera (at minimum three mega-pixel quality), tripod, and case for secure transport of both, laptop and camera (e.g., pelican hardcase with internal/external locking mechanism).

d. The Interrogation Cell will also require 2 x 2400dpi scanners, 2 Printers; 1 x HP laser jet 4100 and 1 x HP Color Laser Jet 4550. All ADP equipment must be network capable.

e. All of the computers will require Biometrics Software (or equivalent software that has facial recognition, fingerprint ability, and is fully

searchable for all data entered to include fingerprints) to be installed and the upgraded system will be the main server for the software. This effort will also require 3 x digital cameras, with tripods, that are compatible with the existing computer software that are, at a minimum, three (3) mega-pixels.

9. **Division Interrogation Support Cell - Manning requirements:** The Division/Regiment Cell is weighted toward Screeners to facilitate rapid processing and categorization of detainees early in the detention process, and identify high value detainees for possible evacuation to theater. A basic Research and Interrogation capability is included to facilitate local interrogation operations. All positions will require work to be performed twelve-hours per day, six-days/week. The work schedule will be staggered, in order to provide one-day of rest for employee, while still maintaining support seven-days per week). *The following requirements will be supported with three (3) separate interrogation support cells, which will be located with separate CJTF US Major Subordinate Commands.*

a. *Database Entry/Intelligence Research Clerk (D/IRC).* **Two (2)** D/IRCs are required at minimum, to support the interrogation operations of the Division Interrogation Facility, identified D/IRCs should be the civilian equivalent to one of the following: 96BE, 350B/E or an individual with a similar skill set), and US Citizens with a Secret clearance.

b. *Screeners.* **Six (6)** screeners are required at minimum, to support the interrogation operations of the Division Interrogation Facility, identified screeners should be the civilian equivalent to one of the following: 97B/E, 351B/E, 95BV5, Strategic Debriefer or an individual with a similar skill set), and US Citizens with a Secret clearance.

c. *Interrogators.* **Four (4)** interrogators are required at minimum, to support the interrogation operations of the Division Interrogation Facility, identified interrogators should be the civilian equivalent to one of the following: 97E, 351E, Strategic Debriefer or an individual with a similar skill set, and US Citizens with a Secret clearance. Arabic speakers are highly desired. ASI 9N and N7 desired.

10. **Division Interrogation Support Cell – ADP Equipment requirements:** The following is a list of the Office Equipment requirements required for an effective Interrogation support operations. This office support equipment will be purchased by the Contractor for operations ISO the contract customer:

a. 6 Dell Optiplex GX400 computers each with a minimum of a 1.5 GHZ processor, 40 gb hard drive, 256MB of RAM, a CD/RW drive, 40 gb media tape drive, UPS power supply (capable of both US/UK

standards – i.e., 110v/220v), and a 17" monitor.

b. 1 x Computer with a minimum of 2 GHZ processor, 100 gb hard drive, 512MB of RAM, a CD/RW, 40 gb media tape drive, a UPS power supply (capable of both US/UK standards – i.e., 110v/220v), and a 19" monitor. (This computer will be utilized as the main database storage unit and will require the upgraded specifications, due to the increased activity on this system).

c. 2 x Dell Laptops with Pentium processors, 40 gb hard drive, a CD/RW drive, 256MB of RAM with a power supply capable of both, US/UK standards – i.e., 110v/220v. NOTE: These identified laptops will be primarily used for mobile interrogation operations, equipped with a digital camera (at minimum three mega-pixel quality), tripod, and case for secure transport of both, laptop and camera (e.g., pelican hardcase with internal/external locking mechanism).

d. Also required: 1 x 2400dpi scanners, 1 Printers; 1 x HP laser jet 4100. All ADP equipment must be network capable.

e. All of the computers will require Biometrics Software (or equivalent software that has facial recognition, fingerprint ability, and is fully searchable for all data entered to include fingerprints) to be installed and the upgraded system will be the main server for the software. This effort will also require 2 x digital cameras, with tripods, that are compatible with the existing computer software that are, at a minimum, three (3) mega-pixels.

11. **Period of Performance:** **01 AUG 2003 to 31 JUL 2004  (Base Year)**
**01 AUG 2004 to 31 JUL 2005 (Option Year 1)**
**01 AUG 2005 to 31 JUL 2006 (Option Year 2)**

12. **Proposed Contracting Officers Representative:**

13. **Travel:**  The contractors are required to travel in order to provide the services and support required under this plan.  Actual travel requirements will be determined once performance has begun.  Contractor travel shall be reimbursed according to the Joint Travel Regulation.  Travel will be approved only by the Contracting Officer or his/ her representative.

14. **Place of Performance:** The government intends the contractor personnel to perform from the offices of the CJTF-7 Iraq and designated interrogation facilities.

15. **Security Requirements:**  Contractor personnel shall have DoD Security Clearances, prior to start date.  Contractor FSO will ensure that all clearances are

forwarded to the CJTF-7 SSO via proper channels and IAW DoD security regulations and provisions.

16. **Logistics Support:** All contractors under this statement of work will be entitled to logistics support under Regulation 600-700 or its supplements. It is the contractor's responsibility to provide such documentation as necessary to ensure appropriate consideration is made in this regard.

17. **Deliverables:** Deliverables are in the form of a monthly status report of actions accomplished, problems identified, and recommended problem solutions.

18. **Government Furnished Material (GFM) and Equipment (GFE) and Contractor Furnished Equipment (CFE).** The government shall provide appropriate office spaces, Electronic mail access, Internet connectivity, and labor saving devices and consumable office materials for contract performance.

19. **Government Furnished Personnel.** The government will provide an adequate number of linguists in the various languages and dialects to support the Interrogation Support Cell operations 24 hours/day, seven days/week.

20. **Facilities, supplies, and services.** In accordance with DFARS 225.802-70 and AR 715-9 the Government shall provide the following services when the Contractor is deployed in support of CJTF-7 Contingency Operations:

   a. Base support to include: Billeting/Quarters, Messing Facilities, Post/Base Exchange, Banking, Check Cashing, Currency Exchange, Theater, Laundry, Gymnasium, Army/Air Force Postal Services, Morale Welfare and Recreation Services, and full care Medical/Dental Services as applicable to local theater regulations and policies.

   b. Work space for the contractor, with access to office supplies, office furniture, computer and systems automation, internet access, and local and long distance telephone access, including DSN, as required to fulfill contract/mission requirements. Field conditions will be involved.

   c. Organizational clothing and individual equipment (OCIE) and protective clothing/equipment to include protective mask and chemical protective over-garments required in the Theater of operations as per DA PAM 715-16 27 FEB 1998 and specified in Appendix B.

   d. The appropriate documentation commensurate with that given to DoD civilians in the Theater of operations: deploying Contractors will be issued a Uniform Services Identification Card, DD Form 1173, and

a Geneva Conventions Identity Card, DD Form 489. CJTF-7 will provide the Contractor with a Letter of Authorization (LOA) that allows Army Units to issue necessary equipment, tests, shots, and training to the Contractor employee. Required local documentation (for example the Kuwaiti Visa) will be obtained at the Contractor's expense.

e. The necessary deployment processing to include immunization shots and record as required by CJTF-7 for entry into Theater of Operations. This processing may include a dental panograph, DNA sampling, HIV testing, anthrax shots, and all other required shots.

f. On-site transportation to fulfill contract/mission requirements.

g. Appropriate individual readiness training (IRT), area orientations and training/briefings on rules of engagement and general orders applicable to U.S. Armed Forces, DoD Civilians, and U.S. Contractors as issued by the Theater Commander or his/her representative.

h. Force protection measures commensurate with that given to DoD civilians in the Theater of operations. This includes training Contractors in self-protection and NBC.

i. Remains processing in the event of an employee's death while in the theater of operations. This includes the transportation of remains back to CONUS.

j. Contractors are considered non-combatants and are not authorized to be armed.

# EXHIBIT B
# to Billings Declaration

# PERFORMANCE WORK STATMENT
## CJTF-7 C2

1. **Introduction:** This statement of work focuses on providing the Assistant Chief of Staff (ACofS), C2, CJTF-7 with interrogation operations support.

2. **Identification:**
   Organization: Combined Joint Task Force-Seven (CJTF-7)
   Location: Baghdad, Iraq (CJTF-7 AOR)
   Organizational POC: C2, CJTF-7
   Phone number: (DSN) 318-822-1316
   E-mail:

3. **Background:** To provide the ACofS, C2, CJTF-7 with the best value Interrogation Support Cell management and support, functioning as resident experts for the implementation of an Interrogation Support Cell IAW regulations and standard operating procedures within the C2, CJTF-7. The contractor will provide Interrogation Support Cells, as directed by military authority, throughout the CJTF-7 AOR to assist, supervise, coordinate, and monitor all aspects of interrogation activities, in order to provide timely and actionable intelligence to the commander.

4. **General:** An interrogation support program is designed, with mutually-supported efforts, to increase the effectiveness of dealing with detainees, persons of interest, and Enemy Prisoners of War (EPWs) that are in the custody of US/Coalition Forces in the CJTF AOR, in terms of screening, interrogation, and debriefing of persons of intelligence value. It is a multi-faceted interrogation support cell consisting of, but not limited to, C2X Coordinator/Special Advisor, Database Entry/Intelligence Research Clerks, Screeners, and Tactical/Strategic Interrogators. Identified personnel supporting this effort will be integrated into MIL/CIV analyst, screening, and interrogation teams (both static-permanent facilities and mobile locations), in order to accomplish CDR CJTF-7 priorities and tasks IAW Department of Defense, US Civil Code, and International Regulations.

5. **Technical Considerations:** C2X Screening and Interrogation Operations Coordinator/Special Advisor: The Contractor shall contract support to the C2, CJTF-7. This position requires the following skills and experience: proven CI/HUMINT experience at the tactical and operational levels, familiarity with Coalition operations and staff procedures, experience in a Stability and Support Operations (SASO) environment, experience and familiarity with Theater and Division level interrogation and exploitation operations, proven abilities in the planning and conduct of screening and interrogation operations, familiarity with High Value Target (HVT) targeting process, and experience as a Strategic Debriefer (NT). Candidate will be responsible for all Locally Employed Persons (LEP) screening and Interrogation Support to the CJTF. Candidate must be a US citizen and possess a Top Secret/SCI security clearance. Candidate will be required in work twelve hours per day, seven-days per week. Additionally, candidate will be required to travel (ground/air), as tasked/directed, throughout the CJTF AOR, in order to accomplish directed mission. Position requires the usage (24-hour availability) of a Non-Tactical Vehicle (NTV) and reliable means of communications (i.e., hand-held phone/radio). The Contractor is responsible for providing supervision for all contractor personnel).

   a. **C2X Screening and Interrogation Operations Coordinator/Special Advisor.**

      i. Act as coordinator/special advisor to the C2, CJTF-7 on matters concerning Counterintelligence and HUMINT activities, in support of screening and interrogation operations within the AOR.

      ii. Provide oversight and other directed intelligence support to CJTF screening and interrogation operations, with special emphasis on High-Value Detainees (HVD's).

      iii. Provide intelligence support, as necessary, to fully exploit HVDs and derive actionable intelligence ISO Commander's PIRs.

      iv. Act as classified courier, as directed by C2, in support of screening and interrogation operations.

      v. Provide written and oral reports and briefings as directed.

   b. **ADP Equipment requirements:** The following is a list of the Office Equipment requirements required for the aforementioned position. This office support equipment will be purchased by the Contractor for operations ISO the contract customer:

      i. One (1) Dell Desktop computer with a Pentium processor, 80 gb hard drive, 256MB of RAM, a CD-RW drive, UPS power supply (capable of both US/UK standards - i.e., 110v/220v), and a 19" flat screen

monitor

    ii. One (1) Printer; HP Laser Jet 4100 series with a power supply capable of both, US/UK standards – i.e., 110v/220v.

    iii. One (1) Dell Laptop with Pentium processor, 40 gb hard drive, a CD/RW drive, 256MB of RAM with a power supply capable of both, US/UK standards – i.e., 110v/220v. NOTE: This laptop will be primarily used for mobile support (e.g., fly-away capability) missions as directed by the G2. Additionally, one (1) digital camera (at minimum three mega-pixel quality), tripod, and case for secure transport of both, laptop and camera (e.g., pelican hardcase with internal/external locking mechanism)

    iv. All ADP equipment must be network capable.

b. **Technical Considerations – Interrogation Support Operations Teams:** The Interrogation Support Cell is broken down into the following support positions.

    a. **Screener.**

        i. The screener will conduct screening with use of organizational reference documents, IAW local SOP and higher-authority regulations.

        ii. The screener will coordinate and work in conjunction with MP and interrogation unit assigned to support operations of the Theater/Division Interrogation Facility.

        iii. The screener will review the data collected and cross-reference intelligence collection priorities and plans, in order to ensure proper identification, categorization, and disposition of detained persons IAW with screening SOPs and plan.

        iv. The screener will take photographs of detainees for screening report.

        v. The screener will conduct other intelligence supporting activities related to interrogation operations as directed.

    b. **Data-Entry and Intelligence Research Clerk.**

        i. Database/Intelligence Clerk (D/IRC) will enter screening data as provided by the screening team.

        ii. The D/IRC will conduct intelligence research as directed by interrogation team and support interrogation efforts as required (i.e., intelligence analyst support during interrogations).

        iii. D/IRC will conduct other intelligence supporting activities related to interrogation operations as directed.

    c. **Tactical/Strategic Interrogator.**

        i. The interrogator will conduct tactical, operational and strategic interrogations with use of organizational reference documents, IAW local SOP and higher-authority regulations.

        ii. The interrogator will coordinate and work in conjunction with MP unit and MI interrogation units assigned to support operations of the Theater/Division Interrogation Facility.

        iii. The interrogator will review the data collected and cross-reference intelligence collection priorities and plans, in order to ensure proper identification, categorization, disposition, and interrogation of persons IAW with interrogation SOPs and plan.

        iv. The interrogator will conduct, with usage of a supporting linguist and interrogation plan, interrogations of identified persons of interest, detainees, and POWs IAW with local and higher-authority regulations.

        v. The interrogator will conduct other intelligence supporting activities related to interrogation operations as directed.

        vi. Interrogators will report findings of interrogation IAW with local reference documents, SOPs, and higher-authority regulations as required/directed.

d.    JIDC Report Officers (3x). (to be filled within 55 days of contract award)

    i    Receives/ compiles/ provides editing and quality control of reporting for final approval and dissemination to the Local, Theater, and National Intelligence Community. The RO will be responsible for all HUMINT reporting (e.g., SPOT, SIR, screening, interrogation, DIIR, et al) resulting from the screening/interrogations of detainees.

    ii    Strong automation, military intelligence writing/editing skills and close-familiarity with HUMINT reporting required

    iii    Minimum of three years intelligence, analytical or investigative experience required 96B/35 series/97series/18 series  Arabic language skills desired.

    iv    Top Secret/SCI clearances required. Location: Abu Ghurayb/JIDC, Baghdad, Iraq. *This position will require performance of work 12 hours/day, six days/week*

e.    JIDC Intelligence Analysts (20x). (11x to be filled within 45 days of contract approval; 10x to be filled within 55 days of contract award)

    i    Provides intelligence analytical support to the interrogation team during development and execution of the interrogation plan/cycle

    ii    Interfaces with higher, lower and adjacent intelligence organizations to fully prepare interrogation team for exploitation of detainees, as well as preparing post interrogation analytical products/assessments that support further targeting efforts, source development and analysis of the threat.

    iii    Minimum of three years analytical experience within DoD or equivalent government agencies, either all source or HUMINT, Middle East Theater and CT experience desired

    iv    Strong automation skills required, including intelligence analytical applications. 96B/350B/35series/97series equivalents.

    v    Minimum of Associate's Degree required. Top Secret/SCI clearances required. *This position will require performance of work 12 hours/day, six days/week*

7.    **Theater Interrogation Support Cell - Manning requirements:** The Theater Cell is weighted toward Interrogators and Research in order to facilitate exploitation of high value detainees. A basic screening capability is included to facilitate rapid processing and categorization. All positions will require work to be performed twelve-hours per day, six-days/week. The work schedule will be staggered, in order to provide one-day of rest for employee, while still maintaining support seven-days per week.

    a.    *Database Entry/Intelligence Research Clerk (DIRC).* Six (6) DIRC are required at minimum, to support the interrogation operations of the Theater Interrogation Facility. Identified DIRC's should be the civilian equivalent to one of the following: 96BE, 35DB/E or an individual with a similar skill set, and US Citizens: three with a Secret clearance and three with Top Secret clearance.

    b.    *Screeners.* Six (6) screeners are required at minimum, to support the interrogation operations of the Theater Interrogation Facility. Identified screeners should be the civilian equivalent to one of the following: 97B/E, 351B/E, 98NV5, Strategic Debriefer or an individual with a similar skill set), and US Citizens with a Secret clearance.

    c.    *Interrogators.* Ten (10) interrogators are required at minimum, to support the interrogation operations of the Theater Interrogation Facility. Identified interrogators should be the civilian equivalent to one of the following: 97E, 351E, Strategic Debriefer or an individual with a similar skill set, a minimum, require a Top Secret clearance: the other five positions can be either at the Secret or Top Secret clearance levels. Arabic speakers are highly desired. ASI 9N and N7 desired.

8.    **Theater Interrogation Support Cell – ADP Equipment requirements:** The following is a list of the Office Equipment requirements required for effective interrogation support operations. This office support equipment will be purchased by the Contractor for operations ISO the contract customer:

    a.    11 Dell Optiplex GX400 computers each with a minimum of a 1.5 GHZ processor, 40 gb hard drive, 256MB of RAM, a CD-RW drive, 40 gb media tape drive, UPS power supply (capable of both US/UK standards  i.e., 110v/220v), and a 17" monitor.

    b.    1 x Computer with a minimum of 2 GHZ processor, 100 gb hard drive, 512MB of RAM, a CD-RW, 40 gb media tape drive, a UPS power supply (capable of both US/UK standards  i.e., 110v/220v), and a 19" monitor. (This computer will be utilized as the main database storage unit and will require the upgraded specifications, due to the increased activity on this system)

    c.    2 x Dell Laptops with Pentium processors, 40 gb hard drive, a CD-RW drive, 256MB of RAM with a power supply

capable of both, US-UK standards – i.e., 110v/220v.  NOTE: These identified laptops will be primarily used for mobile interrogation operations, equipped with a digital camera (at minimum three mega-pixel quality), tripod, and case for secure transport of both, laptop and camera (e.g., pelican hardcase with internal/external locking mechanism)

d.  The Interrogation Cell will also require 2 x 2400dpi scanners. 2 Printers, 1 x HP laser jet 4100 and 1 x HP Color Laser Jet 4550.  All ADP equipment must be network capable.

e.  All of the computers will require Biometrics Software (or equivalent software that has facial recognition, fingerprint ability, and is fully searchable for all data entered to include fingerprints) to be installed and the upgraded system will be the main server for the software.  This effort will also require 3 x digital cameras, with tripods, that are compatible with the existing computer software that are, at a minimum, three (3) mega-pixels.

f.  2x vehicles (passenger vans - for transportation needs of CACI employees)

g.  12x Motorola walkie-talkies (distribution - TBD by CACI Iraq Representative).

h.  30 - Dell Optiplex SX 270 Ultra Small Form Factor Computers (Laptops)

    Technical Requirements:
    - Pentium 4 3.2 Ghz Processor
    - 1 Gb DDR Ram
    - 20 Gb Hard Drives
    - 8 x speed DVD Drive
    - MS Optical Mouse

i.  10x Dell 1703FP 17" Flat Panel Screens

j.  10x 2 Port KVM Switches

k.  1x Digital Sender

l.  1x Facsimile

m.  2x Laser Printers, network capable

n.  Contractor is authorized to furnish the facilities in order to meet the tasking, as coordinated with the COR. All purchases will be summarized and approved by the CS/COR prior to purchase.

9.  **Division Interrogation Support Cell - Manning requirements:** The Division/Regiment Cell is weighted toward Screeners to facilitate rapid processing and categorization of detainees early in the detention process, and identify high value detainees for possible evacuation to theater.  A basic Research and Interrogation capability is included to facilitate local interrogation operations.  All positions will require work to be performed twelve-hours per day, six-days/week.  The work schedule will be staggered, in order to provide one-day of rest for employee, while still maintaining support seven-days per week.  *The following requirements will be supported with three (3) separate interrogation support cells, which will be located with separate CJTF US Major Subordinate Commands.*

    a.  *Database Entry/Intelligence Research Clerk (DEIRC)*  Two (2) DEIRCs are required at minimum, to support the interrogation operations of the Division Interrogation Facility, identified DEIRC's should be the civilian equivalent to one of the following; 96BE, 350B/E or an individual with a similar skill set), and US Citizens with a Secret clearance

    b.  *Screeners*  Six (6) screeners are required at minimum, to support the interrogation operations of the Division Interrogation Facility. Identified screeners should be the civilian equivalent to one of the following; 97B/E, 351B/E, 95BVS, Strategic Debriefer or an individual with a similar skill set), and US Citizens with a Secret clearance.

    c.  *Interrogation*  Four (4) interrogators are required at minimum, to support the interrogation operations of the Division Interrogation Facility. identified interrogators should be the civilian equivalent to one of the following 97E, 351E, Strategic Debriefer or an individual with a similar skill set, and US Citizens with a Secret clearance Arabic speakers are highly desired. ASI 9N and N7 desired.

10. **Division Interrogation Support Cell – ADP Equipment requirements** The following is a list of the Office Equipment requirements required for an effective interrogation support operations.  This office support equipment will be purchased by the Contractor for operations ISO the contract customer.

    a.  6 Dell Optiplex GX300 computers each with a minimum of a 1.5 GHZ processor, 40 gb hard drive, 256MB of RAM, a CDRW drive, 40 gb media tape drive. UPS power supply (capable of both US-UK standards - i.e., 110v/220v), and a 17" monitor

b.   1 x Computer with a minimum of 2 GHZ processor, 160 gb hard drive, 512MB of RAM, a CD/RW, 40 gb media tape drive, a UPS power supply (capable of both US/UK standards – i.e., 110v/220v), and a 19" monitor. (This computer will be utilized as the main database storage unit and will require the upgraded specifications, due to the increased activity on this system).

c.   2 x Dell Laptops with Pentium processors, 40 gb hard drive, a CD/RW drive, 256MB of RAM with a power supply capable of both, U.S./U.K standards – i.e., 110v/220v.  NOTE: These identified laptops will be primarily used for mobile interrogation operations, equipped with a digital camera (at minimum three mega-pixel quality), tripod, and case for secure transport of both, laptop and camera (e.g., pelican hardcase with internal/external locking mechanism).

d.   Also required: 1 x 2400dpi scanners, 1 Printers; 1 x HP laser jet 4100.  All ADP equipment must be network capable.

e.   All of the computers will require Biometrics Software (or equivalent software that has facial recognition, fingerprint ability, and is fully searchable for all data entered to include fingerprints) to be installed and the upgraded system will be the main server for the software.  This effort will also require 2 x digital cameras, with tripods, that are compatible with the existing computer software that are, at a minimum, three (3) mega-pixels.

11.   Period of Performance:  14 AUG 2003 to 13 AUG 2004

12.   Proposed Contracting Officers Representative:

Major Eugene A. Daniele CJTF7-C2 OPS
Email: Eugene.Daniele@vcmain.hq.c5.army.mil
DSN 318-1319/1105

13.   Travel:  The contractors are required to travel in order to provide the services and support required under th plan.  Actual travel requirements will be determined once performance has begun.  Contractor travel shall be reimbursed according to the Joint Travel Regulation.  Travel will be approved only by the Contracting Office or his/ her representative.

14.   Place of Performance: The government intends the contractor personnel to perform from the offices of the CJTF-7 Iraq and designated interrogation facilities

15.   Security Requirements:  Contractor personnel shall have DoD Security Clearances, prior to start date.  Contractor FSO will ensu that all clearances are forwarded to the CJTF-7 SSO via proper channels and IAW DoD security regulations and provisions.

16.   Logistics Support:  All contractors under this statement of work will be entitled to logistics support under Regulation 600-700 or its supplements.  It is the contractor's responsibility to provide such documentation a necessary to ensure appropriate consideration is made in this regard.

17.   Deliverables:  Deliverables are in the form of a monthly status report of actions accomplished, problems identified, and recommended problem solutions.

18.   Government Furnished Material (GFM) and Equipment (GFE) and Contractor Furnished Equipmen (CFE).  The government shall provide appropriate office spaces, Electronic mail access, Internet connectivit and labor saving devices and consumable office materials for contract performance.

19.   Government Furnished Personnel.  The government will provide an adequate number of linguists in the various languages and dialects to support the Interrogation Support Cell operations 24 hours/day, seven days/week.

**20. Facilities, supplies, and services.** In accordance with DFARS 225.802-70 and AR 715-9 the Government shall provide the following services when the Contractor is deployed in support of CJTF-7 Contingency Operations:

a. Base support to include: Billeting/Quarters, Messing Facilities, Post/Base Exchange, Banking, Check Cashing, Currency Exchange, Theater, Laundry, Gymnasium, Army/Air Force Postal Services, Morale Welfare and Recreation Services, and full care Medical/Dental Services as applicable to local theater regulations and policies.

b. Work space for the contractor, with access to office supplies, office furniture, computer and systems automation, internet access, and local and long distance telephone access, including DSN, as required to fulfill contract/mission requirements. Field conditions will be involved.

c. Organizational clothing and individual equipment (OCIE) and protective clothing/equipment to include protective mask and chemical protective over-garments required in the Theater of operations as per DA PAM 715-16 27 FEB 1998 and specified in Appendix B

d. The appropriate documentation commensurate with that given to DoD civilians in the Theater of operations: deploying Contractors will be issued a Uniform Services Identification Card, DD Form 1172, and a Geneva Conventions Identity Card, DD Form 489. CJTF-7 will provide the Contractor with a Letter of Authorization (LOA) that allows Army Units to issue necessary equipment, tests, shots, and training to the Contractor employee. Required local documentation (for example the Kuwaiti Visa) will be obtained at the Contractor's expense.

e. The necessary deployment processing to include immunization shots and record as required by CJTF-7 for entry into Theater of Operations. This processing may include a dental paragraph, DNA sampling, HIV testing, anthrax shots, and all other required shots.

f. On-site transportation to fulfill contract/mission requirements.

g. Appropriate individual readiness training (IRT), area orientations and training/briefings on rules of engagement and general needs applicable to U.S. Armed Forces, DoD Civilians, and U.S. Contractors as issued by the Theater Commander or his/her representative.

h. Force protection measures commensurate with that given to DoD civilians in the Theater of operations. This includes training Contractors to self-protection and NBC.

i. Remains processing in the event of an employee's death while in the theater of operations. This includes the transportation of remains back to CONUS

j. Contractors are considered non-combatants and are not authorized to be armed.

# EXHIBIT C
# to Billings Declaration

## ORDER FOR SUPPLIES OR SERVICES

IMPORTANT: Mark all packages and papers with contract and/or order numbers.

| PAGE | OF | PAGES |
|---|---|---|
| 1 | | 3 |

| 1. DATE OF ORDER | 2. CONTRACT NO. (If any) | 6. SHIP TO: Susan Goshea |
|---|---|---|

1. DATE OF ORDER
12/03/2003

2. CONTRACT NO. (If any)
GS35F58724

IDER NO.
000071

4. REQUISITION/REFERENCE NO.
See Lines

6. SHIP TO: Susan Goshea

a. NAME OF CONSIGNEE
ACofS C2 CJTF7

5. ISSUING OFFICE (Address correspondence to)

DOI - NBC, Ft. Huachuca AZ
P.O. Box 12924
ATTN: Julie Blankenship, 520-533-8945

Fort Huachuca    AZ    85670-2924

b. STREET ADDRESS
VICTORY CAMP

| c. CITY | d. STATE | e. ZIP CODE |
|---|---|---|
| APO | AE | 09302 |

7. TO:

a. NAME OF CONTRACTOR

f. SHIP VIA

b. COMPANY NAME
CACI/PTI

c. STREET ADDRESS
14151 Park Meadow Drive

8. TYPE OF ORDER

☐ a. PURCHASE
REFERENCE YOUR

Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated.

☐ b. DELIVERY - Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract.

| d. CITY | e. STATE | f. ZIP CODE |
|---|---|---|
| Chantilly | VA | 20151-2218 |

9. ACCOUNTING AND APPROPRIATION DATA
See Funding Detail

10. REQUISITIONING OFFICE
ACofS C2 CJTF7

11. BUSINESS CLASSIFICATION    (Check appropriate box(es))
☐ a. SMALL    ☐ b. OTHER THAN SMALL    ☐ c. DISADVANTAGED    ☐ d. WOMEN OWNED

| 12. F.O.B. POINT Destination | 14. GOVERNMENT B/L NO. | 15. DELIVER TO F.O.B. POINT ON OR BEFORE (Date) | 16. DISCOUNT TERMS |
|---|---|---|---|
| 13. PLACE OF | | | 10 days    % |
| a. INSPECTION    b. ACCEPTANCE | | | 20 days    % |
| | | | 30 days    % |
| | | | days    % |

### 17. SCHEDULE (See reverse for Rejections)

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|
| | SEE LINE ITEM DETAIL | | | | | |

| 18. SHIPPING POINT | 19. GROSS SHIPPING WEIGHT | 20. INVOICE NO. | | |
|---|---|---|---|---|

SEE BILLING INSTRUCTIONS ON REVERSE

21. MAIL INVOICE TO: Teresa Gurule

a. NAME
Dept. of the Interior - National Business Center

b. STREET ADDRESS (or P.O. Box)
Accounting Operations Branch, 7301 W Mansfield Avenue

| c. CITY | d. STATE | e. ZIP CODE | |
|---|---|---|---|
| Denver | CO | 80235-2230 | |

17(h) TOT (Cont pages)

17(i) GRAND TOTAL
$21,789,921.00

22. UNITED STATES OF AMERICA BY (Signature)
*Margaret E. Sebastian*

23. NAME (Typed)
Margaret E. Sebastian
TITLE: CONTRACTING/ORDERING OFFICER

NSN 7540-01-152-8083
Previous edition not usable

OPTIONAL FORM 347 (REV. 6/95)
Prescribed by GSA FAR 48 CFR 53.213(e)

| Line Item Summary | Documen. nber 000071 | Title CACI PTI | Page 2 of 3 |
|---|---|---|---|

**Total Funding:** $21,799,921.00

| FYs | Fund | Budget Org | Sub | Object Class | Sub | Program | Cost Org | Sub | Proj/Job No. | Sub | Reporting Category |
|---|---|---|---|---|---|---|---|---|---|---|---|

See Line Item(s)

| Division | | Closed FYs | | Cancelled Fund | | | | | | | |

| Line Item Number | Description | (Start Date to End Date) | Quantity | Unit of Issue | Unit Price | Total Cost (Includes Discounts) |
|---|---|---|---|---|---|---|

FAR 52.232-7 Payments Under Time-and-Material and Labor Hour Contracts (2/02) the Contracting Officer will not impose the 5% withhold allowed by this clause.

52.204-2 Security Requirements (8/96)

| | | | | | | |
|---|---|---|---|---|---|---|
| 0001 | Technical Services Support | | 1.00 | lot | $16,849,304.000 | $ 16,849,304.00 |

(12/03/2003 to 12/02/2004)

The Contractor shall perform services in accordance with the statement of work entitled "HUMINT Augmentee Contractors, CJTF-7 Division HUMINT Support Package (DHSP)".

Line of Acctg: 2142O2 0000 76-2084 P135197.0000 258A 83 4QG4 MIPR4ADIASD045 4QG4 83 S09076

ALC: To be billed 00005570 and charged back to ALC00006579/DODAAD S09076

| 0002 | Travel, CR/NTE | | 1.00 | lot | $20,314.000 | $ 20,314.00 |
|---|---|---|---|---|---|---|

(12/03/2003 to 12/02/2004)

Travel shall be performed in accordance with the JTR (Joint Travel Regulation).

Line of Acctg : 2142020 0000 76-2084 P135197.0000 258A 83 4QG4 MIPR4ADIASD045 4QG4 83 S090076

ALC: To be billed 00005570 and charged back to ALC 00008579/DODAAD S09076

| 0003 | Other Direct Costs (ODC'S) CR/NTE | | 1.00 | lot | $4,930,303.000 | $ 4,930,303.00 |
|---|---|---|---|---|---|---|

(12/03/2003 to 12/02/2004)

ODC'S shall be obtained in accordance with the requirements of the GSA Schedule including leasing vehicles, equipment, body armor.

Line of Acctg: 2142020 0000 76-2084 P135197.0000 258A 83 4QG4 MIPR4ADIASD045 4QG4 83 S09076

ALC: To be billed 00005570 and charged back to ALC 00006579/DODAAD S09076

Total Cost: $21,799,921.00

J54 is incorporated into this order

| Contract Level Funding Summary | Document Number 000071 | Title CACI PTI | Page 1 of 1 |
| --- | --- | --- | --- |

$0.00

2004 - WH - 6522 - 255D - WHOTH - CJTF45 - FB

$21,799,921.00

Reference Requisition:    NBCHZ040149

Total Funding:  $21,799,921.00

Statement of Work (SOW) for HUMINT Augmentee Contractors, CJTF-7
Division HUMINT Support Packages (DHSP)

### CJTF-7 HUMINT Support Teams

**1. Mission:** Assist CJTF-7 subordinate divisions, their subordinate Brigade Combat Teams (BCT), separate maneuver brigades and organic MI units in performance of HUMINT and Counterintelligence (CI) missions at secure and fixed locations, in order to free military Tactical HUMINT Teams (THT) to focus on support to ongoing operations and collection activities.

**2. Identification:**
Organization: Combined Joint Task Force-Seven (CJTF-7), C2
Location: Baghdad, Iraq (CJTF-7 AOR)
Organizational POC: C2, CJTF-7 (LTC William H. Brady, LTC MI)
Phone number: (DSN) 318-822-1319/1105
E-mail: william.h.brady@us.army.mil

**3. Scope of Work and Task Description:** Division HUMINT Support Packages (DHSP) consists of a G2X CI/HUMINT Special Advisor, and HUMINT Support Teams (HST) comprised of personnel with interrogation, screening, and counterintelligence backgrounds. The G2X CI/HUMINT Advisor is designed to assist the commander in the management and oversight of HUMINT operations, and performs duties as a member of the G2 staff. As the operational element, HSTs support the overall divisional / separate brigade HUMINT mission, and perform under the direction and control of the unit's MI chain of command or Brigade S2, as determined by the supported command. HSTs are primarily designed to support the brigade combat team (BCT) from fixed sites within the BCT AO. HSTs perform routine and recurring CI and HUMINT missions from fixed and secure locations (defined as unit/coalition detainee holding areas, bases, camps and installations). HSTs are designed to free military assets for other duties, but will not be used as mobile THTs. HSTs conduct missions such as debriefing of personnel, intelligence liaison with installation units/personnel, support to OPSEC/SAEDA awareness programs, CI/security assessments, screening of locally employed persons (LEP screening), initial handling of walk-ins, CI support to force protection, intelligence report writing/quality control, and screening/interrogation of detainees at established holding areas. HSTs coordinate closely with the Brigade DS THT(s), and can support or reinforce THT operations within the scope of this SOW. HSTs will be equipped to travel to and operate from multiple fixed sites within an assigned AO and IAW unit procedures, but will not conduct intelligence missions outside of secure areas (as defined above). Under no circumstances will HSTs be armed, employed in direct support of combat operations, or used to conduct source operations or SAEDA investigations.

**4. DHSP/HST Manning and Technical Requirements.** The standard DHSP consists of one HST per maneuver BCT (or separate maneuver brigade), and one GS to the Division. The DHSP also consists of one senior HUMINT operations specialist, who assists the Division G2X in management of CI and HUMINT operations. The CJTF C2X will provide oversight and final recommendations regarding the allocation of HSTs to divisions/separate brigades. The base configuration and required experience of positions within the DHSP and HST is as follows:

a. G2X CI/HUMINT Advisor (DHSP only). Acts as coordinator/special advisor to the G2X on matters concerning CI and HUMINT activities, in support of screening and interrogation operations within the AOR. Provide oversight and other directed intelligence support to division screening and interrogation operations. Oversees LEP screening program, THT/HST employment, interrogation operations and HUMINT reporting. Performs other duties related to CI and HUMINT operations as directed by the G2. Must be very familiar with OPSEC, SAEDA, interrogation and LEP screening operations/programs, as well as CI and HUMINT reporting procedures. Minimum of 10 years CI/HUMINT operational experience required, with preference to Middle East experience and language skills. Individuals must be knowledgeable of Army/Joint interrogation procedures, data processing systems such as CHIMs and SIPRNET search

1

## Statement of Work (SOW) for HUMINT Augmentee Contractors, CJTF-7 Division HUMINT Support Packages (DHSP)

engines. Must have a current Top Secret Clearance. Position requires former MOS 97B/E, 351B/E, 35E/F or civilian/joint service equivalents. *This position will require performance of work 12 hours/day, six days/week.*

b. Senior Counterintelligence Agent (HST): Oversees the HST and HST operations, within the SOW. Facilitates the scheduling and assignment of HST tasks, ICW the MI commander and supported command. Must be familiar with OPSEC, SAEDA, interrogation and LEP screening operations/programs. Supports the production of reports and conducts QC of completed reports/products produced by the HST and Brigade DS THT. Ensures the two way flow of information between BDE and DIV is moving efficiently and effectively. Develops recording mechanism for TTP and lessons learned in the conduct of operations. Individual must be a trained counterintelligence agent or interrogator with 10 years of experience. Individuals must be knowledgeable of Army/Joint interrogation procedures, data processing systems such as CHIMs and SIPRNET search engines. Must have a current Secret Clearance with TS preferred. Knowledge of the Arabic language and culture a plus. Position requires former MOS 97B/E, 351B/E, 35E or civilian/joint service equivalents. *This position will require performance of work 12 hours/day, six days/week.*

c. Junior Counterintelligence Agent (HST): Conduct screenings on various individuals with access to the brigade AO or who are hired into a position that allows them knowledge of brigade operations. Individuals will also interview walk-in sources, conduct liaison, support security/OPSEC/force protection programs and produce written reports and assessments. All actions will be managed by the Senior CI Agent. Individual must be a trained counterintelligence agent with at least 5 years of experience. Individuals must be knowledgeable of Army/Joint interrogation procedures, data processing systems such as CHIMs and SIPRNET search engines. Must have a current Secret Clearance. Knowledge of the Arabic language and culture a plus. Position requires former MOS 97B, 351B or civilian/joint service equivalents. *This position will require performance of work 12 hours/day, six days/week.*

d. Junior Interrogator (HST): Conducts interrogations of detainees. When not employed as interrogators and producing reports, individuals will assist in the HUMINT reporting system maintenance to include Brigade Black/White/Gray list, support screening operations and conducts analysis or liaison to support interrogation operations. All actions will be managed by the Senior CI Agent. Individuals must be trained interrogators with at least 5 years of experience in interrogation. Individuals must be knowledgeable of Army/Joint interrogation procedures, data processing systems such as CHIMs and SIPRNET search engines. Must have a current Secret Clearance. Knowledge of the Arabic language and culture a plus. Position requires former MOS 97E, 351E, or civilian/joint service equivalents. ASI 9N and N7 desired. *This position will require performance of work 12 hours/day, six days/week.*

**5. HST Team Composition**: 5x personnel per team (1x Senior CI Agents, 2x Junior CI Agents; 2x Junior Interrogators).

**6. Requirement for CJTF**: 15x HSTs and 3x G2X CI/HUMINT Advisors based on projected force requirements of US divisions and US Separate Brigades/Regiments. Allocation is based on following:

    a.  4x HST per division: 1x HST per BCT and 1xGS to the Division.
    b.  1x HST per separate brigade/regiment.

**Roll-up of all requirements:**

| G2X CI/HUMINT Advisor | 03 | Division |
|---|---|---|
| Senior Counterintelligence Agents | 15 | Brigade/Div |

2

## Statement of Work (SOW) for HUMINT Augmentee Contractors, CJTF-7
### Division HUMINT Support Packages (DHSP)

| | | |
|---|---|---|
| Junior Interrogator (Screening team) | 30 | Brigade/Div |
| Junior Interrogator (MIT) | 30 | Brigade/Div |
| **Totals:** | 78 | CJTF 7 |

**7. ADP and Special Equipment requirements:** The following is a list of the office equipment requirements required for effective HST operations. This office support equipment will be purchased by the Contractor for operations ISO the contract customer. All ADP equipment must be network capable and multi power (110/220v).

   a.  3x Dell Optiplex SX 270 Ultra Small Form Factor Computers
Technical Requirements:
- Pentium 4 3.2 Ghz Processor
- 1 Gb DDR Ram
- 20 Gb Hard Drives
- 8x DVD Drive
- MS Optical Mouse
- Necessary cabling and UPS for operations, and hard case for transport.

   b.  1x digital camera, with tripod, that are compatible with existing computer software that are, at a minimum, two (2) mega-pixels.

   c.  1x 2400dpi scanner.

   d.  1x Printer, HP laser jet 4100.

   e.  2x cellular phones.

   f.  15 x Vehicles (should be 4X4, diesel-fueled vehicles)

   g.  $15K for office material/furnishings (~1K per HST)

   h.  $45K for minor facility renovations (~3K per HST)

**8. Period of Performance:  1 NOV 2003 to 31 OCT 2004.**(Base Year)
                                  **1 NOV 2004 to 31 OCT 2005.**(Option Year 1)
                                  **1 NOV 2005 to 31 OCT 2006.**(Option Year 2)

**9. Proposed Contracting Officers Representative:** LTC William H. Brady, (DSN) 318-822-1319/1105, E-mail: william.h.brady@us.army.mil.

**10. Travel:** The contractors are required to travel in order to provide the services and support required under this plan. Actual travel requirements will be determined once performance has begun. Contractor travel shall be reimbursed according to the Joint Travel Regulation. Travel will be approved only by the Contracting Officer or his/ her representative.

**11. Place of Performance:** The government intends the contractor personnel to perform from the offices of the CJTF7, Baghdad, Iraq and subordinate divisional Aos located throughout Iraq.

**12. Security Requirements:** Contractor personnel shall have Secret Clearances, prior to start date, with the exception of the G2X Advisor, who requires TS.

## Statement of Work (SOW) for HUMINT Augmentee Contractors, CJTF-7 Division HUMINT Support Packages (DHSP)

**13. Logistics Support:** All contractors under this statement of work will be entitled to logistics support under Regulation 600-700 or its supplements. It is the contractor's responsibility to provide such documentation as necessary to ensure appropriate consideration is made in this regard.

**14. Deliverables:** Deliverables are in the form of a monthly status report of actions accomplished, problems identified, and recommended problem solutions.

**15. Government Furnished Material (GFM) and Equipment (GFE) and Contractor Furnished Equipment (CFE).** The government shall provide appropriate office spaces, Electronic mail access, Internet connectivity, and labor saving devices and consumable office materials for contract performance.

**16. Government Furnished Personnel.** The government will provide an adequate number of linguists in the various languages and dialects to support operations.

**17. Facilities, supplies, and services.** In accordance with DFARS 225.802-70 and AR 715-9 the Government shall provide the services when the Contractor is deployed in support of CJTF-7 Contingency Operations, as identified below. Contractor is authorized to make minor renovations to work facilities in order to meet requirements of the tasking, as coordinated with the COR, and within the scope of the overall contract cost estimate for renovations (see end of SOW).

a. Base support to include Billeting/Quarters, Messing Facilities, Post/Base Exchange, Banking, Check Cashing, Currency Exchange, Theater, Laundry, Gymnasium, Class VI, Army/Air Force Postal Services, Morale Welfare and Recreation Services, and full care Medical/Dental Services as applicable to local theater regulations and policies.

b. Work space for the contractor, with access to office supplies, office furniture, internet access, and local and long distance telephone access, including DSN, as required to fulfill contract/mission requirements.

c. Organizational clothing and individual equipment (OCIE) and protective clothing/equipment to include protective mask and chemical protective over-garments required in the Theater of operations as per DA PAM 715-16 27 FEB 1998 and specified in Appendix B.

d. The appropriate documentation commensurate with that given to DoD civilians in the Theater of operations: deploying Contractors will be issued a Uniform Services Identification Card, DD Form 1173, and a Geneva Conventions Identity Card, DD Form 489. CJTF7 will provide the Contractor with a Letter of Authorization (LOA) that allows Army Units to issue necessary equipment, tests, shots, and training to the Contractor employee. Required local documentation (for example the Kuwaiti Visa) will be obtained at the Contractor's expense.

e. The necessary deployment processing to include immunization shots and record as required by CJTF7 for entry into Theater of Operations. This processing may include a dental pantograph, DNA sampling, HIV testing, anthrax shots, and all other required shots.

f. Appropriate individual readiness training (IRT), area orientations and training/briefings on rules of engagement and general orders applicable to U.S. Armed Forces, DoD Civilians, and U.S. Contractors as issued by the Theater Commander or his/her representative.

g. Force protection measures commensurate with that given to DoD civilians in the Theater of operations. This includes training Contractors in self-protection and NBC.

h. Remains processing in the event of an employee's death while in the theater of operations. This includes the transportation of remains back to CONUS.

4

**Statement of Work (SOW) for HUMINT Augmentee Contractors, CJTF-7
Division HUMINT Support Packages (DHSP)**

i. Contractors are considered non-combatants and are not authorized to be armed.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ILHAM NASSIR IBRAHIM, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>TITAN CORPORATION, et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 1:04-CV-01248-JR |

## DECLARATION OF DANIEL J. PORVAZNIK

I, Daniel J. Porvaznik, hereby declare as follows:

1.      I submit this declaration in support of the CACI defendants' motion for summary judgment.

2.      I am employed by CACI Premier Technology, Inc.

3.      I arrived in Baghdad, Iraq on 5 October 2003 and at Abu Ghraib prison on that same date.  From October 2003 through mid-March 2004, I served as an interrogator and as CACI's Site Lead at Abu Ghraib.  As Site Lead, my responsibilities were to serve as the coordinator/adviser to the Joint Interrogation & Debriefing Center ("JIDC") staff on issues of interrogation and screening operations, the liaison between CACI employees at the JIDC, CACI's country manager, the C2X Special Adviser and CACI and military personnel at the Division Interrogation Facilities ("DIFs").  From mid-March through November 2004, I served as Special Adviser to the C2X (the military commander responsible for all counterintelligence and HUMINT activities).  As the C2X Special Adviser, my responsibilities were to serve as the

coordinator/special adviser to the C2/C2X, MNF-1 on matters concerning counterintelligence and HUMINT activities; to provide advice and coordinate intelligence support to the C2X for MNF-1 screening and interrogation operations; and to manage DCSINT staff inquiries concerning contractor/SOW issues. From November 2004 through September 2005, I served as CACI's Country Manager for Iraq. In that capacity, I managed, monitored, analyzed and coordinated all aspects of the C2 and C4 CACI contracts in Iraq.

4.    From April 1978 through April 1999, I served in the United States Marine Corps. From 1978-1979, I served as the Infantry Weapons Section/Squad Leader for the 2nd Battalion, 4th Marines, 3rd Marine Division, Okinawa, Japan and the Pacific Theater of Operations. From 1980-1983, I served as Operations Chief, Marine Corps Base Chapels, Camp LeJeune, North Carolina. From 1985-1986, I served as Intelligence Chief and Information and Personnel Security Chief, 2nd Battalion, 7th Marines, 1st and 3rd Marine Divisions, Camp Pendelton, California and Pacific Theater of Operations. From 1987-1988, I served as Intelligence Analyst/Interrogator/Translator/Foreign Liaison Officer, 11th Marine Amphibious Unit, Camp Pendelton, California and Pacific Theater of Operations. From 1988-1990, I served as Team Commander/Foreign Liaison Officer/Intelligence Analyst/Translator, 22nd Marine Expeditionary Unit, Camp LeJeune, North Carolina and deployed to the Mediterranean Sea and West Africa. From late 1990 through May 1991, I served as Operations Chief/Battalion Interrogator/Translator (Arabic-Iraqi)/Intelligence Analyst, Operations Desert Shield/Storm. From May 1991 to May 1992, I served as Team Commander/Foreign Liaison Officer/Intelligence Analyst, 2nd Interrogator-Translator Platoon, Camp LeJeune, North Carolina. From June 1992 through December 1995, I served as Course Director, Interrogation of Prisoners of War, Navy and Marine Corps Intelligence Center. From 1996-998, I served as

Operations Manager, Naval and Marine Corps Issues, United States Embassy, Sultanate of Oman.

5.    In the Marine Corps, I received the following commendations:    Defense Meritorious Service Medal; Navy/Marine Corps Commendation Medal (2 awards); Navy/Marine Corps Achievement Medal; National Defense Service Medal; Armed Forces Expeditionary Medal; Southwest Asia Service Medal; Combat Action Ribbon; Joint Meritorious Unit Award, Navy Unit Commendation (3 awards); Meritorious Unit Commendation (3 awards); Marine Corps Expeditionary Medal; Good Conduct Medal (7 awards); Humanitarian Service Medal; Sea Service Deployment Ribbon (6 awards); Overseas Service Ribbon (2 awards); Kuwaiti Liberation Medal, Saudi Arabia; Kuwaiti Liberation Medal, Kuwait.

6.    I am semi-fluent in modern standard Arabic and French, conversational in Magrebhi (North African Arabic dialect), and conversational in Iraqi (Gulf Arabic dialect).

7.    In June 1999, I went to work for Premier Technology Group as an Intelligence Analyst.    In that capacity, I was assigned on-site to U.S. Army Europe ("USAEUR") Headquarters to support the Deputy Chief of Staff for Intelligence.    During that time I also served as the Site Team Lead for Heidelberg Senior Intelligence Analyst contract.    As an Intelligence Analyst, I was responsible for, among other things, preparing a daily written current intelligence product for the Commanding General, U.S. Army Europe, the Deputy Chief of Staff for Operations and major subordinate commands.    I was also responsible for monitoring and analyzing all aspects of political, military and economic development for 34 countries in Europe and the Balkans.    At all times my work was assigned to me by military and DoD personnel, my work product was directed to and delivered to military personnel, and I was at all times subject to

- 3 -

the supervision, command, control and direction of USAEUR personnel in the performance of my duties.

8.    CACI supplied personnel and equipment in Iraq to support the military intelligence mission. That operation generated significant numbers of detainees and a need for intelligence. CACI personnel performed as interrogators, screeners, intelligence analysts, counterintelligence personnel, data-entry and intelligence research clerks.

9.    CACI employees were at all times under the supervision, control and direction of U.S. military personnel in the Iraqi theater of operations.

10.    The United States military approved CACI personnel prior to their deployment to Iraq, assigned tasks to CACI personnel, determined the command structure and governed the CACI employees' work schedule.

11.    CACI interrogators were all required to hold security clearances, which is a determination made exclusively by the United States.

12.    As CACI Site Lead at Abu Ghraib, I (and all CACI interrogators) reported directly to Captain Carolyn Wood, U.S. Army, in her capacity as Officer in Charge ("OIC") of the Interrogation Control Element ("ICE"). I (and all CACI interrogators) also reported to the Non-Commissioned Officer in Charge ("NCOIC"), who reported to Captain Wood.

13.    The United States military had exclusive responsibility for setting all Interrogation Rules of Engagement ("IROEs"). Only the OIC or the NCOIC or higher military authority could approve any deviation from the IROEs.

14.    Below the ICE OIC and NCOIC in the chain of command were Section Leaders. All Section Leaders were members of the United States Army. Each Section Leader was responsible for supervision and control of between four and eight interrogation teams. At times,

- 4 -

CACI personnel advised the military Section Leaders. Each interrogation team consisted of an interrogator, an intelligence analyst and an interpreter. The United States Army personnel supervising the interrogation effort selected the interrogation teams from among the military and civilian interrogators, analysts, and interpreters.

15.    CACI's interrogators performed their mission in a manner that was indistinguishable from the performance of the mission by U.S. military interrogators. Each interrogator, whether military or civilian, would review detainee packages and develop an interrogation plan. The interrogator would then present the proposed interrogation plan to the Section Leader, a member of the military, who would review the interrogation plan. The interrogation plan would subsequently be presented to the OIC or the NCOIC, also military personnel, for review and approval. As a result, each interrogation plan was authorized at both the Section Leader level and the NCOIC/OIC, or by higher military authority.

16.    After concluding an interrogation, the interrogator would prepare a draft Intelligence Information Report ("IIR") based on his or her Interrogation Notes ("INS"). The IIR would be entered into the military's computer server.

17.    All databases and computer systems used by CACI employees were the property of the United States. All information entered into those databases by CACI employees was the property of the United States. The databases used by CACI personnel and into which CACI personnel entered information were the same servers used by military interrogators and into which military personnel entered information concerning the interrogations they had performed.

18.    CACI also reported to the Contracting Officer's Representative ("COR"), who was responsible for monitoring CACI's compliance with its contract and for contract administration. For example, leave for CACI employees had to be approved in the first instance

by the major subordinate command to which they were assigned, and leave policy had to be approved by the COR, and CACI's invoices had to be approved by the COR. From October 2003 until February 2004, the COR was Lt. Colonel William H. Brady, U.S. Army. In February 2004, Lt. Colonel Brady was replaced as COR by Major Eugene Daniels, U.S. Army.

19.    The only supervisory positions held by CACI employees were purely internal CACI-related positions, such as country manager and site lead, that existed solely for providing administrative support to CACI personnel and for making liaison with U.S. Army personnel for contract-related issues. These internal administrative managers did not exercise any operational control over CACI or military interrogators.

5.    I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _28th_ day of October , 2005.

Daniel J. Porvaznik

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ILHAM NASSIR IBRAHIM, et al.,          )
                                       )
          Plaintiffs,                  )
                                       )
      v.                               )     Civil Action No. 1:04-CV-01248-JR
                                       )
TITAN CORPORATION, et al.,             )
                                       )
          Defendants.                  )
                                       )

## DECLARATION OF CHARLES MUDD

I, Charles Mudd, hereby declare as follows:

1.      I submit this declaration in support of the motion of CACI Premier Technology, Inc. ("CACI PT") for summary judgment.

2.      I am employed by CACI PT as Vice President-Division Manager. I have been employed in that capacity since approximately May 2003, when substantially all of the assets of Premier Technology Group, Inc. ("PTG") were acquired by CACI PT. In my capacity as Vice President-Division Manager, I had management responsibility for CACI PT's intelligence support services in Iraq.

3.      Prior to my employment by CACI PT, from 1998-2003 I was employed by PTG as Vice President of the Division of Analysis & Information Services. In that capacity I was responsible for the operational management of PTG's Department of Defense programs.

4.      CACI PT employees first deployed from Germany with U.S. Army forces to Iraq in summer 2003 in connection with their work under a contract to support V Corps G2, which is

CM

part of U.S. Army-Europe ("USAREUR"). CACI PT employees were providing intelligence support services to V Corps G2 under a DO issued by an Army contracting office pursuant to PTG's GSA schedule contract.

5.    In July 2003, I traveled to Kuwait and to Iraq to check on the CACI PT employees that had employed to Iraq with the Army, and to determine whether there were any business opportunities for CACI PT in Iraq. In connection with the latter endeavor, I visited Army contracting facilities in Kuwait and in Iraq. During those visits, I explained the types of services that CACI PT could provide, attempted to determine what the Government's needs were that CACI PT might be in a position to satisfy, and generally attempted to determine how to go about contracting for business in Iraq. When queried about providing contracting assistance, those Army contracting offices indicated they were not in a position to contract directly for the types of intelligence support services that the Army needed. The Army's in-country contracting officials asked if CACI PT had an existing contract vehicle that could be used to procure those services, and when they were informed of a contract administered by Ft. Huachuca, advised that CACI PT should deal directly with Ft. Huachuca.

6.    Subsequently, the Department of the Interior contracting office of Ft. Huachuca issued eleven delivery orders to CACI PT for the provision of intelligence and logistics support services. Two of those delivery orders involved CACI PT's provision of interrogators.

7.    Pursuant to the delivery orders, CACI PT supplied personnel and equipment in Iraq to support the military intelligence mission, which generated significant numbers of detainees and a need for intelligence. CACI PT personnel performed as interrogators, screeners, intelligence analysts, counterintelligence personnel, data-entry and intelligence research clerks.

8.      I was the CACI PT officer responsible for the day-to-day management of CACI PT's performance of the delivery orders. In that capacity, I learned the interrogation rules of engagement ("IROEs") applicable to military and civilian interrogators alike. The IROEs were promulgated exclusively by the U.S. Government.

9.      In managing the CACI PT personnel deployed to Iraq, I visited Iraq every 2-3 months. During those visits, I interacted with CACI PT employees, who were at all times under the supervision, control and direction of U.S. military personnel in the Iraqi theater of operations. With respect to interrogators employed by CACI PT, CACI PT had no responsibility for promulgation of any regulations, rules of engagement, standard operating procedures, priorities, or tasks. CACI PT did not in fact promulgate or establish any regulations, rules of engagement, standard operating procedures, priorities or tasks. Those were promulgated exclusively by the United States Government, and CACI PT personnel were at all times required to follow and comply with those regulations, rules of engagement, standard operating procedures, priorities and tasks. I also interacted with the Contracting Officer's Representative ("COR"), who was responsible for monitoring CACI PT's compliance with its contract and for contract administration.

10.     The United States military approved CACI PT personnel prior to their deployment to Iraq, assigned the tasks performed by CACI PT personnel, determined the command structure and governed the CACI PT employees' work schedule. The COR also determined whether CACI PT should remove an employee from the contract.

11.     The only supervisory positions held by CACI PT employees were purely internal CACI PT-related positions, such as country manager and site lead, that existed solely for providing administrative support to CACI PT personnel and for communicating with U.S. Army

- 3 -

personnel for contract-related issues. These internal administrative managers did not exercise any operational control over CACI or military interrogators.

12.    I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _15_ day of December, 2005.

Charles Mudd

- 4 -

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ILHAM NASSIR IBRAHIM, et al.,          )
                                       )
            Plaintiffs,                )
                                       )
       v.                              )        Civil Action No. 1:04-CV-01248-JR
                                       )
TITAN CORPORATION, et al.,             )
                                       )
            Defendants,                )
                                       )

## DECLARATION OF COL WILLIAM H. BRADY, U.S. ARMY

I, Colonel William H. Brady, U.S. Army, hereby declare as follows:

1.     I am a Colonel in the United States Army.  From October 2003 until February 2004, while deployed in Iraq, one of my assigned duties involved contracts for intelligence services under which CACI Premier Technology, Inc. ("CACI PT") provided, among other personnel, civilian contract interrogators in support of the United States Army's mission in Iraq. I was the United States Army representative responsible for overseeing the performance and execution of the CACI PT contract for intelligence services in the Iraq theater of operations.  As such, it was part of my duties to be familiar with the manner in which interrogators provided under the contract were deployed and supervised.

2.     As part of my duties, I assigned contract interrogators--in coordination with CACI representatives--to fill interrogation requirements throughout Iraq, to include interrogation operations at the theater interrogation cell at Abu Ghraib. Once the contract interrogators arrived at the theater interrogation cell, a CACI site manager would assign them to military interrogation

units or teams. During all relevant times, the civilian interrogators provided by CACI PT in support of the United States Army's mission at the theater interrogation site were under the supervision of military personnel from the military unit to which they were assigned to support under contract. For example, CACI PT interrogators serving at Abu Ghraib prison were directly supervised by the chain of command for the 205th Military Intelligence Brigade and Joint Interrogation and Debriefing Center ("JIDC"). The CACI PT interrogators were integrated within the military interrogation process of the military units to which they were assigned to support. That is, CACI PT interrogators received the same operational interrogation taskings and direction from the military as their military interrogator counterparts. Subject to the two exceptions detailed below, there was no differentiation in the interrogation mission and practice between a military interrogator and a CACI PT interrogator at the theater interrogation site. All of the interrogators -- military and civilian -- were treated as part of one team and as having the same interrogation responsibilities, reporting obligations, and mission direction. From a functional standpoint, the only apparent differences between the CACI PT interrogators and military interrogators were that the CACI PT interrogators wore civilian clothes while their military counterparts wore uniforms, and -- at least at Abu Ghraib prison -- the CACI PT interrogators were billeted in a separate facility from the military interrogators.

3.     While the CACI PT interrogators were under the functional control and supervision of the United States military, CACI PT did have a country manager and site leads who provided administrative support for these interrogators. For example, if a CACI PT interrogator had a pay issue, he or she would address that administrative issue through the CACI PT site leads and country manager. If a CACI PT interrogator sought to take leave, the request typically would be made to the United States Army personnel with functional control over the

interrogator. If the supported military unit approved of the leave request, I would then consider the request and, if I approved, the request would be forwarded to the CACI administrative support personnel for consideration and action. With respect to the conduct of required interrogations and related operational issues, however, CACI PT interrogators reported directly to the United States Army personnel who supervised them.

4.     I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___6th___ day of December, 2005.

COL William H. Brady, U.S. Army

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ILHAM NASSIR IBRAHIM, et al.,  )
                               )
         Plaintiffs,           )
                               )
    v.                         )         Civil Action No. 1:04-CV-01248-JR
                               )
TITAN CORPORATION, et al.,     )
                               )
         Defendants.           )

## DECLARATION OF LTC EUGENE DANIELS, U.S. ARMY

I, Lieutenant Colonel Eugene Daniels, U.S. Army, hereby declare as follows:

1.      I am a Lieutenant Colonel in the United States Army. From January 2004 until February 2005, I was deployed with the United States Army in Iraq. From February 2004 until my departure from Iraq in February 2005, one of my assigned duties was as the Contracting Officer's Representative ("COR") for the contracts for intelligence services under which CACI Premier Technology, Inc. ("CACI PT") provided, among other personnel, civilian contract interrogators in support of the United States Army's mission in Iraq. As the COR, I was the United States Army representative in charge of overseeing the performance and execution of the CACI PT contract for intelligence services. As such, it was part of my duties to be familiar with the manner in which interrogators provided under the contract were deployed and supervised.

2.      As part of my COR duties, I assigned contract interrogators--in coordination with CACI representatives--to fill interrogation requirements throughout Iraq, to include interrogation operations at the theater interrogation cell at Abu Ghraib. Once the contract interrogators arrived

at the theater interrogation cell, a CACI site manager would assign them to military interrogation units or teams. During all relevant times, the civilian interrogators provided by CACI PT in support of the United States Army's mission in Iraq were under the supervision of military personnel. At no relevant time were the civilian interrogators provided by CACI PT in charge of the interrogation mission in Iraq, or any aspect of that mission. Rather, the CACI PT civilian interrogators performed their own interrogation tasks as assigned by the United States Army and were subject to the oversight and supervision of United States Army personnel with respect to the CACI PT interrogators' performance of such assigned duties. As members of integrated teams of military personnel and contractors, CACI PT employees received all interrogation taskings from the military chain of command. From a functional standpoint, the only apparent differences between the CACI PT interrogators and military interrogators were that the CACI PT interrogators wore civilian clothes while their military counterparts wore uniforms, and the CACI PT interrogators were billeted in a separate facility from the military interrogators. The CACI PT interrogators performed the same interrogation duties, did the same reporting, and reported to the same military supervisors as military interrogators.

3.    While the CACI PT interrogators were under the supervision of the United States military, CACI PT did have a country manager and site leads who provided administrative support for these interrogators. For example, if a CACI PT interrogator had a pay issue, he or she would address that administrative issue through the CACI PT site leads and country manager. If a CACI PT interrogator sought to take leave, the request typically would be made first to the United States Army personnel who supervised the interrogator. If the United States Army approved the leave request, the request would be routed by the CACI PT interrogator through his site lead and/or country manager for consideration. With respect to the conduct of

required interrogations and related operational issues, however, CACI PT interrogators reported directly to the United States Army personnel who supervised them

4.    I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _86_ day of December, 2005.

LTC Eugene Daniels, U.S. Army

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ILHAM NASSIR IBRAHIM, et al.,          )
                                       )
        Plaintiffs,                    )
                                       )
        v.                             )       Civil Action No. 1:04-CV-01248-JR
                                       )
TITAN CORPORATION, et al.,             )
                                       )
        Defendants.                    )
                                       )

## DECLARATION OF SCOTT NORTHROP

I, Scott Northrop, hereby declare as follows:

1.      I submit this declaration in support of the motion of CACI Premier Technology, Inc. ("CACI PT") for summary judgment.

2.      I am employed by CACI PT as a Project Manager.

3.      I arrived in Baghdad, Iraq in November 2003. From November 2003 through December 2004, I served as CACI PT's Iraq-In-Country Manager. In that capacity, I managed, monitored, analyzed and coordinated all administrative aspects of the C2 (intelligence) and C4 (logistics) CACI contracts in Iraq.

4.      CACI supplied personnel and equipment in Iraq to support the military intelligence mission. CACI personnel performed as interrogators, screeners, intelligence analysts, counterintelligence personnel, data-entry and intelligence research clerks.

5.      As Iraq In-Country Manager, I provided administrative support to CACI personnel and communicated with U.S. Army personnel on contract-related issues. I did not

exercise any operational control over CACI or military interrogators, nor did I supervise or direct their performance of interrogations. Rather, CACI employees were at all times under the operational supervision, control and direction of U.S. military personnel in the Iraq Theater of Operations.

6.     The United States military approved CACI personnel prior to their deployment to Iraq, assigned tasks to CACI personnel, determined the command structure and governed the CACI employees' work schedule.

7.     CACI interrogators were all required to hold security clearances, which is a determination made exclusively by the United States.

8.     All CACI interrogators at Abu Ghraib reported directly to the Military Intelligence Officer in Charge ("OIC") of the Interrogation Control Element ("ICE"). All CACI interrogators at Abu Ghraib also reported to the Non-Commissioned Officer in Charge ("NCOIC").

9.     In connection with the intelligence support work performed by CACI PT in Iraq, including interrogation, the U.S. Army had exclusive responsibility for establishing all rules of engagement, standard operating procedures, regulations, priorities, tasks, and local reference documents. CACI PT personnel were required to follow and comply with those authorities.

10.     CACI's interrogators performed their mission in a manner that was indistinguishable from the performance of the mission by U.S. military interrogators. Each interrogator, whether military or civilian, would review detainee packages and develop an interrogation plan. The interrogator would then present the proposed interrogation plan to the Section Leader, a member of the military, who would review the interrogation plan. The interrogation plan would subsequently be presented to the OIC or the NCOIC, also military

personnel, for review and approval.  As a result, each interrogation plan was authorized at both the Section Leader level and the NCOIC/OIC, or by higher military authority.

11.     All databases and computer systems used by CACI employees were the property of the United States.  All information entered into those databases by CACI employees was the property of the United States.

12.     CACI also reported to the Contracting Officer's Representative ("COR"), who was responsible for monitoring CACI's compliance with its contract and for contract administration.  For example, leave for CACI employees had to be approved in the first instance by the major subordinate command to which they were assigned, and leave policy had to be approved by the COR, and CACI's invoices had to be approved by the COR.  From the time of my arrival in Iraq until February 2004, the COR was Lt. Colonel William H. Brady, U.S. Army.  In February 2004, Lt. Colonel Brady was replaced as COR by Major Eugene Daniels, U.S. Army.

5.     I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this _16th_ day of December, 2005.

Scott Northrop

- 3 -

# EXHIBIT 7

# ALLEGATIONS OF MISTREATMENT OF IRAQI PRISONERS

### FRIDAY, MAY 7, 2004

U.S. SENATE,
COMMITTEE ON ARMED SERVICES,
*Washington, DC.*

The committee met, pursuant to notice, at 11:45 a.m. in room SD–106, Dirksen Senate Office Building, Senator John Warner (chairman) presiding.

Committee members present: Senators Warner, McCain, Roberts, Allard, Sessions, Collins, Talent, Chambliss, Graham, Dole, Cornyn, Levin, Kennedy, Byrd, Lieberman, Reed, Akaka, Bill Nelson, E. Benjamin Nelson, Dayton, Bayh, Clinton, and Pryor.

Other Senators present: Senator Bill Frist.

Committee staff members present: Judith A. Ansley, staff director; and Leah C. Brewer, nominations and hearings clerk.

Majority staff members present: Charles W. Alsup, professional staff member; L. David Cherington, counsel; Regina A. Dubey, research assistant; Ambrose R. Hock, professional staff member; Thomas L. MacKenzie, professional staff member; Elaine A. McCusker, professional staff member; Lucian L. Niemeyer, professional staff member; Paula J. Philbin, professional staff member; Lynn F. Rusten, professional staff member; Joseph T. Sixeas, professional staff member; Scott W. Stucky, general counsel; and Richard F. Walsh, counsel.

Minority staff members present: Richard D. DeBobes, Democratic staff director; Kenneth M. Crosswalt, professional staff member; Evelyn N. Farkas, professional staff member; Richard W. Fieldhouse, professional staff member; Jeremy L. Hekhuis, professional staff member; Gerald J. Leeling, minority counsel; Peter K. Levine, minority counsel; Michael J. McCord, professional staff member; William G.P. Monahan, minority counsel; and Arun A. Seraphin, professional staff member.

Staff assistants present: Michael N. Berger, Bridget Ward, Nicholas W. West, and Pendred K. Wilson.

Committee members' assistants present: Cord Sterling and James B. Kadtke, assistants to Senator Warner; Christopher J. Paul, assistant to Senator McCain; Mark Powers, assistant to Senator Inhofe; Darren M. Dick, assistant to Senator Roberts: Arch Galloway II, assistant to Senator Sessions; Derek J. Maurer, assistant to Senator Collins; Lindsey R. Neas, assistant to Senator Talent; Clyde A. Taylor IV, assistant to Senator Chambliss; Aleix Jarvis and Meredith Moseley, assistants to Senator Graham; Christine O. Hill, assistant to Senator Dole; Russell J. Thomasson, assistant

20

Secretary RUMSFELD. Certainly, anyone who recommended the kind of behavior that I've seen depicted in those photos needs to be brought to justice.

Chairman WARNER. Thank you, Senator.

Senator LEVIN. My time is up. Thank you.

Chairman WARNER. Senator McCain.

Senator MCCAIN. Thank you, Mr. Secretary.

I come to this hearing with a deep sense of sorrow and grave concern. Sorrow after the shock and anger of seeing these pictures for the first time, that so many brave young Americans who are fighting and dying are under this cloud. I attended the memorial service of Pat Tillman, a brave American who sacrificed his life recently. He and others, unfortunately, at least in some way, are diminished by this scandal.

I'm gravely concerned that many Americans will have the same impulse I did when I saw these pictures, and that's to turn away from them. We risk losing public support for this conflict. As Americans turned away from the Vietnam War, they may turn away from this one unless this issue is resolved, with full disclosure, immediately.

With all due respect to investigations ongoing and panels being appointed, the American people deserve immediate and full disclosure of all relevant information so that we can be assured and comforted that something that we never believed could happen will never happen again.

Now, Mr. Secretary, I'd like you to give the committee the chain of command from the guards to you, all the way up.

Secretary RUMSFELD. I think General Myers brought an indication of it, and we'll show it.

Senator MCCAIN. Thank you. I'd like to know what agencies or private contractors were in charge of interrogations. Did they have authority over the guards? What were their instructions to the guards?

Secretary RUMSFELD. First, with respect to the——

General MYERS. We did not bring it.

Secretary RUMSFELD. Oh, my.

General MYERS. Yeah, oh, my, sir.

Secretary RUMSFELD. It was all prepared.

General MYERS. It was, indeed.

Secretary RUMSFELD. Do you want to walk through it?

Senator MCCAIN. Well, anyway, who was in charge? What agency or private contractor was in charge of the interrogations? Did they have authority over the guards? What were the instructions that they gave to the guards?

General MYERS. I'll walk through the chain of command and——

Senator MCCAIN. No, you can just submit the chain of command for the record, please.

[The information referred to follows:]

21

*Operational Chain of Command (before 19 Nov 03)*

Hon. Donald Rumsfeld
Secretary of Defense
|
GEN Abizaid
Commander USCENTCOM
|
LTG Sanchez
Commander Joint Task Force 7
MG Wojdakowski
Deputy Commander CJTF-7
*Supervised 800ᵗʰ MP BDE*

BG Karpinski,
Commander, 800ᵗʰ Military Police (MP) Brigade
|
LTC Philabaum,
Commander, 320th MP Battalion
*Abu Ghraib Camp Commander*
|
CPT Reese
Commander, 372nd MP Company
*Responsible for Cell Block 1A*

22

## Operational Chain of Command (after 19 Nov 03)

**Hon. Donald Rumsfeld**
Secretary of Defense

**GEN Abizaid**
Commander USCENTCOM

**LTG Sanchez**
Commander Joint Task Force 7

**MG Wojdakowski**
Deputy Commander CJTF-7
*Supervised 205th MI & 800th MP BDEs*

**BG Karpinski,**
*Commander, 800th MP BDE*

**COL Pappas**
Commander 205th Military Intelligence (MI) Brigade
*Abu Ghraib Camp Commander*

*(ADCON)*

**LTC Phlabaum**
Commander, 320th MP Battalion
*(TACON to 205th MI for security of detainees)*

**CPT Reese**
Commander, 372nd MP Company
*Responsible for Cell Block 1A*

Secretary RUMSFELD. General Smith, do you want to respond?

Senator MCCAIN. No, Secretary Rumsfeld, in all due respect, you have to answer this question, and it could be satisfied with a phone call. This is a pretty simple, straightforward question.

Who was in charge of the interrogations? What agencies and private contractors were in charge of the interrogations? Did they have authority over the guards? What were the instructions to the guards? This goes to the heart of this matter.

Secretary RUMSFELD. It does, indeed. As I understand it, there were two contractor organizations. They supplied interrogators and linguists. I was advised by General Smith that there were maybe a total of 40.

Senator MCCAIN. Now, were they in charge of the interrogations?

General SMITH. Yes, sir. There were 37 interrogators that were——

Senator MCCAIN. I'm asking who was in charge of the interrogations.

General SMITH. They were not in charge. They were interrogators.

Senator MCCAIN. My question is, who was in charge of the interrogations?

General SMITH. The brigade commander for the MI brigade.

Senator MCCAIN. Did he also have authority over the guards?

General SMITH. Sir, he had tactical control over the guards, so he was——

23

Senator McCain. Mr. Secretary, you can't answer these questions?

Secretary Rumsfeld. I can. I thought the purpose of the question was to try to make sure we got an accurate presentation, and we have the expert here who was in the chain of command.

Senator McCain. I think these are fundamental questions to this issue.

Secretary Rumsfeld. Fine.

Senator McCain. What were the instructions to the guards?

Secretary Rumsfeld. There are two sets of responsibilities, as your question suggests. In one set, you have the people who have the responsibility for managing the detention process. They are not interrogators. The MI people, as General Smith has indicated, were the people who were in charge of the interrogation part of the process. The responsibility, as I have reviewed the matter, shifted over a period of time, and the General is capable of telling you when that responsibility shifted.

[Clarifying information provided by the DOD follows:]

The overall responsibility for the Baghdad Central Confinement Facility (Abu Ghraib) was transferred from the 800th MP Brigade to the 205th MI Brigade by a CJTF-7 Fragmentary Order (FRAGO) on November 18, 2003. In accordance with the order, the units operating at Abu Ghraib came under the tactical control of the 205th MI Brigade for security of detainees and FOB protection. The MP, however, retained responsibility for detention operations.

Senator McCain. What were the instructions to the guards?

Secretary Rumsfeld. That is what the investigation that I have indicated has been undertaken is determining.

Senator McCain. Mr. Secretary, that's a very simple, straight-forward question.

Secretary Rumsfeld. As the Chief of Staff of the Army can tell you, the guards are trained to guard people. They are not trained to interrogate, and their instructions are to, in the case of Iraq, adhere to the Geneva Conventions. The Geneva Conventions apply to all of the individuals there, in one way or another. They apply to the POWs, and they're written out, and they're instructed, and the people in the Army train them to that. The people in the CENTCOM have the responsibility of seeing that, in fact, their conduct is consistent with the Geneva Conventions. The criminals in the same detention facility are handled under a different provision of the Geneva Conventions. I believe it's the fourth, and the prior one is the third.

[Clarifying information provided by the DOD follows:]

Detainees who are criminals, persons who attack the force and civilians who are security threats are called "civilian internees" and are protected persons under Geneva Convention IV. Geneva Convention IV applies to all categories of civilian personnel we have detained in Iraq.

Senator McCain. So the guards were instructed to treat the prisoners, under some kind of changing authority, as I understand it, according to the Geneva Conventions.

Secretary Rumsfeld. Absolutely.

Senator McCain. I thank you, Mr. Chairman.

Chairman Warner. Thank you, Senator.

Senator Kennedy.

24

Senator KENNEDY. Thank you very much. Thank you, Mr. Chairman.

To the people in the Middle East, and too often today, the symbol of America is not the Statue of Liberty, it's the prisoner standing on a box wearing a dark cape and a dark hood on his head with wires attached to his body, afraid that he's going to be electrocuted. Now, these incidents of torture and abuse have resulted in a catastrophic crisis of credibility for our Nation.

Since the beginning of the war, the International Committee of the Red Cross (ICRC) has provided the Pentagon officials with reports of abuses at this prison, saying that some of them were tantamount to torture. They issued serious complaints during the inspection of the prison in October 2003 and at several other times.

The State Department and the Coalition Provisional Authority (CPA) appealed to you to stop the mistreatment of the military detainees. Secretary Powell raised this issue at Cabinet meetings and elsewhere, pleading with officials from your Department, Mr. Secretary, to see that detainees were properly cared for and treated, and your Department failed to act.

The military leadership put the troops in charge of the prison. They weren't trained to do the job, and they assigned far too few guards to the prison that were required to do the job right. They relied on the civilian contractors to perform military duties, as I understand it, including the interrogation of Iraqi prisoners. As Senator Levin pointed out, the top-level DOD officials directed guards at the prison to set physical and mental conditions for favorable interrogation of the detainees, a decision that directly resulted in the abuses.

The military leadership failed to respond in a systematic way even after it initiated the 35 criminal investigations into alleged mistreatment of detainees in Iraq and Afghanistan, 25 of these investigations involving deaths. I know that Secretary Brownlee referred to this.

In particular, in December 2002, military doctors at the Bagram Air Base in Afghanistan ruled that two Afghan men in U.S. custody died from blunt-force injuries. No one in the military has been held accountable for those homicides.

You and your senior leadership have shown, I believe, a disregard for the protection of the Geneva Conventions in detainee operations. In January 2002, you were asked why you believed the Geneva Conventions do not apply to detainees in Guantanamo. You replied that you did not have the slightest concern about their treatment, in light of what occurred September 11.

According to The New York Times, you have known about the graphic photographic evidence of abuse in the Abu Ghraib prison since mid-January. You told President Bush about these reports of abuse shortly thereafter. Yet, rather than work with Congress to deal with the problem together, you and other top DOD officials have apparently spent the last 3 weeks preparing a public relations plan.

Can you tell us what exactly you did tell the President about these reports of abuse in late January, and what did he say? What did you do about it, and why did month after month after month

42

Senator REED. Mr. Secretary, were you aware that a specific recommendation was to use MPs to enable an interrogation process?

Mr. CAMBONE. In that precise language, no; but I knew that we were trying to get to the point where we were assuring that when they were in the general population, those that were under confinement were not undermining the interrogation process.

Senator REED. So this was Major General Miller's own policy?

Mr. CAMBONE. No, sir, it was not a policy; it was a recommendation that he made to the command.

Senator REED. So General Sanchez adopted this policy, making it a policy of the United States Army and the DOD, without consultation with you on any specific——

Mr. CAMBONE. Sir, I don't think that's a proper rendering of it.

Senator REED. I don't know what the proper rendering is, but that seems to be at the core of this issue. Were you encouraging a policy that had MP officers enabling interrogations, which created the situation where these——

Mr. CAMBONE. No, sir.

Secretary RUMSFELD. May I comment? I think it is probably best put this way. They are different responsibilities, detaining and interrogating. However, they do need to be looked at together. They found, in Guantanamo, that how they are detained, in terms of the rhythm of their lives, can affect the interrogation process. So the linkage between the two is desirable if, in fact, you're concerned about finding more information that can prevent additional terrorist acts or, in the case of Iraq, the killing of our forces. So it's important that there be a linkage, a relationship. The way it can be put is that it has a bad connotation. Goodness knows, that's not desirable or a policy that General Miller would have recommended.

On the other hand, it can——

Senator REED. The policy seems to be to link——

Chairman WARNER. Senator, I have to ask if you would require the witnesses to provide further responses for the record.

Senator REED. Mr. Chairman, I will certainly ask for additional responses.

Chairman WARNER. Thank you very much.

Senator REED. Thank you.

Chairman WARNER. Senator Collins.

Senator COLLINS. Mr. Secretary, the vast majority of American troops performed their duties with compassion, fairness, and courage. This abuse makes the tasks which they've been assigned far more difficult and far more dangerous, and that troubles me greatly. Worst of all, our Nation, a Nation that, to a degree unprecedented in human history, has sacrificed its blood and treasure to secure liberty and human rights around the world, now must try to convince the world that the horrific images on their TV screens and front pages are not the real America, that what they see is not who we are.

That is why, Mr. Secretary, I'm so troubled by the Pentagon's failure to come forward to fully disclose this appalling abuse, to express outrage and concern, and to outline swift, tough, corrective actions. I believe that had you done that, it would have mitigated somewhat how this abuse has been perceived around the world, particularly in the Muslim communities. I'm not talking about

43

issuing a press release from Baghdad. I'm talking about you personally coming forward and telling the world what you knew about this abuse.

In retrospect, do you believe that you erred in not coming forward, not just to the President and Congress—you've made very clear today that you regret not doing that—but to the world community? Would it have made a difference if it had been the Pentagon itself that had disclosed the full extent of this abuse, whatever you knew, and what actions you were going to take?

Secretary RUMSFELD. I think in my statement I responded in full to your question. I would characterize what was done in CENTCOM, by way of swift corrective action, as being just that—swift corrective action.

Second, I don't know quite how to respond to your question. The DOD announced that abuse was being charged, there were criminal investigations underway. No one had seen the photographs. They were part of a criminal investigation, and I say no one in the Pentagon had seen them. They were part of that CENTCOM investigative process. It is the photographs that give one the vivid realization of what actually took place. Words don't do it. The words that there were abuses, that it was cruel, that it was inhumane, all of which is true—that it was blatant—you read that, and it's one thing. You see the photographs, and you get a sense of it, and you cannot help but be outraged.

There are, at any given time, in the DOD, these 3,000 courts-martial underway—general courts-martial, some 1,200; criminal investigations, 18,000 last year. The importance of protecting the people charged, protecting their rights, and the importance of seeing that if, in fact, they're guilty, they don't get off because of command influence—so there's a pattern of not reaching down into those things, bringing them up, and looking at all the evidence before it ever arrives. In this case, it was released to the press.

Now, we announced the problem to the press. We did not release the Taguba Report to the press. That was done by someone, to release, against the law, a secret document. That's how it surprised everyone. It shocked Congress. It shocked me. It shocked the President. It shocked the country.

But to suggest that they had not taken tough, swift, corrective actions in CENTCOM, it seems to me is inconsistent with what took place.

Senator COLLINS. Mr. Secretary, that's not what I said. What I said is—and I have no doubt that the military is committed to swift corrective action—it's the disclosure of the abuse, and the promise to take those actions. That's where I feel the Pentagon fell short. I think that rather than calling CBS and asking for a delay in the airing of the pictures, it would have been far better if you, Mr. Secretary, with all respect, had come forward and told the world about these pictures and of your personal determination—a determination I know you have—to set matters right and to hold those responsible accountable.

Secretary RUMSFELD. Senator Collins, I wish I had done that, as I said in my remarks. We have to find a better way to do it, but I wish I knew how you reach down into a criminal investigation when it is not just a criminal investigation, but it turns out to be

44

something that is radioactive, something that has strategic impact in the world. We don't have those procedures. They've never been designed. We're functioning with peacetime constraints, with legal requirements, in a wartime situation, in the information age where people are running around with digital cameras and taking these unbelievable photographs, and then passing them off, against the law, to the media, to our surprise, when they had not even arrived in the Pentagon. There isn't a person at this table, except General Smith, who had even seen them.

Chairman WARNER. You're free to amplify that for the record, if you wish, Mr. Secretary.

Senator AKAKA.

Senator AKAKA. Thank you, Mr. Chairman.

Secretary Rumsfeld, according to General Taguba's report, civilian contractors were found wandering around Abu Ghraib unsupervised and with free access to the detainee areas. I have two questions on that. What are the roles of the private contractors at this and other detention facilities in Iraq and Afghanistan? Who monitors and supervises these contracted employees?

Secretary RUMSFELD. The answer is that the civilian contractors, as I indicated, numbered something like 37 in this particular facility. They tend to be interrogators and linguists. They're responsible to MI personnel who hire them and have the responsibility for supervising them.

Mr. BROWNLEE. Sir, if I might?

Senator AKAKA. Secretary Brownlee.

Mr. BROWNLEE. In the theater, we have employed civilian contract interrogators and linguists. CENTCOM has done this. These people have no supervisory responsibilities at all. They work under the supervision of officers or noncommissioned officers (NCOs) in charge of whatever team or unit they are on. They, most of them, are retired military, and they are usually of the skill that they retired in, and that's what they're employed for. They assist in these processes, but they are not in a supervisory role. In fact, they would be forbidden from doing that, because it would be inherently governmental.

General SMITH. Sir, I might add to that. In this particular case, there is a "tiger team" that interrogates and goes through that process. One is an interpreter, normally; one is an analyst; and one is an interrogator. Where we have shortages in the military of interrogators and translators, we go to contractors to do that.

I gave the wrong numbers. The number of contractors we have with CACI for interrogators is 27. Then we have hundreds of translators that are under contract throughout the country, under Titan Corporation.

Senator AKAKA. Secretary Rumsfeld, the alleged abuse at this detention facility has been characterized as sadistic, blatant, wanton, and criminal abuse. So far, we have discussed allegations against military members. Are there allegations of abuse against contractors who are working with the military members? If so, are any of these allegations being investigated?

Secretary RUMSFELD. My recollection is—and I think it's okay to say this—that the investigations are ongoing, and that time will tell.

45

Go ahead, General.

[Clarifying information from the DOD follows:]

David Passaro, a CIA contractor, was indicted Thursday, June 17, 2004, in connection with the beating death of a prisoner in Afghanistan. Passaro is the first civilian to face criminal charges related to U.S. treatment of prisoners in Afghanistan and Iraq.

Information on two other CACI contractors (Steve Stepanowicz and John Israel) has been forwarded to the U.S. Attorney General's Office by the U.S. Army CID to determine whether evidence supports criminal charges against these two contractors.

An ongoing investigation is reviewing the MI operations and includes a review of the actions of civilian contractors involved in interrogation activities.

General SMITH. Yes, sir. There are two contractors that are being investigated under the investigation for the MI brigade, and that is from the recommendation of the Taguba Report.

Senator AKAKA. Mr. Chairman, I want to say that I recently traveled to Iraq and Afghanistan, and I was so impressed with the professionalism of the men and women serving in our military who I had the opportunity to meet. I want to say that I am really proud of what they are doing there.

General Myers, General Taguba's AR 15–6 Report finds a general lack of knowledge, implementation, and emphasis of basic legal, regulatory, doctrinal, and command requirements within the 800th MP brigade and its subordinate units. Understanding that there is an issue with authority between the MP and MI units at Abu Ghraib, how is it that an entire brigade could be deployed to Iraq and not train for their mission?

Chairman WARNER. Senator, I'll have to ask that General Myers provide his response for the record.

[The information referred to follows:]

# EXHIBIT 8

# THE DEPARTMENT OF THE ARMY INSPECTOR GENERAL REPORT ON DETENTION OPERATION DOCTRINE AND TRAINING

## THURSDAY, JULY 22, 2004

U.S. SENATE,
COMMITTEE ON ARMED SERVICES,
*Washington, DC.*

The committee met, pursuant to notice, at 9:40 a.m. in room SD–106, Dirksen Senate Office Building, Senator John Warner (chairman) presiding.

Committee members present: Senators Warner, McCain, Sessions, Talent, Levin, Kennedy, Reed, Akaka, Bill Nelson, E. Benjamin Nelson, Clinton, and Pryor.

Committee staff members present: Judith A. Ansley, staff director; and Leah C. Brewer, nominations and hearings clerk.

Majority staff members present: Charles W. Alsup, professional staff member; Ambrose R. Hock, professional staff member; Paula J. Philbin, professional staff member; Lynn F. Rusten, professional staff member; Scott W. Stucky, general counsel; and Richard F. Walsh, counsel.

Minority staff members present: Richard D. DeBobes, Democratic staff director; Daniel J. Cox, Jr., professional staff member; Peter K. Levine, minority counsel; and William G.P. Monahan, minority counsel.

Staff assistants present: Alison E. Brill, Andrew W. Florell, and Nicholas W. West.

Committee members' assistants present: Christopher J. Paul, assistant to Senator McCain; John A. Bonsell, assistant to Senator Inhofe; James P. Dohoney, Jr., assistant to Senator Collins; Clyde E. Taylor IV, assistant to Senator Chambliss; Meredith Moseley, assistant to Senator Graham; Christine O. Hill, assistant to Senator Dole; Russell J. Thomasson, assistant to Senator Cornyn; Mieke Y. Eoyang and Jarret A. Wright, assistants to Senator Kennedy; Erik Raven, assistant to Senator Byrd; Elizabeth King, assistant to Senator Reed; Davelyn Noelani Kalipi and Richard Kessler, assistants to Senator Akaka; William K. Sutey, assistant to Senator Bill Nelson; Eric Pierce, assistant to Senator Ben Nelson; Andrew Shapiro, assistant to Senator Clinton; and Terri Glaze, assistant to Senator Pryor.

(675)

1020

ties. So what was the command environment there? Was there this case of permission, encouragement, or just looking the other way?

We sought to determine that environment by talking to the soldiers who had redeployed, because they at the time of our inspection were in the demobilization process or had demobilized. So we looked at this through the eyes of the soldiers.

What we found, as I mentioned, was not a good picture. The soldiers told us that their living conditions were—and that is the case at Abu Ghraib—austere, the chain of command perhaps not as responsive to improving their living conditions; their security requirements there, that when mortar attacks started to occur or when the situation changed and became dangerous, the leadership failed to show up, was not present, beyond the people who were permanently stationed there; that visits were not—basically stopped from the chain of command.

Chairman WARNER. You mean the senior officers after a mortar attack on the prison compound just did not appear?

General MIKOLASHEK. This is the perspective of these soldiers who told us these things, and yes, sir, that is correct.

Chairman WARNER. Did you confirm the accuracy of those observations by the soldiers?

General MIKOLASHEK. Sir, if you review the Taguba report it generally agrees with what we found.

Chairman WARNER. That they found that to be correct?

General MIKOLASHEK. Sir, I think what we have to do is balance what these soldiers told us and what the Taguba report says, and they are generally in coincidence. So our assessment then again, based on the information that we had, is exactly that. Probably to go much further would now get into an investigation of that case and we did not want to cross that line.

Chairman WARNER. Did you have occasion to talk to Colonel Pappas or to General Karpinski?

General MIKOLASHEK. Sir, we talked to General Karpinski and Colonel Pappas about the guidance that they received and how they understood the orders that were communicated to them to conduct these kinds of operations.

Chairman WARNER. What about the environment or the culture, which is the subject of the——

General MIKOLASHEK. We did not ask that question specifically, but you can deduce from their statements and their responses that they were concerned mostly about the how-to piece. At least certainly Colonel Pappas was. But we did not find again across the breadth of our inspection that kind of environment.

Within Abu Ghraib it was a unique set of leadership circumstances that were unfortunate.

Chairman WARNER. You mean the improper leadership?

General MIKOLASHEK. Exactly, yes, sir, to go beyond that now gets into——

Chairman WARNER. Then you're into the investigation.

General MIKOLASHEK. Gets into the investigation which General Fay is doing and which the——

Chairman WARNER. Did you talk to General Fast?

General MIKOLASHEK. Yes, sir, we did, as part of our inspection, and again it was to achieve an understanding as to how the process

1021

was set up, how the internment or the joint interrogation and de-briefing center was established, the decisions that she made on how to establish it and who to put in command. That was to help us gain an understanding of how our doctrine did or did not sup-port what she was trying to do and how our training and so on and so forth.

Chairman WARNER. What conclusions did you reach from what she advised you?

General MIKOLASHEK. Sir, not only just from what she advised but also from our own observations and interviews of the soldiers who were there, it is reflected in our conclusion about the need for more precise doctrinal specificity on how to organize these kinds of facilities, how to separate and more clearly define the independent and interdependent roles of the MPs and the MI; and then also to make sure that our training events replicate as close as possible those kinds of interactions that take place. All of those are con-firmed in our report.

Chairman WARNER. General Fast had overall responsibility there, did she not? She is the two-star general who is the——

General MIKOLASHEK. She is the intelligence officer.

Chairman WARNER. ——intelligence officer for General Abizaid; is that correct?

General MIKOLASHEK. For General Sanchez, now General Casey.

Chairman WARNER. General Casey.

General MIKOLASHEK. Sir, in terms of the interrogation process and the intel systems, she is as a staff officer responsible for that.

Now, since our inspection they have established a position of the deputy commanding general for detainee operations and in terms of the administration, in terms of the resettlement facilities, that has been transferred to him.

Chairman WARNER. Are General Fast's actions being further scrutinized in the several inquiries going on?

General MIKOLASHEK. Sir, I believe that—I am almost certain that under the Procedure 15, the General Fay report, that she is a witness.

General SCHOOMAKER. Sir, if I could, we need to clarify. General Fast is the——

Chairman WARNER. If I said "Fay," I meant "Fast."

General SCHOOMAKER. "Fast," yes. Major General Fast is the in-telligence staff officer——

Chairman WARNER. That is correct.

General SCHOOMAKER. ——for now General Casey, previously Gen-eral Sanchez, not to be confused with being in the chain of com-mand. However, General Mikolashek is correct. I believe her re-sponsibilities and her interaction is being looked at under the Pro-cedure 15, which is the intelligence investigation going on now.

Chairman WARNER. I just want to make sure that that is being examined.

General SCHOOMAKER. But the chain of command, again, ran through General Karpinski at Abu Ghraib, through the military chain of command.

Chairman WARNER. But this committee, you may recall, Mr. Sec-retary, was specifically asked to move her promotion expeditiously,

1022

and we did that based on the recommendations from the Pentagon. I am just concerned about that situation.

Colleagues, thank you for indulging the chairman. I think Mr. Akaka is next.

Senator AKAKA. Thank you very much, Mr. Chairman. Thank you for being so patient.

I want to thank our witnesses also for being patient. General Mikolashek, I am interested in your finding 22 in your report, which refers to civilian contractors. Some quick questions here. Were all of the contractors U.S. citizens?

General MIKOLASHEK. Sir, let me—I believe so. Of the 31 interrogators, I believe so, if I could ask one of my officers. Yes, sir, they were. Those are all U.S. citizens, the interrogators.

Senator AKAKA. Who did the contractors report to in the military chain of command?

General MIKOLASHEK. There is a military intelligence supervisor or detachment commander that they reported to for their day-to-day work, as stated in the contract.

Senator AKAKA. Who in the military was responsible for overseeing or keeping track of the activities of the contractors?

General MIKOLASHEK. The immediate supervisor is responsible for how they perform their mission, their security, and what they did. Of course there is a contracting officer that then ensures that the contract was being followed. But in terms of what they did and how they performed, their oversight on a day-to-day basis was that military supervisor, that MI person in that organization to whom they reported.

Senator AKAKA. Since I read stories in the media and the mention of contractors I have been interested in knowing where they fit and who they were, the reason for my questions.

This question is to the Secretary and to General Schoomaker as well as you, General Mikolashek. You have testified that contract interrogators and translators were of considerable value in Afghanistan and Iraq and state that in the future all such interrogators would receive formal military training in interrogation techniques. However, our laws provide that inherently governmental functions, including functions that call for the exercise of sovereign government authority and those that may significantly affect the life, liberty, or property of private persons—and this is what I want to underscore—must be performed by government employees.

An Army memorandum dated December 26, 2000, and still in effect today made the express determination that gathering tactical intelligence is an inherently governmental function. The memorandum states that intelligence at the tactical level is integral to the application of combatant power by the sovereign authority. The memorandum concludes: "At the tactical level, the intelligence function under the operational control of the Army, performed by the military in the operating forces, is inherently a governmental function, barred from private sector performance."

Now, my question to all of you: Are you aware of this Army memorandum? In view of the memorandum, what is the legal basis for the Army's decision to contract out inherently government functions?

Mr. BROWNLEE. May I respond to that, sir?

1023

Senator AKAKA. Mr. Secretary.

Mr. BROWNLEE. Yes, sir. Sir, we have reviewed that memorandum. There is another place in that memorandum where it says that if these—I do not recall the exact wording, but if these functions are performed by contract interrogators under an entity, which in this case was Central Command or CJTF–7 specifically, then they would not be considered inherently governmental.

Senator AKAKA. Thank you. That answers it.

To all of you: One of the concerns that has been raised about the use of contract employees as interrogators and translators is that they stand outside the chain of command. The Taguba report states:

> "In general, U.S. civilian contract personnel do not appear to be properly supervised within the detention facility at Abu Ghraib. During our on-site inspection, they wandered about with too much unsupervised free access in the detainee area. Having civilians in various outfits in and about the detainee area causes confusion and may have contributed to the difficulties in the accountability process and with detecting escape."

A draft DOD directive included in the Army's September 2003 guidebook for contractors accompanying the force specifically notes that commanders lack the authority to directly discipline contractor personnel. The directive states: "Commanders have no penal authority to compel contractor personnel to perform their duties or to punish any acts of misconduct beyond the Military Extraterritorial Jurisdiction Act of 2000. Contractor employees are disciplined by their contracted business entity through the terms of the employee and employer relationship."

Do you see any problem with accountability under a system which provides that, absent emergency circumstances, a contracting officer rather than a commander of a facility like a prison is responsible for providing direction to a contractor and the contractor's employees? Mr. Secretary?

Mr. BROWNLEE. Sir, may I respond? Yes, sir. Sir, clearly any contract employee like that, especially a contract interrogator, is supposed to work under the direct supervision of an officer or noncommissioned officer who would be the supervisor of that person. So these procedures are in place and if they were not followed then somebody was not following the law, the procedures.

The contract person of course can be terminated in terms of the contract. They can be fired. If the commander or the supervisor is unhappy with their actions, they can request that that person be terminated. If it is a criminal act they are subject to U.S. law and can be prosecuted under U.S. law.

Senator AKAKA. Thank you very much, Mr. Secretary.

Thank you very much, Mr. Chairman. My times has expired.

Chairman WARNER. Thank you very much.

Senator Ben Nelson, you have been very patient.

Senator BEN NELSON. Thank you, Mr. Chairman.

Gentlemen, there have been so many reports and investigations that it is almost like a mosaic. Some of the pieces are in place, and many of the pieces are not in place. We are not always sure when they are all going to be in place or what will be the next piece put