**United States Government Accountability Office**

# GAO

## Report to Congressional Committees

**April 2005**

# INTERAGENCY CONTRACTING

# Problems with DOD's and Interior's Orders to Support Military Operations



**G A O**
Accountability * Integrity * Reliability

April 2005



## G A O
### Accountability · Integrity · Reliability
# Highlights

Highlights of GAO-05-201, a report to congressional committees

# INTERAGENCY CONTRACTING

## Problems with DOD's and Interior's Orders to Support Military Operations

## Why GAO Did This Study

In recent years, federal agencies have increasingly turned to interagency contracts—where one agency, for example, places an order under an existing contract for another agency—as a way to streamline the procurement process. Interagency contracting can offer benefits of improved efficiency, but this approach needs to be effectively managed.

To learn more about some of the challenges of interagency contracting, we reviewed the process that the Department of Defense (DOD) used to acquire interrogation and certain other services through the Department of the Interior to support military operations in Iraq. On behalf of DOD, Interior issued 11 task orders, valued at over $66 million, on an existing contract.

This report identifies breakdowns in the procurement process, contributing factors that led to the breakdowns, and the extent to which recent actions by Interior and DOD address these contributing factors.

### What GAO Recommends

A number of corrective actions are already underway, such as clarifying policies and adding training requirements. GAO makes recommendations on steps that Interior and DOD should take to further refine their efforts. In written comments, both agencies agreed with the recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-201.

To view the full product, including the scope and methodology, click on the link above. For more information, contact David E. Cooper at (202)-512-4841or cooperd@gao.gov.

## What GAO Found

DOD, faced with an urgent need for interrogation and other services in support of military operations in Iraq, turned to the Department of the Interior for contracting assistance. Numerous breakdowns occurred in the issuance and administration of the orders for these services. The breakdowns included

- issuing orders that were beyond the scope of the underlying contract, in violation of competition rules;
- not complying with additional DOD competition requirements when issuing task orders for services on existing contracts;
- not properly justifying the decision to use interagency contracting;
- not complying with ordering procedures meant to ensure best value for the government; and
- inadequate monitoring of contractor performance.

Because the officials at Interior and the Army responsible for the orders did not fully carry out their roles and responsibilities, the contractor was allowed to play a role in the procurement process normally performed by the government.

A lack of effective management controls—in particular insufficient management oversight and a lack of adequate training—led to the breakdowns. When these management controls are not in place, particularly in an interagency fee-for-service contracting environment, more emphasis can be placed on customer satisfaction and revenue generation than on compliance with sound contracting policy and required procedures. Significant problems in the way Interior's contracting office carried out its responsibilities in issuing the orders for interrogation and other services on behalf of DOD were not detected or addressed by management. Further, the Army officials responsible for overseeing the contractor, for the most part, lacked knowledge of contracting issues and were not aware of their basic duties and responsibilities.

In response to the above concerns, Interior and DOD have taken actions to strengthen management controls. For example, Interior has re-issued or clarified several policies for its contracting personnel and has required them to take training on the proper use of General Service Administration contracts. DOD has issued a new policy requiring that military departments and defense agencies establish procedures for reviewing and approving the use of other agencies' contracts. These actions are a positive step toward addressing some of the contributing causes to the breakdowns GAO found, but it is too soon to tell how effective they will be.

# Contents

| | | |
|---|---|---:|
| **Letter** | | **1** |
| | Results in Brief | 3 |
| | Background | 4 |
| | Breakdowns Occurred When Interior Procured Interrogation and Other Services for DOD | 7 |
| | Need for Strong Management Controls | 14 |
| | Too Early to Tell If Actions to Increase Oversight and Improve Training Will Be Effective | 19 |
| | Recommendations | 21 |
| | Agency Comments and Our Evaluation | 21 |
| **Appendix I** | **Scope and Methodology** | **25** |
| **Appendix II** | **Comments from the Department of Defense** | **26** |
| **Appendix III** | **Comments from the Department of the Interior** | **29** |
| **Appendix IV** | **Comments from CACI International Inc.** | **36** |
| **Appendix V** | **Summary of Task Orders Issued to CACI for Work in Iraq** | **55** |
| **Table** | | |
| | Table 1: Comparison of Labor Categories from DOD's Statements of Work to the Information Technology Contract | 8 |

**Abbreviations**

| | |
|---|---|
| BPA | blanket purchase agreement |
| CACI | CACI International, Inc. |
| CJTF-7 | Coalition Joint Task Force Seven |
| COR | contracting officer's representative |
| DOD | Department of Defense |
| FAR | Federal Acquisition Regulation |
| GSA | General Services Administration |
| IG | Inspector General |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

April 29, 2005

The Honorable John Warner
Chairman
The Honorable Carl Levin
Ranking Minority Member
Committee on Armed Services
United States Senate

The Honorable Duncan Hunter
Chairman
The Honorable Ike Skelton
Ranking Minority Member
Committee on Armed Services
House of Representatives

In recent years, federal agencies have made a major shift in the way they buy goods and services, turning increasingly to interagency contracts as a way to streamline the procurement process. Interagency contracting occurs when an agency needing supplies or services obtains them from another agency, often for a fee. For example, an agency can use an existing contract that has already been awarded by another agency, or turn to another agency to issue and administer task orders on its behalf.[1] Interagency contracting can offer the benefits of improved efficiency and timeliness, but this approach needs to be effectively managed. Use of these contracts demands a high degree of business acumen and flexibility on the part of the federal acquisition workforce. Due to the challenges associated with interagency contracts, we recently designated interagency contracting as a governmentwide high-risk area.[2]

The process that the Department of the Interior used to acquire interrogation and certain other services for the Department of Defense

---

[1] Task orders are placed against established contracts that provide for the issuance of orders for the performance of tasks during the period of the contract. In a prior report, we examined the fees charged for some types of interagency contracting vehicles. See GAO, *Contract Management: Interagency Contract Program Fees Need More Oversight*, GAO-02-734 (Washington, D.C.: July 25, 2002).

[2] GAO, *High Risk Series: An Update*, GAO-05-207 (Washington, D.C.: January 2005).

(DOD) during military operations in Iraq provides insight into aspects of interagency contracting that need careful attention. By August 2003, DOD was faced with a critical and largely unforeseen need for interrogators and screeners, some of whom were needed at Abu Ghraib prison. DOD had in place only a contingency contracting office in Iraq at the time, whose efforts were focused on obtaining basic necessities such as portable sanitation facilities and water trucks. To obtain interrogation and other services quickly, DOD relied on an Interior contracting office that specializes in awarding and administering contracts for other agencies through fee-for-service arrangements. Over an 8-month period, the Interior contracting office issued 11 task orders, valued at over $66 million, to CACI International, Inc. (CACI) on behalf of DOD. Of the 11 orders, 6 were for interrogation, screening, and other intelligence-related services, and 5 were for logistics support services. Interior placed the task orders on an information technology contract that CACI had in place with the General Services Administration (GSA) under GSA's Schedule program.[3] The Interior Inspector General (IG) and GSA subsequently determined that 10 of the 11 orders were out of scope of the information technology contract. Following the disclosure of the prisoner abuse at Abu Ghraib and the implication of contractor employees in the abuse, questions arose about how DOD used Interior to acquire interrogators and screeners on an information technology contract and, more generally, about the integrity of the federal procurement process.

To learn more about some of the challenges associated with interagency contracting, we assessed (1) breakdowns that occurred in the procurement process when Interior placed orders with CACI for interrogation and other services in Iraq, (2) factors that led to the breakdowns, and (3) the extent to which recent or planned actions by Interior and DOD address these factors. To help ensure that the corrective actions underway will fully address the problems, we are recommending steps Interior and DOD can take to further refine those efforts.

We conducted our work at Interior, DOD, and GSA. In addition, we spoke with Army program officials who were responsible for overseeing the contractor's performance in Iraq and with contractor employees and representatives. Appendix I contains more detail on our scope and methodology. Appendix V contains a summary of the 11 orders for

---

[3]Schedule contracts allow agencies to quickly procure commonly available commercial goods and services at prices associated with volume buying.

interrogation and other services in Iraq. We conducted our review from July 2004 to January 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

Numerous breakdowns occurred in the issuance and administration of Interior's task orders for interrogation and other services on behalf of DOD for military operations in Iraq.  These breakdowns included

- orders for services beyond the scope of the underlying contract, in violation of competition rules;
- not complying with additional DOD competition requirements when issuing task orders for services on existing contracts;
- not properly justifying the decision to use interagency contracting;
- not complying with ordering procedures meant to ensure best value for the government; and
- inadequate monitoring of contractor performance.

Because DOD and Interior officials effectively abdicated certain contracting responsibilities, the contractor was allowed to play a large role in aspects of the procurement process normally performed by government personnel.

The situation in Iraq at the time the orders for interrogation and other services were placed was extraordinary—a wartime environment and an atmosphere of turmoil and urgency. Nevertheless, a lack of management controls—in particular insufficient management oversight and a lack of adequate training—led to the breakdowns. When these controls are not in place, particularly in an interagency fee-for-service contracting environment, more emphasis can be placed on customer satisfaction and revenue generation than on compliance with sound contracting policy and required procedures. Significant problems in the way Interior's contracting office carried out its responsibilities in issuing the orders for interrogation and other services on behalf of DOD were not detected or addressed by management. Further, the Army officials responsible for overseeing the contractor, for the most part, lacked knowledge of contracting issues and were not aware of their basic duties and responsibilities in administering the orders.

The high-profile nature of the interrogation orders has served to focus attention on ways to improve the use of interagency contracts. Interior and DOD have taken actions to strengthen management controls. For example, Interior has re-issued or clarified several policies for its contracting

personnel and has required them to take training on the proper use of GSA contracts. DOD has issued a new policy designed to improve oversight of its use of other agencies' contracts, but it has left implementation to the individual departments and agencies and does not have a mechanism in place to provide for departmentwide monitoring of the policy's implementation. While these actions are a positive step toward addressing some of the causes to the breakdowns with the orders, it is too soon to tell how effective they will be.

Because a number of corrective actions are already underway, we make recommendations in this report on steps that Interior and DOD should take to further refine their efforts to improve management oversight and training. In written comments on a draft of this report, both agencies agreed with the recommendations and discussed actions they are taking to implement them. We also received written comments from CACI. While acknowledging that our report identifies a number of areas where the government can improve its contracting processes, CACI raised several issues that it believes we did not adequately address. The comments from DOD, Interior, and CACI are discussed beginning on page 21 and are reproduced in their entirety in appendices II, III, and IV, respectively.

## Background

In recent years, agencies have increasingly placed orders against existing contracts that have been awarded by another agency to save time and administrative effort. Rather than going through the often lengthy process involved in awarding a new contract for services—soliciting offers, evaluating proposals, and awarding the contract—agencies can place task orders against established indefinite quantity contracts that meet their needs. When placing orders against multiple-award task order contracts, agencies are generally required to ensure that contractors have a fair opportunity to be considered for each order with certain exceptions (such as urgency or logical follow-on). For GSA Schedule contracts, agencies are required to follow ordering procedures such as reviewing prices from at least three contractors, evaluating prices for services requiring a statement of work, and seeking price reductions for large orders.

Interagency contracting is often handled by entrepreneurial, fee-for-service organizations, where agency contracting units operate like a business and provide contracting assistance to other agencies for a fee. The Interior contracting office that placed the orders for interrogation and other services—the Southwest Branch of Interior's National Business Center, located in Fort Huachuca, Arizona—is one such organization. This office's contracting activity, primarily on behalf of other agencies, has

increased substantially over the past 3 years, with reported obligations increasing from $609 million in fiscal year 2002 to $1.02 billion in fiscal year 2004.

The fee-for-service procurement process generally involves three parties: the agency requiring a good or service; the agency placing the order or awarding the contract; and contractors providing the goods and services the government needs. The requiring agency officials determine the goods or services needed and, if applicable, prepare a statement of work, sometimes with the assistance of the ordering organization. The contracting officer at the ordering office ensures that the contract or order is properly awarded or issued (including any required competition), and administered under applicable regulations and agency requirements. If contract performance will be ongoing, a contracting officer's representative—generally an official at the requiring agency with relevant technical expertise—is normally designated by the contracting officer to monitor the contractor's performance and serve as the liaison between the contracting officer and the contractor.

At the same time as use of interagency contracting has increased, DOD has also increased its use of contractors in military operations. Particularly since the 1991 Gulf War, contractors have taken over support positions that were traditionally filled by government personnel. For example, a company that CACI later acquired began providing intelligence support to the Army in Germany in 1999.[4] When the Army in Europe deployed intelligence personnel to the Iraq theater in 2003, CACI employees went with them. Following the announcement of the end of major combat in May 2003, the Army, as part of the Coalition Joint Task Force Seven (CJTF-7), was expecting a non-hostile situation and did not plan for an insurgency.[5] It was unprepared for the volume of Iraqi detainees and the

---

[4]In 1999, the Army acquired intelligence analysis support from Premier Technology Group. CACI acquired the assets of Premier Technology Group in May 2003, including the GSA contract.

[5]The CJTF was designed to conduct offensive operations to defeat remaining noncompliant forces and neutralize destabilizing influences in the Iraq theater to create a secure environment in direct support of the Coalition Provisional Authority. Previous reports demonstrate that DOD did not adequately plan for the acquisition support required to perform its mission in Iraq. In fact, in June 2004, we recommended that the Secretary of Defense develop a strategy for assuring that adequate acquisition staff and other resources can be made available in a timely manner to improve the delivery of acquisition support in future operations. GAO, *Rebuilding Iraq: Fiscal Year 2003 Contract Award Procedures and Management Challenges*, GAO-04-605 (Washington, D.C.: June 1, 2004).

need for interrogation and other intelligence and logistics services. An Army investigative report from August 2004 noted that the CJTF-7 headquarters in Iraq lacked adequate personnel and equipment and that the military intelligence units at Abu Ghraib were severely under-resourced.

The out-of-scope orders for interrogation and other services issued by Interior have been terminated. However, the Army has continued contracting for intelligence functions and logistics services through bridge contracts awarded on a sole source basis to CACI. The original term of the contracts was 4 months, and the Army subsequently exercised options for an additional 2 months, through early 2005. According to an Army official, the contract terms were recently extended further to allow the Army adequate time to competitively award contracts for these services.[6]

Recently, in the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005,[7] Congress took steps to ensure the proper use of interagency contracts by DOD, the largest customer for these types of contract arrangements. The act prohibits DOD from procuring goods and services above the simplified acquisition threshold (generally $100,000) through a contract entered into by an agency outside DOD, unless the procurement is done in accordance with procedures prescribed by DOD for reviewing and approving the use of such contracts.[8] The conference report accompanying the legislation established expectations that

- DOD's procedures will ensure that any fees paid by DOD to the contracting agency are reasonable in relation to work actually performed;
- the supplies or services are consistent with the appropriated funds being used;
- the goods and services procured are within the scope of the non-DOD contract vehicle; and
- such orders are in compliance with all applicable DOD-unique statutes, regulations, directives, and other requirements prior to approval.

---

[6]The intelligence contract was extended until July 2005 and the logistics contract was extended until April 2005.

[7]P.L. 108-375.

[8]Section 854.

Further, the act required reviews of certain non-DOD contracting offices to determine if they are compliant with Defense procurement requirements. [9] If an office is deemed non-compliant, DOD could be prohibited from ordering, purchasing or otherwise procuring property or services in excess of $100,000 through that contracting office. In addition, a recent change to the Federal Acquisition Regulation (FAR), effective July 2004, added language to make it clear that a contracting officer placing an order against a GSA Schedule on another agency's behalf is responsible for applying that agency's regulatory and statutory requirements.[10]

# Breakdowns Occurred When Interior Procured Interrogation and Other Services for DOD

The process of procuring interrogation and other services for DOD broke down at numerous points. In general, breakdowns in the procurement process, such as not following competition requirements and not properly justifying the decision to use interagency contracting, occurred when the orders were issued. The process also broke down during the administration of the contract, as the contractor's performance was not adequately monitored. Because the officials at Interior and the Army responsible for the orders did not fully carry out their roles and responsibilities, the contractor was allowed to play a role in the procurement process normally performed by the government. This situation increased the risk that the government would not get the services it needed at reasonable prices and in compliance with competition and other contracting requirements.

## Task Orders Were Out of Scope of Underlying Contract

Orders issued outside the scope of the underlying contract do not satisfy legal requirements under the Competition in Contracting Act for competing the award of government contracts.[11] In such cases, the out-of-scope work should have been awarded using competitive procedures or supported with a justification and approval for other than full and open competition. The Interior IG and GSA have determined that 10 of the 11 task orders issued by Interior to CACI for interrogation and other services in Iraq were outside the scope of the underlying GSA information

---

[9]Section 802.

[10]Federal Acquisition Circular 2001-24, Item V—Federal Supply Schedule Services and Blanket Purchase Agreements (BPA) (FAR Case 1999-603).

[11]We recently described these competition requirements in the context of out-of-scope orders (GAO-04-605).

technology contract.[12] The Army has also determined that interrogation services were outside the scope of the contract.

The labor category descriptions in the GSA contract were, in most cases, significantly different from the descriptions on DOD's statements of work and do not accurately represent the work that the contractor performed. Table 1 demonstrates some of the disparities between the labor categories in DOD's statements of work and the information technology contract.

**Table 1: Comparison of Labor Categories from DOD's Statements of Work to the Information Technology Contract**

| Statements of work | Information technology contract |
|---|---|
| Screening / Interrogation Operations Coordinator | Senior System Engineer |
| Senior Counterintelligence Agent | Senior Analyst |
| Counterintelligence Agent | Senior Functional Analyst |
| Screener | Training Specialist |
| Interrogator | Senior Functional Analyst |
| Tactical/Strategic Interrogator | Senior System Planner |

Source: GAO analysis of Interior's task order files.

CACI representatives stated that they determined the salary and benefits the company would pay interrogators and screeners and then selected the GSA information technology contract labor categories that would sufficiently cover the company's employee salary and benefits expenses, overhead, and profit. In other words, CACI selected the labor categories in the contract for cost and pricing purposes, rather than as a reflection of the work to be performed. Army representatives in Iraq told us that the services on the orders for interrogators, screeners, and logistics support were not information technology services. The Interior contracting officer also had concerns about whether the orders were within scope, asking the contractor for a verbal and, later, written explanation as to how the labor categories in the contract were related to the services the company was to provide in Iraq.

The contracting officer neglected to follow a requirement for legal review that could have raised questions about whether the orders were within

---

[12]GSA determined that the orders for interrogation services could not be purchased through any of the GSA Schedules, but the orders for logistics services could have been procured through GSA's Logistics Worldwide Schedule.

scope. A July 2001 Interior policy requires legal review for all proposed solicitations in excess of $500,000 for non-commercial items and $2 million for commercial items. Interior contracting officials stated that they did not believe this requirement extended to orders placed on GSA contracts. Representatives from Interior's offices of general counsel and acquisition policy, however, told us that orders placed on GSA contracts are subject to legal review and that the orders for interrogation and other services should have been reviewed.

Further, the Interior contracting officer did not perform the required evaluation of the contractor's proposed approach for addressing DOD's requirements. Normally, when ordering services from GSA Schedules that require a statement of work, the ordering office is responsible for evaluating the contractor's level of effort and mix of labor proposed to perform the specific tasks being ordered and for making a determination that the price is reasonable. In this situation, however, the Interior contracting officer did not evaluate the mix of labor categories or establish that the level of effort was reasonable. Although documents in Interior's contract files provided that "technical review does not take exception to the proposal," no documentation exists to support the statement that an evaluation was performed and, in fact, Interior contracting officials told us that no such review was done.

## DOD Task Order Competition Requirements Were Not Followed

In addition to violating competition rules by placing orders that were not in the scope of the underlying contract, Interior contracting officials also did not comply with requirements contained in section 803 of the National Defense Authorization Act for Fiscal Year 2002 relating to DOD's purchase of services from GSA Schedule contracts.[13] Specifically, for DOD orders for services over $100,000 placed on GSA contracts, notice must be provided to all GSA Schedule contractors offering the required services or to as many contractors as practicable to ensure that offers will be received from at least three contractors. If three offers are not received, a written determination must be made that no additional contractors could be identified despite reasonable attempts to do so. The requirements that DOD orders be placed on a competitive basis can be waived in writing for certain circumstances such as urgency. Section 803 requirements applied to the Iraq orders, even though Interior was the contracting agency, because DOD regulations require application of section 803 provisions to

---

[13]P.L. 107-107.

orders placed by non-DOD agencies on behalf of DOD.[14] The Interior contracting office, however, placed the orders directly with CACI without notifying other prospective contractors. Interior did not make any written determination that no additional contractors could be identified or that the competition requirement should be waived in this case.

## Decision to Use Interagency Contracting Was Not Properly Justified

In contracting through Interior, the Army did not follow requirements to justify use of interagency contracts. According to procurement regulations, an Economy Act determination and findings should have been approved by an Army contracting officer or another designated official to justify the use of Interior to acquire the services for the Army.[15] The Economy Act authorizes agencies to enter into mutual agreements to obtain supplies or services by interagency acquisition.[16] The FAR mandates that the requiring activity document that an Economy Act order is in the agency's best interest and that it cannot obtain the goods and services as conveniently or economically by contracting directly with a private source. However, Army personnel did not prepare the determination and findings, as required.[17]

## Ordering Procedures Meant to Ensure Best Value Were Not Followed

Interior placed the orders with CACI by using a blanket purchase agreement (BPA) established under the GSA Information Technology Schedule contract in 1998.[18] BPAs, a simplified method of filling anticipated repetitive needs for supplies and services, allow agencies to establish "charge accounts" with qualified vendors. The BPA in this case

---

[14]DFARS § 208.404-70 (effective Oct. 25, 2002).

[15]FAR Subpart 17.5.

[16]31 U.S.C. § 1535; FAR § 17.502(a).

[17]An Economy Act determination and findings is not required when the agency needing the services uses certain required or optional sources of supply (such as GSA Schedule contracts) or for acquisitions using government wide acquisition contracts (FAR § 17.500). These conditions were not met in this instance because the Army—the agency needing the services—was not ordering directly from the GSA Schedules and because a government wide acquisition contract was not used.

[18]The BPA in question was originally established in 1998 between Premier Technology Group Inc. (the assets of which were acquired by CACI in May 2003) and the Army Directorate of Contracting at Fort Huachuca, Arizona. In 2001, Interior's National Business Center assumed responsibility for the contracting staff at Fort Huachuca, and the BPA was transferred to Interior. Interior subsequently extended the BPA in 2003 to match the time frame of the underlying GSA contract.

was improperly established and improperly used. Interior's contracting office did not comply with required BPA procedures meant to ensure the government receives the best value for its dollars and that competition is encouraged. Under procedures referred to in the Schedule contract, ordering offices that establish a single BPA are required to select a contractor that represents the best value and results in lowest overall cost, and to inform other contractors of the basis for the selection. We found no evidence, either in the BPA files or in our discussions with Interior contracting staff, that these requirements were followed, even though documents in the contract files state that the BPA is "best value." In essence, the BPA was used to direct business to the company on a sole source basis.

Contracting officials also failed to seek discounts from CACI's established GSA contract prices, as required. Applicable procedures in the contract stipulate, for example, that discounts are to be sought when orders exceed $500,000.[19] We found that no discounts were sought, even though the value of the orders for work in Iraq ranged from $953,000 to $21.8 million. In addition, the procedures in the GSA contract require that BPAs are reviewed annually to ensure the government continues to receive best value. These annual reviews were never conducted. Further, the BPA was improper because it did not contain defined requirements, as stipulated in the GSA contract. Rather, the BPA states that "the categories of service provided by this BPA may include but are not limited to" various classes of information technology services. Finally, in 2001, Interior added several items and services to the BPA. This action improperly expanded the scope of services contained in the underlying GSA contract. According to GSA guidance, such scope expansions are a potential violation of the Competition in Contracting Act. When we asked Interior's contracting officials—including the contracting officer who signed the BPA—about these additions, they were unable to explain how or why the additions had been made.

## Contractor's Performance Was Not Adequately Monitored

One of the contracting officer's key responsibilities is ensuring that the government monitors the contractor's performance. The contracting officer may assign this responsibility to a contracting officer's

---

[19]The maximum order threshold cited in the contract is $500,000. The maximum order threshold is the point at which ordering agencies are to seek additional price reductions beyond those offered under the vendor's GSA contract.

representative (COR). At Interior, the contracting officer is required to verify that the COR has the appropriate training and to issue a designation letter to the COR outlining the duties to be performed. These duties can include

- verifying that the contractor performs the technical requirements of the contract in accordance with the contract terms, conditions, and specifications;
- monitoring the contractor's performance, notifying the contractor of deficiencies observed during surveillance, and directing appropriate action to effect correction; and
- reporting to the contracting officer in a monthly report the performance of services rendered under the contract.

We found that Interior's contracting officials never verified that the Army personnel serving as CORs had the appropriate training and, with one exception, sent the COR designation letter either months after the fact or not at all. Interior officials, including the contracting officer who placed the orders for DOD, had no explanation for why contractor surveillance policies were not followed. Moreover, the contracting officer had little to no communication with the CORs in Iraq and did not follow up to obtain monthly reports from them on the contractor's performance.

Proper surveillance of the contractor's performance under the orders was especially critical because the work was done on a time and materials basis, where services are billed on the basis of direct labor hours at specified fixed hourly rates (which includes wages, overhead, general and administrative expenses, and profit). According to the FAR, time and materials contracts require appropriate government oversight because there is no incentive for the contractor to control costs or be efficient.[20] This requirement was recently reiterated in a September 2004 memo from DOD's Director, Defense Procurement and Acquisition Policy, which states that, because labor hour and time and materials contracts usually require significant surveillance to ensure the government receives good value, CORs should be appointed to verify the appropriateness of labor categories and the reasonableness of the number of hours worked.

In Iraq, the Army CORs responsible for the orders for interrogation and other services performed limited surveillance of the contractor's

---

[20]FAR § 16.601(b)(1).

performance. Contractor employees were stationed in various locations around Iraq, with no COR or assigned representative on site to monitor their work. One contractor interrogator who had been located at the Abu Ghraib prison told us that, although he interacted with military personnel at the prison, he had no interaction with the COR. Further, although the COR in Baghdad stated that he relied on other military personnel on site to report back to him, a recent Army investigative report showed that the military personnel on site were not given guidance on how to oversee the contractors. In fact, one of the military interrogators at Abu Ghraib prison indicated that the primary point of contact for the contractors was the contractor's on-site manager, with no mention of the COR. The Army investigative report pointed to this lack of contractor surveillance at the Abu Ghraib prison as a contributing factor to the environment in which the prisoner abuse occurred. The report noted that it is very difficult, if not impossible, to effectively administer a contract when the COR is not on site and that the Army needs to improve its oversight of contractors' performance to ensure that the Army's interests are protected.

## Contractor Played a Role in the Procurement Process Normally Performed by Government Personnel

In procuring the interrogation and other services in Iraq, Interior and Army officials abdicated their contracting responsibilities to a large degree. In this void, the contractor played a significant role in developing, issuing, and administering the orders, including

- developing requirements;
- identifying the contractor's BPA with Interior as the contract vehicle to provide the services;
- drafting statements of work;
- suggesting that Army officials use the company's rough order of magnitude price as the government cost estimate;
- acting as a conduit for information from the Army in Iraq to the Interior contracting office;
- providing the Interior contracting office with a draft justification and approval to award additional work to the company on a sole source basis;
- sending invoices directly for payment; and
- requesting that construction work be performed under the BPA, which would have also been out of scope from the GSA Schedule contract, although subsequent discussions between CACI and Interior contracting officials resulted in the work being awarded separately on a sole source basis due to urgency.

By acting in this manner, the contractor effectively replaced government decision-makers in several aspects of the procurement process. For example, a contractor employee proposed the initial requirements package for human intelligence, which included interrogators, and provided information to the Army personnel regarding skill sets needed for positions. Contractor employees also identified the company's BPA with Interior as the contract vehicle to provide the services. Contractor officials acknowledge they helped to draft statements of work, with contractor employees in Iraq sending the statements of work to company headquarters in the United States for suggestions. In fact, one of the statements of work we found in official contract files was on the contractor's letterhead. We also found that contractor employees wrote a draft justification and approval for Interior to award additional work noncompetitively to the company. Such a level of participation by the contractor creates a conflict of interest and undermines the integrity of the competitive contracting process.

Contractor officials explained that they marketed their services directly to Army intelligence and logistics officials in Iraq because of relationships they had developed over time. According to contractor officials, Army officials told them to work directly with the Interior contracting office because the DOD contingency contracting office in Iraq was focused on obtaining other necessary services. They also told us that, because military communication channels were not adequate, they communicated directly with the Interior contracting office. Interior contracting officials went along with this arrangement, citing problems in reaching Army officials in Iraq. The contract files contain emails between the contractor and Interior contracting officials on matters such as funding requests, statements of work, and COR assignments. Further, a COR responsible for the logistics orders told us that contractor officials informed him that Interior had merged two task orders; he was unaware that this had occurred. According to contractor officials, because Army and Interior officials allowed contractor personnel to act as the go-between, the contractor sent its invoices directly to Interior for payment after the COR signed them, as opposed to the normal practice of having government personnel perform this task.

# Need for Strong Management Controls

Although use of streamlined contracting vehicles can be beneficial, they must be effectively managed to ensure compliance with the FAR and to protect the government's interests. When a requiring agency's contracting needs are being handled by an outside agency, effective management controls become even more critical due to the more complex environment

involved. Management controls, synonymous with internal controls, are an integral component of an organization's management that provide reasonable assurance that operations are effective and efficient and that employees comply with applicable laws and regulations. Two controls include management oversight and training. When these controls are not in place, particularly in a fee-for-service environment, more emphasis can be placed on customer satisfaction and revenue generation than on compliance with sound contracting policy and required procedures. We found an absence of these management controls for the 11 orders that were issued and administered for interrogation and other services.

## Lack of Management Oversight

Significant problems in the way Interior's contracting office carried out its responsibilities in issuing these orders were not detected or addressed by management. Further, managers at this office told us that they intentionally created an office culture of providing inexperienced staff with the opportunity to learn contracting by taking on significant responsibilities. More experienced contracting officers were responsible for overseeing and reviewing less experienced and trained purchasing agents and contract specialists. However, some staff told us that the contracting officers' reviews were not always thorough and appeared to be a "rubber stamp." Further, some staff indicated discomfort at the level of responsibility given to less experienced personnel and believed oversight of the activities of these employees was inadequate.

Moreover, Interior's headquarters did not exercise thorough oversight of the contracting activity that placed the orders. An April 2003 Interior Acquisition Management Review concluded that the contracting office was highly effective, despite the fact that the review identified a number of problems where contracting personnel did not comply with sound contracting practices. Nonetheless, an Interior headquarters official told us that the contracting office did not require extensive oversight, based in part on the determination that the office was highly effective. The review cited the following:

- A conscious decision was made not to comply with Interior's requirements for legal review because the office believed the reviews took too long.[21]

---

[21] At the time, the contracting office did not have an attorney on site and had to turn to Interior headquarters for legal advice. An attorney was assigned to the office in September 2003.

- A general weakness in cost support was noted. For instance, "best value" analysis was cited in sole source awards.[22] Also, the contracting office accepted contractors' proposed prices without analyzing the cost and pricing data in depth to ensure that the prices were fair and reasonable. Further, the contractor's proposed cost and the government's cost estimate were identical without any explanation.
- Labor rates included in contracts and orders were not adequately justified.
- Competition requirements were not followed when placing orders using BPAs.

The review's conclusion that the office was highly effective was based in part on the office's peer review process, where contracting actions were reviewed by a second person as a management control. However, the review found no consistent methodology or format for the peer reviews and little or no information on results. Rather, the process for conducting and reporting the results of the reviews varied from individual to individual. Based on our interviews with Interior employees, we found that the peer reviews were often conducted by personnel with little contracting experience and training.

Adequate management oversight is particularly critical to ensuring that interagency fee-for-service contracting organizations, such as the Interior contracting office, comply with procurement regulations. The fee-for-service arrangement creates an incentive to increase sales volume in order to support other programs of the agency that awards and administers an interagency contract. This may lead to an inordinate focus on meeting customer demands at the expense of complying with required ordering procedures. The managers at Interior's contracting office promote a business-like entrepreneurial philosophy modeled after the private sector and empower employees to market services, interact with contractors, and make decisions in support of acquisitions. We found examples where the Interior contracting office marketed its BPA with CACI to federal agencies as a way to obtain services quickly without competition. Further, the performance measures for individual employees at Interior's contracting

---

[22]A best value determination is not typically involved in a sole source award since there is no evaluation of competing proposals to determine which prospective contractor's approach would represent the best value to the government, price and technical factors considered. In contrast, the price of a sole source award is determined to be fair and reasonable using other techniques such as comparison to prices known to be reasonable, cost realism analysis, or a detailed review of the contractor's cost and pricing data, as described in FAR Subpart 15.4.

office, which measure quality, teamwork, and customer service, specifically state that customer satisfaction is a high priority in achieving good customer service. In fact, Interior's Acquisition Management Review of the contracting office focused heavily on customer satisfaction as a performance metric. Several of the office's customers were interviewed, and their compliments were summarized in detail as a key section of the review.

The Army also lacked management oversight of the contracting activity for interrogation and other services. This lack of oversight is evidenced by some questions that were raised by the Army's Chief of Contracts in Iraq in February 2004, about 6 months after the initial orders were placed. The Chief of Contracts asked the Interior contracting office

- whether the orders were against a GSA contract and what the contract number was,
- what labor rates were included in the contract,
- whether there was a performance description for contractor personnel providing services,
- whether all contractor employees in Iraq were in accordance with the statements of work,
- who had been keeping track of the labor hours the contractor billed to the government,
- whether Interior had received monthly status reports on the contractor's performance, and
- whether an Economy Act determination and findings had been prepared.

Further, DOD is required to have a management structure in place for the procurement of services that provides for a designated official in each military department and defense agency to exercise responsibility for the management of the procurement of services by that department or agency.[23] This management structure is to include a means by which employees of the departments and defense agencies are accountable to the designated officials for carrying out certain requirements. These requirements include ensuring that services are procured by means of contracts or task orders that are in the best interest of DOD and are entered into or issued and managed in compliance with applicable statutes, regulations, directives, and other requirements, regardless of

---

[23]10 U.S.C. § 2330, as added by section 801 of the National Defense Authorization Act for Fiscal Year 2002 (P.L. 107-107).

whether the services are procured by DOD directly or through a non-DOD contract or task order. These requirements also include approving, in advance, any procurement of services above certain thresholds that is to be made through the use of a contract entered into, or a task order issued, by a government official outside DOD. Notwithstanding the requirement for this management structure, it is clear that DOD's implementation did not ensure that these requirements were met in procuring the interrogation and other services through Interior.

## Lack of Adequate Training

Interior's contracting office personnel and Army personnel in Iraq that were responsible for the orders for interrogation and other services lacked adequate training on their contracting responsibilities. While a warranted contracting officer at Interior signed the orders, certain requirements were not understood or followed, such as the need for legal review and competition. Further, an inexperienced purchasing agent administered the BPA on a day-to-day basis, including preparing various contracting documents. The employee had taken only one basic contracting course, even though the contracting office's training requirements require purchasing agents to take three contracting courses. Moreover, one staff member who had not taken the required training for a purchasing agent position was promoted to a contract specialist position. Several contracting employees we spoke with were concerned about the frequency and consistency of training they had received. We found that employees took training on their own initiative and that the training was not monitored or enforced by managers.

Army personnel in Iraq responsible for overseeing CACI employees' performance in Iraq were not adequately trained to properly exercise their responsibilities. An Army investigative report concluded that the lack of training for the CORs assigned to monitor contractor performance at Abu Ghraib prison, as well as an inadequate number of assigned CORs, put the Army at risk of being unable to control poor performance or become aware of possible misconduct by contractor personnel. We found that the personnel acting as CORs did not, for the most part, have the requisite training and were unaware of the scope of their duties and responsibilities. For example, they did not know that they were required to monitor and verify the hours worked by the contractor and instead just signed off on the invoices provided by the contractor. During the course of our work, we found confusion about whether the CORs were required to meet Interior's or DOD's training requirements. DOD and Interior officials told us that no policy or guidance exists on this matter when interagency contracting is used.

One COR for the logistics orders in Iraq, who had prior contracting experience, observed problems with two orders as soon as he was designated COR in February 2004. The concerns included: (1) a "clear mismatch" between the underlying contract and the statement of work, (2) the fact that no invoices had been submitted for work that began several months earlier, (3) Army personnel not overseeing and verifying time cards, (4) significant delays and issues in communicating with Interior's contracting office, and (5) significant problems with the administration of the orders by both the government and the contractor.

## Too Early to Tell If Actions to Increase Oversight and Improve Training Will Be Effective

The discovery of the problems with the Iraq orders encouraged Interior and DOD to take corrective actions aimed at improving management oversight and training, particularly as they pertain to interagency contracting. However, due to the recent nature of these efforts, it is too soon to tell how effective they will be.

In June 2004, Interior issued a policy memorandum prohibiting its contracting officers from acquiring interrogation or human intelligence services "regardless of the dollar value" for internal or external customers. Further, to focus attention on proper use of GSA contracts, Interior plans to evaluate its use of GSA contracts in its fiscal year 2006 agencywide targeted performance review, an annual self-reported review by each of its contracting activities focusing on issues that are deemed important by top executives.

Also in June 2004, Interior's National Business Center, which has direct oversight responsibility for the contracting office that placed the orders for DOD in Iraq, clarified for its contracting activities the requirements for competition when ordering on behalf of DOD. At the same time, it updated its policy outlining COR requirements, emphasizing the need for written designation letters; issued new guidance for using BPAs and GSA contracts; and clarified its legal review policy. Moreover, the National Business Center intends to hire an additional manager whose responsibilities will include overseeing the contracting activities under the Center's purview. Officials at Interior agree that management controls are critical in fee-for-service contracting offices with a focus on customer service, and, in comments on this report, Interior stated that the National Business Center has established a new performance rating system that provides incentives to contracting officials to exercise due diligence.

Officials at the Interior contracting office that ordered the services for the Army told us that they are no longer placing orders against the CACI BPA.

Once all orders expire, the BPA will be terminated. In addition, in December 2004, the contracting office released a revised independent quality review process to include specific checks for GSA contract actions, including whether the maximum order threshold is exceeded, section 803 competition compliance, and scope determination with a labor category verification. Officials also plan to review the amount of activity on all existing BPAs to determine if these BPAs are still needed and to assess whether prices are competitive.  Interior, in commenting on this report, stated that the contracting office has also established a policy to ensure that BPAs are reviewed annually.

In addition, Interior has taken steps to improve training for its contracting officers. For fiscal year 2005, Interior has required each of its contracting activities to certify that all warranted contracting officers have taken two training courses on GSA contract use. Further, the contracting office that placed the orders for the Army has re-instituted regular, formal training seminars for newer contracting staff. It has also implemented a new mentoring program to augment training standards and assist new employees in learning on the job. However, a mechanism is not yet in place to track or monitor the training.

DOD, for its part, issued a policy in October 2004, signed by high-level officials from the Office of the Comptroller and the Office of Acquisition, Technology, and Logistics, requiring that military departments and defense agencies establish procedures for reviewing and approving the use of other agencies' contracts. The procedures are to ensure that the use of another agency's contract is in the best interest of DOD; tasks are within the scope of the contract being used; funding is being used in accordance with appropriation limitations; unique terms and conditions are provided to the ordering activity; and data are collected on the use of outside ordering activities. The procedures took effect in January 2005. Most military services have outlined procedures where the requiring activity is responsible for coordinating with the contracting office, and in some cases the legal and financial offices, when planning to use interagency contracting and for documenting compliance with the policy's guidelines. While the policy does not include a mechanism for monitoring the departments' implementation plans, ensuring ongoing compliance with the policy, or sharing information across DOD, agency officials stated that these functions are being performed informally.

## Recommendations for Executive Action

While the actions Interior and DOD have recently put in place or plan to initiate are positive steps, additional actions are needed to further refine these efforts. Accordingly, we recommend that:

The Secretary of the Interior take the following four actions:

- Ensure that management reviews of Interior contracting offices emphasize and assess whether contracting officials are trained adequately and BPAs are used appropriately.
- Ensure that performance measures for contracting officials provide incentives to exercise due diligence and comply with applicable contracting rules and regulations.
- Ensure that CORs are properly designated when contracts are awarded or orders are issued for other agencies and that they have met appropriate training requirements.
- Direct the National Business Center at Fort Huachuca to take the following three actions:

  - Establish a consistent methodology for conducting peer reviews of contracting actions and ensure that experienced and trained contracting officials perform the reviews.

  - Ensure that reviews of BPAs are done annually, as required by the FAR, to determine whether they still represent best value.

  - Ensure that the contracting staff are properly trained and effective mechanisms are in place to track the training.

The Secretary of Defense take the following action:

- Develop a mechanism to track implementation of the new policy that establishes procedures for reviewing and approving the use of non-DOD contracts and to ensure that the military services and defense agencies have the opportunity to share information on how they are implementing it.

## Agency Comments and Our Evaluation

We provided a draft of this report to DOD, Interior, and CACI for review and comment. Their written comments are included as appendices II, III, and IV, respectively.

DOD agreed with our recommendation to develop a mechanism to track implementation of the new policy that establishes procedures for reviewing and approving the use of non-DOD contracts. DOD plans to post implementation policies on its web site and is considering establishing a

community of practice on this issue. Our draft report contained a second recommendation to ensure that CORs are properly assigned, as appropriate, for all orders that DOD places on interagency contracts and that they are provided requisite training. Because DOD recently concurred with a similar recommendation in another GAO report,[24] we have deleted this recommendation.

Interior agreed with all of our recommendations and outlined actions and plans to address the issues that we identified in our report.[25] In general, Interior is taking actions to improve oversight and training for its contracting staff, in particular for the National Business Center offices.  In some cases, officials initiated corrective actions during the course of our review, as we brought issues to their attention.

While acknowledging that our report identified a number of areas where the government can improve its contracting processes, CACI took issue with several aspects of the report:

- CACI suggested that our report does not adequately take into account the impact of the wartime environment in Iraq. We believe that our report adequately references the wartime situation. As CACI pointed out, the wartime circumstances may have justified the government's use of non-competitive contracting procedures. However, such authorized flexibilities were not employed by the agencies involved.  Instead, as described in the report, Interior improperly used CACI's GSA contract in servicing its DOD customer.

- CACI offered a number of detailed comments to support its position that the orders fell within the scope of the GSA contract. We did not find these arguments convincing. Every government agency involved determined that most of the work performed on the orders was out of scope. Contrary to CACI's assertion, our finding was not based merely on a comparison of the labor categories in CACI's GSA contract and those in the orders'

---

[24]GAO, *Contract Management: Opportunities to Improve Surveillance on Department of Defense Service Contracts*, GAO-05-274 (Washington, D.C.: Mar. 17, 2005).

[25]Interior's response includes a reference to enclosure 1, which consisted of technical comments on our report and, as agreed with Interior, is not reproduced in this report. We incorporated changes to the draft based on the comments as appropriate. Further, the response refers to one concern that was not included in enclosure 1. This word choice was explained by Interior as an oversight that should have been deleted from the response.

statements of work, but on the material differences between the services authorized by the GSA contract and the services actually ordered by Interior and provided by CACI. While some of the services involved information technology, that, by itself, does not mean that those services (such as interrogation of detainees) can be ordered from CACI's GSA contract. The GSA contract is for the performance of certain commercial-type information technology services, not for any service that happens to involve the use of information technology. As noted in our report, the Army officials we spoke with stated that the services were not information technology services. In addition, while CACI's earlier orders from GSA's Federal Technology Service may help explain how the services in Iraq came to be ordered by Interior, it is not determinative of the proper use of that contract in this situation.

- On the issue of the contractor playing an unusually large role in actions normally performed by government officials, CACI defends its actions as being appropriate in the wartime environment. The intent of that section of our report is not to suggest that the contractor acted with malfeasance; rather, we highlight the fact that, because the government officials did not exercise due diligence in carrying out their duties, the contractor was either allowed or encouraged to step in to fill the void. Further, CACI refers to our description of out-of-scope construction work and the drafting of the sole source justification as "incomplete and out of context." Based on our audit work with Interior and CACI officials, we found that CACI intended to include the construction work on the order for intelligence services under the BPA. However, because subsequent decisions by CACI contracting personnel and Interior's contracting office led to a separate, sole source award, we revised the wording in our report to reflect this outcome. The contractor did—as CACI's response confirms—draft a sole source justification for additional construction work. As stated above, we included this in our report to demonstrate how the contractor was encouraged to perform duties normally fulfilled by government personnel.

- CACI questioned whether our findings on the lack of adequate contractor surveillance were well-founded. Our findings are not based solely on our discussion with the contractor interrogator who had been located at Abu Ghraib prison; rather, they are based on our file reviews and a number of discussions with DOD officials.

We are sending copies of this report to the Director, Office of Management and Budget, the Secretaries of Defense and the Interior, and CACI. We will make copies available to others on request. In addition, this report will be available at no charge on GAO's Web site at http://www.gao.gov.

If you have any questions about this report, please contact me on (202) 512-4841 or Michele Mackin on (202) 512-4309. Other major contributors to this report were Alexandra Dew, James Kim, Adam Vodraska, and Tatiana Winger.

David E. Cooper, Director
Acquisition and Sourcing Management

# Appendix I: Scope and Methodology

We conducted our work at the Department of the Interior, including its National Business Center headquarters and office at Fort Huachuca, Arizona; and the Department of Defense (DOD), including the Defense Procurement and Acquisition Policy office and the Department of the Army. We also met with representatives of CACI, International, Inc. (CACI) and the General Services Administration (GSA).

To determine what breakdowns occurred in the process of procuring interrogation and other services and the contributing factors to the breakdowns, we reviewed contract files on the 11 orders issued to CACI to understand the facts about how the orders were issued. We also reviewed internal controls and guidance to assess what safeguards were in place to ensure compliance with regulations, including training requirements and performance evaluation factors at the National Business Center's office in Fort Huachuca. We reviewed the two orders for interrogators, placed in August and December 2003, to corroborate GSA's and Interior's determination that the orders were out of the scope of the GSA contract. We also identified and analyzed pertinent policies and regulatory requirements governing the contracting process to assess whether Interior, Army, and contractor officials operated in compliance with those requirements. We interviewed Army representatives who were responsible for overseeing the contractor's performance in Iraq. We spoke with officials at the Interior's Offices of Acquisition and Property Management, National Business Center, and employees of the Fort Huachuca office who were involved with the orders for interrogation and other services. Additionally, we interviewed several CACI employees, including a contractor interrogator, and attorneys representing CACI. We used GAO's Standards for Internal Control in the Federal Government (GAO/AIMD-00-21.3.1, November 1999) as criteria to demonstrate the importance of management controls such as oversight and training.

To evaluate the extent to which actions taken by Interior and DOD address contributing factors to breakdowns in the procurement process, we identified and reviewed steps taken by these agencies, such as newly released policies and guidance. In particular, we reviewed recently issued policies from Interior's headquarters, National Business Center, and the contracting office at Fort Huachuca, as well as DOD.

We conducted our review from July 2004 to January 2005 in accordance with generally accepted government auditing standards.

# Appendix II: Comments from the Department of Defense



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
3000 DEFENSE PENTAGON
WASHINGTON, DC 20301-3000

ACQUISITION
TECHNOLOGY
AND LOGISTICS

APR 1 3 2005

Mr. David E. Cooper
Director, Acquisition and Sourcing
   Management
U.S. Government Accountability Office
441 G. Street, NW
Washington, DC  20548

Dear Mr. Cooper:

    This is the Department of Defense (DoD) response to the GAO draft report, INTERAGENCY CONTRACTING:  Problems with DoD's and Interior's Orders to Support Military Operations, dated March 9, 2005, (GAO Code 120371/GAO-05-201). Our comments on the report are enclosed.

    We are currently collaborating with the Department of the Interior (DOI) to ensure that the issues identified in the report are effectively addressed and resolved.  Earlier this year we initiated reviews of civilian agencies that provide contracting support to DoD. The National Business Center and "Gov Works," the two DOI providers of contracting services for DoD, volunteered to be one of the first organizations to participate in the DoD review.  A representative from Defense Procurement and Acquisition policy visited each site to initiate the review process.  While the reviews are still ongoing our collaborative effort and open communication at the most senior levels should ensure our future success.

    Thank you for the opportunity to review and comment on the subject draft report. For further questions concerning this report, please contact Mike Canales, on 703-695-8571 or via e-mail at Michael.Canales@osd.mil.

Sincerely,

Deidre A. Lee
Director, Defense Procurement
   and Acquisition Policy

Enclosure:
As stated



**GAO DRAFT REPORT – DATED MARCH 9, 2005**
**GAO CODE 120371/GAO-05-201**

**"INTERAGENCY CONTRACTING: PROBLEMS WITH DOD'S AND**
**INTERIORS ORDERS TO SUPPORT MILITARY OPERATIONS'**

**DEPARTMENT OF DEFENSE COMMENTS TO THE**
**RECOMMENDATIONS**

**RECOMMENDATION 1:**  The GAO recommended that the Secretary of Defense develop a mechanism to track implementation of the new policy that establishes procedures for reviewing and approving the use of non-DoD contracts and to ensure that the military services and defense agencies have the opportunity to share information on how they are implementing it.  (p.21/GAO Draft Report)

**RESPONSE:**  Concur.  The Director, Defense Procurement and Acquisition Policy, will post all implementation policies of the Military Department and Defense Agencies on the website, http://www.acq.osd.mil/dpap/specificpolicy/index.htm, established for the policy on the "Proper Use of Non-DoD Contracts."  In addition, we are exploring the feasibility of establishing a community of practice through the Defense Acquisition University on this same policy.

**RECOMMENDATION 2:**  The GAO recommended that the Secretary of Defense ensure that Contracting Officer's Representatives (CORs) are assigned, as appropriate, for all orders that DoD places on interagency contracts and that they are provided requisite training for performing their duties and responsibilities. (p. 21/GAO Draft Report)

**RESPONSE:**  Partially concur.  Consistent with the DoD response to GAO-05-274, "Contract Management:  Opportunities to Improve Surveillance on Department of Defense Services Contracts," we will require that properly trained contracting officer representatives must be appointed for all contracts for services including those awarded by other federal agencies.  DoD will modify DFARS to require that, unless a waiver is approved in writing, contracting officers must appoint a properly trained contracting officer representative (COR) in writing before performance commences on any contract action for services awarded by a DoD component or by another federal agency on behalf of DoD.  We do not agree that a COR be appointed for all orders for supplies because most orders for supplies clearly define the deliverables and don't require as much oversight during

**Appendix II: Comments from the Department of Defense**

contract performance as contracts for services.  The appointment of a COR on orders for supplies will be discretionary.

# Appendix III: Comments from the Department of the Interior



## United States Department of the Interior

OFFICE OF THE ASSISTANT SECRETARY
POLICY, MANAGEMENT AND BUDGET
Washington, DC 20240



APR 0 8 2005

Mr. David E. Cooper
Director, Acquisition and Sourcing Management
U. S. Government Accountability Office
Washington, DC 20548

Dear Mr. Cooper:

Thank you for giving us the opportunity to review and comment on the draft report entitled "Interagency Contracting: Problems with DOD's and Interior's Orders to Support Military Operations." We concur with the recommendations contained in the report and have made notable strides in improving our acquisition operations to date. The report's recommendations, as well as a previous report by Interior's Inspector General, helped us focus on necessary corrective actions so the deficiencies identified in the report do not recur in the future.

We are currently collaborating with the Department of Defense (DOD) to ensure that the issues raised in the report are effectively addressed and resolved. For example, a provision in the FY 2005 National Defense Authorization Act (NDAA) requires review of certain non-DOD contracting offices to determine if they are compliant with Defense procurement requirements. In early 2005, DOD initiated reviews of civilian agency contracting offices providing contracting support to DOD customers. The National Business Center (NBC), as one of two Department of the Interior (DOI) providers of contract services for DOD, volunteered to be one of the first organizations to participate in the DOD reviews. A representative from the Office of the Secretary of Defense visited NBC's acquisition office at Fort Huachuca on March 8-10, 2005, to initiate the review process. This review is currently on-going. Further, as evidence of both parties' commitment to compliance with this new Act, NBC and DOD are establishing a Memorandum of Agreement delineating the responsibilities and expectations of both parties when the NBC provides contracting services to DOD clients.

We also appreciate GAO's willingness to incorporate DOI comments provided during the audit exit briefing on December 15, 2004. As a result, we believe the draft report is a more accurate presentation of the issues. However, there are still a few comments in the body of the draft report which give us concern. All of these concerns, except one, are addressed in Enclosure 1.

Appendix III: Comments from the Department of the
Interior

Page Two

Enclosure 2 contains a description of actions completed and actions remaining to
be completed. We are working very closely with DOD to aggressively implement
all recommendations of the report to ensure full compliance with all existing
rules and regulations when providing contracting support. The end result will be
an acquisition function that adheres to policy and procedures while providing
effective, efficient, and mission-critical acquisition support.

Mr. John Nyce, Assistant Director for Administrative Operations, NBC, is
available at 202-208-3932 to answer any questions your staff may have regarding
this issue.

Sincerely,

**Acting** P. Lynn Scarlett
Assistant Secretary for Policy, Management
and Budget

Enclosures (2)

cc:    Douglas J. Bourgeois, Director, NBC
       Debra E. Sonderman, Director, Office of Acquisition and Property
           Management
       John Nyce, Assistant Director for Administrative Operations, NBC

Enclosure 2

## Response to Audit Recommendations

**Recommendation 1:  Ensure that management reviews of Interior contracting offices emphasize and assess whether contracting officials are trained adequately and BPAs are used appropriately.**

**Response: Concur**

### Departmental Action:

Existing management control guidance/checklists used by DOI bureaus in the course of management reviews assess whether Interior contracting officials are trained adequately and BPA's are used appropriately. (See checklists at the following Office of Acquisition and Property Management Internet site:  http://www.doi.gov/pam/acqqual.html).  The FY 2005 DOI Management Control Review mandates that all warranted GS-1102 Contract Specialists and GS-1105 Purchasing Agents, Department-wide, complete two training courses:  (1) Using GSA Schedules - Customers (Online) and (2) Using GSA Schedules - Customers (FAR 8.4 Revisions). The FY 2006 DOI Management Control Review reporting cycle will, at minimum, mandate that:  (1) all remaining warranted personnel (i.e., those not in the GS-1102 or GS-1105 series) and non-warranted GS-1102 and GS-1105 complete the above referenced coursework; and (2) bureaus/offices review and evaluate their BPA award, administration, and review processes for compliance with FAR requirements.

### NBC Action:

Actions Completed:

- NBC developed management review criteria tailored specifically to assess the process and procedures being utilized at the four NBC Acquisition Offices when issuing orders under GSA schedules or under internally created BPA/IDIQ contracting instruments.  Review criteria also assesses whether files contain proper documentation and that contracting personnel are following all applicable rules and regulations.
- NBC established a local policy at Southwest Acquisition Office (Fort Huachuca) on December 16, 2004 to ensure that reviews of BPA's are accomplished annually.
- NBC developed management review schedules for all four NBC Acquisition Offices.  All reviews will be completed by June 30, 2005.

1

Action plans will be developed by each Office in accordance with the
results of each review.
- NBC collaborated with DOD to complete the first of the scheduled NBC
  management reviews from March 8-10, 2005 at the Southwest
  Acquisition Office.  The results of the review are being finalized and an
  action plan will be created based on these results.
- All NBC contracting officials at Ft. Huachuca and the majority of
  contracting officials across the entire organization completed the two
  day GSA-sponsored training course on the use of schedules.

On-going Actions:

- A review is currently being performed at the Southwest Branch on all
  open BPA's to determine if appropriate to remain active.  The review
  will be completed by June 17, 2005.
- BPA policy is being developed to reinforce that the award,
  administration and annual review requirements are being followed at
  all sites.  The policy will be completed and implemented by June 17,
  2005.
- NBC will perform process reviews at all NBC Acquisition sites during
  FY06 as required by the DOI Acquisition Management Control Review
  guidelines.

**Recommendation 2:  Ensure that performance measures for
contracting officials provide incentives to exercise due diligence and
comply with applicable rules and regulations.**

**Response: Concur**

**Departmental Action:**

The DOI acquisition and human resources policy, including the DOI
Contracting Officers Warrant Manual System, identifies incentives to
exercise due diligence and comply with applicable contracting rules and
regulations as well as disincentives for non-compliance, e.g., warrant
suspension and termination.  The DOI Office of Acquisition and Property
Management (PAM) will issue policy to DOI bureaus and offices
reiterating the importance of including the exercise of due diligence and
compliance with applicable contracting rules and regulations as
performance measures in all reviews/assessments of contracting activities.
The policy will be completed by June 30, 2005.

**NBC Action:**

In accordance with Departmental guidance for FY 2005, NBC established
a new five-tier performance rating system for all employees.  The
performance ratings established for contracting officials specifically

2

provide for incentives to exercise due diligence and to assure compliance with applicable rules and regulations. The specific performance element and fully successful criteria are listed below:

Critical Element 2 - Quality Contract Execution and Administration.

1) Work with customers in developing proper acquisition strategies.
2) Show sound business judgment in making various acquisition or business decisions throughout the entire process.
3) Properly document files when awarding contracting actions.
4) Demonstrate quality analysis and negotiate in good faith to achieve mutually satisfactory resolution of issues.

Performance Standard – Fully Successful - Complies with federal acquisition laws and regulations including the FAR, DIAR, DOI/PAM policies, NBC policies and when applicable, external customer rules and regulations. Achieves satisfactory rating on FY 2005 Acquisition Management Review (AMR). Develops plan to correct any deficiencies found in the AMR and demonstrates progress in implementing plan.

**Recommendation 3: Ensure that COR's are properly designated when contracts are awarded or orders are issued for other agencies and that they have met appropriate training requirements.**

**Response: Concur**

**Departmental Action:**

The DOI Office of Acquisition and Property Management will issue policy requiring that contracting activities that award or issue orders for other agencies ensure that Contracting Officer Representatives (CORs) are properly designated and meet appropriate training requirements. The policy will be completed by June 30, 2005.

**NBC Action:**

- On June 4, 2004, the NBC Acquisition and Property Management (A&PMD) Division Head issued the "Administrative Guidelines Relating to Contracting Officer Representative (COR's or COTR's), Invoices, and Performance Reporting" policy.
- This process is being reviewed as part of the FY 2005 AMR discussed above.

3

**Recommendation 4:  Direct the NBC at Fort Huachuca take the following three actions:**

**(a) Establish a consistent methodology for conducting peer reviews of contracting actions and ensure that experienced and trained contracting officials perform the reviews.**

**Response:  Concur**

   **NBC Action**:

   • On December 2, 2004, NBC Southwest Acquisition Office (Fort Huachuca) established a detailed policy and procedure for conducting peer reviews.
   • The implementation of this policy was specifically reviewed during the AMR at the Southwest Acquisition Office on March 8-9, 2005.
   • An action plan will be developed when the findings are received in the final AMR.

**(b) Ensure that reviews of BPA's are done annually, as required by FAR, to determine whether they still represent best value.**

**Response:  Concur**

   **NBC Action**:

   • NBC developed management review criteria tailored specifically to assess the process and procedures being utilized at the four NBC Acquisition Offices when issuing orders under GSA schedules or under internally created BPA/IDIQ contracting instruments.  The review criteria also assesses whether files contain proper documentation and that contracting personnel are following all applicable rules and regulations.
   • On December 16, 2004, the NBC Southwest Acquisition Office established a local policy to ensure that reviews of BPAs are accomplished annually.
   • An NBC-wide BPA policy is being developed to reinforce that the award administration and annual review requirements are being followed at all sites.  The policy will be completed by June 17, 2005.   NBC will perform a process review at all NBC Acquisition Offices during FY 2006 as required by the PAM management control review guidance.

**(c) Ensure that the contracting staff is properly trained, and effective mechanisms are in place to track training.**

**Response:  Concur**

4

Appendix III: Comments from the Department of the
Interior

**NBC Action:**

- On December 9, 2005, the NBC Southwest Acquisition Office
  implemented a local procedure requiring that a training plan be
  developed for an individual within two weeks of employment at that
  office.  Specific guidelines, timeframes for completion, and annual
  assessment of training are addressed in this procedure.
- NBC has completed updating the warrant-related training history for
  all NBC acquisition offices personnel who hold warrants, and is
  working diligently to complete a training inventory for all staff across
  the acquisition function.
- NBC continues to work with the Department's Office of Acquisition and
  Property Management (PAM) and the other DOI bureau procurement
  chiefs to continually review and revise the warranted contracting
  officers training requirements and qualification standards.

5

# Appendix IV: Comments from CACI International Inc.



EVER VIGILANT

April 07, 2005

Mr. David E. Cooper, Director
Acquisition and Sourcing Management
United States Government Accountability Office
441 G. Street, N.W.
Washington, D.C. 20548

Re: *CACI Comments on Draft GAO Report*

Dear Mr. Cooper:

**I.     Executive Summary**

CACI International Inc and CACI Premier Technology, Inc. (collectively "CACI") submit the following comments on the GAO's draft report, *Interagency Contracting, Problems with DOD's and Interior's Orders to Support Military Operations* (GAO-05-201) ("GAO Report" or "Report"). CACI believes that the GAO Report has identified a number of areas in which the Government can improve its contracting processes. CACI also believes, however, that several aspects of the Report require clarification or revision, as discussed further below.[1]  In summary:

    1.  CACI recommends that the final Report more fully acknowledge the impacts of the urgent, wartime circumstances on the contracting practices used by the Army and Department of the Interior ("DOI") and on the relationships between CACI and the Army and DOI.

    2.  CACI believes it acted reasonably and in good faith in accepting and performing the delivery orders ("DOs") for intelligence support services in Iraq that were awarded pursuant to a Blanket Purchase Agreement ("BPA") established under CACI Premier Technology, Inc.'s ("CACI-PTI") GSA Federal Supply Schedule Information Technology ("IT") contract, particularly given the exigent wartime circumstances and prior course of dealing among the parties.  Likewise, CACI believes that the DOI acted reasonably under the circumstances in awarding those DOs to CACI.

---

[1] These comments focus primarily on matters in the Report relating to CACI and do not address GAO's comments and recommendations relating solely to internal Government processes and controls.

CACI International Inc and Subsidiary Companies
Worldwide Headquarters • 1100 North Glebe Road • Arlington, Virginia  22201 • (703) 841-7800 • Fax (703) 841-7882
CACI Website - www.caci.com

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 2

3. CACI submits that prior Government determinations that the DOs for intelligence support services in Iraq were "outside the scope" of CACI-PTI's GSA schedule contract, did not properly consider:

- The prior course of dealing between the Army and CACI's predecessor, Premier Technology Group, Inc. ("PTG"), in using the GSA IT contract, and its related BPA, for the acquisition of intelligence support services; and

- The importance of IT in the performance of intelligence support work, including interrogation.

4. CACI believes that it (i) acted reasonably and with full disclosure to the DOI and the Army in its selection of GSA labor categories and labor rates for interrogation support services provided under the Statements of Work ("SOWs"), and that (ii) contract scope determinations should not be based on unduly narrow and mechanical comparison of SOWs and GSA contract labor categories.

5. The suggestions in the Report that CACI's employees improperly displaced Government employees in the acquisition process or had a "conflict of interest" that undermined the integrity of the competitive procurement process, are both unfair and unwarranted in that they fail to consider all the relevant circumstances surrounding the award and performance of the DOs and the contributions that CACI made to filling an urgent need on the ground in Iraq.

6. CACI has enhanced its contracting policies and procedures as a result of various Government reviews of those DOs, and believes that the Report provides a baseline for improving the interagency acquisition process.

II.    **Importance of the Unique Wartime Environment**

The GAO Report includes some recognition of the fact that the Army's acquisition of the intelligence and other services discussed in the Report occurred in unique, wartime circumstances. As the Report correctly points out:

- "[At] the end of major combat in May 2003, the Army . . . was expecting a non-hostile situation and did not plan for an insurgency," Report at 5;

- The situation in Iraq at that time "was extraordinary – a wartime environment and an atmosphere of turmoil and urgency," *id.* at 3; and,

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 3

- "[The Army] was unprepared for the volume of Iraqi detainees and the need for interrogation and other intelligence and logistics services." *Id.* at 5.[2]

CACI believes, however, that the Report does not fully capture the impact that the wartime conditions had on the parties – Government and Contractor – and how they affected the contracting process used by the Army. In order to provide a fully accurate picture of the situation, this should be given additional emphasis in GAO's final report.

For example, the GAO Report criticizes DOI (and the Army) for awarding the task orders to CACI without competition, citing the Competition in Contracting Act ("CICA") and § 803 of the FY 2002 DOD Authorization Act (P.L. 107-107). *See* Report at 3 & 8-9. Although the Report nominally acknowledges that both CICA and § 803 permit awards without competition, *id.* at 8-9, it does not recognize that the exigent circumstances which the Army confronted in Iraq fell squarely within the exemptions available under those statutes.

In this regard, CICA and its implementing regulations expressly permit awards without competition where "the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals." 10 U.S.C. § 2304(c)(2); *see also* FAR 6.302-2.[3] Similarly, § 803 and its implementing regulations include an exception to the special ordering procedures applicable to DOD purchases of services under a GSA schedule contract where "[t]he . . . need for the . . . services is so urgent that [placing orders on a competitive basis] would result in unacceptable delays." FAR 16.505(b)(2)(i); *see also* DFARS 208.404-70(b)(1).

CACI recognizes that these statutes and their implementing regulations require a procuring activity to comply with certain justification, approval, and/or documentation requirements (*see* FAR 6.302-2(c); DFARS 208.404-70(b)), and CACI is not suggesting that

---

[2] These findings are consistent with those in an earlier Army report, which concluded that, although there had been a declaration of the end of hostilities, the war had not ended. Rather, the Army found itself confronting a complex counterinsurgency operation, which generated significant, and unanticipated, numbers of detainees and a need for intelligence for which the Army was not prepared in terms of personnel, equipment and organization. AR 15-6, *Investigation of the Abu Ghraib Prison and 205th Military Intelligence Brigade*, LTG Anthony R. Jones (2004) at 8 & 10-11.

[3] As discussed below, CACI disagrees with the Report's contention (at 7) that the work covered by the task orders should have been competed because it was outside the scope of the GSA contract held by CACI-PTI. However, even assuming, *arguendo*, that the work at issue was outside the scope of that contract, the award of that work to CACI-PTI without competition was fully consistent with CICA due to the "unusual and compelling urgency" that existed on the ground in Iraq.

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 4

agencies can or should ignore those requirements when contracting without competition. Further, CACI is not in a position to question GAO's conclusion that DOI (and the Army) did not prepare the required documentation here. CACI does believe, however, that the final GAO Report should more clearly acknowledge that, while the two agencies apparently did not comply with all of the procedural requirements applicable to an award without competition, the exigent wartime circumstances in Iraq fully supported a sole-source award to CACI.

As discussed further below, the unique wartime circumstances also impacted and influenced other aspects of the working relationships among CACI, DOI and the Army in connection with the acquisition.

### III.    The Conclusion That the Task Orders Were "Outside the Scope" of CACI's Contract

The Report focuses on 11 DOs that were issued to CACI between August 2003 and March 2004, by DOI's National Business Center ("NBC") at Ft. Huachuca pursuant to a BPA that had been established under a GSA IT schedule contract.[4]  The Report states that the DOI IG and GSA determined that 10 of the 11 DOs were outside the scope of CACI-PTI's GSA IT contract and that the Army also concluded that certain of the services called for under the DOs were outside the scope of that contract.  Report at 7.  CACI notes that all of those determinations were made nearly *a year after the initial DOs were awarded* and after the agencies involved had come under intense public scrutiny as a result of the events at Abu Ghraib.[5]  Further, those after-the-fact determinations were made without prior consultation with CACI; for example, the DOI IG never requested any information from or communicated with CACI regarding its review of the DOs, and CACI was not previously even aware that the Army had reached any conclusion on the contract scope issue.  CACI did subsequently address GSA's concerns regarding the use of the GSA IT contract in discussions with GSA's Suspension and Debarment Official, and CACI has enhanced its internal procedures for addressing contract scope issues.

---

[4]  The BPA was originally awarded by the Army to PTG and was later assumed and extended by DOI when it took over responsibility from the Army for the contracting office at Ft. Huachuca.  CACI acquired substantially all of the assets of PTG, including its GSA contract and the subject BPA, in mid-May 2003, shortly before DOI placed the DOs at issue.  *See* Report at 10 n.17.

[5]  Those determinations were also made against a background of heightened sensitivity to issues relating to the use of GSA schedule contracts more generally, as a result of other audits released in 2004.  *See, e.g.,* GSA Office of Inspector General, *Audit of Federal Technology Service's Client Support Centers,* No. A020144/T/5/Z04002 (Jan. 8, 2004); DOD Office of Inspector General, *Contacts Awarded for Coalition Provisional Authority by the Defense Contracting Command - Washington D.C.* (D-2004-057) (Mar. 18, 2004).

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 5

Contrary to the after-the-fact determinations discussed above, CACI understands that the DOI Contracting Officer ("CO") had determined that the intelligence support and other services covered by the DOs were within the scope of the GSA contract at the time they were issued.[6] For example, a DOI official was quoted as stating that "[i]n this case, the contracting officer determined that the interrogators would be using IT equipment provided by the contract by entering information into databases, analyzing the information collected using IT software and disseminating the intelligence to other military commands using the IT systems." *Army's Use of IT Contract to Hire Interrogators Questioned,* Computerworld (May 31, 2004). As discussed below, CACI submits that the DOI CO's determination was reasonable in light of all the facts and circumstances, as was CACI's acceptance of those DOs.

As GAO itself has recognized, whether work is within the scope of a particular contract is "primarily an issue of contract interpretation and judgment by the contracting officer." *Rebuilding Iraq, Fiscal Year 2003 Contract Award Procedures and Management Challenges,* GAO-04-605 at 15 (June 2004). In addition, there are "no statutory or regulatory criteria or procedures that guide a contracting officer in making this determination," *id.,* but rather only "guiding principles" as set forth in GAO and judicial bid protest decisions. *Id.*[7] Further, as the Federal Circuit has stated, in deciding whether a contract modification is subject to a requirement for competition (*i.e.,* is within the scope of an existing contract):

> The analysis thus focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified. Thus, a broad original competition may validate a broader range of later modifications without further bid procedures.

---

[6] *See* "GSA Fact Sheet" (which was provided to GAO and which refers to the DOI CO's determination); Federal Contracts Report, Vol. 81, No. 21 at 645-46 (June 1, 2004) (same). We do not read the GAO Report as concluding otherwise on this point. *See* Report at 8. In addition, as discussed below, the CO's determination that the orders were in scope was consistent with the established practice of the parties.

[7] Those GAO and court bid protest decisions arose out of actions brought by potential competitors contending that a modification was "outside the scope" of the original contract and that the supplies or services covered by the modification therefore should have been competed. As the Court of Appeals for the Federal Circuit has observed, "CICA sets forth no standard for determining when modification of an existing contact requires a new competition or falls within the scope of the original competitive procurement," *AT&T Comm. Inc. v. Wiltel, Inc.,* 1 F.3d 1201, 1205 (Fed. Cir. 1993), and each case must be decided on its particular facts. *See also* n.3, *supra,* noting that out-of-scope work does need to be competed where, as here, a CICA exemption applies.

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 6

*AT&T v. Wiltel*, 1 F.3d at 1205. Accordingly, a CO should have more latitude in making contract scope determinations under a GSA Schedule 70 (IT) contract, as such contracts necessarily cover a very broad range of potentially available services. As stated by GSA, Schedule 70 includes "[t]housands of companies offering several million products and services."[8]

CACI submits that, for the reasons set out below, the "out-of-scope determinations" referenced by GAO do not reflect the kind of careful interpretation and judgment necessary for determining whether the work called for under the DOs was within the scope of CACI-PTI's IT schedule contract.

A.    **Failure to Consider the Prior Course of Dealing**

Because contract scope determinations involve issues of contract interpretation, the prior course of conduct between the parties is relevant to such determinations, just as it is to any other issue of contract interpretation. *See G&H Mach. Co. v. United States*, 16 Cl. Ct. 568, 577-78 (1989) (where the Government argued that the course of dealing between the parties should be given "controlling weight" on an issue of contract scope under a contract administered by GSA).[9] As the courts and boards have frequently observed, the course of performance *before* a dispute arises reflects a "practical interpretation of the contract by the parties . . . [that] is entitled

---

[8]

http://www.gsa.gov/Portal/gsa/ep/channelView.do?pageTypeId=8199&channelPage=%252Fep %252Fchannel%252FgsaOverview.jsp&channelId=-13472. Schedule 70 includes "general purpose commercial information technology, equipment, software and services." Special Item Number ("SIN")132-51, Information Technology Services, includes "resources and facilities management, database planning and design, systems analysis and design, network services, programming, . . . network services project management, data/records management, subscriptions/publications (electronic media) and other services." http://www.gsaelibrary.gsa.gov/ElibMain/ScheduleSummary?scheduleNumber=70&x=5&y=6.

[9] *G&H Mach* apparently involved a GSA supply schedule contract and the issue was whether repairs of certain types of equipment requested by various user agencies were within the scope of the contract. *See id.* at 570 & n2. As noted above, the Government relied on the course of dealing in opposing the contractor's contention that certain work was out of scope. According to the Court, the Government contended that "[the contractor's] acceptance of the equipment over the life of the contract indicates that [the contractor] considered repair of the equipment to be within the scope of the contract." *Id.* at 578. The Court also looked to the course of conduct of the parties in concluding that they considered the equipment at issue to be within the scope of the contract, and went on to state that "[e]ven assuming that the parties had not originally intended to include this equipment within the scope of these classifications, the parties were free to modify the existing obligations, in this case to expand the scope of the classifications . . . ." *Id.* at 578.

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 7

to great, if not controlling weight." *Montana Power Co. v. United States*, 8 Cl. Ct. 730, 735 (1985) (quoting *Inland Empire Builders, Inc. v. United States*, 191 Ct. Cl. 742, 755 (1970)). Indeed, the conduct of the parties can provide the basis from which a court or board can infer that they have agreed to modify its terms. *See, e.g., id.* at 735-36; *Carabetta Enter., Inc. v. United States*, 58 Fed. Cl. 563, 567 (2003); *G&H Mach. v. U.S.*, 16 Cl. Ct. at 578 (same). Here, however, the post hoc contract scope determinations made by the DOI, GSA and, we assume, the Army, failed to consider the prior course of dealing between the Army and CACI-PTI's predecessor, PTG, as described below.

PTG obtained its first order for intelligence-related services under its GSA contract on May 27, 1999. That order was issued by *GSA's* FTS Office of Information Security, Washington, DC, pursuant to a competitive solicitation. (GSA RFQ No. TIB-99133-JF1, May 13, 1999.)[10] The CO and COTR involved with that contract action were both GSA employees.[11] The RFQ for the work clearly contemplated an award under a GSA schedule contract.

The subject GSA RFQ was issued to support U.S. Army Europe ("USAREUR") Office of Deputy Chief of Staff, Intelligence ("DCSINT"). The SOW provided that its "objective" was "to provide the full scope of intelligence analysis required for battle staff planning concerning intelligence preparation of the battlefield (IPB) support[ing] contingency operations in the European Theater of Operations." Functional requirements included, among others, signals analysis (all sources) and HUMNIT/Counterintelligence. The RFQ defined the "skill set" required for HUMNIT/Counterintelligence positions, for example, to include personnel:

Capable of providing the full range of CI/HUMINT expertise including collection, management, analysis and tasking. Focused on support to contingency operations and the force protection aspects of those operations. Experienced with counterterrorism, subversion, sabotage and espionage threats posed by various entities within the area of operations. Familiar with threat analysis, operations, related systems: MDITDS, IIR production, VCHPAS and DIAMS.

RFQ SOW § 2, Functional Requirements.

_____

[10] CACI understands that two or three other offerors also responded to GSA's solicitation.

[11] GAO had information and documents provided by CACI relating to this order, but the GAO Report includes only a very limited discussion of this important background information. *See* Report at 5.

CACI Comments on Draft GAO Report
Page 8

That original GSA DO required PTG to provide 25 Senior Intelligence Analysts and five Intelligence Analysts who could meet the functional requirements of the SOW, and specifically incorporated the SOW into the order. Moreover, GSA awarded the work even though PTG's GSA schedule had no labor category listing for "Senior Intelligence Analyst" or "Intelligence Analyst," and the job requirements in the SOW did not "match" those in PTG's GSA contract. Further, PTG's proposal made clear that it was using labor rates from its GSA IT contract in responding to the RFQ.[12]

GSA issued this initial DO for a period of 90 days and subsequently extended it for an additional nine months, through May 31, 2000. Shortly after the award of that GSA DO, PTG received a DO to provide additional intelligence support services to the USAREUR's DCSINT that was issued by the Army's contracting office at Ft. Huachuca pursuant to the PTG GSA contract BPA. PTG continued to provide intelligence support services to the Army (and to other DOD components) under the PTG DO contract through, and subsequent to, the time that the contracts of PTG were acquired by CACI. This included intelligence support services provided under DOs issued under the GSA contract BPA by the contracting office at Ft. Huachuca.[13]

The intelligence support services called for under the DOs addressed in the GAO Report are similar to those which PTG had been providing to its Army customers for several years prior to its acquisition by CACI. Yet DOI and GSA apparently summarily determined that all the intelligence-related DOs were out of scope and did so without any apparent consideration of established practice.[14] CACI submits that the screening and interrogation services called for in the DOs that are the subject of the GAO Report are not inconsistent with past practice, as they, too, are and were understood by CACI's employees to be intelligence support services. Accordingly, given the prior course of dealing and exigent wartime circumstances, it was not

---

[12] GSA's competitive award of a task order for intelligence support services that was priced on the basis of PTG's GSA contract labor rates provides further confirmation that those rates were fair and reasonable for the intelligence support work, *see* FAR 15.402(a) & (a)(1). Further, the parties continued to rely on those rates in the pricing of subsequent DOs.

[13] PTG also had an established practice – which continued after the acquisition by CACI – of providing logistics support services to the Army under the GSA BPA that were similar to those called for under Iraq DOs 64, 67, 73 and 80 that are also the subject of the GAO Report. Even assuming, *arguendo*, that those four logistics DOs were not within the scope of the CACI-PTI IT schedule contract, however, those services could – as both GAO and GSA have recognized – have been acquired under a GSA logistics schedule contract (which CACI also has). Further, as noted above, an order for those services could have been issued directly to CACI pursuant to the urgent-circumstances exception in § 803 and its implementing regulations.

[14] This included the three intelligence DOs – open source intelligence support and analysis (DO 37), special security office assistance (DO 38), and general C-2 intelligence staff support (DO 72) -- that did not include any interrogation and/or screening effort.

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 9

unreasonable for the Army (acting through DOI's NBC) to award CACI-PTI task orders for
intelligence support services under its GSA contract, even if the labor categories listed in that
contract did not precisely match those in the Army's SOWs for work in Iraq.

**B.    Failure to Acknowledge that Intelligence Support Work Involves IT**

CACI believes the post hoc judgments that the intelligence support DOs were outside the
scope of its GSA IT contract reflect an unduly narrow view of intelligence support and of the
requirements of the DOs.  Moreover, CACI does not believe that mechanical comparisons of
labor categories from the Army's SOWs with those from the GSA contract like that in Table 1 of
the GAO Report, provide an adequate basis for concluding that the DOs were outside the scope
of the GSA contract.  For example, in a recent DOD-sponsored report on IT occupations in the
military, the Rand Corporation included "intelligence" in its list of military "IT related"
occupations, *i.e.*, those "that rely extensively on IT in duty performance."  Rand Corp., National
Defense Research Institute, *Attracting the Best, How the Military Competes for Information
Technology Personnel* (2004) ("Rand Report") at 9; *see also id.* at  24 & 97.[15]  In discussing
intelligence as an IT-related occupation, the Rand Report stated:

> We view intelligence as IT related for two main reasons.  First,
> signal intelligence seems to fit naturally with the IT classification,
> given its heavy use of IT systems.  The other aspect of intelligence,
> ***human intelligence, can also be interpreted as an IT occupation,
> because it includes not only the gathering of information
> through interrogation, but also the compilation and access to
> that information, which are assisted now by IT***.

*Id.* at 24 (emphasis added).

To our knowledge, the after-the-fact Government determinations (including GAO's) that
the work was "out of scope," did not consider or recognize the importance of IT in performing
the intelligence support work required under the DOs.  For example, the SOWs for the two DOs
for interrogation support services specifically required CACI to provide ADP equipment and
recognized that such equipment was "required for effective [interrogation support] operations."
*See* DO 35 (Interrogation Support), SOW at 6; DO 71 (HUMINT Support Teams), SOW at 4.  In
addition, DO 71 required CACI to provide personnel experienced with various databases and
systems (*see* DO 71, SOW at 2-3), and DO 72 (C2 Intelligence Support Staff) specifically called
for an Information Management Specialist and an Intelligence Architecture and Communications
Engineer, both of whom were required to have extensive IT experience and who provided

---

[15] The Rand Report focused on the issues relating to the adequacy of the supply of IT
workers to meet manpower requirements of military and intelligence agencies, and focused on
occupations which the military considered to be "IT" occupations.

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 10

"critical and unique technical skills in the management of CJTF-7 intelligence and information management architectures." DO 72, SOW at 4.[16]

More generally, the necessity to track, cross-reference, link and transmit large volumes of data in a timely fashion makes IT a critical component of successful interrogation operations. *See also Rand Report, supra*, at 24. For example, in describing the screening process, the SOW for DO 36 (Screening Cell Support) stated that Phase I, "Preparation," begins by "[c]onducting name check of [Host Country Nationals ("HCNs")] scheduled for screening using the HCN data base and any other applicable agencies to obtain pertinent information needed to conduct the interview." DO 36, SOW at 1. The SOW goes on to state that in Phase II, Reporting Results, "[a]fter conducting the interviews, the data base administrator (or screener, where applicable) will update the information on the HCN . . . from the interview in the locally held HCN database." *Id.* at 2. Similarly, successful interrogation requires a broad range of skills, including good questioning techniques, a good memory, report-writing abilities, the capability to research, **and** IT hardware, software and skill sets. This is because no single interrogation of a detainee stands on its own. He and his story, background, family, personal and professional alliances, and his activities may be connected to other detainees, present, past and future. Moreover, a historical and evidentiary file must follow the detainee from the time he is apprehended, until he is either turned over to host-nation authorities or released into the general population.

CACI personnel working in Iraq regularly used IT equipment in performing intelligence support work, including screening and interrogation.[17] For example:

- IT is needed at even the lowest levels to begin tracking a detainee's record from the time of apprehension (including, in particular, circumstances of capture) until release.

- At the lowest level where equipment and connectivity can be supported, detainee biometric data (photo, fingerprints, and iris

---

[16] The duties of the Information Management Specialist included, among other things, management of database development, review and recommendations on software and hardware modifications, and coordination and support of information management systems and network enhancements project technical service requirements. *See id.* at 4-5. The Intelligence Architecture and Communications Engineer's duties included managing the overall intelligence and communications architecture for CJTF-7 intelligence operations, and management of the "Information Technology (IT) infrastructure and . . . CJTF-7 IT system design and implementation effort, which includes all systems, applications, and all local and wide area network connections in the CJTF-7 areas of operation." *Id.* at 6.

[17] GAO reports that "Army representatives in Iraq" have said that services for interrogators, screeners and logistics were "not information technology services." Report at 8. We do not know who these individuals were or the basis on which they reached that conclusion.

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 11

scan) is collected and entered into a large database with controlled accessibility, to further the intelligence collection mission.

- Retrievable historical and empirical data is required to adequately prepare for, conduct and follow up on interrogation and screening operations. IT also enables interrogators to conduct research on the detainee himself, his organization, affiliations, and other detainees who may be connected to him in any way, shape or form before going into the "booth." Similarly, additional research is always conducted after the interrogation is finished, as databases, message traffic, other interrogation reports, and intelligence websites are reviewed to check the veracity of the detainee's information. These areas are also reviewed to prepare the interrogator and analyst for the next time the same detainee is interrogated.

- The interrogator and the analyst both use IT software and hardware to produce intelligence information reports and put them into a larger database so others can use the information to further the overall intelligence cycle.

- Finally, the IT systems used by interrogators, screeners and intelligence analysts supporting interrogation operations include: Biometric Automated Toolset Suite ("BATS"); analysts Notebook (used to conduct link analysis of detainees and other human sources and their activities, such as meetings, phone calls and vehicle usage); various classified and unclassified intelligence web sites; mapping and photo programs; open-source websites; and message-handling systems.

### C.    CACI's Selection of Contract Labor Categories Was Reasonable

As noted above, CACI does not believe that a determination of whether the work was in or out of scope should be based on a mechanical comparison of the labor categories in the SOWs with those in the IT contract. Similarly, CACI submits that the assertion in the Report (at 8), that "CACI selected the labor categories in the contract for cost and pricing purposes rather than as a reflection of the work to be performed," while accurate, has been taken out of context, and that CACI's approach was reasonable under the circumstances.

In providing professional services to support the Army's requirements for intelligence personnel and related services in Iraq, it was necessary for CACI to relate the positions identified in the Army's SOWs to labor categories on its GSA schedule contract. In other words, CACI had to relate labor categories from its GSA schedule contract to the job descriptions in the SOWs. This was similar to the practice that CACI's predecessor, PTG, followed in providing intelligence support services to the Army since the first DO was issued by GSA in 1999.

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 12

More generally, the specific labor category elements included within a SOW for an IT task order are rarely worded so as to create an exact match with the labor categories on a GSA schedule contract. As a result, a contractor typically will attempt to "match" or relate the requirements in a SOW to its existing job descriptions and contract labor categories. Typically, however, there is not a perfect, word-for-word correspondence between the SOW job title/requirements and the GSA schedule labor categories, nor is one required. We believe this is consistent with GSA's view. For example, GSA recently responded to an allegation in a bid protest that an offeror had proposed services that were outside the scope of its GSA Schedule 70 IT contract because the offeror did not have a specific labor category on its contract for the services required by the user agency. In doing so, GSA's Deputy Director of the Information Technology Acquisition Center, and longtime GSA CO, stated:

> The Group 70 Information Technology Schedule does not solicit specific labor categories. Offerors are asked to respond to the Solicitation with their commercial services, identifying . . . the general nature of the services. GSA does not define labor categories, but rather asks the vendor to provide a description of the background and capabilities of each offered category.

> As such, an ordering activity is advised not to specify a particular labor category. The [ordering activity's] requirement should be stated as a need or problem to be solved, with the vendor left to formulate and articulate a solution to meet the requirement.

Letter from Robert D. Bourne, Jr., Deputy Director, Information Technology Acquisition Center, Federal Supply Service, to Sharon Larkin, GAO Procurement Law Control Group, Subject: *Protest of American Systems Consulting Group, Inc.* (*ASCI*), B-294644 (Nov. 22, 2004). We submit that this is a sensible and practical interpretation of the relationship between the positions set out in a particular SOW and in the GSA IT schedule contract labor categories.

The process of relating the positions in the Army's SOWs for intelligence support services to the labor categories in CACI-PTI's GSA contract was further complicated by the fact that CACI had to recruit and retain employees for work in the Iraq war zone where they were (and still are) under constant threat of attack, as well as risk of capture and possible execution. Thus, CACI had to determine what salary/benefits it would need to pay to attract qualified individuals to serve in Iraq in the positions identified in the SOWs.[18] After determining the

---

[18] The data available for making those determinations was limited at that time. For example, there were no market surveys of salary and benefits for the required positions in a war zone, and those addressing positions outside a war zone were of limited use in determining the salary and allowances necessary to attract an applicant to a position in Iraq (as an applicant typically would expect a much higher compensation package to work in a war zone than he or she would in a more conventional setting).

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 13

required salary/benefits for a given position, CACI then identified a labor category on its GSA schedule contract that, in light of the number of hours the individual filling the position was expected to work, provided a rate that was sufficient to cover the anticipated salary and benefit costs and applicable margin. That labor rate from the GSA schedule would then be used in invoicing for work performed under the DO. (Individuals working in Iraq also received certain allowances that are treated as ODCs.)

Accordingly, the selected GSA schedule contract labor categories were not intended to suggest a precise congruence between the job responsibilities of the positions called for in the Army's SOWs and the job titles/responsibilities of the labor categories on the GSA schedule. Moreover, the proposals that CACI submitted to DOI fully disclosed that it was using the labor rates from the GSA schedule contract for the positions specified in the SOWs.

For example, the cover letter to CACI's proposal for DO 35 (Interrogation Support Cell) clearly stated that "[t]he estimated costs . . . are based upon CACI's GSA IT Schedule No. GS-35F-5872H." Similarly, one of the proposal's "Assumptions and Clarifications" (No. 14) stated that "[t]his order is priced using CACI-PTI's currently approved GSA Schedule Pricelist." That proposal also included tables which (i) showed the applicable GSA IT contract labor categories, corresponding hourly rates from that contract, and estimated hours for each position, and (ii) paired the "functional" labor categories in the SOW with the applicable hourly labor rates from the GSA contract. In short, both DOI and the Army were fully aware CACI was using labor categories from its GSA IT contract in providing personnel to perform the work specified under the DOs, including interrogation and screening support. Moreover, those GSA contract labor rates were the same as the rates that had been used in previous acquisitions of intelligence support services from PTG.[19]

**IV.    The Suggestions that CACI Employees Improperly Displaced Government Employees or Had "Conflicts of Interest" that "Undermin[ed] the Integrity of the Competitive Contracting Process" are Unfair and Unwarranted**

The Report asserts that "the contractor effectively replaced government decision-makers in several aspects of the procurement process" and that this participation in the procurement "creates a conflict of interest and undermines the integrity of the competitive contracting process." Report at 13-14. CACI is concerned that this assertion provides an incomplete presentation of the activities of its employees that fails to set out all of the relevant facts and that is based on a failure to recognize the unique facts and circumstances surrounding the award and performance of the subject task orders.

---

[19] CACI understands that PTG received two economic price adjustments (per Mod 0001, effective August 1999, and Mod 0004 in January 2002) to its GSA labor rates between the date of the GSA-issued intelligence DO in May 1999 and its acquisition by CACI. The "PTG" rates were used in pricing DOs issued to CACI through September 15, 2003, which included the initial DOs for work in Iraq.

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 14

        As discussed above, the acquisition was conducted in urgent, wartime circumstances when the Army found itself with an immediate need for intelligence support services, including interrogation services, which it could not fill internally.  These difficulties were compounded by the fact that the Army's local, in-country contracting personnel were focused on providing basic necessities and unable to devote time and resources to the acquisition of intelligence support services.  Further, as the GAO Report acknowledges (at 14), communications between Iraq and Ft. Huachuca were problematic.  Under these circumstances, in an effort to assist Army personnel stretched thin dealing with the situation, CACI employees did step into the breach and provided information and assistance to Army and DOI personnel involved in the acquisition.  While those involvements may have been different from, or even more substantial than, those found in a typical domestic, peacetime procurement, we submit that peacetime procurements are not an appropriate basis for assessing the appropriateness of the action taken.  In addition, and most important, while CACI provided information and assistance, there is no question that *all* procurement decisions were made by the responsible Government (DOI and Army) personnel.

        As discussed more fully below, we are concerned that the Report fails to acknowledge the contributions that contractors such as CACI have made in meeting the DOD's urgent, wartime need for additional intelligence capabilities.  In that regard, we call GAO's attention to a recent report by Vice Admiral Albert T. Church, III, Naval Inspector General, on DOD's interrogation operations that was issued after the GAO completed its draft Report.  *See Executive Summary of review of Department of Defense interrogation operations*, Vice Admiral Albert T. Church, Naval Inspector General (Mar. 2005) ("Church Report") (http://www.defenselink.mil/news/Mar2005/d20050310exe.pdf).  In his report, Admiral Church concluded that:

- "It is clear that contract interrogators and support personnel are 'bridging gaps' in the DoD force structure in GTMO, Afghanistan and Iraq.  As a senior intelligence officer at CENTCOM stated:  '[s]imply put, interrogation operations in Afghanistan, Iraq and Guantanamo cannot be reasonably accomplished without contractor support,' *id.* at 17;

- "Overall, we found that contractors made a significant contribution to U.S. intelligence efforts," *id.*; and,

- Contractor personnel "often served longer tours than DoD personnel, creating continuity and enhancing corporate knowledge at their commands." *Id.*

**A.    Involvement in Defining Requirements and SOWs**

        CACI personnel did assist the Army in defining its requirements for intelligence support services and in developing the SOWs for those DOs.  They also provided ROM estimates of the

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 15

cost of that work prior to award.[20]  However, these involvements were at the request of responsible Army personnel and subject to their review and approval. Further, these involvements need to be seen in the context of the facts on the ground in Iraq.[21]

There is no general prohibition on prospective contractors providing information or input to procuring agencies regarding their requirements or SOWs.  *See generally* FAR 15.201 (permitting exchanges between Government and industry, including on matters relating to requirements, industry capabilities, and SOWs).  Moreover, DOD and its services have recognized the need for flexibility and expeditious action to meet the needs of its war fighters. Accordingly, we submit that it is in the Government's interest to interpret existing regulations in a manner that does not deter its in-country personnel from utilizing the contractor expertise available to it under such circumstances.

CACI recognizes that FAR Subpart 9.5 imposes certain ground rules on a contractor's participation in procurements for which it prepared or assisted in preparing the SOW, *see* FAR 9.505-2, and CACI has policies and procedures in place to comply with those ground rules. CACI does not believe, however, that any input its employees had in the preparation of SOWs for the Iraq DOs  implicated the concerns identified in FAR Subpart 9.505–2(b)(1), which is the only provision of FAR 9.505 that is potentially applicable here.

The mere fact that a contractor had some input in preparation of the SOW for a procurement does not create an impermissible conflict of interest under FAR 9.505-2(b)(1). Further, the limitations in FAR Subpart 9.505–2(b)(1) relating to contractor preparation of SOWs are directed at ***competitive*** procurements and aimed at preventing one offeror from obtaining an unfair competitive advantage over its competitors.  FAR 9.505-2(b)(1)(i) specifically recognizes that a contractor's preparation of or assistance in preparation of a SOW for supplies or services does not create a conflict of interest where "[i]t is the sole source."  *See also Litton Computer*

---

[20] CACI does not understand the statement in the Report that CACI personnel "suggest[ed] that Army officials use the company's rough order of magnitude price as the government cost estimate."  If the Government used the cost estimates provided by CACI at Government's request as the "government cost estimate," that was the Government's decision. The Report also seems to imply that the Government was required to prepare its own, independent cost estimate.  We are not aware, however, of any such requirement in relevant FAR provisions, such as Subparts 8.4, 15.4 or 16.6.

[21] One of the CACI employees involved in these efforts had deployed to Iraq with the Army's V Corps, for which he was providing intelligence support services under a DO issued under PTG's GSA IT contract by an Army contracting office in Germany. That employee had an established working relationship with the Army officers who were involved in defining the requirement for intelligence support services and developing the SOWs. It is interesting to note that this employee initially proposed a limited contractor intelligence support effort and was told by Army personnel that they needed a much more substantial level of contractor support.

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 16

*Serv.*, B-256225, 94-2 C.P.D. ¶ 36 (July 21, 1994) (where GAO applied this exception to a sole source award based on urgent and compelling circumstances). As discussed above, the decision to award the DOs to CACI on a sole source basis was made by the Government, not CACI, and that judgment was fully consistent with applicable laws and regulations, given the exigent wartime conditions on the ground in Iraq. That said, CACI agrees that having a SOW on CACI "letterhead" was a mistake and simply should not have happened. However, that error did not, for the reasons noted above, undermine the integrity of any competitive procurement process.

FAR Subpart 9.5 imposes a duty on Government acquisition officials to identify, evaluate and take steps to avoid or mitigate potential conflicts of interest. *See* FAR 9.504 & 9.506. At no time was CACI informed that the Army or DOI believed that any input by a CACI employee in the definition of requirements or development of the SOWs presented an impermissible conflict of interest or required any kind of mitigation effort. Indeed, given the urgent wartime conditions, it appears that the Government concluded that it was in the best interest of the Government to obtain input from experienced CACI employees in defining its requirements and developing the SOWs. Moreover, the SOWs for the Iraq DOs were subject to review and approval by the Government, and the decision to proceed with the procurement and issue the DOs to CACI was made by appropriate Government personnel in Iraq (including the Coalition Acquisition Review Board) and at DOI's NBC at Ft. Huachuca. Finally, as the discussion below demonstrates, CACI does not believe that any of the other activities cited by GAO even remotely created any kind of "conflict of interest" or otherwise "undermined" the integrity of the procurement process.

**B.    Other Activities neither Replaced Government Decision-Making nor Undermined the Integrity of the Procurement Process**

**1.    Identification of the BPA as a Potential Contract Vehicle**

The Report implies that CACI employees acted inappropriately in identifying the DOI BPA as a possible contract vehicle for acquiring the intelligence support services. This is mistaken. There is simply nothing improper with a contractor informing Government personnel of the availability of a contract vehicle that the Government could use to acquire particular supplies or services. *See also* FAR 15.201(c) (encouraging exchanges with industry to, *inter alia*, "identify and resolve concerns regarding the acquisition strategy, including [among other things] proposed contract type [and] terms and conditions").

Further, CACI's discussions with Army contracting personnel in Iraq and Kuwait need to be seen in context. As discussed above, when queried about providing contracting assistance, those Army contracting offices indicated they were overwhelmed and not in a position to contract directly for the types of intelligence support services that the Army needed. Thus, the Army's in-country contracting officials reasonably asked if CACI had an existing contract vehicle that could be used to procure those services, and when they were informed of the BPA administered by Ft. Huachuca, told CACI to deal directly with Ft. Huachuca. This was extremely reasonable under the circumstances. Moreover, as discussed above, the Army had a well-established practice of acquiring intelligence support services under the PTG/CACI-PTI BPA through the Ft. Huachuca contracting office (which had previously been operated by the

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 17

Army). Thus, it is not surprising that CACI was encouraged to use that familiar vehicle to fill the requirements in Iraq. *See also* Report at 5, 10 n.17.

### 2. Facilitating Communications and Submission of Invoices

The Report's criticism of the involvement of CACI personnel in facilitating communications between the Army users in Iraq and the DOI contracting office in Arizona, is similarly misplaced. It simply ignores the fact – apparently confirmed by DOI (*see* Report at 14) – that it was difficult for DOI to communicate directly with Iraq. While the level of contractor involvement in communicating information was perhaps unusual, it was done as an accommodation to the Government. Given that the acquisition was conducted on a sole source basis, there was no prejudice to the competitive procurement process.

Regarding submission of invoices, CACI submitted them to the COR for review and approval in accordance the terms of the DOs.[22] While the contract contemplated that the COR would forward invoices to the payment office, the circumstances in Iraq made that difficult, slow and chancy. Accordingly, CACI personnel assisted by carrying the invoices out of Iraq and forwarding them to the DOI payment office. While perhaps atypical, these actions were entirely ministerial, and CACI categorically rejects any suggestion that this accommodation was in any way improper.

### 3. Out-of-Scope "Construction" Work and Draft Justification for Sole Source Award

The Report's comments on a "request" to perform out-of-scope construction work under the BPA, and preparation of a draft Justification and Approval ("J&A") for additional, sole source work, are incomplete and out of context. In the Fall of 2003, after consultation with the COR and other Army officials, CACI was asked to undertake certain building renovation work that was needed to provide facilities for performance of its (LEP) screening work. Consideration was initially given to performing this work under a modification to DO 36, on the ground that the work was incidental to performance of the LEP screening effort required by that DO. The GAO Report, however, fails to mention that relevant DOI and Army personnel were directly involved in that process and were clearly prepared to have the work done under that DO. Moreover, as documents which CACI provided to GAO show, it was *CACI's* contracts officials who

---

[22] Consistent with its proposals and the requirements of its GSA contract and accompanying BPA, CACI used the labor rates from the GSA schedule in invoicing for work performed under the DOs. The invoices that were submitted to the COR for approval and signature listed the labor categories from the CACI-PTI GSA schedule contract (*e.g.*, Sr. Systems Engineer), the hours being billed, and the applicable labor rates from the GSA IT contract. They also included a supporting schedule in which the individual employees whose time was being billed were paired, by name, with the GSA IT labor category and applicable labor rate under which they were being billed.

WASHINGTON D.C. • SAN DIEGO • LONDON

CACI Comments on Draft GAO Report
Page 18

concluded that such renovation work was not within the scope of CACI's GSA IT contract and should be done under a separate contract. That determination was communicated to DOI, which concurred and issued a separate contract to CACI for that work. Further, the value of this effort was indeed not material in amount, approximately $199,000.

CACI understands that the draft J&A referenced at page 13 of the Report relates to another facility rehabilitation project that was undertaken by CACI shortly after the one described above. Again in this case, CACI was asked to renovate certain space for use by CACI personnel who were involved in the intelligence support effort. Consistent with the decision on the previous renovation project, the parties (DOI and CACI) planned to have this work performed under a separate contract and not under the BPA. CACI submitted a draft sole source justification to DOI for that work. *DOI* subsequently sent CACI the DOI's sole source justification from the prior renovation project so it could be adapted for the new work. CACI accommodated DOI's request and returned the revised sole source justification to DOI. More important, according to CACI's final cost proposal, the cost of this work was about $99,500, well below the applicable simplified acquisition threshold and, as such, not subject to a requirement for competition or the need for a sole source justification. *See* 10 U.S.C. § 2304(a)(1) & (g)(1)(A); FAR 6.001(e); FAR 2.101, 48 C.F.R. § 2.101 (2003) (defining simplified acquisition threshold, which, for the work at issue here, was at least $200,000); *see also Information Ventures, Inc.*, B-290785, 2002 C.P.D. ¶ 152 (Aug. 26, 2002). Moreover, given the limited nature, location and urgency of the effort, CACI does not believe that there is any basis for suggesting that its action here compromised the integrity of the competitive contracting process.

Finally, we note that, due to poor coordination and delays in paperwork, CACI completed the work before a contract was issued. Ft. Huachuca then took the position that, since the work had been completed, it would not issue a contract and told CACI to pursue a ratification with the Army. CACI has paid about $60,000 to an Iraqi subcontractor for the work, but has not received any payment from the Government for that work.

**V.     Monitoring of Contractor Performance**

CACI recognizes that the Report's comments regarding surveillance of contractor performance are directed principally at DOI and the Army. CACI does not disagree that the Government is responsible for oversight of contractor performance and that such oversight is appropriate. CACI believes, however, that the criticisms of the Army are somewhat unfair given the circumstances in Iraq.

As the Report notes, contractor employees were, and continue to be, stationed at multiple locations throughout Iraq. While the Army perhaps ideally should have had a COR at each of those sites, conditions in Iraq were not ideal and, as noted above, the Army was operating in an environment in which its internal resources were already stretched thin. Moreover, while the Army may not have had a formal COR assigned to each location, CACI employees worked under the supervision of military personnel.

WASHINGTON D.C. • SAN DIEGO • LONDON

Appendix IV: Comments from CACI
International Inc.

CACI Comments on Draft GAO Report
Page 19

In addition, the Army's COR assigned to administer CACI's work has indicated that he was very pleased with the support provided by CACI.[23]  Further, as discussed above, Admiral Church recently concluded that contractors such as CACI "[have] made a significant contribution to U.S. intelligence efforts."  Church Report at 17.

CACI agrees with the general statement that Government oversight is appropriate where work is performed on a Time and Materials ("T&M") basis.  We believe, however, that CACI's work was subject to adequate surveillance in this regard, and do not understand the Report to suggest that the Government did not get "good value" from CACI.  Report at 12.

**VI.    Conclusion**

CACI appreciates the opportunities which GAO has afforded to CACI to provide information and input, including the opportunity to submit these comments.  As discussed above, CACI believes that the Army's and DOI's use of the CACI GSA contract BPA was reasonable given the exigent wartime circumstances that existed in Iraq in 2003 and the established practice of use of PTG's GSA contract for the acquisition of intelligence support services.  As we have noted, however, CACI has learned a number of lessons from reviews by GSA and other agencies and has taken steps to enhance its contracting practices.  CACI also believes that the recommendations in GAO's Report will provide a baseline for enhancement in the Government's acquisition processes.

Sincerely,

Jeffrey P. Elefante
Executive Vice President,
Secretary and General Counsel

---

[23]  In that regard, we question whether GAO's observation (Report at 12), that one interrogator said that he had "no interaction with COR," is probative of a lack of adequate Government oversight.

WASHINGTON D.C. • SAN DIEGO • LONDON

# Appendix V: Summary of Task Orders Issued to CACI for Work in Iraq

| Order number and date | Maximum order value | Description of order | Selected labor categories from the CACI contract | Department of Defense customer |
|---|---|---|---|---|
| 35 (8/2003) | $19,915,407 | Provide interrogation support. | Senior System Engineer, Training Specialist, Senior System Planner | Intelligence |
| 36 (8/2003) | 3,222,503 | Provide screening cell management and support. | Senior Security Computer Specialist, Training Specialist, Database Manager | Intelligence |
| 37 (8/2003) | 1,254,367 | Provide support to man, organize, and execute as members of the Open Source Intelligence Team. | Senior Systems Engineer, Senior Computer Security Specialist, Database Manager | Intelligence |
| 38 (8/2003) | 998,117 | Provide special security and security support to the intelligence function. | Senior Security Computer Specialist, Communications Analyst | Intelligence |
| 64 (9/2003) | 952,695 | Provide and maintain an operational property book team. | Project Manager, Senior Editor/Writer | Logistics |
| 67 (10/2003) | 6,191,315 | Provide technical and functional knowledge of the total property book system. | Principal Engineer/Project Manager, Senior Computer Security Specialist | Logistics |
| 70 (11/2003) | 1,189,100 | Provide technical and training support services for a military information technology system. | Program/Project Manager, Database Manager | Logistics |
| 71 (12/2003) | 21,799,921 | Assist in performance of human intelligence and counterintelligence missions. | Senior System Engineer, Senior Analyst, Senior Functional Analyst | Intelligence |
| 72 (12/2003) | 4,895,478 | Assist in intelligence support staff and analytical functions. | Senior Functional Analyst, Senior Analyst, Senior Systems Engineer | Intelligence |
| 73 (12/2003) | 1,822,240 | Establish and staff a Command Automation Logistics Assistance/Instructional Team. | Program/Project Manager, Subject Matter Expert II | Logistics |
| 80 (3/2004) | 3,980,000 | Provide technical and functional knowledge of the total property book system. | Program/Project Manager, Subject Matter Expert I | Logistics |
| **Total** | **$66,221,143** | | | |

Source: GAO analysis of documents obtained from the Department of the Interior.

Notes: The Department of the Interior Inspector General and the General Services Administration determined that Order 70 was not out of scope.

Maximum order values include order modifications made subsequent to the order date.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |



PRINTED ON RECYCLED PAPER