**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

CACI PREMIER TECHNOLOGY, INC. )
and CACI INTERNATIONAL, INC. )
                              )
            Plaintiffs,       )
                              )
v.                            )    CIVIL ACTION NO. 1:05-1111
                              )
RANDI RHODES and PIQUANT, LLC )
d/b/a, AIR AMERICA RADIO,     )
                              )
            Defendants.       )

**MEMORANDUM ORDER**

THIS MATTER is before the Court on Defendants Randi Rhodes
and Piquant, LLC's ("Air America Radio") Motion for Summary
Judgment on all of Plaintiffs CACI Premier Technology, Inc. and
CACI International, Inc.'s (referred to collectively as "CACI")
claims.  This case concerns an action for monetary damages for
defamation *per se* by CACI against Defendants Randi Rhodes, a
radio personality, and Piquant, LLC, doing business as Air
America Radio.[1]  Plaintiffs' claims arise out of allegedly false
and defamatory statements regarding CACI's provision of
interrogators to the United States military in Iraq made by
Rhodes between on or about August 10-26, 2005, during radio show
broadcasts by Air America Radio.  The issue before the Court is
whether the Court should grant summary judgment in favor of

_____

[1] Plainitffs' Second Amended Complaint contains only one Count – an
action for defamation *per se* under Virginia law.  *See* Pls.' Second Amend.
Compl. ¶ 27.

159

Defendants because, based on the evidence adduced thus far, a reasonable jury could not conclude that: (a) the alleged defamatory statements can "reasonably be interpreted as stating actual facts" about CACI; and/or (b) the statements were made with actual malice -- i.e. a "reckless disregard for the truth."

The Court grants Defendants' Motion for Summary Judgment because, based on the evidence adduced thus far, a reasonable jury could not conclude that: (a) the alleged defamatory statements can "reasonably be interpreted as stating actual facts" about CACI; and/or (b) the statements were made with actual malice -- i.e. a "reckless disregard for the truth."

## I. BACKGROUND

This case concerns on-air statements that Air America Radio talk show host Randi Rhodes made with regard to CACI's performance overseeing the Abu Ghraib detention facility in Iraq. Ms. Rhodes has hosted *The Randi Rhodes Show* on Air America Radio since March 2004. (Pls.' Opp., at 3.) Ms. Rhodes had approximately twelve (12) years of experience as a talk show host prior to broadcasting for Air America Radio, (*Id.*), during which time Ms. Rhodes's received numerous awards as a result of her success. (Rhodes Decl., at 2, ¶ 2.) Ms. Rhodes's show, as well as many, if not all, of Air America Radio's broadcasting, presents liberal political commentary on various contemporary

issues of public concern.  (Rhodes Decl., at 2, ¶¶ 3-4.)  The War

on Terrorism and the military operations in Iraq have been a

regular subject of criticism on Ms. Rhodes's show.  (*Id.*)  Ms.

Rhodes claims to make frequent use of hyperbole in her criticism

of the "[Bush] Administration and everything having to do with

the war in Iraq."  (Rhodes Decl., at 4, ¶ 7.)  Referring to her

tendency to employ the use of hyperbole, Ms. Rhodes explained,

"[t]hat's what talk-show hosts do."  (*Id.*)

　　Ms. Rhodes claims to prepare herself rigorously for each of

her radio broadcasts.  Her preparation includes reading

newspapers, visiting news web sites, watching C-SPAN, selecting

specific issues to hone in on, and then conducting "in-depth

research" on the topics that she will focus on in the show.

(Rhodes Decl., at 4, ¶ 9).  Among the sources that Ms. Rhodes

relied upon for the segments at issue in this lawsuit were:

- a report on the Abu Ghraib detention facility by Major
  General Anthony Taguba ("Taguba Report"), (Handman
  Decl., Ex. 24);

- the Investigation of the Abu Ghraib Detention Facility
  conducted by Major General George R. Fay and Military
  Intelligence Brigade Lieutenant General Anthony Jones
  ("Fay/Jones Investigation") (Handman Decl., Ex. 25);

- comments by Army Reserve Brigadier General Janis
  Karpinski, (Rhodes Decl., Ex. 12);

- a David Phinney article published by *CORPWATCH*, (Rhodes
  Decl., Ex. 13);

- a *Washington Post* article by Renae Merle and Ellen
  McCarthy, (Rhodes Decl., Ex. 14);

- a Seymour Hersh article published in the *New Yorker*, (Rhodes Decl., Ex. 15);

- a Greg Mitchell article posted by *Editor & Publisher*, relating remarks by a Republican senator, (Rhodes Decl., Ex. 17); and

- a *Guardian* article entitled "US Military in Torture Scandal," (Rhodes Decl., Ex. 18).

In April 2004, reports of abuse at the Abu Ghraib facility surfaced when *60 Minutes* and other news organizations released graphic images of detainees at the facility being humiliated and abused by United States soldiers and contractors. (Rhodes Decl., at 7, ¶ 15.) Although reports implicated CACI employees in the abuse scandal (*id.* at 8, ¶ 15.), CACI was never found guilty of violating any law of either the United States or relevant international treaties.

On numerous occasions in August 2005, Ms. Rhodes's criticisms targeted CACI, a military subcontractor with contracts to conduct operations in Iraq, for its conduct in overseeing the Abu Ghraib Confinement Facility in Iraq. Ms. Rhodes never contacted CACI to confirm or deny whether her allegations of CACI's behavior were accurate. *See* Pls.' Second Amend. Compl. ¶¶ 23, 25-26. Generally, CACI claims that Ms. Rhodes's statements were defamatory because they wrongly, and with reckless disregard for the truth, alleged that "CACI engaged in murder, rape, and torture at the Abu Graib prison, that CACI interrogators misrepresented themselves as military officers, that CACI

supplied interrogators to the United States in Guantanamo Bay, Cuba and Afghanistan, and that CACI fought on the side of the pro-apartheid South African government." (Pls.' Opp., at 1.) Specifically, CACI bases its defamation claims on thirteen (13) separate statements that Ms. Rhodes made in August 2005. (Rhodes Decl., Exs. 1-7.)

**Summary of The Statements**

The following is a brief summary of the statements allegedly made by Ms. Rhodes's that are at issue here:

1. On August 10, 2005, in the midst of a conversation about the conflict in Iraq with a caller, Ms. Rhodes addressed issues relating to the Abu Ghraib detention facility. She stated that "there are rape rooms" that are "grotesque" and that "the people that are torturing and raping are using our soldiers to film it and that the ones that are being paid to do this are not our troops but it's CACI and Titan and the people who relieved General Karpinski of her command in . . . Abu Ghraib . . . . They were independent contractors." (Rhodes Decl., Ex. 1, at 7.) She further alleged during that broadcast that "General Miller came from Guantanamo and brought all these practices to Iraq and Afghanistan . . . . And the same independent contractors are doing the same grotesque things to little boys and girls." (*Id.*)

2. On the following day, August 11, 2005, Ms. Rhodes asked rhetorically, why are independent contractors, including CACI, "allowed to torture and rape little children using low-level clerks, who then go to jail for 10 to 15 years?" (Rhodes Decl., Ex. 2, at 3.) Ms. Rhodes further alleged that "low-level specialists"

convicted of crimes at Abu Ghraib "testified that they believed they were working for their government, and really they were working for CACI and Titan." (*Id.*)

3.   A few days later, on August 15, 2005, Ms. Rhodes stated, "[t]here's hundreds of thousands of mercenaries there.  And God only knows who is commanding them.  God only knows who is giving them their marching orders.  Who do they answer to?  And are they part of the problem, are they part of the solution?  I don't know, they're mercenaries." (Rhodes Decl., Ex. 3, at 8.)  Further, referring to a *New York Times Magazine* article, Rhodes stated that "[n]o one dared talk about all these [independent contractors], Blackwater, and CACI, and Titan, and . . . Three Canopies." (Rhodes Decl., Ex. 3, at 8-9.)  She claimed "there's no command and control.  They don't report to anybody.  They're not loyal to you, they're not loyal to me.  They're not loyal to America.  They're loyal to the corporation." (Rhodes Decl., Ex. 3, at 9.)  Further, she stated "they have fought on the side of Apartheid, just like Cheney used to vote against abolishing Apartheid.  He loves these guys.  These guys literally fought on the side of Mobutu, who used to chop peop-, little children's hands off." (*Id.*)  Rhodes continues with similar allegations relating to military subcontractors in Sierra Leone and finishes by criticizing Congress for funding the independent contractors because Congress keeps "writin' these appropriation bills and this money keeps going to these contractors." (*Id.*)

4.   On August 22, 2005, in the midst of complaining about the pay disparity between troops working for the United States military and those working for independent contractors,  Ms. Rhodes criticized the use of contractors because of their alleged shield from the law.  She stated "call Triple Canopy or call Blackwater or call CACI and Titan, especially if you want to torture people, and never have to come under the long arm of the law.  I mean that's how you get away with murder." (Rhodes Decl., Ex. 4, at 5-6.)

5.   Statements five (5) through eight (8) were made on August 24, 2005.  (Rhodes Decl., Ex. 5 at, 2-4.)  Statement five (5) includes Ms. Rhodes's claim, in reference to the Abu Ghraib facility, that "[t]here are videos" that "clearly show rape and murder and, yes, they show . . . the rapes of children and . . . the

murder of people who have been caught in these dragnets in Iraq." (Rhodes Decl., Ex. 5, at 2.) She did not specify CACI in that statement.

6.    On that same date, Ms. Rhodes also stated that the newly revealed "sick, twisted stuff . . . was done and carried out . . . by people who work for private contractors. . . . Who . . . were able to access our kids and tell our kids – we're from special forces, or – we're from CIA, but you don't need to know who we are but we know who you are and you're going to do this because this is what we want you to do." (Rhodes Decl., Ex. 5, at 3.)

7.    Referring to an interview with Army Reserve Brigadier General Janis Karpinski, (Rhodes Decl., Ex. 12), Rhodes claimed that General Karpinski "was shunted aside" and "told not to go [to the Abu Ghraib facility] anymore." (Rhodes Decl., Ex. 5, at 3.) She claimed that the contractors, without mentioning CACI directly, "had control of the prisons and it was obviously the contractors who then misrepresented to our kids who they were and what they were ordered to do." (Rhodes Decl., Ex. 5, at 4.)

8.    Ms. Rhodes continued, "[u]nless we actually apologize for these, unless we actually have a president of the United States who says – look what's been done here and I know who did it and this is who did it and it was CACI and it was Titan and it was Blackwater and it was Halliburton and it was Bechtel and it was DynCorp. . . . and it was Triple – whoever it was, and he actually says these people are going to be put on trial and they will be charged with murder, and . . . rape, and . . . molesting children. And . . . crimes against humanity. . . . the recruitment for Al Qaeda is going to surpass our recruitment capabilities here in the United States." (Rhodes Decl., Ex. 5, at 4.)

9.    Ms. Rhodes's August 25, 2005, broadcast featured statements nine (9), ten (10), and eleven (11). In statement nine (9), Ms. Rhodes, referring to an interview with General Karpinski, said "[t]he President let those contractors go [into the Abu Ghraib facility], and he let those contractors lie to our

kids, and those kids believed that those contractors were military intelligence units, that they were CIA. But they weren't.  They weren't.  They were employees of CACI and Titan."  (Rhodes Decl., Ex. 6, at 1.)

10.  Continuing on a discussion of the General Karpinski interview and raising criticism of the manner in which independent contractors in Iraq were being paid, Ms. Rhodes said "this deteriorated into contractor heaven. Mercenaries all over the country, killing people. [General Karpinski] said they had no previous training. The ones from CACI and Titan that were sent to the prison, to Abu Ghraib, she said.  They were supposed to be interrogators but that CACI and Titan had offered them a chance to upgrade their employment to interrogators, and she said it was a deadly mix because they had no training in being interrogators."  (Rhodes Decl., Ex. 6, at 5.)

"They were translators.  But CACI and Titan was going to pay them more if they would interrogate the prisoners.  So they kicked her out of the compound at night, told her she couldn't travel at night to the cell blocks, couldn't come to Abu Ghraib at night, and at night, the little mice would play, and they would play rape the boys, and rape the girls, and pile them high, and they'd use the low-level military people, and they wore military uniforms, too, these contractors. They literally impersonated officers."  (Rhodes Decl., Ex. 6, at 4-5.)

After criticizing the failure of the law to regulate CACI's behavior, Ms. Rhodes stated "the only law that anybody wants to prosecute CACI . . . and believe me, people do - and the only law that they can find to prosecute CACI and Titan is this obscure Department of Defense law, and it says that they have had to have committed a crime that has a penalty over a one-year maximum."  (Rhodes Decl., Ex. 6, at 5.)

11.  Ms. Rhodes continues moments later, in the same broadcast, discussing the alleged opinions of Iraqis, "[t]hey say that the raping of their children and the raping of their children in front of them is no different than Saddam.  It's incredible. . . . So this was Donald Rumsfeld's wet dream. . . ."  (Rhodes Decl.,

Ex. 6, at 6.)

Referring still to the General Karpinski interview, "these contractors were supposed to help and be translators, and they became the interrogators and they had no experience doing it, and it became this free-for-all." (Rhodes Decl., Ex. 6, at 6.)

12. Ms. Rhodes made statements twelve (12) and thirteen (13) on her August 26, 2005, broadcast. Ms. Rhodes made statement twelve (12), according to her declaration, after she had made statement (13) and in the midst her telephone conversation with anti-war activist Cindy Sheehan. (Rhodes Decl., Ex. 7, at 14.) Ms. Rhodes said to Ms. Sheehan "I'm for getting the mercenaries who are making $3,000 a week out of there, who are not loyal to your son, are not loyal to this country, don't care a thing about democracy, they care about the bottom-line of Triple Canopy or Blackwater or CACI or Titan or DynCorp, and they are some of the most notoriously evil people, and they are getting paid with our tax dollars." (Rhodes Decl., Ex. 7, at 14.)

She continued, "[t]hese guys . . . would fi[ght] on the side of the government in South Africa that wanted to keep apartheid. They fought on the side of the government that was literally chopping off young boys' hands because they didn't want to kill them. They wanted them to be handless as little reminders to everybody, that if you stood up to this government, that's what's going to happen to you, and they were like walking billboards for tyranny, for treachery, for murder!" (Rhodes Decl., Ex. 7, at 14-15.) "And that is who . . . is fighting alongside - that's who is fighting alongside your son." (Rhodes Decl., Ex. 7, at 15.)

13. The final statement, made just before statement number twelve (12), was made in the midst of Ms. Rhodes's interview with David, a fourteen year old caller. (Rhodes Decl., Ex. 7, at 4.) The statement began with David expressing that he was "annoyed" that when he becomes an adult, he will be responsible for paying the costs of the conflict in Iraq. (Id.) Ms. Rhodes replied, "[n]ot only are you going to pay for the actual bombs and the war and the mercenaries and their billions of dollars that they got. You know you've got guys over there making, what, three thousand dollars a

9

week, three hundred dollars a day." (*Id.*) David in
turn responded affirmatively, "[y]eah the contractors."
(*Id.*)  The dialogue continued:

> **Ms. Rhodes:** Yeah, don't call them contractors,
> call them what they are, they're hired
> killers, they're mercenaries.
>
> **David:** Hired killers, yeah.
>
> **Randi Rhodes:** Yeah, they're hired killers.
>
> **David:** Hired killers from Halliburton.
>
> **Randi Rhodes:** They're from everywhere, they're
> from DynCour and CACI and Titan in the
> prisons, and then you've got Triple Canopy and
> Blackwater. . . . these companies didn't exist
> before this war.  They did not even exist and
> you had a bunch of retired Delta guys who
> said, um, what can we do to keep America safe?
> And then all of a sudden they realized the
> Department of Defense was giving out these big
> huge contracts.  And they just hired any old
> schmuck. . . .

(*Id.*)


**Additional Statements**

The Court notes that Ms. Rhodes provided many statements,

other than those that CACI has alleged to be defamatory, to

provide the context in which the statements were made.  While

many of these statements may be relevant to the inquiry here,

those of August 25, 2005, appear most pertinent.  In her

discussion of the Fay/Jones Investigation, Ms. Rhodes reports

that the investigation implicated CACI and Titan, another

independent contractor in Iraq, in sixteen (16) of the forty-four

(44) incidences of abuse found at the Abu Ghraib detention facility. (Rhodes Decl., Ex. 8, at 4.) Shortly thereafter, Ms. Rhodes notes that "[b]oth companies reject the allegations." (Rhodes Decl., Ex. 8, at 6.)

## II. DISCUSSION

### A. Standard of Review

*Summary Judgment*

Rule 56 of the Federal Rules of Civil Procedure allows a party, at any time, to move for summary judgment. FED. R. CIV. P. 56(b). A court should grant summary judgment if (1) "there is no genuine issue as to any material fact" and (2) "the moving party is entitled to a judgment as a matter of law."[2] FED. R. CIV. P. 56(c); *Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 241 (4th Cir. 1995). The moving party has the burden of proving each of these requirements. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970)). After a party has moved for summary judgment, the nonmoving party has the burden of showing that a genuine issue remains before the Court. *Anderson v. Liberty*

---

[2] The Eastern District of Virginia's Local Rule 56(a) requires that a motion for summary judgment be filed in a timely manner, and Local Rule 56(b) requires that "[e]ach brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed." E.D. VA. LOCAL R. 56(a), (b).

*Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citing Fed. R. Civ. P. 56(e)). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . *must* set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." *Id.*

In summary judgment motions where a public figure alleges defamation, a court should find that a genuine issue of material facts exists if the record could support, by clear and convincing evidence, a finding by a reasonable jury that the plaintiff made the defamatory statements with actual malice. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986); *see Wells v. Liddy*, 186 F.3d 505, 520 (4th Cir. 1999).


   *Defamation Per Se Under Virginia Law*

"Under Virginia law, a plaintiff seeking to recover for defamation per se must allege a publication of false information concerning the plaintiff that tends to defame the plaintiff's reputation." *Hatfill v. New York Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005) (citing *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). Determining whether a statement is

12

capable of having a defamatory meaning is a question of law to be decided by the court. *Id.* "Under Virginia law, the following kinds of statements are actionable as defamation *per se*: (1) statements that 'impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished,' (2) statements that 'impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society,' (3) statements that 'impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of duties of such an office or employment,' and (4) statements that 'prejudice such person in his or her profession or trade.'" *Id.* at 330-31 (citing *Carwile v. Richmond Newspapers*, Inc., 196 Va. 1 (1954)). In assessing whether particular words are defamatory, a court should take those words "in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." *Id.* at 331 (citing *Carwile*, 196 Va. at 7). Furthermore, the Fourth Circuit has observed that a defamatory charge under Virginia law "may be made expressly or by 'inference, implication or insinuation.'" *Id.* Therefore, "courts applying Virginia defamation law should consider not only the words themselves but also the 'inferences fairly

13

attributable' to them." *Id.* (citing *Wells v. Liddy*, 186 F.3d 505, 523 (4th Cir. 1999)).

*Constitutional Limitations on Defamation Actions*

The United States Supreme Court has "recognized constitutional limits on the *type* of speech which may be the subject of state defamation actions." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16 (1990) (citations omitted) (emphasis in original). Thus, while defamation actions "have their basis in state common law," they are still "subject to principles of freedom of speech arising under the First Amendment to the United States Constitution . . . ." *Yeagle v. Collegiate Times*, 255 Va. 293, 295 (1998). The following constitutional limitations are relevant to the present case:

1. Statements Must Be "Provably False"

First, statements made by a media defendant on matters of public concern must be "provable as false" before they can support an action for defamation. *Milkovich*, 497 U.S. at 19-20 (relying on *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986)); *see Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 183 (4th Cir. 1998); *Yeagle*, 255 Va. at 295. Thus, statements of opinion on matters of public concern that do not contain a "provably false factual connotation" are entitled to full

14

constitutional protection. *Milkovich*, 497 U.S. at 19-20.

### 2. Statements Must Relay "Actual Facts"

Second, statements are immune from defamation liability if they "cannot reasonably [be] interpreted as stating actual facts about an individual." *Milkovich*, 497 U.S. at 20 (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) (internal quotations omitted) (alteration in original)); *Biospherics, Inc.*, 151 F.3d at 183; *Yeagle*, 255 Va. at 295. In assessing whether a statement could be reasonably interpreted as an assertion of fact, the *Milkovich* Court considered the language used -- i.e. whether it was "loose, figurative, or hyperbolic language which would negate the impression that the writer" was stating fact -- and the context and "general tenor of the article." *Biospherics, Inc.*, 151 F.3d at 184 (quoting *Milkovich*, 497 U.S. at 21); *Schnare v. Ziessow*, 104 F. App'x 847, 851-52 (4th Cir. 2004) (unpublished). Speech that is "insulting, offensive, or otherwise inappropriate, but constitutes no more than 'rhetorical hyperbole,'" is not actionable. *Yeagle*, 255 Va. at 295-96 (emphasis added); *Schnare*, 104 F. App'x at 853 ("In short, the statements might be offensive, but they are not defamatory."). Whether an allegedly defamatory statement "fall[s] within the type of speech which will support a state defamation action is a matter for the trial judge to determine as a matter of law." *Id.*

15

at 296.

### 3. Statements Against "Public Figures" Must Be Made with "Actual Malice"

Finally, "public figures" alleging defamation must prove that (1) the statements made were demonstrably false and (2) the party making the allegedly defamatory comments made such comments with *actual malice* -- i.e. "with knowledge of their false implications or with reckless disregard of their truth." *Milkovich*, 497 U.S. at 20 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

### a. "Public Figures"

"'Public figures' . . . are those persons who, though not public officials, are involved in issues in which the public has a justified and important interest . . . ." *Time, Inc. v. Johnston*, 448 F.2d 378, 380 (4th Cir. 1971) (internal quotations and citations omitted). In assessing whether a party is a public figure, the court must determine (1) "whether a public controversy gave rise to the defamatory statement" and (2) "whether the plaintiff's participation in that controversy sufficed to establish him as a public figure within the context of that public controversy." *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001) (citing *Foretich v. Capital Cities/ABC, Inc.*,

37 F.3d 1541, 1551 (4th Cir. 1994)).  "The defendant bears the burden of proving the plaintiff's public figure status."  *Id.*

"A '*public controversy*' does not encompass every conceivable issue of interest to the public.  *Time*, 424 U.S. at 454.  Rather, 'public controversy' . . . only encompasses a dispute 'that in fact has received public attention because *its ramifications will be felt by persons who are not direct participants*.'"  *Carr*, 259 F.3d at 279 (citing *Foretich*, 37 F.3d at 1554) (emphasis added).  The Fourth Circuit applies a five-factor test to determine whether "the plaintiff has thrust himself into a controversy to the extent necessary to trigger limited-purpose public figure status."  *Id.*  The Fourth Circuit considers whether:

(1) the plaintiff has access to channels of effective communication,
(2) the plaintiff voluntarily assumed a role of special prominence in the controversy,
(3) the plaintiff sought to influence the resolution of the controversy,
(4) the controversy existed prior to the publication of the defamatory statements, and
(5) the plaintiff retained public figure status at the time of the alleged defamation.

*Id.* at 280 (citing *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982)).


b. "Actual Malice"

A plaintiff who is a public figure may only recover in a defamation action if he can show that the defendant published the alleged defamatory statements with "actual malice."  *Carr*, 259

17

F.3d at 282. "Proof of falsity is not enough; [plaintiff] must also demonstrate that [defendant] 'made the [false] statement with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (citation omitted). "Reckless disregard means 'publishing with a high degree of awareness of . . . probable falsity.'" *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). "Establishing actual malice is no easy task, because the defamation plaintiff bears the burden of proof by clear and convincing evidence." *Id.* Furthermore, determining "whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Milkovich*, 497 U.S. at 17 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989)).

**B. Analysis**

1.  Summary Judgment

This matter is appropriate for summary judgment because the parties do not dispute what Ms. Rhodes stated on the air. "The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 241 (4th Cir. 1995).

CACI argues that summary judgment is not appropriate here because inquiry into the facts is necessary to clarify the application of law. (Pls.' Opp., at 8 (citing *McKinney v. Bd. of Trs. of Mayland Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir. 1992) ("[S]ummary judgments should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not necessary to clarify the application of the law.")).) However, the Supreme Court has stated that "a public figure . . . could escape summary judgment only if the evidence in the record would permit a reasonable finder of fact, by clear and convincing evidence, to conclude that respondents published a defamatory statement with actual malice as defined by our cases." *Masson v. New Yorker Magazine*, 501 U.S. 496, 508 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986)). For a district court, "where the factual dispute concerns actual

malice . . . the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Liberty Lobby*, 477 U.S. at 255-56.

In a defamation action, some inquiry into the facts is inevitable in determining whether a jury could reasonably find that the defendant made statements with actual malice. The Fourth Circuit, applying *Liberty Lobby*, has stated that, in defamation actions, consideration of the clear and convincing standard of review coupled with First Amendment concerns weighs in favor of deciding the case on summary judgment. *Wells v. Liddy*, 186 F.3d 505, 520 (4th Cir. 1999). The court emphasized, "we have 'an obligation to make an independent examination of the *whole record* in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Id.* (quoting *Milkovich*, 497 U.S. at 17). The Court finds that summary judgment is appropriate here because the Court is able to determine, viewing the whole record, whether Defendants are entitled to judgment as a matter of law.

## 2.  Defamation *Per Se*

The Court grants Defendants' Motion for Summary Judgment because, based on the evidence adduced thus far, a reasonable jury could not conclude that: (a) the alleged defamatory statements can "reasonably be interpreted as stating actual facts" about CACI; and/or (b) the statements were made with actual malice -- i.e. a "reckless disregard for the truth." CACI claims that Ms. Rhodes's statements were defamatory because they wrongly, and with reckless disregard for the truth, alleged that "CACI engaged in murder, rape, and torture at the Abu Graib prison, that CACI interrogators misrepresented themselves as military officers, that CACI supplied interrogators to the United States in Guantanamo Bay, Cuba and Afghanistan, and that CACI fought on the side of the pro-apartheid South African government." (Pls.' Opp., at 1.) Specifically, CACI bases its defamation claims on thirteen (13) separate statements that Ms. Rhodes made in August 2005. (Rhodes Decl., Exs. 1-7.)

### a. Statements Concerning "Torture" and "Confusion"

### i. CACI is a "Public Figure"

CACI does not dispute that it is a "public figure" for purposes of this defamation action. In any case, the Court finds that CACI is a public figure because of CACI's prominent role in the circumstances surrounding the events that occurred at Abu

Ghraib -- an issue of grave public concern.  "'Public figures' .
. . are those persons who, though not public officials, are
involved in issues in which the public has a justified and
important interest and include artists, athletes, business
people, dilettantes, anyone who is famous or infamous because of
who he is or what he has done." *Time, Inc. v. Johnston*, 448 F.2d
378, 380 (4th Cir. 1971).  In determining whether a party is a
public figure, the court determines (1) "whether a public
controversy gave rise to the defamatory statement" and (2)
"whether the plaintiff's participation in that controversy
sufficed to establish him as a public figure within the context
of that public controversy." *Carr v. Forbes, Inc.*, 259 F.3d 273,
278 (4th Cir. 2001) (citation omitted).

Here, a public controversy certainly gave rise to the
defamatory statements.  Heads of states, public officials, media
sources, academics, and individuals throughout the world took
note of, and commented on, the events at the Abu Ghraib prison.
Additionally, CACI's participation in the Abu Ghraib controversy
was prominent.  CACI, an independent contractor assigned to
assist in interrogating detainees at Abu Ghraib and translating
their statements, has employees actively engaged in the precise
events that gave rise to the controversy.  The Court finds that
CACI's involvement in this very public controversy is sufficient
to render it a public figure for the purpose of determining

whether Ms. Rhodes's statements are actionable.  As mentioned, "public figures" alleging defamation must prove that (1) the statements made were demonstrably false and (2) the party making the allegedly defamatory comments made such comments with *actual malice* -- i.e. "with knowledge of their false implications or with reckless disregard of their truth." *Milkovich*, 497 U.S. at 20 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).


### ii. No Demonstrably False Statements

**Torture.**  The Court finds that Ms. Rhodes's statements alleging that CACI tortured Iraqi detainees at Abu Ghraib are not defamatory because the record suggests that these statements are not demonstrably false since, according to that record, CACI employees, in fact, may have engaged in activities that amounted to torture.  Therefore, Ms. Rhodes's statements were not demonstrably false.  The following allegedly defamatory statements of Ms. Rhodes cited by CACI specifically relate to CACI's alleged involvement in torturing Iraqi prisoners:

- Statement No. 1: On August 10, 2005, in the midst of a conversation about the conflict in Iraq with a caller, Ms. Rhodes addressed issues relating to the Abu Ghraib detention facility.  She stated that "there are rape rooms" that are "grotesque" and that **"the people that are torturing** and raping are using our soldiers to film it and that the ones that are being paid to do this **are**

23

not our troops but it's CACI and Titan . . . ." (Rhodes Decl., Ex. 1, at 7.)

- Statement No. 2:  On August 11, 2005, Ms. Rhodes asked rhetorically, **why are independent contractors, including CACI, "allowed to torture** and rape **little children** using low-level clerks, who then go to jail for 10 to 15 years?"  (Rhodes Decl., Ex. 2, at 3.)

- Statement No. 4:  On August 22, 2005, in the midst of complaining about the pay disparity between troops working for the United States military and those working for independent contractors,  Ms. Rhodes criticized the use of contractors because of their alleged shield from the law.  **She stated "call Triple Canopy or call Blackwater or call CACI and Titan, especially if you want to torture people, and never have to come under the long arm of the law.**  I mean that's how you get away with murder."  (Rhodes Decl., Ex. 4, at 5-6.)

The record reflects that several CACI employees cooperated with military personnel in the abuse of Iraqi prisoners.  As stated above, the Taguba Report found that CACI interrogator Stephanowicz "clearly knew his instructions equated to physical abuse."  (Handman Decl., Ex. 24, at 49.)  The Fay Report documents several instances where CACI employees were present, and cooperating with military personnel while the military personnel inflicted physical abuse upon the Iraqi detainees. (Handman Decl., Ex. 25, the Fay Report, at RR409-421.)  Such instances included military personnel holding detainees in stress positions, unleashing security dogs on the detainees, dressing detainees in women's clothing, stripping the detainees naked, and threatening the detainees with other forms of abuse and torture.

(*Id.*)

From the Fay Report, it is impossible to determine with certainty whether CACI employees physically abused prisoners. For example, "Incident #2," as documented by a photograph, involved a CACI interrogator questioning a detainee who was "squatting on a chair in an unauthorized stress position." (Handmand Decl., Ex. 25, the Fay Report, at RR412.) Whether the CACI interrogator physically forced the detainee into that position, or whether it was United States military personnel, is not clear. However, the Court finds this irrelevant. The definition of torture, and whether CACI employees in fact tortured Iraqi detainees at Abu Ghraib, is not on trial here. All that the Court must determine is whether Ms. Rhodes's allegation that CACI employees tortured Iraqi detainees is demonstrably false.

The Court declines to further explore the issue of whether or not CACI employees actually tortured Iraqi detainees. Such a determination would require the Court to determine: (1) whether CACI employees directly abused Iraqi detainees; (2) if CACI employees directly abused detainees, whether such abuse amounted to torture; and (3) if CACI employees did not directly abuse detainees, whether their involvement in directing and cooperating with those who abused detainees would warrant a finding that CACI employees effectively tortured Iraqi detainees. Suffice it to

say that the Court finds that Ms. Rhodes's statements alleging or suggesting that CACI employees had tortured Iraqi detainees were not defamatory because, according to the government investigations, there are facts which support allegations that CACI employees, in fact, may have engaged in improper activities that amounted to torture.

**Confusion.**  The Court finds that any of Ms. Rhodes's statements indicating that CACI employees supervised military personnel or misrepresented themselves as actual military personnel are not defamatory because the statements are not demonstrably false since it appears from government investigation reports that CACI, in fact, may have contributed to the confusion in the chain of command.  The following allegedly defamatory statements of Ms. Rhodes cited by CACI specifically relate to CACI employees' alleged involvement in misrepresenting themselves as military personnel:

- <u>Statement No. 2</u>:  On August 11, 2005, Ms. Rhodes alleged that **"low-level specialists"** convicted of **crimes at Abu Ghraib "testified that they believed they were working for their government, and really they were working for CACI and Titan."**  (Rhodes Decl., Ex. 2, at 3.)

- <u>Statement No. 6</u>:  On August 24, 2005, Ms. Rhodes also stated that the newly revealed "sick, twisted stuff . .

. was done and carried out . . . **by people who work for
private contractors. . . . Who . . . were able to
access our kids and tell our kids – we're from special
forces, or – we're from CIA, but you don't need to know
who we are but we know who you are** and you're going to
do this because this is what we want you to do."
(Rhodes Decl., Ex. 5, at 3.)

- <u>Statement No. 7</u>: On August 24, 2005, referring to an
interview with Army Reserve Brigadier General Janis
Karpinski, (Rhodes Decl., Ex. 12), Rhodes claimed that
General Karpinski "was shunted aside" and "told not to
go [to the Abu Ghraib facility] anymore." (Rhodes
Decl., Ex. 5, at 3.) She claimed that the contractors,
without mentioning CACI directly, "had control of the
prisons **and it was obviously the contractors who then
misrepresented to our kids who they were and what they
were ordered to do."** (Rhodes Decl., Ex. 5, at 4.)

- <u>Statement No. 9</u>: On August 25, 2005, Ms. Rhodes,
referring to an interview with General Karpinski, said
**"[t]he President let those contractors go [into the Abu
Ghraib facility], and he let those contractors lie to
our kids, and those kids believed that those
contractors were military intelligence units, that they
were CIA. But they weren't. They weren't. They were
employees of CACI and Titan."** (Rhodes Decl., Ex. 6, at
1.)

- <u>Statement No. 10</u>: Finally, on August 25, 2005,
continuing on a discussion of the General Karpinski
interview and raising criticism of the manner in which
independent contractors in Iraq were being paid, Ms.
Rhodes said, "CACI and Titan was going to pay [their
employees] more if they would interrogate the
prisoners. So they kicked [General Karpinski] out of
the compound at night, told her she couldn't travel at
night to the cell blocks, couldn't come to Abu Ghraib
at night, and at night, the little mice would play, and
they would play rape the boys, and rape the girls, and
pile them high, and they'd use the low-level military
people, **and they wore military uniforms, too, these
contractors. They literally impersonated officers."**

(Rhodes Decl., Ex. 6, at 4-5.)

The record reflects that several CACI employees actually interacted with and, at times, gave United States troops specific orders, causing confusion about the chain of command. According to the Jones Report, "interrogation operations were . . . plagued by a lack of organizational chain of command presence and by a lack of proper actions to establish standards and training by the senior leaders present." (Handman Decl., Ex. 25, the Jones Report, at RR347.) The Jones Report explained that "[i]ntegration of some contractors without training, qualifications, and certification created ineffective interrogation teams and the potential for non-compliance with doctrine and applicable laws." (*Id.* at RR348.)

The Fay Report notes that CACI contractors specifically hired for interrogation purposes at the Abu Ghraib prison were from CACI. (Handman Decl., Ex. 25, the Fay Report, at RR339.) The Fay Report specifically found that the arrival of CACI contract interrogators was a "complicating factor with respect to command and control." (*Id.* at RR370.) Further, the report stated that according to Sargent Adams, "CACI employees were in positions of authority, and appeared to be supervising government personnel." (*Id.* at RR381.) One CACI employee "was listed as being in charge of screening." (*Id.* at RR381-82.) Another "was in charge of 'B Section' with military personnel listed as

28

subordinates on the organization chart." (*Id.* at RR382.) In at least one instance, a CACI employee reported that an officer was his supervisor. (*Id.*) From the Fay Report, it is apparent that there was significant confusion in the chain of command. There is also evidence that CACI, in fact, contributed to this confusion by acting in a supervisory and managerial capacity, giving orders to United States military personnel, and, at times, taking orders from military personnel.

The Taguba Report made similar findings regarding CACI's contribution to confusion in the chain of command. (Handman Report, Ex. 24, at RR33, 49.) The Taguba Report found that CACI contract interrogator Steven Stephanowicz "[a]llowed and/or instructed MPs, who were not trained in interrogation techniques, to facilitate interrogations by 'setting conditions'" which were neither authorized nor in accordance with applicable regulations and policy. (*Id.* at RR49.) The Taguba Report underscored that Stephanowicz "clearly knew his instructions equated to physical abuse." (*Id.*)

Army Reserve Brigadier General Janis Karpinski stated in an interview that "[t]he majority of those contractors were either in Guantanamo Bay or Afghanistan prior to being sent to Abu Ghraib." (Rhodes Decl., Ex. 12, at RR11.) She claimed that the contractors did not have formal training in interrogation techniques. (*Id.*) The Fay Report also found that the CACI

interrogators were not adequately trained.  At least one of the
CACI contract interrogators had "little or no interrogator
experience prior to coming to Abu Ghraib."  (Handman Decl., Ex.
25, the Fay Report, at RR381.)  The Report suggested that this
was an issue common to other CACI contractors, largely a result
of CACI's failure to properly provide or insure that CACI's
interrogators had received adequate training.  (*Id.*)  According
to the Report, such training should have included (1) "training
in the Geneva Conventions standards for the treatment of
detainees/ prisoners," (2) "a discussion of the chain of
command," and (3) "establishment of some sort of 'hotline' where
suspected abuses can be reported in addition to reporting through
the chain of command."  (*Id.*)

    Therefore, the Court finds that any of Ms. Rhodes's
statements indicating that CACI employees supervised military
personnel or misrepresented themselves as actual military
personnel are not defamatory because the statements are not
demonstrably false since it appears from government investigation
reports that CACI, in fact, may have contributed to the confusion
in the chain of command and acted in a such a manner that
suggested that CACI employees had the authority to direct United
States military personnel.  Thus, Ms. Rhodes's political
commentary was based upon publicly available information, and she
is entitled to state her political opinions in her talk radio

program and these statements are not defamatory.

### iii. No Actual Malice

**Torture and Confusion.**  The Court finds that Ms. Rhodes's statements were not made with actual malice because she did not recklessly disregard the truth or the probable falsity of the statements.  As stated, the Court finds that Ms. Rhodes's statements regarding CACI's role in causing confusion in the chain of command and torturing Iraqi detainees were not demonstrably false because government reports reflect that CACI employees may have, in fact, engaged in such conduct.  However, even if the Court found those claims to be demonstrably false, the Court finds that Ms. Rhodes's statements regarding confusion and torture certainly did not rise to the level of actual malice.

Ms. Rhodes's knowledge of the Taguba and the Fay/Jones reports findings, claiming that CACI employees contributed to confusion in the chain of command, gave Ms. Rhodes reasonable grounds to make claims that CACI employees either directed United States military personnel or acted in the capacity of United States personnel when directing military personnel. Additionally, Ms. Rhodes's knowledge of the many instances of what was clearly CACI contract interrogators' cooperation with United States military personnel's physical abuse of Iraqi

31

detainees is sufficient to defeat CACI's claim that Ms. Rhodes recklessly disregarded the truth when alleging that CACI employees had tortured Iraqi detainees.

**b. Statements that CACI Fought on the Side of the Pro-Apartheid South African Government and Supplied Interrogators to the United States in Guantanamo Bay, Cuba and Afghanistan**

i. Not Stating "Actual Facts"/"Hyperbole"

**South African Apartheid Regime.** The Court finds that Ms. Rhodes's statements regarding CACI's relation to the South African apartheid (and Sierra Leone) regime were not defamatory because they constituted "hyperbole" and "cannot reasonably be interpreted as stating actual facts" about CACI. CACI cites the following allegedly defamatory statements by Ms. Rhodes in this regard:

- Statement No. 3: On August 15, 2005, Ms. Rhodes stated, "[t]here's hundreds of thousands of mercenaries there. And God only knows who is commanding them. God only knows who is giving them their marching orders. Who do they answer to? And are they part of the problem, are they part of the solution? I don't know, they're mercenaries." (Rhodes Decl., Ex. 3, at 8.) **Further, referring to a *New York Times Magazine* article, Rhodes stated that "[n]o one dared talk about all these [independent contractors], Blackwater, and CACI, and Titan, and . . . Three Canopies."** (Rhodes

32

Decl., Ex. 3, at 8-9.)  She claimed "there's no command and control.  They don't report to anybody.  They're not loyal to you, they're not loyal to me.  They're not loyal to America.  They're loyal to the corporation." (Rhodes Decl., Ex. 3, at 9.)  **Further, she stated "they have fought on the side of Apartheid, just like Cheney used to vote against abolishing Apartheid.  He loves these guys.  These guys literally fought on the side of Mobutu, who used to chop peop-, little children's hands off."  (Id.)  Rhodes continues with similar allegations relating to military subcontractors in Sierra Leone** and finishes by criticizing Congress for funding the independent contractors because Congress keeps "writin' these appropriation bills and this money keeps going to these contractors."  (Id.)

- **Statement No. 12**:  Similarly, on August 26, 2005, in the midst her telephone conversation with anti-war activist Cindy Sheehan, (Rhodes Decl., Ex. 7, at 14.), Ms. Rhodes said to Ms. Sheehan "I'm for getting the mercenaries who are making $3,000 a week out of there, who are not loyal to your son, are not loyal to this country, don't care a thing about democracy, **they care about the bottom-line of Triple Canopy or Blackwater or CACI or Titan or DynCorp,** and they are some of the most notoriously evil people, and they are getting paid with our tax dollars."  (Rhodes Decl., Ex. 7, at 14.)

She continued, "[t]hese guys . . . would fi[ght] on the **side of the government in South Africa that wanted to keep apartheid.  They fought on the side of the government that was literally chopping off young boys' hands because they didn't want to kill them.  They wanted them to be handless as little reminders to everybody, that if you stood up to this government, that's what's going to happen to you, and they were like walking billboards for tyranny, for treachery, for murder!"**  (Rhodes Decl., Ex. 7, at 14-15.)  "And that is who . . . is fighting alongside - that's who is fighting alongside your son."  (Rhodes Decl., Ex. 7, at 15.)

As mentioned, statements are immune from defamation liability if they "cannot reasonably [be] interpreted as stating actual facts about an individual." *Milkovich*, 497 U.S. at 20. In assessing whether a statement could be reasonably interpreted as an assertion of fact, the *Milkovich* Court considered the language used -- i.e. whether it was "loose, figurative, or hyperbolic language which would negate the impression that the writer" was stating fact -- and the context and "general tenor of the article." *Biospherics, Inc.*, 151 F.3d at 184 (quoting *Milkovich*, 497 U.S. at 21); *Schnare v. Ziessow*, 104 F. App'x 847, 851-52 (4th Cir. 2004) (unpublished). Speech that is "insulting, offensive, or otherwise inappropriate, but constitutes no more than 'rhetorical hyperbole,'" is not actionable. *Yeagle*, 255 Va. at 295-96 (emphasis added).

Here, Ms. Rhodes's statements were clearly not made to suggest that CACI literally fought alongside the apartheid military. Rather, put in context, her statements likened independent contractors operating in Iraq, generally, to those that operated in apartheid South Africa. To accomplish this, Ms. Rhodes indulged in "loose, figurative, or hyperbolic language which would negate the impression" she was stating fact. *Biospherics, Inc.*, 151 F.3d at 184; see *Yeagle*, 255 Va. at 295-96.

There are at least three (3) aspects of these substantively identical statements that distinguish them as non-actionable rhetorical hyperbole.  First, Ms. Rhodes refers to CACI only as part of a broader collection of named and unnamed independent contractors, such that hers is a general commentary on the subject matter, rather than a specific, directed charge of criminal liability.  Second, the fact that Ms. Rhodes immediately equates her generalized "allegation" that CACI "fought on the side of Apartheid" with Vice president Cheney's alleged "vote[s] against abolishing Apartheid" (presumably during his time as a member of the United States House of Representatives) only strengthens the notion that these statements constitute rhetorical political hyperbole.  Finally, in her statements, Ms. Rhodes clearly accuses the apartheid government itself of committing atrocities including "chopping off young boys' hands," while she amorphously accuses the generalized field of independent contractors, which includes CACI, of "fighting alongside" those governments.

For these reasons, the Court finds that Ms. Rhodes's statements regarding CACI's relation to the South African apartheid (and Sierra Leone) regime were not defamatory because they constituted "hyperbole" and "cannot reasonably be interpreted as stating actual facts" about CACI.

**Supplying Interrogators.**    Similarly, the Court finds that Ms. Rhodes's statements relating to the claim that CACI supplied interrogators to the United States in Guantanamo Bay, Cuba and Afghanistan and thereafter imported torture techniques developed there to Iraq are, at best, non-actionable hyperbole or, more likely, completely without merit.    The relevant statement by Ms. Rhodes in this regard is as follows:

- <u>Statement No. 1</u>:  On August 10, 2005, in the midst of a conversation about the conflict in Iraq with a caller, Ms. Rhodes addressed issues relating to the Abu Ghraib detention facility.  She stated that "there are rape rooms" that are "grotesque" and that "the people that are torturing and raping are using our soldiers to film it **and that the ones that are being paid to do this are not our troops but it's CACI and Titan and the people who relieved General Karpinski of her command in Iraq in Abu Ghraib . . . . They were independent contractors. And that they took over these prisons all over the world. They took over the prisons in Iraq because General Miller came from Guantanamo and brought all these practices to Iraq and Afghanistan. And to tell you the truth, they're identical. And the same independent contractors are doing the same grotesque things to little boys and girls.**"   (Rhodes Decl., Ex. 1, at 7.)

This statement does not appear to be actionable as defamation for at least three (3) reasons.  First, on a plain reading of the statement, it does not appear that Ms. Rhodes actually accuses CACI of having supplied *any* interrogators to the United States in either Guantanamo Bay, Cuba or Afghanistan. Second, even drawing such a strained inference, which the Court may properly do at this procedural stage, the statement actually

36

alleges that it was General Miller who "brought all these [tortious] tactics to Iraq and Afghanistan." Finally, to the extent that the statement makes any association between CACI and the use of such techniques, it does so in a hyperbolic, non-specific manner that refers broadly to "independent contractors" that "took over these prisons all over the world."

Accordingly, the Court finds that Ms. Rhodes's statements relating to the claim that CACI supplied interrogators to the United States in Guantanamo Bay, Cuba and Afghanistan and thereafter imported torture techniques developed there to Iraq are, at best, non-actionable hyperbole.

### c. Statements Concerning "Murder" and "Rape"

#### i. Not Stating "Actual Facts"/"Hyperbole"

**Murder.** The Court finds that Ms. Rhodes's statements regarding CACI's alleged involvement in murdering Iraqis were not defamatory because they constituted "hyperbole" and "cannot reasonably be interpreted as stating actual facts" about CACI. The following statements are relevant in this regard:

- Statement No. 5: On August 24, 2005. Ms. Rhodes claimed, in reference to the Abu Ghraib facility, that "[t]here are videos" that "clearly show rape and murder and, yes, they show . . . the rapes of children and . . . . the murder of people who have been caught in these dragnets in Iraq." (Rhodes Decl., Ex. 5, at 2.)

- <u>Statement No. 8</u>:  On August 24, 2005, Ms. Rhodes continued, **"[u]nless we actually apologize for these, unless we actually have a president of the United States who says - look what's been done here and I know who did it and this is who did it and it was CACI and it was Titan and it was Blackwater and it was Halliburton and it was Bechtel and it was DynCorp. . . . and it was Triple** - whoever it was, **and he actually says these people are going to be put on trial and they will be charged with murder,** and . . . rape, and . . . molesting children.  And . . . crimes against humanity. . . . the recruitment for Al Qaeda is going to surpass our recruitment capabilities here in the United States."  (Rhodes Decl., Ex. 5, at 4.)

- <u>Statement No. 10</u>:  On August 25, 2005, continuing on a discussion of the General Karpinski interview and raising criticism of the manner in which independent contractors in Iraq were being paid, Ms. Rhodes said **"this deteriorated into contractor heaven.  Mercenaries all over the country, killing people."**  (Rhodes Decl., Ex. 6, at 5.)

- <u>Statement No. 13</u>:  On August 26, 2005, in using the terms **"mercenaries"** and **"hired killers"** to refer to independent contractors in Iraq, Ms. Rhodes stated, **"[t]hey're from everywhere, they're from DynCour and CACI and Titan in the prisons, and then you've got Triple Canopy and Blackwater. . . . these companies didn't exist before this war."**  (Rhodes Decl., Ex. 7, at 4.)

None of these statements, viewed in context, is actionable as defamation.

First, Statement No. 5 does not state actual facts about CACI because, while it refers generally to "videos" that show murder at Abu Ghraib, it does not sufficiently identify CACI employees as having committed the crimes featured on those "videos."  Second, Statement No. 8 similarly "cannot reasonably

38

be interpreted as stating actual facts" about CACI because the context and language used "negate the impression that the writer" was stating fact.  Here, Ms. Rhodes is offering her opinion that terrorist recruitment will continue to benefit from the Abu Ghraib prison scandal unless the President of the United States publicly states which independent contractors were responsible for abuses there, "whoever it was," and vows to prosecute them.  The statement (a) does not actually claim that CACI specifically engaged in murder, naming CACI as part of a litany of other independent contractors, and (b) frames any allegations in terms of a "call to action" to the President and an opinion about how to slow terrorist recruitment by bringing any guilty parties in this scandal to justice.

Finally, Statement Nos. 10 and 13 are quintessential examples of non-actionable rhetorical hyperbole.  In those statements, Ms. Rhodes talks about how Iraq had "deteriorated into contractor heaven" with "[m]ercenaries all over the country, killing people."  Additionally, in identifying CACI and a number of other companies by name, Ms. Rhodes alternately refers to independent contractors in Iraq as "mercenaries," and "hired killers."  Courts have consistently held that "loose, figurative and hyperbolic" language of this kind is protected because it makes clear to all reasonable listeners that the statements are

offered as personal opinions and not as fact.[3]

The case of *Horsley v. Rivera*, 292 F.3d 695 (11th Cir. 2002), provides a useful example. There, the Eleventh Circuit Court of Appeals held that television talk show host Geraldo Rivera's allegedly defamatory on-air statement that his anti-abortion activist guest was "an accomplice to murder," based on the guest's actions in including a recently murdered doctor's name on a website where he posted the identities of physicians who performed abortions and would later strike an "X" through the doctors' names following their murder, was protected under the First Amendment as non-literal, rhetorical hyperbole. In considering the context of Mr. Rivera's statement, the Court concluded that, because "it consisted of the sort of loose, figurative language that no reasonable person would believe presented facts," "[a] reasonable viewer would have understood Rivera's comments merely as expressing his belief that [plaintiff] shared in the moral culpability for [the recently

---

[3]*See, e.g., Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) (ad parody about public figure protected under First Amendment since it "could not reasonably have been interpreted as stating actual facts about the public figure involved"); *Letter Carriers v. Austin*, 418 U.S. 264, 284-86 (1974) (use of word "traitor" in literary definition of union "scab" not actionable under federal labor law because use of word was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members"); *Schnare v. Ziessow*, 104 F. App'x 847, 849, 853 (4th Cir. 2004) (unpublished) (holding article claiming that fellow dog breeder's court affidavit contained "fact and fiction, innuendo, half-truths, exaggerations, and fabrications" not actionable as allegation of perjury because language and context of the article "alert the reader to the hyperbolic nature of the statements"); *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184, 186 (4th Cir. 1998) (holding that "tenor, language, and context" of stock tip article indicated to readers that piece contained constitutionally protected opinions and not actionable factual statements).

murdered doctor's] death, not as a literal assertion that [plaintiff] had, by his actions, committed a felony." *Rivera*, 292 F.3d at 702.

The language that Ms. Rhodes uses in the statements at issue here (e.g., "mercenaries" and "hired killers") is similarly loose, figurative, and hyperbolic. Ms. Rhodes's commentary was not intended to be an objective reporting of the news. Rather, talk radio is a forum for dialogue, heated discussion of issues of the day, and the venting of often bombastic and extravagant opinions of "talking heads" like Ms. Rhodes and their diverse audience of callers. Talk radio, and Ms. Rhodes's show, is more a form of commentary and entertainment than so-called objective news reporting. Therefore, Ms. Rhodes's commentary has to be viewed in the context of her self-proclaimed role as a liberal radio commentator and talk show host.

Accordingly, the Court finds that Ms. Rhodes's statements regarding CACI's alleged involvement in murdering Iraqis were not defamatory because they constituted "hyperbole" and "cannot reasonably be interpreted as stating actual facts" about CACI.

**Rape.** The Court similarly finds that some of Ms. Rhodes's statements concerning CACI's alleged involvement in raping Iraqis were not defamatory because they constituted "hyperbole" and "cannot reasonably be interpreted as stating actual facts" about

41

CACI.  The relevant statements are as follows:

- **Statement No. 8**: On August 24, 2005, Ms. Rhodes
  continued, **"[u]nless we actually apologize for these,
  unless we actually have a president of the United
  States who says - look what's been done here and I know
  who did it and this is who did it and it was CACI and
  it was Titan and it was Blackwater and it was
  Halliburton and it was Bechtel and it was DynCorp. . .
  . and it was Triple** - whoever it was, **and he actually
  says these people are going to be put on trial and they
  will be charged with** murder, and **. . . rape, and . . .
  molesting children.**  And . . . crimes against humanity.
  . . . the recruitment for Al Qaeda is going to surpass
  our recruitment capabilities here in the United
  States."  (Rhodes Decl., Ex. 5, at 4.)

- **Statement No. 11**: On August 25, 2006, Ms. Rhodes, in
  discussing the alleged opinions of Iraqis, stated
  **"[t]hey say that the raping of their children and the
  raping of their children in front of them is no
  different than Saddam.  It's incredible. . . . So this
  was Donald Rumsfeld's wet dream. . . ."**  (Rhodes Decl.,
  Ex. 6, at 6.)

First, Statement No. 8 does not support a claim for

defamation based on allegations of rape for the same reasons it

does not support a defamation action based on allegations of

murder; namely because the statement "cannot reasonably be

interpreted as stating actual facts" about CACI since the context

and language used "negate the impression that the writer" was

stating fact.  Here again, Ms. Rhodes is offering her opinion

that terrorist recruitment will continue to benefit from the Abu

Ghraib prison scandal unless the President of the United States

publicly states which independent contractors were responsible for abuses there, "whoever it was," and vows to prosecute them. The statement (a) does not actually claim that CACI specifically engaged in rape, naming CACI as part of a litany of other independent contractors, and (b) frames any allegations in terms of a "call to action" to the President and an opinion about how to slow terrorist recruitment by bringing any guilty parties in this scandal to justice.

Additionally, Statement No. 11 is not actionable because it does not state actual facts about (let alone mention) CACI and refers generally to the opinions of Iraqis whose children had been raped.

Therefore, the Court finds that these statements by Ms. Rhodes concerning CACI's alleged involvement in raping Iraqis were not defamatory because they constitute "hyperbole" and "cannot reasonably be interpreted as stating actual facts" about CACI.

### ii. No "Actual Malice"

**Murder and Rape.** The Court finds that any remaining statements by Ms. Rhodes allegedly claiming that CACI murdered and raped Iraqis are not actionable because CACI is a "public figure" and it has not demonstrated by clear and convincing evidence that Ms. Rhodes made such statements with "actual

malice." As mentioned, "public figures" alleging defamation must prove that (1) the statements made were demonstrably false and (2) the party making the allegedly defamatory comments made such comments with *actual malice* -- i.e. "with knowledge of their false implications or with reckless disregard of their truth." *Milkovich*, 497 U.S. at 20 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). The relevant statements by Ms. Rhodes are as follows:[4]

- Statement No. 1: On August 10, 2005, in the midst of a conversation about the conflict in Iraq with a caller, **Ms. Rhodes addressed issues relating to the Abu Ghraib detention facility. She stated that "there are rape rooms" that are "grotesque" and that "the people that are torturing and raping are using our soldiers to film it and that the ones that are being paid to do this are not our troops but it's CACI and Titan** and the people who relieved General Karpinski of her command in . . . Abu Ghraib . . . . They were independent contractors." (Rhodes Decl., Ex. 1, at 7.) She further alleged during that broadcast that "General Miller came from Guantanamo and brought all these practices to Iraq and Afghanistan . . . . **And the same independent contractors are doing the same grotesque things to little boys and girls."** (*Id.*)

- Statement No. 2: On August 11, 2005, **Ms. Rhodes asked rhetorically, why are independent contractors, including CACI, "allowed to torture and rape little children using low-level clerks, who then go to jail for 10 to 15 years?"** (Rhodes Decl., Ex. 2, at 3.) Ms. Rhodes further alleged that "low-level specialists"

---

[4] Although the Court will not list here others of the thirteen (13) statements concerning murder and rape that it determined were non-actionable for other reasons, the Court similarly finds that Defendants have not demonstrated by "clear and convincing evidence" that Ms. Rhodes published any of those such statements with "actual malice."

convicted of crimes at Abu Ghraib "testified that they
believed they were working for their government, and
really they were working for CACI and Titan."  (*Id.*)

CACI alleges that Ms. Rhodes "cannot point to *any* source . . .

that verifies, confirms or supports her accusations that CACI

employees engaged in murder, rape, and torture in Iraq." (Pls.'

Opp., at 21.)  However, Ms. Rhodes need not confirm her

accusation.  Rather, she must only demonstrate that she did not

make statements with a reckless disregard for the truth.  And,

while the record does not confirm the truth of Ms. Rhodes's

allegations, it provides enough support for her allegations to

defeat a finding that she made them with a reckless disregard for

the truth.

The record reflects that CACI employees supervised United

States military personnel, generally, and that CACI employees

were present at the compound during the suspected rape and deaths

of Iraqi detainees.  While the statements that CACI employees

actually raped and murdered Iraqi detainees appears to be false,

based on the reports, such a determination cannot be made with

certainty.  The Taguba Report clearly states that an MP had "sex

with a female detainee." (Handman Decl., Ex. 24, at 25.)

Whether that instance of sex was, in fact, rape is obviously not

on trial, but the Court will assume, for purposes here, that the

act referred to in the Taguba Report was rape.  The Taguba report

also finds that, on other occasions, unknown persons sodomized a

detainee with a "chemical light and perhaps a broom stick." (*Id.* at 26.)    Immediately thereafter, the Taguba Report, without specifically mentioning CACI, finds that "interrogators actively requested that MP guards set physical and mental conditions for favorable interrogation of witnesses." (*Id.* at 27.)

There is no evidence that CACI employees had knowledge of, or participated in, the United States military personnel's rape of the female Iraqi detainee or the instance of sodomizing the male detainee.    However, given Ms. Rhodes's consideration of published government investigation reports which reported claims of confusion in the chain of command, CACI interrogators' roles in commanding United States military personnel and in participating in interrogations where United States military personnel physically abused detainees, Ms. Rhodes's opinions and reports do not appear reckless.

David Phinney, reporting on the Fay/Jones report, stated that investigators found that contract employees "violently assaulted prisoners, demanded that prisoners be forced into unauthorized stress positions and threatened prisoners with dogs." (Rhodes Decl., Ex. 13, at RR68-69.)    Phinney stated that the report also "*documents allegations of rape made by one witness who told investigators the perpetrator could be a civilian and possibly a translator who was wearing a military uniform.*" (*Id.* at RR69 (emphasis added).)    Phinney's article

also reported allegations made by an Iraqi widow that CACI employees at Abu Ghraib were at least in part responsible for her husband's death.  (*Id.* at RR70.)  A *Washington Post* article reported that CACI interrogators Stefanowicz and Frederick directed military personnel to severely abuse detainees.  (Rhodes Decl., Ex. 14, at RR79.)  In the *New Yorker*, Seymour Hersh underscores the Taguba Report's finding that CACI employees "were either directly or indirectly responsible for the abuse at Abu Ghraib."  (*Id.*, Ex. 15, at RR58.)

The government investigation record suggests that no CACI employees have been prosecuted for raping or murdering a single Iraqi detainee.  However, the record does reflect that Iraqi detainees were sexually abused and raped at Abu Ghraib and that CACI employees were deployed at the prison at the time of these incidents.  Again, whether CACI employees should be held liable for involvement with the rape or murder of Iraqi detainees is not on trial here.  There are, in fact, suits filed in other federal courts attempting to prove such liability.  Here, the Court must only decide whether or not Ms. Rhodes recklessly disregarded the truth when claiming or suggesting that CACI employees raped and murdered Iraqi detainees.

The Court holds that Ms. Rhodes did not recklessly disregard the truth when making statements regarding CACI's role in the rape and murder of Iraqi detainees at Abu Ghraib because the

government reports of investigations into the Abu Ghraib scandal and published news reports provided a factual background for Ms. Rhodes's hyperbolic statements on her talk radio show. Ms. Rhodes's statements on her talk radio show have to be put in context as political commentary. Thus, Ms. Rhodes statements fall short of actual malice and remain in the realm of political opinion, conjecture, and hyperbole.

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment because, based on the evidence adduced thus far, a reasonable jury could not conclude that: (a) the alleged defamatory statements can "reasonably be interpreted as stating actual facts" about CACI; and/or (b) the statements were made with actual malice -- i.e. a "reckless disregard for the truth."

Accordingly, it is hereby

ORDERED that Defendants Randi Rhodes and Piquant, LLC's ("Air America Radio") Motion for Summary Judgment is GRANTED.

The Clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this _21st_ day of September, 2006.

_____
Gerald Bruce Lee
United States District Judge

Alexandria, Virginia
09/21/06