**EXHIBIT B**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SALEH et al., )
)
     Plaintiffs, )
)
v. )  Case No. 05-cv-1165 (JR)
)
TITAN et al. )
     Defendants. )
)
)
_____ )

### *DECLARATION OF TORIN S. NELSON*

I hereby declare under penalty of perjury to the following:

1. My name is Torin S. Nelson. I am a United States citizen. I am an interrogator by profession. At present, I hold a Top Secret/SSBI level security clearance.

2. At the request of Susan L. Burke, counsel in this matter, I testified under oath about my experiences working as an interrogator for CACI immediately prior to being deployed overseas to Afghanistan. The testimony was recorded by a court reporter. The transcript attached as Exhibit A accurately sets forth my testimony.

3. As set forth in the attached transcript, subsequent to my resignation from CACI, I was contacted by lawyers from Steptoe & Johnson as part of CACI's internal investigation. They emailed me the list of topics being investigated. A true and correct copy of the list is attached as Exhibit B. At the time I received that list of topics, I had already resigned from CACI. I provided a copy of this list of topics to Ms. Burke subsequent to providing the sworn testimony attached as Exhibit A.

5. During my tenure in Iraq as a CACI interrogator, I was never advised by either CACI personnel or military personnel that I was required to follow orders from the military.

6. I reported to the CACI management chain. During my tenure in Iraq, I reported to Dan Porvaznik.

7. I worked with and shared information with military interrogators and their superiors on a daily basis. I never had any military personnel directly supervise my conduct of an interrogation in an interrogation booth. Although I submitted proposed plans of interrogation to military personnel, no one from the military ever commented on or stopped me from implementing any proposed interrogation plan.

8. As set forth more fully in the attached transcript, during my tenure, I had a series of discussions that led to a confirmation from military personnel and CACI personnel (specifically, Steve Stefanowicz) that the military personnel were not permitted to give civilian contractors direct orders outside operational issues related to interrogation. For example, no one in the military could order me not to speak my mind to an officer.

9. I did submit interrogation reports on what I had learned from detainees to the military, and received direct feedback about the content of the reports from the military. In addition, the military determined which detainees I would interrogate.

9. During my tenure in Iraq, my colleagues and I referred to the company we worked for as CACI or CACI International. We never used the term CACI P.T. to describe our employer. The only time I recall seeing the name CACI P.T. appear is on my employment contract.

10. I understood I was reporting through a CACI corporate managerial chain of command that reported back to CACI International in Arlington, Virginia. When CACI management would come from the United States to Iraq to oversee CACI operations, they would identify themselves as being with CACI, not with CACI P.T.

I declare the foregoing to be true and correct under penalty of perjury.

September 14, 2006

Torin S. Nelson

# Exhibit A

```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA


                            -O-


SALEH, an individual residing   :
in Sweden and Dearborn,
Michigan; HAJ ALI SHALLAL       :   Case No. 1:05-cv-1165
ABBAS AL-UWEISSI, an individual
residing in Iraq; JILAL MEHDE   :
HADOD, an individual residing
in Iraq; UMER ABDUL MUTALIB     :   Statement Under Oath of:
ABDUL LATIF, an individual          TORIN NELSON
residing in Iraq; AHMED         :
SHEHAB AHMED, an individual
residing in Iraq; AHMED         :
IBRAHIEM NEISEF JASSEM, an
individual residing in Iraq;    :
ISMAEL NEISEF JASSEM AL-NIDAWI, Place:
an individual residing in       :   HOTEL MONACO
Iraq; KINAN ISMAEL NEISEF           15 West 200 South
AL-NIDAWI, an individual        :   Salt Lake City, Utah 84101
residing in Iraq; ESTATE OF
IBRAHIEM NEISEF JASSEM, the     :   Date:
heirs and estate of Ibrahiem        September 9, 2005
Neisef Jassem; MUSTAFA, an      :
individual residing in Iraq;        Time:
NATHEER, an individual          :   12:50 p.m.
residing in Iraq; OTHMAN, an
individual residing in Iraq;    :   Reporter:
HASSAN, an individual residing      Ariel Mumma, CSR/RPR
in Iraq; and CLASSES OF         :
PERSONS SIMILARLY SITUATED,
KNOWN HEREINAFTER AS JOHN and   :
JANE DOES NOS. 1 - 1050,
                                :
              Plaintiffs,
                                :
          -v-
                                :
TITAN CORPORATION, a Delaware
Corporation; ADEL NAKHLA, a     :
former Titan employee residing
in Maryland; JOHN B. ISRAEL,    :
a former Titan employee
temporarily residing in Iraq;   :
                    *


                    *
```

CACI INTERNATIONAL INC., a
Delaware Coorporation; CACI          :
INCORPORATED - FEDERAL, a
Delaware Corporation; CACI           :
PREMIER TECHNOLOGY, INC., a
Delaware Corporation;                :
STEVEN A. STEFANOWICZ, a
former CACI employee residing        :
in Pennsylvania; TIMOTHY
DUGGAN, a former CACI                :
employee residing in Ohio,
and DANIEL E. JOHNSON, a             :
former CACI employee residing
in the United States,                :

                    Defendants.      :


                    -O-

3

```
 1              A P P E A R A N C E S

 2
    For the Plaintiffs:
 3              Ms. Susan Burke
                BURKE PYLE LLC
 4              3527 Lanchastire Avenue
                Philadelphia, PA 19104
 5              (215) 387-4705
                (215) 387-4713 (fax)
 6              sburke@burkepyle.com

 7 Also Present:
                Mr. Keith Rohman
 8

 9                      -oOo-

10
                    I N D E X
11
    Witness                              Page
12
        TORIN NELSON
13 Examination by Ms. Burke                 5

14
                      -oOo-
15

16

17

18

19

20

21

22

23

24

25
```

4

```
1                    E X H I B I T S

2  No.                  Description              Page

3  1   Interrogation Rules of Engagement          31
       (1 page)
4

5                        -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

```
             1              September 9, 2005; 12:50 p.m.
             2                    P R O C E E D I N G S
             3
             4                        TORIN NELSON,
             5       called as a witness, having been duly sworn,
             6          was examined and testified as follows:
             7
             8              MS. BURKE:  I'd like to state for the
             9       record:  Susan Burke representing the plaintiffs in
12:49:51    10       the Saleh matter, and we have here as well Keith
            11       Rohman, who is the investigator for the plaintiffs.
            12
            13                        EXAMINATION
            14       BY MS. BURKE:
12:49:59    15          Q.    Mr. Nelson, could you please state your
            16       full name for the record.
            17          A.    Torin Steed Nelson.  Steed -- Steed,
            18       S-t-e-e-d.
            19          Q.    And what is your present address?
12:50:09    20          A.    6410 Battle Creek Court -- three words --
            21       West Valley City, Utah 84118.
            22          Q.    And you understand that we've asked you
            23       here today to give a statement under oath?
            24          A.    Yes.
12:50:24    25          Q.    And you understand that you have to -- it
```

6

1  has to be in your own words, and you have to tell the

2  full truth?

3      A.    Yes.

4      Q.    And just so the record is clear, you have

12:50:34  5  met me before?

6      A.    Um-hm.  Once.

7      Q.    And at any time have I ever told you what

8  to say or suggested what you should say?

9      A.    No.

12:50:44  10      Q.    What we're going to do is just run through

11  a series of questions about your experiences with CACI

12  in Iraq.

13          First, can you tell us:  When did you

14  first hear from CACI or get in touch with CACI?

12:50:58  15      A.    Well, actually I was first told over the

16  phone, on my way to work one day in about August 2003,

17  from an old friend of mine who is also a fellow

18  interrogator, that he had recommended me for a

19  position from a company named CACI that he had been

12:51:16  20  talking with, and he wasn't going to take a position

21  with them and that they were going to call me shortly.

22          In the next -- probably about an hour

23  later I got a phone call from a woman; I think her

24  name was Michelle.  She was a recruiter for -- working

12:51:31  25  for CACI.  She spoke with me for about maybe 10

1 minutes, just to see if there was any interest, and

2 what my background was.

3          Then she said I would be receiving another

4 phone call that day from a woman named Amy Jensen, who

12:51:48 5 is the program manager for CACI; and it was a few

6 hours later that I received another call, while I was

7 at work, from Amy Jensen.

8          That call lasted for about a half an hour,

9 and I've talked about it often before.  It's -- it was

12:52:04 10 about five minutes of her interviewing me to find out

11 what my background was, what my skills were, and then

12 about 25 minutes of her telling me all the great

13 things that I could come to expect from working with

14 the company, and how much of a family they were, and

12:52:20 15 how they had such a great retention rate -- it was

16 like 90, 95 percent, I remember her saying -- and all

17 the benefits I would be getting, and all this sort of

18 stuff, and just really trying to sell me on the job.

19     Q.     And at that point had you ever had

12:52:35 20 dealings with CACI before?

21     A.     No.

22     Q.     Had you ever heard of them before?

23     A.     No.

24     Q.     And I take it you had a background in

12:52:41 25 intelligence?

8

1       A.      In human intelligence, as an interrogator,

2  trained by the U.S. Army.

3              I finished -- I started my training in

4  1992, finished my training in 1994; worked for six

12:52:57  5  years overall from '92 to '98 in the active regular

6  army as an interrogator and a debriefer.

7              Then left the regular army, joined the

8  Utah National Guard after I came back with my family,

9  and joined in January of '99, and left the Utah

12:53:18 10  National Guard in January of 2004.

11             So five years with the Utah National

12  Guard, also as an interrogator.  I've only been an

13  interrogator.

14      Q.      The -- the CACI personnel, Michelle and

12:53:29 15  Amy Jensen --

16      A.      Yes.

17      Q.      -- what were their qualifications to

18  interview you?

19      A.      I really don't know.  They didn't specify

12:53:39 20  their backgrounds.

21      Q.      So you don't know whether or not they were

22  interrogators?

23      A.      No, I don't.  My inclination is probably

24  that they weren't.

12:53:48 25      Q.      And what happened next?  Were you hired by

9

1 CACI?

2    A.    I was given an offer letter after probably

3 a couple more conversations over the phone, just

4 basically negotiating a price.

12:53:59 5    Q.    And when you say conversations over the

6 phone, Mr. Nelson, conversations with Miss Jensen

7 or --

8    A.    With Miss Jensen.  I really didn't talk to

9 Michelle, the recruiter, after that.  All my

12:54:11 10 conversations were with Amy Jensen after that.

11    Q.    Okay.  And with Amy Jensen -- during any

12 of these subsequent conversations, did Amy Jensen

13 interview you again, or was it a salary negotiation?

14    A.    It was pretty much negotiation at that

12:54:23 15 point.  I had some specific questions about where I

16 might be working, who I was going to be working with,

17 and what capacity I'd be working, the salary that I

18 would be receiving and what rate that would be, when

19 it would become official.

12:54:34 20        She was mainly worried about getting --

21 making sure that all documentation was taken care of

22 that would facilitate me being able to go overseas,

23 such as passport, application form, resume.  That sort

24 of stuff had to be sent at about the same time that

12:54:52 25 they were going to send me the contract.

1              It was -- it was more or less a moot point

2 that I was already hired, if I wanted the job.  It was

3 just a matter of reaching an understanding about the

4 pay and other aspects of it.

12:55:03 5      Q.    And what was the job that you were being

6 hired to do?

7      A.    I was an interrogator.  That's what I was

8 told -- it's what I do -- and that they had positions

9 for interrogators over there.

12:55:15 10     Q.    Did you get -- did you start -- when did

11 you start?

12     A.    Well, they wanted me to start earlier

13 around October, but I needed a bit more time to be

14 able to take care of family matters, business, legal

12:55:26 15 matters, that sort of stuff.

16              So I didn't end up leaving for the

17 training portion until November 16th, I think it was,

18 when I flew down to Fort Bliss, Texas, where they have

19 the CRC, which is the CONUS -- C-O-N-U-S -- I think

12:55:47 20 it's Readiness Center.  It's done by the U.S. military

21 for any personnel, whether military or civilian, that

22 are deploying overseas, usually into a combat zone.

23              Civilians have to be there for about five

24 to six days, which I was.  And it's -- it's not for

12:56:07 25 training, really, it's just to make sure that your

11

1 paperwork is all in order for the military; that they

2 can track you; that they know that you have your

3 medical files with you, and all your shots that you

4 need, that sort of stuff; so then I went overseas.

12:56:21 5     Q.    Prior to -- prior to going down to the

6 location, did you ever meet anybody from CACI in

7 person?

8     A.    No.  The first time I met with any CACI

9 personnel was actually when I arrived at Fort Bliss,

12:56:34 10 Texas.  There were about five, maybe six other CACI

11 personnel, but they were all new -- new people as

12 well.

13     Q.    Did you meet anyone from CACI management,

14 or anyone who -- who was part of the interview

12:56:46 15 process?

16     A.    No.

17           Technically, yes, you would say that I met

18 somebody from CACI management, because a new hire that

19 was -- that I met down there who was going through CRC

12:56:57 20 with me as well -- as well, Scott Northrup.  He was

21 the new country manager for CACI, and so I guess

22 technically you could say, yeah, I met management down

23 there, but nobody who was established.

24     Q.    Okay.  So nobody who was already with the

12:57:15 25 company?

12

```
            1       A.      Correct.

            2       Q.      Do you know who, other than Amy Jensen,

            3  signed off on you being hired?

            4       A.      No.  I -- I didn't know.

12:57:22    5       Q.      And nobody ever interviewed you in person?

            6       A.      No.

            7       Q.      Now, you mentioned that this location,

            8  Fort Bliss, was run by the U.S. military?

            9       A.      Yes.  Fort Bliss -- the CRC there is run,

12:57:37   10  I believe, probably by the U.S. Army, because it's an

           11  army post, even though I think civilians -- and it's

           12  mostly U.S. military, U.S. Army personnel going

           13  through there; there might have been some other

           14  services, Air Force, Navy, but I don't know.

12:57:54   15       Q.      At this point in time what was your

           16  understanding as to whether you were reporting to CACI

           17  or reporting to the U.S. military?

           18       A.      As far as I knew, I was not reporting to

           19  the U.S. military at all.  We were just going through

12:58:05   20  the motions to make sure that administratively our

           21  paperwork was in order; but we were supposed to be

           22  reporting to CACI, and that all we were taking care of

           23  was just travel, transportation issues, to that point.

           24       Q.      Did you ever -- did anyone from CACI ever

12:58:19   25  tell you that you had to report to the U.S. military?
```

13

```
              1    A.      No.

              2    Q.      And did you ever report to the U.S.

              3 military while you worked for CACI?

              4    A.      Well, during my time in Iraq when I was in

12:58:30      5 Abu Ghraib, we would report on occasion to the U.S.

              6 military because they ran operations there.

              7    Q.      When you were down in Fort Bliss, what

              8 kind -- what happened?  What kind of training did you

              9 get there?

12:58:43     10    A.      It's not really any training.  It was

             11 just -- it was mainly paperwork, to make sure that

             12 passports were in order, that our travel itineraries

             13 were in order, that we had the necessary gear with us.

             14             Any gear that we didn't have with us that

12:59:00     15 was required foreign country was issued to us at that

             16 time; that medical and dental paperwork was in order,

             17 and that we signed off on a couple of other stations,

             18 such as the legal, finance, chaplain, your --

             19             It's typical that you have to go through a

12:59:18     20 number of stations with the military that you --

             21 before you go overseas, that you have to be signed off

             22 by certain individuals.  They just basically check

             23 over your paperwork, just to make sure that

             24 everything's in order.  That was it.

12:59:30     25             As far as any training goes, I think there
```

14

1  was probably one day when we sat through a series of

2  briefings, on safety briefings, short cultural

3  awareness briefing, I think -- and I'm not even sure

4  if that's from when I deployed with CACI or if that's

12:59:49  5  from when I deployed with the military, because it was

6  so -- so quick, and it was really not even very

7  effective.  It was somebody who didn't even know the

8  culture, giving a slide presentation about -- about

9  the culture.

13:00:01  10      Q.    And just to make sure I'm understanding,

11  Mr. Nelson, when you said -- when you were referring

12  to your prior experience, when you had deployed as an

13  interrogator to Cuba?

14      A.    Correct.  When I would deploy, the most

13:00:25  15  recent one being -- actually when I deployed to Kuwait

16  for Operation Iraqi Freedom, which was just following

17  my deployment to Guantanamo Bay, Cuba, in 2002;

18  subsequent 2003, to Kuwait for OIF.

19          Prior to that I had deployed also before,

13:00:44  20  short trips, Eastern Europe, that sort of stuff, so

21  CRC was a very familiar process to me.

22      Q.    What -- what is the date after which you

23  were no longer associated with the U.S. military, so

24  we can keep the record clear?

13:00:57  25      A.    Officially January 22nd, I believe, 2004

15

1 is my end date, although I really hadn't been drilling

2 with them since late 2003, obviously, because I was

3 overseas in Iraq as a civilian contractor.

4          Q.     And during the time that you were going

13:01:17 5 through CRC, did you get any materials that were from

6 CACI, an employment manual, any kind of training

7 manuals, anything like that?

8          A.     The only thing that I got -- and that was

9 prior to leaving for CRC, I remember -- was a

13:01:31 10 packet -- was basically an employees benefits packet

11 talking about your typical 401(k) plans,

12 administrative leave, dental, medical, insurance, life

13 insurance -- things you would expect with almost any

14 major company -- but nothing specific towards Iraq,

13:01:52 15 towards deployment, towards interrogation.

16          Q.     Did you ever receive anything specific

17 about interrogation or Iraq from CACI?

18          A.     From CACI, no.

19          Q.     Did you ever receive from CACI any

13:02:04 20 direction on their own corporate code of ethics?

21          A.     Possibly.  I -- I don't remember.  If I

22 did, it was probably one or two sheets of paper.  It

23 may have been right about the same time that I got a

24 couple of documents that were the non-disclosure

13:02:26 25 documents, non-compete clause, those sorts of things

16

1  that -- legal technical issues.

2              I think if they had given me anything

3  regarding what you were asking, it would have been

4  about that time.

13:02:39  5      Q.    Okay.  And that was before you went to

6  Fort Bliss?

7      A.    Hm --

8      Q.    When did you get -- when did you get the

9  non-compete and the non-disclosure?

13:02:47  10     A.    Right about the same time that I got

11  the -- the actual offer letter, so that would have

12  been before going to Fort Bliss.

13     Q.    Okay.

14              When you -- when you -- when you were

13:03:01  15  going through this process -- the CRC, the U.S.

16  military process -- was there any direction given to

17  you from CACI about what legal regime applied to

18  interrogation?

19     A.    No.

13:03:19  20     Q.    How long did this -- how long did the

21  Fort Bliss --

22     A.    We arrived there on the 16th.  We departed

23  I believe on the 20th.

24     Q.    And when you left, where did you go?

13:03:30  25     A.    Well, we flew on a chartered flight from

1 Fort Bliss through Louisiana to Frankfurt, Germany,

2 down to Kuwait, is where it was stopped.

3          We arrived in Kuwait I believe on the 21st

4 or the 22nd, and we stayed at Camp Wolf, which is

13:03:53 5 adjacent to Camp -- or to Kuwaiti International

6 Airport, for about two or three days while Scott

7 Northrup was trying to arrange flight travel for us,

8 military air, into Baghdad.

9          We arrived in Baghdad probably around

13:04:13 10 the 25th, I would think, of November, 2003, and I was

11 at CACIville -- which is in Camp Victory, next to the

12 Baghdad International Airport -- for about two days.

13          So I from there was transported by vehicle

14 probably around the 26th or 27th of November, is when

13:04:45 15 I actually arrived in Abu Ghraib.

16     Q.     Did you know from CACI, before you left,

17 that you were going to be assigned to Abu Ghraib?

18     A.     No.  I had never gotten the name

19 Abu Ghraib before.

13:04:57 20          I inquired about that, as to where I would

21 go.  Amy Jensen told me that I was going to some

22 prison which is in the south of Iraq -- or south of

23 Baghdad, she said, in a very safe zone that they've

24 never had any problems or incidents there; that we

13:05:12 25 would probably be living in the cells, but they're

1 very -- you know, they're very clean, very -- you

2 know, it's very well taken care of there, and it's,

3 you know -- it's very good accommodations.

4          Q.    And did that turn out to be the reality?

13:05:26 5    A.    No.

6              Well, the reality was I was in a -- in a

7 prison, but it was actually a prison between Baghdad

8 and Fallujah, on the main road between those two

9 locations; and it's actually west of Baghdad in -- in

13:05:44 10 a location that is very far away from any green zone.

11              In fact, it was pretty much out in the

12 middle of, you know, hostile country, and that they

13 had had incidents of -- of prison breaks, uprisings,

14 attempted violent uprisings, mortar attacks, sniper

13:06:08 15 fire, and rocket attacks, since they had opened up

16 operations, which I believe was August of that year.

17              And I found out, after I had arrived at

18 the prison, that CACI personnel who were there since

19 August had actually been reporting back to CACI

13:06:21 20 headquarters, almost on a daily basis, explaining all

21 of the violent attacks that had occurred.

22          Q.    And what -- what did CACI do about it?

23          A.    Oh, they just -- typical.

24              In fact, on the same day that I was --

13:06:36 25 that I arrived, Chuck Mudd, who my understanding is he

1 was the vice president -- that's what I was told, the

2 vice president of CACI -- came and had a meeting with

3 all the CACI personnel, because there was a lot of

4 disgruntled people at that time.  And that meeting

13:06:52 5 itself, the night that I arrived, was almost enough to

6 make me turn around and leave Abu Ghraib.

7            And I've been in some pretty bad places

8 before but this one was just horrible.  There was -- I

9 received reports from these other CACI personnel that

13:07:11 10 were there about all the attacks that had occurred;

11 about the fact that there was no force protection

12 measures of any real level; that we were outnumbered,

13 we were outgunned, we were completely surrounded by

14 hostile personnel, and we also had hostile personnel

13:07:31 15 who were somehow arming themselves within the camp.

16            And that during that meeting, I could see

17 that typical -- Chuck Mudd was just kind of, you know,

18 trying to allay everybody's fears and calm them down;

19 but really not giving any substance to -- other than

13:07:50 20 saying, well, things are going to get better, we're

21 going to spend money, we're going to get things done.

22            He -- he was talking more about like

23 trying to do window-dressing improvements so that --

24 that our cells looked better, so that we'd, you know,

13:08:00 25 be living in nicer conditions, but nothing really

20

1 saying anything about like improving the safety

2 conditions.

3            That's why the next morning I talked to

4 Dan Provoznik early in the morning and I said, "Dan, I

13:08:14 5 don't think I can do this, not here.  I mean, this --

6 you know, it's not like I'm a chicken or something,

7 I've been in some bad places before, but this is --

8 you guys are just in the middle of Indian territory,

9 really, and you're General Custer in the Last Stand

13:08:28 10 here.  I can't be expected to do that."

11            Dan was actually very understanding, and

12 he said, "You know, if you feel that way, I have no

13 problems with it.  I completely agree with all your

14 sentiments, and the situation is piss poor, but -- and

13:08:43 15 there's nothing we can do about it.

16            "So if you want to quit, that's fine, or

17 if you want to transfer to another location, that's

18 fine.  I just ask that you give it two weeks, if you

19 can, and just see if things get better."

13:08:55 20            And so I told him I would.  And that's

21 pretty much how it happened.

22    Q.    And for the record, just so we know the

23 names of the different people, the vice president

24 was --

13:09:03 25    A.    -- Chuck Mudd, as far as I know.  He was

1 vice president.

2    Q.    And -- and who else -- if you could just

3 walk us through the CACI people that were -- that were

4 over in Iraq, that -- the names that you know that was

13:09:21 5 the management structure of CACI, and explain to us

6 their roles.

7    A.    Well, my understanding was -- was the top

8 administrative personnel for CACI on permanent

9 assigned basis in country was Scott Northrup, the new

13:09:39 10 CACI employee that I went through CRC with.  And that

11 he was country manager; that was his position.

12        He was in charge of all of CACI personnel,

13 but not just the intelligence people, but also

14 logistics people, at a number of different locations

13:09:57 15 throughout the country.

16    Q.    Approximately how many CACI people total

17 do you think there were in Iraq at that time?

18    A.    I was told at that time about 200

19 positions countrywide.

13:10:06 20    Q.    And how many of those positions were

21 interrogators?

22    A.    I don't know.  But my understanding, after

23 being in country for a while, it was probably

24 somewhere around 75 to 80 personnel would be

13:10:20 25 intelligence people.  Of the intelligence people,

1 maybe 40 of those would probably be interrogators.

2      Q.      And of the intelligence people that were

3 not interrogators, what were they doing?

4      A.      Either analysts or screening work.

13:10:35 5      Q.      Okay.  And I'm sorry, I interrupted you.

6 If you want to go back.

7              Scott Northrup has everybody reporting in

8 to him?

9      A.      Yes, from a variety of locations and a

13:10:45 10 variety of missions.  And so that he was the top

11 administrative personnel.

12             At our location at Abu Ghraib, our top

13 person for CACI was Dan Provoznik, as far as

14 administrative duties go; that he was the site

13:11:06 15 manager.  But he was also the senior intel person,

16 really; that if you had problems even with some

17 intelligence matters, that you should take it through

18 the military chain of command, obviously, but you

19 should also let CACI chain of command, Dan Provoznik,

13:11:27 20 know about it.

21             Not that CACI -- we knew that CACI

22 couldn't do anything really about operational affairs,

23 intelligence matters, anything like that, but at least

24 that they should be aware of the fact that some of the

13:11:36 25 CACI personnel were dealing through the military chain

1 of command with intelligence matters or operational

2 matters.

3      Q.      And so that was Dan Provoznik?

4      A.      Correct.

13:11:45  5      Q.      Was there anyone else in a supervisory

6 chain?

7      A.      Well, officially there was Tom Howard, who

8 was kind of in a side role.  He -- I was aware of him

9 as being the C2X -- the C2X -- that he was the senior

13:12:08 10 CACI intelligence officer in Iraq who was reporting

11 directly to the C2 in Baghdad, the C2 is in charge of

12 all intelligence operations.

13      Q.      What is the C2; what's that mean?

14      A.      The C2 -- in the military there are four

13:12:28 15 different shops.  At battalion brigade level they're

16 considered S shops.  At the division and higher level

17 is when you -- when you refer to the same shop but

18 as -- with a different letter, will be either G, J,

19 or C.

13:13:02 20           The C, my understanding is that pretty

21 much it's at a corps level, and the 2 refers to

22 intelligence operations.

23      Q.      And -- and so to make sure I'm

24 understanding, the interrogators at Abu Ghraib, the --

13:13:20 25 the top supervisor for the interrogators was Dan

1 Provoznik, and Tom Howard was the number two guy, or

2 am I misunderstanding that?

3      A.      On site, our top CACI personnel was Dan

4 Provoznik, and he handled mainly administrative

13:13:38 5 affairs as a site manager.

6           In Baghdad the C2X -- who is the top

7 intelligence personnel but who is also a CACI

8 employee -- was Tom Howard; and he reported, actually,

9 to my understanding, to the C2 in Baghdad, who was

13:13:56 10 Brigadier -- no, either Brigadier or Major General --

11 I think she got promoted right about that time --

12 Barbara Fast.

13      Q.      So the CACI interrogators reported to

14 Howard, and Howard reported to Fast?

13:14:09 15      A.      No.  CACI interrogators at Abu Ghraib

16 reported, through our chain of command, to the

17 military personnel who were running the J-I-D-C, the

18 JIDC, at Abu Ghraib; we would report to them, as far

19 as operational matters go.

13:14:25 20           That information would go up to

21 individuals like Tom Howard or I believe Wodjakowski,

22 and that would then eventually reach the desk of

23 General Fast, who is the C2.

24           We wouldn't directly report to Tom Howard.

13:14:45 25 He would just be aware of many of the things that were

25

1 going on with us.

2            And I found out later through a

3 conversation with Tom, that he actually had a much

4 more hands-on role with approving people for work, for

13:14:59 5 transfers, for assignments, and that sort of stuff.

6 So he had a great deal of influence when it came to

7 running operations on the CACI side in country.

8     Q.    Dan Provoznik had access to the

9 interrogation reports that you created?

13:15:17 10    A.    Correct.

11     Q.    And Tom Howard as well had access to the

12 interrogation reports you created?

13    A.    Correct.

14            I believe that Tom Howard would have

13:15:25 15 accessed them more because that was part of his

16 function, whereas Dan Provoznik would have -- although

17 he probably had access to them because he had the

18 security clearance to be able to look at those and

19 then check on what our status was -- was more

13:15:39 20 concerned with administrative matters, and so forth;

21 and so during normal parts of work he was not expected

22 to really be checking up on our -- on our work.

23     Q.    Okay.  Anyone else, other than these two

24 gentlemen, that were in the CACI supervisory ranks

13:15:56 25 over at Abu Ghraib?

```
        1    A.     Well, officially, no.

        2           The -- there was one kind of side issue

        3   that was becoming a bit of a hassle later on, was

        4   Steve Stephanowicz, when I first got in there, was

13:16:12 5   really kind of putting himself into a position of a

        6   number two person to Dan Provoznik.

        7           He was really trying -- he was trying to

        8   present himself or establish himself as the senior

        9   intelligence person for the JIDC -- for the JIDC at

13:16:28 10  Abu Ghraib; that -- on the CACI side, so that any CACI

       11   personnel who had operational questions would go to

       12   Steve first, and then if he couldn't resolve it, then

       13   they would go to Dan; and if there was a problem there

       14   still, it would probably go to either Scott Northrup

13:16:44 15  on the administrative side, or to Tom Howard on the

       16   operational side.

       17           Steve was just trying to put himself into

       18   that position of authority.

       19    Q.     And in that position of authority in the

13:17:05 20  operational line as opposed to the administrative

       21   line?

       22    A.     Yes.

       23    Q.     And -- and just so that the record is

       24   clear, when you say the operational line, you're

13:17:14 25  talking about the actual conducting of intelligence?
```

        1     A.     Correct.

        2     Q.     On -- on that line, other than Tom and Dan

        3 and then Steve, who was informally trying to be in the

        4 hierarchy, was there anyone else who actually was in

13:17:32  5 that hierarchy that was in country, in Iraq?

        6     A.     No.

        7     Q.     What about back in the United States; did

        8 you know who was operationally in the line of -- of

        9 command at CACI, back in the United States?

13:17:47 10     A.     The operations side, to my knowledge there

      11 was nobody at home office or stateside that was CACI

      12 that was even concerned with operational matters, and

      13 that their concern was administrative matters solely.

      14     Q.     Can you tell us a bit about what you

13:18:12 15 actually did day-to-day.

      16     A.     Once I got into the routine, my typical

      17 day consisted of getting up somewhere around 8:00 in

      18 the morning, taking care of hygiene first off --

      19 actually, strike that.

13:18:25 20         I'd probably get up about 7:00 in the

      21 morning, take care of hygiene, breakfast, and just

      22 preparation.  Then get into the office about 8:00.

      23         And I would usually work through to lunch,

      24 take about a half hour off for lunch right around

13:18:41 25 12:00, go back in, and work anywhere from 8:00 to

1 midnight.  So I'd put in minimum of 12 hours;

2 sometimes it would stretch up to 16 hours in one day.

3      Q.      What did you actually do?

4      A.      Well, during the morning usually -- if I

13:18:58 5 was scheduled for an interrogation in the morning, I

6 would go into a quick prep-up for the interrogation,

7 conduct the interrogation.

8              Usually the interrogation itself would run

9 anywhere from a half hour to four hours, but generally

13:19:10 10 it ranged from two to two-and-a-half hours.

11      Q.      Now, when you say a quick prep up, what

12 does that mean?

13      A.      Well, generally make sure that I have all

14 my files and my paperwork; that I'm making sure that

13:19:18 15 I'm scheduled to be with the right person in the right

16 booth; that my interrogation plan that I had submitted

17 the day before had been approved.  If it hadn't, then

18 I had to make -- you know, revise it really quick,

19 submit it.  It was a one-page interrogation plan, just

13:19:30 20 mainly administrative work.

21      Q.      And when you say a one-page administration

22 plan, mainly administrative work, that it was not

23 necessary -- or I mean what was the purpose of those

24 interrogation plans?

13:19:44 25      A.      It was absolutely necessary.

29

```
          1              According to the book, to do things
          2 correctly, you had to submit an interrogation plan, an
          3 IP, on stating who your source was, what background
          4 they had, what possible PIR information they had --
13:20:03  5 which Priority Intelligence Requirement is PIR -- the
          6 probable approaches that you would be using in the
          7 booth; if there were any special circumstances that
          8 required advanced notification; and general
          9 information, such as their physical condition -- if
13:20:24 10 it's in good condition or not; what they were
         11 considered, as far as the level of cooperation and the
         12 level of knowledgeability beforehand.  All of this can
         13 be put on to one page.
         14              That would be submitted usually in --
13:20:37 15 handwritten, be submitted the day before, and then be
         16 approved.
         17              As long as it didn't require any special
         18 considerations due to special requests on approaches,
         19 it would be approved up within a 24-hour period, and
13:20:52 20 usually quicker.
         21      Q.    Did you ever request any of the special
         22 considerations?
         23      A.    No.
         24      Q.    And when you say special considerations,
13:20:59 25 what are you actually talking about, Mr. Nelson?
```

1      A.      Well, we're talking about techniques used

2 in approaches that I consider harsh or aggressive --

3 the terms that I use.  And these consist of such

4 things as solitary confinement, extended solitary

13:21:18 5 confinement, use of dogs, sleep deprivation, meal

6 management, noise exposure, light exposure, and stress

7 positions.

8          These were all considered to be extra

9 approach strategies in addition to the normal 17

13:21:49 10 devised through the U.S. Army's interrogation manual,

11 the FM 34-52.

12          Because I was so used to using the

13 FM 34-52 and knew how to use all the 17 approaches in

14 a variety of situations, I personally felt no need, or

13:22:04 15 no compunction to ever require anything in addition to

16 what I could pull out from just the FM.  So I never

17 felt any need or desire to make a special request.

18      Q.      Did you learn about the availability of

19 these approaches that were outside of the FM, from

13:22:26 20 CACI?

21      A.      No.  No.  I -- I became aware of them at

22 Abu Ghraib during my in-processing, which was in the

23 first day or two after arrival.

24          And it was during an initial briefing

13:22:49 25 where we had about 40 slides to go through, just on a

1 computer screen.  And somewhere in the middle there

2 were listed the IROE, the Interrogator Rules of

3 Engagement, and on the left side were the 17 approved

4 FM 34-52 standard approaches that I was familiar with.

13:23:12 5           On the right side were the contentious

6 extra, more aggressive techniques that I was aware

7 that people were wanting to use or trying to use, just

8 from my experiences at Guantanamo Bay.

9           And that the column on the left side said,

13:23:30 10 you know, local command approval for the normal

11 procedures; on the right-hand column, the extra

12 procedures required commanding general's approval.

13           That was when I basically became aware of

14 that going on, or at least the -- the aspect that it

13:23:54 15 could take place at that location, was within the

16 first couple of days after arrival.  But that was from

17 the military.  That was a military briefing that I

18 received.

19           MS. BURKE:  We're going to just go off the

13:24:04 20 record briefly now, and I'm going to get that document

21 and see whether it's the same document.

22           THE WITNESS:  Okay.

23      (There was a discussion held off the record.)

24      Q.    BY MS. BURKE:  We're going to mark,

13:28:13 25 Mr. Nelson, a document as Exhibit 1, and I'm going to

1 ask you whether that's the document that you talked

2 about when you described the interrogation rules of

3 engagement.

4        (Exhibit 1 was marked for identification.)

13:28:23 5        THE WITNESS:  Yes, it is.

6    Q.    BY MS. BURKE:  And you had made reference

7 before to things on the right side and the left side.

8        The -- the "Approved approaches for all

9 detainees," that list, do you see the list there?

13:28:37 10    A.    Yes.

11    Q.    And that's what you're comfortable with

12 and familiar with from Field Manual 32?

13    A.    FM 34-52 is the manual that I used and

14 trained with and have grown familiar with.  These are

13:28:50 15 all the approaches that I know how to use.

16    Q.    And so these are approaches you are

17 comfortable using?

18    A.    Yes.

19    Q.    And on this other side of the document

13:28:57 20 here, where we say "Requires CG's Approval," those are

21 the approaches you are not comfortable with, correct?

22    A.    Correct.  I feel no need to use these.

23    Q.    What -- do you know whether or not any of

24 the CACI interrogators used any of these approaches

13:29:19 25 that required CG approval?

33

1    A.     During the majority of the time that I was

2 there, I really didn't feel like there was any of the

3 CG approval approaches being used.

4          However, as time went on, towards the end

13:29:39 5 of December, after we had received some high-value

6 detainees from the capture of Saddam Hussein, and into

7 the beginning of January, is when I started to have

8 some concerns and some -- some hesitation or some

9 doubts that -- that some CACI individuals were using,

13:30:02 10 or at least wanting to use, some of the more

11 questionable techniques.

12    Q.     And which CACI interrogators were those?

13    A.     Well, the first one that really got my

14 attention was Tim Duggan, just because of the fact

13:30:18 15 that there was some credible evidence that I actually

16 saw, along with the testimony, and then was

17 corroborated afterwards by U.S. personnel; the

18 testimony being from a detainee that was under my

19 control who had gone through a series of

13:30:37 20 interrogators.

21          And that he had described an incident

22 where the interrogator had basically thrown him out of

23 a truck while he was handcuffed and hooded, down to

24 the ground where there was a lot of rocks, and had

13:30:56 25 dragged him across the rocks.

1          Every time that he would try to stand, the

2 interrogator would throw him back down and yell at

3 him, and dragged him into the interrogation booth that

4 way.  That's how he started the interrogation.  He was

13:31:09 5 very rough with him.

6          That there was another time that he had --

7     Q.    Wait.  I'm sorry.  Just before we leave

8 that time, when the -- when the detainee is telling

9 you about that, was there any physical evidence of

13:31:17 10 that?

11     A.    Well, he pulled up his left sleeve and

12 showed me a bruise that was yellow and brown, so it

13 had been aging a little bit but it was still fairly

14 fresh, within the last couple of weeks, I -- I would

13:31:28 15 assume, that he stated had been given to him when he

16 had been forcibly dragged across the rocks, and that's

17 when he described the incident to me.

18          And the bruise went pretty much from his

19 wrist to his elbow, so it was somewhere around eight,

13:31:47 20 nine inches long, is what I -- what I would figure,

21 and went around about half to a three-quarters of --

22 of his forearm.

23          In addition to that, he showed me a bump

24 on his head, on his forehead, where he stated that

13:32:00 25 while he had be hooded, he had been thrown face first

1 into a wall, but he didn't know who did that at that

2 time.

3      Q.      How did you find out who did that?

4      A.      Well, after the interrogation session

13:32:13  5 where I wrote down all the information and was going

6 to put it into the report, I was confronted by my

7 analyst -- at first I thought it was my -- my

8 interpreter, but going back I'm pretty sure that it

9 was the analyst, actually, who had spoken to me,

13:32:35 10 Sergeant Hernandez -- and he said --

11          Sergeant Hernandez approached me and said

12 that he had actually witnessed that occurring, and so

13 that he was very familiar with it, and that what he

14 was telling me was true.

13:32:48 15          At that point, that's when I really became

16 more alert as to what -- not just CACI, but other

17 personnel, other interrogators -- military personnel

18 as well -- the techniques that they might be using;

19 and that I felt like I was at a situation where I

13:33:05 20 probably -- the best thing that I could do for the

21 needs of the military as -- as well, was to report

22 what I had seen officially, but also continue to

23 quietly look at the actions of some of my colleagues.

24      Q.      Did Sergeant Hernandez tell you what

13:33:24 25 interrogator had done that to the detainee?

36

1    A.    He had described an older fellow, but he

2  did not know the gentleman's name.  Most of us,

3  either -- if we were military, we wore sterile

4  uniforms --

13:33:37  5    Q.    Sterile?

6    A.    Sterile.  No name tags on them, or name

7  tags taped over, and military would -- or I'm sorry,

8  civilian personnel would usually go by first-name

9  basis only, and only to a few people.  It was not

13:33:52  10  widely known.

11            The military personnel a lot of times

12  wouldn't interact with CACI personnel in off-duty

13  hours, just because it was almost considered

14  fraternization; and it's something I know from

13:34:07  15  military experience, that you generally just don't

16  associate too much with civilian personnel on a

17  unprofessional basis, outside of work.

18    Q.    The -- when you were doing your job as a

19  CACI interrogator, did -- so you didn't wear anything

13:34:23  20  that revealed you were CACI?

21    A.    No.  We had no standard uniform.  We were

22  just all in civilian clothes.

23            Generally I would wear either cargo pants

24  or blue jeans, boots, some sort of button-down

13:34:39  25  shirt -- sometimes a T-shirt, but generally you

37

1 wouldn't even see that because I -- it was during the

2 winter months and I had a fleece jacket on, black

3 fleece jacket on over that; and of course, then, my

4 body armor and my helmet.  And under that I would

13:34:57 5 generally wear a night watch cap, black night watch

6 cap.

7          It was actually kind of similar to the

8 outfit that Steve Stephanowicz would wear.

9          Q.     What -- did you ever find out who it was

13:35:07 10 that had -- that had hurt the -- the detainee?

11          A.     Later on.

12          Q.     Tell us about that.

13          A.     Later on I had, through the description --

14 nobody actually told me that it was Tim Duggan, but

13:35:20 15 from the description of the individuals, I had

16 ascertained that it was -- it could only be Tim Duggan

17 or one other fellow; but the other gentleman did not

18 work in interrogations of detainees, whereas Tim

19 Duggan had quite a bit.

13:35:37 20          So from the description -- old,

21 overweight, grey hair, and fairly -- fairly stocky --

22 that I had figured it was either Tim Duggan or one

23 other fellow; and the other fellow, again, like I

24 said, never worked in that capacity.

13:35:57 25          Q.     And did you ever learn anything else about

1 Tim Duggan or from Tim Duggan about the way that he

2 treated detainees during interrogations?

3    A.    Well, actually Tim was a cellmate of mine

4 for a few days when we were in transition, and he

13:36:14 5 liked to talk a lot in his off hours -- generally when

6 he was drinking.  He would usually have it in a coffee

7 mug, and I didn't find out until later that it was

8 actually alcohol.

9        But he talked about some of his more

13:36:31 10 difficult detainees, about there was one general that

11 he had where he used the general's son against the

12 general.

13        Basically the general was playing dumb,

14 and you know, saying that he wasn't involved in

13:36:47 15 anything, and so during the middle of the night one

16 night, they took the general --

17    Q.    When you say "they," Duggan and others?

18    A.    Duggan, and he was referring to others,

19 but I don't know exactly who it was, but of course, he

13:37:00 20 was probably working with a couple of other people,

21 because usually when you conduct an interrogation, you

22 have to at least have an interpreter with you and your

23 analyst with you, if you're the interrogator.

24        So Tim was describing this encounter that

13:37:18 25 he had with his general who was being difficult.  And

1 that they took him into a cell -- into an

2 interrogation booth, had him sit there for a while,

3 then went into another interrogation booth, put his

4 son -- the general's son, in that interrogation booth.

13:37:35  5          They had roughed him up a little bit,

6 ripped up his clothes and messed up his hair, put mud

7 on him -- smeared mud on his face and that stuff, but

8 not to my understanding actually physically beat or

9 assaulted the person -- the son, but just made it look

13:37:51 10 like they had really messed him up.

11          And then they kept the son in the

12 interrogation booth, went to the other interrogation

13 booth where the general was, grabbed him, brought him

14 into the same interrogation booth with his son -- the

13:38:08 15 lights were out -- and then they shone a flashlight on

16 his son.

17          They took the hood off of the general,

18 quickly shone a flashlight in the son's face showing

19 him very disoriented and seemingly messed up, and then

13:38:23 20 took him out of the interrogation booth.

21          And according to Tim, the general was so

22 distraught after that, that he said, Okay, fine, I'll

23 tell you whatever you want to know.  And so Tim was

24 very proud of that, you know, working.

13:38:34 25          He said that he had tried this same

40

1  technique on another general, but it hadn't worked,

2  that he just continued to play dumb.

3          I don't know.  He wasn't getting very

4  specific about which names, which generals, but my

13:38:50  5  understanding is probably the one that didn't work on

6  was the same general who had been roughed up -- the

7  incident that I described, with dragging across the

8  rocks that was in my custody at the time.

9          And that this could also probably be

13:39:09  10  figured out just because of the fact that my detainee,

11  my general, also had a son that was at the location,

12  and we were actually trying to get his son released.

13          But that -- that incident, that's about as

14  much as I know about it from what Tim said.

13:39:27  15          There was one other time --

16      Q.    I'm sorry.  Just before we leave that --

17  so Tim Duggan was bragging about having done that?

18      A.    Oh, correct.

19      Q.    And so do you know whether he bragged

13:39:37  20  about doing, it to anyone other than you?

21      A.    I think there was probably one or two

22  other people in the cell with us when he was talking

23  about that, but I don't know who they were.

24          I think one of them might have been Dan

13:39:50  25  Johnson because he liked to come in -- DJ, as we

41

1 called him -- liked to swap stories from time to time

2 within that cell with Tim.  He and Tim seemed to be

3 very close.

4         Q.     And go ahead, you were going to tell me

13:40:05 5 about another incident.

6         A.     Tim was also talking about another time

7 when he was interrogating.  He didn't have much

8 respect for his interrogator -- and this was where it

9 got me confused about what actually Tim's role at

13:40:19 10 Abu Ghraib was.  Was he hired as an analyst, or was he

11 hired as an interrogator, because it seemed like he

12 was doing both.

13         Q.     Well, do you know what his background was?

14         A.     He stated that he had been an interrogator

13:40:30 15 a long time ago in the military, in the army; and that

16 he had spent the last dozen or 20 years or something,

17 in the civilian world working as an investigator, and

18 that he had worked in corporate investigations, that

19 sort of thing.  But that was the extent to what I knew

13:40:49 20 about his background.

21              Tim was describing one night -- it may

22 have in fact been the same night that he talked about

23 the previous incident that I mentioned -- where he was

24 talking about another detainee who he dragged into the

13:41:05 25 interrogation booth and handcuffed him to the eyebolt

1 on the floor in the center of the interrogation booth.

2          The eyebolt was actually screwed into the

3 floor of the interrogation booth.  And generally you

4 handcuff the leg irons of the detainee or the prisoner

13:41:25  5 to that so that they don't -- won't just run out of

6 the booth and try to escape.

7          But Tim used it to handcuff the detainee,

8 so he was in a squatting position very low to the

9 ground.  And then he put the table that they -- that

13:41:42 10 we usually have in the booth, right up against the

11 detainee so the detainee was looking over the table at

12 the interrogator and the analyst, with basically his

13 nose right -- right at the level of the table.  And

14 that's when they started the interrogation.

13:41:56 15          The -- the military interrogator for the

16 team -- because it's a two-man team plus the

17 interpreter -- started the interrogation, but was

18 just, according to what Tim said, using -- using

19 generally by-the-book type of techniques and just

13:42:14 20 doing the normal questioning, and not seeming to be

21 very effective; and according to Tim it was really

22 pissing him off.

23     Q.     Pissing Tim off?

24     A.     Correct.

13:42:24 25          Tim was quiet the whole time, just staring

1 at the detainee or the prisoner eyebolted to the

2 floor, and when the military interrogator seemed to be

3 done and was saying, "Okay, we'll just wrap it up," or

4 something like that, "Do you -- do you have anything

13:42:40 5 to add," asking Tim, Tim, according to his own words,

6 leaned back in his chair and took one leg and kicked

7 the table that the detainee was right up against up

8 into the air.

9        He said he kicked it hard enough that it

13:43:00 10 actually hit the ceiling.  I don't know if it actually

11 would have hit the ceiling or not; there's usually a

12 fluorescent light that goes across the ceiling.

13        But the detainee -- prisoner said that Tim

14 had kicked him in the face doing that, that the table

13:43:14 15 hit him in the face, and Tim said, "Well, I don't

16 believe that."  According to his own words, "I don't

17 believe that that ever happened."

18        But Tim seemed to have very little regard

19 for any of the prisoners in our custody, and just

13:43:28 20 seemed to refer to them on a regular basis as you

21 would a subhuman.

22    Q.    Do you know whether, in addition to the

23 incidents you've mentioned, Tim at any other times

24 used any of these techniques on the far right on the

13:43:47 25 page, the non-approved techniques?

44

1      A.      To my knowledge, no.

2              I was trying to investigate more of the

3 activities of Mr. Duggan and Mr. Johnson, because

4 those were the first two that I really seemed to have

13:44:02 5 some suspicions about.  But right about that same time

6 is when CID investigators came into Abu Ghraib and

7 started questioning people.

8              When I gave my testimony, my identity,

9 which was supposed to be kept confidential, was made

13:44:15 10 known, within 24 hours of me actually giving my

11 testimony; and so after that I was pretty much a

12 marked person, and I didn't continue on with my

13 investigation.

14      Q.      Well, I -- and I do want to circle back

13:44:26 15 around to that, to -- to what happened there.

16              But before we get to that, the CID

17 investigation, can you tell us about DJ Johnson.  You

18 said he was another one that you were suspicious

19 about?

13:44:42 20      A.      Well, DJ, who tended to hang around Tim

21 Duggan a lot, talked a lot about wanting to get tough

22 with the detainees, wanting to use the fear up harsh a

23 lot, getting in their face, yelling at them; and just

24 seemed really energetic to me when he was talking

13:45:05 25 about doing interrogations:  That he loved doing it,

45

1 that he had only been doing it a couple of years but

2 he wanted to make a career of it.

3         And he was asking a lot of the more senior

4 people, more experienced people, about ways that he

13:45:18  5 could work into a career of being an interrogator.

6 And so he was trying -- it seemed like he was asking

7 about getting into Blackwater, getting into -- which

8 is another contracting company -- and getting into the

9 CIA.

13:45:32 10         He mentioned one time that he would want

11 to get into the CIA, thinking that their

12 interrogations -- you know, that they could do more,

13 as he would put it, cool things.  He was young and --

14    Q.    When he says "cool things," what are you

13:45:46 15 understanding him to mean by that?

16    A.    Well, my understanding is that when he

17 said it at the time, I'm thinking more of what a

18 typical American young adult or teenager who grows up

19 watching things like "24," "Hill Street Blues," all

13:46:05 20 these cop shows, and all the new shows that show

21 interrogations being fast paced, and throwing them up

22 against the wall and shout in their face and get them

23 to cry, that that's effective stuff, and that it's --

24 it's glamorous and it's fast moving, and

13:46:25 25 you-can-always-get-your-guy type of thing, whereas the

46

1  reality is completely opposite.

2            And generally when I talk to younger

3  people like that, when they ask me about my

4  experience, I say, well, you know, some of the most

13:46:38  5  effective interrogations that I've done are ones where

6  I never even had to raise my voice, let alone really

7  try and -- really try and bring any fear or shame upon

8  a person, or anything like that, you know, based upon

9  what they had done; that almost some of the best

13:46:56 10 sources that I've ever had have wanted to be my

11 friend, you know.

12           Then they generally tend to dismiss that

13 and not talk to me any more about that, about

14 interrogation techniques or something.

13:47:07 15    Q.    And so -- so Johnson's own words made you

16 concerned that he might be using violence against

17 people?

18       A.    Well, that -- that, coupled with the fact

19 that one interrogation that I was doing -- in fact,

13:47:20 20 with my main general that I was talking with -- we

21 were in the secondary interrogation booths.  There's

22 primary interrogation booths very close to Camp

23 Vigilant, right next to the JIDC; there was a

24 secondary one which is past the hard site, where most

13:47:37 25 of the infamous photos were taken.

47

1         Outside of there, there's a wooden shack

2 which is divided up into about six, I think, different

3 interrogation booths, all divided up by wood.

4         And I was conducting an interrogation in

13:47:53 5 one booth during the day, and DJ was conducting an

6 interrogation in the very next booth -- and I know it

7 was DJ because he was yelling and kicking and

8 screaming and throwing furniture and breaking

9 something -- I don't know what -- but he was so loud I

13:48:07 10 could clearly hear his voice when he was yelling.

11         And so I knew, just from not only what he

12 said, but also just actually seeing -- hearing him in

13 action and then reading a couple of his reports, that

14 he loved techniques such as a harsh fear up.  He just

13:48:25 15 really loved that.

16    Q.    Now, when you say reading his reports,

17 what did you read in his reports that caused concern?

18    A.    Well, at the same time that I was working

19 with this two-star general that was a high-value

13:48:36 20 detainee, I was also given an assignment to work with

21 a couple of brothers, part of a four-brother family

22 that had been brought in, who were suspected of being

23 financiers for the insurgents.

24         And the two brothers that I talked to had

13:48:55 25 very credible stories, very believable.  And so really

48

1 the -- the responsibility was on me to try and find

2 any gaps in the story and see if it was a cover story

3 and if there really was anything to what their

4 activities there were, but it was very plausible.

13:49:13   5              And at the same time -- one of the

6 techniques that I use when I -- when I have access to

7 a couple of different people that are from the same

8 unit or from the same family, or something like

9 that -- shared background, is that I will work on

13:49:26  10 either trying to get all of them in my authority so

11 that I can interrogate them all and cross-reference

12 them, or I will work with the interrogation personnel

13 or the interrogation teams that are working with

14 detainees or prisoners that I don't have direct

13:49:40  15 authority over.

16              So I was working with a couple of

17 different interrogators.  One of them was another CACI

18 personnel --

19    Q.    Who was that?

13:49:47  20    A.    Kevin Bloodworth, I think was his name,

21 who I had a lot of respect for.  I think he was a

22 good -- good person for not having a strong military

23 intelligence background; he seemed like he did most of

24 his interrogation on a police background.

13:50:07  25              But he and I corroborated quite a bit, not

49

1 only on the family of the suspected financiers, but

2 also by my general who was associated with a couple of

3 other generals, and that seemed to work very well.

4          DJ had one person out of that family of

13:50:26  5 four who he had been working with, and I wasn't -- I

6 would try and get some information from him, ask him

7 in a informal status -- usually in between the

8 changeovers of shifts, I would ask DJ if he had gotten

9 anything, if he -- what his thoughts were on that, and

13:50:45 10 DJ was very quick.

11          He -- he wasn't interested really in

12 working with me and sharing a lot of information and

13 corroborating; he'd just pretty much wanted to leave

14 the JIDC and go do his own thing, I guess.

13:51:02 15          And so when I started suspecting some of

16 these activities, well, then, I thought, okay, instead

17 of just getting information from DJ's -- personally,

18 I'll also go through the reports of this one detainee

19 that he has, who is associated with my detainee, to

13:51:17 20 see if there's any information in the reports.

21          Once I started reading in the reports, I

22 started seeing that there was a pattern of him placing

23 people either into solitary confinement, or talking

24 about using harsh fear ups along with stress

13:51:33 25 positions, and very long, lengthy approaches to -- to

50

1 try and wear down the detainee from -- from resisting.

2          And also I noticed that the writing in his

3 reports was fairly unprofessional, because he would

4 refer to such things as "Detainee is crying like a

13:51:50 5 baby"; "Detainee is broken into a thousand pieces like

6 Humpty Dumpty," things like that.  And these are

7 reports actually that the whole intelligence community

8 can actually have access to and look over.

9          So I was actually going to talk to him a

13:52:08 10 little about that; about, if nothing else, improving

11 the level of his professionalism in your reporting, as

12 well as in the conduct of your interrogations.

13     Q.    Did Tom Howard and Dan Provoznik have

14 access to these reports?

13:52:43 15     A.    As far as I know, Tom Howard had complete

16 access to them.

17          I don't know about Dan Provoznik, just

18 because of the fact that I wasn't really familiar with

19 the --

13:52:52 20          There's -- there's two rules of

21 accessibility for intelligence information:  One is

22 your access clearance based upon your security

23 clearance; the other is your access based upon your

24 need-to-know basis.

13:53:09 25          And so Dan, if he has a need to know based

1 upon his function as site manager, then of course he

2 has complete access to all of our files, because he

3 has the necessary security clearance.

4           Tom Howard, on the other hand, pretty much

13:53:24 5 has a need to know just because of the normal function

6 of his job; and plus, of course, he obviously has

7 clearance.

8      Q.    Was there anything else that you learned

9 or heard about DJ Johnson that -- that caused concern?

13:53:41 10     A.    There might have been some talk amongst a

11 couple of interrogators about how young DJ was and how

12 he liked to use fear up.

13     Q.    Were you ever asked to take over

14 interrogating a prisoner that he had previously been

13:53:58 15 interrogating?

16     A.    Well, the two-star general that I had been

17 working with -- Sergeant Astin, Staff Sergeant Astin,

18 actually specifically requested me to take over that

19 interrogation from DJ, who had, I guess, been the

13:54:15 20 previous interrogator, although I never received any

21 reports of DJ concerning that general.

22           But because of the fact that the general,

23 who was probably in his mid-'60s, was borderline heart

24 attack, according to the attending physician, and that

13:54:33 25 not only -- either -- either heart attack, I'm sorry,

1 or stroke -- and that they needed someone who could go

2 into more of a -- the softer approach.

3            I had already gained a reputation, within

4 the last month and a half of being there, for being a

13:54:50 5 person who not only was good at it, but also liked to

6 use softer approaches in the interrogations.  And so

7 that's why I was specifically requested by Sergeant

8 Astin to take over this detainee, because he was a

9 health risk.

13:55:05 10      Q.     In making the request, did Sergeant Astin

11 say anything about DJ?

12      A.     Well, he just said he didn't think DJ was

13 up to doing something like that; he had pushed him a

14 little bit with his last couple of interrogations.

13:55:40 15      Q.     Other than Tim Duggan and DJ Johnson, were

16 there ever -- were there any other CACI interrogators

17 whose conduct caused you concern?

18      A.     Well, there was one time when I was

19 sitting at my desk working on my reports, and I

13:55:57 20 remember -- this probably would have been early

21 January when Steve was in -- on the other side of

22 the --

23      Q.     And when you say Steve --

24      A.     Steve Stephanowicz -- sorry -- who had

13:56:08 25 actually, it seemed to me, had been trying to work on

1 who he considered to be Al Qaeda operatives operating

2 in Iraq -- and that he was really trying to become the

3 Al Qaeda expert for the JIDC -- - which I actually

4 have no problem with someone trying to become an

5 Al Qaeda expert.

6               In fact, I was helping him out, in the

7 sense that I was getting articles and such from the

8 web dealing with Al Qaeda with some of the latest

9 information about them from newspaper reports, and

13:56:37 10 such.  I would print those out and I would forward

11 those to Steve, because I thought the more information

12 you have on it, the better you're going to be able to

13 do your job.

14               Well, Steve was talking with someone -- I

13:56:48 15 think it was a couple people, one male, one female at

16 one time in the JIDC -- while I was working at my

17 computer, and he was bragging about how he had gotten

18 his detainee to admit to being Osama bin Laden in

19 disguise.

13:57:03 20               He didn't specifically state how he had

21 done that.  And at first I really didn't think much

22 about it, other than, well, that's pretty much

23 pointless information because chances are he's not

24 Osama bin Laden in disguise.  But then later on it

13:57:16 25 started to get me wondering, "Well, just exactly what

1 do you have to do to a guy to get somebody to admit

2 that they are that?"

3          And so that's when I really started to

4 wonder about what Steve was doing, but I was too busy

13:57:32 5 really focusing on just what Tim and DJ were doing to

6 really even think about Steve.

7     Q.    Now, you had -- you had begun to tell us

8 about when the CID investigation started.

9          Can you -- can you walk us through what

13:57:42 10 happened there.

11    A.    It would have been probably right around

12 mid-January to maybe the third week of January when we

13 all in the JIDC were notified that we would need to go

14 over to CID, on another part of the camp, to go

13:58:01 15 testify as to, you know, if we've seen anything, you

16 know, untoward.  And they were mainly referring to the

17 MPs.

18          And so I went over one day, waited in

19 line, and we were -- you know, there was a number of

13:58:15 20 us analysts, screeners, interrogators who were all

21 waiting in line -- mostly CACI personnel, a couple of

22 military -- and we were just joking, and nobody really

23 seemed to be aware of what was going on.

24          Some people were talking about, "Well, I

13:58:31 25 didn't see anything and that's my story and I'm

1 sticking with it," kind of thing.

2             When I got in, I sat down in a room by

3 myself, had a one-page paper -- I think it had two

4 sides to it -- with questions about mostly things had

13:58:46 5 I seen regarding MPs.  But then there was also some

6 areas where have you seen anything else, you know,

7 that seemed to be a violation, or questionable, or

8 anything like that.

9             That's when I started writing about some

13:59:03 10 of the things that Tim Duggan -- that I suspected him

11 of doing.  And the next day I was specifically called,

12 notified, while I was in the JIDC doing my job, that I

13 was to go over and report to CID, and that they wanted

14 to talk to me.  So I had to cancel my interrogation

13:59:24 15 scheduled for that day.

16             I went over.  I talked to a CID

17 investigator -- I don't know his name -- it was

18 probably late 20s to early 30s, I would think, thin

19 fellow -- and I gave my testimony.

13:59:41 20             He wanted me to write it down, and I said,

21 "Well, seriously, if you want it written down, why

22 don't you just type it yourself?"  I'll just -- "You

23 know, I can tell you.  That's probably just better."

24 So he did the typing while I spoke.

13:59:51 25             And the gist of it mainly was I was trying

56

 1  to get CID to just pick up where -- where I had ended,

 2  and say, look, you guys, this is your job, you're

 3  supposed to look at other people's work; so here, take

 4  a look at Tim Duggan and DJ, because there's some

14:00:12  5  questionable things that I've seen about them.

 6            I don't really have anything really

 7  damning, but go ahead and take this, and maybe if it

 8  helps your investigation, it does.  If not, so be it.

 9            That was pretty much it.  I thought that

14:00:24 10  would be the end of it, and I could go back to just

11  doing my job.

12            The next day I'm walking -- let's see, I

13  was getting ready for work, and Tim had walked by the

14  cell, and I was getting ready to talk to him, and he

14:00:45 15  just completely ignored me and continued on.  So I ran

16  him down, and -- you know, trying to get him to talk

17  to me and see what was up; and then he turned

18  around -- and he did not look too happy -- and he just

19  stared at my face and said, "You better watch your

14:01:06 20  back.  You're dead to me.  I'm through with you," and

21  then he turned around and walked away.

22            And I suspected at that time somehow some

23  word had gotten to him that I said something against

24  him.  But I pretty much acted innocent of the whole

14:01:23 25  affair, and went walking around trying to find Dan

57

1 Provoznik to see what was going on.

2            When I found Dan, it was over by the chow

3 hall, by the cafeteria in the center of the camp; and

4 I spoke with him, asked him what was going on, and Dan

14:01:44 5 kind of looked at me quizzically and he said, "Well, I

6 think he thinks that you're ratting on him to CID," or

7 something like that.

8            And then based on that, I -- I tried to

9 play innocent and said, "I don't know what he's

14:01:56 10 talking about, you know.  I went and I talked to CID,

11 but if they've got anything on, you know, Tim, it's

12 got to be from somewhere else."

13           Dan seemed to be pretty skeptical of the

14 whole affair.

14:02:08 15           And then I went back into the office and

16 tried to pick up what was going on.  Found out from

17 another CACI employee -- I don't remember who it

18 was -- but the word was, was that I had ratted out

19 both DJ and Tim, and that they were pretty much both

14:02:24 20 on the -- you know, I was on the shit list for both of

21 them, and that a number of other CACI personnel were

22 pretty pissed off at me for even saying anything about

23 any CACI guys.  And then -- and it was because CID had

24 actually given the information to one of them,

14:02:44 25 apparently.

58

1    Q.    That's what you learned later?

2    A.    Yes.  That -- that within, gosh, it must

3 have been the next day or two.  Things kind of went

4 really muddy right around that time for me.

14:02:56 5    Q.    Did you let anyone in CACI management know

6 that Duggan had made the -- the comment, "Watch your

7 back, you're dead to me"?

8    A.    No.  No.  I -- well, actually probably --

9 I probably mentioned it to Dan, but -- because that

14:03:18 10 was pretty much my reason for quitting after a couple

11 of days of realizing that I wasn't going to get any

12 help.

13    I -- I remember Dan being, again, kind of

14 skeptical towards -- it seemed to me at the time that

14:03:36 15 Dan was very skeptical towards my role and everything,

16 and that -- just how I should be treated, and he kind

17 of wanted to be a little bit standoff-ish, is just

18 what it seemed like.

19    Q.    So you quit?

14:03:45 20    A.    So I wrote an email to Amy Jensen

21 basically stating that -- for the two reasons:  One,

22 that I feared for my life -- and I didn't specify why;

23 and two, that I did not trust the local chain of

24 command, and I didn't specify which chain of command.

14:04:02 25 And I said but for those two reasons I'm -- I'm

59

1 quitting.

2    Q.     And when you say you didn't specify which

3 chain of command, meaning you didn't specify whether

4 you didn't trust the military or you didn't trust

14:04:13 5 CACI?

6    A.     Correct.  I didn't specify, because I

7 didn't want to -- one, I didn't want to upset too many

8 people right off; but two, I didn't -- I didn't really

9 trust either chain of command at the time, because it

14:04:23 10 seemed the more and more I was finding out, it seemed

11 like the more and more there was really something

12 serious going on.

13           When I went and I gave the testimony to

14 the CID individual, he was telling me about some

14:04:34 15 really bad things that they were finding out.  He was

16 confiding to me a lot of things that I had no idea

17 could have possibly been going on under the watch of

18 responsible people.

19           And so that's really when I started to

14:04:47 20 wonder just what the heck am I doing here in the

21 middle of Iraq surrounded by a whole bunch of people

22 who I thought I knew but now I don't know.

23           And so I didn't trust either the local

24 military chain of command or CACI's chain of command,

14:05:01 25 and I also feared for my life.

60

1          I feared for my life from Day One from the

2 outside, from all the attacks we were getting; but now

3 at that time, I feared for my life also from the fact

4 that I didn't know what I could trust on the CACI or

14:05:16 5 the military side as to, you know, now being found out

6 that I'm sort of a stool pigeon, you know.

7          A lot of people who come from military

8 backgrounds, intelligence backgrounds, or police

9 backgrounds, for that matter, don't like those types

14:05:30 10 of people.

11     Q.     Did you then come back to United States?

12     A.     Well, what happened at that time was when

13 Scott Northrup just was coming out -- actually, on

14 just one of his regular visits, which he would

14:05:41 15 occasionally do, Scott and I had built up a fairly

16 good working relationship, very friendly professional

17 relationship, I thought.  I had a lot of respect for

18 him, and he seemed to come to me for some pointers as

19 to what's going on on the intel side to be able to

14:06:03 20 help him do his job.

21     Q.     And if you could just explain that a bit

22 more, Mr. Nelson.

23          When you said he came to you for pointers

24 on the intel side, he would ask you questions about

14:06:12 25 what was going on at Abu Ghraib?

61

1    A.    Mainly his concern was for administrative

2 purposes, quality-of-life issues, how things could be

3 better.

4          So I would always tell him about how we

14:06:24 5 needed better force protection measures there at

6 the -- the camp; that things were really, you know,

7 piss-poor run management-wise; things were very

8 chaotic, very lack -- very little responsibility, it

9 seemed like, on the part of the leadership overall,

14:06:40 10 and generally talk about things like that.  And so

11 Scott always liked talking to me.

12          When he saw me -- this was probably a

13 couple of days after I had sent off the email -- he

14 wasn't even aware of the fact that I had sent off an

14:06:56 15 email saying that I was quitting.  And so when he came

16 to me, he was just -- casually just -- you know, just

17 checking in to say hi, I basically said, "Well, I'm

18 quitting, I'm leaving," and then I unloaded on him,

19 telling him the whole story about what was going on,

14:07:13 20 and how I was pretty much, you know, afraid for my

21 life, and the fact that I didn't trust the local

22 command.

23          I really hadn't talked to Dan.  I hadn't

24 talked to anybody about this since my one encounter

14:07:24 25 with Dan.  And so Scott was pretty much, "Well, I've

62

1 got enough room in the SUV.  Pack your bags.  I'll

2 take you back to Baghdad with me today, right now."

3 And so that same day I left.

4          MS. BURKE:  We're going to take a break.

5          (There was a break taken.)

6          MS. BURKE:  We're back on the record.

7     Q.     So when you got back -- when you got back

8 to the United States having -- having quit CACI, did

9 anyone from CACI contact you?

14:09:27 10     A.     No.

11          Once I finally arrived back at my -- at my

12 home, no CACI personnel contacted me.  There was a bit

13 of time -- this was a few months later, actually,

14 after the release of the photos on the internet and

14:09:46 15 the Taguba report, where --

16     Q.     And just so the record is clear, you left

17 Iraq when?

18     A.     I left Iraq -- I think it was about

19 February 7th -- I think -- I'm not sure of the

14:10:16 20 specific date, but it was right at the beginning of

21 February.

22     Q.     And so all of the time you were there

23 predated the -- the public release of the Abu Ghraib

24 photos?

14:10:25 25     A.     Correct.

63

1    Q.    And so you're back in the States, and a
2  few months pass, and you haven't heard word from CACI
3  at all?

4    A.    Not at all.

14:10:31 5    Q.    And then did you hear from CACI, or did
6  you hear from somebody else?

7    A.    Well, once the release of the photos and
8  Taguba investigation, and then actually when I was
9  asked to fly back to D.C. --

14:10:44 10    Q.    Who asked you to fly back to D.C.?

11    A.    It was some fellow who was working for the
12  Pentagon, a colonel.  I can't remember his name.

13    Q.    So not CACI, a military person?

14    A.    Military person -- asked me to fly back to
14:10:57 15  the States from Afghanistan, where I was working at
16  the time, to testify for the Fey investigation -- the
17  General Fey investigation, F-e-y.

18            And at that time, because my name had been
19  released in the Taguba report, it was no longer
14:11:16 20  allowed for me to be able to work my same function in
21  Afghanistan.  So at the same time I also had to leave
22  my job in Afghanistan because of that release, and so
23  I was going home right after my testimony to
24  General Fey.

14:11:30 25    Q.    Tell us about the testimony to General

64

1 Fey.  Who interviewed you and -- and --

2       A.       This would have been right about in the

3 beginning of June, somewhere around the 2nd or 3rd of

4 June, I think, when I flew back to Washington, D.C.

14:11:45 5 and stayed there for a couple of days.

6               I went down to northern Virginia, to an

7 unmarked building, pretty much, in northern Virginia,

8 and basically General Fey was leading an investigation

9 using CID personnel, as -- as well as other

14:12:06 10 intelligence personnel, to conduct this investigation.

11              General Fey himself interviewed me over

12 the course of one day.  The first day I didn't

13 actually answer any questions because there was a

14 point about possibly getting some immunity from

14:12:24 15 prosecution later on.  And he said that they weren't

16 offering that to anybody, and that, you know, I could,

17 you know, give information or not give information,

18 either way.

19              So the next day I went back and I actually

14:12:39 20 mentioned everything that I had mentioned in the

21 Taguba report, plus we talked a little bit more at

22 length about things that I had witnessed at Guantanamo

23 Bay, and things like that, to see if any -- if any of

24 that could help with their investigation.

14:12:52 25              After that I went home to Salt Lake City,

1 and while I was at home I received a phone call --

2 series of phone calls, actually -- from a fellow who

3 was a lawyer representing CACI, and that they just

4 wanted to interview me to try and get a better picture

14:13:17  5 of, you know, things that were going on.

6    Q.    Was it Bill Koegel?

7    A.    That's the name.  Bill Koegel.

8         And I at first was a little bit hesitant.

9 I wanted my lawyer to be there.

14:13:33 10         There were some questions about were they

11 coming out to see me or would I be flown out, you

12 know, to talk to them.  And things were also very

13 hectic, and so I put him off for a couple of days.

14         He called back a couple more times, but

14:13:47 15 about after a week or two, and three or four phone

16 calls to me where I wasn't -- oh, and the other thing

17 was that he emailed me a list of questions and asked

18 me to basically type out a whole narrative for him and

19 then email it back to him.

14:14:01 20         And I said, "Well, I'm not going to do all

21 the work for you guys.  If you want to -- I'll answer

22 your questions but you've got to ask them," but I'm

23 not going to sit there, and, you know, take a whole

24 day of my time typing.

14:14:11 25         And then after about the -- probably the

1 fourth time that he called, or something like that,

2 I -- his words to me were, "Well, you've got our

3 number.  When you feel like talking you to us you can

4 give us a call," and pretty much left it at that.

14:14:27 5          I was really skeptical -- skeptical about

6 talking with them, just because of the fact that if

7 they were legal advisors representing CACI, my feeling

8 was was that they would try and manipulate anything

9 that I said to disadvantage me, and that it was

14:14:47 10 something that CACI personally had against me.

11          And so I was very hesitant to cooperate

12 with them, and that's why I needed a little bit more

13 assurance that they were actually doing this for --

14 you know, for positive reasons.

14:14:58 15    Q.    And you never got that assurance?

16    A.    No, I didn't.

17    Q.    Did any -- other than those calls from

18 Bill Koegel, did you get any other contacts from

19 anyone in CACI management?

14:15:10 20    A.    No.  In fact -- this was the interesting

21 thing:  Just a couple of months ago I ran into a

22 fellow at Fort Huachuca who had just left CACI who I

23 never met before.  And we were going through this

24 course together at the same time, and just, you know,

14:15:27 25 talking casual conversation and such, yeah, been over

1 to Iraq; yeah, just came from Iraq.  Who were you

2 working with?  Oh, I was working with CACI, and that

3 sort of stuff.

4              And so we started talking about

14:15:37 5 Abu Ghraib, and the gentleman started talking about

6 Steve Stephanowicz, saying, "Yeah, that guy is not

7 welcome at all in CACI anymore."

8              And he mentioned something about being on

9 the Today show, talking with Katie Couric and Matt

14:15:55 10 Lauer on the Today show -- which I don't think Steve

11 has ever done, but I knew that I had -- because right

12 after my name was released on the Taguba report, I

13 felt like I really needed to talk to a couple of

14 people in the -- in the news, because people were

14:16:11 15 making assumptions.  Some people were putting me

16 with -- you know, in league with some of the suspects,

17 as opposed to being a witness.

18              And so I really wanted to clear up not

19 only my name, but also the name of professional

14:16:24 20 interrogators, and let them know what professional

21 interrogation is about.

22              So this gentleman I think was confusing me

23 with Steve.  And when he mentioned that, "Yeah, once

24 he came out on the Today show, that -- that fellow is

14:16:38 25 pretty much hated by all CACI, and they won't even let

1 him walk through the front doors of CACI."

2          So I never mentioned to this fellow that

3 it was -- that it was probably me that he was

4 referring to, but yeah, that was just something I

14:16:49 5 recently discovered in the last couple of months.

6    Q.    When you were -- when you were over in

7 Iraq, did you get any sense as to whether or not CACI

8 management cared about whether the interrogators were

9 getting results from interrogations?

14:17:07 10    A.    Well, something that Tim had mentioned

11 when --

12    Q.    And by Tim you mean Tim Duggan?

13    A.    Duggan.

14          Something Tim Duggan had mentioned was the

14:17:18 15 fact that he was pretty proud of the fact that he had

16 gotten, apparently, some kudoes for some of the work

17 that he had been doing on trying to track down

18 Ibrahim al-Duri, who was Number Six on the Most Wanted

19 list out of the 52 Most Wanted in Iraq.

14:17:42 20          And that I believe he had mentioned even

21 that General Fast had, you know, personally asked for,

22 you know, Tim, or recommended -- said something good

23 about Tim and some of the work that he had done.

24          And so that that was, you know, something

14:17:59 25 that he wanted to basically put on his checklist of

1 bragging rights, plus he wanted some recognition,

2 maybe, you know, from the company side, or something

3 like that.

4              But to my knowledge that there was any

14:18:11 5 type of official policy that the better results you

6 get, or anything like that, that you would be rewarded

7 by CACI, no, not -- not to that extent.

8              MS. BURKE:  Why don't we take a brief

9 break and get the spelling of that name.

14:27:34 10           (There was a break taken.)

11              MS. BURKE:  So we're back on the record.

12              We've talked about some specifics that you

13 know about some of the CACI colleagues.

14       Q.     Did you see anything else, during your

14:27:47 15 short tenure over at Abu Ghraib, that caused you

16 concern?

17       A.     Well, a couple of other incidents of

18 questionable nature.

19              One was sometime in probably mid- to late

14:28:02 20 December, I think.  I was working with another

21 suspected financier, a businessman, and completing

22 that interrogation.  I was walking back to the --

23 through the hard site back to the JIDC, and as I was

24 passing one of the solitary confinement cells, the

14:28:32 25 outer door was open -- the outer door is the solid

1 door that blocks all light coming in and such, most

2 noise.

3          The -- inside the outer door is a row of

4 bars with a door -- a barred door, and through the

14:28:47 5 bars there was a detainee sitting with his arms -- he

6 was sitting down on the ground, I think cross-legged,

7 and his hands were cuffed through the bars so that he

8 could not get away.  He had to sit there on the floor

9 directly in front of the door, and in between the door

14:29:07 10 of the bars and the outer door there was a boom box, a

11 stereo, and an MP was in the process of changing out a

12 CD or something with the boom box.

13          But basically he was sitting on the floor

14 directly in front of the detainee who was handcuffed

14:29:28 15 and sitting on the floor, and it was obvious that it

16 was a -- well, one, it was a stress position for

17 extended period of time sitting -- sitting like that

18 barred; and two, it was sensory -- or sensory overload

19 with the noise.

14:29:46 20          And that it was obviously a -- it did not

21 look like it was any type of punishment; that it

22 looked like it was some sort of softening up, based

23 upon things that you see in the movies, reading bad

24 books, that sort of thing.

14:30:00 25          But I don't know who it was that was in

1 the process of doing that.  I don't know -- I never

2 got any word on whose detainee that was.

3          The other time that I saw anything

4 questionable was -- well, there was some dogs one

14:30:16 5 night, as I was finishing up an interrogation with

6 my -- with my main general.  This would have been

7 early January, I think.

8          We -- I was escorting the general back to

9 his cell, and there was some dogs, two dogs, that were

14:30:35 10 coming through --

11    Q.    With dog handlers?

12    A.    With the dog handlers; I believe it was

13 one per -- one per dog -- there was a black dog and

14 then a more of a brown dog -- they both looked to be

14:30:46 15 German-shepherd type -- but they were definitely

16 excited, barking very loudly, they did not have

17 muzzles on them.

18          That's why -- I wasn't so worried about

19 myself because I've grown up around dogs, but I was

14:30:58 20 putting myself in between me and my detainee -- the

21 general, because I was trying to protect him from this

22 as they were coming through.

23          And I wasn't sure what the dogs were being

24 used for, if they were being used for sniffing out

14:31:18 25 contraband, or anything like that, at the time.  Found

72

1 out later that they were probably there as part of

2 somebody's techniques, and that they were being used

3 to scare the detainees.

4          Other than that --

14:31:34  5     Q.     Did -- did you ever learn anything about

6 the CACI contract with the military?

7     A.     Well, the overall contract I'm still kind

8 of wondering about.  But after I had put in my notice

9 and said I was quitting and Scott Northrup drove me

14:31:56  10 back to CACIville in Camp Victory, which is the

11 headquarters for CACI in country, Scott said, you

12 know, that he would put me to work for a couple of

13 days while they tried to figure out some

14 transportation issues for me.

14:32:09  15          Tom Howard approached me at that time and

16 I explained my situation.  Tom said, "You know what?

17 If you want to stay, I'd love to have you stay.  In

18 fact, we've got another contract, another bit of work

19 that needs to be filled."

14:32:21  20          He asked me if I had any experience

21 working on Tac HUMINT Teams, THTs.  These are

22 primarily counterintelligence personnel who work on

23 these teams, but they're very similar to interrogators

24 and the mobile interrogation teams; and I actually had

14:32:39  25 personal experience in THTs in Bosnia, so I was very

73

1 familiar with the whole process, and actually trained

2 up other people to be on THT teams as well.

3          And so I said, "Yeah, I'd be more than

4 interested to look at it."

14:32:53 5          He gave me a copy of the SOW -- the S-O-W,

6 which is the Statement Of Work -- and there were a

7 number of different positions.  There was a junior CI

8 agent, a senior CI agent, who was the team leader, and

9 a G2X special advisor for HUMINT, H-U-M-I-N-T.

14:33:31 10          Off the record.  Can I get some more

11 water?  I'm getting really dry.  That's why I'm

12 messing up.

13          Back on the record.

14          The junior CI agent slot was definitely

14:33:47 15 something I was overqualified for; it was basically

16 for somebody who was pretty much brand new to the --

17 to the system.

18          The senior CI position was something I

19 could do, but I wasn't sure if I really wanted it at

14:34:00 20 that point because of all the stress I'd been going

21 through, something I really wanted to do.

22          The G2X special advisor for HUMINT was

23 something I really felt like if I was going to stay in

24 country, that it was something that I could probably

14:34:15 25 do.

74

1             There were three slots available --

2 apparently three different division slots available

3 for those in country, and I said, "Well, I'm qualified

4 for it.  I'll go ahead and take that, if you're

14:34:26 5 offering."

6             I actually thought that Tom would balk at

7 that and say "No," you know, "that's something way

8 beyond you.  We need somebody's who's got a little

9 more formal training, a little bit more time

10 specifically in that," and so then that would be my

11 excuse to say, okay, no, I'm going to leave.

12             So I was surprised when he said, "Okay.

13 Let's see what we can do.  We'll try and make it

14 happen."

14:34:46 15             Throughout -- he wanted an updated resume

16 from me, so I went ahead and did that, submitted it to

17 him, he submitted it to someone else.  He looked it

18 over and he said, you know, it looked okay.  And he

19 wasn't going to give me a definitive, but he was --

14:35:01 20 either way.

21             But one thing that he did say was that

22 even though there were a couple of other people who

23 were vying for the position, they were both stateside,

24 and the big advantage I had was that I was there in

14:35:12 25 country, and that that really beat a lot of other

75

1 people just by being there, because they didn't have

2 to worry about is he going to arrive, is he going to

3 show up, is he going to have problems going through

4 CRC, any of that stuff.  Just being there in country

14:35:27 5 was a big plus.

6        Q.        Did you ever learn how CACI got the

7 contract?

8        A.        Well, Tom also, in one conversation,

9 mentioned to me that he personally had basically

14:35:40 10 gotten a contract for CACI; that he had, prior to

11 that, been TIF CICA -- T-I-F, C-I-C-A -- which is a

12 very influential position.  During some exercises in

13 Poland I believe he had been operating as a TIF CICA.

14        Q.        In the military --

14:35:59 15        A.        I don't know.

16        Q.        -- or was he on the outside?

17        A.        He did not mention.  He did not specify

18 and I didn't ask if he was working as a contract

19 civilian or if he was military at the time.  My

14:36:10 20 thinking is that he might have been doing it as a

21 civilian at that time.

22              And that during that time period, that he

23 had basically worked through his network of people

24 that he knew, generals and such like that, to be able

14:36:23 25 to gain this contract for CACI, and that he was really

1   responsible for that.

2              I had also heard something prior to my

3   leaving -- and I can't remember who it was from -- but

4   somebody -- another CACI personnel had also mentioned

14:36:44  5   the fact that Tom really had been very influential in

6   getting that contract, and that CACI hadn't given him

7   any type of reward or compensation for that, and --

8   but Tom himself had never mentioned anything of that

9   nature.

14:37:00  10   Q.    How much -- sorry, go ahead.

11   A.    Well, the other thing was that Tom also

12   talked about all this, concerning this particular

13   contract with the THTs, with the Tac HUMINT Teams,

14   that those needed to be filled as quickly as possible;

14:37:19  15   otherwise, if they, you know, hit a certain deadline,

16   that they could be penalized, and it would not only go

17   against them on the record as not having fulfilled a

18   contract in a timely manner, but they could also

19   receive a --

14:37:33  20             MR. ROHMAN:   -- penalty.

21   A.    -- financial penalty, or the fact that

22   they would not be able to -- or it would be negative

23   points for them in the future, when they went to bid

24   on future contracts in -- in human intelligence.

14:37:47  25             And so that there was -- there was

1 definitely some incentive for them to try and fill

2 those contract positions as quickly as possible.

3          Then -- I'm trying to think -- as far as

4 when I left, they -- they really -- other than just

14:38:11 5 trying to keep me there for that extra contract, that

6 was about it.

7          MS. BURKE:  Okay.  We'll -- we'll go off

8 the record.

9     (There was a discussion held off the record.)

14:38:52 10          MS.BURKE:  We're back on the record.

11          Mr. Nelson, thank you very much for your

12 time today.

13          THE WITNESS:  Thanks for having me.  I

14 apologize for being late.

14:39:00 15          MS. BURKE:  Not a problem.

16          Okay.  We're off the record.

17     (The statement was concluded at 2:39 p.m.)

18                    *          *          *

19

20

21

22

23

24

25

78

1                    Reporter's Certificate

2

3 State of Utah          )
  County of Salt Lake )
4

5              I, Ariel Mumma, Certified Shorthand

6 Reporter, Registered Professional Reporter, and Notary

7 Public for the State of Utah, do hereby certify:

8              THAT the foregoing proceedings were taken

9 before me at the time and place set forth herein; that

10 the witness was duly sworn to tell the truth, the

11 whole truth, and nothing but the truth; and that the

12 proceedings were taken down by me in shorthand and

13 thereafter transcribed into typewriting under my

14 direction and supervision;

15             THAT the foregoing pages contain a true

16 and correct transcription of my said shorthand notes

17 so taken.

18             IN WITNESS WHEREOF, I have subscribed my

19 name and affixed my seal this _____ day of

20 _____, 2005.

21

                    _____
22                        Notary Public

23
   My commission expires
24 November 15, 2005.

25

# Exhibit B

# INTERVIEW TOPICS

1.  Background on dates in Iraq.

2.  Orientation, briefing and understanding regarding CACI Code of Conduct, Geneva Conventions, etc.

3.  Observations on conditions at Abu Ghraib and treatment of detainees upon arrival in Iraq (were detainees clothed, etc.) and during tenure in Iraq.

4.  Knowledge of IROEs and changes to IROEs during time in Iraq.

5.  Knowledge of any IROEs applicable to the MPs.

6.  Chain of command:  military – civilian contractors.

7.  General manner of interaction between interrogators and MPs (division of labor, degree of coordination, etc.); SOPs for MPs.

8.  General manner of interaction between MI and MPs and how this changed, if at all, over time.

9.  Manner of obtaining approval for special programs.

10. Manner of implementing special programs.

11. Performance of CACI interrogators.

12. Observation or knowledge of any misconduct by CACI personnel.

13. Observation or knowledge of any misconduct by military personnel.

14. Knowledge of any of the practices noted in Taguba report (*e.g.*, keeping detainees naked, use of dogs during interrogations, use of women's underwear for male detainees).

15. Knowledge of investigations of abuses at Abu Ghraib (statements/interviews).

16. Reason(s) for departure.

17. Information acquired post–departure.

18. Lessons learned.