UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ILHAM NASSIR IBRAHIM, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE TITAN CORPORATION, *et al.*, )<br><br>Defendants. ) | Civil Action No. 04-01248 (JR) |
| SALEH *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE TITAN CORPORATION *et al.*, )<br><br>Defendants. ) | Civil Action No. 05-1165 (JR)<br><br>**PUBLIC VERSION** |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO TITAN'S MOTIONS FOR
SUMMARY JUDGMENT ON THE GOVERNMENT CONTRACTOR DEFENSE**

## TABLE OF CONTENTS

### ARGUMENT

I. **TITAN BEARS THE BURDEN OF PROVING WITH UNDISPUTED FACTS THAT THE MILILTARY CONTROLLED, AND BENEFITTED FROM, CACI'S CONDUCT.** .................................................................. 3

II. **TITAN IS INELIGIBLE TO INVOKE THE AFFIRMATIVE GOVERNMENT CONTRACTOR DEFENSE BECAUSE TITAN** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ .................................................................. 5

A. The Government Contractor Defense Protects Only Those Contractors Who Act Precisely As Directed by the Government. ..................................... 7

B. The Titan Military Contract Required Titan, Not the Military, To Supervise Titan Employees. ............................................................... 8

C. The Express Terms of the Contract and Titan's Own Public Statements ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ .................................................................. 10

D. As Part of Titan's Litigation Effort To Invoke the Defense, Titan ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ .................................................................. 11

III. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ .................................................................. 14

A. The Military Witness Proffered by Titan Did Not Support Titan's Claims ............................................................................... 15

B. Military Witnesses With First-Hand Knowledge Contradict Titan's Claims ............................................................................... 16

C. The Military Command and Control Structure Prohibits the Military From Using Titan Translators As Soldier Equivalents. ..................................... 17

D. Controlling Law Prohibits the Military From Using Titan Translators As Soldier Equivalents. .......................................................... 20

E. The Military Did Not Benefit From ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Employees ............................................................................... 26

## TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) .................................................. 4

*Bloomgarden v. Coyer*, 479 F.2d 201 (D.C. Cir. 1973) .......................................................... 5

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) ............................................. passim

*Cafeteria Workers v. McElroy*, 367 U.S. 886, 893 (1961) .................................................. 10

*Celotex Corp. v Catrett*, 477 U.S 317, 322 (1986) ............................................................. 5

*Chappell v. Wallace*, 462 U.S. 296, 300 (1983) ..................................................................... 27

*Cole v. Burns Int'l Security Servs.*, 105 F.3d 1465, 1485 (D.C. Cir. 1997) ........................... 8

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) ....................................... 7

*Fort Bragg Ass'n of Educators v. Fed. Labor Relations Auth.*,
    870 F.2d 698, 703 (D.C. Cir. 1989) ................................................................................. 18

*Greer v. Spock*, 424 U.S. 828, 838 (1976) ........................................................................... 10

*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 18 n.6 (D.D.C. 2005) ................................ passim

*In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626,
    632 (2d Cir. 1990) ............................................................................................................ 8

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) .......................................................... 6

*Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 650 (D.C. Cir. 2003) .............. 5

*Orloff v. Willoughby*, 345 U.S. 83, 94 (1953) ....................................................................... 27

*Parker v. Levy*, 417 U.S. 733, 743 (1974) ............................................................................ 27

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*,
    485 A.2d 199, 205 (D.C. Ct. App. 1984) .......................................................................... 8

*Saleh v. Titan Corp.*, 436 F. Supp. 2d 55 (D.D.C. 2006) ................................................ passim

*Schlesinger v. Councilman*, 420 U.S. 738, 757 (1975) ........................................................... 27

*Shurr v. A.R. Siegler, Inc.*, 70 F. Supp. 2d 900, 927 (E.D. Wis. 1999) ................................. 7

*United States v. Brown*, 348 U.S. 110, 112 (1954) ............................................................... 27

*United States v. Grimley*, 137 U.S. 147, 152 (1890) ............................................................... 27

*West Point Elementary School Teachers Ass'n v. Fed. Labor Relations Auth.*,
855 F.2d  936, 940-41 (2nd Cir. 1988)................................................................................ 18

## Code of Federal Regulations

48 C.F.R. § 37.104 (1987) ...................................................................................................... 18

48 C.F.R. § 37.104(a) (1987)................................................................................................... 18

48 C.F.R. § 37.104(b) (1987)................................................................................................... 18

48 C.F.R. § 37.104(c) (1987)................................................................................................... 18

48 C.F.R. § 7.503 .................................................................................................................... 19

## United States Codes

U.S.C. § 2680(j) (2006) ............................................................................................................ 6

## Publications

Maj. Karen L. Douglas, *Contractors Accompanying the Force: Empowering
Commanders with Emergency Change Authority*, 55 A.F.L. 127, 134 (2004)................ 21

Maj. Ricou Heaton, *Civilians at War: Reexamining the Status
of Civilians Accompanying the Armed Forces*,  57 A.F.L. 155, 173 (2005) .................... 22

Major Lisa L. Turner, *Civilians at the Tip of the Spear*,
51 A.F.L. 1, 27 (2001) ..................................................................................................... 21

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ILHAM NASSIR IBRAHIM, *et al.*,                    )
                                                   )
    Plaintiffs,                 )    Civil Action No. 04-01248 (JR)
                                                   )
    v.                          )
                                                   )
THE TITAN CORPORATION, *et al.*,                   )
                                                   )
    Defendants.                 )
                                                   )

SALEH *et al.*,                                    )
                                                   )
    Plaintiffs,                 )    Civil Action No. 05-1165 (JR)
                                                   )
    v.                          )    ▬▬▬▬▬▬▬▬▬
                                                   )
THE TITAN CORPORATION *et al.*,                    )
                                                   )
    Defendants.                 )
                                                   )

### PLAINTIFFS' CONSOLIDATED OPPOSITION TO TITAN'S MOTIONS FOR SUMMARY JUDGMENT ON THE GOVERNMENT CONTRACTOR DEFENSE

Titan has moved for summary judgment in both the above-captioned cases, arguing that the undisputed material facts establish that Titan is entitled to invoke the judicially-created "government contractor defense." *See Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). Plaintiffs in both the actions oppose Titan's motion, and hereby file this Consolidated Opposition.[1]

---

[1] Because the Consolidated Opposition is being filed by unrelated parties in lieu of two separate Oppositions, plaintiffs exceeded the page limits applicable to a single Opposition but remained within the page limits applicable to filing two Oppositions.

This Court should deny Titan's motions for summary judgment because, as set forth in detail below and in the enclosed Appendices, Titan employees cannot be considered soldier-equivalents entitled to invoke the "combatant exception" available under the Federal Tort Claims Act. There are significant disputes about the "facts" Titan misleadingly portrays as "undisputed."

As set forth in the accompanying Statement of Disputed Facts and Appendices ("Plts. Facts"), Titan and the military entered into a contract under which Titan was contractually obliged to supervise Titan employees in Iraq. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Now, Titan tries to transform its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ into evidence that the military, not Titan, supervised Titan employees. But such a result is not possible in light of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

The facts, taken as a whole, establish that Titan cannot invoke the government contractor defense because Titan ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of having acted consistent with the terms of the contract in a manner designed to benefit the United States. It serves no judicially-cognizable purpose to permit a defense contractor who has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ defense designed to protect the United States' interests. Here, Titan's conduct serves no

federal interest, but rather violated the law, and has damaged the reputation of the United

States.   Not surprisingly in light of the facts, the U.S. Government has not filed a

Statement of Interest supporting the extension of the government contractor defense to

Titan.

## ARGUMENT

The judicially-created government contractor defense arose from the concern that

a company, doing exactly as the government wanted, should not be subject to liability

under state law for those very same actions. The situation here, however, is the reverse,

as is detailed in this Opposition and the accompanying Statement of Material Facts.

Section I of the Opposition sets forth the relevant standard of proof. *See Section I, pp. 3-*

*5.* Section II demonstrates that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮. *See Section II, pp. 6-14.*   Section III describes the

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See*

*Section III, pp. 14-29.*

## I.    TITAN BEARS THE BURDEN OF PROVING WITH UNDISPUTED FACTS THAT THE MILILTARY CONTROLLED, AND BENEFITTED FROM, CACI'S CONDUCT.

This Court has provided Titan an opportunity to establish on summary judgment

that holding them liable for the gross misconduct of Adel Nakla and other Titan

employees would create a "significant conflict" with the purposes of the combatant

activities exception to FTCA. *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 18 n.6 (D.D.C.

2005). Defendant Titan has the burden of establishing it is entitled to the government

contractor defense. *Ibrahim,* 391 F. Supp. 2d at 17-18 (D.D.C. 2005) ("[P]reemption

under the government contractor defense is an affirmative defense, with the burden of proof on the defendants.").

Although this Court granted Defendants an opportunity to establish their entitlement to the government contractor defense by means of summary judgment, the Court cautioned Titan that, in order to be entitled to invoke the affirmative defense, it would have to prove that its employees in Iraq were *de facto* members of the United States military ("soldiers in all but name"). *Id.*; *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55 (D.D.C. 2006).

This Court expressly advised Titan as to the types of material facts that had to be shown as beyond dispute in order to prevail on summary judgment:

> [M]ore information is needed on what exactly defendants' employees were doing in Iraq. What were their contractual responsibilities? To whom did they report? How were they supervised? What were the structures of command and control? If they were indeed soldiers in all but name, the government contractor defense will succeed, but the burden is on defendants to show that they are entitled to preemption.

*Id.*

Titan, seeking to comply with the Court's directive, submitted such evidence by filing a Statement of Material Facts in support of its Motion for Summary Judgment (hereinafter "Titan Facts"). But summary judgment is appropriate only if there are no genuine disputes about these material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Titan bears the heavy burden of proving that there are no disputes about these material facts (contractual responsibilities, reporting structure, supervision, and military command and control). Stated differently, Defendant Titan, the moving party, is entitled to a judgment as a matter of law only if the *Saleh* and *Ibrahim* plaintiffs, as the nonmoving parties, fail to establish the existence of a dispute about any of the material

- 4 -

facts undergirding the invocation of the affirmative government contractor defense premised on the "combatant activities" exception. *See Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 650 (D.C. Cir. 2003), *citing Celotex Corp. v Catrett*, 477 U.S 317, 322 (1986). Plaintiffs, not Titan, are entitled to have this Court draw all inferences from factual record in the light most favorable to them as the nonmoving parties. *See Bloomgarden v. Coyer*, 479 F.2d 201 (D.C. Cir. 1973).

Titan has not carried this heavy burden. As set forth in the following Sections, there are numerous genuine disputes about the validity of Titan's version of the material facts. These disputes go right to the heart of whether Titan has the evidence needed to invoke the government contractor defense – namely, evidence that Titan performed according to the contract specifications. ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ which "all justifiable inference" must be drawn in plaintiffs' favor." Fed. R. Civ. P. 56(c).

## II.    TITAN IS INELIGIBLE TO INVOKE THE AFFIRMATIVE GOVERNMENT CONTRACTOR DEFENSE BECAUSE TITAN ███████████████████████████████████████████████ ███████████████.

This Court has permitted Titan to try via a motion for summary judgment to establish – with undisputed evidence -- the factual predicates needed to invoke the

"government contractor defense." The Supreme Court created the "government

contractor defense" in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), in order

to ensure that federal contractors were not being held liable under state tort law for

conduct that was required by the terms of their contracts with the federal government.

The Court reasoned that imposing state tort liability on contractors for decision-making

that was actually done by the federal government would implicate "uniquely federal

interests" and create a "significant conflict" with federal policies. *Boyle*, 487 U.S. at 504-

513, *see also Ibrahim* at 18. More specifically, the Court barred a products liability suit

against the manufacturer of a helicopter designed according to military specifications,

because imposing such liability "would produce the same effect sought to be avoided by

the [Federal Tort Claims Act's discretionary function] exemption." *Boyle*, 487 U.S. at

511.

In *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), the Court of Appeals for

the Ninth Circuit extended the defense to bar suits against military contractors that

implicated another Federal Tort Claims Act ("FTCA") exception. FTCA's waiver of

sovereign immunity excepts "[a]ny claim arising out of combatant activities of the

military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j)

(2006). The *Koohi* Court held that a manufacturer of a weapons detection system – who

had indisputably manufactured the system to the military's specifications – could not be

held liable when the military mistakenly used that system to shoot down a passenger

plane. *Koohi*, 976 F.2d at 1337. This *Koohi*-extension was relied on by this Court to

entitle Titan an opportunity to avail itself of the defense if the facts established that the

- 6 -

Titan contract terms, and the implementation thereof, required Titan employees to act as solider-equivalents.

### A. The Government Contractor Defense Protects Only Those Contractors Who Act Precisely As Directed by the Government.

Clearly, the contract, and the defense contractor's performance under the contract, is the key to whether the affirmative defense may be invoked. The government contractor defense is not intended to protect a contractor from liability resulting from its *violation* of contract terms, or federal laws and federal policies. *See Shurr v. A.R. Siegler, Inc.*, 70 F. Supp. 2d 900, 927 (E.D. Wis. 1999) (Government contractor defense is "intended to protect contractors from 'civil liabilities arising out of the performance of federal procurement contracts,' and *not from liabilities arising out of the breach of such contracts*.") (internal citations omitted)(emphasis added.) The federal government has no interest protecting contractors who are acting for their own purposes, rather than on behalf of the federal government. If it were otherwise, the government contractor defense would be distorted into protecting the entirety of the contracting industry from any form of liability.

The Supreme Court has held that the government contractor defense does *not* apply even in "an intermediate situation, in which the duty sought to be imposed on the contractor is not identical to one assumed under the contract, but is also not contrary to any assumed." *Boyle*, 487 U.S. at 509. As long as "[t]he contractor could comply with both its contractual obligations and the state prescribed duty of care," state law will not generally be pre-empted. *Id. See also Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) ("Where the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where

the contractor may assert a defense."); *In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990) ("Stripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.'").

In assessing whether Titan abided by its contract with the military, the contract itself obviously must be read as compliant with the Geneva Conventions, the customary laws of war, federal regulations, and binding Army doctrine.[2] *See 1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205 (D.C. Ct. App. 1984) (A contract "must be interpreted as a whole, giving a reasonable, *lawful*, and effective meaning to all its terms") (emphasis added); Restatement (Second) of Contracts § 203(a) (1981) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"); *Cole v. Burns Int'll Security Servs.,* 105 F.3d 1465, 1485 (D.C. Cir. 1997) ("where a contract is unclear on a point, an interpretation that makes the contract lawful is preferred to one that renders it unlawful.") This is not a difficult task, because there is nothing in the text of Titan's contract with the military that contradicts the requirements of the laws of war, the Geneva Conventions, Army Regulations, and other binding military doctrine. Only Titan's proposed reading of the contract would create a contradiction.

## B. The Titan Military Contract Required Titan, Not the Military, To Supervise Titan Employees.

It is clear that lack of supervision of Titan employees caused serious problems at the Abu Ghraib prison. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[2] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉

Who was supposed to have been supervising Nakla and the other Titan employees to make sure they were acting appropriately in the manner set forth in the military contract? The answer is crystal clear: Titan's military contract requires Titan to supervise its employees. *Plts. Facts ¶¶ 8-9, 22-24. See also Plts. Facts ¶27,* explaining that the contract requires Titan to prevent its individual employees from coordinating directly with the military units. It requires Titan to train its employees. *Plts. Facts ¶19.* It requires Titan to institute a quality control program to ensure that its employees' performance satisfies the military's needs. *Plts. Facts ¶ 26.*

The Statement of Work requires Titan employees to provide only "interpretation and translation services". *Plts. Facts ¶ 17-18.* The contract refers to military personnel as Titan translators' "customers," not their employers or commanders, and states explicitly that Titan translators "remain employees of the Contractor and will not be considered employees of the Government." *Plts. Facts ¶ 21; see also Plts. Facts ¶ 28.* Titan is obligated to provide the military specified numbers of translators, but there is nothing in the contract that prevents a particular translator from quitting his job at any time. *Plts. Facts ¶¶ 1-32.*

The contract forbids Titan employees from wearing "any identification badge or tags that identifies them as an employee of the United States government," and forbids them from possessing weapons. *Plts. Facts ¶11.*

The military contract permits the military to remove from the theatre any Titan translator who fails to follow military instructions and adhere to military directives. This

right of removal is a standard provision in contracts to provide battlefield support services to the military. *Plts. Facts ¶¶29-30; see also* AR 715-6, § 3-2(f). The military's power to demand a defense contractor remove an employee from Iraq is merely a subset of a military commander's "historically unquestioned power...summarily to exclude civilians from the area of his command," which applies to contract employees and non-contractors alike. *Greer v. Spock*, 424 U.S. 828, 838 (1976), *quoting Cafeteria Workers v. McElroy*, 367 U.S. 886, 893 (1961). The military's ability to order a translators' removal from theater is simply the right of one contracting party to insist that another party's employee be removed from the contract if his or her work does not comply with the requirements of the contract. This right of removal from theater did not require Titan to terminate or discipline the employee. Those employment decisions belonged to Titan, who was free to (and did on occasion) assign the employee to some other government contract. *Plts. Facts ¶ 46.*

### C. The Express Terms of the Contract and Titan's Own Public Statements ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

Most of the allegedly "undisputed" factual assertions that Titan makes about the contract's requirements are supported not by the text of the contract itself, but by Declarations from two Titan employees, David Winkler[3] and Kevin Hopkins. The Court should give these declarations no weight with respect to Titan's contractual obligations because ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

---

[3] Mr. Winkler has since left Titan's employment, but he was a current employee when he signed his declaration.

[REDACTED]

Titan's claim that Titan had no contractual responsibility to provide operational supervision over Titan's own employees is squarely contradicted by the plain text of the contract, as well as by numerous contemporaneously-generated documents prepared outside the context of litigation. [REDACTED]

Further, outside the context of this litigation, Titan is on the public record as admitting that its Site Management in Iraq supervises Titan employees. For example, a recent advertisement looking to hire Site Managers for the Iraq military contract refers to Titan Site Managers being required to "[p]rovide operational direction to Titan linguists in the Area of Operations," "[e]nsure that linguists adhere to Titan, Armed Forces and host nation standards of conduct concerning in-theater operations," and "[e]ffectively manage any linguist management issues that may arise." *Plts. Facts* ¶ *62.*

### D. As Part of Titan's Litigation Effort To Invoke the Defense, Titan Witnesses [REDACTED]

Titan witnesses admitted that [REDACTED]

perform the supervision that Titan was being paid to provide. *See id; see also Winkler*

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉)

Titan witnesses admitted that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉



*Facts ¶ 53.*

In addition to failing to supervise their employees in accordance with the contract,

Titan employees in Iraq also routinely

In sum, the evidence obtained during discovery reveals that Titan utterly failed to

Instead, Titan sent over and hired from the

nothing to ensure adequate supervision. Further, Titan management ▓▓▓▓▓▓▓▓▓▓▓▓ military directive (enshrined in the contract and elsewhere) prohibiting Titan employees (and other defense contractors) from carrying weapons. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ workforce that they could ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓. Now, Titan has the audacity to argue to this Court that Titan's ▓▓▓ ▓▓▓▓ to perform according to the terms of the military contract should be rewarded by permitting Titan to transform its ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ into some military-initiated deliberate undertaking to have military, not Titan, command and control Titan employees. But such a transformation not only would violate the law, but lacks any ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

### III.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

The military and indeed all other U.S. executive departments have conspicuously declined to intervene on Titan's behalf in this litigation, in contrast to other litigations in which the government has weighed in to support the invocation of the government contractor defense.

Titan asserts as a fact that the military precluded Titan from supervising its translators and assumed the supervision duties over Titan employees. This "fact" is actually fiction. For Titan to carry the burden of proving that there is no material dispute as to this issue, it must provide evidence of the *military's* interpretation of the contract as well as its own. Titan has not even attempted to do this.

**A. The Military Witness Proffered by Titan Did Not Support Titan's Claims.**

The only member of the military whose Declaration Titan provided as support for

its motion, Chief Warrant Officer Douglas Rumminger, did ████████████████████████

████████████████████████████████████████████

First, Rumminger's Declaration did not cite to the Titan military contract, a

contract ████████████████████, but instead discusses his personal interactions

with Titan employees. *Plts. Facts* ¶ *6.*  Chief Warrant Officer Rumminger did not serve

as the Contracting Officer, Contracting Officer's Representative, or Alternate Contracting

Officer's Representative for Titan's contract with the Army. ████████████████████████

████████████████████████████████████████ *See,*

*e.g., Plts. Facts* ¶ *6; Rumminger Tr.* at 62 (████████████████████████████

████████████ *id.* at 196 (█████████████████████). His testimony falls

far short of providing an interpretation of the contract consistent with Titan's claims.

Second, Chief Warrant Officer Rumminger testified ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

**B. Military Witnesses With First-Hand Knowledge Contradict Titan's Claims**.

Military witnesses with first-hand knowledge of working with Titan employees directly contradict Titan's claims. The military could not control the Titan personnel like soldiers. According to military witnesses, Titan translators could refuse translation assignments that they considered too dangerous. *Plts. Facts ¶¶ 64-66, 84-86 (Declaration of General Karpinski ¶¶ 8, 9)*. Military officers had no means of forcing Titan employees to go on dangerous field missions, and such missions sometimes had to be postponed because no Titan translators would accept the assignment. *Id.*

In one instance, General Janis Karpinski, commander in chief for military police throughout Iraq, was visiting the Abu Ghraib prison as part of her oversight duties. She decided it would further the military mission of "winning hearts and minds" to send a physician into the community surrounding Abu Ghraib prison to provide free medical services. General Karpinski asked the Titan employees working at Abu Ghraib prison to accompany the physician. They all refused to do so. As a result, the Army had to delay the mission until they were able to locate a soldier with the requisite language skills and order him to accompany the physician into the community. *Plts. Facts ¶85*.

Without question, a mission "outside the wire" at Abu Ghraib was more dangerous, but General Karpinski determined that the risks were justified. Whereas soldiers with the correct skills set could have been (and were) ordered by General Karpinski to undertake the mission, the military had no such rights against the Titan employees. Titan employees refused to follow orders from General Karpinski, as was within their rights to do as civilian contractors. *Id.*

- 16 -

Similarly, the military lacked any means to assure the quality of Titan interpreters' translations. Because most soldiers in Iraq did not speak Arabic, they had no way of knowing whether translators were interpreting correctly. Specialist Tony Lagouranis, an Arabic-speaking interrogator with the 513th M.I. brigade, repeatedly observed interpreters making errors in translation. Sometimes these errors were accidental, but it was also common for Shi'ite and Kurdish translators to deliberately exaggerate or falsify confessions from Sunni suspects so that they would be arrested or remain in prison. Lagouranis verbally reprimanded Titan employees for doing this, but he had no effective means of stopping it. *Plts. Facts ¶¶ 88-91.*

### C. The Military Command and Control Structure Prohibits the Military From Using Titan Translators As Soldier Equivalents.

Even if there were any factual support for Titan's claim that the military controlled Titan employees (which there is not), the military command and control structure is legally prohibited from using Titan employees as soldier-equivalents.

Titan claims that "[u]nder this contract, Titan functioned as a human resources provider to the U.S. Army," and "literally filled the slots that would have otherwise been filled by soldiers had the demand for these combatant activities not so far and so quickly outstripped the available supply of soldiers." Titan's proposed interpretation of the contract requires this Court to assume – without any evidence --- that the military intentionally violated two separate provisions of the U.S. Federal Acquisition Regulations: (1) the prohibition on "personal services contracts", and (2) the prohibition on hiring a contractor to perform an "inherently governmental function."

Federal Acquisition Regulations bar the government from hiring personnel under "personal services contracts" unless specifically authorized by statute. 48 C.F.R. §

37.104(b) (1987).  Under section 37.104(a), a contract is for personal services if it creates an "employer-employee relationship" between the government and a contract employee. The test, as set forth in the regulations, states that "an employer-employee relationship under a service contract occurs when, as a result of (i) the contract's terms or (ii) the manner of its administration during performance, contractor personnel are subject to the relatively continuous supervision and control of a Government officer or employee." *Id.* at 37.104(c).

Titan argues at great length that – under the contract's terms and in its performance – that their employees were "loaned" to the military and worked under "relatively continuous supervision and control of a Government officer or employee." *See, e.g., Titan Motion for Summary Judgment.* at 18 (characterizing Titan translators as "loaned servants"); *id.* at 19 (Titan translators were under "exclusive military supervision"). If that characterization of the contract were accurate (which it is not), the military would have violated the law by entering into a contract that so clearly falls within the personal services prohibition.

The military simply cannot enter into such "loaned employee" contracts. *See Fort Bragg Ass'n of Educators v. Fed. Labor Relations Auth.*, 870 F.2d 698, 703 (D.C. Cir. 1989) (Army use of personal service contracts for teachers on Army bases unlawful and a violation of 48 C.F.R. § 37.104 (1987)); *West Point Elementary School Teachers Ass'n v. Fed. Labor Relations Auth.*, 855 F.2d 936, 940-41 (2nd Cir. 1988) (Army use of personal service contracts unlawful).  Only a specific statutory authorization may relieve an agency from the directives of section 37.104(b).  *West Point Elementary School Teachers Ass'n v. Federal Labor Relations Authority*, 855 F.2d 936, 940-41 (2nd Cir.

- 18 -

1988). But here, the military did not obtain specific authorization from Congress to allow the use of personal service contracts in the Titan contract.

A separate clause in the Federal Acquisition Regulations states that government "[c]ontracts shall not be used for the performance of inherently governmental functions." 48 C.F.R. § 7.503. The military considers combat operations and the use of force to be inherently governmental functions:

> In times of crisis, the DOD has a responsibility to ensure the integrity of military operations (the coherence of action) particularly with regard to the use of deadly force and conduct under fire. This responsibility is non-transferable and must be safeguarded through a strict command structure and extensive military training of the troops expected to enter into, or sustain, combat operations. Functions inherent to, or necessary for the sustainment of combat operations, that are performed under combat conditions or in otherwise uncontrolled situations, and that require direct control by the military command structure and military training for their proper execution, are considered inherently governmental. This includes functions performed exclusively by military (active and reserve) who are trained for combat and the use of deadly force, where performance by a contractor or civilian would violate their non-combatant status under the Geneva Conventions or represent an inappropriate risk to military operations.

AR 715-9. *See also* Joint Publication 4-0, Doctrine for Logistic Support of Joint Operations (April 6, 2000) V-1, http://www.dtic.mil/doctrine/jel/new_pubs/jp4_0.pdf ("In all instances, contractor employees cannot lawfully perform military functions and should not be working in scenarios that involve military combat operations where they might be conceived as combatants).

Titan proffers *no* evidence, let alone undisputed evidence, on which this Court can rest a finding that the military violated the personal services prohibition. Titan's self-serving interpretation of the contract is contradicted by the military witnesses, as set forth above. Further and importantly, Titan fails to proffer any military official willing to agree with Titan's proposed contractual interpretation. In the absence of any evidence, this

Court should not, merely based on Titan's self-serving effort to protect its corporate

coffers, assume the military violated several regulatory provisions and illicitly contracted

with Titan to have Titan provide combatants under the guise of a contract for translations

services.[4]

### D. Controlling Law Prohibits the Military From Using Titan Translators As Soldier Equivalents.

In its Motion for Summary Judgment, Titan claims that the translators it provided

to the military at Abu Ghraib and elsewhere in Iraq were *"soldiers in all but name,"* who

*"undeniably engaged…in combatant activities." Titan Motion for Summary Judgment at

5, 22* (emphasis added).[5]  Titan also alleges that "the reality on the ground was that one

could not visually distinguish between Titan's employees and the soldiers at whose

direction they worked." *Id.* at 20.

First, as set forth above, those facts are in dispute. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆,

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ intended to be used for." *Ingham

T. 203-266.* ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *T. 159.*

---

[4] Even if the military did violate the personal services prohibition, this would not eliminate Titan's liability.

[5] As set forth more fully above, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆

Moreover, Titan is asking this Court to find that the military used Titan translators in a manner that was both outside the terms of the contract and in violation of the Geneva Conventions and the customary laws of war. Under the Third Geneva Convention of 1949, Titan translators are considered "Persons who accompany the armed forces without actually being members thereof." Third 1949 GC, Art. 4(4). As civilians authorized to accompany the force, they are entitled to be treated as Prisoners of War if captured, *id.*, and cannot be specifically or deliberately targeted for attack, but they are forbidden from engaging in combat.

Contractors who engage in combat also lose their status as civilian prisoners of war and can be prosecuted for their actions.[6] *See* Major Lisa L. Turner, *Civilians at the Tip of the Spear*, 51 A.F.L. 1, 27 (2001) ("Civilians, as a sub-category of non-combatant, generally are not authorized to take *direct part* in hostilities. Civilians who take direct part in hostilities are 'unlawful combatants' and 'regarded as marauders or bandits.' In any form of armed conflict, unlawful combatants lose the protections afforded their civilian status") (internal citations omitted); Maj. Karen L. Douglas, *Contractors Accompanying the Force: Empowering Commanders with Emergency Change Authority*, 55 A.F.L. 127, 134 (2004) ("Those civilians who do become unlawful combatants by taking direct part in hostilities lose the protections afforded to non-combatants.

---

[6] Titan employees do not fall into any of the combatant prisoner-of-war categories in the Geneva Conventions. They are not members of the United States or Iraqi Army; they are not "[m]embers of regular armed forces who profess allegiance" to another government; they are not part of a militia "commanded by a person responsible for his subordinates". GC III, Art. 4(1)-(3). *See also* Statement of John Bellinger III, State Department Legal Advisor, at George Washington University Law School, September 30, 2005 ("Article 4 of the Third Convention provides us with definitive guidance as to who may legitimately expect to be provided with the status of prisoner of war...the requirement of falling into a specific category under Article 4 [is] one of the "essential conditions" of POW status. By its very definition, Article 4 excludes those not falling within its ambit.")

Contractors, as civilians, are not lawful combatants in international armed conflict, and the military is strictly forbidden from using contractors as combatants."); Maj. Ricou Heaton, *Civilians at War: Reexamining the Status of Civilians Accompanying the Armed Forces*, 57 A.F.L. 155, 173 (2005) ("contractors who take part in hostilities will be considered unlawful combatants.").

The bedrock customary international law principle is one of distinction. As the Director-General of the International Red Cross has stated, "the cornerstone of all international humanitarian law is the principle of distinction. That principle prohibits all attacks on civilians. It requires parties to a conflict to maintain distinction – at all times – between combatants and civilians. Only combatants may be attacked." Statement of Angelo Gnaedinger, Director-General of the International Red Cross, to the United Nations, December 10, 2002. *See also* Statement of John Bellinger III, State Department Legal Advisor, at George Washington University Law School, September 30, 2005 ("The principle of distinction, among the foundational principles of humanitarian law, exists for the purposes of civilian protection, to ensure that fighters can identify the combatant from the bystander."); Protocol Additional to the Geneva Conventions (1977), Art. 48 ("In order to ensure respect for and protection of the civilian population and civilian objects, the Parties to the conflict shall at all times distinguish between the civilian population and combatants.")[7]

---

[7] The United States has not ratified the 1977 Additional Protocol, but recognizes Article 48 as an accurate statement of binding customary international law. *See* Michael Matheson, U.S. Department of State Deputy Legal Advisor, "The Sixth Annual American Red Cross--Washington College of Law Conference on International Humanitarian Law: A Workshop on Customary International Law and the 1977 Protocols Additional to the 1949 Geneva Conventions," 2 *American University Journal of International Law & Policy*, (1987), 419-27.

Military regulations, and binding military doctrine set forth in field manuals, recognize these obligations. *See, e.g.,* Field Manual 100-21, § 4-49 ("Nations and their military forces are required to distinguish between military forces (combatants) and civilians (noncombatants), according to the Geneva convention."). Accordingly, the military forbids contractors from engaging in combat or taking "any role that could jeopardize their status as civilians accompanying the force" under the laws of war. AR 715-9, § 3-3(d).

Aside from conducting combat operations, the "three conditions that make an individual a combatant" are (1) wearing a distinctive insignia or uniform, (2) carrying weapons openly; and (3) being commanded or controlled by a published chain of command. *Field Manual 100-21, § 2-33.* Accordingly, Army Regulation 715-9 states that contractors "are not authorized to wear military uniforms, except for specific items required for safety or security." *AR 715-9, § 3-3(e).* Field Manual 100-21 similarly provides that "[c]ontractor employees supporting military operations should be visibly distinct from the forces they are supporting so that they do not jeopardize their status as civilians authorized to accompany the force in the field." *See also Field Manual 100-21, § 6-27.* The regulations and field manual also place strict limits on the use of weapons by contractor employees. *See AR 715-9 at p. 21* (the Department of Defense has a "non-transferable" responsibility over "the use of deadly force and conduct under fire"); *Field Manual 100-21 § 6-29* ("[t]he general policy of the Army is that contractor employees will not be armed," and deviations of this policy must be approved by the combatant commander; contractor company policies; and the individual employee. Contractors are never permitted to possess privately-owned weapons.")

- 23 -

AR 715-9 and Field Manual 100-21 also state repeatedly that contract employees

are *not* subject to the military chain of command, and cannot be directly supervised by

military personnel. *See AR 715-9 § 3-2(f)* ("Contractor employees are not under the

direct supervision of military personnel in the chain of command."); *id. at § 3-3(b)*

("Contracted support service personnel shall not be supervised or directed by military

or Department of the Army (DA) civilian personnel"). *See also Field Manual 100-21, §*

*1-22* ("Management of contractor activities is accomplished through the responsible

contracting organization, not the chain of command. Commanders do not have direct

control over contractors or their employees (contractor employees are not the same as

government employees)"); *id. at § 1-23* ("The management and control of contractors is

significantly different than the[command and control] of soldiers and [Department of the

Army civilian employees ("DACs")]. During military operations, soldiers and DACs are

under the direct [command and control] of the military chain of command..... Military

commanders do not have, however, the same authority or control over contractors and

their employees"); *id.* at § 4-2 ("As stated earlier, contractor management does not flow

through the standard Army chain of command.... It must be clearly understood that

commanders do not have direct control over contractor employees (**contractor**

**employees are not government employees**)"(emphasis in original)).

Because the military is unable to directly command, discipline, or supervise

contractor employees, contractors are required to supervise their own employees. *See AR*

*715-9, § 3-2(c)* ("Commercial firm(s) providing battlefield support services will

supervise and manage functions of their employees"); *id. at § 3-2(f)* (""The commercial

firm(s) providing the battlefield support services will perform the necessary supervisory

and management functions of their employees."). *See also* FM 100-21, § 1-22 ("only

contractors manage, supervise, and give directions to their employees."); *id.* at § 1-25

("Only the contractor can directly supervise its employees"); *id. at § 4-2* ("only

contractors directly manage and supervise their employees.").

Contractor employees are required to comply with "with all applicable US and/or

international laws." *FM 100-21*, § 1-39. Ensuring that contractor employees obey the law

is the contractor's responsibility, not the military's:

> Contractor employees are not subject to military law under the UCMJ when
> accompanying US forces, except during a declared war. Maintaining discipline of
> contractor employees is the responsibility of the contractor's management
> structure, not the military chain of command. The contractor, through company
> policies, has the most immediate influence in dealing with infractions involving
> its employees. It is the contractor who must take direct responsibility and action
> for his employee's conduct. *Id.* at § 4-45.

*See also* Joint Publication 4-0, Doctrine for Logistic Support of Joint Operations (April 6,

2000) V-7, *available at* http://www.dtic.mil/doctrine/jel/new_pubs/jp4_0.pdf ("Since

contractor personnel are not subject to command authority enforced by an internal system

of penal discipline, commanders have no method of guaranteeing armed contractor

personnel will act in accordance with the law of war or [host nation] law."); *id.* at V-8

("Contract employees are disciplined by the contractor through the terms of the employee

and employer relationship. Employees may be disciplined for criminal conduct by their

employer per the terms of their employment agreement.....Commanders have no penal

authority to compel contractor personnel to perform their duties or to punish any acts of

misconduct.")

**E.  The Military Did Not Benefit From Titan's ▓▓▓▓▓▓▓▓▓▓▓▓ Employees.**

Titan's claim that "the military chain of command supervised, directed, and controlled Titan linguists 24 hours per day, 7 days a week" is utterly at odds with the situation on the ground.  Titan's only remaining explanation of why allowing the plaintiffs' claims to proceed would violate federal interests is a vague assertion that "to get employers to take responsible control over the actions of their employees…would here conflict directly with the concept of the military chain of command and the 'federal interest in unfettered military action.'"  This argument is meritless.  As set forth above, the military neither sought nor obtained the legal authority to command or control Titan translators.  The military needed Titan to perform its contractual duties, and ensure that Titan translators acted lawfully.

Titan's main basis for asserting that the military exercised complete operational control over its employees is the fact that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓They were not "soldiers in all but name;" they were civilian contractors operating in breach of their contract, army doctrine, military regulations, and the Geneva Conventions.

Courts have long recognized the unique nature of the military's command structure, its necessity during combat, and the dangers in interfering with officers' authority to give legally binding orders to their subordinates.  But for an equally long period, they have recognized that obedience to this structure of command and control is a

function of a soldier's enlistment in the United States armed forces. There is no civilian equivalent. *See, e.g., United States v. Grimley*, 137 U.S. 147, 152 (1890) (The Army's "law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier"); *id.* at 152 ("By enlistment the citizen becomes a soldier. His relations to the state and the public are changed. He acquires a new *status*, with correlative rights and duties."); *id.* at 156-67 ("the taking of the oath of allegiance is the pivotal fact which changes the *status* from that of civilian to that of soldier"). *See also Orloff v. Willoughby*, 345 U.S. 83, 94 (1953) (holding "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters," but that this deference only applies to those "lawfully inducted" into the Army); *United States v. Brown*, 348 U.S. 110, 112 (1954) (noting "[t]he peculiar and special relationship of the soldier to his superiors"); *Parker v. Levy*, 417 U.S. 733, 743 (1974) ("This Court has long recognized that the military is, by necessity, a specialized society separate from civilian society"); *Schlesinger v. Councilman*, 420 U.S. 738, 757 (1975) ("To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life."); *Chappell v. Wallace*, 462 U.S. 296, 300 (1983) ("no military organization can function without strict discipline and regulation that would be unacceptable in a civilian setting.... Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers;

- 27 -

that relationship is at the heart of the necessarily unique structure of the military establishment.").

Titan translators in Iraq were not subject to any of these requirements. On occasion, ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████ These Tit█████████████████████████████████████████████ ██████████████████ Pls. Facts ¶¶ 8, 10, 15-18. █████████████ ████████████████████████████████████████████████████████████ █████████████████████ Pls. Facts ¶¶ 64-66. ████████████████ ████████████████████████████████████████████████████████████ ███████ Pls. Facts ¶ 88. ███████████████████████████████████████ the Uniform Code of Military Justice ████████████████████████████ ████████████████████████████████████████████████████████ Pls. ██████████

Here, the evidence establishes that Titan broke the law and violated the contract in myriad ways. █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████ Pls. Facts ¶ 73. ████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

translators was not conduct directed or controlled by the military. Such extra-contractual conduct did not benefit the military mission in Iraq. Rather, it undermined the mission, and brought grave shame to this nation.

Both the facts and the law establish that the military was not able to, and did not, supervise corporate employees. There is no reason why Titan should be insulated from the consequences of its corporate failure to perform the contractually-required screening, training and supervision. The government contractor defense simply cannot be invoked by those who fail to perform in accord with their contract terms. Indeed, permitting the government contractor defense to be invoked by a corporation whose top management blatantly ignored military directives would be disastrous.

**CONCLUSION**

For the foregoing reasons, plaintiffs respectfully suggest that the Court deny Titan's Motion for Summary Judgment and set a date for trial.

Palmer Foret (D.C. Bar No. 260356)
THE LAW FIRM OF PALMER FORET, P.C.
1735 20th Street, N.W.
Washington, D.C 20009
Telephone: (202) 232-2404
Facsimile: (202) 332-2808
lpforet@foretlaw.com
www.foretlaw.com

Craig T. Jones (GA Bar No. 399476)
EDMOND & JONES, LLP
127 Peachtree Street, NE
Suite 410

Susan L. Burke (D.C. Bar No. 414939)
William T. O'Neil (D.C. Bar No. 426107)
Katherine R. Hawkins (admitted *pro hac vice*)
BURKE O'NEIL LLC
Telephone: (215) 487-6590
Facsimile: (215) 482-0874
sburke@burkepyle.com

Shereef Hadi Akeel (admitted *pro hac vice*)
AKEEL & VALENTINE, P.C.
401 South Old Woodward Avenue
Suite 430

Atlanta, GA 30303
Telephone: (404) 525-1080
Facsimile: (404) 525-1073
cjones@edmondfirm.com

*Counsel for Ibrahim Plaintiffs*

Birmingham, MI 48009
Telephone: (248) 594-9595
Facsimile: (248) 594-4477
shereef@akeelvalentine.com

Jennifer Green
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
 7th Floor
New York, NY 10012
Telephone: (212) 614-6439
Facsimile: (212) 614-6499
jgreen@ccr-ny.org

*Counsel for Saleh Plaintiffs*