## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IBRAHIM, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 04-CV-1248 (JR) |
| v. | ) | |
| | ) | |
| TITAN CORP., *et al.*, | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| Defendants. | ) | **FILED UNDER SEAL** |
| | ) | (PUBLIC VERSION) |

| | | |
|---|---|---|
| SALEH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 05-CV-1165 (JR) |
| | ) | |
| v. | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| TITAN CORP., *et al.*, | ) | **FILED UNDER SEAL** |
| | ) | (PUBLIC VERSION) |
| Defendants. | ) | |

### REPLY OF DEFENDANTS CACI INTERNATIONAL INC
### AND CACI PREMIER TECHNOLOGY, INC. IN
### <u>SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
Frank H. Griffin, IV (Bar No. 481446)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:     (202) 429-3000
Facsimile:      (202) 429-3902

*Counsel for Defendants CACI International Inc and
CACI Premier Technology, Inc.*

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................... 1

II.  ANALYSIS ............................................................................................................ 2

  A.   Plaintiffs Have Failed to Disclose Their Knowledge of Available
       Administrative Remedies ............................................................................... 2

  B.   The CACI PT Personnel Were Under the Complete Operational Control of
       the United States Army .................................................................................. 5

    1.   The Army Controlled Exclusively the Interrogation Activities of
         Both Military Interrogators and CACI PT Interrogators .......................... 5

    2.   The CACI PT "Supervisors" Identified By Plaintiffs Provided
         Solely  Administrative Support ............................................................... 11

    3.   Janis Karpinski: ███████████████████████████
         ██████████ ............................................................................... 16

  C.   Plaintiffs' Other Arguments Ignore the Relevant Preemption Test
       Established By the Court and Are Unsupported By the Record ...................... 18

    1.   CACI Did Not Breach the SOW By Improperly "Supervising"
         Military Personnel .................................................................................. 20

    2.   CACI Did Not Supervise or Direct the Abuse of Iraqi Prisoners ............. 22

    3.   CACI Did Not Breach the Statement of Work by Failing to Report
         Prisoner Abuse ....................................................................................... 23

  D.   The Foreign Country and Intentional Tort Exceptions Bar Plaintiffs'
       Claims ......................................................................................................... 24

III. CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294 (Fed. Cir. 2001).........................20

*Aydin v. Widnall*, 61 F.3d 1571 (Fed. Cir. 1995)...........................................................................21

*Barron v. Martin-Marietta Corp.*, 868 F. Supp. 1203 (N.D. Cal. 1994) ......................................19

*Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486 (C.D. Cal. 1993)...........................................19

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) ............................................................19

*Galvin v. Eli Lilly & Co.*, 488 F.3d 1026 (D.C. Cir. 2007).......................................................17, 18

*Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838 (D.C. Cir. 1982).........................20

*Hamdi v. Rumsfeld*, 124 S. Ct. 2633 (2004) ..................................................................................20

*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005).................................................. *passim*

*Jama v. INS*, 334 F. Supp. 2d 662 (D.N.J. 2004)............................................................................19

*Johnson v. United States*, 170 F.2d 767 (9th Cir. 1948)............................................................4, 18

*In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626 (2d. Cir. 1990) ........................19

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) .............................................................18, 19

*Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C. Cir. 1983) ...............................................20

*Nat'l Leased Housing Ass'n v. United States*, 105 F.3d 1423 (Fed. Cir. 1997) .............................21

*Nat'l Maritime Union of Am. v. Commander, Military Sealift Command*, 824 F.2d 1228
(D.C. Cir. 1987) ...........................................................................................................................20

*Neilson v. George Diamond Vogel Paint Co.*, 892 F.2d 1450 (9th Cir. 1990)...............................19

*Shurr v. A.R. Sigler, Inc.*, 70 F. Supp. 2d 900 (E.D. Wis. 1999) ...................................................19

*Sosa v. Alvarez-Machain*, 124 S.Ct. 2739 (2004)..........................................................................24

*Veitch v. England*, 471 F.3d 124 (D.C. Cir. 2006) .........................................................................23

**STATUTES**

10 U.S.C. § 2734(a) ................................................................................................4

32 C.F.R. § 842.41 ................................................................................................4

48 C.F.R. 7.503(d)(9) ...........................................................................................8

28 U.S.C. § 2680(a) .............................................................................................19

Fed. R. Civ. P. 56(e) ...........................................................................................17

**MISCELLANEOUS**

*David P. Stephenson, An Introduction to the Payment of Claims Under the Foreign and the International Agreement Claims Act,* 37 A.F.L. Rev. 191, 197 (1994).........................4

## I.    INTRODUCTION

In ruling on Defendants' motions to dismiss, the Court identified the matters that would inform its analysis of Defendants' preemption arguments:

> More information is needed on what exactly defendants' employees were doing in Iraq.  What were their contractual responsibilities?  To whom did they report?  How were they supervised?  What were the structures of command and control?  If they were indeed soldiers in all but name, the government contractor defense will succeed, but the burden is on defendants to show that they are entitled to preemption.

*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 19 (D.D.C. 2005).  The CACI Defendants' summary judgment motion shows that the Army had complete operational control over CACI PT's interrogators and fully integrated them within the Army's operational chain of command.

Plaintiffs took seven depositions regarding CACI PT's provision of interrogators in Iraq.  The witnesses confirmed that the CACI PT interrogators were under the Army's operational control, and that their conduct of interrogations was indistinguishable from an Army interrogator.  Plaintiffs ignore this inconvenient (for them) testimony, mischaracterizing the record and focusing instead on administrative control issues.  Corporate administrative oversight neither negates nor contradicts the Army's absolute operational control.  Plaintiffs also make a straw man argument by invoking the "government contractor defense" test used for peacetime procurement contracts.  In doing so they ignore the Court's articulated test for evaluating preemption in the context of CACI PT's provision of interrogation services in a combat zone.[1]  Plaintiffs' argument about the government contractor defense is simply beside the point.

Moreover, the CACI Defendants recently learned that Plaintiffs have allowed the Court to labor under an assumption that Plaintiffs' counsel *knew* was untrue: that Plaintiffs have no

-----

[■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■]

federal administrative remedy to compensate them for any injuries they might have suffered.  In reality, however, *one of the named Plaintiffs* filed an administrative compensation claim with the United States government.  The United States not only made an offer of compensation for the named Plaintiff's substantiated injuries, but also confirmed that the administrative claims process is available to compensate for injuries allegedly arising out of detainee abuse in Iraq.  Contrary to the Court's "working assumption," there *is* a federal remedy available to displace Plaintiffs' state-law tort claims, one Plaintiffs have known about for some time.  That remedy underscores the conclusion that no tort claims should arise from combatant activities.

## II.     ANALYSIS

### A.     Plaintiffs Have Failed to Disclose Their Knowledge of Available Administrative Remedies

In establishing the relevant for preemption, the Court announced its "working assumption" that the Court was the only forum in which Plaintiffs could obtain relief:

> Defendants point to three alternative methods by which plaintiffs might seek redress (although not from defendants themselves): the Military Claims Act …; the Foreign Claims Act …; and a very general pledge by the Secretary of Defense to compensate detainees mistreated at Abu Ghraib.  The first two on their face are limited to "noncombat activities," which would make them inapplicable here if, as defendants argue elsewhere, the activities in question here were "combat activities."  At oral argument, plaintiffs insisted that this court is the only forum in which compensation is available to them.  Although the State Department has also stated that relief may be available as defendants describe, *the record does not establish that any of these routes is actually viable, and my working assumption is that it is either this court or nothing for plaintiffs.*

*Ibrahim*, 319 F. Supp. 2d at 17 n.4 (emphasis added) (citations omitted).  Plaintiffs have known for years that this "working assumption" is wrong.  At the same time that the lead *Saleh* plaintiff was pursuing his claims in this Court, he was pursuing compensation from the United States under the Foreign Claims Act for the very same injuries.  Indeed, the United States has offered

that plaintiff a monetary settlement of those claims. Plaintiffs, however, have never disclosed any of this information to this Court or to the Defendants.

As the CACI Defendants recently learned, ████ Saleh, the lead Plaintiff in the *Saleh* case, filed an administrative claim for compensation with the United States on May 12, 2004, claiming $79,000 for cash allegedly seized by U.S. forces, $3,000 for the value of a vehicle seized by U.S. forces, and $3,500,000 for personal injuries he allegedly suffered while detained at Abu Ghraib prison. Griffin Decl., Ex. 3. That claim was filed on Saleh's behalf by Shereef Akeel, Esq. (one of the *Saleh* Plaintiffs' counsel of record).

On November 17, 2004, the U.S. Army Claims Service recommended settlement of Saleh's claim for $5,000. Although Saleh alleged that "soldiers" and "American personnel" had abused him, the Army's investigation revealed that "the United States had custody of the claimant from 4 October 2003 - 16 January 2004, but he was never interrogated" and never abused while in U.S. custody. Griffin Decl Ex. 5. at 7-11. In fact, the Army found Saleh "completely lacking in credibility regarding his allegation of abuse," in part because he was not even located in the parts of Abu Ghraib where alleged abuse occurred. *Id.* at 8-9. The Army also determined that the U.S. had seized about $28 from Saleh and not the $79,000 in cash that he claimed to have been carrying. *Id.* at 8. Saleh's falsehoods notwithstanding, the Army found that the military had negligently detained Saleh for too long and that detaining him at Abu Ghraib prison might have exacerbated Saleh's mild post-traumatic stress disorder diagnosis. *Id.* at 12. The Army made a $5,000 settlement offer to Mr. Saleh's counsel on April 7, 2005. Griffin Decl., Ex. 6.

In response, Susan L. Burke, Esq., sent a letter to the Army asking it to confirm that "injuries resulting from criminal acts of torture and abuse are beyond the purview of the Claims

Service." Griffin Decl., Ex. 7. The Army disagreed. In a May 3, 2006 response, the Army

confirmed its authority to provide compensation for substantiated claims of detainee abuse:

> Accordingly, in answer to the question posed in your letter, injuries
> resulting from criminal acts of torture and abuse by US personnel would
> be cognizable under the FCA if the allegations are substantiated. As
> stated in our April 7, 2005, letter, however, our investigation found no
> evidence substantiating your client's allegations of abuse.
>
> Your client has the ability to submit additional evidence and arguments in
> support of his appeal. I am granting you a 90-day extension of time within
> which to submit any such evidence and argument.

Griffin Decl., Ex. 8 at 1. In August 2006, Ms. Burke wrote a letter declining to provide any

documentation of abuse. Griffin Decl., Ex. 9. The CACI Defendants are not aware of any

further effort by Saleh to substantiate his claims of abuse.

This is not a case where, as the Court assumed, "It is either this court or nothing for

plaintiffs." *Ibrahim*, 319 F. Supp. 2d at 17 n.4.[2]  As Plaintiff Saleh and his counsel know, the

United States Army *is* paying claims by detainees at Abu Ghraib prison, and *will* compensate

claimants for incidents of detainee abuse. The availability of a federal administrative remedy

further supports the conclusion that Plaintiffs' state tort claims are preempted.

---

[2] Because the purpose of the FCA is "[t]o promote and to maintain friendly relations
through the prompt settlement of meritorious claims," 10 U.S.C. § 2734(a), the Service
Secretaries have applied the exclusion from the FCA of damages from "combat activities" very
narrowly, to cover only "combat, war or armed conflict." 32 C.F.R. § 842.41. Thus, while the
combatant activities exception to the FTCA encompasses all actions "necessary to and in direct
connection with actual hostilities," *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948),
the military will pay claims under the FCA unless the damages arise from actual combat itself.
David P. Stephenson, *An Introduction to the Payment of Claims Under the Foreign and the
International Agreement Claims Act*, 37 A.F.L. Rev. 191, 197 (1994). Moreover, as a policy
matter, the United States on occasion pays claims under the FCA even when the damages are
squarely the result of combat action. *Id.* at 197 & n.52 (noting United States' payment of combat
damages in Grenada as a matter of policy). This is consistent with the Secretary of Defense's
direction that the Army identify funds to pay abuse claims even if the claims would not be
payable under the FCA. Griffin Decl., Ex. 10 at 22.

**B.    The CACI PT Personnel Were Under the Complete Operational Control of the United States Army**

**1.    The Army Controlled Exclusively the Interrogation Activities of Both Military Interrogators and CACI PT Interrogators**

Even in the parts of their opposition where they actually purport to respond to the issues raised by the Court – the actual supervision, command and control of CACI PT interrogators – Plaintiffs mischaracterize the record. Notably, Plaintiffs avoid quoting what the witnesses they deposed actually said, relying on misleading paraphrases designed to obscure the substance of the witnesses' testimony. As all of the relevant witnesses testified, the U.S. Army controlled every aspect of the CACI PT interrogators' performance of duties in Iraq. Thus, as it relates to actual dealings with detainees in Iraq, the operational supervision for a CACI PT interrogator was indistinguishable from the military interrogator working in the adjacent interrogation booth.

An Army memorandum provided to military and civilian personnel reporting to Abu Ghraib prison explicitly describes



Griffin Decl., Ex. 1, at ¶ 6 (emphasis added); *see also* Mudd Dep. at 141-42. The memo further directs civilians



Griffin Decl., Ex. 1, at ¶ 7. By contrast,

*Id.* ¶ 5.

5

This distinction between administrative and operational control was explained by Colonel

Pappas[3] 

A:

Q:

A:

Pl. Ex. C-24 at 50-51 (emphasis added).[4]

In fact, 

Griffin Decl., Ex. 2; *see also* Porvaznik Dep. at 201-04.  Indeed, witness after witness deposed by Plaintiffs'

counsel referenced the total operational control actually exercised by the military over CACI PT

personnel, and CACI PT's concomitant lack of involvement in operational supervision.

When Plaintiffs' counsel asked Colonel Brady, the Contracting Officer's Representative

---

[3]  Pl. Ex. C-24 at 1-2.

[4] In keeping with their misleading characterization of the record, Plaintiffs quote the first question and answer in their statement of disputed facts, which discusses administrative reporting, but omit the second question and answer, which makes clear that Army personnel had operational control over CACI PT personnel.  Pl. Stmt. Disputed Facts ¶ 114.

("COR") for the CACI PT contract. ████████████████████████████████████████

█████████████████████████████████ Colonel Brady responded:



Brady Dep. at 68 (emphasis added).[5]  When asked to describe the similarities and differences between assigned civilian personnel as compared to soldiers, Colonel Brady testified that "[t]hey are a member of our team." *Id.* at 12.  When asked whether there are any differences between soldiers and civilian contractors assigned to support the Army, Colonel Brady testified that "there are some differences, primarily administrative and logistical.  But from a missions standpoint, no." *Id.* at 13.

████████████████████████████████████████████████'s identical to that of Daniel Porvaznik, who served as CACI PT's administrative "site lead" at Abu Ghraib prison in late 2003 and early 2004, and as CACI PT's "country manager" beginning in late 2004.  As Mr. Porvaznik explained in his deposition:

> The only real distinction between the military and the CACI-PT interrogators over there is we didn't wear uniforms.  It was pretty clear that we were civilians to anybody looking, namely because we – we dressed in [mufdy – a slang for civilian attire].  We – A good amount actually had long hair or facial hair, things that one – a soldier would not be wearing or – or have, and we didn't carry weapons.  We're not authorized to carry weapons.  Other than that, though, in the sense of the interrogation business, we worked along with, for, and again under command, control, and direction of the U.S. military.  We used their computer databases, every – all the report – everything else was pretty much in sync.

Porvaznik Dep. at 317-18; *see also* Billings Dep. at 139.  CACI PT's country manager, Scott

---

[5] *See also* Brady Dep. at 108 ████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

Northrop, testified similarly:

> In their operational capacity, whatever their job may be, whether it be a property book officer on the logistic side or an intelligence analyst on the intelligence side, [CACI PT employees] worked for a military person whether it be an NCO or an officer, depending on where they were. And they took their – their operational – for example, you need to write intelligence reports or you need to ensure that all of this equipment is accounted for. Their operational day to day work and support of the military was supervised by [a] military NCO or officer.

Northrop Dep. at 43-44.

These broad statements about the CACI PT employees' complete integration into the Army's operational structure are fully supported in the granular level detail. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Brady Dep. at 142.[6] CACI PT made resumes of candidates meeting the terms of the SOW available to Colonel Brady for his review, and he reviewed a significant percentage of those resumes. ▮▮▮▮▮▮▮▮▮ Northrop Dep. at 67-70. If CACI PT sought to fill a position with someone who did not meet the qualifications set forth in the SOW, it made that request to the COR, who would decide whether to grant a waiver. Monahan Dep. at 79-80.

Once an employee deployed to Iraq, the Army decided where the employee would be placed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Brady Dep. at 51; Porvaznik Dep. at 233-34 ("[W]ell, we responded to the client's need. If they wanted people at the division facilities, that's where we would send them. . . . But the military at the end of the day is the ones who really made the decision."). And the military leaders at the sites where CACI PT personnel deployed knew that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Brady Dep. at 59.

---

[6] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Brady Dep. at 142. Moreover, because the CACI PT contract was not competitively bid, but was a sole-source contract, there is no prohibition on a contractor having input into the SOW. *See* FAR 15.201; FAR Subpart 9.505-2(b)(1)(i) (Griffin Decl., Ex. 18; 48 C.F.R. 7.503(d)(9) (recognizing propriety of contractor assistance in "the development of statements of work").

Once CACI PT interrogators and analysts were assigned to a military facility, the Army, as it did with military personnel, assigned the CACI PT employees to Tiger Teams, which included military and civilian personnel interchangeably. Porvaznik Dep. at 137 (Captain Wood, OIC of the Interrogation Control Element, told of CACI PT personnel's experience, which "enabled her to make a decision as to where she wanted to employ the CACI-PT personnel"). Plaintiffs quote a sentence fragment from Captain Wood's CID statement to the effect that the CACI PT interrogators arrived "out of the blue," to suggest Captain Wood had no idea she would be receiving civilian interrogators. Pl. Opp. at 21. But the language on all sides of the sentence fragment quoted by Plaintiffs makes clear that Captain Wood knew that her force would be augmented by CACI PT interrogators, and that she exercised operational control over them:

> *Although I had been told to eventually expect contract augmentees*, the three CACI contractors [who arrived in September 2003] arrived out of the blue. I never received official guidance or perimeters [sic] from higher as to how to employ them. I briefly interviewed each contractor, provided in-brief information, and standards of conduct and interrogation rules of engagement and paired them up with a military interrogator since I knew my soldiers' capabilities but did not know that of the contractors. At this time I created a three to four page initial counseling statement which each contractor signed. *The statement essentially covered the standards of conduct, performance expectations, informed them of the military chain of command and to whom to report any incidents, operational security awareness.* . . . I presented each CACI contractor with a new arrival briefing and had each sign an initial counseling statement and acknowledge his understanding of the operation and IROE [Interrogation Rules of Engagement].

Pls. Ex. C-26 at 3 (emphasis added). Porvaznik Dep. at 132-33 ("Now [Captain Wood] and other JIDC staff made a determination where people were to be assigned. Yes, that's what – that's part of what she did.").

Once the Army staffed Tiger Teams with military and civilian personnel, the Army then assigned the Tiger Teams to particular detainees and provided direction as to the tasks to be accomplished. When Plaintiffs' counsel asked Mr. Porvaznik whether he collected information

9

on CACI PT personnel so he could "decide how most appropriately to sign out the work," Mr. Porvaznik corrected the false assumption within that question: "Well, I didn't assign the work. That – that would have been done [by] the – the JIDC staff or the Joint Interrogation & Debriefing Center staff, more specifically the OIC." Porvaznik Dep. at 132-33; Mudd Dep. at 143 (CACI PT personnel were "directed in their day-to-day duties by the military"); Northrop Dep. at 148 ("[The CACI PT employees] were there as intelligence support so they were under the supervision of the intelligence OIC and NC[O]ICs."); Billings Dep. at 112 (CACI PT employees briefed that they took their operational direction from the military). Captain Wood held regular shift-change meetings, attended by both military and civilian interrogators, in which she would identify the intelligence-gathering priorities for the day. Porvaznik Dep. at 159-60.[7]

The Army not only assigned CACI PT personnel to Tiger Teams and set the operational priorities, but also established the rules for conducting interrogations. The Army created interrogation rules of engagement ("IROEs") that established permissible interrogation techniques, techniques requiring higher headquarters approval, and techniques that were prohibited. Mudd Dep. at 108-09; Porvaznik Dep. at 162; Northrop Dep. at 106. In addition, the Army required each interrogator – military or civilian – to submit for approval an interrogation plan before each interrogation. These interrogation plans were provided by an interrogator to the relevant military section leader, and from there the plan would be routed through the NCOIC and OIC of the Interrogation Control Element. Porvaznik Dep. at 161-62; *see also id.* at 325-26.

It also was common for the military leadership to observe interrogations by both military and civilian personnel. *Id.* at 140-42 (Captain Wood "listened to the interrogations performed by

---

[7] Apart from personnel involved in the interrogation effort, CACI also supplied "triage screeners" and "LEP screeners" to screen, respectively, persons being processed as prisoners at a detention facility and persons screening local nationals for possible employment aboard a military facility. These screeners were directed by the military in their daily activities. Mudd Dep. at 57-58, 63-65.

CACI-PT personnel; and also watch[ed] them in their planning and preparation; also their report writing, their interrogator notes, discussions with them between interrogations."). ████████

████ Mudd Dep. at 106. Moreover, once an interrogator – military or civilian – completed an interrogation, the military required the interrogator to prepare an interrogation report that was placed in a classified military database. Mudd Dep. at 75; Porvaznik Dep. at 140-42. Thus, every step of the way, from deployment to a particular facility in Iraq, to assignment to a Tiger Team, to the assignment of detainees to be interrogated, to the establishment of IROEs, to the review of interrogation plans, and to the review of interrogation reports, the United States Army exercised complete control over the CACI PT employees' performance of their duties.[8]

## 2. The CACI PT "Supervisors" Identified By Plaintiffs Provided Solely Administrative Support

Plaintiffs' opposition tries to manufacture a fact dispute by asserting that CACI PT management personnel "supervised" CACI PT interrogators in Iraq. Plaintiffs point to program managers, country managers, and site leads employed by CACI PT as persons who supposedly provided operational supervision in Iraq. Pl. Opp. at 14-19. The record, however, tells a far different story. Every one of the witnesses deposed testified that any oversight provided by CACI PT personnel over CACI PT interrogators in Iraq was administrative in nature, providing the type of administrative support that a soldier would receive from a unit's personnel office. At all times, operational supervision was vested exclusively in the United States Army.

---

[8] The Army also had to approve the promotion of CACI PT screeners to interrogator positions (Monahan Dep. at 31-32; Billings Dep. at 44-46, 166; Mudd Dep. at 68-70); as well as transfers of CACI PT personnel within Iraq (Monahan Dep. at 115; Mudd Dep. at 85, 184-85, 223; ████ and could direct removal of a CACI PT employee from the contract. Monahan Dep. at 45; Billings Dep. at 88; Mudd Dep. at 72-73, 206, 215 ████ Northrop Dep. at 46-47, 147. Given that the military had an absolute right to direct that a CACI PT employee be removed from the contract, Plaintiffs' assertion that "[t]he military could not fire" CACI PT employees is indefensible. Pl. Opp. at 7. While the military could not terminate an individual's status as a CACI PT employee, the military could direct the removal of such employees from the CACI PT contract, and did when it saw fit. Northrop Dep. at 167, 179, 190.

The Program Manager for CACI PT's Iraq contract, who never traveled to Iraq, testified repeatedly that most of her dealings with CACI PT personnel concerned pay issues, and all of her interactions concerned administrative matters. Monahan Dep. at 43 ("Most of the discussion regarding personnel at that point in time focused on pay and benefits and leave."); *id.* at 68 (in explaining why she had more communications with some CACI PT employees in Iraq as compared to others: "I mean, sometimes people had pay issues when other people didn't, so that would have instigated a lot more communication."). So removed from operational supervision was the CACI PT Program Manager that she did not know what rules the military established for conducting interrogations, as she simply had no "need to know." *Id.* at 60-61.

Similarly, while CACI PT provided a country manager in Iraq, that position involved providing administrative support for the CACI PT employees and a sole point of contact for the COR on contract issues. Northrop Dep. at 41-42. Because the role of country manager involved no operational supervision of the intelligence-collection effort, there was no requirement that the country manager have intelligence expertise. Indeed, the CACI PT country manager for most of the relevant time frame – Scott Northrop – had virtually no intelligence experience. Mudd Dep. at 137, 147; Northrop Dep. at 10. The country manager was located at Camp Victory – away from the intelligence-collection effort – and did not have regular access to interrogation reports. Northrop Dep. at 37, 109-10. When asked whether CACI PT personnel at Abu Ghraib were assigned to strict shifts, Mr. Northrop testified, "[o]nce again I can't answer that definitively because it was an operational thing and I didn't – I didn't get into the operational side of things with the military." *Id.* at 83-84.

Plaintiffs also try to create the illusion of operational supervision by CACI PT personnel by characterizing the duties of the CACI PT "site leads" and "C2X advisor" in ways that are

directly refuted by the record. For example, Plaintiffs take a half-sentence from the Porvaznik deposition, and strip it of all context in order to argue that the site lead was "in charge" (Pl. Opp. at 15), but Mr. Porvaznik was clear that the site lead's duties were solely administrative:

> There were a lot of administrative issues that had to be handled, quite a few actually. Anything from insurance, pay issues, mail, living quarters – establishing living quarters, that was a – that was a big thing; getting the equipment from – you know, once it arrived in Iraq, getting it out to Abu Ghraib . . . .

Porvaznik Dep. at 104. The "position" of site lead is not even a position called for in CACI PT's contract (*see* Pl. Exs. C-1, C-2), but was a collateral duty assigned to a CACI PT employee at each site to be an administrative point of contact for CACI PT managers stateside and the military leadership to which the CACI PT employees were operationally committed. Monahan Dep. at 13-14 ("In most cases, the site lead is also – holds a functional position on the contract, but they just help assist with administrative responsibilities, knowing who is coming to work on time, who's absent, assisting with time cards, doing customer liaison support."); *id.* at 42 ("[A site lead's] responsibility was to assist administratively with the project manager back in the States, since we were not physically there."); Northrop Dep. at 76.

When asked whether CACI PT site leads briefed CACI PT employees when they were deployed to a site, CACI PT executive Charles Mudd testified that "[t]hey did the briefings on the admin stuff, here is how we do time sheets, this says you have to keep a daily time sheet. So they did the CACI admin type stuff, make sure they understand their chain of command." Mudd. Dep. at 93; *id.* at 178. Consistent with CACI PT's lack of involvement in operational supervision, Mr. Mudd, who developed the business opportunity in Iraq and made seventeen trips to Iraq to check on the welfare of CACI PT personnel, has no intelligence background. Mudd Dep. at 99, 109-11, 145. When he visited Iraq, Mr. Mudd's purposes were checking on employee welfare and customer relations. Mudd Dep. at 182 ("I didn't go around watching

operations because I wasn't there for operational issues. The government ran that.").

Plaintiffs next argue that CACI PT exercised operational control because one of the CACI PT site leads – Mr. Porvaznik – gave advice on interrogation techniques and had access to interrogation reports. Pl. Opp. at 19. But Mr. Porvaznik deployed *as an interrogator*, so he necessarily had access to the military's interrogation database. *See* Mudd Dep. at 100 (site leads who were interrogators had access to interrogation data based on their status as interrogators). As someone with considerable interrogation experience (Porvaznik Dep. at 37-38), it is hardly noteworthy that a less experienced interrogator would seek counsel from Mr. Porvaznik and other more experienced interrogators. Porvaznik Dep. at 161. In any event, Mr. Porvaznik testified that it was the Army, and not the CACI PT site lead, that exercised operational control over the interrogation effort. *Id.* at 132-33. Moreover, in trying to characterize the site lead as a pseudo-interrogation manager, Plaintiffs ignore that ███████ a CACI PT employee who was *not* an interrogator, was appointed site lead at Abu Ghraib prison in spring 2004. Mudd Dep. at 145. That fact alone demonstrates that the qualification for the position of site lead was the ability to handle administrative support issues and not technical interrogation skills.

Plaintiffs' opposition similarly makes the incorrect statement that "under the Statement of Work, CACI was required to employ managers with specific backgrounds – namely persons with knowledge of intelligence gathering and with sufficient security clearances needed to supervise the CACI employees." Pl. Opp. at 15. That statement is supposedly supported by paragraph 18 of Plaintiffs' statement of facts. However, the supposed "manager" position cited in paragraph 18 of Plaintiffs' statement of facts is the C2X advisor position, a position that existed before V Corps deployed from Germany to Iraq and before CACI PT ever had a contract to provide the military with interrogators. *See* Pl. Ex. C-1, at ¶ 5; Pl. Ex. C-2, at ¶ 4.a. The C2X advisor works

directly for the HUMINT (human intelligence) officer in the CJTF-7 intelligence office at Camp Victory. A cursory review of the job description contained in the SOWs shows that ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆ Rather, the C2X advisor undertakes projects assigned by the C2X officer, such as responding to requests for information from an Army division, or dealing with intelligence-gathering software issues. Porvaznik Dep. at 261-63. Notably, there were *no CACI PT employees* in the C2X shop other than the C2X advisor. *Id.* at 264. The C2X advisor would occasionally see interrogation reports prepared by CACI PT personnel, but no more or less than reports prepared by military interrogators. *Id.* at 265. While the C2X advisor would "on occasion" interact with CACI PT personnel, his "main focus of effort, though, was to support the colonel and his staff," and most of his communications were with soldiers. *Id.* at 262-63.

As a final note, Plaintiffs' opposition uses the term "CACI shops" as a supposed term of art to describe CACI PT's presence in Iraq. According to Plaintiffs, "the military hired CACI to set up permanent intelligence gathering units ('CACI Shops')" and that "[t]hese CACI shops were not under control of the military." Pl. Opp. at 14-15. First, "CACI shops" is not a term of art used by CACI PT personnel. As best as the CACI Defendants can tell, the *only* person who used that phrase in any of the depositions was *Plaintiffs' counsel*, and no witness adopted that phrase. *See* Porvaznik Dep. at 255. Plaintiffs' use of the term "CACI shops" is an attempt to create the illusion of a permanent CACI PT structure separate and apart from the military.

Moreover, Plaintiffs' assertion that these supposed "CACI shops were not under the control of the military" is unsupported by any citation to the record, with the only citation in the entire paragraph being to paragraph 18 of Plaintiffs' statement of facts. As discussed above, that paragraph refers to the C2X advisor position, a staff position with no responsibility for supervising *anybody*. Indeed ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

████████████████████████████████████████████████████
████████████████████████████████████  Griffin Decl., Ex. 2.

3.    **Janis Karpinski:** ████████████████████████████
████████████████

Faced with deponents who uniformly rejected Plaintiffs' position regarding supervision, command and control, Plaintiffs submitted a declaration from Colonel Janis Karpinski (ret.). ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████  Knowing that Col. Karpinski had no personal knowledge regarding CACI PT's work in Iraq, the CACI Defendants sought to take Col. Karpinski's deposition to establish the lack of personal knowledge for her declaration assertions. Plaintiffs vigorously opposed that deposition. The reasons for that opposition are now evident.

In her deposition, Col. Karpinski ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

16



████████████████████████████ it is difficult to see how Plaintiffs' counsel could, in good faith, interview Col. Karpinski and then draft and file the declaration that they prepared for her signature. *Id.* at 119-20. Regardless, Col. Karpinski has no admissible evidence regarding the operational control exercised by the Army over CACI PT interrogation personnel.

## C.  Plaintiffs' Other Arguments Ignore the Relevant Preemption Test Established By the Court and Are Unsupported By the Record

As the Court has recognized, the CACI Defendants' preemption argument is firmly grounded in the combatant activities exception to the FTCA and the federal interests embodied in that exception. The combatant activities exception bars tort claims against the United States for injuries arising out of activities "necessary to and in direct connection with actual hostilities." *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948). As this Court observed:

> The exception seems to represent Congressional acknowledgement that war is an inherently ugly business for which tort claims are simply inappropriate. As the Supreme Court has explained in a different context, "It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." State law regulation of combat activity would present a "significant conflict" with this federal interest in unfettered military action.

*Ibrahim*, 391 F. Supp. 2d at 18-19 (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 780 (1950)). Based on these government interests, this Court held that Plaintiffs' tort claims conflict with the purposes of the combatant activities exception, and are preempted, if the CACI PT interrogators were "soldiers in all but name," which the Court characterized as requiring inquiry into the types of duties assigned to CACI PT interrogators and how those interrogators were supervised in the performance of those duties. *Ibrahim*, 391 F. Supp. 2d at 16-17; *see also Koohi v. United States*, 976 F.2d 1328, 1336-37 (9th Cir. 1992) (applying combatant activities preemption).

Even though the CACI Defendants' preemption argument is firmly grounded in the combatant activities exception, and the Court explicitly announced a preemption test based on the policies informing the combatant activities exception, Plaintiffs' opposition makes no mention whatsoever of the combatant activities exception. Nor does it address the cases, such as *Koohi* and *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486 (C.D. Cal. 1993), in which courts have preempted state law claims based on the combatant activities exception. Plaintiffs' opposition pays mere lip service to the preemption test announced by the Court (Pl. Opp. at 4), and then ignores that test to argue that, as with peacetime procurement contracts, the CACI Defendants must prove precise specifications and absolute compliance in order to invoke a preemption defense. Pl. Opp. at 25-26.[9] From that faulty premise, Plaintiffs claim that CACI PT breached various terms of its contracts – or at least that there is a factual dispute as to whether such a breach occurred – and that summary judgment is therefore inappropriate.

But the Court has already identified the preemption analysis it will use. *Ibrahim*, 319 F. Supp. 2d at 19. That test is based on the combatant activities exception and not, as in the case of peacetime procurement contracts, the discretionary function exception. In determining whether a federal interest preempts Plaintiffs' state law claims, the issue for this Court is not, as Plaintiffs would present it, whether CACI PT was exercising a exercising a discretionary governmental function (thus requiring a demonstration of compliance with contract specifications), but whether

---

[9] All of the cases cited at pages 25-26 of Plaintiffs' opposition involve peacetime procurement contracts and apply the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). *See Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) (discretionary function preemption involving contractor running a halfway house); *In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626 (2d. Cir. 1990) (discretionary function preemption involving contractors supplying asbestos to Navy yards); *Neilson v. George Diamond Vogel Paint Co.*, 892 F.2d 1450 (9th Cir. 1990) (discretionary function preemption involving paint manufacturer); *Jama v. INS*, 334 F. Supp. 2d 662 (D.N.J. 2004) (discretionary function preemption involving contractor running INS detention agency in New Jersey); *Shurr v. A.R. Sigler, Inc.*, 70 F. Supp. 2d 900, 927 (E.D. Wis. 1999) (discretionary function preemption based on tanker aircraft that exploded in Milwaukee); *Barron v. Martin-Marietta Corp.*, 868 F. Supp. 1203 (N.D. Cal. 1994) (discretionary function preemption involving manufacturer of missile component in California).

the detention and interrogation of prisoners in a U.S. combat zone in Iraq is a combatant activity. This Court has recognized that interrogation activities implicate the unique federal interests protected by the combatant activities exception. *Id.* at 18; *see also Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2640 (2004). The preemption analysis for procurement contracts, focusing on mandated specifications and compliance, has nothing to do with combatant activities preemption, and this Court has recognized as much, establishing a different test for combatant activities preemption than the test for procurement contracts. *See Ibrahim*, 319 F. Supp. 2d at 19. Thus, Plaintiffs' breach of contract claims are irrelevant to the Court's preemption analysis, which concerns whether the CACI PT interrogators were supervised such that they were "soldiers in all but name." *Id.* In any event, Plaintiffs' breach of contract claims are entirely unfounded.[10]

## 1. CACI Did Not Breach the SOW By Improperly "Supervising" Military Personnel

In arguing that CACI improperly "supervised" military personnel, Plaintiffs do not claim that CACI breached the terms of the SOW itself. Rather, Plaintiffs argue that CACI supervised

---

[10] In a related vein, Plaintiffs try to avoid the Court's announced preemption test by arguing that CACI PT's interrogation contracts were invalid and that preemption is somehow unavailable in such circumstances. Pl. Opp. at 12 n.6. As a threshold matter, Plaintiffs lack standing to seek a judicial declaration that a contract to which Plaintiffs are not parties was invalid. While a disappointed bidder sometimes has standing to challenge a government contract for failure to comply with applicable statutes and regulations, *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 841-42 (D.C. Cir. 1982), other non-parties generally lack standing to do so, even if they suffered an injury-in-fact as a result of the contract award. *See, e.g., Nat'l Maritime Union of Am. v. Commander, Military Sealift Command*, 824 F.2d 1228, 1235-37 (D.C. Cir. 1987); *see also Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1298-1302 (Fed. Cir. 2001). Moreover, the United States is an indispensable party to a suit seeking to declare a federal contract invalid. *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983). Plaintiffs, of course, have not joined the United States in their actions.

Equally problematic, Plaintiffs' argument has no bearing on the duties actually performed by CACI PT interrogators or the manner in which these interrogators were supervised. It is not as if the interrogation support actually provided by CACI PT interrogators would retroactively cease to exist if the CACI PT contract were invalid, and Plaintiffs have cited to no authority suggesting that preemption would be unavailable – even for a procurement contract – in such a situation. Moreover, the United States has never asserted that CACI PT's interrogation contract was invalid. Therefore, the "open legal question" posed by Plaintiffs is simply irrelevant.

Army personnel, and that such "supervision" breaches the terms of Army field manuals that Plaintiffs assert must be read into the SOW.[11] Pl. Op. at 9-10. Of course, Plaintiffs resort to the Army field manual, and not the terms of the SOW, precisely because the SOW required that CACI interrogators act under the operational supervision, direction, and control of the military.

However, as Colonel Brady testified, Army field manuals do not have the force of regulations and are not binding on Army operations. Brady Dep. at 130-32. Moreover, even binding statutes and regulations are not incorporated into a government contract unless a review of the contract's express terms demonstrates express or implied incorporation. *Nat'l Leased Housing Ass'n v. United States*, 105 F.3d 1423, 1433 (Fed. Cir. 1997); *Aydin v. Widnall*, 61 F.3d 1571, 1577-78 (Fed. Cir. 1995). Thus, Plaintiffs' attempt to impliedly incorporate a non-binding field manual is particularly unpersuasive. Regardless, the COR for CACI PT's contract – LTC Daniels – testified that ███████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ *See* Supp. Daniels Decl. ¶ 2.[12]

The additional materials cited by Plaintiffs are not to the contrary. Most importantly, Plaintiffs rely extensively on Captain Wood's witness statement, and the Fay/Jones Report's characterization of Captain Wood's testimony. Pls. Facts ¶¶ 117-23. But Plaintiffs' discussion

---

[11] Plaintiffs argue that the SOW must be construed to mean whatever they would like to say because "CACI, not the military, drafted the Statement of Work." Pl. Opp. at 13. Plaintiffs' implication that the military had no involvement with the SOW is simply untrue. ███████████

[12] Plaintiffs also argue that other field manual provisions prohibit the U.S. Army from directly supervising contractors. Pl. Opp. at 9-10. But the field manuals also state that "proper military oversight of contractors is imperative," and provide for operational military control over contractors. Pls. Ex. 11 at 1-7; 3-17-18. Because an inflexible approach does not reflect battlefield reality, FM 100-21 recognizes a commander's discretion to establish policies relating to contractor oversight. *Id.* at 4-1-2. Thus, it was appropriate for the CJTF-7 commander to provide that CACI PT interrogators would perform interrogations at the military's direction, and under the military's operational control, while maintaining separate administrative oversight.

of Captain Wood's sworn statement is entirely misleading. Captain Wood does not assert in her sworn statement that CACI PT personnel supervised soldiers; she says exactly the opposite. *See* Pl. Ex. C-26 at 3-4 (Captain Wood relied on her "military section chief . . . and section leaders" to oversee CACI interrogators). Tellingly, Plaintiffs elected not to seek Captain Wood's deposition, preferring to rely on out-of-context snippets from Captain Wood's sworn statement.

Similarly, Plaintiffs rely on a heavily-redacted statement from a Sergeant Adams, in which she indicates a belief that a CACI PT employee was placed in a supervisory role over certain screener functions. Pl. Facts ¶¶ 124-25. Aside from the fact that this allegation does not involve interrogations, Plaintiffs elected not to develop this evidence by seeking to depose SGT Adams. Regardless, even the SGT Adams statement acknowledges that all of these operations were under the overall control of military personnel. Pl. Ex. C-28 at 5. Thus, even the highly redacted statement upon which Plaintiffs rely demonstrates the Army's operational control.

**2.    CACI Did Not Supervise or Direct the Abuse of Iraqi Prisoners**

Not content with arguing that CACI improperly "supervised" soldiers, Plaintiffs also argue that such "supervision" caused the abuse of Iraqi prisoners. Pl. Opp. at 27-28. Plaintiffs' attempts to portray CACI interrogators as "ringleaders" of prisoner abuse is unadulterated fiction, perpetrated by Plaintiffs' counsel as part of their "Big Lie" propaganda technique. Pl. Opp. at 2. Moreover, the Court has already acknowledged that the preemption issue will be determined not based on merits issues, but on the type of work assigned to CACI PT interrogators and the manner in which they were supervised. *Ibrahim*, 319 F. Supp. 2d at 19.

In any event, the voluminous statements of convicted felons proffered by Plaintiffs are most notable for what they do not do: they do not state, suggest or show that CACI PT employees were ringleaders of some sort of abuse conspiracy. The statement of convicted felon Charles Graner is neither signed nor sworn, and would be inadmissible on summary judgment

22

even if its contents were relevant. *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006). That infirmity aside, even Graner admits that ██████████████████████████████████████
██████████████████████████████████████████ P. Ex. C-38 at 234.

Plaintiffs' claim that CACI PT interrogators were in charge and responsible for the abuse is entirely inconsistent with the allegations of the *Saleh* Complaint: that the abuse was the result of a vast "Torture Conspiracy" directed by the Secretary of Defense and assisted by a panoply of high-ranking U.S. officials, including Col. Janis Karpinski, whom Plaintiffs' counsel now represents. ████████████████████ At the end of the day, Plaintiffs' attempt to create a sideshow of abuse does not change the fact – already acknowledged by the Court – that the conduct of war zone interrogations implicates the federal interests embodied in the combatant activities exception to the FTCA, and that Plaintiffs' claims will be preempted if the CACI PT interrogators operated under Army command and control. *Ibrahim*, 319 F. Supp. 2d at 18-19.

### 3.    CACI Did Not Breach the Statement of Work by Failing to Report Prisoner Abuse

Finally, Plaintiffs argue that CACI PT breached the SOW by failing to report the abuse of prisoners by military personnel. Once again, Plaintiffs do not rely on the SOW, which contains no such duty. Instead, Plaintiffs claim that "CACI managers admitted that *the agreement with the military required* CACI employees to stop and report torture of prisoners." Pl. Opp. at 28 (emphasis added). However, no CACI PT employee testified to this effect. The transcripts cited by Plaintiffs uniformly consist of CACI PT employees testifying to the unremarkable proposition that CACI PT expected its employees not to act illegally. For example, Dan Porvaznik testified that – while it had never occurred – he would have expected CACI PT employees not to use illegal interrogation techniques. Porvaznik Dep. at 307-08. Similarly, Charles Mudd testified that CACI PT employees could refuse orders to abuse prisoners. Mudd. Dep. at 149.

More importantly, Plaintiffs' claim that CACI PT failed to report prisoner abuse rests on a single document ███████████████████████████████████████████████ another witness Plaintiffs affirmatively chose not to depose. In that email ██████████████ ████████████████████████████████████████████████████████████ ████████████ In particular, ████████ concluded that ████████████████████████ ████████████████████████████████████████████ Pls. Ex. C-53 at 1. The email does not state what ████████ saw. Indeed, ██████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ Thus, even if it would be relevant if CACI PT personnel failed to report abuse by soldiers, Plaintiffs have not presented evidence to support such a contention.

### D.  The Foreign Country and Intentional Tort Exceptions Bar Plaintiffs' Claims

CACI's opening brief explained how the foreign country and intentional tort exceptions to the FTCA bar Plaintiffs' claims. In a footnote, Plaintiffs argue that the foreign country exception is inapplicable because Plaintiffs "are not seeking to subject CACI to liability under Iraqi law" (which Plaintiffs admit renders CACI immune from suit). That argument is a *non-sequitur*. The Supreme Court has held that the foreign country exception does not depend on whether foreign law would apply. *Sosa v. Alvarez-Machain*, 124 S.Ct. 2739, 2754 (2004); *see also* CACI Br. at 22-24. Plaintiffs have offered no response to the CACI Defendants' contention that it would violate due process to apply the law of any state or the District of Columbia to these claims. The due process implications of Plaintiffs' attempt to invoke domestic law reinforces the propriety of applying the foreign country exception.

Plaintiffs' response to the intentional tort exception is similarly unpersuasive. Citing *Boyle*, Plaintiffs argue the intentional tort exception does not apply because "the government does not require contractors to commit intentional torts." Once again, Plaintiffs incorrectly apply the *Boyle* standard to an entirely unrelated area of preemption. The intentional tort exception bars claims against the United States for the intentional torts that Plaintiffs have asserted in this case. CACI Br. at 25-26. Accordingly, that federal interest preempts Plaintiffs claims.

## III.    CONCLUSION

This is the rare case where the Court has already stated the test that it will apply on summary judgment: whether Defendants' employees were "soldiers in all but name" as it relates to job duties and supervision. Plaintiffs devote precious little space in their opposition to this central issue. The reason is simple – the witnesses on the ground in Iraq reject Plaintiffs' premises concerning command and control of CACI PT personnel. CACI PT's employees were fully integrated into the military chain of command, taking all of their operational direction from military personnel. Because there is no genuine dispute of fact on the relevant question, the Court should enter summary judgment in the CACI Defendants' favor.

Respectfully submitted,

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
Frank H. Griffin, IV. (Bar No. 481446)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000

*Counsel for Defendants CACI International Inc. and CACI Premier Technology, Inc.*

August 3, 2007

25

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Reply Of Defendants CACI International Inc and CACI Premier Technology, Inc. In Support Of Their Motion for Summary Judgment, as well as the accompanying Declaration of Frank H. Griffin, IV, was served this 3rd day of August 2007 by overnight delivery, and all of the above-listed papers except for the exhibits to the Griffin Declaration also served by electronic transmission, on the following counsel of record:

Susan L. Burke, Esq.
Burke Pyle LLC
4112 Station Street
Philadelphia, PA 19127
*Attorneys for Saleh Plaintiffs*

L. Palmer Forest, Esq.
The Law Firm of Palmer Foret, P.C.
1735 20th Street, N.W.
Washington, Dc 20009
*Attorneys for Ibrahim Plaintiffs*

Ari S. Zymelman, Esq.
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20005
*Attorneys for Defendants The Titan Corporation*

John F. O'Connor