# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RECEIV

AUG - 7 2007

NANCY MAYER WHITTINGTON, CI
U.S. DISTRICT COURT

| | |
|---|---|
| ILHAM NASSIR IBRAHIM, *et al.*, | |
| Plaintiffs, | Civil Action No. 04-01248 (JR) |
| v. | ORAL ARGUMENT REQUESTED |
| THE TITAN CORPORATION, *et al.*, | |
| Defendants. | **Public Version** |

| | |
|---|---|
| SALEH, *et al.*, | |
| Plaintiffs, | Civil Action No. 05-1165 (JR) |
| v. | ORAL ARGUMENT REQUESTED |
| THE TITAN CORPORATION, *et al.*, | |
| Defendants. | |

## DEFENDANT L-3 COMMUNICATIONS TITAN CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (CORRECTED)

.

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

**WILLIAMS & CONNOLLY LLP**
725 12th Street, N.W.
Washington, D.C.  20005
(202) 434-5000

*Attorneys for Defendant L-3 Communications*
*Titan Corporation*

Dated: August 7, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

TABLE OF ABBREVIATIONS ........................................................................................... iv

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

I.     It Is Plaintiffs Who Fail To Meet Their Burden on Summary Judgment ........................... 3

II.    The Undisputed Material Facts Demonstrate the Military's Complete Operational Control Over the Titan Linguists to the Exclusion of Titan .......................... 4

      A.    The Court Must Accept Titan's Statement of Material Facts As to Which There is No Genuine Issue as Undisputed ................................................ 5

      B.    The Depositions Were Fully Consistent with Titan's Submissions in Support its Motion ............................................................................................. 7

      C.    Plaintiffs' Attacks On Titan's Declarants are Unavailing ................................. 7

      D.    The Declarations of Plaintiffs' Declarants Do Not Create a Dispute of Material Fact ..................................................................................................... 9

            1.    ........................................................................................ 10

            2.    ........................................................................................ 11

            3.    ........................................................................................ 13

III.   Plaintiffs Cannot Overcome the Undisputed Evidence by Arguing that Titan Violated the Contract ...................................................................................................... 14

      A.    Plaintiffs' Reformulation of the Inquiry Articulated by this Court Is Inconsistent with the Rationale of *Koohi* .......................................................... 14

      B.    Plaintiffs' Argument that the Contract "Required" Titan to Supervise the Linguists Has Been Rejected, Is Immaterial, and Is Wrong ........................... 15

            1.    The Evidence Adduced Through Declaration and Deposition Was that the Contract Did Not Require Operational Supervision by Titan ....................................................................... 17

            2.    The Department of Defense Understood that Operational Supervision of the Linguists was Consistent with Regulation ................ 18

      C.    The Geneva Conventions Are Irrelevant to the Question at Issue ...................... 21

      D.    Titan's Alleged Other Breaches Do Not Bar Pre-Emption .................................. 22

IV.   The Court's Prior Decisions Pre-Suppose that Titan Linguists Are Not Soldiers or Government Employees ................................................................................. 24

## TABLE OF AUTHORITIES

### CASES

*Bloomgarden v. Coyer*, 479 F.2d 201 (D.C. Cir. 1973)------------------------------------------- 3

*Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)----------------------------------- *passim*

*Burke v. Gould*, 286 F.3d 513 (D.C. Cir. 2002)------------------------------------------------ 6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)------------------------------------------------- 3

*Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465 (D.C. Cir. 1977)------------------------------- 21

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001)----------------------------------- 21

*Fort Bragg Ass'n of Educators. v. Fed. Labor Relations Auth.*,
  870 F.2d 698 (D.C. Cir. 1989)------------------------------------------------------------- 20

*Hunter v. Rice*, No. 04-cv-857, 2007 U.S. Dist. LEXIS 20856, (D.D.C. Mar. 26, 2007)---------- 6

\* *Ibrahim v. Titan Corp.*, 391 F. Supp.2d 10 (D.D.C. 2005)----------------------------------- *passim*

*In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626 (2d Cir. 1996)----------------- 20

*Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*,
  101 F.3d 145 (D.C. Cir. 1996)-------------------------------------------------------------- 6

\* *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992)------------------------------------- 15

*Krombein v. Gali Serv. Indus., Inc.*, 317 F. Supp. 2d 14 (D.D.C. 2004)------------------------- 3

\* *Macharia v. United States*, 238 F. Supp. 2d 13, 27 (D.D.C. 2002)---------------------------- 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574(1986)-----------------------3, 4

*1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*,
  485 A.2d 199 (D.C. Ct. App. 1984)--------------------------------------------------------- 21

*Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 6 (D.D.C. 2003)--------------------------------- 3

*Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 57 (D.D.C. 2006)----------------------------------- 1, 21

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir.1985)----------------------------------- 5

*Scott v. Harris*, 127 S. Ct. 1769 (2007)-------------------------------------------------------- 4

*SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000)-------------------------------------- 6

*Shur v. A.R. Siegler, Inc.*, 70 F. Supp. 2d 900 (E.D. Wis. 1999)------------------------------- 14

*West Point Elementary Sch. Teachers Ass'n v. Fed. Labor Relations Auth.*,
  855 F.2d 936 (2d Cir. 1988)---------------------------------------------------------------- 20

**OTHER AUTHORITY**

Local Civil Rule 7------------------------------------------------------------------------------------ 6

Restatement (Second) of Contracts § 203------------------------------------------------------ 21

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| CACI | Collectively, defendants CACI International Inc., CACI Incorporated – Federal, and CACI Premier Technology, Inc. |
| FTCA | Federal Tort Claims Act |
| Mem. | Titan's Memorandum in Support of Motion to Dismiss the Third Amended Complaint |
| Opp. | Plaintiffs' Opposition to Titan's Motion to Dismiss the Third Amended Complaint |
| Pls.' SOMF | Plaintiffs' Consolidated Statement of Disputed Facts |
| SMF | Titan's Statement of Material Facts |
| SOW | Statement of Work |
| Titan | L-3 Communications Titan Corporation and The Titan Corporation |
| UCMJ | Uniform Code of Military Justice |

## INTRODUCTION

Faced with their inability to create a factual dispute on the single issue framed by the Court as determinative of pre-emption—did the military directly control and supervise Titan linguists in their "day to day operations," and what was Titan's role in that regard—plaintiffs instead attempt to distract with a succession of red herrings that bear no relation to this issue. Plaintiffs' arguments about whether the military should or could have employed civilian translators, Titan's alleged breaches of the contract, and the basic differences between soldiers and civilians that have been known since this process started (e.g., they do not salute, were not subject to the UCMJ, can quit their jobs with more limited consequences) have nothing to do with the core issue before the Court: whether the civilian linguists' role and supervision in Iraq meant that they were acting as "essentially" soldiers.

In rejecting many of the arguments and materials plaintiffs recycle here, this Court ruled that if the military supervised linguists in their day-to-day operations and Titan had no such role, plaintiffs' state law claims would be pre-empted.[1]  The summary judgment record clearly establishes that it was members of the military, and the military alone, that directed and controlled the linguists.  Military supervisors assigned them to specific teams and/or duty stations, told them what to do in their assignments, monitored their performance, corrected and counseled them when the performance was not what the military wanted, and had to approve their leave.  Titan submitted declarations of the three people most knowledgeable about the direction and control of Titan linguists assigned to military units in Iraq and in particular at Abu Ghraib—the exclusive site of the named plaintiffs' allegations against Titan employees.  Unlike the declarations submitted by plaintiffs, Titan's declarants specified in great detail (none of which is disputed by plaintiffs' evidence) exactly what the linguists did, who told them how to

---

[1] *See Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 18 (D.D.C. 2005) (finding "the treatment of prisoners during wartime implicates 'uniquely federal interests'"); *id.* at 18-19 ("State law regulation of combat activity would present a 'significant conflict' with th[e] federal interest in unfettered military action."); *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 57 (D.D.C. 2006) (incorporating by reference *Ibrahim*, 391 F. Supp. 2d 10.).

do it, and who was in charge of them as they performed their duties. They also specified the extent to which Titan managers did not participate in any of those activities.

Plaintiffs' extensive discovery on these issues—thousands of pages in document discovery and 19 depositions (12 of which related to Titan's motion) over three months including military witnesses of their choosing—confirmed these details and that the overall picture was what Titan represented to the Court during the motion to dismiss stage: Titan linguists were "essentially on loan to the military," and "the military's operational control over [these employees was] total."[2] Not only did deponent after deponent confirm and expand upon the details of the linguists' control and direction by the military, but plaintiffs' own witnesses confirmed the core facts: that the military told Titan linguists precisely *what* to do on a day-to-day basis, instructed them precisely *how* to do it, reported problems with linguists up the military chain of command, counseled linguists, and, by way of contrast, that Titan handled administrative issues like pay. *See infra* p. 7.

Faced with the inability to dispute the facts set forth in support of Titan's motion,[3] plaintiffs seek to change the subject, and pretend that the Court has not already considered the contract and their legal arguments but instead sent everyone out on a wild goose-chase. A wild goose-chase because if the arguments plaintiffs present here prevail, there was no need for the months of discovery they petitioned for and were awarded. But none of their arguments cast doubt on the showing Titan has made of "what exactly [Titan's] employees were doing in Iraq," *Ibrahim*, 391 F. Supp. 2d. at 19, or warrant the Court revisiting its earlier decision to award summary judgment for making that showing. And no matter how much plaintiffs assail without justification the knowledge of the declarants submitted by Titan, make up facts never established by the record, or complain about evidence allegedly not brought forward by Titan, they cannot avoid their failure to dispute the showing Titan has made.

---

[2] *Ibrahim*, 391 F. Supp. 2d at 19 (internal quotations and citations omitted).

[3] As set forth below, plaintiffs' failure to specifically identify which of Titan's undisputed facts they contend are disputed (and by which evidence), means that Titan's Statement of Material Facts ("SMF") must be accepted as true as a matter of circuit law. *See* II.A, *infra*.

Nor are their attempts to transform the test set out by the Court back into the *Boyle* three-prong test or to turn the facts and procedural context on their head by wrongly arguing that the contract required Titan to supervise operations even if it did not happen that way availing. Plaintiffs' attempt to substitute (and re-argue) their factually unsupported view (three-times presented and rejected by this Court) of what *should have happened* for the uncontroverted evidence of what did happen cannot defeat Titan's motion for summary judgment. Finally, plaintiffs' attempt to make the Court's test of whether the linguists were "essentially" acting as soldiers, into one of whether they *were* soldiers—a test that no civilian could ever meet and certainly not what the Court could have meant—has nothing to do with the pre-emption issues before the Court and is plainly inconsistent with the Court's analysis. For all these reasons, the Court should enter summary judgment on plaintiffs' remaining state law claims.

## ARGUMENT

### I.    It Is Plaintiffs Who Fail To Meet Their Burden on Summary Judgment

In language echoing federal procedural law predating the reforms of *Anderson*, *Celotex*, and *Matsushita*, plaintiffs repeatedly argue that Titan has not "met its heavy burden" by failing to come forward with allegedly necessary evidence or not having good enough evidence. *See* Opp. 3-5. But it is their burden in this context, a burden they have not shouldered. Titan informed the Court and plaintiffs of the basis for its motion, i.e., the preemption of state law, its derivative immunity from suit and the facts supporting the legal theories. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden of production then shifts to plaintiffs.

To fend off summary judgment, plaintiffs must come forward with evidence of a genuine issue of material fact. *Id.* Plaintiffs' own authority establishes that "more is necessary tha[n] mere assertions in the pleadings." *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C. Cir. 1973). Plaintiffs must "set forth specific facts crystallizing a genuine issue for trial." *Krombein v. Gali Serv. Indus., Inc.*, 317 F. Supp. 2d 14, 19 (D.D.C. 2004). "A 'genuine issue' is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action." *Id.* at 18 (*quoting Celotex*, 477 U.S. at 322). "[T]he mere existence of a factual

dispute, by itself, is not sufficient to bar summary judgment." *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003). Plaintiffs "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Nor is it enough that plaintiffs are able to construct an incredible spin of the record. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S. Ct. at 1776.

Plaintiffs argue principally about how Titan linguists *should have been* supervised, an argument addressed below. *See* § III.B, *infra*. Even if their argument about what should have happened had not already been rejected by this Court and was correct, it would still not create a dispute of material fact about what happened, i.e., that the military exercised exclusive operational control over Titan linguists and Titan managers provided administrative support only. *See Scott*, 127 S. Ct. at 1776 n.8. (the Court is to draw "all inferences in favor of the nonmoving party *to the extent supportable by the record*"). Inferences contradicted by the record are not construed in favor of the nonmoving party. *Id.*

## II.    The Undisputed Material Facts Demonstrate the Military's Complete Operational Control Over the Titan Linguists to the Exclusion of Titan

Although the Court posed four questions in identifying the inquiry behind its "soldier in all but name" formulation as an attempt to get at what the Titan linguists were doing in Iraq, as a matter of law and practical reality, the inquiry boils down to whether the military directly supervised and controlled the linguists' operations. That this is the relevant inquiry is illustrated by a highly analogous case in the D.C. Circuit, *Macharia v. United States*, 238 F. Supp. 2d 13, *aff'd on other grounds* 334 F. 3d 61 (D.C. Cir 2003), *cert. denied*, 540 U.S. 1149 (2004). That case, involving an attempt to sue the federal government directly under the FTCA for damages sustained in the Nairobi embassy bombing, fully discussed the implications of government supervision and control over non-governmental personnel. *Id.* at 68-69. While pre-emption was

not an issue because it was a suit against the government, the case directly turned on the FTCA and several claims more particularly on whether the personnel were under the supervision and control of the government. The district court found that (a) the contractor trained and supervised the local guards in Nairobi, Kenya, (b) applicable regulations state "'day to day activities are to be managed and supervised by and supervised by the contractor,'" and (c) the contract "set forth detailed guidelines and regulations that the contractor was required to conform with as it implemented its hiring, training and supervision." 238 F. Supp. 2d at 27-28. The court concluded that because of these contract terms, regulations, and the presence of contractor supervisors, there was no claim under the FTCA because of the lack of government control. *Id.*

The D.C. Circuit, in affirming on other grounds (that the claim was barred by the Foreign Country exception), rejected the district court's reasoning, observing that that presence and participation of a government supervisor, notwithstanding the factors identified by the lower court, might give rise to FTCA liability because it would make the personnel agents of the government.[4] *Macharia*, 334 F.3d at 69. If in *Macharia* the D.C. Circuit was willing to find an agency relationship between the government and civilian personnel working outside of the embassy under the co-control of the government and the contractor and where the district court found such contractor supervision was, unlike here, required by contract and regulation, how much more so should the Court find the necessary relationship to implicate federal interests and give rise to pre-emption, where there were *no* Titan managers engaged in operational control, or even present during the linguists' work, and the military was the exclusive provider of operational supervision?

### A.    The Court Must Accept Titan's Statement of Material Facts As to Which There is No Genuine Issue as Undisputed

In conformity with local civil rule 7(h), Titan submitted with its motion for summary

---

[4] This agency type analysis undergirds the derivative immunity found in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985). In Titan's opening brief it asked the Court to reconsider in light of the factual record its unwillingness to apply such immunity to Titan (Mem. 23-25), and plaintiffs did not respond. Accordingly we rest on our opening brief and repeat our request that the Court reconsider.

judgment a separate document of 30 numbered paragraphs (some with subparagraphs) setting forth the material facts undergirding its motion. Plaintiffs' obligation was to submit a separate filing identifying which of these facts they disputed, and providing the relevant record references supporting the dispute. *See* LCvR 7(h);[5] *Hunter v. Rice*, No. 04-cv-857, 2007 U.S. Dist. LEXIS 20856, at *11 (D.D.C. Mar. 26, 2007) (nonmovant must isolate material facts, distinguish disputed from undisputed facts, and identify the pertinent parts of the record). Plaintiffs instead filed a parallel statement of facts that does not directly respond to the material facts Titan contends are undisputed, but instead sets forth its own rendition of what it considers material. Nowhere do plaintiffs identify which of the thirty paragraphs are disputed (and by what) and which are agreed upon. Because plaintiffs' submission falls far short of the requirements of LCvR 7(h),[6] Titan's SMF should be treated as undisputed. *See SEC v. Banner Fund Int'l*, 211 F.3d 602, 615-16 (D.C. Cir. 2000) (finding that the district court was "fully justified in treating as admitted the [movant's] statement of material facts" where the party opposing summary judgment filed a parallel statement of facts in support of its cross-motion for summary judgment but nevertheless failed to identify "specific parts of the record controverting the [movant's] statement of undisputed facts"); *see also Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002) (requiring strict compliance with the district court's local rules on summary judgment); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150-51 (D.C. Cir. 1996) (discussing Rule 7(h)'s predecessor rule).[7]

---

[5] "An opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. . . . In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h).

[6] *See supra* note 5.

[7] The broad disclaimer at the beginning of their factual statement that they "dispute Defendant Titan's recitation of the facts," far from preserving their position merely highlights the egregiousness of their non-compliance.

**B.**    **The Depositions Were Fully Consistent with Titan's Submissions in Support its Motion**

Titan's opening brief and supporting materials provided the specific, detailed facts that answered the Court's question of "exactly what [Titan's] employees were doing in Iraq" and whether those facts showed that the linguists were under the exclusive operational direction and control of the military, i.e., essentially acting as soldiers. Plaintiffs then took 19 depositions (12 of them directed towards Titan's motion), followed by Titan's depositions of two of plaintiffs' three new declarants, for a total of 14 Titan-related depositions. What is remarkable if unsurprising is that on the core factual issues, the deponents (including those who submitted declarations allegedly in support of plaintiffs) were unanimously in sync with the declarations submitted with the opening brief, which set forth how the military:[8]

.

and, by way of contrast, that Titan

**C.**    **Plaintiffs' Attacks On Titan's Declarants are Unavailing**

Plaintiffs assert that                        "did not agree the military was supervising Titan employees."                        As set forth in our response to those facts,

---

[8] Although we point the Court to particular sections of the depositions, we have included with our submission the complete transcript of every deposition because we would urge the Court to review the complete record. Taken as a whole, we believe that they leave no possibility for finding a dispute of material facts.

this grossly mischaracterizes his testimony and is flatly contradicted by the facts set forth in his declaration and at his deposition.

Plaintiffs further argue that in any event, his declaration should be ignored because

Plaintiffs cannot fend off summary judgment by attacking the "credibility" or knowledge of Titan's declarants. Having put the issues in play, the burden is for plaintiffs, the non-moving parties, to adduce contrary evidence. Simply throwing stones at Titan's delcarants is insufficient. But here, the stones thrown miss their mark by a wide margin. The first complaint, even if true, is simply irrelevant. As set forth below in section III, what matters is not what was in the contract but the facts on the ground. But it is not true. There is plenty of evidence in the record that the military did not believe that Titan was required to provide operational supervision of its linguists under the contract. *See* § III B.2, *infra*.

---

**D.    The Declarations of Plaintiffs' Declarants Do Not Create a Dispute of Material Fact**

Notwithstanding that plaintiffs received the right to take up to 24 depositions over 90 days, plus document discovery, plaintiffs decided to oppose Titan's summary judgment motion with three new declarations from previously unidentified witnesses:

linguist).[11] The declarations are remarkable as much for their confirmation of the material facts, as they are for plaintiffs' attempt to elicit broad conclusions that upon deposition became clear were unsupported by facts personally known to the declarants. We address each in turn.

---

[11] Plaintiffs have resubmitted the vague, conclusory declaration of _____ with their motion, which the *Saleh* plaintiffs submitted in support of their motion for summary judgment. Although we address it where appropriate in our Response to Plaintiffs' "Consolidated Statement of Disputed Facts," we do not do so here because it is not addressed in plaintiffs' brief, and the Court's denial of plaintiffs' motion and grant of their Rule 56(f) application makes it clear that the Court properly read the declaration as insufficient to create a dispute of material fact.

At any rate, plaintiffs' assertion that the military could not monitor the quality of linguists' performance due to a lack of proficient Arabic speakers proves nothing about their supervision. The same dynamic is true with respect to the evaluation of military linguists. It is the reason that the military needed Titan in the first place.

### III. Plaintiffs Cannot Overcome the Undisputed Evidence by Arguing that Titan Violated the Contract

Plaintiffs argue that state law is not preempted because Titan allegedly

        : They wrongly

contend that the contract required Titan to supervise the linguists and that Titan's alleged default

in this regard prevents there from being pre-emption, no matter whether the military actually

supervised them. They also contend that various other alleged breaches by Titan, e.g., weapons

possession by Titan employees         similarly prevents pre-emption. These assertions

are wrong as a matter of law and as a matter of fact.

#### A. Plaintiffs' Reformulation of the Inquiry Articulated by this Court Is Inconsistent with the Rationale of *Koohi*

Plaintiffs assert that Titan's motion for summary judgment should be denied because

Titan violated specifications supposedly set forth in its contract. In other words, plaintiffs

contend that because Titan allegedly failed to meet the second prong of the three-part *Boyle* test,

state law is not preempted. But the *Boyle* test does not apply here. Indeed, the Court pre-

supposed as much *before* it proceeded to conclude that state law is nevertheless preempted if the

facts are as defendants represented them. *Ibrahim*, 391 F. Supp.2d at 19 n.6.[18]

To make this argument, plaintiffs mischaracterize *Koohi v. United States*, 976 F.2d 1328

(9th Cir. 1992), as predicated on the contractor's conduct "indisputably" conforming to military

specifications.         Neither the district court nor the Ninth Circuit ever undertook such

an inquiry and certainly never articulated such a finding. *Koohi* was decided at the pleadings

stage; the Court did not engage in a factual inquiry to determine whether the alleged defect was

---

[18] Plaintiffs' reliance on other product liability cases and *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001), all of which arise from events within the United States during peacetime, are inapposite.         Plaintiffs quote *dicta* in two decisions applying the three-prong *Boyle* test in the context of procurement contracts. *See Shur v. A.R. Siegler, Inc.*, 70 F. Supp. 2d 900, 927 (E.D. Wis. 1999) (design, manufacturing, and testing defect); *In re Joint E. & S. Dist. New York Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir. 1990) (extending *Boyle* to failure to warn claims). *Malesko*'s holding—that *Bivens* actions may not be brought against corporate as opposed to individual defendants—is inapplicable, and at any rate, the *dicta* cited by Plaintiffs concerned a domestic facility where the employees were operationally controlled by the corporation under contract, not U.S. military-operated detention facilities in the midst of an overseas war where the corporate employees were supervised and directed by the military.

attributable to the government (e.g., through the approval of reasonably precise specifications) or to the contractor (e.g., due to a manufacturing defect within the fire control system at issue). It did not matter. *Koohi* held that state law was preempted by the federal interests enshrined in the combatant activities exception to the FTCA. What mattered there, and what matters here, is that the injuries arose in the context of the combatant activities of the U.S. military during wartime.

### B.    Plaintiffs' Argument that the Contract "Required" Titan to Supervise the Linguists Has Been Rejected, Is Immaterial, and Is Wrong

Plaintiffs argue that the Court should ignore the undisputed facts of who actually supervised Titan's linguists' performance of their duties (the military) and who didn't (Titan) in favor of their interpretation of the statement of work and military regulations.

As set forth above, this harkens back to the *Boyle* test, not the test set forth by the Court. In setting forth its test, the Court had before it on the motions to dismiss (considered in the context of each of the consolidated cases) the very SOW that plaintiffs contend answers the question posed by Titan's motion. Moreover, the Court had before it the *Saleh* plaintiffs' motion for summary judgment on this issue including almost all of the regulatory and other materials that they recycle here. Nonetheless, in denying that motion and the pending motions to dismiss, the Court correctly articulated that what mattered was what actually happened, not plaintiffs' interpretation of the SOW that at most suggested Titan had met the test. *Ibrahim*, 391 F.Supp.2d at 19.

The procedural posture is particularly relevant. If plaintiffs were correct that the contract terms and regulations answered the relevant issue for pre-emption (or at least created a dispute of material fact), then the Court would have either granted their motion for summary judgment (the information answered the question) or denied BOTH sides' motions (it made supervision a disputed issue of fact). Under plaintiffs' interpretations of the SOW and the regulations, there was no need to engage in discovery because no matter what additional evidence was adduced by plaintiffs, the issue was either decided or in dispute. But the Court denied their motion *and* allowed plaintiffs to engage in discovery to respond to Titan's factual record. This is consistent

only with a rejection of plaintiffs' arguments that what the contract terms meant is determinative. Put another way, even if plaintiffs were correct that the 1999 contract terms required Titan to provide operational supervisors, what matters in terms of pre-emption of plaintiffs' claims arising in the context of the Iraq war is the respective roles of the military and Titan in the operational control of the linguists. But plaintiffs are not correct about what the contract means or the materiality of the regulations.

The best evidence of whether a party is complying with its contractual obligation is what the parties to the contract think, not what third-party non-beneficiaries of the contract such as plaintiffs assert.[19] If Titan was in dereliction of its duties to supervise,[20] it is certain that there would be evidence from the responsible parties in the military that Titan was in default of such a fundamental obligation. Plaintiffs cannot point to a single piece of such evidence. In fact the behavior was to the contrary. First, the government exercised its last option under its contract with Titan into the Iraq invasion. After the contract expired, the government has continued to issue orders to Titan to perform under that very contract, in the same way to this very day.

Plaintiffs have introduced no competent evidence the contract required something different, or that the military believed Titan should have been providing operational supervisors for the linguists.[21]

---

[19] For much the same standing reasons that the Court dismissed plaintiffs' claims under the government contracting law, it is inconceivable that without standing they can assert supposed violations of this law as a bar to pre-emption.

[20] It is undisputed that Titan had managers in Iraq and in the United States that were responsible for the linguists before and after their assignment to military units, and provided administrative supervision (e.g., pay, insurance, etc.) while the military was supervising the linguists who were performing duties while assigned to military units.

[21] Although plaintiffs strongly assert that the alleged declination of the United States to intervene in these cases is "conspicuous"          they cite no law, and we are aware of none, that intervention of the United States is relevant to deciding whether state law is pre-empted. They do not even identify any other "litigations" at the district court level where the government "weighed in" on pre-emption. As this Court knows, the government does not intervene in the vast majority of cases where a defendant asserts federal pre-emption.

1.     **The Evidence Adduced Through Declaration and Deposition Was that the Contract Did Not Require Operational Supervision by Titan**

Although the burden was on plaintiffs (as the non-moving parties) to adduce evidence that the contract meant that Titan had to supervise the linguists' performance on behalf of the military units to which they were assigned, contrary to plaintiffs' assertion             the record is full of plenty of evidence that the contract meant no such thing.  Most notable is the testimony

Plaintiffs do not dispute that it was physically impossible for Titan site managers to see, much less supervise, Titan linguists on a daily or even weekly basis.  There were far too many

---

[22] Plaintiffs assert that, based on a hiring advertisement,

But the job advertisement for site managers in May 2007 cannot be evidence of the relationship on the ground between linguists and the military in 2003 and 2004, and certainly does not prove that Titan supervised linguists then or now.
Indeed, Titan linguist "operations," as explained by
comprised screening linguists for proficiency, hiring them, coordinating Army counter-intelligence screening, transporting linguists to the CRC, turning them over to military units, obtaining signatures on time cards, administering pay, and facilitating leave.  In short, Titan "operations" were delivering linguists to military units in a combat zone halfway around the world and administratively supporting them.

Plaintiffs also blatantly mischaracterize the testimony of              and             in arguing that they "admitted" Titan did not adequately supervise its translators.

These witnesses "admitted" only that Titan did not exercise operational supervision because the military units did so exclusively, not that they used inadequate efforts.

linguists assigned to far too many units, far too much hostile territory separating these units, and far too few site managers.[23] They argue, however, that the Court should infer from this, and their interpretation of the contract more generally, that Titan breached its obligation to hire sufficient management personnel.          But the military, not Titan, set the ceiling on the number of Titan management staff in Iraq.

That the military approved only as many managers as needed for administrative support and far too few to supervise the performance of Titan linguists is compelling evidence that the military did not understand the contract to require operational supervision by Titan.  At any rate, even if the military set the ceiling too low, that could not possibly constitute a breach of contract by *Titan* to supply the number of managers approved by the military.  While the evidence shows

, it would not matter that it was.[24]  This is precisely the sort of trade-off by the federal government that pre-emption protects.[25]  *Ibrahim*, 391 F.2d at 18 (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)).

### 2.    The Department of Defense Understood that Operational Supervision of the Linguists was Consistent with Regulation

The evidence is also clear that it was both understood and affirmative military policy at the highest levels that the linguists would be directly supervised by the military.  When asked

---

[23] Indeed, plaintiffs' own evidence suggests this

[24] Contrary to the assertion of some of plaintiffs' declarants whose lack of foundation is self-evident,

[25] What is more, the military prohibited Titan management, in particular the site managers they contend should have been supervising linguists, from observing interrogations or even entering the confinement facility.  Plaintiffs fail to present a shred of evidence to the contrary, notwithstanding their naked assertions in that regard. *See, e.g.*,

If there was a "contractual" requirement to supervise, such a requirement would surely have been excused because of the government's interference.

"[w]ho monitors and supervises these contracted employees," in the context of a Congressional hearing specifically held to inquire into the command and control at Abu Ghraib (including that over the linguists), Secretary Rumsfeld testified, under oath, that interrogators and linguists at Abu Ghraib were "responsible to MI [Military Intelligence] personnel who hire them and have the responsibility for supervising them."[26] The Secretary of the Army elaborated, explaining that "[t]hey work under the supervision of officers or Noncommissioned Officers (NCOs) in charge of whatever team or unit they are on." *Id.* The Army Inspector General testified that "their oversight on a day-to-day basis was that military supervisor, that MI person in that organization to whom they reported."[27]    Lieutenant General Smith, Deputy Commander, U.S. Central Command, testified that "there's a 'tiger team' that interrogates and goes through that process. One is an interpreter, normally; one is an analyst; and one is an interrogator. *Where we have shortages in the military of interrogators and translators, we go to contractors to do that.*" *Ibrahim,* Dkt. 55 (Ex. 7), at 44 (statement of LTG Lance Smith, Deputy Commander, U.S. Central Command) (emphasis added).

      Plaintiffs argue that

                                        Setting aside that their terminology (i.e., "soldier-equivalents") is inherently ambiguous and not the standard articulated by the Court, plaintiffs' reliance on an impressionistic portrayal of government regulations is incorrect.  The Congressional testimony of senior military officials responsible for Iraq War policy referenced above, speaking on behalf of the Department of Defense, testified that the very regulations plaintiffs rely upon to dispute military control were consistent with operational control by the government.  For example, the Secretary of the Army stated that Army doctrine

---

[26] Decl. of John F. O'Connor, filed in support of Mot. for Summ. J. of CACI Premier Technology, Inc. (*Ibrahim v. Titan,* Docket No. 55) ("*Ibrahim,* Dkt. 55") (Ex. 7), *Allegations of Mistreatment of Iraqi Prisoners: Hearing Before the U.S. Senate Committee on the Armed Services,* 108th Congress 44 (May 7, 2004).

[27] *Ibrahim,* Dkt. 55 (Ex. 8), *The Department of the Army Inspector General Report on Detention Operation Doctrine and Training: Hearing Before the U.S. Senate Committee on the Armed Services,* 108th Congress 675, 1022 (July 22, 2004) (Statement of Secretary of the Army Brownlee).

for contractors accompanying the force, which plaintiffs cite at                does not prevent the

Army from exercising direct operational control or pose accountability problems:

> [C]learly any contract employee like that, especially a contract interrogator, is
> supposed to work under the direct supervision of an officer or non-commissioned
> officer who would be the supervisor of that person.  So these procedures are in
> place and if they were not followed then somebody was not following the law, the
> procedures.  The contract person of course can be terminated in terms of the
> contract.  They can be fired.  If the commander or the supervisor is unhappy with
> their actions, they can request that that person be terminated.  If it is a criminal act
> they are subject to U.S. law and can be prosecuted under U.S. law.

*Ibrahim*, Dkt. 55 (Ex. 8), at 1023.[28]

The Secretary of the Army also addressed the "inherently governmental function"

doctrine as applied to this precise circumstance.                He testified that contractors

supporting interrogations "are not in a supervisory role.  In fact, they would be forbidden from

doing that, because it would be inherently governmental."  *See Ibrahim*, Dkt. 55 (Ex. 7), at 44;

*see also Ibrahim*, Dkt. 55 (Ex. 8), at 1023 ("[I]f these functions are performed by contract

interrogators under an entity, which in this case was Central Command or CJTF-7 specifically,

then they would not be considered inherently governmental.").  In other words, the plaintiffs

have it backwards: direct supervision is required (rather than prohibited) where inherently

government functions are supported by contract employees.[29]  The necessity for and wisdom of

---

[28] Plaintiffs' reliance upon *Fort Bragg Association of Educators v. Federal Labor Relations Authority*, 870 F.2d 698 (D.C. Cir. 1989), and *West Point Elementary Sch. Teachers Ass'n v. Fed. Labor Relations Auth.*, 855 F.2d 936, 940–41 (2d Cir. 1988), to argue that the "military simply cannot enter into such 'loaned employee' contracts,"            is misplaced.  These cases involved a challenge by affected unions to the issuance of personal services contracts to individual government *employees* (teachers in Army schools within the United States) to circumvent collective bargaining agreement provisions.  The decisions hold that "the language of section (b) of the regulation 'is not limited to employees covered by the civil service regulations,'" *Fort Bragg*, 870 F.2d at 703 (*quoting West Point*, 855 F.2d at 940); they say nothing about the implication of those regulations for pre-emption of state law to protect the combatant activities exception interest.  By contrast, Titan linguists are supporting Army combatant activities in a hostile war zone pursuant to a contract with a corporation—not a contract with them as individuals.  At any rate, this issue was also raised in the Congressional hearing described above, and the military was clear that the relationship with Titan's linguists did not implicate those provisions.  *See* pp. 18-21.

[29] Plaintiffs rely on military regulations to argue that the "military considers combat operations and the use of force to be inherently governmental functions."

But this misses the point: whether the military could outsource the use of force or combat operations is not at issue here.  Titan was not hired to provide personnel to take over either function.  They were hired to provide linguists in support of these functions (combatant

the military's use of contractors in Iraq, particularly with respect to other categories of contracts, has seen much public debate, but that debate is not pertinent to the question presented here. In short, it could not be more clear than the Department of Defense understood and required that the linguists were to be under the direct supervision and control of military units and that this policy was in fact executed as conceived.[30]

### C.    The Geneva Conventions Are Irrelevant to the Question at Issue

Plaintiffs argue that



                                    This argument, and the extended discussion of legal commentary that

follows                              are red herrings. First, as with the government contracting regulations

they invoke, the Court has already rejected plaintiffs' attempt to bring claims under international law generally, and even the plaintiffs have conceded they have no claims under the Geneva Conventions in particular. *See* Pls.' Mot. Amend Compl., *Saleh v. Titan Corp.*, Docket No. 18, at 7. Second, international law has nothing to say about the permissibility of using contract linguists in a combat zone for interrogations and detention operations, other than making them eligible for POW status as civilians accompanying the force. Plaintiffs do not contend otherwise. Plaintiffs' argument instead depends on (yet another) attempt to re-litigate what this Court already decided: that the federal interests enshrined in the combatant activities exception should

---

activities as opposed to combat) under the direction and control of the military commanders who remained squarely in control of these missions.

[30] Also misguided is plaintiffs' argument that the undisputed evidence of the parties' intent is somehow overridden by regulations.            The authority they rely upon concerns provisions whose meaning was disputed by the parties to the contract. *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d, 1465, 1485 (D.C. Cir. 1977) (disputed term in employment contract); *1010 Potomac Assoc. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 n.6 (D.C. Ct. App. 1984) (disputed term in lease). There is no such dispute here, and a nonparty's conflicting interpretation does not create a dispute, as plaintiffs' own authority suggests. Restatement (Second) of Contracts § 203 cmt a ("But parties are free to make agreements which seem unreasonable to others, and circumstances may show that even an agreement innocent on its face has an illegal purpose. The search is for the manifested intention of the parties."). Moreover, the contract states "[t]hese services shall be provided in accordance with this work statement and any mandatory directives as may be listed in Section C-6 or elsewhere throughout this document." SOW § C-5.1. The various regulations plaintiffs wish to incorporate are nowhere referenced in the contract.

extend only to actual use of force and physical violence. But that construction was already rejected by this Court.[31] What matters is that the military activities that Titan linguists supported were *combatant activities*, as this Court already determined.[32] Accordingly, neither the law of war nor humanitarian law are pertinent to the issue before the Court.

### D.    Titan's Alleged Other Breaches Do Not Bar Pre-Emption

Plaintiffs also argue that various other "breaches" by Titan should prevent it from prevailing on a pre-emption defense. As set forth above, even when the alleged breaches go to the heart of the issue, e.g., supervision, the relevant question is not, as under the *Boyle* test, compliance with the contract. Here, the alleged breaches have little to nothing to do with whether allowing state law claims would conflict with uniquely federal interests. Nonetheless, we address the major so-called breaches below: Titan employees' carrying of weapons and the so-called failure to train.

Plaintiffs argue that Titan violated the contract by "permitting" its employees to carry weapons.        It is apparent that Plaintiffs invented this argument when, after seeking to elicit testimony that linguists never carried weapons (to support their argument that linguists were noncombatants and thus not "soldiers"), they in fact learned that this was not true: when dictated by military necessity, military commanders were authorized to issue weapons to Titan linguists attached to their units.[33] Having elicited this testimony, Plaintiffs were forced to

---

[31] Plaintiffs suggest that the military's direction that Titan linguists wear military uniforms violated the bedrock humanitarian law principle of "distinction," which their own authority shows is to enable the parties to the hostilities to distinguish between lawful targets (i.e., combatants) and civilians in order to protect the civilian population.        But what is *prohibited* by humanitarian law is the targeting of civilians, which is unrelated to any issue before this Court. *See* Oppenheim's Int'l Law 346-47 (Lauterpacht, ed. 1952).

[32] The military's issuance of weapons to Titan linguists does not attenuate the uniquely federal interests involved. Nor would it necessarily violate the law of war, particularly if undertaken pursuant to the commanders' inherent right of self-defense. The Geneva Convention addresses only the *consequences* of taking up arms without meeting the criteria for POW status. It does not restrict the methods and means of warfare. Plaintiffs conflate these two distinct aspects of the law of war and humanitarian law.

confront it by arguing that the carrying of weapons by Titan linguists is evidence that Titan breached its contract with the military. This argument fails for a number of reasons. First, the issuance of weapons to Titan linguists by the military commanders to which they were assigned is not (and could not possibly be) a breach of the contract by *Titan*. Second, it is not a breach of contract at all. The contract states: "Contractor personnel are not authorized to carry or possess *personal* weapons to include, but not limited to, firearms and knives with a blade length in excess of three inches." SOW § C-1.8.5 (emphasis added). Weapons issued by military commanders '

are not "personal weapons," which is what the contract prohibits. Finally, even if there were a breach by Titan, the authority relied on by Plaintiffs        still would not support their argument because (a) these products liability cases involve injuries *caused by* the contractors' failure to manufacture the product at issue in accordance with the government's specifications, and (b) as explained above, the inquiry undertaken in those cases to determine whether the injuries were caused by the government's design defect or the contractor's manufacturing defect is simply not pertinent to the interests enshrined in the combatant activities exception.[34]

    Plaintiffs also complain that Titan did not engage in the training plaintiffs think they should have. But their submissions are bereft of evidence that Titan breached its contract in this fashion, and of an explanation as to why this indicates that linguists were not controlled and directed by the military. The evidence is that Titan did the training it was required to do. The Army assumed the responsibility of providing all theater-level pre-deployment training as well as unit-specific training upon arrival to the unit. (SMF ¶¶ 21-22). Although plaintiffs make much of the fact that Titan instituted additional law of war training for U.S.-origin Titan linguists (the only linguists eligible to work in interrogations in detention facilities because of security

---

    But that is even further removed from the question of preemption. No Titan manager is alleged to have abused, aided abuse, or even witnessed any abuse. Nor does Titan argue that its managers were turned over to the exclusive direction and control of the military.

clearance requirements)                 the undisputed evidence is that Titan did not believe it
was contractually obligated to do so and that the military told the linguists what it wanted them
to know about the Law of War both at the CRC before deployment and upon arrival at individual
military units themselves.[35]

## IV.    The Court's Prior Decisions Pre-Suppose that Titan Linguists Are Not Soldiers or Government Employees

Throughout their brief, (           ("soldier-equivalents");        ("*de facto* members of
the military")), and in conclusion (·          (the military's "structure of command and control
is a function of a soldier's enlistment in the United States armed forces")), plaintiffs contend that
Titan linguists must have the same indicia of military enlistment as do soldiers to prevail.  This
perverts the Court's opinions and has no basis in the case law.  The Court's prior decision pre-
supposes the opposite and asks instead who the civilian Titan linguists reported to and how their
day-to-day activities were directed and controlled.  *Ibrahim*, 391 F. Supp. 2d at 19; *see also*
4/21/05 Hrg. Tr. at 7  ("Interpreter A goes to the Abu Ghraib prison . . . *he doesn't salute*, but he
says yes, sir to the captain who's in charge, the captain tells him what to do that day.  Who does
he report to?" (emphasis added)).  Put differently, if preemption never applied to civilian
contractors, who by definition would never be soldiers, there would have been no need for
months of discovery on this issue.

Thus, it does not matter that Titan linguists did not enlist in the Army, attend boot camp,
wear rank insignia, salute, and were not subject to prosecution under the Uniform Code of
Military Justice for quitting their jobs.  These only suggest what is presupposed: that they are
not soldiers.  It also does not matter whether or not Titan linguists wore the military uniforms
neatly or sloppily, volunteered for dangerous assignments, or resisted military orders to clean up
their quarters.  The evidence suggests that, like soldiers, Titan linguists did many of these things
in varying degrees.  That they did them at all indicates the extent of control the military exerted

---

over their core operations. What ultimately matters is who was present with the linguists when they performed their duties, who told them what to do and what not to do, and whose authority were they carrying out in performing the duties for which the military contracted. The undisputed evidence shows the answer to be that the military did these things exclusively to the exclusion of Titan management.

Respectfully Submitted,

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Dated:  August 7, 2007

*Attorneys for Defendant L-3
Communications Titan Corporation*