IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ILHAM NASSIR IBRAHIM, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>THE TITAN CORPORATION, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 04-01248 (JR) |
| SALEH, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>THE TITAN CORPORATION, *et al.*,<br><br>　　　　　Defendants. | Civil Action No. 05-1165 (JR) |

**POST-HEARING MEMORANDUM OF
DEFENDANT L-3 COMMUNICATIONS TITAN CORPORATION
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

F. Whitten Peters (DC Bar No. 255083)
Ari S. Zymelman (DC Bar No. 421593)
F. Greg Bowman (DC Bar No. 486097)

WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Attorneys for Defendant L-3 Communications Titan Corporation*

Dated: October 15, 2007

Defendant L-3 Communications Titan Corporation ("Titan") submits this post-hearing memorandum pursuant to Court's leave at the summary judgment hearing

## I.     Citations to *McMahon* and *Carmichael*

During oral argument, plaintiffs' counsel confirmed that their initial position was that the Court should revisit its determination that state law is preempted to the extent that the military exercised operational control over Titan linguists based in part on the decisions of two district courts denying motions to dismiss raised only in plaintiffs' opposition to CACI's motion, *McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315 (M.D. Fla.), *aff'd in part*, No. 06-15303, 2007 U.S. LEXIS App. 23373 (11th Cir. Oct. 5, 2007);[1] *Carmichael v. Halliburton*, 450 F. Supp. 2d 1373 (N.D. Ga. 2006).[2] The line of cases that include the two invoked by plaintiffs' counsel involves injuries to soldiers or contract employees arising from contractor activities in Iraq and Afghanistan: contractor-operated supply convoys in Iraq, a contractor-operated aircraft in Afghanistan, and a contractor-operated dining facility in Iraq. Those cases also arose in overseas combat zones and were brought against U.S. military contractors for the alleged actions of their employees.

---

[1] In a decision issued after the hearing, the Eleventh Circuit affirmed the district court's refusal to dismiss on grounds of intra-military immunity (also known as the *Feres* Doctrine) and the political question doctrine, *McMahon*, 2007 U.S. LEXIS App. 23373 at *49 (noting that "private contractor agents may be entitled to some form of immunity that protects their making or executing sensitive military judgments, and that overlaps and possibly extends beyond the protection provided by the political question doctrine"), but did not review the district court's decision denying the applicability of preemption based on the fact that this was a service contract, except to note that the district court's rationale was contrary to controlling precedent regarding applying the government contractor defense to service contracts. *See id.* at *7 (citing *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329 (11th Cir. 2003)).

[2] *McMahon* and *Carmichael* are among a number of decisions issued after this Court's decision in *Ibrahim*, addressing different sorts of claims than those at issue here against U.S. contractors in Iraq and Afghanistan. *See Smith-Idol v. Halliburton*, H-06-1168, 2006 U.S. Dist. LEXIS 75574 (S.D. Tex. Oct. 11, 2006); *Woodson v. Halliburton*, H-06-2107, 2006 U.S. Dist. LEXIS 70311 (S.D. Tex. Sept. 28, 2006); *Fisher v. Halliburton, Inc.*, 454 F. Supp. 2d 637 (S.D. Tex. 2006); *Smith v. Halliburton Co.*, H-06-0462, 2006 U.S. Dist. LEXIS 61980 (S.D. Tex. Aug. 30, 2006); *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006); *Lessin v. Kellogg Brown & Root*, H-05-1853, 2006 U.S. Dist. LEXIS 39403 (S.D. Tex. 2006); *cf. Lane v. Halliburton*, H-06-1971, 2006 U.S. Dist. LEXIS 63948 (S.D. Tex. 2006) (finding the "Army's supervision was significant, detailed, and ongoing" and denying plaintiff's motion to remand).

The courts in each of those cases undertook essentially the same inquiry as did this Court: examination of the "control the United States had over either the conduct at issue or the private party defendants." *McMahon*, 460 F. Supp. 2d at 1320. Collectively, the cases demonstrate that all courts to have considered these issues have properly sought to ensure that state tort law does not affect wartime military decision-making or regulate military combat-related activities during war. And, consistent with the approach of this Court, those courts have sought a sufficient factual record to determine the facts on the ground regarding the degree to which the challenged activities fell under military control.[3] These cases reinforce that *Ibrahim* was correctly decided with respect to the availability of the preemption defense under these circumstances.

They are also consistent with the court's decision to permit limited discovery on the question of actual operational control, rather than battling over the interpretations of how the Statement of Work and various Army regulations might have been applied. Implicit in the decision of this court, and the line of decisions invoked by plaintiffs at oral argument, is that what matters in determining whether state law would interfere with uniquely federal interests is what happened on the ground. Certainly there is nothing in these decisions that suggests the Court's *Ibrahim* decision should be revisited. Indeed, in five of eight decisions, courts dismissed claims of U.S. soldiers or U.S. contractor employees because the claims would trench upon military decision making or policies.[4] The three denials of the motions to dismiss were based, as

---

[3] *See, e.g., McMahon*, 2007 U.S. LEXIS App. 23373 at *97 n.36 ("We emphasize that our decision is based only on the record considered by the district court: the complaint, the contract, and the SOW. Presidential remains free to argue that other evidence justifies dismissal on political question grounds.")

[4] *See Smith-Idol*, 2006 U.S. Dist. LEXIS 7557; *Woodson*, 2006 U.S. Dist. LEXIS 70311; *Fisher*, 454 F. Supp. 2d 637; *Smith*, 2006 U.S. Dist. LEXIS 61980; *Whitaker*, 444 F. Supp. 2d 1277. *McMahon* and *Carmichael* were rulings on motions to dismiss in which the courts refused to dismiss at the pleadings stage, as this Court did in *Ibrahim*, 391 F. Supp. 2d 10. Both acknowledged that evidence developed in discovery might demonstrate a degree of military control that would require dismissal. *Carmichael*, 450 F. Supp. 2d at 1375 (dismissal appropriate if "'military decision-making or policy would be a necessary inquiry, inseparable from the claims asserted'") (quoting *Lessin*, 2006 U.S. Dist. LEXIS 39403 at *7); *McMahon*, 460 F. Supp. 2d at 1320 (explaining that the courts dismissing such suits "emphasized the control the United States had over either the conduct at issue or the private party defendants").

in this case, on the incompleteness of the record at that stage of the proceedings.[5] Several of these decisions also considered the general statements in Army Regulation 715-9 and other Army policy documents concerning the relationship between contractors and the military,[6] but no court found these regulations dispositive.

While the cases are similar in their setting, there are important differences that highlight why this case is appropriately disposed of on summary judgment on the issue of pre-emption, i.e., that the facts of this case do not push the edge of the question, but instead fall at the core of the uniquely federal interests that prohibit regulation of these matter through state tort law. These differences include: (i) the nature of the functions assigned to the contractors (supply convoys, airlift, and food service are fundamentally different than those involved in this case—translation for soldiers engaging in military detention operations and intelligence interrogations); (ii) the record in those cases suggested different and concurrent structures of command and control rather than what the uncontroverted evidence demonstrates here, i.e., sole military and no Titan control; and (iii) the claims were brought by U.S. citizens (soldiers or contractor employees) rather than "perceived enemies," as plaintiffs in this case were while detained by the U.S. military and to whom *Koohi* said no duty was owed.[7]

---

[5] That the claims were dismissed on political question grounds rather than preemption grounds is unimportant. Although those courts adopted a different label, the underlying rationale—that the degree of the military's operational control (as contrasted with that of the contractor) would determine the outcome—was the same as undergirds this Court's pre-emption analysis.

[6] *Fisher*, 454 F. Supp. 2d at 642-43; *Smith*, 2006 U.S. Dist. LEXIS at *12-14; *Whitaker*, 444 F. Supp. 2d at 1279.

[7] *See Johnson v. Eisentrager*, 339 U.S. 763 (1950) ("In the primary meaning of the words, an alien friend is the subject of a foreign state at peace with the United States; an alien enemy is the subject of a foreign state at war with the United States.") (internal citations and quotations omitted). That some courts found this factor to be critical in determining whether state law is preempted is not evidence of animus toward non-Americans but rather recognition of the unique regulatory structure (grounded in international law and committed to the political branches) applicable to the interaction between deployed U.S. military forces and the local populace (including insurgents forces) in overseas combat zones. *See, e.g., Carmichael*, 450 F. Supp. 2d at 1379 ("Here, Plaintiff's husband was not injured because by the United States because he was perceived as its enemy; rather, Sergeant Carmichael was a United States soldier/citizen injured (allegedly) by a private contractor."); *see also Ibrahim*, "[i]t would be difficult to devise a more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from

The first two differences are really two sides of the same coin. Given the nature of the functions at issue here (difference (i)), there could not be concurrent operational control over the Titan linguists (difference (ii)). Rather than contracting out a self-contained function to a company to provide a service—such as food service, airlift, or convoy operations—this case involves hiring a company to provide personnel to be assigned to military units performing military functions that implicate uniquely federal interests.[8] In that sense, one cannot separate out the linguists from the units into which they were integrated as individuals. Given that the military was, and had to be, the one in operational control of prisoner detention and interrogation, the linguists had to be (and were) under the operational control of the military. In that sense, the linguists were much more like equipment than the service providers in those other cases, i.e., their control was provided by the units to which they were assigned, not by a Titan management structure to whom an "out-sourceable" task was assigned. In short, unlike those cases and *Macheria*, see Titan Reply at 5, there was no parallel contractor operational control that complicates the inquiry in those cases. Titan not only did not have managers operationally controlling linguists (observing and directing their functions), they could not do so.[9]

Contrast the evidence of the facts on the ground with what plaintiffs' view of Titan's alleged liability would require. Titan managers would have to be able to observe interrogations, direct interpreters not to participate in ones in that the Titan managers viewed as exposing the company to liability, and in general, be the ones telling the linguists what do, where to go, when to report with all the authority and participation in detention and interrogation activities that such

---

the military offensive abroad to the legal defensive at home." *Id.* at 18 (quoting *Johnson v. Eisentrager*, 339 U.S. 763, 778 (1950)).

[8] *See Ibrahim*, 391 F. Supp. 2d 10, 18 ("Under the first step of Boyle's analysis, I must agree that the treatment of prisoners during wartime implicates 'uniquely federal interests.'"); *id.* at 18-19 ("State law regulation of combat activity would present a 'significant conflict' with this federal interest in *unfettered* military action."); s*ee also Hamdi v. Rumsfeld*, 124 S. Ct. 2633, 2640 (2004).

[9] For example, Titan managers were not allowed to know about what happened in interrogations where linguists performed their function and were not allowed to be physically present in the Abu Ghraib "hard-site" where much of the alleged torts were committed. *See* Titan SMF ¶¶ 15, 16; Rumminger Decl. ¶ 39; Winkler Decl. ¶¶ 28, 29, 32, 43.

operational control requires. That would be absurd in the context of the military's operation of prisons and interrogations in Iraq, and even if conceivable, was not what happened.[10]

Indeed, this is one of the precise concerns that animated the Congressional hearings on Abu Ghraib: members of the oversight committees were concerned that the government had ceded too much control over these functions to contactors. The Secretary of Defense and other senior military officials testified that the military retained control and that the contractors were directed by the military chain of command. *See* Titan Reply 18-20.[11]

This case is far more compelling on the facts than those involving wholesale outsourcing of support functions—airlift in Afghanistan (*McMahaon*), supply convoys in Iraq (*Lessin, Whitaker, Carmichael, Fisher, Woodson, Smith-Idol*), and food service in Iraq (*Smith*). There was no allegation or evidence credited by those courts that the allegedly negligent contractor personnel in those cases were assigned to work directly for individual military units—as the undisputed evidence shows is the case with respect to Titan translators in this case.[12] Instead, the

---

[10] Plaintiffs' allegations (and the findings of a number of the government investigations upon which they rely) that the facilities were poorly run by the military does not create a dispute that it was the military rather than Titan that was doing so: there is not a shred of evidence contravening the testimony of every witness that the military exercised exclusive control over detention operations—which included establishing and controlling conditions of confinement and controlling access to detention facilities—and interrogation operations—which included setting rules for conducting interrogations, approving interrogation plans, and reviewing the results of interrogations. Even if there was poor oversight by the military command structure of the soldiers, there is no question that the oversight was exclusive to the military.

[11] And with regard to the statutory and regulatory scheme on which plaintiffs rely to argue that the military cannot engage in such control, the Army (to whom this court owes deference under *Chevron* even if plaintiffs had standing to raise the issue), clearly articulated that they believed such operational control was permitted by that scheme and there was no regulatory/statutory conflict. *See* Titan Reply at 18-21.

[12] For example, in *McMahon*, the contractor did not argue that its personnel were placed under the control of individual military units but that military decision-making would be implicated because flights plans were jointly developed by the contractor—which developed and implemented the flight plan according to civilian commercial standards—and the military—which determined what needed to be flown where and at what time, subject to the contractor's safety requirements. *McMahon*, 2007 U.S. LEXIS App. 23373 at * 77-82. Unlike Titan where every detail of the performance was directed and monitored by the military exclusively, *see* Titan Reply at 7, in *McMahon,* insofar as the court could discern without the benefit of discovery, Presidential had principle responsibility for flight safety, while military control over the flights, other than to specified start and end points and times of flights (subject to Presidential's power to decline a mission for safety reasons), was extremely limited. *McMahon*, 2007 U.S. LEXIS App. 23373 at *81-82.

record in those cases suggests that the contractors were hired to perform a function supportive of, but not entangled with the activities of the military to whom they were providing the service. In contrast, Titan's linguists had no function independent of the combatant activities for which they were providing translation. In a very real sense, the linguists' operations at Abu Ghraib could not take place without military personnel engaged in detention or interrogation activities being on one side of the translated conversation in a place completely controlled by the military (a cell block, an interrogation booth, any other place in the prison). The activities at issue in the line of cases relied upon by plaintiffs (running a mess tent, running convoys of supply trucks along pre-determined routes, providing scheduled air service), are activities provided to the military but where the companies could and did have operational control. But, notwithstanding the far greater participation of the companies (based on the limited record developed in those cases), the courts recognized that even in those cases, the military strove to "'fully integrate contractor support into the theater operational support structure" and that to do so, "proper military oversight is imperative,'" *Fisher v. Halliburton, Inc.*, 454 F. Supp. 2d 637, 643 (S.D. Tex. 2006) (quoting Army Field Manual 100-21, *Contractors on the Battlefield*). Thus, the courts in those cases undertook to examine the extent to which military control was involved in the activities at issue because notwithstanding contractor operational control (totally lacking here), military participation, might by itself, preclude the claims asserted.

## II. Burden of Proof

At oral argument, plaintiffs asserted that because the issue of pre-emption is an affirmative defense, the burden of proof borne by Defendants is different than and "much higher . . . than is set forth in [Defendants'] papers" (10/3/07 Hrg. Tr. 36), citing *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744 (9th Cir. 1997), a case not cited in their briefs.[13] In *Snell*, the court reversed the summary judgment for defendants because a genuine issue of material fact existed on defendants' affirmative defense. The court concluded that "a reasonable jury" could find that

---

[13] In denying the motion to dismiss, the Court cited *Snell* for the proposition that pre-emption is an affirmative defense. *Ibrahim v. Titan Corporation*, 391 F. Supp.2d 10, 18 (D.D.C 2005).

the defense had not been established because issues of fact remained. *See Snell*, 107 F.2d at 746, 748.[14] It did not establish a higher burden as plaintiffs argue.

"The general principles of practice under Rule 56 also apply to the assertion of defenses by a motion for summary judgment. The motion will be granted when it raises at least one legally sufficient defense that would bar plaintiff's claim and that involves no triable issue of fact." 10B Charles Alan Wright, *et al.*, *Federal Practice and Procedure: Civil 3d* § 2734 (1998). It does not matter if the motion is based on an affirmative defense or an element of plaintiff's claim, as for any motion for summary judgment under Rule 56, "if the movant makes out a *prima facie* case that would entitle him to a judgment as a matter of law if uncontroverted at trial, summary judgment will be granted unless the opposing party offers some competent evidence that could be presented at trial showing that there is a genuine issue as to a material fact." 10A Charles Alan Wright, *et al.*, *Federal Practice and Procedure: Civil 3d* § 2727 (1998).[15]

### III.  Summary Judgment on Pre-Emption Cannot be Fended off by Conclusory Allegations and Subjective Beliefs

Titan has set forth a litany of facts establishing a *prima facie* case that would entitle it to judgment as a matter of law based on demonstrating the operational control of the military over Titan linguists giving rise to federal preemption of state law and/or Titan's derivative immunity

---

[14] The Court stated that "there are a couple of standards for summary judgment. One of them is no shred of evidence supporting that genuine issue of material fact, the other one is no reasonable juror." (10/3/07 Hrg. Tr. 59:3-6.) To the extent that there ever was a difference between those two formulations, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–253 (1986) (White, J.) (standards mirror each other, are very close, and the inquiry is the same), as set forth in our papers (Titan Reply 3-4), the Supreme Court has made clear that there is no longer. In particular, the standard is whether there is a dispute of material fact, and in assessing the question, the facts must be one's that a reasonable juror would credit. *See Scott v. Harris*, 127 S. Ct. 1769 (2007).

[15] *See Krombein v. Gali Serv. Indus., Inc.*, 317 F. Supp. 2d 14, 19-20 (D.D.C. 2004) (granting summary judgment on affirmative defense when defendant "discharged its burden of persuasion" on the affirmative defense, but plaintiff failed to "set forth specific facts crystallizing a genuine issue for trial"); *see also Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9 (1st Cir. 1997) (granting motion for summary judgment on affirmative defense when plaintiff "presented no competent evidence that created a genuine issue of material fact" as to affirmative defense); *Overall v. Klotz*, 846 F. Supp. 297 (S.D.N.Y. 1994) (granting summary judgment on affirmative defense when "the plaintiff fail[ed] to show the existence of any genuine issue of fact relating to the [affirmative] defense").

from suit. Titan's showing shifted the burden to plaintiffs to come forward with evidence demonstrating a genuine dispute of material fact about whether the military exercised such control. Rather than do so, plaintiffs argued (1) that the Court should revisit its decision to apply the combatant activities exception in the first instance; (2) if it is to apply the exception, that the standard should be different than that articulated by the court (i.e., that the court should ignore objective facts of operational control in favor of what plaintiffs argue should have happened or certain witnesses' subjective interpretation of what actually happened); and (3) that conclusory statements about "supervision" should be allowed to oppose the motion.

As set forth above, even the new cases relied upon by plaintiffs demonstrate that what matters is the operational control of the Titan linguists. Titan provided objective evidence of precisely that through declarations of Titan's Director of Linguist Operations Kevin Hopkins (who also served as a Titan linguist accompanying combat maneuver units in the invasion of Iraq in March 2003 and later served as a site manager in Iraq before being promoted to Director of Operations); Titan's site manager for Abu Ghraib David Winkler, and Chief Warrant Officer Douglas Rumminger, who was the U.S. Army point of contact that oversaw the assignment and supervision of Titan linguists at Abu Ghraib. These witnesses established the very specific factual details concerning the who, what, where, and how of the control of linguists' daily activities, and the absence of Titan's role in that control, or even the ability of Titan to exercise that control. It is these *facts* that give rise to the legal *conclusions* the military exercised exclusive operational control over Titan linguists while Titan was excluded from doing so and provided purely administrative support. None of the many Titan-related witnesses selected by plaintiffs to depose contradicted these facts; in fact their deposition testimony reinforced the factual record from which the conclusions could be drawn.

Unable to coax any witness—whether associated with the military or Titan—into testifying to facts supporting that Titan had any role in operational control or that the military did not, plaintiffs' counsel resorted to filing declarations containing conclusory assertions without supporting facts and/or assertions without personal knowledge and/or subjective views of

whether the military could "give orders" or the linguists "had to follow" orders. But as set forth above, under the standard for summary judgment, none create disputed issues of material fact.

For example, the Crowley declaration does not assert that he was involved in any of the activities that constitute operational control (e.g., telling linguists which jobs to do, how to specifically perform them, observing them as they performed them, etc.) or asserts that the Army was not doing those things to the exclusion of Titan. Instead he makes conclusory assertions about supervision and whether he told linguists to report undescribed "problems" to him or the military. Crowley's carefully worded conclusory and non-specific assertions are too general to create a dispute about the conclusions to be drawn from the undisputed detailed facts established by the record.[16]

In the case of the declarations of Colonel Karpinski and Mr. Lagouranis, their depositions firmly established that they did not contradict the factual predicate of Titan's motion. *See* Titan Reply at 9-13. Instead, as with Mr. Mawiri's declaration which so much did not did not contradict the material facts of control that Titan chose not to depose him, e.g., that he went months without seeing Titan managers and that soldiers directed his translation activities, one is left with the declarants' subjective views of whether the military could "give orders" or Titan linguists "took orders."

But the determination of whether the unique federal interests in the combatant activities of detention and interrogation in a war zone are in conflict with allowing state law tort claims to regulate the behavior of the linguists who were the "translation machines" of the military engaged in those activities cannot turn on subjective intent. Whether military officers can direct

---

[16] The Court should certainly not find that this creates a dispute of material fact given that he asserts that he "supervised" as a site manager (the first level of Titan management) more than one thousand linguists spread across Iraq. Such "supervision" cannot possibly be consistent with the conclusion of operational control. *See also* Titan Reply at 10 n.11. While plaintiffs are entitled to inferences, they must refute with facts, not conclusory assertions, especially where the inferences they seek are not just factually unsupported, but contrary to the facts adduced for summary judgment. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S. Ct. at 1776.

their translators (military or civilian contractors) on the battlefield free from the regulation of state tort law cannot turn on what they say was their subjective understanding of the relationship. It must turn on the objective facts about who was giving direction, i.e., the military (whether they thought they were "orders" or not), and who was not, i.e., Titan managers (whether or not the linguists thought they were "being ordered"). Those facts are undisputed with regard to who had operational control of the linguists assigned to military units in Iraq,[17] and Titan's motion should be granted.

                                          Respectfully Submitted,

                                          F. Whitten Peters (DC Bar No. 255083)
                                          Ari S. Zymelman (DC Bar No. 421593)
                                          F. Greg Bowman (DC Bar No. 486097)

                                          WILLIAMS & CONNOLLY LLP
                                          725 12th Street, N.W.
                                          Washington, D.C. 20005
                                          (202) 434-5000

Dated: October 15, 2007                  *Attorneys for Defendant L-3 Communications Titan Corporation*

---

[17] Perhaps recognizing the paucity of their real record, plaintiffs have submitted volumes of materials, perhaps assuming that the Court will just take their word for the fact that somewhere in there a material fact must be disputed. The tip-off is of course that plaintiffs did not follow the rules and specifically contest the Statement of Material Facts submitted by defendants and did not even address the issue at oral argument, even after it was raised by defendants' counsel. Nonetheless, a careful review of their statement of facts and Titan's dissection of their assertions reveals that their failure to dispute arose from a lack of a record to do so.