# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ILHAM NASSIR IBRAHIM, *et al.*,      :
                                     :
        Plaintiffs,                  :
                                     :
    v.                               :  Civil Action No. 04-1248 (JR)
                                     :
TITAN CORPORATION, *et al.*,         :
                                     :
        Defendants.                  :


SALEH, *et al.*,                     :
                                     :
        Plaintiffs,                  :
                                     :
    v.                               :  Civil Action No. 05-1165 (JR)
                                     :
TITAN CORPORATION, *et al.*,         :
                                     :
        Defendants.                  :


## MEMORANDUM ORDER

        Named plaintiffs in both of these cases are Iraqi
nationals who allege that they or their late husbands were
tortured or otherwise mistreated while detained by the U.S.
military at Abu Ghraib and other prisons in Iraq.  Defendants are
government contractors who provided interpreters (Titan)[1] or
interrogators (CACI)[2] to the U.S. military in Iraq.  The

---

[1] When these suits were originally filed, this defendant was
a publicly traded company called The Titan Corporation.  In July
2005, L-3 Communications Corporation acquired Titan and renamed
it L-3 Communications Titan Corporation.  The renamed entity is
now a wholly owned subsidiary of L-3 Communications Corporation.
Regardless of the name under which it was then operating, I will
refer to this defendant as Titan throughout.

[2] The Saleh plaintiffs have sued both CACI Premier
Technologies, Inc., and its parent company, CACI International,

defendants have moved for summary judgment, asserting that plaintiffs' common law tort claims should be preempted under the government contractor defense.

**Background**

**A. Procedural History**

On August 12, 2005, I dismissed the <u>Ibrahim</u> plaintiffs' claims under the Alien Tort Statute, RICO, various international laws and agreements, and U.S. contracting laws. I also dismissed their common law claims for false imprisonment and conversion. This left the plaintiffs with four common law claims: assault and battery, wrongful death and survival, intentional infliction of emotional distress, and negligence. Defendants urged that those claims be dismissed as well, arguing that they should be preempted under an extension of the government contractor defense. I concluded that the defendants had not produced sufficient factual support at that stage of the record's development to justify the application of this affirmative defense. Limited discovery was needed on the question of whether defendants' employees "were essentially acting as soldiers," and I asked, "What were [the defendants'] contractual responsibilities? To whom did [their employees] report? How were they supervised? What were the structures of command and

---

Inc.  The <u>Ibrahim</u> plaintiffs have only brought claims against CACI Premier Technologies, Inc.  For simplicity's sake, in this opinion I will refer to both defendants as CACI.

control?"  Ibrahim v. Titan Corp., 391 F. Supp.2d 10, 19 (D.D.C.

2005).  On June 26, 2006, I dismissed the Saleh plaintiffs'

federal claims.  Saleh v. Titan Corp., 436 F. Supp.2d 55, 57-59

(D.D.C. 2006).  That disposition rendered Saleh virtually

indistinguishable from Ibrahim, because the Saleh plaintiffs also

bring a number of common law claims, including assault and

battery, sexual assault, wrongful death, negligent hiring and

supervision, and intentional and negligent infliction of

emotional distress.  The cases were consolidated for discovery

purposes only.

**B. Legal Framework**

       In Boyle v. United Technologies Corporation, 487 U.S.

500 (1992), the Supreme Court laid out a general framework for

identifying whether state law tort claims brought against

military contractors should be preempted by judge-made federal

common law.  First, the court must determine whether "uniquely

federal interests" are at stake.  Id. at 504-07.  Second, the

court must determine whether the application of state tort law

would produce a "significant conflict" with federal policies or

interests.  Id. at 507-13.

       In the August 12, 2005, opinion in Saleh, I concluded

that the treatment of prisoners during wartime undoubtedly

implicates uniquely federal interests.  As Boyle instructs, I

looked to the Federal Tort Claims Act (FTCA) for guidance on the

- 3 -

question of whether allowing these suits to go forward would produce a significant conflict with identifiable federal policies or interests.  The defendants urged that plaintiffs' claims conflict with the federal interests embodied in the FTCA's combatant activities exception, which bars suit against the federal government for "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war."  28 U.S.C. § 2680(j).  As explained by the Ninth Circuit in Koohi v. United States, the purpose of that exception "is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action."  976 F.2d 1328, 1337 (9th Cir. 1992).

In Koohi, as in Boyle, the preempted tort claims were for products liability.  There was, and is, no controlling authority applying the combatant activities exception to the tortious acts or omissions of civilian contractors in the course of rendering services during "wartime encounters."[3]  I concluded

---

[3] Other district courts have limited the preemptive effect of the government contractor defense to the products liability context.  See, e.g., McMahon v. Presidential Airways Inc., 460 F. Supp.2d 1315, 1331 (M.D. Fla. 2006); Fisher v. Halliburton, 390 F. Supp.2d 610, 615 (S.D. Tex. 2005).  The Eleventh Circuit has, however, applied the government contractor defense to preempt tort claims that arose out of a contract for services.  Hudgens v. Bell Helicopters, 328 F.3d 1329, 1345 (11th Cir. 2003) (discretionary function exception applied to preempt claims that defendant negligently serviced and maintained a military helicopter).  According to the Hudgens court, preemption does not depend on what type of contract the defendant had with the

that plaintiffs' state tort claims would be preempted if the
defendants could show that their employees at Abu Ghraib
functioned as soldiers in all but name.[4]  Discovery and briefing
in this case have allowed sharper definition of the showing
necessary for preemption pursuant to the FTCA's combatant
activities exception.  As a threshold matter, defendants must
have been engaged in "activities both necessary to and in direct
connection with actual hostilities."  United States v. Johnson,
170 F.2d 767, 770 (9th Cir. 1948).  If this was the case, the
combatant activities exception will preempt state law only when
defendants' employees were acting under the direct command and
exclusive operational control of the military chain of command.

     That test follows the approach to federal interest
preemption that the Supreme Court set forth in Boyle.  Boyle
explains that the "scope of displacement" of state law must be
tailored to the scope of the federal interest being protected.
In that case, the estate of a Marine helicopter pilot sued the
private helicopter manufacturer for wrongful death caused by
alleged design defects.  The plaintiff's allegations focused on

---

military (i.e., one for goods or one for services).  Instead,
"the question is whether subjecting a contractor to liability
under state tort law would create a significant conflict with a
unique federal interest."  Id. at 1334.

     [4] Some of the abuse alleged by the Saleh plaintiffs occurred
at locations other than Abu Ghraib.  None of the parties have
argued that where the abuse occurred is significant for
preemption purposes.

the function of the helicopter's escape hatch, which was designed according to government specifications.  Among the defects alleged was the fact that the escape hatch opened out, rather than in, making it ineffective when the craft crashed in water. After finding that uniquely federal interests were at stake – including the rights and obligations of the United States under its contracts – the Supreme Court concluded that the imposition of state tort liability would conflict with the discretionary function exception to the FTCA.  See 28 U.S.C. § 1346(b) (barring suits against the United States that are "based upon exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused").  As the Supreme Court explained, "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision." Boyle, 487 U.S. at 511.  In order to preserve the federal interests embodied by the discretionary function exception, the Supreme Court set out a three-part test to determine when this federal interest requires the displacement of state law.  Military contractors cannot be held liable under state law for design defects when: 1) the United States approved reasonably precise specifications; 2) the equipment conformed to those specifications; and 3) the supplier warned the United

- 6 -

States about the dangers in the use of the equipment that were known to the supplier but not to the United States.  Id. at 512. Boyle's three factors ensure that state law will be preempted only when "the suit is within the area where the policy of the 'discretionary function' would be frustrated – i.e., they assure that the design feature in question was considered by a Government officer and not merely by the contractor itself."  Id.

The federal interest at stake in the present case is embodied, not by the discretionary function exception, but by the combatant activities exception.  In such a case a different test for preemption must be used to ensure that any displacement of state law will also be commensurate with the scope of the federal interest at issue.  The policy underlying the FTCA's combatant activities exception is that the military ought be "free from the hindrance of a possible damage suit" based on its conduct of battlefield activities.  Johnson, 170 F.2d at 769.  In this respect, the policy echoes the Supreme Court's admonition that "[i]t would be difficult to devise a more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home."  Johnson v. Eisentrager, 339 U.S. 763, 778 (1950).

Although preemption pursuant to the combatant activities exception relieves the contractor of liability, this effect is incidental to the real function of preemption, which is to shield military combat decisions from state law regulation. This function is seen in the way the exception operates under the FTCA. As applied to the military, this reservation of sovereign immunity ensures that state law will not interfere with an officer's authority, pursuant to the military chain of command, to give legally binding orders to his subordinates. In other words, the exception eliminates the possibility that state law liability could cause a soldier to second-guess a direct order.

In context of preemption, the federal interest embodied by the exception is the same. Where contract employees are under the direct command and exclusive operational control of the military chain of command such that they are functionally serving as soldiers, preemption ensures that they need not weigh the consequences of obeying military orders against the possibility of exposure to state law liability. It is the military chain of command that the FTCA's combatant activities exception serves to safeguard, however, and common law claims against private contractors will be preempted only to the extent necessary to insulate <u>military</u> decisions from state law regulation. This is why the degree of operational control exercised by the military over contract employees is dispositive. When the military allows

private contractors to retain authority to oversee and manage their employees' job performance on the battlefield, no federal interest supports relieving those contractors of their state law obligations to select, train, and supervise their employees properly.

The government contractor defense is an affirmative defense, so the burden is on defendants to show that they meet the requirements for preemption.  Whether they have done so is ultimately a question of fact for the jury.  See Boyle, 487 U.S. at 514.  When the defense is put forward on a motion for summary judgment, as defendants have done here, the factual showing required is a demanding one.  On a motion for summary judgment, the question is not whether the defendants have submitted evidence sufficient to allow a jury to apply the defense.  The question is instead whether the defendants are "entitled to judgment as a matter of law, i.e., whether no reasonable jury could fail to find that the defense ha[s] been established." Snell v. Bell Helicopter Textron, Inc., 107 F.3d 744, 746 (9th Cir. 1997).  In other words, defendants' motions for summary judgment must be denied if plaintiffs have raised a genuine question of material fact as to whether the defendants' employees were acting under the direct command and exclusive operational control of the military chain of command.

## C. Factual Background

### 1. Titan

In 1999, the U.S. Army awarded a contract to Titan's
corporate predecessor for the provision of civilian linguists.
Def.'s Ex. 1, Hopkins Decl. at ¶ 10.  This contract did not
request a set number of linguists but instead allowed for
individual delivery orders to be made as the need arose.  Such
needs became quite urgent following the deployment of military
personnel into Iraq and Afghanistan.  The military could not
provide for the large number of linguists that were needed, so it
turned to Titan to recruit civilian linguists who were to be
"directly attached to units deployed to Afghanistan and Iraq in
support of U.S. military combat operations."  Hopkins Decl. at
¶ 11.  Titan provided linguists to the military in Iraq under a
series of delivery orders, each of which contained a materially
similar "Statement of Work" providing the terms of the
relationship between Titan and the military.  Def.'s Resp. to
Pls.' Statement of Material Facts at ¶ 3.

According to the Statement of Work, Titan was to
provide "all personnel, equipment, tools, material, <u>supervision</u>,
and other items and services . . . necessary to provide foreign
language interpretation and translation services in support of"
military operations in the Persian Gulf region.  Statement of
Work at C-1.1, Ex. A to Hopkins Decl.  (emphasis added).  The

type of supervision required under the contract is not defined. For example, the contract does not make clear whether the military expected Titan to provide only administrative supervision (i.e., delivering linguists to their assigned units and facilitating their payment), or whether Titan was also to provide operational supervision (i.e., overseeing linguists' day-to-day performance of translation duties).  The agreement did make clear, however, that "[c]ontractor personnel must adhere to the standards of conduct established by the operational or unit commander."  Statement of Work at C-1.8.4.

The Statement of Work required Titan to have an "on-site representative" available to the Administrative Contracting Officer or the Contracting Officer's Representative (COR), the military officials who were to be Titan's point of contact with the military on the ground.  Statement of Work at C-1.3.2.  In practice, however, Titan's "site managers" were not generally on-site with the linguists that they managed.  For example, in December 2003, Titan's Iraq operations employed 28 site managers for 3052 linguists.  According to Titan's Director for Operations, Kevin S. Hopkins, this ratio meant that "site managers often found it difficult to see all of their linguists more than once a week, if that."  Hopkins Decl. at ¶ 14.  From October 2003 until January 2004, Titan's site manager for Abu Ghraib was David Winkler.  Def.'s Ex. 3, Winkler Decl. at ¶ 1.

Winkler lived in the Green Zone in Baghdad and would escort newly
arriving linguists to the facility to which they had been
assigned.  This initial assignment was done not by Titan but by
the military.  Major John Scott Harris oversaw the assignment of
both military and civilian linguists within Iraq.  Id. at ¶ 51.
According to Winkler, once Titan linguists were on-site, their
work assignments "were under the exclusive direction and control
of the military unit commander or the OIC/NCOIC."  Id. at ¶ 41.
Winkler explained that this meant that Titan linguists were
subject to their military unit commander's tasking "24 hours per
day, seven days per week. . . .  Titan supervisors played no role
in the tasking of linguists or in supervising their work
performance."  Id.  During the period of November 2003 through
January 2004, Winkler visited the 30-40 U.S. citizen Titan
linguists employed at Abu Ghraib "about 2-3 times per week."  Id.
at ¶ 46.  During these visits he was "prohibited by the military
from observing linguists performing their duties or from
discussing their interrogations."  Id. at ¶ 36.  Instead, Winkler
would check in with each linguist to see how he or she personally
was getting along and would deal with issues relating to benefits
and pay.  Winkler Depo. at 44.  Winkler also "spoke periodically"
with the military commanders of the units to which Titan
linguists were assigned.  Winkler Decl. at ¶ 3.  Military
officials sometimes approached Winkler when "personality

conflicts" with linguists had arisen.  Winkler's approach to such

situations was to

> discuss the matter with the linguists, remind
> them that they work for the military.  They
> take their orders from the military.  If
> there was something which was nothing more
> than a misunderstanding, I would try to clear
> that up.  And then I would talk to the NCOIC
> or OIC or their first-line [military]
> supervision, as the case may be, and explain
> what I had ascertained to be the truth from
> the linguist's point of view and then allowed
> them to work things out accordingly.

Winkler Depo. at 46-47.

At Abu Ghraib, Chief Warrant 3 Officer Douglas

Rumminger of the U.S. Army Reserve "oversaw the linguist

program."  Def.'s Ex. 2, Rumminger Decl. at ¶ 2.  While there

were "a few" military linguists at Abu Ghraib, most of the

linguists at the facility were contracted from Titan.  Id. at

¶ 36.  In his declaration, Rumminger explained that he was

responsible for "the indoctrination of new Titan linguists to

[Abu Ghraib]; delivery of the linguist to one of the various

teams operating at [Abu Ghraib], and, after assignment to a team,

helping oversee the well being of the Titan linguists."  Id. at

¶ 2.

Upon arrival at Abu Ghraib, Rumminger spent about

thirty minutes with each Titan linguist to explain "what was

authorized by the interrogation policies and what was

prohibited."  Id. at ¶ 38.  Linguists were then required to sign

- 13 -

two documents: one on the interrogation rules of engagement and a "memorandum of understanding with the unit." Id. at ¶ 39, attached at Rumminger Decl., Ex. A. This memorandum explained the military's expectations relating to linguists' job performance. For example, the memorandum stressed the importance of conducting word for word translations and mirroring the interrogators' voice inflection and choice of words. Explaining that "it is not the translator's place to second guess the interrogator and refuse to translate words or phrases," the memorandum stated that at no time should linguists and interrogators argue in front of a detainee. Rumminger Decl., Ex. A. Initially drafted for use in Afghanistan, this memorandum was modified by Rumminger for use at Abu Ghraib. Titan had no input into the document.

Through daily planning meetings in which Titan supervisors did not participate, Rumminger assigned linguists to specific interrogations. Once linguists were assigned to interrogation teams, those teams were free "to assign their linguists as they saw fit without seeking permission from Titan or other military authorities." Rumminger Decl. at ¶ 21. When linguist shortfalls occurred at Abu Ghraib, interrogation teams negotiated among themselves the borrowing of a Titan linguist from one team to another. This process took place without any consultation with Titan supervisors. Id. at ¶ 37.

Military unit commanders had to sign off on any requests for leave by Titan linguists.  Rumminger explained that this rule was strictly enforced at Abu Ghraib: he recalled "a particular incident in which four linguists were removed on the spot by a senior military commander for being absent without leave when they were caught returning to the [Abu Ghraib] compound."  Id. at ¶ 51.  Titan was not consulted in advance of this removal.  The Statement of Work itself provided that the military's contracting officer could "require [Titan] to remove . . . any employee for reasons of misconduct, security, or [when] found to be or suspected to be under the influence of alcohol, drugs, or other incapacitating agent."  Statement of Work, C-1.5.

## 2. CACI

CACI provided interrogators at Abu Ghraib under two delivery orders, Delivery Order 35 and Delivery Order 71.  Def.'s Ex. 1, Billings Decl. at ¶ 13.  The Statement of Work for Delivery Order 35 asserted that personnel hired for these interrogator positions would be "integrated into" various intelligence and interrogation teams, Billings Decl., Ex. A at ¶ 4, but it also provided that "[t]he Contractor is responsible for providing supervision for all contract personnel."  Id. at ¶ 5.  Delivery Order 71 does not contain this same language regarding contractor supervision; instead it states that

- 15 -

contracted personnel (including interrogators) will perform
"under the direction and control of the unit's MI chain of
command or Brigade S2, as determined by the supported command."
Billings Decl., Ex. B at ¶ 3.  Unlike the Titan Statement of
Work, the CACI Statements of Work make no mention of any
procedures for having contract employees removed at the direction
of the Contracting Officer.

        Lieutenant Colonel Eugene Davis of the United States
Army was the Contracting Officer's Representative for the
contract under which CACI provided interrogators.  Lt. Col.
Daniels stated that "in coordination with CACI representatives,"
he assigned contract interrogators to posts throughout Iraq,
including at Abu Ghraib.  Def.'s Ex. 5, Daniel Decl. at ¶ 2.
Once contract interrogators arrived at their assigned locations,
Ltc. Daniels stated, "a CACI site manager would assign them to
military interrogation units or teams."  Id.

        The CACI site manager for interrogators at Abu Ghraib
from October 2003 to March 2004 was Daniel Porvaznik.  Def.'s Ex.
2, Porvaznik Decl. at ¶ 3.  Porvaznik himself was stationed at
Abu Ghraib.  In his deposition Porvaznik stated that, as part of
his "site lead managerial duties," he interviewed newly arrived
contract interrogators "at great length" to get a sense of their
skill sets and backgrounds.  Porvaznik Depo. at 131-32.
Porvaznik worked closely with the officer in charge of the

Interrogation Control Element, Capt. Carolyn Wood.  After
familiarizing himself with the skills of newly arrived CACI
interrogators, Porvaznik "provided [Capt. Wood] with input" about
each interrogator's background, input that she used in deciding
how to deploy these contract employees.  Id. at 137.

Porvaznik's involvement with the substance of contract
interrogators' work continued after their initial assignments.
In his role as site lead, Porvaznik had daily conversations with
Capt. Wood about "how my people were doing or not doing."  Id. at
138.  Porvaznik observed a number of interrogations and said that
he "absolutely" would have stopped any interrogation which
involved physical abuse.  Id. at 143.  He agreed that stopping
abuse was among his job responsibilities as site manager; in his
words it was "part of quality control."  Id. at 143-44.
Porvaznik explained that all CACI employees had a duty to report
any abuse they saw both to him as the CACI representative, and to
the military; he agreed that CACI interrogators effectively had a
"double duty" to report abuse.  Id. at 146.

In addition to observing interrogations, Porvaznik
advised CACI interrogators on different approaches that they
might try; he would advise them as to whether he thought that
their planned approach was a "good idea, [or a] bad idea."  Id.
at 161.  Porvaznik could not give final approval to a particular
interrogation plan.  Both contract and military interrogators

were to submit such plans to the military personnel in the
Interrogation Control Element for ultimate approval.  Id. at 162.
In his capacity as site lead, however, Porvaznik did have the
authority to prohibit a contract interrogator from pursuing an
interrogation plan that he felt was not consistent with the CACI
Code of Ethics.  Id. at 185.  If a contract interrogator ignored
a direct order from Porvaznik, termination was among the
potential consequences.  Id.

While Porvaznik did not see "most" of the submitted
interrogation plans, he testified that he did see a "goodly
amount" of those written up by CACI contractors.  Id. at 167.
Beyond reading interrogation plans for himself, Porvaznik
testified that he would speak to military personnel who were
working directly with CACI personnel in order to elicit feedback
on CACI interrogators' performance.  Id. at 168.

## Analysis

### Titan

Serving as a translator for the interrogation of
persons detained by the U.S. military in a combat zone is an
activity that clearly has a "direct connection with actual
hostilities."  Titan therefore satisfies the threshold inquiry
for potential application of the combatant activities exception.
The dispositive question here is whether the undisputed facts

show that Titan's interpreters were under the direct command and exclusive operational control of the military chain of command.

Plaintiffs make two different types of argument in support of their contention that the claims against Titan should not be preempted. First, the plaintiffs attempt to shift the focus away from the question of operational control by arguing that the military is not permitted to directly supervise contract employees. There is no question that, as a general matter, Army policy places significant limits on the way that contract personnel are to be used and supervised. For example, Army Regulation 715-9 provides that "Contracted support service personnel shall not be supervised or directed by military or Department of Army civilian personnel. Instead . . . the Contracting Officer's Representation [COR] shall communicate the Army's requirements and prioritize the contractor's activities within the terms and conditions of the contract." Contractors Accompanying the Force, Army Reg. 715-9 (Oct. 29, 1999), Pls.' Ex. C-3. Likewise, a 2003 Army Field Manual provides that:

> Only the contractor can directly supervise its employees. The military chain of command exercises management control through the contract. The military link to the contractor, through the terms and conditions of the contract, is the contracting officer or the duly appointed COR, who communicates the commander's specific needs to the contractor, when the requirement has already been placed on the contract.

- 19 -

Contractors on the Battlefield, FM 3-100.21, Headquarters of
Department of the Army, at 1-25, 1-26 (Jan. 2003), Pls.' Ex. C-4.
Whether Titan should have provided more or a different kind of
supervision is not, however, the issue before the court.
Instead, the proper focus is on the structures of supervision
that the military actually adopted on the ground.

Plaintiffs also argue that they have raised material
issues of genuine fact as to the military's authority over Titan
contractors.  For example, plaintiffs point to the declaration of
an Army interrogator who was stationed at Abu Ghraib, Anthony
Lagouranis, that two Titan linguists assigned to his team
transferred to other locations without seeking or receiving
permission from the military's team leader.  See Pls.' Ex. A-4,
Lagouranis Decl. at ¶ 20.  Although such testimony potentially
contradicts Winkler's statement that Titan played "no role in the
tasking of linguists," the contradiction is immaterial.  That
Titan reassigned linguists without coordinating such reassignment
with the military does not show that the military shared
operational command and control of the linguists with Titan.
Moving linguists from location to location involves
administrative oversight; there is nothing in this record to
suggest that it has to do with operational control of linguists'
duties.  The facts as to operational control of linguists' job
performance are uncontradicted: the military, and not Titan, gave

all the orders that determined how linguists performed their
duties.  Although the record contains a declaration to the effect
that Titan linguists did not always follow military orders, <u>see</u>
Pls.' Ex. A-5, Marwan Mawiri Decl. at ¶ 10, the insubordination
of some linguists does not change the fact that it was the
military, and not Titan, that exerted operational control over
contract linguists.

Titan has shown that its linguists were fully
integrated into the military units to which they were assigned
and that they performed their duties under the direct command and
exclusive operational control of military personnel.  No genuine
issue of material fact has been identified that might support the
opposite conclusion.  Titan's motions for summary judgment will
accordingly be granted.

**<u>CACI</u>**

There can be no question that the nature and
circumstances of the activities that CACI employees were engaged
in – interrogation of detainees in a war zone – meet the
threshold requirement for preemption pursuant to the combatant
activities exception.  However, the facts regarding military
control of CACI interrogators differ considerably from those
regarding Titan.

From the deposition testimony of site manager Daniel
Porvaznik, a reasonable jury could conclude that he effectively

- 21 -

co-managed contract interrogators, giving them advice and feedback on the performance of their duties.  The trier of fact could also conclude, contrary to CACI's assertion, that "the responsibilities, supervision, and reporting requirements of CACI PT interrogators" were <u>not</u> "identical to those of their military counterparts."  Def.'s Mot. for Summ. J. at 8.  Unlike military interrogators, CACI interrogators were supervised by both Mr. Porvaznik and Capt. Wood.  Also unlike military interrogators, CACI interrogators had a requirement to report abuse not only up the military chain of command but also to CACI.  Moreover, Porvaznik had the authority to direct CACI interrogators not to carry out an interrogation plan that was inconsistent with company policy.  Military interrogators were not subject to this kind of dual oversight.

These facts can reasonably be construed as showing that CACI interrogators were subject to a dual chain of command, with significant independent authority retained by CACI supervisors.  When the facts are construed in this manner, no federal interest requires that CACI be relieved of state law liability.

## Conclusion

The critical differences between the ways that contract translators and contract interrogators were managed and supervised lead to different outcomes.  Because the facts on the ground show that Titan linguists performed their duties under the

exclusive operational control of the military, the remaining state law claims against Titan are preempted and must be dismissed.  Because a reasonable trier of fact could conclude that CACI retained significant authority to manage its employees, however, I am unable to conclude at this summary judgment stage that the federal interest underlying the combatant activities exception requires the preemption of state tort claims against CACI.  This does not mean that CACI may not successfully prove this affirmative defense at trial, but the task of sorting through the disputed facts regarding the military's command and control of CACI's employees will be for the jury.

*   *   *   *   *

For the foregoing reasons, it is

  **ORDERED** that Titan's motions for summary judgment [#75 in 05-1165 and #56 in 04-1248] are **granted**, and that CACI's motions for summary judgment [#79 in 05-1165 and #54 in 04-1248] are **denied**; it is

  **FURTHER ORDERED** that the Clerk set a status conference for a date and time convenient for the parties approximately 30 days after the date of this memorandum order.


        JAMES ROBERTSON
       United States District Judge