## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALEH, *et al.*,<br><br>               Plaintiffs,<br><br>         v.<br><br>TITAN CORP., *et al.*,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 05-CV-1165 (JR) |

### MOTION OF DEFENDANTS CACI INTERNATIONAL
### INC AND CACI PREMIER TECHNOLOGY, INC. TO
### DISMISS PLAINTIFFS' FOURTH AMENDED COMPLAINT

Defendants CACI International Inc and CACI Premier Technology, Inc. (collectively, the "CACI Defendants"), hereby move to dismiss Plaintiffs' Fourth Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Dismissal is appropriate because the Fourth Amended Complaint fails to state a claim for which relief may be granted and the Court lacks subject-matter jurisdiction over Plaintiffs' claims. The basis for the motion to dismiss is set out in greater detail in the accompanying Memorandum.

WHEREFORE, the CACI Defendants respectfully request that the Court dismiss the Fourth Amended Complaint with prejudice. A proposed order is attached.

Respectfully submitted,

/s/  John F. O'Connor

_____
J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:    (202) 429-3000
Facsimile:    (202) 429-3902

**Counsel for Defendants CACI International Inc
and CACI Premier Technology, Inc.**

January 4, 2008

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SALEH, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | )    Civil Action No. 05-CV-1165 (JR) |
| v. | ) |
| | ) |
| TITAN CORP., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OF DEFENDANTS CACI INTERNATIONAL INC AND CACI PREMIER TECHNOLOGY, INC. IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FOURTH AMENDED COMPLAINT

J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington,  D.C. 20036
Telephone:   (202) 429-3000
Facsimile:    (202) 429-3902

*Counsel for Defendants CACI International Inc and*
*CACI Premier Technology, Inc.*

January 4, 2008

# TABLE OF CONTENTS
**Table of Contents**

**Page**

I.   INTRODUCTION ..........................................................................................................1

II.  THE ALLEGATIONS IN PLAINTIFFS' COMPLAINT ..................................................2

III. MOTION TO DISMISS STANDARD..........................................................................6

IV.  ANALYSIS..............................................................................................................7

    A.   The CACI Defendants Are Absolutely Immune From Plaintiffs' Suit..................7

    B.   Because Plaintiffs' Tort Claims Would Be Governed By Iraqi Law, the
        CACI Defendants Are Immune From Suit Even If They Were Not
        Entitled to Absolute Official Immunity ................................................................13

    C.   Plaintiffs' Claims Present Non-Justiciable Political Questions ...........................19

        1.   Plaintiffs' Complaint Alleges Conspiratorial Conduct That
            Necessarily Involves Official Complicity, Thereby Implicating
            Foreign Power Responsibilities Constitutionally Committed to the
            Political Branches ..................................................................................20

        2.   Whether Recovery for Wartime Injuries Should Be Available is a
            Political Question Constitutionally Committed to the Political
            Branches.................................................................................................23

        3.   There Are No Judicially Discoverable and Manageable Standards
            for Evaluating Plaintiffs' Claims ............................................................27

    D.   Plaintiffs Fail to State Factual Allegations Sufficient to Show a Plausible
        Entitlement to Relief............................................................................................29

    E.   Plaintiffs' Complaint Fails to Allege Facts Sufficient to Establish
        *Respondeat Superior* Liability ............................................................................35

    F.   Plaintiffs' Attempt to Impose Vicarious Liability on the CACI Defendants
        for the Actions of Military and Titan Personnel Fails as a Matter of Law ...........37

    G.   Plaintiffs' Claims Are Preempted .......................................................................41

V.   CONCLUSION.......................................................................................................42

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.G. Van Metre Const., Inc. v. NVKettler L.P.*,
No. 13174, 1992 WL 884467 (Va. Cir. Ct. Jan. 29, 1992) .......................................................39

*Abanco Int'l, Inc. v. Guestlogix Inc.*,
486 F. Supp. 2d 779 (N.D. Ill. 2007) ...................................................................................41

*Aktieselskabet AF 21 v. Fame Jeans, Inc.*,
511 F. Supp. 2d 1 (D.D.C. 2007) ...............................................................................32, 33

*Almy v. Grisham*,
639 S.E.2d 182 (Va. 2007) ......................................................................................38

*Anderman v. Fed. Republic of Austria*,
256 F. Supp. 2d 1098 (C.D. Cal. 2003) ..................................................................24, 26, 27

*Baker v. Carr*,
369 U.S. 186 (1962) .........................................................................................20, 26

*Bancoult v. McNamara*,
445 F.3d 427 (D.C. Cir. 2006) ..................................................................................21, 23

*Barr v. Matteo*,
360 U.S. 564 (1959) (plurality opinion) .............................................................................8, 9

*Beebe v. WMATA*,
129 F.3d 1283 (D.C. Cir. 1997) ..................................................................................... passim

*Bell Atl. Co. v. Twombly*,
127 S. Ct. 1955 (2007) ......................................................................................... passim

*Bentzlin v. Hughes Aircraft Co.*,
833 F. Supp. 1486 (C.D. Cal. 1993) ...................................................................................27

*Boyle v. United Technologies Corp.*,
487 U.S. 500 (1988) .........................................................................................7, 40

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002) ............................................................................................6

*Burlington Indus. v. Ellerth*,
524 U.S. 742 (1998) .........................................................................................36

*Burnett v. Al Baraka Investment & Development Corp.*,
   274 F. Supp. 2d 86 (D.D.C. 2003) ........................................................................31, 35

*Burns v. Wilson*,
   346 U.S. 844 (1953) ........................................................................................16

*Bush v. Butler*,
   ___ F. Supp. 2d ___, 2007 WL 3357144 (D.D.C. 2007) .................................6, 7, 29

*Cadet v. Draper & Goldberg, PLLC*,
   No. 05-2105, 2007 WL 2893418 (D.D.C. Sept. 28, 2007) ....................................32

*Carl Colteryahn Dairy, Inc. v. W. Pa. Teamsters & Employers Pension Fund*,
   785 F. Supp. 536 (W.D. Pa. 1992) ...............................................................41

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) ........................................................................................27

*City of Worcester v. HCA Mgmt. Co., Inc.*,
   753 F. Supp. 31 (D. Mass. 1990) ...................................................................9

*\*Coleman v. Tennessee*,
   97 U.S. 509 (1878) ....................................................................................15, 16

*Commercial Business Sys., Inc. v. Halifax Corp.*,
   484 S.E.2d 892 (Va. 1997) .............................................................................38

*Conley v. Gibson*,
   355 U.S. 41 (1957) ........................................................................................29

*Dalton v. Little Rock Family Planning Servs.*,
   516 U.S. 474 (1996) ........................................................................................40

*Dennis v. Sparks*,
   449 U.S. 24 (1980) ........................................................................................40

*Dostal v. Haig*,
   652 F.2d 173 (1981) ...................................................................................16, 17

*Dow v. Johnson*,
   100 U.S. 158 (1879) ........................................................................................16

*\*Drs. Groover, Christie & Merritt, P.C. v. Burke*,
   917 A.2d 1110 (D.C. 2007) ...........................................................................13

*Dye v. United States*,
   ___ F. Supp. 2d ___, 2007 WL 2800376 (D.D.C. 2007) ...............................29, 31

*El-Shifa Pharm. Indus. Co. v. United States*,
 55 Fed. Cl. 751 (2003), *aff'd*, 378 F.3d 134 (Fed. Cir. 2004)..................................26

*Ellipso, Inc. v. Draim*,
 No. 06-1373, 2007 WL 1866799 (D.D.C. June 28, 2007)........................................29

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*,
 749 A.2d 724 (D.C. 2000) ...................................................................................38

*Fischer v. Estate of Flax*,
 816 A.2d 1 (D.C. 2003) .......................................................................................39

*Flax v. Schertler*,
 ___ A.2d ___, 2007 WL 3375179 (D.C. Nov. 15, 2007) .......................................39

*Gilligan v. Morgan*,
 413 U.S. 1 (1973).................................................................................................13

*Goldman v. Weinberger*,
 475 U.S. 503 (1986).............................................................................................13

*\*Gonzalez-Vera v. Kissinger*,
 449 F.3d 1260 (D.C. Cir. 2006)....................................................................... passim

*Gov't of Rwanda v. Rwanda Working Group*,
 150 F. Supp. 2d 1 (D.D.C. 2001)............................................................................7

*Halberstam v. Welch*,
 705 F.2d 472 (D.C. Cir. 1983).........................................................................38, 39

*Hamdan v. Rumsfeld*,
 126 S. Ct. 2749 (2006).........................................................................................15

*Hamilton v. McClaughry*,
 136 F. 445 (C.C. D. Kan. 1905)............................................................................16

*Hancock v. Homeq Servicing Corp.*,
 No. 05-0307, 2007 WL 1238746 (D.D.C. Apr. 27, 2007).......................................39

*Hauck Mfg. Co. v. Astec Indus., Inc.*,
 375 F. Supp. 2d 649 (E.D. Tenn. 2004)..................................................................41

*Herbert v. Nat'l Acad. of Sciences*,
 974 F.2d 192 (D.C. Cir. 1992)................................................................................7

*Hill v. Medlantic Health Care Group*,
 933 A.2d 314 (D.C. 2007) ...................................................................................38

*Hwang Geum Joo v. Japan*,
  172 F. Supp. 2d 52 (D.D.C. 2001) ...............................................................24, 26

*Ibrahim v. Titan Corp.*,
  391 F. Supp. 2d 10 (D.D.C. 2005) ................................................................. passim

*\*Ibrahim v. Titan Corp.*,
  ___ F. Supp. 2d ___, 2007 WL 3274784 (D.D.C. 2007) ................................ passim

*In re African-American Slave Descendants Litig.*,
  304 F. Supp. 2d 1027 (N.D. Ill. 2004) .........................................................24, 26

*In re Lo Dolce*,
  106 F. Supp. 455 (W.D.N.Y. 1952) ...................................................................16

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
  193 F.3d 781 (3d Cir. 1999)..............................................................................39

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
  510 F. Supp. 2d 35 (D.D.C. 2007) ......................................................................8

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941)...........................................................................................13

*\*Koohi v. United States*,
  976 F.2d 1328 (9th Cir. 1992) ...........................................................................12

*Leitensdorfer v. Webb*,
  61 U.S. 176 (1857).............................................................................................15

*Madsen v. Kinsella*,
  343 U.S. 341 (1952)......................................................................................16, 17

*\*Mangold v. Analytic Services, Inc.*,
  77 F.3d 1442 (4th Cir. 1996) .....................................................................8, 9, 12

*McKinney v. Whitfield*,
  736 F.2d 766 (D.C. Cir. 1984) ...........................................................................11

*Midland Psychiatric Assocs., Inc. v. United States*,
  145 F.3d 1000 (8th Cir. 1998) .............................................................................9

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985)............................................................................................40

*Murray v. Northrop Grumman Information Tech., Inc.*,
  444 F.3d 169 (2d Cir. 2006).................................................................................9

*New Orleans v. The Steamship Co.,*
  87 U.S. 387 (1874) ..................................................................................................15

*Nix v. Hoke,*
  139 F. Supp. 2d 125 (D.D.C. 2001) .......................................................................18

*\*Pani v. Empire Blue Cross Blue Shield,*
  152 F.3d 67 (2d Cir. 1998) ......................................................................................9

*Paul v. Howard Univ.,*
  754 A.2d 297 (D.C. 2000) .......................................................................................38

*Pearce v. E.F. Hutton Group, Inc.,*
  664 F. Supp. 1490 (D.D.C. 1987) ...........................................................................18

*Perrin v. United States,*
  4 Ct. Cl. 543 (1868) ................................................................................................23

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985) ...........................................................................................13, 14

*Reid v. Covert,*
  354 U.S. 1 (1957) ....................................................................................................15

*Saleh v. Titan Corp.,*
  436 F. Supp. 2d 55 (D.D.C. 2006) ................................................................. passim

*Sarei v. Rio Tinto PLC,*
  221 F. Supp. 2d 1116 (C.D. Cal. 2002) .............................................................24, 26

*Schneider v. Kissinger,*
  310 F. Supp. 2d 251 (D.D.C. 2004) .......................................................................36

*\*Schneider v. Kissinger,*
  412 F.3d 190 (D.C. Cir. 2005) ...........................................................................23, 36

*Schroer v. Billington,*
  ___ F. Supp. 2d ___, 2007 WL 4225667 (D.D.C. 2007) .......................................29

*Smith v. CNA Fin. Corp.,*
  No. 01-CV-00653, 2003 WL 24253672 (W.D. Va. Nov. 28, 2003) .....................39

*Smith v. United States,*
  507 U.S. 197 (1993) ................................................................................................18

*Sparrow v. Reynolds,*
  646 F. Supp. 834 (D.D.C. 1986) ............................................................................25

*Tennessee v. Hibdom*,
    23 F. 795 (C.C. M.D. Tenn. 1885)................................................................................16

*United States v. Johnson*,
    170 F.2d 767 (9th Cir. 1948) ......................................................................................40

*Ware v. Hylton*,
    3 U.S. (3 Dall.) 199 (1796) ....................................................................................23, 26

*Westfall v. Erwin*,
    484 U.S. 292 (1988)..........................................................................................8, 9, 10, 11

*Wigfall v. Wilpoff & Abramson, LLP*,
    No. 05-591(JR), 2005 WL 3213955 (D.D.C. Nov. 1, 2005) ....................................13

*Zivkovich v. Vatican Bank*,
    242 F. Supp. 2d 659 (N.D. Cal. 2002) ................................................................24, 26, 27

## STATUTES

28 U.S.C. § 2680(j)................................................................................................................42

## RULES

Federal Rule of Civil Procedure 12(b)(6) ............................................................... passim

Federal Rule of Civil Procedure 12(b)(1) ....................................................................... 6-7

## BOOKS AND ARTICLES

Gerhard von Glahn, *The Occupation of Enemy Territory: A Commentary on the Law and Practice of Belligerent Occupation* 112 (1957).....................................................16

Restatement (Second) of Agency § 228..............................................................................36

Restatement (Second) of Agency § 229..............................................................................36

2 William Winthrop, *Military Law and Precedents* 800 (2d rev. ed. 1896)...........................15, 17

## I.    INTRODUCTION

Plaintiffs' Fourth Amended Complaint (the "complaint") is deafening for what it does not say.  After three-and-one-half years of litigation, with dozens of depositions during the summary judgment process, not a single one of the 256 Plaintiffs in this action makes a single factual allegation that they had any contact whatsoever with a CACI PT interrogator.  These Plaintiffs do not even specify how they were supposedly abused, with each Plaintiff simply offering the rote incantation that they were somehow "tortured and otherwise mistreated by CACI and its co-conspirators."  Compl. App. A at ¶ 1-256.  Because of Plaintiffs' wholesale failure to allege any direct contact with CACI PT interrogators, Plaintiffs' complaint entirely rises or falls on Plaintiffs' ability (or in this case, inability) to hold the CACI Defendants liable for the conduct of others in Iraq.

Plaintiffs' complaint, however, falls far short of the mark in alleging facts sufficient to state a plausible claim of co-conspirator liability for torts that Plaintiffs, by omission, are unable to allege were committed by CACI PT employees (if they occurred at all).  The absence of factual allegations sufficient to state a plausible claim against the CACI Defendants requires dismissal of all of Plaintiffs' remaining claims.  But Plaintiffs' lack of factual support in their complaint is but one of a myriad of reasons why Plaintiffs' complaint must be dismissed.  The unique and unprecedented factual context of Plaintiffs' claims – with persons detained by the United States military in a war zone seeking tort relief against the employer of persons directed by the United States to conduct combat zone interrogation of detainees – gives rise to a number of other defenses that require dismissal.

First, Plaintiffs' complaint demonstrates that the CACI Defendants are immune from suit, both on absolute official immunity grounds and based on the CACI Defendants' immunity under Iraqi law.  Second, Plaintiffs' allegation of a conspiracy that included objectives such as

falsifying death certificates and hiding detainees from the Red Cross necessarily involves the type of official complicity that the Court previously warned could give rise to non-justiciable political questions. *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55, 58 (D.D.C. 2006). Third, Plaintiffs have failed to allege sufficient facts to render the CACI Defendants liable on a *respondeat superior* theory *even if* Plaintiffs had sufficiently alleged incidents of misconduct by CACI PT employees. Fourth, Plaintiffs' inability to allege that a CACI PT interrogator actually physically abused them is fatal to Plaintiffs' claims because this Court's prior preemption rulings necessarily render conduct by military personnel and Titan Corporation non-tortious, and a party cannot be held liable on a conspiracy theory for conduct that was not itself a tort. Finally, Plaintiffs' tort claims are preempted by the strong federal interests reflected in the combatant activities exception and foreign country exception to the Federal Tort Claims Act.

This is Plaintiffs' fifth iteration of a complaint in this action. Thus far, Plaintiffs have shown a noteworthy flexibility in their allegations of fact, changing their allegations and conspiracy theories to fit what they believe the Court will allow to proceed, with little to no apparent concern to whether their allegations are supported by the facts or even good faith. The time has come, after three-and-one-half years, for the Court to call Plaintiffs on their abject lack of factual allegations that a CACI PT employee did *anything* to them. The Court should dismiss Plaintiffs' complaint with prejudice, without leave to file a sixth version of the complaint.

## II.    THE ALLEGATIONS IN PLAINTIFFS' COMPLAINT

As referenced above, Plaintiffs' Fourth Amended Complaint does not contain a single allegation of contact between a Plaintiff and a CACI PT interrogator. Rather, all of the facts relevant to each of the 256 Plaintiffs in this action are set forth in Appendix A to Plaintiffs' complaint, where all of one paragraph is devoted to identifying the facts pertinent to each

Plaintiff's claims. And these single paragraphs are hardly illuminating. Virtually all of the Plaintiffs offer a rote and conclusory allegation that they (or their decedent) were "tortured and otherwise mistreated by CACI and its co-conspirators," with no disclosure whatsoever of who supposedly injured these Plaintiffs, or when they were injured, or how they were injured, or the basis for the Plaintiff's conclusion that the CACI Defendants were somehow involved in (or responsible for) any injuries the Plaintiff supposedly suffered. Compl. App. A at ¶¶ 1-8, 10-118, 120-256. Two of the Plaintiffs add the allegation that their decedents died as a result of the injures they suffered, Compl. App. A at ¶¶ 9, 119, but these Plaintiffs still do not allege who caused these injuries, how they were caused, or what the injuries were. *Id.*

The unprincipled nature of Plaintiffs' complaint is best exemplified by Plaintiffs' changing conspiracy allegations, which is the crux of Plaintiffs' complaint in light of their inability to make allegations of actual interaction between Plaintiffs and CACI PT employees. In the first four versions of Plaintiffs' complaint, when Plaintiffs were trying to keep a civil RICO claim on life support, Plaintiffs' claimed conspiracy was a business conspiracy. In allegations this Court described as "conjured" by Plaintiffs and "quite fantastic," *Saleh*, 436 F. Supp. 2d at 58, Plaintiffs alleged that the sitting Secretary of Defense, two Undersecretaries of Defense, and dozens of military personnel, ranking from general officers to low-ranking MPs, committed treason in conspiring with the CACI Defendants and Titan to drive up the market demand for civilian interrogation services by knowingly obtaining faulty intelligence through abusive interrogations. Third Am. Compl. ¶ 99. Plaintiffs' RICO claim having met its fate, and the Court having warned Plaintiffs of the political question implications of the grand conspiracy they

alleged,[1] Plaintiffs now revamp their conspiracy allegations to try to sidestep the political question problems identified by the Court.

Plaintiffs' complaint now identifies by name only seven soldiers as alleged co-conspirators – two dog handlers and five MPs, none of whom were above the rank of staff sergeant, and most of whom were considerably below that rank. Compl. ¶ 42. Plaintiffs also allege that two Titan linguists were part of the conspiracy. *Id.* While limiting their explicit identification of supposed co-conspirators to a small group of low-level soldiers, Plaintiffs continue to allege a conspiratorial purpose of grand scale, including alleged conspiratorial goals of falsifying death records, designating detainees as "ghost detainees," and making false reports to the Red Cross (Compl. ¶ 41). This tactic likely is a reflection of Plaintiffs' efforts to avoid explicitly naming any supposed conspirator of sufficient heft to implicate the political question doctrine, with Plaintiffs adding the catch-all that there were unnamed "others" involved in the conspiracy. Compl. ¶ 42.

Perhaps most egregiously, Plaintiffs have added a new twist to their ever-changing conspiracy allegations. Plaintiffs allege, not even on information and belief, that "[t]he conspiracy to torture and abuse prisoners also included several Iraqi nationals who were assigned as prison guards responsible for the portion of the prison housing Iraqi criminals." Compl. ¶ 44. No doubt, Plaintiffs have added this wrinkle to their complaint to address the problems brought to the fore by the administrative claim Plaintiff Saleh filed with the United States. Although Plaintiff Saleh claimed that he had been tortured during interrogations, Army records demonstrated that he was housed in the part of Abu Ghraib prison reserved for suspected

---

[1] *Saleh*, 436 F. Supp. 2d at 58 ("And the more plaintiffs assert official complicity in the acts of which they complain, the closer they sail to the jurisdictional limitation of the political question doctrine.").

criminals with no intelligence value, and that Plaintiff Saleh had never been interrogated by anyone.  O'Connor Decl., Ex. A.  Faced with the prospect that many, if not the vast majority, of the Plaintiffs were never interrogated, Plaintiffs simply change their conspiracy allegations to claim that the CACI Defendants conspired not only to abuse and torture interrogatees, but also criminals who had no intelligence value whatsoever.  One can almost see the drafters of the Fourth Amended Complaint sitting at a word processor and, when facing factual holes in Plaintiffs' claims, simply shrugging and saying "eh, just add it to the conspiracy."[2]

Moreover, unlike the four prior versions of their complaint, Plaintiffs' "new" conspiracy does not allege that the CACI Defendants were a founding member of the "torture conspiracy." Rather, Plaintiffs allege that CACI PT interrogators reached Iraq beginning in October 2003, observed conspiratorial acts of torture and related misconduct by military and Titan personnel, and that the CACI Defendants then made the corporate decision to join this existing conspiracy. Compl. ¶¶ 39, 48-55.  How did the CACI Defendants decide to join this ongoing "torture conspiracy" and convey that decision to the existing conspirators?  According to the complaint, "as reasonable discovery will establish, CACI conveyed its intent to join the conspiracy to the existing co-conspirators by a series of verbal statements made in October, November and December 2003."  Compl. ¶ 55.  So, Plaintiffs essentially allege that the CACI Defendants joined the ongoing torture conspiracy, and are therefore liable for the acts of the other conspirators, by telling something to somebody during a three-month period in late 2003, or at least Plaintiffs claim to believe discovery will show this to be true.  As explained below, Plaintiffs' claims continue to be a "quite fantastic" story "conjured" by Plaintiffs out of whole cloth, *Saleh*, 436 F.

---

[2] Plaintiffs also now allege that the "torture conspiracy" included unnamed Army Criminal Investigation Division investigators who were assigned to investigate allegations of detainee abuse.  Compl. ¶ 43.

Supp. 2d at 58, and these outrageous and unprincipled claims cannot withstand a motion to dismiss.

## III.     MOTION TO DISMISS STANDARD

With the exception of the CACI Defendants' political question defense, all of the other grounds for dismissal identified in the CACI Defendants' motion to dismiss are properly considered under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must "show[] that the pleader is entitled to relief in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Co. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). A plaintiff must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to meet this pleading standard. *Id.* at 1964-65. Indeed, a plaintiff must allege facts that create more than the "mere possibility" of an entitlement to relief, as the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," or must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 1965, 1968. When the factual allegations in a complaint lack the heft to nudge an entitlement to relief from the merely possible to the plausible, a court should dismiss the plaintiffs' claims pursuant to Rule 12(b)(6).

The CACI Defendants' political question defense challenges the subject-matter jurisdiction of the Court and, therefore, is properly treated as a Rule 12(b)(1) motion. *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1262 (D.C. Cir. 2006). When a court is deciding a motion to dismiss for lack of subject-matter jurisdiction, the court may dispose of the motion based on the complaint alone or may consider materials outside the pleadings. *Bush v. Butler*, ___ F. Supp. 2d ___, 2007 WL 3357144, at *2 (D.D.C. 2007). "[W]here necessary, the court may consider

the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).  The plaintiff bears the burden of persuasion when a motion to dismiss challenges the court's subject-matter jurisdiction.  *Gov't of Rwanda v. Rwanda Working Group*, 150 F. Supp. 2d 1, 5 (D.D.C. 2001); *see also Bush*, 2007 WL 3357144, at *2.  Because Plaintiffs' complaint cannot survive scrutiny under either Rule 12(b)(6) or Rule 12(b)(1), the Court should grant the CACI Defendants' motion to dismiss.

## IV.    ANALYSIS

### A.    The CACI Defendants Are Absolutely Immune From Plaintiffs' Suit

In declining to dismiss the *Ibrahim* Plaintiffs' tort claims on preemption grounds, the Court stated in *dicta* that the Supreme Court's decision in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 505 (1988), "explicitly declined to address the question of extending federal immunity to non-government employees, and [the Court] will not extend that immunity here." *Ibrahim*, 391 F. Supp. 2d at 17.  That *sua sponte* comment by the Court did not take into account the decisions of a number of numerous appellate courts, including the D.C. Circuit in *Beebe v. WMATA*, 129 F.3d 1283, 1289 (D.C. Cir. 1997), that non-government employees *can* enjoy official immunity in connection with performing tasks delegated by the United States government.

Immunity is available to the CACI Defendants here.  Subsequent to the decision in *Ibrahim*, 391 F. Supp. 2d at 17, this Court made an express finding that the CACI PT interrogators were performing combatant activities in Iraq pursuant to CACI PT's contract with the United States.  This is precisely the type of delegated activity to which absolute official immunity applies.  Therefore, the Court should dismiss Plaintiffs' remaining claims on the basis of absolute official immunity.

In *Westfall v. Erwin*, 484 U.S. 292, 297-98 (1988), the Supreme Court held that federal officials are absolutely immune from state-law tort actions when their alleged conduct falls "within the scope of their official duties and the conduct is discretionary in nature." *Id.* While Congress overturned *Westfall* as it relates to federal employees, and substituted a statutory standard in its place, the *Westfall* test remains the common-law rule and continues to supply the analytical framework for assessing absolute official immunity claims by non-government employees. As the Fourth Circuit observed in *Mangold v. Analytic Services, Inc.*, 77 F.3d 1442 (4th Cir. 1996):

> The privilege [of absolute immunity] is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.
>
> If absolute immunity protects a particular governmental function, no matter how many times or to what level that function is delegated, it is a small step to protect that function when delegated to private contractors, particularly in light of the government's unquestioned need to delegate governmental functions. The government cannot perform all necessary and proper services itself and must therefore contract out some services for performance by the private sector. When the government delegates discretionary governmental functions through contracting with private contractors, therefore, the same public interest identified in *Barr* and *Westfall* – the interest in efficient government – demands that the government possess the ability meaningfully to investigate these contracts to ensure that they are performed without fraud, waste, or mismanagement.

*Id.* at 1447-48 (citation omitted).

The D.C. Circuit cited approvingly to *Mangold* in *Beebe*, 129 F.3d at 1289, and specifically adopted the *Mangold* court's conclusion that the *Westfall* test continues to apply to non-government employees. *Id.*; *see also In re Series 7 Broker Qualification Exam Scoring*

- 8 -

*Litig.*, 510 F. Supp. 2d 35, 44-45 (D.D.C. 2007) (adopting *Mangold* court's analysis and applying *Westfall* test to non-government employees' absolute immunity defense). Other federal courts of appeals similarly have held that the absolute official immunity doctrine applies to non-government officials performing delegated government functions. *See, e.g.*, *Murray v. Northrop Grumman Information Tech., Inc.*, 444 F.3d 169, 175 (2d Cir. 2006); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71-73 (2d Cir. 1998); *Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1005 (8th Cir. 1998); *see also City of Worcester v. HCA Mgmt. Co., Inc.*, 753 F. Supp. 31, 37-38 (D. Mass. 1990).

In *Beebe*, the plaintiff sued two WMATA officials in their individual capacities, alleging that these officials committed a panoply of torts (including the intentional torts of fraud and intentional infliction of emotional distress) in the course of reorganizing WMATA's office of procurement. *Beebe*, 129 F.3d at 1289. The plaintiffs also alleged that the defendants were motivated by personal animus in intentionally injuring the plaintiff during the reorganization process. *Id.* Nevertheless, the court held that the common-law doctrine of absolute official immunity shielded the defendants from suit even though they were not themselves government employees but were performing delegated governmental functions. *Id.*

The D.C. Circuit's analysis began with a recognition that the plaintiffs had made no allegation that the individual defendants had acted outside the scope of their official duties. Indeed, as the court noted, a defendant need not even be acting within the precise scope of his duties in order to enjoy absolute official immunity, so long as the defendant's alleged activities are "within the outer perimeter of [his] official duties." *Id.* (*quoting Barr v. Matteo*, 360 U.S. 564, 575 (1959) (plurality opinion)). That the individual defendants were alleged to have committed intentional torts that were motivated by personal animus rather than the successful

completion of the government's work did not change the court's analysis. It was sufficient for immunity purposes that the alleged conduct "related directly" to the individual defendants' delegated responsibilities, even if their motives were not to further the government's interests. *Id.* With respect to the second requirement for absolute official immunity, the Court concluded that reorganization of WMATA's office of procurement was a discretionary function because it involved some degree of decision-making rather than the mere performance of ministerial functions. *Id.* at 1288.

The D.C. Circuit's decision in *Beebe* compels the conclusion that the CACI Defendants enjoy absolute immunity from Plaintiffs' remaining tort claims. Plaintiffs' complaint alleges that they were injured by *somebody* – notably, Plaintiffs' complaint is short on allegations of actual contact between Plaintiffs' and CACI PT personnel – during the course of their detention and, in some cases, interrogation in combat detention facilities in Iraq. Interactions with detainees are clearly within at least the "outer perimeter" of the responsibilities delegated to CACI PT interrogators in Iraq, just as interacting with the plaintiff was part of the reorganization effort in *Beebe*. *See id.* at 1289. Indeed, as the D.C. Circuit observed, it does not matter that Plaintiffs allege (without detail) that CACI PT employees were somehow motivated by animus, acted intentionally to injure others, or were acting contrary to the government's actual interests; so long as the CACI PT interrogators' actions occurred in the course of performing the duties they were assigned, the first prong of the *Westfall* immunity test is satisfied. *Beebe*, 129 F.3d at 1289.[3]

---

[3] The *Beebe* court did observe in *dicta* that certain "extreme" acts by defendants could "exceed the outer perimeters of their responsibilities," so that the first prong of the *Westfall* test for immunity is not satisfied. The court offered two examples of where conduct in the course of performing official duties might nonetheless be so extreme as to exceed the outer perimeters of an official's duties: (1) where the defendants "resort to physical force to compel the obedience of

With respect to the second requirement for absolute official immunity under *Westfall*, that the defendants' duties involved performance of a discretionary function, the *Beebe* court held that the proper focus is on whether the assigned duties are "discretionary" or "ministerial." *Id.* at 1287. Because the plaintiff in *Beebe* had not alleged facts to support an allegation that the defendants' tasks were purely ministerial, dismissal on absolute immunity grounds was appropriate. *Id.* at 1289. That same analysis applies here. Plaintiffs have not alleged that the CACI PT interrogators were performing purely ministerial functions. Indeed, if Plaintiffs had made such an allegation, it would clearly support combatant activities preemption even under the test announced by this Court. *See Ibrahim v. Titan Corp.*, ___ F. Supp. 2d ___, 2007 WL 3274784, at *9 (D.D.C. 2007). Therefore, if Plaintiffs allegations are that the CACI PT interrogators were permitted to exercise discretion in performing interrogation services, *Westfall* absolute immunity requires dismissal of Plaintiffs' complaint. If Plaintiffs' complaint could be construed as alleging that the CACI PT interrogators were to perform solely a ministerial function, then combatant activities preemption requires dismissal of Plaintiffs' complaint. There is no middle ground.

Indeed, the government interest served by absolute immunity here is clear. The United States has an urgent and compelling interest in having the conduct of combatant activities free

their managerial subordinates"; and (2) where the defendants threaten their employees with false criminal charges if they do not resign. *Beebe*, 129 F.3d at 1289 (*quoting McKinney v. Whitfield*, 736 F.2d 766, 771-72 (D.C. Cir. 1984)). Here, however, the Plaintiffs were not the "managerial subordinates" of CACI PT interrogators. Rather, they were persons detained by the United States and, to the extent they even came into contact with CACI PT interrogators, part of the CACI Defendants' official responsibilities involved coercion of their subjects and, in appropriate cases, causing discomfort in those subjects as permitted by the interrogation rules of engagement. Moreover, if the allegations against the CACI PT interrogators (vague as they may be) are so extreme, and so divorced from their actual duties as to defeat a defense of absolute official immunity, it is difficult to see how the CACI Defendants could be liable on a *respondeat superior* theory for any such extreme and illegal actions by their employees. *See* Section IV.E, *infra*.

from the interference of tort law.  As the Ninth Circuit observed in *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), "one purpose of the combatant activities exception [to the FTCA] is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action."  *Koohi*, 976 F.2d at 1337; *see also Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 18 (D.D.C. 2005) (combatant activities exception "seems to represent Congressional acknowledgement that was is an inherently ugly business for which tort claims are simply inappropriate").  Whether the United States is a defendant in this action or not, the fact remains that allowing tort suits such as Plaintiffs' will require military and government officials to justify and explain their wartime decisions in court, a result that completely undermines the purposes of the combatant activities exception.

In addition, the government has a strong interest in retaining the flexibility to delegate functions to contractors, and to augment its personnel with contractor support when such support is necessary to achieve the federal government's objectives.  *Mangold*, 77 F.3d at 1447-48.[4] But a refusal to extend the immunity enjoyed by government employees to contractor personnel working with them side-by-side, and performing the same duties, impairs the government's flexibility because government officials will know that they operate in a tort-free environment so long as they use no contractors, but that the government's functions will be subject to tort regulation if the government augments its force with civilian contractors.  This judicial fettering of government decision-making is particularly inappropriate in the area of combatant activities, where the Constitution vests decision-making authority in the political branches and where the Supreme Court has observed that, by comparison to the political branches, the judiciary is

---

[4] Indeed, Plaintiffs expressly allege that the military turned to CACI PT for interrogator support as a result of the military's "serious personnel shortfall" in fighting the war in Iraq. Compl. ¶ 29.

institutionally lacking in expertise. *See, e.g.*, *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). For these reasons, the Court should hold the CACI Defendants absolutely immune from suit and dismiss Plaintiffs' complaint.

>   **B.    Because Plaintiffs' Tort Claims Would Be Governed By Iraqi Law, the CACI Defendants Are Immune From Suit Even If They Were Not Entitled to Absolute Official Immunity**

Plaintiffs' common-law tort claims do not have an independent, ethereal existence, but must derive from the application of some jurisdiction's laws. The relevant choice of law rules appear to require that the CACI Defendants' liability, if any, for torts committed in Iraq be governed by Iraqi law. However, as the discussion below demonstrates, the CACI Defendants are immune from Iraqi tort law, both as a matter of customary (and binding) international law as well as through the executive proclamation of the Coalition Provisional Authority. Because the governing law renders the CACI Defendants immune from liability in tort, Plaintiffs' tort claims must be dismissed.

A federal court sitting in diversity applies the choice of law rules of the jurisdiction in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490 (1941). For tort claims, District of Columbia courts consider the interest of the various jurisdictions, paying particular attention to the place of injury, the place of the allegedly tortious conduct, the parties' domiciles, and the place where the relationship is centered. *Drs. Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007); *Wigfall v. Wilpoff & Abramson, LLP*, No. 05-591(JR), 2005 WL 3213955, at *2 (D.D.C. Nov. 1, 2005).

Of course, state choice of law rules must yield when they conflict with constitutional requirements of due process. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985). Due process requires that a state have a "significant contact or significant aggregation of contacts" to the claims of each and every plaintiff and his claims in order for the application of

-13-

that state's law to comport with the constitutional requirements of due process. *Id.* The application of the law of a state that lacks such contacts is by definition arbitrary and constitutionally impermissible. *Id.* These Plaintiffs have no connection to any state whatsoever, and their claims arise out of allegations of misconduct occurring entirely in Iraq. The *only* states with any connection whatsoever to plaintiffs' claims are Delaware (as Defendants' state of incorporation) and Virginia (as Defendants' principal place of business). But it would be arbitrary to apply the law of Delaware or Virginia to causes of action arising entirely overseas during the course of the CACI Defendants' support of a quintessential federal function, the waging of war and conduct of interrogations in a combat-zone detention facility operated by the federal government. Even if the District of Columbia's choice of law rules were to point to application of the law of a state, due process would preclude application of state law.

Here, however, there is no constitutional difficulty because the allegedly tortious conduct, if it occurred, took place entirely in Iraq. The Plaintiffs are principally Iraqi citizens, and the few who are not Iraqi citizens were voluntarily present in wartime Iraq at the time of their apprehension by military forces. Any contact between Plaintiffs and CACI PT personnel indisputably occurred in Iraq. The only choice of law factor that does not strongly point toward application of application of Iraqi law is the domicile of the CACI Defendants, which are incorporated in Delaware with their principal places of business in Virginia. The occupation government of Iraq clearly has a greater interest in having its law govern conduct and injuries occurring in occupied Iraq as compared to any state of the United States, particularly as it relates to conduct allegedly occurring by contractors present in Iraq to support the warfighting and occupation effort. Because the relevant choice of law factors point strongly toward Iraq, it

appears that any tort liability the CACI Defendants theoretically could face for Plaintiffs' unsupported and reckless allegations would have to be a product of Iraqi law.

But the CACI Defendants are immune from the application of Iraq law, both as a matter of binding international law and through Coalition Provisional Authority Order 17.  As the Supreme Court has held, the local law of an occupied territory applies only to the extent permitted by the occupation government.  *Coleman v. Tennessee*, 97 U.S. 509, 517 (1878); *New Orleans v. The Steamship Co.*, 87 U.S. 387, 394 (1874) ("[T]he conquering power has a right to displace the pre-existing authority, and to assume to such extent as it may deem proper the exercise by itself of all the powers and functions of government.").  If the occupying government permits the local laws of the occupied territory to remain in effect, those local laws govern only the relations between inhabitants of the occupied territory.  *Coleman*, 97 U.S. at 517 ("In other words, the municipal laws of the [occupied] State, and their administration, remain in full force so far as the inhabitants of the country are concerned, unless changed by the occupying belligerent."); *see also Leitensdorfer v. Webb*, 61 U.S. 176, 177 (1857) (holding that local laws of occupied New Mexico governed solely internal relations between inhabitants of that territory).  The local law of the occupied territory, however, does not apply to occupying personnel.  *Coleman*, 97 U.S. at 517-19; *see also* 2 William Winthrop, *Military Law and Precedents* 800 (2d rev. ed. 1896) ("Whether administered by officers of the army of the belligerent, or by civilians left in office or appointed by him for the purpose, [the occupation government] is the government of and for all the inhabitants, native or foreign, wholly superseding the local law and civil authority except in so far as the same may be permitted by him to subsist.").[5]

---

[5] Colonel Winthrop's "classic treatise" has been recognized by the Supreme Court as authoritative, with the Supreme Court acknowledging Colonel Winthrop as the "Blackstone of Military Law."  *See Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2777 (2006) (plurality opinion); *Reid*

Because local laws have no application to occupying personnel, "indigenous courts have no right whatsoever (during belligerent occupation) to try enemy persons (that is, individuals of the occupant's nationality or of that of any of his allies in the war) for any and all acts committed by them in the course of hostilities in the broadest sense of the term."  Gerhard von Glahn, *The Occupation of Enemy Territory: A Commentary on the Law and Practice of Belligerent Occupation* 112 (1957).  Consistent with these principles, the Supreme Court and other federal courts repeatedly have held that local laws have no application to persons part of or accompanying an occupying force in occupied territory.  *See, e.g.*, *Madsen v. Kinsella*, 343 U.S. 341, 345 n.6 (1952) (recognizing immunity of dependent of American servicemember to jurisdiction of local courts in occupied post-war Germany); *Dow v. Johnson*, 100 U.S. 158, 166 (1879) (civil laws of occupied state continue to apply only to extent permitted by occupying power).[6]

More recently, the D.C. Circuit rejected a suit by a group of Germans and Americans challenging the refusal by U.S. government officials to provide a judicial forum in which the plaintiffs could challenge zoning determinations in occupied Berlin.  *Dostal v. Haig*, 652 F.2d 173, 176-77 (1981).  Noting that *Coleman v. Tennessee*, 97 U.S. at 517, rendered the defendants – both military officers and civilian government officials – immune from the jurisdiction of local German courts, the D.C. Circuit held that the United States, as the occupying force in Berlin, was

---

*v. Covert*, 354 U.S. 1, 19 n.38 (1957) (plurality opinion); *Burns v. Wilson*, 346 U.S. 844, 849 n.1 (1953) Opinion of Frankfurter, J.).

[6] *See also Coleman*, 97 U.S. at 517 (members of occupying force immune from application of occupied territory's criminal laws); *Hamilton v. McClaughry*, 136 F. 445, 448-49 (C.C. D. Kan. 1905); *Tennessee v. Hibdom*, 23 F. 795, 796 (C.C. M.D. Tenn. 1885); *In re Lo Dolce*, 106 F. Supp. 455, 459-60 (W.D.N.Y. 1952).

"practically 'sole sovereign' in its sector, and exercises 'supreme authority,' local government institutions and courts being but its creatures." *Dostal*, 652 F.2d at 176.

As the foregoing discussion demonstrates, upon the United States' occupation of Iraq, Iraq law could continue to govern the affairs solely between inhabitants of Iraq, "subject however to their being in whole or in part suspended and others substituted in their stead – in the discretion of the governing authority." *Madsen*, 343 U.S. at 349 (quoting Winthrop, *supra*, at 800). In that regard, it could not be clearer that the "governing authority" for occupied Iraq reaffirmed the customary principle that persons serving with or accompanying the occupying force would remain immune from Iraqi law.

In Coalition Provisional Authority Order 17, issued on June 27, 2003, Ambassador Paul Bremer, the Coalition Provisional Authority administrator, issued the following statement concerning the extent to which non-Iraqi personnel serving with or accompanying the occupying force could be subject to Iraqi law:

> [U]nder international law occupying powers, including their forces, ***personnel***, property and equipment, funds and assets, are not subject to the laws or jurisdiction of the occupied territory.

CPA Order 17 at 1 (6/27/03) (emphasis added) (copy attached as Exhibit D to O'Connor Decl.). There can be no doubt that the term "personnel" includes CACI PT's employees, as the term "Coalition Personnel" is defined in CPA Order 17 as "all non-Iraqi military and ***civilian personnel*** assigned to or under the command of the Commander, Coalition Forces, or all forces employed by a Coalition State ***including attached civilians***, as well as all non-Iraqi military and civilian personnel assigned to, or under the direction or control of the Administrator of the CPA." *Id.* (emphasis added). Moreover, under CPA Order 17, Coalition Personnel are immune from local jurisdiction absent a waiver of this immunity from the person's parent state. As CPA Order 17 provides:

> Coalition contractors and their sub-contractors as well as their
> employees not normally resident in Iraq, shall not be subject to
> Iraqi laws or regulations in matters relating to the terms and
> conditions of their contracts in relation to the Coalition Forces or
> the CPA.

*Id.* at 2.[7]

Because the CACI Defendants are immune from Iraqi tort law, and Iraqi tort law applies under the relevant choice of law test, the CACI Defendants are entitled to dismissal of Plaintiffs' tort claims. When the governing law renders a defendant immune, or otherwise does not supply a cause of action, courts may not simply select a governing law that *will* provide a viable course of action; rather, the proper result is to respect the governing law and dismiss the suit. *See Smith v. United States*, 507 U.S. 197, 202 n.3 (1993) (plaintiff could not avoid sovereign immunity of FTCA by asking court to apply the law of the plaintiff's domicile instead of the law of the place where the act or omission occurred); *Nix v. Hoke*, 139 F. Supp. 2d 125, 132 (D.D.C. 2001) (dismissing prima facie tort claim because choice of law analysis dictated application of law of state that did not recognize cause of action); *Pearce v. E.F. Hutton Group, Inc.*, 664 F. Supp. 1490, 1500 (D.D.C. 1987) (dismissing false light tort claim because choice of law analysis dictated application of law of state that did not recognize cause of action). Therefore, because the relevant choice of law rules require that CACI PT's tort liability be judged pursuant to Iraqi law, and CACI PT is immune from the application of Iraqi law, Plaintiffs' tort claims must be dismissed.

---

[7] CPA Administrator Bremer subsequently issued a revised CPA Order 17 on June 27, 2004. The original CPA Order 17 governs the CACI Defendants because it was the order in effect at the time of the events alleged in Plaintiffs' complaint. Regardless, however, the revised CPA order 17 in no way suggests a change in the customary immunity from local law provided to personnel – such as the CACI PT interrogators – accompanying an occupying force.

C.     **Plaintiffs' Claims Present Non-Justiciable Political Questions**

The prosecution of the Iraq war is a quintessential political question.  In ruling on the

CACI Defendants' motion to dismiss Plaintiffs' Third Amended Complaint, the Court issued this

warning to Plaintiffs:

> [T]he more plaintiffs assert official complicity in the acts of which
> they complain, the closer they sail to the jurisdictional limitation of
> the political question doctrine.

*Saleh*, 436 F. Supp. 2d at 58.  Plaintiffs' repeated disregard of this admonition from the Court

now requires dismissal of Plaintiffs' complaint because, under any reading, the complaint alleges

official complicity in the actions in which CACI PT interrogators supposedly engaged.

Under Plaintiffs' latest iteration of their claimed conspiracy, the "torture conspiracy" was

conceived, launched, and directed by military police personnel who were charged with the

administration of detainee operations.  The CACI Defendants, so the theory goes, supposedly

joined this ongoing government conspiracy months after it began, through some indeterminate

signaling of its desire to join the conspiracy.  Compl. ¶¶ 39-55.  Plaintiffs try to conceal their

"official complicity" problem by stripping out any explicit reference to high-level government

conspirators, and instead list only low-level enlisted soldiers and undefined "others" as

additional government conspirators, all the while alleging the same high-level goals and conduct

Plaintiffs alleged earlier when they explicitly identified the Secretary of Defense and several

general officers, as well as dozens of military personnel co-conspirators.

Nevertheless, Plaintiffs cannot by artful pleading avoid the problem of official complicity

by confining their list of alleged conspirators to low ranking solders and "others" not named in

the complaint.  Despite Plaintiffs' strategic pleading, the claims asserted in Plaintiffs' Fourth

Amended Complaint do not merely sail close to the jurisdictional limitation of the political

question doctrine, they crash into its shoals.

Moreover, the decision whether to make reparations available for wartime injuries is a policy decision constitutionally committed to the political branches of government, and the courts have no permissible role in that process. Finally, the claims remaining in this action lack a judicially discoverable standard for resolution because the common-law tort claims remaining in the case necessarily would require the Court to make a judgment on the reasonableness of actions taken by personnel performing the United States' wartime mission in a combat zone. For all of these reasons, the Court should dismiss Plaintiffs' remaining claims as barred under the political question doctrine.

**1.    Plaintiffs' Complaint Alleges Conspiratorial Conduct That Necessarily Involves Official Complicity, Thereby Implicating Foreign Power Responsibilities Constitutionally Committed to the Political Branches**

As the Court observed in *Saleh*, 436 F. Supp. 2d at 58, an allegation that Plaintiffs suffered injuries as a result of conduct involving official complicity implicates the separation of powers concerns underlying the political question doctrine.[8] The D.C. Circuit recently made this point in *Gonzalez-Vera*, 449 F.3d at 1263-64, with the court holding that claims against former Secretary of State Kissinger based on his alleged role in fostering torture under the Pinochet regime in Chile presented non-justiciable political questions. As the Court explained:

---

[8] Cases raising political questions generally have one or more of the of the following characteristics: (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for non judicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker v. Carr*, 369 U.S. 186, 217 (1962). If any "one of these formulations is inextricable from the case," the Court must dismiss the case as presenting a non-justiciable political question. *Id.* While not every case having a foreign affairs connection presents a political question, the political question doctrine unquestionably has widespread application to "questions touching foreign relations." *Baker*, 369 U.S. at 211.

-20-

> The plaintiffs have alleged and challenged drastic measures taken by the United States and Kissinger in order to implement United States policy with respect to Chile. For the court to evaluate the legal validity of those measures would require us to delve into questions of policy textually committed to a coordinate branch of government. . . . Nor are we persuaded by the plaintiffs' purported distinction between challenging an "action" and challenging a "policy." As we explained in [*Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006)], the dichotomy is false; actions taken in furtherance of foreign relations themselves may constitute foreign policy decisions.

*Gonzalez-Vera*, 449 F.3d at 1263-64 (internal quotations and citations omitted).

Plaintiffs try to soft-peddle the official complicity they are alleging, by dropping express allegations of involvement by high-level government and military officials, and instead listing a few enlisted soldiers as alleged conspirators and adding that there are "other" conspirators that Plaintiffs decline to identify by name. Compl. ¶ 42. Plaintiffs' strategic pleading notwithstanding, the official complicity alleged by Plaintiffs jumps from the pages of their complaint by the very nature of the allegedly conspiratorial conduct.

In the current version of their ever-changing conspiracy allegation, Plaintiffs allege that the CACI Defendants had no role whatsoever in forming the alleged conspiracy. Rather, Plaintiffs allege that CACI PT interrogators began arriving in Iraq in October 2003 and observed an existing conspiracy, and that the CACI Defendants "had to decide whether to join this ongoing conspiracy comprised of military and government personnel who were willing to and were engaging in the illegal torture and abuse of prisoners." Compl. ¶ 48. Then, Plaintiffs allege that "as reasonable discovery will establish, CACI conveyed its intent to join the conspiracy to the existing co-conspirators by a series of verbal statements made in October, November and December 2003. *Id.* ¶ 55. Of course, Plaintiffs allege no facts concerning who would have supposedly conveyed the CACI Defendants' decision to enter into this ill-defined conspiracy, or who they would have told, or where these communications would have occurred, or any details

whatsoever to suggest that the allegations are anything more than the invention of a creative litigant.

Regardless, however, the nature of the conduct Plaintiffs allege that the supposed conspirators engaged in as part of their conspiracy demonstrates that Plaintiffs' allegations involve claims of official complicity in the conspiratorial conduct alleged:

> Reasonable discovery will establish that, in addition to observing the actual physical and mental abuse of the prisoners, CACI observed other forms of conspiratorial misconduct, including, but not limited to, preventing the reporting of the torture and abuse to non-conspiring authorities, the Red Cross, and the media; hiding prisoners from the Red Cross; misleading non-conspiring military and government officials about the state of affairs at the prisons; creating false records such as false death certificates to obscure and hide the facts; and destroying evidence relating to the torture and abuse.

Compl. ¶ 41.

Beyond alleging that CACI PT interrogators observed this conduct *before* CACI PT supposedly agreed to join the existing conspiracy, Plaintiffs' complaint alleges that CACI PT interrogators and other, unnamed co-conspirators engaged in similar conspiratorial conduct *after* CACI PT supposedly joined the existing conspiracy. *Id.* ¶ 75 (alleging that "CACI and its co-conspirators attempted to avoid detection by treating some plaintiffs and other prisoners as 'ghost detainees,'" a term describing detainees "who were never recorded as having been detained" so that they would not be reported to the Red Cross), ¶ 76 (alleging that reasonable discovery will show the involvement of the CACI Defendants in hiding abused detainees from the Red Cross), ¶ 77 (alleging that the CACI Defendants "knew or should have known that its co-conspirators issued false death certificates for the prisoners killed in the conspiracy.").

Much of the conspiratorial conduct alleged – deciding not to report the capture of certain detainees, deciding to hide detainees, making false reports to the Red Cross, issuing false death

certificates, and misleading non-conspiring government and military officials about all of the above – are not activities within the purview of a civilian contractor or a handful of low-ranking enlisted soldiers.   If these actions occurred, they are high-level determinations made in furtherance of the United States' war effort, the precise type of official involvement in foreign affairs decisions that triggers the political question doctrine.  *Gonzalez-Vera*, 449 F.3d at 1263-64; *Bancoult*, 445 F.3d at 432; *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005). Plaintiffs cannot evade the non-justiciable nature of their claims by listing only low-level soldiers and concealing as "others" the high-ranking government and military personnel who would have the ability to implement a decision to engage in this type of conduct.   Therefore, Plaintiffs' remaining claims must be dismissed.

> **2.**     **Whether Recovery for Wartime Injuries Should Be Available is a Political Question Constitutionally Committed to the Political Branches**

Reduced to their essentials, Plaintiffs' claims seek reparations for the injuries that they allegedly suffered as a consequence of the actions of the United States in invading and occupying Iraq.  Those actions included the provision of interrogation services by CACI PT pursuant to a contract with the United States.

American courts have long recognized that they have no role in assessing the propriety of reparations for wartime injuries.  *See Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 230 (1796); *Perrin v. United States*, 4 Ct. Cl. 543 (1868), *aff'd*, 79 U.S. (12 Wall.) 315 (1871).  These cases establish that, from the earliest days of the Republic, the federal courts have recognized that they have no role in compensating individuals, whether the defendant is the United States or a private party, for injuries suffered as a result of the manner in which the United States wages war, even if the United States violated the law of nations through its war-fighting tactics.  Rather, the advisability

of such compensation appropriately is determined through the diplomatic efforts of the political branches of government.

More recent cases have echoed this principle.  For example, in *Zivkovich v. Vatican Bank*, 242 F. Supp. 2d 659, 666-67 (N.D. Cal. 2002), the court held that claims against a bank for financial losses suffered by the plaintiff during World War II were reparations claims constitutionally committed to the political branches: "As an issue affecting United States relations with the international community, war reparations fall within the domain of the political branches and are not subject to judicial review."  *Id.* at 666 (citation omitted).  The *Zivkovich* court also rejected plaintiff's argument that his claim was not for reparations because it was asserted against a private bank.  *Id.* at 666-67.  There is considerable support for that view.  *See In re African-American Slave Descendants Litig.*, 304 F. Supp. 2d 1027, 1055 (N.D. Ill. 2004); *Anderman v. Fed. Republic of Austria*, 256 F. Supp. 2d 1098, 1117 (C.D. Cal. 2003); *Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116, 1195 (C.D. Cal. 2002).

Indeed, the D.C. Circuit recently rejected on political question grounds a wartime reparations claim asserted by former "'comfort women'" who alleged that they had been abducted and forced into sexual slavery by the Japanese Army before and during World War II. *Hwang Geum Joo v. Japan*, 172 F. Supp. 2d 52, 55 (D.D.C. 2001), *aff'd*, 332 F.3d 679 (D.C. Cir. 2003), *vacated on other grounds*, 542 U.S. 901 (2004), *reaff'd*, 413 F.3d 45 (D.C. Cir. 2005), *cert. denied,* 126 S. Ct. 1418 (2006).  In *Hwang Geum Joo*, the court of appeals affirmed the dismissal of plaintiffs' complaint on the grounds that the plaintiffs' claims for reparations implicated the United States' foreign policy.

In *Ibrahim*, 391 F. Supp. 2d at 16, this Court opined that the claims by the *Ibrahim* plaintiffs were not "a standard matter of 'war reparations,'" which, as discussed above are the

sole province of the political branches, because "there is no state-negotiated reparations agreement competing for legitimacy with this court's rulings." However, the Court's judgment in this regard was informed by its "working assumption" that there is no administrative remedy available to detainees alleging that they were abused during their detention. *Id.* at 17 n.4. That working assumption, however, is not correct. As the CACI Defendants learned shortly before filing their summary judgment reply, and the *Saleh* Plaintiffs' counsel has known all along, it is the position of the United States that it will provide an administrative remedy for persons presenting credible claims that they were abused while detained by the United States in Iraq. *See* O'Connor Decl., Ex. B at 1.[9] Indeed, the United States took this position despite the best efforts of the *Saleh* Plaintiffs' counsel to convince the United States to take the contrary position and deny an administrative remedy for detainee abuse in Iraq. *Id.*, Ex. C. Therefore, to the extent that the Court is of the view that an available administrative remedy is necessary to bring claims within the general rule that reparations claims are non-justiciable, the United States' position in this regard that such a remedy is available requires dismissal of Plaintiffs' complaint.

That said, however, a reparations agreement is not the *sine qua non* for dismissal based on the political question doctrine. Not all cases dismissing reparations claims on political question grounds have involved cases where the claimant could file an administrative claim elsewhere. In fact, as the D.C. Circuit has observed, an agreement *that makes no provision for reparations* just as conclusively bars war claims as an agreement providing for reparations:

_____

[9] The Court is permitted to consider the United States' position in this regard. As the D.C. Circuit observed in *Gonzalez-Vera*, 449 F.3d at 1262, the political question doctrine is one of subject-matter jurisdiction, and therefore not subject to the general requirement that Rule 12(b)(6) motions be decided without regard to material outside the complaint. In any event, the Court is permitted to take judicial notice of facts in deciding a Rule 12(b)(6) motion, so the Court could have considered the availability of an administrative remedy even if the political question doctrine was more properly considered under Rule 12(b)(6). *See Sparrow v. Reynolds*, 646 F. Supp. 834, 837 (D.D.C. 1986)

> Hence it follows, that the restitution of, or compensation for, British property confiscated, or extinguished, during the war, by any of the United States, could only be provided for by the treaty of peace; and *if there had been no provision, respecting these subjects, in the treaty,* they could not be agitated after the treaty, by the British government, much less by her subjects in courts of justice.

*Hwang Geum Joo*, 413 F.3d at 51 (*quoting Ware v. Hylton,* 3 U.S. (3 Dal.) 199, 230 (1796)) (emphasis by the Court of Appeals), *cert. denied,* 126 S. Ct. 1418 (2006).

The courts have relied upon the political question doctrine to reject reparations claims even though the claimants had no administrative claims procedure or other means of recovery available to them. *See, e.g.*, *In re African-American Slave Descendants Litig.*, 304 F. Supp. 2d at 1055; *El-Shifa Pharm. Indus. Co. v. United States*, 55 Fed. Cl. 751, 769 (2003), *aff'd,* 378 F.3d 134 (Fed. Cir. 2004); *Sarei,* 221 F. Supp. 2d at 1195; *Alperin,* 242 F. Supp. 2d at 689-90; *Anderman,* 256 F. Supp. 2d at 1117; *Zivkovich,* 242 F. Supp. 2d at 666-67.

These cases present political questions even when the claims involve intentional infliction of injury, and even when the claims involve credible allegations of some of the most heinous conduct imaginable, such as forced labor, slavery, sexual assault, and wartime plunder. These cases nevertheless stand for the proposition that claims for compensation for injuries suffered as a consequence of war – whether asserted against governments or against private companies – present non-justiciable political questions. This is so even in the absence of any alternative procedure for recourse, though as discussed above, an administrative remedy *does* exist for credible claims of detainee abuse in Iraq.[10]

---

[10] Moreover, because the Constitution vests the power to wage war and conduct foreign affairs in the political branches, adjudicating Plaintiffs' reparations claims would demonstrate a lack of respect for the proper constitutional role of coordinate branches of government, which, under *Baker*, supports a finding of non-justiciability. *Zivkovich,* 242 F. Supp. 2d at 668.

3.     **There Are No Judicially Discoverable and Manageable Standards for Evaluating Plaintiffs' Claims**

Much of the evidence bearing on Plaintiffs' claims, and establishing Defendants' utter blamelessness with respect to those claims, likely will be impossible for the Court and the parties to discover. The Court acknowledged this possibility in *Ibrahim*, 391 F. Supp. 2d at 14. Because there are no judicially manageable standards for evaluating Plaintiffs' claims, the political question doctrine renders Plaintiffs' claims non-justiciable.

Federal courts regularly have held that they lack judicially manageable standards for evaluating claims for wartime injuries that would require an extensive review of classified materials, or materials that are unlikely to be discoverable because of the "fog of war." *See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *Anderman*, 256 F. Supp. 2d at 1112-13; *Alperin*, 242 F. Supp. 2d at 695; *Zivkovich*, 242 F. Supp. 2d at 668. As one court has observed, "[i]n wartime, it would be inappropriate to have soldiers assembling evidence, collected from the 'battlefield.'" *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1495 (C.D. Cal. 1993). All of these concerns apply with full force here.

Plaintiffs' claims arise out of activities taking place in combat-zone detention facility. All records regarding who was detained by the United States and why, what detainees were interrogated (and by whom), what interrogation techniques were approved by military authority, the reports of interrogations, and whether a detainee made a report of abuse, are within the exclusive province of the United States. These records are in large measure, if not entirely, classified, and the CACI Defendants would hardly be surprised if the war-zone context of these detention activities make recordkeeping less than perfect. But the CACI Defendants would need access to all of these records in order to test the veracity of any Plaintiffs' claims of abuse.

In addition to classified records in United States custody, much of the evidence relating to Plaintiffs' claims will be located in Iraq.  For example, if a Plaintiff makes an unsubstantiated claim of abuse, the CACI Defendants will need to take discovery of persons, such as other detainees, who may have been detained in the vicinity of the Plaintiff.  Indeed, given the *Saleh* Plaintiffs' outrageous claim that the CACI Defendants were in a conspiracy with Iraqi nationals hired by the military to guard Iraqi criminals with no intelligence value, the CACI Defendants would need extensive discovery of non-party Iraqi nationals in order to address this matter.  Plaintiffs' counsel's intimation at the December 6, 2007 status conference that taking discovery in Iraq is really no different from taking discovery in, say, England, is delusional.  Iraq was, is, and will be for the foreseeable future, a war zone.   At present, there is no functioning government in Iraq.  There is no reasonable prospect that the CACI Defendants would be able to rely on the assistance of an Iraqi judiciary or diplomatic agency in obtaining compelled testimony or production of documents.

To give the Court a flavor of the situation on the ground in Iraq as it relates to access to sources of proof in Iraq, the quotation below is taken from a December 18, 2007 report from General Barry McCaffery, U.S. Army (retired) from his recent site visit to Iraq:

> **Central Government Does Not Work:**
>
> There is no functional central Iraqi government.  Incompetence, corruption, factional paranoia, and political gridlock have paralyzed the state.  The constitution promotes bureaucratic stagnation and factional strife.  The budgetary process cannot provide responsive financial support to the military and the police – nor local government for health, education, governance, reconstruction, and transportation.

O'Connor Decl., Ex. E at 6.  Thus, there is no reasonable process by which the CACI Defendants can expect to obtain access to any sources of proof located in Iraq, and the CACI Defendants' access to evidence in the hands of the United States, is hindered not only by the inherent

difficulties in recordkeeping in a war zone, but also by the classified nature of the information crucial to the CACI Defendants' defense. For these reasons, Plaintiffs' claims are precisely the types of wartime claims that defy resolution through the judicial process.

### D.    Plaintiffs Fail to State Factual Allegations Sufficient to Show a Plausible Entitlement to Relief

As this Court has observed, the permissive "no set of facts" standard of *Conley v. Gibson*, 355 U.S. 41 (1957), was "very recently undercut, if not obliterated by the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, [127 S. Ct. 1955, 1965 (2007)]." *Ellipso, Inc. v. Draim*, No. 06-1373, 2007 WL 1866799, at *1 (D.D.C. June 28, 2007). "In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must make sufficient factual allegations to suggest 'plausible grounds' for the suit." *Schroer v. Billington*, ___ F. Supp. 2d ___, 2007 WL 4225667, at *3 (D.D.C. 2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions. . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Bush*, 2007 WL 3357144, at *1 (omissions and alterations in original) (quoting *Twombly*, 127 S. Ct. at 1276). For that reason, "'rote accusations' of 'unlawful' and 'unauthorized' behavior, without more, are simply too conclusory to support [a cause of action]." *Dye v. United States*, ___ F. Supp. 2d ___, 2007 WL 2800376, at *10 (D.D.C. 2007). Plaintiffs' latest version of their complaint, filed three-and-one-half years after the initiation of this action, and after dozens of depositions, falls well short of the minimum pleading standard announced in *Twombly*.

The *Saleh* Plaintiffs' lead counsel has been particularly brazen in the rhetoric she has used in this Court to describe the CACI Defendants and the CACI PT interrogators who voluntarily deployed to Iraq in support of the United States military, referring to them variously

-29-

as, among other things, "thugs" and "torturers," and asserting that CACI PT personnel were the "ringleaders in the torture of prisoners at Abu Ghraib prison in Iraq." *See, e.g.*, Pl. Opp. to CACI Summ. J. Mot. at 2 (filed 5/25/07). In light of that aggressive rhetoric, and cognizant of the CACI Defendants' position that Plaintiffs could not allege claims consistent with the *Twombly* "plausibility" standard, one might have expected some effort to detail interactions between Plaintiffs and CACI PT interrogators. These types of facts, however, are notable for their complete absence from Plaintiffs' Fourth Amended Complaint, a complaint filed three-and-one-half years after this litigation began and after Plaintiffs had taken dozens of depositions.

Plaintiffs' complaint alleges, in the vaguest terms possible, that a few individual CACI PT interrogators engaged in abuse of detainees. Compl. ¶¶ 58-71. But what the Court *will not find* in Plaintiffs' complaint is a single allegation of fact that they had any interaction whatsoever with a CACI PT employee, much less an interaction that allegedly resulted in their abuse. So secondary are the actual Plaintiffs to Plaintiffs' complaint that their individual allegations are relegated to an appendix to the complaint, one that shows an impressive ability to use the "copy and paste" feature on a word processor but nothing in the sense of actual factual allegations.

Each of the 256 Plaintiffs has one (1) paragraph in the appendix to the complaint that sets out the individual facts of his or her claim. For 254 of the 256 Plaintiffs, the core allegation is identical: that the Plaintiff (or his decedent) "was tortured or otherwise mistreated by CACI and its co-conspirators while in custody." Compl. App. A, ¶¶ 1-8, 10-118, 120-256. For two of the Plaintiffs, the complaint deviates from this rote and conclusory statement and alleges instead that the Plaintiff's decedent died in prison "as a result of acts and inactions by CACI and its co-conspirators." *Id.* at ¶¶ 9, 119. That is the sum and substance of each Plaintiff's allegations. In some cases, the complaint lists a Plaintiff's detainee number, or the date on which he was

arrested by U.S. forces, but there is not a single allegation by any Plaintiff of contact between that Plaintiff and an employee of the CACI Defendants.  Nor do Plaintiffs provide any factual allegations whatsoever as to *who* supposedly inflicted physical harm on them, *what* that physical harm allegedly was, *where* the abuse allegedly occurred, or *who*, if anyone, other than the alleged abuser was present for any such abuse.  As this Court observed in *Burnett v. Al Baraka Investment & Development Corp.*, 274 F. Supp. 2d 86, 111 (D.D.C. 2003), a case decided under the more lenient pre-*Twombly* standard for motions to dismiss, allegations in a complaint must not be "too vague to permit an understanding of just what [the Defendant] has been charged with, or what [it] must defend."  Plaintiffs' rote and conclusory allegations that CACI and/or its alleged co-conspirators "tortured or otherwise mistreated" Plaintiffs falls far short of this requirement, and cannot withstand a Rule 12(b)(6) motion to dismiss.  *See Twombly*, 127 S. Ct. at 1276; *Dye*, ___ F. Supp. 2d ___, 2007 WL 2800376, at *10.

By far the most likely reason for Plaintiffs' lack of disclosure of any allegations of actual conduct between Plaintiffs and CACI PT employees (much less abuse of Plaintiffs by CACI PT employees) is what the CACI Defendants have said in this case for three-and-one-half years: that very few, if any, of the Plaintiffs likely would have had any meaningful contact with the handful of CACI PT interrogators in Iraq.  This is likely why Plaintiffs have taken the unprincipled step of revamping the conspiracy they have alleged to include Iraqi nationals who guarded persons being held as criminals in Iraq, a desperate step taken by Plaintiffs to try to tag the CACI Defendants with liability for abuses supposedly suffered by detainees in Iraq who had so little intelligence value that they never saw an interrogator.  Because Plaintiffs' complaint lacks even a single allegation of contact between Plaintiffs and a CACI PT interrogator, it becomes clear that Plaintiffs' complaint is entirely dependent on imposing co-conspirator liability on the CACI

Defendants.  But the complaint falls woefully short of meeting the required pleading standard for co-conspirator liability, and their complaint consequently must be dismissed.

Three-and-one-half years after filing their complaint, Plaintiffs have dropped their claim that the CACI Defendants were involved in forming the supposed "torture conspiracy."  Now, Plaintiffs allege that there was an existing "torture conspiracy" between military and Titan personnel before CACI PT interrogators ever deployed to Iraq, and that CACI PT then agreed to join this existing conspiracy.  Compl. ¶ 48.  Plaintiffs allege that the military and Titan co-conspirators were seven enlisted soldiers (none above the rank of staff sergeant) and two Titan linguists, as well as "others" who Plaintiffs decline to identify.  Compl. ¶ 42.  Plaintiffs further allege that members of the torture conspiracy included U.S. Army Criminal Investigation Division investigators and Iraqi nationals guarding persons detained as criminals and having no intelligence value.  Compl. ¶¶ 43, 44.

One thing that is clear from *Twombly* is that a litigant cannot identify parallel conduct and then take a free pass beyond the motion to dismiss stage with a mere allegation that the parties were engaged in a conspiracy.  *Twombly*, 127 S. Ct. at 1971-72.  Rather, a plaintiff must allege facts sufficient to compel an inference that the alleged co-conspirators were acting in concert, as distinguished from independent, parallel behavior.  *Id.*; *see also Aktieselskabet AF 21 v. Fame Jeans, Inc.*, 511 F. Supp. 2d 1, 16-17 (D.D.C. 2007).  An important element of this requirement is that the plaintiff allege facts to show a motive for conspiratorial conduct. *Aktieselskabet AF 21*, 511 F. Supp. 2d at 17 (*citing Twombly*, 127 S. Ct. at 1971-72); *see also Cadet v. Draper & Goldberg, PLLC*, No. 05-2105, 2007 WL 2893418, at *14 (D.D.C. Sept. 28, 2007) (dismissing conspiracy claims where plaintiff alleged a conspiracy but "failed to plead any facts to establish the existence of such a specific agreement between defendants" and instead

relied "upon conclusory statements that defendants engaged in allegedly fraudulent activity 'in concert and by agreement or understanding'").

This is the allegation in Plaintiffs' complaint that supposedly provides the factual support for Plaintiffs' claim that the CACI Defendants made the corporate decision to join an ongoing conspiracy between military and Titan personnel:

> Instead, as reasonable discovery will establish, CACI conveyed its intent to join the conspiracy to the existing co-conspirators by a series of verbal statements made in October, November and December 2003.

Compl. ¶ 55. Thus, Plaintiffs' "facts" concerning their allegation that the CACI Defendants made the decision to enter into a "torture conspiracy" is that they believe (without any statement of the grounds for their belief) that discovery will show that someone with the CACI Defendants said something to someone who was already part of the conspiracy sometime in late 2003 to convey somehow that the CACI Defendants were going to join this conspiracy.

While it is true that plaintiffs are not required in all cases to have at the pleading stage precise knowledge of the words used by conspirators to enter into a conspiracy, *Twombly* and decisions by this Court make clear that, absent direct evidence of the formation of a conspiracy, a plaintiff must make factual allegations sufficient to compel an inference of conspiratorial conduct, most often by showing the motive of the parties to conspire. *Aktieselskabet AF 21*, 511 F. Supp. 2d at 17 (*citing Twombly*, 127 S. Ct. at 1971-72). Here, however, Plaintiffs' allegations of motive are self-contradictory, and cannot nudge their allegations of conspiracy beyond the theoretically possible (though actually false) to the plausible showing required by *Twombly*.

In this regard, Plaintiffs are defeated by their own attempt at strategic pleading. What exactly would be the CACI Defendants' corporate motive to engage in a torture conspiracy with a half-dozen low-level soldiers and a pair of Titan linguists? No doubt mindful of the Court's

admonition that "the more plaintiffs assert official complicity in the acts of which they complain, the closer they sail to the jurisdictional limitation of the political question doctrine," *Saleh v. Titan*, 436 F. Supp. 2d 55, 58 (D.D.C. 2006), Plaintiffs have stripped from their complaint any allegations of official complicity or high-level government or military involvement in this supposed conspiracy.[11]   But the only conspiratorial motive Plaintiffs even allude to in their complaint is that the CACI Defendants decided to enter into the supposed ongoing torture conspiracy (as opposed to reporting the "torture conspiracy" to government officials) in order to reap financial gain.  Compl. ¶ 50 ("But CACI determined that such adherence to the law would have resulted in CACI being seen as not on the 'team' by conspiracy members, including the military conspiracy members."), ¶ 51 ("CACI, motivated exclusively by greed, wanted to maintain close relationships with the military conspiracy members, and did not want to risk alienating anyone who could potentially impact CACI's revenue stream.").

But if there were no official complicity in the alleged "torture conspiracy," how would the CACI Defendants benefit financially by casting their lot with a half-dozen low-ranking MPs who were violating the law rather than reporting such abuses to the high-level government and military personnel who Plaintiffs now feel constrained to allege were not officially complicit in the supposed conspiracy?  Wouldn't the CACI Defendants be better off financially by reporting a conspiracy that they supposedly discovered, and therefore currying favor with the government

---

[11]   While Plaintiffs remove any allegation of high-level government or military involvement in the conspiracy they allege, Plaintiffs continue to allege conspiratorial acts, such as failing to register detainees with the Red Cross, that by their nature are outside the purview of the low-level soldiers who supposedly formed the alleged conspiracy.  *See* Section IV.C, *supra*. Therefore, Plaintiffs' claims present non-justiciable political questions even though Plaintiffs conceal their allegations of official complicity by deleting explicit reference to high-level conspirators and instead noting that there were "other" conspirators beyond the low-level soldiers identified by name.

and military hierarchy that Plaintiffs now do not allege (or at least do not explicitly allege) were part of the "torture conspiracy"?

The core lesson of *Twombly* is that a lack of specific factual allegations of concerted conduct requires that the plaintiff make factual allegations that plausibly compel an inference of conspiratorial conduct, as opposed to independent parallel conduct. Plaintiffs' conspiracy claim is on its face implausible (indeed, the Court called a prior version of Plaintiffs' conspiracy "quite fantastic" – *Saleh*, 436 F. Supp. 2d at 58), and *Twombly* therefore requires dismissal of all of Plaintiffs' conspiracy and aiding and abetting claims. Moreover, because, as discussed above, Plaintiffs have not alleged that a single CACI PT interrogator had direct contact with a Plaintiff, much less physically abused a Plaintiff, Plaintiffs' direct tort claims must be dismissed as well.

### E.    Plaintiffs' Complaint Fails to Allege Facts Sufficient to Establish *Respondeat Superior* Liability

In deciding Defendants' motions to dismiss in the *Saleh* case, the Court noted that "Plaintiffs will have a hard enough time establishing CACI-PT's respondeat superior liability for these torts." *Saleh*, 436 F. Supp. 2d at 59. Aside from being able to *prove respondeat superior* liability, Plaintiffs' complaint does not even *allege* facts that, if proven, would be sufficient to render CACI PT vicariously liable for the intentional torts that Plaintiffs have alleged. For this reason, all of Plaintiffs' remaining claims must be dismissed.

As this Court has observed, allegations in a complaint must not be "too vague to permit an understanding of just what [the Defendant] has been charged with, or what [it] must defend." *Burnett*, 274 F. Supp. 2d at 111. Here, the vague allegations in Plaintiffs' complaint fall far short of providing reasonable notice of exactly what the CACI Defendants supposedly did in order to render themselves liable for intentional torts supposedly committed by their employees or by other supposed co-conspirators in Iraq.

Employers are liable for the intentional torts of their employees only when the tortious acts fall within the scope of their employment. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 756 (1998).[12]  Conduct is within the scope of employment if it is "of the same general nature as that authorized" or "incidental to the conduct authorized." *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265 (D.D.C. 2004) (*quoting* Restatement (Second) of Agency § 229), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005).  Acts alleged to be within the scope of employment also must be "actuated, at least in part, by a purpose to serve the master."  Restatement (Second) of Agency § 228. Plaintiffs' complaint makes clear that any acts of detainee abuse were not authorized conduct, and there are no facts alleged in the Complaint to support a conclusion that the CACI Defendants authorized CACI PT personnel to engage in conduct with detainees that was prohibited by competent military authority.  Indeed, the complaint also fails to allege any plausible theory as to how the abuse of detainees by CACI PT employees would serve the interests of CACI PT.

The most specific allegation in Plaintiffs' complaint touching on the *respondeat superior* issue is that the CACI Defendants – as opposed to individual CACI PT employees acting without corporate approval – entered into a conspiracy to abuse detainees in Iraq.  Plaintiffs allege that, "as reasonable discovery will establish, CACI conveyed its intent to join the conspiracy to the existing co-conspirators by a series of verbal statements made in October, November and December 2003."  Thus, as Plaintiffs would have it, the CACI Defendants are liable for the intentional torts of their employees in Iraq because someone from the CACI Defendants told something to someone else in October, November or December 2003 to signal that the CACI Defendants had agreed as corporate entities to participate in a conspiracy to abuse detainees in

---

[12] As the CACI Defendants have explained in Section IV.B, *supra*, it does not appear that the tort law of any jurisdiction can be applied in this case.  Nevertheless, in explaining why Plaintiffs' assertion of *respondeat superior* liability fails as a matter of law, the CACI Defendants will cite to general principles of *respondeat superior* law for illustrative purposes.

Iraq. That allegation – one that is not only incomprehensibly vague but also made on information and belief – provides no notice of the conduct that the CACI Defendants supposedly engaged in that would signal an approval of the commission of detainee abuse by its employees. That falls far short of the "fair notice" to which the CACI Defendants are entitled in order to defend against a claim of *respondeat superior* liability and requires dismissal of Plaintiffs' claims.

### F. Plaintiffs' Attempt to Impose Vicarious Liability on the CACI Defendants for the Actions of Military and Titan Personnel Fails as a Matter of Law

Because of the absence of allegations of actual contact between CACI PT interrogators and Plaintiffs, much less abuse of Plaintiffs by CACI PT interrogators, Plaintiffs' complaint is entirely dependent on being able to render CACI PT liable for conduct by military personnel and/or Titan employees. However, the Court's prior rulings in this action make clear that any conduct in which military personnel and Titan employees may have engaged in Iraq was not a tort, as any body of law that theoretically could render such conduct tortious is preempted as a matter of law by the combatant activities exception to the FTCA. Therefore, even if Plaintiffs' reckless and fantastic claims were true, the CACI Defendants could not be held vicariously liable in tort for the actions of military personnel or Titan employees, as it is impossible to tortiously conspire with or aid and abet another in committing a non-tort. For these reasons, the Court must dismiss all of Plaintiffs' claims to the extent they depend on imposing vicarious liability on the CACI Defendants.

As explained above, the CACI Defendants fail to see how *any* tort law conceivably could apply to Plaintiffs' tort claims. To the extent that the relevant choice of law rules point to application of Iraqi law, the CACI Defendants are immune from Iraqi law. *See* Section IV.B, *supra*. Moreover, imposing state tort law on the conduct of CACI PT personnel in Iraq is the

definition of an arbitrary and capricious act precluded by notions of due process.  *See* Section IV.B, *supra*.  Regardless, however, using as illustrative examples the tort law of the District of Columbia and Virginia (the forum jurisdiction and the CACI Defendants' principal place of business), it is clear that state tort law, even if it could be applied, would not permit vicarious conspiracy or aiding and abetting liability in light of the Court's preemption decision.

Under both District of Columbia and Virginia law, a bedrock requirement for co-conspirator vicarious liability is that an underlying tort have been committed.[13]  As the D.C. Circuit has explained: "Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort."  *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983) (predicting District of Columbia law).  The requirement of an underlying tortious act is hardly unique to District of Columbia and Virginia law.  In multidistrict litigation involving the laws of thirty different jurisdictions, the Third Circuit surveyed the law of co-conspirator liability and found, without exception, that the notion that conspiracy claims lie only when the underlying conduct itself is tortious is a universal requirement of tort law:

> Because this multidistrict litigation implicates the state law of many different jurisdictions, we have reviewed the law of every

---

[13] *See Hill v. Medlantic Health Care Group*, 933 A.2d 314, 334 (D.C. 2007) ("Civil conspiracy 'is not an independent tort but only a means for establishing vicarious liability for an underlying tort.'" (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000))); *Paul*, 754 A.2d at 310 n.27 (noting that an underlying tort would have had to be proven if plaintiff had established a conspiracy); *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) ("[C]ivil conspiracy depends on performance of some underlying tortious act. It is thus not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort." (citations and internal quotations omitted) (alteration in original); *see also Almy v. Grisham*, 639 S.E.2d 182, 188-89 (Va. 2007) ("We begin with the observation that, in Virginia, a common law claim of civil conspiracy generally requires proof that the underlying tort was committed."); *Commercial Business Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 896 (Va. 1997) ("For without proof of the underlying tort, there can be no conspiracy to commit the tort.").

applicable jurisdiction on this point.  Having done so, we are unaware of any jurisdiction that recognizes civil conspiracy as a cause of action requiring no separate tortious conduct.  To the contrary, the law uniformly requires that conspiracy claims be predicated upon an underlying tort that would be independently actionable against a single defendant.

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999).

The same is true of aiding and abetting liability, as there is no vicarious liability under District of Columbia or Virginia law for aiding and abetting conduct that is not itself a tort.[14] Therefore, Plaintiffs cannot impose vicarious liability on the CACI Defendants for any conduct by military and Titan personnel in Iraq unless the conduct by the military and Titan personnel itself constituted a tort.  The Court's summary judgment decision forecloses this possibility as a matter of law.

In granting Titan's motion for summary judgment, the Court held that the combatant activities exception to the FTCA preempts state tort law when two requirements are satisfied: the actor was "engaged in 'activities both necessary to and in direct connection with actual

---

[14] *See Halberstam*, 705 F.2d at 478 (holding that, where recognized, aiding and abetting liability requires proof that the underlying conduct was "known to be tortious" upon the party sought to be held vicariously liable); *Hancock v. Homeq Servicing Corp.*, No. 05-0307, 2007 WL 1238746, at *9 (D.D.C. Apr. 27, 2007) ("Like civil conspiracy, aiding and abetting requires an underlying tortious act.") (citing *Fischer v. Estate of Flax*, 816 A.2d 1, 5 (D.C. 2003)); *see also Smith v. CNA Fin. Corp.*, No. 01-CV-00653, 2003 WL 24253672, at *7 (W.D. Va. Nov. 28, 2003) ("Virginia and North Carolina courts have explicitly refused to recognize the tort of aiding and abetting fraud . . . ."); *A.G. Van Metre Const., Inc. v. NVKettler L.P.*, No. 13174, 1992 WL 884467, at *3 (Va. Cir. Ct. Jan. 29, 1992) ("Aiding and abetting is a criminal concept and not a civil concept.").  The CACI Defendants note that the D.C. Circuit predicted in 1983 that the District of Columbia courts would recognize a tort of aiding and abetting tortious conduct. *Halberstam*, 705 F.2d at 479.  However, as the D.C. Court of Appeals observed in 2007, it has not recognized such a tort and is not bound by the D.C. Circuit prediction that it would.  *Flax v. Schertler*, ___ A.2d ___, 2007 WL 3375179, at *12 (D.C. Nov. 15, 2007).  Regardless, however, the above-cited cases make clear that, where aiding and abetting liability is recognized as an independent tort or as a theory of vicarious liability, a fundamental requirement is that the underlying conduct itself be tortious.

hostilities,'"[15] and the actor was "acting under the direct command and exclusive operational control of the military chain of command."[16]   The Court expressly found that service as a translator or interrogator for persons detained by the military in a combat zone detention facility satisfies the first prong of the Court's test.  *Ibrahim*, 2007 WL 3274784, at *8.

Moreover, the Court found it an undisputed fact that Titan's employees were under the "direct command and exclusive operational control of military personnel."  *Id.*   As a result, the Court held that the combatant activities exception to the FTCA preempted the application of tort law, meaning that no tort law legally could be applied and that the Titan translators' conduct therefore was *not tortious* as a matter of law.  *Boyle v. United Techs. Corp.*, 487 U.S. 500 & 507 & n.3 (1988) (holding that *Boyle* preemption is a displacement of state tort law); *see also Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996) (federal preemption displaces state law).[17]   Of course, military personnel are also inarguably under the "direct command and exclusive operational control of military personnel"; as such, tort law cannot be applied to their conduct either.

---

[15]  *Ibrahim*, 2007 WL 3274784, at *2 (quoting *United States v. Johnson*, 170 F.2d 767, 770 (9th Cir. 1948)).

[16]  *Id.*

[17]  By contrast to preemption, immunity does not displace state tort law, but renders one or more actors immune from any torts they may have committed.  *See, e.g.*, *Mitchell v. Forsyth*, 472 U.S. 511, 523-27 (1985).  Because one party's immunity from suit does not negate the tortious nature of his conduct, the Supreme Court has held that one party's immunity from suit does not necessarily render his co-conspirators immune from suit based on the tortious conduct that occurred.  *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).  A finding of preemption, however, means not that the party is immune from suit for an existing tort, but that his conduct is not tortious because tort law cannot be applied to govern his conduct.  The absence of an underlying tort by soldiers or Titan personnel therefore defeats as a matter of law Plaintiffs' vicarious liability theories.

-40-

If, as the Court has ruled, the conduct of personnel, such as soldiers and Titan employees, who are conducting combatant activities under the military's exclusive operational control, is not subject to tort regulation, then there is no underlying tort for which the CACI Defendants may be liable on a vicarious liability theory.  *See Ibrahim*, 2007 WL 3274784, at *3 (holding that preemption insulates military decisions "from state law regulation").  Indeed, courts considering this question have recognized that where conduct alleged is not itself tortious because federal preemption displaces state tort regulation of the conduct, there can be no vicarious liability under a civil conspiracy theory because the preemption ruling eliminates the required element of an underlying tort.  *See, e.g.*, *Abanco Int'l, Inc. v. Guestlogix Inc.*, 486 F. Supp. 2d 779, 782 (N.D. Ill. 2007) (dismissing civil conspiracy claim where alleged underlying conduct was not tortious by virtue of preemption of state tort law); *Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 660-61 (E.D. Tenn. 2004) (same); *Carl Colteryahn Dairy, Inc. v. W. Pa. Teamsters & Employers Pension Fund*, 785 F. Supp. 536, 544 (W.D. Pa. 1992) (same).

As a result, then, even if the Court rejected every other argument submitted by the CACI Defendants in support of their motion to dismiss, the Court's prior preemption rulings by their very nature eliminate as a matter of law any attempt by Plaintiffs to hold the CACI Defendants vicariously liable for the conduct of military personnel or Titan employees, as conduct by military personnel and Titan employees is not tortious.  Therefore, the Court must dismiss on this basis each and every claim that is not supported by allegations sufficient to satisfy the *Twombly* standard that a CACI PT employee actually injured a particular Plaintiff.  Because there are no such allegations in the complaint, all of Plaintiffs' remaining claims must be dismissed.

### G.    Plaintiffs' Claims Are Preempted

The CACI Defendants previously have moved to dismiss Plaintiffs' tort claims on the grounds that those claims are preempted by the federal interests underlying the combatant

activities exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(j). The Court has twice denied the CACI Defendants' arguments at the motion to dismiss stage. *See Ibrahim*, 391 F. Supp. 2d at 19; *Saleh*, 436 F. Supp. 2d at 58. The Court also denied the CACI Defendants' motion for summary judgment on this issue. *Ibrahim*, 2007 WL 3274784, at *9. The CACI Defendants believe that they remain entitled to dismissal of Plaintiffs' claims on the grounds that the federal policies underlying the combatant activities exception preempt such claims, and for the reasons previously stated by the CACI Defendants in their prior motion to dismiss and in their summary judgment pleadings, which are incorporated here by reference.

Similarly, the CACI Defendants also asserted that Plaintiffs' claims were preempted by the foreign country exception to the FTCA. The Court declined to dismiss Plaintiffs' claims on this basis at the motion to dismiss stage, *Ibrahim*, 391 F. Supp. 2d at 18 n.6, and rejected the CACI Defendants' arguments *sub silentio* at the summary judgment stage by denying the CACI Defendants' summary judgment motion without addressing the foreign country exception. The CACI Defendants continue to assert that the foreign country exception to the FTCA preempts Plaintiffs' claims, and incorporate their argument in that regard in their summary judgment pleadings rather than repeating their argument in full here.

## V.    CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' complaint.

Respectfully submitted,

/s/  John F. O'Connor

_____
J. William Koegel, Jr. (Bar No. 323402)
John F. O'Connor (Bar No. 460688)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:    (202) 429-3000
Facsimile:    (202) 429-3902

**Counsel for Defendants CACI International Inc
and CACI Premier Technology, Inc.**

January 4, 2008