## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IBRAHIM, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 04-CV-1248 (JR) |
| v. ) | |
| ) | |
| TITAN CORP., *et al.,* ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| SALEH, *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 05-CV-1165 (JR) |
| v. ) | |
| ) | |
| TITAN CORP., *et al.,* ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF JOHN F. O'CONNOR

I, John F. O'Connor, hereby declare as follows:

1.      I am a partner in the law firm of Steptoe & Johnson LLP, and am one of the counsel of record for Defendants CACI International Inc and CACI Premier Technology, Inc. (collectively, the "CACI Defendants") in the above-captioned actions.  I am submitting this Declaration in connection with the CACI Defendants' Motion to Dismiss Plaintiffs' Fourth Amended Complaint in the *Saleh* action, and CACI Premier Technology, Inc.'s Motion to Dismiss Plaintiffs' Third Amended Complaint in the Ibrahim action.

2.      Attached hereto as Exhibit A is a true copy of a November 17, 2004 report by the

United States Army Claims Service with respect to an administrative claim filed by Haider Saleh, a Plaintiff in the *Saleh* action.

3.    Attached hereto as Exhibit B is a true copy of a May 3, 2006 letter from the U.S. Army Claims Service to Susan L. Burke, Esq., one of the plaintiffs' counsel in the *Saleh* action.

4.    Attached hereto as Exhibit C is a true copy of an October 3, 2005 letter from Susan L. Burke, Esq., to the U.S. Army Claims Service personnel concerning Plaintiff Saleh's administrative claim.

5.    Attached hereto as Exhibit D is a true copy of Coalition Provisional Authority Order 17, issued on June 27, 2003.

6.    Attached hereto as Exhibit E is a true copy of a December 18, 2007 report from General Barry McCaffery, U.S. Army (retired) concerning conditions in Iraq.

7.    Attached hereto as Exhibit F is a December 18, 2007 letter from John F. O'Connor to L. Palmer Foret, one of the plaintiffs' counsel for the *Ibrahim* plaintiffs, as well as Mr. Foret's email in response to this letter.

8.    I swear under penalty of perjury that the foregoing in true and correct.  Executed this 4th day of January, 2008.

John F. O'Connor

2

# EXHIBIT A



**DEPARTMENT OF THE ARMY**
US ARMY CLAIMS SERVICE
OFFICE OF THE JUDGE ADVOCATE GENERAL
4411 LLEWELLYN AVENUE
FORT GEORGE G MEADE MARYLAND 20755-5360

REPLY TO
ATTENTION OF:

JACS-TCF

NOV 1 7 2004

MEMORANDUM THRU THE ASSISTANT JUDGE ADVOCATE GENERAL

DOD GENERAL COUNSEL, ATTN: INTERNATIONAL AFFAIRS

FOR ARMY GENERAL COUNSEL, ATTN: DEPUTY GENERAL COUNSEL (ETHICS AND FISCAL)

SUBJECT: Claim of Haider Saleh, 04-C01-T065

1. PURPOSE: To recommend approval of a settlement of the subject claim, under the Foreign Claims Act (FCA), 10 U.S.C. § 2734, as implemented by Army Regulation (AR) 27-20, Chapter 10, with a total cost to the Government of $5,000. As the claim involves allegations of negligence or misconduct at Abu Ghraib prison in Iraq, your action is required by the Office of the Secretary of Defense. Tab A.

2. CLAIMANT AND COUNSEL:

   a. The claimant is Haider Saleh (DOB: 1 Jul 61.) The claimant resides at 58648 Scottgordon, Linkoping, Sweden.

   b. The claimant is represented by Shereef H. Akeel of Melamed, Dailey and Akeel, 2611 Woodward Avenue, Huntington Woods, Michigan, 48070-1332.

3. CLAIM:

   a. The claim was filed on 12 May 2004 by Haider Saleh. This claim, in the total amount of $3,582,000, alleges that on or about 25 September 2003, US military personnel, without provocation, stopped the claimant in his 1988 Mercedes 300 near the town of Najaf, Iraq. It alleges that he had in his possession $79,000 US Dollars (USD), family savings to be invested in a home and a business enterprise. A "Captain ███" brought him to Najaf where the claimant was imprisoned and beaten for approximately eight days. On 4 October 2003, military authorities transferred him to Abu Ghraib prison, the same prison where he had been incarcerated by Saddam Hussein's regime from 1980 – 1985. While at Abu Ghraib, the claimant alleges he was abused and humiliated. Tab B.

JACS-TCF
SUBJECT: Claim of Haider Saleh, 04-C01-T065

   b.  The claimant states that he was routinely interrogated for his refusal to sign an admission of guilt. He alleges that he was roped together with 12 other naked prisoners by their genitals, pushed and humiliated. He alleges he was stripped naked and beaten with a hood over his head. The claimant alleges that he was forced to masturbate and the semen was poured on his head and body. His claim states that he was forced to lay naked on other detainees and had cold water poured on him. He alleges he was kept awake by the constant playing of loud music and repeatedly shocked with an electric stick. He alleges that he was called dehumanizing names. The claimant states that on one occasion, a belt was tied around his neck and he was dragged approximately 70 feet. He alleges that dogs were used to intimidate him and that he was pistol-whipped. He states that he saw five detainees killed when a US guard shot randomly at a crowd. The claimant alleges he was burned with chemicals from light fixtures and that he saw two young male detainees raped in front of him in the tents. He states he was sodomized with a stick and beaten with cables while hung from a cable in the ceiling. The claimant alleges US service members digitally sodomized him on another occasion. The claimant states that another detainee confided in him that he had been raped, and he heard female detainees screaming and crying as they were raped. He alleges that he was shot with plastic bullets, was starved, and forced to carry feces in buckets. The claimant was released on or about 23 December 2003, and he alleges he was given his confinement facility identification bracelet by a guard who told him to go to America and tell everyone what happened.

   c.  After his release, he immediately went to Syria to obtain medical treatment and then subsequently, arrived in the United States on 19 March 2004. He alleges that he is receiving psychiatric care, and he has permanent physical disabilities such as closed-head injuries. The claimant is seeking return of his personal property, including his documents, $79,000 USD, and his Mercedes, valued at $3,000. He is claiming compensation for pain and suffering and emotional distress, valued at $3,500,000.

4.  JURISDICTION: This claim is for property loss and personal injury of a non-United States citizen. Claims submitted by inhabitants of foreign countries are cognizable under the FCA, 10 USC § 2734. Claims submitted under the FCA are evaluated under the law of the country in which the act or omission occurred. AR 27-20, paragraph 10-5a. The claim was submitted in a proper and timely manner.

5.  FACTS:

   a.  On 22 September 2003, a US Special Forces (SF) team apprehended the claimant outside of Najaf, Iraq, while driving a mid-80s model Mercedes. The SF team that apprehended the claimant took him to the Najaf Police Department. Iraqi police (IQP) searched the claimant and then in-processed him and his property into their facility. Tabs C, D.

JACS-TCF
SUBJECT: Claim of Haider Saleh, 04-C01-T065

b. On 4 October 2003, the claimant was in-processed at the Abu Ghraib Confinement Facility and given his 72-hour review. Tab E. At that time, it was determined that the claimant was a security internee due to the fact that he "ran two checkpoints, evaded coalition forces, and there was already intel that this man was a security threat." The claimant was medically processed upon intake that same day. Tab F.

c. On 5 October 2003, the claimant was notified of his Geneva Convention Status and Appellate Rights in Arabic, and he was given an opportunity to respond, which he did. Tab G. Translations of these rights and his response are included at Tab H.

d. On 12 November 2003, US forces at Abu Ghraib received notice from the Embassy of Sweden in Amman, Jordan, that the claimant was a Swedish citizen. Tab I.

e. On 28 December 2003, the Article 78 Appellate Review Panel determined that "imperative reasons of security do not exist," and the claimant was released to the "Iraqi citizenry" because "no reasonable basis to justify continued detention, nor is detainee a threat to coalition forces." A second Article 78 Appellate Review Panel, that same day, composed of different members, made the same determination but released him to a "foreign government." It concluded that "this internee is indeed a Swedish national." The email traffic, ending with the statement from ▮▮▮▮▮▮ documents that "internee's name has been run through M[ilitary] I[ntelligence] database channels with zero results. No evidence in file indicating internee's involvement in anti-coalition activities." Tab J.

f. Mr. Saleh was released from Abu Ghraib on 16 January 2004. Tab K,[1] p. 9. He arrived in the United States on 19 March 2004. Tab L. Upon arrival in the US, he sought medical/psychological care from physicians in the Detroit Metro area. Tabs M, N.

g. On 8 June 2004, USARCS personnel interviewed the claimant. Tab O. He returned to Sweden on 18 June 2004. Tab L.

6. USARCS INVESTIGATION:

a. This Service's investigation revealed that a US Special Forces team apprehended the claimant on 22 September 2003. According to Captain ▮▮▮▮▮▮▮▮ the claimant ran multiple (2 in series) checkpoints manned by Iraqi Security Forces, ran a Coalition vehicle off the road, and then sped erratically and in excess of 140 kilometers/hour toward Najaf. Tab P. At the

---

[1] On 4 October 2004, LTC Charlotte R. Herring of this Service interviewed Captain (CPT) Christopher Gaffney telephonically to clarify the dates listed in his recommendation. He confirmed that the date under paragraph 2 should read "Between September 2003 and December 2003"; and paragraph 5(n) should read "[O]n 28 December 2003, the Article 78 Appellate Review Panel . . . "

3

JACS-TCF
SUBJECT: Claim of Haider Saleh, 04-C01-T065

time of his apprehension, the claimant was driving a mid-80s model Mercedes in a congested traffic area in Najaf. The claimant had several documents in his vehicle, including two passports, an Iraqi Police Force I.D., a weapons permit, and 50,000 Iraqi Dinar (IQD) that personnel found in the glove box. The only other person present, Staff Sergeant ███████ assisted CPT ███████ the interdiction, and then drove the claimant to the Najaf police station. CPT ███████ drove the claimant's vehicle. According to CPT ███████ there were only two individuals at the interdiction; there was no interpreter present. The team took Mr. Saleh to the Najaf Police Station where they turned the claimant, his vehicle, and property over to the custody of the IQP. CPT ███████ discussed the apprehension with the Chief of Police and the Watch Officer on duty, and then the IQP searched and in-processed the claimant into their detention facility. The total time that CPT ███████ spent with the claimant was 15 minutes from the time of interdiction to the time that he was in-processed into the local IQP. The investigation also revealed that the ████████████ team was coming off shift at the time. Therefore, the statements written by ████████████ did not contain first hand information but information relayed to them from ████████ Tab D. Since the claimant indicated that the person who detained him was CPT ██████ his explanation seems reasonable.

b. This Service's investigation indicates the claimant was turned over to the IQP on 22 September 2003, and he remained there until he was returned to US custody on 4 October 2003.

c. On 4 October 2003, the claimant was in-processed at Abu Ghraib Confinement Facility where he sought and received medical treatment with a medic, Private First Class (PFC) ████████ informing him that he had a history of stroke and seizures and that he took medications for the seizures. Tab F. In addition, the claimant told the medic that he took a drug called Ultraxin.[2]

d. On 5 October 2003, the claimant received his Notice of Geneva Convention Status and Appellate Rights in which he was told that he was a suspect in anti-coalition activities and that he would not be released at that time. Tabs G, H – English/Arabic. The claimant submitted a response to this notice stating that (1) he had been previously tortured under Saddam's prior regime; (2) he was driving his Mercedes at a high speed on the highway; (3) he was released that same day and re-arrested; (4) upon inspection of his car there was nothing unlawful contained in the vehicle; and (5) his family lived in Detroit, Michigan. Tabs G, H – English/Arabic. In his response, the claimant failed to mention that he had any money (either IQD or USD), or that he had been abused recently by any personnel, either Iraqi or US forces.

---

[2] Ultraxin is a broad-spectrum penicillin manufactured by the Arab Pharmaceutical Manufacturing Co. LTD.

4

JACS-TCF
SUBJECT: Claim of Haider Saleh, 04-C01-T065

e. After his hearing, personnel transported the claimant to the internment camp, called Camp Ganci, where he was housed in Ganci 8. He remained there until he was released on 16 January 2004. Tab K, pp. 2, 9. The claimant's confinement facility identification bracelet issued on 4 October 2003 notes that he was at Camp Ganci. Another confinement facility identification bracelet, issued on 26 November 2003 states BCF (Baghdad Confinement Facility.)[3] Tab Q. Upon this Service questioning Captain ███████████, the Foreign Claims Commission located at Abu Ghraib, he was unable to provide any reason for the two different bracelets.

f. On 12 November 2003, the Swedish Embassy requested the release of the claimant. Tab I.

g. On 27 December 2003, Major (MAJ) ██████████ Joint Intelligence and Debriefing Center, Operations Officer in Charge (JIDC OPS OIC,) in an email to 320th Military Police Battalion personnel, confirmed that Military Intelligence had not talked to the claimant nor that it intended to do so. Tab R. On 28 December 2003, the Information Dominance Cell cleared the claimant for release. That same day, the Article 78 Appellate Review Panel determined that "imperative reasons of security do not exist," and the claimant was released to the "Iraqi citizenry" because "no reasonable basis to justify continued detention, nor is detainee a threat to coalition forces." A second Article 78 Appellate Review Panel, also convened on 28 December 2003, composed of different members, made the same determination but released him to a "foreign government." It concluded that "this internee is indeed a Swedish national." The email traffic, ending with the statement from Mr. ██████ documents that the "internee's name has been run through MI database channels with zero results. No evidence in file indicating internee's involvement in anti-coalition activities."

h. On 16 January 2004, the claimant was released. Tab K, p. 9. There is no information in his file indicating where the claimant went immediately upon release. However, in his interview, he stated that the first thing he did was to go back "to Najaf to find his car and money." After visiting family in Baghdad, he then went to Syria; and 10 days after his release, he saw a doctor. Tab O.

i. The claimant presented a doctor's report from Dr. A. Alkawarit, which states that he treated the claimant for "iniencephanly"[4] from 25 December 2003 until 15 February 2004. This "iniencephanly" was the result of a vehicle accident on 26 September 2003, and affected the

---

[3] Camp Ganci is part of the Baghdad Confinement Facility. Baghdad Confinement Facility is also another name for Abu Ghraib

[4] A review of several medical sources, including The Merck Manual, 17th Ed., Merck & Co. (1999), Taber's Cyclopedic Medical Dictionary, 19th Ed., Davis Co. (2001), and an internet search failed to identify this diagnosis. However, iniencephaly is a rare neural tubal birth defect that combines extreme retroflexion (backwards bending) of the head with severe defects of the spine. This is usually diagnosed after birth and the prognosis is poor.

5

JACS-TCF
SUBJECT:  Claim of Haider Saleh, 04-C01-T065

movement of his right hand and left leg about 30%.  Tab S.  The claimant did not tell ███
██████ his first treating physician, that he had been abused by US forces.

    j.  The claimant presented medical records, which show that he had his first appointment with
Dr.████████, a licensed psychologist in the Detroit metro area, on 29 March 2004.  After
running a series of tests, she diagnosed him with adjustment disorder mixed with depression and
anxiety secondary to assault and torture, posttraumatic stress disorder (PTSD), cognitive
disorder, traumatic brain injury (mild) with loss of consciousness, possible seizure, hearing loss
and impaired vision.  Tab M.  On 14 May 2004, Dr. ██████████ a family practice physician,
diagnosed him with acute depression with PTSD, closed head injury, new onset seizure disorder,
cephalgia,[5] back strain, bilateral shoulder, hip and knee strain, and blunt trauma to the whole
body.  Tab N.[6]  Dr.██████scheduled the claimant for a magnetic resonance imaging (MRI) of
the brain, C-spine, T-spine and L/S spine on 24 May 2004.  The C-spine MRI confirmed
herniated discs with degeneration at C3-C4 and C6-C7 and cord compression at C6-C7 but no
myelomalacia[7] and some compression of the subarachnoid space and cord at C3-C4 with some
high signal abnormality in the cord consistent with early myelomalacia.  Tab T.  Although
scheduled for that same day, the claimant failed to have MRIs done of the brain, T-spine, or L/S
spine.  According to Dr. ██████ absent a brain MRI, he was unable to diagnose accurately the
closed head trauma.

    k.  On 29 September 2004, this Service interviewed Dr. (COL)███████ Associate
Professor of Psychiatry at the Uniformed Services University of the Health Sciences and
Psychiatry Consultant to the Army Surgeon General.  Tab W.  Dr██████made several
observations, most notably, that there was no evidence that any medications were prescribed for
the claimant's PTSD, and that there was no brain MRI conducted.  Dr. ██████ stated that "[m]ost
patients with symptoms this severe would have been medicated."  Dr. ████████termined that the
claimant is suffering from depression and PTSD.[8]  Based on his current level of psychological
disability and the available medical records, this claimant's condition was likely exacerbated by
his detention.

    l.  On 1 October 2004, this Service conducted a follow-up interviewed with Dr. Washim
████████ Tab X.  Dr.█████ advised this Service that he only saw the claimant on one

---

[5] Headache.
[6] Both Dr. ██████ and Dr██████ based their assessments of the claimant's injuries as secondary to his "torture"
at Abu Ghraib.  There opinions are based upon the claimant's assertion of abuse at Abu Ghraib.
[7] Abnormal softening of the spinal cord.
[8] In Dr██████interview she stated that "[a]ccording to their accounts, these diagnoses are secondary to his torture
at Abu Ghraib.  However, there is no independent evidence of torture at Abu Ghraib other than his claim.  In
addition, according to their accounts, he is severely disabled.  However, we have no independent evidence of his
disability.  Furthermore, we do not know his prior level of functioning before his detention.  The claimant could have
had a pre-existing disorder."

JACS-TCF
SUBJECT: Claim of Haider Saleh, 04-C01-T065

occasion, for approximately one hour, and that the claimant's nephew served as the interpreter. Dr. ███ stressed that his report was only an assessment, not a diagnosis, and that multiple tests were necessary to diagnose the claimant properly. Dr. ████ recommended several MRIs: brain, C-spine, thoracic spine, and lombosacral spine, yet only one, the C-spine, was conducted. Dr. █████ed that without the recommended MRIs "he could not confirm his assessment diagnoses." He did not "understand why Mr. Saleh did not follow-up with the test that he ordered." He stated that he did not place the claimant on any medications for the PTSD because he wanted a brain MRI first. Dr. ███, in this initial assessment, stated that the claimant had "medical restrictions: Work wise: Totally disabled." However, upon request, Dr. ███ provided this Service previously undisclosed medical records, including physical therapy evaluations which state his "rehabilitation potential" is "good," and his "Certification of Employment Disability" states that the claimant's "period of disability" was only one month, from 14 May 2003 until 14 June 2003. Tab N.

7. LIABILITY AND DAMAGES:

   a. This Service finds that the initial stop by US forces on 22 September 2003 was reasonable, as was turning the claimant over to the IQP. This Service also finds that the United States had custody of the claimant from 4 October 2003 – 16 January 2004, but he was never interrogated. We find that the failure to do so was negligent, and that the result of this negligence was the claimant's unnecessary internment at Abu Ghraib for approximately three months. We did not find any evidence substantiating that the claimant's assertion he was abused by US personnel.

   b. The claimant submitted a claim for $3000 for the loss of his 1988 Mercedes 300. The claimant provided proof of ownership dated July 2003, and the Swedish embassy in its letter requesting the claimant's release from Abu Ghraib, made reference to his Mercedes. Tab Y. The initial stop by US forces was appropriate, as was turning the vehicle over to the IQP. Tab P. Since US forces were not negligent, a requirement for compensation under the FCA, this Service recommends we do not compensate the claimant for the loss of his vehicle.

   c. The claimant alleges the loss of $79,000 USD in cash from his vehicle at the time of his detention. The claimant failed to provide any evidence that he had $79,000 with him even after multiple requests from this Service for any type of substantiation (i.e. bank withdrawal slips, Swedish customs declaration forms, exchange receipts, Swedish income tax forms.) Nor, despite requests from this Service, has he been able to substantiate that he was even employed in Sweden. During the course of this Service's interview with the claimant, he alleged that his income at the time of his detention was 120,000 Swedish Kronor (SEK) per annum.[9] In his

---

[9] According to the UN operation rates (www.un.org/depts/treasury/2003 ) in Sep '2003, the conversion rate was 8.49 SEK = 1 USD. The claimant's yearly income was $14,134.28. $79,000 represents almost 6 years of wages for this claimant.

JACS-TCF
SUBJECT: Claim of Haider Saleh, 04-C01-T065

interview, the claimant even stated that "[t]he Swedish government wanted the cars out of the country so they did not charge him and his friends any taxes," which this Service finds unreasonable to believe. Tab O, p. 3. The evidence does show that the claimant had 50,000 IQD ($28 – USD) on him.[10] This was turned over to the IQP in Najaf on 22 September 2003. Since there is no evidence the claimant had $79,000 in his possession at the time of the stop, and turning over the 50,000 IQD was appropriate, this Service recommends we do not compensate the claimant for the loss of any funds.

   d. The claimant alleges abuse at the hands of US personnel at El Dewaniyah and Abu Ghraib. This alleged abuse comprises the majority of the damages in this claim. This Service's investigation reveals absolutely no evidence to support his assertion of abuse by US forces and finds the claimant completely lacking credibility for the following reasons:

   (1) The claimant alleges that he was under US custody and control from 22 September 2003 until 4 October 2003 when he was in-processed at Abu Ghraib. This is not true. This Service's investigation found that the claimant was in IQP custody and control until he was in-processed at Abu Ghraib. Although there is no evidence that he suffered injuries while in the custody of the IQP, this Service notes that The International Community of the Red Cross (ICRC),[11] in its report dated February 2004, found numerous instances of Iraqi-on-Iraqi abuse at

---

[10] According to the UN operation rates (www.un.org/depts/treasury/2003 ) in September 2003, the conversion rate was 1800 IQD = 1 USD. The claimant had $27.78 at the time of his detention.

[11] Report of the International Committee of the Red Cross (ICRC) on the Treatment by the Coalition Forces of Prisoners of War and other Protected Persons by the Geneva Conventions in Iraq during Arrest, Internment and Interrogation, February 2004, paragraph 3.5 Allegations of Ill Treatment by Iraqi Police:

   Alleged ill-treatment during arrest and transportation included hooding, tight handcuffing, verbal abuse, beating with fists and rifle butts, and kicking. During interrogation, the detaining authorities allegedly whipped persons deprived of their liberty with cables on the back, kicked them in the lower parts of the body, including in the testicles, handcuffed and left them hanging from the iron bars of the cell windows or doors in painful positions for several hours at a time, and burned them with cigarettes (signs on bodies witnessed by ICRC delegates). Several persons deprived of their liberty alleged that they had been made to sign a statement that they had not been allowed to read. These allegations concerned several police stations in Baghdad including Al-Qana, Al-Jiran Al-Kubra in al-Amariyya, Al-Hurriyyeh in Al-Doura, Al-Salhiyye in Salhiyye, and Al-Baiah. Many persons deprived of their liberty drew parallels between police practices under the occupation with those of the former regime.

   In early June 2003, for instance, a group of persons deprived of their liberty was taken to the former police academy after they had been arrested. There, they were allegedly hooded and cuffed and made to stand against a wall while a policeman placed his pistol against their heads and pulled the trigger in a mock execution (the pistol was in fact unloaded); they were also allegedly forced to sit on chairs when they were hit on the legs, the soles of their feet and on their sides with sticks. They also allegedly had water poured on their legs and had electrical shocks administered to them

8

JACS-TCF
SUBJECT: Claim of Haider Saleh, 04-C01-T065

the IQ police stations and listed several locations where this abuse occurred. Tab U. Though El Dewaniya was not specifically included in the ICRC list, it is reasonable to assume that it was not specifically excluded. If the claimant was detained at El Dewaniya, it was under the custody and control of the IQP. Upon reading the ICRC report, it is noted that much of the abuse at the IQ police stations is very similar to that alleged by the claimant as having been committed against him by US forces. The abuse alleged by the claimant was similar in kind, duration and scope to the abuse revealed in the ICRC report. It is also similar to the abuse committed under the former regime, as evidenced by television, newspaper, and internet accounts.[12] Tab V.

(2) All instances of reported abuse at Abu Ghraib were on the nightshift in Tier 1A and Tier 1B. The claimant's claim and testimony are inconsistent with most allegations of abuse made, and documented in Major General (MG) ████ AR 15-6 Investigation (Tab AA) or in the Final Report of the Independent Panel to Review DoD Detention Operations.

(3) The claimant was never housed in Tier One (the "hard side") according to First Lieutenant (1LT) ████ Assistant S-1, 391 MP Battalion at Abu Ghraib and CW3 ████ ████ Chief, Interrogation Control Element, Joint Intelligence and Debriefing Center, Abu Ghraib. There is absolutely no testimonial or documentary evidence that the claimant ever even went to the "hard side." Tab K, pp. 2, 9. Personnel never interrogated the claimant while he was at Abu Ghraib as evidenced by the email exchange between prison personnel. Tab R. According to CW3 ████ US forces never interrogated the claimant and, therefore, he was never asked to sign any type of incriminating statements by US forces. (However, this was common practice of the IQP as indicated in footnote 10.)

(4) The majority of the claimant's allegations of abuse, if true, would be the sole instances reported of this type and kind of abuse at Abu Ghraib, in Tiers 1A/1B and Camp Ganci. However, the claimant's allegations are completely consistent with the kinds of abuse committed at Abu Ghraib during Saddam Hussein's reign. Tab V.

---

with stripped tips of electric wires. The mother of one of the persons deprived of liberty was reportedly brought in and the policemen threatened to mistreat her. Another person deprived of his liberty was threatened with having his wife brought in and raped. They were made to fingerprint their alleged confessions of guilt, which resulted in their transfer to the C[onfinement] F[acility] to be interned pending trial.

[12] "Saddam Hussein, Crimes and Human Rights Abuses," The Foreign and Commonwealth Offices, UK, Nov 02, Annex One: "eye-gouging, piercing of hands with an electric drill, suspension from a ceiling, electric shock, rape and other forms of sexual abuse, beating of the soles of feet with cables until lack of consciousness, mock executions, extraction of finger/toe nails, extinguishing cigarettes on the body and acid baths."

9

JACS-TCF
SUBJECT:  Claim of Haider Saleh, 04-C01-T065

(5)  1LT ████ onfirmed that there were no reported allegations made by military police or detainees concerning sexual abuse or torture by the guard on prisoners within the internment camp (Camp Ganci.) Tab K, p. 9.

(6)  CPT ████ interviewed two Iraqi interpreters at Abu Ghraib, one who personally knew the claimant and one who had worked there during the September 2003 timeframe.[13] Mr. ████ (Titan contractor) knew Mr. Saleh and said that the claimant never told him that he had been or was being abused; nor had he heard rumors of the claimant being abused by guards from other detainees. Mr. ████ confirmed that he had never heard of abuse of detainees at the internment camp (Camp Ganci.) Mr. ████ (interpreter) also testified that he worked at Abu Ghraib in September 2003 and he too said, based on his experience at the prison, that the claimant's allegations were not credible. Tab K, p. 10.

(7)  In addition, CPT ████ nterviewed two detainees at the internment camp (Camp Ganci.) Both internees were at Camp Ganci at the same time as the claimant. Both detainees confirmed that they had never heard of any type of sexual abuse/humiliation at the internment camp (Camp Ganci) though one stated that he had heard of abuse at the "hard side." Tab K, p. 10. They confirmed that this kind of information would definitely have been known by other detainees in the internment camp (Camp Ganci.)

(8)  CPT ████ also investigated whether there was any inmate at Camp Ganci during the time that the claimant was there named ████ particularly one housed with the claimant in Ganci 8. There was not. Conveniently, the only person that the claimant alleges he told of his alleged abuse was ████ who according to the claimant was shot and allowed to bleed to death for three days. This Service's investigation also found no evidence of a Swedish doctor ever practicing at Abu Ghraib.[14]

(9)  The claimant denied ever being questioned by any Americans prior to LTC ████ questioning him. Yet in his statements to his treating physicians in Michigan, he stated that US forces questioned him daily at Abu Ghraib and it is that interrogation that forms the basis of his claim.

---

[13]  CPT ████ ocated the interpreters who were at Abu Ghraib from 4 Oct 2003 – 16 Jan 2004. CPT ████ "asked around" until he found some. He located the two detainees by reviewing detainee records and comparing their detainee numbers. Detainee numbers are consecutive and therefore, he was able to determine which detainees were at Abu Ghraib from 4 Oct 2003 – 16 Jan 2004 by comparing numbers.
[14]  In Oct 2004, Captain ████ Chief, Claims, MNF-1, questioned the current medical detachment located at Abu Ghraib about whether a Swedish doctor was at Abu Ghraib from Sep 2003 – Jan 2004. They said that no Swedish doctor had ever been there as far as they knew.

JACS-TCF
SUBJECT: Claim of Haider Saleh, 04-C01-T065

(10) On 8 June 2004, the claimant denied to LTC ████████ ever being tortured at the hands of Saddam Hussein, except for the "light torture of being whipped when late going to the bathroom." He did testify that he was in solitary confinement for four years and eight months. Tab O, para. 5. Conversely, the claimant told his treating physicians in Michigan, but not the first treating physician he saw in Syria, that he was brutally tortured at Abu Ghraib from 1980 – 1985, including being shot in the hand in prison. The claimant intentionally withheld this fact from this Service during the course of this investigation. The claimant testified that the abuse from 22 September 2003 – 4 October 2003 (4 months) was substantially worse than the abuse he suffered over 5 years under Saddam Hussein.

(11) According to the claimant, he saw a physician immediately upon being released from Abu Ghraib in December 2003. However, the dates on the medical report directly contradict the dates of the claimant's detention paperwork and the claimant was unable to explain the discrepancy. Tab O, para. 22. ████████ interview, para. 17. In the claimant interview, this Service based questions on the claimant's assertion that he was released from Abu Ghraib on 22 December 2003. It was not until 24 June 2004, upon receipt of CPT ████████ memorandum, that this Service found out that the claimant was released on 16 January 2004. The discrepancy in these dates clearly clouds the reliability of Dr. ████████ medical report. In addition, even if we assume that this medical record is not fabricated, but merely depicts inaccurate dating, it is clear that this claimant did not inform the doctor about his alleged mistreatment at Abu Ghraib. Common sense dictates that if this claimant was abused, as he has claimed, he would have informed his first treating physician of this abuse, and not that he was in an "accident" on 26 September 2003. In addition, during the claimant interview, the claimant acknowledged to this Service that he did not tell Dr. ████████ about the alleged mistreatment.

(12) The claimant denied a prior negative health history to his treating physicians in Michigan, alleging he was a perfectly healthy, fully employed male, yet the intake Standard Form 600 at Abu Ghraib dated 4 October 2003 indicates that the claimant had a history of strokes and seizures for which he took medication. Therefore, the evidence this Service has indicates that the claimant had a pre-existing disability.

(13) The claimant's recitation of the details of his arrest has changed. In the claimant's appeal dated 5 October 2003, the claimant admits to "driving his Mercedes at a high speed on the highway." Tab H. Yet, when the claimant filed his claim (Tab B), he alleges he was stopped for no reason; the claimant later stated this again in his interview (Tab O, para. 8) when he said, "there was no reason to stop him."

e. Since this Service finds no evidence of negligence or misconduct, particularly abuse, of this claimant while under the custody and control of the US forces at Abu Ghraib, the US is not liable for any minimal physical disabilities that he may currently suffer. Any physical disabilities

11

JACS-TCF
SUBJECT: Claim of Haider Saleh, 04-C01-T065

he suffers are likely the result of long-term disabilities from his 1980 – 1985 detention abuse, or treatment he received while under the control of the IQP from 22 September 2003 – 4 October 2003. Again, it is noted that the opinions of Dr. ███████ and Dr. ███████ that the claimant's injuries were secondary to the torture at Abu Ghraib is based solely on the claimant's assertion that he was tortured at Abu Ghraib.

   f. This Service finds that the claimant was negligently held in Abu Ghraib prison for approximately three months. Claims submitted under the FCA are evaluated under the law of the country in which the act or omission occurred. In May 2004, this Service requested the Multi-National Corps–Iraq to draft an information paper enumerating Iraqi compensation for personal injuries. Tab Z. Damages are broken down into three separate categories: MADY (physical or material), ADABY (psychological, moral and spiritual), and customary damages for long-term physical disability outside the realm of psychological damage.

   g. On several occasions, this Service discussed this case with Dr. (COL) ███████ Associate Professor of Psychiatry at the Uniformed Services University of the Health Sciences and Psychiatry Consultant to the Army Surgeon General. Tab W. After reviewing medical records and other documentation, Dr. ███████ made several observations, most notably, that based on the claimant's current level of psychological disability, claimant suffers from PTSD, and that it was likely exacerbated by his detention. Given his physical disabilities, it is this Service's opinion that any exacerbation of his PTSD caused by his negligent detention was minimal.

   h. Total damages to the claimant are for three months of negligent internment in Abu Ghraib and a minimal exacerbation of his PTSD due to his detention. This Service recommends a payment of $5,000 for any injuries he suffered.

8. RECOMMENDATION: I recommend that you approve the proposed settlement of the subject claim with a total cost to the Government of $5,000 by signing the memorandum at the red tab.


                                              *Charlotte R. Herring*
                                              CHARLOTTE R. HERRING
                                              LTC, JA
                                              Chief, Foreign Torts Branch


                                              12

JACS-TCF
SUBJECT:  Claim of Haider Saleh, 04-C01-T065

JACS-Z

I have carefully considered the claim of Haidar Saleh, and the memorandum of LTC Charlotte R. Herring, recommending a proposed settlement in a total amount of $5,000. Inasmuch as the recommendation is based on sound regulatory provisions having a recognized basis in American tort law and is reasonable under the circumstances, I adopt the recommendation as my own.

MELVIN OLMSCHEID
COL, JA
Commanding

13

# EXHIBIT B



**DEPARTMENT OF THE ARMY**
U.S. ARMY CLAIMS SERVICE
OFFICE OF THE JUDGE ADVOCATE GENERAL
4411 LLEWELLYN AVENUE
FORT GEORGE G. MEADE, MARYLAND 20755-5360



MAY 3 2005



CERTIFIED MAIL — RETURN RECEIPT REQUESTED

Foreign Torts Branch

SUBJECT:  Claim of Haidar Muhsin Saleh, 04-C01-T065

Susan L. Burke
Burke Pyle LLC
3527 Lancaster Avenue
Philadelphia, Pennsylvania  19104-4915

Dear Ms. Burke:

This letter responds to your October 3, 2005, letter to Lieutenant Colonel Kerry M. Wheelehan of my staff, concerning your client Haidar Muhsin Saleh.  Your letter is being treated as an appeal from the final offer extended to you on April 7, 2005, a copy of which is enclosed.  The requirement stated in that letter that your client must accept the final offer within 180 days is rescinded.

As you know, this Service considered your client's claim under the Foreign Claims Act (FCA), 10 U.S.C. § 2734, as implemented by Army Regulation 27-20, *Claims*, Chapter 10.  The FCA applies to claims for personal injury, or loss of or damage to property, resulting from noncombat activities of the United States or from negligent or wrongful acts or omissions of soldiers or employees of the U.S. Armed Forces.  Scope of employment is not a consideration under the FCA.  Accordingly, in answer to the question posed in your letter, injuries resulting from criminal acts of torture and abuse by U.S. personnel would be cognizable under the FCA if the allegations are substantiated.  As stated in our April 7, 2005, letter, however, our investigation found no evidence substantiating your client's allegations of abuse.

Your client has the ability to submit additional evidence and arguments in support of his appeal.  I am granting you a 90-day extension of time within which to submit any such evidence and argument.  We will defer final action on the appeal to provide your client an opportunity to submit additional material for our review and consideration.  He must send any such material, postmarked not later than 90 days after you receive this letter, to the Commander, U.S. Army Claims Service, 4411 Llewellyn Avenue, Fort George G. Meade, Maryland 20755-5360.  If the 90th day falls on a day on which the post office is closed, this Service will consider the next day on which the post office is open for business as the final day of the extension period.

If your client elects not to submit additional matters, his appeal will be considered on the basis of the record as it existed at the time of this letter.  Upon receipt of all evidence

-2-

and arguments in support of the appeal, the file will be submitted to the appropriate
designee of the Secretary of the Army, for review and final action. The decision made by
that designee after consideration of the appeal will constitute final and conclusive action
under Title 10, United States Code, § 2735. Your client will have no further ability to
appeal or any further recourse on the claim.

Sincerely,

Dale N. Woodling
Colonel, US Army
Commanding Officer

Enclosures

Copy Furnished:
     Shereef H. Akeel
     Melamed, Dailey and Akeel, P.C.
     26611 Woodward Avenue
     Huntington Woods, Michigan 48070-1332

# EXHIBIT C



Burke Pyle LLC

3527 lancaster avenue        philadelphia, pa 19104        tel: 215.387.4705        fax: 215.387.4713

October 3, 2005

**By facsimile and FedEx**

Lieutenant Colonel Charlotte Herring
United States Army Claims Service
4411 Llewellyn Avenue
Fort George G. Meade, MD 20755-5360
Attention: JACS-TCF

Re:    Claim of Haidar Muhsin Saleh, 04-C01-T065

Dear Lieutenant Colonel Herring:

    Please be advised that we, along with Shereef Akeel, Esq. of Akeel & Valentine, P.C., represent Haidar Muhsin Saleh with respect to the injuries he suffered while in United States custody at Abu Ghraib. We have received your letter dated April 7, 2005. We understand, however, that the United States military's Criminal Investigation Division has opened a criminal investigation regarding the abuse suffered by Mr. Saleh. Our understanding is that injuries resulting from criminal acts of torture and abuse are beyond the purview of the Claims Service. Please advise if you disagree.

Sincerely,

Susan L. Burke (JNP)

Susan L. Burke

cc:    Col. Melvin G. Olmscheid
       Shereef Akeel, Esq.

# EXHIBIT D

030628·04

# COALITION PROVISIONAL AUTHORITY ORDER NUMBER 17

## STATUS OF THE COALITION, FOREIGN LIAISON MISSIONS, THEIR PERSONNEL AND CONTRACTORS

*Pursuant* to my authority as head of the Coalition Provisional Authority (CPA), and under the laws and usages of war, and consistent with relevant U.N. Security Council resolutions, including Resolution 1483 (2003),

*Recalling* that under international law occupying powers, including their forces, personnel, property and equipment, funds and assets, are not subject to the laws or jurisdiction of the occupied territory,

*Conscious* that states are contributing personnel, equipment and other resources to the Coalition in order to contribute to the security and stability that will enable the relief, recovery and development of Iraq,

*Noting* that states are sending Foreign Liaison Mission Personnel to Iraq,

*Conscious* of the need to establish and confirm the status of such Coalition and Foreign Liaison Mission Personnel in respect of the CPA and the local courts,

I hereby promulgate the following:

### Section 1
### Definitions

1) "Coalition Personnel" means all non-Iraqi military and civilian personnel assigned to or under the command of the Commander, Coalition Forces, or all forces employed by a Coalition State including attached civilians, as well as all non-Iraqi military and civilian personnel assigned to, or under the direction or control of the Administrator of the CPA.

2) "Foreign Liaison Mission Personnel" means those individuals who have been issued Foreign Liaison Mission personnel identification cards by the Iraqi Ministry of Foreign Affairs under the supervision of the CPA.

3) "Legal Process" means any arrest, detention or legal proceedings in the Iraqi courts or other Iraqi bodies, whether criminal, civil, administrative or other in nature.

4) "Parent State" means the state providing Coalition Personnel as part of the Coalition in Iraq or the state providing Foreign Liaison Mission Personnel.

5) "Coalition contractors" means non-Iraqi business entities or individuals not normally resident in Iraq supplying goods and/or services to or on behalf of the Coalition Forces or the CPA under contractual arrangements.

6) "Coalition sub-contractors" means non-Iraqi business entities or individuals not normally resident in Iraq supplying goods and/or services to or on behalf of Coalition contractors and in respect of Coalition or CPA activities under contractual arrangements

### Section 2
### Coalition and Foreign Liaison Mission Personnel

) CPA, Coalition Forces and Foreign Liaison Mission, their property, funds and assets of shall be immune from Iraqi Legal Process.

2) All Coalition personnel and Foreign Liaison Mission personnel shall respect the Iraqi laws applicable to those Coalition personnel and Foreign Liaison Mission personnel in the territory of Iraq and the Regulations, Orders, Memoranda and Public Notices issued by the Administrator of the CPA.

3) Foreign Liaison Mission personnel shall be immune from Legal Process.

4) All Coalition personnel shall be subject to the exclusive jurisdiction of their Parent States and, they shall be immune from local criminal, civil, and administrative jurisdiction and from any form of arrest or detention other than by persons acting on behalf of their Parent States, except that nothing in this provision shall prevent Coalition Forces personnel from preventing acts of serious misconduct by Coalition personnel, or otherwise temporarily detaining Coalition personnel who pose a risk of injury to themselves or others, pending expeditious turnover to the appropriate authorities of the Parent State. In all such circumstances the national contingent commander of the detained person shall be notified immediately.

5) In respect of those Coalition personnel who commit an act or acts in Iraq for which there are no criminal sanctions in the Parent State, the CPA may request from the Parent State waiver of jurisdiction to try such act or acts under Iraqi law. In such cases, no Legal Process shall be commenced without the written permission of the Administrator of the CPA.

### Section 3
### Contractors

1) Coalition contractors and their sub-contractors as well as their employees not normally resident in Iraq, shall not be subject to Iraqi laws or regulations in matters relating to the terms and conditions of their contracts in relation to the Coalition Forces or the CPA. Coalition contractors and sub-contractors other than contractors and sub-contractors normally resident in Iraq shall not be subject to Iraqi laws or regulations with respect to licensing and registration of employees, businesses and corporations in relation to such contracts.

2) Coalition contractors and their sub-contractors as well as their employees not normally resident in Iraq, shall be immune from Iraqi Legal Process with respect to acts performed by them within their official activities pursuant to the terms and conditions of a contract between a contractor and Coalition Forces or the CPA and any sub-contract thereto.

3) In respect of acts or omissions of Coalition contractors and sub-contractors as well as their employees not normally resident in Iraq, which are not performed by them in the course of their official activities pursuant to the terms and conditions of a contract between them and the Coalition or the CPA, no Iraqi or CPA Legal Process shall be commenced without the written permission of the Administrator of the CPA.

## Section 4
## Duration of Immunity From Legal Process

The immunity from Legal Process provided by the present Order to Coalition personnel and Foreign Liaison Mission personnel as well as Coalition contractors, sub-contractors and their employees not normally resident in Iraq operates only in respect to acts or omissions by them during the period of authority of the CPA.

## Section 5
## Waiver of Legal Immunity and Jurisdiction

1) The immunity from Legal Process of Coalition personnel, Foreign Liaison Mission personnel, Coalition contractors and their sub-contractors as well as their employees not normally resident in Iraq is not for the benefit of the individuals concerned and may be waived by the Parent State.

2) Requests to waive jurisdiction over Coalition personnel or Foreign Liaison Mission personnel shall be referred to the respective Parent State.

3) Requests to waive the immunities with respect to Coalition contractors and sub-contractors and their employees not normally resident in Iraq as set forth in Section 3 of this Order shall be referred to the respective Parent State with which the contractor has contracted.

## Section 6
## Claims

1) Third party claims including those for property loss or damage and for personal injury, illness or death or in respect of any other matter arising from or attributed to Coalition personnel or any persons employed by them, whether normally resident in Iraq or not and that do not arise in connection with military combat operations, shall be submitted and dealt with by the Parent State whose Coalition personnel, property, activities or other assets are alleged to have caused the claimed damage, in a manner consistent with the national laws of the Parent State.

2) Third party claims for property loss or damage and for personal injury, illness or death or in respect of any other matter arising from or attributed to Foreign Liaison Mission personnel shall be submitted and dealt with by the Parent State whose Foreign Liaison Mission personnel, property, activities or other assets are alleged to have caused the claimed damage, in a manner consistent with the national laws of the Parent State.

### Section 7
### Entry Into Force

This Order shall enter into force on the date of signature.

*6/27/03*

L Paul Bremer, Administrator
Coalition Provisional Authority

# EXHIBIT E



*Adjunct Professor of International Affairs*

December 18, 2007

**MEMORANDUM FOR:**     **Colonel Michael Meese**
                        **Professor and Head Dept of Social Sciences**
                        **United States Military Academy**

**CC:**                 **Colonel Cindy Jebb**
                        **Professor and Deputy Head Dept of Social Sciences**
                        **United States Military Academy**

**SUBJECT:**            After Action Report—General Barry R McCaffrey USA (Ret)
                        **VISIT IRAQ AND KUWAIT 5-11 DECEMBER 2007**

**1. PURPOSE:**         This memo provides feedback on my strategic and operational
                        assessment of current security operations in Iraq. Look forward to
                        providing lectures to faculty and cadet national security seminars.

                        Will provide follow-on comprehensive report with attachments of
                        current unclassified data and graphs documenting the current counter-
                        insurgency situation in Iraq.

**2. SOURCES:**

   **1.)**   **ADM William (Fox) Fallon USN, Commander US Central Command
(CENTCOM)** One-on -one meeting in Iraq. Theater strategic assessment.

   **2.)**   **GEN David Petraeus, Commanding General Multi-National Forces Iraq (CG,
MNF-I)** One-on-one office call: strategic assessment.

   **3.)**   **LTG Raymond Odierno, Commanding General Multi-National Corps-Iraq (CG,
MNC-I)** Campaign briefing.

   **4.)**   **LTG Jim Dubik, Commander, Multi-National Security Transition Command -
Iraq (MNSTC-I)** MNSTC-I Overview brief and ministerial capacity discussion
"Building the Iraqi Police and Army".

1

5.) **Chargé Ambassador Pat Butenis, Deputy Chief of Mission** (Ambassador Ryan Crocker on personal leave)     One-on-one diplomatic assessment.

6.) **MG John Paxton USMC, Chief of Staff Multi National Forces- Iraq (COS, MNF-I)** MNF-I Battle Update Assessment.

7.) **MG Joe Fil, Commanding General, Multi-National Division -Baghdad (CG, MND-B)** Update- "The struggle for Bagdad."

8.) **MG Mark Hertling, Commanding General Multi-National Division- North (CG, MND-N)** MND-N "Battle Update Brief the northern zones...AQI final refuge."

9.) **MG Rick Lynch, Commanding General Multi-National Division Center-(CG, MND-C)** MND-C Operations & Intelligence Round Table. "The struggle for the southern approaches to Baghdad."

10.) **MG Mike Jones, Commander Civilian Police Assistance Training Team (CPATT)** Round table discussion at Taqaddam Airbase. **"Building the Iraqi Police."**

11.) **MG Kevin Bergner, Deputy Chief of Staff for Strategic Effects, MNF-I** Update briefing with senior MNF-I Staff.

12.) **MG Maston Robeson (Deputy Chief of Staff for Strategy, Plans and Assessments MNF-I), RADML Greg Smith (PAOMNF-I):** Update briefing with senior MNF-I Staff.

13.) **MG Dennis Hardy, Deputy Commanding General, Third Army, U.S. Army Central (USARCENT), Coalition Forces Land Component Command (CFLCC):** Briefing on strategic situation in Kuwait.

14.) **BG Geoff Freeman, CG, 335th Theater Sig Cmd (Prov), C6, Coalition Forces Land Component Command:** Update briefing on communications support, Iraq and Afghanistan.

15.) **US Embassy Baghdad Country Team Briefing – AMB Marci Ries (Pol-Mil Counselor), AMB Charlie Ries (Coordinator for Economic Transition in Iraq), Todd Schwartz (Economic Counselor), Matt Tueller (Political Counselor), Dr. Chris Schnaubelt (Chief of Joint Strategic Plans and Assessments).**

16.) **BG Jim Yarbrough, CG, Iraqi Assistance Group (IAG):** Update briefing MNC-I assistance group. "The status and training of US MiTT teams imbedded in Iraqi Forces."

17.) **Operational Intelligence Briefings. BG (P) Vince Brooks (DCG S, MND-B), COL Jack Ballantyne (Chief of Staff and MND-B), COL Bill West (Chief ISF Cell, MND-B), LTC Steve North (G2, MND-B), LTC Chris Bonheim (Deputy G3, MND-B):** "Iraqi Forces engaged in the struggle for Baghdad."

18.) **Campaign briefing with MNC-I CG Team. COL Jerry Tait (C2, MNC-I), COL John Murray (C3, MNC-I), COL J.T. Thomson (XO, MNC-I CG)** "The campaign Plan."

19.) **Sensing session and open discussion with thirty-eight US battalion commanders: MND-B Battalion Commander's Conference.** Working Lunch --- BG John Campbell, DCG (S).

20.) **BG Barry McManus (Joint Headquarters Transition Team CMATT), BG Robert Allardice (Air Force Transition Team CMATT), and RADM Edward Winters (Navy Transition Team CMATT), and COL Al Dochnal (Chief of Staff CMATT):** MNSTC-I Overview Brief Iraqi: Security Forces and Ministerial Capacity Discussion

21.) **BG Jim Kessler, CG 2nd Marine Logistic Group MNF-W, COL Rivers Johnson (PAO, CPATT), Mr. Don Lane (Chief of Training CPATT):** Round Table Discussion. (Forced down by dust storm weather with the Marines!)

22.) **BG Edward Cardon, DCG-S, MND-C:** MND-C Battle Update Brief.

23.) **BG Charles Gurganus USMC (CG Ground Component Element, II MEF), COL John Charlton USA (Commander 1st Bde, MNF-W), and COL Dave Fuquea USMC (G3-ISF MNF-W):** Overview, Ramadi city visits, and working lunch Marine/US Army leadership Camp Ramadi.

24.) **COL Jim Hickey, (Director, MNC-I COIC), MAJ Brian Bricker (XO, MNC-I COIC):** Office call with MNC-I Counter-IED Operational Integration Center. "Strategic intelligence assessment."

25.) **COL Ricky Gibbs, (Commander 4/1 ID), LTC Pat Frank (Commander 1-28 IN):** 4/1 ID BCT & 1-28 IN "O&I Brief with focus on the battle for Baghdad." (US 80 KIA and 600+ WIA in this brigade during the campaign.)

26.) **COL Rodger Cloutier (G3 MND-C), MAJ David Waldron (G3 Ops MND-C), MAJ David Stender (720th MP Bn S3), MAJ Michael Kelly (G3 ISF Cell MND-C):** Lunch & Brief on Iraqi Security Forces Status & Readiness on the southern approaches to Baghdad."

27.) **COL Dominic Caracillo (Commander, 3/101 ABN), LTC Andrew Rohling (Commander, 3-187 IN), COL Ahmad (Iraqi Battalion Commander PB Kemple):** Visit with 3rd BCT, 101 ABN at Patrol Base Kemple. "The battle for the southern approaches to Baghdad."

28.) **COL Wayne Grigsby (Commander 3rd Bde, 3ID), MAJ Luis Rivera (XO, 1-10 FA Bn), and CPT Pat Moffett (Commander, A/1-10 FA Bn):** Battle updates "the southern belt" ..."market walk Iraqi City" with 3rd Bde, 3ID

29.) **COL Bryan Watson (Chief of Staff, MND-N), COL Steve Schenk (G3 MND-N):** MND-N Battle Update briefs the northern zones.

3

30.) **COL John Broadmedow USMC, Chief 7th IA Division MiTT:** 7th IA Division Mitt Overview& Discussion at Camp Black Diamond. "The reconciliation campaign for Anbar province."

31.) **COL Steve Schenk (G3 MND-N), MAJ Sam Lex (G3-ISF MND-N):** Meeting with MND-N Iraqi Security Forces Cell.

32.) **COL Jessie Farrington (Commander 1st CAB), LTC Jim Cutting (Commander, TF Odin), MAJ Bill Huff (Brigade S3, 1st CAB):** 1st Combat Aviation Brigade and TF Odin Briefing-- Tikrit.

33.) **LTC Thomas Hauerwas (Bde XO 1/101[st] ABN), MAJ George Bratcher (Bde S2, 1/101[st] ABN):** 1/101[st] ABN Operations and Intelligence Update "the southern approaches."

34.) **Round table discussion with International Police Advisors: Donald Lane (Chief of Training CPATT), Steve Ryan, International Police Advisor, Habbaniyah, Dave Smith, International Police Advisor, Ed Weibl, International Police Advisor. "Effectiveness of the Iraqi Police."**

35.) **MG Tariq Yusuf, Anbar Provincial Chief of Police:** Operational assessment at Ramadi Government Center.

36.) **Meeting/ briefing with 7th Iraqi Army Division Commander and senior staff. "The struggle for Anbar Province."**

37.) **Sensing Session with twenty US Company Commanders. Multi National Division North. "Morale, career plans, performance of Iraqi Security Forces, trust in Commanders."**

38.) **Field visit 1st Battalion, 30th Infantry, MAJ Eric Weis, S3.** (Serve as honorary Colonel of the regiment. Was honored to present awards for valor and purple heart medals, as well as receive update brief on their counter-insurgency operations south of Baghdad.)

39.) **Visit Public Market Place. MND Center. Narhwan, Iraq** (Population 100,000)

40.) **Visit "Concerned Local Citizens" security group. MND Center.**

41.) **Visit Iraq Police Station. Ramadi, Iraq.**

42.) **Visit Iraq Police. MND Bagdad, Iraq.**

43.) **Visit Iraq Army. MND Bagdad, Iraq.**

44.) **Visit Iraq Regional Training Center. Police & Army. Habbaniyah, Iraq.**

## 1. THE BOTTOM LINE---AN OPERATIONAL ASSESSMENT:

### a. VIOLENCE DOWN DRAMATICALLY:

The struggle for stability in the Iraqi Civil War has entered a new phase with dramatically reduced levels of civilian sectarian violence, political assassinations, abductions, and small arms/ indirect fire and IED attacks on US and Iraqi Police and Army Forces.

This is the unmistakable new reality ---and must be taken into account as the US debates its options going forward. The national security debate must move on to an analysis of why this new political and security situation exists---not whether it exists.

General David Petraeus and Ambassador Ryan Crocker have provided brilliant collective leadership to US Forces and have ably engaged the Iraqi political and military leadership.

### b. AL QAEDA TACTICALLY DEFEATED AND TRYING TO REGENERATE:

Al Qaeda in Iraq (AQI) has been defeated at a tactical and operational level in Baghdad and Anbar Province and is trying to re-constitute in the north and along the Syrian frontier.

The Iraqi people have turned on AQI because it overreached trying to impose an alien and harsh practice of Islam inconsistent with the more moderate practices of the Sunni minority. (16% of the population.) The foreign jihadist elements in AQI (with their enormous hatred of what they view as the apostate Shia) have alienated the nationalism of the broader Iraqi population. Foreign intervention across the Syrian frontier has dropped substantially. Most border-crossers are suicide bombers who are dead within four days while carrying out largely ineffective attacks on the civilian population and the Iraqi Police.

The senior leaders of AQI have become walking dead men because of the enormous number of civilian intelligence tips coming directly to US Forces. US and Brit Special Operations Forces are deadly against AQI leadership. Essentially AQI has been driven out of Baghdad and is now trying to reconstitute their capabilities.

### c. IRAQI SECURITY FORCES KEY FACTOR IN SUCCESSFUL INTERNAL SECURITY:

The Iraqi Security Forces are now beginning to take a major and independent successful role in the war. Under the determined leadership of LTG Jim Dubik ---both the equipment and force levels of the Iraqi Security Forces are now for the first time in the war at a realistic level of resource planning.

The previously grossly ineffective and corrupt Iraqi Police have been forcefully re-trained and re-equipped. The majority of their formerly sectarian police leadership has been replaced. The police are now a mixed bag--- but many local units are now effectively providing security and intelligence penetration of their neighborhoods.

The Iraqi Army has made huge progress in leadership, training, and equipment capability. The embedded US training teams have simply incredible levels of trust and mutual

5

cooperation with their Iraqi counterparts. Corruption remains endemic. However, much remains to be done. This is the center-of-gravity of the war.

The ISF still lacks credibility as a coherent counter-insurgency and deterrent force. It has no national logistics and maintenance system. It lacks any semblance of an Air Force with a robust lift and attack helicopter force and fixed wing C-130 lift to support counter-insurgency. It lacks any semblance of a functioning military medical system to provide country-wide trauma care, evacuation, and rehabilitation. It lacks any artillery with precision munitions to provide stand-off attack of hard targets—or to assist in counter-battery fire to protect the population and military installations. It lacks any serious armor capability to act as a deterrent force to protect national sovereignty. (In my judgment the Army needs 9000+ wheel and track armored vehicles for their 13 combat divisions.)

## d. CENTRAL GOVERNMENT DOES NOT WORK:

There is no functional central Iraqi Government. Incompetence, corruption, factional paranoia, and political gridlock have paralyzed the state. The constitution promotes bureaucratic stagnation and factional strife. The budgetary process cannot provide responsive financial support to the military and the police---nor local government for health, education, governance, reconstruction, and transportation.

Mr. Maliki has no political power base and commands no violent militias who have direct allegiance to him personally---making him a non-player in the Iraqi political struggle for dominance in the post-US withdrawal period which looms in front of the Iraqi people.

However, there is growing evidence of the successful re-constitution of local and provincial government. Elections for provincial government are vitally important to creating any possible form of functioning Iraqi state.

## e. POPULATION AND REFUGEES IN MISERY:

There are 4 million plus dislocated Iraqis---possibly one in six citizens. Many of the intelligentsia and professional class have fled to Syria, Jordan, or abroad. 60,000 + have been murdered or died in the post-invasion violence. Medical care is primitive. Security and justice for the individual is weak. Many lack clean water or adequate food and a roof over their family. Anger and hatred for the cruelties of the ongoing Civil War overwhelm the desire for reconciliation.

There is widespread disbelief that the Iraqi government can bring the country together. The people (and in particular the women) are sick of the chaotic violence and want an end to the unpredictable violence and the dislocation of the population.

## f. ECONOMY SHOWING SIGNS OF COMING BACK:

The economy is slowly reviving--- although there is massive 50% or more unemployment or under-employment.

The electrical system is slowly coming back--- but it is being overwhelmed by huge increases in demand as air conditioners, TV's, and light industry load the system.

6

The production and distribution of gasoline is increasing but is incapable of keeping up with a gigantic increase in private vehicle and truck ownership.

The Iraqi currency to everyone's astonishment is very stable and more valued than the weak US dollar.

The agricultural system is under-resourced and poorly managed---it potentially could feed the population and again become a source of export currency earnings.

### g. US COMBAT FORCES NOW DOMINATING THE CIVIL WAR:

The morale and tactical effectiveness of engaged US military forces are striking. The "surge" of five additional US Brigade Combat Teams helped. (Although we are now forced to begin an immediate drawdown because of the inadequate resources of the worldwide US Army.)

These combat forces have become the most effective counter-insurgency (and forensic police investigative service) in history. LTG Ray Odierno the MNC-I Commander and his senior commanders have gotten out of their fixed bases and operate at platoon level in concert with small elements of the Iraqi Army and Police. Their aggressive tactics combined with simply brilliant use of the newly energized Provincial Reconstruction Teams (PRT's -- Superb State Department leadership and participation) for economic development have dramatically changed the tone of the war.

US Forces have now unilaterally constituted some 60,000+ armed "Iraqi Concerned Local Citizen Groups" to the consternation of the Maliki Government. These CLC Groups have added immeasurably to the security of the local populations -- as well as giving a paycheck to unemployed males to support their families. Although the majority of these CLC Groups are Sunnis – increasingly the concept is being extended to Shia Groups south of Baghdad.

The US battalion and brigade commanders have grown up in combat with near continuous operations in the past 20 years in the Balkans, Desert Storm, Afghanistan, and Operation Iraqi Freedom. Many of the Army combat forces are now beginning their 4th round of year+ combat tours in Iraq or Afghanistan. Many of the Marine units are now on their 5th tour of seven month combat deployments. The troops and their leaders are simply fearless---despite 34,000 US killed and wounded.

The US company and battalion commanders now operate as the de facto low-level government of the Iraqi state…schools, health, roads, police, education, governance. The Iraqis tend to defer to US company and battalion commanders based on their respect for their counterparts' energy, integrity, and the assurance of some level of security. These US combat units have enormous discretion to use CRP Funds to jump start local urban and rural economic and social reconstruction. They are rapidly mentoring and empowering local Iraqi civilian and police leadership.

Direct intelligence cooperation has sky-rocketed. The civilian population provides by-name identification of criminal leadership. They point out IED's. They directly interact with US forces at low level in much of the country. (There are still 3000+ attacks on US Forces each month…this is still a Civil War.)

7

**h. SUNNI ARABS WANT BACK IN--- BEFORE US FORCES DEPART:**

The Sunnis Arabs have stopped seeing the US as the enemy and are now cooperating to eliminate AQI -- and to position themselves for the next phase of the Civil War when the US Forces withdraw.

There is no leadership that can speak for all the Sunnis. The former regime elements have now stepped forward ---along with tribal leadership ---to assert some emerging control.

**i. SHIA ARABS HOLDING IN CEASEFIRE—STRUGGLE FOR INTERNAL POWER:**

The Shia JAM militia under the control of Mr. Sadr have maintained their cease-fire, are giving up rogue elements to be harvested by US Special Operations teams, and are consolidating control over their ethnic cleansing success in Baghdad---as well as maneuvering to dominate the Iranian affiliated Badr brigade forces in the south.

However, Mr. Sadr lost great credibility when his forces violently intervened in the Holy City of Najaf ---and were videoed on national TV and throughout the Arab world carrying out criminal acts against the pilgrims and protectors of the Shia population.

Sadr himself is an enigma. He may well want back into the political process. He is not a puppet of the Iranians and may lack their real support. His command and control of his own forces appears weak. He personally lacks the theological gravitas of a true Shia Islamic scholar like the venerable Sistani. He may be personally fearful of being killed or captured by ISF special operations forces if he is visibly leading inside Iraq…hence his frequent absences to Iran at the sufferance of that government.

**j. DOMINANCE OF CRIMINAL ELEMENTS:**

There is no clear emerging nation-wide Shia leadership for their 60% of the Iraqi population. It is difficult to separate either Shia or Sunni political factions from Mafia criminal elements-- with a primary focus on looting the government financial system and oil wealth of the nation.

In many cases neighborhoods are dominated by gangs of armed thugs who loosely legitimize their arbitrary violence by implying allegiance to a higher level militia.

The Iraqi justice system…courts, prosecutors, defense attorneys, police investigators, jails for pre-trial confinement, prisons for sentences, integrity of public institutions---does not yet exist. Vengeance is the only operative law of the land. The situation is starting to change. The Iraqi Police will be in charge of most neighborhoods by the end of next year.

**k. THE KURDS---AN AUTOMOMOUS SUCCESSFUL REGION:**

The Kurds are a successful separate autonomous state---with a functioning and rapidly growing economy, a strong military (Both existing Pesh Merga Forces and nominally Iraqi-Kurdish Army divisions), a free press, relative security, significant foreign

8

investment, and a growing tourist industry which serves as a neutral and safe meeting place for separated and terrified Sunni and Shia Arab families from the south.

There are Five Star hotels, airline connections to Europe, a functioning telephone system, strong trade relations with Syria, enormous mutually beneficial trade relations with Turkey, religious tolerance, a functional justice system, and an apparently enduring cease-fire between the traditional Kurdish warring factions.

Kurdish adventurism and appetite to confront both their external neighbors and the Iraqi central state may have been tempered in a healthy way by the prospect of invasion from the powerful Turkish Armed Forces to avenge the continued cross-border KKP terrorism.

The war-after-next will be the war of the Iraqi Arabs against the Kurds ---when Mosul as well as Kirkuk and its giant oil basin (and an even greater Kurdish claimed buffer zone to the south) is finally and inevitably absorbed (IAW the existing Constitution) by the nascent Kurdish state. The only real solution to this dread inevitability is patient US diplomacy to continually defer the fateful Kurdish decision ad infinitum.

## 2. THE WAY AHEAD:

### a. THE CENTRAL US MILITARY PURPOSE MUST BE TO CREATE ADEQUATE IRAQI SECURITY FORCES:

The Iraqis are the key variable. The center of our military effort must be the creation of well-equipped, trained, and adequately supported Iraqi Police and Army Forces with an operational Air Force and Navy.

We have rapidly decreasing political leverage on the Iraqi factional leadership. It is evident that the American people have no continued political commitment to solving the Iraqi Civil War. The US Armed Forces cannot for much longer impose an internal skeleton of governance and security on 27 million warring people.

The US must achieve our real political objectives to withdraw most US combat forces in the coming 36 months leaving in place:

1st: A stable Iraqi government.

2nd: A strong and responsive Iraqi security force.

3rd: A functioning economy.

4th: Some form of accountable, law-based government.

5th: A government with active diplomatic and security ties to its six neighboring states.

9

**b. THE US ARMY IS TOO SMALL AND POORLY RESOURCED TO CONTINUE SUCCESSFUL COUNTER-INSURGENCY OPERATIONS IN IRAQ AND AFGHANISTAN AT THE CURRENT LEVEL:**

An active counter-insurgency campaign in Iraq could probably succeed in the coming decade with twenty-five US Brigade Combat Teams. (Afghanistan probably needs two more US combat brigades for a total of four in the coming 15 year campaign to create an operational state--- given more robust NATO Forces and ROE). We can probably sustain a force in Iraq indefinitely (given adequate funding) of some 10+ brigades. However, the US Army is starting to unravel.

Our recruiting campaign is bringing into the Army thousands of new soldiers (perhaps 10% of the annual input) who should not be in uniform. (Criminal records, drug use, moral waivers, non-high school graduates, pregnant from Basic Training and therefore non-deployable, lowest mental category, etc.)

We are losing our combat experienced mid-career NCOs' and Captains at an excessive rate. (ROTC DMG's, West Pointers, Officers with engineering and business degrees, etc.) Their morale is high, they are proud of their service, they have enormous personal courage---however, they see a nation of 300 million people with only an under resourced Armed Forces at war. The US Army at 400,000 troops is too small to carry out the current military strategy. The active duty US Army needs to be 800,000 strong to guarantee US national security.

The National Guard and Reserves are too small, are inadequately resourced, their equipment is broken or deployed, they are beginning their second involuntary combat deployments, and they did not sign up to be a regular war-fighting force. They have done a superb job in combat but are now in peril of not being ready for serious homeland security missions or deployment to a major shooting war such as Korea.

The modernization of our high technology US Air Force and Navy is imperiled by inadequate Congressional support. Support has focused primarily on the ground war and homeland security with $400 Billion+. We are digging a strategic hole for the US as we mono-focus on counter-insurgency capabilities ---while China inevitably emerges in the coming 15 years as a global military power.

**c. HEALING THE MORAL FISSURES IN THE ARMED FORCES:**

The leadership of Secretary Bob Gates in DOD has produced a dramatic transformation of our national security effort which under the Rumsfeld leadership was characterized by: a failing under-resourced counter-insurgency strategy; illegal DOD orders on the abuse of human rights; disrespect for the media and the Congress and the other departments of government; massive self-denial on wartime intelligence; and an internal civilian-imposed integrity problem in the Armed Forces---that punished candor, de-centralized operations, and commanders initiative.

Admiral Mullen as CJCS and Admiral Fallon as CENTCOM Commander bring hard-nosed realism and integrity of decision-making to an open and collaborative process which re-emerged as Mr. Rumsfeld left office. (Mr. Rumsfeld was an American patriot, of great personal talent, energy, experience, bureaucratic cleverness, and charisma---who

operated with personal arrogance, intimidation and disrespect for the military, lack of forthright candor, avoidance of personal responsibility, and fundamental bad judgment.)

Secretary Gates has turned the situation around with little drama in a remarkable display of wisdom, integrity, and effective senior leadership of a very complex and powerful organization. General Petraeus now has the complete latitude and trust in his own Departmental senior civilian leadership to have successfully changed the command climate in the combat force in Iraq. His commanders now are empowered to act in concert with strategic guidance. They can frankly level with the media and external visitors. I heard this from many senior leaders -- from three star General to Captain Company commanders.

### 3. THE END GAME:

It is too late to decide on the Iraqi exit strategy with the current Administration. However, the Secretary of Defense and CENTCOM can set the next Administration up for success by getting down to 12 + Brigade Combat teams before January of 2009 ---and by massively resourcing the creation of an adequate Iraqi Security Force.

We also need to make the case to Congress that significant US financial resources are needed to get the Iraqi economy going. ($3 billion per year for five years.) The nation-building process is the key to a successful US Military withdrawal---and will save enormous money and grief in the long run to avoid a failed Iraqi state.

Clearly we must continue the current sensible approach by Secretary of State Rice to open dialog with Syria, Turkey, and the Iranians---and to focus Arab attention with Saudi leadership on a US diplomatic offensive to mitigate the confrontation between Israel and the Arab states. We must also build a coalition to mitigate the dangers of a nuclear armed Iran.

The dysfunctional central government of Iraq, the warring Shia/Sunni/Kurdish factions, and the unworkable Iraqi constitution will only be put right by the Iraqis in their own time---and in their own way. It is entirely credible that a functioning Iraqi state will slowly emerge from the bottom up...with a small US military and diplomatic presence holding together in loose fashion the central government. The US must also hold at bay Iraq's neighbors from the desperate mischief they might cause that could lead to all out Civil War with regional involvement.

A successful withdrawal from Iraq with the emergence of a responsible unified Iraqi nation is vitally important to the security of the American people and the Mid-East. We are clearly no longer on a downward spiral. However, the ultimate outcome is still quite seriously in doubt.

Barry R McCaffrey
General USA (Ret)
Adjunct Professor of International Affairs
Department of Social Sciences, USMA
West Point, NY.

11

# EXHIBIT F

**O'Connor, John**

| | |
|---|---|
| **From:** | L. Palmer Foret [lpforet@foretlaw.com] |
| **Sent:** | Wednesday, December 19, 2007 4:17 PM |
| **To:** | O'Connor, John |
| **Cc:** | 'Craig T. Jones' |
| **Subject:** | RE: Ibrahim v. CACI PT |

John:
1.  The allegation in paragraph 17 identified in your letter of today is withdrawn.
2.  The allegation in paragraph 55 as to any interpreter being an employee of CACI PT is withdrawn.  However we reserve the right to claim a non-interpreter civilian named David as a CACI PT employee.
3.  The chart on page 3 of today's letter is correct.
I believe this takes care of the issues in your letter.  If not please advise.  Thanks.

L. Palmer Foret
The Law Firm of L. Palmer Foret, P.C.
1735 20th Street, N.W.
Washington, D.C. 20009
202-332-2404
202-332-2808: Fax
lpforet@foretlaw.com
www.foretlaw.com

---

**From:** O'Connor, John [mailto:joconnor@steptoe.com]
**Sent:** Wednesday, December 19, 2007 9:42 AM
**To:** L. Palmer Foret
**Cc:** Craig T. Jones
**Subject:** Ibrahim v. CACI PT

Gentlemen:

Please see the attached correspondence.

Best regards,
John O'Connor

STEPTOE & JOHNSON LLP

ATTORNEYS AT LAW

John F. O'Connor
202.429.8095
joconnor@steptoe.com

1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel 202.429.3000
Fax 202.429.3902
steptoe.com

December 19, 2007

**VIA ELECTRONIC MAIL**

L. Palmer Foret, Esq.
The Law Firm of L. Palmer Foret, P.C.
1735 20th Street, N.W.
Washington, D.C. 20009

> **Re:**  ***Ibrahim, et al. v. CACI Premier Technology, Inc.***
> **No. 04-1248 (D.D.C.)**

Dear Palmer:

We are writing on behalf of Defendant CACI Premier Technology, Inc. ("CACI PT") to seek clarification of some of the allegations contained in the Third Amended Complaint.

<u>**Allegations Appearing To Be Included Erroneously**</u>

Paragraph 17 of Third Amended Complaint alleges that CACI PT had some involvement in the provision of interrogators and linguists to support United States efforts at Guantanamo Bay, Cuba. If that was an intended allegation by Plaintiffs in the Third Amended Complaint, we request that Plaintiffs identify the basis for making that allegation and any support that they have for such an allegation. Neither CACI PT nor any CACI entity has supplied personnel to perform interrogation or linguist services at Guantanamo Bay, and we do not believe that Plaintiffs or their counsel could make such an allegation consistent with the obligations set forth in Federal Rule of Civil Procedure 11. If this is an allegation that Plaintiffs made in error with respect to CACI PT, or an allegation that Plaintiffs no longer assert, we request that Plaintiffs clarify that so the parties can resolve this issue accordingly.

Similarly, Paragraph 55 of the Third Amended Complaint alleges that Plaintiff Khalaf was able to identify two persons with whom he came into contact at Abu Ghraib prison: "a U.S. soldier named 'Graner' (believed to be Charles Graner) and a civilian interpreter named 'David' (believed to be an agent or employee of CACI)." From this allegation, we presume that Plaintiff Khalaf was able to state only that he had contact with a civilian interpreter named "David," and that Plaintiffs' counsel surmised from that statement that this interpreter was an employee of CACI PT. However, as you know, and as discovery in this action has demonstrated, neither CACI PT nor any other CACI entity supplied interpreters in Iraq. Therefore, we can only assume that this allegation that "David" is a CACI PT employee is a holdover from the earlier

L. Palmer Foret, Esq.
December 19, 2007
Page 2

stages in this case when Plaintiffs' counsel was confused as to which Defendant supplied interrogators and which Defendant supplied interpreters. If Plaintiffs continue to assert that a civilian interpreter known as "David" was a CACI PT agent or employee, we request that Plaintiffs' counsel identify the support they have for such an allegation, as we do not believe that Plaintiffs or their counsel could make such an allegation consistent with the obligations set forth in Federal Rule of Civil Procedure 11. If this paragraph is one of the paragraphs in the Third Amended Complaint on which Plaintiffs no longer rely, we ask that Plaintiffs state as much so that the parties can proceed accordingly.

## Allegations Repeated Solely To Preserve Them For Appeal

Footnote 2 of the Third Amended Complaint states:

> Some of Plaintiffs' claims, including all claims against Titan Corporation, have been previously dismissed by interlocutory orders of the Court which are not yet ripe for appeal. Those claims are being re-alleged herein for the sole purpose of avoiding any arguable waiver or preclusion of any claim, allegation or issue in the event of a final appeal.

We take Footnote 2 to mean that certain allegations and claims are being repleaded in the Third Amended Complaint so that Plaintiffs can avoid any theoretical argument of waiver on appeal, but that Plaintiffs are not proceeding with these allegations and claims in light of the Court's prior rulings. If this understanding is incorrect, please advise at your earliest convenience, as we are proceeding on that understanding in responding to the Third Amended Complaint.

Notably, however, the Third Amended Complaint does not distinguish expressly between the allegations and claims on which Plaintiffs are currently proceeding, and the allegations that Plaintiffs have repleaded solely for the purpose of preserving Plaintiffs' positions on appeal. Because CACI PT is entitled to know what Plaintiffs are currently alleging in this case, we ask that Plaintiffs review the list below of allegations and claims that CACI PT regards as no longer being asserted in this case, allegations that were repleaded solely to preserve arguments for appeal, and advise us immediately if the list is incorrect in any way.

L. Palmer Foret, Esq.
December 19, 2007
Page 3

**Allegations and Counts from the Third Amended Complaint
That CACI PT Understands Are Pleaded Solely for Appeal
Preservation and Not Currently Being Pursued Against CACI PT**

| PARAGRAPH | COMMENT |
|---|---|
| Count I (¶¶ 91-96) | ATS claim previously dismissed by Court |
| Count II (¶¶ 97-103) | RICO claim previously dismissed by Court |
| Count V (¶¶ 112-115) | False Imprisonment claim previously dismissed by Court |
| Count VII (¶¶ 120-122) | Conversion claim previously dismissed by Court |
| Count IX (¶¶ 128-131) | Violation of Contracting Laws claim previously dismissed by Court |
| Part of ¶ 1 | Portion of ¶ 1 asserting subject-matter jurisdiction under ATS, asserting RICO violation, and asserting entitlement to declaratory and injunctive relief based on violation of contracting laws claim previously dismissed by Court |
| ¶ 15 | Reflecting Titan as a current Defendant |
| Part of ¶ 19 | Portion of ¶19 asserting federal question jurisdiction, supplemental or pendant jurisdiction, declaratory judgment jurisdiction, ATS jurisdiction, and RICO jurisdiction |
| ¶¶ 26-33 | Allegations purporting to support ATS claim previously dismissed by Court |
| ¶132(c), (d), and (e) | Seeking relief for claims previously dismissed by Court |

L. Palmer Foret, Esq.
December 19, 2007
Page 4


　　　Given CACI PT's impending deadline to respond to the Third Amended Complaint, we request your prompt attention in confirming the accuracy of CACI PT's understandings as set forth herein and/or advising us of those instances in which CACI PT's understanding does not accurately reflect Plaintiffs' position.

　　　　　　　　　　　Very truly yours,

　　　　　　　　　　　John F. O'Connor

cc:　　Craig T. Jones, Esq.