# EXHIBIT C

VOL II of VII
ORIGINAL COPY

VERBATIM[1]
# RECORD OF TRIAL[2]
(and accompanying papers)

OF

__FREDERICK, Ivan L., II__
(NAME: Last, First Middle Initial)

__HHC, 16th MP Bde (ABN)__
__III Corps__
(unit/Command Name)

_____
(Social Security Number)

__US Army__
(Branch of Service)

__Staff Sergeant__
(Rank)

__Victory Base, Iraq__
(Station or Ship)

BY
__GENERAL__ COURT-MARTIAL

CONVENED BY  __COMMANDING GENERAL__
(Title of Convening Authority)

__Headquarters, III Corps__
(Unit/Command of Convening Authority)

TRIED AT

__Baghdad and Victory Base, Iraq__     ON     __19 May, 21-22 Jun; 24 Aug;__
(Place or Places of Trial)                            __20-21 Oct 04__
                                                (Date or Dates of Trial)

COMPANION CASES:

Transcript R.200 through R.489

---

[1] Insert "verbatim" or "summarized" as appropriate. (This form will be used by the Army and Navy for verbatim records of trial only.)
[2] See inside back cover for instructions as to preparation and arrangement.

DD FORM 490, OCT 84          *Previous editions are obsolete.*          FRONT COVER

20041129

1    TC: Yes, sir.

2    MJ: Any objection?

3    DC: No, Your Honor.

4    MJ: And similarly, defense, you've not been misled?

5    DC: No, Your Honor.

6    MJ: You prepared to defend against those dates?

7    DC: Yes, Your Honor.

8    MJ: The motion to amend Specification 4 of Charge III is
9    granted.

10        Trial counsel, if the accused is provident as pled, does
11   the government intend to go forward with any charge or specification
12   not encompassed by the accused's guilty plea?

13   TC: No, Your Honor.

14   MJ: Sergeant Frederick, your counsel has entered a plea of
15   guilty for you to several charges and their specifications. Your
16   plea of guilty will not be accepted unless you understand its meaning
17   and effect. I'm going to discuss your plea of guilty with you. If
18   at any time you have any questions, feel free to stop and ask them.
19   Do you understand that?

20   ACC: Yes, Your Honor.

21   MJ: A plea of guilty is equivalent to a conviction and is the
22   strongest form of proof known to the law. On your plea alone and

1  without receiving any evidence, this court can find you guilty of the
2  offenses to which you've pled guilty. Your plea will not be accepted
3  unless you realize that by your plea, you admit every act or omission
4  and element of the offenses to which you've pled guilty, and that
5  you're pleading guilty because you actually are, in fact, guilty. If
6  you do not believe that you are guilty, then you should not, for any
7  reason, plead guilty.
8         Do you understand what I've said so far?
9  ACC: Yes, Your Honor.
10 MJ: Now, by pleading guilty, you give up three important
11 rights, but you give up these rights solely with respect to the
12 offenses which you have pled guilty. First, the right against self-
13 incrimination; that is, the right to say nothing at all.
14        Second, the right to a trial of the facts by this court;
15 that is, your right to have this court-martial decide whether or not
16 you're guilty based upon evidence the prosecution would present and
17 on any evidence you may introduce.
18        Third, the right to be confronted by and to cross-examine
19 any witness called against you.
20        Do you have any questions about any of these rights?
21 ACC: No, Your Honor.

1   MJ:  Do you understand that by pleading guilty, you no longer
2   have these rights?
3       ACC: Yes, Your Honor.
4   MJ:  By pleading guilty, you no longer have these rights.  You
5   understand that?
6       ACC: Yes, Your Honor.
7   MJ:  If you continue with your guilty plea, you will be placed
8   under oath, and I will question you to determine whether you are, in
9   fact, guilty.  Anything you tell me may be used against you in the
10  sentencing portion of the trial.  Do you understand this?
11      ACC: Yes, Your Honor.
12  MJ:  If you tell me anything that is untrue, your statements may
13  be used against you later for charges of perjury or making false
14  statements.  Do you understand this?
15      ACC: Yes, Your Honor.
16  MJ:  Trial counsel, place the accused under oath.  [The trial
17  counsel did as directed and the accused was sworn.]
18       Trial counsel, there is a stipulation of fact?
19      TC: Yes, Your Honor.
20  MJ:  It's been marked as Prosecution Exhibit 1 for
21  identification.  Does the accused have a copy in front of him?
22      DC: Yes, Your Honor, with addendum.

1    MJ:    So there's no issue that these guys weren't causing you
2    trouble.
3    ACC:   No, Your Honor.
4    MJ:    Now, and on the 28th of November, again, you had problems
5    with who you referred to as Houdini, but when he was between those
6    litters, was he cooperating with you?
7    ACC:   Yes, Your Honor.
8    MJ:    Did you have to hold him down with your body to make sure
9    he didn't move?
10   ACC:   No, Your Honor.
11   MJ:    And other than that time with Sergeant Romero--move back,
12   you told me earlier that sometimes the intelligence folks slash
13   interrogator folks would say, tell you guys to set conditions for
14   subsequent interrogations.  Is that correct?
15   ACC:   Yes, Your Honor.
16   MJ:    And you told me, except for the time with Romero, it
17   usually was very specific, one guy, detainee one, sleep deprivation.
18   Detainee two....
19   ACC:   Yes, Your Honor.
20   MJ:    And other than the time with Romero when he says, "I don't
21   care what you do, just don't kill him," did you ever receive
22   directions from anybody that were that general that Romero told you?

351

1       ACC:  Yes, Your Honor.

2       MJ:   From whom?

3       ACC:  Mr. Johnson.

4       MJ:   Who's Mr. Johnson?

5       ACC:  He was with CACI, an interrogator.

6       MJ:   And what was his relationship to you?

7       ACC:  He was there the night of the shooting.

8       MJ:   I'm sorry, which night?

9       ACC:  He was there the night a detainee received a weapon, a
10  Syrian, a detainee, there was a shootout within 1 Bravo.

11      MJ:   Okay.

12      ACC:  And he was interrogating Iraqi police.

13      MJ:   And about when did that event occur?

14      ACC:  That was 2 days before Thanksgiving 2003.

15      MJ:   So that was after the first two instances and before the
16  third instance with the Houdini?

17      ACC:  Yes, Your Honor.

18      MJ:   And what happened on that day?

19      ACC:  He was talking to the IP, the Iraqi Police about who
20  brought the weapon in and trying to find out who the Saddam loyals
21  were of the Iraqi Police.  And he asked me, he would tell the
22  detainees, "If you don't answer my questions, I'm going to bring

1  Sergeant Frederick back in here," and he would ask me to show him
2  pressure points and things of that nature.
3      MJ:  Now, so he said, "I'll bring Sergeant Frederick back here
4  to..." do what to the detainees?
5      ACC: To intimidate them.
6      MJ:  To intimidate the detainees.
7      ACC: Yes, Your Honor.
8      MJ:  Did you actually touch a detainee?
9      ACC: Yes, Your Honor.
10     MJ:  What did you do?
11     ACC: I showed him a couple pressure points.
12     MJ:  What do you mean by that?
13     ACC: I put just a little bit of force in a pressure point.
14     MJ:  But Mr.----
15     ACC: While he----
16     MJ:  Go ahead, I'm sorry.
17     ACC: While he asked him a question, if they didn't answer right
18 away, I hit him with a pressure point.
19     MJ:  And when you say you hit him with a pressure point, what
20 did you do?
21     ACC: I would use the pressure point up under the cheek bone,
22 under the chin, behind the ear.

```
1      MJ:  Is that where you kind of push with your finger?
2      ACC: Yes, Your Honor.
3      MJ:  That causes some kind of pain?
4      ACC: Yes, Your Honor.
5      MJ:  Where did you learn about pressure points?
6      ACC: From people in the military, the training at our civilian
7  side, corrections.
8      MJ:  So at that time with Mr. Johnson, he specifically brought
9  you in on this one occasion to physically inflict pain on these
10 detainees?
11     ACC: Yes, Your Honor.
12     MJ:  Now....
13     ACC: And there were other times, also.
14     MJ:  Other times of what?
15     ACC: With other people.
16     MJ:  Was there ever a time where the other intelligence
17 people...and I'm not sure what the relationship is, CACI as everybody
18 else, you said there was other times before this that you had to
19 physically inflict pain on detainees because somebody told you to do
20 it?
```

1    ACC: Yes, Specialist Spencer, she would ask us to take their
2    cigarettes away, take the clothes, PT them, not physical abuse, but
3    just....
4    MJ:  Okay, but now who is this person?
5    ACC: She's military intelligence.
6    MJ:  What's her name?
7    ACC: Specialist Spencer.
8    MJ:  But I'm just trying to clarify, what you've told me with
9    Spencer and Johnson is, they said, "We want you to do this to this
10   individual detainee and here's what we want you to do," correct?
11   ACC: Yes, Your Honor.
12   MJ:  You said Spencer says, "Take away their cigarettes.  Take
13   away their clothes."
14   ACC: Yes, Your Honor, "Give them PT until they're tired."
15   MJ:  But each time, except again Romero, I want to put him to
16   the side, but each time somebody, whether it was a CACI employee or
17   Specialist Spencer or whomever, when they told you to do something to
18   a detainee, did they specify what to do?
19   ACC: Yes, Your Honor.
20   MJ:  Okay, so it was take cigarettes away, PT, and in Johnson's
21   case, pressure points.
22   ACC: Yes, Your Honor.

```
1     A.   Except for the one, he didn't want to stop, so I put him in
2  an isolation cell by himself.
3     Q.   So one of the three who you showed to masturbate continued
4  to masturbate.  Is that correct?
5     A.   Yes, sir.
6     Q.   And you put him in a separate cell?
7     A.   Yes, sir.
8     Q.   Did you then leave?
9     A.   Yes, sir.
10    Q.   Did you have any role in instructing these men to engage in
11 what appears to be simulated oral sex with each other?
12    A.   No, sir.
13    Q.   So this young man who testified today about that happening
14 to him, you weren't there for that?
15    A.   No, sir.
16    Q.   Now, there was another--there were three other people I'd
17 like to talk to you about.  There was a CACI employee named Johnson.
18 Is that correct?
19    A.   Yes, sir.
20    Q.   And as I understand it, you and Mr. Johnson were involved
21 on the night of the IP problem, the Iraqi Police problem.  Is that
22 correct?
```

1   A.   Yes, sir.

2   Q.   Now, did Johnson give you specific instructions to hit
3   pressure points on this man he was interviewing?

4   A.   Yes, sir.

5   Q.   And was the man he was interviewing an Iraqi policeman?

6   A.   Yes, sir.

7   Q.   So we have a CACI employee interrogating an Iraq policeman
8   who is paid by the United States?

9   A.   Yes, sir.

10  Q.   And you are being told by this CACI employee to apply
11  pressure points to him. Is that correct?

12  A.   Yes, sir.

13  Q.   And you did it.

14  A.   Yes, sir.

15  Q.   Did you also twist the man's handcuffs so that his wrists
16  were bent?

17  A.   I twisted it a little bit and applied a little bit of
18  pressure.

19  MJ:  Major Holley?

20  TC:  And I apologize, Your Honor.

21  MJ:  Sure.

1    TC:  Apparently there will be an EOD detonation in a few
2    moments.  I don't know if you want to recess, Your Honor.  Just so
3    that all the parties are aware.
4    MJ:  I hear other explosions.  Since we know it's coming, go
5    ahead, Mr. Myers.
6    CDC: Thank you very much, Your Honor.
7    Q.   Now, the second person I want to talk to you about is Mr.
8    Stefanowicz.  Was he also a civilian contractor?
9    A.   Yes, sir.
10   Q.   How frequently would you see him?
11   A.   I would see him two or three times a week, maybe four.
12   Q.   What, if any instructions, did he give you?
13   A.   He wanted--basically, he just said, "Treat them like shit.
14   Treat this one like shit.  Put the dog on this guy as much as you
15   can, intimidate them."
16   Q.   But the dogs didn't come until when?
17   A.   Around the middle or the end of November, I believe.
18   Q.   The dogs came.
19   A.   Yes, sir.
20   Q.   And what did Stefanowicz tell you should be done with the
21   dogs?
22   A.   To let them intimidate certain detainees.

1    Q.    And did you?

2    A.    Yes, sir.

3    Q.    Now, you're not charged with that offense, but that did
4    happen, right?

5    A.    Yes, sir.

6    Q.    And you're not charged with the Johnson offense, but that
7    did happen.

8    A.    Yes, sir.

9    Q.    And there was another MI person that you dealt with,
10   Luciana Spencer, correct?

11   A.    Yes, sir.

12   Q.    She was a specialist, I think?

13   A.    Yes, sir.

14   Q.    Did she also provide you with instructions on how to treat
15   detainees?

16   A.    Yes, sir.

17   Q.    Can you give us some examples?

18   A.    Just PT them rigorously until they get tired, worn out.
19   Take their cigarettes. Don't give them any cigarettes, things like
20   that.

21   Q.    When you say "PT them vigorously," that sounds very polite.
22   Did you force them to exercise to the point of exhaustion?