EXHIBIT D

Volume 8 of 25
Original
(ROT 777-959, 10 Jan)

## Verbatim [1]

## RECORD OF TRIAL [2]

## (and accompanying papers)

of

| | | |
|---|---|---|
| GRANER, Charles A. Jr. | | Specialist/E-4 |
| (Name, Last, First, MI) | (Social Security Number) | (Rank) |
| HHC, 16th MP Bde (ABN), III Corps | U.S. Army | Fort Hood, Texas 76544 |
| (Unit/Command Name) | (Branch of Service) | (Station or Ship) |

By

## GENERAL COURT-MARTIAL

Convened by COMMANDER
(Title of Convening Authority)

HQ, III Corps
(Unit/Command of Convening Authority)

Tried at

| | |
|---|---|
| Green Zone, Iraq; Victory Base, Iraq; Mannheim, Germany; Fort Hood, Texas | 19 May 04; 21 Jun 04; 23 Aug 04; 22 Oct 04; 6 Dec 04; 6-15 Jan 05 |
| (Place or Places of Trial) | (Date or Dates of Trial) |

## COMPANION CASE(S):

US ARMY JUDICIARY
2006 APR 25 A 1:19
RECEIVED
CLERK OF COURT

1 Insert "verbatim" or "summarized" as appropriate. (This form will be used by the Army and Navy for verbatim records of trial only.)
2 See inside back cover for instructions as to preparation and arrangement.

1              [The court was called to order at 1332 hours, 10

2              January 2005.]

3      MJ:   The court is called to order.  All parties are again

4   present.   Trial counsel?

5      ATC:  The government calls Private Ivan Frederick.

6

7   **Private (E-1) Ivan L. Frederick II was called as a witness for the**

8   **prosecution on the merits, was sworn, and testified as follows:**

9

10                     <u>DIRECT EXAMINATION</u>

11   Questions by the assistant trial counsel:

12      Q:   What was your unit of assignment while you were in Iraq?

13      A:   The 372nd Military Police Company.

14      Q:   Before we get into your deployment to Iraq, can you give

15   the panel some of your background?  Where did you grow up?

16      A:   I grew up in a small town in western Maryland.  I lived

17   there most of my life.  In my last two years of high school, I

18   graduated from a small town in West Virginia.  I joined the

19   military my senior year in high school and went off to Combat

20   Engineer School in 1984.

21      Q:   And, at that point, what component of the Army did you

22   sign up for?

1      Q:   But he lived?

2      A:   Yes, sir.

3      Q:   He had a leg injury?

4      A:   Yes, sir.

5      Q:   Did y'all normally call him "Shooter"?

6      A:   "Shooter" or "Trigger", yes, sir.

7      Q:   And that's because he had shot one of y'all?

8      A:   Yes, sir.

9      Q:   Now, was an investigation done into how he managed to get

10   a pistol in Tier 1A?

11     A:   It was in the process, yes.

12     Q:   The civilian contract interrogators were helping with

13   that, weren't they?

14     A:   Yes, sir.

15     Q:   And, ultimately, y'all figured out that it was an Iraqi

16   guard who had given him that pistol?

17     A:   Yes, sir, that's what we were told.

18     Q:   Look at Defense Exhibit L.   Is that DJ here?

19     A:   Yes, sir.

20     Q:   And Eetof {phonetic}?

21     A:   Yes, sir.

1      Q:    The man who is squatted down there in that chair, that's
2    the Iraqi guard, isn't it?

3      A:    Yes, sir.

4      Q:    The one who gave the pistol to "Shooter"?

5      A:    Supposedly, yes, sir.

6      Q:    And this scene was taken during the course of his
7    interrogation, wasn't it?

8      A:    Yes, sir.

9      Q:    He was being --- now, instead of being a guard at Abu
10   Ghraib, he was being held at Abu Ghraib?

11     A:    Yes, sir.

12     Q:    And you assisted in this interrogation, didn't you?

13     A:    A couple of times, yes.

14     Q:    And what you assisted was with this gooseneck come-along,
15   is that right?

16     A:    Yes, sir.

17     Q:    Earlier, when you were telling the court about an
18   incident where an Iraqi was being subjected to a gooseneck come-
19   along and fell down and got hurt, that was this guy?

20     A:    Yes, sir.

21     Q:    It was the Iraqi guard who gave the gun to "Shooter"?

22     A:    Yes, sir.

                              992

1    Q:    Okay, and the reason y'all were doing the gooseneck come-

2  along was because DJ told you to, correct?

3    A:    I don't remember him telling us to.

4    Q:    Okay, don't you recall that DJ told y'all to "rough that

5  guy up"?

6    A:    Yes, he told us to give him some PT and pressure points,

7  things like that.

8    Q:    And what is a pressure point?

9    A:    Excuse me?

10    Q:    You said "pressure point".  What is that?

11    A:    Yes, that's just manipulative touchings of sensitive

12  areas on the body.

13    Q:    And you make it sound like it's people at a birthday

14  party tickling each other.  This is something that hurts, right?

15    A:    Yes, sir.

16    Q:    And, if someone is trained in using these pressure

17  points, they can make someone have a lot of pain.

18    A:    Yes, sir.

19    Q:    DJ wanted you and Corporal Graner to inflict some pain on

20  this guy, didn't he?

21    A:    Yes, sir.

1      Q:   Because they were trying to get --- DJ was trying to get

2  him to confess to providing "Shooter" with a pistol.

3      A:   Yes, sir.

4      Q:   Now, you and Corporal Graner assisted DJ, didn't you?

5      A:   Yes, sir.

6      Q:   And you --- up to a point, you and Graner followed his

7  instructions?

8      A:   Yes, sir.

9      Q:   But he wanted you to get too rough, didn't he?

10      A:   Yes, sir.

11      Q:   And so y'all refused?

12      A:   Yes, sir.

13      Q:   And he had some Iraqi prisoners come in and take up where

14  you left off?

15      A:   Yes, sir.

16      Q:   Ultimately, this guy here .. the guard that gave

17  "Shooter" the pistol .. got a cut on his head.

18      A:   Yes, sir, on his forehead.

19      Q:   And DJ told you not to get the medics, didn't he?

20      A:   I don't remember that.

21      Q:   Think back.  Remember the picture of Corporal Graner

22  suturing his wound.

1    A:    Yes, sir.

2    Q:    Don't you recall that DJ prohibited y'all from getting

3   medics to come down?

4    A:    I don't remember that part.

5    Q:    And he told y'all to handle it.  Don't you remember that?

6    A:    I remember Corporal Graner got his Combat Lifesavers Kit

7   and stitched him up.

8    Q:    And that's because Corporal Graner is a trained Combat

9   Lifesaver.

10    A:    Yes, sir.

11    Q:    Kind of like a poor man's version of medic, isn't it?

12    A:    Yes, sir.

13    Q:    And, from time to time, you would use Corporal Graner to

14   help with medical things like cuts and minor things.

15    A:    Yes.

16    Q:    And that was because of his training?

17    A:    Yes, sir.

18        [Pause.]

19    Q:    If you can see it on my picture on the screen, can you

20   see the monitor from where you're sitting?

21    A:    Yes, sir.

22    Q:    Can you see that screen pretty well?

995

1     A:   Yes, sir.

2     Q:   Can you see the person in the middle on the other side of

3  the bars, he's holding a flashlight?

4     A:   Yes, sir.

5     Q:   Who is that?

6     A:   That is Staff Sergeant Glunt.

7     Q:   I'm sorry?

8     A:   Staff Sergeant Glunt.

9     Q:   Glunt?

10    A:   Yes, sir.

11    Q:   Who is Staff Sergeant Glunt?

12    A:   He was another one of my assistant NCOICs.

13    Q:   How many assistant NCOICs did you have?

14    A:   Two.

15    Q:   So there was Glunt and Elliot?

16    A:   Yes, sir.

17    Q:   So, on this occasion, when DJ had you and Corporal Graner

18  working over this guard, Glunt was there and saw y'all suturing him

19  up?

20    A:   Yes, sir.

21    Q:   Okay, was he there while y'all were roughing up the

22  guard?

1     A:   No, sir.

2     Q:   So he saw what happened then?

3     A:   Yes, sir.

4     Q:   Did he ask y'all what you had been doing?

5     A:   No, sir, not that I recall.

6     Q:   Did you bother to tell him, "Oh, this guy just cut his

7  head open"?

8     A:   I believe I did, but I'm not sure.

9     Q:   How did the cut occur?

10    A:   When he hit his head on the corner of the bunkbed.

11    Q:   He fell on that, right?

12    A:   Yes, sir, when Graner wrenched down on his gooseneck

13  come-along.

14    Q:   Okay, but you've already told us that the treatment got

15  much worse --- much rougher later, didn't it?

16    A:   Not after that.  That was the last thing.

17    Q:   So that was after the Iraqis had already worked him over.

18    A:   Yes, that's probably another night from what I remember.

19    Q:   So you think that this guy was worked over on different

20  nights?

21    A:   Yes, sir.

22          [Pause.]

1    A:    We were being ordered to do things like hand-cuffing

2    to the doors and the nudity, but the things that we were

3    specifically charged for we weren't able to do those.

4    Q:    Well, were you told to PT prisoners?

5    A:    Yes, sir.

6    Q:    And some of the things that y'all were doing were

7    part of the PT, wasn't it?

8    A:    As far as physical training, yes.

9    Q:    Now, Private Frederick, the things like using

10   pressure points and the things that you did to that Iraqi

11   policeman, those were specific instructions from DJ, correct?

12   A:    Yes.

13   Q:    From a civilian contract interrogator.

14   A:    Yes, sir.

15   Q:    And he gave you --- he was standing there,

16   supervising you at the time?

17   A:    Yes, sir.

18   Q:    Giving you specific instructions about what to do?

19   A:    Yes, sir.

20   Q:    And, in other cases, like with Gilligan, you were

21   just given general instructions, "I don't care what you do to

1       Q:    Do you know a person named Steve Stevanovich

2   [phonetic], also known as "Big Steve"?

3       A:    Yes, sir.

4       Q:    Tell the court who "Big Steve" is.

5       A:    He was a civilian contractor also.

6       Q:    He seemed to be the leader of the civilian

7   contractors, didn't he?

8       A:    Yeah, he could say that.  He handled the most high-

9   value detainees at Abu Ghraib.

10      Q:    He told you that y'all were doing a great job.

11      A:    Yes, sir.

12      Q:    And to keep up the good work.

13      A:    Yes, sir.

14      ATC: Objection; hearsay, Your Honor.

15      MJ:  Overruled.

16      Q:    And Stevanovich and his people would routinely give

17  y'all orders to follow, either implicit or direct, correct?

18      A:    Yes, sir.

19      Q:    And "Big Steve" said that y'all were getting better

20  results than the last unit.

21      A:    Yes.

22      ATC: Objection; hearsay.

1           [Pause.]

2     MJ:  Overruled.

3     Q:  Private Frederick, having seen what was done by your

4  predecessors and having gone through your chain of command,

5  both MPs and MIs, and being told to follow the orders of the

6  MIs and continue to march, you did that, didn't you?

7     A:  Yes, sir.

8     Q:  And you told what you were learning from these

9  superiors --- you passed that on to the men who worked for

10  you.

11     A:  Probably, yes.

12     Q:  The men and women who worked for you.

13     A:  Yes, sir.

14     Q:  And when you got orders and taskings from the MIs

15  and these civilian contract interrogators, you would pass

16  those orders on to your subordinates.

17     A:  Yes, sir, mostly to Graner.  I never got the ---

18  really got the orders.  Mostly, Graner would get those.

19     Q:  So they'd go to him directly with something?

20     A:  Yes, sir.

21     Q:  And he complained to you, as you said that all your

22  men did?

1052

1          [Negative response from each member.]

2     MJ:  Apparently not.

3               [The witness was duly warned, temporarily

4               excused, and withdrew from the courtroom.]

5     MJ:  Defense?

6     CDC:  Sir, we'd call Private Frederick to the stand.

7

8  **Private E-1 Ivan L. Frederick was called as a witness for the**

9  **defense on the merits, was reminded that he was still under**

10 **oath, and testified as follows:**

11

12                    <u>**DIRECT EXAMINATION**</u>

13 Questions by the civilian defense counsel:

14    Q:   Private Frederick, a couple of quick questions for

15 you:  do you recall the incident of what I've calling "the

16 seven rioters" that were brought in that night?

17    A:   Yes, sir.

18    Q:   Okay, now, when the rioters were brought in, were

19 they already wearing the sandbags?

20    A:   Yes, sir, they were.

21    Q:   And that was standard for you to receive prisoners

22 with sandbags on them, right?

1425

1    A:   Yes, sir.

2    Q:   And you took that and you placed wires on this

3    detainee, isn't that correct?

4    A:   Yes, sir.

5    Q:   And you ended up abusing him, correct?

6    A:   Yes, sir.

7    Q:   But you knew that it was unlawful and you ended up

8    pleading guilty to that, didn't you?

9    A:   Yes, sir.

10   Q:   All right, let's talk about the overt orders.  Mr.

11   Womack just talked to you about an incident with Mr. Dan

12   Johnson, is that correct?

13   A:   Yes, sir.

14   Q:   Is it Dan or Don?

15   A:   Dan.

16   Q:   Dan.  Okay, he told you to apply pressure points on

17   this detainee, correct?

18   A:   Yes, sir.

19   Q:   And this detainee is one of the Iraqi police

20   officers who you believed had smuggled a weapon in to

21   "Shooter" that night, right?

22   A:   Yes, sir.

1443

1     Q:   And that was about the end of November, November 24th

2 or so, correct?

3     A:   Yes, sir.

4     Q:   And, at a certain point, even though he was telling

5 you to use this force, you thought, "Hey, wait a minute, this

6 is way too much force," isn't that correct?

7     A:   Yes, sir.

8     Q:   And you told him, "I'm not going any further than

9 this," right?

10     A:   Yes, sir.

11     Q:   And then he had to bring in Iraqi police officers to

12 do more, correct?

13     A:   Yes, sir.

14     Q:   So you thought, minimally, "There is some limit to

15 what I can do to these people."

16     A:   Yes, sir.

17     Q:   And you told him, "No" when you thought you'd

18 reached that point?

19     A:   Yes, sir.

20     Q:   And Corporal Graner left with you that night, right?

21     A:   Yes, sir.

22     Q:   He went no further than what you did.

1     A:   No, sir.

2     Q:   So he knew there was a limit to what orders could be

3 given as well, correct?

4     A:   Yes, sir.

5     DC:  Objection.

6     MJ:  The objection's overruled.

7     Q:   Now, as far as the direct orders from anybody, the

8 only interrogator who gave you direct orders, as far as an

9 interrogation and to apply pressure to someone, was Dan

10 Johnson, correct?

11    A:   Yes, sir.

12    Q:   And Steven Stevanovich.

13    A:   Yes, sir.

14    Q:   And Specialist Lucianna Spencer [phonetic]?

15    A:   Yes, sir.

16    Q:   So those three.  It wasn't like MI-wide, but it was

17 just those three people, correct?

18    A:   Yes, sir.

19    ATC: No further questions, Your Honor.

20    CDC: No questions, Your Honor.

21    MJ:  Panel members, any questions for this witness?

22           [Negative response from each member.]

1   explains some of those terms that you saw earlier, I believe,

2   in Defense Exhibit W, which was the stipulation of fact which

3   lists certain interrogation techniques.

4          When I take judicial notice of a fact, that means

5   that you're now permitted to recognize and consider this fact

6   without further proof.  It should be considered by you as

7   evidence, along with all other evidence in the case.  You may,

8   but are not required to, accept as conclusive any matter that

9   I have judicially noticed.  As with other evidence that has

10  been admitted, it will go back with you in your deliberations.

11         Defense?

12  DC:  Yes, sir, the defense would call Ms. Megan Ambuhl.

13

14  **Ms. Megan Ambuhl was called as a witness for the defense on**

15  **the merits, was reminded that she was still under oath, and**

16  **testified as follows:**

17

18                      **DIRECT EXAMINATION**

19  Questions by the defense counsel:

20     Q:   Ms. Ambuhl, I've got a few questions for you, and

21  we're going to be a little bit broader this time.

22         Ms. Ambuhl, what unit were you with?

1    put them in the shower, and close the door, lock the door, and

2    give them a few minutes to take a shower, or I'd give them a

3    razor or whatever, and then I'd make sure they handed that

4    back before I let them out.  Then I would take them out and

5    put them back in their cell.

6         Q:    When you took these detainees to be showered,

7    routinely, did you go in and look at them naked?

8         A:    No, sir.

9         Q:    Did you go in and point at them?

10        A:    No, sir.

11        Q:    Did you laugh at them?

12        A:    No, sir.

13        Q:    Did you ever hear the term "soften up" or "break"

14    somebody used?

15        A:    Yes, sir.

16        Q:    Who used that term?

17        A:    An MI interrogator, Steve.

18        Q:    And who was Steve?

19        A:    A civilian MI contractor.

20        Q:    Did Steve ever give you orders to do things?

21        A:    Yes, sir.

1     Q:   Do you remember what context or about what detainee

2  this term was used?

3     A:   This was about a detainee we called "Al Qaeda".

4     Q:   And what did you know about "Al Qaeda"?

5     A:   About the detainee himself?

6     Q:   Sure --- yes, about the detainee "Al Qaeda" --- or

7  what was your understanding of "Al Qaeda's" background?

8     A:   That he was in the Al Qaeda, sir.

9     Q:   Did you ever receive any compliments, encouragement,

10  or admonishment from MI or civilian intelligence personnel?

11     A:   Yes, sir.

12     Q:   Can you think of a specific instance where you were

13  encouraged?

14     A:   They encouraged us all of the time, telling us we

15  were doing a good job, sir.

16     Q:   Do you remember an instance with "Al Qaeda",

17  specifically?

18     A:   Steve told us that we were doing a good job and that

19  breaking "Al Qaeda" would have global implications and could

20  save a lot of lives.

21     TC:  Objection, hearsay.

22     MJ:  Sustained.

1633

1                    [Pause.]

2        Q:    Did Steve encourage you, or did you receive

3    admonishments or encouragements from Steve?

4        A:    Encouragements, sir.

5        Q:    With respect to which detainee?

6        A:    With respect to "Al Qaeda".

7        Q:    Did you believe that helping out with interrogations

8    or following MI's orders was important?

9        A:    Yes, sir.

10       Q:    How important?

11       A:    We were helping to save the lives of soldiers who

12   were outside the wire, sir.

13       Q:    Did you come up with that --- well, why do you say

14   that?  Why do you think that this was so important?

15       A:    Because the detainees had important knowledge that

16   the interrogators needed to find out about.

17       Q:    And that was your personal understanding?

18       A:    That was pretty much what we were told.

19       TC:   Objection, hearsay, Your Honor.

20       MJ:   Sustained.  Please, Ms. Ambuhl, listen to the

21   question carefully and just answer the question that's asked.

22                    [Pause.]

1      MJ:  You may.  Members, at this time, the defense is

2  going to read a stipulation of expected testimony.  As this is

3  a stipulation of expected testimony, it is simply read to you,

4  as any other form of testimony, and the document will not be

5  given to you.  Go ahead.

6                      [The defense counsel read Defense Exhibit LL to

7                      the members of the court.].

8      CDC: Your Honor, we'd call Specialist Graner to the stand

9  to make an unsworn statement.

10     MJ:  Proceed.

11

12 Specialist Charles A. Graner, Jr., US Army, the accused in

13 this case, was called as a witness for the defense in

14 extenuation and mitigation and made the following unsworn

15 statement:

16

17                      UNSWORN STATEMENT

18 Questions by the civilian defense counsel:

19     Q:   Specialist Graner, we've already heard from your

20 mother and father, earlier in the sentencing proceedings, but

21 where were you born?

22     A:   I was born in Pittsburg, Pennsylvania, sir.

1      A:    Well, "dietary management" to me was when we had ---

2  well, we had the "good Iraqi" list and the "bad Iraqi" list.

3  If you were on the "good Iraqi" list, you ate Iraqi food.  You

4  ate the catered food that the rest of the prisoners ate, and

5  that I ate because I ate the catered food.

6      Q:    And what did the bad Iraqis get?

7      A:    The bad Iraqis ate sterilized MREs.

8      Q:    So they got ---

9      A:    I'm not saying that they were bad, cut they were on

10 the "bad" list.  Then you also had --- they adjusted your

11 meals, as far as what times they were allowed to eat.  Say,

12 someone was in the isolation cell.  I was to feed him at a

13 certain time and, when I opened up the door, I'd bring him out

14 naked and I was screaming at him.

15     Q:    Why?

16     A:    To put stress on the prisoner.

17     Q:    Who told you to do that?

18     A:    Whoever the handler was.  We had specific

19 instructions on each prisoner as to how we were supposed to

20 treat them, and I'm giving this as an example.  A lot of our

21 off-the-wall stuff were from the civilian interrogators, but

1    A:    There was an incident where we had had a prisoner---

2    the prisoner sitting in the chair is the prisoner we referred

3    to as "Taxi Driver".  The person with their back facing the

4    camera is an Iraqi physician.  "Taxi Driver" was also the man

5    that was in the cell with the panties on his head.  He was one

6    of Big Steve's men --- one of Big Steve's people, one that he

7    controlled.

8    Q:    Now, Big Steve was Steve Stevanovich?

9    A:    Steve Stevanovich.

10   Q:    And he was one of the interrogators --- the civilian

11   interrogators?

12   A:    Yes, sir.

13   Q:    And so this was one of his holds?

14   A:    Yes, sir.  We had had him out on the block, just

15   yelling and screaming at him.  We had who we thought was an MI

16   soldier, at the time, come in and was talking to him.  The

17   next thing you know, the guy kicked him in the head.

18   Q:    You mean the interrogator kicked this guy in the

19   head?

20   A:    Yes, sir.

21   Q:    Did it cause any kind of injury?

1    A:    At the time, no, but when we had walked him back

2    into the cell and he and I both slipped on water and he cut up

3    his ear.

4    Q:    Now, was that an accident or were you doing

5    something on purpose?

6    A:    It was --- the getting kicked in the head part, that

7    wasn't accident.  But the ear was.    .

8    Q:    So the part that you did was the ear, where you

9    fell?

10    A:    Yes, sir, but I referenced this, again, in one of

11    the emails.  I found out --- now, the MI soldier that I ---

12    the MI soldier/translator, he was just walking around Abu

13    Ghraib, and we later knew him as "Michael".  He's in DCUs, an

14    IBA with sappy plates, where not all of my soldiers had sappy

15    plates yet.  He had a Kevlar helmet with an NVG attachment on

16    the roof [sic], and he was --- he was a former EPW who had

17    been at Buka [phonetic], who was a former Republican

18    Guardsman, just walking around Abu Ghraib.

19    Q:    Okay, so I guess he had graduated up to being a

20    friendly interrogator?

21    A:    I guess so.

22    Q:    And he's the one who kicked Taxi Driver?

2212